1  Damian P. Richard, Esq. (SBN 262805)
2  Sessions, Fishman, Nathan & Israel, L.L.P.
   1545 Hotel Circle South, Suite 150
3  San Diego, CA  92108-3426
4  Tel:   619/758-1891
   Fax:  619/296-2013
5  drichard@sessions.legal
6  *Attorneys for Defendants*
   *National Collegiate Student Loan Trust 2006-1,*
7  *National Collegiate Student Loan Trust 2006-4,*
8  *National Collegiate Student Loan Trust 2007-4*
9  *(erroneously sued as National Collegiate Student Loan Trust 2007-1)*

10              UNITED STATES BANKRUPTCY COURT
11               CENTRAL DISTRICT OF CALIFORNIA

12  IN RE:                          )  Case No.  16-BK-30625-MH
13        JOHN MARTIN MATA          )
          LIVIER MATA               )  Chapter 7
14                                  )
    _____)
15                                  )  Adversary No. 6:18-AP-01089-MH
    JOHN M. MATA,                   )
16                                  )
                 Plaintiff,         )
17        vs.                       )  DECLARATION OF BRADLEY
                                    )  LUKE IN SUPPORT OF
18  NATIONAL COLLEGIATE             )  DEFENDANTS' MOTION FOR
19  STUDENT LOAN TRUST 2006-1, et   )  SUMMARY JUDGMENT
    al.                             )
20                 Defendants.      )
    _____)
21

22      I, Bradley Luke, hereby affirm and declare as follows:

23      1.    I am employed by Transworld Systems Inc. (hereinafter "TSI"), a

24  servicer for National Collegiate Student Loan Trust 2006-1 ("NCSLT 2006-1"),

25  National Collegiate Student Loan Trust 2006-4 ("NCSLT 2006-4"), and National

26  Collegiate Student Loan Trust 2007-4 (erroneously sued as National Collegiate

27  Student Loan Trust 2007-1) ("NCSLT 2007-4") (collectively "Defendants"),

28  pertaining to the student loans forming the subject matter of this adversary

1  proceeding filed by plaintiff, John M. Mata ("Plaintiff"). TSI is the post-default
2  servicer and designated Custodian of Records for Defendants. As the post-default
3  servicer, TSI maintains loan history records for Defendants.

4      2.    I am the Director of Operations for TSI. I have been an employee of
5  TSI since November 2014. From January 2010 until November 2014, I was
6  employed by NCO Financial Systems, Inc. ("NCO") and worked on many of the
7  same client portfolios as I do currently with TSI, including Defendants here. I am
8  duly authorized to make the representations contained in this declaration for and
9  on behalf of Defendants and am competent to testify to the matters stated in this
10  declaration.

11      3.    I am over the age of 18 and competent to testify to the matters stated
12  herein. As an employee of TSI, I am duly authorized by Defendants and U.S.
13  Bank, National Association to make the representations contained in this
14  Declaration.

15      4.    TSI has been contracted to perform the duties of the Subservicer for
16  Defendants by U.S. Bank, National Association, the Special Servicer of the
17  Defendants.  TSI, as the Subservicer of the Defendants, is the designated
18  Custodian of Records for the Plaintiff's student loans.   Additionally, TSI
19  maintains the dedicated system of record for electronic transactions pertaining to
20  Plaintiff's student loans, including, but not necessarily limited to, payments,
21  credits, interest accrual and any other transactions that could impact the Plaintiff's
22  student loans.

23      5.    I have access and training on the system of record utilized by TSI to
24  enter and maintain loan account records and documentation concerning the
25  Plaintiff's student loans for Defendants.

26      6.    I am familiar with the process by which TSI receives prior account
27  records, including student loan origination records from the time of application
28  and disbursement.

1      7.     As custodian of records it is TSI's regularly-conducted business

2 practice to incorporate prior loan records and/or documentation into TSI's

3 business records.

4      8.     I am further competent and authorized to testify regarding Plaintiff's

5 student loans through personal knowledge of the business records maintained by

6 TSI as Custodian of Records, including electronic data provided to TSI related to

7 Plaintiff's student loans, and the business records attached to this declaration.

8      9.     These student loan records are created, compiled and recorded as

9 part of regularly conducted business activity at or near the time of the event and

10 from information transmitted from a person with personal knowledge of said

11 event and a business duty to report it, or from information transmitted by a person

12 with personal knowledge of the accounts or events described within the business

13 record. Such records are created, kept, maintained, and relied upon in the course

14 of ordinary and regularly conducted business activity.

15     10.    I have reviewed the student loan records described in this

16 declaration.

17     **The First Loan (NCSLT 2006-1)**

18     11.    A true and correct copy of the underlying Credit Agreement and

19 Note Disclosure Statement for Plaintiff's student loan owing to NCSLT 2006-1 is

20 attached hereto as **Exhibit A-1.** On January 02, 2006, Plaintiff executed a "Loan

21 Request/Credit Agreement" with Charter One Bank, N.A. for a graduate loan in

22 order to fund his enrollment and Cost of Attendance at Loma Linda University

23 ("LLU") during the academic period from January 2006 to March 2006 in the

24 amount of $30,000. When executing the Credit Agreement Plaintiff certified that

25 "I acknowledge that the requested loan is subject to the limitations on

26 dischargeability in bankruptcy contained in Section 523(a)(8) of the United States

27 Bankruptcy Code. Specifically, I understand that you have purchased a guaranty

28

1  of this loan, and that this loan is guaranteed by The Education Resources Institute,

2  Inc. ("TERI"), a non-profit Institution." **Ex. A-1, ¶ L(12)**.

3      12.    The signature page for the loan was faxed back. *See* **Ex. A-1**. The

4  terms and conditions were part of the loan package any student applying for an

5  applicable loan was provided but were not required to be sent back via fax. The

6  signature page was also part of the loan package. TSI maintains true and correct

7  copies of all applicable terms and conditions.

8      13.    The loan proceeds were disbursed on January 6, 2006 exclusively for

9  the purposes of Plaintiff's enrollment at LLU. *See* **Ex. A-1**. None of the loan

10  proceeds were returned or refunded.

11     14.    The loan is subject to the terms and conditions affixed to the Credit

12  Agreement.

13     15.    A true and correct copy of the Loan Financial Activity pages from

14  pre-default servicer American Education System's ("AES") system of record,

15  Compass, which is accessible to TSI as the post-default servicer of NCSLT loans,

16  is attached hereto as **Exhibit A-2.**

17     16.    On March 9, 2006, before the loan went into default, the loan was

18  sold to NCSLT 2006-1, assigning all right, title, and interest. A true and correct

19  copy of the Pool Supplement and Deposit and Sale Agreement is attached hereto

20  as **Exhibit A-3**. Plaintiff currently owes NCSLT 2006-1 the sum of $48,644.40

21  for principal and accrued interest, with the last payment made on July 6, 2012. A

22  true and correct copy of the Loan Payment History Report from TSI is attached

23  hereto as **Exhibit A-4**. Plaintiff went into default under the terms of the Credit

24  Agreement on April 1, 2013.

25     17.    TERI is the guarantor for Plaintiff's loan owing to NCSLT 2006-1 is

26  the guarantor for the Charter One Bank, N.A. graduate loan program. A true and

27  correct copy of the NCSLT 2006-1 Trust Agreement, dated March 9, 2006 is

28  attached hereto as **Exhibit D**. A true and correct copy of the NCSLT 2006-1

1   Deposit and Security Agreement, dated March 9, 2006 is attached hereto as

2   **Exhibit G**. A true and correct copy of TERI's Guaranty Agreement with Charter

3   One Bank, N.A. pertaining to Plaintiff's NCSLT 2006-1 graduate loan is attached

4   hereto as **Exhibit J**.

5         18.   Since the aforementioned transaction, the loan has not been

6   transferred or sold, and all right, title, and interest remain with NCSLT 2006-1.

7                   **The Second Loan (NCSLT 2006-4)**

8         19.   A true and correct copy of the underlying Credit Agreement and

9   Note Disclosure Statement for Plaintiff's student loan owing to NCSLT 2006-4 is

10   attached hereto as **Exhibit A-5**. On September 26, 2006, Plaintiff executed a

11   "Loan Request/Credit Agreement" with Charter One Bank, N.A. for an Astrive

12   Graduate Loan to attend Loma Linda University during the academic period from

13   August 2006 to June 2007 in the amount of $30,000. When executing the Credit

14   Agreement Plaintiff certified that "I acknowledge that the requested loan is

15   subject to the limitations on dischargeability in bankruptcy contained in Section

16   523(a)(8) of the United States Bankruptcy Code because either or both of the

17   following apply: (a) this loan was made pursuant to a program funded in whole or

18   in part by [] TERI[] a non-profit institution, or (b) this is a qualified education

19   loan as defined in the Internal Revenue Code." **Ex. A-5, ¶ L(12).**

20         20.   The signature page for the loan was faxed back. *See* **Ex. A-5.** The

21   terms and conditions were part of the loan package any student applying for an

22   applicable loan was provided but were not required to be sent back via fax. The

23   signature page was also part of the loan package. TSI maintains true and correct

24   copies of all applicable terms and conditions.

25         21.   The loan proceeds were disbursed on September 29, 2006

26   exclusively for the purposes of Plaintiff's enrollment at LLU. *See* **Ex. A-5.** None

27   of the loan proceeds were returned or refunded.

28

1
2    22.    The loan is subject to the terms and conditions affixed to the Credit
Agreement.

3    23.    A true and correct copy of the Loan Financial Activity pages from
4    pre-default servicer AES's system of record, Compass, which is accessible to TSI
5    as the post-default servicer of NCSLT loans, is attached hereto as **Exhibit A-6.**

6    24.    On December 7, 2006, before the loan went into default, the loan
7    was sold to NCSLT 2006-4, assigning all right, title, and interest.  A true and
8    correct copy of the Pool Supplement and Deposit and Sale Agreement is attached
9    hereto as **Exhibit A-7**.  Plaintiff currently owes NCSLT 2006-4 the sum of
10   $48,147.57 for principal and accrued interest, with the last payment made on July
11   06, 2012.  A true and correct copy of the Loan Payment History Report from TSI
12   is attached hereto as **Exhibit A-8**.  Plaintiff went into default under the terms of
13   the Credit Agreement on April 1, 2013.

14   25.    TERI is the guarantor for Plaintiff's loan owing to NCSLT 2006-4
15   and is the guarantor for the Charter One Bank, N.A. Astrive Graduate Loan
16   program.  A true and correct copy of the NCSLT 2006-4 Trust Agreement, dated
17   December 7, 2006 is attached hereto as **Exhibit E**.  A true and correct copy of the
18   NCSLT 2006-4 Deposit and Security Agreement dated December 7, 2006 is
19   attached hereto as **Exhibit H**.  A true and correct copy of TERI's Guaranty
20   Agreement with Charter One Bank, N.A. pertaining to Plaintiff's NCSLT 2006-4
21   graduate loan is attached hereto as **Exhibit K.**

22   26.    Since the aforementioned transaction, the loan has not been
23   transferred or sold, and all right, title, and interest remain with NCSLT 2006-4.

24   **The Third Loan (NCSLT 2007-4)**

25   27.    A true and correct copy of the underlying Credit Agreement and
26   Note Disclosure Statement for Plaintiff's student loan owing to NCSLT 2007-4 is
27   attached hereto as **Exhibit A-9**.  On August 8, 2007, Plaintiff executed a "Loan
28   Request/Credit Agreement" with Charter One Bank, N.A. for a Next Student

1    Graduate Loan to attend Loma Linda University during the academic period from
2    August 2007 – December 2007 in the amount of $30,000. When executing the
3    Credit Agreement Plaintiff certified that "I acknowledge that the requested loan is
4    subject to the limitations on dischargeability in bankruptcy contained in Section
5    523(a)(8) of the United States Bankruptcy Code because either or both of the
6    following apply: (a) this loan was made pursuant to a program funded in whole or
7    in part by [] TERI[] a non-profit institution, or (b) this is a qualified education
8    loan as defined in the Internal Revenue Code." **Ex. A-9, ¶ L(12).**

9        28.    The signature page for the loan was faxed back. *See* **Ex. A-9**. The
10    terms and conditions were part of the loan package any student applying for an
11    applicable loan was provided but were not required to be sent back via fax. The
12    signature page was also part of the loan package. TSI maintains true and correct
13    copies of all applicable terms and conditions.

14        29.    The loan proceeds were disbursed on August 21, 2007 exclusively
15    for the purposes of Plaintiff's enrollment at LLU. *See* **Ex. A-9**. None of the loan
16    proceeds were returned or refunded.

17        30.    The loan is subject to the terms and conditions affixed to the Credit
18    Agreement.

19        31.    A true and correct copy of the Loan Financial Activity pages from
20    pre-default servicer AES's system of record, Compass, which is accessible to TSI
21    as the post-default servicer of NCSLT loans, is attached hereto as **Exhibit A-10.**

22        32.    On September 20, 2007, before the loan went into default, the loan
23    was sold to NCSLT 2007-4, assigning all right, title, and interest. A true and
24    correct copy of the Pool Supplement and Deposit and Sale Agreement is attached
25    hereto as **Exhibit A-11**. Plaintiff's Complaint incorrectly names NCSLT 2007-4
26    as a defendant in this action. NCSLT 2007-4 did not purchase the loan funded by
27    the August 2007 Agreement. The Loan was instead sold to NCSLT 2007-4.
28    Plaintiff currently owes NCSLT 2007-4 the sum of $48,601.46 for principal and

1  accrued interest, with the last payment made on July 06, 2012. A true and correct
2  copy of the Loan Payment History Report from TSI is attached hereto as **Exhibit**
3  **A-12.** Plaintiff went into default under the terms of the August 2007 Agreement
4  on April 1, 2013.

5      33.  TERI is the guarantor for Plaintiff's loan owing to NCSLT 2007-4
6  and is the guarantor for the Charter One Bank, N.A. Next Student Graduate Loan
7  program. A true and correct copy of the NCSLT 2007-4 Trust Agreement, dated
8  September 20, 2007 is attached hereto as **Exhibit F**. A true and correct copy of
9  the NCSLT 2007-4 Deposit and Security Agreement dated September 20, 2007 is
10  attached hereto as **Exhibit I**. A true and correct copy of TERI's Guaranty
11  Agreement with Charter One Bank, N.A. pertaining to Plaintiff's NCSLT 2007-4
12  graduate loan is attached hereto as **Exhibit J.**

13      34.  Since the aforementioned transaction, the loan has not been
14  transferred or sold, and all right, title, and interest remain with NCSLT 2007-4.

15      I declare under penalty of perjury under the laws of the United States of
16  America that the foregoing is true and correct.

17      Executed this 8th day of January, 2019, at Peachtree Corners, Georgia.

18
19
20  Bradley Luke
21
22
23
24
25
26
27
28

# Exhibit A-1

Exhibit A-1

From: unknown    Page: 2/5    Date: 1/2/2006 3:09:47 PM

## Cosigned    Loan Request/Credit Agreement – Signature Page
### NON-NEGOTIABLE CREDIT AGREEMENT – THIS IS A CONSUMER CREDIT TRANSACTION

### LOAN PROGRAM INFORMATION

Next Student Graduate Loan                     Academic Period: 01/2006-03/2006

Lender: Charter One Bank, N.A.          School: LOMA LINDA UNIVERSITY

Loan Amount Requested: $30000.00      Repayment Option: Deferred Principal and Interest

Deferral Period Margin: 4.75      Repayment Period Margin: 4.75      Loan Origination Fee Percentage: 10.50

### STUDENT BORROWER INFORMATION (Must be at least 18 years of age)

Borrower Name: John Mata           Home Address: 5489 Cambridge St Mount Clair, CA 91763
Social Security #: [    ]-8533      Date of Birth: [    ]/1968      Home Telephone: 9099838045

Student Citizenship (check one box): ☒ U.S. Citizen    ☐ Eligible Non-Citizen(Attach front & back copy of CIS or student visa card)
Note: Personal reference name and address cannot match that of the Cosigner.
Personal Reference Name: _Angela Villasando_          Reference Home Tel #: _(909) 210-9901_          Work Tel #: _____
Reference Street Address: _13243 16th St_
Reference City/State/Zip: _Chino, CA 91710_

### COSIGNER INFORMATION (Must be at least 18 years of age)

Cosigner Name: Anita Mata          Home Address: 5489 Cambridge St Mount Clair, CA 91763
Social Security #: [    ]-7992      Date of Birth: [    ]/1943      Home Telephone: 9099838045
Have you ever defaulted on a student loan or declared bankruptcy?  ☒ No  ☐ Yes
Current Employer: GAMBRO HEALTH CARE                                           Employer Telephone: 9099463802
Current Position: Semiprofessional          Years There: 17 Years
Years at Previous Employment:

Alimony, child support, or separate maintenance income need not have to be revealed if you do not want them considered for repaying this
obligation. If you are relying on such additional income, please provide details on a separate sheet of paper.

Cosigner Citizenship (check one box): ☒ U.S. Citizen    ☐ Eligible Non-Citizen (Attach front & back copy of CIS)
Note: Personal reference name and address cannot match that of the Student.
Personal Reference Name: _Larry Pilcher_          Reference Home Tel #: _(909) 986-6776_          Work Tel #: _____
Reference Street Address: _1311 W 5th St_
Reference City/State/Zip: _Ontario, CA 91762_

By my signature, I certify that I have read, understand and agree to the terms of and undertake the obligations set forth on all five (5) pages of this Loan Request/Credit
Agreement AB.05-06.CSX1.10DC.0205 ("Credit Agreement"). I understand that any person who knowingly makes a false statement or misrepresentation on this form
is subject to penalties, which may include fines or imprisonment. This Credit Agreement is signed under seal. I understand that I am not required to fax my signature
on or to sign electronically this Credit Agreement and any related notices that require signature. If I choose to fax my signature on or to sign electronically this Credit
Agreement and any related notices that require signature, I intend: (i) my fax or electronic signature to be an electronic signature under applicable federal and state law,
(ii) any fax printout or printout of Lender's electronic record of this Credit Agreement and related notices to be an original document, (iii) to conduct business with the
Lender by electronic records and electronic signatures, and (iv) that this Credit Agreement will not be governed by Article 3 of the Uniform Commercial Code, and my
obligations under this Credit Agreement will not be subject to, but any transfer of my obligations will be subject to, Article 9 of the Uniform Commercial Code.

FOR ALABAMA RESIDENTS: CAUTION – IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU
SIGN IT.

FOR WISCONSIN RESIDENTS - NOTICE TO CUSTOMER:  (a) DO NOT SIGN THIS CREDIT AGREEMENT BEFORE YOU READ
THE WRITING ON THE FOLLOWING PAGES, EVEN IF OTHERWISE ADVISED.
(b) DO NOT SIGN THIS CREDIT AGREEMENT IF IT CONTAINS ANY BLANK SPACES.
(c) YOU ARE ENTITLED TO AN EXACT COPY OF ANY AGREEMENT YOU SIGN.
(d) YOU HAVE THE RIGHT AT ANY TIME TO PAY IN ADVANCE THE UNPAID BALANCE UNDER THIS CREDIT AGREEMENT
AND YOU MAY BE ENTITLED TO A PARTIAL REFUND OF THE FINANCE CHARGE.

PLEASE SIGN BELOW - RETURN This Page with Proof of Income and Other Information (if applicable)  FAX TO: 800-708-9497

Signature of Borrower _____          Date _1/2/06_

BY SIGNING THIS CREDIT AGREEMENT BELOW, I CERTIFY THAT I INTEND TO (i) APPLY FOR JOINT CREDIT AND
(ii) BE JOINTLY LIABLE WITH THE BORROWER FOR THIS LOAN.

Signature of Cosigner _____          Date _1/2/06_

AB.05-06.CSX1.10DC.0205          LENDER COPY
PN01_PF_05_06_CSX1_E_X_MATA_A103540214.pdf                    NSGRDF

In this Credit Agreement, the words "I", "me", "my", and "mine" mean the person(s) who signed this Credit Agreement as Borrower and Cosigner. The words "you", "your", "yours", and "Lender" mean Charter One Bank, N.A., its successors and assigns, and any other holder of this Credit Agreement. "School" means the school named at the top of the first page of this Credit Agreement. The "servicer" means the Lender or any entity it designates to service my loan.

**A. PROMISE TO PAY:** I promise to pay to you the principal sum of the Loan Amount Requested shown on the first page of this Credit Agreement, to the extent it is advanced to me or paid on my behalf, and any Loan Origination Fee added to my loan (see Paragraph F) ("Principal Sum"), interest on such Principal Sum, interest on any unpaid interest added to the Principal Sum and late fees (see Paragraph E.6).

**B. IMPORTANT – READ THIS CAREFULLY:**
1. When you receive my signed Credit Agreement, you are not agreeing to lend me money. If you decide to make a loan to me, you will electronically transfer the loan funds to the School for me, mail a loan check to the School for me, or mail a loan check directly to me. You have the right to not make a loan or to lend an amount less than the Loan Amount Requested. I agree to accept an amount less than the Loan Amount Requested and to repay that portion of the Loan Amount Requested that you actually lend to me. You have the right to disburse my loan through an agent. At your option, you may also make any loan check co-payable to me and the Cosigner or to me and the School.

2. HOW I AGREE TO THE TERMS OF THIS LOAN. By signing this Credit Agreement, and submitting it to the Lender, I am requesting that you make this loan to me in an amount equal to the Loan Amount Requested plus any Loan Origination Fee described in Paragraph F of this Credit Agreement. If you approve this request and agree to make this loan, you will notify me in writing and provide me with a Disclosure Statement, as required by law, at the time the loan proceeds are disbursed. The Disclosure Statement is incorporated herein by reference and made a part hereof. The Disclosure Statement will tell me the amount of the loan which you have approved, the amount of the Loan Origination Fee, and other important information. I will let you know that I agree to the terms of the loan as set forth in this Credit Agreement and in the Disclosure Statement by doing either of the following: (a) endorsing or depositing the check that disburses the loan proceeds; or (b) allowing the loan proceeds to be used by or on behalf of the Student without objection. Upon receipt of the Disclosure Statement, I will review the Disclosure Statement and notify you in writing if I have any questions. If I am not satisfied with the terms of my loan as disclosed in the Disclosure Statement, I may cancel my loan. To cancel my loan, I will give you a written cancellation notice within ten (10) days after I receive the Disclosure Statement. If loan proceeds have been disbursed, I agree that I will immediately return the loan proceeds to you, will not endorse any check which disburses the loan proceeds and will instruct the School to return any loan proceeds to you. If I give notice of cancellation but do not comply with the requirements of this Paragraph B.2, this Credit Agreement will not be canceled and I will be in default of this Credit Agreement. (See Paragraph I.)

**C. DEFINITIONS:**
1. "Disbursement Date" means the date or dates on which you lend money to me in consideration for my Credit Agreement and will be the date(s) shown on any loan check you prepare or the date(s) you initiate any electronic funds transfer.
2. The "Deferment Period" will begin on the Disbursement Date and end on the Deferment End Date.
3. "Deferment End Date" means the date specified below for the applicable loan program (the applicable loan program is stated on the first page of this Credit Agreement).
(a) *Undergraduate Alternative Loan Program:* If I have elected the "Immediate Repayment" option (the applicable repayment option is stated on the first page of this Credit Agreement), there is no Deferment Period, and my first payment will be 30-60 days after the disbursement of my loan. If I have elected the "Interest Only" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), then interest payments will begin 30-60 days after the disbursement of my loan, the "Deferment End Date" will be the date the Student graduates or ceases to be enrolled at least half-time in the School (or another school participating in this loan program), and principal and interest payments will begin 30-60 days after that date. In any event, if I have elected the "Interest Only" repayment option, the Deferment End Date will be no more than 5 years after the Disbursement Date. If I have elected the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), then the "Deferment End Date" will be 180 days after the Student graduates or ceases to be enrolled at least half-time in the School (or another school participating in this Loan Program). In any event, if I have elected the "Full Deferral" repayment option, the Deferment End Date will be no more than 5½ years after the Disbursement Date.
(b) *Graduate Professional Education Loan Program:* 180 days after the Student graduates or ceases for any other reason to be enrolled at least half-time in the School (or another school participating in this Loan Program), but no more than 4½ years after the Disbursement Date; provided, however, that if the Student begins a medical residency or internship during the Deferment Period, then the Deferment Period will end 180 days after the day the residency or internship ends, but no more than 8½ years after the Disbursement Date.
4. The "Repayment Period" begins the day after the Deferment Period ends. If there is no Deferment Period for my loan, the Repayment Period will begin when my loan is fully disbursed. The Repayment Period is 20 years unless monthly payments equal to

the minimum monthly payment amount (See Paragraph E.2) will repay all amounts owed in less than 20 years, in which case the Repayment Period will be the number of months necessary to pay in full the amount I owe at the minimum payment.

**D. INTEREST:**
1. Accrual – Beginning on the Disbursement Date, interest will be calculated at the Variable Rate (Paragraph D.2) and charged on the Principal Sum, and on any unpaid interest later added to the Principal Sum according to Paragraph D.3. During the Repayment Period, interest will be calculated at the Variable Rate and charged on the outstanding balance of this Credit Agreement until all amounts are paid in full. Interest will be calculated on a daily simple interest basis. The daily interest rate will be equal to the annual interest rate in effect on that day, divided by the number of days in that calendar year.
2. Variable Rate – The "Variable Rate" is equal to the Current Index plus a Margin. The Margins for both the Deferment Period and the Repayment Period are shown on the first page of this Credit Agreement. In no event will the Variable Rate exceed the maximum interest rate allowed by the laws of the State of Ohio. The Variable Rate will change quarterly on the first day of each January, April, July and October (the "Change Date(s)") if the Current Index changes. The "Current Index" for any calendar quarter beginning on a Change Date (or for any shorter period beginning on the Disbursement Date and ending on the last day of a calendar quarter) is based on the one-month London Interbank Offered Rate ("LIBOR") as published in the "Money Rates" section of The Wall Street Journal. The index for each calendar quarter (or for any shorter period beginning on a Disbursement Date and ending on the last day of a calendar quarter) will equal the average of the LIBOR rates published on the first business day of each of the three (3) immediately preceding calendar months, rounded to the nearest one-hundredth percent (0.01%). If The Wall Street Journal is not published or the Current Index is not given on that date, then the Current Index will be determined by using the immediately preceding published Current Index. If the Current Index is no longer available, you will choose a comparable index.
3. Capitalization – If I have elected the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), I am not obligated to make any payments until the loan enters the Repayment Period and you will add unpaid accrued interest to the principal loan balance as of the last day of each calendar quarter (the last day of December, March, June and September) during the Deferment Period and as of the last day of my Deferment Period. Interest that is added to principal is called "Capitalized" interest. Capitalized interest will be treated as principal. In addition, If I am in default (see Paragraph I) and the loan has been sold to TERI (see Paragraph L.12), TERI may capitalize accrued and unpaid interest as of the date it purchases my loan. I understand that you will also add all accrued and unpaid interest to the principal balance of my loan at the end of any forbearance period (see Paragraph H).

**E. TERMS OF REPAYMENT:**
1. Deferment Period – If I have elected either the "Interest Only" repayment option or the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), you will send statements during the Deferment Period (showing the total outstanding principal balance of my loan and the interest that has accrued on my loan). You reserve the right to send statements or notices to either the Borrower or the Cosigner. Statements will be sent to me at the address shown on your records. If I have elected the "Interest Only" repayment option, I agree to make payments each month during the Deferment Period equal to the accrued interest on the outstanding balance of this Credit Agreement. If I have elected the "Full Deferral" repayment option I may, but am not required to make payments during the Deferment Period. You will add any interest that I do not pay during the Deferment Period to the principal balance, as described in Paragraph D.3.
2. Repayment Period – The amount of my monthly payment ("Monthly Payment Amount") will be established based on the rules in this Credit Agreement when my Repayment Period begins. During the Repayment Period, you will send me monthly statements that show the Monthly Payment Amount and the payment due dates, and I will pay the Monthly Payment Amount shown on my monthly statement, which amount will in no event be less than $25 or the unpaid balance, whichever is less. I understand that the Monthly Payment Amount is due each month. I may pay more than my Monthly Payment Amount at any time without penalty or charge. If my loan is in paid-ahead status, I may, but will not be required to make monthly payments. You reserve the right to send monthly statements to the Borrower and/or the Cosigner. Even if I do not receive monthly statements, I will make consecutive monthly payments in amounts at least equal to the Monthly Payment Amount by the applicable payment due dates until I have paid all of the principal and interest and any other charges I may owe under this Credit Agreement.
3. Repayment Terms - My Monthly Payment Amount will be calculated as of the day the Repayment Period begins ("Repayment Date"). It will be recalculated (a) once each year prior to the anniversary of the Repayment Date, (b) if the Variable Rate changes between anniversaries of the Repayment Date to the extent that the Monthly Payment Amount would not pay in full the accrued monthly interest on my loan, (c) following any subsequent deferment or forbearance period or (d) following any request by the Borrower to the servicer to change the monthly payment due date (each of which events is a new "Repayment Date"). As of any Repayment Date, my Monthly Payment Amount will be recalculated. My new Monthly Payment Amount will be disclosed to me by the servicer. The new Monthly Payment Amount will equal the amount necessary to pay in full, over the number of months remaining in the Repayment Period, the amount I owe in equal monthly installments of principal and

interest at the Variable Rate in effect at the time of the calculation. I understand that this may result in a reduction or increase in my monthly payment as calculated as of each Repayment Date. I understand that during the Repayment Period (and, if I have elected the "Interest Only" repayment option, during the period of interest payments) the servicer may change the monthly payment due date of future payments to a later date for the convenience of the servicer in processing payments or in order to coordinate the due dates of all of my loans processed by the servicer.

4. Amounts Owing at the End of the Repayment Period – Since interest accrues daily upon the unpaid principal balance of my loan, if I make payments after my payment due dates, I may owe additional interest. If I have not paid my late fees, I will also owe additional amounts for those late fees. In such cases you will increase the amount of my last monthly payment to the amount necessary to repay my loan in full.

5. Payments – Payments will be applied first to late fees, other fees and charges, accrued interest, and the remainder to principal.

6. Other Charges - If any part of a monthly payment remains unpaid for a period of more than 15 days after the payment due date, I will pay a late fee not exceeding $5.00 or 5% of the overdue payment amount, whichever is less. To the extent permitted by law, I agree to pay you all amounts you incur in enforcing the terms of this Credit Agreement, including reasonable collection agency and attorney's fees and court costs and other collection costs.

F. LOAN ORIGINATION FEE: If you charge me, I will pay you a Loan Origination Fee at the time my loan is disbursed. The dollar amount of any Loan Origination Fee will be determined by multiplying the Principal Sum times the Loan Origination Fee Percentage shown on the first page of this Credit Agreement. The percentage would be higher if computed only on the amount advanced rather than on the entire Principal Sum (Loan Origination Fee plus the loan amount advanced). For example, a nominal Loan Origination Fee of 6.5% on the entire principal amount would equal 6.9519% of the amount advanced. The Loan Origination Fee I will pay, if any, will be shown on my Disclosure Statement and included with the Principal Sum. To the extent permitted by law, and unless I timely cancel this Credit Agreement (see Paragraph B.2), I will not be entitled to a refund of any Loan Origination Fee after my loan has been disbursed.

G. RIGHT TO PREPAY: I have the right to prepay all or any part of my loan at any time without penalty.

H. FORBEARANCE: If I am unable to repay my loan in accordance with the terms established under this Credit Agreement because of a hardship such as financial or medical difficulty, I may request that you modify these terms. I understand that such modification would be at your option. I understand that I will remain responsible for all interest accruing during any period of forbearance and that you will add any interest that I do not pay during any forbearance period to the principal balance, as described in Paragraph D.3.

I. WHOLE LOAN DUE: To the extent permitted by applicable law, I will be in default and you have the right to give me notice that the whole outstanding principal balance, accrued interest, and all other amounts payable to you under the terms of this Credit Agreement, are due and payable at once (subject to any applicable law which may give me a right to cure my default) if: (1) I fail to make any monthly payment to you when due, (2) I die, (3) I break any of my other promises in this Credit Agreement, (4) any bankruptcy proceeding is begun by or against me, or I assign any of my assets for the benefits of my creditors, or (5) I make any false written statement in applying for this loan or any other loan or at any time during the Deferment or Repayment Periods. If I default, I will be required to pay interest on this Loan accruing after default. The interest rate after default will be subject to adjustment in the same manner as before default. Upon default, you may also capitalize any interest and fees (i.e., add accrued and unpaid interest and fees to the principal balance), and increase the Margin used to compute the Variable Rate by two percentage points (2%).

J. NOTICES:
1. I will send written notice to you, any subsequent holder of this Credit Agreement, and the servicer within ten days after any change in name, address, or enrollment status (for example, if the Borrower withdraws from the School or transfers to another school participating in this loan program).
2. Any notice required to be given to me by you will be effective when mailed by first class mail to the latest address you have for me. Unless required by applicable law, you need not give a separate notice to the Cosigner, if any.

K. INFORMATION:
1. I must update the information I provided to you whenever you ask me to do so.
2. I authorize you from time to time to request and receive from others credit related information about me (and about my spouse if I live in a community property state).

3. CREDIT BUREAU REPORTING
**You may report information about my account to credit bureaus. Late payments, missed payments, or other defaults in my account may be reflected in my credit report.**

I understand that the reporting of information about my account to credit bureaus may adversely affect my credit rating and my ability to obtain other credit. You may also report the status of my loan and my payment history, including information about a late payment, missed payment or other defaults, to the School and others in accordance with applicable law.

L. ADDITIONAL AGREEMENTS:
1. I understand that you are located in Ohio and that this Credit Agreement will be entered into in the same state. CONSEQUENTLY, THE PROVISIONS OF THIS

CREDIT AGREEMENT WILL BE GOVERNED BY FEDERAL LAW AND THE LAWS OF THE STATE OF OHIO, WITHOUT REGARD TO CONFLICT OF LAW RULES.
2. The proceeds of this loan will be used only for my educational expenses at the School. The Cosigner, if any, will not receive any of the loan proceeds.
3. My responsibility for paying the loan evidenced by this Credit Agreement is unaffected by the liability of any other person to me or by your failure to notify me that a required payment has not been made. Without losing any of your rights under this Credit Agreement you may accept (a) late payments, (b) partial payments or (c) payments marked "paid in full" or with other restrictions. You may delay, fail to exercise, or waive any of your rights on any occasion without losing your entitlement to exercise the right at any future time, or on any future occasion. You will not be obligated to make any demand upon me, send me any notice, present this Credit Agreement to me for payment or make protest of non-payment to me before suing to collect on this Credit Agreement if I am in default, and to the extent permitted by applicable law, I hereby waive any right I might otherwise have to require such actions. I WILL NOT SEND YOU PAYMENTS MARKED "PAID IN FULL", "WITHOUT RECOURSE" OR WITH OTHER SIMILAR LANGUAGE UNLESS THOSE PAYMENTS ARE MARKED FOR SPECIAL HANDLING AND SENT TO THE ADDRESS IDENTIFIED FOR SUCH PAYMENTS ON MY BILLING STATEMENT, OR TO SUCH OTHER ADDRESS AS I MAY BE GIVEN IN THE FUTURE.
4. I may not assign this Credit Agreement or any of its benefits or obligations. You may assign this Credit Agreement at any time.
5. The terms and conditions set forth in this Credit Agreement and Instructions and the Disclosure Statement constitute the entire agreement between you and me.
6. If any provision of this Credit Agreement is held invalid or unenforceable, that provision shall be considered omitted from this Credit Agreement without affecting the validity or enforceability of the remainder of this Credit Agreement.
7. A provision of this Credit Agreement may only be modified if jointly agreed upon in writing by you and me. Any modification will not affect the validity or enforceability of the remainder of this Credit Agreement.
8. To the extent permitted by law, you have the right to apply money from any of my deposit account(s) with you to pay all or a portion of any amount overdue under this Credit Agreement. I hereby authorize you to obtain from the School all amounts which may be owed to me by the School, including any refund due to overpayment, early termination of enrollment, or otherwise.
9. If this Credit Agreement is executed by more than one Borrower, each Borrower agrees that any communication between you and any of the Borrowers will be binding on all of the Borrowers. I intend to be treated as a principal of this Credit Agreement and not as a surety. To the extent I may be treated as a surety, I waive all notices to which I might otherwise be entitled as such by law, and all suretyship defenses that might be available to me (including, without limitation, contribution, subrogation and exoneration). I agree that the Borrower may agree to any forbearance or other modification of the repayment schedule and that such agreement will be binding on me. It shall not be necessary for you to resort to or exhaust your remedies against the borrower before calling upon me to make repayment. For purposes of this paragraph only, "I" and "me" refer to the Cosigner only.
10. All dollar amounts stated in this Credit Agreement are in United States dollars. I will make all payments in United States Dollars with no deduction for currency exchange.
11. If the Student fails to complete the education program paid for with this loan, the Cosigner and I are not relieved of any obligation within or pursuant to this Credit Agreement.
12. I acknowledge that the requested loan is subject to the limitations on dischargeability in bankruptcy contained in Section 523 (a) (8) of the United States Bankruptcy Code. Specifically, I understand that you have purchased a guaranty of this loan, and that this loan is guaranteed by The Education Resources Institute, Inc. ("TERI"), a non-profit institution.
13. I authorize any school that I may attend to release to you, and any other persons designated by you, any requested information pertinent to this loan (e.g., enrollment status, prior loan history, and current address).
14. I authorize the Lender, any subsequent holder of this Credit Agreement, and their agents to: (1) advise the School of the status of my application and my loan, (2) respond to inquiries from prior or subsequent lenders or holders with respect to my Credit Agreement and related documents, (3) release information and make inquiries to the persons I have given you as references, for the purposes of learning my current address and telephone number, (4) check my credit and employment history and to answer questions about their credit experience with me, and (5) disclose to TERI, the Borrower, and/or the Cosigner either in connection with this transaction or any future transaction all information (including status information and non-public personal information) of the Borrower and/or the Cosigner provided in connection with this Credit Agreement. If in the future I apply for a loan that is guaranteed by TERI and funded by another lender, I also authorize the sharing of application information for this loan (other than information in a consumer report) with the other lender and TERI and the reuse of such information by such new lender and TERI in my new application.
15. Waiver by Lender: You waive (give up) any right to claim a security interest in any property to secure this Credit Agreement. This does not affect any right to offset as a matter of law.
16. If I fax my signature(s) on the first page of this Credit Agreement back to you and keep the copy I signed, I understand that under federal law the fax you receive will be an original of the first page of this Credit Agreement. You and I agree that all copies of

this Credit Agreement (including the fax you receive and the copy I retain), taken together, shall constitute a single original agreement.

17. If any Borrower or Cosigner elects to sign electronically an electronic record of this Credit Agreement, then the following will apply as between Lender and such person: (a) Lender will keep a non-modifiable electronic record of this document and provide a copy to me upon request, (b) I can and have downloaded and/or printed a copy of this document for my records or notified the Lender to mail me a copy of this document, and (c) the Lender's electronic record of this document and any printout from that record shall be an original for all purposes, including any lawsuit to collect amounts that I owe. If I physically sign a copy of this document that has been electronically signed by any other Cosigner or Borrower, as between me and the Lender the copy I sign (and any fax of that copy I may send to Lender) will be an original. However, the electronic signature of another party to this Credit Agreement and the Lender's electronic record of this document containing that signature will be as valid against me as an original, physical document that is physically signed by all parties.

M. DISCLOSURE NOTICES

---

**ALL APPLICANTS:**
**IMPORTANT FEDERAL LAW NOTICE—**

*Important information about procedures for opening a new account:*
To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.

*What this means for you:*
When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

---

CALIFORNIA RESIDENTS: I have the right to prohibit the use of information contained in my credit file in connection with transactions not initiated by me. I may exercise this right by notifying the consumer credit reporting agency. A married applicant may apply for a separate account. If you take any adverse action as defined by Section 1785.3 of the California Civil Code and the adverse action is based, in whole or in part, on any information contained in a consumer credit report, I have the right to obtain within 60 days a free copy of my consumer credit report from the consumer reporting agency who furnished you my consumer credit report and from any other consumer credit reporting agency which compiles and maintains files on consumers on a nationwide basis. I have the right as described by Section 1785.16 of the California Civil Code to dispute the accuracy or completeness of any information in a consumer credit report furnished by the consumer credit reporting agency.

CALIFORNIA AND UTAH RESIDENTS: As required by California and Utah law, I am hereby notified that a negative credit report reflecting on my credit record may be submitted to a credit reporting agency if I fail to fulfill the terms of my credit obligations.

IOWA, KANSAS AND NEBRASKA RESIDENTS (For purposes of the following notice, the word "you" refers to the Borrower and the Cosigner, not the Lender): NOTICE TO CONSUMER. This is a consumer credit transaction. 1. DO NOT SIGN THIS CREDIT AGREEMENT BEFORE YOU READ THIS CREDIT AGREEMENT. 2. YOU ARE ENTITLED TO A COPY OF THIS CREDIT AGREEMENT. 3. YOU MAY PREPAY THE UNPAID BALANCE AT ANY TIME WITHOUT PENALTY AND MAY BE ENTITLED TO A REFUND OF UNEARNED CHARGES IN ACCORDANCE WITH LAW.

MARYLAND RESIDENTS: In Paragraph L.1, Lender and I have agreed that this Credit Agreement is governed by federal law and the laws of OHIO, without regard to conflict of laws rules; if any court should nevertheless determine that this Credit Agreement is subject to Maryland laws concerning credit, then only to the extent that Maryland law applies, Lender and I agree and elect that this loan is made under and governed by Subtitle 10, Credit Grantor Closed End Credit Provisions, of Title 12 of the Commercial Law Article of the Annotated Code of Maryland, except as preempted by federal law.

**MISSOURI RESIDENTS: Oral agreements or commitments to loan money, extend credit or to forbear from enforcing repayment of a debt including promises to extend or renew such debt are not enforceable. To protect me (borrower(s)) and you (creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.**

NEVADA RESIDENTS: This is a loan for study.

NEW JERSEY RESIDENTS: The section headings of this Credit Agreement are a table of contents and not contract terms. Portions of this Credit Agreement with references to actions taken to the extent of applicable law apply to acts or practices that New Jersey law permits or requires. In this Credit Agreement, acts or practices (i)

by you which are or may be permitted by "applicable law" are permitted by New Jersey law, and, (ii) that may or will be taken by you unless prohibited by "applicable law" are permitted by New Jersey law.

NEW YORK, RHODE ISLAND AND VERMONT RESIDENTS: A consumer report (credit report) may be obtained from a consumer-reporting agency (credit bureau) in connection with this loan. If I request (1) I will be informed whether or not consumer reports were obtained, and (2) if reports were obtained, I will be informed of the names and addresses of the credit bureaus that furnished the reports. If you agree to make this loan to me, a consumer credit report may be requested or used in connection with renewals or extensions of any credit for which I have applied, reviewing my loan, taking collection action on my loan, or legitimate purposes associated with my loan.

OHIO RESIDENTS: The Ohio laws against discrimination require that all creditors make credit equally available to all credit worthy customers, and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with this law.

WISCONSIN RESIDENTS: For married Wisconsin residents, my signature on this Credit Agreement confirms that this loan obligation is being incurred in the interest of my marriage or family. No provision of any marital property agreement (pre-marital agreement), unilateral statement under Section 766.59 or court decree under Section 766.70 adversely affects the interest of the Lender unless the Lender, prior to the time that the loan is approved, is furnished with a copy of the agreement, statement, or decree or has actual knowledge of the adverse provision when the obligation to the Lender is incurred. If the loan for which I am applying is granted, my spouse will also receive notification that credit has been extended to me.

N. BORROWER'S CERTIFICATION: I declare under penalty of perjury under the laws of the United States of America that the following is true and correct. I certify that all information I provided to you in connection with this loan, including without limitation, the information contained in this Credit Agreement, is true, complete and correct to the best of my knowledge and belief and is made in good faith. I understand that I am responsible for repaying immediately any funds that I receive which are not to be used or are not used for educational expenses related to attendance at the School for the academic period stated. I certify that I am not now in default on a Federal Perkins Loan, a Federal Stafford Loan, a Federally Insured Student Loan, a Federal Supplemental Loan for Students (SLS), a Federal PLUS Loan, an Income Contingent Loan, a Federal Consolidation Loan, a Federal Ford Direct Loan, or any other education loan received for attendance at any school.

O. STATE-SPECIFIC COSIGNER NOTICES: For the purposes of the following notices only, the words "you" and "your" refer to the Cosigner, where applicable, not to the Lender.

FOR OBLIGORS COSIGNING IN WEST VIRGINIA:

---

**NOTICE TO COSIGNER**
You are being asked to guarantee this debt. Think carefully before you do. If the borrower doesn't pay the debt, you will have to. Be sure you can afford to pay it if you have to, and that you want to accept this responsibility. You may have to pay up to the full amount of the debt if the borrower does not pay. You may also have to pay late fees or collection costs, which increase this amount. The creditor can collect this debt from you without first trying to collect from the borrower. The creditor can use the same collection methods against you that can be used against the borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become a part of your credit record. This notice is not the contract that makes you liable for the debt.

---

FOR OBLIGORS COSIGNING IN IOWA, NEW YORK AND SOUTH CAROLINA:

NOTICE: You agree to pay the debt identified below although you may not personally receive any property, goods, services, or money. You may be sued for payment although the person who receives the property, goods, services, or money is able to pay. You should know that the Total of Payments listed below does not include finance charges resulting from delinquency, late charges, repossession or foreclosure costs, court costs or attorney's fees, or other charges that may be stated in the Credit Agreement or contract. You will also have to pay some or all of these costs and charges if the Credit Agreement or contract, the payment of which you are guaranteeing requires the borrower to pay such costs and charges. This notice is not the Credit Agreement or contract that obligates you to pay the debt. Read the Credit Agreement or contract for the exact terms of your obligation.

IDENTIFICATION OF DEBT (S) YOU MAY HAVE TO PAY
Name of Debtor: The Borrower and Cosigner identified on the first
page of this Credit Agreement.
Name of Creditor: Charter One Bank, N.A., and its successors and
assigns.
Date:  If the loan is disbursed by check, the date of the check.  If the
loan is disbursed electronically, the date the creditor transmits the
funds to the School.
Kind of Debt: Education loan.
Total of Payments: The Loan Amount Requested set forth on the first
page of this Credit Agreement (to the extent advanced), plus interest
and the Loan Origination Fee set forth in this Credit Agreement.

FOR OBLIGORS COSIGNING IN VERMONT:

### NOTICE TO COSIGNER

YOUR SIGNATURE ON THIS CREDIT AGREEMENT MEANS
THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS
LOAN.  IF THE BORROWER DOES NOT PAY, THE LENDER HAS
A LEGAL RIGHT TO COLLECT FROM YOU.

## FEDERAL AND CALIFORNIA COSIGNER NOTICES

For the purposes of these Notices, the words "you" and "your" refer to the Cosigner, not the Lender.

**NOTICE TO COSIGNER (Traduccion en Ingles Se Requiere Por La Ley):**

You are being asked to guarantee this debt. Think carefully before you do. If the borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to, and that you want to accept this responsibility.

You may have to pay up to the full amount of the debt if the borrower does not pay. You may also have to pay late fees or collection costs, which increase this amount.

The holder of the loan can collect this debt from you without first trying to collect from the borrower. The holder of the loan can use the same collection methods against you that can be used against the borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become part of your credit record.

This notice is not the contract that makes you liable for the debt.

**AVISO PARA EL FIADOR (Spanish Translation Required by Law):**

Se le está pidiendo que garantice esta deuda. Piénselo con cuidado antes de ponerse de acuerdo. Si la persona que ha pedido este préstamo no paga la deuda, usted tendrá que pagarla. Esté seguro de que usted podrá pagar si sea obligado a pagarla y de que usted desea aceptar la responsabilidad.

Si la persona que ha pedido el préstamo no paga la deuda, es posible que usted tenga que pagar la suma total de la deuda, mas los cargos por tardarse en el pago o el costo de cobranza, lo cual aumenta el total de esta suma.

El acreedor (financiero) puede cobrarle a usted sin, primeramente, tratar de cobrarle al deudor. Los mismos metodos de cobranza que pueden usarse contra el deudor, podran usarse contra usted, tales como presentar una demanda en corte, quitar parte de su sueldo, etc. Si alguna vez no se cumpla con la obligación de pagar esta deuda, se puede incluir esa información en la historia de credito de usted.

Este aviso no es el contrato mismo en que se le echa a usted la responsabilidad de la deuda.

AB.05-06.CSX1.10DC.0205.FD
(W0276775.3)

### NOTE DISCLOSURE STATEMENT

$ __33,519.55__
__03540214__
Loan No.

Borrower(s)   __JOHN MATA__
              __ANITA MATA__

Student:   __JOHN MATA__
Date:      __January 6, 2006__

JOHN MATA
5489 CAMBRIDGE ST
MOUNT CLAIR , CA  91763

Lender Name and Address:
__CHARTER ONE BANK, N.A.__
__833 BROADWAY__
__ALBANY, NY 12207__

This disclosure statement relates to your Loan Note disbursed on          January 6, 2006
Because your Loan is either being disbursed or entering repayment, or the repayment terms are being modified, the following information about your Loan is being given to you.

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments scheduled. |
|---|---|---|---|
| __9.938__   % | $  __61,929.60__ | $  __30,000.00__ | $  __91,929.60__ |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments are due |
|---|---|---|
| 240 | $  383.04 | On the   20th day of each month beginning on   12/2008 |
|  |  |  |
|  |  |  |
|  |  |  |

**VARIABLE RATE:** The Annual Percentage Rate, which is based on an index plus a margin, may increase during the term of the loan if the index rate increases. The index is (check one):

[ ] **Prime Rate Index Adjusted Monthly** - The highest U.S. bank prime rate published in the "Money Rates" section of The Wall Street Journal on the last business day of each calendar month.

[ ] **Prime Rate Index Adjusted Quarterly** - The highest U.S. bank prime rate published in the "Money Rates" section of The Wall Street Journal on the last business day of each calendar quarter.

[X] **LIBOR Index Adjusted Quarterly** - The average of the one-month London Interbank Offered Rates published in the "Money Rates" section of The Wall Street Journal on the first business day of each of the three (3) calendar months immediately preceding the first day of each calendar quarter.

Any increase in the index and the Annual Percentage Rate which occurs while principal payments are deferred will increase the amount of any current and all future payments. Any increase in the index and the Annual Percentage Rate which occurs while principal and interest payments are deferred will increase the amount of all future payments. Any increase in the index and the Annual Percentage Rate which occurs after you have begun to make principal and interest payments on your loan will increase the amount of your future principal and interest payments beginning with your next annual payment adjustment date. For example, assume you obtain a loan in your junior year, in the amount of $10,000, at an interest rate of 11%, and you defer principal and interest payments until after your graduation, and the repayment term of the loan is 20 years. If the interest rate increased to 12% on January 1st of your senior year, the interest which accrues while principal and interest payments are deferred will increase by $91.01, and your monthly principal and interest payments would increase by $9.37.

**SECURITY:** You have given a security interest in all refunds or amounts owed to you at any time by the student's educational institution. Collateral securing other loans with the Lender may also secure this Loan.

**LATE CHARGES:** If a payment is more than 15 days late, you may be charged $5.00 or 5% of the payment, whichever is less. If you default, Lender (or any subsequent holder or any subsequent holder of your Loan Note) may increase the margin used to compute the Annual Percentage Rate by two percentage points (2%).

**PREPAYMENT:** If you pay off early, you will not have to pay a penalty.

See your contract documents for any additional information about non-payment, default, any required repayment in full before the scheduled date, any security interest and prepayment refunds and penalties.

**Estimates:** All numerical disclosures except the late payment disclosure are estimates.

Principal Amount of Note (Amount Financed plus Prepaid Finance Charge)          $          33,519.55

Itemization of Amount Financed
Amount paid to   JOHN MATA   and          $
Amount paid to   ANITA MATA                $          30,000.00
Total Amount Financed                                          $          30,000.00

Itemization of Prepaid Finance Charge
Origination Fee                            $          3,519.55
Total Prepaid Finance Charge(s)                               $          3,519.55

TRAJ 603 FU6  411          NSGRDF  Next Student Graduate Loan          File Copy

# Exhibit A-2

Exhibit A-2

```
    ITS2C*****8533;;              AES/PA      VTAM NAHU     TSX2D
   DATE 02/23/16 11:27:16   LOAN FINANCIAL ACTIVITY      PAGE  1 OF  7

BORROWER SSN: ***-**-8533  NAME: MATA, JOHN M JR
1ST DISB: 01/06/06 LN SEQ: 0002  LN PGM: PEPLN   OWN: 122962QC-NCT
GUARANTOR: TERI              CUST ACCT:  LT08  ORIG BAL:  33,519.55
BOND ISSUE: NCT20061   PD AHEAD:    STATUS: ACTIVE    CURR BAL:     0.00
```

| | REV REA | EFFECTIVE DATE | POSTED DATE | TRAN TYPE | TRAN AMOUNT | INTEREST ACCRUED | PRINCIPAL BALANCE |
|---|---|---|---|---|---|---|---|
| 1 | | 04/03/13 | 04/03/13 | 5003A | 35.00CR | 0.00 | 0.00 |
| 2 | | 04/01/13 | 04/01/13 | 1030A | 48,948.26CR | 83.70 | 0.00 |
| 3 | | 03/19/13 | | 2601A | 5.00 | 180.27 | 47,380.47 |
| 4 | | 02/19/13 | | 2601A | 5.00 | 199.59 | 47,380.47 |
| 5 | | 01/19/13 | | 2601A | 5.00 | 199.87 | 47,380.47 |
| 6 | | 12/19/12 | | 2601A | 5.00 | 193.79 | 47,380.47 |
| 7 | | 11/19/12 | | 2601A | 5.00 | 200.25 | 47,380.47 |
| 8 | | 10/19/12 | | 2601A | 5.00 | 193.79 | 47,380.47 |
| 9 | | 09/19/12 | | 2601A | 5.00 | 316.53 | 47,380.47 |
| 10 | | 08/01/12 | 08/01/12 | 7001A | 0.00 | 165.69 | 47,380.47 |

```
        SELECTION __

 F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
    ITS2C*****8533;;              AES/PA         VTAM NAHU      TSX2D
  DATE 02/23/16 11:27:17   LOAN FINANCIAL ACTIVITY    .     PAGE  2 OF  7

BORROWER SSN: ***-**-8533  NAME: MATA, JOHN M JR
1ST DISB: 01/06/06 LN SEQ: 0002  LN PGM: PEPLN    OWN: 122962QC-NCT
GUARANTOR: TERI                 CUST ACCT:  LT08  ORIG BAL:  33,519.55
BOND ISSUE: NCT20061   PD AHEAD:    STATUS: ACTIVE    CURR BAL:      0.00
```

| | REV REA | EFFECTIVE DATE | POSTED DATE | TRAN TYPE | TRAN AMOUNT | INTEREST ACCRUED | PRINCIPAL BALANCE |
|---|---|---|---|---|---|---|---|
| 1 | | 07/06/12 | 07/06/12 | 1010C | 118.22CR | 448.58 | 46,742.40 |
| 2 | | 04/27/12 | 04/27/12 | 1010C | 358.02CR | 243.31 | 46,742.40 |
| 3 | | 03/20/12 | 03/20/12 | 1010C | 356.36CR | 178.79 | 46,742.40 |
| 4 | | 02/21/12 | 02/21/12 | 1010C | 198.49CR | 210.72 | 46,742.40 |
| 5 | | 01/19/12 | 01/19/12 | 1010C | 198.49CR | 191.00 | 46,742.40 |
| 6 | | 12/20/11 | 12/20/11 | 1010C | 196.90CR | 183.83 | 46,742.40 |
| 7 | | 11/21/11 | 11/21/11 | 1010C | 196.90CR | 209.18 | 46,742.40 |
| 8 | | 10/19/11 | 10/19/11 | 1010C | 0.30CR | 76.06 | 46,742.40 |
| 9 | | 10/07/11 | 10/07/11 | 1010C | 196.60CR | 25.35 | 46,742.40 |
| 10 | | 10/03/11 | 10/04/11 | 1010C | 196.90CR | 285.80 | 46,742.40 |

```
      SELECTION __

F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
     ITS2C*****8533;;              AES/PA        VTAM NAHU      TSX2D
     DATE 02/23/16 11:27:18    LOAN FINANCIAL ACTIVITY        PAGE 3 OF  7

BORROWER SSN: ***-**-8533  NAME: MATA, JOHN M JR
1ST DISB: 01/06/06 LN SEQ: 0002  LN PGM: PEPLN    OWN: 122962QC-NCT
GUARANTOR: TERI                CUST ACCT:  LT08   ORIG BAL:  33,519.55
BOND ISSUE: NCT20061   PD AHEAD:     STATUS: ACTIVE    CURR BAL:      0.00
```

|   | REV REA | EFFECTIVE DATE | POSTED DATE | TRAN TYPE | TRAN AMOUNT | INTEREST ACCRUED | PRINCIPAL BALANCE |
|---|---|---|---|---|---|---|---|
| 1 |  | 08/19/11 | 08/19/11 | 1010C | 196.90CR | 196.90 | 46,742.40 |
| 2 |  | 07/19/11 | 07/19/11 | 1010C | 0.60CR | 6.35 | 46,742.40 |
| 3 |  | 07/18/11 | 07/18/11 | 1010C | 196.30CR | 107.98 | 46,742.40 |
| 4 |  | 07/01/11 | 07/01/11 | 1010C | 27.41CR | 70.57 | 46,742.40 |
| 5 |  | 07/01/11 | 07/01/11 | 1010C | 2.59CR | 0.00 | 46,742.40 |
| 6 |  | 06/20/11 | 06/20/11 | 1010C | 171.48CR | 44.91 | 46,742.40 |
| 7 |  | 06/13/11 | 06/13/11 | 1010C | 27.41CR | 64.15 | 46,742.40 |
| 8 |  | 06/03/11 |  | 2601A | 1.37 | 12.83 | 46,742.40 |
| 9 |  | 06/01/11 | 06/01/11 | 1010C | 171.48CR | 282.29 | 46,742.40 |
| 10 |  | 04/18/11 | 04/18/11 | 1010C | 198.89CR | 179.64 | 46,742.40 |

```
        SELECTION __

 F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
    ITS2C*****8533;;                AES/PA        VTAM NAHU        TSX2D
    DATE 02/23/16 11:27:18    LOAN FINANCIAL ACTIVITY        PAGE 4 OF  7

BORROWER SSN: ***-**-8533  NAME: MATA, JOHN M JR
1ST DISB: 01/06/06 LN SEQ: 0002  LN PGM: PEPLN   OWN: 122962QC-NCT
GUARANTOR: TERI               CUST ACCT:  LT08  ORIG BAL:  33,519.55
BOND ISSUE: NCT20061   PD AHEAD:    STATUS: ACTIVE    CURR BAL:      0.00
```

|  | REV REA | EFFECTIVE DATE | POSTED DATE | TRAN TYPE | TRAN AMOUNT | INTEREST ACCRUED | PRINCIPAL BALANCE |
|---|---|---|---|---|---|---|---|
| 1 |  | 03/21/11 | 03/21/11 | 1010C | 197.70CR | 134.73 | 46,742.40 |
| 2 |  | 02/28/11 | 02/28/11 | 1010C | 152.40CR | 89.82 | 46,742.40 |
| 3 |  | 02/14/11 | 02/14/11 | 1010C | 160.37CR | 70.57 | 46,742.40 |
| 4 |  | 02/14/11 | 02/14/11 | 1010C | 7.97CR | 0.00 | 46,742.40 |
| 5 |  | 02/03/11 |  | 2601A | 5.00 | 128.31 | 46,742.40 |
| 6 |  | 01/14/11 | 01/14/11 | 1010C | 160.37CR | 70.57 | 46,742.40 |
| 7 |  | 01/03/11 |  | 2601A | 5.00 | 19.29 | 46,742.40 |
| 8 |  | 12/31/10 | 01/03/11 | 1010C | 160.37CR | 174.61 | 46,742.40 |
| 9 |  | 12/04/10 |  | 2601A | 5.00 | 213.41 | 46,742.40 |
| 10 |  | 11/01/10 | 11/01/10 | 1010C | 160.37CR | 271.47 | 46,742.40 |

```
      SELECTION __

 F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
     ITS2C*****8533;;                 AES/PA        VTAM NAHU        TSX2D
     DATE 02/23/16 11:27:19    LOAN FINANCIAL ACTIVITY          PAGE  5 OF  7
```

```
BORROWER SSN: ***-**-8533  NAME: MATA, JOHN M JR
1ST DISB: 01/06/06 LN SEQ: 0002  LN PGM: PEPLN    OWN: 122962QC-NCT
GUARANTOR: TERI                 CUST ACCT:  LT08  ORIG BAL:  33,519.55
BOND ISSUE: NCT20061   PD AHEAD:   STATUS: ACTIVE    CURR BAL:      0.00
```

| | REV REA | EFFECTIVE DATE | POSTED DATE | TRAN TYPE | TRAN AMOUNT | INTEREST ACCRUED | PRINCIPAL BALANCE |
|---|---|---|---|---|---|---|---|
| 1 | | 09/20/10 | 09/20/10 | 1010C | 160.37CR | 309.80 | 46,742.40 |
| 2 | | 08/03/10 | 08/03/10 | 1010C | 160.37CR | 180.72 | 46,742.40 |
| 3 | | 07/06/10 | 07/07/10 | 1010C | 155.37CR | 159.82 | 46,742.40 |
| 4 | | 06/11/10 | 06/11/10 | 1010C | 285.04CR | 51.01 | 46,742.40 |
| 5 | | 06/03/10 | | 2601A | 5.00 | 216.83 | 46,742.40 |
| 6 | | 04/30/10 | 04/30/10 | 1010C | 200.00CR | 312.75 | 46,742.40 |
| 7 | | 03/12/10 | 04/26/10 | 7001A | 0.00 | 411.70 | 46,742.40 |
| 8 | | 01/06/10 | 04/26/10 | 7001A | 0.00 | 31.64 | 46,330.70 |
| 9 | | 01/01/10 | 04/26/10 | 7001A | 0.00 | 579.64 | 46,299.06 |
| 10 | | 10/01/09 | 04/26/10 | 7001A | 0.00 | 586.99 | 45,719.42 |

```
     SELECTION __
```

```
F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
   ITS2C*****8533;;              AES/PA         VTAM NAHU      TSX2D
   DATE 02/23/16 11:27:19   LOAN FINANCIAL ACTIVITY          PAGE  6 OF  7

BORROWER SSN: ***-**-8533  NAME: MATA, JOHN M JR
1ST DISB: 01/06/06 LN SEQ: 0002  LN PGM: PEPLN   OWN: 122962QC-NCT
GUARANTOR: TERI                CUST ACCT:  LT08  ORIG BAL: 33,519.55
BOND ISSUE: NCT20061   PD AHEAD:      STATUS: ACTIVE    CURR BAL:       0.00
```

|   | REV REA | EFFECTIVE DATE | POSTED DATE | TRAN TYPE | TRAN AMOUNT | INTEREST ACCRUED | PRINCIPAL BALANCE |
|---|---------|----------------|-------------|-----------|-------------|------------------|-------------------|
| 1 |  | 07/01/09 | 04/26/10 | 7001A | 0.00 | 577.62 | 45,132.43 |
| 2 |  | 04/01/09 | 04/26/10 | 7001A | 0.00 | 174.42 | 44,554.81 |
| 3 |  | 03/13/09 | 03/16/09 | 1010C | 175.24CR | 128.64 | 44,380.39 |
| 4 |  | 02/27/09 | 04/26/10 | 7001A | 0.00 | 333.99 | 44,421.99 |
| 5 |  | 01/21/09 |  | 2601A | 5.00 | 447.41 | 43,640.59 |
| 6 |  | 12/01/08 | 04/26/10 | 7001A | 0.00 | 1,540.05 | 43,640.59 |
| 7 |  | 06/05/08 | 06/05/08 | 1010C | 72.59CR | 38.54 | 42,100.54 |
| 8 |  | 06/01/08 | 10/04/08 | 7001A | 0.00 | 160.80 | 42,134.59 |
| 9 |  | 05/15/08 | 05/15/08 | 1010C | 48.40CR | 659.11 | 41,363.08 |
| 10 |  | 03/10/08 | 03/10/08 | 7001A | 0.00 | 748.08 | 41,363.08 |

```
        SELECTION __


F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
     ITS2C*****8533;;                AES/PA        VTAM NAHU      TSX2D
     DATE 02/23/16 11:27:19     LOAN FINANCIAL ACTIVITY          PAGE  7 OF  7

BORROWER SSN: ***-**-8533  NAME: MATA, JOHN M JR
1ST DISB: 01/06/06 LN SEQ: 0002  LN PGM: PEPLN      OWN: 122962QC-NCT
GUARANTOR: TERI                CUST ACCT:  LT08  ORIG BAL:  33,519.55
BOND ISSUE: NCT20061  PD AHEAD:      STATUS: ACTIVE     CURR BAL:      0.00
```

|    | REV REA | EFFECTIVE DATE | POSTED DATE | TRAN TYPE | TRAN AMOUNT | INTEREST ACCRUED | PRINCIPAL BALANCE |
|----|---------|----------------|-------------|-----------|-------------|------------------|-------------------|
| 1  |         | 01/01/08       | 01/02/08    | 7001A     | 0.00        | 1,019.96         | 40,615.00         |
| 2  |         | 10/01/07       | 10/01/07    | 7001A     | 0.00        | 980.12           | 39,595.04         |
| 3  |         | 07/01/07       | 08/15/07    | 7001A     | 0.00        | 945.72           | 38,614.92         |
| 4  |         | 04/01/07       | 08/15/07    | 7001A     | 0.00        | 913.55           | 37,669.20         |
| 5  |         | 01/01/07       | 08/15/07    | 7001A     | 0.00        | 912.47           | 36,755.65         |
| 6  |         | 10/01/06       | 10/02/06    | 7001A     | 0.00        | 858.86           | 35,843.18         |
| 7  |         | 07/01/06       | 07/03/06    | 7001A     | 0.00        | 962.02           | 34,984.32         |
| 8  |         | 03/09/06       | 03/09/06    | 0390A     | 34,022.30   | 0.00             | 33,519.55         |
| 9  |         | 03/09/06       | 03/09/06    | 0395A     | 34,022.30CR | 502.75           | 0.00              |
| 10 |         | 01/06/06       | 01/06/06    | 0101A     | 33,519.55   | 0.00             | 33,519.55         |

```
        SELECTION __


F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
    ITS31*****8533;                AES/PA        VTAM NAHU      TSX31
  DATE 02/23/16 11:27:27 DEFERMENT/FORBEARANCE LOAN DETAIL


BORROWER SSN: ***-**-8533 NAME: JOHN M MATA JR
1ST DISB DATE: 01/06/06   OWNER: NCT                  LOAN PGM: PEPLN
LOAN SEQ: 002        GUARANTOR: TERI
```

| DEFER/FORB TYP | BEGIN DATE | END DATE | GRACE END DATE | CAP IND | DAYS USED | DAYS LEFT | TOTL MOS USED | CERT DATE |
|---|---|---|---|---|---|---|---|---|
| _ F - TEMP HRDSH | 05 01 12 | 07 31 12 | | Y | 92 | 3 | 11.9 | 05 29 12 |
| _ F - LAT SCH NT | 01 06 10 | 03 11 10 | | Y | 65 | UNL | 2.1 | 03 12 10 |
| _ F - TEMP HRDSH | 02 01 09 | 02 26 09 | | Y | 26 | 3 | 11.9 | 03 16 09 |
| _ F - TEMP HRDSH | 06 01 08 | 11 30 08 | | Y | 183 | 3 | 11.9 | 10 04 08 |
| _ F - TEMP HRDSH | 04 01 08 | 05 31 08 | | Y | 61 | 3 | 11.9 | 04 25 08 |
| _ | — — — | — — — | — — — | _ | | | | |
| _ | — — — | — — — | — — — | _ | | | | |

```
    F1=HELP  F3=EXIT  F5=RFR  F6=ELG  F7=BKWD  F8=FWD  F9=PRT  F10=HIST  F12=CAN
```

```
    ITS2X*****8533;                    AES/PA        VTAM NAHU      TSX2Y
    DATE 02/23/16 11:27:30 REPAYMENT SCHEDULE SUMMARY SELECTION   PAGE  1 OF  4

BORROWER SSN ***-**-8533   NAME JOHN M MATA JR


        SCHED   INSTALL  REPAY REPAY 1ST DUE 1ST DISB   LOAN
  SEL STA TYPE  AMOUNT   LVLS  TERM   DATE    DATE      PGM       OWNER
   1  ***********************************************************
   2  ***********************************************************
   3  I   L     364.26     2   189  09/03/12 01/06/06 PEPLN       NCT
   4  ***********************************************************
   5  ***********************************************************
   6  I   L     358.02     2   193  04/19/12 01/06/06 PEPLN       NCT
   7  ***********************************************************
   8  I   TG    356.36     3   196  01/19/12 01/06/06 PEPLN       NCT
   9  ***********************************************************
  10  ***********************************************************
  11  ***********************************************************
  12  ***********************************************************


  SELECTION  __



  F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
        ITS2X*****8533;                    AES/PA        VTAM NAHU      TSX2Y
        DATE 02/23/16 11:27:31 REPAYMENT SCHEDULE SUMMARY SELECTION   PAGE  2 OF  4

    BORROWER SSN ***-**-8533    NAME JOHN M MATA JR


            SCHED   INSTALL  REPAY  REPAY  1ST DUE 1ST DISB   LOAN
    SEL STA TYPE    AMOUNT   LVLS   TERM   DATE    DATE       PGM      OWNER
      1 ***************************************************************************
      2 ***************************************************************************
      3 I   L      344.93     2     202   07/19/11 01/06/06 PEPLN      NCT
      4 I   TG     196.90     3     202   07/19/11 01/06/06 PEPLN      NCT
      5 I   TG     198.89     3     205   05/18/11 01/06/06 PEPLN      NCT
      6 ***************************************************************************
      7 I   TG     198.89     3     216   04/18/11 01/06/06 PEPLN      NCT
      8 ***************************************************************************
      9 ***************************************************************************
     10 I   TG     160.37     4     227   05/18/10 01/06/06 PEPLN      NCT
     11 I   TG     159.30     4     228   04/18/10 01/06/06 PEPLN      NCT
     12 I   TG     154.45     4     227   05/05/09 01/06/06 PEPLN      NCT


    SELECTION  __



    F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
      ITS2X*****8533;                  AES/PA          VTAM NAHU      TSX2Y
      DATE 02/23/16 11:27:32 REPAYMENT SCHEDULE SUMMARY SELECTION   PAGE 3 OF  4


    BORROWER SSN ***-**-8533   NAME JOHN M MATA JR


          SCHED   INSTALL  REPAY  REPAY  1ST DUE 1ST DISB   LOAN
    SEL STA TYPE  AMOUNT    LVLS   TERM   DATE    DATE       PGM      OWNER
      1 **********************************************************************
      2 **********************************************************************
      3 I   TG     175.24    4     231  01/05/09 01/06/06 PEPLN        NCT
      4 **********************************************************************
      5 **********************************************************************
      6 I   TG     180.52    4     238  06/05/08 01/06/06 PEPLN        NCT
      7 **********************************************************************
      8 **********************************************************************
      9 I   L      358.48    2     239  05/05/08 01/06/06 PEPLN        NCT
     10 **********************************************************************
     11 **********************************************************************
     12 I   L      394.81    2     239  04/23/08 01/06/06 PEPLN        NCT


    SELECTION   __


    F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
    ITS2X*****8533;                    AES/PA          VTAM NAHU      TSX2Y
    DATE 02/23/16 11:27:32 REPAYMENT SCHEDULE SUMMARY SELECTION    PAGE  4 OF  4


BORROWER SSN ***-**-8533    NAME JOHN M MATA JR


        SCHED    INSTALL  REPAY  REPAY  1ST DUE 1ST DISB    LOAN
   SEL STA TYPE  AMOUNT   LVLS   TERM   DATE    DATE       PGM     OWNER
    1 *********************************************************************
    2 *********************************************************************
    3  I  L       373.98     2    239  07/22/07 01/06/06 PEPLN       NCT
    4 *********************************************************************
    0 *********************************************************************
    0 *********************************************************************
    0 *********************************************************************
    0 *********************************************************************
    0 *********************************************************************
    0 *********************************************************************
    0 *********************************************************************
    0 *********************************************************************


  SELECTION  __


01033 PRESS ENTER TO DISPLAY MORE DATA
F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
   ITS2X*****8533;                    AES/PA          VTAM NAHU         TSX2Y
   DATE 02/23/16 11:27:33 REPAYMENT SCHEDULE SUMMARY SELECTION    PAGE  1 OF  1


 BORROWER SSN ***-**-8533    NAME JOHN M MATA JR


         SCHED    INSTALL   REPAY  REPAY  1ST DUE 1ST DISB    LOAN
   SEL  STA TYPE  AMOUNT    LVLS   TERM    DATE    DATE       PGM      OWNER
     O   ****************************************************************
     O   ****************************************************************
     O   ****************************************************************
     O   ****************************************************************
     O   ****************************************************************
     O   ****************************************************************
     O   ****************************************************************
     O   ****************************************************************
     O   ****************************************************************
     O   ****************************************************************
     O   ****************************************************************
     O   ****************************************************************


   SELECTION  __



  F1=HELP   F3=EXIT   F5=RFR   F7=BKWD   F8=FWD   F9=PRT   F12=CAN
```

# Exhibit A-3

Exhibit A-3

EX-10.17 14 p060388_ex10-17.htm POOL SUPPLEMENT

**EXHIBIT 10.17**

### POOL SUPPLEMENT
### CHARTER ONE BANK, N.A.

This Pool Supplement (the "<u>Supplement</u>") is entered into pursuant to and forms a part of each of the Note Purchase Agreements (the "<u>Agreements</u>") set forth on <u>Schedule 1</u> attached hereto, each as amended or supplemented from the date of execution of the Agreement through the date of this Supplement, by and between The First Marblehead Corporation ("<u>FMC</u>") and Charter One Bank, N.A. (the "<u>Program Lender</u>"). This Supplement is dated as of March 9, 2006. Capitalized terms used in this Supplement without definitions have the meanings set forth in the Agreements.

<u>Article 1: Purchase and Sale</u>.

In consideration of the Minimum Purchase Price, the Program Lender hereby transfers, sells, sets over and assigns to The National Collegiate Funding LLC (the "<u>Depositor</u>"), upon the terms and conditions set forth in the Agreements (which are incorporated herein by reference with the same force and effect as if set forth in full herein), each student loan set forth on attached <u>Schedule 2</u> (the "<u>Transferred Loans</u>") along with all of the Program Lender's rights under the Guaranty Agreements relating to the Transferred Loans. The Depositor in turn will sell the Transferred Loans to The National Collegiate Student Loan Trust 2006-1 (the "<u>Trust</u>"). The Program Lender hereby transfers and delivers to the Depositor each Note evidencing such Transferred Loan and all Origination Records relating thereto, in accordance with the terms of the Agreements. The Depositor hereby purchases said Notes on said terms and conditions.

<u>Article 2: Price</u>.

The amount paid pursuant to this Supplement is the Minimum Purchase Price, as that term is defined in Section 2.04 of the Agreement.

<u>Article 3: Representations and Warranties</u>.

3.01.    <u>By Program Lender</u>.

The Program Lender repeats the representations and warranties contained in Section 5.02 of the Agreements for the benefit of each of the Depositor and the Trust and confirms the same are true and correct as of the date hereof with respect to the Agreements and to this Supplement.

3.02.    <u>By Depositor</u>.

The Depositor hereby represents and warrants to the Program Lender that at the date of execution and delivery of this Supplement by the Depositor:

(a)    The Depositor is duly organized and validly existing as a limited liability company under the laws of the State of Delaware with the due power and authority to own its properties and to conduct its business as such properties are currently owned and such business is presently conducted, and had at all relevant times, and has, the power, authority and legal right to acquire and own the Transferred Loans.

(b)    The Depositor is duly qualified to do business and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business shall require such qualifications.

(c)    The Depositor has the power and authority to execute and deliver this Supplement and to carry out its respective terms; the Depositor has the power and authority to purchase the Transferred Loans and rights relating thereto as provided herein from the Program Lender, and the Depositor has duly authorized such purchase from the Program Lender by all necessary action; and the execution, delivery and performance of this Supplement has been duly authorized by the Depositor by all necessary action on the part of the Depositor.

(d)    This Supplement, together with the Agreements of which this Supplement forms a part, constitutes a legal, valid and binding obligation of the Depositor, enforceable in accordance with its terms.

(e)    The consummation of the transactions contemplated by the Agreements and this Supplement and the fulfillment of the terms hereof do not conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time) a default under, the governing instruments of the Depositor or any indenture, agreement or other instrument to which the Depositor is a party or by which it is bound; or result in the creation or imposition of any lien upon any of its properties pursuant to the terms of any such indenture, agreement or other instrument; or violate any law or any order, rule or regulation applicable to the Depositor of any court or of any federal or state regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Depositor or its properties.

(f)    There are no proceedings or investigations pending, or threatened, before any court, regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Depositor or its properties: (i) asserting the invalidity of the Agreements or this Supplement, (ii) seeking to prevent the consummation of any of the transactions contemplated by the Agreements or this Supplement, or (iii) seeking any determination or ruling that is likely to materially or adversely affect the performance by the Depositor of its obligations under, or the validity or enforceability of the Agreements or this Supplement.

Article 4: Cross Receipt.

The Program Lender hereby acknowledges receipt of the Minimum Purchase Price. The Depositor hereby acknowledges receipt of the Transferred Loans included in the Pool.

Article 5: Assignment of Origination, Guaranty and Servicing Rights.

The Program Lender hereby assigns and sets over to the Depositor any claims it may now or hereafter have under the Guaranty Agreements, the Origination Agreements and the Servicing Agreements to the extent the same relate to the Transferred Loans described in Schedule 2, other than any right to obtain servicing after the date hereof. It is the intent of this provision to vest in the Depositor any claim of the Program Lender relating to defects in origination, guaranty or servicing of the loans purchased hereunder in order to permit the Depositor to assert such claims directly and obviate any need to make the same claims against the Program Lender under this Supplement.

IN WITNESS WHEREOF, the parties have caused this Supplement to be executed as of the date set forth above.

THE FIRST MARBLEHEAD CORPORATION

By:       /s/ John A. Hupalo
Name:     John A. Hupalo
Title:    Executive Vice President

CHARTER ONE BANK, N.A.

By:       /s/ Michael McFarlane
Name:     Michael McFarlane
Title:    Senior Vice President

THE NATIONAL COLLEGIATE FUNDING LLC

By:    GATE Holdings, Inc., Member

       By:       /s/ Donald R. Peck
       Name:     Donald R. Peck
       Title:    Treasurer

## SCHEDULE 1

<u>Note Purchase Agreements</u>

- Note Purchase Agreement dated as of October 31, 2003 by and between FMC and the Program Lender for AES.

- Note Purchase Agreement dated as of May 15, 2002 by and between FMC and the Program Lender for AMS.

- Note Purchase Agreement dated as of July 15, 2003 by and between FMC and the Program Lender for Brazos.

- Note Purchase Agreement dated as of May 15, 2002 by and between FMC and the Program Lender for CFS.

- Note Purchase Agreement dated as of June 30, 2003 by and between FMC and the Program Lender for Citibank.

- Note Purchase Agreement dated as of July 1, 2002 by and between FMC and the Program Lender for CLC.

- Note Purchase Agreement dated as of December 4, 2002 by and between FMC and the Program Lender for Comerica.

- Note Purchase Agreement dated as of May 15, 2002 by and between FMC and the Program Lender for EAS.

- Note Purchase Agreement dated as of May 15, 2003 by and between FMC and the Program Lender for ESF.

- Note Purchase Agreement dated as of September 20, 2003 by and between FMC and the Program Lender for M & I Bank.

- Note Purchase Agreement dated as of November 17, 2003 by and between FMC and the Program Lender for National Education.

- Note Purchase Agreement dated as of May 15, 2003 by and between FMC and the Program Lender for Navy Federal.

- Note Purchase Agreement dated as of May 15, 2002 by and between FMC and the Program Lender for Nextstudent.

- Note Purchase Agreement dated as of September 15, 2003 by and between FMC and the Program Lender for North Texas Higher Education.

| LENDER NAME | MARKETER | LOAN DESC | BSSN |
|---|---|---|---|
| CHARTER ONE BANK | Next Student | DTC - Graduate | XXXXX8533 |

| SEQ | ACTUAL MARGIN | RECON PRIN | RECON INT |
|---|---|---|---|
| 0002 | 0.0475 | $33,519.55 | $502.75 |

EXECUTION COPY

## DEPOSIT AND SALE AGREEMENT
## THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1

This DEPOSIT AND SALE AGREEMENT (the "Sale Agreement"), dated as of March 9, 2006, between The National Collegiate Funding LLC, in its capacity as seller (in such capacity, the "Seller"), and The National Collegiate Student Loan Trust 2006-1, as purchaser (the "Purchaser"), shall be effective upon execution by the parties hereto.

WHEREAS, the Seller is the owner of certain student loans; and

WHEREAS, the Seller desires to sell its interest in such student loans and the Purchaser desires to purchase such loans from the Seller.

NOW, THEREFORE, in connection with the mutual promises contained herein, the parties hereto agree as follows:

## ARTICLE I
### TERMS

This Sale Agreement sets forth the terms under which the Seller is selling and the Purchaser is purchasing the student loans listed on Schedule 2 or 3, as applicable, to each of the Pool Supplements set forth on Schedule A attached hereto (the "Transferred Student Loans").

## ARTICLE II
### DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the definitions set forth in Appendix A of the Indenture dated as of March 1, 2006 between U.S. Bank National Association (the "Indenture Trustee") and the Purchaser.

## ARTICLE III
### SALE AND PURCHASE

Section 3.01.  Sale of Loans.  The Seller hereby sells and the Purchaser hereby purchases the Transferred Student Loans.

Section 3.02.  Assignment of Rights.  The Seller hereby assigns to the Purchaser and the Purchaser hereby accepts all of the Seller's rights and interests under each of the Pool Supplements listed on Schedule A attached hereto and the related Student Loan Purchase Agreements listed on Schedule B attached hereto.

Section 3.03.  Settlement of the Payment.  The Purchaser shall pay the Seller the purchase price set forth in Schedule 1 of each of the Pool Supplements by wire transfer in immediately available funds to the account specified by the Seller.

SSL-DOCS2 70267813v4

Section 3.04.  <u>Assistance by Seller</u>.  Following the execution of this Sale Agreement, the Seller shall provide any reasonable assistance requested by the Purchaser in determining that all required documentation on the Transferred Student Loans is present and correct.

## ARTICLE IV
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER

Section 4.01.  <u>General</u>.  The Seller represents and warrants to the Purchaser that as of the date of this Sale Agreement:

(a)    The Seller is duly organized and existing under the laws of the State of Delaware; and

(b)    The Seller has all requisite power and authority to enter into and to perform the terms of this Sale Agreement.

Section 4.02.  <u>Loan Representations</u>.  The Seller represents and warrants to the Purchaser that with respect to each Transferred Student Loan purchased by the Purchaser pursuant to this Sale Agreement, the Seller is making the same representations and warranties made by the respective program lender with respect to each Transferred Student Loan pursuant to the respective Student Loan Purchase Agreement listed on <u>Schedule B</u> attached hereto.

Section 4.03.  <u>Covenants</u>.  The Seller, in its capacity as purchaser of the Transferred Student Loans pursuant to the Pool Supplements, hereby covenants that it will enforce the covenants and agreements of each program lender in the respective Student Loan Purchase Agreement and related Pool Supplement.  The Seller further covenants that it will not waive, amend, modify, supplement or terminate any Student Loan Purchase Agreement or Pool Supplement or any provision thereof without the consent of the Purchaser, which consent the Purchaser hereby agrees not to provide without the prior written consent of the Indenture Trustee and the Interested Noteholders in accordance with the Purchaser's covenant in Section 3.07(c) of the Indenture.

## ARTICLE V
## PURCHASE OF LOANS; REIMBURSEMENT

Each party to this Sale Agreement shall give notice to the other such parties and to the Servicers, First Marblehead Data Services, Inc. and Wilmington Trust Company (the "<u>Owner Trustee</u>") promptly, in writing, upon the discovery of any breach of the Seller's representations and warranties made pursuant to this Sale Agreement which has a materially adverse effect on the interest of the Purchaser in any Transferred Student Loan.  In the event of such a material breach, the Seller shall cure or repurchase the Transferred Student Loan in accordance with the remedies set forth in the respective Student Loan Purchase Agreement.

## ARTICLE VI
## LIABILITY OF SELLER; INDEMNITIES

The Seller shall be liable in accordance herewith only to the extent of the obligations specifically undertaken by the Seller under this Sale Agreement.

2

SSL-DOCS2 70267813v4

(a)     The Seller shall indemnify, defend and hold harmless the Purchaser and the Owner Trustee in its individual capacity and their officers, directors, employees and agents from and against any taxes that may at any time be asserted against any such Person with respect to the transactions contemplated herein and in the other Basic Documents (except any such income taxes arising out of fees paid to the Owner Trustee), including any sales, gross receipts, general corporation, tangible and intangible personal property, privilege or license taxes and costs and expenses in defending against the same.

(b)     The Seller shall indemnify, defend and hold harmless the Purchaser and the Owner Trustee in its individual capacity and their officers, directors, employees and agents from and against any and all costs, expenses, losses, claims, damages and liabilities arising out of, or imposed upon such Person through, the Seller's willful misfeasance, bad faith or gross negligence in the performance of its duties under this Sale Agreement, or by reason of reckless disregard of its obligations and duties under this Sale Agreement.

Indemnification under this Section shall survive the termination of this Sale Agreement and shall include reasonable fees and expenses of counsel and expenses of litigation.  If the Seller shall have made any indemnity payments pursuant to this Section and the Person to or for the benefit of whom such payments are made thereafter shall collect any of such amounts from others, such Person shall promptly repay such amounts to the Seller, without interest.

### ARTICLE VII
### MERGER OR CONSOLIDATION OF, OR ASSUMPTION
### OF THE OBLIGATIONS OF, SELLER

Any Person (a) into which the Seller may be merged or consolidated, (b) which may result from any merger or consolidation to which the Seller shall be a party or (c) which may succeed to the properties and assets of the Seller substantially as a whole, shall be the successor to the Seller without the execution or filing of any document or any further act by any of the parties to this Sale Agreement; provided, however, that the Seller hereby covenants that it will not consummate any of the foregoing transactions except upon satisfaction of the following: (i) the surviving Person, if other than the Seller, executes an agreement of assumption to perform every obligation of the Seller under this Sale Agreement, (ii) immediately after giving effect to such transaction, no representation or warranty made pursuant to this Sale Agreement shall have been breached, (iii) the surviving Person, if other than the Seller, shall have delivered an Officers' Certificate and an opinion of counsel each stating that such consolidation, merger or succession and such agreement of assumption comply with this Section and that all conditions precedent, if any, provided for in this Sale Agreement relating to such transaction have been complied with, and that the Rating Agency Condition shall have been satisfied with respect to such transaction, (iv) if the Seller is not the surviving entity, such transaction will not result in a material adverse federal or state tax consequence to the Purchaser or the Noteholders, and (v) if the Seller is not the surviving entity, the Seller shall have delivered an opinion of counsel either (A) stating that, in the opinion of such counsel, all financing statements and continuation statements and amendments thereto have been executed and filed that are necessary fully to preserve and protect the interest of the Purchaser in the Transferred Student Loans and reciting the details of such filings, or (B) stating that, in the opinion of such counsel, no such action shall be necessary to preserve and protect such interests.

3

## ARTICLE VIII
### LIMITATION ON LIABILITY OF SELLER AND OTHERS

The Seller and any director or officer or employee or agent thereof may rely in good faith on the advice of counsel or on any document of any kind, prima facie properly executed and submitted by any Person respecting any matters arising hereunder (provided that such reliance shall not limit in any way the Seller's obligations under this Sale Agreement). The Seller shall not be under any obligation to appear in, prosecute or defend any legal action that shall not be incidental to its obligations under this Sale Agreement or the Student Loan Purchase Agreements, and that in its opinion may involve it in any expense or liability.

## ARTICLE IX
### SURVIVAL OF COVENANTS

All covenants, agreements, representations and warranties made herein shall survive the consummation of the purchase of the Transferred Student Loans; provided, however, that to the extent any of the same relate to a corresponding covenant, agreement, representation or warranty contained in a Student Loan Purchase Agreement, the same shall survive to the extent that such corresponding covenant, agreement, representation or warranty survives the applicable Student Loan Purchase Agreement. All covenants, agreements, representations and warranties made or furnished pursuant hereto by or for the benefit of the Seller shall bind and inure to the benefit of any successors or assigns of the Purchaser, **including the Indenture Trustee.** This Sale Agreement may be changed, modified or discharged, and any rights or obligations hereunder may be waived, only by a written instrument signed by a duly authorized officer of the party against whom enforcement of any such waiver, change, modification or discharge is sought. The waiver by the Indenture Trustee, at the direction of the Noteholders pursuant to the Indenture, of any covenant, agreement, representation or warranty required to be made or furnished by the Seller or the waiver by the Indenture Trustee, at the direction of the Noteholders pursuant to the Indenture, of any provision herein contained shall not be deemed to be a waiver of any breach of any other covenant, agreement, representation, warranty or provision herein contained, nor shall any waiver or any custom or practice which may evolve between the parties in the administration of the terms hereof, be construed to lessen the right of the Indenture Trustee, at the direction of the Noteholders pursuant to the Indenture, to insist upon the performance by the Seller in strict accordance with said terms.

## ARTICLE X
### COMMUNICATION AND NOTICE REQUIREMENTS

All communications, notices and approvals provided for hereunder shall be in writing and mailed or delivered to the Seller or the Purchaser, as the case may be. Notice given in any such communication, mailed to the Seller or the Purchaser by appropriately addressed registered mail, shall be deemed to have been given on the day following the date of such mailing and shall be addressed as follows:

SSL-DOCS2 70267813v4

If to the Purchaser, to:

>       The National Collegiate Student Loan Trust 2006-1
>       c/o Wilmington Trust Company, as Owner Trustee
>       Rodney Square North
>       100 North Market Street
>       Wilmington, Delaware 19890-0001
>       Attention:  Corporate Trust Department

If to the Seller, to:

>       The National Collegiate Funding LLC
>       c/o First Marblehead Data Services, Inc.
>       The Prudential Tower
>       800 Boylston Street - 34th Floor
>       Boston, MA 02199-8157
>       Attention:  Ms. Rosalyn Bonaventure

with a copy to:

>       First Marblehead Corporation
>       The Prudential Tower
>       800 Boylston Street - 34th Floor
>       Boston, MA 02199-8157
>       Attention: Corporate Law Department

or to such other address as either party shall have provided to the other parties in writing.  Any notice required to be in writing hereunder shall be deemed given if such notice is mailed by certified mail, postage prepaid, or hand delivered to the address of such party as provided above.

## ARTICLE XI
## AMENDMENT

This Sale Agreement may be amended by the parties hereto without the consent of the Noteholders for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the Sale Agreement or of modifying in any manner the rights of such Noteholders; provided that such action will not, in the opinion of counsel satisfactory to the Indenture Trustee, materially affect the interest of any such Noteholder.

In addition, this Sale Agreement may also be amended from time to time by the Seller and the Purchaser, with the consent of the Noteholders of the Notes evidencing a majority of the Outstanding Amount of the Notes and the consent of the Certificateholders of the Certificates evidencing a majority of the outstanding principal amount of the Certificates, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Sale Agreement or of modifying in any manner the rights of the Noteholders or the Certificateholders, respectively; provided, however, that no such amendment shall (a) increase or reduce in any manner the amount of, or accelerate or delay the time of, collections of payments with respect to Transferred Student Loans or distributions that shall be required to be made for

5

SSL-DOCS2 70267813v4

the benefit of the Noteholders, or (b) reduce the aforesaid percentage of the Outstanding Amount of the Notes or the Certificates, the Noteholders or the Certificateholders of which are required to consent to any such amendment, without the consent of all outstanding Noteholders or Certificateholders, respectively.

Promptly after the execution of any such amendment or consent (or, in the case of the Rating Agencies, five Business Days prior thereto), the Purchaser shall furnish written notification of the substance of such amendment or consent to the Indenture Trustee and each of the Rating Agencies.

It shall not be necessary for the consent of Noteholders pursuant to this Section to approve the particular form of any proposed amendment or consent, but it shall be sufficient if such consent shall approve the substance thereof.

Prior to the execution of any amendment to this Sale Agreement, the Owner Trustee shall be entitled to receive and rely upon an opinion of counsel stating that execution of such amendment is authorized or permitted by this Sale Agreement. The Owner Trustee may, but shall not be obligated to, enter into any such amendment which affects the Owner Trustee's own rights, duties or immunities under this Sale Agreement or otherwise.

### ARTICLE XII
### ASSIGNMENT

The Seller hereby assigns its entire right, title and interest as purchaser under this Sale Agreement and the Student Loan Purchase Agreement thereunder to the Purchaser as of the date hereof and acknowledges that the Purchaser will assign the same, together with the right, title and interest of the Purchaser hereunder, to the Indenture Trustee under the Indenture.

### ARTICLE XIII
### GOVERNING LAW

**THIS SALE AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, BUT OTHERWISE WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.**

### ARTICLE XIV
### LIMITATION OF LIABILITY OF OWNER TRUSTEE

Notwithstanding anything contained herein to the contrary, this instrument has been executed by Wilmington Trust Company, not in its individual capacity but solely in its capacity as Owner Trustee of the Purchaser, and in no event shall Wilmington Trust Company in its individual capacity or any beneficial owner of the Purchaser have any liability for the representations, warranties, covenants, agreements or other obligations of the Purchaser hereunder, as to all of which recourse shall be had solely to the assets of the Purchaser. For all purposes of this Sale Agreement, in the performance of any duties or obligations of the Purchaser

6

hereunder, the Owner Trustee shall be subject to, and entitled to the benefits of, the terms and provisions of Articles VIII, IX and X of the Trust Agreement.

[Signature Pages Follow]

7

SSL-DOCS2 70267813v4

IN WITNESS WHEREOF, the parties hereto have caused this Sale Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

THE NATIONAL COLLEGIATE FUNDING LLC,
as Seller

By: GATE Holdings, Inc., Member


By: _____
Name: Donald R. Peck
Title: Treasurer


THE NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2006-1, as Purchaser

By: Wilmington Trust Company, not in its individual
capacity but solely as Owner Trustee


By: _____
Name:
Title:


[Signature Page to Deposit and Sale Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Sale Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

THE NATIONAL COLLEGIATE FUNDING LLC,
as Seller

By: GATE Holdings, Inc., Member

By: _____
Name: John A. Hupalo
Title:   Vice President

THE NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2006-1, as Purchaser

By: Wilmington Trust Company, not in its individual
capacity but solely as Owner Trustee

By: _____
Name:
Title:        Michele C. Harra
              Financial Services Officer

[Signature Page to Deposit and Sale Agreement]

## SCHEDULE A

### *Pool Supplements*

Each of the following Pool Supplements was entered into by and among The First Marblehead Corporation, The National Collegiate Funding LLC and:

- Bank of America, N.A., dated March 9, 2006, for loans that were originated under Bank of America's BAGEL Loan Program, CEDU Loan Program, Direct to Consumer Loan Program and ISLP Loan Program.
- Bank One, N.A., dated March 9, 2006, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program, EDUCATION ONE Loan Program and M&T REFERRAL Loan Program.
- Charter One Bank, N.A., dated March 9, 2006, for loans that were originated under the following Charter One programs: AAA Southern New England Bank, AES EducationGAIN Loan Program, (AMS) TuitionPay Diploma Loan Program, Brazos Alternative Loan Program, CFS Direct to Consumer Loan Program, Citibank Flexible Education Loan Program, College Loan Corporation Loan Program, Comerica Alternative Loan Program, Custom Educredit Loan Program, Edfinancial Loan Program, Education Assistance Services Loan Program, ESF Alternative Loan Program, Extra Credit II Loan Program (North Texas Higher Education), M&I Alternative Loan Program, National Education Loan Program, Navy Federal Alternative Loan Program, NextStudent Alternative Loan Program, NextStudent Private Consolidation Loan Program, PNC Bank Resource Loan Program, SAF Alternative Loan Program, START Education Loan Program, Southwest Loan Program, WAMU Alternative Student Loan Program, Charter One Referral Loan Program and Axiom Alternative Loan Program.
- Chase Manhattan Bank USA, N.A., dated March 9, 2006, for loans that were originated under Chase's Chase Extra Loan Program.
- Citizens Bank of Rhode Island, dated March 9, 2006, for loans that were originated under Citizens Bank of Rhode Island's Compass Bank Loan Program, DTC Loan Program, Navy Federal Referral Loan Program and Xanthus Loan Program.
- First National Bank Northeast, dated March 9, 2006, for loans that were originated under First National Bank Northeast's CASL Undergraduate Alternative Loan Program.
- HSBC Bank USA, National Association, dated March 9, 2006, for loans that were originated under the HSBC Loan Program.
- The Huntington National Bank, dated March 9, 2006, for loans that were originated under The Huntington National Bank's Huntington Bank Education Loan Program.
- Manufacturers and Traders Trust Company, dated March 9, 2006, for loans that were originated under Manufacturers and Traders Trust Company's M&T Alternative Loan Program.
- PNC Bank, N.A., dated March 9, 2006, for loans that were originated under PNC Bank's PNC Bank Alternative Loan Program.
- Sovereign Bank, dated March 9, 2006, for loans that were originated under Sovereign Bank's Alternative Loan Program.
- SunTrust Bank, dated March 9, 2006, for loans that were originated under SunTrust Bank's SunTrust Alternative Loan Program.

SSL-DOCS2 70267813v4

- TCF National Bank, dated March 9, 2006, for loans that were originated under TCF National Bank's Alternative Loan Program.
- U.S. Bank, N.A., dated March 9, 2006, for loans that were originated under U.S Bank's Alternative Loan Program.

SSL-DOCS2 70267813v4

**SCHEDULE B**

*Student Loan Purchase Agreements*

Each of the following Note Purchase Agreements, as amended or supplemented, was entered into by and between The First Marblehead Corporation and:

- Bank of America, N.A., dated April 30, 2001, for loans that were originated under Bank of America's BAGEL Loan Program, CEDU Loan Program and ISLP Loan Program.
- Bank of America, N.A., dated June 30, 2003, for loans that were originated under Bank of America's Direct to Consumer Loan Program.
- Bank One, N.A., dated May 1, 2002, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program and EDUCATION ONE Loan Program.
- Bank One, N.A., dated July 26, 2002, for loans that were originated under Bank One's M&T REFERRAL Loan Program
- Charter One Bank, N.A., dated as of December 29, 2003 for loans that were originated under Charter One's AAA Southern New England Bank Loan Program.
- Charter One Bank, N.A., dated October 31, 2003, for loans that were originated under Charter One's AES EducationGAIN Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's (AMS) TuitionPay Diploma Loan Program.
- Charter One Bank, N.A., dated July 15, 2003, for loans that were originated under Charter One's Brazos Alternative Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's CFS Direct to Consumer Loan Program.
- Charter One Bank, N.A., dated June 30, 2003, for loans that were originated under Charter One's Citibank Flexible Education Loan Program.
- Charter One Bank, N.A., dated July 1, 2002, for loans that were originated under Charter One's College Loan Corporation Loan Program.
- Charter One Bank, N.A., dated December 4, 2002, for loans that were originated under Charter One's Comerica Alternative Loan Program.
- Charter One Bank, N.A., dated December 1, 2003, for loans that were originated under Charter One's Custom Educredit Loan Program.
- Charter One Bank, N.A., dated May 10, 2004, for loans that were originated under Charter One's Edfinancial Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's Education Assistance Services Loan Program.
- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's ESF Alternative Loan Program.
- Charter One Bank, N.A., dated September 15, 2003, for loans that were originated under Charter One's Extra Credit II Loan Program (North Texas Higher Education).
- Charter One Bank, N.A., dated September 20, 2003, for loans that were originated under Charter One's M&I Alternative Loan Program.
- Charter One Bank, N.A., dated November 17, 2003, for loans that were originated under Charter One's National Education Loan Program.

B-1

- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's Navy Federal Alternative Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's NextStudent Alternative Loan Program.
- Charter One Bank, N.A., dated March 26, 2004, for loans that were originated under Charter One's NextStudent Private Consolidation Loan Program.
- Charter One Bank, N.A., dated March 17, 2003, for loans that were originated under Charter One's PNC Bank Resource Loan Program.
- Charter One Bank, N.A., dated May 1, 2003, for loans that were originated under Charter One's SAF Alternative Loan Program.
- Charter One Bank, N.A., dated September 20, 2002, for loans that were originated under Charter One's Southwest Loan Program.
- Charter One Bank, N.A., dated March 25, 2004, for loans that were originated under Charter One's START Education Loan Program.
- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's WAMU Alternative Student Loan Program.
- Charter One Bank, N.A., dated February 15, 2005, for loans that were originated under Charter One's Referral Loan Program and Axiom Alternative Loan Program.
- Chase Manhattan Bank USA, N.A., dated September 30, 2003, as amended on March 1, 2004, September 8, 2004 and February 25, 2005, for loans that were originated under Chase's Chase Extra Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Compass Bank Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's DTC Alternative Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Navy Federal Referral Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Xanthus Loan Program.
- First National Bank Northeast, dated August 1, 2001, for loans that were originated under First National Bank Northeast's CASL Undergraduate Alternative Loan Program.
- HSBC Bank USA, National Association, dated April 17, 2002, as amended on June 2, 2003 and August 1, 2003, for loans that were originated under the HSBC Loan Program.
- The Huntington National Bank, dated May 20, 2003, for loans that were originated under The Huntington National Bank's Huntington Bank Education Loan Program.
- Manufacturers and Traders Trust Company, dated April 29, 2004, for loans that were originated under Manufacturers and Traders Trust Company's Alternative Loan Program.
- National City Bank, dated November 13, 2002, for loans that were originated under National City Bank's National City Loan Program.
- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's Alternative Conforming Loan Program.
- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Loan Program.
- SunTrust Bank, dated March 1, 2002, for loans that were originated under SunTrust Bank's SunTrust Alternative Loan Program.

B-2

SSL-DOCS2 70267813v4

- TCF National Bank, dated July 22, 2005, for loans that were originated under TCF National Bank's Alternative Loan Program.
- U.S. Bank, N.A., dated May 1, 2005, for loans that were originated under U.S Bank's Alternative Loan Program.

B-3

# Exhibit A-4

Exhibit A-4

# Loan Payment History Report
## Date: 2016-04-14

| | | | |
|---|---|---|---|
| Account Number: | ████3533-002-PHEA | | |
| Social Security Number: | ████3533 | Product: | DFG DIRECT TO CONSUMER GRAD |
| Name: | MATA, JOHN M | Officer Code: | 777061 |
| Birth Date: | 1968-████ | School: | LOMA LINDA UNIVERSITY |
| Address 1: | C/O CLARK MICHAEL E | Program Year: | 200506 |
| Address 2: | 100 N BARRANCA ST STE 250 | | |
| City: | WEST COVINA | Variable Rate Code: | FU QUARTERLY LIBOR |
| State: | CA | Interest Rate: | 10.00% |
| Zip Code: | 91791 | Last Payment Date: | 2012-07-06 |
| Cosigner Name: | MATA, ANITA | | |
| Social Security Number: | ████7992 | | |
| Address 1: | 5489 CAMBRIDGE ST | | |
| Address 2: | | | |
| City: | MONTCLAIR | | |
| State: | CA | | |
| Zip Code: | 91763-2526 | | |
| | | Last Payment Amount: | $118.22 |
| | | Payment Due Date: | |
| Contract Date: | 2006-01-06 | Last Interest Date: | 2016-04-14 |
| Date Assigned: | 2015-08-06 | Accrued Interest: | $1,263.93 |
| Charge Off Date: | 2013-04-01 | Recovered Interest: | $0.00 |
| Charge Off Amount: | $47,380.47 | Net Interest: | $1,263.93 |
| Recovered Principal: | $0.00 | Associated Costs: | $570.00 |
| Net Charge Off: | $53,790.57 | Recovered Costs: | $0.00 |
| Disbursement Date: | 2006-01-06 | Net Costs: | $570.00 |
| Disbursement Amount: | $33,519.55 | | |

## Transaction History

| User | Date | Time | Code | Description | Amount |
|---|---|---|---|---|---|
| System | 2013-04-09 | 00:01 | 82 | $48,948.26 @ 4.960 / 04/05/2013 - 04/09/2013 | $53.22 |
| System | 2013-04-30 | 00:01 | 82 | $48,948.26 @ 4.950 / 04/09/2013 - 04/30/2013 | $139.40 |
| System | 2013-05-31 | 00:01 | 82 | $48,948.26 @ 4.950 / 04/30/2013 - 05/31/2013 | $205.78 |
| System | 2013-06-30 | 00:01 | 82 | $48,948.26 @ 4.950 / 05/31/2013 - 06/30/2013 | $199.15 |
| System | 2013-07-31 | 00:01 | 82 | $48,948.26 @ 4.950 / 06/30/2013 - 07/31/2013 | $205.78 |
| System | 2013-08-31 | 00:01 | 82 | $48,948.26 @ 4.950 / 07/31/2013 - 08/31/2013 | $205.78 |
| System | 2013-09-30 | 00:01 | 82 | $48,948.26 @ 4.950 / 08/31/2013 - 09/30/2013 | $199.15 |
| System | 2013-10-03 | 00:01 | 82 | $48,948.26 @ 4.950 / 09/30/2013 - 10/03/2013 | $19.91 |
| System | 2013-10-09 | 00:01 | 82 | $48,948.26 @ 4.950 / 10/03/2013 - 10/09/2013 | $39.83 |

| System | 2013-10-31 | 00:01 | 82 | $48,948.26 @ 4.940 / 10/09/2013 - 10/31/2013 | $145.75 |
|---|---|---|---|---|---|
| System | 2013-11-30 | 00:01 | 82 | $48,948.26 @ 4.940 / 10/31/2013 - 11/30/2013 | $198.74 |
| System | 2013-12-31 | 00:01 | 82 | $48,948.26 @ 4.940 / 11/30/2013 - 12/31/2013 | $205.37 |
| System | 2014-01-06 | 00:01 | 82 | $48,948.26 @ 4.940 / 12/31/2013 - 01/06/2014 | $39.74 |
| System | 2014-01-31 | 00:01 | 82 | $48,948.26 @ 4.920 / 01/06/2014 - 01/31/2014 | $164.95 |
| System | 2014-02-28 | 00:01 | 82 | $48,948.26 @ 4.920 / 01/31/2014 - 02/28/2014 | $184.74 |
| System | 2014-04-03 | 00:01 | 82 | $48,948.26 @ 4.920 / 02/28/2014 - 04/03/2014 | $224.33 |
| System | 2014-04-14 | 00:00 | 44 | Interest Adjustment | $-704.55 |
| System | 2014-04-14 | 00:01 | 82 | $48,948.26 @ 4.910 / 04/03/2014 - 04/14/2014 | $72.43 |
| System | 2014-05-05 | 00:01 | 82 | $48,948.26 @ 0.000 / 04/14/2014 - 05/05/2014 | $0.00 |
| System | 2014-05-07 | 00:01 | 82 | $48,948.26 @ 0.000 / 05/05/2014 - 05/07/2014 | $0.00 |
| System | 2014-05-21 | 00:01 | 82 | $48,948.26 @ 4.910 / 05/07/2014 - 05/21/2014 | $92.18 |
| System | 2014-07-03 | 00:01 | 82 | $48,948.26 @ 4.910 / 05/21/2014 - 07/03/2014 | $283.14 |
| System | 2014-07-31 | 00:01 | 82 | $48,948.26 @ 4.900 / 07/03/2014 - 07/31/2014 | $183.99 |
| System | 2014-08-01 | 00:01 | 82 | $48,948.26 @ 4.900 / 07/31/2014 - 08/01/2014 | $6.57 |
| System | 2014-08-31 | 00:01 | 82 | $48,948.26 @ 4.905 / 08/01/2014 - 08/31/2014 | $197.34 |
| System | 2014-09-02 | 00:01 | 82 | $48,948.26 @ 4.905 / 08/31/2014 - 09/02/2014 | $13.16 |
| System | 2014-09-30 | 00:01 | 82 | $48,948.26 @ 4.900 / 09/02/2014 - 09/30/2014 | $183.99 |
| System | 2014-10-31 | 00:01 | 82 | $48,948.26 @ 4.900 / 09/30/2014 - 10/31/2014 | $203.71 |
| System | 2014-11-04 | 00:01 | 82 | $48,948.26 @ 4.900 / 10/31/2014 - 11/04/2014 | $26.28 |
| System | 2014-11-05 | 00:01 | 82 | $48,948.26 @ 4.910 / 11/04/2014 - 11/05/2014 | $6.58 |
| System | 2014-11-30 | 00:01 | 82 | $48,948.26 @ 4.910 / 11/05/2014 - 11/30/2014 | $164.61 |
| System | 2014-12-31 | 00:01 | 82 | $48,948.26 @ 4.910 / 11/30/2014 - 12/31/2014 | $204.12 |
| System | 2015-01-31 | 00:01 | 82 | $48,948.26 @ 4.910 / 12/31/2014 - 01/31/2015 | $204.12 |
| System | 2015-02-28 | 00:01 | 82 | $48,948.26 @ 4.910 / 01/31/2015 - 02/28/2015 | $184.37 |
| System | 2015-03-31 | 00:01 | 82 | $48,948.26 @ 4.910 / 02/28/2015 - 03/31/2015 | $204.12 |
| System | 2015-04-02 | 00:01 | 82 | $48,948.26 @ 4.910 / 03/31/2015 - 04/02/2015 | $13.17 |
| System | 2015-04-30 | 00:01 | 82 | $48,948.26 @ 4.920 / 04/02/2015 - 04/30/2015 | $184.74 |
| System | 2015-05-31 | 00:01 | 82 | $48,948.26 @ 4.920 / 04/30/2015 - 05/31/2015 | $204.54 |
| System | 2015-06-30 | 00:01 | 82 | $48,948.26 @ 4.920 / 05/31/2015 - 06/30/2015 | $197.94 |
| System | 2015-07-01 | 00:01 | 82 | $48,948.26 @ 4.920 / 06/30/2015 - 07/01/2015 | $6.60 |
| System | 2015-07-31 | 00:01 | 82 | $48,948.26 @ 4.930 / 07/01/2015 - 07/31/2015 | $198.34 |
| System | 2015-08-06 | 00:01 | 82 | $48,948.26 @ 4.930 / 07/31/2015 - 08/06/2015 | $39.67 |
| System | 2015-08-31 | 00:01 | 82 | $48,948.26 @ 4.930 / 08/06/2015 - 08/31/2015 | $165.28 |
| System | 2015-09-30 | 00:01 | 82 | $48,948.26 @ 4.930 / 08/31/2015 - 09/30/2015 | $198.34 |
| System | 2015-10-01 | 00:01 | 82 | $48,948.26 @ 4.930 / 09/30/2015 - 10/01/2015 | $6.61 |
| System | 2015-10-14 | 00:00 | 34 | Advn'd by Agency | $435.00 |
| System | 2015-10-14 | 00:01 | 82 | $48,948.26 @ 4.940 / 10/01/2015 - 10/14/2015 | $86.12 |
| System | 2015-11-04 | 00:01 | 82 | $48,948.26 @ 4.940 / 10/14/2015 - 11/04/2015 | $139.12 |
| System | 2015-11-24 | 00:00 | 34 | Advn'd by Agency | $135.00 |
| System | 2015-11-24 | 00:01 | 82 | $48,948.26 @ 4.940 / 11/04/2015 - 11/24/2015 | $132.50 |
| System | 2015-12-31 | 00:01 | 82 | $48,948.26 @ 4.940 / 11/24/2015 - 12/31/2015 | $245.12 |
| System | 2016-01-01 | 00:01 | 82 | $48,948.26 @ 4.940 / 12/31/2015 - 01/01/2016 | $6.61 |
| System | 2016-01-27 | 00:00 | 43 | Principal Adjustment | $4,842.31 |
| System | 2016-01-27 | 00:00 | 44 | Interest Adjustment | $-5,815.39 |
| System | 2016-01-27 | 00:01 | 82 | $48,948.26 @ 4.960 / 01/01/2016 - 01/27/2016 | $172.47 |
| System | 2016-04-14 | 00:01 | 82 | $53,790.57 @ 10.000 / 01/27/2016 - 04/14/2016 | $1,146.36 |

# Exhibit A-5

Exhibit A-5

From: 9099411445     Page: 2/5     Date: 9/26/2006 7:43:29 PM

## Co-Signed* Loan Request/Credit Agreement - Signature Page

### NON-NEGOTIABLE CREDIT AGREEMENT – THIS IS A CONSUMER CREDIT TRANSACTION

#### LOAN PROGRAM INFORMATION

Astrive Graduate Loan                                              Academic Period: 08/2006-06/2007

Lender: Charter One Bank, N.A.          School: LOMA LINDA UNIVERSITY

Loan Amount Requested: $30000.00        Repayment Option: Full Deferral

Deferral Period Margin: 5.75            Repayment Period Margin: 5.75     Loan Origination Fee Percentage: 8.50

#### STUDENT BORROWER INFORMATION (Must be at least 18 years of age)

Borrower Name: John M Mata Jr              Home Address: 5489 Cambridge St Montclair, CA 91763
Social Security #: ■■■■-8533               Date of Birth: ■■/1968       Home Telephone: (909) 983-8045
Student Citizenship (check one box): ☒ U.S. Citizen   ☐ Eligible Non-Citizen (Attach front & back copy of CIS or student visa card)
Note: Personal reference name and address cannot match that of the Cosigner.
Personal Reference Name: Angelica Villalpando              Reference Home Tel #: (909) 935-5272        Work Tel #: (909) 621-9743
Reference Street Address: 13243 Sixteenth St
Reference City/State/Zip: Chino, CA 91710

#### COSIGNER INFORMATION (Must be at least 18 years of age)

Cosigner Name: Anita Mata                  Home Address: 5489 Cambridge St Montclair, CA 91763
Social Security #: ■■■■-7992               Date of Birth: ■■/1942       Home Telephone: (909) 983-8045
Have you ever defaulted on a student loan or declared bankruptcy?   ☒ No   ☐ Yes
Current Employer: DAVITA HEALTH CARE                                          Employer Telephone: (909) 946-3802
Current Position: Professional             Years There: 16 Years 7 Months
Years at Previous Employment: 0 Years

Alimony, child support, or separate maintenance incomes do not have to be revealed if you do not want them considered for repaying this obligation. If you are relying on such additional income, please provide details on a separate sheet of paper.

Cosigner Citizenship (check one box): ☒ U.S. Citizen   ☐ Eligible Non-Citizen (Attach front & back copy of CIS)
Note: Personal reference name and address cannot match that of the Student.
Personal Reference Name: Larry Pitcher              Reference Home Tel #: (909) 985-6776        Work Tel #: (909) 506-0086
Reference Street Address: 1311 W 5th St
Reference City/State/Zip: Ontario, CA 91762

By my signature, I certify that I have read, understand and agree to the terms of and undertake the obligations set forth on all five (5) pages of this Loan Request/Credit Agreement AB.06-07.CSX1.10DC.0206 ("Credit Agreement"). I understand that any person who knowingly makes a false statement or misrepresentation on this form is subject to penalties, which may include fines or imprisonment. This Credit Agreement is signed under seal. I understand that I am not required to fax my signature on or to sign electronically this Credit Agreement and any related notices that require signature. If I choose to fax my signature on or to sign electronically this Credit Agreement and any related notices that require signature, I intend: (i) my fax or electronic signature to be an electronic signature under applicable federal and state law, (ii) any fax printout or printout of Lender's electronic record of this Credit Agreement and related notices to be an original document, (iii) to conduct business with the Lender by electronic records and electronic signatures, and (iv) that this Credit Agreement will not be governed by Article 3 of the Uniform Commercial Code, and my obligations under this Credit Agreement will not be subject to, but any transfer of my obligations will be subject to, Article 9 of the Uniform Commercial Code.

**For purposes of the following notices, "you" means the Borrower and Cosigner, not the Lender.**

FOR ALABAMA RESIDENTS: CAUTION – IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.

FOR WISCONSIN RESIDENTS - NOTICE TO CUSTOMER: (a) DO NOT SIGN THIS CREDIT AGREEMENT BEFORE YOU READ THE WRITING ON THE FOLLOWING PAGES, EVEN IF OTHERWISE ADVISED.
(b) DO NOT SIGN THIS CREDIT AGREEMENT IF IT CONTAINS ANY BLANK SPACES.
(c) YOU ARE ENTITLED TO AN EXACT COPY OF ANY AGREEMENT YOU SIGN.
(d) YOU HAVE THE RIGHT AT ANY TIME TO PAY IN ADVANCE THE UNPAID BALANCE UNDER THIS CREDIT AGREEMENT AND YOU MAY BE ENTITLED TO A PARTIAL REFUND OF THE FINANCE CHARGE.

#### PLEASE SIGN BELOW – RETURN ENTIRE PAGE WITH PROOF OF Income and Other Information (if applicable) – FAX TO: 800-704-9406

Signature of Borrower  *John M Mata*                                        Date  9/26/06

BY SIGNING THIS CREDIT AGREEMENT BELOW, I CERTIFY THAT I INTEND TO (i) APPLY FOR JOINT CREDIT AND (ii) BE JOINTLY LIABLE WITH THE BORROWER FOR THIS LOAN.

Signature of Cosigner  *Anita Mata*                                        Date  9/26/06

AB.06-07.CSX1.10DC.0206                    LENDER COPY
PN01_RF_06-07_CSX1_F_X_MATA JR_A104360539.pdf                         AVJGDF

In this Credit Agreement, the words "I", "me", "my", and "mine" mean the person(s) who signed this Credit Agreement as Borrower and Cosigner. The words "you", "your", "yours", and "Lender" mean RBS Citizens, National Association (doing business as Charter One Bank, N.A.), its successors and assigns, and any other holder of this Credit Agreement. "School" means the school named at the top of the first page of this Credit Agreement. The "servicer" means the Lender or any entity it designates to service my loan.

**A. PROMISE TO PAY:** I promise to pay to you the principal sum of the Loan Amount Requested shown on the first page of this Credit Agreement, to the extent it is advanced to me or paid on my behalf, and any Loan Origination Fee added to my loan (see Paragraph F) (together, the "Principal Sum"), interest on such Principal Sum, interest on any unpaid interest added to the Principal Sum and late fees (see Paragraph E.6).

**B. IMPORTANT – READ THIS CAREFULLY:**
1. When you receive my signed Credit Agreement, you are not agreeing to lend me money. If you decide to make a loan to me, you will electronically transfer the loan funds to the School for me, mail a loan check to the School for me, or mail a loan check directly to me. You have the right to not make a loan or to lend an amount less than the Loan Amount Requested. I agree to accept an amount less than the Loan Amount Requested and to repay that portion of the Loan Amount Requested that you actually lend to me along with interest and all other amounts I owe (see Paragraph A). You have the right to disburse my loan through an agent. At your option, you may also make any loan check co-payable to me and the Cosigner or to me and the School.
2. **HOW I AGREE TO THE TERMS OF THIS LOAN.** By signing this Credit Agreement, and submitting it to the Lender, I am requesting that you make this loan to me in an amount equal to the Loan Amount Requested plus any Loan Origination Fee described in Paragraph F of this Credit Agreement. If you approve this request and agree to make this loan, you will notify me in writing and provide me with a Disclosure Statement, as required by law, at the time the loan proceeds are disbursed. The Disclosure Statement is incorporated herein by reference and made a part hereof. The Disclosure Statement will tell me the amount of the loan which you have approved, the amount of the Loan Origination Fee, and other important information. I will let you know that I agree to the terms of the loan as set forth in this Credit Agreement and in the Disclosure Statement by doing either of the following: (a) endorsing or depositing the check that disburses the loan proceeds; or (b) allowing the loan proceeds to be used by or on behalf of the student Borrower without objection. Upon receipt of the Disclosure Statement, I will review the Disclosure Statement and notify you in writing if I have any questions. If I am not satisfied with the terms of my loan as disclosed in the Disclosure Statement, I may cancel my loan. To cancel my loan, I will give you a written cancellation notice within ten (10) days after I receive the Disclosure Statement. If loan proceeds have been disbursed, I agree that I will immediately return the loan proceeds to you, will not endorse any check which disburses the loan proceeds and will instruct the School to return any loan proceeds to you. If I give notice of cancellation but do not comply with the requirements of this Paragraph B.2, this Credit Agreement will not be canceled and I will be in default of this Credit Agreement. (See Paragraph I.)

**C. DEFINITIONS:**
1. "Disbursement Date" means the date or dates on which you lend money to me in consideration for my Credit Agreement and will be the date(s) shown on any loan check you prepare or the date(s) you initiate any electronic funds transfer.
2. The "Deferment Period" will begin on the Disbursement Date and end on the Deferment End Date.
3. "Deferment End Date" means the date specified below for the applicable loan program (the applicable loan program is stated on the first page of this Credit Agreement).
(a) *Undergraduate Alternative Loan Program:* If I have elected the "Immediate Repayment" option (the applicable repayment option is stated on the first page of this Credit Agreement), there is no Deferment Period, and my first payment will be 30-60 days after the disbursement of my loan. If I have elected the "Interest Only" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), then interest payments will begin 30-60 days after the disbursement of my loan, the "Deferment End Date" will be the date the student Borrower first graduates or ceases to be enrolled at least half-time in the School (or another school participating in this loan program), and principal and interest payments will begin 30-60 days after that date. In any event, if I have elected the "Interest Only" repayment option, the Deferment End Date will be no more than 5 years after the Disbursement Date. If I have elected the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), then the "Deferment End Date" will be 180 days after the date the student Borrower first graduates or ceases to be enrolled at least half-time in the School (or another school participating in this Loan Program). In any event, if I have elected the "Full Deferral" repayment option, the Deferment End Date will be no more than 5½ years after the Disbursement Date. For borrowers who chose the "Interest Only" or "Full Deferral" repayment options, joint and serial (associates to bachelors) degree recipients may continue in-school deferment while completing their second degree, up to the 5-year or 5 ½- year maximum.
(b) *Graduate Professional Education Loan Program:* The Deferment End Date will be 180 days after the student Borrower graduates or ceases for any other reason to be enrolled at least half-time in the School (or another school participating in this Loan

Program), but no more than 4½ years after the Disbursement Date; provided, however, that if the student Borrower begins a medical residency or internship during the Deferment Period, then the Deferment Period will end 180 days after the day the residency or internship ends, but no more than 8½ years after the Disbursement Date.
4. The "Repayment Period" begins the day after the Deferment End Date. If there is no Deferment Period for my loan, the Repayment Period will begin when my loan is fully disbursed. The Repayment Period is 20 years unless monthly payments equal to the minimum monthly payment amount (See Paragraph E.2) will repay all amounts owed in less than 20 years, in which case the Repayment Period will be the number of months necessary to pay in full the amount I owe at the minimum payment.

**D. INTEREST:**
1. Accrual – Beginning on the Disbursement Date, interest will be calculated at the Variable Rate (Paragraph D.2) and charged on the Principal Sum, and on any unpaid interest later added to the Principal Sum according to Paragraph D.3. During the Repayment Period, interest will be calculated at the Variable Rate and charged on the outstanding balance of this Credit Agreement until all amounts are paid in full. Interest will be calculated on a daily simple interest basis. The daily interest rate will be equal to the annual interest rate in effect on that day, divided by the number of days in that calendar year.
2. Variable Rate – The "Variable Rate" is equal to the Current Index plus a Margin. The Margins for both the Deferment Period and the Repayment Period are shown on the first page of this Credit Agreement. In no event will the Variable Rate exceed the maximum interest rate allowed by the laws of the State of Rhode Island. The Variable Rate will change monthly on the first day of each calendar month (the "Change Date(s)") if the Current Index changes. The "Current Index" for any calendar month (or for any shorter period beginning on the Disbursement Date and ending on the last day of a calendar month) is based on the one-month London Interbank Offered Rate ("LIBOR") as published in the "Money Rates" section of *The Wall Street Journal* (Eastern Edition). The index for each calendar month (or for any shorter period beginning on a Disbursement Date and ending on the last day of a calendar month) will equal the LIBOR rate published on the first business day of the immediately preceding calendar month, rounded to the nearest one-hundredth of one percent (0.01%). If *The Wall Street Journal* (Eastern Edition) is not published or the Current Index is not given on that date, then the Current Index will be determined by using the immediately preceding published Current Index. If the Current Index is no longer available, you will choose a comparable index.
3. Capitalization – If I have elected the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), I am not obligated to make any payments until the loan enters the Repayment Period and you will add unpaid accrued interest to the principal loan balance as of the last day of each calendar quarter (the last day of December, March, June and September) during the Deferment Period and as of the last day of my Deferment Period. Interest that is added to principal is called "Capitalized" interest. Capitalized interest will be treated as principal. In addition, if I am in default (see Paragraph I) and the loan has been sold to TERI (see Paragraph L.12), TERI may capitalize accrued and unpaid interest as of the date it purchases my loan. I understand that you will also add all accrued and unpaid interest to the principal balance of my loan at the end of any forbearance period (see Paragraph H). In all cases, the sum of interest you capitalize plus the then-outstanding principal balance is thereafter considered the principal balance, and interest will accrue on the new principal balance.

**E. TERMS OF REPAYMENT:**
1. Deferment Period – If I have elected either the "Interest Only" repayment option or the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), you will send statements during the Deferment Period (showing the total outstanding principal balance of my loan and the interest that has accrued on my loan). You reserve the right to send statements or notices to either the Borrower or the Cosigner. Statements will be sent to me at the address shown on your records. If I have elected the "Interest Only" repayment option, I agree to make payments each month during the Deferment Period equal to the accrued interest on the outstanding balance of this Credit Agreement. If I have elected the "Full Deferral" repayment option I may, but am not required to make payments during the Deferment Period. You will add any interest that I do not pay during the Deferment Period to the principal balance, as described in Paragraph D.3.
2. Repayment Period – The amount of my monthly payment ("Monthly Payment Amount") will be established based on the rules in this Credit Agreement when my Repayment Period begins. During the Repayment Period, you will send me monthly statements that show the Monthly Payment Amount and the payment due dates, and I will pay the Monthly Payment Amount shown on my monthly statement, which amount will in no event be less than $25 or the unpaid balance, whichever is less. I understand that the Monthly Payment Amount is due each month. I may pay more than my Monthly Payment Amount at any time without penalty or charge. If my loan is in paid-ahead status, I may, but will not be required to make monthly payments. You reserve the right to send monthly statements to the Borrower and/or the Cosigner. Even if I do not receive monthly statements, I will make consecutive monthly payments in amounts at least equal to the Monthly Payment Amount by the applicable payment due dates until I have paid all of the principal and interest and any other charges I may owe under this Credit Agreement.
3. Repayment Terms - My Monthly Payment Amount will be calculated as of the day the Repayment Period begins ("Repayment Date"). It will be recalculated (a) once

each year prior to the anniversary of the Repayment Date, (b) if the Variable Rate changes between anniversaries of the Repayment Date to the extent that the Monthly Payment Amount would not pay in full the accrued monthly interest on my loan, (c) following any subsequent deferment or forbearance period or (d) following any request by the Borrower to the servicer to change the monthly payment due date (each of which events is a new "Repayment Date"). As of any Repayment Date, my Monthly Payment Amount will be recalculated. My new Monthly Payment Amount will be disclosed to me by the servicer. The new Monthly Payment Amount will equal the amount necessary to pay in full, over the number of months remaining in the Repayment Period, the amount I owe in equal monthly installments of principal and interest at the Variable Rate in effect at the time of the calculation. I understand that this may result in a reduction or increase in my monthly payment as calculated as of each Repayment Date. I understand that during the Repayment Period (and, if I have elected the "Interest Only" repayment option, during the period of interest payments) the servicer may change the monthly payment due date of future payments to a later date for the convenience of the servicer in processing payments or in order to coordinate the due dates of all of my loans processed by the servicer.

4. Amounts Owing at the End of the Repayment Period – Since interest accrues daily upon the unpaid principal balance of my loan, if I make payments after my payment due dates, I may owe additional interest. If I have not paid my late fees, I will also owe additional amounts for those late fees. In such cases you will increase the amount of my last monthly payment to the amount necessary to repay my loan in full.

5. Payments – Payments will be applied first to late fees, other fees and charges, accrued interest, and the remainder to principal.

6. Other Charges - If any part of a monthly payment remains unpaid for a period of more than 15 days after the payment due date, I will pay a late fee not exceeding $5.00 or 5% of the overdue payment amount, whichever is less. To the extent permitted by law, I agree to pay you all amounts you incur in enforcing the terms of this Credit Agreement, including reasonable collection agency and attorneys' fees and court costs and other collection costs.

**F. LOAN ORIGINATION FEE:** If you charge me, I will pay you a Loan Origination Fee at the time my loan is disbursed. The dollar amount of any Loan Origination Fee will be determined by multiplying the Principal Sum times the Loan Origination Fee Percentage shown on the first page of this Credit Agreement. The percentage would be higher if computed only on the amount advanced rather than on the entire Principal Sum (Loan Origination Fee plus the loan amount advanced). For example, a nominal Loan Origination Fee of 6.5% on the entire principal amount would equal 6.9519% of the amount advanced. The Loan Origination Fee I will pay, if any, will be shown on my Disclosure Statement and included with the Principal Sum. To the extent permitted by law, and unless I timely cancel this Credit Agreement (see Paragraph B.2), I will not be entitled to a refund of any Loan Origination Fee after my loan has been disbursed.

**G. RIGHT TO PREPAY:** I have the right to prepay all or any part of my loan at any time without penalty.

**H. FORBEARANCE:** If I am unable to repay my loan in accordance with the terms established under this Credit Agreement because of a hardship such as financial or medical difficulty, I may request that you modify these terms. I understand that such modification would be at your option, and, to the extent not prohibited by applicable law, you may charge me a fee equal to two percent 2% of the outstanding principal balance if you agree to modify the terms of this Credit Agreement. I understand that I will remain responsible for all interest accruing during any period of forbearance and that you will add any 2% fee described in the previous sentence and all interest that I do not pay during any forbearance period to the principal balance, as described in Paragraph D.3.

**I. WHOLE LOAN DUE:** To the extent permitted by applicable law, I will be in default and you have the right to give me notice that the whole outstanding principal balance, accrued interest, and all other amounts payable to you under the terms of this Credit Agreement, are due and payable at once (subject to any applicable law which may give me a right to cure my default) if: (1) I fail to make any monthly payment to you when due, (2) I die, (3) I break any of my other promises in this Credit Agreement, (4) any bankruptcy proceeding is begun by or against me, or I assign any of my assets for the benefit of my creditors, or (5) I make any false written statement in applying for this loan or any other loan or at any time during the Deferment or Repayment Periods. If I default, I will be required to pay interest on this loan accruing after default. The interest rate after default will be subject to adjustment in the same manner as before default. Upon default, you may also capitalize any interest and fees (i.e., add accrued and unpaid interest and fees to the principal balance), and increase the Margin used to compute the Variable Rate by two percentage points (2%).

**J. NOTICES:**
1. I will send written notice to you, any subsequent holder of this Credit Agreement, and the servicer within ten days after any change in name, address, or enrollment status (for example, if the Borrower withdraws from the School or transfers to another school participating in this loan program).
2. Any notice required to be given to me by you will be effective when mailed by first class mail to the latest address you have for me. Unless required by applicable law, you need not give a separate notice to the Cosigner, if any.

**K. INFORMATION:**
1. I must update the information I provided to you whenever you ask me to do so.
2. I authorize you from time to time to request and receive from others credit related information about me (and about my spouse if I live in a community property state).

> **You may report information about my account to credit bureaus. Late payments, missed payments, or other defaults in my account may be reflected in my credit report.**

I understand that the reporting of information about my account to credit bureaus may adversely affect my credit rating and my ability to obtain other credit. You may also provide the School with certain personally-identifiable information about me (such as my Social Security Number and my Loan ID number) and report the status of my loan and my payment history, including information about a late payment, missed payment or other defaults, to the School and others in accordance with applicable law.

**L. ADDITIONAL AGREEMENTS:**
1. I understand that you are located in Rhode Island and that this Credit Agreement will be entered into in the same state. CONSEQUENTLY, THE PROVISIONS OF THIS CREDIT AGREEMENT WILL BE GOVERNED BY FEDERAL LAW AND THE LAWS OF THE STATE OF RHODE ISLAND, WITHOUT REGARD TO CONFLICT OF LAW RULES.
2. The proceeds of this loan will be used only for my educational expenses at the School. The Cosigner, if any, will not receive any of the loan proceeds.
3. My responsibility for paying the loan evidenced by this Credit Agreement is unaffected by the liability of any other person to me or by your failure to notify me that a required payment has not been made. Without losing any of your rights under this Credit Agreement you may accept (a) late payments, (b) partial payments or (c) payments marked "paid in full" or with other restrictions. You may delay, fail to exercise, or waive any of your rights on any occasion without losing your entitlement to exercise the right at any future time, or on any future occasion. You will not be obligated to make any demand upon me, send me any notice, present this Credit Agreement to me for payment or make protest of non-payment to me before suing to collect on this Credit Agreement if I am in default, and to the extent permitted by applicable law, I hereby waive any right I might otherwise have to require such actions. I WILL NOT SEND YOU PAYMENTS MARKED "PAID IN FULL", "WITHOUT RECOURSE" OR WITH OTHER SIMILAR LANGUAGE UNLESS THOSE PAYMENTS ARE MARKED FOR SPECIAL HANDLING AND SENT TO THE ADDRESS IDENTIFIED FOR SUCH PAYMENTS ON MY BILLING STATEMENT, OR TO SUCH OTHER ADDRESS AS I MAY BE GIVEN IN THE FUTURE.
4. I may not assign this Credit Agreement or any of its benefits or obligations. You may assign this Credit Agreement at any time.
5. The terms and conditions set forth in this Credit Agreement and the Disclosure Statement constitute the entire agreement between you and me.
6. If any provision of this Credit Agreement is held invalid or unenforceable, that provision shall be considered omitted from this Credit Agreement without affecting the validity or enforceability of the remainder of this Credit Agreement.
7. A provision of this Credit Agreement may only be modified if jointly agreed upon in writing by you and me. Any modification will not affect the validity or enforceability of the remainder of this Credit Agreement.
8. To the extent permitted by law, you have the right to apply money from any of my deposit account(s) with you to pay all or a portion of any amount overdue under this Credit Agreement. I hereby authorize you to obtain from the School all amounts which may be owed to me by the School, including any refund due to overpayment, early termination of enrollment, or otherwise.
9. If this Credit Agreement is executed by more than one Borrower, each Borrower agrees that any communication between you and any of the Borrowers will be binding on all of the Borrowers. I intend to be treated as a principal of this Credit Agreement and not as a surety. To the extent I may be treated as a surety, I waive all notices to which I might otherwise be entitled as such by law, and all suretyship defenses that might be available to me (including, without limitation, contribution, subrogation and exoneration). I agree that the Borrower may agree to any forbearance or other modification of the repayment schedule and that such agreement will be binding on me. It shall not be necessary for you to resort to or exhaust your remedies against the borrower before calling upon me to make repayment. For purposes of this paragraph only, "I" and "me" refer to the Cosigner only.
10. All dollar amounts stated in this Credit Agreement are in United States dollars. I will make all payments in United States Dollars with no deduction for currency exchange.
11. If the student Borrower fails to complete the education program paid for with this loan, the Cosigner and I are not relieved of any obligation within or pursuant to this Credit Agreement.
12. I understand and agree that this loan is an education loan and certify that it will be used only for costs of attendance at the School. I acknowledge that the requested loan is subject to the limitations on dischargeability in bankruptcy contained in Section 523 (a) (8) of the United States Bankruptcy Code because either or both of the following apply: (a) this loan was made pursuant to a program funded in whole or in part by The Education Resources Institute, Inc. ("TERI"), a non-profit institution, or (b) this is a qualified education loan as defined in the Internal Revenue Code. This means that if, in the event of bankruptcy, my other debts are discharged, I will probably still have to pay this loan in full.

13. I authorize any school that I may attend to release to you, and any other persons designated by you, any requested information pertinent to this loan (e.g., enrollment status, prior loan history, and current address).

14. I authorize the Lender, any subsequent holder of this Credit Agreement, and their agents to: (1) advise the School of the status of my application and my loan, (2) respond to inquiries from prior or subsequent lenders or holders with respect to my Credit Agreement and related documents, (3) release information and make inquiries to the persons I have given you as references, for the purposes of learning my current address and telephone number, (4) check my credit and employment history and to answer questions about their credit experience with me, and (5) disclose to TERI, the Borrower, and/or the Cosigner either in connection with this transaction or any future transaction all information (including status information and non-public personal information) of the Borrower and/or the Cosigner provided in connection with this Credit Agreement. If in the future I apply for a loan that is guaranteed by TERI and funded by another lender, I also authorize the sharing of application information for this loan (other than information in a consumer report) with the other lender and TERI and the reuse of such information by such new lender and TERI in my new application.

15. Waiver by Lender: You waive (give up) any right to claim a security interest in any property to secure this Credit Agreement. This does not affect any right to offset as a matter of law.

16. If I sign my signature(s) on the first page of this Credit Agreement back to you and keep the copy I signed, I understand that under federal law the fax you receive will be an original of the first page of this Credit Agreement. You and I agree that all copies of this Credit Agreement (including the fax you receive and the copy I retain), taken together, shall constitute a single original agreement.

17. If any Borrower or Cosigner elects to sign electronically an electronic record of this Credit Agreement, then the following will apply as between Lender and such person: (a) Lender will keep a non-modifiable electronic record of this document and provide a copy to me upon request, (b) I can and have downloaded and/or printed a copy of this document for my records or notified the Lender to mail me a copy of this document, and (c) the Lender's electronic record of this document and any printout from that record shall be an original for all purposes, including any lawsuit to collect amounts that I owe. If I physically sign a copy of this document that has been electronically signed by any other Cosigner or Borrower, as between me and the Lender the copy I sign (and any fax of that copy I may send to Lender) will be an original. However, the electronic signature of another party to this Credit Agreement and the Lender's electronic record of this document containing that signature will be as valid against me as an original, physical document that is physically signed by all parties.

M. DISCLOSURE NOTICES

---

**ALL APPLICANTS:**
**IMPORTANT FEDERAL LAW NOTICE—**

*Important information about procedures for opening a new account:*
To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.

*What this means for you:*
When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

---

CALIFORNIA RESIDENTS: I have the right to prohibit the use of information contained in my credit file in connection with transactions not initiated by me. I may exercise this right by notifying the consumer credit reporting agency. A married applicant may apply for a separate account. If you take any adverse action as defined by the California Civil Code and the adverse action is based, in whole or in part, on any information contained in a consumer credit report, I have the right to obtain within 60 days a free copy of my consumer credit report from the consumer reporting agency who furnished my consumer credit report and from any other consumer credit reporting agency which compiles and maintains files on consumers on a nationwide basis. I have the right as described by Section 1785.16 of the California Civil Code to dispute the accuracy or completeness of any information in a consumer credit report furnished by the consumer credit reporting agency.

CALIFORNIA AND UTAH RESIDENTS: As required by California and Utah law, I am hereby notified that a negative credit report reflecting on my credit record may be submitted to a credit reporting agency if I fail to fulfill the terms of my credit obligations.
IOWA, KANSAS AND NEBRASKA RESIDENTS (For purposes of the following notice, the word "you" refers to the Borrower and the Cosigner, not the Lender): NOTICE TO CONSUMER. This is a consumer credit transaction. 1. DO NOT SIGN THIS CREDIT AGREEMENT BEFORE YOU READ THIS CREDIT AGREEMENT. 2. YOU ARE ENTITLED TO A COPY OF THIS CREDIT AGREEMENT. 3. YOU MAY PREPAY THE UNPAID BALANCE AT ANY TIME WITHOUT PENALTY AND MAY BE ENTITLED TO A REFUND OF UNEARNED CHARGES IN ACCORDANCE WITH LAW.

MARYLAND RESIDENTS: In Paragraph L.1, Lender and I have agreed that this Credit Agreement is governed by federal law and the laws of RHODE ISLAND, without regard to conflict of laws rules; if any court should nevertheless determine that this Credit Agreement is subject to Maryland laws concerning credit, then only to the extent that Maryland law applies, Lender and I agree and elect that this loan is made under and governed by Subtitle 10, Credit Grantor Closed End Credit Provisions, of Title 12 of the Commercial Law Article of the Annotated Code of Maryland, except as preempted by federal law.

**MISSOURI RESIDENTS: Oral agreements or commitments to loan money, extend credit or to forbear from enforcing repayment of a debt including promises to extend or renew such debt are not enforceable. To protect me (borrower(s)) you (creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree to modify it.**

NEVADA RESIDENTS: This is a loan for study.

NEW JERSEY RESIDENTS: The section headings of this Credit Agreement are a table of contents and not contract terms. Portions of this Credit Agreement with references to actions taken to the extent of applicable law apply to acts or practices that New Jersey law permits or requires. In this Credit Agreement, acts or practices (i) by you which are or may be permitted by "applicable law" are permitted by New Jersey law, and (ii) that may or will be taken by you unless prohibited by "applicable law" are permitted by New Jersey law.

NEW YORK, RHODE ISLAND AND VERMONT RESIDENTS: A consumer report (credit report) may be obtained from a consumer-reporting agency (credit bureau) in connection with this loan. If I request (1) I will be informed whether or not consumer reports were obtained, and (2) if reports were obtained, I will be informed of the names and addresses of the credit bureaus that furnished the reports. If you agree to make this loan to me, a consumer credit report may be requested or used in connection with renewals or extensions of any credit for which I have applied, reviewing my loan, taking collection action on my loan, or legitimate purposes associated with my loan.

OHIO RESIDENTS: The Ohio laws against discrimination require that all creditors make credit equally available to all credit worthy customers, and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with this law.

WISCONSIN RESIDENTS: For married Wisconsin residents, my signature on this Credit Agreement confirms that this loan obligation is being incurred in the interest of my marriage or family. No provision of any marital property agreement (pre-marital agreement), unilateral statement under Section 766.59 or court decree under Section 766.70 adversely affects the interest of the Lender unless the Lender, prior to the time that the loan is approved, is furnished with a copy of the agreement, statement, or decree or has actual knowledge of the adverse provision when the obligation to the Lender is incurred. If the loan for which I am applying is granted, my spouse will also receive notification that credit has been extended to me.

N. BORROWER'S CERTIFICATION: I declare under penalty of perjury under the laws of the United States of America that the following is true and correct. I certify that all information I provided to you in connection with this loan, including without limitation, the information contained in this Credit Agreement, is true, complete and correct to the best of my knowledge and belief and is made in good faith. I understand that I am responsible for repaying immediately any funds that I receive which are not to be used or are not used for educational expenses related to attendance at the School for the academic period stated. I certify that I am not now in default on a Federal Perkins Loan, a Federal Stafford Loan, a Federally Insured Student Loan, a Federal Supplemental Loan for Students (SLS), a Federal PLUS Loan, an Income Contingent Loan, a Federal Consolidation Loan, a Federal Ford Direct Loan, or any other education loan received for attendance at any school.

O. STATE-SPECIFIC COSIGNER NOTICES: For the purposes of the following notices only, the words "you" and "your" refer to the Cosigner, where applicable, not to the lender.

---

FOR OBLIGORS COSIGNING IN WEST VIRGINIA:

**NOTICE TO COSIGNER**
You are being asked to guarantee this debt. Think carefully before

---

you do.  If the Borrower doesn't pay the debt, you will have to.  Be
sure you can afford to pay it if you have to, and that you want to
accept this responsibility. You may have to pay up to the full
amount of the debt if the Borrower does not pay.  You may also
have to pay late fees or collection costs, which increase this
amount. The creditor can collect this debt from you without first
trying to collect from the Borrower.  The creditor can use the same
collection methods against you that can be used against the
Borrower, such as suing you, garnishing your wages, etc.  If this
debt is ever in default, that fact may become a part of your credit
record. This notice is not the contract that makes you liable for the
debt.

FOR OBLIGORS COSIGNING IN VERMONT:

*NOTICE TO COSIGNER*

**YOUR SIGNATURE ON THIS CREDIT AGREEMENT MEANS
THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS
LOAN.  IF THE BORROWER DOES NOT PAY, THE LENDER HAS
A LEGAL RIGHT TO COLLECT FROM YOU.**

## FEDERAL AND CALIFORNIA COSIGNER NOTICES

For the purposes of these Notices, the words "you" and "your" refer to the Cosigner, not the Lender.

**NOTICE TO COSIGNER (Traduccion en Ingles Se Requiere Por La Ley):**
You are being asked to guarantee this debt. Think carefully before you do. If the borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to, and that you want to accept this responsibility.

You may have to pay up to the full amount of the debt if the borrower does not pay. You may also have to pay late fees or collection costs, which increase this amount.

The holder of the loan can collect this debt from you without first trying to collect from the borrower. The holder of the loan can use the same collection methods against you that can be used against the borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become part of your credit record.

This notice is not the contract that makes you liable for the debt.

**AVISO PARA EL FIADOR (Spanish Translation Required by Law):**
Se le está pidiendo que garantice esta deuda. Piénselo con cuidado antes de ponerse de acuerdo. Si la persona que ha pedido este préstamo no paga la deuda, usted tendrá que pagarla. Esté seguro de que usted podrá pagar si sea obligado a pagarla y de que usted desea aceptar la responsabilidad.

Si la persona que ha pedido el préstamo no paga la deuda, es posible que usted tenga que pagar la suma total de la deuda, mas los cargos por tardarse en el pago o el costo de cobranza, lo cual aumenta el total de esta suma.

El acreedor (financiero) puede cobrarle a usted sin, primeramente, tratar de cobrarle al deudor. Los mismos metodos de cobranza que pueden usarse contra el deudor, podran usarse contra usted, tales como presentar una demanda en corte, quitar parte de su sueldo, etc. Si alguna vez no se cumpla con la obligación de pagar esta deuda, se puede incluir esa información en la historia de credito de usted.

Este aviso no es el contrato mismo en que se le echa a usted la responsabilidad de la deuda.

**AB.06-07.CSX1.10DC.0206.FD**
{W0819991.1}

### NOTE DISCLOSURE STATEMENT

$ _32,786.89_____

_04360539_____

Loan No.

Borrower(s) _JOHN M MATA JR_____

_ANITA MATA_____

Student: _JOHN M MATA JR_____

Date: _September 29, 2006_____

JOHN M MATA JR
5489 CAMBRIDGE ST
MONTCLAIR , CA  91763    USA

Lender Name and Address:
_CHARTER ONE BANK, N.A._____
_725 CANTON STREET_____
_NORWOOD, MA 02062_____

This disclosure statement relates to your Loan Note disbursed on _____September 29, 2006_____.
Because your Loan is either being disbursed or entering repayment, or the repayment terms are being modified, the following
information about your Loan is being given to you.

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments scheduled. |
| _12.149_ % | $ _74,899.20_ | $ _30,000.00_ | $ _104,899.20_ |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments are due |
|---|---|---|
| 240 | $    437.08 | On the    25th day of each month beginning    1/2009 |
|  |  |  |
|  |  |  |
|  |  |  |

**VARIABLE RATE:** The Annual Percentage Rate, which is based on an index plus a margin, may increase during the term of
the loan if the index rate increases. The index is (check one):

☐ **Prime Rate Index Adjusted Monthly** - The highest U.S. bank prime rate published in the "Money Rates" section of
The Wall Street Journal (Eastern Edition) on the last business day of each calendar month.

☐ **Prime Rate Index Adjusted Quarterly** - The highest U.S. bank prime rate published in the "Money Rates" section of
The Wall Street Journal (Eastern Edition) on the last business day of each calendar quarter.

☐ **LIBOR Index Adjusted Quarterly** - The average of the one-month London Interbank Offered Rates published in the
"Money Rates" section of The Wall Street Journal (Eastern Edition) on the first business day of each of the three (3)
calendar months immediately preceding the first day of each calendar quarter.

☒ **LIBOR Index Adjusted Monthly** - The one-month London Interbank Offered Rate published in the "Money Rates"
section of The Wall Street Journal (Eastern Edition) on the first business day of each calendar month.

Any increase in the index and the Annual Percentage Rate which occurs while principal payments are deferred will increase
the amount of any current and all future payments. Any increase in the index and the Annual Percentage Rate which occurs while
principal and interest payments are deferred will increase the amount of all future payments. Any increase in the index and the
Annual Percentage Rate which occurs after you have begun to make principal and interest payments on your loan will increase the
amount of your future principal and interest payments beginning with your next annual payment adjustment date. For example,
assume you obtain a loan in your junior year, in the amount of $10,000, at an interest rate of 11%, and you defer principal and
interest payments until after your graduation, and the repayment term of the loan is 20 years. If the interest rate increased to 12%
on January 1st of your senior year, the interest which accrues while principal and interest payments are deferred will increase by
$91.01, and your monthly principal and interest payments would increase by $9.37.

**LATE CHARGES:** If a payment is more than 15 days late, you may be charged $5.00 or 5% of the payment, whichever is less. If
you default, Lender (or any subsequent holder or any subsequent holder of your Loan Note) may increase the margin used to
compute the Annual Percentage Rate by two percentage points (2%).
**PREPAYMENT:** If you pay off early, you will not have to pay a penalty.

<u>Estimates:</u> All numerical disclosures except the late payment disclosure are estimates.

See your contract documents for any additional information about non-payment, default, any required repayment in full before the
scheduled date, any security interest and prepayment refunds and penalties.

Principal Amount of Note (Amount Financed plus Prepaid Finance Charge)                $_____32,786.89

Itemization of Amount Financed
Amount paid to    JOHN M MATA JR   and                          $_____
Amount paid to    ANITA MATA                                    $_____30,000.00
Total Amount Financed                                                           $_____30,000.00

Itemization of Prepaid Finance Charge
Origination Fee                                                 $_____2,786.89
Total Prepaid Finance Charge(s)                                                 $_____2,786.89

CSA TRAI 603 9736  B                    AVJGDF  Astrive Graduate Loan              **File Copy**

# Exhibit A-6

Exhibit A-6

```
   ITS2C*****8533;;                AES/PA        VTAM NAHU      TSX2D
   DATE 02/23/16 11:27:44     LOAN FINANCIAL ACTIVITY      PAGE  1 OF  6

   BORROWER SSN: ***-**-8533  NAME: MATA, JOHN M JR
   1ST DISB: 09/29/06 LN SEQ: 0005  LN PGM: PEPLN    OWN: 122962QC-NCT
   GUARANTOR: TERI - DTC            CUST ACCT:  LT11  ORIG BAL: 32,786.89
   BOND ISSUE: NCT20064   PD AHEAD:    STATUS: ACTIVE     CURR BAL:       0.00
```

|   | REV<br>REA | EFFECTIVE<br>DATE | POSTED<br>DATE | TRAN<br>TYPE | TRAN<br>AMOUNT | INTEREST<br>ACCRUED | PRINCIPAL<br>BALANCE |
|---|---|---|---|---|---|---|---|
| 1 |  | 04/03/13 | 04/03/13 | 5003A | 30.00CR | 0.00 | 0.00 |
| 2 |  | 04/01/13 | 04/01/13 | 1030A | 48,620.20CR | 205.82 | 0.00 |
| 3 |  | 03/05/13 |  | 2601A | 5.00 | 236.66 | 46,764.36 |
| 4 |  | 02/02/13 |  | 2601A | 5.00 | 236.71 | 46,764.36 |
| 5 |  | 01/02/13 |  | 2601A | 5.00 | 228.47 | 46,764.36 |
| 6 |  | 12/03/12 |  | 2601A | 5.00 | 236.07 | 46,764.36 |
| 7 |  | 11/02/12 |  | 2601A | 5.00 | 229.19 | 46,764.36 |
| 8 |  | 10/03/12 |  | 2601A | 5.00 | 482.92 | 46,764.36 |
| 9 |  | 08/01/12 | 08/01/12 | 7001A | 0.00 | 192.91 | 46,764.36 |
| 10 |  | 07/06/12 | 07/06/12 | 1010C | 77.34CR | 519.37 | 45,335.39 |

```
      SELECTION __


   F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
     ITS2C*****8533;;              AES/PA      VTAM NAHU      TSX2D
   DATE 02/23/16 11:27:46    LOAN FINANCIAL ACTIVITY      PAGE  2 OF  6


   BORROWER SSN: ***-**-8533  NAME: MATA, JOHN M JR
   1ST DISB: 09/29/06 LN SEQ: 0005  LN PGM: PEPLN    OWN: 122962QC-NCT
   GUARANTOR: TERI - DTC           CUST ACCT:  LT11  ORIG BAL:  32,786.89
   BOND ISSUE: NCT20064   PD AHEAD:    STATUS: ACTIVE      CURR BAL:      0.00
```

|    | REV REA | EFFECTIVE DATE | POSTED DATE | TRAN TYPE | TRAN AMOUNT | INTEREST ACCRUED | PRINCIPAL BALANCE |
|----|---------|----------------|-------------|-----------|-------------|------------------|-------------------|
| 1  |         | 04/27/12       | 04/27/12    | 1010C     | 232.94CR    | 282.24           | 45,335.39         |
| 2  |         | 03/20/12       | 03/20/12    | 1010C     | 232.94CR    | 208.88           | 45,335.39         |
| 3  |         | 02/21/12       | 02/21/12    | 1010C     | 232.94CR    | 246.81           | 45,335.39         |
| 4  |         | 01/19/12       | 01/19/12    | 1010C     | 231.79CR    | 223.65           | 45,335.39         |
| 5  |         | 12/20/11       | 12/20/11    | 1010C     | 231.02CR    | 215.99           | 45,335.39         |
| 6  |         | 11/21/11       | 11/21/11    | 1010C     | 230.63CR    | 245.19           | 45,335.39         |
| 7  |         | 10/19/11       | 10/19/11    | 1010C     | 56.02CR     | 88.98            | 45,335.39         |
| 8  |         | 10/07/11       | 10/07/11    | 1010C     | 172.69CR    | 29.66            | 45,335.39         |
| 9  |         | 10/03/11       | 10/04/11    | 1010C     | 172.69CR    | 332.07           | 45,335.39         |
| 10 |         | 08/19/11       | 08/19/11    | 1010C     | 172.69CR    | 361.51           | 45,335.39         |

```
        SELECTION __


   F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
     ITS2C*****8533;;                 AES/PA       VTAM NAHU      TSX2D
    DATE 02/23/16 11:27:47     LOAN FINANCIAL ACTIVITY      PAGE  3 OF  6


  BORROWER SSN: ***-**-8533   NAME: MATA, JOHN M JR
  1ST DISB: 09/29/06 LN SEQ: 0005  LN PGM: PEPLN     OWN: 122962QC-NCT
  GUARANTOR: TERI - DTC            CUST ACCT:  LT11  ORIG BAL:  32,786.89
  BOND ISSUE: NCT20064   PD AHEAD:     STATUS: ACTIVE     CURR BAL:      0.00
```

|    | REV REA | EFFECTIVE DATE | POSTED DATE | TRAN TYPE | TRAN AMOUNT | INTEREST ACCRUED | PRINCIPAL BALANCE |
|----|---------|----------------|-------------|-----------|-------------|------------------|-------------------|
| 1  |         | 07/01/11       | 07/01/11    | 1010C     | 2.59CR      | 81.42            | 45,335.39         |
| 2  |         | 07/01/11       | 07/01/11    | 1010C     | 168.89CR    | 0.00             | 45,335.39         |
| 3  |         | 06/20/11       | 06/20/11    | 1010C     | 27.41CR     | 51.81            | 45,335.39         |
| 4  |         | 06/13/11       | 06/13/11    | 1010C     | 144.07CR    | 282.27           | 45,335.39         |
| 5  |         | 05/06/11       | 05/06/11    | 1010C     | 171.48CR    | 231.28           | 45,335.39         |
| 6  |         | 04/05/11       | 04/05/11    | 1010C     | 168.34CR    | 186.62           | 45,335.39         |
| 7  |         | 03/11/11       | 03/11/11    | 1010C     | 168.34CR    | 186.62           | 45,335.39         |
| 8  |         | 02/14/11       | 02/14/11    | 1010C     | 7.97CR      | 104.50           | 45,335.39         |
| 9  |         | 02/14/11       | 02/14/11    | 1010C     | 160.37CR    | 0.00             | 45,335.39         |
| 10 |         | 01/31/11       | 01/31/11    | 1010C     | 160.37CR    | 126.90           | 45,335.39         |

```
        SELECTION __


   F1=HELP   F3=EXIT   F5=RFR   F7=BKWD   F8=FWD   F9=PRT   F12=CAN
```

```
   ITS2C*****8533;;                    AES/PA        VTAM NAHU        TSX2D
   DATE 02/23/16 11:27:47     LOAN FINANCIAL ACTIVITY        PAGE  4 OF  6


BORROWER SSN: ***-**-8533   NAME: MATA, JOHN M JR
1ST DISB: 09/29/06 LN SEQ: 0005   LN PGM: PEPLN     OWN: 122962QC-NCT
GUARANTOR: TERI - DTC              CUST ACCT:  LT11  ORIG BAL: 32,786.89
BOND ISSUE: NCT20064    PD AHEAD:    STATUS: ACTIVE      CURR BAL:      0.00
```

|    | REV | EFFECTIVE | POSTED   | TRAN  | TRAN     | INTEREST | PRINCIPAL  |
|----|-----|-----------|----------|-------|----------|----------|------------|
|    | REA | DATE      | DATE     | TYPE  | AMOUNT   | ACCRUED  | BALANCE    |
| 1  |     | 01/14/11  | 01/14/11 | 1010C | 10.94CR  | 104.49   | 45,335.39  |
| 2  |     | 12/31/10  | 01/03/11 | 1010C | 165.37CR | 290.75   | 45,335.39  |
| 3  |     | 11/22/10  | 11/22/10 | 1010C | 160.37CR | 156.76   | 45,335.39  |
| 4  |     | 11/01/10  | 11/01/10 | 1010C | 7.97CR   | 246.46   | 45,335.39  |
| 5  |     | 09/29/10  | 03/30/11 | 7001A | 0.00     | 670.43   | 45,335.39  |
| 6  |     | 07/01/10  | 03/30/11 | 7001A | 0.00     | 658.64   | 44,664.96  |
| 7  |     | 04/01/10  | 03/30/11 | 7001A | 0.00     | 639.81   | 44,006.32  |
| 8  |     | 01/01/10  | 03/30/11 | 7001A | 0.00     | 646.07   | 43,366.51  |
| 9  |     | 10/01/09  | 03/30/11 | 7001A | 0.00     | 642.04   | 42,720.44  |
| 10 |     | 07/01/09  | 03/30/11 | 7001A | 0.00     | 642.59   | 42,078.40  |

```
     SELECTION __


F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
    ITS2C*****8533;;                AES/PA        VTAM NAHU       TSX2D
   DATE 02/23/16 11:27:47     LOAN FINANCIAL ACTIVITY        PAGE  5 OF  6


   BORROWER SSN: ***-**-8533  NAME: MATA, JOHN M JR
   1ST DISB: 09/29/06 LN SEQ: 0005  LN PGM: PEPLN    OWN: 122962QC-NCT
   GUARANTOR: TERI - DTC            CUST ACCT:  LT11  ORIG BAL: 32,786.89
   BOND ISSUE: NCT20064   PD AHEAD:     STATUS: ACTIVE     CURR BAL:      0.00
```

| | REV REA | EFFECTIVE DATE | POSTED DATE | TRAN TYPE | TRAN AMOUNT | INTEREST ACCRUED | PRINCIPAL BALANCE |
|---|---|---|---|---|---|---|---|
| 1 | | 04/01/09 | 03/30/11 | 7001A | 0.00 | 132.65 | 41,435.81 |
| 2 | | 03/13/09 | 03/16/09 | 1010C | 175.69CR | 97.96 | 41,303.16 |
| 3 | | 02/27/09 | 03/30/11 | 7001A | 0.00 | 158.54 | 41,375.89 |
| 4 | | 02/04/09 | | 2601A | 5.00 | 571.54 | 40,645.81 |
| 5 | | 12/01/08 | 03/30/11 | 7001A | 0.00 | 1,624.25 | 40,645.81 |
| 6 | | 06/05/08 | 06/05/08 | 1010C | 69.67CR | 36.49 | 39,021.56 |
| 7 | | 06/01/08 | 10/04/08 | 7001A | 0.00 | 150.49 | 39,054.74 |
| 8 | | 05/15/08 | 05/15/08 | 1010C | 46.45CR | 607.29 | 38,343.41 |
| 9 | | 03/10/08 | 03/10/08 | 7001A | 0.00 | 740.60 | 38,343.41 |
| 10 | | 01/01/08 | 01/02/08 | 7001A | 0.00 | 1,010.04 | 37,602.81 |

```
        SELECTION __


   F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
    ITS2C*****8533;;                    AES/PA        VTAM NAHU        TSX2D
  DATE 02/23/16 11:27:48     LOAN FINANCIAL ACTIVITY         PAGE  6 OF  6


BORROWER SSN: ***-**-8533  NAME: MATA, JOHN M JR
1ST DISB: 09/29/06 LN SEQ: 0005  LN PGM: PEPLN    OWN: 122962QC-NCT
GUARANTOR: TERI - DTC           CUST ACCT:  LT11  ORIG BAL:  32,786.89
BOND ISSUE: NCT20064    PD AHEAD:    STATUS: ACTIVE    CURR BAL:      0.00


      REV   EFFECTIVE   POSTED   TRAN        TRAN      INTEREST      PRINCIPAL
      REA     DATE       DATE    TYPE       AMOUNT     ACCRUED        BALANCE
 1          10/01/07   10/01/07  7001A        0.00      993.31      36,592.77
 2          07/01/07   08/15/07  7001A        0.00      956.12      35,599.46
 3          04/01/07   08/15/07  7001A        0.00      921.33      34,643.34
 4          01/01/07   08/15/07  7001A        0.00      248.59      33,722.01
 5          12/07/06   12/07/06  0390A    33,473.42       0.00      32,786.89
 6          12/07/06   12/07/06  0395A    33,473.42CR   686.53          0.00
 7          09/29/06   09/29/06  0101A    32,786.89       0.00      32,786.89
 8
 9
10


       SELECTION __


  F1=HELP   F3=EXIT   F5=RFR   F7=BKWD   F8=FWD   F9=PRT   F12=CAN
```

```
   ITS31*****8533;                    AES/PA          VTAM NAHU        TSX31
DATE 02/23/16 11:27:55 DEFERMENT/FORBEARANCE LOAN DETAIL


BORROWER SSN: ***-**-8533 NAME: JOHN M MATA JR
1ST DISB DATE: 09/29/06    OWNER: NCT                   LOAN PGM: PEPLN
LOAN SEQ: 005          GUARANTOR: TERI - DTC
```

|   | DEFER/FORB TYP | BEGIN DATE | END DATE | GRACE END DATE | CAP IND | DAYS USED | DAYS LEFT | TOTL MOS USED | CERT DATE |
|---|---|---|---|---|---|---|---|---|---|
| _ | F - TEMP HRDSH | 05 01 12 | 07 31 12 | | Y | 92 | 3 | 11.9 | 05 29 12 |
| _ | D - SCHL FULL | 02 27 09 | 09 28 10 | | Y | 579 | 881 | 19.0 | 03 28 11 |
| _ | F - TEMP HRDSH | 02 01 09 | 02 26 09 | | Y | 26 | 3 | 11.9 | 03 16 09 |
| _ | F - TEMP HRDSH | 06 01 08 | 11 30 08 | | Y | 183 | 3 | 11.9 | 10 04 08 |
| _ | F - TEMP HRDSH | 04 01 08 | 05 31 08 | | Y | 61 | 3 | 11.9 | 04 25 08 |
| _ | | __ __ __ | __ __ __ | | __ | | | | |
| _ | | __ __ __ | __ __ __ | | __ | | | | |

```
F1=HELP   F3=EXIT   F5=RFR   F6=ELG   F7=BKWD   F8=FWD   F9=PRT   F10=HIST   F12=CAN
```

```
   ITS2X*****8533;                      AES/PA        VTAM NAHU      TSX2Y
 DATE 02/23/16 11:27:58 REPAYMENT SCHEDULE SUMMARY SELECTION    PAGE  1 OF  4


 BORROWER SSN ***-**-8533    NAME JOHN M MATA JR


         SCHED   INSTALL   REPAY  REPAY  1ST DUE 1ST DISB    LOAN
 SEL STA TYPE    AMOUNT    LVLS   TERM    DATE    DATE       PGM        OWNER
   1  I   L      380.20     2     200   03/03/13 09/29/06 PEPLN       NCT
   2 ************************************************************************
   3 ************************************************************************
   4  I   TG     369.69     3     206   09/03/12 09/29/06 PEPLN       NCT
   5 ************************************************************************
   6 ************************************************************************
   7  I   TG     232.94     3     212   02/19/12 09/29/06 PEPLN       NCT
   8 ************************************************************************
   9  I   TG     231.79     3     213   01/19/12 09/29/06 PEPLN       NCT
  10  I   TG     231.02     3     214   12/19/11 09/29/06 PEPLN       NCT
  11  I   TG     228.71     3     215   11/19/11 09/29/06 PEPLN       NCT
  12  I   TG     230.63     3     215   11/19/11 09/29/06 PEPLN       NCT


   SELECTION  __



 F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
   ITS2X*****8533;                 AES/PA        VTAM NAHU      TSX2Y
   DATE 02/23/16 11:28:00 REPAYMENT SCHEDULE SUMMARY SELECTION   PAGE  2 OF  4


BORROWER SSN ***-**-8533    NAME JOHN M MATA JR


      SCHED    INSTALL  REPAY  REPAY  1ST DUE 1ST DISB    LOAN
SEL STA TYPE   AMOUNT    LVLS   TERM    DATE    DATE      PGM       OWNER
  1 ***************************************************************
  2 I   TG      172.69     4     219  08/19/11 09/29/06 PEPLN       NCT
  3 ***************************************************************
  4 ***************************************************************
  5 ***************************************************************
  6 I   TG      171.48     4     222  05/05/11 09/29/06 PEPLN       NCT
  7 ***************************************************************
  8 ***************************************************************
  9 I   TG      168.34     4     228  11/05/10 09/29/06 PEPLN       NCT
 10 ***************************************************************
 11 ***************************************************************
 12 ***************************************************************


   SELECTION  __



   F1=HELP   F3=EXIT   F5=RFR   F7=BKWD   F8=FWD   F9=PRT   F12=CAN
```

```
    ITS2X*****8533;                    AES/PA        VTAM NAHU        TSX2Y
  DATE 02/23/16 11:28:00 REPAYMENT SCHEDULE SUMMARY SELECTION    PAGE  3 OF  4


 BORROWER SSN ***-**-8533    NAME JOHN M MATA JR


           SCHED    INSTALL   REPAY   REPAY  1ST DUE 1ST DISB    LOAN
   SEL STA TYPE    AMOUNT     LVLS    TERM    DATE    DATE       PGM       OWNER
     1  I   TG     154.96      4      227   05/05/09 09/29/06  PEPLN       NCT
     2  ***************************************************************************
     3  ***************************************************************************
     4  I   TG     175.69      4      231   01/05/09 09/29/06  PEPLN       NCT
     5  ***************************************************************************
     6  ***************************************************************************
     7  I   TG     173.26      4      238   06/05/08 09/29/06  PEPLN       NCT
     8  ***************************************************************************
     9  ***************************************************************************
    10  I   L      344.14      2      239   05/05/08 09/29/06  PEPLN       NCT
    11  ***************************************************************************
    12  ***************************************************************************


    SELECTION  __



    F1=HELP   F3=EXIT   F5=RFR   F7=BKWD   F8=FWD   F9=PRT   F12=CAN
```

```
   ITS2X*****8533;                AES/PA        VTAM NAHU      TSX2Y
DATE 02/23/16 11:28:01 REPAYMENT SCHEDULE SUMMARY SELECTION    PAGE 4 OF 4


BORROWER SSN ***-**-8533    NAME JOHN M MATA JR


         SCHED   INSTALL  REPAY  REPAY  1ST DUE 1ST DISB    LOAN
SEL STA TYPE    AMOUNT   LVLS   TERM    DATE    DATE        PGM       OWNER
  1  I   L      397.39     2    239   04/23/08 09/29/06 PEPLN        NCT
  2  ************************************************************************
  3  ************************************************************************
  4  I   L      368.55     2    239   07/22/07 09/29/06 PEPLN        NCT
  0  ************************************************************************
  0  ************************************************************************
  0  ************************************************************************
  0  ************************************************************************
  0  ************************************************************************
  0  ************************************************************************
  0  ************************************************************************
  0  ************************************************************************


 SELECTION  __


01033 PRESS ENTER TO DISPLAY MORE DATA
F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
   ITS2X*****8533;                   AES/PA         VTAM NAHU        TSX2Y
   DATE 02/23/16 11:28:01 REPAYMENT SCHEDULE SUMMARY SELECTION    PAGE  1 OF  1


   BORROWER SSN ***-**-8533    NAME JOHN M MATA JR


        SCHED    INSTALL   REPAY  REPAY  1ST DUE 1ST DISB    LOAN
   SEL STA TYPE   AMOUNT    LVLS   TERM    DATE    DATE      PGM        OWNER
     O  *********************************************************************
     O  *********************************************************************
     O  *********************************************************************
     O  *********************************************************************
     O  *********************************************************************
     O  *********************************************************************
     O  *********************************************************************
     O  *********************************************************************
     O  *********************************************************************
     O  *********************************************************************
     O  *********************************************************************
     O  *********************************************************************


   SELECTION   __



   F1=HELP   F3=EXIT   F5=RFR   F7=BKWD   F8=FWD   F9=PRT   F12=CAN
```

# Exhibit A-7

Exhibit A-7

EX-99.20 17 p06-1875_ex9920.htm POOL SUPPLEMENT

EXHIBIT 99.20

**2006-4 POOL SUPPLEMENT**
**CHARTER ONE BANK, N.A.**

This Pool Supplement (the "Supplement") is entered into pursuant to and forms a part of each of the Note Purchase Agreements (the "Agreements") set forth on Schedule 1 attached hereto, each as amended or supplemented from the date of execution of the Agreement through the date of this Supplement, by and between The First Marblehead Corporation ("FMC") and Charter One Bank, N.A. (the "Program Lender"). This Supplement is dated as of December 7, 2006. Capitalized terms used in this Supplement without definitions have the meanings set forth in the Agreements.

Article 1: Purchase and Sale.

In consideration of the Minimum Purchase Price, the Program Lender hereby transfers, sells, sets over and assigns to The National Collegiate Funding LLC (the "Depositor"), upon the terms and conditions set forth in the Agreements (which are incorporated herein by reference with the same force and effect as if set forth in full herein), each student loan set forth on the attached Schedule 2 (the "Transferred Loans") along with all of the Program Lender's rights under the Guaranty Agreement, and any agreement pursuant to which TERI granted collateral for its obligations under the Guaranty Agreement, relating to the Transferred Loans. The Depositor in turn will sell the Transferred Loans to The National Collegiate Student Loan Trust 2006-4 (the "Trust"). The Program Lender hereby transfers and delivers to the Depositor each Note evidencing such Transferred Loan and all Origination Records relating thereto, in accordance with the terms of the Agreements. The Depositor hereby purchases said Notes on said terms and conditions.

Article 2: Price.

The amount paid pursuant to this Supplement is the Minimum Purchase Price, as that term is defined in Section 2.04 of the Agreements.

Article 3: Representations and Warranties.

3.01. By Program Lender.

The Program Lender repeats the representations and warranties contained in Section 5.02 of the Agreements for the benefit of each of the Depositor and the Trust and confirms the same are true and correct as of the date hereof with respect to the Agreements and to this Supplement.

3.02. By Depositor.

The Depositor hereby represents and warrants to the Program Lender that at the date of execution and delivery of this Supplement by the Depositor:

(a) The Depositor is duly organized and validly existing as a limited liability company under the laws of the State of Delaware with the due power and authority to own its properties and to conduct its business as such properties are currently owned and such business is presently conducted, and had at all relevant times, and has, the power, authority and legal right to acquire and own the Transferred Loans.

(b) The Depositor is duly qualified to do business and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business shall require such qualifications.

(c) The Depositor has the power and authority to execute and deliver this Supplement and to carry out its respective terms; the Depositor has the power and authority to purchase the Transferred Loans and rights relating thereto as provided herein from the Program Lender, and the Depositor has duly authorized such purchase from the Program Lender by all necessary action; and the execution, delivery and performance of this Supplement has been duly authorized by the Depositor by all necessary action on the part of the Depositor.

(d) This Supplement, together with the Agreements of which this Supplement forms a part, constitutes a legal, valid and binding obligation of the Depositor, enforceable in accordance with its terms.

(e) The consummation of the transactions contemplated by the Agreements and this Supplement and the fulfillment of the terms hereof do not conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time) a default under, the governing instruments of the Depositor or any indenture, agreement or other instrument to which the Depositor is a party or by which it is bound; or result in the creation or imposition of any lien upon any of its properties pursuant to the terms of any such indenture, agreement or other instrument; or violate any law or any order, rule or regulation applicable to the Depositor of any court or of any federal or state regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Depositor or its properties.

(f) There are no proceedings or investigations pending, or threatened, before any court, regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Depositor or its properties: (i) asserting the invalidity of the Agreements or this Supplement, (ii) seeking to prevent the consummation of any of the transactions contemplated by the Agreements or this Supplement, or (iii) seeking any determination or ruling that is likely to

materially or adversely affect the performance by the Depositor of its obligations under, or the validity or enforceability of the Agreements or this Supplement.

### Article 4: Cross Receipt.

The Program Lender hereby acknowledges receipt of the Minimum Purchase Price. The Depositor hereby acknowledges receipt of the Transferred Loans included in the Pool.

### Article 5: Assignment of Origination, Guaranty and Servicing Rights.

The Program Lender hereby assigns and sets over to the Depositor any claims it may now or hereafter have under the Guaranty Agreements, the Origination Agreements and the Servicing Agreements to the extent the same relate to the Transferred Loans described in Schedule 2, other than any right to obtain servicing after the date hereof. It is the intent of this provision to vest in the Depositor any claim of the Program Lender relating to defects in origination, guaranty or servicing of the loans purchased hereunder in order to permit the Depositor to assert such claims directly and obviate any need to make the same claims against the Program Lender under this Supplement. The Program Lender also hereby assigns and sets over to the Depositor any claims it may now have or hereafter have to any collateral pledged by TERI to the Program Lender to secure its obligations under the Guaranty Agreement that relates to the Transferred Loans, and Program Lender hereby releases any security interest it may have in such collateral. Program Lender hereby authorizes the Depositor, its successors and assigns, to file in any public filing office where a Uniform Commercial Code Filing with respect to collateral pledged by TERI is of record, any partial release or assignment that it deems necessary or appropriate to reflect in the public records the conveyance and assignment effected hereby.

[Remainder of page intentionally blank]

IN WITNESS WHEREOF, the parties have caused this Supplement to be executed as of the date set forth above.

THE FIRST MARBLEHEAD CORPORATION

By:  /s/ John A. Hupalo
_____
John A. Hupalo
Senior Executive Vice President

CHARTER ONE BANK, N.A.

By:  /s/ Dino DiMascio
_____
Name: Dino DiMascio
Title: Vice President

THE NATIONAL COLLEGIATE FUNDING LLC

By:    GATE Holdings, Inc., Member

By:  /s/ John A. Hupalo
_____
John A. Hupalo
President

### Schedule 1

Note Purchase Agreements

- Note Purchase Agreement dated as of October 31, 2003 by and between FMC and the Program Lender for AES.

- Note Purchase Agreement dated as of June 30, 2003 by and between FMC and the Program Lender for Citibank.

- Note Purchase Agreement dated as of July 1, 2002 by and between FMC and the Program Lender for CLC.

- Note Purchase Agreement dated as of September 20, 2003 by and between FMC and the Program Lender for M & I Bank.

Unassociated Document                                                                                                          Page 3 of 5

- Note Purchase Agreement dated as of November 17, 2003 by and between FMC and the Program Lender for National Education.

- Note Purchase Agreement dated as of May 15, 2002 by and between FMC and the Program Lender for Nextstudent.

- Note Purchase Agreement dated as of September 15, 2003 by and between FMC and the Program Lender for North Texas Higher Education.

- Note Purchase Agreement dated as of May 15, 2003 by and between FMC and the Program Lender for Washington Mutual (WAMU).

- Note Purchase Agreement dated as of December 29, 2003 by and between FMC and the Program Lender for AAA Southern New England Bank.

- Note Purchase Agreement dated as of December 1, 2003 by and between FMC and the Program Lender for the Custom Educredit Loan Program.

- Note Purchase Agreement dated as of May 10, 2004 by and between FMC and the Program Lender for the Edfinancial Loan Program.

- Note Purchase Agreement dated as of March 26, 2004 by and between FMC and the Program Lender for the NextStudent Private Consolidation Loan Program.

- Note Purchase Agreement dated as of February 15, 2005 by and between FMC and the Program Lender for the Charter One Referral Loan Program (including loans in the UPromise, Collegiate Solutions, College Board and Axiom Alternative Loan Programs).

- Note Purchase Agreement dated May 15, 2002 by and between FMC and the Program Lender for TERI-Guaranteed CFS Loan Program.

- Note Purchase Agreement dated May 15, 2002 by and between FMC and the Program Lender for TERI-Guaranteed NextStudent Loan Program.

- Note Purchase Agreement dated May 25, 2004 by and between FMC and the Program Lender for TERI-Guaranteed START Education Loan Program

Schedule 2

[Transferred Loans]

**National Collegiate Student Loan Trust 2006-4**

**Roster:**  **CHARTER ONE BANK**

| Lender | Lender Code | Marketer | Loan Product | BSSN |
|---|---|---|---|---|
| CHARTER ONE BANK | 907785QC | Astrive - Undesignated | DTC - Graduate | XXXXX8533 |

| GUARREF | Disb. Date | Tier | Repay Type | Margin |
|---|---|---|---|---|
| 04360539 | 29-Sep-06 | 4 | DF | 0.0575 |

| Fee to Borrower | TERI Admin Fee | Marketing Fee | Total Gross Disbursed | Total Net Disbursed |
|---|---|---|---|---|
| 0.085 | 0.0175 | 0.0075 | $32,786.89 | $30,000.00 |

| Total Net Principal | Total Capitalized Interest | Total Outstanding Gross Principal | Total Outstanding Unpaid Interest | Administrative Fee Reimbursement on 0% Fee Loans |
|---|---|---|---|---|
| $30,000.00 | $0.00 | $32,786.89 | $686.53 | $0.00 |

| | Final Reconciliation Settlement Figures | | | |
|---|---|---|---|---|
| Origination Fee Reimbursement Due Bank | Total Marketing Fees | Marketing Fees Due FMC | Marketing Fees Due Bank | Total Amount Due Bank |
| $225.00 | $225.00 | $0.00 | $225.00 | $33,923.42 |

EX-99.5 7 d587610.htm DEPOSIT AND SALE AGREEMENT

EXHIBIT 99.5

## DEPOSIT AND SALE AGREEMENT
## THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4

This DEPOSIT AND SALE AGREEMENT (the "Sale Agreement"), dated as of December 7, 2006, between The National Collegiate Funding LLC, in its capacity as seller (in such capacity, the "Seller"), and The National Collegiate Student Loan Trust 2006-4, as purchaser (the "Purchaser"), shall be effective upon execution by the parties hereto.

WHEREAS, the Seller is the owner of certain student loans; and

WHEREAS, the Seller desires to sell its interest in such student loans and the Purchaser desires to purchase such loans from the Seller.

NOW, THEREFORE, in connection with the mutual promises contained herein, the parties hereto agree as follows:

### ARTICLE I
### TERMS

This Sale Agreement sets forth the terms under which the Seller is selling and the Purchaser is purchasing the student loans listed on Schedule 1 or Schedule 2 to each of the Pool Supplements set forth on Schedule A attached hereto (the "Transferred Student Loans").

### ARTICLE II
### DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the definitions set forth in Appendix A of the Indenture dated as of December 1, 2006 between U.S. Bank National Association (the "Indenture Trustee") and the Purchaser.

### ARTICLE III
### SALE AND PURCHASE

Section 3.01.       Sale of Loans. The Seller hereby sells and the Purchaser hereby purchases the Transferred Student Loans.

Section 3.02.       Assignment of Rights. The Seller hereby assigns to the Purchaser and the Purchaser hereby accepts all of the Seller's rights and interests under each of the Pool Supplements listed on Schedule A attached hereto and the related Student Loan Purchase Agreements listed on Schedule B attached hereto.

Section 3.03.       Settlement of the Payment. The Purchaser shall pay the Seller the purchase price set forth in Article 2 of each of the Pool Supplements by wire transfer in immediately available funds to the account specified by the Seller.

Section 3.04.       Assistance by Seller. Following the execution of this Sale Agreement, the Seller shall provide any reasonable assistance requested by the Purchaser in determining that all required documentation on the Transferred Student Loans is present and correct.

### ARTICLE IV
### REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER

Section 4.01.    General. The Seller represents and warrants to the Purchaser that as of the date of this Sale Agreement:

(a)    The Seller is duly organized and existing under the laws of the State of Delaware; and

(b)    The Seller has all requisite power and authority to enter into and to perform the terms of this Sale Agreement.

Section 4.02.    Loan Representations. The Seller represents and warrants to the Purchaser that with respect to each Transferred Student Loan purchased by the Purchaser pursuant to this Sale Agreement, the Seller is making the same representations and warranties made by the respective program lender with respect to each Transferred Student Loan pursuant to the respective Student Loan Purchase Agreement listed on Schedule B attached hereto.

Section 4.03.    Covenants. The Seller, in its capacity as purchaser of the Transferred Student Loans pursuant to the Pool Supplements, hereby covenants that it will enforce the covenants and agreements of each program lender in the respective Student Loan Purchase Agreement and related Pool Supplement. The Seller further covenants that it will not waive, amend, modify, supplement or terminate any Student Loan Purchase Agreement or Pool Supplement or any provision thereof without the consent of the Purchaser, which consent the Purchaser hereby agrees not to provide without the prior written consent of the Indenture Trustee and the Interested Noteholders in accordance with the Purchaser's covenant in Section 3.07(c) of the Indenture.

<div style="text-align:center">

**ARTICLE V**
**PURCHASE OF LOANS; REIMBURSEMENT**

</div>

Each party to this Sale Agreement shall give notice to the other such parties and to the Servicers, First Marblehead Data Services, Inc., the Indenture Trustee, and Wilmington Trust Company (the "Owner Trustee") promptly, in writing, upon the discovery of any breach of the Seller's representations and warranties made pursuant to this Sale Agreement which has a materially adverse effect on the interest of the Purchaser in any Transferred Student Loan. In the event of such a material breach, the Seller shall cure or repurchase the Transferred Student Loan in accordance with the remedies set forth in the respective Student Loan Purchase Agreement.

<div style="text-align:center">

**ARTICLE VI**
**LIABILITY OF SELLER; INDEMNITIES**

</div>

The Seller shall be liable in accordance herewith only to the extent of the obligations specifically undertaken by the Seller under this Sale Agreement.

(a)    The Seller shall indemnify, defend and hold harmless the Purchaser and the Owner Trustee in its individual capacity and their officers, directors, employees and agents from and against any taxes that may at any time be asserted against any such Person with respect to the transactions contemplated herein and in the other Basic Documents (except any such income taxes arising out of fees paid to the Owner Trustee), including any sales, gross receipts, general corporation, tangible and intangible personal property, privilege or license taxes and costs and expenses in defending against the same.

(b)    The Seller shall indemnify, defend and hold harmless the Purchaser and the Owner Trustee in its individual capacity and their officers, directors, employees and agents from and against any and all costs, expenses, losses, claims, damages and liabilities arising out of, or imposed upon such Person through, the Seller's willful misfeasance, bad faith or gross negligence in the performance of its duties under this Sale Agreement, or by reason of reckless disregard of its obligations and duties under this Sale Agreement.

Indemnification under this Section shall survive the termination of this Sale Agreement and shall include reasonable fees and expenses of counsel and expenses of litigation. If the Seller shall have made any indemnity payments pursuant to this

Section and the Person to or for the benefit of whom such payments are made thereafter shall collect any of such amounts from others, such Person shall promptly repay such amounts to the Seller, without interest.

## ARTICLE VII
## MERGER OR CONSOLIDATION OF, OR ASSUMPTION
## OF THE OBLIGATIONS OF, SELLER

Any Person (a) into which the Seller may be merged or consolidated, (b) which may result from any merger or consolidation to which the Seller shall be a party or (c) which may succeed to the properties and assets of the Seller substantially as a whole, shall be the successor to the Seller without the execution or filing of any document or any further act by any of the parties to this Sale Agreement; provided, however, that the Seller hereby covenants that it will not consummate any of the foregoing transactions except upon satisfaction of the following: (i) the surviving Person, if other than the Seller, executes an agreement of assumption to perform every obligation of the Seller under this Sale Agreement, (ii) immediately after giving effect to such transaction, no representation or warranty made pursuant to this Sale Agreement shall have been breached, (iii) the surviving Person, if other than the Seller, shall have delivered an Officers' Certificate and an opinion of counsel each stating that such consolidation, merger or succession and such agreement of assumption comply with this Section and that all conditions precedent, if any, provided for in this Sale Agreement relating to such transaction have been complied with, and that the Rating Agency Condition shall have been satisfied with respect to such transaction, (iv) if the Seller is not the surviving entity, such transaction will not result in a material adverse federal or state tax consequence to the Purchaser or the Noteholders, and (v) if the Seller is not the surviving entity, the Seller shall have delivered an opinion of counsel either (A) stating that, in the opinion of such counsel, all financing statements and continuation statements and amendments thereto have been executed and filed that are necessary fully to preserve and protect the interest of the Purchaser in the Transferred Student Loans and reciting the details of such filings, or (B) stating that, in the opinion of such counsel, no such action shall be necessary to preserve and protect such interests.

## ARTICLE VIII
## LIMITATION ON LIABILITY OF SELLER AND OTHERS

The Seller and any director or officer or employee or agent thereof may rely in good faith on the advice of counsel or on any document of any kind, prima facie properly executed and submitted by any Person respecting any matters arising hereunder (provided that such reliance shall not limit in any way the Seller's obligations under this Sale Agreement). The Seller shall not be under any obligation to appear in, prosecute or defend any legal action that shall not be incidental to its obligations under this Sale Agreement or the Student Loan Purchase Agreements, and that in its opinion may involve it in any expense or liability.

## ARTICLE IX
## SURVIVAL OF COVENANTS

All covenants, agreements, representations and warranties made herein shall survive the consummation of the purchase of the Transferred Student Loans; provided, however, that to the extent any of the same relate to a corresponding covenant, agreement, representation or warranty contained in a Student Loan Purchase Agreement, the same shall survive to the extent that such corresponding covenant, agreement, representation or warranty survives the applicable Student Loan Purchase Agreement. All covenants, agreements, representations and warranties made or furnished pursuant hereto by or for the benefit of the Seller (including without limitation, under Article VI) shall bind and inure to the benefit of any successors or assigns of the Purchaser, including the Indenture Trustee. This Sale Agreement may be changed, modified or discharged, and any rights or obligations hereunder may be waived, only by a written instrument signed by a duly authorized officer of the party against whom enforcement of any such waiver, change, modification or discharge is sought. The waiver by the Indenture Trustee, at the direction of the Noteholders or otherwise pursuant to the Indenture, of any covenant, agreement, representation or warranty required to be made or furnished by the Seller or the waiver by the Indenture Trustee, at the direction of the Noteholders or otherwise pursuant to the Indenture, of any provision herein contained shall not be deemed to be a waiver of any breach of any other covenant, agreement, representation, warranty or provision herein contained, nor shall any waiver or any custom or practice which may evolve between the parties in the administration of the terms hereof, be construed to lessen the right of the Indenture Trustee, at the direction of the Noteholders pursuant to the Indenture, to insist upon the performance by the Seller in strict accordance with said terms.

**ARTICLE X**
**COMMUNICATION AND NOTICE REQUIREMENTS**

All communications, notices and approvals provided for hereunder shall be in writing and mailed or delivered to the Seller or the Purchaser, as the case may be. Notice given in any such communication, mailed to the Seller or the Purchaser by appropriately addressed registered mail, shall be deemed to have been given on the day following the date of such mailing and shall be addressed as follows:

If to the Purchaser, to:

> The National Collegiate Student Loan Trust 2006-4
> c/o Wilmington Trust Company, as Owner Trustee
> 100 North Market Street
> Wilmington, Delaware 19890-0001
> Attention: Corporate Trust Department

If to the Seller, to:

> The National Collegiate Funding LLC
> c/o First Marblehead Data Services, Inc.
> The Prudential Tower
> 800 Boylston Street - 34th Floor
> Boston, MA 02199-8157
> Attention: Ms. Rosalyn Bonaventure

with a copy to:

> First Marblehead Corporation
> The Prudential Tower
> 800 Boylston Street - 34th Floor
> Boston, MA 02199-8157
> Attention: Corporate Law Department

or to such other address as either party shall have provided to the other parties in writing. Any notice required to be in writing hereunder shall be deemed given if such notice is mailed by certified mail, postage prepaid, or hand delivered to the address of such party as provided above.

**ARTICLE XI**
**AMENDMENT**

This Sale Agreement may be amended by the parties hereto without the consent of the Noteholders for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the Sale Agreement or of modifying in any manner the rights of such Noteholders; provided that such action will not, in the opinion of counsel reasonably satisfactory to the Indenture Trustee, materially affect the interest of any such Noteholder.

In addition, this Sale Agreement may also be amended from time to time by the Seller and the Purchaser, with the consent of the Noteholders of the Notes evidencing a majority of the Outstanding Amount of the Notes and the consent of the Certificateholders of the Certificates evidencing a majority of the outstanding principal amount of the Certificates, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Sale Agreement or of modifying in any manner the rights of the Noteholders or the Certificateholders, respectively; provided, however, that no such amendment shall (a) increase or reduce in any manner the amount of, or accelerate or delay the time of, collections of payments with respect to Transferred Student Loans or distributions that shall be required to be made for the benefit of the Noteholders, or (b) reduce the aforesaid percentage of the Outstanding Amount of the Notes or the Certificates, the Noteholders or the Certificateholders of which are required to consent to any such amendment, without the consent of all

outstanding Noteholders or Certificateholders, respectively.

Promptly after the execution of any such amendment or consent (or, in the case of the Rating Agencies, five Business Days prior thereto), the Purchaser shall furnish written notification of the substance of such amendment or consent to the Indenture Trustee and each of the Rating Agencies.

It shall not be necessary for the consent of Noteholders pursuant to this Section to approve the particular form of any proposed amendment or consent, but it shall be sufficient if such consent shall approve the substance thereof.

Prior to the execution of any amendment to this Sale Agreement, the Owner Trustee shall be entitled to receive and rely upon an opinion of counsel stating that execution of such amendment is authorized or permitted by this Sale Agreement. The Owner Trustee may, but shall not be obligated to, enter into any such amendment which affects the Owner Trustee's own rights, duties or immunities under this Sale Agreement or otherwise.

## ARTICLE XII
## ASSIGNMENT

The Seller hereby assigns its entire right, title and interest as purchaser under this Sale Agreement and the Student Loan Purchase Agreement thereunder to the Purchaser as of the date hereof and acknowledges that the Purchaser will assign the same, together with the right, title and interest of the Purchaser hereunder, to the Indenture Trustee under the Indenture.

## ARTICLE XIII
## GOVERNING LAW

**THIS SALE AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, BUT OTHERWISE WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.**

## ARTICLE XIV
## LIMITATION OF LIABILITY OF OWNER TRUSTEE

Notwithstanding anything contained herein to the contrary, this instrument has been executed by Wilmington Trust Company, not in its individual capacity but solely in its capacity as Owner Trustee of the Purchaser, and in no event shall Wilmington Trust Company in its individual capacity or any beneficial owner of the Purchaser have any liability for the representations, warranties, covenants, agreements or other obligations of the Purchaser hereunder, as to all of which recourse shall be had solely to the assets of the Purchaser. For all purposes of this Sale Agreement, in the performance of any duties or obligations of the Purchaser hereunder, the Owner Trustee shall be subject to, and entitled to the benefits of, the terms and provisions of Articles VIII, IX and X of the Trust Agreement.

[Signature Pages Follow]

    IN WITNESS WHEREOF, the parties hereto have caused this Sale Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

THE NATIONAL COLLEGIATE FUNDING LLC,
as Seller

By:   GATE Holdings, Inc., Member

By:   /s/ John A. Hupalo
Name:  John A. Hupalo
Title:  President

THE NATIONAL COLLEGIATE STUDENT LOAN TRUST
2006-4, as Purchaser

By:   Wilmington Trust Company, not in its individual
      capacity but solely as Owner Trustee

By:   /s/ Michele C. Harra
Name:  Michele C. Harra
Title:  Financial Services Officer

**SCHEDULE A**

*Pool Supplements*

Each of the following Pool Supplements was entered into by and among The First Marblehead Corporation, The National Collegiate Funding LLC and:

- Bank of America, N.A., dated December 7, 2006, for loans that were originated under Bank of America's BAGEL Loan Program, TERI Loan Program, Direct to Consumer Loan Program and ISLP Loan Program.

- Charter One Bank, N.A., dated December 7, 2006, for loans that were originated under the following Charter One programs: AAA Southern New England Bank, AES EducationGAIN Loan Program, Asrtive Education Loan Program, AstriveAlliance Education Loan Program, Axiom Alternative Loan Program, CFS Direct to Consumer Loan Program, Citibank Education Assistance Loan Program, College Board Alternative Loan Program, College Loan Corporation Loan Program, Collegiate Solutions Alternative Loan Program, Custom Educredit Loan Program, EdFinancial Loan Program, Extra Credit II Loan Program (North Texas Higher Education), M&I Alternative Loan Program, National Education Loan Program, NextStudent Alternative Loan Program, NextStudent Private Consolidation Loan Program, ThinkFinancial Alternative Loan Program, UPromise Alternative Loan Program, and WAMU Alternative Student Loan Program..

- Citizens Bank of Rhode Island, dated December 7, 2006, for loans that were originated under Citizens Bank of Rhode Island's Compass Bank Loan Program, Alternative Loan Program, Navy Federal Referral Loan Program, Penn State Undergraduate Loan Program, FinanSure Alternative Loan Program, and Xanthus Loan Program.

- First National Bank Northeast, dated December 7, 2006, for loans that were originated under First National Bank Northeast's Nelnet Alternative Loan Program.

- GMAC Bank, dated December 7, 2006, for loans that were originated under GMAC Bank's Alternative Loan Program.

- HSBC Bank USA, National Association, dated December 7, 2006, for loans that were originated under the HSBC Loan Program.

- The Huntington National Bank, dated December 7, 2006, for loans that were originated under The Huntington National Bank's Huntington Bank Education Loan Program.

- JPMorgan Chase Bank, N.A. (successor to Bank One, N.A.) dated December 7, 2006, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program, EDUCATION ONE Loan Program, and Campus One Loan Program.

- KeyBank, dated December 7, 2006, for loans that were originated under KeyBank's Private Education Loan Program.

- Manufacturers and Traders Trust Company, dated December 7, 2006, for loans that were originated under Manufacturers and Traders Trust Company's M&T Alternative Loan Program.

- National City Bank, dated December 7, 2006, for loans that were originated under National City Bank's Alternative Loan Program.

- National City Bank, dated July 21, 2006, for loans that were originated under National City Bank's Referral Loan Program, including the Astute Private Loan Program.

- PNC Bank, N.A., dated December 7, 2006, for loans that were originated under PNC Bank's PNC Bank Alternative Loan Program, Brazos Alternative Loan Program, Edvisors Alternative Loan Program, GE Money Bank Alternative Loan Prorgam, Old National Bank Alternative Loan Program, Regions Bank Alternative Loan Program, and Varsity Group Alternative Loan Program.

- Sovereign Bank, dated December 7, 2006, for loans that were originated under Sovereign Bank's Alternative Loan Program.

- SunTrust Bank, dated December 7, 2006, for loans that were originated under SunTrust Bank's SunTrust Alternative Loan Program.

- TCF National Bank, dated December 7, 2006, for loans that were originated under TCF National Bank's Alternative Loan Program.

- U.S. Bank, N.A., dated December 7, 2006, for loans that were originated under U.S Bank's Alternative Loan Program.

**SCHEDULE B**

*Student Loan Purchase Agreements*

Each of the following Note Purchase Agreements, as amended or supplemented, was entered into by and between The First Marblehead Corporation and:

- Bank of America, N.A., dated April 30, 2001, for loans that were originated under Bank of America's BAGEL Loan Program, TERI Alternative Loan Program and ISLP Loan Program.

- Bank of America, N.A., dated June 30, 2006, for loans that were originated under Bank of America's BAGEL Loan Program, TERI Alternative Loan Program and ISLP Loan Program.

- Bank of America, N.A., dated June 30, 2003, for loans that were originated under Bank of America's Direct to Consumer Loan Program.

- Bank of America, N.A., dated April 1, 2006, for loans that were originated under Bank of America's Direct to Consumer Loan Program.

- Charter One Bank, N.A., dated as of December 29, 2003 for loans that were originated under Charter One's AAA Southern New England Bank Loan Program.

- Charter One Bank, N.A., dated October 31, 2003, for loans that were originated under Charter One's AES EducationGAIN Loan Program.

- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's CFS Direct to Consumer Loan Program.

- Charter One Bank, N.A., dated June 30, 2003, for loans that were originated under Charter One's Citibank Education Assistance Loan Program.

- Charter One Bank, N.A., dated July 1, 2002, for loans that were originated under Charter One's College Loan Corporation Loan Program.

- Charter One Bank, N.A., dated December 1, 2003, for loans that were originated under Charter One's Custom Educredit Loan Program.

- Charter One Bank, N.A., dated May 10, 2004, for loans that were originated under Charter One's EdFinancial Loan Program.

- Charter One Bank, N.A., dated September 15, 2003, for loans that were originated under Charter One's Extra Credit II Loan Program (North Texas Higher Education).

- Charter One Bank, N.A., dated September 20, 2003, for loans that were originated under Charter One's M&I Alternative Loan Program.

- Charter One Bank, N.A., dated November 17, 2003, for loans that were originated under Charter One's National Education Loan Program.

- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's NextStudent Alternative Loan Program.

- Charter One Bank, N.A., dated March 26, 2004, for loans that were originated under Charter One's NextStudent Private Consolidation Loan Program.

- Charter One Bank, N.A., dated March 25, 2004, for loans that were originated under Charter One's Astrive and AstriveAlliance Education Loan Programs.

- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's WAMU Alternative Student Loan Program.

- Charter One Bank, N.A., dated February 15, 2005, for loans that were originated under Charter One's Referral Loan Program (including loans in the UPromise Alternative Loan Program, Collegiate Solutions Alternative Loan Program, College Board Alternative Loan Program, Axiom Alternative Loan Program, and ThinkFinancial Alternative Loan Program).

- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Alternative Loan Program, Compass Bank Alternative Loan Program, FinanSure Alternative Loan Program, Navy Federal Alternative Loan Program, and Xanthus Alternative Loan Program.

- Citizens Bank of Rhode Island, dated October 1, 2002, for loans that were originated under Citizens Bank of Rhode Island's Penn State Undergraduate Loan Program.

- First National Bank Northeast, dated August 1, 2001, for loans that were originated under First National Bank Northeast's Nelnet Undergraduate Alternative Loan Program.

- GMAC Bank, dated May 30, 2003, for loans that were originated under GMAC Bank's Alternative Loan Program

- HSBC Bank USA, National Association, dated April 17, 2002, as amended on June 2, 2003 and August 1, 2003, for loans that were originated under the HSBC Loan Program.

- The Huntington National Bank, dated May 20, 2003, for loans that were originated under The Huntington National Bank's Huntington Bank Education Loan Program.

- JPMorgan Chase Bank, N.A,, (successor to Bank One, N.A.), dated May 1, 2002, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program, EDUCATION ONE Loan Program, and Campus One Loan Program.

- KeyBank, dated May 12, 2006, for loans that were originated under KeyBank's Private Education Loan Program.

- Manufacturers and Traders Trust Company, dated April 29, 2004, for loans that were originated under Manufacturers and Traders Trust Company's Alternative Loan Program.

- National City Bank, dated November 13, 2002, for loans that were originated under National City Bank's National City Loan Program.

- National City Bank, dated July 21, 2006, for loans that were originated under National City Bank's Referral Loan Program, including the Astute Private Loan Program.

- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's Alternative Conforming Loan Program, Brazos Alternative Loan Program, Edvisors Alternative Loan Program, GE Money Bank Alternative Loan Prorgam, Old National Bank Alternative Loan Program, Regions Bank Alternative Loan Program, and Varsity

Group Alternative Loan Program.

- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Loan Program.

- SunTrust Bank, dated March 1, 2002, for loans that were originated under SunTrust Bank's SunTrust Alternative Loan Program.

- TCF National Bank, dated July 22, 2005, for loans that were originated under TCF National Bank's Alternative Loan Program.

- U.S. Bank, N.A., dated May 1, 2005, for loans that were originated under U.S Bank's Alternative Loan Program.

# Exhibit A-8

Exhibit A-8

# Loan Payment History Report
## Date: 2016-04-14

| | | | |
|---|---|---|---|
| Account Number: | ████3533-005-PHEA | | |
| Social Security Number: | ████3533 | Product: | DFG DIRECT TO CONSUMER GRAD |
| Name: | MATA, JOHN M | Officer Code: | 777064 |
| Birth Date: | 1968-████ | School: | LOMA LINDA UNIVERSITY |
| Address 1: | C/O CLARK  MICHAEL E | Program Year: | 200607 |
| Address 2: | 100 N BARRANCA ST STE 250 | | |
| City: | WEST COVINA | Variable Rate Code: | F3 MONTHLY LIBOR |
| State: | CA | Interest Rate: | 10.00% |
| Zip Code: | 91791 | Last Payment Date: | 2012-07-06 |
| Cosigner Name: | MATA, ANITA | | |
| Social Security Number: | ████7992 | | |
| Address 1: | 5489 CAMBRIDGE ST | | |
| Address 2: | | | |
| City: | MONTCLAIR | | |
| State: | CA | | |
| Zip Code: | 91763-2526 | | |
| | | Last Payment Amount: | $77.34 |
| | | Payment Due Date: | |
| Contract Date: | 2006-09-29 | Last Interest Date: | 2016-04-14 |
| Date Assigned: | 2015-08-06 | Accrued Interest: | $1,383.21 |
| Charge Off Date: | 2013-04-01 | Recovered Interest: | $0.00 |
| Charge Off Amount: | $46,764.36 | Net Interest: | $1,383.21 |
| Recovered Principal: | $0.00 | Associated Costs: | $660.00 |
| Net Charge Off: | $54,436.11 | Recovered Costs: | $0.00 |
| Disbursement Date: | 2006-09-29 | Net Costs: | $660.00 |
| Disbursement Amount: | $32,786.89 | | |

# Transaction History

| User | Date | Time | Code | Description | Amount |
|---|---|---|---|---|---|
| System | 2013-04-30 | 00:01 | 82 | $48,620.20 @ 5.950 / 04/05/2013 - 04/30/2013 | $229.84 |
| System | 2013-05-31 | 00:01 | 82 | $48,620.20 @ 5.950 / 04/30/2013 - 05/31/2013 | $245.70 |
| System | 2013-06-30 | 00:01 | 82 | $48,620.20 @ 5.950 / 05/31/2013 - 06/30/2013 | $237.77 |
| System | 2013-07-04 | 00:01 | 82 | $48,620.20 @ 5.950 / 06/30/2013 - 07/04/2013 | $31.70 |
| System | 2013-07-31 | 00:01 | 82 | $48,620.20 @ 5.940 / 07/04/2013 - 07/31/2013 | $213.64 |
| System | 2013-08-31 | 00:01 | 82 | $48,620.20 @ 5.940 / 07/31/2013 - 08/31/2013 | $245.29 |
| System | 2013-09-30 | 00:01 | 82 | $48,620.20 @ 5.940 / 08/31/2013 - 09/30/2013 | $237.37 |
| System | 2013-10-03 | 00:01 | 82 | $48,620.20 @ 5.940 / 09/30/2013 - 10/03/2013 | $23.74 |
| System | 2013-10-09 | 00:01 | 82 | $48,620.20 @ 5.940 / 10/03/2013 - 10/09/2013 | $47.47 |

| System | 2013-10-31 | 00:01 | 82 | $48,620.20 @ 5.930 / 10/09/2013 - 10/31/2013 | $173.78 |
|--------|-----------|-------|----|----------------------------------------------|---------|
| System | 2013-11-30 | 00:01 | 82 | $48,620.20 @ 5.930 / 10/31/2013 - 11/30/2013 | $236.97 |
| System | 2013-12-04 | 00:01 | 82 | $48,620.20 @ 5.930 / 11/30/2013 - 12/04/2013 | $31.60 |
| System | 2013-12-31 | 00:01 | 82 | $48,620.20 @ 5.920 / 12/04/2013 - 12/31/2013 | $212.92 |
| System | 2014-01-31 | 00:01 | 82 | $48,620.20 @ 5.920 / 12/31/2013 - 01/31/2014 | $244.46 |
| System | 2014-02-28 | 00:01 | 82 | $48,620.20 @ 5.920 / 01/31/2014 - 02/28/2014 | $220.80 |
| System | 2014-04-03 | 00:01 | 82 | $48,620.20 @ 5.920 / 02/28/2014 - 04/03/2014 | $268.12 |
| System | 2014-04-14 | 00:00 | 44 | Interest Adjustment | $-842.35 |
| System | 2014-04-14 | 00:01 | 82 | $48,620.20 @ 5.910 / 04/03/2014 - 04/14/2014 | $86.60 |
| System | 2014-05-05 | 00:01 | 82 | $48,620.20 @ 0.000 / 04/14/2014 - 05/05/2014 | $0.00 |
| System | 2014-05-07 | 00:01 | 82 | $48,620.20 @ 0.000 / 05/05/2014 - 05/07/2014 | $0.00 |
| System | 2014-05-21 | 00:01 | 82 | $48,620.20 @ 5.900 / 05/07/2014 - 05/21/2014 | $110.03 |
| System | 2014-07-31 | 00:01 | 82 | $48,620.20 @ 5.900 / 05/21/2014 - 07/31/2014 | $558.00 |
| System | 2014-08-31 | 00:01 | 82 | $48,620.20 @ 5.900 / 07/31/2014 - 08/31/2014 | $243.63 |
| System | 2014-09-02 | 00:01 | 82 | $48,620.20 @ 5.900 / 08/31/2014 - 09/02/2014 | $15.72 |
| System | 2014-09-30 | 00:01 | 82 | $48,620.20 @ 5.910 / 09/02/2014 - 09/30/2014 | $220.43 |
| System | 2014-10-31 | 00:01 | 82 | $48,620.20 @ 5.910 / 09/30/2014 - 10/31/2014 | $244.05 |
| System | 2014-11-05 | 00:01 | 82 | $48,620.20 @ 5.910 / 10/31/2014 - 11/05/2014 | $39.36 |
| System | 2014-11-30 | 00:01 | 82 | $48,620.20 @ 5.910 / 11/05/2014 - 11/30/2014 | $196.81 |
| System | 2014-12-31 | 00:01 | 82 | $48,620.20 @ 5.910 / 11/30/2014 - 12/31/2014 | $244.05 |
| System | 2015-01-05 | 00:01 | 82 | $48,620.20 @ 5.910 / 12/31/2014 - 01/05/2015 | $39.36 |
| System | 2015-01-31 | 00:01 | 82 | $48,620.20 @ 5.900 / 01/05/2015 - 01/31/2015 | $204.34 |
| System | 2015-02-03 | 00:01 | 82 | $48,620.20 @ 5.900 / 01/31/2015 - 02/03/2015 | $23.58 |
| System | 2015-02-28 | 00:01 | 82 | $48,620.20 @ 5.920 / 02/03/2015 - 02/28/2015 | $197.14 |
| System | 2015-03-31 | 00:01 | 82 | $48,620.20 @ 5.920 / 02/28/2015 - 03/31/2015 | $244.46 |
| System | 2015-04-30 | 00:01 | 82 | $48,620.20 @ 5.920 / 03/31/2015 - 04/30/2015 | $236.57 |
| System | 2015-05-01 | 00:01 | 82 | $48,620.20 @ 5.920 / 04/30/2015 - 05/01/2015 | $7.89 |
| System | 2015-05-31 | 00:01 | 82 | $48,620.20 @ 5.930 / 05/01/2015 - 05/31/2015 | $236.97 |
| System | 2015-06-30 | 00:01 | 82 | $48,620.20 @ 5.930 / 05/31/2015 - 06/30/2015 | $236.97 |
| System | 2015-07-31 | 00:01 | 82 | $48,620.20 @ 5.930 / 06/30/2015 - 07/31/2015 | $244.87 |
| System | 2015-08-03 | 00:01 | 82 | $48,620.20 @ 5.930 / 07/31/2015 - 08/03/2015 | $23.70 |
| System | 2015-08-06 | 00:01 | 82 | $48,620.20 @ 5.940 / 08/03/2015 - 08/06/2015 | $23.74 |
| System | 2015-08-31 | 00:01 | 82 | $48,620.20 @ 5.940 / 08/06/2015 - 08/31/2015 | $197.81 |
| System | 2015-09-30 | 00:01 | 82 | $48,620.20 @ 5.940 / 08/31/2015 - 09/30/2015 | $237.37 |
| System | 2015-10-01 | 00:01 | 82 | $48,620.20 @ 5.940 / 09/30/2015 - 10/01/2015 | $7.91 |
| System | 2015-10-14 | 00:00 | 34 | Advn'd by Agency | $435.00 |
| System | 2015-10-14 | 00:01 | 82 | $48,620.20 @ 5.950 / 10/01/2015 - 10/14/2015 | $103.03 |
| System | 2015-11-04 | 00:01 | 82 | $48,620.20 @ 5.950 / 10/14/2015 - 11/04/2015 | $166.44 |
| System | 2015-11-05 | 00:01 | 82 | $48,620.20 @ 5.950 / 11/04/2015 - 11/05/2015 | $7.93 |
| System | 2015-11-24 | 00:00 | 34 | Advn'd by Agency | $135.00 |
| System | 2015-11-24 | 00:01 | 82 | $48,620.20 @ 5.940 / 11/05/2015 - 11/24/2015 | $150.34 |
| System | 2015-12-31 | 00:01 | 82 | $48,620.20 @ 5.940 / 11/24/2015 - 12/31/2015 | $292.76 |
| System | 2016-01-01 | 00:01 | 82 | $48,620.20 @ 5.940 / 12/31/2015 - 01/01/2016 | $7.89 |
| System | 2016-01-31 | 00:01 | 82 | $48,620.20 @ 5.990 / 01/01/2016 - 01/31/2016 | $238.72 |
| System | 2016-02-01 | 00:01 | 82 | $48,620.20 @ 5.990 / 01/31/2016 - 02/01/2016 | $7.96 |
| System | 2016-02-04 | 00:00 | 43 | Principal Adjustment | $5,815.91 |
| System | 2016-02-04 | 00:00 | 44 | Interest Adjustment | $-7,257.81 |
| System | 2016-02-04 | 00:01 | 82 | $48,620.20 @ 6.180 / 02/01/2016 - 02/04/2016 | $24.63 |

| System | 2016-04-01 | 00:00 | 34 | Advn'd by Agency | $90.00 |
| System | 2016-04-01 | 00:01 | 82 | $54,436.11 @ 10.000 / 02/04/2016 - 04/01/2016 | $847.78 |
| System | 2016-04-14 | 00:01 | 82 | $54,436.11 @ 10.000 / 04/01/2016 - 04/14/2016 | $193.35 |

# Exhibit A-9

Exhibit A-9

From: Fax    Page: 3/9    Date: 8/16/2007 7:32:49 PM

8/16/2007 4:28 PM FROM: Fax NextStudent TO: 916007049406    PAGE: 003 OF 009

08/16/2007    13:28    CHARUU UPLIANU DEBS → 18007491103    NO.505    002

## * Cosigned *    Loan Request/Credit Agreement - Signature Page

**NON-NEGOTIABLE CREDIT AGREEMENT – THIS IS A CONSUMER CREDIT TRANSACTION**

### LOAN PROGRAM INFORMATION

Next Student Graduate Loan                            Academic Period: 08/2007-12/2007

Lender: Charter One Bank, N.A.        School: LOMA LINDA UNIVERSITY

Loan Amount Requested: $30000.00        Repayment Option: Full Deferral

Deferral Period Margin*: 7.35        Repayment Period Margin*: 7.35        Loan Origination Fee Percentage: 10.50
*Variable interest rate equals the LIBOR index plus the Margin (see paragraph D.2).

### STUDENT BORROWER INFORMATION

Borrower Name: John Mata        Home Address: 5489 Cambridge Montclair, CA 91763
Social Security #: (XXX)-8533        Date of Birth: XX/1968        Home Telephone: (909) 983-8045
Mobile Telephone:        E-mail Address:
Student Citizenship (check one box): ☒ U.S. Citizen        ☐ Eligible Non-Citizen (Attach front & back copy of CIS or student visa card)
Note: Personal reference name and address cannot match that of the Cosigner.
Personal Reference Name: Larry Pfizer        Reference Home Tel #: (909) 866-6778        Work Tel #:
Reference Street Address: 1311 W 5th St
Reference City/State/Zip: Ontario, CA 91762

### COSIGNER INFORMATION (Must be age of majority in state of residence)

Cosigner Name: Anita Mata        Home Address: 5489 Cambridge St Montclair, CA 91763
Social Security #: (XXX)-7992        Date of Birth: XX/1943,        Home Telephone: (909) 983-8045
        41
Mobile Telephone:        E-mail Address:
Have you ever defaulted on a student loan or declared bankruptcy?  ☒ No   ☐ Yes
Current Employer: DA VITA        Employer Telephone: (909) 945-3882
        946-1552
Current Position: Professional        Years There: 18 Years        dm
Years at Previous Employment: 0 Years

Alimony, child support, or separate maintenance incomes do not have to be revealed if you do not want them considered for repaying this obligation. If you are relying on such additional income, please provide details on a separate sheet of paper.

Cosigner Citizenship (check one box): ☒ U.S. Citizen        ☐ Eligible Non-Citizen (Attach front & back copy of CIS)
Note: Personal reference name and address cannot match that of the Student.
Personal Reference Name: Rene Mata        Reference Home Tel #: (909) 354-6354        Work Tel #:
Reference Street Address: 4891 Manchester Ln
Reference City/State/Zip: Riverside, CA 92509

By my signature, I certify that I have read, understand and agree to the terms of and undertake the obligations set forth on all five (5) pages of this Loan Request/Credit Agreement AB.07-08.CSX1.10DC.1106 ("Credit Agreement"). I understand that any person who knowingly makes a false statement or misrepresentation on this form is subject to penalties, which may include fines or imprisonment. This Credit Agreement is signed under seal. I understand that I am not required to fax my signature on or to sign electronically this Credit Agreement and any related notices that require signature. If I choose to fax my signature on or to sign electronically this Credit Agreement and any related notices that require signature, I intend: (i) any fax or electronic signature to be an electronic signature under applicable federal and state law, (ii) any fax printout or printout of Lender's electronic record of this Credit Agreement and related notices to be an original document, (iii) to conduct business with the Lender by electronic records and electronic signatures, and (iv) that this Credit Agreement will not be governed by Article 3 of the Uniform Commercial Code, and my obligations under this Credit Agreement will not be subject to, but any transfer of my obligations will be subject to, Article 9 of the Uniform Commercial Code.

**For purposes of the following notices, "you" means the Borrower and Cosigner, not the Lender.**

**FOR ALABAMA RESIDENTS: CAUTION – IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.**

**FOR WISCONSIN RESIDENTS - NOTICE TO CUSTOMER: (a)** DO NOT SIGN THIS CREDIT AGREEMENT BEFORE YOU READ THE WRITING ON THE FOLLOWING PAGES, EVEN IF OTHERWISE ADVISED.
**(b)** DO NOT SIGN THIS CREDIT AGREEMENT IF IT CONTAINS ANY BLANK SPACES.
**(c)** YOU ARE ENTITLED TO AN EXACT COPY OF ANY AGREEMENT YOU SIGN.
**(d)** YOU HAVE THE RIGHT AT ANY TIME TO PAY IN ADVANCE THE UNPAID BALANCE UNDER THIS CREDIT AGREEMENT AND YOU MAY BE ENTITLED TO A PARTIAL REFUND OF THE FINANCE CHARGE.

PLEASE SIGN BELOW – RETURN This Page With Proof of Income and Other Information (if applicable) - FAX TO: 1-866-749-1358

Signature of Borrower ___John M. Mata___        Date _8·8·07_

**BY SIGNING THIS CREDIT AGREEMENT BELOW, I CERTIFY THAT I INTEND TO (i) APPLY FOR JOINT CREDIT AND (ii) BE JOINTLY LIABLE WITH THE BORROWER FOR THIS LOAN.**

Signature of Cosigner ___Anita Mata___        Date _8·08·07_

AB.07-08.CSX1.10DC.1106        LENDER COPY

In this Credit Agreement, the words "I", "me", "my", and "mine" mean the person(s) who signed this Credit Agreement as Borrower and Cosigner. The words "you", "your", "yours", and "Lender" mean Charter One Bank, N.A., its successors and assigns, and any other holder of this Credit Agreement. "School" means the school named at the top of the first page of this Credit Agreement. The "servicer" means the Lender or any entity it designates to service my loan.

**A. PROMISE TO PAY:** I promise to pay to you the principal sum of the Loan Amount Requested shown on the first page of this Credit Agreement, to the extent it is advanced to me or paid on my behalf, and any Loan Origination Fee added to my loan (see Paragraph F) (together, the "Principal Sum"), interest on such Principal Sum, interest on any unpaid interest added to the Principal Sum and late fees (see Paragraph E.6).

**B. IMPORTANT – READ THIS CAREFULLY:**
1. When you receive my signed Credit Agreement, you are not agreeing to lend me money. If you decide to make a loan to me, you will electronically transfer the loan funds to the School for me, mail a loan check to the School for me, or mail a loan check directly to me. You have the right to not make a loan or to lend an amount less than the Loan Amount Requested. I agree to accept an amount less than the Loan Amount Requested and to repay that portion of the Loan Amount Requested that you actually lend to me along with interest and all other amounts I owe (see Paragraph A). You have the right to disburse my loan through an agent. At your option, you may also make any loan check co-payable to me and the Cosigner or to me and the School.
2. HOW I AGREE TO THE TERMS OF THIS LOAN. By signing this Credit Agreement, and submitting it to the Lender, I am requesting that you make this loan to me in an amount equal to the Loan Amount Requested plus any Loan Origination Fee described in Paragraph F of this Credit Agreement. If you approve this request and agree to make this loan, you will notify me in writing and provide me with a Disclosure Statement, as required by law, at the time the loan proceeds are disbursed. The Disclosure Statement is incorporated herein by reference and made a part hereof. The Disclosure Statement will tell me the amount of the loan which you have approved, the amount of the Loan Origination Fee, and other important information. I will let you know that I agree to the terms of the loan as set forth in this Credit Agreement and in the Disclosure Statement by doing either of the following: (a) endorsing or depositing the check that disburses the loan proceeds; or (b) allowing the loan proceeds to be used by or on behalf of the student Borrower without objection. Upon receipt of the Disclosure Statement, I will review the Disclosure Statement and notify you in writing if I have any questions. If I am not satisfied with the terms of my loan as disclosed in the Disclosure Statement, I may cancel my loan. To cancel my loan, I will give you a written cancellation notice within ten (10) days after I receive the Disclosure Statement. If loan proceeds have been disbursed, I agree that I will immediately return the loan proceeds to you, will not endorse any check which disburses the loan proceeds and will instruct the School to return any loan proceeds to you. If I give notice of cancellation but do not comply with the requirements of this Paragraph B.2, this Credit Agreement will not be canceled and I will be in default of this Credit Agreement. (See Paragraph I.)

**C. DEFINITIONS:**
1. "Disbursement Date" means the date or dates on which you lend money to me in consideration for my Credit Agreement and will be the date(s) shown on any loan check you prepare or the date(s) you initiate any electronic funds transfer.
2. The "Deferment Period" will begin on the Disbursement Date and end on the Deferment End Date.
3. "Deferment End Date" means the date specified below for the applicable loan program (the applicable loan program is stated on the first page of this Credit Agreement).
(a) *Undergraduate Alternative Loan Program:* If I have elected the "Immediate Repayment" option (the applicable repayment option is stated on the first page of this Credit Agreement), there is no Deferment Period, and my first payment will be 30-60 days after the disbursement of my loan. If I have elected the "Interest Only" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), then interest payments will begin 30-60 days after the disbursement of my loan, the "Deferment End Date" will be the date the student Borrower first graduates or ceases to be enrolled at least half-time in the School (or another school participating in this loan program), and principal and interest payments will begin 30-60 days after that date. In any event, if I have elected the "Interest Only" repayment option, the Deferment End Date will be no more than 5 years after the Disbursement Date. If I have elected the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), then the "Deferment End Date" will be 180 days after the date the student Borrower first graduates or ceases to be enrolled at least half-time in the School (or another school participating in this Loan Program). In any event, if I have elected the "Full Deferral" repayment option, the Deferment End Date will be no more than 5½ years after the Disbursement Date. For borrowers who chose the "Interest Only" or "Full Deferral" repayment options, joint and serial (associates to bachelors) degree recipients may continue in-school deferment while completing their second degree, up to the 5-year or 5 ½- year maximum.
(b) *Graduate Professional Education Loan Program:* The Deferment End Date will be 180 days after the student Borrower graduates or ceases for any other reason to be enrolled at least half-time in the School (or another school participating in this Loan Program), but no more than 4½ years after the Disbursement Date; provided,

however, that if the student Borrower begins a medical residency or internship during the Deferment Period, then the Deferment Period will end 180 days after the day the residency or internship ends, but no more than 8½ years after the Disbursement Date.
4. The "Repayment Period" begins the day after the Deferment Period ends. If there is no Deferment Period for my loan, the Repayment Period will begin when my loan is fully disbursed. The Repayment Period is 20 years unless monthly payments equal to the minimum monthly payment amount (See Paragraph E.2) will repay all amounts owed in less than 20 years, in which case the Repayment Period will be the number of months necessary to pay in full the amount I owe at the minimum payment.

**D. INTEREST:**
1. Accrual – Beginning on the Disbursement Date, interest will be calculated at the Variable Rate (Paragraph D.2) and charged on the Principal Sum, and on any unpaid interest later added to the Principal Sum according to Paragraph D.3. During the Repayment Period, interest will be calculated at the Variable Rate and charged on the outstanding balance of this Credit Agreement until all amounts are paid in full. Interest will be calculated on a daily simple interest basis. The daily interest rate will be equal to the annual interest rate in effect on that day, divided by the number of days in that calendar year.
2. Variable Rate – The "Variable Rate" is equal to the Current Index plus a Margin. The Margins for both the Deferment Period and the Repayment Period are shown on the first page of this Credit Agreement. In no event will the Variable Rate exceed the maximum interest rate allowed by the laws of the State of Ohio. The Variable Rate will change monthly on the first day of each calendar month (the "Change Date(s)") if the Current Index changes. The "Current Index" for any calendar month (or for any shorter period beginning on the Disbursement Date and ending on the last day of a calendar month) is based on the one-month London Interbank Offered Rate ("LIBOR") as published in the "Money Rates" section of *The Wall Street Journal* (Eastern Edition). The index for each calendar month (or for any shorter period beginning on a Disbursement Date and ending on the last day of a calendar month) will equal the LIBOR rate published on the first business day of the immediately preceding calendar month, rounded to the nearest one-hundredth of one percent (0.01%). If *The Wall Street Journal* (Eastern Edition) is not published or the Current Index is not given on that date, then the Current Index will be determined by using the immediately preceding published Current Index. If the Current Index is no longer available, you will choose a comparable index.
3. Capitalization – If I have elected the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), I am not obligated to make any payments until the loan enters the Repayment Period and you will add unpaid accrued interest to the principal loan balance as of the last day of each calendar quarter (the last day of December, March, June and September) during the Deferment Period and as of the last day of my Deferment Period. Interest that is added to principal is called "Capitalized" interest. Capitalized interest will be treated as principal. In addition, if I am in default (see Paragraph I) and the loan has been sold to TERI (see Paragraph L.12), TERI may capitalize accrued and unpaid interest as of the date it purchases my loan. I understand that you will also add all accrued and unpaid interest to the principal balance of my loan at the end of any forbearance period (see Paragraph H). In all cases, the sum of interest you capitalize plus the then-outstanding principal balance is thereafter considered the principal balance, and interest will accrue on the new principal balance.

**E. TERMS OF REPAYMENT:**
1. Deferment Period – If I have elected either the "Interest Only" repayment option or the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), you may, or, if required by applicable law, will send statements during the Deferment Period (showing the total outstanding principal balance of my loan and the interest that has accrued on my loan). You reserve the right to send statements or notices to either the Borrower or the Cosigner. Statements will be sent to me at the address shown on your records. If I have elected the "Interest Only" repayment option, I agree to make payments each month during the Deferment Period equal to the accrued interest on the outstanding balance of this Credit Agreement. If I have elected the "Full Deferral" repayment option I may, but am not required to make payments during the Deferment Period. You will add any interest that I do not pay during the Deferment Period to the principal balance, as described in Paragraph D.3.
2. Repayment Period – The amount of my monthly payment ("Monthly Payment Amount") will be established based on the rules in this Credit Agreement when my Repayment Period begins. During the Repayment Period, you will send me monthly statements that show the Monthly Payment Amount and the payment due dates, and I will pay the Monthly Payment Amount shown on my monthly statement, which amount will in no event be less than $25 or the unpaid balance, whichever is less. I understand that the Monthly Payment Amount is due each month. I may pay more than my Monthly Payment Amount at any time without penalty or charge. If my loan is in paid-ahead status, I may, but will not be required to make monthly payments. You reserve the right to send monthly statements to the Borrower and/or the Cosigner. Even if I do not receive monthly statements, I will make consecutive monthly payments in amounts at least equal to the Monthly Payment Amount by the applicable payment due dates until I have paid all of the principal and interest and any other charges I may owe under this Credit Agreement.
3. Repayment Terms - My Monthly Payment Amount will be calculated as of the day the Repayment Period begins ("Repayment Date"). It will be recalculated (a) once

each year prior to the anniversary of the Repayment Date, (b) if the Variable Rate changes between anniversaries of the Repayment Date to the extent that the Monthly Payment Amount would not pay in full the accrued monthly interest on my loan, (c) following any subsequent deferment or forbearance period or (d) following any request by the Borrower to the servicer to change the monthly payment due date (each of which events is a new "Repayment Date"). As of any Repayment Date, my Monthly Payment Amount will be recalculated. My new Monthly Payment Amount will be disclosed to me by the servicer. The new Monthly Payment Amount will equal the amount necessary to pay in full, over the number of months remaining in the Repayment Period, the amount I owe in equal monthly installments of principal and interest at the Variable Rate in effect at the time of the calculation. I understand that this may result in a reduction or increase in my monthly payment as calculated as of each Repayment Date. I understand that during the Repayment Period (and, if I have elected the "Interest Only" repayment option, during the period of interest payments) the servicer may change the monthly payment due date of future payments to a later date for the convenience of the servicer in processing payments or in order to coordinate the due dates of all of my loans processed by the servicer.
4.  Amounts Owing at the End of the Repayment Period – Since interest accrues daily upon the unpaid principal balance of my loan, if I make payments after my payment due dates, I may owe additional interest. If I have not paid my late fees, I will also owe additional amounts for those late fees. In such cases you will increase the amount of my last monthly payment to the amount necessary to repay my loan in full.
5.  Payments – Payments will be applied first to late fees, other fees and charges, accrued interest, and the remainder to principal.
6.  Other Charges - If any part of a monthly payment remains unpaid for a period of more than 15 days after the payment due date, I will pay a late fee not exceeding $5.00 or 5% of the overdue payment amount, whichever is less. To the extent permitted by law, I agree to pay you all amounts you incur in enforcing the terms of this Credit Agreement, including reasonable collection agency and attorneys' fees and court costs and other collection costs.
F.  LOAN ORIGINATION FEE:  If you charge me, I will pay you a Loan Origination Fee at the time my loan is disbursed. The dollar amount of any Loan Origination Fee will be determined by multiplying the Principal Sum times the Loan Origination Fee Percentage shown on the first page of this Credit Agreement.  The percentage would be higher if computed only on the amount advanced rather than on the entire Principal Sum (Loan Origination Fee plus the loan amount advanced).  For example, a nominal Loan Origination Fee of 6.5% on the entire principal amount would equal 6.9519% of the amount advanced.  The Loan Origination Fee I will pay, if any, will be shown on my Disclosure Statement and included with the Principal Sum.  To the extent permitted by law, and unless I timely cancel this Credit Agreement (see Paragraph B.2), I will not be entitled to a refund of any Loan Origination Fee after my loan has been disbursed.
G.  RIGHT TO PREPAY:  I have the right to prepay all or any part of my loan at any time without penalty.
H.  FORBEARANCE:  If I am unable to repay my loan in accordance with the terms established under this Credit Agreement because of a hardship such as financial or medical difficulty, I may request that you modify these terms. I understand that such modification would be at your option, and, to the extent not prohibited by applicable law, you may charge me a fee equal to two percent 2% of the outstanding principal balance if you agree to modify the terms of this Credit Agreement. I understand that I will remain responsible for all interest accruing during any period of forbearance and that you will add any 2% fee described in the previous sentence and all interest that I do not pay during any forbearance period to the principal balance, as described in Paragraph D.3.
I.  WHOLE LOAN DUE:  To the extent permitted by applicable law, I will be in default and you have the right to give me notice that the whole outstanding principal balance, accrued interest, and all other amounts payable to you under the terms of this Credit Agreement, are due and payable at once (subject to any applicable law which may give me a right to cure my default) if: (1) I fail to make any monthly payment to you when due, (2) I die, (3) I break any of my other promises in this Credit Agreement, (4) any bankruptcy proceeding is begun by or against me, or I assign any of my assets for the benefit of my creditors, or (5) I make any false written statement in applying for this loan or any other loan or at any time during the Deferment or Repayment Periods. If I default, I will be required to pay interest on this loan accruing after default. The interest rate after default will be subject to adjustment in the same manner as before default. Upon default, you may also capitalize any interest and fees (i.e., add accrued and unpaid interest and fees to the principal balance), and increase the Margin used to compute the Variable Rate by two percentage points (2%).
J.  NOTICES:
1.  I will send written notice to you, any subsequent holder of this Credit Agreement, and the servicer within ten days after any change in name, address, or enrollment status (for example, if the Borrower withdraws from the School or transfers to another school participating in this loan program).
2.  Any notice required to be given to me by you will be effective when mailed by first class mail to the latest address you have for me. Unless required by applicable law, you need not give a separate notice to the Cosigner, if any.
K.  INFORMATION:
1.  I must update the information I provided to you whenever you ask me to do so.
2.  I authorize you from time to time to request and receive from others credit related information about me (and about my spouse if I live in a community property state).

3.  <u>CREDIT BUREAU REPORTING</u>

> You may report information about my account to credit bureaus. Late payments, missed payments, or other defaults in my account may be reflected in my credit report.

I understand that the reporting of information about my account to credit bureaus may adversely affect my credit rating and my ability to obtain other credit. You may also provide the School with certain personally-identifiable information about me (such as my Social Security Number and my Loan ID number) and report the status of my loan and my payment history, including information about a late payment, missed payment or other defaults, to the School and others in accordance with applicable law.
L.  ADDITIONAL AGREEMENTS:
1.  I understand that you are located in Ohio and that this Credit Agreement will be entered into in the same state. CONSEQUENTLY, THE PROVISIONS OF THIS CREDIT AGREEMENT WILL BE GOVERNED BY FEDERAL LAW AND THE LAWS OF THE STATE OF OHIO, WITHOUT REGARD TO CONFLICT OF LAW RULES.
2.  The proceeds of this loan will be used only for my educational expenses at the School. The Cosigner, if any, will not receive any of the loan proceeds.
3.  My responsibility for paying the loan evidenced by this Credit Agreement is unaffected by the liability of any other person to me or by your failure to notify me that a required payment has not been made. Without losing any of your rights under this Credit Agreement you may accept (a) late payments, (b) partial payments or (c) payments marked "paid in full" or with other restrictions. You may delay, fail to exercise, or waive any of your rights on any occasion without losing your entitlement to exercise the right at any future time, or on any future occasion. You will not be obligated to make any demand upon me, send me any notice, present this Credit Agreement to me for payment or make protest of non-payment to me before suing to collect on this Credit Agreement if I am in default, and to the extent permitted by applicable law, I hereby waive any right I might otherwise have to require such actions. I WILL NOT SEND YOU PAYMENTS MARKED "PAID IN FULL", "WITHOUT RECOURSE" OR WITH OTHER SIMILAR LANGUAGE UNLESS THOSE PAYMENTS ARE MARKED FOR SPECIAL HANDLING AND SENT TO THE ADDRESS IDENTIFIED FOR SUCH PAYMENTS ON MY BILLING STATEMENT, OR TO SUCH OTHER ADDRESS AS I MAY BE GIVEN IN THE FUTURE.
4.  I may not assign this Credit Agreement or any of its benefits or obligations. You may assign this Credit Agreement at any time.
5.  The terms and conditions set forth in this Credit Agreement and the Disclosure Statement constitute the entire agreement between you and me.
6.  If any provision of this Credit Agreement is held invalid or unenforceable, that provision shall be considered omitted from this Credit Agreement without affecting the validity or enforceability of the remainder of this Credit Agreement.
7.  A provision of this Credit Agreement may only be modified if jointly agreed upon in writing by you and me. Any modification will not affect the validity or enforceability of the remainder of this Credit Agreement.
8.  To the extent permitted by law, you have the right to apply money from any of my deposit account(s) with you to pay all or a portion of any amount overdue under this Credit Agreement. I hereby authorize you to obtain from the School all amounts which may be owed to me by the School, including any refund due to overpayment, early termination of enrollment, or otherwise.
9.  If this Credit Agreement is executed by more than one Borrower, each Borrower agrees that any communication between you and any of the Borrowers will be binding on all of the Borrowers. I intend to be treated as a principal of this Credit Agreement and not as a surety. To the extent I may be treated as a surety, I waive all notices to which I might otherwise be entitled as such by law, and all suretyship defenses that might be available to me (including, without limitation, contribution, subrogation and exoneration). I agree that the Borrower may agree to any forbearance or other modification of the repayment schedule and that such agreement will be binding on me. It shall not be necessary for you to resort to or exhaust your remedies against the borrower before calling upon me to make repayment. For purposes of this paragraph only, "I" and "me" refer to the Cosigner only.
10.  All dollar amounts stated in this Credit Agreement are in United States dollars. I will make all payments in United States Dollars with no deduction for currency exchange.
11.  If the student Borrower fails to complete the education program paid for with this loan, the Cosigner and I are not relieved of any obligation within or pursuant to this Credit Agreement.
12.  I understand and agree that this loan is an education loan and certify that it will be used only for costs of attendance at the School. I acknowledge that the requested loan is subject to the limitations on dischargeability in bankruptcy contained in Section 523 (a) (8) of the United States Bankruptcy Code because either or both of the following apply: (a) this loan was made pursuant to a program funded in whole or in part by The Education Resources Institute, Inc. ("TERI"), a non-profit institution, or (b) this is a qualified education loan as defined in the Internal Revenue Code. This means that if, in the event of bankruptcy, my other debts are discharged, I will probably still have to pay this loan in full.
13.  I authorize any school that I may attend to release to you, and any other persons designated by you, any requested information pertinent to this loan (e.g., enrollment status, prior loan history, and current address).

14. I authorize the Lender, any subsequent holder of this Credit Agreement, and their agents to: (1) advise the School of the status of my application and my loan, (2) respond to inquiries from prior or subsequent lenders or holders with respect to my Credit Agreement and related documents, (3) release information and make inquiries to the persons I have given you as references, for the purposes of learning my current address and telephone number, (4) check my credit and employment history and to answer questions about their credit experience with me, and (5) disclose to TERI, the Borrower, and/or the Cosigner either in connection with this transaction or any future transaction all information (including status information and non-public personal information) of the Borrower and/or the Cosigner provided in connection with this Credit Agreement. If in the future I apply for a loan that is guaranteed by TERI and funded by another lender, I also authorize the sharing of application information for this loan (other than information in a consumer report) with the other lender and TERI and the reuse of such information by such new lender and TERI in my new application.

15. Waiver by Lender: You waive (give up) any right to claim a security interest in any property to secure this Credit Agreement. This does not affect any right to offset as a matter of law.

16. If I fax my signature(s) on the first page of this Credit Agreement back to you and keep the copy I signed, I understand that under federal law the fax you receive will be an original of the first page of this Credit Agreement. You and I agree that all copies of this Credit Agreement (including the fax you receive and the copy I retain), taken together, shall constitute a single original agreement.

17. If any Borrower or Cosigner elects to sign electronically an electronic record of this Credit Agreement, then the following will apply as between Lender and such person: (a) Lender will keep a non-modifiable electronic record of this document and provide a copy to me upon request, (b) I can and have downloaded and/or printed a copy of this document for my records or notified the Lender to mail me a copy of this document, and (c) the Lender's electronic record of this document and any printout from that record shall be an original for all purposes, including any lawsuit to collect amounts that I owe. If I physically sign a copy of this document that has been electronically signed by any other Cosigner or Borrower, as between me and the Lender the copy I sign (and any fax of that copy I may send to Lender) will be an original. However, the electronic signature of another party to this Credit Agreement and the Lender's electronic record of this document containing that signature will be as valid against me as an original, physical document that is physically signed by all parties.

M. DISCLOSURE NOTICES

---

**ALL APPLICANTS:**
**IMPORTANT FEDERAL LAW NOTICE—**

*Important information about procedures for opening a new account:*
**To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.**

*What this means for you:*
**When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.**

---

CALIFORNIA RESIDENTS: I have the right to prohibit the use of information contained in my credit file in connection with transactions not initiated by me. I may exercise this right by notifying the consumer credit reporting agency. A married applicant may apply for a separate account. If you take any adverse action as defined by Section 1785.3 of the California Civil Code and the adverse action is based, in whole or in part, on any information contained in a consumer credit report, I have the right to obtain within 60 days a free copy of my consumer credit report from the consumer reporting agency who furnished you my consumer credit report and from any other consumer credit reporting agency which compiles and maintains files on consumers on a nationwide basis. I have the right as described by Section 1785.16 of the California Civil Code to dispute the accuracy or completeness of any information in a consumer credit report furnished by the consumer credit reporting agency.

CALIFORNIA AND UTAH RESIDENTS: As required by California and Utah law, I am hereby notified that a negative credit report reflecting on my credit record may be submitted to a credit reporting agency if I fail to fulfill the terms of my credit obligations.

IOWA, KANSAS AND NEBRASKA RESIDENTS (For purposes of the following notice, the word "you" refers to the Borrower and the Cosigner, not the Lender): NOTICE TO CONSUMER. This is a consumer credit transaction. 1. DO NOT SIGN THIS CREDIT AGREEMENT BEFORE YOU READ THIS CREDIT AGREEMENT. 2. YOU ARE ENTITLED TO A COPY OF THIS CREDIT AGREEMENT. 3. YOU MAY PREPAY THE UNPAID BALANCE AT ANY TIME WITHOUT PENALTY AND MAY BE ENTITLED TO A REFUND OF UNEARNED CHARGES IN ACCORDANCE WITH LAW.

MARYLAND RESIDENTS: In Paragraph L.1, Lender and I have agreed that this Credit Agreement is governed by federal law and the laws of OHIO, without regard to conflict of laws rules; if any court should nevertheless determine that this Credit Agreement is

subject to Maryland laws concerning credit, then only to the extent that Maryland law applies, Lender and I agree and elect that this loan is made under and governed by Subtitle 10, Credit Grantor Closed End Credit Provisions, of Title 12 of the Commercial Law Article of the Annotated Code of Maryland, except as preempted by federal law.

MISSOURI RESIDENTS: Oral agreements or commitments to loan money, extend credit or to forbear from enforcing repayment of a debt including promises to extend or renew such debt are not enforceable. To protect me (borrower(s)) and you (creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.

NEVADA RESIDENTS: This is a loan for study.

NEW JERSEY RESIDENTS: The section headings of this Credit Agreement are a table of contents and not contract terms. Portions of this Credit Agreement with references to actions taken to the extent of applicable law apply to acts or practices that New Jersey law permits or requires. In this Credit Agreement, acts or practices (i) by you which are or may be permitted by "applicable law" are permitted by New Jersey law, and (ii) that may or will be taken by you unless prohibited by "applicable law" are permitted by New Jersey law.

NEW YORK, RHODE ISLAND AND VERMONT RESIDENTS: A consumer report (credit report) may be obtained from a consumer-reporting agency (credit bureau) in connection with this loan. If I request (1) I will be informed whether or not consumer reports were obtained, and (2) if reports were obtained, I will be informed of the names and addresses of the credit bureaus that furnished the reports. If you agree to make this loan to me, a consumer credit report may be requested or used in connection with renewals or extensions of any credit for which I have applied, reviewing my loan, taking collection action on my loan, or legitimate purposes associated with my loan.

OHIO RESIDENTS: The Ohio laws against discrimination require that all creditors make credit equally available to all credit worthy customers, and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with this law.

WISCONSIN RESIDENTS: For married Wisconsin residents, my signature on this Credit Agreement confirms that this loan obligation is being incurred in the interest of my marriage or family. No provision of any marital property agreement (pre-marital agreement), unilateral statement under Section 766.59 or court decree under Section 766.70 adversely affects the interest of the Lender unless the Lender, prior to the time that the loan is approved, is furnished with a copy of the agreement, statement, or decree or has actual knowledge of the adverse provision when the obligation to the Lender is incurred. If the loan for which I am applying is granted, my spouse will also receive notification that credit has been extended to me.

N. BORROWER'S CERTIFICATION: I declare under penalty of perjury under the laws of the United States of America that the following is true and correct. I certify that all information I provided to you in connection with this loan, including without limitation, the information contained in this Credit Agreement, is true, complete and correct to the best of my knowledge and belief and is made in good faith. I understand that I am responsible for repaying immediately any funds that I receive which are not to be used or are not used for educational expenses related to attendance at the School for the academic period stated. I certify that I am not now in default on a Federal Perkins Loan, a Federal Stafford Loan, a Federally Insured Student Loan, a Federal Supplemental Loan for Students (SLS), a Federal PLUS Loan, an Income Contingent Loan, a Federal Consolidation Loan, a Federal Ford Direct Loan, or any other education loan received for attendance at any school.

By signing this Credit Agreement, to the extent permitted by applicable law, I hereby ratify, confirm, and acknowledge the validity of all prior credit agreements I have signed with the Lender for this loan program. I intend and agree that all such credit agreements shall be binding on me. The consideration for this affirmation is the new credit extended by the Lender to me under this Credit Agreement.

O. STATE-SPECIFIC COSIGNER NOTICES: For the purposes of the following notices only, the words "you" and "your" refer to the Cosigner, where applicable, not to the lender.

FOR OBLIGORS COSIGNING IN WEST VIRGINIA:

---

**NOTICE TO COSIGNER**
You are being asked to guarantee this debt. Think carefully before you do. If the Borrower doesn't pay the debt, you will have to. Be sure you can afford to pay it if you have to, and that you want to accept this responsibility. You may have to pay up to the full amount of the debt if the Borrower does not pay. You may also have to pay late fees or collection costs, which increase this

---

amount. The creditor can collect this debt from you without first
trying to collect from the Borrower. The creditor can use the same
collection methods against you that can be used against the
Borrower, such as suing you, garnishing your wages, etc. If this
debt is ever in default, that fact may become a part of your credit
record. This notice is not the contract that makes you liable for the
debt.

FOR OBLIGORS COSIGNING IN VERMONT:

### NOTICE TO COSIGNER

**YOUR SIGNATURE ON THIS CREDIT AGREEMENT MEANS
THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS
LOAN. IF THE BORROWER DOES NOT PAY, THE LENDER HAS
A LEGAL RIGHT TO COLLECT FROM YOU.**

## FEDERAL AND CALIFORNIA COSIGNER NOTICES

For the purposes of these Notices, the words "you" and "your" refer to the Cosigner, not the Lender.

**NOTICE TO COSIGNER (Traduccion en Ingles Se Requiere Por La Ley):**
You are being asked to guarantee this debt. Think carefully before you do. If the borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to, and that you want to accept this responsibility.

You may have to pay up to the full amount of the debt if the borrower does not pay. You may also have to pay late fees or collection costs, which increase this amount.

The holder of the loan can collect this debt from you without first trying to collect from the borrower. The holder of the loan can use the same collection methods against you that can be used against the borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become part of your credit record.

This notice is not the contract that makes you liable for the debt.

**AVISO PARA EL FIADOR (Spanish Translation Required by Law):**
Se le está pidiendo que garantice esta deuda. Piénselo con cuidado antes de ponerse de acuerdo. Si la persona que ha pedido este préstamo no paga la deuda, usted tendrá que pagarla. Esté seguro de que usted podrá pagar si sea obligado a pagarla y de que usted desea aceptar la responsabilidad.

Si la persona que ha pedido el préstamo no paga la deuda, es posible que usted tenga que pagar la suma total de la deuda, mas los cargos por tardarse en el pago o el costo de cobranza, lo cual aumenta el total de esta suma.

El acreedor (financiero) puede cobrarle a usted sin, primeramente, tratar de cobrarle al deudor. Los mismos metodos de cobranza que pueden usarse contra el deudor, podran usarse contra usted, tales como presentar una demanda en corte, quitar parte de su sueldo, etc. Si alguna vez no se cumpla con la obligación de pagar esta deuda, se puede incluir esa información en la historia de credito de usted.

Este aviso no es el contrato mismo en que se le echa a usted la responsabilidad de la deuda.

**AB.07-08.CSX1.10DC.1106.FD**
{W0687584.1}

## NOTE DISCLOSURE STATEMENT

$ 33,519.55
05550481
Loan No.

Borrower(s)    JOHN MATA
               ANITA MATA

Student:    JOHN MATA
Date:       August 21, 2007

JOHN MATA
5489 CAMBRIDGE
MONTCLAIR , CA 91763  USA

Lender Name and Address:
CHARTER ONE BANK, N.A.
725 CANTON STREET
NORWOOD, MA 02062

This disclosure statement relates to your Loan Note disbursed on        August 21, 2007
Because your Loan is either being disbursed or entering repayment, or the repayment terms are being modified, the following
information about your Loan is being given to you.

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments scheduled. |
| 14.003  % | $  91,593.60 | $  30,000.00 | $  121,593.60 |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments are due |
|---|---|---|
| 240 | $  506.64 | On the   1st   day of each month beginning   12/2009 |
|  |  |  |
|  |  |  |
|  |  |  |

**VARIABLE RATE:** The Annual Percentage Rate, which is based on an index plus a margin, may increase during the term of
the loan if the index rate increases. The index is (check one):

☐ **Prime Rate Index Adjusted Monthly** - The highest U.S. bank prime rate published in the "Money Rates" section of
The Wall Street Journal (Eastern Edition) on the last business day of each calendar month.

☐ **Prime Rate Index Adjusted Quarterly** - The highest U.S. bank prime rate published in the "Money Rates" section of
The Wall Street Journal (Eastern Edition) on the last business day of each calendar quarter.

☐ **LIBOR Index Adjusted Quarterly** - The average of the one-month London Interbank Offered Rates published in the
"Money Rates" section of The Wall Street Journal (Eastern Edition) on the first business day of each of the three (3)
calendar months immediately preceding the first day of each calendar quarter.

☒ **LIBOR Index Adjusted Monthly** - The one-month London Interbank Offered Rate published in the "Money Rates"
section of The Wall Street Journal (Eastern Edition) on the first business day of the preceding calendar month.

Any increase in the index and the Annual Percentage Rate which occurs while principal payments are deferred will increase
the amount of any current and all future payments. Any increase in the index and the Annual Percentage Rate which occurs while
principal and interest payments are deferred will increase the amount of all future payments. Any increase in the index and the
Annual Percentage Rate which occurs after you have begun to make principal and interest payments on your loan will increase the
amount of your future principal and interest payments beginning with your next annual payment adjustment date. For example,
assume you obtain a loan in your junior year, in the amount of $10,000, at an interest rate of 11%, and you defer principal and
interest payments until after your graduation, and the repayment term of the loan is 20 years. If the interest rate increased to 12%
on January 1st of your senior year, the interest which accrues while principal and interest payments are deferred will increase by
$91.01, and your monthly principal and interest payments would increase by $9.37.

**LATE CHARGES:** If a payment is more than 15 days late, you may be charged $5.00 or 5% of the payment, whichever is less. If
you default, Lender (or any subsequent holder of your Loan Note) may increase the margin used to compute the Annual Percentage
Rate by two percentage points (2%).
**PREPAYMENT:** If you pay off early, you will not have to pay a penalty.

Estimates: All numerical disclosures except the late payment disclosure are estimates.

See your contract documents for any additional information about non-payment, default, any required repayment in full before the
scheduled date, any security interest and prepayment refunds and penalties.

Principal Amount of Note (Amount Financed plus Prepaid Finance Charge)        $        33,519.55

Itemization of Amount Financed
Amount paid to    JOHN MATA   and                $
Amount paid to    ANITA MATA                     $        30,000.00
Total Amount Financed                                          $        30,000.00

Itemization of Prepaid Finance Charge
Origination Fee                                  $        3,519.55
Total Prepaid Finance Charge(s)                                $        3,519.55

CSA TRAI 603 9734  12/91              NSJGDF  Next Student Graduate Loan          File Copy

# Exhibit A-10

Exhibit A-10

```
    ITS2C*****8533;;              AES/PA      VTAM NAHU      TSX2D
    DATE 02/23/16 11:28:13    LOAN FINANCIAL ACTIVITY      PAGE  1 OF  5


BORROWER SSN: ***-**-8533  NAME: MATA, JOHN M JR
1ST DISB: 08/21/07 LN SEQ: 0006  LN PGM: PEPLN   OWN: 122962QC-NCT
GUARANTOR: TERI - DTC          CUST ACCT: LT15  ORIG BAL: 33,519.55
BOND ISSUE: NCT20074   PD AHEAD:   STATUS: ACTIVE    CURR BAL:     0.00
```

| | REV REA | EFFECTIVE DATE | POSTED DATE | TRAN TYPE | TRAN AMOUNT | INTEREST ACCRUED | PRINCIPAL BALANCE |
|---|---|---|---|---|---|---|---|
| 1 | | 04/03/13 | 04/03/13 | 5003A | 30.00CR | 0.00 | 0.00 |
| 2 | | 04/01/13 | 04/01/13 | 1030A | 50,739.59CR | 263.31 | 0.00 |
| 3 | | 03/05/13 | | 2601A | 5.00 | 302.67 | 47,148.24 |
| 4 | | 02/02/13 | | 2601A | 5.00 | 302.73 | 47,148.24 |
| 5 | | 01/02/13 | | 2601A | 5.00 | 292.19 | 47,148.24 |
| 6 | | 12/03/12 | | 2601A | 5.00 | 301.90 | 47,148.24 |
| 7 | | 11/02/12 | | 2601A | 5.00 | 292.91 | 47,148.24 |
| 8 | | 10/03/12 | | 2601A | 5.00 | 870.95 | 47,148.24 |
| 9 | | 07/06/12 | 07/06/12 | 1010C | 204.38CR | 68.44 | 47,148.24 |
| 10 | | 06/29/12 | 06/29/12 | 1010C | 399.94CR | 488.87 | 47,148.24 |

```
    SELECTION __


F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
   ITS2C*****8533;;              AES/PA         VTAM NAHU        TSX2D
   DATE 02/23/16 11:28:15    LOAN FINANCIAL ACTIVITY        PAGE  2 OF  5

BORROWER SSN: ***-**-8533  NAME: MATA, JOHN M JR
1ST DISB: 08/21/07 LN SEQ: 0006  LN PGM: PEPLN    OWN: 122962QC-NCT
GUARANTOR: TERI - DTC              CUST ACCT:  LT15   ORIG BAL: 33,519.55
BOND ISSUE: NCT20074   PD AHEAD:    STATUS: ACTIVE    CURR BAL:     0.00
```

|    | REV | EFFECTIVE | POSTED   | TRAN  | TRAN     | INTEREST | PRINCIPAL |
|----|-----|-----------|----------|-------|----------|----------|-----------|
|    | REA | DATE      | DATE     | TYPE  | AMOUNT   | ACCRUED  | BALANCE   |
| 1  |     | 05/10/12  | 05/10/12 | 1010C | 195.56CR | 351.98   | 47,148.24 |
| 2  |     | 04/04/12  | 04/04/12 | 1010C | 195.56CR | 284.21   | 47,148.24 |
| 3  |     | 03/06/12  | 03/06/12 | 1010C | 195.56CR | 315.09   | 47,148.24 |
| 4  |     | 02/03/12  | 02/03/12 | 1010C | 195.56CR | 294.56   | 47,148.24 |
| 5  |     | 01/04/12  | 01/05/12 | 1010C | 195.56CR | 294.51   | 47,148.24 |
| 6  |     | 12/05/11  | 12/05/11 | 1010C | 195.56CR | 313.78   | 47,148.24 |
| 7  |     | 11/03/11  | 11/03/11 | 1010C | 195.56CR | 264.06   | 47,148.24 |
| 8  |     | 10/07/11  | 10/07/11 | 1010C | 195.56CR | 457.99   | 47,148.24 |
| 9  |     | 08/21/11  | 08/22/11 | 7001A | 0.00     | 491.54   | 47,148.24 |
| 10 |     | 07/01/11  | 07/05/11 | 7001A | 0.00     | 1,694.15 | 46,656.70 |

```
        SELECTION __

   F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
     ITS2C*****8533;;              AES/PA       VTAM NAHU      TSX2D
    DATE 02/23/16 11:28:16    LOAN FINANCIAL ACTIVITY        PAGE  3 OF  5


 BORROWER SSN: ***-**-8533  NAME: MATA, JOHN M JR
 1ST DISB: 08/21/07 LN SEQ: 0006  LN PGM: PEPLN    OWN: 122962QC-NCT
 GUARANTOR: TERI - DTC            CUST ACCT:  LT15  ORIG BAL: 33,519.55
 BOND ISSUE: NCT20074  PD AHEAD:   STATUS: ACTIVE     CURR BAL:     0.00
```

|   | REV REA | EFFECTIVE DATE | POSTED DATE | TRAN TYPE | TRAN AMOUNT | INTEREST ACCRUED | PRINCIPAL BALANCE |
|---|---------|----------------|-------------|-----------|-------------|------------------|-------------------|
| 1 | | 01/01/11 | 03/30/11 | 7001A | 0.00 | 845.84 | 44,962.55 |
| 2 | | 10/01/10 | 03/30/11 | 7001A | 0.00 | 838.52 | 44,116.71 |
| 3 | | 07/01/10 | 03/30/11 | 7001A | 0.00 | 805.12 | 43,278.19 |
| 4 | | 04/01/10 | 03/30/11 | 7001A | 0.00 | 779.62 | 42,473.07 |
| 5 | | 01/01/10 | 03/30/11 | 7001A | 0.00 | 783.67 | 41,693.45 |
| 6 | | 10/01/09 | 03/30/11 | 7001A | 0.00 | 774.26 | 40,909.78 |
| 7 | | 07/01/09 | 03/30/11 | 7001A | 0.00 | 767.56 | 40,135.52 |
| 8 | | 04/01/09 | 03/30/11 | 7001A | 0.00 | 158.58 | 39,367.96 |
| 9 | | 03/13/09 | 03/16/09 | 1010C | 189.07CR | 117.09 | 39,209.38 |
| 10 | | 02/27/09 | 03/30/11 | 7001A | 0.00 | 188.68 | 39,276.36 |

```
         SELECTION __

 F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
     ITS2C*****8533;;                AES/PA        VTAM NAHU      TSX2D
    DATE 02/23/16 11:28:16    LOAN FINANCIAL ACTIVITY        PAGE  4 OF  5

BORROWER SSN: ***-**-8533  NAME: MATA, JOHN M JR
1ST DISB: 08/21/07 LN SEQ: 0006  LN PGM: PEPLN     OWN: 122962QC-NCT
GUARANTOR: TERI - DTC            CUST ACCT:  LT15  ORIG BAL:  33,519.55
BOND ISSUE: NCT20074  PD AHEAD:    STATUS: ACTIVE     CURR BAL:     0.00
```

| | REV REA | EFFECTIVE DATE | POSTED DATE | TRAN TYPE | TRAN AMOUNT | INTEREST ACCRUED | PRINCIPAL BALANCE |
|---|---|---|---|---|---|---|---|
| 1 | | 02/04/09 | | 2601A | 5.00 | 649.87 | 38,437.81 |
| 2 | | 12/01/08 | 03/30/11 | 7001A | 0.00 | 1,811.17 | 38,437.81 |
| 3 | | 06/05/08 | 06/05/08 | 1010C | 72.99CR | 40.66 | 36,626.64 |
| 4 | | 06/01/08 | 10/04/08 | 7001A | 0.00 | 167.43 | 36,658.97 |
| 5 | | 05/15/08 | 05/15/08 | 1010C | 48.65CR | 671.58 | 35,868.61 |
| 6 | | 03/10/08 | 03/10/08 | 7001A | 0.00 | 796.54 | 35,868.61 |
| 7 | | 01/01/08 | 01/02/08 | 7001A | 0.00 | 1,075.48 | 35,072.07 |
| 8 | | 10/01/07 | 10/01/07 | 7001A | 0.00 | 127.98 | 33,996.59 |
| 9 | | 09/20/07 | 09/20/07 | 0390A | 33,868.61 | 0.00 | 33,519.55 |
| 10 | | 09/20/07 | 09/20/07 | 0395A | 33,868.61CR | 349.06 | 0.00 |

```
        SELECTION __

 F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
   ITS2C*****8533;;                 AES/PA        VTAM NAHU      TSX2D
   DATE 02/23/16 11:28:16    LOAN FINANCIAL ACTIVITY         PAGE 5 OF 5

BORROWER SSN: ***-**-8533  NAME: MATA, JOHN M JR
1ST DISB: 08/21/07 LN SEQ: 0006  LN PGM: PEPLN     OWN: 122962QC-NCT
GUARANTOR: TERI - DTC            CUST ACCT: LT15  ORIG BAL: 33,519.55
BOND ISSUE: NCT20074   PD AHEAD:     STATUS: ACTIVE    CURR BAL:     0.00

       REV  EFFECTIVE   POSTED   TRAN      TRAN      INTEREST    PRINCIPAL
       REA    DATE       DATE    TYPE     AMOUNT     ACCRUED      BALANCE
  1          08/21/07  08/21/07  0101A   33,519.55      0.00     33,519.55
  2
  3
  4
  5
  6
  7
  8
  9
 10

       SELECTION __

  F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
   ITS31*****8533;                    AES/PA      VTAM NAHU      TSX31
   DATE 02/23/16 11:28:24 DEFERMENT/FORBEARANCE LOAN DETAIL


   BORROWER SSN: ***-**-8533 NAME: JOHN M MATA JR
   1ST DISB DATE: 08/21/07   OWNER: NCT                    LOAN PGM: PEPLN
   LOAN SEQ: 006        GUARANTOR: TERI - DTC


                                                        TOTL
                      BEGIN      END     GRACE    CAP  DAYS  DAYS  MOS    CERT
       DEFER/FORB TYP DATE      DATE   END DATE  IND  USED  LEFT  USED   DATE
   _   D - SCHL FULL  02 27 09  08 20 11          Y    905   555  29.8  03 28 11
   _   F - TEMP HRDSH 02 01 09  02 26 09          Y     26    95   8.9  03 16 09
   _   F - TEMP HRDSH 06 01 08  11 30 08          Y    183    95   8.9  10 04 08
   _   F - TEMP HRDSH 04 01 08  05 31 08          Y     61    95   8.9  04 25 08

   _                  __ __ __  __ __ __          __

   _                  __ __ __  __ __ __          __

   _                  __ __ __  __ __ __          __




   F1=HELP  F3=EXIT  F5=RFR  F6=ELG  F7=BKWD  F8=FWD  F9=PRT  F10=HIST  F12=CAN
```

```
   ITS2X*****8533;                 AES/PA        VTAM NAHU      TSX2Y
 DATE 02/23/16 11:28:27 REPAYMENT SCHEDULE SUMMARY SELECTION   PAGE  1 OF  4


 BORROWER SSN ***-**-8533   NAME JOHN M MATA JR


       SCHED   INSTALL  REPAY  REPAY  1ST DUE 1ST DISB   LOAN
 SEL STA TYPE  AMOUNT   LVLS   TERM   DATE    DATE       PGM      OWNER
   1  *************************************************************
   2  I   TG    304.33    3     217  10/03/12 08/21/07 PEPLN      NCT
   3  *************************************************************
   4  *************************************************************
   5  I   TG    204.38    4     220  07/03/12 08/21/07 PEPLN      NCT
   6  *************************************************************
   7  *************************************************************
   8  *************************************************************
   9  *************************************************************
  10  *************************************************************
  11  *************************************************************
  12  *************************************************************


 SELECTION  __



 F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
    ITS2X*****8533;                 AES/PA        VTAM NAHU      TSX2Y
    DATE 02/23/16 11:28:29 REPAYMENT SCHEDULE SUMMARY SELECTION   PAGE  2 OF  4


    BORROWER SSN ***-**-8533   NAME JOHN M MATA JR


          SCHED   INSTALL  REPAY  REPAY  1ST DUE 1ST DISB   LOAN
    SEL STA TYPE   AMOUNT   LVLS   TERM   DATE    DATE      PGM      OWNER
      1 I   TG     195.56     4     229  10/03/11 08/21/07 PEPLN     NCT
      2 *****************************************************************
      3 *****************************************************************
      4 *****************************************************************
      5 *****************************************************************
      6 *****************************************************************
      7 *****************************************************************
      8 I   TG     189.06     4     228  04/05/11 08/21/07 PEPLN     NCT
      9 *****************************************************************
     10 *****************************************************************
     11 *****************************************************************
     12 *****************************************************************


    SELECTION   __



    F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
      ITS2X*****8533;                   AES/PA          VTAM NAHU       TSX2Y
      DATE 02/23/16 11:28:29 REPAYMENT SCHEDULE SUMMARY SELECTION   PAGE  3 OF  4

      BORROWER SSN ***-**-8533   NAME JOHN M MATA JR


            SCHED   INSTALL  REPAY  REPAY  1ST DUE 1ST DISB   LOAN
      SEL STA TYPE  AMOUNT   LVLS   TERM    DATE    DATE      PGM       OWNER
       1  ***************************************************************
       2  I   TG    165.87    4     227   05/05/09 08/21/07 PEPLN       NCT
       3  ***************************************************************
       4  ***************************************************************
       5  I   TG    185.77    4     231   01/05/09 08/21/07 PEPLN       NCT
       6  ***************************************************************
       7  ***************************************************************
       8  I   TG    181.48    4     238   06/05/08 08/21/07 PEPLN       NCT
       9  ***************************************************************
      10  ***************************************************************
      11  I   L     360.12    2     239   05/05/08 08/21/07 PEPLN       NCT
      12  ***************************************************************


      SELECTION  __



      F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
   ITS2X*****8533;              AES/PA          VTAM NAHU       TSX2Y
   DATE 02/23/16 11:28:30 REPAYMENT SCHEDULE SUMMARY SELECTION   PAGE  4 OF  4

   BORROWER SSN ***-**-8533   NAME JOHN M MATA JR

         SCHED   INSTALL  REPAY  REPAY  1ST DUE 1ST DISB   LOAN
   SEL STA TYPE  AMOUNT   LVLS   TERM   DATE    DATE       PGM       OWNER
     1 *******************************************************************
     2 I   L      411.87     2    239  04/23/08 08/21/07 PEPLN        NCT
     3 *******************************************************************
     4 *******************************************************************
     0 *******************************************************************
     0 *******************************************************************
     0 *******************************************************************
     0 *******************************************************************
     0 *******************************************************************
     0 *******************************************************************
     0 *******************************************************************
     0 *******************************************************************

   SELECTION  __

   01033 PRESS ENTER TO DISPLAY MORE DATA
   F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

```
   ITS2X*****8533;                 AES/PA           VTAM NAHU       TSX2Y
   DATE 02/23/16 11:28:30 REPAYMENT SCHEDULE SUMMARY SELECTION    PAGE  1 OF  1


BORROWER SSN ***-**-8533    NAME JOHN M MATA JR


        SCHED    INSTALL   REPAY  REPAY  1ST DUE 1ST DISB    LOAN
SEL STA TYPE    AMOUNT    LVLS   TERM    DATE    DATE       PGM       OWNER
   0 ************************************************************************
   0 ************************************************************************
   0 ************************************************************************
   0 ************************************************************************
   0 ************************************************************************
   0 ************************************************************************
   0 ************************************************************************
   0 ************************************************************************
   0 ************************************************************************
   0 ************************************************************************
   0 ************************************************************************
   0 ************************************************************************


SELECTION  __



F1=HELP  F3=EXIT  F5=RFR  F7=BKWD  F8=FWD  F9=PRT  F12=CAN
```

Exhibit A-11

# Exhibit A-11

EX-99.31 27 d720160.htm POOL SUPPLEMENT (CHARTER ONE BANK, N.A.)

<div align="right">EXHIBIT 99.31</div>

<div align="center">POOL SUPPLEMENT
RBS CITIZENS, N.A. (SUCCESSOR TO CHARTER ONE BANK, N.A.)</div>

This Pool Supplement (the "Supplement") is entered into pursuant to and forms a part of each of the Note Purchase Agreements (the "Agreements") set forth on Schedule 1 attached hereto, each as amended or supplemented from the date of execution of the Agreement through the date of this Supplement, by and between The First Marblehead Corporation and RBS Citizens, N.A., successor by merger to Charter One Bank, N.A. (the "Program Lender"). This Supplement is dated as of September 20, 2007. Capitalized terms used in this Supplement without definitions have the meanings set forth in the Agreements.

Article 1:  Purchase and Sale.

In consideration of the Minimum Purchase Price, the Program Lender hereby transfers, sells, sets over and assigns to The National Collegiate Funding LLC (the "Depositor"), upon the terms and conditions set forth in the Agreements (which are incorporated herein by reference with the same force and effect as if set forth in full herein), each student loan set forth on the attached Schedule 2 (the "Transferred Loans") along with all of the Program Lender's rights under the Guaranty Agreement, and any agreement pursuant to which TERI granted collateral for its obligations under the Guaranty Agreement, relating to the Transferred Loans.  The Depositor in turn will sell the Transferred Loans to a Purchaser Trust.  The Program Lender hereby transfers and delivers to the Depositor each Note evidencing such Transferred Loan and all Origination Records relating thereto, together with any additional information relating to the Transferred Loans heretofore provided by TERI (as origination agent) to the Servicer or FMC in connection with the subject Securitization Transaction.  The Depositor hereby purchases said Notes on said terms and conditions.

Article 2:  Price.

The amount paid pursuant to this Supplement is the Minimum Purchase Price, as that term is defined in Section 2.04 of the Agreements .

Article 3:  Representations and Warranties.

3.01.            By Program Lender.

The Program Lender repeats the representations and warranties contained in Section 5.02 of the Agreements for the benefit of each of the Depositor and the Purchaser Trust and confirms the same are true and correct as of the date hereof with respect to the Agreements and to this Supplement.

3.02.            By Depositor.

The Depositor hereby represents and warrants to the Program Lender that at the date of execution and delivery of this Supplement by the Depositor:

(a)            The Depositor is duly organized and validly existing as a limited liability company under the laws of the State of Delaware with the due power and authority to own its properties and to conduct its business as such properties are currently owned and such business is presently conducted, and had at all relevant times, and has, the power, authority and legal right to acquire and own the Transferred Loans.

(b)            The Depositor is duly qualified to do business and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business shall require such qualifications.

(c)            The Depositor has the power and authority to execute and deliver this Supplement and to carry out its respective terms; the Depositor has the power and authority to purchase the Transferred Loans and rights relating thereto as provided herein from the Program Lender, and the Depositor has duly authorized such purchase from the Program Lender by all necessary action; and the execution, delivery and performance of this Supplement has been duly authorized by the Depositor by all necessary action on the part of the Depositor.

(d)    This Supplement, together with the Agreements of which this Supplement forms a part, constitutes a legal, valid and binding obligation of the Depositor, enforceable in accordance with its terms.

(e)    The consummation of the transactions contemplated by the Agreements and this Supplement and the fulfillment of the terms hereof do not conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time) a default under, the governing instruments of the Depositor or any indenture, agreement or other instrument to which the Depositor is a party or by which it is bound; or result in the creation or imposition of any lien upon any of its properties pursuant to the terms of any such indenture, agreement or other instrument; or violate any law or any order, rule or regulation applicable to the Depositor of any court or of any federal or state regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Depositor or its properties.

(f)    There are no proceedings or investigations pending, or threatened, before any court, regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Depositor or its properties: (i) asserting the invalidity of the Agreements or this Supplement, (ii) seeking to prevent the consummation of any of the transactions contemplated by the Agreements or this Supplement, or (iii) seeking any determination or ruling that is likely to materially or adversely affect the performance by the Depositor of its obligations under, or the validity or enforceability of the Agreements or this Supplement.

<u>Article 4:  Cross Receipt.</u>

The Program Lender hereby acknowledges receipt of the Minimum Purchase Price. The Depositor hereby acknowledges receipt of the Transferred Loans included in the Pool.

<u>Article 5: Assignment of Origination, Guaranty and Servicing Rights</u>.

　　　The Program Lender hereby assigns and sets over to the Depositor any claims it may now or hereafter have under the Guaranty Agreements, the Origination Agreements and the Servicing Agreements to the extent the same relate to the Transferred Loans described in <u>Schedule 2</u>, other than any right to obtain servicing after the date hereof. It is the intent of this provision to vest in the Depositor any claim of the Program Lender relating to defects in origination, guaranty or servicing of the loans purchased hereunder in order to permit the Depositor to assert such claims directly and obviate any need to make the same claims against the Program Lender under this Supplement. The Program Lender also hereby assigns and sets over to the Depositor any claims it may now have or hereafter have to any collateral pledged by TERI to the Program Lender to secure its obligations under the Guaranty Agreement that relates to the Transferred Loans, and Program Lender hereby releases any security interest it may have in such collateral. Program Lender hereby authorizes the Depositor, its successors and assigns, to file in any public filing office where a Uniform Commercial Code Filing with respect to collateral pledged by TERI is of record, any partial release or assignment that it deems necessary or appropriate to reflect in the public records the conveyance and assignment effected hereby.

[Remainder of page intentionally blank]

IN WITNESS WHEREOF, the parties have caused this Supplement to be executed as of the date set forth above.

THE FIRST MARBLEHEAD CORPORATION

By: /s/ John A. Foxgrover
_____
John A. Foxgrover
Senior Vice President

RBS CITIZENS, N.A., successor by merger to
CHARTER ONE BANK, N.A.

By:   /s/ Dino DiMascio
_____
Name: Dino DiMascio
Title: Vice President

THE NATIONAL COLLEGIATE FUNDING LLC

By:  GATE Holdings, Inc., Member

By: /s/ John A. Foxgrover
_____
John A. Foxgrover
Vice President

<u>Schedule 1</u>

<u>Note Purchase Agreements</u>

Each of the Note Purchase Agreements, as amended or supplemented, entered into by and between The First Marblehead Corporation and:

- Charter One Bank, N.A., dated as of December 29, 2003 for loans that were originated under Charter One's AAA Southern New England Bank Loan Program.

- Charter One Bank, N.A., dated October 31, 2003, for loans that were originated under Charter One's AES EducationGAIN Loan Program.

- Charter One Bank, N.A., dated June 30, 2003, for loans that were originated under Charter One's Citibank Education Assistance Loan Program.

- Charter One Bank, N.A., dated July 1, 2002, for loans that were originated under Charter One's College Loan Corporation Loan Program.

- Charter One Bank, N.A., dated May 10, 2004, for loans that were originated under Charter One's EdFinancial Loan Program.

- Charter One Bank, N.A., dated September 15, 2003, for loans that were originated under Charter One's Extra Credit II Loan Program (North Texas Higher Education).

- Charter One Bank, N.A., dated September 20, 2003, for loans that were originated under Charter One's M&I Alternative Loan Program.

- Charter One Bank, N.A., dated November 17, 2003, for loans that were originated under Charter One's National Education Loan Program.

- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's NextStudent Alternative Loan Program.

- Charter One Bank, N.A., dated March 25, 2004, for loans that were originated under Charter One's Astrive and AstriveAlliance Education (f/k/a START) Loan Programs.

- Charter One Bank, N.A., dated February 15, 2005, for loans that were originated under Charter One's Referral Loan Program (including loans in the Charter One Bank Alternative Loan Program, E-Loan Private Loan Program, UPromise Alternative Loan Program, Collegiate Solutions Alternative Loan Program, College Board Alternative Loan Program, Axiom Alternative Loan Program, American Student Loan Services Private Loan Program, nBuy Private Loan Program and ThinkFinancial Alternative Loan Program).

**National Collegiate Student Loan Trust 2007-4**
**Roster:**        **CHARTER ONE BANK**

| Lender | Lender Code | Marketer | Loan Product | BSSN |
|---|---|---|---|---|
| CHARTER ONE BANK | 907780QC | Next Student | DTC - Graduate | XXXXX8533 |

| GUARREF | Disb. Date | Tier | Repay Type | Margin |
|---|---|---|---|---|
| 5550481 | 8/21/2007 | 6 | DF | 7.35% |

| Fee to Borrower | TERI Admin Fee | Marketing Fee | Total Gross Disbursed | Total Net Disbursed |
|---|---|---|---|---|
| 10.50% | 1.75% | 0.50% | 33519.55 | 29999.9972 |

| Total Net Principal | Total Capitalized Interest | Total Outstanding Gross Principal | Total Outstanding Unpaid Interest | Administrative Fee Reimbursement on 0% Fee Loans |
|---|---|---|---|---|
| 29999.9972 | 0 | 33519.55 | 349.06 | 0 |

| | | | | **Final Reconciliation Settlement Figures** |
|---|---|---|---|---|
| **Origination Fee Reimbursement Due Bank** | **Total Marketing Fees** | **Marketing Fees Due FMC** | **Marketing Fees Due Bank** | **Total Amount Due Bank** |
| 225 | 150 | 0 | 150 | 34243.61 |

EX-99.4 9 d719503.htm DEPOSIT AND SALE AGREEMENT

<div align="right">EXHIBIT 99.4</div>

## DEPOSIT AND SALE AGREEMENT

### THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4

This DEPOSIT AND SALE AGREEMENT (the "Sale Agreement"), dated as of September 20, 2007, between The National Collegiate Funding LLC, as seller (in such capacity, the "Seller"), and The National Collegiate Student Loan Trust 2007-4, as purchaser (the "Purchaser"), shall be effective upon execution by the parties hereto.

WHEREAS, the Seller is the owner of certain student loans; and

WHEREAS, the Seller desires to sell its interest in such student loans and the Purchaser desires to purchase such loans from the Seller.

NOW, THEREFORE, in connection with the mutual promises contained herein, the parties hereto agree as follows:

### ARTICLE I
### TERMS

This Sale Agreement sets forth the terms under which the Seller is selling and the Purchaser is purchasing the student loans listed on Schedule 1 or Schedule 2 to each of the Pool Supplements set forth on Schedule A attached hereto (the "Transferred Student Loans").

### ARTICLE II
### DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the definitions set forth in Appendix A of the Indenture dated as of September 1, 2007 between U.S. Bank National Association (the "Indenture Trustee") and the Purchaser.

### ARTICLE III
### SALE AND PURCHASE

Section 3.01.      Sale of Loans. The Seller hereby sells and the Purchaser hereby purchases the Transferred Student Loans.

Section 3.02.      Assignment of Rights. The Seller hereby assigns to the Purchaser and the Purchaser hereby accepts all of the Seller's rights and interests under each of the Pool Supplements listed on Schedule A attached hereto and the related Student Loan Purchase Agreements listed on Schedule B attached hereto.

Section 3.03.      Settlement of the Payment. The Purchaser shall pay the Seller the purchase price set forth in Article 2 of each of the Pool Supplements by wire transfer in immediately available funds to the account specified by the Seller.

Section 3.04.      Assistance by Seller. Following the execution of this Sale Agreement, the Seller shall provide any reasonable assistance requested by the Purchaser in determining that all required documentation on the Transferred Student Loans is present and correct.

### ARTICLE IV
### REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER

Section 4.01.    <u>General</u>. The Seller represents and warrants to the Purchaser that as of the date of this Sale Agreement:

(a)    The Seller is duly organized and existing under the laws of the State of Delaware; and

(b)    The Seller has all requisite power and authority to enter into and to perform the terms of this Sale Agreement.

Section 4.02.    <u>Loan Representations</u>. The Seller represents and warrants to the Purchaser that with respect to each Transferred Student Loan purchased by the Purchaser pursuant to this Sale Agreement, the Seller is making the same representations and warranties made by the respective program lender with respect to each Transferred Student Loan pursuant to the respective Student Loan Purchase Agreement listed on <u>Schedule B</u> attached hereto.

Section 4.03.    <u>Covenants</u>. The Seller, in its capacity as purchaser of the Transferred Student Loans pursuant to the Pool Supplements, hereby covenants that it will enforce the covenants and agreements of each program lender in the respective Student Loan Purchase Agreement and related Pool Supplement. The Seller further covenants that it will not waive, amend, modify, supplement or terminate any Student Loan Purchase Agreement or Pool Supplement or any provision thereof without the consent of the Purchaser, which consent the Purchaser hereby agrees not to provide without the prior written consent of the Indenture Trustee and the Controlling Party in accordance with the Purchaser's covenant in Section 3.07(c) of the Indenture.

## ARTICLE V
## PURCHASE OF LOANS; REIMBURSEMENT

Each party to this Sale Agreement shall give notice to the other such parties and to the Servicers, First Marblehead Data Services, Inc., the Indenture Trustee and Wilmington Trust Company (the "<u>Owner Trustee</u>") promptly, in writing, upon the discovery of any breach of the Seller's representations and warranties made pursuant to this Sale Agreement which has a materially adverse effect on the interest of the Purchaser in any Transferred Student Loan. In the event of such a material breach, the Seller shall cure or repurchase the Transferred Student Loan in accordance with the remedies set forth in the respective Student Loan Purchase Agreement.

## ARTICLE VI
## LIABILITY OF SELLER; INDEMNITIES

The Seller shall be liable in accordance herewith only to the extent of the obligations specifically undertaken by the Seller under this Sale Agreement.

(a)    The Seller shall indemnify, defend and hold harmless the Purchaser and the Owner Trustee in its individual capacity and their officers, directors, employees and agents from and against any taxes that may at any time be asserted against any such Person with respect to the transactions contemplated herein and in the other Basic Documents (except any such income taxes arising out of fees paid to the Owner Trustee), including any sales, gross receipts, general corporation, tangible and intangible personal property, privilege or license taxes and costs and expenses in defending against the same.

(b)    The Seller shall indemnify, defend and hold harmless the Purchaser and the Owner Trustee in its individual capacity and their officers, directors, employees and agents from and against any and all costs, expenses, losses, claims, damages and liabilities arising out of, or imposed upon such Person through, the Seller's willful misfeasance, bad faith or gross negligence in the performance of its duties under this Sale Agreement, or by reason of reckless disregard of its obligations and duties under this Sale Agreement.

Indemnification under this Section shall survive the termination of this Sale Agreement and shall include reasonable fees and expenses of counsel and expenses of litigation. If the Seller shall have made any indemnity payments pursuant to this Section and the Person to or for the benefit of whom such payments are made thereafter shall collect any of such amounts from others, such Person shall promptly repay such amounts to the Seller, without interest.

### ARTICLE VII
### MERGER OR CONSOLIDATION OF, OR ASSUMPTION
### OF THE OBLIGATIONS OF, SELLER

Any Person (a) into which the Seller may be merged or consolidated, (b) which may result from any merger or consolidation to which the Seller shall be a party or (c) which may succeed to the properties and assets of the Seller substantially as a whole, shall be the successor to the Seller without the execution or filing of any document or any further act by any of the parties to this Sale Agreement; provided, however, that the Seller hereby covenants that it will not consummate any of the foregoing transactions except upon satisfaction of the following: (i) the surviving Person, if other than the Seller, executes an agreement of assumption to perform every obligation of the Seller under this Sale Agreement, (ii) immediately after giving effect to such transaction, no representation or warranty made pursuant to this Sale Agreement shall have been breached, (iii) the surviving Person, if other than the Seller, shall have delivered an Officers' Certificate and an opinion of counsel each stating that such consolidation, merger or succession and such agreement of assumption comply with this Section and that all conditions precedent, if any, provided for in this Sale Agreement relating to such transaction have been complied with, and that the Rating Agency Condition shall have been satisfied with respect to such transaction and, so long as any of the Notes are outstanding or any amounts are owed to the Note Insurer, the consent of the Note Insurer, (iv) if the Seller is not the surviving entity, such transaction will not result in a material adverse federal or state tax consequence to the Purchaser or the Noteholders, and (v) if the Seller is not the surviving entity, the Seller shall have delivered an opinion of counsel either (A) stating that, in the opinion of such counsel, all financing statements and continuation statements and amendments thereto have been executed and filed that are necessary fully to preserve and protect the interest of the Purchaser in the Transferred Student Loans and reciting the details of such filings, or (B) stating that, in the opinion of such counsel, no such action shall be necessary to preserve and protect such interests.

### ARTICLE VIII
### LIMITATION ON LIABILITY OF SELLER AND OTHERS

The Seller and any director or officer or employee or agent thereof may rely in good faith on the advice of counsel or on any document of any kind, prima facie properly executed and submitted by any Person respecting any matters arising hereunder (provided that such reliance shall not limit in any way the Seller's obligations under this Sale Agreement). The Seller shall not be under any obligation to appear in, prosecute or defend any legal action that shall not be incidental to its obligations under this Sale Agreement or the Student Loan Purchase Agreements, and that in its opinion may involve it in any expense or liability.

### ARTICLE IX
### SURVIVAL OF COVENANTS

All covenants, agreements, representations and warranties made herein shall survive the consummation of the purchase of the Transferred Student Loans; provided, however, that to the extent any of the same relate to a corresponding covenant, agreement, representation or warranty contained in a Student Loan Purchase Agreement, the same shall survive to the extent that such corresponding covenant, agreement, representation or warranty survives the applicable Student Loan Purchase Agreement. All covenants, agreements, representations and warranties made or furnished pursuant hereto by or for the benefit of the Seller (including without limitation, under Article VI) shall bind and inure to the benefit of any successors or assigns of the Purchaser, including the Indenture Trustee. This Sale Agreement may be changed, modified or discharged, and any rights or obligations hereunder may be waived, only by a written instrument signed by a duly authorized officer of the party against whom enforcement of any such waiver, change, modification or discharge is sought. The waiver by the Indenture Trustee, at the direction of the Controlling Party or otherwise pursuant to the Indenture, of any covenant, agreement, representation or warranty required to be made or furnished by the Seller or the waiver by the Indenture Trustee, at the direction of the Controlling Party or otherwise pursuant to the Indenture, of any provision herein contained shall not be deemed to be a waiver of any breach of any other covenant, agreement, representation, warranty or provision herein contained, nor shall any waiver or any custom or practice which may evolve between the parties in the administration of the terms hereof, be construed to lessen the right of the Indenture Trustee, at the direction of the Controlling Party pursuant to the Indenture, to insist upon the performance by the Seller in strict accordance with said terms.

### ARTICLE X

## COMMUNICATION AND NOTICE REQUIREMENTS

All communications, notices and approvals provided for hereunder shall be in writing and mailed or delivered to the Seller or the Purchaser, as the case may be. Notice given in any such communication, mailed to the Seller or the Purchaser by appropriately addressed registered mail, shall be deemed to have been given on the day following the date of such mailing and shall be addressed as follows:

If to the Purchaser, to:

> The National Collegiate Student Loan Trust 2007-4
> c/o Wilmington Trust Company, as Owner Trustee
> Rodney Square North
> 100 North Market Street
> Wilmington, Delaware 19890-0001
> Attention: Corporate Trust Department

If to the Seller, to:

> The National Collegiate Funding LLC
> c/o First Marblehead Data Services, Inc.
> The Prudential Tower
> 800 Boylston Street - 34th Floor
> Boston, MA 02199-8157
> Attention: Ms. Rosalyn Bonaventure

with a copy to:

> First Marblehead Corporation
> The Prudential Tower
> 800 Boylston Street - 34th Floor
> Boston, MA 02199-8157
> Attention: Corporate Law Department

or to such other address as either party shall have provided to the other parties in writing. Any notice required to be in writing hereunder shall be deemed given if such notice is mailed by certified mail, postage prepaid, or hand delivered to the address of such party as provided above.

### ARTICLE XI
### AMENDMENT

This Sale Agreement may be amended by the parties hereto with the consent of the Note Insurer, but without the consent of the Noteholders, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Sale Agreement or of modifying in any manner the rights of such Noteholders; provided that such action will not, in the opinion of counsel reasonably satisfactory to the Indenture Trustee, materially affect the interest of any such Noteholder.

In addition, this Sale Agreement may also be amended from time to time by the Seller and the Purchaser, with the consent of the Noteholders of the Notes evidencing a majority of the Outstanding Amount of the Notes and the consent of the Certificateholders of the Certificates evidencing a majority of the percentage interest in the Certificates and, so long as any of the Notes are outstanding or any amounts are owed to the Note Insurer, the consent of the Note Insurer, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Sale Agreement or of modifying in any manner the rights of the Noteholders or the Certificateholders, respectively; provided, however, that no such amendment shall (a) increase or reduce in any manner the amount of, or accelerate or delay the time of, collections of payments with respect to Transferred Student Loans or distributions that shall be required to be made for the benefit of the Noteholders,

or (b) reduce the aforesaid percentage of the Outstanding Amount of the Notes or the Certificates, the Noteholders or the Certificateholders of which are required to consent to any such amendment, without the consent of all outstanding Noteholders or Certificateholders, respectively.

Promptly after the execution of any such amendment or consent (or, in the case of the Rating Agencies, five Business Days prior thereto), the Purchaser shall furnish written notification of the substance of such amendment or consent to the Indenture Trustee, the Note Insurer and each of the Rating Agencies.

It shall not be necessary for the consent of Noteholders pursuant to this Section to approve the particular form of any proposed amendment or consent, but it shall be sufficient if such consent shall approve the substance thereof.

Prior to the execution of any amendment to this Sale Agreement, the Owner Trustee shall be entitled to receive and rely upon an opinion of counsel stating that execution of such amendment is authorized or permitted by this Sale Agreement. The Owner Trustee may, but shall not be obligated to, enter into any such amendment which affects the Owner Trustee's own rights, duties or immunities under this Sale Agreement or otherwise.

## ARTICLE XII
## ASSIGNMENT

The Seller hereby assigns its entire right, title and interest as purchaser under this Sale Agreement and each Student Loan Purchase Agreement to the Purchaser as of the date hereof and acknowledges that the Purchaser will assign the same, together with the right, title and interest of the Purchaser hereunder, to the Indenture Trustee under the Indenture.

## ARTICLE XIII
## THIRD PARTY BENEFICIARY

The Noteholders and the Note Insurer are third party beneficiaries hereof.

## ARTICLE XIV
## GOVERNING LAW

THIS SALE AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, BUT OTHERWISE WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

## ARTICLE XV
## LIMITATION OF LIABILITY OF OWNER TRUSTEE

Notwithstanding anything contained herein to the contrary, this instrument has been executed by Wilmington Trust Company, not in its individual capacity but solely in its capacity as Owner Trustee of the Purchaser, and in no event shall Wilmington Trust Company in its individual capacity or any beneficial owner of the Purchaser have any liability for the representations, warranties, covenants, agreements or other obligations of the Purchaser hereunder, as to all of which recourse shall be had solely to the assets of the Purchaser. For all purposes of this Sale Agreement, in the performance of any duties or obligations of the Purchaser hereunder, the Owner Trustee shall be subject to, and entitled to the benefits of, the terms and provisions of Articles VIII, IX and X of the Trust Agreement.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Sale Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

THE NATIONAL COLLEGIATE FUNDING
LLC,
as Seller

By: GATE Holdings, Inc., Member


By: /s/ John A. Foxgrover
      Name:   John A. Foxgrover
      Title:    Vice President

THE NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2007-4, as Purchaser

By: Wilmington Trust Company, not in its
      individual capacity but solely as Owner
      Trustee

By: /s/ Patricia A. Evans
      Name:   Patricia A. Evans
      Title:    Vice President

SCHEDULE A

*Pool Supplements*

Each of the following Pool Supplements was entered into by and among The First Marblehead Corporation, The National Collegiate Funding LLC and:

- Bank of America, N.A., dated September 20, 2007, for loans that were originated under Bank of America's Direct to Consumer Loan Program.

- Bank of America, N.A., dated September 20, 2007, for loans that were originated under Bank of America's Private Loan Program, TERI (School Channel) Loan Program and TERI ISLP Loan Program.

- RBS Citizens, N.A., successor by merger to Charter One Bank, N.A., dated September 20, 2007, for loans that were originated under the following Charter One programs: AAA Southern New England Bank, AES EducationGAIN Loan Program, Citibank Education Assistance Loan Program, College Loan Corporation Loan Program, National Education Loan Program, NextStudent Alternative Loan Program, Astrive Education (f/k/a START) Loan Program, AstriveAlliance Education (f/k/a START) Loan Program, Alternative Loan Program, E-Loan Private Loan Program, UPromise Alternative Loan Program, Collegiate Solutions Alternative Loan Program, College Board Alternative Loan Program, Axiom Alternative Loan Program, American Student Loan Services Private Loan Program, nBuy Private Loan Program and ThinkFinancial Alternative Loan Program.

- RBS Citizens, N.A., successor by merger to Citizens Bank of Rhode Island, dated September 20, 2007, for loans that were originated under Citizens Bank of Rhode Island's Alternative Loan Program, ISLP Loan Program, Compass Bank Loan Program, Navy Federal Alternative Loan Program, FinanSure Alternative Loan Program, Xanthus Alternative Loan Program and Penn State Undergraduate Loan Program.

- Comerica Bank, dated September 20, 2007, for loans that were originated under Comerica Bank's Private Loan Program.

- HSBC Bank USA, National Association, dated September 20, 2007, for loans that were originated under the HSBC Loan Program.

- The Huntington National Bank, dated September 20, 2007, for loans that were originated under the Huntington Education Loan Program.

- InsurBanc, dated September 20, 2007, for loans that were originated under the InsurBanc Loan Program.

- JPMorgan Chase Bank, N.A. (successor to Bank One, N.A.) dated September 20, 2007, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program, EDUCATION ONE Loan Program, and Campus One Loan Program.

- KeyBank National Association, dated September 20, 2007, for loans that were originated under KeyBank's Private Education Loan Program.

- Manufacturers and Traders Trust Company, dated September 20, 2007, for loans that were originated under the M&T Alternative Loan Program.

- National City Bank, dated September 20, 2007, for loans that were originated under the National City Loan Program.

- National City Bank, dated September 20, 2007, for loans that were originated under the National City Bank Referral Loan Program, including the Astute Private Loan Program and Student Lending Works Private Loan Program.

- PNC Bank, N.A., dated September 20, 2007, for loans that were originated under PNC Bank's PNC Bank Alternative Loan Program, Brazos Alternative Loan Program, Edvisors Alternative Loan Program, Fondo Futuro Loan Program, GE Money Bank Student Loan Program, Old National Bank Private Loan Program, and Regions Bank Private Loan Program.

- Sovereign Bank, dated September 20, 2007, for loans that were originated under Sovereign Bank's Alternative Student Loan Program.

- SunTrust Bank, dated September 20, 2007, for loans that were originated under the SunTrust Loan Program.

- TCF National Bank, dated September 20, 2007, for loans that were originated under the TCF National Bank Alternative Loan Program.

- Union Federal Savings Bank, dated September 20, 2007, for loans that were originated under the UFSB Astrive Loan Program.


## SCHEDULE B

### *Note Purchase Agreements*

Each of the Note Purchase Agreements, as amended or supplemented, was entered into by and between The First Marblehead Corporation and:

- Bank of America, N.A., dated April 30, 2001, for loans that were originated under Bank of America's Private Loan Program, TERI School Channel Loan Program and ISLP Loan Program.

- Bank of America, N.A., dated June 30, 2006, for loans that were originated under Bank of America's Private Loan Program, TERI School Channel Loan Program and ISLP Loan Program.

- Bank of America, N.A., dated April 1, 2006, for loans that were originated under Bank of America's Direct to Consumer Loan Program.

- Charter One Bank, N.A., dated as of December 29, 2003 for loans that were originated under Charter One's AAA Southern New England Bank Loan Program.

- Charter One Bank, N.A., dated October 31, 2003, for loans that were originated under Charter One's AES EducationGAIN Loan Program.

- Charter One Bank, N.A., dated June 30, 2003, for loans that were originated under Charter One's Citibank Education Assistance Loan Program.

- Charter One Bank, N.A., dated July 1, 2002, for loans that were originated under Charter One's College Loan Corporation Loan Program.

- Charter One Bank, N.A., dated November 17, 2003, for loans that were originated under Charter One's National Education Loan Program.

- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's NextStudent Alternative Loan Program.

- Charter One Bank, N.A., dated March 25, 2004, for loans that were originated under Charter One's Astrive and AstriveAlliance Education (f/k/a START) Loan Programs.

- Charter One Bank, N.A., dated February 15, 2005, for loans that were originated under Charter One's Referral Loan Program (including loans in the Charter One Bank Alternative Loan Program, E-Loan Private Loan Program, UPromise Alternative Loan Program, Collegiate Solutions Alternative Loan Program, College Board Alternative Loan Program, Axiom Alternative Loan Program, American Student Loan Services Private Loan Program, nBuy Private Loan Program, and ThinkFinancial Alternative Loan Program).

- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Alternative Loan Program, ISLP Loan Program, Compass Bank Loan Program, FinanSure Alternative Loan Program, Navy Federal Alternative Loan Program, and Xanthus Alternative Loan Program.

- Citizens Bank of Rhode Island, dated October 1, 2002, for loans that were originated under Citizens Bank of Rhode Island's Penn State Undergraduate Loan Program.

- Comerica Bank, dated June 30, 2006, for loans that were originated under Comerica Bank's Private Loan Program.

- HSBC Bank USA, National Association, dated April 17, 2002, as amended on June 2, 2003 and August 1, 2003, for loans that were originated under the HSBC Loan Program.

- The Huntington National Bank, dated May 20, 2003, for loans that were originated under the Huntington Education Loan Program.

- InsurBanc, dated July 1, 2006, for loans that were originated under the InsurBanc Loan Program.

- JPMorgan Chase Bank, N.A., (successor to Bank One, N.A.), dated May 1, 2002, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program, EDUCATION ONE Loan Program, and Campus One Loan Program.

- KeyBank National Association, dated May 12, 2006, for loans that were originated under KeyBank's Private Education Loan Program.

- Manufacturers and Traders Trust Company, dated April 29, 2004, for loans that were originated under the M&T Alternative Loan Program.

- National City Bank, dated November 13, 2002, for loans that were originated under the National City Loan Program.

- National City Bank, dated July 21, 2006, for loans that were originated under the National City Referral Loan Program, including the Astute Private Loan Program and Student Lending Works Private Loan Program.

- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's Alternative Loan Program, Brazos Alternative Loan Program, Edvisors Alternative Loan Program, Fondo Futuro Loan Program, GE Money Bank Student Loan Program, Old National Bank Private Loan Program, and Regions Bank Private Loan Program.

- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Student Loan

Program.

- SunTrust Bank, dated March 1, 2002, for loans that were originated under the SunTrust Loan Program.

- TCF National Bank, dated July 22, 2005, for loans that were originated under the TCF National Bank Alternative Loan Program.

- Union Federal Savings Bank, dated March 26, 2007, for loans that were originated under the UFSB Astrive Loan Program.

# Exhibit A-12

Exhibit A-12

# Loan Payment History Report
## Date: 2016-04-14

| | | | |
|---|---|---|---|
| Account Number: | ████8533-006-PHEA | | |
| Social Security Number: | ████8533 | Product: | DFG DIRECT TO CONSUMER GRAD |
| Name: | MATA, JOHN M | Officer Code: | 777074 |
| Birth Date: | 1968█ | School: | LOMA LINDA UNIVERSITY |
| Address 1: | C/O CLARK  MICHAEL E | Program Year: | 200708 |
| Address 2: | 100 N BARRANCA ST STE 250 | | |
| City: | WEST COVINA | Variable Rate Code: | F3 MONTHLY LIBOR |
| State: | CA | Interest Rate: | 10.00% |
| Zip Code: | 91791 | Last Payment Date: | 2012-07-06 |
| Cosigner Name: | MATA, ANITA | | |
| Social Security Number: | ████7992 | | |
| Address 1: | 5489 CAMBRIDGE ST | | |
| Address 2: | | | |
| City: | MONTCLAIR | | |
| State: | CA | | |
| Zip Code: | 91763-2526 | | |
| | | Last Payment Amount: | $204.38 |
| | | Payment Due Date: | |
| Contract Date: | 2007-08-21 | Last Interest Date: | 2016-04-14 |
| Date Assigned: | 2015-08-06 | Accrued Interest: | $1,453.22 |
| Charge Off Date: | 2013-04-01 | Recovered Interest: | $0.00 |
| Charge Off Amount: | $47,148.24 | Net Interest: | $1,453.22 |
| Recovered Principal: | $0.00 | Associated Costs: | $570.00 |
| Net Charge Off: | $58,448.26 | Recovered Costs: | $0.00 |
| Disbursement Date: | 2007-08-21 | Net Costs: | $570.00 |
| Disbursement Amount: | $33,519.55 | | |

## Transaction History

| User | Date | Time | Code | Description | Amount |
|---|---|---|---|---|---|
| System | 2013-04-30 | 00:01 | 82 | $50,739.59 @ 7.550 / 04/05/2013 - 04/30/2013 | $304.37 |
| System | 2013-05-31 | 00:01 | 82 | $50,739.59 @ 7.550 / 04/30/2013 - 05/31/2013 | $325.36 |
| System | 2013-06-30 | 00:01 | 82 | $50,739.59 @ 7.550 / 05/31/2013 - 06/30/2013 | $314.86 |
| System | 2013-07-04 | 00:01 | 82 | $50,739.59 @ 7.550 / 06/30/2013 - 07/04/2013 | $41.98 |
| System | 2013-07-31 | 00:01 | 82 | $50,739.59 @ 7.540 / 07/04/2013 - 07/31/2013 | $283.00 |
| System | 2013-08-31 | 00:01 | 82 | $50,739.59 @ 7.540 / 07/31/2013 - 08/31/2013 | $324.93 |
| System | 2013-09-30 | 00:01 | 82 | $50,739.59 @ 7.540 / 08/31/2013 - 09/30/2013 | $314.45 |
| System | 2013-10-03 | 00:01 | 82 | $50,739.59 @ 7.540 / 09/30/2013 - 10/03/2013 | $31.44 |
| System | 2013-10-09 | 00:01 | 82 | $50,739.59 @ 7.540 / 10/03/2013 - 10/09/2013 | $62.89 |

| System | 2013-10-31 | 00:01 | 82 | $50,739.59 @ 7.530 / 10/09/2013 - 10/31/2013 | $230.29 |
|--------|------------|-------|----|----------------------------------------------|---------|
| System | 2013-11-30 | 00:01 | 82 | $50,739.59 @ 7.530 / 10/31/2013 - 11/30/2013 | $314.03 |
| System | 2013-12-04 | 00:01 | 82 | $50,739.59 @ 7.530 / 11/30/2013 - 12/04/2013 | $41.87 |
| System | 2013-12-31 | 00:01 | 82 | $50,739.59 @ 7.520 / 12/04/2013 - 12/31/2013 | $282.25 |
| System | 2014-01-31 | 00:01 | 82 | $50,739.59 @ 7.520 / 12/31/2013 - 01/31/2014 | $324.06 |
| System | 2014-02-28 | 00:01 | 82 | $50,739.59 @ 7.520 / 01/31/2014 - 02/28/2014 | $292.70 |
| System | 2014-04-03 | 00:01 | 82 | $50,739.59 @ 7.520 / 02/28/2014 - 04/03/2014 | $355.43 |
| System | 2014-04-14 | 00:00 | 44 | Interest Adjustment | $-1,117.06 |
| System | 2014-04-14 | 00:01 | 82 | $50,739.59 @ 7.510 / 04/03/2014 - 04/14/2014 | $114.84 |
| System | 2014-05-05 | 00:01 | 82 | $50,739.59 @ 0.000 / 04/14/2014 - 05/05/2014 | $0.00 |
| System | 2014-05-07 | 00:01 | 82 | $50,739.59 @ 0.000 / 05/05/2014 - 05/07/2014 | $0.00 |
| System | 2014-05-21 | 00:01 | 82 | $50,739.59 @ 7.500 / 05/07/2014 - 05/21/2014 | $145.96 |
| System | 2014-07-31 | 00:01 | 82 | $50,739.59 @ 7.500 / 05/21/2014 - 07/31/2014 | $740.24 |
| System | 2014-08-31 | 00:01 | 82 | $50,739.59 @ 7.500 / 07/31/2014 - 08/31/2014 | $323.20 |
| System | 2014-09-02 | 00:01 | 82 | $50,739.59 @ 7.500 / 08/31/2014 - 09/02/2014 | $20.85 |
| System | 2014-09-30 | 00:01 | 82 | $50,739.59 @ 7.510 / 09/02/2014 - 09/30/2014 | $292.32 |
| System | 2014-10-31 | 00:01 | 82 | $50,739.59 @ 7.510 / 09/30/2014 - 10/31/2014 | $323.64 |
| System | 2014-11-05 | 00:01 | 82 | $50,739.59 @ 7.510 / 10/31/2014 - 11/05/2014 | $52.20 |
| System | 2014-11-30 | 00:01 | 82 | $50,739.59 @ 7.510 / 11/05/2014 - 11/30/2014 | $261.00 |
| System | 2014-12-31 | 00:01 | 82 | $50,739.59 @ 7.510 / 11/30/2014 - 12/31/2014 | $323.64 |
| System | 2015-01-05 | 00:01 | 82 | $50,739.59 @ 7.510 / 12/31/2014 - 01/05/2015 | $52.20 |
| System | 2015-01-31 | 00:01 | 82 | $50,739.59 @ 7.500 / 01/05/2015 - 01/31/2015 | $271.07 |
| System | 2015-02-03 | 00:01 | 82 | $50,739.59 @ 7.500 / 01/31/2015 - 02/03/2015 | $31.28 |
| System | 2015-02-28 | 00:01 | 82 | $50,739.59 @ 7.520 / 02/03/2015 - 02/28/2015 | $261.34 |
| System | 2015-03-31 | 00:01 | 82 | $50,739.59 @ 7.520 / 02/28/2015 - 03/31/2015 | $324.07 |
| System | 2015-04-30 | 00:01 | 82 | $50,739.59 @ 7.520 / 03/31/2015 - 04/30/2015 | $313.61 |
| System | 2015-05-01 | 00:01 | 82 | $50,739.59 @ 7.520 / 04/30/2015 - 05/01/2015 | $10.45 |
| System | 2015-05-31 | 00:01 | 82 | $50,739.59 @ 7.530 / 05/01/2015 - 05/31/2015 | $314.03 |
| System | 2015-06-30 | 00:01 | 82 | $50,739.59 @ 7.530 / 05/31/2015 - 06/30/2015 | $314.03 |
| System | 2015-07-31 | 00:01 | 82 | $50,739.59 @ 7.530 / 06/30/2015 - 07/31/2015 | $324.50 |
| System | 2015-08-03 | 00:01 | 82 | $50,739.59 @ 7.530 / 07/31/2015 - 08/03/2015 | $31.40 |
| System | 2015-08-06 | 00:01 | 82 | $50,739.59 @ 7.540 / 08/03/2015 - 08/06/2015 | $31.44 |
| System | 2015-08-31 | 00:01 | 82 | $50,739.59 @ 7.540 / 08/06/2015 - 08/31/2015 | $262.04 |
| System | 2015-09-30 | 00:01 | 82 | $50,739.59 @ 7.540 / 08/31/2015 - 09/30/2015 | $314.45 |
| System | 2015-10-01 | 00:01 | 82 | $50,739.59 @ 7.540 / 09/30/2015 - 10/01/2015 | $10.48 |
| System | 2015-10-14 | 00:00 | 34 | Advn'd by Agency | $435.00 |
| System | 2015-10-14 | 00:01 | 82 | $50,739.59 @ 7.550 / 10/01/2015 - 10/14/2015 | $136.44 |
| System | 2015-11-04 | 00:01 | 82 | $50,739.59 @ 7.550 / 10/14/2015 - 11/04/2015 | $220.40 |
| System | 2015-11-05 | 00:01 | 82 | $50,739.59 @ 7.550 / 11/04/2015 - 11/05/2015 | $10.50 |
| System | 2015-11-24 | 00:00 | 34 | Advn'd by Agency | $135.00 |
| System | 2015-11-24 | 00:01 | 82 | $50,739.59 @ 7.540 / 11/05/2015 - 11/24/2015 | $199.15 |
| System | 2015-12-31 | 00:01 | 82 | $50,739.59 @ 7.540 / 11/24/2015 - 12/31/2015 | $387.82 |
| System | 2016-01-01 | 00:01 | 82 | $50,739.59 @ 7.540 / 12/31/2015 - 01/01/2016 | $10.45 |
| System | 2016-01-27 | 00:00 | 43 | Principal Adjustment | $7,708.67 |
| System | 2016-01-27 | 00:00 | 44 | Interest Adjustment | $-9,291.85 |
| System | 2016-01-27 | 00:01 | 82 | $50,739.59 @ 7.590 / 01/01/2016 - 01/27/2016 | $273.58 |
| System | 2016-04-14 | 00:01 | 82 | $58,448.26 @ 10.000 / 01/27/2016 - 04/14/2016 | $1,245.62 |

# Exhibit D

Exhibit D

8/21/2018     Case 6:18-ap-01089-MH    Doc 33-4    Filed 01/09/19    Entered 01/09/19 13:20:46    Desc
Declaration in Support     Page 136 of 369
EX-10.10 7 p060388_ex10-10.htm TRUST AGREEMENT

Exhibit 10.10

**THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1**

TRUST AGREEMENT

Among

WILMINGTON TRUST COMPANY
as OWNER TRUSTEE

and

THE NATIONAL COLLEGIATE FUNDING LLC
and THE EDUCATION RESOURCES INSTITUTE, INC.
as OWNERS

Dated as of
March 9, 2006

TABLE OF CONTENTS

ARTICLE I

DEFINITIONS
      Section 1.01 Capitalized Terms

ARTICLE II

ORGANIZATION
      Section 2.01 Name
      Section 2.02 Office
      Section 2.03 Purposes and Powers.
      Section 2.04 Appointment of the Owner Trustee
      Section 2.05 Declaration of Trust
      Section 2.06 No Liability of Owners for Expenses or Obligations of Trust
      Section 2.07 Situs of Trust

ARTICLE III

TRUST CERTIFICATES AND TRANSFER OF INTEREST
      Section 3.01 Issuance of Trust Certificate.
      Section 3.02 Registration and Transfer of Certificates.
      Section 3.03 Lost, Stolen, Mutilated or Destroyed Certificates
      Section 3.04 Limitation on Transfer of Ownership Rights.
      Section 3.05 Assignment of Right to Distributions

ARTICLE IV

CONCERNING THE OWNERS
      Section 4.01 Action by Owners with Respect to Certain Matters.
      Section 4.02 Action Upon Instructions.
      Section 4.03 Super-majority Control
      Section 4.04 Representations and Warranties of the Depositor
      Section 4.05 Power of Attorney.

ARTICLE V

INVESTMENT AND APPLICATION OF TRUST FUNDS
      Section 5.01 Investment of Trust Funds
      Section 5.02 Application of Funds

ARTICLE VI

CAPITAL
      Section 6.01 Tax Characterization

Section 6.02 Initial Capital Contributions of Owners
Section 6.03 Capital Accounts
Section 6.04 Interest
Section 6.05 No Additional Capital Contributions
Section 6.06 Investment of Capital Contributions
Section 6.07 Repayment and Return of Capital Contributions


ARTICLE VII

ALLOCATION OF PROFIT AND LOSS; DISTRIBUTIONS
Section 7.01 Profit
Section 7.02 Loss
Section 7.03 Special Allocations
Section 7.04 Curative Allocations
Section 7.05 Other Allocation Rules
Section 7.06 Distribution of Net Cash Flow
Section 7.07 Distribution Date Statement
Section 7.08 Allocation of Tax Liability
Section 7.09 Method of Payment
Section 7.10 No Segregation of Funds; No Interest
Section 7.11 Interpretation and Application of Provisions by the Administrator


ARTICLE VIII

AUTHORITY AND DUTIES OF THE OWNER TRUSTEE
Section 8.01 General Authority
Section 8.02 Specific Authority
Section 8.03 General Duties
Section 8.04 Accounting and Reports to the Owners, the Internal Revenue Service and Others
Section 8.05 Signature of Returns
Section 8.06 Right to Receive and Rely Upon Instructions
Section 8.07 No Duties Except as Specified in this Agreement or in Instructions
Section 8.08 No Action Except Under Specified Documents or Instructions
Section 8.09 Restriction


ARTICLE IX

CONCERNING THE OWNER TRUSTEE
Section 9.01 Acceptance of Trusts and Duties
Section 9.02 Furnishing of Documents
Section 9.03 Reliance; Advice of Counsel
Section 9.04 Not Acting in Individual Capacity
Section 9.05 Representations and Warranties of Owner Trustee

---

ARTICLE X

COMPENSATION OF OWNER TRUSTEE

Section 10.01 Owner Trustee's Fees and Expenses
Section 10.02 Indemnification
Section 10.03 Lien on Trust Property
Section 10.04 Payments to the Owner Trustee

ARTICLE XI

TERMINATION OF TRUST

Section 11.01 Termination of Trust
Section 11.02 Distribution of Assets
Section 11.03 No Termination by Depositor or Owners

ARTICLE XII

SUCCESSOR OWNER TRUSTEES AND ADDITIONAL OWNER TRUSTEES

Section 12.01 Resignation of Owner Trustee; Appointment of Successor
Section 12.02 Appointment of Additional Owner Trustees

ARTICLE XIII

TAX MATTERS PARTNER

Section 13.01 Tax Matters Partner
Section 13.02 Notice of Tax Audit
Section 13.03 Authority to Extend Period for Assessing Tax
Section 13.04 Choice of Forum for Filing Petition for Readjustment
Section 13.05 Authority to Bind Owners by Settlement Agreement
Section 13.06 Notices Sent to the Internal Revenue Service
Section 13.07 Indemnification of Tax Matters Partner
Section 13.08 Approval of Tax Matters Partner's Decisions
Section 13.09 Participation by Owners in Internal Revenue Service Administrative Proceedings

ARTICLE XIV

MISCELLANEOUS

Section 14.01 Supplements and Amendments
Section 14.02 No Legal Title to Trust Property in Owner
Section 14.03 Pledge of Collateral by Owner Trustee is Binding
Section 14.04 Limitations on Rights of Others
Section 14.05 Notices
Section 14.06 Severability
Section 14.07 Separate Counterparts
Section 14.08 Successors and Assigns
Section 14.09 Headings

Section 14.10 Governing Law

Section 14.11 General Interpretive Principles

SCHEDULE A      CAPITAL CONTRIBUTIONS, INITIAL SHARING RATIOS AND PERCENTAGE INTERESTS

SCHEDULE B      LOAN ORIGINATORS

SCHEDULE C      LOAN PURCHASE AGREEMENTS

SCHEDULE D      GUARANTY AGREEMENTS

EXHIBIT 1      FORM OF TRUST CERTIFICATE

EXHIBIT 2      FORM OF ACCESSION AGREEMENT

TRUST AGREEMENT, dated as of March 9, 2006, among The National Collegiate Funding LLC, a Delaware limited liability company (the "Depositor"), The Education Resources Institute, Inc., a private non-profit corporation organized under Chapter 180 of the Massachusetts General Laws, and Wilmington Trust Company, a Delaware banking corporation (the "Owner Trustee").

WHEREAS, the parties hereto intend to amend and restate that certain Interim Trust Agreement, dated as of February 8, 2006 (the "Interim Trust Agreement"), by and between the Depositor and the Owner Trustee, on the terms and conditions hereinafter set forth.

NOW THEREFORE, in consideration of the premises and of the mutual agreements herein contained and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties here to amend and restate the Interim Trust Agreement in its entirety and further agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01 <u>Capitalized Terms</u>. For all purposes of this Agreement, the following terms shall have the meanings set forth below:

"Administration Agreement" means the Administration Agreement, dated as of March 9, 2006, among the Trust, the Indenture Trustee, the Owner Trustee, the Depositor and First Marblehead Data Services, Inc., as Administrator, as it may be amended from time to time.

"Administrator" means First Marblehead Data Services, Inc., a Massachusetts corporation, as Administrator under the Administration Agreement, or any successor Administrator as appointed pursuant to the terms of the Administration Agreement.

"Affiliate" means, with respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agreement" means this Trust Agreement, as it may be amended or restated from time to time.

"Assignments of Servicing Agreements" means each of the Servicer Consent Letters, dated as of March 9, 2006, among the Trust, The First Marblehead Corporation and the Pennsylvania Higher Education Assistance Agency, Great Lakes Educational Loan Services, Inc., CFS-SunTech Servicing, LLC, Educational Services of America, Inc. and Nelnet, Inc., respectively, relating to the assignment of each of the respective Servicing Agreements to the Trust.

"Authorized Officer" means any officer of the Owner Trustee who is authorized to act for the Owner Trustee in matters relating to, and binding upon, the Trust and whose name appears on a list of such authorized officers furnished by the Owner Trustee as such list may be amended or supplemented from time to time.

"Back-up Agreement" means the Back-up Administration Agreement, dated as of March 9, 2006, among the Trust, the Depositor, the Owner Trustee, the Administrator and U.S. Bank National Association.

"Bankruptcy Action" has the meaning set forth in Section 4.01(b)(iv)(G).

"Beneficial Interest" as to any Owner, means all or any part of the interest of that Owner in the Trust, including without limitation its (a) right to a distributive share of the Profit and Loss of the Trust, (b) right to a distributive share of the assets of the Trust, and (c) right to direct or consent to actions of the Owner Trustee and otherwise participate in the management of and control the affairs of the Trust.

"Business Day" means any day that is not a Saturday, Sunday or any other day on which commercial banking institutions in Delaware are authorized or obligated by law or executive order to be closed.

"Capital Account" means the Capital Account maintained for each Owner pursuant to Article VI of this Agreement.

"Capital Contribution" means the amount of money contributed or deemed to have been contributed by an Owner to the capital of the Trust, which shall be as set forth on Schedule A to this Agreement.

"Certificate of Trust" means the Certificate of Trust filed with the Secretary of State by the Owner Trustee on behalf of the Trust.

"Custodial Agreements" means each of the Custodial Agreements, dated as of March 9, 2006, among the Trust, the Indenture Trustee and the Pennsylvania Higher Education Assistance Agency, Great Lakes Educational Loan Services, Inc., CFS-SunTech Servicing, LLC, Educational Services of America, Inc. and Nelnet, Inc., respectively.

"Deposit and Sale Agreement" means the Deposit and Sale Agreement, dated as of March 9, 2006, between the Depositor and the Trust.

"Deposit and Security Agreement" means the Deposit and Security Agreement, dated as of March 9, 2006, among the Administrator, TERI and the Trust.

"Depositor" means The National Collegiate Funding LLC, a Delaware limited liability company.

"Distribution Date" means the first Business Day following a day on which the Owner Trustee obtains receipt of funds or, if instructed by the Owners, such other Business Day as they shall specify in writing.

"Distribution Date Statement" means the statement described as such in Section 7.07.

"Distribution" means any money or other property distributed to an Owner with respect to its Beneficial Interest.

"Eligible Investments" means one or more of the following (it being acknowledged by the parties hereto that Eligible Investments will have the meaning set forth in the Indenture until such time as the Notes are no longer outstanding):

(a)     Obligations of or guaranteed as to principal and interest by the United States or any agency or instrumentality thereof when such obligations are backed by the full faith and credit of the United States;

(b)     Repurchase agreements on obligations specified in clause (a) maturing not more than one month from the date of acquisition thereof, provided that the unsecured obligations of the party agreeing to repurchase such obligations are at the time rated by each of the Rating Agencies in its highest short-term rating available;

(c)     Federal funds, certificates of deposit, demand deposits, time deposits and bankers' acceptances (which shall each have an original maturity of not more than 90 days and, in the case of bankers' acceptances, shall in no event have an original maturity of more than 365 days or a remaining maturity of more than 30 days) denominated in United States dollars of any U.S. depository institution or trust company incorporated under the laws of the United States or any state thereof or of any domestic branch of a foreign depository institution or trust company; provided that the debt obligations of such depository institution or trust company at the date of acquisition thereof have been rated by each of the Rating Agencies in its highest short-term rating available; and, provided further that, if the original maturity of such short-term obligations of a domestic branch of a foreign depository institution or trust company shall exceed 30 days, the short-term rating of such institution shall have a credit rating in one of the two highest applicable categories from each of the Rating Agencies;

(d)     Commercial paper (having original maturities of not more than 365 days) of any corporation incorporated under the laws of the United States or any state thereof, which, on the date of acquisition has been rated by each of the Rating Agencies in its highest short-term rating available; provided that such commercial paper shall have a remaining maturity of not more than 30 days;

(e)     A money market fund rated by each of the Rating Agencies in its highest rating available which may be a money market fund of the Owner Trustee; and

(f)     Other obligations or securities that are acceptable to each of the Rating Agencies as an Eligible Investment hereunder;

provided, however, that no instrument shall be an Eligible Investment if it provides for either (i) the right to receive only interest payments with respect to the underlying debt instrument or (ii) the right to receive both principal and interest payments derived from the obligations underlying such instrument and the principal and interest payments with respect to such instrument provide a yield to maturity greater than 120% of the yield to maturity at par of such underlying

obligations; and provided further that so long as the Notes are outstanding, no instrument that is not a permitted investment under the Indenture shall be an Eligible Investment for purposes of this Agreement.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Fiscal Year" means the twelve month period ending on June 30 each year or such portion thereof as the Trust may be in existence.

"Indemnification Agreements" means each of the Indemnification Agreements, dated as of March 9, 2006, between The First Marblehead Corporation and Bank of America, N.A. and JPMorgan Chase Bank, N.A., respectively.

"Indenture" means the Indenture between the Trust and U.S. Bank National Association, as Indenture Trustee, dated as of March 1, 2006, as amended or supplemented from time to time pursuant to which the Notes are to be issued.

"Indenture Trustee" means the bank or trust company acting as Indenture Trustee under the Indenture.

"Interested Noteholders" shall have the meaning set forth in the Indenture.

"Issuer Order" means the Issuer Order to the Indenture Trustee from the Trust dated March 9, 2006.

"Issuer Orders to Authenticate" means the Issuer Orders to Authenticate to the Indenture Trustee from the Trust dated March 9, 2006.

"Liquidity Note Agreement " means the Revolving Liquidity Note Agreement, dated as of March 9, 2006, between the Trust and UBS AG, Stamford branch.

"Loan Originators" means each of the originators of the Student Loans, as set forth on Schedule B attached hereto, as amended or supplemented from time to time.

"Loan Purchase Agreements" means each of the loan purchase agreements entered into between each of the Loan Originators and The First Marblehead Corporation, as set forth on Schedule C attached hereto, as amended or supplemented from time to time.

"Net Cash Flow" means, with respect to any fiscal period of the Trust, all revenues of the Trust decreased by (a) cash expenditures for operating expenses (including interest on indebtedness of the Trust but not including expense items which do not require current cash outlay), (b) reserves for contingencies and working capital established in such amounts as the Owner Trustee, with the consent of the Owners, may determine, (c) repayments of principal on any Trust indebtedness, and (d) taxes.

"1933 Act" has the meaning set forth in Section 3.02(a).

"Notes" mean the collateralized student loan asset backed notes to be issued by the Trust pursuant to the Indenture.

"Noteholder" means any holder of the Notes.

"Owner" means each of the Depositor, TERI and any other Person who becomes an owner of a Beneficial Interest.

"Owner Trustee" means Wilmington Trust Company, a Delaware banking corporation with its principal place of business in the State of Delaware, not in its individual capacity but solely as trustee, or any successor thereto, duly appointed in accordance with Section 12.01 hereof.

"Percentage Interest" means the initial undivided beneficial interest in the Trust Property of an Owner expressed as a percentage of the total initial undivided beneficial interests in the Trust Property. References to Percentage Interests herein shall be solely for the purpose of certificating Owners' interests hereunder and for any other purpose specified in this Agreement.

"Periodic Filings" means any filings or submissions that the Trust is required to make with any state or Federal regulatory agency or under the Code.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, trust (including any beneficiary thereof), estate, custodian, nominee, unincorporated organization or government or any agency or political subdivision thereof.

"Plan" has the meaning set forth in Section 3.04(d).

"Plan Assets" has the meaning set forth in Section 3.04(d).

"Rating Agencies" means Moody's Investors Service, Inc., Fitch, Inc. and Standard & Poors Rating Services, a division of The McGraw-Hill Companies, Inc.

"Revolving Liquidity Note" means a revolving liquidity note executed and delivered to the liquidity provider pursuant to the Liquidity Note Agreement in an aggregate maximum amount outstanding at any time not to exceed $65,000,000.

"Secretary of State" means the office of the Secretary of State of the State of Delaware.

"Servicers" means the Pennsylvania Higher Education Assistance Agency, Great Lakes Educational Loan Services, Inc., CFS-SunTech Servicing, LLC, Educational Services of America, Inc., Nelnet, Inc. and any other loan servicer satisfying the Rating Agency Condition.

"Servicing Agreements" means (a) the agreement by which the Pennsylvania Higher Education Assistance Agency will act as the Servicer, dated as of October 16, 2001, as amended, between The First Marblehead Corporation and the Pennsylvania Higher Education Assistance Agency, (b) the Non-FFELP Loan Servicing Agreement, dated as of May 1, 2003, as amended, by and between Great Lakes Educational Loan Services, Inc. and The First Marblehead Corporation, (c) the Private Consolidation Agreement dated as of March 26, 2004 as amended,

between CFS-SunTech Servicing, LLC and The First Marblehead Corporation, (d) Alternative Servicing Agreement dated as of February 1, 2004, as supplemented, between Educational Services of America, Inc. and The First Marblehead Corporation, and (e) the Loan Servicing Agreement, dated as of August 1, 2001, as amended, between Nelnet, Inc. (as successor in interest to UNIPAC Service Corporation and The First Marblehead Corporation, all of which agreements will be assigned to the Trust concurrent with the initial purchase of Financed Student Loans, or any other servicing agreement between the Issuer and a servicer under which such servicer agrees to service Financed Student Loans included in the Indenture Trust Estate, which servicing agreement shall satisfy the Rating Agency Condition.

"Sharing Ratio" means, with respect to any Owner, the ratio (expressed as a percentage) specified on Schedule A attached hereto.

"Statutory Trust Statute" means the Delaware Statutory Trust Act, 12 Del. Code §3801 et seq.

"Structuring Advisor" means The First Marblehead Corporation.

"Structuring Advisory Agreement" means the Structuring Advisory Agreement between the Structuring Advisor and the Trust, dated as March 9, 2006.

"Student Loans" means the education loans, to or for the benefit of students, originated under one of the Student Loan Programs.

"Student Loan Notes" means the promissory notes to be sold to the Trust by the Loan Originators pursuant to the Loan Purchase Agreements representing education loans, to or for the benefit of students, originated under the Student Loan Programs.

"Student Loan Programs" means each of the programs for the origination of the Student Loans by each of the Loan Originators pursuant to the Loan Purchase Agreements.

"Super-majority Owners" shall have the meaning set forth in Section 4.03.

"TERI" means The Education Resources Institute, Inc., a private non-profit corporation organized under Chapter 180 of the Massachusetts General Laws.

"TERI Deposit Account" means the special deposit account established by TERI pursuant to the Deposit and Security Agreement.

"TERI Guaranty Agreements" means each of the Guaranty Agreements entered into between each of the Loan Originators and TERI as set forth on Schedule D attached hereto, as amended or supplemented from time to time.

"TERI Guaranteed Loans" means Student Loans originated under the Student Loan Programs owned by the Trust and guaranteed by TERI pursuant to the Guaranty Agreements.

"Transfer" means the sale, transfer or other assignment of all of an Owner's right, title and interest in all or a portion of such Owner's Beneficial Interest.

---

"Trust" means The National Collegiate Student Loan Trust 2006-1 established by this Agreement.

"Trust Certificate" means a certificate evidencing the Beneficial Interest of an Owner in substantially the form attached hereto as Exhibit 1.

"Trust Property" means all right, title and interest of the Trust or the Owner Trustee on behalf of the Trust in and to any property contributed to the Trust by the Owners or otherwise acquired by the Trust, including without limitation all distributions, payments or proceeds thereon.

"Trust Related Agreements" means any instruments or agreements signed by the Owner Trustee on behalf of the Trust, including without limitation, the Indenture, the Loan Purchase Agreements, the Administration Agreement, the Deposit and Sale Agreement, the Deposit and Security Agreement, the Structuring Advisory Agreement, the Assignments of Servicing Agreements, the Back-up Agreement, the Custodial Agreements, the Notes, the Indemnification Agreements, the Liquidity Note Agreement, the Revolving Liquidity Note, the Issuer Order and the Issuer Orders to Authenticate.

Tax Terms:

"Adjusted Capital Account Deficit" means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)     Credit to such Capital Account the minimum gain chargeback that such Partner is deemed to be obligated to restore pursuant to the penultimate sentences of sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations and the amount of such Partner's share of Partner Nonrecourse Debt Minimum Gain; and

(b)     Debit to such Capital Account the items described in sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"Code" means the Internal Revenue Code of 1986, as amended.

"Nonrecourse Deductions" has the meaning set forth in section 1.704-2(b)(1) of the Regulations.

"Nonrecourse Liability" has the meaning set forth in section 1.704-2(b)(3) of the Regulations.

"Partner Nonrecourse Debt" has the meaning set forth in section 1.704-2(b)(4) of the Regulations.

"Partner Nonrecourse Debt Minimum Gain" means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with section 1.704-2(i)(3) of the Regulations.

"Partner Nonrecourse Deductions" has the meaning set forth in sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Regulations.

"Partners" means the Owners.

"Partnership" means the Trust.

"Partnership Minimum Gain" has the meaning set forth in sections 1.704-2(b)(2) and 1.704-2(d) of the Regulations.

"Profit and Loss" means, for each Fiscal Year, an amount equal to the Partnership's taxable income or loss for such Fiscal Year, determined in accordance with section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(a)       Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profit or Loss pursuant to this definition shall be added to such taxable income or loss;

(b)       Any expenditures of the Partnership described in section 705(a)(2)(B) of the Code or treated as expenditures under section 705(a)(2)(B) of the Code pursuant to section 1.704-1(b)(2)(iv)(i) of the Regulations (other than expenses in respect of which an election is properly made under section 709 of the Code), and not otherwise taken into account in computing Profit or Loss pursuant to this definition, shall be subtracted from such taxable income or loss;

(c)       Notwithstanding any other provisions of this definition, any items which are specially allocated pursuant to Section 7.03 or 7.04 shall not be taken into account in computing Profit or Loss.

The amounts of the items of Partnership income, gain, loss, or deduction available to be specially allocated pursuant to Sections 7.03 and 7.04 shall be determined by applying rules analogous to those set forth in clauses (a) and (b) above.

"Regulations" means the federal income tax regulations promulgated by the United States Treasury Department under the Code as such Regulations may be amended from time to time. All references herein to a specific section of the regulations shall be deemed also to refer to any corresponding provision of succeeding Regulations.

"Regulatory Allocations" has the meaning set forth in Section 7.04.

ARTICLE II

ORGANIZATION

Section 2.01 <u>Name</u>. The Trust continued hereby shall be known as The National Collegiate Student Loan Trust 2006-1, in which name the Owner Trustee may take any action as provided herein.

Section 2.02 <u>Office</u>. The principal place of business and principal office of the Trust shall be in care of the Owner Trustee, at the address set forth in Section 14.05. The Trust shall also have an office at 800 Boylston Street - 34th Floor, Boston, Massachusetts 02199.

Section 2.03 <u>Purposes and Powers</u>.

(a)    The purpose of the Trust is to engage in the following activities and only these activities:

(i)    To acquire a pool of Student Loans, to execute the Indenture and to issue the Notes;

(ii)    To enter into the Trust Related Agreements and to provide for the administration of the Trust and the servicing of the Student Loans;

(iii)    To engage in those activities and to enter into such agreements that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith; and

(iv)    To engage in such other activities as may be required in connection with conservation of the Trust Property and Distributions to Owners. Until the Indenture is discharged, the Trust shall not engage in any business or activities other than in connection with, or relating to, the foregoing and other than as required or authorized by the terms of this Agreement and the Indenture, except as are incidental to and necessary to accomplish such activities, unless the Interested Noteholders consent to the Trust engaging in other activities.

(b)    Until the Indenture is discharged, the operations of the Trust shall be conducted in accordance with the following standards:

(i)    The Trust will act solely in its own name and the Owner Trustee or other agents selected in accordance with this Agreement will act on behalf of the Trust subject to direction by the Owners as provided herein, but such action shall not be in violation of the terms of this Agreement;

(ii)    The Trust's funds and assets shall at all times be maintained separately from those of the Owners and any of their respective Affiliates;

(iii)    The Trust shall maintain complete and correct books, minutes of the meetings and proceedings of the Owners, and records of accounts;

(iv)    The Trust shall conduct its business at the office of the Owner Trustee and will use stationery and other business forms of the Trust under its own name and not that of the Owners or any of their respective Affiliates, and will avoid the appearance (A) of conducting business on behalf of any Owner or any Affiliate of an Owner or (B) that the assets of the Trust are available to pay the creditors of the Owner Trustee or any Owner;

(v)    The Trust's operating expenses shall be paid out of its own funds;

(vi)    The Trust shall not incur, guarantee or assume any debt (other than the Notes or pursuant to the Liquidity Note Agreement) nor hold itself out as being liable for the debts of any entity, including any Owner or any Affiliates of any Owner;

(vii)    For so long as any of the Notes are outstanding, the Trust shall not (A) merge or consolidate with or into any other entity, (B) convey or transfer all or substantially all of its assets to any other entity (other than to the Indenture Trustee pursuant to the Indenture), or (C) dissolve, liquidate or terminate in whole or in part; and

(viii)    For so long as any of the Notes are outstanding, the Trust shall not own or acquire any financial asset that requires the Trust, the Owners or the Administrator to make any decisions regarding such asset other than the servicing of the asset.

Section 2.04 <u>Appointment of the Owner Trustee</u>. The Depositor hereby appoints the Owner Trustee as trustee of the Trust, to have all the rights, powers and duties set forth herein and in the Statutory Trust Statute. The Owner Trustee acknowledges receipt in trust from the Depositor, of the sum of one dollar ($1), constituting the initial Trust Property.

Section 2.05 <u>Declaration of Trust</u>. The Owner Trustee hereby declares that it will hold the Trust Property in trust upon and subject to the conditions set forth herein for the use and benefit of the Owners, subject to the obligations of the Owner Trustee under the Trust Related Agreements. It is the intention of the parties hereto that the Trust constitute a statutory trust under the Statutory Trust Statute and that this Agreement constitute the governing instrument of the Trust.

Section 2.06 <u>No Liability of Owners for Expenses or Obligations of Trust</u>. No Owner shall be liable for any liability, expense or other obligation of the Trust.

Section 2.07 <u>Situs of Trust</u>. The Trust will be located and administered in the State of Delaware. The Trust shall not have any employees in any state other than in the State of Delaware and payments will be received by the Owner Trustee on behalf of the Trust only in the State of Delaware and payments will be made by the Owner Trustee on behalf of the Trust only from the State of Delaware.

https://www.sec.gov/Archives/edgar/data/1352760/000088237706000922/p060388_ex10-10.htm

## ARTICLE III

### TRUST CERTIFICATES AND TRANSFER OF INTEREST

Section 3.01 <u>Issuance of Trust Certificate</u>.

(a)        As of the date hereof, as set forth on Schedule A attached hereto, the Depositor has been issued a Trust Certificate evidencing a percentage of the Beneficial Interest in the Trust and TERI has been issued a Trust Certificate evidencing a percentage of the Beneficial Interest in the Trust.

(b)        Each Trust Certificate shall be executed by manual signature on behalf of the Owner Trustee by one of its Authorized Officers. Trust Certificates bearing the manual signature of an individual who was, at the time when such signature was affixed, authorized to sign on behalf of the Owner Trustee shall bind the Trust, notwithstanding that such individual has ceased to be so authorized prior to the delivery of such Trust Certificate or does not hold such office at the date of such Trust Certificate. Each Trust Certificate shall be dated the date of its issuance.

Section 3.02 <u>Registration and Transfer of Certificates</u>.

(a)        The Owner Trustee shall maintain at its office referred to in Section 2.02, or at the office of any agent appointed by it and approved in writing by the Owners at the time of such appointment, a register for the registration and Transfer of Trust Certificates. No Transfer of a Beneficial Interest shall be made unless such Transfer is made pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "1933 Act"), and state securities laws, or is exempt from the registration requirements under the 1933 Act and state securities laws.

(b)        The registered Owner of any Trust Certificate may Transfer all or any portion of the Beneficial Interest evidenced by such Trust Certificate upon surrender thereof to the Owner Trustee accompanied by the documents required by Section 3.04. Such Transfer may be made by the registered Owner in person or by its attorney duly authorized in writing upon surrender of the Trust Certificate to the Owner Trustee accompanied by a written instrument of Transfer and with such signature guarantees and evidence of authority of the Persons signing the instrument of Transfer as the Owner Trustee may reasonably require. Promptly upon the receipt of such documents and receipt by the Owner Trustee of the transferor's Trust Certificate, the Owner Trustee shall (i) record the name of such transferee as an Owner and its Percentage Interest in the Trust Certificate register and (ii) issue, execute and deliver to such Owner a Trust Certificate evidencing such Percentage Interest. In the event a transferor Transfers only a portion of its Beneficial Interest, the Owner Trustee shall register and issue to such transferor a new Trust Certificate evidencing such transferor's new Percentage Interest. Subsequent to a Transfer and upon the issuance of the new Trust Certificate or Trust Certificates, the Owner Trustee shall cancel and destroy the Trust Certificate surrendered to it in connection with such Transfer. The Owner Trustee may treat the Person in whose name any Trust Certificate is registered as the sole Owner of the Beneficial Interest in the Trust evidenced by such Trust Certificate.

(c)        As a condition precedent to any registration of Transfer, the Owner Trustee may require the payment of a sum sufficient to cover the payment of any tax or taxes or other governmental charges required to be paid in connection with such Transfer and any other reasonable expenses connected therewith.

Section 3.03 <u>Lost, Stolen, Mutilated or Destroyed Certificates</u>. If (i) any mutilated Trust Certificate is surrendered to the Owner Trustee, or (ii) the Owner Trustee receives evidence to its satisfaction that any Trust Certificate has been destroyed, lost or stolen, and upon proof of ownership satisfactory to the Owner Trustee together with such security or indemnity as may be requested by the Owner Trustee to save it harmless, the Owner Trustee shall execute and deliver a new Trust Certificate for the same Percentage Interest as the Trust Certificate so mutilated, destroyed, lost or stolen, of like tenor and bearing a different issue number, with such notations, if any, as the Owner Trustee shall determine. In connection with the issuance of any new Trust Certificate under this Section 3.03, the Owner Trustee may require the payment by the registered Owner thereof of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the reasonable fees and expenses of the Owner Trustee) connected therewith. Any replacement Trust Certificate issued pursuant to this Section 3.03 shall constitute complete and indefeasible evidence of ownership of a Beneficial Interest, as if originally issued, whether or not the lost, stolen or destroyed Trust Certificate shall be found at any time.

Section 3.04 <u>Limitation on Transfer of Ownership Rights</u>.

(a)        No Transfer of all or any part of a Beneficial Interest shall be made to any Person unless (i) such Person delivers to the Owner Trustee an accession agreement substantially in the form of Exhibit 2 hereof, (ii) except for the initial transfer of the Beneficial Interest of the Depositor, the Owner Trustee shall have received a written opinion of counsel in form and substance satisfactory to the Owner Trustee stating that such Transfer is exempt from the 1933 Act and any applicable state securities laws.

(b)        At any time that there is more than one Owner, no Transfer of a Beneficial Interest shall be valid unless the Owner making such Transfer shall have received the prior written consent to such Transfer of the Owners holding at least 85% of both the Percentage Interests and the Sharing Ratios in the Trust at such time, which consent may not be unreasonably withheld; <u>provided</u>, <u>however</u>, that in calculating the total Beneficial Interests in the Trust the Beneficial Interest owned by the transferor or (unless the transferor and its Affiliates are the only Owners) any Affiliate thereof shall be excluded.

(c)        Except for the initial issuance of the Trust Certificates to the Depositor, no Transfer shall be valid if, as a result of such Transfer, (i) any Person would have a Percentage Interest or a Sharing Ratio of 100%, considering for such purpose all interests owned by any Affiliate of such Person as owned by such Person, or (ii) such Transfer would result in a termination of the Trust for Federal income tax purposes.

(d)        No Transfer of all or any part of a Beneficial Interest shall be made to any employee benefit plan or certain other retirement plans and arrangements, including individual retirement accounts and annuities, Keogh plans and bank collective investment funds and

insurance company general or separate accounts at which such plans, accounts or arrangements are invested, that are subject to ERISA or Section 4975 of the Code (collectively, "Plan"), nor to any Person acting, directly or indirectly, on behalf of any such Plan or any Person acquiring the Beneficial Interest with "plan assets" of a Plan within the meaning of the Department of Labor regulation promulgated at 29 C.F.R. § 2510.3-101 ("Plan Assets") unless the Owner Trustee is provided with an opinion of counsel which establishes to the satisfaction of the Owner Trustee that the purchase of the Beneficial Interest is permissible under applicable law, will not constitute or result in any prohibited transaction under ERISA or Section 4975 of the Code and will not subject the Owners, the Owner Trustee or the Trust to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to that undertaken in this Agreement, which opinion of counsel shall not be an expense of the Owners, the Owner Trustee or the Trust.

(e)　　　No Transfer of all or any part of a Beneficial Interest shall be permitted, and no such transfer shall be effective hereunder, if such transfer would cause the Trust to be classified as a publicly traded partnership, taxable as a corporation for federal income tax purposes, by causing the Trust to have more than 100 Owners at any time during any taxable year of the Trust.

Section 3.05 <u>Assignment of Right to Distributions</u>. An Owner may assign all or any part of its right to receive distributions hereunder, but such assignment (in the absence of a permitted Transfer) shall effect no change in the ownership of the Trust.

ARTICLE IV

CONCERNING THE OWNERS

Section 4.01 <u>Action by Owners with Respect to Certain Matters</u>.

(a)　　　The Owner Trustee will take such action or refrain from taking such action under this Agreement or any Trust Related Agreement as it shall be directed pursuant to an express provision of this Agreement or such Trust Related Agreement or, with respect to nonministerial matters, as it shall be directed by all the Owners for so long as any of the Notes are outstanding.

(b)　　　Without limiting the generality of the foregoing, in connection with the following nonministerial matters, the Owner Trustee will take no action, and will not have authority to take any such action, unless it receives prior written approval from all the Owners for so long as any of the Notes are outstanding:

(i)　　　Initiate any claim or lawsuit by the Trust and compromise any claim or lawsuit brought by or against the Trust, except for claims or lawsuits initiated in the ordinary course of business by the Trust or its agents or nominees for collection on the Student Loans owned by the Trust;

(ii)　　　Amend, change or modify this Agreement or any Trust Related Agreement;

(iii)　　　File a voluntary petition in bankruptcy for the Trust, which in no event shall the Owner Trustee be permitted to do or be instructed to do until at least 367 days

after the payment in full of the Outstanding Notes (as defined in the Indenture) issued by the Trust; and

(iv)       (A) Institute proceedings to have the Trust declared or adjudicated bankrupt or insolvent, (B) consent to the institution of bankruptcy or insolvency proceedings against the Trust, (C) file a petition or consent to a petition seeking reorganization or relief on behalf of the Trust under any applicable federal or state law relating to bankruptcy, (D) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or any similar official) of the Trust or a substantial portion of the property of the Trust, (E) make any assignment for the benefit of the Trust's creditors, (F) cause the Trust to admit in writing its inability to pay its debts generally as they become due, or (G) take any action, or cause the Trust to take any action, in furtherance of any of the foregoing (any of the above, a "Bankruptcy Action"). No Owner shall have the power to take, and no Owner shall take, any Bankruptcy Action with respect to the Trust or direct the Owner Trustee to take any Bankruptcy Action with respect to the Trust.

(c)       No Owner shall take any action to cause the filing of an involuntary petition in bankruptcy against the Trust.

Section 4.02 Action Upon Instructions.

(a)       The Owner Trustee shall take such action or actions as may be specified in this Agreement or in any instructions delivered in accordance with this Article IV or Article VIII; provided, however, that the Owner Trustee shall not be required to take any such action if it shall have reasonably determined, or shall have been advised by counsel, that such action (i) is contrary to the terms hereof or of any document contemplated hereby to which the Trust or the Owner Trustee is a party or is otherwise contrary to law, (ii) is likely to result in personal liability on the part of the Owner Trustee, unless the Owners shall have provided to the Owner Trustee indemnification or security reasonably satisfactory to the Owner Trustee against all costs, expenses and liabilities arising from the Owner Trustee's taking of such action, or (iii) would adversely affect the status of the Trust as a partnership for Federal income tax purposes.

(b)       No Owner shall direct the Owner Trustee to take or refrain from taking any action contrary to this Agreement or any Trust Related Agreement, nor shall the Owner Trustee be obligated to follow any such direction, if given.

(c)       Notwithstanding anything contained herein or in any Trust Related Agreement to the contrary, the Owner Trustee shall not be required to take any action in any jurisdiction other than in the State of Delaware if the taking of such action will (i) require the consent or approval or authorization or order for the giving of notice to, or the registration with or taking of any action in respect of, any state or other governmental authority or agency of any jurisdiction other than the State of Delaware; (ii) result in any fee, tax or other governmental charge under the laws of any jurisdiction or any political subdivision thereof in existence on the date hereof other than the State of Delaware becoming payable by the Owner Trustee; or (iii) subject the Owner Trustee to personal jurisdiction in any jurisdiction other than the State of Delaware for causes of action arising from acts unrelated to the consummation of the transactions by the Owner Trustee contemplated hereby.

(d)         The Owner Trustee shall not have the power to remove the Administrator under the Administration Agreement or appoint a successor Administrator pursuant to the Administration Agreement without written instruction by the Owners.

Section 4.03 <u>Super-majority Control</u>. Except as otherwise expressly provided in this Agreement, any action which may be taken or consent or instructions which may be given by the Owners under this Agreement may be taken by the Owners holding in the aggregate at least 85% of both the Percentage Interests and the Sharing Ratios in the Trust at the time of such action (the "Super-majority Owners"). Any written notice of the Owners delivered pursuant to this Agreement shall be effective only if signed by the Super-majority Owners at the time of the delivery of such notice.

Section 4.04 <u>Representations and Warranties of the Depositor</u>. The Depositor hereby represents and warrants to the Owner Trustee as follows:

(a)         Upon the receipt of the Trust Property by the Owner Trustee under this Agreement, the Owner Trustee on behalf of the Trust will have good title to the Trust Property free and clear of any lien.

(b)         The Trust is not and will not be, upon conveyance of the Trust Property to the Owner Trustee, an "Investment Company" or under the "control" of an "Investment Company," as such terms are defined in the Investment Company Act of 1940, as amended.

(c)         Except for the filing of the Certificate of Trust with the Secretary of State, no consent, approval, authorization or order of, or filing with, any court or regulatory, supervisory or governmental agency or body is required under current law in connection with the execution, delivery or performance by the Depositor of this Agreement or the consummation of the transactions contemplated hereby; <u>provided</u>, <u>however</u>, that no representation or warranty is made herein as to compliance with Federal securities laws or the securities or "blue sky" laws of any state.

(d)         This Agreement has been duly and validly authorized, executed and delivered by, and constitutes a valid and binding agreement of, the Depositor, enforceable in accordance with its terms.

Section 4.05 <u>Power of Attorney</u>.

(a)         <u>General</u>. Each Owner hereby irrevocably constitutes and appoints the Administrator, with full power of substitution, such Owner's true and lawful attorney-in-fact, in such Owner's name, place and stead, with full power to act jointly and severally, to make, execute, sign, acknowledge, swear to, verify, deliver, file, record and publish the following documents:

(i)         Any certificate, instrument or document to be filed by the Owners under the laws of any state, or with any governmental agency in connection with this Agreement;

(ii)        Any certificate, instrument or document which may be required to effect the continuation or the termination of the Trust, including any amendments to this Agreement; provided such continuation or termination is in accordance with the terms of this Agreement; and

(iii)        Any written notice, instruction, instrument or document under Article XII of this Agreement.

(b)        Duration of Power of Attorney. It is expressly intended by each of the Owners that the Power of Attorney granted under this Section 4.05 is coupled with an interest, and it is agreed that such Power of Attorney shall survive (i) the dissolution, death or incompetency of any Owner and (ii) the assignment by any Owner of the whole or any portion of such Owner's Beneficial Interest.

ARTICLE V

INVESTMENT AND APPLICATION OF TRUST FUNDS

Section 5.01 Investment of Trust Funds. Unless otherwise directed in writing by the Owners, income with respect to and proceeds of the Trust Property which are received by the Owner Trustee more than one day prior to a Distribution Date shall be invested and reinvested by the Owner Trustee in Eligible Investments. Interest earned from such investment and reinvestment shall be credited to the Trust Property.

Section 5.02 Application of Funds. Income with respect to and proceeds of Trust Property held by the Owner Trustee on a Distribution Date shall be remitted directly to the Indenture Trustee for application in accordance with the Indenture for so long as any of the Notes is outstanding, and thereafter shall be applied by the Owner Trustee on such Distribution Date in the following order:

(i)        First, to pay any amounts due to the Owner Trustee under this Agreement;

(ii)        Second, to pay any amounts due to the Administrator under the Administration Agreement and to the Structuring Advisor under the Structuring Advisory Agreement;

(iii)        Third, to pay any amounts then due to any Person under the Trust Related Agreements;

(iv)        Fourth, to pay any other expenses of the Trust; and

(v)        Fifth, to the Owners in accordance with Section 7.06.

All payments to be made under this Agreement by the Owner Trustee shall be made only from the income and proceeds of the Trust Property and only to the extent that the Owner Trustee has received such income or proceeds.

## ARTICLE VI

## CAPITAL

Section 6.01 <u>Tax Characterization</u>. It is intended that the Trust be characterized and treated as a partnership for federal income tax purposes. To the extent the Trust is characterized and treated as anything other than a partnership for federal, state or local income tax purposes, the Owners shall jointly and severally be liable for, and hereby agree to indemnify the Trust for, any tax liability arising out of such characterization. All references to a "Partner," the "Partners" and to the "Partnership" in this Agreement and in the provisions of the Code and Regulations cited in this Agreement shall be deemed to refer to an Owner, the Owners and the Trust, respectively. The Tax Matters Partner of the Trust shall be as set forth in Article XIII.

Section 6.02 <u>Initial Capital Contributions of Owners</u>. The Depositor shall make an initial Capital Contribution in the amount of one dollar ($1) upon execution of this Agreement. Upon their accession to this Agreement as Owners and the issuance of Trust Certificates to them in accordance with Section 3.01(a), the Owners will be deemed to have made initial Capital Contributions in the amounts set forth on Schedule A attached hereto.

Section 6.03 <u>Capital Accounts</u>. A capital account shall be maintained for each Owner throughout the term of the Trust in accordance with the rules of section 1.704-1(b)(2)(iv) of the Regulations as in effect from time to time, and, to the extent not inconsistent therewith, to which the following provisions apply:

(a)        To each Owner's Capital Account there shall be credited (i) the amount of money contributed by such Owner to the Trust (including each Owner's share of any liabilities of the Trust assumed by such Owner as provided in section 1.704-1(b)(2)(iv)(c) of the Regulations), (ii) the fair market value of any property contributed to the Trust by such Owner (net of liabilities secured by such contributed property that the Trust is considered to assume or take subject to under section 752 of the Code), and (iii) such Owner's share of Profit and items of income and gain that are specially allocated pursuant to Sections 7.03 and 7.04 (other than any income or gain allocated to such Owner pursuant to Section 7.03(f) in accordance with section 704(c) of the Code). The initial Capital Contributions of each Owner are set forth on Schedule A attached hereto.

(b)        To each Owner's Capital Account there shall be debited (i) the amount of money distributed to such Owner by the Trust (including any liabilities of such Owner assumed by the Trust as provided in section 1.704-1(b)(2)(iv)(c) of the Regulations) other than amounts that are in repayment of debt obligations of the Trust to such Owner, (ii) the fair market value of property distributed to such Owner (net of liabilities secured by such distributed property that such Owner is considered to assume or take subject to), and (iii) such Owner's share of Loss and items of loss or deduction that are specially allocated pursuant to Sections 7.03 and 7.04 (other than any deduction or loss allocated to such Owner pursuant to Section 7.03(f) in accordance with section 704(c) of the Code).

(c)        The Capital Account of a transferee Owner shall include the appropriate portion of the Capital Account of the Owner from whom the transferee Owner's interest was obtained.

(d)    In determining the amount of any liability, there shall be taken into account section 752(c) of the Code and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with section 1.704-1(b) of the Regulations, and shall be interpreted and applied in a manner consistent with such Regulations.

Section 6.04 <u>Interest</u>. No Owner shall be entitled to interest on its Capital Contribution or on any Profit retained by the Trust.

Section 6.05 <u>No Additional Capital Contributions</u>. No Owner shall make an additional Capital Contribution to the Trust, or receive a distribution from the Trust, of property unless this Agreement shall have first been amended to the extent necessary to comply with the requirements of sections 704(b) and (c) of the Code regarding the distributive shares of, and the allocation of income, gain, loss, deduction and credit among, partners of a partnership.

Section 6.06 <u>Investment of Capital Contributions</u>. The cash Capital Contributions of the Owners shall be invested by the Owner Trustee in accordance with Section 5.01.

Section 6.07 <u>Repayment and Return of Capital Contributions</u>. The Owner Trustee shall have no personal liability for the repayment of any Capital Contributions of the Owners.

<div align="center">ARTICLE VII</div>

<div align="center">ALLOCATION OF PROFIT AND LOSS; DISTRIBUTIONS</div>

Section 7.01 <u>Profit</u>. After giving effect to special allocations set forth in Section 7.03 and Section 7.04, Profit for any Fiscal Year shall be allocated to the Owners in proportion to their respective Sharing Ratios.

Section 7.02 <u>Loss</u>. After giving effect to the special allocations set forth in Sections 7.03 and 7.04, Loss for any Fiscal Year shall be allocated as follows:

(a)    <u>Special Allocation of Loss Attributable to Note Defaults on TERI Guaranteed Loans</u>. To the extent of any positive balance in TERI's Capital Account as an Owner, TERI shall be specially allocated all Losses for such Fiscal Year resulting from defaults, as determined pursuant to the TERI Guaranty Agreements, on the TERI Guaranteed Loans owned by the Trust to the extent that the Trust is not reimbursed for such Losses by TERI as a guaranty payment pursuant to the TERI Guaranty Agreements.

(b)    <u>Other Loss</u>. All Loss not allocated pursuant to Section 7.02(a) shall be allocated to the Owners in proportion to their Sharing Ratios.

(c)    <u>Effect of Adjusted Capital Account Deficit</u>. The Loss allocated pursuant to Section 7.02(a) and (b) shall not exceed the maximum amount of Loss that can be so allocated without causing any Owner to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event some but not all of the Owners would have Adjusted Capital Account Deficits as a consequence of an allocation of Loss pursuant to Section 7.02(a) and (b), the limitation set

forth in this Section 7.02(c) shall be applied for an Owner by Owner basis so as to allocate the maximum permissible Loss to each Owner under section 1.704-1(b)(2)(ii)(d) of the Regulations.

(d)        Remaining Loss. In the event that there is any remaining Loss in excess of the limitation set forth in Section 7.02(c), such remaining Loss shall be allocated among the Owners in proportion to their respective Sharing Ratios.

Section 7.03 Special Allocations.

(a)        Minimum Gain Chargeback. Except as otherwise provided in section 1.704-2(f) of the Regulations, notwithstanding any other provision of this Section 7.03, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, each Owner shall be specially allocated items of Trust income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Owner's share of the net decrease in Partnership Minimum Gain, determined in accordance with section 1.704-2(g) of the Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Owner pursuant thereto. The items to be so allocated shall be determined in accordance with sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Regulations. This Section 7.03(a) is intended to comply with the minimum gain chargeback requirement in section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

(b)        Owner Minimum Gain Chargeback. Except as otherwise provided in section 1.704-2(i)(4) of the Regulations, notwithstanding any other provision of this Section 7.03, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Fiscal Year, each Owner who has a share of the Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with section 1.704-2(i)(5) of the Regulations, shall be specially allocated items of Partnership income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Partner's share of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with section 1.704-2(i)(4) of the Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Partner pursuant thereto. The items to be so allocated shall be determined in accordance with sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Regulations. This Section 7.03(b) is intended to comply with the minimum gain chargeback requirement in section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

(c)        Qualified Income Offset. In the event any Owner unexpectedly receives any adjustments, allocations, or distributions described in section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Trust income and gain shall be specially allocated to the Owner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Owner as quickly as possible, provided that an allocation pursuant to this Section 7.03(c) shall be made only if and to the extent that the Owner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article VII have been tentatively made as if this Section 7.03(c) were not in this Agreement.

---

(d)      Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year shall be specially allocated among the Owners in proportion to their Sharing Ratios.

(e)      Partner Nonrecourse Deductions. Any Partner Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Owner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with section 1.704-2(i)(1) of the Regulations.

(f)      Mandatory Allocations Under Section 704(c) of the Code. Notwithstanding the foregoing provisions of this Section 7.03, in the event section 704(c) of the Code or section 704(c) of the Code principles applicable under section 1.704-1(b)(2)(iv) of the Regulations require allocations of income, gain, deduction or loss in a manner different than that set forth above, the provisions of section 704(c) of the Code and the Regulations thereunder shall control such allocations. Any item of Trust income, gain, loss and deduction with respect to any property (other than cash) that has been contributed by a Partner to the capital of the Trust or which has been revalued for Capital Account purposes pursuant to section 1.744-1(b)(2)(iv) of the Regulations and which is required to be allocated to such Partner for income tax purposes under section 704(c) of the Code so as to take into account the variation between the tax basis of such property and its fair market value at the time of its contribution shall be allocated solely for income tax purposes in the manner required or permitted under section 704(c) of the Code using the "traditional method" described in section 1.704-3(b) of the Regulations, provided, however, that curative allocations consisting of the special allocation of gain or loss upon the sale or other disposition of the contributed property shall be made in accordance with section 1.704-3(c) of the Regulations to the extent necessary to eliminate any disparity, to the extent possible, between the Partners' book and tax Capital Accounts attributable to such property; further provided, however, that any other method allowable under applicable Regulations may be used for any contribution of property as to which there is agreement between the contributing Partner and the Administrator.

(g)      Gross Income Allocation. In the event any Owner has an Adjusted Capital Account Deficit, such Owner shall be specially allocated items of Trust income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 7.03(g) shall be made only if and to the extent that such Owner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 7.03 have been made as if Sections 7.03(c) and 7.03(g) were not in this Agreement.

Section 7.04 Curative Allocations. The allocations set forth in Sections 7.02 and 7.03(a) through (e) (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the Owners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Trust income, gain, loss, or deduction. Therefore, notwithstanding any other provision of this Article VII (other than the Regulatory Allocations), offsetting special allocations of Trust income, gain, loss, or deduction shall be made so that, after such offsetting allocations are made, each Owner's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Owner would have had if the Regulatory Allocations were not part of this Agreement and all Trust items were allocated pursuant to Sections 7.01 and 7.02. In making such offsetting allocations, there shall be taken into account future Regulatory

Allocations under Section 7.03(a) and (b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Section 7.03(d) and (e).

Section 7.05 <u>Other Allocation Rules</u>.

(a)     For purposes of determining the Profit, Loss, or any other items allocable to any period, Profit, Loss, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Owner Trustee, under the direction of the Super-majority Owners, using any method permissible under section 706 of the Code and the Regulations thereunder.

(b)     The Owners are aware of the income tax consequences of the allocations made by this Article VII and hereby agree to be bound by the provisions of this Article VII in reporting their shares of Trust income and loss for income tax purposes.

(c)     Solely for purposes of determining an Owner's proportionate share of the "excess nonrecourse liabilities" of the Trust within the meaning of section 1.752-3(a)(3) of the Regulations, the Owners' interests in Trust profits are in proportion to their Sharing Ratios.

(d)     To the extent permitted by section 1.704-2(h)(3) of the Regulations, the Owner Trustee shall endeavor to treat distributions of Net Cash Flow as having been made from the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt only to the extent that such distributions would cause or increase an Adjusted Capital Account Deficit for any Owner.

Section 7.06 <u>Distribution of Net Cash Flow</u>. Except to the extent prohibited by any other agreement to which the Trust is a party or is otherwise bound, Net Cash Flow on each Distribution Date shall be distributed on such Distribution Date to each Owner in an amount equal to (i) the Profit allocated to such Owner under this Article VII and not previously distributed to such Owner less (ii) the amount of Losses allocated to such Owner to the extent such Losses were not applied in reduction of the amount of any previous distribution of Net Cash Flow to such Owner. All payments to be made under this Agreement by the Owner Trustee shall be made only from the income and proceeds of the Trust Property and only to the extent the Owner Trustee has received such income or proceeds.

Section 7.07 <u>Distribution Date Statement</u>. With each distribution to an Owner pursuant to Section 7.06, the Owner Trustee shall deliver a Distribution Date Statement setting forth, for the period since the preceding Distribution Date:

(a)     Income and proceeds received by the Owner Trustee with respect to the Trust Property;

(b)     Amounts paid to the Owner Trustee;

(c)     Amounts paid to any Person pursuant to a Trust Related Agreement; and

(d)     Amounts paid for other expenses of the Trust.

Section 7.08 <u>Allocation of Tax Liability</u>. In the event that any tax is imposed on the Trust, such tax shall be charged against amounts otherwise distributable to the Owners in

proportion to their respective Sharing Ratios. The Owner Trustee is hereby authorized to retain from amounts otherwise distributable to the Owners sufficient funds to pay or provide for the payment of, and then to pay, such tax as is legally owed by the Owner (but such authorization shall not prevent the Owner Trustee from contesting any such tax in appropriate proceedings, and withholding payment of such tax, if permitted by law, pending the outcome of such proceedings).

Section 7.09 <u>Method of Payment</u>. All amounts payable to an Owner pursuant to this Agreement shall be paid by the Owner Trustee to such Owner or a nominee therefor by check payable to such Owner, mailed first class to the address of such Owner appearing on the register maintained pursuant to Section 3.02, or by crediting the amount to be distributed to such Owner to an account maintained by such Owner with the Owner Trustee or by transferring such amount by wire transfer in immediately available funds to a banking institution with bank wire transfer facilities for the account of such Owner, as instructed in writing from time to time by such Owner. The Owner Trustee may require an Owner to pay any wire transfer fees incurred in connection with any wire transfer made to such Owner.

Section 7.10 <u>No Segregation of Funds; No Interest</u>. Subject to Sections 2.03(b)(ii) and 5.01, funds received by the Owner Trustee hereunder need not be segregated in any manner except to the extent required by law and may be deposited under such general conditions as may be prescribed by law, and the Owner Trustee shall not be liable for any interest thereon.

Section 7.11 <u>Interpretation and Application of Provisions by the Administrator</u>. The Owner Trustee shall appoint and authorize the Administrator to interpret and apply the provisions set forth in Articles V, VI, VII and XI regarding application of funds, allocations of Profit and Loss and Distributions of Net Cash Flow, to resolve any ambiguities that may result from such application and to provide the Owner Trustee and the Owners with clarification of any provision as may be necessary or appropriate. The determinations of the Administrator shall be binding upon the Owners.

## ARTICLE VIII

## AUTHORITY AND DUTIES OF THE OWNER TRUSTEE

Section 8.01 <u>General Authority</u>. The Owner Trustee is authorized to take all actions required or permitted to be taken by it pursuant to the terms of this Agreement, the Trust Related Agreements and the Statutory Trust Statute. The Owner Trustee is further authorized from time to time to take such action as the Administrator directs with respect to the Trust Related Agreements.

Section 8.02 <u>Specific Authority</u>. The Owner Trustee is hereby authorized and directed to take the following actions:

(a) Execute the Certificate of Trust;

(b) Execute and deliver the Administration Agreement and the Back-up Agreement and on behalf of the Trust, as well as the Trust Related Agreements, including without limitation, the Trust Certificates and any other document contemplated by the foregoing, in each case in

such form as the Administrator shall approve, as evidenced conclusively by the Owner Trustee's execution thereof; and

(c)     Execute and deliver on behalf of the Trust any documents necessary or appropriate, in such form as the Administrator shall approve, as evidenced conclusively by the Owner Trustee's execution thereof, to cause the repurchase by TERI or the Trust, as the case may be, of any Student Loan Note required to be repurchased in accordance with the TERI Guaranty Agreements.

Section 8.03 General Duties. It shall be the duty of the Owner Trustee to discharge (or cause to be discharged) all of its responsibilities pursuant to the terms of this Agreement and to administer the Trust in the interest of the Owners. Notwithstanding the foregoing, the Owner Trustee shall be deemed to have discharged its duties and responsibilities hereunder and under the Trust Related Agreements to the extent the Administrator has agreed in the Administration Agreement to perform such acts or to discharge such duties of the Owner Trustee hereunder or under any Trust Related Agreement, and the Owner Trustee shall not be held liable for the default or failure of the Administrator to carry out its obligations under the Administration Agreement.

Section 8.04 Accounting and Reports to the Owners, the Internal Revenue Service and Others. The Administrator shall (a) maintain or cause to be maintained the books of the Trust on a fiscal year basis using the accrual method of accounting, (b) deliver to each Owner, within 60 days of the end of each Fiscal Year, or more often, as may be required by the Code and the Regulations thereunder, a copy of the annual financial statement of the Trust for such Fiscal Year and a statement in such form and containing such information as may be required by such Regulations, and as is necessary and appropriate to enable each Owner to prepare its federal and state income tax returns, (c) file such tax returns relating to the Trust, and make such elections, including an election for the first taxable year of the Trust, necessary for the Trust to qualify as a partnership, or as may from time to time be required under any applicable state or federal statute or rule or regulation thereunder, (d) cause such tax returns to be signed in the manner required by law, (e) collect or cause to be collected any withholding tax required by the Code to be withheld by the Owner Trustee with respect to distributions to Owners who are nonresident aliens or foreign corporations, and (f) cause to be mailed to each Owner copies of all such reports and tax returns of the Trust.

Section 8.05 Signature of Returns. The Owner Trustee shall sign on behalf of the Trust the tax returns and other Periodic Filings of the Trust, unless applicable law requires an Owner to sign such documents, in which case, so long as the Depositor is an Owner and applicable law allows the Depositor to sign any such document, the Depositor shall sign such document. At any time that the Depositor is not an Owner, or is otherwise not allowed by law to sign any such document, then the Owner required by law to sign such document shall sign.

Section 8.06 Right to Receive and Rely Upon Instructions. In the event that the Owner Trustee is unable to decide between alternative courses of action, or is unsure as to the application of any provision of this Agreement or any Trust Related Agreement, or such provision is ambiguous as to its application, or is or appears to be in conflict with any other applicable provision, or in the event that this Agreement or any Trust Related Agreement permits

any determination by the Owner Trustee or is silent or is incomplete as to the course of action which the Owner Trustee is required to take with respect to a particular set of facts, the Owner Trustee may give notice (in such form as shall be appropriate under the circumstances) to the Owners requesting instructions and, to the extent that the Owner Trustee shall have acted or refrained from acting in good faith in accordance with any instructions received from the Owners, the Owner Trustee shall not be liable to any Person on account of such action or inaction. If the Owner Trustee shall not have received appropriate instructions within ten days of such notice (or within such shorter period of time as may be specified in such notice) the Owner Trustee may, but shall be under no duty to, take or refrain from taking such action, not inconsistent with this Agreement or the Trust Related Agreements, as the Owner Trustee shall deem to be in the best interests of the Owners, and the Owner Trustee shall have no liability to any Person for such action or inaction.

Section 8.07 <u>No Duties Except as Specified in this Agreement or in Instructions</u>. The Owner Trustee shall not have any duty or obligation to manage, make any payment in respect of, register, record, sell, dispose of or otherwise deal with the Trust Property, or to otherwise take or refrain from taking any action under, or in connection with, any document contemplated hereby to which the Owner Trustee or the Trust is a party, except as expressly provided by the terms of this Agreement, and no implied duties or obligations shall be read into this Agreement against the Owner Trustee. The Owner Trustee nevertheless agrees that it will, at its own cost and expense, promptly take all action as may be necessary to discharge any liens on any part of the Trust Property which result from claims against the Owner Trustee personally that are not related to the ownership or the administration of the Trust Property or the transactions contemplated by the Trust Related Agreements.

Section 8.08 <u>No Action Except Under Specified Documents or Instructions</u>. The Owner Trustee shall not manage, control, use, sell, dispose of or otherwise deal with any part of the Trust Property except (a) in accordance with the powers granted to and the authority conferred upon the Owner Trustee pursuant to this Agreement, and (b) in accordance with instructions delivered to the Owner Trustee pursuant to Section 8.06 and Article IV hereof.

Section 8.09 <u>Restriction</u>. Notwithstanding anything herein to the contrary, the Owner Trustee shall not take any action (a) that is inconsistent with the purposes of the Trust or (b) that would result in the Trust being treated as an association taxable as a corporation for Federal income tax purposes.

<div align="center">ARTICLE IX</div>

<div align="center">CONCERNING THE OWNER TRUSTEE</div>

Section 9.01 <u>Acceptance of Trusts and Duties</u>. The Owner Trustee accepts the trusts hereby created and agrees to perform its duties hereunder with respect to the same but only upon the terms of this Agreement. The Owner Trustee shall not be personally liable under any circumstances, except (a) for its own willful misconduct or gross negligence, (b) for liabilities arising from the failure by the Owner Trustee to perform obligations expressly undertaken by it in the last sentence of Section 8.07, or (c) for taxes, fees or other charges on, based on or measured by any fees, commissions or compensation received by the Owner Trustee in

connection with any of the transactions contemplated by this Agreement or the Trust Related Agreements. In particular, but not by way of limitation:

(i)      The Owner Trustee shall not be personally liable for any error of judgment made in good faith by an Authorized Officer of the Owner Trustee;

(ii)      The Owner Trustee shall not be personally liable with respect to any action taken or omitted to be taken by the Owner Trustee in good faith in accordance with the instructions of the Administrator or the Owners;

(iii)      No provision of this Agreement shall require the Owner Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of any of its rights or powers hereunder if the Owner Trustee shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it;

(iv)      Under no circumstance shall the Owner Trustee be personally liable for any indebtedness of the Trust under any Trust Related Agreement;

(v)      The Owner Trustee shall not be personally responsible for or in respect of the validity or sufficiency of this Agreement or for the due execution hereof by the Depositor, or for the form, character, genuineness, sufficiency, value or validity of any Student Loan or Trust Certificate (other than with respect to the due execution thereby by an Authorized Officer), or for or in respect of the validity or sufficiency of the Administration Agreement or the Trust Related Agreements; and

(vi)      The Owner Trustee shall not be liable for the default or misconduct of the Administrator under any of the Trust Related Agreements or otherwise and the Owner Trustee shall have no obligation or liability to perform the obligations of the Trust hereunder or under any Trust Related Agreement that are required to be performed by the Administrator under the Administration Agreement.

Section 9.02 <u>Furnishing of Documents</u>. The Owner Trustee shall furnish to the Owners, promptly upon receipt thereof, duplicates or copies of all material reports, notices, requests, demands, certificates, financial statements and any other instruments furnished to the Owner Trustee hereunder (other than documents originated by or otherwise furnished to such Owners).

Section 9.03 <u>Reliance; Advice of Counsel</u>.

(a)      The Owner Trustee shall incur no liability to anyone in acting upon any signature, instrument, notice, resolution, request, consent, order, certificate, report, opinion, note or other document or paper believed by it to be genuine and believed by it to be signed by the proper party or parties. The Owner Trustee may accept a certified copy of a resolution of the board of directors or other governing body of any corporate party as conclusive evidence that such resolution has been duly adopted by such body and that the same is in full force and effect. As to any fact or matter the manner of ascertainment of which is not specifically prescribed herein, the Owner Trustee may for all purposes hereof rely on a certificate, signed by the president or any vice president or by the treasurer or any assistant treasurer or the secretary of the relevant party,

as to such fact or matter, and such certificate shall constitute full protection to the Owner Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon.

(b)       In the exercise or administration of the trusts hereunder and in the performance of its duties and obligations under any of the Trust Related Agreements, the Owner Trustee (i) may act directly or, at the expense of the Trust, through agents or attorneys pursuant to agreements entered into with any of them, and the Owner Trustee shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys shall have been selected by the Owner Trustee with reasonable care; and (ii) may, at the expense of the Trust, consult with counsel, accountants and other skilled persons to be selected with reasonable care and employed by it, and the Owner Trustee shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons.

Section 9.04 <u>Not Acting in Individual Capacity</u>. Except as expressly provided in this Article IX, in accepting the trusts hereby created, the Owner Trustee acts solely as trustee hereunder and not in its individual capacity, and all Persons having any claim against the Owner Trustee by reason of the transactions contemplated by this Agreement or the Trust Related Agreements shall look only to the Trust Property for payment or satisfaction thereof.

Section 9.05 <u>Representations and Warranties of Owner Trustee</u>. The Owner Trustee represents and warrants to the Depositor that (a) the Owner Trustee meets the requirements of (i) Rule 3(a)(7) promulgated under the Investment Company Act of 1940, as amended, and (ii) section 3807 of the Statutory Trust Statute and (b) the Owner Trustee or the Owner Trustee's parent entity has a combined capital and surplus of at least $50,000,000.

ARTICLE X

COMPENSATION OF OWNER TRUSTEE

Section 10.01 <u>Owner Trustee's Fees and Expenses</u>. The Owner Trustee shall receive compensation from the Administrator and, to the extent not paid by the Administrator, from the Trust Property for its services hereunder as set forth in a separate fee agreement between The First Marblehead Corporation, the Depositor and the Owner Trustee. The Owner Trustee shall be entitled to be reimbursed by the Administrator and, to the extent not paid by the Administrator, from the Trust Property for its reasonable expenses hereunder, including the reasonable compensation, expenses and disbursements of such agents, representatives, experts and counsel as the Owner Trustee may employ in connection with the exercise and performance of its rights and duties under this Agreement and the Trust Related Agreements.

Section 10.02 <u>Indemnification</u>. The National Collegiate Funding LLC and The Education Resources Institute, Inc. shall be jointly and severally liable for, and hereby agree to, indemnify Wilmington Trust Company, individually and as Owner Trustee, and its successors, assigns, agents and servants, from and against any and all liabilities, obligations, losses, damages, taxes (other than taxes incurred as the result of the payment of fees and expenses pursuant to Section 10.01), claims, actions, suits, costs, expenses and disbursements (including legal fees and expenses) of any kind and nature whatsoever which may be imposed on, incurred

by or asserted at any time against the Owner Trustee (whether or not indemnified against by other parties) in any way relating to or arising out of this Agreement, any Trust Related Agreement, the administration of the Trust Property or the action or inaction of the Owner Trustee hereunder, except only that the Owners shall not be required to indemnify the Owner Trustee for expenses arising or resulting from any of the matters described in the second sentence of Section 9.01. The indemnities contained in this Section 10.02 shall survive the termination of this Agreement. The obligations of The National Collegiate Funding LLC and The Education Resources Institute, Inc. pursuant to this Section 10.02 shall be borne in proportion to their respective Percentage Interests. The indemnities contained in this Section 10.02 extend only to the Owner Trustee in its individual capacity.

Section 10.03 <u>Lien on Trust Property</u>. Following the retirement of the Notes, the Owner Trustee shall have a lien on the Trust Property for any compensation or expenses and indemnity due hereunder which lien shall be prior to all other liens.

Section 10.04 <u>Payments to the Owner Trustee</u>. Any amounts paid to the Owner Trustee from the Trust Property pursuant to this Article X shall be deemed not to be part of the Trust Property immediately after such payment.

ARTICLE XI

TERMINATION OF TRUST

Section 11.01 <u>Termination of Trust</u>.

(a)     The trust created hereby shall dissolve and terminate and, except as otherwise provided in this Article XI, this Agreement shall be of no further force or effect, upon the earlier of (i) if the Notes are no longer outstanding, the unanimous consent of the Owners, (ii) if the Notes are no longer outstanding, the sale or other final disposition by the Owner Trustee of the Trust Property and the final distribution by the Owner Trustee of all funds or other property or proceeds of the Trust Property in accordance with the terms of this Agreement and the Trust Related Agreements, and (iii) 21 years less one day after the death of the survivor of the descendants living on the date of this Agreement of Joseph P. Kennedy, the late Ambassador of the United States to the Court of St. James.

(b)     The bankruptcy, death, incapacity, dissolution or termination of any Owner shall not operate to dissolve or terminate this Agreement, nor entitle such Owner's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust Property, nor otherwise affect the rights, obligations and liabilities of the parties hereto.

(c)     Upon the termination of the Trust pursuant to this Article XI, the Owner Trustee shall cause a Certificate of Termination to be filed with the Secretary of State.

Section 11.02 <u>Distribution of Assets</u>. Upon dissolution and termination of the Trust, the Owner Trustee shall take full account of the Trust assets and liabilities, shall liquidate the assets as promptly as is consistent with obtaining the fair value thereof, and shall apply and distribute the proceeds therefrom in the following order:

(a)　　To the payment of the expenses of liquidation and the debts and liabilities of the Trust;

(b)　　To the setting up of reserves which the Owner Trustee may deem necessary or appropriate for anticipated obligations or contingencies of the Trust arising out of or in connection with the operation of the Trust. Such reserves may be paid over by the Owner Trustee to an escrow agent or trustee selected by the Owner Trustee to be disbursed by such escrow agent or trustee in payment of any of such obligations or contingencies and, if any balance remains at the expiration of such period as the Owner Trustee shall deem advisable, to be distributed by such escrow agent or trustee in the manner hereinafter provided;

(c)　　To each of the Owners, other than TERI, in accordance with the positive balances in each such Owner's Capital Account to the extent of the aggregate unreturned Capital Contributions of such Owner credited therein; and

(d)　　To the Owners, the balance of any proceeds in accordance with the positive balances in their respective Capital Accounts; provided that with respect to any distribution to TERI, such distribution shall be reduced by the amount of money paid to TERI by the Trust in accordance with paragraph 4 of the Section 2.05 Supplement to Master Loan Guaranty Agreement between TERI and The First Marblehead Corporation dated April 30, 2001 less the amount by which aggregate Distributions to TERI of Net Cash Flow pursuant to Section 7.06 hereof have been reduced by the application of subsection (iii) thereof, and any such reduction shall be distributed to the Owners other than TERI in accordance with the positive balances in their respective Capital Accounts.

If, at the time of liquidation, the Owner Trustee shall determine that an immediate sale of some or all of the assets would cause undue loss to the Owners, the Owner Trustee may, in order to avoid such loss and with the consent of the Owners, defer liquidation.

Section 11.03 No Termination by Depositor or Owners. Except as provided in Section 11.01, neither the Depositor nor the Owners shall be entitled to terminate or revoke the Trust established hereunder.

ARTICLE XII

SUCCESSOR OWNER TRUSTEES AND ADDITIONAL OWNER TRUSTEES

Section 12.01 Resignation of Owner Trustee; Appointment of Successor.

(a)　　The Owner Trustee may resign at any time without cause by giving at least 60 days' prior written notice to the Administrator, the Owners and the Administrative Agent, such resignation to be effective upon the acceptance of appointment by a successor Owner Trustee under Section 12.01(b). In addition, the Super-majority Owners may at any time remove the Owner Trustee without cause by an instrument in writing delivered to the Owner Trustee and the Administrator, such removal to be effective upon the acceptance of appointment by a successor Owner Trustee under Section 12.01(b). In case of the resignation or removal of the Owner Trustee, the Owners may appoint a successor Owner Trustee by an instrument signed by the Owners. If a successor Owner Trustee shall not have been appointed within 30 days after the

giving of written notice of such resignation or the delivery of the written instrument with respect to such removal, the Owner Trustee or the Owners may apply to any court of competent jurisdiction to appoint a successor Owner Trustee to act until such time, if any, as a successor Owner Trustee shall have been appointed as provided above. Any successor Owner Trustee so appointed by such court shall immediately and without further act be superseded by any successor Owner Trustee appointed as above provided within one year from the date of the appointment by such court.

(b)        Any successor Owner Trustee, however appointed, shall execute and deliver to the predecessor Owner Trustee an instrument accepting such appointment, and thereupon such successor Owner Trustee, without further act (except for the filing required under clause (e) below), shall become vested with all the estates, properties, rights, powers, duties and trust of the predecessor Owner Trustee in the trusts hereunder with like effect as if originally named the Owner Trustee herein; but nevertheless, upon the written request of such successor Owner Trustee and the payment of all fees and indemnities due the predecessor Owner Trustee, such predecessor Owner Trustee shall execute and deliver an instrument transferring to such successor Owner Trustee, upon the trusts herein expressed, all the estates, properties, rights, powers, duties and trusts of such predecessor Owner Trustee, and such predecessor Owner Trustee shall duly assign, transfer, deliver and pay over to such successor Owner Trustee all funds or other property then held or subsequently received by such predecessor Owner Trustee upon the trusts herein expressed.

(c)        Any successor Owner Trustee, however appointed, shall be a bank or trust company (i) that meets the requirements of (A) Rule 3(a)(7) promulgated under the Investment Company Act of 1940, as amended, and (B) section 3807 of the Statutory Trust Statute and (ii) whose parent entity has a combined capital and surplus of at least $50,000,000, if there be such an institution willing, able and legally qualified to perform the duties of the Owner Trustee hereunder upon reasonable or customary terms.

(d)        Any corporation into which the Owner Trustee may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Owner Trustee shall be a party, or any corporation to which substantially all the corporate trust business of the Owner Trustee may be transferred, shall, subject to the terms of Section 12.01(c), be the Owner Trustee under this Agreement without further act.

(e)        Any successor Owner Trustee appointed pursuant to this Article XII shall file an amendment to the Certificate of Trust with the Secretary of State reflecting the name and principal place of business of such successor Owner Trustee.

Section 12.02 Appointment of Additional Owner Trustees. At any time or times for the purpose of meeting any legal requirements of any jurisdiction in which any part of the Trust Property may at the time be located, the Owner Trustee and the Administrator, acting jointly, by an instrument in writing, may appoint one or more individuals or corporations approved by the Administrator and the Owner Trustee to act as separate trustee or separate trustees of all or any part of the Trust Property to the full extent that local law makes it necessary or appropriate for such separate trustee or separate trustees to act alone. If the Administrator shall not have joined

in such appointment within fifteen days after the receipt of such request, the Owner Trustee, acting alone, shall have the power to make such appointment.

ARTICLE XIII

TAX MATTERS PARTNER

Section 13.01 <u>Tax Matters Partner</u>. The tax matters partner (within the meaning of section 6231(a)(7) of the Code and applicable Regulations) of the Trust for all federal income tax purposes set forth in the Code shall be The National Collegiate Funding LLC. Subject to Section 13.08, the tax matters partner shall have the authority to represent the Trust and perform the duties imposed on the tax matters partner under the Code, and as set forth in this Article XIII.

Section 13.02 <u>Notice of Tax Audit</u>. The tax matters partner shall give prompt notice to the Owners upon receipt of advice that the Internal Revenue Service intends to examine Trust income tax returns for any year.

Section 13.03 <u>Authority to Extend Period for Assessing Tax</u>. Subject to Section 13.08, the tax matters partner shall have the authority to extend the period for assessing any tax imposed on any Owner under the Code by any agreement as provided for under section 6229(b)(1)(B) of the Code.

Section 13.04 <u>Choice of Forum for Filing Petition for Readjustment</u>. Any petition for readjustment may, but is not required to, be filed by the tax matters partner in accordance with section 6226(a) of the Code in the United States District Court for the district in which the Trust's principal place of business is located, or the United States Claims Court.

Section 13.05 <u>Authority to Bind Owners by Settlement Agreement</u>. Subject to Section 13.08, the tax matters partner shall enter into a settlement agreement in accordance with section 6224(c)(3) of the Code as directed by the Owners.

Section 13.06 <u>Notices Sent to the Internal Revenue Service</u>. The tax matters partner shall use its best efforts to furnish to the Internal Revenue Service the name, address, profits interest and taxpayer identification number of each Owner and any additional information it receives from each Owner regarding any change in that Owner's name, address, profits interest and taxpayer identification number. In no event shall the tax matters partner be liable, responsible or accountable in damages or otherwise to the Owner for any loss in connection with furnishing such information to the Internal Revenue Service if the tax matters partner acts in good faith and is not guilty of fraud or gross negligence.

Section 13.07 <u>Indemnification of Tax Matters Partner</u>. The Trust shall indemnify and save harmless the tax matters partner against any loss, damage, cost or expense (including attorneys' fees) incurred by it as a result of any act performed or omitted on behalf of the Trust or any Owner or in furtherance of the Trust's interests or the interests of the Owner, in its capacity as tax matters partner, without, however, relieving the tax matters partner of liability for bad faith, fraud or gross negligence.

Section 13.08 <u>Approval of Tax Matters Partner's Decisions</u>. The tax matters partner shall call a meeting of the Owners at any time in order to discuss any decisions the tax matters partner may propose to make, notice of which shall be included in the notice of such meeting. The tax matters partner shall make no decision and take no action with respect to the determination, assessment or collection of any tax imposed by the Code on the Owners unless and until such decision has been approved by the Owners.

Section 13.09 <u>Participation by Owners in Internal Revenue Service Administrative Proceedings</u>. Nothing contained in this Article XIII shall be construed to take away from any Owner any right granted to such person by the Code to participate in any manner in administrative proceedings of the Internal Revenue Service.

ARTICLE XIV

MISCELLANEOUS

Section 14.01 <u>Supplements and Amendments</u>.

(a)    This Agreement may be amended only by a written instrument signed by the Owner Trustee and all of the Owners at the time of such amendment and upon satisfaction of the Rating Agency Condition (as defined in the Indenture); <u>provided</u>, <u>however</u>, that if, in the opinion of the Owner Trustee, any instrument required to be so executed adversely affects any right, duty or liability of, or immunity or indemnity in favor of, the Owner Trustee under this Agreement or any of the documents contemplated hereby to which the Owner Trustee or the Trust is a party, or would cause or result in any conflict with or breach of any terms, conditions or provisions of, or default under, the charter documents or by-laws of the Owner Trustee or any document contemplated hereby to which the Owner Trustee is a party, the Owner Trustee may in its sole discretion decline to execute such instrument. The Certificate of Trust shall be amended (except as required by the Statutory Trust Statute) only upon satisfaction of the Rating Agency Condition (as defined in the Indenture). The Owner Trustee shall be fully protected in relying upon a certificate of the Administrator in determining if the Rating Agency Condition (as defined in the Indenture) has been satisfied.

(b)    The Trust shall not change its jurisdiction of formation without first satisfying the Rating Agency Condition (as defined in the Indenture).

Section 14.02 <u>No Legal Title to Trust Property in Owner</u>. Legal title to all Trust Property shall be vested at all times in the Trust as a separate legal entity, except where the laws of any jurisdiction require title to be vested in a trustee in which case legal title shall be vested in the Owner Trustee on behalf of the Trust. The Owners shall not have legal title to any part of the Trust Property and shall only have an undivided beneficial interest therein. No transfer, by operation of law or otherwise, of any right, title and interest of the Owners in and to their undivided Beneficial Interests in the Trust Property hereunder shall operate to terminate this Agreement or the trusts hereunder or entitle any successor transferee to an accounting or to the transfer to it of legal title to any part of the Trust Property.

Section 14.03 <u>Pledge of Collateral by Owner Trustee is Binding</u>. The pledge of any Trust Property to any Person by the Owner Trustee made under any Trust Related Agreement and pursuant to the terms of this Agreement shall bind the Owners and shall be effective to transfer or convey the rights of the Owner Trustee and the Owners in and to such Trust Property to the extent set forth in such Trust Related Agreement. No purchaser or other grantee shall be required to inquire as to the authorization, necessity, expediency or regularity of such pledge or as to the application of any proceeds with respect thereto by the Owner Trustee.

Section 14.04 <u>Limitations on Rights of Others</u>. Nothing in this Agreement, whether express or implied, shall be construed to give to any Person other than the Owner Trustee, the Administrator and the Owners any legal or equitable right, remedy or claim in the Trust Property or under or in respect of this Agreement or any covenants, conditions or provisions contained herein <u>provided</u>, <u>however</u>, that for so long as any of the Notes are outstanding or any amounts are owed to the Indenture Trustee, the Noteholders are third party beneficiaries hereof.

Section 14.05 <u>Notices</u>. Unless otherwise expressly specified or permitted by the terms hereof, all notices shall be in writing and delivered by hand or mailed by certified mail, postage prepaid, if to the Owner Trustee, addressed to: Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware, 19890, Attention: Corporate Trust Administration, or to such other address as the Owner Trustee may have set forth in a written notice to the Owners; and if to an Owner, addressed to it at the address set forth for such Owner in the register maintained by the Owner Trustee. Whenever any notice in writing is required to be given by the Owner Trustee hereunder, such notice shall be deemed given and such requirement satisfied 72 hours after such notice is mailed by certified mail, postage prepaid, addressed as provided above; any notice given by an Owner to the Owner Trustee shall be effective upon receipt by an Authorized Officer of the Owner Trustee. A copy of any notice delivered to the Owner Trustee shall also be delivered to the Administrator, addressed to: First Marblehead Data Services, Inc., The Prudential Tower, 800 Boylston Street - 34th Floor, Boston, MA 02199-8157, Attention: Ms. Rosalyn Bonaventure, with a copy to First Marblehead Corporation, The Prudential Tower, 800 Boylston Street - 34th Floor, Boston, MA 02199-8157, Attention: Mr. Richard P. Zermani, or to such other addresses as the Administrator may have set forth in a written notice to the Owner Trustee.

Section 14.06 <u>Severability</u>. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 14.07 <u>Separate Counterparts</u>. This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 14.08 <u>Successors and Assigns</u>. All covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the Owner Trustee and its successors and assigns and each Owner and its successors and permitted assigns, all as herein provided. Any

request, notice, direction, consent, waiver or other instrument or action by an Owner shall bind the successors and assigns of such Owner.

Section 14.09 <u>Headings</u>. The headings of the various Articles and Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

Section 14.10 <u>Governing Law</u>. This Agreement shall in all respects be governed by, and construed in accordance with, the laws of the State of Delaware (excluding conflict of law rules), including all matters of construction, validity and performance.

Section 14.11 <u>General Interpretive Principles</u>. For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)     The defined terms in this Agreement include the plural as well as the singular, and the use of any gender herein shall be deemed to include any other gender;

(b)      Accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date hereof;

(c)      References herein to "Articles," "Sections," "paragraphs" and other subdivisions without reference to a document are to designated Articles, Sections, paragraphs and other subdivisions of this Agreement;

(d)      A reference to a paragraph without further reference to a Section is a reference to such paragraph as contained in the same Section in which the reference appears, and this rule shall also apply to subparagraphs and other subdivisions;

(e)      The words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)      The term "include" or "including" shall mean without limitation by reason of enumeration.

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

WILMINGTON TRUST COMPANY, not in its individual capacity except as expressly provided herein, but solely as Owner Trustee

By:    /s/ Patricia A. Evans
Name:    Patricia A. Evans
Title:    Vice President


THE NATIONAL COLLEGIATE FUNDING LLC, as Depositor and Owner

By:    GATE Holdings, Inc., Member

By:    /s/ Donald R. Peck
Name:    Donald R. Peck
Title:    Treasurer and Secretary


THE EDUCATION RESOURCES INSTITUTE, Inc., as Owner

By:    /s/ William G. Davidson
Name:    William G. Davidson
Title:    Vice President, Treasurer and CFO


ACKNOWLEDGED WITH RESPECT
TO THE POWER OF ATTORNEY
GRANTED IN SECTION 4.05

FIRST MARBLEHEAD DATA SERVICES, INC.

By:    /s/ Donald R. Peck
Name:    Donald R. Peck
Title:    Secretary and Clerk

**SCHEDULE A**

| Owners | Capital Contribution ($) | Sharing Ratio (%) | Percentage Interest (%) |
|---|---|---|---|
| The National Collegiate Funding LLC | $1.00 | 87.27%* | 87.27%* |
| The Education Resources Institute, Inc. | None | 12.73%* | 12.73%* |

* Subject to final reconciliation.

## SCHEDULE B
*Loan Originators*

- Bank of America, N.A.

- Bank One, N.A.

- Charter One Bank, N.A.

- Chase Manhattan Bank USA, N.A.

- Citizens Bank of Rhode Island

- First National Bank Northeast

- HSBC Bank USA, National Association

- The Huntington National Bank

- Manufacturers and Traders Trust Company

- National City Bank

- PNC Bank, N.A.

- Sovereign Bank

- SunTrust Bank

- TCF National Bank

- U.S. Bank, N.A.

---

## SCHEDULE C

*Loan Purchase Agreements*

Each of the Note Purchase Agreements, as amended or supplemented, was entered into by and between The First Marblehead Corporation and:

- Bank of America, N.A., dated April 30, 2001, for loans that were originated under Bank of America's BAGEL Loan Program, CEDU Loan Program and ISLP Loan Program.

- Bank of America, N.A., dated June 30, 2003, for loans that were originated under Bank of America's Direct to Consumer Loan Program.

- Bank One, N.A., dated May 1, 2002, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program and EDUCATION ONE Loan Program.

- Bank One, N.A., dated July 26, 2002, for loans that were originated under Bank One's M&T REFERRAL Loan Program

- Charter One Bank, N.A., dated as of December 29, 2003 for loans that were originated under Charter One's AAA Southern New England Bank Loan Program.

- Charter One Bank, N.A., dated October 31, 2003, for loans that were originated under Charter One's AES EducationGAIN Loan Program.

- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's (AMS) TuitionPay Diploma Loan Program.

- Charter One Bank, N.A., dated July 15, 2003, for loans that were originated under Charter One's Brazos Alternative Loan Program.

- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's CFS Direct to Consumer Loan Program.

- Charter One Bank, N.A., dated June 30, 2003, for loans that were originated under Charter One's Citibank Flexible Education Loan Program.

- Charter One Bank, N.A., dated July 1, 2002, for loans that were originated under Charter One's College Loan Corporation Loan Program.

- Charter One Bank, N.A., dated December 4, 2002, for loans that were originated under Charter One's Comerica Alternative Loan Program.

- Charter One Bank, N.A., dated December 1, 2003, for loans that were originated under Charter One's Custom Educredit Loan Program.

---

- Charter One Bank, N.A., dated May 10, 2004, for loans that were originated under Charter One's Edfinancial Loan Program.

- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's Education Assistance Services Loan Program.

- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's ESF Alternative Loan Program.

- Charter One Bank, N.A., dated September 15, 2003, for loans that were originated under Charter One's Extra Credit II Loan Program (North Texas Higher Education).

- Charter One Bank, N.A., dated September 20, 2003, for loans that were originated under Charter One's M&I Alternative Loan Program.

- Charter One Bank, N.A., dated November 17, 2003, for loans that were originated under Charter One's National Education Loan Program.

- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's Navy Federal Alternative Loan Program.

- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's NextStudent Alternative Loan Program.

- Charter One Bank, N.A., dated March 26, 2004, for loans that were originated under Charter One's NextStudent Private Consolidation Loan Program.

- Charter One Bank, N.A., dated March 17, 2003, for loans that were originated under Charter One's PNC Bank Resource Loan Program.

- Charter One Bank, N.A., dated May 1, 2003, for loans that were originated under Charter One's SAF Alternative Loan Program.

- Charter One Bank, N.A., dated September 20, 2002, for loans that were originated under Charter One's Southwest Loan Program.

- Charter One Bank, N.A., dated March 25, 2004, for loans that were originated under Charter One's START Education Loan Program.

- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's WAMU Alternative Student Loan Program.

- Charter One Bank, N.A., dated February 15, 2005, for loans that were originated under Charter One's Referral Loan Program and Axiom Alternative Loan Program.

- Chase Manhattan Bank USA, N.A., dated September 30, 2003, as amended on March 1, 2004, September 8, 2004 and February 25, 2005, for loans that were originated under Chase's Chase Extra Loan Program.

- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Compass Bank Loan Program.

- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's DTC Alternative Loan Program.

- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Navy Federal Referral Loan Program.

- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Xanthus Loan Program.

- First National Bank Northeast, dated August 1, 2001, for loans that were originated under First National Bank Northeast's CASL Undergraduate Alternative Loan Program.

- HSBC Bank USA, National Association, dated April 17, 2002, as amended on June 2, 2003 and August 1, 2003, for loans that were originated under the HSBC Loan Program.

- The Huntington National Bank, dated May 20, 2003, for loans that were originated under The Huntington National Bank's Huntington Bank Education Loan Program.

- Manufacturers and Traders Trust Company, dated April 29, 2004, for loans that were originated under Manufacturers and Traders Trust Company's Alternative Loan Program.

- National City Bank, dated November 13, 2002, for loans that were originated under National City Bank's National City Loan Program.

- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's Alternative Conforming Loan Program.

- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Loan Program.

- SunTrust Bank, dated March 1, 2002, for loans that were originated under SunTrust Bank's SunTrust Alternative Loan Program.

- TCF National Bank, dated July 22, 2005, for loans that were originated under TCF National Bank's Alternative Loan Program.

- U.S. Bank, N.A., dated May 1, 2005, for loans that were originated under U.S Bank's Alternative Loan Program.

---

## SCHEDULE D

*Guaranty Agreements*

Each of the following Guaranty Agreements, as amended or supplemented, was entered into by and between The Education Resources Institute, Inc. and:

- Bank of America, N.A., dated April 30, 2001, for loans that were originated under Bank of America's BAGEL Loan Program, CEDU Loan Program and ISLP Loan Program.

- Bank of America, N.A., dated June 30, 2003, for loans that were originated under Bank of America's Direct to Consumer Loan Program.

- Bank One, N.A., dated May 13, 2002, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program and EDUCATION ONE Loan Program.

- Bank One, N.A., dated July 26, 2002, for loans that were originated under Bank One's M&T REFERRAL Loan Program

- Charter One Bank, N.A., dated as of December 29, 2003 for loans that were originated under Charter One's AAA Southern New England Bank Loan Program.

- Charter One Bank, N.A., dated October 31, 2003, for loans that were originated under Charter One's AES EducationGAIN Loan Program.

- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's (AMS) TuitionPay Diploma Loan Program.

- Charter One Bank, N.A., dated July 15, 2003, for loans that were originated under Charter One's Brazos Alternative Loan Program.

- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's CFS Direct to Consumer Loan Program.

- Charter One Bank, N.A., dated June 30, 2003, for loans that were originated under Charter One's Citibank Flexible Education Loan Program.

- Charter One Bank, N.A., dated July 1, 2002, for loans that were originated under Charter One's College Loan Corporation Loan Program.

- Charter One Bank, N.A., dated December 4, 2002, for loans that were originated under Charter One's Comerica Alternative Loan Program.

- Charter One Bank, N.A., dated December 1, 2003, for loans that were originated under Charter One's Custom Educredit Loan Program.

- Charter One Bank, N.A., dated May 10, 2004, for loans that were originated under Charter One's Edfinancial Loan Program.

- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's Education Assistance Services Loan Program.

- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's ESF Alternative Loan Program.

- Charter One Bank, N.A., dated September 15, 2003, for loans that were originated under Charter One's Extra Credit II Loan Program (North Texas Higher Education).

- Charter One Bank, N.A., dated September 20, 2003, for loans that were originated under Charter One's M&I Alternative Loan Program.

- Charter One Bank, N.A., dated November 17, 2003, for loans that were originated under Charter One's National Education Loan Program.

- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's Navy Federal Alternative Loan Program.

- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's NextStudent Alternative Loan Program.

- Charter One Bank, N.A., dated March 26, 2004, for loans that were originated under Charter One's NextStudent Private Consolidation Loan Program.

- Charter One Bank, N.A., dated March 17, 2003, for loans that were originated under Charter One's PNC Bank Resource Loan Program.

- Charter One Bank, N.A., dated May 1, 2003, for loans that were originated under Charter One's SAF Alternative Loan Program.

- Charter One Bank, N.A., dated September 20, 2002, for loans that were originated under Charter One's Southwest Loan Program.

- Charter One Bank, N.A., dated March 25, 2004, for loans that were originated under Charter One's START Education Loan Program.

- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's WAMU Alternative Student Loan Program.

- Charter One Bank, N.A., dated February 15, 2005, for loans that were originated under Charter One's Referral Loan Program and Axiom Alternative Loan Program.

- Chase Manhattan Bank USA, N.A., dated September 30, 2003, as amended on March 1, 2004 and February 25, 2005, for loans that were originated under Chase's Chase Extra Loan Program.

- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Compass Bank Loan Program.

- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's DTC Alternative Loan Program.

- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Navy Federal Referral Loan Program.

- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Xanthus Loan Program.

- First National Bank Northeast, dated August 1, 2001, for loans that were originated under First National Bank Northeast's CASL Undergraduate Alternative Loan Program.

- HSBC Bank USA, National Association, dated April 17, 2002, as amended on August 1, 2003 and May 14, 2004, for loans that were originated under the HSBC Loan Program.

- The Huntington National Bank, dated May 20, 2003, for loans that were originated under The Huntington National Bank's Huntington Bank Education Loan Program.

- Manufacturers and Traders Trust Company, dated April 29, 2004, for loans that were originated under Manufacturers and Traders Trust Company's Alternative Loan Program.

- National City Bank, dated July 26, 2002, for loans that were originated under National City Bank's National City Loan Program.

- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's Alternative Conforming Loan Program.

- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Loan Program.

---

- SunTrust Bank, dated March 1, 2002, for loans that were originated under SunTrust Bank's SunTrust Alternative Loan Program.

- TCF National Bank, dated July 22, 2005, for loans that were originated under TCF National Bank's Alternative Loan Program.

- U.S. Bank, N.A., dated May 1, 2005, for loans that were originated under U.S Bank's Alternative Loan Program.

Exhibit P

FORM OF TRUST CERTIFICATE

THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1

TRUST CERTIFICATE

**THE BENEFICIAL INTEREST IN THE TRUST REPRESENTED BY THIS TRUST CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAW, AND MAY NOT BE DIRECTLY OR INDIRECTLY OFFERED OR SOLD OR OTHERWISE DISPOSED OF (INCLUDING PLEDGED) BY THE HOLDER HEREOF UNLESS IN THE OPINION OF COUNSEL SATISFACTORY TO THE OWNER TRUSTEE, SUCH TRANSACTION IS EXEMPT FROM REGISTRATION UNDER THE ACT AND STATE SECURITIES LAWS. THE TRANSFER OF THIS TRUST CERTIFICATE WILL NOT BE EFFECTIVE UNLESS THE TRANSFEREE HAS DELIVERED TO THE OWNER TRUSTEE A LETTER IN THE FORM REQUIRED BY SECTION 3.04(A) OF THE TRUST AGREEMENT AND THE TRANSFEREE PROVIDES THE OWNER TRUSTEE WITH EVIDENCE SATISFACTORY TO THE OWNER TRUSTEE DEMONSTRATING THE TRANSFEROR'S COMPLIANCE WITH SECTION 3.04(B) OF THE TRUST AGREEMENT.**

TRUST CERTIFICATE
UNDER THE TRUST AGREEMENT, DATED
as of March 9, 2006

Certificate No. _____

Wilmington Trust Company, not in its individual capacity, but solely as owner trustee (the "Owner Trustee") under the Trust Agreement, dated as of March 9, 2006, with The National Collegiate Funding LLC and The Education Resources Institute, Inc., on behalf of the holders from time to time (each an "Owner") of beneficial interests in the trust created thereby (the "Trust Agreement"), hereby certifies that _____ is the owner of an undivided beneficial interest equal to the percentage listed on Schedule A to the Trust Agreement in the Trust Property provided for and created by the Trust Agreement. This Trust Certificate is issued pursuant to and is entitled to the benefits of the Trust Agreement, and each Owner by acceptance hereof shall be bound by the terms of the Trust Agreement. Reference is hereby made to the Trust Agreement for a statement of the rights and obligations of the Owner hereof. The Owner Trustee may treat the person shown on the register maintained by the Owner Trustee pursuant to Section 3.02 of the Trust Agreement as the absolute Owner hereof for all purposes.

Capitalized terms used herein without definition have the meanings ascribed to them in or by reference in the Trust Agreement.

Transfer of this Trust Certificate is subject to certain restrictions and limitations set forth in the Trust Agreement, including the requirement that any transfer requires the prior consent of owners of at least 85% of the Percentage Interests in the Trust. In the manner more fully set

forth in, and as limited by, the Trust Agreement, this Trust Certificate may be transferred upon the books of the Owner Trustee by the registered Owner in person or by his attorney duly authorized in writing upon surrender of this Trust Certificate to the Owner Trustee accompanied by a written instrument of transfer and with such signature guarantees and evidence of authority of the Persons signing the instrument of transfer as the Owner Trustee may reasonably require, whereupon the Owner Trustee shall issue in the name of the transferee a Trust Certificate or Trust Certificates evidencing the amount and extent of interest of the transferee.

The Owner hereof, by its acceptance of this Trust Certificate, warrants and represents to the Owner Trustee and to the Owners of the other Trust Certificates issued under the Trust Agreement and agrees not to transfer this Trust Certificate except in accordance with the Trust Agreement.

This Trust Certificate and the Trust Agreement shall in all respects be governed by, and construed in accordance with, the laws of the State of Delaware (excluding conflict of law rules), including all matters of construction, validity and performance.

---

IN WITNESS WHEREOF, the Owner Trustee, pursuant to the Trust Agreement, has caused this Trust Certificate to be issued as of the date hereof.

WILMINGTON TRUST COMPANY, not in its individual capacity, but solely as Owner Trustee

By: _____

Name:

Title:

Dated: March 9, 2006

## EXHIBIT 2

## FORM OF ACCESSION AGREEMENT

_____, _____

Wilmington Trust Company
Rodney Square North
1100 North Market Street
Wilmington, Delaware 19890
Attention:

Dear Sirs:

      We refer to the Trust Agreement, dated as of March 9, 2006 (the "Trust Agreement"), among The National Collegiate Funding LLC (the "Company"), The Education Resources Institute, Inc. and Wilmington Trust Company, a Delaware banking corporation (in its capacity as trustee thereunder, the "Owner Trustee"). We propose to purchase a beneficial interest in The National Collegiate Student Loan Trust 2006-1, a Delaware statutory trust (the "Trust") formed pursuant to the Trust Agreement. Capitalized terms used herein without definition have the meanings given them in the Trust Agreement.

1.      We understand that our Trust Certificate is not being registered under the Securities Act of 1933, as amended (the "1933 Act"), or any state securities or "Blue Sky" law and is being sold to us in a transaction that is exempt from the registration requirements of the 1933 Act and any applicable state laws.

2.      We have knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Trust, we are able to bear the economic risk of investment in the Trust and we are an "accredited investor" as defined in Regulation D under the 1933 Act.

3.      We acknowledge that none of the Trust, the Company or the Owner Trustee has advised us concerning the federal or state income tax consequences of owning a beneficial interest in the Trust, including the tax status of the Trust or the likelihood that distributions from the Trust would be characterized as "unrelated business income" for federal tax purposes, and we have consulted with our own tax advisor with respect to such matters.

4.      We are acquiring our Trust Certificate for our own account and not for the benefit of any other person and not with a view to any distribution of our beneficial interest in the Trust subject, nevertheless, to the understanding that disposition of our property shall at all times be and remain within our control.

5.      We agree that our beneficial interest in the Trust must be held indefinitely by us unless subsequently registered under the 1933 Act and any applicable state securities or "Blue Sky" law or unless exemptions from the registration requirements of the 1933 Act and applicable state laws are available.

6.      We agree that in the event that at some future time we wish to dispose of or exchange any of our beneficial interest in the Trust, we will not transfer or exchange any of our beneficial interest in the Trust unless we have obtained the prior written consent to such transfer or exchange pursuant to Section 3.04 of the Trust Agreement, and either:

(A)      (1) the transfer or exchange is made to an Eligible Purchaser (as defined below), (2) a letter to substantially the same effect as this letter is executed promptly by such Eligible Purchaser, and (3) all offers or solicitations in connection with the sale (if a sale), whether made directly or through any agent acting on our behalf, are limited only to Eligible Purchasers and are not made by means of any form of general solicitation or general advertising whatsoever; or

(B)      our beneficial interest in the Trust is sold in a transaction that does not require registration under the 1933 Act and any applicable State "Blue Sky" law.

"Eligible Purchaser" means a corporation, partnership or other entity which we have reasonable grounds to believe and do believe can make representations with respect to itself to substantially the same effect as the representations set forth herein.

7.      We understand that our Trust Certificate bears a legend to substantially the following effect:

THE BENEFICIAL INTEREST IN THE TRUST REPRESENTED BY THIS TRUST CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAW, AND MAY NOT BE DIRECTLY OR INDIRECTLY OFFERED OR SOLD OR OTHERWISE DISPOSED OF (INCLUDING PLEDGED) BY THE HOLDER HEREOF UNLESS IN THE OPINION OF COUNSEL SATISFACTORY TO THE OWNER TRUSTEE SUCH TRANSACTION IS EXEMPT FROM REGISTRATION UNDER THE ACT AND STATE SECURITIES LAWS. THE TRANSFER OF THIS TRUST CERTIFICATE WILL NOT BE EFFECTIVE UNLESS THE TRANSFEREE HAS DELIVERED TO THE OWNER TRUSTEE A LETTER IN THE FORM REQUIRED BY SECTION 3.04(A) OF THE TRUST AGREEMENT AND THE TRANSFEREE PROVIDES THE OWNER TRUSTEE WITH EVIDENCE SATISFACTORY TO THE OWNER TRUSTEE DEMONSTRATING THE TRANSFEROR'S COMPLIANCE WITH SECTION 3.04(B) OF THE TRUST AGREEMENT.

8.      We agree to be bound by all terms and conditions of our Trust Certificate and the Trust Agreement.

Very truly yours,

_____
Name of Purchaser

By:      _____
Name:
Title:

Accepted and Acknowledged this
_____th day of _____, _____.

WILMINGTON TRUST COMPANY, not in its
individual capacity,
but solely as Owner Trustee

By:      _____
Name:

Title:

# Exhibit E

Exhibit E

EX-99.12 9 d601424.htm TRUST AGREEMENT

EXHIBIT 99.12

**THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4**

TRUST AGREEMENT

Among

WILMINGTON TRUST COMPANY
as OWNER TRUSTEE

and

THE NATIONAL COLLEGIATE FUNDING LLC
and THE EDUCATION RESOURCES INSTITUTE, INC.
as OWNERS

Dated as of
December 7, 2006

TABLE OF CONTENTS

## ARTICLE I
## DEFINITIONS

Section 1.01        Capitalized Terms

## ARTICLE II
## ORGANIZATION

Section 2.01        Name
Section 2.02        Office
Section 2.03        Purposes and Powers.
Section 2.04        Appointment of the Owner Trustee
Section 2.05        Declaration of Trust
Section 2.06        No Liability of Owners for Expenses or Obligations of Trust
Section 2.07        Situs of Trust

## ARTICLE III
## TRUST CERTIFICATES AND TRANSFER OF INTEREST

Section 3.01        Issuance of Trust Certificate.
Section 3.02        Registration and Transfer of Certificates.
Section 3.03        Lost, Stolen, Mutilated or Destroyed Certificates
Section 3.04        Limitation on Transfer of Ownership Rights.
Section 3.05        Assignment of Right to Distributions

## ARTICLE IV
## CONCERNING THE OWNERS

Section 4.01        Action by Owners with Respect to Certain Matters.
Section 4.02        Action Upon Instructions.
Section 4.03        Super-majority Control
Section 4.04        Representations and Warranties of the Depositor
Section 4.05        Power of Attorney.

## ARTICLE V
## INVESTMENT AND APPLICATION OF TRUST FUNDS

Section 5.01        Investment of Trust Funds
Section 5.02        Application of Funds

## ARTICLE VI
## CAPITAL

Section 6.01        Tax Characterization
Section 6.02        Initial Capital Contributions of Owners
Section 6.03        Capital Accounts
Section 6.04        Interest
Section 6.05        No Additional Capital Contributions
Section 6.06        Investment of Capital Contributions
Section 6.07        Repayment and Return of Capital Contributions

## ARTICLE VII

ALLOCATION OF PROFIT AND LOSS; DISTRIBUTIONS

Section 7.01    Profit
Section 7.02    Loss
Section 7.03    Special Allocations.
Section 7.04    Curative Allocations
Section 7.05    Other Allocation Rules.
Section 7.06    Distribution of Net Cash Flow
Section 7.07    Distribution Date Statement
Section 7.08    Allocation of Tax Liability
Section 7.09    Method of Payment
Section 7.10    No Segregation of Funds; No Interest
Section 7.11    Interpretation and Application of Provisions by the Administrator

<div align="center">

ARTICLE VIII

AUTHORITY AND DUTIES OF THE OWNER TRUSTEE

</div>

Section 8.01    General Authority
Section 8.02    Specific Authority
Section 8.03    General Duties
Section 8.04    Accounting and Reports to the Owners, the Internal Revenue Service and Others
Section 8.05    Signature of Returns
Section 8.06    Right to Receive and Rely Upon Instructions
Section 8.07    No Duties Except as Specified in this Agreement or in Instructions
Section 8.08    No Action Except Under Specified Documents or Instructions
Section 8.09    Restriction

<div align="center">

ARTICLE IX

CONCERNING THE OWNER TRUSTEE

</div>

Section 9.01    Acceptance of Trusts and Duties
Section 9.02    Furnishing of Documents
Section 9.03    Reliance; Advice of Counsel.
Section 9.04    Not Acting in Individual Capacity
Section 9.05    Representations and Warranties of Owner Trustee

<div align="center">

ARTICLE X

COMPENSATION OF OWNER TRUSTEE

</div>

Section 10.01    Owner Trustee's Fees and Expenses
Section 10.02    Indemnification
Section 10.03    Lien on Trust Property
Section 10.04    Payments to the Owner Trustee

<div align="center">

ARTICLE XI

TERMINATION OF TRUST

</div>

Section 11.01    Termination of Trust.
Section 11.02    Distribution of Assets
Section 11.03    No Termination by Depositor or Owners

<div align="center">

ARTICLE XII

SUCCESSOR OWNER TRUSTEES AND ADDITIONAL OWNER TRUSTEES

</div>

Section 12.01    Resignation of Owner Trustee; Appointment of Successor.
Section 12.02    Appointment of Additional Owner Trustees

<div align="center">

ARTICLE XIII

</div>

ARTICLE XIII
TAX MATTERS PARTNER

Section 13.01    Tax Matters Partner
Section 13.02    Notice of Tax Audit
Section 13.03    Authority to Extend Period for Assessing Tax
Section 13.04    Choice of Forum for Filing Petition for Readjustment
Section 13.05    Authority to Bind Owners by Settlement Agreement
Section 13.06    Notices Sent to the Internal Revenue Service
Section 13.07    Indemnification of Tax Matters Partner
Section 13.08    Approval of Tax Matters Partner's Decisions
Section 13.09    Participation by Owners in Internal Revenue Service Administrative Proceedings

ARTICLE XIV
MISCELLANEOUS

Section 14.01    Supplements and Amendments.
Section 14.02    No Legal Title to Trust Property in Owner
Section 14.03    Pledge of Collateral by Owner Trustee is Binding
Section 14.04    Limitations on Rights of Others
Section 14.05    Notices
Section 14.06    Severability
Section 14.07    Separate Counterparts
Section 14.08    Successors and Assigns
Section 14.09    Headings
Section 14.10    Governing Law
Section 14.11    General Interpretive Principles


SCHEDULE A    CAPITAL CONTRIBUTIONS, INITIAL SHARING RATIOS AND PERCENTAGE INTERESTS
SCHEDULE B    LOAN ORIGINATORS
SCHEDULE C    LOAN PURCHASE AGREEMENTS
SCHEDULE D    GUARANTY AGREEMENTS


EXHIBIT 1    FORM OF TRUST CERTIFICATE
EXHIBIT 2    FORM OF ACCESSION AGREEMENT

TRUST AGREEMENT, dated as of December 7, 2006, among The National Collegiate Funding LLC, a Delaware limited liability company (the "Depositor"), The Education Resources Institute, Inc., a private non-profit corporation organized under Chapter 180 of the Massachusetts General Laws, and Wilmington Trust Company, a Delaware banking corporation (the "Owner Trustee").

WHEREAS, the parties hereto intend to amend and restate that certain Interim Trust Agreement, dated as of November 2, 2006 (the "Interim Trust Agreement"), by and between the Depositor and the Owner Trustee, on the terms and conditions hereinafter set forth.

NOW THEREFORE, in consideration of the premises and of the mutual agreements herein contained and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto amend and restate the Interim Trust Agreement in its entirety and further agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01     Capitalized Terms. For all purposes of this Agreement, the following terms shall have the meanings set forth below:

"Administration Agreement" means the Administration Agreement, dated as of December 7, 2006, among the Trust, the Indenture Trustee, the Owner Trustee, the Depositor and First Marblehead Data Services, Inc., as Administrator, as it may be amended from time to time.

"Administrator" means First Marblehead Data Services, Inc., a Massachusetts corporation, as Administrator under the Administration Agreement, or any successor Administrator as appointed pursuant to the terms of the Administration Agreement.

"Affiliate" means, with respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agreement" means this Trust Agreement, as it may be amended or restated from time to time.

"Assignments of Servicing Agreements" means each of the Servicer Consent Letters, dated as of December 7, 2006, among the Trust, The First Marblehead Corporation and the Pennsylvania Higher Education Assistance Agency, CFS-SunTech Servicing LLC, Great Lakes Educational Loan Services, Inc., EdFinancial Services, LLC, Nelnet, Inc. and ACS Education Services, Inc., respectively, relating to the assignment of each of the respective Servicing Agreements to the Trust.

"Authorized Officer" means any officer of the Owner Trustee who is authorized to act for the Owner Trustee in matters relating to, and binding upon, the Trust and whose name appears on a list of such authorized officers furnished by the Owner Trustee as such list may be amended or supplemented from time to time.

"Back-up Agreement" means the Back-up Administration Agreement, dated as of December 7, 2006, among the Trust, the Depositor, the Owner Trustee, the Administrator and U.S. Bank National Association.

"Bankruptcy Action" has the meaning set forth in Section 4.01(b)(iv)(G).

"Beneficial Interest" as to any Owner, means all or any part of the interest of that Owner in the Trust, including without limitation its (a) right to a distributive share of the Profit and Loss of the Trust, (b) right to a distributive share of the assets of the Trust, and (c) right to direct or consent to actions of the Owner Trustee and otherwise participate in the management of and control the affairs of the Trust.

"Business Day" means any day that is not a Saturday, Sunday or any other day on which commercial banking institutions in Delaware are authorized or obligated by law or executive order to be closed.

"Capital Account" means the Capital Account maintained for each Owner pursuant to Article VI of this Agreement.

"Capital Contribution" means the amount of money contributed or deemed to have been contributed by an Owner to the capital of the Trust, which shall be as set forth on Schedule A to this Agreement.

"Certificate of Trust" means the Certificate of Trust filed with the Secretary of State by the Owner Trustee on behalf of the Trust.

"Custodial Agreements" means each of the Custodial Agreements, dated as of December 7, 2006, among the Trust, the Indenture Trustee and the Pennsylvania Higher Education Assistance Agency, CFS-SunTech Servicing LLC, Great Lakes Educational Loan Services, Inc., EdFinancial Services, LLC, Nelnet, Inc. and ACS Education Services, Inc., respectively.

"Deposit and Sale Agreement" means the Deposit and Sale Agreement, dated as of December 7, 2006, between the Depositor and the Trust.

"Deposit and Security Agreement" means the Deposit and Security Agreement, dated as of December 7, 2006, among the Administrator, TERI and the Trust.

"Depositor" means The National Collegiate Funding LLC, a Delaware limited liability company.

"Distribution Date" means the first Business Day following a day on which the Owner Trustee obtains receipt of funds or, if instructed by the Owners, such other Business Day as they shall specify in writing.

"Distribution Date Statement" means the statement described as such in Section 7.07.

"Distribution" means any money or other property distributed to an Owner with respect to its Beneficial Interest.

"Eligible Investments" means one or more of the following (it being acknowledged by the parties hereto that Eligible Investments will have the meaning set forth in the Indenture until such time as the Notes are no longer outstanding):

(a)    Obligations of or guaranteed as to principal and interest by the United States or any agency or instrumentality thereof when such obligations are backed by the full faith and credit of the United States;

(b)    Repurchase agreements on obligations specified in clause (a) maturing not more than one month from the date of acquisition thereof, provided that the unsecured obligations of the party agreeing to repurchase such obligations are at the time rated by each of the Rating Agencies in its highest short-term rating available;

(c)    Federal funds, certificates of deposit, demand deposits, time deposits and bankers' acceptances (which shall each have an original maturity of not more than 90 days and, in the case of bankers' acceptances, shall in no event have an original maturity of more than 365 days or a remaining maturity of more than 30 days) denominated in United States dollars of any U.S. depository institution or trust company incorporated under the laws of the United States or any state thereof or of any domestic branch of a foreign depository institution or trust company; provided that the debt obligations of such depository institution or trust company at the date of acquisition thereof have been rated by each of the Rating Agencies in its highest short-term rating available; and, provided further that, if the original maturity of such short-term obligations of a domestic branch of a foreign depository institution or trust company shall exceed 30 days, the short-term rating of such institution shall have a credit rating in one of the two highest applicable categories from each of the Rating Agencies;

(d)    Commercial paper (having original maturities of not more than 365 days) of any corporation incorporated under the laws of the United States or any state thereof, which, on the date of acquisition has been rated by each of the Rating Agencies in its highest short-term rating available; provided that such commercial paper shall have a remaining maturity of not more than 30 days;

(e)    A money market fund rated by each of the Rating Agencies in its highest rating available which may be a money market fund of the Owner Trustee; and

(f)      Other obligations or securities that are acceptable to each of the Rating Agencies as an Eligible Investment hereunder; provided, however, that no instrument shall be an Eligible Investment if it provides for either (i) the right to receive only interest payments with respect to the underlying debt instrument or (ii) the right to receive both principal and interest payments derived from the obligations underlying such instrument and the principal and interest payments with respect to such instrument provide a yield to maturity greater than 120% of the yield to maturity at par of such underlying obligations; and provided further that so long as the Notes are outstanding, no instrument that is not a permitted investment under the Indenture shall be an Eligible Investment for purposes of this Agreement.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Fiscal Year" means the twelve-month period ending on June 30 each year or such portion thereof as the Trust may be in existence.

"Indemnification Agreements" means each of the Indemnification Agreements, dated as of December 7, 2006, between the Trust, the Depositor and The First Marblehead Corporation and Bank of America, N.A. and JPMorgan Chase Bank, N.A., respectively.

"Indenture" means the Indenture between the Trust and U.S. Bank National Association, as Indenture Trustee, dated as of December 1, 2006, as amended or supplemented from time to time pursuant to which the Notes are to be issued.

"Indenture Trustee" means the bank or trust company acting as Indenture Trustee under the Indenture.

"Interested Noteholders" shall have the meaning set forth in the Indenture.

"Issuer Order" means the Issuer Order to the Indenture Trustee from the Trust dated December 7, 2006.

"Issuer Orders to Authenticate" means the Issuer Orders to Authenticate to the Indenture Trustee from the Trust dated December 7, 2006.

"Loan Originators" means each of the originators of the Student Loans, as set forth on Schedule B attached hereto, as amended or supplemented from time to time.

"Loan Purchase Agreements" means each of the loan purchase agreements entered into between each of the Loan Originators and The First Marblehead Corporation, as set forth on Schedule C attached hereto, as amended or supplemented from time to time.

"Net Cash Flow" means, with respect to any fiscal period of the Trust, all revenues of the Trust decreased by (a) cash expenditures for operating expenses (including interest on indebtedness of the Trust but not including expense items which do not require current cash outlay), (b) reserves for contingencies and working capital established in such amounts as the Owner Trustee, with the consent of the Owners, may determine, (c) repayments of principal on any Trust indebtedness, and (d) taxes.

"1933 Act" has the meaning set forth in Section 3.02(a).

"Notes" mean the collateralized student loan asset backed notes to be issued by the Trust pursuant to the Indenture.

"Noteholder" means any holder of the Notes.

"Owner" means each of the Depositor, TERI and any other Person who becomes an owner of a Beneficial Interest.

"Owner Trustee" means Wilmington Trust Company, a Delaware banking corporation with its principal place of business in the State of Delaware, not in its individual capacity but solely as trustee, or any successor thereto, duly appointed in accordance with Section 12.01 hereof.

"Percentage Interest" means the initial undivided beneficial interest in the Trust Property of an Owner expressed as a percentage of the total initial undivided beneficial interests in the Trust Property. References to Percentage Interests herein shall be solely for the purpose of certificating Owners' interests hereunder and for any other purpose specified in this Agreement.

"Periodic Filings" means any filings or submissions that the Trust is required to make with any state or Federal regulatory agency or under the Code.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, trust (including any beneficiary thereof), estate, custodian, nominee, unincorporated organization or government or any agency or political subdivision thereof.

"Plan" has the meaning set forth in Section 3.04(d).

"Plan Assets" has the meaning set forth in Section 3.04(d).

"Rating Agencies" means Moody's Investors Service, Inc., Fitch, Inc. and Standard & Poors Rating Services, a division of The McGraw-Hill Companies, Inc.

"Secretary of State" means the office of the Secretary of State of the State of Delaware.

"Servicers" means the Pennsylvania Higher Education Assistance Agency, CFS-SunTech Servicing LLC, Great Lakes Educational Loan Services, Inc., EdFinancial Services, LLC, Nelnet, Inc. and ACS Education Services, Inc. and any other loan servicer satisfying the Rating Agency Condition.

"Servicing Agreements" means (a) the Amended and Restated Private Student Loan Servicing Agreement, dated as of September 28, 2006, between the Pennsylvania Higher Education Assistance Agency and The First Marblehead Corporation, (b) the Private Consolidation Agreement dated as of March 26, 2004 as amended, between CFS-SunTech Servicing LLC and The First Marblehead Corporation, (c) the Non-FFELP Loan Servicing Agreement, dated as of May 1, 2003, as amended, by and between Great Lakes Educational Loan Services, Inc. and The First Marblehead Corporation, (d) the Alternative Servicing Agreement dated as of February 1, 2004, as supplemented, between EdFinancial Services, LLC (as successor in interest to Educational Services of America, Inc.) and The First Marblehead Corporation, (e) the Loan Servicing Agreement, dated as of August 1, 2001, as amended, between Nelnet, Inc. (as successor in interest to UNIPAC Service Corporation) and The First Marblehead Corporation, and (f) the Alternative Servicing Agreement, dated as of March 1, 2005, as amended, between ACS Education Services, Inc. and The First Marblehead Corporation, all of which agreements will be assigned to the Trust concurrent with the initial purchase of Financed Student Loans, or any other servicing agreement between the Issuer and a servicer under which such servicer agrees to service Financed Student Loans included in the Indenture Trust Estate, which servicing agreement shall satisfy the Rating Agency Condition.

"Servicer Consent Letters" means each of the Servicer Consent Letters, dated as of December 7, 2006, among The First Marblehead Corporation, the Trust and the Pennsylvania Higher Education Assistance Agency, CFS-SunTech Servicing LLC, Great Lakes Educational Loan Services, Inc., EdFinancial Services, LLC, Nelnet, Inc. and ACS Education Services, Inc., respectively

"Sharing Ratio" means, with respect to any Owner, the ratio (expressed as a percentage) specified on Schedule A attached hereto.

"Statutory Trust Statute" means the Delaware Statutory Trust Act, 12 Del. Code §3801 et seq.

"Structuring Advisor" means The First Marblehead Corporation.

"Structuring Advisory Agreement" means the Structuring Advisory Agreement between the Structuring Advisor and the Trust, dated as December 7, 2006.

"Student Loans" means the education loans, to or for the benefit of students, originated under one of the Student Loan Programs.

"Student Loan Notes" means the promissory notes to be sold to the Trust by the Loan Originators pursuant to the Loan Purchase Agreements representing education loans, to or for the benefit of students, originated under the Student Loan Programs.

"Student Loan Programs" means each of the programs for the origination of the Student Loans by each of the Loan Originators pursuant to the Loan Purchase Agreements.

"Super-majority Owners" shall have the meaning set forth in Section 4.03.

"TERI" means The Education Resources Institute, Inc., a private non-profit corporation organized under Chapter 180 of the Massachusetts General Laws.

"TERI Deposit Account" means the special deposit account established by TERI pursuant to the Deposit and Security Agreement.

"TERI Guaranty Agreements" means each of the Guaranty Agreements entered into between each of the Loan Originators and TERI as set forth on Schedule D attached hereto, as amended or supplemented from time to time.

"TERI Guaranteed Loans" means Student Loans originated under the Student Loan Programs owned by the Trust and guaranteed by TERI pursuant to the Guaranty Agreements.

"Transfer" means the sale, transfer or other assignment of all or an Owner's right, title and interest in all or a portion of such Owner's Beneficial Interest.

"Trust" means The National Collegiate Student Loan Trust 2006-4 established by this Agreement.

"Trust Certificate" means a certificate evidencing the Beneficial Interest of an Owner in substantially the form attached hereto as Exhibit 1.

"Trust Property" means all right, title and interest of the Trust or the Owner Trustee on behalf of the Trust in and to any property contributed to the Trust by the Owners or otherwise acquired by the Trust, including without limitation all distributions, payments or proceeds thereon.

"Trust Related Agreements" means any instruments or agreements signed by the Owner Trustee on behalf of the Trust, including without limitation, the Indenture, the Loan Purchase Agreements, the Administration Agreement, the Deposit and Sale Agreement, the Deposit and Security Agreement, the Servicer Consent Letters, the Structuring Advisory Agreement, the Assignments of Servicing Agreements, the Back-up Agreement, the Custodial Agreements, the Notes, the Indemnification Agreements, the Issuer Order and the Issuer Orders to Authenticate.

Tax Terms:

"Adjusted Capital Account Deficit" means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)     Credit to such Capital Account the minimum gain chargeback that such Partner is deemed to be obligated to restore pursuant to the penultimate sentences of sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations and the amount of such Partner's share of Partner Nonrecourse Debt Minimum Gain; and

(b)     Debit to such Capital Account the items described in sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"Code" means the Internal Revenue Code of 1986, as amended.

"Nonrecourse Deductions" has the meaning set forth in section 1.704-2(b)(1) of the Regulations.

"Nonrecourse Liability" has the meaning set forth in section 1.704-2(b)(3) of the Regulations.

"Partner Nonrecourse Debt" has the meaning set forth in section 1.704-2(b)(4) of the Regulations.

"Partner Nonrecourse Debt Minimum Gain" means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in

accordance with section 1.704-2(i)(3) of the Regulations.

"Partner Nonrecourse Deductions" has the meaning set forth in sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Regulations.

"Partners" means the Owners.

"Partnership" means the Trust.

"Partnership Minimum Gain" has the meaning set forth in sections 1.704-2(b)(2) and 1.704-2(d) of the Regulations.

"Profit and Loss" means, for each Fiscal Year, an amount equal to the Partnership's taxable income or loss for such Fiscal Year, determined in accordance with section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(a)    Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profit or Loss pursuant to this definition shall be added to such taxable income or loss;

(b)    Any expenditures of the Partnership described in section 705(a)(2)(B) of the Code or treated as expenditures under section 705(a)(2)(B) of the Code pursuant to section 1.704-1(b)(2)(iv)(i) of the Regulations (other than expenses in respect of which an election is properly made under section 709 of the Code), and not otherwise taken into account in computing Profit or Loss pursuant to this definition, shall be subtracted from such taxable income or loss;

(c)    Notwithstanding any other provisions of this definition, any items which are specially allocated pursuant to Section 7.03 or 7.04 shall not be taken into account in computing Profit or Loss.

The amounts of the items of Partnership income, gain, loss, or deduction available to be specially allocated pursuant to Sections 7.03 and 7.04 shall be determined by applying rules analogous to those set forth in clauses (a) and (b) above.

"Regulations" means the federal income tax regulations promulgated by the United States Treasury Department under the Code as such Regulations may be amended from time to time.

All references herein to a specific section of the regulations shall be deemed also to refer to any corresponding provision of succeeding Regulations.

"Regulatory Allocations" has the meaning set forth in Section 7.04.


ARTICLE II

ORGANIZATION

Section 2.01    Name. The Trust continued hereby shall be known as The National Collegiate Student Loan Trust 2006-4, in which name the Owner Trustee may take any action as provided herein.

Section 2.02    Office. The principal place of business and principal office of the Trust shall be in care of the Owner Trustee, at the address set forth in Section 14.05. The Trust shall also have an office at 800 Boylston Street - 34th Floor, Boston, Massachusetts 02199.

Section 2.03    Purposes and Powers.

(a)    The purpose of the Trust is to engage in the following activities and only these activities:

(i)    To acquire a pool of Student Loans, to execute the Indenture and to issue the Notes;

(ii)    To enter into the Trust Related Agreements and to provide for the administration of the Trust and the servicing of the Student Loans;

(iii)    To engage in those activities and to enter into such agreements that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith; and

(iv)    To engage in such other activities as may be required in connection with conservation of the Trust Property and Distributions to Owners. Until the Indenture is discharged, the Trust shall not engage in any business or activities other than in connection with, or relating to, the foregoing and other than as required or authorized by the terms of this Agreement and the Indenture, except as are incidental to and necessary to accomplish such activities, unless the Interested Noteholders consent to the Trust engaging in other activities.

(b)    Until the Indenture is discharged, the operations of the Trust shall be conducted in accordance with the following standards:

(i)    The Trust will act solely in its own name and the Owner Trustee or other agents selected in accordance with this Agreement will act on behalf of the Trust subject to direction by the Owners as provided herein, but such action shall not be in violation of the terms of this Agreement;

(ii)    The Trust's funds and assets shall at all times be maintained separately from those of the Owners and any of their respective Affiliates;

(iii)    The Trust shall maintain complete and correct books, minutes of the meetings and proceedings of the Owners, and records of accounts;

(iv)    The Trust shall conduct its business at the office of the Owner Trustee and will use stationery and other business forms of the Trust under its own name and not that of the Owners or any of their respective Affiliates, and will avoid the appearance (A) of conducting business on behalf of any Owner or any Affiliate of an Owner or (B) that the assets of the Trust are available to pay the creditors of the Owner Trustee or any Owner;

(v)    The Trust's operating expenses shall be paid out of its own funds;

(vi)    The Trust shall not incur, guarantee or assume any debt (other than the Notes) nor hold itself out as being liable for the debts of any entity, including any Owner or any Affiliates of any Owner;

(vii)    For so long as any of the Notes are outstanding, the Trust shall not (A) merge or consolidate with or into any other entity, (B) convey or transfer all or substantially all of its assets to any other entity (other than to the Indenture Trustee pursuant to the Indenture), or (C) dissolve, liquidate or terminate in whole or in part; and

(viii)    For so long as any of the Notes are outstanding, the Trust shall not own or acquire any financial asset that requires the Trust, the Owners or the Administrator to make any decisions regarding such asset other than the servicing of the asset.

Section 2.04    <u>Appointment of the Owner Trustee</u>. The Depositor hereby appoints the Owner Trustee as trustee of the Trust, to have all the rights, powers and duties set forth herein and in the Statutory Trust Statute. The Owner Trustee acknowledges receipt in trust from the Depositor, of the sum of one dollar ($1), constituting the initial Trust Property.

Section 2.05    <u>Declaration of Trust</u>. The Owner Trustee hereby declares that it will hold the Trust Property in trust upon and subject to the conditions set forth herein for the use and benefit of the Owners, subject to the obligations of the Owner Trustee under the Trust Related Agreements. It is the intention of the parties hereto that the Trust constitute a statutory trust under the Statutory Trust Statute and that this Agreement constitute the governing instrument of the Trust.

Section 2.06    <u>No Liability of Owners for Expenses or Obligations of Trust</u>. No Owner shall be liable for any liability, expense or other obligation of the Trust.

Section 2.07    <u>Situs of Trust</u>. The Trust will be located and administered in the State of Delaware. The Trust shall not have any employees in any state other than in the State of Delaware and payments will be received by the Owner Trustee on behalf of the Trust only in the State of Delaware and payments will be made by the Owner Trustee on behalf of the Trust only from the State of Delaware.

ARTICLE III

TRUST CERTIFICATES AND TRANSFER OF INTEREST

Section 3.01    <u>Issuance of Trust Certificate</u>.

(a)    As of the date hereof, as set forth on Schedule A attached hereto, the Depositor has been issued a Trust Certificate evidencing a percentage of the Beneficial Interest in the Trust and TERI has been issued a Trust Certificate evidencing a percentage of the Beneficial Interest in the Trust.

(b)    Each Trust Certificate shall be executed by manual signature on behalf of the Owner Trustee by one of its Authorized Officers. Trust Certificates bearing the manual signature of an individual who was, at the time when such signature was affixed, authorized to sign on behalf of the Owner Trustee shall bind the Trust, notwithstanding that such individual has ceased to be so authorized prior to the delivery of such Trust Certificate or does not hold such office at the date of such Trust Certificate. Each Trust Certificate shall be dated the date of its issuance.

Section 3.02    <u>Registration and Transfer of Certificates</u>.

(a)    The Owner Trustee shall maintain at its office referred to in Section 2.02, or at the office of any agent appointed by it and approved in writing by the Owners at the time of such appointment, a register for the registration and Transfer of Trust Certificates. No Transfer of a Beneficial Interest shall be made unless such Transfer is made pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "1933 Act"), and state securities laws, or is exempt from the registration requirements under the 1933 Act and state securities laws.

(b)    The registered Owner of any Trust Certificate may Transfer all or any portion of the Beneficial Interest evidenced by such Trust Certificate upon surrender thereof to the Owner Trustee accompanied by the documents required by Section 3.04. Such Transfer may be made by the registered Owner in person or by its attorney duly authorized in writing upon surrender of the Trust Certificate to the Owner Trustee accompanied by a written instrument of Transfer and with such signature guarantees and evidence of authority of the Persons signing the instrument of Transfer as the Owner Trustee may reasonably require. Promptly upon the receipt of such documents and receipt by the Owner Trustee of the transferor's Trust Certificate, the Owner Trustee shall (i) record the name of such transferee as an Owner and its Percentage Interest in the Trust Certificate register and (ii) issue, execute and deliver to such Owner a Trust Certificate evidencing such Percentage Interest. In the event a transferor Transfers only a portion of its Beneficial Interest, the Owner Trustee shall register and issue to such transferor a new Trust Certificate evidencing such transferor's new Percentage Interest. Subsequent to a Transfer and upon the issuance of the new Trust Certificate or Trust Certificates, the Owner Trustee shall cancel and destroy the Trust Certificate surrendered to it in connection with such Transfer. The Owner Trustee may treat the Person in whose name any Trust Certificate is registered as the sole Owner of the Beneficial Interest in the Trust evidenced by such Trust Certificate.

(c)    As a condition precedent to any registration of Transfer, the Owner Trustee may require the payment of a sum sufficient to cover the payment of any tax or taxes or other governmental charges required to be paid in connection with such Transfer and any other reasonable expenses connected therewith.

(d)    The Trust Certificates may not be acquired or held by or for the account of a Plan (as defined herein).

Section 3.03      Lost, Stolen, Mutilated or Destroyed Certificates. If (i) any mutilated Trust Certificate is surrendered to the Owner Trustee, or (ii) the Owner Trustee receives evidence to its satisfaction that any Trust Certificate has been destroyed, lost or stolen, and upon proof of ownership satisfactory to the Owner Trustee together with such security or indemnity as may be requested by the Owner Trustee to save it harmless, the Owner Trustee shall execute and deliver a new Trust Certificate for the same Percentage Interest as the Trust Certificate so mutilated, destroyed, lost or stolen, of like tenor and bearing a different issue number, with such notations, if any, as the Owner Trustee shall determine. In connection with the issuance of any new Trust Certificate under this Section 3.03, the Owner Trustee may require the payment by the registered Owner thereof of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the reasonable fees and expenses of the Owner Trustee) connected therewith. Any replacement Trust Certificate issued pursuant to this Section 3.03 shall constitute complete and indefeasible evidence of ownership of a Beneficial Interest, as if originally issued, whether or not the lost, stolen or destroyed Trust Certificate shall be found at any time.

Section 3.04      Limitation on Transfer of Ownership Rights.

(a)      No Transfer of all or any part of a Beneficial Interest shall be made to any Person unless (i) such Person delivers to the Owner Trustee an accession agreement substantially in the form of Exhibit 2 hereof, (ii) except for the initial transfer of the Beneficial Interest of the Depositor, the Owner Trustee shall have received a written opinion of counsel in form and substance satisfactory to the Owner Trustee stating that such Transfer is exempt from the 1933 Act and any applicable state securities laws.

(b)      At any time that there is more than one Owner, no Transfer of a Beneficial Interest shall be valid unless the Owner making such Transfer shall have received the prior written consent to such Transfer of the Owners holding at least 85% of both the Percentage Interests and the Sharing Ratios in the Trust at such time, which consent may not be unreasonably withheld; provided, however, that in calculating the total Beneficial Interests in the Trust the Beneficial Interest owned by the transferor or (unless the transferor and its Affiliates are the only Owners) any Affiliate thereof shall be excluded.

(c)      Except for the initial issuance of the Trust Certificates to the Depositor, no Transfer shall be valid if, as a result of such Transfer, (i) any Person would have a Percentage Interest or a Sharing Ratio of 100%, considering for such purpose all interests owned by any Affiliate of such Person as owned by such Person, or (ii) such Transfer would result in a termination of the Trust for Federal income tax purposes.

(d)      No Transfer of all or any part of a Beneficial Interest shall be made to any employee benefit plan or certain other retirement plans and arrangements, including individual retirement accounts and annuities, Keogh plans and bank collective investment funds and insurance company general or separate accounts in which such plans, accounts or arrangements are invested, that are subject to ERISA or Section 4975 of the Code (collectively, "Plan"), nor to any Person acting, directly or indirectly, on behalf of any such Plan or any Person acquiring the Beneficial Interest with "plan assets" of a Plan within the meaning of the Department of Labor regulation promulgated at 29 C.F.R. § 2510.3-101 ("Plan Assets") unless the Owner Trustee is provided with an opinion of counsel which establishes to the satisfaction of the Owner Trustee that the purchase of the Beneficial Interest is permissible under applicable law, will not constitute or result in any prohibited transaction under ERISA or Section 4975 of the Code and will not subject the Owners, the Owner Trustee or the Trust to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to that undertaken in this Agreement, which opinion of counsel shall not be an expense of the Owners, the Owner Trustee or the Trust.

(e)      No Transfer of all or any part of a Beneficial Interest shall be permitted, and no such transfer shall be effective hereunder, if such transfer would cause the Trust to be classified as a publicly traded partnership, taxable as a corporation for federal income tax purposes, by causing the Trust to have more than 100 Owners at any time during any taxable year of the Trust.

Section 3.05      Assignment of Right to Distributions. An Owner may assign all or any part of its right to receive distributions hereunder, but such assignment (in the absence of a permitted Transfer) shall effect no change in the ownership of the Trust.

ARTICLE IV

CONCERNING THE OWNERS

Section 4.01      Action by Owners with Respect to Certain Matters.

(a)      The Owner Trustee will take such action or refrain from taking such action under this Agreement or any Trust Related Agreement as it shall be directed pursuant to an express provision of this Agreement or such Trust Related Agreement or, with respect to nonministerial matters, as it shall be directed by all the Owners for so long as any of the Notes are outstanding.

(b)      Without limiting the generality of the foregoing, in connection with the following nonministerial matters, the Owner Trustee will take no action, and will not have authority to take any such action, unless it receives prior written approval from all the Owners for so long as any of the Notes are outstanding:

(i)      Initiate any claim or lawsuit by the Trust and compromise any claim or lawsuit brought by or against the Trust, except for claims or lawsuits initiated in the ordinary course of business by the Trust or its agents or nominees for collection on the Student Loans owned by the Trust;

(ii)      Amend, change or modify this Agreement or any Trust Related Agreement;

(iii)      To the fullest extent permitted by applicable law, file a voluntary petition in bankruptcy for the Trust, which in no event shall the Owner Trustee be permitted to do or be instructed to do until at least 367 days after the payment in full of the Outstanding Notes (as defined in the Indenture) issued by the Trust; and

(iv)      To the fullest extent permitted by applicable law, (A) Institute proceedings to have the Trust declared or adjudicated bankrupt or insolvent, (B) consent to the institution of bankruptcy or insolvency proceedings against the Trust, (C) file a petition or consent to a petition seeking reorganization or relief on behalf of the Trust under any applicable federal or state law relating to bankruptcy, (D) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or any similar official) of the Trust or a substantial portion of the property of the Trust, (E) make any assignment for the benefit of the Trust's creditors, (F) cause the Trust to admit in writing its inability to pay its debts generally as they become due, or (G) take any action, or cause the Trust to take any action, in furtherance of any of the foregoing (any of the above, a "Bankruptcy Action"). No Owner shall have the power to take, and no Owner shall take, any Bankruptcy Action with respect to the Trust or direct the Owner Trustee to take any Bankruptcy Action with respect to the Trust.

(c)      No Owner shall take any action to cause the filing of an involuntary petition in bankruptcy against the Trust.

Section 4.02      Action Upon Instructions.

(a)      The Owner Trustee shall take such action or actions as may be specified in this Agreement or in any instructions delivered in accordance with this Article IV or Article VIII; provided, however, that the Owner Trustee shall not be required to take any such action if it shall have reasonably determined, or shall have been advised by counsel, that such action (i) is contrary to the terms hereof or of any document contemplated hereby to which the Trust or the Owner Trustee is a party or is otherwise contrary to law, (ii) is likely to result in personal liability on the part of the Owner Trustee, unless the Owners shall have provided to the Owner Trustee indemnification or security reasonably satisfactory to the Owner Trustee against all costs, expenses and liabilities arising from the Owner Trustee's taking of such action, or (iii) would adversely affect the status of the Trust as a partnership for Federal income tax purposes.

(b)      No Owner shall direct the Owner Trustee to take or refrain from taking any action contrary to this Agreement or any Trust Related Agreement, nor shall the Owner Trustee be obligated to follow any such direction, if given.

(c)      Notwithstanding anything contained herein or in any Trust Related Agreement to the contrary, the Owner Trustee shall not be required to take any action in any jurisdiction other than in the State of Delaware if the taking of such action will (i) require the consent or approval or authorization or order for the giving of notice to, or the registration with or taking of any action in respect of, any state or other governmental authority or agency of any jurisdiction other than the State of Delaware; (ii) result in any fee, tax or other governmental charge under the laws of any jurisdiction or any political subdivision thereof in existence on the date hereof other than the State of Delaware becoming payable by the Owner Trustee; or (iii) subject the Owner Trustee to personal jurisdiction in any jurisdiction other than the State of Delaware for causes of action arising from acts unrelated to the consummation of the transactions by the Owner Trustee contemplated hereby.

(d)       The Owner Trustee shall not have the power to remove the Administrator under the Administration Agreement or appoint a successor Administrator pursuant to the Administration Agreement without written instruction by the Owners.

Section 4.03       <u>Super-majority Control</u>. Except as otherwise expressly provided in this Agreement, any action which may be taken or consent or instructions which may be given by the Owners under this Agreement may be taken by the Owners holding in the aggregate at least 85% of both the Percentage Interests and the Sharing Ratios in the Trust at the time of such action (the "Super-majority Owners"). Any written notice of the Owners delivered pursuant to this Agreement shall be effective only if signed by the Super-majority Owners at the time of the delivery of such notice.

Section 4.04       <u>Representations and Warranties of the Depositor</u>. The Depositor hereby represents and warrants to the Owner Trustee as follows:

(a)       Upon the receipt of the Trust Property by the Owner Trustee under this Agreement, the Owner Trustee on behalf of the Trust will have good title to the Trust Property free and clear of any lien.

(b)       The Trust is not and will not be, upon conveyance of the Trust Property to the Owner Trustee, an "Investment Company" or under the "control" of an "Investment Company," as such terms are defined in the Investment Company Act of 1940, as amended.

(c)       Except for the filing of the Certificate of Trust with the Secretary of State, no consent, approval, authorization or order of, or filing with, any court or regulatory, supervisory or governmental agency or body is required under current law in connection with the execution, delivery or performance by the Depositor of this Agreement or the consummation of the transactions contemplated hereby; <u>provided</u>, <u>however</u>, that no representation or warranty is made herein as to compliance with Federal securities laws or the securities or "blue sky" laws of any state.

(d)       This Agreement has been duly and validly authorized, executed and delivered by, and constitutes a valid and binding agreement of, the Depositor, enforceable in accordance with its terms.

Section 4.05       <u>Power of Attorney</u>.

(a)       <u>General</u>. Each Owner hereby irrevocably constitutes and appoints the Administrator, with full power of substitution, such Owner's true and lawful attorney-in-fact, in such Owner's name, place and stead, with full power to act jointly and severally, to make, execute, sign, acknowledge, swear to, verify, deliver, file, record and publish the following documents:

(i)       Any certificate, instrument or document to be filed by the Owners under the laws of any state, or with any governmental agency in connection with this Agreement;

(ii)       Any certificate, instrument or document which may be required to effect the continuation or termination of the Trust, including any amendments to this Agreement; provided such continuation or termination is in accordance with the terms of this Agreement; and

(iii)       Any written notice, instruction, instrument or document under Article XII of this Agreement.

(b)       <u>Duration of Power of Attorney</u>. It is expressly intended by each of the Owners that the Power of Attorney granted under this Section 4.05 is coupled with an interest, and it is agreed that such Power of Attorney shall survive (i) the dissolution, death or incompetency of any Owner and (ii) the assignment by any Owner of the whole or any portion of such Owner's Beneficial Interest.

ARTICLE V

INVESTMENT AND APPLICATION OF TRUST FUNDS

Section 5.01    Investment of Trust Funds. Unless otherwise directed in writing by the Owners, income with respect to and proceeds of the Trust Property which are received by the Owner Trustee more than one day prior to a Distribution Date shall be invested and reinvested by the Owner Trustee in Eligible Investments. Interest earned from such investment and reinvestment shall be credited to the Trust Property.

Section 5.02    Application of Funds. Income with respect to and proceeds of Trust Property held by the Owner Trustee on a Distribution Date shall be remitted directly to the Indenture Trustee for application in accordance with the Indenture for so long as any of the Notes is outstanding, and thereafter shall be applied by the Owner Trustee on such Distribution Date in the following order:

(i)    First, to pay any amounts due to the Owner Trustee under this Agreement;

(ii)    Second, to pay any amounts due to the Administrator under the Administration Agreement and to the Structuring Advisor under the Structuring Advisory Agreement;

(iii)    Third, to pay any amounts then due to any Person under the Trust Related Agreements;

(iv)    Fourth, to pay any other expenses of the Trust; and

(v)    Fifth, to the Owners in accordance with Section 7.06.

All payments to be made under this Agreement by the Owner Trustee shall be made only from the income and proceeds of the Trust Property and only to the extent that the Owner Trustee has received such income or proceeds.

ARTICLE VI

CAPITAL

Section 6.01    Tax Characterization. It is intended that the Trust be characterized and treated as a partnership for federal income tax purposes. To the extent the Trust is characterized and treated as anything other than a partnership for federal, state or local income tax purposes, the Owners shall jointly and severally be liable for, and hereby agree to indemnify the Trust for, any tax liability arising out of such characterization. All references to a "Partner," the "Partners" and to the "Partnership" in this Agreement and in the provisions of the Code and Regulations cited in this Agreement shall be deemed to refer to an Owner, the Owners and the Trust, respectively. The Tax Matters Partner of the Trust shall be as set forth in Article XIII.

Section 6.02    Initial Capital Contributions of Owners. The Depositor shall make an initial Capital Contribution in the amount of one dollar ($1) upon execution of this Agreement. Upon their accession to this Agreement as Owners and the issuance of Trust Certificates to them in accordance with Section 3.01(a), the Owners will be deemed to have made initial Capital Contributions in the amounts set forth on Schedule A attached hereto.

Section 6.03    Capital Accounts. A capital account shall be maintained for each Owner throughout the term of the Trust in accordance with the rules of section 1.704-1(b)(2)(iv) of the Regulations as in effect from time to time, and, to the extent not inconsistent therewith, to which the following provisions apply:

(a)    To each Owner's Capital Account there shall be credited (i) the amount of money contributed by such Owner to the Trust (including each Owner's share of any liabilities of the Trust assumed by such Owner as provided in section 1.704-1(b)(2)(iv)(c) of the Regulations), (ii) the fair market value of any property contributed to the Trust by such Owner (net of liabilities secured by such contributed property that the Trust is considered to assume or take subject to under section 752 of the Code), and (iii) such Owner's share of Profit and items of income and gain that are specially allocated pursuant to Sections 7.03 and 7.04 (other than any income or gain allocated to such Owner pursuant to Section 7.03(f) in accordance with section 704(c) of the Code). The initial Capital Contributions of each Owner are set forth on Schedule A attached hereto.

(b)    To each Owner's Capital Account there shall be debited (i) the amount of money distributed to such Owner by the Trust (including any liabilities of such Owner assumed by the Trust as provided in section 1.704-1(b)(2)(iv)(c) of the Regulations) other than amounts that are in repayment of debt obligations of the Trust to such Owner, (ii) the fair market value of property distributed to such Owner (net of liabilities secured by such distributed property that such Owner is considered to assume or take subject to), and (iii) such Owner's share of Loss and items of loss or deduction that are specially allocated pursuant to Sections 7.03 and 7.04 (other than any deduction or loss allocated to such Owner pursuant to Section 7.03(f) in accordance with section 704(c) of the Code).

(c)    The Capital Account of a transferee Owner shall include the appropriate portion of the Capital Account of the Owner from whom the transferee Owner's interest was obtained.

(d)    In determining the amount of any liability, there shall be taken into account section 752(c) of the Code and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with section 1.704-1(b) of the Regulations, and shall be interpreted and applied in a manner consistent with such Regulations.

Section 6.04    Interest. No Owner shall be entitled to interest on its Capital Contribution or on any Profit retained by the Trust.

Section 6.05    No Additional Capital Contributions. No Owner shall make an additional Capital Contribution to the Trust, or receive a distribution from the Trust, of property unless this Agreement shall have first been amended to the extent necessary to comply with the requirements of sections 704(b) and (c) of the Code regarding the distributive shares of, and the allocation of income, gain, loss, deduction and credit among, partners of a partnership.

Section 6.06    Investment of Capital Contributions. The cash Capital Contributions of the Owners shall be invested by the Owner Trustee in accordance with Section 5.01.

Section 6.07    Repayment and Return of Capital Contributions. The Owner Trustee shall have no personal liability for the repayment of any Capital Contributions of the Owners.

ARTICLE VII

ALLOCATION OF PROFIT AND LOSS; DISTRIBUTIONS

Section 7.01    Profit. After giving effect to special allocations set forth in Section 7.03 and Section 7.04, Profit for any Fiscal Year shall be allocated to the Owners in proportion to their respective Sharing Ratios.

Section 7.02    Loss. After giving effect to the special allocations set forth in Sections 7.03 and 7.04, Loss for any Fiscal Year shall be allocated as follows:

(a)    Special Allocation of Loss Attributable to Note Defaults on TERI Guaranteed Loans. To the extent of any positive balance in TERI's Capital Account as an Owner, TERI shall be specially allocated all Losses for such Fiscal Year resulting from defaults, as determined pursuant to the TERI Guaranty Agreements, on the TERI Guaranteed Loans owned by the Trust to the extent that the Trust is not reimbursed for such Losses by TERI as a guaranty payment pursuant to the TERI Guaranty Agreements.

(b)    Other Loss. All Loss not allocated pursuant to Section 7.02(a) shall be allocated to the Owners in proportion to their Sharing Ratios.

(c)    Effect of Adjusted Capital Account Deficit. The Loss allocated pursuant to Section 7.02(a) and (b) shall not exceed the maximum amount of Loss that can be so allocated without causing any Owner to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event some but not all of the Owners would have Adjusted Capital Account Deficits as a consequence of

an allocation of Loss pursuant to Section 7.02(a) and (b), the limitation set forth in this Section 7.02(c) shall be applied on an Owner by Owner basis so as to allocate the maximum permissible Loss to each Owner under section 1.704-1(b)(2)(ii)(d) of the Regulations.

(d)    Remaining Loss. In the event that there is any remaining Loss in excess of the limitation set forth in Section 7.02(c), such remaining Loss shall be allocated among the Owners in proportion to their respective Sharing Ratios.

Section 7.03    Special Allocations.

(a)    Minimum Gain Chargeback. Except as otherwise provided in section 1.704-2(f) of the Regulations, notwithstanding any other provision of this Section 7.03, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, each Owner shall be specially allocated items of Trust income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Owner's share of the net decrease in Partnership Minimum Gain, determined in accordance with section 1.704-2(g) of the Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Owner pursuant thereto. The items to be so allocated shall be determined in accordance with sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Regulations. This Section 7.03(a) is intended to comply with the minimum gain chargeback requirement in section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

(b)    Owner Minimum Gain Chargeback. Except as otherwise provided in section 1.704-2(i)(4) of the Regulations, notwithstanding any other provision of this Section 7.03, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Fiscal Year, each Owner who has a share of the Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with section 1.704-2(i)(5) of the Regulations, shall be specially allocated items of Partnership income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Partner's share of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with section 1.704-2(i)(4) of the Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Partner pursuant thereto. The items to be so allocated shall be determined in accordance with sections 1.704- 2(i)(4) and 1.704-2(j)(2) of the Regulations. This Section 7.03(b) is intended to comply with the minimum gain chargeback requirement in section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

(c)    Qualified Income Offset. In the event any Owner unexpectedly receives any adjustments, allocations, or distributions described in section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Trust income and gain shall be specially allocated to the Owner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Owner as quickly as possible, provided that an allocation pursuant to this Section 7.03(c) shall be made only if and to the extent that the Owner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article VII have been tentatively made as if this Section 7.03(c) were not in this Agreement.

(d)    Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year shall be specially allocated among the Owners in proportion to their Sharing Ratios.

(e)    Partner Nonrecourse Deductions. Any Partner Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Owner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with section 1.704-2(i)(1) of the Regulations.

(f)    Mandatory Allocations Under Section 704(c) of the Code. Notwithstanding the foregoing provisions of this Section 7.03, in the event section 704(c) of the Code or section 704(c) of the Code principles applicable under section 1.704-1(b)(2)(iv) of the Regulations require allocations of income, gain, deduction or loss in a manner different than that set forth above, the provisions of section 704(c) of the Code and the Regulations thereunder shall control such allocations. Any item of Trust income, gain, loss and deduction with respect to any property (other than cash) that has been contributed by a Partner to the capital of the Trust or which has been revalued for Capital Account purposes pursuant to section 1.744-1(b)(2)(iv) of the Regulations and which is required to be allocated to such Partner for income tax purposes under section 704(c) of the Code so as to take into account the variation between the tax basis of such property and its fair market value at the time of its contribution shall be allocated solely for income tax purposes in the manner required or permitted under section 704(c) of the Code using the "traditional method" described in section 1.704-3(b) of the Regulations, provided, however, that curative allocations consisting of the special allocation of gain or loss upon the sale or other disposition of the contributed property shall be made in accordance with section 1.704-3(c) of the Regulations to the extent necessary to eliminate any disparity, to the extent possible, between the Partners' book and tax Capital Accounts attributable to such property; further provided, however, that any other method allowable under applicable Regulations may be used for any contribution of property as to which there is agreement between the contributing Partner and the Administrator.

(g)        Gross Income Allocation. In the event any Owner has an Adjusted Capital Account Deficit, such Owner shall be specially allocated items of Trust income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 7.03(g) shall be made only if and to the extent that such Owner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 7.03 have been made as if Sections 7.03(c) and 7.03(g) were not in this Agreement.

Section 7.04        Curative Allocations. The allocations set forth in Sections 7.02 and 7.03(a) through (e) (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the Owners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Trust income, gain, loss, or deduction. Therefore, notwithstanding any other provision of this Article VII (other than the Regulatory Allocations), offsetting special allocations of Trust income, gain, loss, or deduction shall be made so that, after such offsetting allocations are made, each Owner's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Owner would have had if the Regulatory Allocations were not part of this Agreement and all Trust items were allocated pursuant to Sections 7.01 and 7.02. In making such offsetting allocations, there shall be taken into account future Regulatory Allocations under Section 7.03(a) and (b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Section 7.03(d) and (e).

Section 7.05        Other Allocation Rules.

(a)        For purposes of determining the Profit, Loss, or any other items allocable to any period, Profit, Loss, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Owner Trustee, under the direction of the Super-majority Owners, using any method permissible under section 706 of the Code and the Regulations thereunder.

(b)        The Owners are aware of the income tax consequences of the allocations made by this Article VII and hereby agree to be bound by the provisions of this Article VII in reporting their shares of Trust income and loss for income tax purposes.

(c)        Solely for purposes of determining an Owner's proportionate share of the "excess nonrecourse liabilities" of the Trust within the meaning of section 1.752-3(a)(3) of the Regulations, the Owners' interests in Trust profits are in proportion to their Sharing Ratios.

(d)        To the extent permitted by section 1.704-2(h)(3) of the Regulations, the Owner Trustee shall endeavor to treat distributions of Net Cash Flow as having been made from the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt only to the extent that such distributions would cause or increase an Adjusted Capital Account Deficit for any Owner.

Section 7.06        Distribution of Net Cash Flow. Except to the extent prohibited by any other agreement to which the Trust is a party or is otherwise bound, Net Cash Flow on each Distribution Date shall be distributed on such Distribution Date to each Owner in an amount equal to (i) the Profit allocated to such Owner under this Article VII and not previously distributed to such Owner less (ii) the amount of Losses allocated to such Owner to the extent such Losses were not applied in reduction of the amount of any previous distribution of Net Cash Flow to such Owner. All payments to be made under this Agreement by the Owner Trustee shall be made only from the income and proceeds of the Trust Property and only to the extent the Owner Trustee has received such income or proceeds.

Section 7.07        Distribution Date Statement. With each distribution to an Owner pursuant to Section 7.06, the Owner Trustee shall deliver a Distribution Date Statement setting forth, for the period since the preceding Distribution Date:

(a)        Income and proceeds received by the Owner Trustee with respect to the Trust Property;

(b)        Amounts paid to the Owner Trustee;

(c)        Amounts paid to any Person pursuant to a Trust Related Agreement; and

(d)        Amounts paid for other expenses of the Trust.

Section 7.08    <u>Allocation of Tax Liability</u>. In the event that any tax is imposed on the Trust, such tax shall be charged against amounts otherwise distributable to the Owners in proportion to their respective Sharing Ratios. The Owner Trustee is hereby authorized to retain from amounts otherwise distributable to the Owners sufficient funds to pay or provide for the payment of, and then to pay, such tax as is legally owed by the Trust (but such authorization shall not prevent the Owner Trustee from contesting any such tax in appropriate proceedings, and withholding payment of such tax, if permitted by law, pending the outcome of such proceedings).

Section 7.09    <u>Method of Payment</u>. All amounts payable to an Owner pursuant to this Agreement shall be paid by the Owner Trustee to such Owner or a nominee therefor by check payable to such Owner, mailed first class to the address of such Owner appearing on the register maintained pursuant to Section 3.02, or by crediting the amount to be distributed to such Owner to an account maintained by such Owner with the Owner Trustee or by transferring such amount by wire transfer in immediately available funds to a banking institution with bank wire transfer facilities for the account of such Owner, as instructed in writing from time to time by such Owner. The Owner Trustee may require an Owner to pay any wire transfer fees incurred in connection with any wire transfer made to such Owner.

Section 7.10    <u>No Segregation of Funds; No Interest</u>. Subject to Sections 2.03(b)(ii) and 5.01, funds received by the Owner Trustee hereunder need not be segregated in any manner except to the extent required by law and may be deposited under such general conditions as may be prescribed by law, and the Owner Trustee shall not be liable for any interest thereon.

Section 7.11    <u>Interpretation and Application of Provisions by the Administrator</u>. The Owner Trustee shall appoint and authorize the Administrator to interpret and apply the provisions set forth in Articles V, VI, VII and XI regarding application of funds, allocations of Profit and Loss and Distributions of Net Cash Flow, to resolve any ambiguities that may result from such application and to provide the Owner Trustee and the Owners with clarification of any provision as may be necessary or appropriate. The determinations of the Administrator shall be binding upon the Owners.

ARTICLE VIII

AUTHORITY AND DUTIES OF THE OWNER TRUSTEE

Section 8.01    <u>General Authority</u>. The Owner Trustee is authorized to take all actions required or permitted to be taken by it pursuant to the terms of this Agreement, the Trust Related Agreements and the Statutory Trust Statute. The Owner Trustee is further authorized from time to time to take such action as the Administrator directs with respect to the Trust Related Agreements.

Section 8.02    <u>Specific Authority</u>. The Owner Trustee is hereby authorized and directed to take the following actions:

(a)    Execute the Certificate of Trust;

(b)    Execute and deliver the Administration Agreement and the Back-up Agreement and on behalf of the Trust, as well as the Trust Related Agreements, including without limitation, the Trust Certificates and any other document contemplated by the foregoing, in each case in such form as the Administrator shall approve, as evidenced conclusively by the Owner Trustee's execution thereof; and

(c)    Execute and deliver on behalf of the Trust any documents necessary or appropriate, in such form as the Administrator shall approve, as evidenced conclusively by the Owner Trustee's execution thereof, to cause the repurchase by TERI or the Trust, as the case may be, of any Student Loan Note required to be repurchased in accordance with the TERI Guaranty Agreements.

Section 8.03    <u>General Duties</u>. It shall be the duty of the Owner Trustee to discharge (or cause to be discharged) all of its responsibilities pursuant to the terms of this Agreement and to administer the Trust in the interest of the Owners. Notwithstanding the foregoing, the Owner Trustee shall be deemed to have discharged its duties and responsibilities hereunder and under the Trust Related Agreements to the extent the Administrator has agreed in the Administration Agreement to perform such acts or to discharge such duties of the Owner Trustee hereunder or under any Trust Related Agreement, and the Owner Trustee shall not be held liable for the default or failure of the Administrator to carry out its obligations under the Administration Agreement.

Section 8.04    Accounting and Reports to the Owners, the Internal Revenue Service and Others. The Administrator shall (a) maintain or cause to be maintained the books of the Trust on a fiscal year basis using the accrual method of accounting, (b) deliver to each Owner, within 60 days of the end of each Fiscal Year, or more often, as may be required by the Code and the Regulations thereunder, a copy of the annual financial statement of the Trust for such Fiscal Year and a statement in such form and containing such information as may be required by such Regulations, and as is necessary and appropriate to enable each Owner to prepare its federal and state income tax returns, (c) file such tax returns and reports relating to the Trust, and make such elections, including an election for the first taxable year of the Trust, as may be necessary for the Trust to qualify as a partnership, or as may from time to time be required under any applicable state or federal statute or rule or regulation thereunder, (d) cause such tax returns to be signed in the manner required by law, (e) collect or cause to be collected any withholding tax required by the Code to be withheld by the Owner Trustee with respect to distributions to Owners who are nonresident aliens or foreign corporations, and (f) cause to be mailed to each Owner copies of all such reports and tax returns of the Trust.

Section 8.05    Signature of Returns. The Owner Trustee shall sign on behalf of the Trust the tax returns and other Periodic Filings of the Trust, unless applicable law requires an Owner to sign such documents, in which case, so long as the Depositor is an Owner and applicable law allows the Depositor to sign any such document, the Depositor shall sign such document. At any time that the Depositor is not an Owner, or is otherwise not allowed by law to sign any such document, then the Owner required by law to sign such document shall sign.

Section 8.06    Right to Receive and Rely Upon Instructions. In the event that the Owner Trustee is unable to decide between alternative courses of action, or is unsure as to the application of any provision of this Agreement or any Trust Related Agreement, or such provision is ambiguous as to its application, or is or appears to be in conflict with any other applicable provision, or in the event that this Agreement or any Trust Related Agreement permits any determination by the Owner Trustee or is silent or is incomplete as to the course of action which the Owner Trustee is required to take with respect to a particular set of facts, the Owner Trustee may give notice (in such form as shall be appropriate under the circumstances) to the Owners requesting instructions and, to the extent that the Owner Trustee shall have acted or refrained from acting in good faith in accordance with any instructions received from the Owners, the Owner Trustee shall not be liable to any Person on account of such action or inaction. If the Owner Trustee shall not have received appropriate instructions within ten days of such notice (or within such shorter period of time as may be specified in such notice) the Owner Trustee may, but shall be under no duty to, take or refrain from taking such action, not inconsistent with this Agreement or the Trust Related Agreements, as the Owner Trustee shall deem to be in the best interests of the Owners, and the Owner Trustee shall have no liability to any Person for such action or inaction.

Section 8.07    No Duties Except as Specified in this Agreement or in Instructions. The Owner Trustee shall not have any duty or obligation to manage, make any payment in respect of, register, record, sell, dispose of or otherwise deal with the Trust Property, or to otherwise take or refrain from taking any action under, or in connection with, any document contemplated hereby to which the Owner Trustee or the Trust is a party, except as expressly provided by the terms of this Agreement, and no implied duties or obligations shall be read into this Agreement against the Owner Trustee. The Owner Trustee nevertheless agrees that it will, at its own cost and expense, promptly take all action as may be necessary to discharge any liens on any part of the Trust Property which result from claims against the Owner Trustee personally that are not related to the ownership or the administration of the Trust Property or the transactions contemplated by the Trust Related Agreements.

Section 8.08    No Action Except Under Specified Documents or Instructions. The Owner Trustee shall not manage, control, use, sell, dispose of or otherwise deal with any part of the Trust Property except (a) in accordance with the powers granted to and the authority conferred upon the Owner Trustee pursuant to this Agreement, and (b) in accordance with instructions delivered to the Owner Trustee pursuant to Section 8.06 and Article IV hereof.

Section 8.09    Restriction. Notwithstanding anything herein to the contrary, the Owner Trustee shall not take any action (a) that is inconsistent with the purposes of the Trust or (b) that would result in the Trust being treated as an association taxable as a corporation for Federal income tax purposes.

ARTICLE IX

CONCERNING THE OWNER TRUSTEE

Section 9.01    Acceptance of Trusts and Duties. The Owner Trustee accepts the trusts hereby created and agrees to perform its duties hereunder with respect to the same but only upon the terms of this Agreement. The Owner Trustee shall not be

personally liable under any circumstances, except (a) for its own willful misconduct or gross negligence, (b) for liabilities arising from the failure by the Owner Trustee to perform obligations expressly undertaken by it in the last sentence of Section 8.07, or (c) for taxes, fees or other charges on, based on or measured by any fees, commissions or compensation received by the Owner Trustee in connection with any of the transactions contemplated by this Agreement or the Trust Related Agreements. In particular, but not by way of limitation:

(i)       The Owner Trustee shall not be personally liable for any error of judgment made in good faith by an Authorized Officer of the Owner Trustee;

(ii)      The Owner Trustee shall not be personally liable with respect to any action taken or omitted to be taken by the Owner Trustee in good faith in accordance with the instructions of the Administrator or the Owners;

(iii)     No provision of this Agreement shall require the Owner Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of any of its rights or powers hereunder if the Owner Trustee shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it;

(iv)     Under no circumstance shall the Owner Trustee be personally liable for any indebtedness of the Trust under any Trust Related Agreement;

(v)      The Owner Trustee shall not be personally responsible for or in respect of the validity or sufficiency of this Agreement or for the due execution hereof by the Depositor, or for the form, character, genuineness, sufficiency, value or validity of any Student Loan or Trust Certificate (other than with respect to the due execution thereby by an Authorized Officer), or for or in respect of the validity or sufficiency of the Administration Agreement or the Trust Related Agreements; and

(vi)     The Owner Trustee shall not be liable for the default or misconduct of the Administrator under any of the Trust Related Agreements or otherwise and the Owner Trustee shall have no obligation or liability to perform the obligations of the Trust hereunder or under any Trust Related Agreement that are required to be performed by the Administrator under the Administration Agreement.

Section 9.02       Furnishing of Documents. The Owner Trustee shall furnish to the Owners, promptly upon receipt thereof, duplicates or copies of all material reports, notices, requests, demands, certificates, financial statements and any other instruments furnished to the Owner Trustee hereunder (other than documents originated by or otherwise furnished to such Owners).

Section 9.03       Reliance; Advice of Counsel.

(a)       The Owner Trustee shall incur no liability to anyone in acting upon any signature, instrument, notice, resolution, request, consent, order, certificate, report, opinion, note or other document or paper believed by it to be genuine and believed by it to be signed by the proper party or parties. The Owner Trustee may accept a certified copy of a resolution of the board of directors or other governing body of any corporate party as conclusive evidence that such resolution has been duly adopted by such body and that the same is in full force and effect. As to any fact or matter the manner of ascertainment of which is not specifically prescribed herein, the Owner Trustee may for all purposes hereof rely on a certificate, signed by the president or any vice president or by the treasurer or any assistant treasurer or the secretary of the relevant party, as to such fact or matter, and such certificate shall constitute full protection to the Owner Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon.

(b)       In the exercise or administration of the trusts hereunder and in the performance of its duties and obligations under any of the Trust Related Agreements, the Owner Trustee (i) may act directly or, at the expense of the Trust, through agents or attorneys pursuant to agreements entered into with any of them, and the Owner Trustee shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys shall have been selected by the Owner Trustee with reasonable care; and (ii) may, at the expense of the Trust, consult with counsel, accountants and other skilled persons to be selected with reasonable care and employed by it, and the Owner Trustee shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons.

Section 9.04       Not Acting in Individual Capacity. Except as expressly provided in this Article IX, in accepting the trusts hereby created, the Owner Trustee acts solely as trustee hereunder and not in its individual capacity, and all Persons having any claim

against the Owner Trustee by reason of the transactions contemplated by this Agreement or the Trust Related Agreements shall look only to the Trust Property for payment or satisfaction thereof.

        Section 9.05       <u>Representations and Warranties of Owner Trustee</u>. The Owner Trustee represents and warrants to the Depositor that (a) the Owner Trustee meets the requirements of (i) Rule 3a(7) promulgated under the Investment Company Act of 1940, as amended, and (ii) section 3807 of the Statutory Trust Statute and (b) the Owner Trustee or the Owner Trustee's parent entity has a combined capital and surplus of at least $50,000,000.

## ARTICLE X

## COMPENSATION OF OWNER TRUSTEE

        Section 10.01       <u>Owner Trustee's Fees and Expenses</u>. The Owner Trustee shall receive compensation from the Administrator and, to the extent not paid by the Administrator, from the Trust Property for its services hereunder as set forth in a separate fee agreement between The First Marblehead Corporation, the Depositor and the Owner Trustee. The Owner Trustee shall be entitled to be reimbursed by the Administrator and, to the extent not paid by the Administrator, from the Trust Property for its reasonable expenses hereunder, including the reasonable compensation, expenses and disbursements of such agents, representatives, experts and counsel as the Owner Trustee may employ in connection with the exercise and performance of its rights and duties under this Agreement and the Trust Related Agreements.

        Section 10.02       <u>Indemnification</u>. The National Collegiate Funding LLC and The Education Resources Institute, Inc. shall be jointly and severally liable for, and hereby agree to, indemnify Wilmington Trust Company, individually and as Owner Trustee, and its successors, assigns, agents and servants, from and against any and all liabilities, obligations, losses, damages, taxes (other than taxes incurred as the result of the payment of fees and expenses pursuant to Section 10.01), claims, actions, suits, costs, expenses and disbursements (including legal fees and expenses) of any kind and nature whatsoever which may be imposed on, incurred by or asserted at any time against the Owner Trustee (whether or not indemnified against by other parties) in any way relating to or arising out of this Agreement, any Trust Related Agreement, the administration of the Trust Property or the action or inaction of the Owner Trustee hereunder, except only that the Owners shall not be required to indemnify the Owner Trustee for expenses arising or resulting from any of the matters described in the second sentence of Section 9.01. The indemnities contained in this Section 10.02 shall survive the termination of this Agreement. The obligations of The National Collegiate Funding LLC and The Education Resources Institute, Inc. pursuant to this Section 10.02 shall be borne in proportion to their respective Percentage Interests. The indemnities contained in this Section 10.02 extend only to the Owner Trustee in its individual capacity.

        Section 10.03       <u>Lien on Trust Property</u>. Following the retirement of the Notes, the Owner Trustee shall have a lien on the Trust Property for any compensation or expenses and indemnity due hereunder which lien shall be prior to all other liens.

        Section 10.04       <u>Payments to the Owner Trustee</u>. Any amounts paid to the Owner Trustee from the Trust Property pursuant to this Article X shall be deemed not to be part of the Trust Property immediately after such payment.

## ARTICLE XI

## TERMINATION OF TRUST

        Section 11.01       <u>Termination of Trust</u>.

        (a)       The trust created hereby shall dissolve and terminate and, except as otherwise provided in this Article XI, this Agreement shall be of no further force or effect, upon the earlier of (i) if the Notes are no longer outstanding, the unanimous consent of the Owners, (ii) if the Notes are no longer outstanding, the sale or other final disposition by the Owner Trustee of the Trust Property and the final distribution by the Owner Trustee of all funds or other property or proceeds of the Trust Property in accordance with the terms of this Agreement and the Trust Related Agreements, and (iii) 21 years less one day after the death of the survivor of the

descendants living on the date of this Agreement of Joseph P. Kennedy, the late Ambassador of the United States to the Court of St. James.

(b)      The bankruptcy, death, incapacity, dissolution or termination of any Owner shall not operate to dissolve or terminate this Agreement, nor entitle such Owner's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust Property, nor otherwise affect the rights, obligations and liabilities of the parties hereto.

(c)      Upon the termination of the Trust pursuant to this Article XI, the Owner Trustee shall cause a Certificate of Termination to be filed with the Secretary of State.

Section 11.02      Distribution of Assets. Upon dissolution and termination of the Trust, the Owner Trustee shall take full account of the Trust assets and liabilities, shall liquidate the assets as promptly as is consistent with obtaining the fair value thereof, and shall apply and distribute the proceeds therefrom in the following order:

(a)      To the payment of the expenses of liquidation and the debts and liabilities of the Trust;

(b)      To the setting up of reserves which the Owner Trustee may deem necessary or appropriate for anticipated obligations or contingencies of the Trust arising out of or in connection with the operation of the Trust. Such reserves may be paid over by the Owner Trustee to an escrow agent or trustee selected by the Owner Trustee to be disbursed by such escrow agent or trustee in payment of any of such obligations or contingencies and, if any balance remains at the expiration of such period as the Owner Trustee shall deem advisable, to be distributed by such escrow agent or trustee in the manner hereinafter provided;

(c)      To each of the Owners, other than TERI, in accordance with the positive balances in each such Owner's Capital Account to the extent of the aggregate unreturned Capital Contributions of such Owner credited therein; and

(d)      To the Owners, the balance of any proceeds in accordance with the positive balances in their respective Capital Accounts; provided that with respect to any distribution to TERI, such distribution shall be reduced by the amount of money paid to TERI by the Trust in accordance with paragraph 4 of the Section 2.05 Supplement to Master Loan Guaranty Agreement between TERI and The First Marblehead Corporation dated April 30, 2001 less the amount by which aggregate Distributions to TERI of Net Cash Flow pursuant to Section 7.06 hereof have been reduced by the application of subsection (iii) thereof, and any such reduction shall be distributed to the Owners other than TERI in accordance with the positive balances in their respective Capital Accounts.

If, at the time of liquidation, the Owner Trustee shall determine that an immediate sale of some or all of the assets would cause undue loss to the Owners, the Owner Trustee may, in order to avoid such loss and with the consent of the Owners, defer liquidation.

Section 11.03      No Termination by Depositor or Owners. Except as provided in Section 11.01, neither the Depositor nor the Owners shall be entitled to terminate or revoke the Trust established hereunder.

ARTICLE XII

SUCCESSOR OWNER TRUSTEES AND ADDITIONAL OWNER TRUSTEES

Section 12.01      Resignation of Owner Trustee; Appointment of Successor.

(a)      The Owner Trustee may resign at any time without cause by giving at least 60 days' prior written notice to the Administrator, the Owners and the Administrative Agent, such resignation to be effective upon the acceptance of appointment by a successor Owner Trustee under Section 12.01(b). In addition, the Super-majority Owners may at any time remove the Owner Trustee without cause by an instrument in writing delivered to the Owner Trustee and the Administrator, such removal to be effective upon the acceptance of appointment by a successor Owner Trustee under Section 12.01(b). In case of the resignation or removal of the Owner Trustee, the Owners may appoint a successor Owner Trustee by an instrument signed by the Owners. If a successor Owner Trustee shall not have been appointed within 30 days after the giving of written notice of such resignation or the delivery of the written notice with respect to such removal, the Owner Trustee or the Owners may apply to any court of competent jurisdiction to appoint

a successor Owner Trustee to act until such time, if any, as a successor Owner Trustee shall have been appointed as provided above. Any successor Owner Trustee so appointed by such court shall immediately and without further act be superseded by any successor Owner Trustee appointed as above provided within one year from the date of the appointment by such court.

(b)        Any successor Owner Trustee, however appointed, shall execute and deliver to the predecessor Owner Trustee an instrument accepting such appointment, and thereupon such successor Owner Trustee, without further act (except for the filing required under clause (e) below), shall become vested with all the estates, properties, rights, powers, duties and trust of the predecessor Owner Trustee in the trusts hereunder with like effect as if originally named the Owner Trustee herein; but nevertheless, upon the written request of such successor Owner Trustee and the payment of all fees and indemnities due the predecessor Owner Trustee, such predecessor Owner Trustee shall execute and deliver an instrument transferring to such successor Owner Trustee, upon the trusts herein expressed, all the estates, properties, rights, powers, duties and trusts of such predecessor Owner Trustee, and such predecessor Owner Trustee shall duly assign, transfer, deliver and pay over to such successor Owner Trustee all funds or other property then held or subsequently received by such predecessor Owner Trustee upon the trusts herein expressed.

(c)        Any successor Owner Trustee, however appointed, shall be a bank or trust company (i) that meets the requirements of (A) Rule 3(a)(7) promulgated under the Investment Company Act of 1940, as amended, and (B) section 3807 of the Statutory Trust Statute and (ii) whose parent entity has a combined capital and surplus of at least $50,000,000, if there be such an institution willing, able and legally qualified to perform the duties of the Owner Trustee hereunder upon reasonable or customary terms.

(d)        Any corporation into which the Owner Trustee may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Owner Trustee shall be a party, or any corporation to which substantially all the corporate trust business of the Owner Trustee may be transferred, shall, subject to the terms of Section 12.01(c), be the Owner Trustee under this Agreement without further act.

(e)        Any successor Owner Trustee appointed pursuant to this Article XII shall file an amendment to the Certificate of Trust with the Secretary of State reflecting the name and principal place of business of such successor Owner Trustee.

Section 12.02        Appointment of Additional Owner Trustees. At any time or times for the purpose of meeting any legal requirements of any jurisdiction in which any part of the Trust Property may at the time be located, the Owner Trustee and the Administrator, acting jointly, by an instrument in writing, may appoint one or more individuals or corporations approved by the Administrator and the Owner Trustee to act as separate trustee or separate trustees of all or any part of the Trust Property to the full extent that local law makes it necessary or appropriate for such separate trustee or separate trustees to act alone. If the Administrator shall not have joined in such appointment within fifteen days after the receipt of such request, the Owner Trustee, acting alone, shall have the power to make such appointment.

ARTICLE XIII

TAX MATTERS PARTNER

Section 13.01        Tax Matters Partner. The tax matters partner (within the meaning of section 6231(a)(7) of the Code and applicable Regulations) of the Trust for all federal income tax purposes set forth in the Code shall be The National Collegiate Funding LLC. Subject to Section 13.08, the tax matters partner shall have the authority to represent the Trust and perform the duties imposed on the tax matters partner under the Code, and as set forth in this Article XIII.

Section 13.02        Notice of Tax Audit. The tax matters partner shall give prompt notice to the Owners upon receipt of advice that the Internal Revenue Service intends to examine Trust income tax returns for any year.

Section 13.03        Authority to Extend Period for Assessing Tax. Subject to Section 13.08, the tax matters partner shall have the authority to extend the period for assessing any tax imposed on any Owner under the Code by any agreement as provided for under section 6229(b)(1)(B) of the Code.

Section 13.04        Choice of Forum for Filing Petition for Readjustment. Any petition for readjustment may, but is not required to, be filed by the tax matters partner in accordance with section 6226(a) of the Code in the United States District Court for the

district in which the Trust's principal place of business is located or the United States Claims Court.

Section 13.05    Authority to Bind Owners by Settlement Agreement. Subject to Section 13.08, the tax matters partner shall enter into a settlement agreement in accordance with section 6224(c)(3) of the Code as directed by the Owners.

Section 13.06    Notices Sent to the Internal Revenue Service. The tax matters partner shall use its best efforts to furnish to the Internal Revenue Service the name, address, profits interest and taxpayer identification number of each Owner and any additional information it receives from each Owner regarding any change in that Owner's name, address, profits interest and taxpayer identification number. In no event shall the tax matters partner be liable, responsible or accountable in damages or otherwise to the Owner for any loss in connection with furnishing such information to the Internal Revenue Service if the tax matters partner acts in good faith and is not guilty of fraud or gross negligence.

Section 13.07    Indemnification of Tax Matters Partner. The Trust shall indemnify and save harmless the tax matters partner against any loss, damage, cost or expense (including attorneys' fees) incurred by it as a result of any act performed or omitted on behalf of the Trust or any Owner or in furtherance of the Trust's interests or the interests of the Owner, in its capacity as tax matters partner, without, however, relieving the tax matters partner of liability for bad faith, fraud or gross negligence.

Section 13.08    Approval of Tax Matters Partner's Decisions. The tax matters partner shall call a meeting of the Owners at any time in order to discuss any decisions the tax matters partner may propose to make, notice of which shall be included in the notice of such meeting. The tax matters partner shall make no decision and take no action with respect to the determination, assessment or collection of any tax imposed by the Code on the Owners unless and until such decision has been approved by the Owners.

Section 13.09    Participation by Owners in Internal Revenue Service Administrative Proceedings. Nothing contained in this Article XIII shall be construed to take away from any Owner any right granted to such person by the Code to participate in any manner in administrative proceedings of the Internal Revenue Service.

ARTICLE XIV

MISCELLANEOUS

Section 14.01    Supplements and Amendments.

(a)    This Agreement may be amended only by a written instrument signed by the Owner Trustee and all of the Owners at the time of such amendment and upon satisfaction of the Rating Agency Condition (as defined in the Indenture); provided, however, that if, in the opinion of the Owner Trustee, any instrument required to be so executed adversely affects any right, duty or liability of, or immunity or indemnity in favor of, the Owner Trustee under this Agreement or any of the documents contemplated hereby to which the Owner Trustee or the Trust is a party, or would cause or result in any conflict with or breach of any terms, conditions or provisions of, or default under, the charter documents or by-laws of the Owner Trustee or any document contemplated hereby to which the Owner Trustee is a party, the Owner Trustee may in its sole discretion decline to execute such instrument. The Certificate of Trust shall be amended (except as required by the Statutory Trust Statute) only upon satisfaction of the Rating Agency Condition (as defined in the Indenture). The Owner Trustee shall be fully protected in relying upon a certificate of the Administrator in determining if the Rating Agency Condition (as defined in the Indenture) has been satisfied.

(b)    The Trust shall not change its jurisdiction of formation without first satisfying the Rating Agency Condition (as defined in the Indenture).

Section 14.02    No Legal Title to Trust Property in Owner. Legal title to all Trust Property shall be vested at all times in the Trust as a separate legal entity, except where the laws of any jurisdiction require title to be vested in a trustee in which case legal title shall be vested in the Owner Trustee on behalf of the Trust. The Owners shall not have legal title to any part of the Trust Property and shall only have an undivided beneficial interest therein. No transfer, by operation of law or otherwise, of any right, title and interest of the Owners in and to their undivided Beneficial Interests in the Trust Property hereunder shall operate to terminate this Agreement or the trusts hereunder or entitle any successor transferee to an accounting or to the transfer to it of legal title to any part of the Trust Property.

Section 14.03    Pledge of Collateral by Owner Trustee is Binding. The pledge of any Trust Property to any Person by the Owner Trustee made under any Trust Related Agreement and pursuant to the terms of this Agreement shall bind the Owners and shall be effective to transfer or convey the rights of the Owner Trustee and the Owners in and to such Trust Property to the extent set forth in such Trust Related Agreement. No purchaser or other grantee shall be required to inquire as to the authorization, necessity, expediency or regularity of such pledge or as to the application of any proceeds with respect thereto by the Owner Trustee.

Section 14.04    Limitations on Rights of Others. Nothing in this Agreement, whether express or implied, shall be construed to give to any Person other than the Owner Trustee, the Administrator and the Owners any legal or equitable right, remedy or claim in the Trust Property or under or in respect of this Agreement or any covenants, conditions or provisions contained herein provided, however, that for so long as any of the Notes are outstanding or any amounts are owed to the Indenture Trustee, the Noteholders are third party beneficiaries hereof.

Section 14.05    Notices. Unless otherwise expressly specified or permitted by the terms hereof, all notices shall be in writing and delivered by hand or mailed by certified mail, postage prepaid, if to the Owner Trustee, addressed to: Wilmington Trust Company, 1100 North Market Street, Wilmington, Delaware, 19890, Attention: Corporate Trust Administration, or to such other address as the Owner Trustee may have set forth in a written notice to the Owners; and if to an Owner, addressed to it at the address set forth for such Owner in the register maintained by the Owner Trustee. Whenever any notice in writing is required to be given by the Owner Trustee hereunder, such notice shall be deemed given and such requirement satisfied 72 hours after such notice is mailed by certified mail, postage prepaid, addressed as provided above; any notice given by an Owner to the Owner Trustee shall be effective upon receipt by an Authorized Officer of the Owner Trustee. A copy of any notice delivered to the Owner Trustee shall also be delivered to the Administrator, addressed to: First Marblehead Data Services, Inc., The Prudential Tower, 800 Boylston Street - 34th Floor, Boston, MA 02199-8157, Attention: Ms. Rosalyn Bonaventure, with a copy to First Marblehead Corporation, The Prudential Tower, 800 Boylston Street - 34th Floor, Boston, MA 02199-8157, Attention: Corporate Trust Administration, or to such other addresses as the Administrator may have set forth in a written notice to the Owner Trustee.

Section 14.06    Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 14.07    Separate Counterparts. This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 14.08    Successors and Assigns. All covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the Owner Trustee and its successors and assigns and each Owner and its successors and permitted assigns, all as herein provided. Any request, notice, direction, consent, waiver or other instrument or action by an Owner shall bind the successors and assigns of such Owner.

Section 14.09    Headings. The headings of the various Articles and Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

Section 14.10    Governing Law. This Agreement shall in all respects be governed by, and construed in accordance with, the laws of the State of Delaware (excluding conflict of law rules), including all matters of construction, validity and performance.

Section 14.11    General Interpretive Principles. For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)    The defined terms in this Agreement include the plural as well as the singular, and the use of any gender herein shall be deemed to include any other gender;

(b)    Accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date hereof;

(c)      References herein to "Articles," "Sections," "paragraphs" and other subdivisions without reference to a document are to designated Articles, Sections, paragraphs and other subdivisions of this Agreement;

(d)      A reference to a paragraph without further reference to a Section is a reference to such paragraph as contained in the same Section in which the reference appears, and this rule shall also apply to subparagraphs and other subdivisions;

(e)      The words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)      The term "include" or "including" shall mean without limitation by reason of enumeration.

---

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to the duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

WILMINGTON TRUST COMPANY, not in its individual capacity except as expressly provided herein, but solely as Owner Trustee

By:    /s/ Michele C. Harra
       Name:    Michele C. Harra
       Title:    Financial Services Officer

THE NATIONAL COLLEGIATE FUNDING, LLC, as Depositor and Owner

By:    GATE Holdings, Inc., Member

       By:    /s/ John A. Hupalo
           Name:    John A. Hupalo
           Title:    President

THE EDUCATION RESOURCES INSTITUTE, INC., as Owner

By:    /s/ Willis J. Hulings III
       Name:    Willis J. Hulings III
       Title:    President and Chief Executive Officer

ACKNOWLEDGED WITH RESPECT
TO THE POWER ATTORNEY
GRANTED IN SECTION 4.05

FIRST MARBLEHEAD DATA SERVICES, INC.

By:    /s/ Rosalyn Bonaventure
       Name:    Rosalyn Bonaventure
       Title:    President

**SCHEDULE A**

| Owners | Capital Contributions ($) | Sharing Ratio (%) | Percentage Interest (%) |
|---|---|---|---|
| The National Collegiate Funding LLC | $1.00 | 75.2748%* | 75.2748%* |
| The Education Resources Institute, Inc. | None | 24.7252%* | 24.7252%* |

\* Subject to final reconciliation.

**SCHEDULE B**

*Loan Originators*

Bank of America, N.A.

Charter One Bank, N.A.

Citizens Bank of Rhode Island

First National Bank Northeast

GMAC Bank

HSBC Bank USA, National Association

The Huntington National Bank

JPMorgan Chase Bank, N.A. (as successor to Bank One, N.A.)

KeyBank, N.A.

Manufacturers and Traders Trust Company

National City Bank

PNC Bank, N.A.

Sovereign Bank

SunTrust Bank

TCF National Bank.

U.S. Bank, N.A.

**SCHEDULE C**

*Loan Purchase Agreements*

Each of the Note Purchase Agreements, as amended or supplemented, was entered into by and between The First Marblehead Corporation and:

- Bank of America, N.A., dated April 30, 2001, for loans that were originated under Bank of America's BAGEL Loan Program, TERI Alternative Loan Program and ISLP Loan Program.
- Bank of America, N.A., dated June 30, 2006, for loans that were originated under Bank of America's BAGEL Loan Program, TERI Alternative Loan Program and ISLP Loan Program.
- Bank of America, N.A., dated June 30, 2003, for loans that were originated under Bank of America's Direct to Consumer Loan Program.
- Bank of America, N.A., dated April 1, 2006, for loans that were originated under Bank of America's Direct to Consumer Loan Program.
- Charter One Bank, N.A., dated as of December 29, 2003 for loans that were originated under Charter One's AAA Southern New England Bank Loan Program.
- Charter One Bank, N.A., dated October 31, 2003, for loans that were originated under Charter One's AES EducationGAIN Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's CFS Direct to Consumer Loan Program.
- Charter One Bank, N.A., dated June 30, 2003, for loans that were originated under Charter One's Citibank Education Assistance Loan Program.
- Charter One Bank, N.A., dated July 1, 2002, for loans that were originated under Charter One's College Loan Corporation Loan Program.
- Charter One Bank, N.A., dated December 1, 2003, for loans that were originated under Charter One's Custom Educredit Loan Program.
- Charter One Bank, N.A., dated May 10, 2004, for loans that were originated under Charter One's EdFinancial Loan Program.
- Charter One Bank, N.A., dated September 15, 2003, for loans that were originated under Charter One's Extra Credit II Loan Program (North Texas Higher Education).
- Charter One Bank, N.A., dated September 20, 2003, for loans that were originated under Charter One's M&I Alternative Loan Program.
- Charter One Bank, N.A., dated November 17, 2003, for loans that were originated under Charter One's National Education Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's NextStudent Alternative Loan Program.
- Charter One Bank, N.A., dated March 26, 2004, for loans that were originated under Charter One's NextStudent Private Consolidation Loan Program.
- Charter One Bank, N.A., dated March 25, 2004, for loans that were originated under Charter One's Astrive and AstriveAlliance Education Loan Programs.
- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's WAMU Alternative Student Loan Program.
- Charter One Bank, N.A., dated February 15, 2005, for loans that were originated under Charter One's Referral Loan Program (including loans in the UPromise Alternative Loan Program, Collegiate Solutions Alternative Loan Program, College Board Alternative Loan Program, Axiom Alternative Loan Program, and ThinkFinancial Alternative Loan Program).
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Alternative Loan Program, Compass Bank Alternative Loan Program, FinanSure Alternative Loan Program, Navy Federal Alternative Loan Program, and Xanthus Alternative Loan Program.
- Citizens Bank of Rhode Island, dated October 1, 2002, for loans that were originated under Citizens Bank of Rhode Island's Penn State Undergraduate Loan Program.
- First National Bank Northeast, dated August 1, 2001, for loans that were originated under First National Bank Northeast's Nelnet Undergraduate Alternative Loan Program.
- GMAC Bank, dated May 30, 2003, for loans that were originated under GMAC Bank's Alternative Loan Program
- HSBC Bank USA, National Association, dated April 17, 2002, as amended on June 2, 2003 and August 1, 2003, for loans that were originated under the HSBC Loan Program.
- The Huntington National Bank, dated May 20, 2003, for loans that were originated under The Huntington National Bank's Huntington Bank Education Loan Program.

- JPMorgan Chase Bank, N.A,, (successor to Bank One, N.A.), dated May 1, 2002, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program, EDUCATION ONE Loan Program, and Campus One Loan Program.
- KeyBank, dated May 12, 2006, for loans that were originated under KeyBank's Private Education Loan Program.
- Manufacturers and Traders Trust Company, dated April 29, 2004, for loans that were originated under Manufacturers and Traders Trust Company's Alternative Loan Program.
- National City Bank, dated November 13, 2002, for loans that were originated under National City Bank's National City Loan Program.
- National City Bank, dated July 21, 2006, for loans that were originated under National City Bank's Referral Loan Program, including the Astute Private Loan Program.
- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's Alternative Conforming Loan Program, Brazos Alternative Loan Program, Edvisors Alternative Loan Program, GE Money Bank Alternative Loan Prorgam, Old National Bank Alternative Loan Program, Regions Bank Alternative Loan Program, and Varsity Group Alternative Loan Program.
- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Loan Program.
- SunTrust Bank, dated March 1, 2002, for loans that were originated under SunTrust Bank's SunTrust Alternative Loan Program.
- TCF National Bank, dated July 22, 2005, for loans that were originated under TCF National Bank's Alternative Loan Program.
- U.S. Bank, N.A., dated May 1, 2005, for loans that were originated under U.S Bank's Alternative Loan Program.

## SCHEDULE D

*Guaranty Agreements*

Each of the following Guaranty Agreements, as amended or supplemented, was entered into by and between The Education Resources Institute, Inc. and:

- Bank of America, N.A., dated April 30, 2001, for loans that were originated under Bank of America's BAGEL Loan Program, TERI Loan Program and ISLP Loan Program.
- Bank of America, N.A., dated June 30, 2006, for loans that were originated under Bank of America's BAGEL Loan Program, TERI Loan Program and ISLP Loan Program.
- Bank of America, N.A., dated June 30, 2003, for loans that were originated under Bank of America's Direct to Consumer Loan Program.
- Charter One Bank, N.A., dated as of December 29, 2003 for loans that were originated under Charter One's AAA Southern New England Bank Loan Program.
- Charter One Bank, N.A., dated October 31, 2003, for loans that were originated under Charter One's AES EducationGAIN Loan Program.
- Charter One Bank, N.A., dated March 25, 2004, for loans that were originated under Charter One's Astrive and AstriveAlliance Education Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's CFS Direct to Consumer Loan Program.
- Charter One Bank, N.A., dated June 30, 2003, for loans that were originated under Charter One's Citibank Education Assistance Loan Program.
- Charter One Bank, N.A., dated July 1, 2002, for loans that were originated under Charter One's College Loan Corporation Loan Program.
- Charter One Bank, N.A., dated December 1, 2003, for loans that were originated under Charter One's Custom Educredit Loan Program.
- Charter One Bank, N.A., dated May 10, 2004, for loans that were originated under Charter One's Edfinancial Loan Program.
- Charter One Bank, N.A., dated September 15, 2003, for loans that were originated under Charter One's Extra Credit II Loan Program (North Texas Higher Education).
- Charter One Bank, N.A., dated September 20, 2003, for loans that were originated under Charter One's M&I Alternative Loan Program.
- Charter One Bank, N.A., dated November 17, 2003, for loans that were originated under Charter One's National Education Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's NextStudent Alternative Loan Program.
- Charter One Bank, N.A., dated March 26, 2004, for loans that were originated under Charter One's NextStudent Private Consolidation Loan Program.
- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's WAMU Alternative Student Loan Program.
- Charter One Bank, N.A., dated February 15, 2005, for loans that were originated under Charter One's Referral Loan Program, including the UPromise Alternative Loan Program, Collegiate Solutions Alternative Loan Program, College Board Alternative Loan Program, Axiom Alternative Loan Program, and ThinkFinancial Alternative Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Alternative Loan Program, Compass Bank Alternative Loan Program, FinanSure Alternative Loan Program, Navy Federal Alternative Loan Program, and Xanthus Alternative Loan Program.
- Citizens Bank of Rhode Island, dated October 1, 2002, for loans that were originated under Citizens Bank of Rhode Island's Penn State Undergraduate Loan Program.
- First National Bank Northeast, dated August 1, 2001, for loans that were originated under First National Bank Northeast's CASL Undergraduate Alternative Loan Program.
- GMAC Bank, dated May 30, 2003, for loans that were originated under GMAC Bank's Alternative Loan Program.
- HSBC Bank USA, National Association, dated April 17, 2002, for loans that were originated under the HSBC Loan Program.
- The Huntington National Bank, dated May 20, 2003, for loans that were originated under The Huntington National Bank's Huntington Bank Education Loan Program.
- JPMorgan Chase Bank, N.A., (successor to Bank One, N.A.,) dated May 13, 2002, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program, EDUCATION ONE Loan Program, and Campus One Loan Program.
- KeyBank, dated May 12, 2006, for loans that were originated under KeyBank's Private Education Loan Program.
- Manufacturers and Traders Trust Company, dated April 29, 2004, for loans that were originated under Manufacturers and

Traders Trust Company's Alternative Loan Program.

- National City Bank, dated July 26, 2002, for loans that were originated under National City Bank's National City Loan Program.
- National City Bank, dated July 21, 2006, for loans that were originated under National City Bank's Referral Loan Program, including the Astute Private Loan Program.
- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's Alternative Conforming Loan Program, Brazos Alternative Loan Program, Edvisors Alternative Loan Program, GE Money Bank Alternative Loan Prorgam, Old National Bank Alternative Loan Program, Regions Bank Alternative Loan Program, and Varsity Group Alternative Loan Program
- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Loan Program.
- SunTrust Bank, dated March 1, 2002, for loans that were originated under SunTrust Bank's SunTrust Alternative Loan Program.
- TCF National Bank, dated July 22, 2005, for loans that were originated under TCF National Bank's Alternative Loan Program.
- U.S. Bank, N.A., dated May 1, 2005, for loans that were originated under U.S Bank's Alternative Loan Program.

---

EXHIBIT 1

FORM OF TRUST CERTIFICATE

THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4

TRUST CERTIFICATE

**THE BENEFICIAL INTEREST IN THE TRUST REPRESENTED BY THIS TRUST CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAW, AND MAY NOT BE DIRECTLY OR INDIRECTLY OFFERED OR SOLD OR OTHERWISE DISPOSED OF (INCLUDING PLEDGED) BY THE HOLDER HEREOF UNLESS IN THE OPINION OF COUNSEL SATISFACTORY TO THE OWNER TRUSTEE, SUCH TRANSACTION IS EXEMPT FROM REGISTRATION UNDER THE ACT AND STATE SECURITIES LAWS. THE TRANSFER OF THIS TRUST CERTIFICATE WILL NOT BE EFFECTIVE UNLESS THE TRANSFEREE HAS DELIVERED TO THE OWNER TRUSTEE A LETTER IN THE FORM REQUIRED BY SECTION 3.04(A) OF THE TRUST AGREEMENT AND THE TRANSFEREE PROVIDES THE OWNER TRUSTEE WITH EVIDENCE SATISFACTORY TO THE OWNER TRUSTEE DEMONSTRATING THE TRANSFEROR'S COMPLIANCE WITH SECTION 3.04(B) OF THE TRUST AGREEMENT.**

TRUST CERTIFICATE
UNDER THE TRUST AGREEMENT, DATED
as of December 7, 2006

Certificate No. _____

Wilmington Trust Company, not in its individual capacity, but solely as owner trustee (the "Owner Trustee") under the Trust Agreement, dated as of December 7, 2006, with The National Collegiate Funding LLC and The Education Resources Institute, Inc., on behalf of the holders from time to time (each an "Owner") of beneficial interests in the trust created thereby (the "Trust Agreement"), hereby certifies that _____ is the owner of an undivided beneficial interest equal to the percentage listed on Schedule A to the Trust Agreement in the Trust Property provided for and created by the Trust Agreement. This Trust Certificate is issued pursuant to and is entitled to the benefits of the Trust Agreement, and each Owner by acceptance hereof shall be bound by the terms of the Trust Agreement. Reference is hereby made to the Trust Agreement for a statement of the rights and obligations of the Owner hereof. The Owner Trustee may treat the person shown on the register maintained by the Owner Trustee pursuant to Section 3.02 of the Trust Agreement as the absolute Owner hereof for all purposes.

Capitalized terms used herein without definition have the meanings ascribed to them in or by reference in the Trust Agreement.

Transfer of this Trust Certificate is subject to certain restrictions and limitations set forth in the Trust Agreement, including the requirement that any transfer requires the prior consent of owners of at least 85% of the Percentage Interests in the Trust. In the manner more fully set forth in, and as limited by, the Trust Agreement, this Trust Certificate may be transferred upon the books of the Owner Trustee by the registered Owner in person or by his attorney duly authorized in writing upon surrender of this Trust Certificate to the Owner Trustee accompanied by a written instrument of transfer and with such signature guarantees and evidence of authority of the Persons signing the instrument of transfer as the Owner Trustee may reasonably require, whereupon the Owner Trustee shall issue in the name of the transferee a Trust Certificate or Trust Certificates evidencing the amount and extent of interest of the transferee.

The Owner hereof, by its acceptance of this Trust Certificate, warrants and represents to the Owner Trustee and to the Owners of the other Trust Certificates issued under the Trust Agreement and agrees not to transfer this Trust Certificate except in accordance with the Trust Agreement.

This Trust Certificate may not be acquired or held by a Plan. By accepting and holding this Trust Certificate, the Owner hereof shall be deemed to have represented and warranted that it is not a Plan.

This Trust Certificate and the Trust Agreement shall in all respects be governed by, and construed in accordance with, the laws of the State of Delaware (excluding conflict of law rules), including all matters of construction, validity and performance.

IN WITNESS WHEREOF, the Owner Trustee, pursuant to the Trust Agreement, has caused this Trust Certificate to be issued as of the date hereof.

WILMINGTON TRUST COMPANY, not in its individual capacity , but solely as Owner Trustee

By: _____

     Name:

     Title:

Dated: _____

**EXHIBIT 2**

**FORM OF ACCESSION AGREEMENT**

_____, _____

Wilmington Trust Company
1100 North Market Street
Wilmington, Delaware 19890
Attention:

Dear Sirs:

We refer to the Trust Agreement, dated as of December 7, 2006 (the "Trust Agreement"), among The National Collegiate Funding LLC (the "Company"), The Education Resources Institute, Inc. and Wilmington Trust Company, a Delaware banking corporation (in its capacity as trustee thereunder, the "Owner Trustee"). We propose to purchase a beneficial interest in The National Collegiate Student Loan Trust 2006-4, a Delaware statutory trust (the "Trust") formed pursuant to the Trust Agreement. Capitalized terms used herein without definition have the meanings given them in the Trust Agreement.

1. We understand that our Trust Certificate is not being registered under the Securities Act of 1933, as amended (the "1933 Act"), or any state securities or "Blue Sky" law and is being sold to us in a transaction that is exempt from the registration requirements of the 1933 Act and any applicable state laws.

2. We have knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Trust, we are able to bear the economic risk of investment in the Trust and we are an "accredited investor" as defined in Regulation D under the 1933 Act.

3. We acknowledge that none of the Trust, the Company or the Owner Trustee has advised us concerning the federal or state income tax consequences of owning a beneficial interest in the Trust, including the tax status of the Trust or the likelihood that distributions from the Trust would be characterized as "unrelated business income" for federal tax purposes, and we have consulted with our own tax advisor with respect to such matters.

4. We are acquiring our Trust Certificate for our own account and not for the benefit of any other person and not with a view to any distribution of our beneficial interest in the Trust subject, nevertheless, to the understanding that disposition of our property shall at all times be and remain within our control.

5. We agree that our beneficial interest in the Trust must be held indefinitely by us unless subsequently registered under the 1933 Act and any applicable state securities or "Blue Sky" law or unless exemptions from the registration requirements of the 1933 Act and applicable state laws are available.

6. We agree that in the event that at some future time we wish to dispose of or exchange any of our beneficial interest in the Trust, we will not transfer or exchange any of our beneficial interest in the Trust unless we have obtained the prior written consent to such transfer or exchange pursuant to Section 3.04 of the Trust Agreement, and either:

   (A) (1) the transfer or exchange is made to an Eligible Purchaser (as defined below), (2) a letter to substantially the same effect as this letter is executed promptly by such Eligible Purchaser, and (3) all offers or solicitations in connection with the sale (if a sale), whether made directly or through any agent acting on our behalf, are limited only to Eligible Purchasers and are not made by means of any form of general solicitation or general advertising whatsoever; or

   (B) our beneficial interest in the Trust is sold in a transaction that does not require registration under the 1933 Act and any applicable State "Blue Sky" law.

"Eligible Purchaser" means a corporation, partnership or other entity which we have reasonable grounds to believe and do believe can make representations with respect to itself to substantially the same effect as the representations set forth herein.

7.  We understand that our Trust Certificate bears a legend to substantially the following effect:

THE BENEFICIAL INTEREST IN THE TRUST REPRESENTED BY THIS TRUST CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAW, AND MAY NOT BE DIRECTLY OR INDIRECTLY OFFERED OR SOLD OR OTHERWISE DISPOSED OF (INCLUDING PLEDGED) BY THE HOLDER HEREOF UNLESS IN THE OPINION OF COUNSEL SATISFACTORY TO THE OWNER TRUSTEE SUCH TRANSACTION IS EXEMPT FROM REGISTRATION UNDER THE ACT AND STATE SECURITIES LAWS. THE TRANSFER OF THIS TRUST CERTIFICATE WILL NOT BE EFFECTIVE UNLESS THE TRANSFEREE HAS DELIVERED TO THE OWNER TRUSTEE A LETTER IN THE FORM REQUIRED BY SECTION 3.04(A) OF THE TRUST AGREEMENT AND THE TRANSFEREE PROVIDES THE OWNER TRUSTEE WITH EVIDENCE SATISFACTORY TO THE OWNER TRUSTEE DEMONSTRATING THE TRANSFEROR'S COMPLIANCE WITH SECTION 3.04(B) OF THE TRUST AGREEMENT.

8.  We agree to be bound by all terms and conditions of our Trust Certificate and the Trust Agreement.

Very truly yours,

_____
Name of Purchaser

By: _____
    Name:
    Title:

Accepted and Acknowledged this _____th day of _____, _____.

WILMINGTON TRUST COMPANY, not in its individual capacity, but solely as Owner Trustee

By: _____
    Name:
    Title:

# Exhibit F

Exhibit F

EX-99.7 11 d719505.htm TRUST AGREEMENT

**EXHIBIT 99.7**

---

**THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4**

TRUST AGREEMENT

Among

WILMINGTON TRUST COMPANY
as OWNER TRUSTEE

and

THE NATIONAL COLLEGIATE FUNDING LLC
and THE EDUCATION RESOURCES INSTITUTE, INC.
as OWNERS

Dated as of
September 20, 2007

---

TABLE OF CONTENTS

ARTICLE I

DEFINITIONS

Section        Capitalized Terms
1.01

# ARTICLE II

## ORGANIZATION

Section 2.01    Name

Section 2.02    Office

Section 2.03    Purposes and Powers.

Section 2.04    Appointment of the Owner Trustee

Section 2.05    Declaration of Trust

Section 2.06    No Liability of Owners for Expenses or Obligations of Trust

Section 2.07    Situs of Trust

# ARTICLE III

## TRUST CERTIFICATES AND TRANSFER OF INTEREST

Section 3.01    Issuance of Trust Certificate.

Section 3.02    Registration and Transfer of Certificates.

Section 3.03    Lost, Stolen, Mutilated or Destroyed Certificates

Section 3.04    Limitation on Transfer of Ownership Rights.

Section 3.05    Assignment of Right to Distributions

# ARTICLE IV

## CONCERNING THE OWNERS

Section 4.01    Action by Owners with Respect to Certain Matters.

Section 4.02    Action Upon Instructions.

Section 4.03    Super-majority Control

Section 4.04    Representations and Warranties of the Depositor

Section 4.05    Power of Attorney.

# ARTICLE V

## INVESTMENT AND APPLICATION OF TRUST FUNDS

Section 5.01    Investment of Trust Funds

Section 5.02    Application of Funds

ARTICLE VI

CAPITAL

| Section 6.01 | Tax Characterization |
| Section 6.02 | Initial Capital Contributions of Owners |
| Section 6.03 | Capital Accounts |
| Section 6.04 | Interest |
| Section 6.05 | No Additional Capital Contributions |
| Section 6.06 | Investment of Capital Contributions |
| Section 6.07 | Repayment and Return of Capital Contributions |

ARTICLE VII

ALLOCATION OF PROFIT AND LOSS; DISTRIBUTIONS

| Section 7.01 | Profit |
| Section 7.02 | Loss |
| Section 7.03 | Special Allocations. |
| Section 7.04 | Curative Allocations |
| Section 7.05 | Other Allocation Rules. |
| Section 7.06 | Distribution of Net Cash Flow |
| Section 7.07 | Distribution Date Statement |
| Section 7.08 | Allocation of Tax Liability |
| Section 7.09 | Method of Payment |
| Section 7.10 | No Segregation of Funds; No Interest |
| Section 7.11 | Interpretation and Application of Provisions by the Administrator |

ARTICLE VIII

AUTHORITY AND DUTIES OF THE OWNER TRUSTEE

| Section 8.01 | General Authority |
| Section 8.02 | Specific Authority |
| Section 8.03 | General Duties |
| Section 8.04 | Accounting and Reports to the Owners, the Internal Revenue Service and Others |

Section 8.05    Signature of Returns

Section 8.06    Right to Receive and Rely Upon Instructions

Section 8.07    No Duties Except as Specified in this Agreement or in Instructions

Section 8.08    No Action Except Under Specified Documents or Instructions

Section 8.09    Restriction

## ARTICLE IX

### CONCERNING THE OWNER TRUSTEE

Section 9.01    Acceptance of Trusts and Duties

Section 9.02    Furnishing of Documents

Section 9.03    Reliance; Advice of Counsel.

Section 9.04    Not Acting in Individual Capacity

Section 9.05    Representations and Warranties of Owner Trustee

## ARTICLE X

### COMPENSATION OF OWNER TRUSTEE

Section 10.01    Owner Trustee's Fees and Expenses

Section 10.02    Indemnification

Section 10.03    Lien on Trust Property

Section 10.04    Payments to the Owner Trustee

## ARTICLE XI

### TERMINATION OF TRUST

Section 11.01    Termination of Trust.

Section 11.02    Distribution of Assets

Section 11.03    No Termination by Depositor or Owners

## ARTICLE XII

### SUCCESSOR OWNER TRUSTEES AND ADDITIONAL OWNER TRUSTEES

Section 12.01    Resignation of Owner Trustee; Appointment of Successor.

Section 12.02    Appointment of Additional Owner Trustees

ARTICLE XIII

TAX MATTERS PARTNER

Section 13.01    Tax Matters Partner

Section 13.02    Notice of Tax Audit

Section 13.03    Authority to Extend Period for Assessing Tax

Section 13.04    Choice of Forum for Filing Petition for Readjustment

Section 13.05    Authority to Bind Owners by Settlement Agreement

Section 13.06    Notices Sent to the Internal Revenue Service

Section 13.07    Indemnification of Tax Matters Partner

Section 13.08    Approval of Tax Matters Partner's Decisions

Section 13.09    Participation by Owners in Internal Revenue Service Administrative Proceedings

ARTICLE XIV

MISCELLANEOUS

Section 14.01    Supplements and Amendments.

Section 14.02    No Legal Title to Trust Property in Owner

Section 14.03    Pledge of Collateral by Owner Trustee is Binding

Section 14.04    Limitations on Rights of Others

Section 14.05    Notices

Section 14.06    Severability

Section 14.07    Separate Counterparts

Section 14.08    Successors and Assigns

Section 14.09    Headings

Section 14.10    Governing Law

Section 14.11    General Interpretive Principles

SCHEDULE A    CAPITAL CONTRIBUTIONS, INITIAL SHARING RATIOS AND PERCENTAGE INTERESTS

SCHEDULE B    LOAN ORIGINATORS

SCHEDULE C    LOAN PURCHASE AGREEMENTS

GUARANTY AGREEMENTS

SCHEDULE
D


EXHIBIT 1  FORM OF TRUST CERTIFICATE
EXHIBIT 2  FORM OF ACCESSION AGREEMENT

TRUST AGREEMENT, dated as of September 20, 2007, among The National Collegiate Funding LLC, a Delaware limited liability company (the "Depositor"), The Education Resources Institute, Inc., a private non-profit corporation organized under Chapter 180 of the Massachusetts General Laws, and Wilmington Trust Company, a Delaware banking corporation (the "Owner Trustee").

WHEREAS, the parties hereto intend to amend and restate that certain Interim Trust Agreement, dated as of September 11, 2007 (the "Interim Trust Agreement"), by and between the Depositor and the Owner Trustee, on the terms and conditions hereinafter set forth.

NOW THEREFORE, in consideration of the premises and of the mutual agreements herein contained and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto amend and restate the Interim Trust Agreement in its entirety and further agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01    Capitalized Terms.  For all purposes of this Agreement, the following terms shall have the meanings set forth below:

"Administration Agreement" means the Administration Agreement, dated as of September 20, 2007, among the Trust, the Indenture Trustee, the Owner Trustee, the Depositor and First Marblehead Data Services, Inc., as Administrator, as it may be amended from time to time.

"Administrator" means First Marblehead Data Services, Inc., a Massachusetts corporation, as Administrator under the Administration Agreement, or any successor Administrator as appointed pursuant to the terms of the Administration Agreement.

"Affiliate" means, with respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agreement" means this Trust Agreement, as it may be amended or restated from time to time.

"Assignments of Servicing Agreements" means each of the Servicer Consent Letters, dated as of September 20, 2007, among the Trust, The First Marblehead Corporation and the Pennsylvania Higher Education Assistance Agency and Great Lakes Educational Loan Services, Inc., respectively, relating to the assignment of each of the respective Servicing Agreements to the Trust.

"Auction Agreement" means the Auction Agreement, dated September 20, 2007, between U.S. Bank National Association and The Bank of New York.

"Authorized Officer" means any officer of the Owner Trustee who is authorized to act for the Owner Trustee in matters relating to, and binding upon, the Trust and whose name appears on a list of such authorized officers furnished by the Owner Trustee as such list may be amended or supplemented from time to time.

"Back-up Agreement" means the Back-up Administration Agreement, dated as of September 20, 2007, among the Trust, the Depositor, the Owner Trustee, the Administrator and U.S. Bank National Association.

"Bankruptcy Action" has the meaning set forth in Section 4.01(b)(iv)(G).

"Beneficial Interest" as to any Owner, means all or any part of the interest of that Owner in the Trust, including without limitation its (a) right to a distributive share of the Profit and Loss of the Trust, (b) right to a distributive share of

the assets of the Trust, and (c) right to direct or consent to actions of the Owner Trustee and otherwise participate in the management of and control the affairs of the Trust.

"Broker-Dealer Agreements" means each of the Broker-Dealer Agreements, dated as of September 20, 2007, between The Bank of New York and Banc of America Security LLC, Citigroup Global Markets Inc., Goldman, Sachs & Co. and UBS Securities LLC, respectively.

"Business Day" means any day that is not a Saturday, Sunday or any other day on which commercial banking institutions in Delaware are authorized or obligated by law or executive order to be closed.

"Capital Account" means the Capital Account maintained for each Owner pursuant to Article VI of this Agreement.

"Capital Contribution" means the amount of money contributed or deemed to have been contributed by an Owner to the capital of the Trust, which shall be as set forth on Schedule A to this Agreement.

"Certificate of Trust" means the Certificate of Trust filed with the Secretary of State by the Owner Trustee on behalf of the Trust.

"Custodial Agreements" means each of the Custodial Agreements, dated as of September 20, 2007, among the Trust, the Indenture Trustee and the Pennsylvania Higher Education Assistance Agency and Great Lakes Educational Loan Services, Inc., respectively.

"Deposit and Sale Agreement" means the Deposit and Sale Agreement, dated as of September 20, 2007, between the Depositor and the Trust.

"Deposit and Security Agreement" means the Deposit and Security Agreement, dated as of September 20, 2007, among the Administrator, TERI and the Trust.

"Depositor" means The National Collegiate Funding LLC, a Delaware limited liability company.

"Distribution Date" means the first Business Day following a day on which the Owner Trustee obtains receipt of funds or, if instructed by the Owners, such other Business Day as they shall specify in writing.

"Distribution Date Statement" means the statement described as such in Section 7.07.

"Distribution" means any money or other property distributed to an Owner with respect to its Beneficial Interest.

"Eligible Investments" means one or more of the following (it being acknowledged by the parties hereto that Eligible Investments will have the meaning set forth in the Indenture until such time as the Notes are no longer outstanding):

(a)        Obligations of or guaranteed as to principal and interest by the United States or any agency or instrumentality thereof when such obligations are backed by the full faith and credit of the United States;

(b)        Repurchase agreements on obligations specified in clause (a) maturing not more than one month from the date of acquisition thereof, provided that the unsecured obligations of the party agreeing to repurchase such obligations are at the time rated by each of the Rating Agencies in its highest short-term rating available;

(c)        Federal funds, certificates of deposit, demand deposits, time deposits and bankers' acceptances (which shall each have an original maturity of not more than 90 days and, in the case of bankers' acceptances, shall in no event have an original maturity of more than 365 days or a remaining maturity of more than 30 days) denominated in United States dollars of any U.S. depository institution or trust company incorporated under the laws of the United States or any state thereof or of any domestic branch of a foreign depository institution or trust company; provided that the debt obligations of such depository institution or trust company at the date of acquisition thereof have been rated by each of the

Rating Agencies in its highest short-term rating available; and, provided further that, if the original maturity of such short-term obligations of a domestic branch of a foreign depository institution or trust company shall exceed 30 days, the short-term rating of such institution shall have a credit rating in one of the two highest applicable categories from each of the Rating Agencies;

(d)        Commercial paper (having original maturities of not more than 365 days) of any corporation incorporated under the laws of the United States or any state thereof, which, on the date of acquisition has been rated by each of the Rating Agencies in its highest short-term rating available; provided that such commercial paper shall have a remaining maturity of not more than 30 days;

(e)        A money market fund rated by each of the Rating Agencies in its highest rating available which may be a money market fund of the Owner Trustee; and

(f)        Other obligations or securities that are acceptable to each of the Rating Agencies as an Eligible Investment hereunder; provided, however, that no instrument shall be an Eligible Investment if it provides for either (i) the right to receive only interest payments with respect to the underlying debt instrument or (ii) the right to receive both principal and interest payments derived from the obligations underlying such instrument and the principal and interest payments with respect to such instrument provide a yield to maturity greater than 120% of the yield to maturity at par of such underlying obligations; and provided further that so long as the Notes are outstanding, no instrument that is not a permitted investment under the Indenture shall be an Eligible Investment for purposes of this Agreement.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Fiscal Year" means the twelve-month period ending on June 30 each year or such portion thereof as the Trust may be in existence.

"Indemnification Agreements" means each of the Indemnification Agreements, dated as of September 20, 2007, between the Trust, the Depositor and The First Marblehead Corporation and Bank of America, N.A. and JPMorgan Chase Bank, N.A., respectively.

"Indenture" means the Indenture between the Trust and U.S. Bank National Association, as Indenture Trustee, dated as of September 1, 2007, as amended or supplemented from time to time pursuant to which the Notes are to be issued.

"Indenture Trustee" means the bank or trust company acting as Indenture Trustee under the Indenture.

"Interested Noteholders" shall have the meaning set forth in the Indenture.

"Issuer Order" means the Issuer Order to the Indenture Trustee from the Trust dated September 20, 2007.

"Issuer Orders to Authenticate" means the Issuer Orders to Authenticate to the Indenture Trustee from the Trust dated September 20, 2007.

"Loan Originators" means each of the originators of the Student Loans, as set forth on Schedule B attached hereto, as amended or supplemented from time to time.

"Loan Purchase Agreements" means each of the loan purchase agreements entered into between each of the Loan Originators and The First Marblehead Corporation, as set forth on Schedule C attached hereto, as amended or supplemented from time to time.

"Net Cash Flow" means, with respect to any fiscal period of the Trust, all revenues of the Trust decreased by (a) cash expenditures for operating expenses (including interest on indebtedness of the Trust but not including expense items which do not require current cash outlay), (b) reserves for contingencies and working capital established in such amounts as the Owner Trustee, with the consent of the Owners, may determine, (c) repayments of principal on any Trust indebtedness, and (d) taxes.

"1933 Act" has the meaning set forth in Section 3.02(a).

"Note Insurer Agreements" means (a) the Financial Guaranty Insurance Policy Premium Letter, dated as of September 20, 2007, between the Trust and Ambac Assurance Corporation ("Ambac") and (b) the Insurance and Indemnity Agreement ("the Insurance Agreement"), dated as of September 20, 2007, among The First Marblehead Corporation, First Marblehead Data Services, Inc., U.S. Bank National Association, the Trust and Ambac.

"Notes" mean the collateralized student loan asset backed notes to be issued by the Trust pursuant to the Indenture.

"Noteholder" means any holder of the Notes.

"Owner" means each of the Depositor, TERI and any other Person who becomes an owner of a Beneficial Interest.

"Owner Trustee" means Wilmington Trust Company, a Delaware banking corporation with its principal place of business in the State of Delaware, not in its individual capacity but solely as trustee, or any successor thereto, duly appointed in accordance with Section 12.01 hereof.

"Percentage Interest" means the initial undivided beneficial interest in the Trust Property of an Owner expressed as a percentage of the total initial undivided beneficial interests in the Trust Property. References to Percentage Interests herein shall be solely for the purpose of certificating Owners' interests hereunder and for any other purpose specified in this Agreement.

"Periodic Filings" means any filings or submissions that the Trust is required to make with any state or Federal regulatory agency or under the Code.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, trust (including any beneficiary thereof), estate, custodian, nominee, unincorporated organization or government or any agency or political subdivision thereof.

"Plan" has the meaning set forth in Section 3.04(d).

"Plan Assets" has the meaning set forth in Section 3.04(d).

"Rating Agencies" means Moody's Investors Service, Inc., Fitch, Inc. and Standard & Poors Rating Services, a division of The McGraw-Hill Companies, Inc.

"Secretary of State" means the office of the Secretary of State of the State of Delaware.

"Servicers" means the Pennsylvania Higher Education Assistance Agency and Great Lakes Educational Loan Services, Inc. and any other loan servicer satisfying the Rating Agency Condition.

"Servicing Agreements" means (a) the Amended and Restated Private Student Loan Servicing Agreement, dated as of September 28, 2006, between the Pennsylvania Higher Education Assistance Agency and The First Marblehead Corporation and (b) the Non-FFELP Loan Servicing Agreement, dated as of May 1, 2003, as amended, by and between Great Lakes Educational Loan Services, Inc. and The First Marblehead Corporation, both of which agreements will be assigned to the Trust concurrent with the initial purchase of Financed Student Loans, or any other servicing agreement between the Issuer and a servicer under which such servicer agrees to service Financed Student Loans included in the Indenture Trust Estate, which servicing agreement shall satisfy the Rating Agency Condition.

"Servicer Consent Letters" means each of the Servicer Consent Letters, dated as of September 20, 2007, among The First Marblehead Corporation, the Trust and the Pennsylvania Higher Education Assistance Agency and Great Lakes Educational Loan Services, Inc., respectively.

"Sharing Ratio" means, with respect to any Owner, the ratio (expressed as a percentage) specified on Schedule A attached hereto.

"Statutory Trust Statute" means the Delaware Statutory Trust Act, 12 Del. Code §3801 et seq.

"Structuring Advisor" means The First Marblehead Corporation.

"Structuring Advisory Agreement" means the Structuring Advisory Agreement between the Structuring Advisor and the Trust, dated as September 20, 2007.

"Student Loans" means the education loans, to or for the benefit of students, originated under one of the Student Loan Programs.

"Student Loan Notes" means the promissory notes to be sold to the Trust by the Loan Originators pursuant to the Loan Purchase Agreements representing education loans, to or for the benefit of students, originated under the Student Loan Programs.

"Student Loan Programs" means each of the programs for the origination of the Student Loans by each of the Loan Originators pursuant to the Loan Purchase Agreements.

"Super-majority Owners" shall have the meaning set forth in Section 4.03.

"TERI" means The Education Resources Institute, Inc., a private non-profit corporation organized under Chapter 180 of the Massachusetts General Laws.

"TERI Deposit Account" means the special deposit account established by TERI pursuant to the Deposit and Security Agreement.

"TERI Guaranty Agreements" means each of the Guaranty Agreements entered into between each of the Loan Originators and TERI as set forth on Schedule D attached hereto, as amended or supplemented from time to time.

"TERI Guaranteed Loans" means Student Loans originated under the Student Loan Programs owned by the Trust and guaranteed by TERI pursuant to the TERI Guaranty Agreements.

"Transfer" means the sale, transfer or other assignment of all of an Owner's right, title and interest in all or a portion of such Owner's Beneficial Interest.

"Trust" means The National Collegiate Student Loan Trust 2007-4 established by this Agreement.

"Trust Certificate" means a certificate evidencing the Beneficial Interest of an Owner in substantially the form attached hereto as Exhibit 1.

"Trust Property" means all right, title and interest of the Trust or the Owner Trustee on behalf of the Trust in and to any property contributed to the Trust by the Owners or otherwise acquired by the Trust, including without limitation all distributions, payments or proceeds thereon.

"Trust Related Agreements" means any instruments or agreements signed by the Owner Trustee on behalf of the Trust, including without limitation, the Indenture, the Loan Purchase Agreements, the Administration Agreement, the Deposit and Sale Agreement, the Deposit and Security Agreement, the Servicer Consent Letters, the Structuring Advisory Agreement, the Assignments of Servicing Agreements, the Back-up Agreement, the Custodial Agreements, the Notes, the Indemnification Agreements, the Issuer Order, the Issuer Orders to Authenticate, the Auction Agreement, the Broker-Dealer Agreements and the Note Insurer Agreements.

<u>Tax Terms:</u>

"Adjusted Capital Account Deficit" means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)        Credit to such Capital Account the minimum gain chargeback that such Partner is deemed to be obligated to restore pursuant to the penultimate sentences of sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations and the amount of such Partner's share of Partner Nonrecourse Debt Minimum Gain; and

(b)        Debit to such Capital Account the items described in sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"Code" means the Internal Revenue Code of 1986, as amended.

"Nonrecourse Deductions" has the meaning set forth in section 1.704-2(b)(1) of the Regulations.

"Nonrecourse Liability" has the meaning set forth in section 1.704-2(b)(3) of the Regulations.

"Partner Nonrecourse Debt" has the meaning set forth in section 1.704-2(b)(4) of the Regulations.

"Partner Nonrecourse Debt Minimum Gain" means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with section 1.704-2(i)(3) of the Regulations.

"Partner Nonrecourse Deductions" has the meaning set forth in sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Regulations.

"Partners" means the Owners.

"Partnership" means the Trust.

"Partnership Minimum Gain" has the meaning set forth in sections 1.704-2(b)(2) and 1.704-2(d) of the Regulations.

"Profit and Loss" means, for each Fiscal Year, an amount equal to the Partnership's taxable income or loss for such Fiscal Year, determined in accordance with section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(a)        Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profit or Loss pursuant to this definition shall be added to such taxable income or loss;

(b)        Any expenditures of the Partnership described in section 705(a)(2)(B) of the Code or treated as expenditures under section 705(a)(2)(B) of the Code pursuant to section 1.704-1(b)(2)(iv)(i) of the Regulations (other than expenses in respect of which an election is properly made under section 709 of the Code), and not otherwise taken into account in computing Profit or Loss pursuant to this definition, shall be subtracted from such taxable income or loss;

(c)        Notwithstanding any other provisions of this definition, any items which are specially allocated pursuant to Section 7.03 or 7.04 shall not be taken into account in computing Profit or Loss.

The amounts of the items of Partnership income, gain, loss, or deduction available to be specially allocated pursuant to Sections 7.03 and 7.04 shall be determined by applying rules analogous to those set forth in clauses (a) and (b) above.

"Regulations" means the federal income tax regulations promulgated by the United States Treasury Department under the Code as such Regulations may be amended from time to time.

All references herein to a specific section of the regulations shall be deemed also to refer to any corresponding provision of succeeding Regulations.

"Regulatory Allocations" has the meaning set forth in Section 7.04.

ARTICLE II

ORGANIZATION

Section 2.01        Name.  The Trust continued hereby shall be known as The National Collegiate Student Loan Trust 2007-4, in which name the Owner Trustee may take any action as provided herein.

Section 2.02        Office.  The principal place of business and principal office of the Trust shall be in care of the Owner Trustee, at the address set forth in Section 14.05. The Trust shall also have an office at 800 Boylston Street - 34th Floor, Boston, Massachusetts 02199.

Section 2.03        Purposes and Powers.

(a)        The purpose of the Trust is to engage in the following activities and only these activities:

(i)        To acquire a pool of Student Loans, to execute the Indenture and to issue the Notes;

(ii)        To enter into the Trust Related Agreements and to provide for the administration of the Trust and the servicing of the Student Loans;

(iii)        To engage in those activities and to enter into such agreements that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith; and

(iv)        To engage in such other activities as may be required in connection with conservation of the Trust Property and Distributions to Owners. Until the Indenture is discharged, the Trust shall not engage in any business or activities other than in connection with, or relating to, the foregoing and other than as required or authorized by the terms of this Agreement and the Indenture, except as are incidental to and necessary to accomplish such activities, unless the Interested Noteholders consent to the Trust engaging in other activities.

(b)        Until the Indenture is discharged, the operations of the Trust shall be conducted in accordance with the following standards:

(i)        The Trust will act solely in its own name and the Owner Trustee or other agents selected in accordance with this Agreement will act on behalf of the Trust subject to direction by the Owners as provided herein, but such action shall not be in violation of the terms of this Agreement;

(ii)        The Trust's funds and assets shall at all times be maintained separately from those of the Owners and any of their respective Affiliates;

(iii)        The Trust shall maintain complete and correct books, minutes of the meetings and proceedings of the Owners, and records of accounts;

(iv)        The Trust shall conduct its business at the office of the Owner Trustee and will use stationery and other business forms of the Trust under its own name and not that of the Owners or any of their

respective Affiliates, and will avoid the appearance (A) of conducting business on behalf of any Owner or any Affiliate of an Owner or (B) that the assets of the Trust are available to pay the creditors of the Owner Trustee or any Owner;

(v)        The Trust's operating expenses shall be paid out of its own funds;

(vi)        The Trust shall not incur, guarantee or assume any debt (other than the Notes) nor hold itself out as being liable for the debts of any entity, including any Owner or any Affiliates of any Owner;

(vii)        For so long as any of the Notes are outstanding, the Trust shall not (A) merge or consolidate with or into any other entity, (B) convey or transfer all or substantially all of its assets to any other entity (other than to the Indenture Trustee pursuant to the Indenture), or (C) dissolve, liquidate or terminate in whole or in part; and

(viii)        For so long as any of the Notes are outstanding, the Trust shall not own or acquire any financial asset that requires the Trust, the Owners or the Administrator to make any decisions regarding such asset other than the servicing of the asset.

Section 2.04        Appointment of the Owner Trustee.  The Depositor hereby appoints the Owner Trustee as trustee of the Trust, to have all the rights, powers and duties set forth herein and in the Statutory Trust Statute. The Owner Trustee acknowledges receipt in trust from the Depositor, of the sum of one dollar ($1), constituting the initial Trust Property.

Section 2.05        Declaration of Trust.  The Owner Trustee hereby declares that it will hold the Trust Property in trust upon and subject to the conditions set forth herein for the use and benefit of the Owners, subject to the obligations of the Owner Trustee under the Trust Related Agreements. It is the intention of the parties hereto that the Trust constitute a statutory trust under the Statutory Trust Statute and that this Agreement constitute the governing instrument of the Trust.

Section 2.06        No Liability of Owners for Expenses or Obligations of Trust.  No Owner shall be liable for any liability, expense or other obligation of the Trust.

Section 2.07        Situs of Trust.  The Trust will be located and administered in the State of Delaware. The Trust shall not have any employees in any state other than in the State of Delaware and payments will be received by the Owner Trustee on behalf of the Trust only in the State of Delaware and payments will be made by the Owner Trustee on behalf of the Trust only from the State of Delaware.

ARTICLE III

TRUST CERTIFICATES AND TRANSFER OF INTEREST

Section 3.01        Issuance of Trust Certificate.

(a)        As of the date hereof, as set forth on Schedule A attached hereto, the Depositor has been issued a Trust Certificate evidencing a percentage of the Beneficial Interest in the Trust and TERI has been issued a Trust Certificate evidencing a percentage of the Beneficial Interest in the Trust.

(b)        Each Trust Certificate shall be executed by manual signature on behalf of the Owner Trustee by one of its Authorized Officers. Trust Certificates bearing the manual signature of an individual who was, at the time when such signature was affixed, authorized to sign on behalf of the Owner Trustee shall bind the Trust, notwithstanding that such individual has ceased to be so authorized prior to the delivery of such Trust Certificate or does not hold such office at the date of such Trust Certificate. Each Trust Certificate shall be dated the date of its issuance.

Section 3.02        Registration and Transfer of Certificates.

(a)        The Owner Trustee shall maintain at its office referred to in Section 2.02, or at the office of any agent appointed by it and approved in writing by the Owners at the time of such appointment, a register for the registration and Transfer of Trust Certificates. No Transfer of a Beneficial Interest shall be made unless such Transfer is made pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "1933 Act"), and state securities laws, or is exempt from the registration requirements under the 1933 Act and state securities laws.

(b)        The registered Owner of any Trust Certificate may Transfer all or any portion of the Beneficial Interest evidenced by such Trust Certificate upon surrender thereof to the Owner Trustee accompanied by the documents required by Section 3.04. Such Transfer may be made by the registered Owner in person or by its attorney duly authorized in writing upon surrender of the Trust Certificate to the Owner Trustee accompanied by a written instrument of Transfer and with such signature guarantees and evidence of authority of the Persons signing the instrument of Transfer as the Owner Trustee may reasonably require. Promptly upon the receipt of such documents and receipt by the Owner Trustee of the transferor's Trust Certificate, the Owner Trustee shall (i) record the name of such transferee as an Owner and its Percentage Interest in the Trust Certificate register and (ii) issue, execute and deliver to such Owner a Trust Certificate evidencing such Percentage Interest. In the event a transferor Transfers only a portion of its Beneficial Interest, the Owner Trustee shall register and issue to such transferor a new Trust Certificate evidencing such transferor's new Percentage Interest. Subsequent to a Transfer and upon the issuance of the new Trust Certificate or Trust Certificates, the Owner Trustee shall cancel and destroy the Trust Certificate surrendered to it in connection with such Transfer. The Owner Trustee may treat the Person in whose name any Trust Certificate is registered as the sole Owner of the Beneficial Interest in the Trust evidenced by such Trust Certificate.

(c)        As a condition precedent to any registration of Transfer, the Owner Trustee may require the payment of a sum sufficient to cover the payment of any tax or taxes or other governmental charges required to be paid in connection with such Transfer and any other reasonable expenses connected therewith.

(d)        The Trust Certificates may not be acquired or held by or for the account of a Plan (as defined herein), except as permitted under Section 3.04(d) herein.

Section 3.03        Lost, Stolen, Mutilated or Destroyed Certificates.  If (i) any mutilated Trust Certificate is surrendered to the Owner Trustee, or (ii) the Owner Trustee receives evidence to its satisfaction that any Trust Certificate has been destroyed, lost or stolen, and upon proof of ownership satisfactory to the Owner Trustee together with such security or indemnity as may be requested by the Owner Trustee to save it harmless, the Owner Trustee shall execute and deliver a new Trust Certificate for the same Percentage Interest as the Trust Certificate so mutilated, destroyed, lost or stolen, of like tenor and bearing a different issue number, with such notations, if any, as the Owner Trustee shall determine. In connection with the issuance of any new Trust Certificate under this Section 3.03, the Owner Trustee may require the payment by the registered Owner thereof of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the reasonable fees and expenses of the Owner Trustee) connected therewith. Any replacement Trust Certificate issued pursuant to this Section 3.03 shall constitute complete and indefeasible evidence of ownership of a Beneficial Interest, as if originally issued, whether or not the lost, stolen or destroyed Trust Certificate shall be found at any time.

Section 3.04        Limitation on Transfer of Ownership Rights.

(a)        No Transfer of all or any part of a Beneficial Interest after the date hereof shall be made to any Person unless (i) such Person delivers to the Owner Trustee an accession agreement substantially in the form of Exhibit 2 hereof, (ii) the Owner Trustee shall have received a written opinion of counsel in form and substance satisfactory to the Owner Trustee stating that such Transfer is exempt from the 1933 Act and any applicable state securities laws.

(b)        At any time that there is more than one Owner, no Transfer of a Beneficial Interest shall be valid unless the Owner making such Transfer shall have received the prior written consent to such Transfer of the Super-majority Owners, which consent may not be unreasonably withheld; provided, however, that in calculating the total Beneficial Interests in the Trust the Beneficial Interest owned by the transferor or (unless the transferor and its Affiliates are the only Owners) any Affiliate thereof shall be excluded.

(c)        Except for the initial issuance of the Trust Certificates to the Depositor, no Transfer shall be valid if, as a result of such Transfer, (i) any Person would have a Percentage Interest or a Sharing Ratio of 100%, considering for such

purpose all interests owned by any Affiliate of such Person as owned by such Person, or (ii) such Transfer would result in a termination of the Trust for Federal income tax purposes.

(d)       No Transfer of all or any part of a Beneficial Interest shall be made to any employee benefit plan or certain other retirement plans and arrangements, including individual retirement accounts and annuities, Keogh plans and bank collective investment funds and insurance company general or separate accounts in which such plans, accounts or arrangements are invested, that are subject to ERISA or Section 4975 of the Code (collectively, "Plan"), nor to any Person acting, directly or indirectly, on behalf of any such Plan or any Person acquiring the Beneficial Interest with "plan assets" of a Plan within the meaning of the Department of Labor regulation promulgated at 29 C.F.R. § 2510.3-101 ("Plan Assets") unless the Owner Trustee is provided with an opinion of counsel which establishes to the satisfaction of the Owner Trustee that the purchase of the Beneficial Interest is permissible under applicable law, will not constitute or result in any prohibited transaction under ERISA or Section 4975 of the Code and will not subject the Owners, the Owner Trustee or the Trust to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to that undertaken in this Agreement, which opinion of counsel shall not be an expense of the Owners, the Owner Trustee or the Trust.

(e)       No Transfer of all or any part of a Beneficial Interest shall be permitted, and no such transfer shall be effective hereunder, if such transfer would cause the Trust to be classified as a publicly traded partnership, taxable as a corporation for federal income tax purposes, by causing the Trust to have more than 100 Owners at any time during any taxable year of the Trust.

Section 3.05       Assignment of Right to Distributions.  An Owner may assign all or any part of its right to receive distributions hereunder, but such assignment (in the absence of a permitted Transfer) shall effect no change in the ownership of the Trust.

ARTICLE IV

CONCERNING THE OWNERS

Section 4.01       Action by Owners with Respect to Certain Matters.

(a)       The Owner Trustee will take such action or refrain from taking such action under this Agreement or any Trust Related Agreement as it shall be directed pursuant to an express provision of this Agreement or such Trust Related Agreement or, with respect to nonministerial matters, as it shall be directed by all the Owners for so long as any of the Notes are outstanding.

(b)       Without limiting the generality of the foregoing, in connection with the following nonministerial matters, the Owner Trustee will take no action, and will not have authority to take any such action, unless it receives prior written approval from all the Owners for so long as any of the Notes are outstanding:

(i)       Initiate any claim or lawsuit by the Trust and compromise any claim or lawsuit brought by or against the Trust, except for claims or lawsuits initiated in the ordinary course of business by the Trust or its agents or nominees for collection on the Student Loans owned by the Trust;

(ii)       Amend, change or modify this Agreement or any Trust Related Agreement;

(iii)       To the fullest extent permitted by applicable law, file a voluntary petition in bankruptcy for the Trust, which in no event shall the Owner Trustee be permitted to do or be instructed to do until at least 367 days after the payment in full of the Outstanding Notes (as defined in the Indenture) issued by the Trust; and

(iv)       To the fullest extent permitted by applicable law, (A) institute proceedings to have the Trust declared or adjudicated bankrupt or insolvent, (B) consent to the institution of bankruptcy or insolvency proceedings against the Trust, (C) file a petition or consent to a petition seeking reorganization or relief on behalf of the Trust under any applicable federal or state law relating to bankruptcy, (D) consent to the appointment of a

receiver, liquidator, assignee, trustee, sequestrator (or any similar official) of the Trust or a substantial portion of the property of the Trust, (E) make any assignment for the benefit of the Trust's creditors, (F) cause the Trust to admit in writing its inability to pay its debts generally as they become due, or (G) take any action, or cause the Trust to take any action, in furtherance of any of the foregoing (any of the above, a "Bankruptcy Action"). No Owner shall have the power to take, and no Owner shall take, any Bankruptcy Action with respect to the Trust or direct the Owner Trustee to take any Bankruptcy Action with respect to the Trust.

(c)        No Owner shall take any action to cause the filing of an involuntary petition in bankruptcy against the Trust.

Section 4.02        Action Upon Instructions.

(a)        The Owner Trustee shall take such action or actions as may be specified in this Agreement or in any instructions delivered in accordance with this Article IV or Article VIII; provided, however, that the Owner Trustee shall not be required to take any such action if it shall have reasonably determined, or shall have been advised by counsel, that such action (i) is contrary to the terms hereof or of any document contemplated hereby to which the Trust or the Owner Trustee is a party or is otherwise contrary to law, (ii) is likely to result in personal liability on the part of the Owner Trustee, unless the Owners shall have provided to the Owner Trustee indemnification or security reasonably satisfactory to the Owner Trustee against all costs, expenses and liabilities arising from the Owner Trustee's taking of such action, or (iii) would adversely affect the status of the Trust as a partnership for Federal income tax purposes.

(b)        No Owner shall direct the Owner Trustee to take or refrain from taking any action contrary to this Agreement or any Trust Related Agreement, nor shall the Owner Trustee be obligated to follow any such direction, if given.

(c)        Notwithstanding anything contained herein or in any Trust Related Agreement to the contrary, the Owner Trustee shall not be required to take any action in any jurisdiction other than in the State of Delaware if the taking of such action will (i) require the consent or approval or authorization or order for the giving of notice to, or the registration with or taking of any action in respect of, any state or other governmental authority or agency of any jurisdiction other than the State of Delaware; (ii) result in any fee, tax or other governmental charge under the laws of any jurisdiction or any political subdivision thereof in existence on the date hereof other than the State of Delaware becoming payable by the Owner Trustee; or (iii) subject the Owner Trustee to personal jurisdiction in any jurisdiction other than the State of Delaware for causes of action arising from acts unrelated to the consummation of the transactions by the Owner Trustee contemplated hereby.

(d)        The Owner Trustee shall not have the power to remove the Administrator under the Administration Agreement or appoint a successor Administrator pursuant to the Administration Agreement without written instruction by the Owners.

Section 4.03        Super-majority Control.  Except as otherwise expressly provided in this Agreement, any action which may be taken or consent or instructions which may be given by the Owners under this Agreement may be taken by the Owners holding in the aggregate at least 85% of both the Percentage Interests and the Sharing Ratios in the Trust at the time of such action (the "Super-majority Owners"). Any written notice of the Owners delivered pursuant to this Agreement shall be effective only if signed by the Super-majority Owners at the time of the delivery of such notice.

Section 4.04        Representations and Warranties of the Depositor.  The Depositor hereby represents and warrants to the Owner Trustee as follows:

(a)        Upon the receipt of the Trust Property by the Owner Trustee under this Agreement, the Owner Trustee on behalf of the Trust will have good title to the Trust Property free and clear of any lien.

(b)        The Trust is not and will not be, upon conveyance of the Trust Property to the Owner Trustee, an "Investment Company" or under the "control" of an "Investment Company," as such terms are defined in the Investment Company Act of 1940, as amended.

(c)      Except for the filing of the Certificate of Trust with the Secretary of State, no consent, approval, authorization or order of, or filing with, any court or regulatory, supervisory or governmental agency or body is required under current law in connection with the execution, delivery or performance by the Depositor of this Agreement or the consummation of the transactions contemplated hereby; provided, however, that no representation or warranty is made herein as to compliance with Federal securities laws or the securities or "blue sky" laws of any state.

(d)      This Agreement has been duly and validly authorized, executed and delivered by, and constitutes a valid and binding agreement of, the Depositor, enforceable in accordance with its terms.

Section 4.05      Power of Attorney.

(a)      General.  Each Owner hereby irrevocably constitutes and appoints the Administrator, with full power of substitution, such Owner's true and lawful attorney-in-fact, in such Owner's name, place and stead, with full power to act jointly and severally, to make, execute, sign, acknowledge, swear to, verify, deliver, file, record and publish the following documents:

(i)      Any certificate, instrument or document to be filed by the Owners under the laws of any state, or with any governmental agency in connection with this Agreement;

(ii)      Any certificate, instrument or document which may be required to effect the continuation or the termination of the Trust, including any amendments to this Agreement; provided such continuation or termination is in accordance with the terms of this Agreement; and

(iii)      Any written notice, instruction, instrument or document under Article XII of this Agreement.

(b)      Duration of Power of Attorney.  It is expressly intended by each of the Owners that the Power of Attorney granted under this Section 4.05 is coupled with an interest, and it is agreed that such Power of Attorney shall survive (i) the dissolution, death or incompetency of any Owner and (ii) the assignment by any Owner of the whole or any portion of such Owner's Beneficial Interest.

ARTICLE V

INVESTMENT AND APPLICATION OF TRUST FUNDS

Section 5.01      Investment of Trust Funds.  Unless otherwise directed in writing by the Owners, income with respect to and proceeds of the Trust Property which are received by the Owner Trustee more than one day prior to a Distribution Date shall be invested and reinvested by the Owner Trustee in Eligible Investments. Interest earned from such investment and reinvestment shall be credited to the Trust Property.

Section 5.02      Application of Funds.  Income with respect to and proceeds of Trust Property held by the Owner Trustee on a Distribution Date shall be remitted directly to the Indenture Trustee for application in accordance with the Indenture for so long as any of the Notes is outstanding, and thereafter shall be applied by the Owner Trustee on such Distribution Date in the following order:

(i)      First, to pay any amounts due to the Owner Trustee under this Agreement;

(ii)      Second, to pay any amounts due to the Administrator under the Administration Agreement and to the Structuring Advisor under the Structuring Advisory Agreement;

(iii)      Third, to pay any amounts then due to any Person under the Trust Related Agreements;

(iv)        <u>Fourth</u>, to pay any other expenses of the Trust; and

(v)        <u>Fifth</u>, to the Owners in accordance with Section 7.06.

All payments to be made under this Agreement by the Owner Trustee shall be made only from the income and proceeds of the Trust Property and only to the extent that the Owner Trustee has received such income or proceeds.

ARTICLE VI

CAPITAL

Section 6.01    <u>Tax Characterization</u>. It is intended that the Trust be characterized and treated as a partnership for federal income tax purposes. To the extent the Trust is characterized and treated as anything other than a partnership for federal, state or local income tax purposes, the Owners shall jointly and severally be liable for, and hereby agree to indemnify the Trust for, any tax liability arising out of such characterization. All references to a "Partner," the "Partners" and to the "Partnership" in this Agreement and in the provisions of the Code and Regulations cited in this Agreement shall be deemed to refer to an Owner, the Owners and the Trust, respectively. The Tax Matters Partner of the Trust shall be as set forth in Article XIII.

Section 6.02    <u>Initial Capital Contributions of Owners</u>. The Depositor shall make an initial Capital Contribution in the amount of one dollar ($1) upon execution of this Agreement. Upon their accession to this Agreement as Owners and the issuance of Trust Certificates to them in accordance with Section 3.01(a), the Owners will be deemed to have made initial Capital Contributions in the amounts set forth on Schedule A attached hereto.

Section 6.03    <u>Capital Accounts</u>. A capital account shall be maintained for each Owner throughout the term of the Trust in accordance with the rules of section 1.704-1(b)(2)(iv) of the Regulations as in effect from time to time, and, to the extent not inconsistent therewith, to which the following provisions apply:

(a)    To each Owner's Capital Account there shall be credited (i) the amount of money contributed by such Owner to the Trust (including each Owner's share of any liabilities of the Trust assumed by such Owner as provided in section 1.704-1(b)(2)(iv)(c) of the Regulations), (ii) the fair market value of any property contributed to the Trust by such Owner (net of liabilities secured by such contributed property that the Trust is considered to assume or take subject to under section 752 of the Code), and (iii) such Owner's share of Profit and items of income and gain that are specially allocated pursuant to Sections 7.03 and 7.04 (other than any income or gain allocated to such Owner pursuant to Section 7.03(f) in accordance with section 704(c) of the Code). The initial Capital Contributions of each Owner are set forth on Schedule A attached hereto.

(b)    To each Owner's Capital Account there shall be debited (i) the amount of money distributed to such Owner by the Trust (including any liabilities of such Owner assumed by the Trust as provided in section 1.704-1(b)(2)(iv) (c) of the Regulations) other than amounts that are in repayment of debt obligations of the Trust to such Owner, (ii) the fair market value of property distributed to such Owner (net of liabilities secured by such distributed property that such Owner is considered to assume or take subject to), and (iii) such Owner's share of Loss and items of loss or deduction that are specially allocated pursuant to Sections 7.03 and 7.04 (other than any deduction or loss allocated to such Owner pursuant to Section 7.03(f) in accordance with section 704(c) of the Code).

(c)    The Capital Account of a transferee Owner shall include the appropriate portion of the Capital Account of the Owner from whom the transferee Owner's interest was obtained.

(d)    In determining the amount of any liability, there shall be taken into account section 752(c) of the Code and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with section 1.704-1(b) of the Regulations, and shall be interpreted and applied in a manner consistent with such Regulations.

Section 6.04        Interest.  No Owner shall be entitled to interest on its Capital Contribution or on any Profit retained by the Trust.

Section 6.05        No Additional Capital Contributions.  No Owner shall make an additional Capital Contribution to the Trust, or receive a distribution from the Trust, of property unless this Agreement shall have first been amended to the extent necessary to comply with the requirements of sections 704(b) and (c) of the Code regarding the distributive shares of, and the allocation of income, gain, loss, deduction and credit among, partners of a partnership.

Section 6.06        Investment of Capital Contributions.  The cash Capital Contributions of the Owners shall be invested by the Owner Trustee in accordance with Section 5.01.

Section 6.07        Repayment and Return of Capital Contributions.  The Owner Trustee shall have no personal liability for the repayment of any Capital Contributions of the Owners.

ARTICLE VII

ALLOCATION OF PROFIT AND LOSS; DISTRIBUTIONS

Section 7.01        Profit.  After giving effect to special allocations set forth in Section 7.03 and Section 7.04, Profit for any Fiscal Year shall be allocated to the Owners in proportion to their respective Sharing Ratios.

Section 7.02        Loss.  After giving effect to the special allocations set forth in Sections 7.03 and 7.04, Loss for any Fiscal Year shall be allocated as follows:

(a)        Special Allocation of Loss Attributable to Note Defaults on TERI Guaranteed Loans.  To the extent of any positive balance in TERI's Capital Account as an Owner, TERI shall be specially allocated all Losses for such Fiscal Year resulting from defaults, as determined pursuant to the TERI Guaranty Agreements, on the TERI Guaranteed Loans owned by the Trust to the extent that the Trust is not reimbursed for such Losses by TERI as a guaranty payment pursuant to the TERI Guaranty Agreements.

(b)        Other Loss.  All Loss not allocated pursuant to Section 7.02(a) shall be allocated to the Owners in proportion to their Sharing Ratios.

(c)        Effect of Adjusted Capital Account Deficit.  The Loss allocated pursuant to Section 7.02(a) and (b) shall not exceed the maximum amount of Loss that can be so allocated without causing any Owner to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event some but not all of the Owners would have Adjusted Capital Account Deficits as a consequence of an allocation of Loss pursuant to Section 7.02(a) and (b), the limitation set forth in this Section 7.02(c) shall be applied on an Owner by Owner basis so as to allocate the maximum permissible Loss to each Owner under section 1.704-1(b)(2)(ii)(d) of the Regulations.

(d)        Remaining Loss.  In the event that there is any remaining Loss in excess of the limitation set forth in Section 7.02(c), such remaining Loss shall be allocated among the Owners in proportion to their respective Sharing Ratios.

Section 7.03        Special Allocations.

(a)        Minimum Gain Chargeback.  Except as otherwise provided in section 1.704-2(f) of the Regulations, notwithstanding any other provision of this Section 7.03, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, each Owner shall be specially allocated items of Trust income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Owner's share of the net decrease in Partnership Minimum Gain, determined in accordance with section 1.704-2(g) of the Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Owner pursuant thereto. The items to be so allocated shall be determined in accordance with sections 1.704-2(f)(6) and 1.704-2(j)(2) of the

Regulations. This Section 7.03(a) is intended to comply with the minimum gain chargeback requirement in section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

(b)    Owner Minimum Gain Chargeback. Except as otherwise provided in section 1.704-2(i)(4) of the Regulations, notwithstanding any other provision of this Section 7.03, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Fiscal Year, each Owner who has a share of the Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with section 1.704-2(i)(5) of the Regulations, shall be specially allocated items of Partnership income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Partner's share of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with section 1.704-2(i)(4) of the Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Partner pursuant thereto. The items to be so allocated shall be determined in accordance with sections 1.704- 2(i)(4) and 1.704-2(j)(2) of the Regulations. This Section 7.03(b) is intended to comply with the minimum gain chargeback requirement in section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

(c)    Qualified Income Offset. In the event any Owner unexpectedly receives any adjustments, allocations, or distributions described in section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Trust income and gain shall be specially allocated to the Owner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Owner as quickly as possible, provided that an allocation pursuant to this Section 7.03(c) shall be made only if and to the extent that the Owner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article VII have been tentatively made as if this Section 7.03(c) were not in this Agreement.

(d)    Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year shall be specially allocated among the Owners in proportion to their Sharing Ratios.

(e)    Partner Nonrecourse Deductions. Any Partner Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Owner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with section 1.704-2(i)(1) of the Regulations.

(f)    Mandatory Allocations Under Section 704(c) of the Code. Notwithstanding the foregoing provisions of this Section 7.03, in the event section 704(c) of the Code or section 704(c) of the Code principles applicable under section 1.704-1(b)(2)(iv) of the Regulations require allocations of income, gain, deduction or loss in a manner different than that set forth above, the provisions of section 704(c) of the Code and the Regulations thereunder shall control such allocations. Any item of Trust income, gain, loss and deduction with respect to any property (other than cash) that has been contributed by a Partner to the capital of the Trust or which has been revalued for Capital Account purposes pursuant to section 1.744-1(b)(2)(iv) of the Regulations and which is required to be allocated to such Partner for income tax purposes under section 704(c) of the Code so as to take into account the variation between the tax basis of such property and its fair market value at the time of its contribution shall be allocated solely for income tax purposes in the manner required or permitted under section 704(c) of the Code using the "traditional method" described in section 1.704-3(b) of the Regulations, provided, however, that curative allocations consisting of the special allocation of gain or loss upon the sale or other disposition of the contributed property shall be made in accordance with section 1.704-3(c) of the Regulations to the extent necessary to eliminate any disparity, to the extent possible, between the Partners' book and tax Capital Accounts attributable to such property; further provided, however, that any other method allowable under applicable Regulations may be used for any contribution of property as to which there is agreement between the contributing Partner and the Administrator.

(g)    Gross Income Allocation. In the event any Owner has an Adjusted Capital Account Deficit, such Owner shall be specially allocated items of Trust income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 7.03(g) shall be made only if and to the extent that such Owner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 7.03 have been made as if Sections 7.03(c) and 7.03(g) were not in this Agreement.

Section 7.04    Curative Allocations. The allocations set forth in Sections 7.02 and 7.03(a) through (e) (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the

Owners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Trust income, gain, loss, or deduction. Therefore, notwithstanding any other provision of this Article VII (other than the Regulatory Allocations), offsetting special allocations of Trust income, gain, loss, or deduction shall be made so that, after such offsetting allocations are made, each Owner's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Owner would have had if the Regulatory Allocations were not part of this Agreement and all Trust items were allocated pursuant to Sections 7.01 and 7.02. In making such offsetting allocations, there shall be taken into account future Regulatory Allocations under Section 7.03(a) and (b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Section 7.03(d) and (e).

      Section 7.05        Other Allocation Rules.

      (a)        For purposes of determining the Profit, Loss, or any other items allocable to any period, Profit, Loss, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Owner Trustee, under the direction of the Super-majority Owners, using any method permissible under section 706 of the Code and the Regulations thereunder.

      (b)        The Owners are aware of the income tax consequences of the allocations made by this Article VII and hereby agree to be bound by the provisions of this Article VII in reporting their shares of Trust income and loss for income tax purposes.

      (c)        Solely for purposes of determining an Owner's proportionate share of the "excess nonrecourse liabilities" of the Trust within the meaning of section 1.752-3(a)(3) of the Regulations, the Owners' interests in Trust profits are in proportion to their Sharing Ratios.

      (d)        To the extent permitted by section 1.704-2(h)(3) of the Regulations, the Owner Trustee shall endeavor to treat distributions of Net Cash Flow as having been made from the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt only to the extent that such distributions would cause or increase an Adjusted Capital Account Deficit for any Owner.

      Section 7.06        Distribution of Net Cash Flow.  Except to the extent prohibited by any other agreement to which the Trust is a party or is otherwise bound, Net Cash Flow on each Distribution Date shall be distributed on such Distribution Date to each Owner in an amount equal to (i) the Profit allocated to such Owner under this Article VII and not previously distributed to such Owner less (ii) the amount of Losses allocated to such Owner to the extent such Losses were not applied in reduction of the amount of any previous distribution of Net Cash Flow to such Owner. All payments to be made under this Agreement by the Owner Trustee shall be made only from the income and proceeds of the Trust Property and only to the extent the Owner Trustee has received such income or proceeds.

      Section 7.07        Distribution Date Statement.  With each distribution to an Owner pursuant to Section 7.06, the Owner Trustee shall deliver a Distribution Date Statement setting forth, for the period since the preceding Distribution Date:

      (a)        Income and proceeds received by the Owner Trustee with respect to the Trust Property;

      (b)        Amounts paid to the Owner Trustee;

      (c)        Amounts paid to any Person pursuant to a Trust Related Agreement; and

      (d)        Amounts paid for other expenses of the Trust.

      Section 7.08        Allocation of Tax Liability.  In the event that any tax is imposed on the Trust, such tax shall be charged against amounts otherwise distributable to the Owners in proportion to their respective Sharing Ratios. The Owner Trustee is hereby authorized to retain from amounts otherwise distributable to the Owners sufficient funds to pay or provide for the payment of, and then to pay, such tax as is legally owed by the Trust (but such authorization shall not

prevent the Owner Trustee from contesting any such tax in appropriate proceedings, and withholding payment of such tax, if permitted by law, pending the outcome of such proceedings).

Section 7.09    Method of Payment.  All amounts payable to an Owner pursuant to this Agreement shall be paid by the Owner Trustee to such Owner or a nominee therefor by check payable to such Owner, mailed first class to the address of such Owner appearing on the register maintained pursuant to Section 3.02, or by crediting the amount to be distributed to such Owner to an account maintained by such Owner with the Owner Trustee or by transferring such amount by wire transfer in immediately available funds to a banking institution with bank wire transfer facilities for the account of such Owner, as instructed in writing from time to time by such Owner. The Owner Trustee may require an Owner to pay any wire transfer fees incurred in connection with any wire transfer made to such Owner.

Section 7.10    No Segregation of Funds; No Interest.  Subject to Sections 2.03(b)(ii) and 5.01, funds received by the Owner Trustee hereunder need not be segregated in any manner except to the extent required by law and may be deposited under such general conditions as may be prescribed by law, and the Owner Trustee shall not be liable for any interest thereon.

Section 7.11    Interpretation and Application of Provisions by the Administrator.  The Owner Trustee shall appoint and authorize the Administrator to interpret and apply the provisions set forth in Articles V, VI, VII and XI regarding application of funds, allocations of Profit and Loss and Distributions of Net Cash Flow, to resolve any ambiguities that may result from such application and to provide the Owner Trustee and the Owners with clarification of any provision as may be necessary or appropriate. The determinations of the Administrator shall be binding upon the Owners.

ARTICLE VIII

AUTHORITY AND DUTIES OF THE OWNER TRUSTEE

Section 8.01    General Authority.  The Owner Trustee is authorized to take all actions required or permitted to be taken by it pursuant to the terms of this Agreement, the Trust Related Agreements and the Statutory Trust Statute. The Owner Trustee is further authorized from time to time to take such action as the Administrator directs with respect to the Trust Related Agreements.

Section 8.02    Specific Authority.  The Owner Trustee is hereby authorized and directed to take the following actions:

(a)    Execute the Certificate of Trust;

(b)    Execute and deliver the Administration Agreement and the Back-up Agreement and on behalf of the Trust, as well as the Trust Related Agreements, including without limitation, the Trust Certificates and any other document contemplated by the foregoing, in each case in such form as the Administrator shall approve, as evidenced conclusively by the Owner Trustee's execution thereof; and

(c)    Execute and deliver on behalf of the Trust any documents necessary or appropriate, in such form as the Administrator shall approve, as evidenced conclusively by the Owner Trustee's execution thereof, to cause the repurchase by TERI or the Trust, as the case may be, of any Student Loan Note required to be repurchased in accordance with the TERI Guaranty Agreements.

Section 8.03    General Duties.  It shall be the duty of the Owner Trustee to discharge (or cause to be discharged) all of its responsibilities pursuant to the terms of this Agreement and to administer the Trust in the interest of the Owners. Notwithstanding the foregoing, the Owner Trustee shall be deemed to have discharged its duties and responsibilities hereunder and under the Trust Related Agreements to the extent the Administrator has agreed in the Administration Agreement to perform such acts or to discharge such duties of the Owner Trustee hereunder or under any Trust Related Agreement, and the Owner Trustee shall not be held liable for the default or failure of the Administrator to carry out its obligations under the Administration Agreement.

Section 8.04    <u>Accounting and Reports to the Owners, the Internal Revenue Service and Others</u>.  The Administrator shall (a) maintain or cause to be maintained the books of the Trust on a fiscal year basis using the accrual method of accounting, (b) deliver to each Owner, within 60 days of the end of each Fiscal Year, or more often, as may be required by the Code and the Regulations thereunder, a copy of the annual financial statement of the Trust for such Fiscal Year and a statement in such form and containing such information as may be required by such Regulations, and as is necessary and appropriate to enable each Owner to prepare its federal and state income tax returns, (c) file such tax returns and reports relating to the Trust, and make such elections, including an election for the first taxable year of the Trust, as may be necessary for the Trust to qualify as a partnership, or as may from time to time be required under any applicable state or federal statute or rule or regulation thereunder, (d) cause such tax returns to be signed in the manner required by law, (e) collect or cause to be collected any withholding tax required by the Code to be withheld by the Owner Trustee with respect to distributions to Owners who are nonresident aliens or foreign corporations, and (f) cause to be mailed to each Owner copies of all such reports and tax returns of the Trust.

Section 8.05    <u>Signature of Returns</u>.  The Owner Trustee shall sign on behalf of the Trust the tax returns and other Periodic Filings of the Trust, unless applicable law requires an Owner to sign such documents, in which case, so long as the Depositor is an Owner and applicable law allows the Depositor to sign any such document, the Depositor shall sign such document. At any time that the Depositor is not an Owner, or is otherwise not allowed by law to sign any such document, then the Owner required by law to sign such document shall sign.

Section 8.06    <u>Right to Receive and Rely Upon Instructions</u>.  In the event that the Owner Trustee is unable to decide between alternative courses of action, or is unsure as to the application of any provision of this Agreement or any Trust Related Agreement, or such provision is ambiguous as to its application, or is or appears to be in conflict with any other applicable provision, or in the event that this Agreement or any Trust Related Agreement permits  any determination by the Owner Trustee or is silent or is incomplete as to the course of action which the Owner Trustee is required to take with respect to a particular set of facts, the Owner Trustee may give notice (in such form as shall be appropriate under the circumstances) to the Owners requesting instructions and, to the extent that the Owner Trustee shall have acted or refrained from acting in good faith in accordance with any instructions received from the Owners, the Owner Trustee shall not be liable to any Person on account of such action or inaction. If the Owner Trustee shall not have received appropriate instructions within ten days of such notice (or within such shorter period of time as may be specified in such notice) the Owner Trustee may, but shall be under no duty to, take or refrain from taking such action, not inconsistent with this Agreement or the Trust Related Agreements, as the Owner Trustee shall deem to be in the best interests of the Owners, and the Owner Trustee shall have no liability to any Person for such action or inaction.

Section 8.07    <u>No Duties Except as Specified in this Agreement or in Instructions</u>.  The Owner Trustee shall not have any duty or obligation to manage, make any payment in respect of, register, record, sell, dispose of or otherwise deal with the Trust Property, or to otherwise take or refrain from taking any action under, or in connection with, any document contemplated hereby to which the Owner Trustee or the Trust is a party, except as expressly provided by the terms of this Agreement, and no implied duties or obligations shall be read into this Agreement against the Owner Trustee. The Owner Trustee nevertheless agrees that it will, at its own cost and expense, promptly take all action as may be necessary to discharge any liens on any part of the Trust Property which result from claims against the Owner Trustee personally that are not related to the ownership or the administration of the Trust Property or the transactions contemplated by the Trust Related Agreements.

Section 8.08    <u>No Action Except Under Specified Documents or Instructions</u>.  The Owner Trustee shall not manage, control, use, sell, dispose of or otherwise deal with any part of the Trust Property except (a) in accordance with the powers granted to and the authority conferred upon the Owner Trustee pursuant to this Agreement, and (b) in accordance with instructions delivered to the Owner Trustee pursuant to Section 8.06 and Article IV hereof.

Section 8.09    <u>Restriction</u>.  Notwithstanding anything herein to the contrary, the Owner Trustee shall not take any action (a) that is inconsistent with the purposes of the Trust or (b) that would result in the Trust being treated as an association taxable as a corporation for Federal income tax purposes.

ARTICLE IX

CONCERNING THE OWNER TRUSTEE

Section 9.01    Acceptance of Trusts and Duties. The Owner Trustee accepts the trusts hereby created and agrees to perform its duties hereunder with respect to the same but only upon the terms of this Agreement. The Owner Trustee shall not be personally liable under any circumstances, except (a) for its own willful misconduct, bad faith or gross negligence, (b) for liabilities arising from the failure by the Owner Trustee to perform obligations expressly undertaken by it in the last sentence of Section 8.07, (c) for the inaccuracy of the representations and warranties of the Owner Trustee contained in Section 9.05, or (d) for taxes, fees or other charges on, based on or measured by any fees, commissions or compensation received by the Owner Trustee in  connection with any of the transactions contemplated by this Agreement or the Trust Related Agreements. In particular, but not by way of limitation:

(i)    The Owner Trustee shall not be personally liable for any error of judgment made in good faith by an Authorized Officer of the Owner Trustee;

(ii)    The Owner Trustee shall not be personally liable with respect to any action taken or omitted to be taken by the Owner Trustee in good faith in accordance with the written instructions of the Administrator or the Owners;

(iii)    No provision of this Agreement shall require the Owner Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of any of its rights or powers hereunder if the Owner Trustee shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it;

(iv)    Under no circumstance shall the Owner Trustee be personally liable for any indebtedness of the Trust under any Trust Related Agreement;

(v)    The Owner Trustee shall not be personally responsible for or in respect of the validity or sufficiency of this Agreement or for the due execution hereof by the Depositor, or for the form, character, genuineness, sufficiency, value or validity of any Student Loan or Trust Certificate (other than with respect to the due execution thereby by an Authorized Officer), or for or in respect of the validity or sufficiency of the Administration Agreement or the Trust Related Agreements; and

(vi)    The Owner Trustee shall not be liable for the default or misconduct of the Administrator under any of the Trust Related Agreements or otherwise and the Owner Trustee shall have no obligation or liability to perform the obligations of the Trust hereunder or under any Trust Related Agreement that are required to be performed by the Administrator under the Administration Agreement.

Section 9.02    Furnishing of Documents. The Owner Trustee shall furnish to the Owners, promptly upon receipt thereof, duplicates or copies of all material reports, notices, requests, demands, certificates, financial statements and any other instruments furnished to the Owner Trustee hereunder (other than documents originated by or otherwise furnished to such Owners).

Section 9.03    Reliance; Advice of Counsel.

(a)    The Owner Trustee shall incur no liability to anyone in acting upon any signature, instrument, notice, resolution, request, consent, order, certificate, report, opinion, note or other document or paper believed by it to be genuine and believed by it to be signed by the proper party or parties. The Owner Trustee may accept a certified copy of a resolution of the board of directors or other governing body of any corporate party as conclusive evidence that such resolution has been duly adopted by such body and that the same is in full force and effect. As to any fact or matter the manner of ascertainment of which is not specifically prescribed herein, the Owner Trustee may for all purposes hereof rely on a certificate, signed by the president or any vice president or by the treasurer or any assistant treasurer or the secretary of the relevant party, as to such fact or matter, and such certificate shall constitute full protection to the Owner Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon.

(b)    In the exercise or administration of the trusts hereunder and in the performance of its duties and obligations under any of the Trust Related Agreements, the Owner Trustee (i) may act directly or, at the expense of the Trust, through agents or attorneys pursuant to agreements entered into with any of them, and the Owner Trustee shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys shall have been selected by

the Owner Trustee with reasonable care; and (ii) may, at the expense of the Trust, consult with counsel, accountants and other skilled persons to be selected with reasonable care and employed by it, and the Owner Trustee shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons.

Section 9.04    Not Acting in Individual Capacity.  Except as expressly provided in this Article IX, in accepting the trusts hereby created, the Owner Trustee acts solely as trustee hereunder and not in its individual capacity, and all Persons having any claim against the Owner Trustee by reason of the transactions contemplated by this Agreement or the Trust Related Agreements shall look only to the Trust Property for payment or satisfaction thereof.

Section 9.05    Representations and Warranties of Owner Trustee.  The Owner Trustee represents and warrants to the Depositor that (a) the Owner Trustee meets the requirements of (i) Rule 3(a)(7) promulgated under the Investment Company Act of 1940, as amended, and (ii) section 3807 of the Statutory Trust Statute and (b) the Owner Trustee or the Owner Trustee's parent entity has a combined capital and surplus of at least $50,000,000.

ARTICLE X

COMPENSATION OF OWNER TRUSTEE

Section 10.01    Owner Trustee's Fees and Expenses.  The Owner Trustee shall be entitled to compensation for its services hereunder from the Trust pursuant to the Indenture and, to the extent not paid by the Administrator on behalf of the Trust, the Owner Trustee shall receive such compensation from The First Marblehead Corporation, as set forth in a separate fee agreement between The First Marblehead Corporation, the Depositor and the Owner Trustee. The Owner Trustee shall be entitled to be reimbursed by the Trust for its reasonable expenses hereunder pursuant to the Indenture and, to the extent not paid by the Administrator on behalf of the Trust, the Owner Trustee shall receive such reimbursement from The First Marblehead Corporation, including the reasonable compensation, expenses and disbursements of such agents, representatives, experts and counsel as the Owner Trustee may employ in connection with the exercise and performance of its rights and duties under this Agreement and the Trust Related Agreements.

Section 10.02    Indemnification.  The National Collegiate Funding LLC and The Education Resources Institute, Inc. shall be jointly and severally liable for, and hereby agree to, indemnify Wilmington Trust Company, individually and as Owner Trustee, and its successors, assigns, agents and servants, from and against any and all liabilities, obligations, losses, damages, taxes (other than taxes incurred as the result of the payment of fees and expenses pursuant to Section 10.01), claims, actions, suits, costs, expenses and disbursements (including legal fees and expenses) of any kind and nature whatsoever which may be imposed on, incurred by or asserted at any time against the Owner Trustee (whether or not indemnified against by other parties) in any way relating to or arising out of this Agreement, any Trust Related Agreement, the administration of the Trust Property or the action or inaction of the Owner Trustee hereunder, except only that the Owners shall not be required to indemnify the Owner Trustee for expenses arising or resulting from any of the matters described in the second sentence of Section 9.01. The indemnities contained in this Section 10.02 shall survive the termination of this Agreement. The obligations of The National Collegiate Funding LLC and The Education Resources Institute, Inc. pursuant to this Section 10.02 shall be borne in proportion to their respective Percentage Interests.

Section 10.03    Lien on Trust Property.  Following the retirement of the Notes, the Owner Trustee shall have a lien on the Trust Property for any compensation or expenses and indemnity due hereunder which lien shall be prior to all other liens.

Section 10.04    Payments to the Owner Trustee.  Any amounts paid to the Owner Trustee from the Trust Property pursuant to this Article X shall be deemed not to be part of the Trust Property immediately after such payment.

ARTICLE XI

TERMINATION OF TRUST

Section 11.01    Termination of Trust.

(a)    The trust created hereby shall dissolve and terminate and, except as otherwise provided in this Article XI, this Agreement shall be of no further force or effect, upon the earlier of (i) if the Notes are no longer outstanding, the unanimous consent of the Owners, (ii) if the Notes are no longer outstanding, the sale or other final disposition by the Owner Trustee of the Trust Property and the final distribution by the Owner Trustee of all funds or other property or proceeds of the Trust Property in accordance with the terms of this Agreement and the Trust Related Agreements, and (iii) 21 years less one day after the death of the survivor of the descendants living on the date of this Agreement of Joseph P. Kennedy, the late Ambassador of the United States to the Court of St. James.

(b)    The bankruptcy, death, incapacity, dissolution or termination of any Owner shall not operate to dissolve or terminate this Agreement, nor entitle such Owner's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust Property, nor otherwise affect the rights, obligations and liabilities of the parties hereto.

(c)    Upon the termination of the Trust pursuant to this Article XI, the Owner Trustee shall cause a Certificate of Termination to be filed with the Secretary of State.

Section 11.02    Distribution of Assets.  Upon dissolution and termination of the Trust, the Owner Trustee shall take full account of the Trust assets and liabilities, shall liquidate the assets as promptly as is consistent with obtaining the fair value thereof, and shall apply and distribute the proceeds therefrom in the following order:

(a)    To the payment of the expenses of liquidation and the debts and liabilities of the Trust;

(b)    To the setting up of reserves which the Owner Trustee may deem necessary or appropriate for anticipated obligations or contingencies of the Trust arising out of or in connection with the operation of the Trust. Such reserves may be paid over by the Owner Trustee to an escrow agent or trustee selected by the Owner Trustee to be disbursed by such escrow agent or trustee in payment of any of such obligations or contingencies and, if any balance remains at the expiration of such period as the Owner Trustee shall deem advisable, to be distributed by such escrow agent or trustee in the manner hereinafter provided;

(c)    To each of the Owners, other than TERI, in accordance with the positive balances in each such Owner's Capital Account to the extent of the aggregate unreturned Capital Contributions of such Owner credited therein; and

(d)    To the Owners, the balance of any proceeds in accordance with the positive balances in their respective Capital Accounts; provided that with respect to any distribution to TERI, such distribution shall be reduced by the amount of money paid to TERI by the Trust in accordance with paragraph 4 of the Section 2.05 Supplement to Master Loan Guaranty Agreement between TERI and The First Marblehead Corporation dated April 30, 2001 less the amount by which aggregate Distributions to TERI of Net Cash Flow pursuant to Section 7.06 hereof have been reduced by the application of subsection (iii) thereof, and any such reduction shall be distributed to the Owners other than TERI in accordance with the positive balances in their respective Capital Accounts.

If, at the time of liquidation, the Owner Trustee shall determine that an immediate sale of some or all of the assets would cause undue loss to the Owners, the Owner Trustee may, in order to avoid such loss and with the consent of the Owners, defer liquidation.

Section 11.03    No Termination by Depositor or Owners.  Except as provided in Section 11.01, neither the Depositor nor the Owners shall be entitled to terminate or revoke the Trust established hereunder.

ARTICLE XII

SUCCESSOR OWNER TRUSTEES AND ADDITIONAL OWNER TRUSTEES

Section 12.01    Resignation of Owner Trustee; Appointment of Successor.

(a)      The Owner Trustee may resign at any time without cause by giving at least 60 days' prior written notice to the Administrator and the Owners, such resignation to be effective upon the acceptance of appointment by a successor Owner Trustee under Section 12.01(b). In addition, the Super-majority Owners may at any time remove the Owner Trustee without cause by an instrument in writing delivered to the Owner Trustee and the Administrator, such removal to be effective upon the acceptance of appointment by a successor Owner Trustee under Section 12.01(b). In case of the resignation or removal of the Owner Trustee, the Owners may appoint a successor Owner Trustee by an instrument signed by the Owners. If a successor Owner Trustee shall not have been appointed within 30 days after the giving of written notice of such resignation or the delivery of the written instrument with respect to such removal, the Owner Trustee or the Owners may apply to any court of competent jurisdiction to appoint a successor Owner Trustee to act until such time, if any, as a successor Owner Trustee shall have been appointed as provided above. Any successor Owner Trustee so appointed by such court shall immediately and without further act be superseded by any successor Owner Trustee appointed as above provided within one year from the date of the appointment by such court.

(b)      Any successor Owner Trustee, however appointed, shall execute and deliver to the predecessor Owner Trustee an instrument accepting such appointment, and thereupon such successor Owner Trustee, without further act (except for the filing required under clause (e) below), shall become vested with all the estates, properties, rights, powers, duties and trust of the predecessor Owner Trustee in the trusts hereunder with like effect as if originally named the Owner Trustee herein; but nevertheless, upon the written request of such successor Owner Trustee and the payment of all fees and indemnities due the predecessor Owner Trustee, such predecessor Owner Trustee shall execute and deliver an instrument transferring to such successor Owner Trustee, upon the trusts herein expressed, all the estates, properties, rights, powers, duties and trusts of such predecessor Owner Trustee, and such predecessor Owner Trustee shall duly assign, transfer, deliver and pay over to such successor Owner Trustee all funds or other property then held or subsequently received by such predecessor Owner Trustee upon the trusts herein expressed.

(c)      Any successor Owner Trustee, however appointed, shall be a bank or trust company (i) that meets the requirements of (A) Rule 3(a)(7) promulgated under the Investment Company Act of 1940, as amended, and (B) section 3807 of the Statutory Trust Statute and (ii) whose parent entity has a combined capital and surplus of at least $50,000,000, if there be such an institution willing, able and legally qualified to perform the duties of the Owner Trustee hereunder upon reasonable or customary terms.

(d)      Any corporation into which the Owner Trustee may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Owner Trustee shall be a party, or any corporation to which substantially all the corporate trust business of the Owner Trustee may be transferred, shall, subject to the terms of Section 12.01(c), be the Owner Trustee under this Agreement without further act.

(e)      Any successor Owner Trustee appointed pursuant to this Article XII shall file an amendment to the Certificate of Trust with the Secretary of State reflecting the name and principal place of business of such successor Owner Trustee.

Section 12.02      Appointment of Additional Owner Trustees.  At any time or times for the purpose of meeting any legal requirements of any jurisdiction in which any part of the Trust Property may at the time be located, the Owner Trustee and the Administrator, acting jointly, by an instrument in writing, may appoint one or more individuals or corporations approved by the Administrator and the Owner Trustee to act as separate trustee or separate trustees of all or any part of the Trust Property to the full extent that local law makes it necessary or appropriate for such separate trustee or separate trustees to act alone. If the Administrator shall not have joined in such appointment within fifteen days after the receipt of such request, the Owner Trustee, acting alone, shall have the power to make such appointment.

ARTICLE XIII

TAX MATTERS PARTNER

Section 13.01      Tax Matters Partner.  The  tax matters partner (within the meaning of section 6231(a)(7) of the Code and applicable Regulations) of the Trust for all federal income tax purposes set forth in the Code shall be The National Collegiate Funding LLC. Subject to Section 13.08, the tax matters partner shall have the authority to represent the Trust and perform the duties imposed on the tax matters partner under the Code, and as set forth in this Article XIII.

Section 13.02      Notice of Tax Audit.  The tax matters partner shall give prompt notice to the Owners upon receipt of advice that the Internal Revenue Service intends to examine Trust income tax returns for any year.

Section 13.03      Authority to Extend Period for Assessing Tax.  Subject to Section 13.08, the tax matters partner shall have the authority to extend the period for assessing any tax imposed on any Owner under the Code by any agreement as provided for under section 6229(b)(1)(B) of the Code.

Section 13.04      Choice of Forum for Filing Petition for Readjustment.  Any petition for readjustment may, but is not required to, be filed by the tax matters partner in accordance with section 6226(a) of the Code in the United States District Court for the district in which the Trust's principal place of business is located, or the United States Claims Court.

Section 13.05      Authority to Bind Owners by Settlement Agreement.  Subject to Section 13.08, the tax matters partner shall enter into a settlement agreement in accordance with section 6224(c)(3) of the Code as directed by the Owners.

Section 13.06      Notices Sent to the Internal Revenue Service.  The tax matters partner shall use its best efforts to furnish to the Internal Revenue Service the name, address, profits interest and taxpayer identification number of each Owner and any additional information it receives from each Owner regarding any change in that Owner's name, address, profits interest and taxpayer identification number. In no event shall the tax matters partner be liable, responsible or accountable in damages or otherwise to the Owner for any loss in connection with furnishing such information to the Internal Revenue Service if the tax matters partner acts in good faith and is not guilty of fraud or gross negligence.

Section 13.07      Indemnification of Tax Matters Partner.  The Trust shall indemnify and save harmless the tax matters partner against any loss, damage, cost or expense (including attorneys' fees) incurred by it as a result of any act performed or omitted on behalf of the Trust or any Owner or in furtherance of the Trust's interests or the interests of the Owner, in its capacity as tax matters partner, without, however, relieving the tax matters partner of liability for bad faith, fraud or gross negligence.

Section 13.08      Approval of Tax Matters Partner's Decisions.  The tax matters partner shall call a meeting of the Owners at any time in order to discuss any decisions the tax matters partner may propose to make, notice of which shall be included in the notice of such meeting. The tax matters partner shall make no decision and take no action with respect to the determination, assessment or collection of any tax imposed by the Code on the Owners unless and until such decision has been approved by the Owners.

Section 13.09      Participation by Owners in Internal Revenue Service Administrative Proceedings.  Nothing contained in this Article XIII shall be construed to take away from any Owner any right granted to such person by the Code to participate in any manner in administrative proceedings of the Internal Revenue Service.

ARTICLE XIV

MISCELLANEOUS

Section 14.01      Supplements and Amendments.

(a)      This Agreement may be amended only by a written instrument signed by the Owner Trustee and all of the Owners at the time of such amendment and upon satisfaction of the Rating Agency Condition (as defined in the Indenture) and, so long as any of the Notes are outstanding or any amounts are owed to the Note Insurer, the consent of the Note Insurer; provided, however, that if, in the opinion of the Owner Trustee, any instrument required to be so executed adversely affects any right, duty or liability of, or immunity or indemnity in favor of, the Owner Trustee under this Agreement or any of the documents contemplated hereby to which the Owner Trustee or the Trust is a party, or would cause or result in any conflict with or breach of any terms, conditions or provisions of, or default under, the charter documents or by-laws of the Owner Trustee or any document contemplated hereby to which the Owner Trustee is a party, the Owner Trustee may in its sole discretion decline to execute such instrument. The Certificate of Trust shall be amended (except as required by the Statutory Trust Statute) only upon satisfaction of the Rating Agency Condition (as defined in

the Indenture) and, so long as any of the Notes are outstanding or any amounts are owed to the Note Insurer, the consent of the Note Insurer. The Owner Trustee shall be fully protected in relying upon a certificate of the Administrator in determining if the Rating Agency Condition (as defined in the Indenture) has been satisfied.

(b)    The Trust shall not change its jurisdiction of formation without first satisfying the Rating Agency Condition (as defined in the Indenture) and, so long as any of the Notes are outstanding or any amounts are owed to the Note Insurer, obtaining the consent of the Note Insurer.

Section 14.02    No Legal Title to Trust Property in Owner.  Legal title to all Trust Property shall be vested at all times in the Trust as a separate legal entity, except where the laws of any jurisdiction require title to be vested in a trustee in which case legal title shall be vested in the Owner Trustee on behalf of the Trust. If any portion of the Trust Property is deemed vested in the Owner Trustee, the Owner Trustee, upon an Authorized Officer having actual knowledge thereof, will immediately notify the Indenture Trustee and the Administrator, and the Administrator will cause to be filed such UCC financing statements and related filing documents or writings as are necessary to maintain the Indenture Trustee's security interest in the Trust Property.  The Owner Trustee shall have no duty or obligation to independently investigate whether legal title to any Trust Property is deemed vested in the Owner Trustee.  The Owners shall not have legal title to any part of the Trust Property and shall only have an undivided beneficial interest therein. No transfer, by operation of law or otherwise, of any right, title and interest of the Owners in and to their undivided Beneficial Interests in the Trust Property hereunder shall operate to terminate this Agreement or the trusts hereunder or entitle any successor transferee to an accounting or to the transfer to it of legal title to any part of the Trust Property.

Section 14.03    Pledge of Collateral by Owner Trustee is Binding.  The pledge of any Trust Property to any Person by the Owner Trustee made under any Trust Related Agreement and pursuant to the terms of this Agreement shall bind the Owners and shall be effective to transfer or convey the rights of the Owner Trustee and the Owners in and to such Trust Property to the extent set forth in such Trust Related Agreement. No purchaser or other grantee shall be required to inquire as to the authorization, necessity, expediency or regularity of such pledge or as to the application of any proceeds with respect thereto by the Owner Trustee.

Section 14.04    Limitations on Rights of Others.  Nothing in this Agreement, whether express or implied, shall be construed to give to any Person other than the Owner Trustee, the Administrator and the Owners any legal or equitable right, remedy or claim in the Trust Property or under or in respect of this Agreement or any covenants, conditions or provisions contained herein provided, however, that for so long as any of the Notes are outstanding or any amounts are owed to the Indenture Trustee or the Note Insurer, the Noteholders and the Note Insurer are third party beneficiaries hereof.

Section 14.05    Notices.  Unless otherwise expressly specified or permitted by the terms hereof, all notices shall be in writing and delivered by hand or mailed by certified mail, postage prepaid, if to the Owner Trustee, addressed to: Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware, 19890, Attention: Corporate Trust Administration, or to such other address as the Owner Trustee may have set forth in a written notice to the Owners; and if to an Owner, addressed to it at the address set forth for such Owner in the register maintained by the Owner Trustee. Whenever any notice in writing is required to be given by the Owner Trustee hereunder, such notice shall be deemed given and such requirement satisfied 72 hours after such notice is mailed by certified mail, postage prepaid, addressed as provided above; any notice given by an Owner to the Owner Trustee shall be effective upon receipt by an Authorized Officer of the Owner Trustee. A copy of any notice delivered to the Owner Trustee shall also be delivered to the Administrator, addressed to: The First Marblehead Data Services, Inc., The Prudential Tower, 800 Boylston Street - 34th Floor, Boston, MA 02199-8157, Attention: Ms. Rosalyn Bonaventure, with a copy to First Marblehead Corporation, The Prudential Tower, 800 Boylston Street - 34th Floor, Boston, MA 02199-8157, Attention: Corporate Trust Administration, or to such other addresses as the Administrator may have set forth in a written notice to the Owner Trustee.

Section 14.06    Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 14.07      Separate Counterparts.  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 14.08      Successors and Assigns.  All covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the Owner Trustee and its successors and assigns and each Owner and its successors and permitted assigns, all as herein provided. Any request, notice, direction, consent, waiver or other instrument or action by an Owner shall bind the successors and assigns of such Owner.

Section 14.09      Headings.  The headings of the various Articles and Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

Section 14.10      Governing Law.  This Agreement shall in all respects be governed by, and construed in accordance with, the laws of the State of Delaware (excluding conflict of law rules), including all matters of construction, validity and performance.

Section 14.11      General Interpretive Principles.  For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)      The defined terms in this Agreement include the plural as well as the singular, and the use of any gender herein shall be deemed to include any other gender;

(b)      Accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date hereof;

(c)      References herein to "Articles," "Sections," "paragraphs" and other subdivisions without reference to a document are to designated Articles, Sections, paragraphs and other subdivisions of this Agreement;

(d)      A reference to a paragraph without further reference to a Section is a reference to such paragraph as contained in the same Section in which the reference appears, and this rule shall also apply to subparagraphs and other subdivisions;

(e)      The words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)      The term "include" or "including" shall mean without limitation by reason of enumeration.

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to the duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

WILMINGTON TRUST COMPANY, not in its individual capacity except as expressly provided herein, but solely as Owner Trustee

By:/s/ Patricia A. Evans
    Name:    Patricia A. Evans
    Title:    Vice President

THE NATIONAL COLLEGIATE FUNDING, LLC, as Depositor and Owner

By:       GATE Holdings, Inc., Member

By:  /s/ John A. Foxgrover
    Name: John A. Foxgrover
    Title:  Vice President

THE EDUCATION RESOURCES INSTITUTE, INC.,
as Owner

By: /s/ Willis J. Hulings III
    Name:    Willis J. Hulings III
    Title:    President and Chief Executive Officer

ACKNOWLEDGED WITH
RESPECT
TO THE POWER ATTORNEY
GRANTED IN SECTION 4.05

FIRST MARBLEHEAD DATA
SERVICES, INC.

By:  /s/ Rosalyn Bonaventure
    Name:  Rosalyn Bonaventure
    Title:    President

**Trust Agreement (NCSLT 2007-4)**

**SCHEDULE A**

| Owners | Capital Contributions ($) | Sharing Ratio (%) | Percentage Interest (%) |
|---|---|---|---|
| The National Collegiate Funding LLC | $1.00 | 79.3003% | 79.3003% |
| The Education Resources Institute, Inc. | None | 20.6997% | 20.6997% |

**SCHEDULE B**

*Loan Originators*

- Bank of America, N.A.

- Charter One Bank, N.A.

- Citizens Bank of Rhode Island

- Comerica Bank

- HSBC Bank USA, National Association

- The Huntington National Bank

- InsurBanc

- JPMorgan Chase Bank, N.A.

- KeyBank National Association

- Manufacturers and Traders Trust Company

- National City Bank

- PNC Bank, N.A.

- Sovereign Bank

- SunTrust Bank

- TCF National Bank.

- Union Federal Savings Bank

## SCHEDULE C

*Note Purchase Agreements*

Each of the Note Purchase Agreements, as amended or supplemented, was entered into by and between The First Marblehead Corporation and:

- Bank of America, N.A., dated April 30, 2001, for loans that were originated under Bank of America's Private Loan Program, TERI School Channel Loan Program and ISLP Loan Program.

- Bank of America, N.A., dated June 30, 2006, for loans that were originated under Bank of America's Private Loan Program, TERI School Channel Loan Program and ISLP Loan Program.

- Bank of America, N.A., dated April 1, 2006, for loans that were originated under Bank of America's Direct to Consumer Loan Program.

- Charter One Bank, N.A., dated as of December 29, 2003 for loans that were originated under Charter One's AAA Southern New England Bank Loan Program.

- Charter One Bank, N.A., dated October 31, 2003, for loans that were originated under Charter One's AES EducationGAIN Loan Program.

- Charter One Bank, N.A., dated June 30, 2003, for loans that were originated under Charter One's Citibank Education Assistance Loan Program.

- Charter One Bank, N.A., dated July 1, 2002, for loans that were originated under Charter One's College Loan Corporation Loan Program.

- Charter One Bank, N.A., dated November 17, 2003, for loans that were originated under Charter One's National Education Loan Program.

- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's NextStudent Alternative Loan Program.

- Charter One Bank, N.A., dated March 25, 2004, for loans that were originated under Charter One's Astrive and AstriveAlliance Education (f/k/a START) Loan Programs.

- Charter One Bank, N.A., dated February 15, 2005, for loans that were originated under Charter One's Referral Loan Program (including loans in the Charter One Bank Alternative Loan Program, E-Loan Private Loan Program, UPromise Alternative Loan Program, Collegiate Solutions Alternative Loan Program, College Board Alternative Loan Program, Axiom Alternative Loan Program, American Student Loan Services Private Loan Program, nBuy Private Loan Program, and ThinkFinancial Alternative Loan Program).

- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Alternative Loan Program, ISLP Loan Program, Compass Bank Loan Program, FinanSure Alternative Loan Program, Navy Federal Alternative Loan Program, and Xanthus Alternative Loan Program.

- Citizens Bank of Rhode Island, dated October 1, 2002, for loans that were originated under Citizens Bank of Rhode Island's Penn State Undergraduate Loan Program.

- Comerica Bank, dated June 30, 2006, for loans that were originated under Comerica Bank's Private Loan Program.

- HSBC Bank USA, National Association, dated April 17, 2002, as amended on June 2, 2003 and August 1, 2003, for loans that were originated under the HSBC Loan Program.

-

The Huntington National Bank, dated May 20, 2003, for loans that were originated under the Huntington Education Loan Program.

- InsurBanc, dated July 1, 2006, for loans that were originated under the InsurBanc Loan Program.

- JPMorgan Chase Bank, N.A,, (successor to Bank One, N.A.), dated May 1, 2002, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program, EDUCATION ONE Loan Program, and Campus One Loan Program.

- KeyBank National Association, dated May 12, 2006, for loans that were originated under KeyBank's Private Education Loan Program.

- Manufacturers and Traders Trust Company, dated April 29, 2004, for loans that were originated under the M&T Alternative Loan Program.

- National City Bank, dated November 13, 2002, for loans that were originated under the National City Loan Program.

- National City Bank, dated July 21, 2006, for loans that were originated under the National City Referral Loan Program, including the Astute Private Loan Program and Student Lending Works Private Loan Program.

- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's Alternative Loan Program, Brazos Alternative Loan Program, Edvisors Alternative Loan Program, Fondo Futuro Loan Program, GE Money Bank Student Loan Program, Old National Bank Private Loan Program, and Regions Bank Private Loan Program.

- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Student Loan Program.

- SunTrust Bank, dated March 1, 2002, for loans that were originated under the SunTrust Loan Program.

- TCF National Bank, dated July 22, 2005, for loans that were originated under the TCF National Bank Alternative Loan Program.

  - Union Federal Savings Bank, dated March 26, 2007, for loans that were originated under the UFSB Astrive Loan Program.

## SCHEDULE D
### *Guaranty Agreements*

Each of the following Guaranty Agreements, as amended or supplemented, was entered into by and between The Education Resources Institute, Inc. and:

- Bank of America, N.A., dated April 30, 2001, for loans that were originated under Bank of America's Private Loan Program, TERI (School Channel) Loan Program and TERI ISLP Loan Program.

- Bank of America, N.A., dated June 30, 2006, for loans that were originated under Bank of America's Private Loan Program, TERI (School Channel) Loan Program and TERI ISLP Loan Program.

- Bank of America, N.A., dated June 30, 2003, for loans that were originated under Bank of America's Direct to Consumer Loan Program.

- Charter One Bank, N.A., dated as of December 29, 2003 for loans that were originated under Charter One's AAA Southern New England Bank Loan Program.

- Charter One Bank, N.A., dated October 31, 2003, for loans that were originated under Charter One's AES EducationGAIN Loan Program.

- Charter One Bank, N.A., dated June 30, 2003, for loans that were originated under Charter One's Citibank Education Assistance Loan Program.

- Charter One Bank, N.A., dated July 1, 2002, for loans that were originated under Charter One's College Loan Corporation Loan Program.

- Charter One Bank, N.A., dated November 17, 2003, for loans that were originated under Charter One's National Education Loan Program.

- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's NextStudent Alternative Loan Program.

- Charter One Bank, N.A., dated March 25, 2004, for loans that were originated under Charter One's Astrive and AstriveAlliance Education (f/k/a START) Loan Program.

- Charter One Bank, N.A., dated February 15, 2005, for loans that were originated under Charter One's Referral Loan Program (including loans in the Charter One Bank Alternative Loan Program, E-Loan Private Loan Program, UPromise Alternative Loan Program, Collegiate Solutions Alternative Loan Program, College Board Alternative Loan Program, Axiom Alternative Loan Program, American Student Loan Services Private Loan Program, nBuy Private Loan Program, and ThinkFinancial Alternative Loan Program).

- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Alternative Loan Program, ISLP Loan Program, Compass Bank Alternative Loan Program, FinanSure Alternative Loan Program, Navy Federal Alternative Loan Program, and Xanthus Alternative Loan Program.

- Citizens Bank of Rhode Island, dated October 1, 2002, for loans that were originated under Citizens Bank of Rhode Island's Penn State Undergraduate Loan Program.

- Comerica Bank, dated June 30, 2006, for loans that were originated under Comerica Bank's Private Loan Program.

- HSBC Bank USA, National Association, dated April 17, 2002, for loans that were originated under the HSBC Loan Program.

- The Huntington National Bank, dated May 20, 2003, for loans that were originated under the Huntington Education Loan Program.

- InsurBanc, dated July 1, 2006, for loans that were originated under the InsurBanc Loan Program.

- JPMorgan Chase Bank, N.A., (successor to Bank One, N.A.,) dated May 13, 2002, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program, EDUCATION ONE Loan Program, and Campus One Loan Program.

- KeyBank National Association, dated May 12, 2006, for loans that were originated under KeyBank's Private Education Loan Program.

- Manufacturers and Traders Trust Company, dated April 29, 2004, for loans that were originated under the M&T Alternative Loan Program.

- National City Bank, dated July 26, 2002, for loans that were originated under the National City Loan Program.

- National City Bank, dated July 21, 2006, for loans that were originated under the National City Referral Loan Program, including the Astute Private Loan Program and the Student Lending Works Private Loan Program.

- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's Alternative Loan Program, Brazos Alternative Loan Program, Edvisors Alternative Loan Program, Fondo Futuro Loan Program, GE Money Bank Student Loan Program, Old National Bank Private Loan Program, and Regions Bank Private Loan Program

- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Student Loan Program.

- SunTrust Bank, dated March 1, 2002, for loans that were originated under the SunTrust Loan Program.

- TCF National Bank, dated July 22, 2005, for loans that were originated under the TCF National Bank Alternative Loan Program.

- Union Federal Savings Bank, dated March 26, 2007, for loans that were originated under the USFB Astrive Loan Program.

## EXHIBIT 1

### FORM OF TRUST CERTIFICATE

### THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4

### TRUST CERTIFICATE

**THE BENEFICIAL INTEREST IN THE TRUST REPRESENTED BY THIS TRUST CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAW, AND MAY NOT BE DIRECTLY OR INDIRECTLY OFFERED OR SOLD OR OTHERWISE DISPOSED OF (INCLUDING PLEDGED) BY THE HOLDER HEREOF UNLESS IN THE OPINION OF COUNSEL SATISFACTORY TO THE OWNER TRUSTEE, SUCH TRANSACTION IS EXEMPT FROM REGISTRATION UNDER THE ACT AND STATE SECURITIES LAWS. THE TRANSFER OF THIS TRUST CERTIFICATE WILL NOT BE EFFECTIVE UNLESS THE TRANSFEREE HAS DELIVERED TO THE OWNER TRUSTEE A LETTER IN THE FORM REQUIRED BY SECTION 3.04(a) OF THE TRUST AGREEMENT AND THE TRANSFEREE PROVIDES THE OWNER TRUSTEE WITH EVIDENCE SATISFACTORY TO THE OWNER TRUSTEE DEMONSTRATING THE TRANSFEROR'S COMPLIANCE WITH SECTION 3.04(b) OF THE TRUST AGREEMENT.**

**NO TRANSFER OF THIS CERTIFICATE MAY BE MADE TO ANY PLAN SUBJECT TO ERISA OR SECTION 4975 OF THE CODE OR ANY PERSON ACTING ON BEHALF OF SUCH A PLAN EXCEPT IN ACCORDANCE WITH SECTION 3.04(d) OF THE TRUST AGREEMENT.**

### TRUST CERTIFICATE
### UNDER THE TRUST AGREEMENT, DATED
### as of September 20, 2007

Certificate No. _____

Wilmington Trust Company, not in its individual capacity, but solely as owner trustee (the "Owner Trustee") under the Trust Agreement, dated as of September 20, 2007, with The National Collegiate Funding LLC and The Education Resources Institute, Inc., on behalf of the holders from time to time (each an "Owner") of beneficial interests in the trust created thereby (the "Trust Agreement"), hereby certifies that _____ is the owner of an undivided beneficial interest equal to the percentage listed on Schedule A to the Trust Agreement in the Trust Property provided for and created by the Trust Agreement. This Trust Certificate is issued pursuant to and is entitled to the benefits of the Trust Agreement, and each Owner by acceptance hereof shall be bound by the terms of the Trust Agreement. Reference is hereby made to the Trust Agreement for a statement of the rights and obligations of the Owner hereof. The Owner Trustee may treat the person shown on the register maintained by the Owner Trustee pursuant to Section 3.02 of the Trust Agreement as the absolute Owner hereof for all purposes.

Capitalized terms used herein without definition have the meanings ascribed to them in or by reference in the Trust Agreement.

Transfer of this Trust Certificate is subject to certain restrictions and limitations set forth in the Trust Agreement, including the requirement that any transfer requires the prior consent of owners of at least 85% of the Percentage Interests in the Trust. In the manner more fully set forth in, and as limited by, the Trust Agreement, this Trust Certificate may be transferred upon the books of the Owner Trustee by the registered Owner in person or by his attorney duly authorized in writing upon surrender of this Trust Certificate to the Owner Trustee accompanied by a written instrument of transfer and with such signature guarantees and evidence of authority of the Persons signing the instrument of transfer as the Owner Trustee may reasonably require, whereupon the Owner Trustee shall issue in the name of the transferee a Trust Certificate or Trust Certificates evidencing the amount and extent of interest of the transferee.

The Owner hereof, by its acceptance of this Trust Certificate, warrants and represents to the Owner Trustee and to the Owners of the other Trust Certificates issued under the Trust Agreement and agrees not to transfer this Trust Certificate except in accordance with the Trust Agreement.

This Trust Certificate may not be acquired or held by a Plan.  By accepting and holding this Trust Certificate, the Owner hereof shall be deemed to have represented and warranted that it is not a Plan, unless it has provided the opinion of counsel described in Section 3.04(d) of the Trust Agreement.

This Trust Certificate and the Trust Agreement shall in all respects be governed by, and construed in accordance with, the laws of the State of Delaware (excluding conflict of law rules), including all matters of construction, validity and performance.

IN WITNESS WHEREOF, the Owner Trustee, pursuant to the Trust Agreement, has caused this Trust Certificate to be issued as of the date hereof.

WILMINGTON TRUST COMPANY, not in its
individual capacity , but solely as Owner Trustee

By: _____

Name: _____
Title: _____

Dated: _____

**EXHIBIT 2**

**FORM OF ACCESSION AGREEMENT**

_____, _____

Wilmington Trust Company
1100 North Market Street
Rodney Square North
Wilmington, Delaware 19890
Attention:

Dear Sirs:

We refer to the Trust Agreement, dated as of September 20, 2007 (the "Trust Agreement"), among The National Collegiate Funding LLC (the "Company"), The Education Resources Institute, Inc. and Wilmington Trust Company, a Delaware banking corporation (in its capacity as trustee thereunder, the "Owner Trustee"). We propose to purchase a beneficial interest in The National Collegiate Student Loan Trust 2007-4, a Delaware statutory trust (the "Trust") formed pursuant to the Trust Agreement. Capitalized terms used herein without definition have the meanings given them in the Trust Agreement.

1.      We understand that our Trust Certificate is not being registered under the Securities Act of 1933, as amended (the "1933 Act"), or any state securities or "Blue Sky" law and is being sold to us in a transaction that is exempt from the registration requirements of the 1933 Act and any applicable state laws.

2.      We have knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Trust, we are able to bear the economic risk of investment in the Trust and we are an "accredited investor" as defined in Regulation D under the 1933 Act.

3.      We acknowledge that none of the Trust, the Company or the Owner Trustee has advised us concerning the federal or state income tax consequences of owning a beneficial interest in the Trust, including the tax status of the Trust or the likelihood that distributions from the Trust would be characterized as "unrelated business income" for federal tax purposes, and we have consulted with our own tax advisor with respect to such matters.

4.      We are acquiring our Trust Certificate for our own account and not for the benefit of any other person and not with a view to any distribution of our beneficial interest in the Trust subject, nevertheless, to the understanding that disposition of our property shall at all times be and remain within our control.

5.      We agree that our beneficial interest in the Trust must be held indefinitely by us unless subsequently registered under the 1933 Act and any applicable state securities or "Blue Sky" law or unless exemptions from the registration requirements of the 1933 Act and applicable state laws are available.

6.      We agree that in the event that at some future time we wish to dispose of or exchange any of our beneficial interest in the Trust, we will not transfer or exchange any of our beneficial interest in the Trust unless we have obtained the prior written consent to such transfer or exchange pursuant to Section 3.04 of the Trust Agreement, and either:

(A)      (1) the transfer or exchange is made to an Eligible Purchaser (as defined below), (2) a letter to substantially the same effect as this letter is executed promptly by such Eligible Purchaser, and (3) all offers or solicitations in connection with the sale (if a sale), whether made directly or through any agent acting on our behalf, are limited only to Eligible Purchasers and are not made by means of any form of general solicitation or general advertising whatsoever; or

(B)      our beneficial interest in the Trust is sold in a transaction that does not require registration under the 1933 Act and any applicable State "Blue Sky" law.

"Eligible Purchaser" means a corporation, partnership or other entity which we have reasonable grounds to believe and do believe can make representations with respect to itself to substantially the same effect as the representations set forth herein.

7.      We understand that our Trust Certificate bears a legend to substantially the following effect:

THE BENEFICIAL INTEREST IN THE TRUST REPRESENTED BY THIS TRUST CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAW, AND MAY NOT BE DIRECTLY OR INDIRECTLY OFFERED OR SOLD OR OTHERWISE DISPOSED OF (INCLUDING PLEDGED) BY THE HOLDER HEREOF UNLESS IN THE OPINION OF COUNSEL SATISFACTORY TO THE OWNER TRUSTEE SUCH TRANSACTION IS EXEMPT FROM REGISTRATION UNDER THE ACT AND STATE SECURITIES LAWS. THE TRANSFER OF THIS TRUST CERTIFICATE WILL NOT BE EFFECTIVE UNLESS THE TRANSFEREE HAS DELIVERED TO THE OWNER TRUSTEE A LETTER IN THE FORM REQUIRED BY SECTION 3.04(a) OF THE TRUST AGREEMENT AND THE TRANSFEREE PROVIDES THE OWNER TRUSTEE WITH EVIDENCE SATISFACTORY TO THE OWNER TRUSTEE DEMONSTRATING THE TRANSFEROR'S COMPLIANCE WITH SECTION 3.04(b) OF THE TRUST AGREEMENT.

NO TRANSFER OF THIS CERTIFICATE MAY BE MADE TO ANY PLAN SUBJECT TO ERISA OR SECTION 4975 OF THE CODE OR ANY PERSON ACTING ON BEHALF OF SUCH A PLAN EXCEPT IN ACCORDANCE WITH SECTION 3.04(d) OF THE TRUST AGREEMENT.

8.      We agree to be bound by all terms and conditions of our Trust Certificate and the Trust Agreement.

                                        Very truly yours,


                                        _____
                                        Name of Purchaser


                                        By:_____
                                             Name:
                                             Title:


Accepted and Acknowledged this _____th
day of _____, ____.

WILMINGTON TRUST COMPANY, not
in its individual capacity, but solely as
Owner Trustee


By:    _____
        Name:
        Title:

# Exhibit G

Exhibit G

Massachusetts, 02116 ("TERI"), FIRST MARBLEHEAD DATA SERVICES, INC., a corporation under the General Corporation Law of the State of Delaware, with its principal place of business at lston – 34th Floor, Boston, Massachusetts 02199 (the "Administrator"), and THE NATIONAL IATE STUDENT LOAN TRUST 2006-1, in its capacity as owner (in such capacity, the "Owner").

WHEREAS, the Owner is willing to purchase education loans to borrowers under the education loan listed on Schedule A attached hereto and others in accordance with the Indenture (collectively, the Loan Programs") upon certain terms and conditions, including but not limited to the guaranty of the of principal and interest by TERI pursuant to the terms of the Guaranty Agreements (as hereafter defined) eposit of certain monies with U.S. Bank National Association (the "Trustee"), on behalf of the Owner, as or such payment as more fully described herein and in accordance with the terms and conditions set forth greement, and the agreements (the "Account Security Agreements") listed on Schedule B attached hereto s in accordance with the Indenture;

WHEREAS, under the terms of the Guaranty Agreements listed on Schedule B attached hereto and others ance with the Indenture between TERI and each of the parties (the "Loan Originators") listed on Schedule d hereto and others in accordance with the Indenture, TERI guaranties the payment of principal and n the Loans in exchange for the payment of certain Guaranty Fees (as hereinafter defined);

WHEREAS, pursuant to the Student Loan Purchase Agreements listed on Schedule B attached hereto and accordance with the Indenture, between the Loan Originators and the Owner's predecessor in interest, Marblehead Corporation (the "Student Loan Purchase Agreements"), the Owner has agreed to acquire oans;

WHEREAS, the Administrator is authorized to act for the Owner in all matters relating to this nt; and

WHEREAS, it is the intention of the Owner and TERI that this Agreement shall apply to each Loan that ject to the Guaranty Agreements and (ii) purchased by the Owner with funds held under the Indenture (as defined).

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the ree as follows:

(d)    "Eligible Investments" means the following categories of securities:

(i)    For all purposes:

(A)    Cash (insured at all times by the Federal Deposit Insurance Corporation);

(B)    Obligations of, or obligations guaranteed as to principal and interest by, the
ny agency or instrumentality thereof, when such obligations are backed by the full faith and credit of the
ernment including:

- U.S. treasury obligations
- All direct or fully guaranteed obligations
- Farmers Home Administration
- General Services Administration
- Guaranteed Title XI financing
- Government National Mortgage Association (GNMA)
- State and Local Government Series

(C)    Obligations of government-sponsored agencies that are not backed by the
and credit of the U.S. government including:

- Federal Home Loan Mortgage Corp. (FHLMC) Debt obligations
- Farm Credit System (formerly: Federal Land Banks, Federal Intermediate Credit Banks, and Banks for Cooperatives)
- Federal Home Loan Banks (FHL Banks)
- Federal National Mortgage Association (FNMA) debt obligations
- Financing Corp. (FICO) debt obligations
- Resolution Funding Corp. (REFCORP) debt obligations
- U.S. Agency for International Development (U.S. A.I.D) guaranteed notes

U.S.A.I.D. securities must mature at least four business days before the appropriate payment date.

(ii)    Investments in refunding escrow accounts:

(B)      Direct obligations of any of the following federal agencies which obligations lly guaranteed by the full faith and credit of the U.S.:

- Senior debt obligations issued by the Federal National Mortgage Association (FNMA) or Federal Home Loan Mortgage Corporation (FHLMC)
- Obligations of the Resolution Funding Corporation   (REFCORP)
- Senior debt obligations of the Federal Home Loan Bank System
- Senior debt obligations of other government sponsored agencies

(C)      U.S. dollar denominated deposit accounts, federal funds and bankers' es with domestic commercial banks which have a rating on their short term certificates of deposit on the urchase of: "A-1+" by S&P, "P-1" by Moody's and "F1" by Fitch (if rated by Fitch); and maturing not n 360 calendar days after the date of purchase. (Ratings on holding companies are not considered as the the bank);

(D)      Commercial paper that meets the ratings of the following listed rating at the time of purchase: (1) "A-1+" by S&P, "P-1" by Moody's and "F1" by Fitch (if rated by Fitch); tures not more than 270 calendar days after the date of purchase;

(E)      Investments in a money market fund rated "AAAm" or "AAA-m" by S&P " by Moody's;

(F)      Pre-refunded "municipal obligations" which are defined as follows: any other obligations of any state of the U.S. or of any agency, instrumentality or local governmental unit of state which are not callable at the option of the obligor prior to maturity or as to which irrevocable ns have been given by the obligor to call on the date specified in the notice; and

(1)      Which are rated, based on an irrevocable escrow account or fund row"), in the highest rating category of S&P, Moody's and Fitch (if rated by Fitch) or any successors r

(2)      (a) Which are fully secured as to principal and interest and on premium, if any, by an escrow consisting only of cash or obligations described in



l owners of the Owner in making decisions other than the decisions inherent in servicing the financial luding without limitation any financial asset that includes an option to be exercised by the Owner, the rator or the beneficial owners of the Owner; or

(2)         A derivative financial instrument that involves the Owner, the rator or the beneficial owners of the Owner in making decisions including without limitation any e financial instrument that includes an option allowing the Owner, the Administrator or the beneficial f the Owner to choose to call or put other financial instruments; provided that a derivative financial t shall be an Eligible Investment only if it is acquired from proceeds of the issuance of Notes by the the time of such issuance.

(iii)      The value of the above investments shall be determined as follows:

(A)         For the purpose of determining the amount in any fund, all Investment s credited to such fund shall be valued at fair market value. The Trustee shall determine the fair market ed on accepted industry standards and from accepted industry providers. Accepted industry providers ude but are not limited to pricing services provided by Financial Times Interactive Data Corporation, ynch & Co., Citigroup Global Markets Inc., Bear Stearns & Co. Inc., Deutsche Bank AG, New York r Lehman Brothers;

(B)         As to certificates of deposit and bankers' acceptances: the face amount lus accrued interest thereon; and

(C)         As to any investment not specified above: the value thereof established by ement between the Owner and the Trustee.

(e)         "Existing Pledged Account" means the Pledged Account, if any, created pursuant to the Security Agreements and named therein the "Pledged Account."

(f)          "Guaranty Agreements" shall mean each of the Guaranty Agreements between each of the ginators and TERI, and any amendments or modifications thereto, as set forth on Schedule B attached d others in accordance with the Indenture.

(k)    "Recoveries" shall mean and include: (i) any and all cash, checks, drafts, orders and all other instruments for the payment of money received by TERI from or on behalf of Borrowers in payment of principal of, interest on, late fees with respect to, and costs of collecting defaulted Loans with respect to which TERI has paid in full, Guaranty Claims, from funds in the Pledged Account, and the proceeds of all of the foregoing, (ii) any amount received by TERI upon the sale or other transfer of defaulted Loans with respect to which TERI has paid, in full, Guaranty Claims (including the sale of such Loans to the Owner as provided in each of the Guaranty Agreements or the sale of the right to collect such Loans or other similar rights with respect thereto), and (iii) in connection with any pledge or assignment of defaulted Loans (or rights with respect thereto) to secure a loan to TERI the amount of such loan. In all cases, "Recoveries" shall be computed net of TERI's Costs of Collection. "Costs of Collection" for purposes of this Agreement shall mean all fees and expenses paid to third party collectors and attorneys, and, to cover TERI's internal costs, an amount equal to two and one-half percent (2.5%) of the amount recovered (excluding amounts recovered upon the sale of loans to the Owner as provided in each of the Guaranty Agreements).

(l)    "Secured Obligations" shall have the meaning set forth in Section 6.

(m)    "TERI Guarantee Fee Entitlement" means a portion of Guaranty Fees equal to 2.40% of the principal amount of a Loan, payable in accordance with each of the Guaranty Agreements and Master Loan Guaranty Agreement, dated as of February 2, 2001 by and between The First Marblehead Corporation and TERI, as amended or supplemented.

2.    Creation and Funding of the Pledged Account. Upon the execution of this Agreement, the Owner shall establish with the Trustee pursuant to the Indenture an account (the "Pledged Account") for the purpose of depositing upon receipt portions of the Guaranty Fees, Recoveries and earnings as provided in this Agreement. The Pledged Account shall be funded (a) by transfer of all amounts held on the Closing Date in the Existing Pledged Account that relate to the Loans being purchased on the Closing Date, determined as set forth in each of the Account Security Agreements, (b) by TERI with all Guaranty Fees payable on the Closing Date with respect to the Loans being purchased, and (c) by TERI with all Recoveries with respect to Loans on which TERI has paid Guaranty Claims, and earnings on the Pledged Account, all of which shall be pledged by TERI to the Owner under the terms of this Agreement. TERI hereby irrevocably directs the Owner to deposit the following amounts into the Pledged Account:

(a)    Any and all Guaranty Fees previously paid by the Loan Originators and currently held by the Trustee in the Existing Pledged Account created under each of the Account Security

3.  <u>Pledged Account Investment and Maintenance.</u>

(a)      The Owner shall withdraw from the Pledged Account and deposit into the Collection Account denture any amounts owed by TERI under each of the Guaranty Agreements for Guaranty Claims as in Section 3(d)(i) hereof. The Owner understands and agrees that TERI shall be required to pay any such ounts out of TERI's general reserves and other assets only to the extent that and for so long as the Account is without sufficient funds or is otherwise unavailable to promptly pay whatever amounts are and payable under each of the Guaranty Agreements. Notwithstanding the foregoing, while there is a y TERI under Section 8 hereof continuing, the provisions of Section 9 hereof shall apply.

(b)      Prior to the occurrence of a default by TERI under Section 8 hereof, TERI may direct the invest amounts held in the Pledged Account in one or more Eligible Investments. If a default under occurs and is continuing, the Administrator shall have the sole right to direct investment of the Pledged but such investments shall be limited to Eligible Investments.

(c)      No interest, dividends, distributions or other earnings of whatever nature which are paid and rom the Pledged Account (collectively, "<u>Earnings</u>") shall be withdrawn or paid to the Owner or TERI or r person or entity unless pursuant to the provisions of Section 3(d). All Earnings shall be fully, ely and completely reinvested in the Pledged Account. Any other provisions of this Agreement to the (either expressly or by implication) notwithstanding, all Earnings net of losses shall be credited to and ncome of TERI and not of the Owner, and shall be so treated by TERI.

(d)      Withdrawals and disbursements from the Pledged Account shall be made only in accordance ollowing provisions:

(i)      Upon receipt by the Owner of a Payment of Guaranty Claims Direction Letter, ally in the form of <u>Exhibit 1</u> (and, after the occurrence of a default under Section 8, whether or not such a Letter is received), the Owner shall withdraw from the Pledged Account and deposit in the Collection of the Indenture the full amount of any valid Guaranty Claims made in accordance with each of the Agreements for defaulted Loans.

promptly cause the Trustee to withdraw the requested funds from the Pledged Account. If the
rator objects to any Withdrawal Request, the Administrator shall deliver the request and provide TERI with
statement of the Administrator's reasons for denial, which denial must be reasonably based on the
ents set forth in this Section 3(d).

4.        Excess Funds in the Pledged Account.

(a)        On the Closing Date, the Owner shall pay TERI from funds in the Pledged Account an amount
0.90% of the aggregate outstanding principal balance of the Loans that are guaranteed by TERI and
d by the Owner on the Closing Date.

(b)        If on any Distribution Date under the Indenture, the product of (i) the aggregate outstanding
balance of and earned interest on Loans held by or pledged to the Trustee, multiplied by (ii) a factor equal
hundredths (.16) (the "Stress Factor") is less than the balance in the Pledged Account, and, if no default
reunder or under each of the Guaranty Agreements, the Administrator shall cause the Trustee to pay to
amount by which the balance in the Pledged Account exceeds such product. The parties agree that the
of the Stress Factor by the rating agencies is dependent upon the types of Loans purchased by the Owner
sing under the Indenture.

5.        Security Interest. TERI hereby pledges, assigns and sets over to the Owner, as security for
by TERI of the Secured Obligations (as hereinafter defined), all of TERI's right, title and interest in and
Pledged Account and all amounts on deposit or to be deposited therein as described in Section 2 of this
nt, including without limitation (i) any and all Guaranty Fees previously paid by Loan Originators and
held by the Trustee in the Existing Pledged Account created under each of the Account Security
nts with respect to Loans purchased on the Closing Date as set forth in each of the Security Agreements;
nd all additional Guaranty Fees with respect to such Loans purchased by the Owner, which fees will be
into the Pledged Account on the Closing Date; and (iii) all Recoveries, which Recoveries shall be
by or on behalf of TERI to the Trustee on the 15th day of each month, for Recoveries received during the
month, and (b) TERI's right to receive all Earnings. The foregoing shall not be deemed to include a
ecurity interest in defaulted Loans. In furtherance thereof, TERI hereby grants to the Owner (and its

e agreements, U.S. Treasury Bills, U.S. Treasury Notes, investment grade commercial paper, U.S. Bonds, Federal agency notes or other investments, securities (whether certificated or uncertificated and lly including any securities which are purchased through and for which records are maintained on a book tem through any financial intermediary (as defined in § 8-313 of the Uniform Commercial Code)), intangibles and general intangibles, whether now existing or hereafter arising and wheresoever located, or (all hereinafter called the "<u>Intangibles</u>");

(iii)     All right, title and interest of TERI in or to all instruments and documents covering or o the above described property, including but not limited to, all books, records, computer printouts, tapes, dger sheets, files and other data (all such instruments and documents being called the "<u>Related ts</u>");

(iv)     All interest, dividends and/or other earnings of any kind which are paid with respect ved from the Pledged Account, and all proceeds of any of the foregoing, and the present and continuing ake claim for, collect, receive and receipt for, any and all such interest, dividends and/or other earnings;

(v)     All the proceeds of all of the foregoing;

(b)     All contract and other rights of TERI to receive payment of Guaranty Fees, other than the arantee Fee Entitlement, from the Owner under each of the Guaranty Agreements; TERI's rights to ubsequent Guarantee Fees from the Owner pursuant to each of the Guaranty Agreements, and any undertaking or agreement by the Owner to pay such subsequent Guarantee Fees;

(c)     All Recoveries and all rights of TERI to receive or collect Recoveries; and

(d)     All proceeds of the foregoing.

All of the foregoing property in which the Owner has been granted a security interest is herein ly referred to as "<u>Collateral</u>." It is expressly understood and agreed that this security interest and nt shall automatically attach to any and all future deposits to, earnings from, and proceeds of the Pledged immediately upon deposit or accrual, and all Guaranty Fees and Recoveries immediately upon the receipt ithout the making or doing of any further act or thing whatsoever. TERI shall promptly take all further d

Obligations").

7.        Restrictions on the Pledged Account. TERI shall not (except as provided in Sections 3(d)(ii), 4

r as otherwise specifically permitted by this Agreement) be paid by the Owner, at the direction of the

rator, any funds from or further assign, pledge, or hypothecate the Pledged Account or any portion of the

Account to any individual, person, entity or other third party. Payments to TERI will be by wire transfer

RI requests, in writing, another reasonable form of payment.

8.        Default. TERI shall be in default of this Agreement if TERI fails to remit to the Owner from

ed Account or otherwise, in accordance with the terms and provisions of the Guaranty Agreements, the

balance (including capitalized fees and interest) and accrued interest and late fees on any Loan as to

Guaranty Event (as defined in each of the Guaranty Agreements) has occurred and as to which the

s set forth in each of the Guaranty Agreements to payment of a Guaranty Claim have been satisfied, and

ailure continues for a period of thirty (30) days. Either TERI or the Owner shall be in default of this

nt if (a) any representation, warranty, or statement made by such party in or pursuant to this Agreement or

he Guaranty Agreements is found to be false or erroneous in any material respect, or (b) such party shall

it to perform or observe any material covenant or agreement made by it in this Agreement or each of the

Agreements, and if such circumstance, failure or omission (if susceptible of cure) remains uncured for

) days. Upon the occurrence of an event of default by TERI, and while such default is continuing, the

all cease disbursing any funds at the request of TERI except to pay Guaranty Claims.

9.        Remedies Upon Default. The Owner shall have all of the rights and remedies of a secured

er the Massachusetts Uniform Commercial Code (as the same may be amended from time to time), as

ll rights and remedies provided by any other applicable law, at law, or in equity. Without limiting the

of the foregoing, the Administrator shall also have the right, during the term of this Agreement, to do

of the following upon a default and until any such default is cured:

(a)        Acceleration. Without any notice or demand, the Administrator may declare any or all Secured

ns then in default to be immediately due and payable.

(i)        TERI hereby constitutes and appoints the Administrator (and upon assignment
e Trustee) its true and lawful attorney (which appointment is coupled with an interest), with full power of
on, either in the Administrator's own name or in the name of TERI, to ask for, demand, sue for, collect,
eceipt and give acquittance for, any and all moneys due or to become due to TERI that are part of the
l; to endorse checks, drafts, orders and other instruments for the payment of money payable to TERI on
hereof, to settle, compromise, prosecute, or defend any action, claim, or proceeding with respect thereto;
ll, assign, pledge, transfer and make any agreement respecting, or otherwise deal with, the same.

(ii)        TERI agrees that all Recoveries shall be held by the Owner to whatever extent may
ary to facilitate full and complete payment of all amounts owed under each of the Guaranty Agreements.
Recoveries received by TERI shall be remitted to the Trustee (properly endorsed for collection where
, not later than the next Business Day, and accompanied by Exhibit 2 and deposited in the Pledged
for the payment of all of the Secured Obligations then in default. TERI agrees not to commingle any such
s or proceeds with any of its other funds or property and agrees to hold the same upon an express trust
wner until deposited in the Pledged Account, as aforesaid.

(iii)        The Administrator agrees to provide notice to TERI of the Administrator's or Owner's
of any of its rights under this Section 9(c).

(d)        Transfer of Intangibles. The Administrator shall have the right to take possession of any
t or other document evidencing any of the Intangibles, and may apply for or seek, on behalf of and as
in-fact for TERI, any necessary consent to the assignment, transfer, conveyance, sale, renewal, reissuance
isposition of the same, and TERI shall cooperate fully with the Administrator in doing so and shall take
s reasonably requested by the Administrator in furtherance thereof. TERI hereby constitutes and appoints
inistrator its true and lawful attorney (which appointment is coupled with an interest) with full power of
on, either in the Administrator's own name or in the name of TERI, to assign, transfer and convey, subject
uirements of law, any and all of TERI's rights in and to any of the Intangibles.

the expenses of taking, advertising, processing, preparing and storing the Collateral to be sold, all court
the Administrator's reasonable legal fees in connection therewith;

(ii)        Second, to the payment of valid Guaranty Claims in accordance with the terms
the order in which a complete claim (including all required documentation) is received, treating all
ceived the same day as received at the same time (if there are not sufficient funds in the Pledged Account
claims payable therefrom received on a given day, all such claims shall be paid in part, pro rata, from the
ccount as directed by the Administrator); and

(iii)        Third, any remainder to be held pursuant to the terms of this Agreement as continuing
or TERI's payment of the remaining Secured Obligations.

The Administrator shall apply any such proceeds, monies, or balances in accordance with this Agreement
upon its receipt of the same. In respect of any application pursuant to clause (ii) above, such proceeds,
r balances shall be applied by the Administrator to discharge in whole or in part any unpaid Secured
n, notwithstanding any manifestation of an intent to the contrary expressed in writing or otherwise by
any time. Upon any sale of Collateral by the Administrator (whether pursuant to a power of sale granted
te or under a judicial proceeding), the receipt of the Administrator or of the officer making the sale shall
cient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers
be obligated to see to the application of any part of the purchase money paid over to the Administrator or
cer, or be answerable in any way for the misapplication thereof. Notwithstanding the sale or other
n of any Collateral by the Administrator hereunder, TERI shall remain liable for any deficiency. Any
h respect to which the Owner receives payment in full hereunder will forthwith be transferred to TERI on
and conditions set forth in the Guaranty Agreements.

10.        Remedies Cumulative. All rights, remedies, or powers conferred upon the Owner herein or by
be cumulative and concurrent at the option of the Administrator, and the Administrator may, to whatever
reasonably necessary to cure any default, foreclose or exercise the power of sale or any other remedy
to it successively upon any default or upon successive defaults hereunder without the necessity of
all sums secured hereby to be due and payable. Upon any such occasion, the Administrator shall be
d to sell or dispose of all or any such part of the Collateral as provided in this Agreement or pursuant to

at the Trustee exercise the Owner's rights and obligations hereunder, including, without limitation.

(i)        The withdrawal of funds from the Pledged Account to pay the Trustee, as assignee of s, with respect to a Guaranty Claim pursuant to Section 3(d)(i) hereof;

(ii)        The withdrawal of funds pursuant to Section 3(d)(ii) hereof;

(iii)        The investment of funds in the Pledged Account in Eligible Investments as directed by m time to time; and

(iv)        The exercise of the remedies of the Owner on default by TERI under Section 9.

(b)        The Owner hereby directs TERI to pay all sums intended to be placed in the Pledged Account, , without limitation, all future Recoveries, directly to the Trustee. The Pledged Account shall be d and funds held therein shall be invested by the Trustee in Eligible Investments pursuant to and in ce with the Indenture. Funds held in the Pledged Account in the form of bank deposits shall be deposited institutions that are federally insured.

(c)        The Trustee and the holders of the notes authenticated and delivered pursuant to the Indenture, ded third-party beneficiaries of this Agreement, with rights to enforce the Owner's interests in the same. d-party beneficiaries are not parties hereto and incur no liabilities hereunder.

(d)        The Administrator has been appointed to act for the Owner in connection with the transactions ated by the Indenture. The Administrator has the power and authority to take any action and give any uired or permitted by the Owner hereunder and TERI may deal with Administrator as if it were dealing Owner. Any notice required to be given to the Owner by TERI shall also be given to Administrator. The rator will request instructions from the Indenture Trustee on behalf of the Noteholders (pursuant to the ) for any non-ministerial action that the Administrator is required to take under this Agreement.

12.        <u>Possession of Collateral</u>. Throughout the term of this Agreement, possession of the Collateral maintained by the Trustee, or its agent or nominee (if the Trustee so chooses from time to time), as and appropriate to perfect the Owner's, and, while the

of any financing statements filed under this Agreement. The Administrator agrees to fulfill the Owner's
ns to file such termination statements at its own cost and expense. The security interests hereunder shall
 as to all Collateral lawfully withdrawn by or paid to TERI hereunder, upon the occurrence of such
al or payment.

14.      Representations and Warranties.

(a)      Each party, with respect to itself, represents and warrants that:

        (i)          The making and performance of this Agreement and the activities contemplated
ve been duly authorized by all necessary action and do not and will not:

                (A)          Violate any provision of law, or any regulation, order, decree, writ or
n, or any provision of such party's charter, bylaws, or any other organizing document; or

                (B)          Violate or result in the breach of, or constitute a default or require any
nder, any agreement or instrument by which it or any of its property may be bound or affected.

        (ii)          This Agreement is the legal, valid and binding obligation of such party, enforceable in
ce with the terms hereof.

        (iii)          There is no pending or threatened litigation that would, if resolved adversely to such
ersely impact such party's ability to perform any of its obligations under this Agreement or each of the
 Agreements.

(b)      TERI represents and warrants that:

        (i)          Except for the security interests of the Owner created under this Agreement, TERI is
be the owner of the Collateral, whenever acquired or arising, free and clear of all liens, security interests,
ncumbrances, charges, set-offs, defenses and counterclaims;

e security interest in the Collateral granted to the Owner hereunder.

(v)        Other than the security interest granted to the Owner pursuant to this Agreement, not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Collateral. s not authorized the filing of and is not aware of any financing statements against TERI that include a n of collateral covering the Collateral other than any financing statement relating to the security interest o the Owner hereunder or that has been terminated. TERI is not aware of any judgment or tax lien filings ERI.

going representations and warranties in this Section 14(b) shall continue in full force and effect until on of this Agreement.

(c)        The foregoing representations and warranties are subject to (i) the exercise of judicial in accordance with the general principles of equity; (ii) the valid exercise of the police powers of the ates of the United States of America and of the constitutional powers of the United States of America and ruptcy, insolvency, reorganization, moratorium or similar laws affecting creditor's rights generally.

15.    Covenants of TERI. TERI agrees and covenants with the Owner as follows:

(a)        Maintenance and Use of Collateral. TERI shall not permit the Collateral to be used in violation the Guaranty Agreements or this Agreement.

(b)        Taxes. TERI shall, if so obligated, pay and discharge when due all taxes, assessments, license fees, levies and other charges upon the Collateral, and TERI shall, if so obligated, also pay and discharge all other taxes, levies, or assessments relating to its business which, if unpaid, might give rise to any security interest, lien, charge, levy, assessment, or encumbrance in, on or against the Collateral. The l and all income and/or proceeds of the Collateral shall be, and be treated by TERI as being, the property subject to the pledge and security interest created hereunder, and TERI shall report the Collateral and all eeds as its sole property until, unless and except to the extent any of the Collateral is paid and transferred to each of the Guaranty Agreements and this Agreement.

ion statements, certificates of title and other documents, and TERI shall deliver to the Trustee upon
erefor such securities, agreements, writings, documents, certificates, instruments, or other intangibles, as
ee reasonably deems necessary from time to time to perfect and maintain the perfection of the security
of the Trustee under this Agreement. The Trustee or the Administrator shall have the right to file this
nt and any financing statement reflecting the content of this Agreement for record in any governmental

(e)      <u>Records, Statements and Related Documents</u>. TERI agrees:

(i)        When reasonably requested to do so by the Administrator, to prepare and deliver to
nistrator a schedule in form satisfactory to the Administrator, certified by an authorized officer of TERI,
 Collateral and the location thereof; and

(ii)       To keep accurate and complete records at all times in respect of the Collateral and to
 the Administrator copies of such records and such other information regarding the Collateral which the
rator may reasonably request.

(f)       <u>Location</u>. The principal office of TERI is located at 31 St. James Avenue, Boston,
setts 02116, and all books of account and records relating to the collateral and TERI's business are
t TERI's principal office. TERI shall not, without giving the Administrator at least ten (10) days prior
otice, change the location of any of the Collateral or the location at which it does business, including,
imitation, the location at which any books of account or records relating to the Collateral and TERI's
are kept.

(g)      <u>Notice</u>. TERI shall promptly notify the Owner of any change in TERI's name or its jurisdiction
zation or any physical loss, destruction, or damage to any material portion of the Collateral. TERI shall
 ptly notify the Owner of any default hereunder. In the event of a name change or change in its
on of organization, TERI shall take such actions, if any, as shall be necessary to maintain the security
of the Owner hereunder.

(h)      <u>Further Information</u>. TERI shall execute and deliver, or cause to be executed and delivered, to
ee (and to any other financial institution holding the Pledged Account), in a form satisfactory to the
or such other institution), TERI's certification of its tax identification number and such other documents
 stee shall reasonably request to perform its obligations hereunder.

d an original, but all of which shall together be deemed a single agreement.

18.       <u>Confidentiality</u>. The parties acknowledge that this Agreement contains confidential
on and agree not to disclose any of the terms and conditions relating to this Agreement and the Pledged
without the prior express written consent of the others. The provisions of the foregoing sentence to the
notwithstanding, any such information may be disclosed (a) to any employees, officers, directors or
atives of the parties to effect the purpose of the Student Loan Program; (b) by TERI and the
rator to the affiliates and agents of either of them, and other third parties, to effectuate this Agreement,
 that such parties are under a corresponding written obligation to maintain the confidentiality of the
information; and (c) to the attorneys and accountants of the parties on a confidential basis. This provision
ther, not be construed to prohibit the disclosure of any information relating to this Agreement (i) that is
 the future becomes public information, (ii) as may be required by applicable law or this Agreement, each
uaranty Agreements or the Indenture, (iii) to the underwriters and rating agencies, their employees,
nd attorneys and to such others as the Administrator may determine necessary (including regulators and
 investors in a private or public offering) in connection with the sale, securitization or other financing of
e Loans, (iv) in any private placement memorandum in connection with the sale, securitization or other
 of any of the Loans, and (v) as necessary to perfect or enforce the security interest in the Collateral
ereunder. Nothing in this Agreement shall limit or restrict TERI, the Administrator, or any affiliate of the
rator (A) in their exchange and use of information as among them, to the extent such exchange or use is
 by other agreements; or (B) from using, manipulating, sharing and disclosing Loan information that has
dentified so that the identity of the borrower, the lender, or the holder of a Loan (including but not limited
ner and Trustee) cannot be determined.

19.       <u>Choice of Law</u>. This Agreement shall be governed and construed in accordance with
 setts law, without regard to principles of conflict of laws.

20.       <u>Severability</u>. If at any time one or more provisions of this Agreement is or becomes invalid,
 unenforceable in whole or in part, the validity, legality and enforceability of the remaining provisions
in any way be affected or impaired thereby.

24.    Notices.  All notices under this Agreement shall be sent by any means requiring receipt
, or if by facsimile confirmed by first-class mail, postage or other delivery charge prepaid to

ation Resources Institute, Inc.
 es Avenue
 A 02116
: President

tee:

k National Association
e Trust Services-SFS
ral Street, 3rd Floor
 A 02110
: Vaneta Bernard

inistrator or the Owner:

blehead Data Services, Inc.
ential Tower
ston Street - 34th Floor
 A 02199-8157
: Ms. Rosalyn Bonaventure

py to:

blehead Corporation
ential Tower
ston Street - 34th Floor
 A 02199-8157
: Corporate Law Department

al representations, undertakings and agreements by WTC but is made and intended for the purpose for only the Owner; (c) nothing herein contained shall be construed as creating any liability on WTC, lly or personally, to perform any covenant either expressed or implied contained herein, all such liability, ing expressly waived by the parties hereto and by any Person claiming by, through or under the parties d (d) under no circumstances shall WTC be personally liable for the payment of any indebtedness or of the Owner or be liable for the breach or failure of any obligation, representation, warranty or covenant ndertaken by the Owner under this Agreement or any other document.

[Signature Pages Follow]

By: /s/John A. Hupalo
Name: John A. Hupalo
Title: Vice President


THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1

By:    WILMINGTON TRUST COMPANY, acting solely as
       Owner Trustee and not in its individual capacity


By: /s/Michele C. Harra
Name: Michele C. Harra
Title: Financial Services Officer

– Request for Reimbursement of Income Tax or Other Tax Amounts

e, N.A.

- CORPORATE ADVANTAGE Loan Program
- EDUCATION ONE Loan Program
- M&T REFERRAL Loan Program

ne Bank, N.A.

- AAA Southern New England Bank
- AES EducationGAIN Loan Program
- Academic Management Services (AMS) TuitionPay Diploma Loan Program
- Axiom Alternative Loan Program
- Brazos Alternative Loan Program
- CFS Direct to Consumer Loan Program
- Citibank Flexible Education Loan Program
- College Loan Corporation Loan Program
- Comerica Alternative Loan Program
- Custom Educredit Loan Program
- Edfinancial Loan Program
- Education Assistance Services (EAS) Alternative Loan Program
- ESF Alternative Loan Program
- Extra Credit II Loan Program (North Texas Higher Education)
- M&I Alternative Loan Program
- National Education Loan Program
- Navy Federal Alternative Loan Program
- NextStudent Alternative Loan Program
- NextStudent Private Consolidation Loan Program
- PNC Bank Resource Loan Program
- Referral Loan Program
- SAF Alternative Loan Program
- Southwest Loan Program
- START Education Loan Program
- WAMU Alternative Student Loan Program

ional Bank Northeast

- CASL Undergraduate Alternative Loan Program

ank USA, National Association

- Alternative Loan Program
- The Huntington National Bank
- Huntington Bank Education Loan Program

turers and Traders Trust Company

- M&T Alternative Loan Program

City Bank

- National City Loan Program

k, N.A.

- PNC Bank Alternative Loan Program

n Bank

- Alternative Loan Program

Bank

- SunTrust Alternative Loan Program

ional Bank

- TCF National Bank Alternative Loan Program

k, N.A.

- U.S Bank Alternative Loan Program

Charter One Bank, N.A.

Chase Manhattan Bank USA, N.A.

Citizens Bank of Rhode Island

First National Bank Northeast

HSBC Bank USA, National Association

The Huntington National Bank

Manufacturers and Traders Trust Company

National City Bank

PNC Bank, N.A.

Sovereign Bank

SunTrust Bank

TCF National Bank.

U.S. Bank, N.A.

- Bank One's CORPORATE ADVANTAGE Loan Program and EDUCATION
  Bank One, N.A., dated July 26, 2002, for loans that were originated under
  Bank One's M&T REFERRAL Loan Program
- Charter One Bank, N.A., dated as of December 29, 2003 for loans that were
  originated under Charter One's AAA Southern New England Bank Loan
  Program.
- Charter One Bank, N.A., dated October 31, 2003, for loans that were
  originated under Charter One's AES EducationGAIN Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated
  under Charter One's (AMS) TuitionPay Diploma Loan Program.
- Charter One Bank, N.A., dated July 15, 2003, for loans that were originated
  under Charter One's Brazos Alternative Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated
  under Charter One's CFS Direct to Consumer Loan Program.
- Charter One Bank, N.A., dated June 30, 2003, for loans that were originated
  under Charter One's Citibank Flexible Education Loan Program.
- Charter One Bank, N.A., dated July 1, 2002, for loans that were originated
  under Charter One's College Loan Corporation Loan Program.
- Charter One Bank, N.A., dated December 4, 2002, for loans that were
  originated under Charter One's Comerica Alternative Loan Program.
- Charter One Bank, N.A., dated December 1, 2003, for loans that were
  originated under Charter One's Custom Educredit Loan Program.
- Charter One Bank, N.A., dated May 10, 2004, for loans that were originated
  under Charter One's Edfinancial Loan Program.

- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's NextStudent Alternative Loan Program.
- Charter One Bank, N.A., dated March 26, 2004, for loans that were originated under Charter One's NextStudent Private Consolidation Loan Program.
- Charter One Bank, N.A., dated March 17, 2003, for loans that were originated under Charter One's PNC Bank Resource Loan Program.
- Charter One Bank, N.A., dated May 1, 2003, for loans that were originated under Charter One's SAF Alternative Loan Program.
- Charter One Bank, N.A., dated September 20, 2002, for loans that were originated under Charter One's Southwest Loan Program.
- Charter One Bank, N.A., dated March 25, 2004, for loans that were originated under Charter One's START Education Loan Program.
- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's WAMU Alternative Student Loan Program.
- Charter One Bank, N.A., dated February 15, 2005, for loans that were originated under Charter One's Referral Loan Program and Axiom Alternative Loan Program.
- Chase Manhattan Bank USA, N.A., dated September 30, 2003, as amended on March 1, 2004 and February 25, 2005, for loans that were originated under Chase's Chase Extra Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Compass Bank Loan Program.

- HSBC Bank USA, National Association, dated April 17, 2002, as amended on May 3, 2004, for loans that were originated under the HSBC Loan Program.

- The Huntington National Bank, dated May 20, 2003, for loans that were originated under The Huntington National Bank's Huntington Bank Education Loan Program.

- Manufacturers and Traders Trust Company, dated April 29, 2004, for loans that were originated under Manufacturers and Traders Trust Company's Alternative Loan Program.

- National City Bank, dated July 26, 2002, for loans that were originated under National City Bank's National City Loan Program.

- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's Alternative Conforming Loan Program.

- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Loan Program.

- SunTrust Bank, dated March 1, 2002, for loans that were originated under SunTrust Bank's SunTrust Alternative Loan Program.

- TCF National Bank, dated July 22, 2005, for loans that were originated under TCF National Bank's Alternative Loan Program.

- U.S. Bank, N.A., dated May 1, 2005, for loans that were originated under U.S Bank's Alternative Loan Program.

- Bank One's CORPORATE ADVANTAGE Loan Program and EDUCATION Bank One, N.A., dated July 26, 2002, for loans that were originated under Bank One's M&T REFERRAL Loan Program
- Charter One Bank, N.A., dated as of December 29, 2003 for loans that were originated under Charter One's AAA Southern New England Bank Loan Program.
- Charter One Bank, N.A., dated October 31, 2003, for loans that were originated under Charter One's AES EducationGAIN Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's (AMS) TuitionPay Diploma Loan Program.
- Charter One Bank, N.A., dated July 15, 2003, for loans that were originated under Charter One's Brazos Alternative Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's CFS Direct to Consumer Loan Program.
- Charter One Bank, N.A., dated June 30, 2003, for loans that were originated under Charter One's Citibank Flexible Education Loan Program.
- Charter One Bank, N.A., dated July 1, 2002, for loans that were originated under Charter One's College Loan Corporation Loan Program.
- Charter One Bank, N.A., dated December 4, 2002, for loans that were originated under Charter One's Comerica Alternative Loan Program.
- Charter One Bank, N.A., dated December 1, 2003, for loans that were originated under Charter One's Custom Educredit Loan Program.
- Charter One Bank, N.A., dated May 10, 2004, for loans that were originated under Charter One's Edfinancial Loan Program.

- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's NextStudent Alternative Loan Program.
- Charter One Bank, N.A., dated March 26, 2004, for loans that were originated under Charter One's NextStudent Private Consolidation Loan Program.
- Charter One Bank, N.A., dated March 17, 2003, for loans that were originated under Charter One's PNC Bank Resource Loan Program.
- Charter One Bank, N.A., dated May 1, 2003, for loans that were originated under Charter One's SAF Alternative Loan Program.
- Charter One Bank, N.A., dated September 20, 2002, for loans that were originated under Charter One's Southwest Loan Program.
- Charter One Bank, N.A., dated March 25, 2004, for loans that were originated under Charter One's START Education Loan Program.
- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's WAMU Alternative Student Loan Program.
- Charter One Bank, N.A., dated February 15, 2005, for loans that were originated under Charter One's Referral Loan Program and Axiom Alternative Loan Program.
- Chase Manhattan Bank USA, N.A., dated September 30, 2003, as amended on March 1, 2004, September 8, 2004 and February 25, 2005, for loans that were originated under Chase's Chase Extra Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Compass Bank Loan Program.

- HSBC Bank USA, National Association, dated April 17, 2002, as amended on August 2003, for loans that were originated under the HSBC Loan Program.

- The Huntington National Bank, dated May 20, 2003, for loans that were originated under The Huntington National Bank's Huntington Bank Education Loan Program.

- Manufacturers and Traders Trust Company, dated April 29, 2004, for loans that were originated under Manufacturers and Traders Trust Company's Alternative Loan Program.

- National City Bank, dated November 13, 2002, for loans that were originated under National City Bank's National City Loan Program.

- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's Alternative Conforming Loan Program.

- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Loan Program.

- SunTrust Bank, dated March 1, 2002, for loans that were originated under SunTrust Bank's SunTrust Alternative Loan Program.

- TCF National Bank, dated July 22, 2005, for loans that were originated under TCF National Bank's Alternative Loan Program.

- U.S. Bank, N.A., dated May 1, 2005, for loans that were originated under U.S Bank's Alternative Loan Program.

- Bank One, N.A., dated April 30, 2001, for loans that were originated under ONE Loan Program.

- Bank One, N.A., dated July 26, 2002, for loans that were originated under Bank One's M&T REFERRAL Loan Program

- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's (AMS) TuitionPay Diploma Loan Program.

- Charter One Bank, N.A., dated July 15, 2003, for loans that were originated under Charter One's Brazos Alternative Loan Program.

- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's CFS Direct to Consumer Loan Program.

- Charter One Bank, N.A., dated June 30, 2003, for loans that were originated under Charter One's Citibank Flexible Education Loan Program.

- Charter One Bank, N.A., dated July 1, 2002, for loans that were originated under Charter One's College Loan Corporation Loan Program.

- Charter One Bank, N.A., dated December 4, 2002, for loans that were originated under Charter One's Comerica Alternative Loan Program.

- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's Education Assistance Services Loan Program.

- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's ESF Alternative Loan Program.

- Charter One Bank, N.A., dated September 15, 2003, for loans that were originated under Charter One's Extra Credit II Loan Program (North Texas Higher Education).

- Charter One Bank, N.A., dated September 20, 2003, for loans that were originated under Charter One's M&I Alternative Loan Program.

under Charter One's WAMU Alternative Student Loan Program.
- originated under First National Bank Northeast's CASL Undergraduate Alternative Loan Program.
- HSBC Bank USA, National Association, dated April 17, 2002, for loans that were originated under the HSBC Loan Program.
- The Huntington National Bank, dated May 20, 2003, for loans that were originated under The Huntington National Bank's Huntington Bank Education Loan Program.
- National City Bank, dated July 26, 2002, for loans that were originated under National City Bank's National City Loan Program.
- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Loan Program.
- SunTrust Bank, dated March 1, 2002, for loans that were originated under SunTrust Bank's SunTrust Alternative Loan Program.

Each of the following Control Agreements, as amended or supplemented, was entered into by and among Marblehead Corporation, U.S. Bank National Association and:

- Charter One Bank, N.A., dated December 29, 2003, for loans that were originated under Charter One's AAA Southern New England Bank Loan Program.
- Charter One Bank, N.A., dated October 31, 2003, for loans that were originated under Charter One's AES EducationGAIN Loan Program.
- Charter One Bank, N.A., dated December 1, 2003, for loans that were originated under Charter One's Custom Educredit Loan Program.
- Charter One Bank, N.A., dated May 10, 2004, for loans that were originated under Charter One's Edfinancial Loan Program.

- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Navy Federal Referral Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Xanthus Loan Program
- Manufacturers and Traders Trust Company, dated April 29, 2004, for loans that were originated under Manufacturers and Traders Trust Company's Alternative Loan Program.
- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's PNC Bank Alternative Loan Program.
- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Loan Program.
- TCF National Bank, dated July 22, 2005, for loans that were originated under TCF National Bank's Alternative Loan Program.
- U.S. Bank, N.A., dated May 1, 2005, for loans that were originated under U.S Bank's Alternative Loan Program.

Each of the following Security Agreements, as amended or supplemented, was entered into by and The Education Resources Institute, Inc. and:

- Charter One Bank, N.A., dated December 29, 2003, for loans that were originated under Charter One's AAA Southern New England Bank Loan Program.
- Charter One Bank, N.A., dated October 31, 2003, for loans that were originated under Charter One's AES EducationGAIN Loan Program.

on March 1, 2004 and February 25, 2005, for loans that were originated under

- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Compass Bank Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's DTC Alternative Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Navy Federal Referral Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Xanthus Loan Program
- Manufacturers and Traders Trust Company, dated April 29, 2004, for loans that were originated under Manufacturers and Traders Trust Company's Alternative Loan Program.
- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's PNC Bank Alternative Loan Program.
- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Loan Program.
- TCF National Bank, dated July 22, 2005, for loans that were originated under TCF National Bank's Alternative Loan Program.
- U.S. Bank, N.A., dated May 1, 2005, for loans that were originated under U.S Bank's Alternative Loan Program.

**py to:**

k National Association
te Trust Services-SFS
eral Street, 3rd Floor
 A 02110


I/NCT Pledged Account #


d Gentlemen:


Reference is made to (i) the Deposit and Security Agreement (the "<u>Agreement</u>"), dated as of March 9,
 and among THE EDUCATION RESOURCES INSTITUTE, INC. ("<u>TERI</u>"), FIRST MARBLEHEAD
RVICES, INC. and THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1. Capitalized
ed and not otherwise defined herein have the respective meanings ascribed to such terms in the
nt.


In accordance with the Agreement, please remit $_____ in Guarantee Claims to


k National Association
     _____]
e Trust Department
 # [_____]
: [_____]Collateral Proceeds Acct.
     _____]


In addition, please fax this direction letter along with the attached breakdown, which lists the Loan(s),
d with the above-referenced claim funds to:


 **ner]** Attention: [Name]; and                    **[Servicer]** Attention: [Name]:
 Number: _____                              Fax Number:


ntact me at **[TERI Contact Telephone Number]** should you have any questions regarding this request.

**py to:**

**k National Association**
**te Trust Services-SFS**
**eral Street, 3rd Floor**
  **A 02110**

I/NCT Pledged Account #

d Gentlemen:

Reference is made to the Deposit and Security Agreement (the "<u>Agreement</u>"), dated as of March 9, 2006, mong THE EDUCATION RESOURCES INSTITUTE, INC., ("<u>TERI</u>"), FIRST MARBLEHEAD DATA S, INC. and THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1. Capitalized terms not otherwise defined herein have the respective meanings ascribed to such terms in the Agreement.

In accordance with the Agreement, the following amounts will be wired to the Pledged Account:

_____ Total Guaranty Fees*

> *Attached is a list of each loan name, loan number and amount associated with this Guaranty Fee Remittance.*

_____ Total Recovery**

> ** *Attached is a list of each loan name, loan number and amount associated with this Recovery Remittance.*

_____ Total Amount wired to the Trustee

e-referenced funds will be wired to the Trustee using the following wire instruction:

ntact me at **[TERI Contact Telephone Number]** should you have any questions regarding this request.

ed Signature

**rblehead Data Services, Inc.**
Case 6:18-ap-01089-MH   Doc 33-4   Filed 01/09/19   Entered 01/09/19 13:20:46   Desc
**dential Tower** Declaration in Support   Page 314 of 369
**ston Street - 34th Floor**
  A 02199-8157

I/NCT Pledged Account #

d Gentlemen:

Reference is made to (i) the Deposit and Security Agreement (the "<u>Agreement</u>"), dated as of March 9, and among THE EDUCATION RESOURCES INSTITUTE, INC., ("<u>TERI</u>"), FIRST MARBLEHEAD RVICES, INC. and THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1. Capitalized ed and not otherwise defined herein have the respective meanings ascribed to such terms in the nt.

In accordance with Section 3(d)(ii) of the Agreement, this is to inform you that TERI has been assessed aid the sum of $_____ in income or excise taxes with respect to income the Pledged Account. We hereby request reimbursement of such amount to be sent as follows:

   **USE THE FOLLOWING WIRE INSTRUCTIONS:**

ame]

 cation]

 ION: TERI

ts:

In accordance with the Agreement, we are forwarding a copy of this request to the Owner and the e have also enclosed documentation to support this request.

Please contact me at **[TERI Contact Telephone Number]** should you have any questions regarding this

# Exhibit H

Exhibit H

F has agreed to acquire certain Loans, and (ii) pursuant to that certain Deposit and Sale Agreement dated as of the

r is authorized to act for the Owner in all matters relating to this Agreement; and

 of the Owner and TERI that this Agreement shall apply to each Loan that is (i) subject to the Guaranty Agreements
after defined).

iteration of the premises and for other good and valuable consideration, the parties agree as follows:

 d terms not otherwise defined in this Section, in the recitals hereto or elsewhere in this Agreement shall have the mea
le B attached hereto. In addition:

 mean December 7, 2006.

 e the meaning set forth in Section 5.

 hall have the meaning set forth in the Indenture.

 s" means the following categories of securities:

 ash (insured at all times by the Federal Deposit Insurance Corporation);

 bligations of, or obligations guaranteed as to principal and interest by, the U.S. or any agency or instrumentality there
 overnment including but not limited to:

 . treasury obligations

 direct or fully guaranteed obligations

 mers Home Administration

 neral Services Administration

 aranteed Title XI financing

 vernment National Mortgage Association (GNMA)

 te and Local Government Series

 bligations of government-sponsored agencies that are not backed by the full faith and credit of the U.S. government in

count" means the Pledged Account, if any, created pursuant to the Account Security Agreements and named therein t

ts" shall mean each of the Guaranty Agreements between each of the Loan Originators and TERI, and any amendm
d others in accordance with the Indenture.

hall mean a claim made by or on behalf of the Owner for payment by TERI following a Guaranty Event.

ll mean, collectively, all of the fees payable to TERI for the guarantee of a Loan as described in each of the Guaranty

e Indenture dated as of December 1, 2006, by and between the Owner and the Trustee, as may be amended or suppler

ve the meaning set forth in Section 5(a)(ii).

ean and include: (i) any and all cash, checks, drafts, orders and all other instruments for the payment of money receiv
nterest on, late fees with respect to, and costs of collecting defaulted Loans with respect to which TERI has paid, in fu
of all of the foregoing, (ii) any amount received by TERI upon the sale or other transfer of defaulted Loans with resp
such Loans to the Owner as provided in each of the Guaranty Agreements or the sale of the right to collect such Loar
y pledge or assignment of defaulted Loans (or rights with respect thereto) to secure a loan to TERI, the amount of suc
llection. TERI's "Costs of Collection" for purposes of this Agreement shall mean all fees and expenses paid to third p
equal to two and one-half percent (2.5%) of the amount recovered (excluding amounts recovered upon the sale of loa

" shall have the meaning set forth in Section 6.

e Entitlement" means a portion of Guaranty Fees equal to (i) 1.75% of the principal amount of each Loan listed on
nt of each Loan listed on Schedule C-2 attached hereto and (iii) 0.46% of the aggregate outstanding principal balance
he Closing Date, each payable in accordance with each of the Guaranty Agreements and Master Loan Guaranty Agre
orporation and TERI, as amended or supplemented.

of the Pledged Account. Upon the execution of this Agreement, TERI shall establish with the Trustee an account in t
upon receipt portions of the Guaranty Fees, Recoveries and earnings as provided in this Section 2. The Pledged Acc
the Existing Pledged Account that relate to the Loans being purchased on the Closing Date, determined as set forth i
uaranty Fees payable on the Closing Date with respect to the Loans being purchased, and (c) by TERI with all Reco
rnings on the Pledged Account, all of which shall be pledged by TERI to the Owner under the terms of this Agreeme
unts into the Pledged Account:

Fees previously paid by the Loan Originators and currently held by the Trustee in the Existing Pledged Account crea
ans purchased on the Closing Date as set forth in each of the Account Security Agreements;

l Guaranty Fees with respect to such Loans purchased by the Owner, which fees will be deposited into the Pledged A

h Recoveries shall be remitted by or on behalf of TERI to the Trustee on the 15th day of each month, for Recoveries r

oans purchased by the Owner:

comprising and/or contained in the Pledged Account, as provided in this Agreement, both tangible and intangible, w
ated, including without limitation:

rights, claims, instruments, notes and accounts, whether now existing or hereafter arising, including, without limitatio
ome due to TERI (all hereinafter called the "Accounts");

d investments thereof, whether in the form of certificates of deposit, repurchase agreements, U.S. Treasury Bills, U.S
s, Federal agency notes or other investments, securities (whether certificated or uncertificated and specifically includi
tained on a book entry system through any securities intermediary (as defined in § 8-102(a)(14) of the Uniform Com
xisting or hereafter arising and wheresoever located, or otherwise (all hereinafter called the "Intangibles");

itle and interest of TERI in or to all instruments and documents covering or relating to the above described property, i
s, ledger sheets, files and other data (all such instruments and documents being called the "Related Documents");

, dividends and/or other earnings of any kind which are paid with respect to or derived from the Pledged Account, an
make claim for, collect and receive, any and all such interest, dividends and/or other earnings; and

eeds of all of the foregoing;

r rights of TERI to receive payment of Guaranty Fees, other than the TERI Guarantee Fee Entitlement, from the Own
ubsequent Guarantee Fees from the Owner pursuant to each of the Guaranty Agreements, and any separate undertakin

ll rights of TERI to receive or collect Recoveries; and

oregoing.

in which the Owner has been granted a security interest is herein collectively referred to as "Collateral." It is exp
automatically attach to any and all future deposits to, earnings from, and proceeds of the Pledged Account immed
ately upon the receipt thereof, without the making or doing of any further act or thing whatsoever. TERI shall promp
cuments, as may be requested from time to time by the Owner to create, evidence, maintain and effect the Owner's s

The security interest of the Owner under this Agreement secures (a) the payment and performance of all indebtedness
, to the Owner (or its assignees), pursuant to each of the Guaranty Agreements; (b) performance by TERI of the agre
by the Owner (or its assignees), including, without limitation, reasonable attorney's fees and legal expenses, in the e
s of the Owner (or its assignees), or in the enforcement of the obligations of TERI, under this Agreement or each of th
state or federal bankruptcy, insolvency, or reorganization proceeding); and (d) any renewals, continuations or extensi
"Secured Obligations").

dged Account. TERI shall not (except as provided in Sections 3(d)(ii), 4 and 13, or as otherwise specifically permitte
rator, any funds from or further assign, pledge, or hypothecate the Pledged Account or any portion of the Pledged Ac

payment of all expenses incurred by the Administrator or Trustee in connection with this Agreement or the exercise o
ot limited to the expenses of taking, advertising, processing, preparing and storing the Collateral to be sold, all court c
ewith;

the payment of valid Guaranty Claims in accordance with the terms thereof in the order in which a complete claim (in
e same day as received at the same time (if there are not sufficient funds in the Pledged Account to pay all claims pay
t, pro rata, from the Pledged Account as directed by the Administrator); and

remainder to be held pursuant to the terms of this Agreement as continuing security for TERI's payment of the remai

any such proceeds, monies, or balances in accordance with this Agreement promptly upon its receipt of the same. In
s, or balances shall be applied by the Administrator to discharge in whole or in part any unpaid Secured Obligation
riting or otherwise by TERI at any time. Upon any sale of Collateral by the Administrator (whether pursuant to a pow
e Administrator or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the C
e to the application of any part of the purchase money paid over to the Administrator or such officer, or be answer
her disposition of any Collateral by the Administrator hereunder, TERI shall remain liable for any deficiency. Any l
forthwith be transferred to TERI on the terms and conditions set forth in the Guaranty Agreements.

e. All rights, remedies, or powers conferred upon the Owner herein or by law shall be cumulative and concurrent at th
is reasonably necessary to cure any default, foreclose or exercise the power of sale or any other remedy available to it
hout the necessity of declaring all sums secured hereby to be due and payable. Upon any such occasion, the Administ
llateral as provided in this Agreement or pursuant to the Indenture and as permitted by law. The remaining Collateral
le, lease, or disposition or thereafter to become due or payable on any of the Secured Obligations.

; Role of the Administrator.

that the Owner has pledged all of its right, title and interest under this Agreement and its interest in the Pledged Acco
uch pledge, all rights of the Owner hereunder, subject to the limitations and obligations of this Agreement, may be ex
rms and limitations of this Agreement, the Administrator, on the Owner's behalf, in accordance with the Indenture, sh
under, including, without limitation:

wal of funds from the Pledged Account to pay the Trustee, as assignee of the Loans, with respect to a Guaranty Claim

wal of funds pursuant to Section 3(d)(ii) hereof;

ment of funds in the Pledged Account in Eligible Investments as directed by TERI from time to time; and

se of the remedies of the Owner on default by TERI under Section 9.

irects TERI to pay all sums intended to be placed in the Pledged Account, including, without limitation, all future Rec
y the Trustee in accordance with 8.02(c)(F) of the Indenture and funds held therein shall be invested by the Trustee in
s held in the Pledged Account in the form of bank deposits shall be deposited only with institutions that are federally

aused or will have caused, within ten days the filing of all appropriate financing statements in the proper filing office

curity interest in the Collateral granted to the Owner hereunder in which a security interest can be perfected by the fil

he security interest granted to the Owner pursuant to this Agreement, TERI has not pledged, assigned, sold, granted a
as not authorized the filing of and is not aware of any financing statements against TERI that include a description of
ting to the security interest granted to the Owner hereunder or that has been terminated. TERI is not aware of any judg

anties in this Section 14(b) shall continue in full force and effect until termination of this Agreement.

entations and warranties are subject to (i) the exercise of judicial discretion in accordance with the general principles
e United States of America and of the constitutional powers of the United States of America and (iii) bankruptcy, inso
enerally.

TERI agrees and covenants with the Owner as follows:

  of Collateral. TERI shall not permit the Collateral to be used in violation of any of the Guaranty Agreements or this

so obligated, pay and discharge when due all taxes, assessments, license or permit fees, levies and other charges upon
due all other taxes, levies, or assessments relating to its business which, if unpaid, might give rise to any penalty, sec
gainst the Collateral. The Collateral and all income and/or proceeds of the Collateral shall be, and be treated by TERI
st created hereunder, and TERI shall report the Collateral and all such proceeds as its sole property until, unless and e
ant to each of the Guaranty Agreements and this Agreement.

cept as otherwise expressly permitted in this Agreement, TERI shall not sell, assign, transfer, pledge, hypothecate, or
until all of the Secured Obligations are fully satisfied. TERI shall protect and defend the Collateral from and against a
party other than the Trustee.

rity Interest. TERI agrees that it shall do all things necessary to preserve and maintain the security interests of the Ow
ollateral and shall not permit the creation of any other lien, charge, security interest, or encumbrance in the Collateral
xecution, and the Administrator agrees to file or record (at its own cost and expense), such notices, financing statemen
, and TERI shall deliver to the Trustee upon request therefor such securities, agreements, writings, documents, certifi
eems necessary from time to time to perfect and maintain the perfection of the security interests of the Trustee under
e this Agreement and any financing statement reflecting the content of this Agreement for record in any governmenta

and Related Documents. TERI agrees:

nably requested to do so by the Administrator, to prepare and deliver to the Administrator a schedule in form satisfact
ll Collateral and the location thereof; and

urate and complete records at all times in respect of the Collateral and to deliver to the Administrator copies of such
inistrator may reasonably request.

under this Agreement shall be sent by any means requiring receipt signature, or if by facsimile confirmed by first-clas

rces Institute, Inc.

ssociation
ices-SFS
rd Floor

rnard

r the Owner:

ta Services, Inc.
r
- 34th Floor
157
yn Bonaventure

rporation
r
- 34th Floor
157
Law Department

e other parties in accordance with this section, designate a different address for notices thereafter under this Agreeme

Any action required or permitted to be taken or done hereunder on a day which is not a business day in Boston, Mass
as if taken or done on such non-business day.

rustee. It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by
y but solely as trustee of the Owner in the exercise of the powers and authority conferred and vested in it, (b) each of
the Owner is made and intended not as personal representations, undertakings and agreements by WTC but is made an

WILMINGTON TRUST COM
Trustee and not in its individua

By: /s/ Michele C. Harra

Name: Michele C. Harra

Title: Financial Services Off

ve Loan Program
am

(North Texas Higher Education)
m
 ram
 Program
ation Loan Program
 an Program
rogram
 oan Program

 C and School Channel)
rogram
 rogram
 n Program

ram

n Program

n

 oan Program

 Loan Program
gram

 oan Program

 any

n National Bank

ase Bank, N.A. (as successor to Bank One, N.A.)

.

s and Traders Trust Company

Bank

.A.

k

k

Bank.

A.

, dated October 1, 2002, for loans that were originated under Citizens Bank of Rhode Island's Penn State Undergrad

, dated August 1, 2001, for loans that were originated under First National Bank Northeast's CASL Undergraduate Al

2003, for loans that were originated under GMAC in Bank's Alternative Loan Program.

ssociation, dated April 17, 2002, for loans that were originated under the HSBC Loan Program.

k, dated May 20, 2003, for loans that were originated under The Huntington National Bank's Huntington Bank Educa

, (successor to Bank One, N.A.,) dated May 13, 2002, for loans that were originated under Bank One's CORPO

gram, and Campus One Loan Program.

, for loans that were originated under KeyBank's Private Education Loan Program.

ust Company, dated April 29, 2004, for loans that were originated under Manufacturers and Traders Trust Company's

y 26, 2002, for loans that were originated under National City Bank's National City Loan Program.

y 21, 2006, for loans that were originated under National City Bank's Referral Loan Program, including the Astute Pr

22, 2004, for loans that were originated under PNC Bank's Alternative Conforming Loan Program, Brazos Alternativ

nk Alternative Loan Prorgam, Old National Bank Alternative Loan Program, Regions Bank Alternative Loan Progra

0, 2004, for loans that were originated under Sovereign Bank's Alternative Loan Program.

, 2002, for loans that were originated under SunTrust Bank's SunTrust Alternative Loan Program.

y 22, 2005, for loans that were originated under TCF National Bank's Alternative Loan Program.

, 2005, for loans that were originated under U.S Bank's Alternative Loan Program.

Loan Program, Navy Federal Alternative Loan Program, and Nanthus Alternative Loan Program.

, dated October 1, 2002, for loans that were originated under Citizens Bank of Rhode Island's Penn State Undergradu

, dated August 1, 2001, for loans that were originated under First Bank of Northeast's Nelnet Undergraduate A

2003, for loans that were originated under GMAC Bank's Alternative Loan Program

ssociation, dated April 17, 2002, as amended on June 2, 2003 and August 1, 2003, for loans that were originated und

k, dated May 20, 2003, for loans that were originated under The Huntington National Bank's Huntington Bank Educa

, (successor to Bank One, N.A.), dated May 1, 2002, for loans that were originated under Bank One's CORPO

gram, and Campus One Loan Program.

, for loans that were originated under KeyBank's Private Education Loan Program.

ust Company, dated April 29, 2004, for loans that were originated under Manufacturers and Traders Trust Company's

vember 13, 2002, for loans that were originated under National City Bank's National City Loan Program.

y 21, 2006, for loans that were originated under National City Bank's Referral Loan Program, including the Astute Pr

22, 2004, for loans that were originated under PNC Bank's Alternative Conforming Loan Program, Brazos Alternativ

nk Alternative Loan Prorgam, Old National Bank Alternative Loan Program, Regions Bank Alternative Loan Progra

0, 2004, for loans that were originated under Sovereign Bank's Alternative Loan Program.

, 2002, for loans that were originated under SunTrust Bank's SunTrust Alternative Loan Program.

y 22, 2005, for loans that were originated under TCF National Bank's Alternative Loan Program.

, 2005, for loans that were originated under U.S Bank's Alternative Loan Program.

22, 2004, for all TERI-guaranteed loan programs funded by PNC Bank, N.A..

0, 2004, for loans that were originated under Sovereign Bank's Alternative Loan Program.

y 22, 2005, for loans that were originated under TCF National Bank's Alternative Loan Program.

, 2005, for loans that were originated under U.S Bank's Alternative Loan Program.


Agreements, as amended or supplemented, was entered into by and between The Education Resources Institute, Inc.


d March 1, 2004, for all TERI-guaranteed loan programs funded by Charter One Bank, N.A..

, dated April 30, 2004, for all TERI-guaranteed loan programs funded by Citizens Bank of Rhode Island.

, 2006, for loan originated in the the KeyBank Private Education Loan Program.

ust Company, dated April 29, 2004, for loans that were originated under Manufacturers and Traders Trust Company's

22, 2004, for all TERI-guaranteed loan programs funded by PNC Bank, N.A..

0, 2004, for loans that were originated under Sovereign Bank's Alternative Loan Program.

y 22, 2005, for loans that were originated under TCF National Bank's Alternative Loan Program.

, 2005, for loans that were originated under U.S Bank's Alternative Loan Program.

eposit and Security Agreement (the "<u>Agreement</u>"), dated as of December 7, 2006, by and among THE EDUCATI

TA SERVICES, INC. and THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4. Capitalized terms

to such terms in the Agreement.

ent, please remit $_____ in Guarantee Claims to

_____]Collateral Proceeds Acct.

ection letter along with the attached breakdown, which lists the Loan(s), associated with the above-referenced claim f

e]; and    **[Servicer]** Attention: [Name]:

___             Fax Number:

**elephone Number**] should you have any questions regarding this request.

Authorized Signature

TERI

posit and Security Agreement (the "Agreement"), dated as of December 7, 2006, by and among THE EDUCATIO

TA SERVICES, INC. and THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4. Capitalized terms

to such terms in the Agreement.

ent, the following amounts will be wired to the Pledged Account:

ranty Fees**

*each loan name, loan number and amount associated with this Guaranty Fee Remittance.*

overy****

*of each loan name, loan number and amount associated with this Recovery Remittance.*

unt wired to the Trustee

ed to the Trustee using the following wire instruction:

> **U.S. Bank National Association**
> **Boston, MA 02110**
> **ABA # [_____]**
> **A/C# [_____]**
> **Pledged Account**
> **SEI ###### - 000**

**elephone Number]** should you have any questions regarding this request.

eposit and Security Agreement (the   Agreement ), dated as of December 7, 2006, by and among THE EDUCATIO

TA SERVICES, INC. and THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4. Capitalized terms

to such terms in the Agreement.

(d)(ii) of the Agreement, this is to inform you that TERI has been assessed and has paid the sum of $_____

ned on the Pledged Account. We hereby request reimbursement of such amount to be sent as follows:

**IRE INSTRUCTIONS:**

ent, we are forwarding a copy of this request to the Owner and the Trustee. We have also enclosed documentation to

**ontact Telephone Number]** should you have any questions regarding this request.

Authorized Signature

TERI

# Exhibit I

Exhibit I

10/2/2018   Case 6:18-ap-01089-MH   Doc 33-4   Filed 01/09/19   Entered 01/09/19 13:20:46   Desc
Declaration in Support   Page 337 of 369
EX-99.11 15 d719511.htm DEPOSIT AND SECURITY AGREEMENT

**EXHIBIT 99.11**

<div align="center">

### DEPOSIT AND SECURITY AGREEMENT
### THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4

</div>

This Deposit and Security Agreement (the "Agreement") is made and entered into as of September 20, 2007, by and among THE EDUCATION RESOURCES INSTITUTE, INC., a private non-profit corporation organized under Chapter 180 of the Massachusetts General Laws with its principal place of business at 31 St. James Avenue, Boston, Massachusetts 02116 ("TERI"), FIRST MARBLEHEAD DATA SERVICES, INC., a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business at 800 Boylston – 34th Floor, Boston, Massachusetts 02199 (the "Administrator"), and THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4, in its capacity as owner (in such capacity, the "Owner").

WHEREAS, the Owner is willing to purchase education loans to borrowers under the education loan programs listed on Schedule A attached hereto and others in accordance with the Indenture (collectively, the "Student Loan Programs") upon certain terms and conditions, including but not limited to the guaranty of the payment of principal and interest by TERI pursuant to the terms of the Guaranty Agreements (as hereafter defined) and the deposit of certain monies with U.S. Bank National Association, as Indenture Trustee (the "Trustee"), on behalf of the Owner, as security for such payment as more fully described herein and in accordance with the terms and conditions set forth in this Agreement, and the agreements (the "Account Security Agreements") listed on Schedule B attached hereto and others in accordance with the Indenture;

WHEREAS, under the terms of the Guaranty Agreements listed on Schedule B attached hereto and others in accordance with the Indenture between TERI and each of the parties (the "Loan Originators") listed on Schedule B attached hereto and others in accordance with the Indenture, TERI guaranties the payment of principal and interest on the Loans in exchange for the payment of certain Guaranty Fees (as hereinafter defined);

WHEREAS, (i) pursuant to the Student Loan Purchase Agreements listed on Schedule B attached hereto and others in accordance with the Indenture, between the Loan Originators and The First Marblehead Corporation (the "Student Loan Purchase Agreements"), and related pool supplements among the Loan Originators, The First Marblehead Corporation and The National Collegiate Funding LLC ("NCF"), NCF has agreed to acquire certain Loans, and (ii) pursuant to that certain Deposit and Sale Agreement dated as of the date hereof, the Owner has agreed to acquire such Loans from NCF;

WHEREAS, the Administrator is authorized to act for the Owner in all matters relating to this Agreement; and

WHEREAS, it is the intention of the Owner and TERI that this Agreement shall apply to each Loan that is (i) subject to the Guaranty Agreements and (ii) purchased by the Owner with funds held under the Indenture (as hereafter defined).

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the parties agree as follows:

1.      Definitions. Capitalized terms not otherwise defined in this Section, in the recitals hereto or elsewhere in this Agreement shall have the meanings ascribed to such terms in the Guaranty Agreements listed on Schedule B attached hereto, or if not defined therein, in the Indenture (as defined below).  In addition:

(a)      "Closing Date" shall mean September 20, 2007.

(b)      "Collateral" shall have the meaning set forth in Section 5.

(c)      "Distribution Date" shall have the meaning set forth in the Indenture.

(d)      "Eligible Investments" means the following categories of securities:

(A)      Cash (insured at all times by the Federal Deposit Insurance Corporation);

(B)      Obligations of, or obligations guaranteed as to principal and interest by, the U.S. or any agency or instrumentality thereof, when such obligations are backed by the full faith and credit of the U.S. government including but not limited

to:

·    U.S. treasury obligations

·    All direct or fully guaranteed obligations

·    Farmers Home Administration

·    General Services Administration

·    Guaranteed Title XI financing

·    Government National Mortgage Association (GNMA)

·    State and Local Government Series

(C)    Obligations of government-sponsored agencies that are not backed by the full faith and credit of the U.S. government including:

·    Federal Home Loan Mortgage Corp. (FHLMC) Debt obligations

·    Farm Credit System (formerly: Federal Land Banks, Federal

Intermediate Credit Banks, and Banks for Cooperatives)

·    Federal Home Loan Banks (FHL Banks)

·    Federal National Mortgage Association (FNMA) debt obligations

·    Financing Corp. (FICO) debt obligations

·    Resolution Funding Corp. (REFCORP) debt obligations

·    U.S. Agency for International Development (U.S. A.I.D)

guaranteed notes

(D)    U.s. dollar denominated deposit accounts, federal funds and bankers' acceptances with domestic commercial banks which have a rating on their short term certificates of deposit on the date of purchase of: "A-1+" by S&P, "P-1" by Moody's and "F1" by Fitch (if rated by Fitch); and maturing not more than 360 calendar days after the date of purchase.  (Ratings on holding companies are not considered as the rating of the bank);

(E)    Commercial paper that meets the ratings of the following listed rating agencies at the time of purchase:  (1) "A-1+" by S&P, "P-1" by Moody's and "F1" by Fitch (if rated by Fitch); which matures not more than 270 calendar days after the date of purchase;

(F)    Investments in a money market fund rated "AAAm" or "AAA-m" by S&P and "Aaa" by Moody's;

(G)    Pre-refunded "municipal obligations" which are defined as follows:  any bonds or other obligations of any state of the U.S. or of any agency, instrumentality or local governmental unit of any such state which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(1)    Which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest rating category of S&P, Moody's and Fitch (if rated by Fitch) or any successors thereto; or

(2)          (a) Which are fully secured as to principal and interest and redemption premium, if any, by an escrow consisting only of cash or obligations described in paragraph (i)(B) above, which escrow may be applied only to the payment of such principal of and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, to pay principal of and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate;

(H)          Any other investment that is confirmed by Moody's, S&P and Fitch for the investment of funds held as collateral for securities rated in the highest investment rating category and that is not:

(1)          A financial asset that involves the Owner, the Administrator or the beneficial owners of the Owner in making decisions other than the decisions inherent in servicing the financial assets including without limitation any financial asset that includes an option to be exercised by the Owner, the Administrator or the beneficial owners of the Owner; or

(2)          A derivative financial instrument that involves the Owner, the Administrator or the beneficial owners of the Owner in making decisions including without limitation any derivative financial instrument that includes an option allowing the Owner, the Administrator or the beneficial owners of the Owner to choose to call or put other financial instruments; provided that a derivative financial instrument shall be an Eligible Investment only if it is acquired from proceeds of the issuance of Notes by the Owner at the time of such issuance.

(e)          "Existing Pledged Account" means the Pledged Account, if any, created pursuant to the Account Security Agreements and named therein the "Pledged Account."

(f)          "Guaranty Agreements" shall mean each of the Guaranty Agreements between each of the Loan Originators and TERI, and any amendments or modifications thereto, as set forth on Schedule B attached hereto and others in accordance with the Indenture.

(g)          "Guaranty Claims" shall mean a claim made by or on behalf of the Owner for payment by TERI following a Guaranty Event.

(h)          "Guaranty Fees" shall mean, collectively, all of the fees payable to TERI for the guarantee of a Loan as described in each of the Guaranty Agreements.

(i)          "Indenture" means the Indenture dated as of September 1, 2007, by and between the Owner and the Trustee, as may be amended or supplemented from time to time.

(j)          "Intangibles" shall have the meaning set forth in Section 5(a)(ii).

(k)          "Recoveries" shall mean and include:  (i) any and all cash, checks, drafts, orders and all other instruments for the payment of money received by TERI from or on behalf of Borrowers in payment of principal of, interest on, late fees with respect to, and costs of collecting defaulted Loans with respect to which TERI has paid, in full, Guaranty Claims, from funds in the Pledged Account, and the proceeds of all of the foregoing, (ii) any amount received by TERI upon the sale or other transfer of defaulted Loans with respect to which TERI has paid, in full, Guaranty Claims (including the sale of such Loans to the Owner as provided in each of the Guaranty Agreements or the sale of the right to collect such Loans or other similar rights with respect thereto), and (iii) in connection with any pledge or assignment of defaulted Loans (or rights with respect thereto) to secure a loan to TERI, the amount of such loan.  In all cases, "Recoveries" shall be computed net of TERI's Costs of Collection.  TERI's "Costs of Collection" for purposes of this Agreement shall mean all fees and expenses paid to third party collectors and attorneys, and, to cover TERI's internal costs, an amount equal to two and one-half percent (2.5%) of the amount recovered (excluding amounts recovered upon the sale of loans to the Owner as provided in each of the Guaranty Agreements).

(l)          "Secured Obligations" shall have the meaning set forth in Section 6.

(m)          "TERI Guarantee Fee Entitlement" means a portion of Guaranty Fees equal to (i) 1.75% of the principal amount of each Loan listed on Schedule C-1 attached hereto, (ii) an additional 1.00% of the principal amount of each Loan listed on Schedule C-2 attached hereto and (iii) 0.04% of the aggregate outstanding principal balance of the Loans that are guaranteed by TERI and purchased by the Owner on the Closing Date, each payable in accordance with each of the Guaranty Agreements and Master Loan Guaranty Agreement, dated as of February 2, 2001, by and between The First Marblehead Corporation and TERI, as amended or supplemented.

2.    <u>Creation and Funding of the Pledged Account</u>.  Upon the execution of this Agreement, the Owner shall establish with the Trustee an account (the "<u>Pledged Account</u>"), which Pledged Account shall be pledged by the Owner to the Trustee pursuant to the Indenture, for the purpose of depositing upon receipt portions of the Guaranty Fees, Recoveries and earnings as provided in this Section 2.  The Pledged Account shall be funded (a) by transfer of all amounts held on the Closing Date in the Existing Pledged Account that relate to the Loans being purchased on the Closing Date, determined as set forth in each of the Account Security Agreements, (b) by TERI with certain Guaranty Fees payable on the Closing Date with respect to the Loans being purchased, and (c) by TERI with all Recoveries with respect to Loans on which TERI has paid Guaranty Claims, and earnings on the Pledged Account, all of which shall be pledged by TERI to the Owner under the terms of this Agreement.  TERI hereby irrevocably directs the Owner to deposit the following amounts into the Pledged Account:

(a)    Any and all Guaranty Fees previously paid by the Loan Originators and currently held by the Trustee in the Existing Pledged Account created under each of the Account Security Agreements with respect to Loans purchased on the Closing Date as set forth in each of the Account Security Agreements;

(b)    Any and all additional Guaranty Fees with respect to such Loans purchased by the Owner, which fees will be deposited into the Pledged Account on the Closing Date; and

(c)    All Recoveries, which Recoveries shall be remitted by or on behalf of TERI to the Trustee on the 15th day of each month, for Recoveries received during the preceding month.

Any amounts remitted to the Trustee for deposit into the Pledged Account shall be accompanied by a notice in the form of <u>Exhibit 2</u>.

3.    <u>Pledged Account Investment and Maintenance</u>.

(a)    The Owner shall withdraw from the Pledged Account and deposit into the Collection Account of the Indenture any amounts owed by TERI under each of the Guaranty Agreements for Guaranty Claims as provided in Section 3(d)(i) hereof.  The Owner understands and agrees that TERI shall be required to pay any such claim amounts out of TERI's general reserves and other assets only to the extent that and for so long as the Pledged Account is without sufficient funds or is otherwise unavailable to promptly pay whatever amounts are then due and payable under each of the Guaranty Agreements.  Notwithstanding the foregoing, while there is a default by TERI under Section 8 hereof continuing, the provisions of Section 9 hereof shall apply.

(b)    Prior to the occurrence of a default by TERI under Section 8 hereof, TERI may direct the Owner to invest amounts held in the Pledged Account in one or more Eligible Investments.  If a default under Section 8 occurs and is continuing, the Administrator on behalf of the Owner shall have the sole right to direct investment of the Pledged Account, but such investments shall be limited to Eligible Investments.

(c)    No interest, dividends, distributions or other earnings of whatever nature which are paid and derived from the Pledged Account (collectively, "<u>Earnings</u>") shall be withdrawn or paid to the Owner or TERI or any other person or entity unless pursuant to the provisions of Section 3(d).  All Earnings shall be fully, immediately and completely reinvested in the Pledged Account.  Any other provisions of this Agreement to the contrary (either expressly or by implication) notwithstanding, all Earnings net of losses shall be credited to and deemed income of TERI and not of the Owner, and shall be so treated by TERI.

(d)    Withdrawals and disbursements from the Pledged Account shall be made only in accordance with the following provisions:

(i)    Upon receipt by the Owner of a Payment of Guaranty Claims Direction Letter, substantially in the form of <u>Exhibit 1</u> (and, after the occurrence of a default under Section 8, whether or not such a Direction Letter is received), the Owner shall withdraw from the Pledged Account and deposit in the Collection Account of the Indenture the full amount of any valid Guaranty Claims made in accordance with each of the Guaranty Agreements for defaulted Loans.

(ii)    In the event TERI's income on the Pledged Account should become subject to federal income taxation or the income from the Pledged Account should become subject to excise tax under section 4940 of the Internal Revenue Code of 1986, as amended, TERI shall be entitled to the release of Earnings from the Pledged Account equal to the taxes actually paid by TERI with respect to the income on the Pledged Account.  TERI shall provide the Administrator, the Trustee and the Note Insurer with a written request substantially in the form of <u>Exhibit 3</u> attached hereto, for any such withdrawal, which request shall be accompanied by documentation as to the amounts to be withdrawn ("<u>Withdrawal Request</u>").  Not later than 15 days following receipt by the Administrator of a Withdrawal Request, the Administrator may either (A) notify TERI of any objection to such Withdrawal Request

along with reasons for such objection or (ii) request any further information or documentation relating to such request. If the Administrator does not object or request further information from TERI within such 15 day period, the Administrator shall be deemed to have consented to the Withdrawal Request, and the Administrator shall thereafter promptly cause the Trustee to withdraw the requested funds from the Pledged Account, *provided, however*, that so long as the Indenture is in effect, no such withdrawal may be made without the consent of the Note Insurer (which consent shall be required regardless of whether the Administrator has consented thereto), such consent not to be unreasonably withheld. If the Administrator objects to any Withdrawal Request, the Administrator shall deny the request, notify the Trustee of such denial and provide TERI with a written statement of the Administrator's reasons for denial, which denial must be reasonably based on the requirements set forth in this Section 3(d).

4.　Underline{Excess Funds in the Pledged Account}.

(a)　On the Closing Date, the Owner shall pay TERI from funds in the Pledged Account an amount equal to 0.06% of the aggregate outstanding principal balance of the Loans that are guaranteed by TERI and purchased by the Owner on the Closing Date.

(b)　If on any Distribution Date under the Indenture (after giving effect to all payments on that Distribution Date), the product of (i) the aggregate outstanding principal balance of and earned interest on Loans held by or pledged to the Trustee, multiplied by (ii) a factor equal to sixteen hundredths (.16) (the "Stress Factor") is less than the balance in the Pledged Account, and, if no default exists hereunder or under any of the Guaranty Agreements and the sum of (x) the Pool Balance at the end of the preceding Collection Period plus (y) amounts on deposit in the Reserve Account and the Future Distribution Account is greater than or equal to 103% of the Outstanding Amount of the Notes, the Administrator shall cause the Trustee to pay to TERI the amount by which the balance in the Pledged Account exceeds such product. The parties agree that the approval of the Stress Factor by the rating agencies is dependent upon the types of Loans purchased by the Owner on the Closing Date.

5.　Underline{Security Interest}. As security for payment by TERI of the Secured Obligations (as hereinafter defined), TERI hereby grants a security interest in and to (x) all property of TERI now or hereafter deposited or held or required to be deposited or held in the Pledged Account as described in Section 2 of this Agreement, including without limitation (i) any and all Guaranty Fees previously paid by Loan Originators and currently held by U.S. Bank National Association as Trustee in the Existing Pledged Account created under each of the Account Security Agreements with respect to Loans purchased on the Closing Date as set forth in each of the Account Security Agreements; (ii) any and all additional Guaranty Fees with respect to such Loans purchased by the Owner, which fees will be deposited into the Pledged Account on the Closing Date; and (iii) all Recoveries, which Recoveries shall be remitted by or on behalf of TERI to the Trustee on the 15th day of each month for Recoveries received during the preceding month, and (y) TERI's right to receive all Earnings. The foregoing shall not be deemed to include a grant of a security interest in defaulted Loans. In furtherance thereof and in confirmation of the foregoing, TERI hereby grants to the Owner (and its assigns) a first priority security interest in and to the following, to the extent they relate to Loans purchased by the Owner:

(a)　All property of TERI deposited or held or required to be deposited or held in the Pledged Account, as provided in this Agreement, or relating to any such property of TERI, whether tangible or intangible, and whether now owned or hereafter acquired by TERI and wheresoever located, including without limitation:

(i)　All contract rights, claims, instruments, notes and accounts, whether now existing or hereafter arising, including, without limitation, all of the same evidencing or representing indebtedness due or to become due to TERI (all hereinafter called the "Accounts");

(ii)　All funds and investments thereof, whether in the form of certificates of deposit, repurchase agreements, U.S. Treasury Bills, U.S. Treasury Notes, investment grade commercial paper, U.S. Treasury Bonds, Federal agency notes or other investments, securities (whether certificated or uncertificated and specifically including any securities which are purchased through and for which records are maintained on a book entry system through any securities intermediary (as defined in § 8-102(a)(14) of the Uniform Commercial Code)), payment intangibles and general intangibles, whether now existing or hereafter arising and wheresoever located, or otherwise (all hereinafter called the "Intangibles");

(iii)　All right, title and interest of TERI in or to all instruments and documents relating to the above described property, including but not limited to, all books, records, computer printouts, tapes, disks, ledger sheets, files and other data (all such instruments and documents being called the "Related Documents");

(iv)　All interest, dividends and/or other earnings of any kind which are paid with respect to or derived from the Pledged Account, and all proceeds of any of the foregoing, and the present and continuing right to make claim for, collect and receive, any and all such interest, dividends and/or other earnings; and

(v)      All the proceeds of all of the foregoing;

(b)      All contract and other rights of TERI to receive payment of Guaranty Fees, other than the TERI Guarantee Fee Entitlement, from the Owner under each of the Guaranty Agreements; TERI's rights to receive subsequent Guarantee Fees from the Owner pursuant to each of the Guaranty Agreements, and any separate undertaking or agreement by the Owner to pay such subsequent Guarantee Fees;

(c)      All Recoveries and all rights of TERI to receive or collect Recoveries; and

(d)      All proceeds of the foregoing.

All of the foregoing property in which the Owner has been granted a security interest is herein collectively referred to as "Collateral." It is expressly understood and agreed that this security interest shall automatically attach to any and all future deposits to, earnings from, and proceeds of the Pledged Account immediately upon deposit or accrual, and all Guaranty Fees and Recoveries immediately upon the receipt thereof, without the making or doing of any further act or thing whatsoever. TERI shall promptly take all further action, and execute and deliver to the Owner such other documents, as may be requested from time to time by the Owner to create, evidence, maintain and effect the Owner's security interest in the Pledged Account and the other rights pledged hereunder.

6.      Secured Obligations. The security interest of the Owner under this Agreement secures (a) the payment and performance of all indebtedness, obligations and liabilities of TERI arising at any time, now or in the future, to the Owner (or its assignees), pursuant to each of the Guaranty Agreements; (b) performance by TERI of the agreements set forth in this Agreement; (c) all payments made or expenses incurred by the Owner (or its assignees), including, without limitation, reasonable attorney's fees and legal expenses, in the exercise, preservation or enforcement of any of the rights, powers or remedies of the Owner (or its assignees), or in the enforcement of the obligations of TERI, under this Agreement or each of the Guaranty Agreements (whether or not paid or incurred in the context of a state or federal bankruptcy, insolvency, or reorganization proceeding); and (d) any renewals, continuations or extensions of any of the foregoing (all of which are collectively referred to as the "Secured Obligations").

7.      Restrictions on the Pledged Account. TERI shall not (except as provided in Sections 3(d)(ii), 4 and 13, or as otherwise specifically permitted by this Agreement) be paid by the Owner, at the direction of the Administrator, any funds from or further assign, pledge, or hypothecate the Pledged Account or any portion of the Pledged Account to any individual, person, entity or other third party without the express prior written consent of the Owner and, while the Indenture is in effect, the Note Insurer. Payments to TERI will be by wire transfer unless TERI requests, in writing, another reasonable form of payment.

8.      Default. TERI shall be in default of this Agreement if TERI fails to remit to the Owner from the Pledged Account or otherwise, in accordance with the terms and provisions of the Guaranty Agreements, the principal balance (including capitalized fees and interest) and accrued interest and late fees on any Loan as to which a Guaranty Event (as defined in each of the Guaranty Agreements) has occurred and as to which the conditions set forth in each of the Guaranty Agreements to payment of a Guaranty Claim have been satisfied, and if such failure continues for a period of thirty (30) days. Either TERI or the Owner shall be in default of this Agreement if (a) any representation, warranty, or statement made by such party in or pursuant to this Agreement or each of the Guaranty Agreements is found to be false or erroneous in any material respect, or (b) such party shall fail or omit to perform or observe any material covenant or agreement made by it in this Agreement or each of the Guaranty Agreements, and if such circumstance, failure or omission (if susceptible of cure) remains uncured for thirty (30) days. Upon the occurrence of an event of default by TERI, and while such default is continuing, the Owner shall cease disbursing any funds at the request of TERI except to pay Guaranty Claims.

9.      Remedies Upon Default. The Owner shall have all of the rights and remedies of a secured party under the Massachusetts Uniform Commercial Code (as the same may be amended from time to time), as well as all rights and remedies provided by any other applicable law, at law, or in equity. Without limiting the generality of the foregoing, the Administrator shall also have the right, during the term of this Agreement, to do any or all of the following upon a default and until any such default is cured:

(a)      Acceleration. Without any notice or demand, the Administrator may declare any or all Secured Obligations then in default to be immediately due and payable.

(b)      Possession. Without notice, demand, or hearing, any right to which is hereby waived by TERI, the Administrator shall have full power and authority to hold, sequester, set-off or withdraw any and all funds from the Pledged Account and to (i) direct such funds for application to any Loan as to which a Guarantee Event has occurred and TERI has failed to remit the principal balance (including capitalized fees and interest) and accrued interest and late fees thereon in accordance with the terms and conditions of each of the Guaranty Agreements or (ii) hold the funds in the Pledged Account without making any disbursements of any kind to TERI as

otherwise provided in this Agreement, and to apply the funds if any Loan is made when a Guarantee Event occurs and TERI fails to promptly remit to the Owner the unpaid principal balance (including capitalized fees and interest) and accrued interest and late fees thereon in accordance with the conditions of each of the Guaranty Agreements.

        (c)      <u>Collection of Accounts</u>.

        (i)      TERI hereby constitutes and appoints the Administrator (and upon assignment hereof, the Trustee) its true and lawful attorney (which appointment is coupled with an interest), with full power of substitution, either in the Administrator's own name or in the name of TERI, to ask for, demand, sue for, collect, receive, receipt and give acquittance for, any and all moneys due or to become due to TERI that are part of the Collateral; to endorse checks, drafts, orders and other instruments for the payment of money payable to TERI on account thereof, to settle, compromise, prosecute, or defend any action, claim, or proceeding with respect thereto; and to sell, assign, pledge, transfer and make any agreement respecting, or otherwise deal with, the same.

        (ii)      TERI agrees that all Recoveries shall be held by the Owner to whatever extent may be necessary to facilitate full and complete payment of all amounts owed under each of the Guaranty Agreements. All such Recoveries received by TERI shall be remitted to the Trustee (properly endorsed for collection where required), on the 15th day of each month, for Recoveries received during the preceding month, and accompanied by <u>Exhibit 2</u> and deposited in the Pledged Account, for the payment of all of the Secured Obligations then in default. TERI agrees not to commingle any such collections or proceeds with any of its other funds or property and agrees to hold the same upon an express trust for the Owner until deposited in the Pledged Account, as aforesaid.

        (iii)      The Administrator agrees to provide notice to TERI of the Administrator's or Owner's exercise of any of its rights under this Section 9(c).

        (d)      <u>Transfer of Intangibles</u>. The Administrator shall have the right to take possession of any agreement or other document evidencing any of the Intangibles, and may apply for or seek, on behalf of and as attorney-in-fact for TERI, any necessary consent to the assignment, transfer, conveyance, sale, renewal, reissuance or other disposition of the same, and TERI shall cooperate fully with the Administrator in doing so and shall take all actions reasonably requested by the Administrator in furtherance thereof. TERI hereby constitutes and appoints the Administrator its true and lawful attorney (which appointment is coupled with an interest) with full power of substitution, either in the Administrator's own name or in the name of TERI, to assign, transfer and convey, subject to all requirements of law, any and all of TERI's rights in and to any of the Intangibles.

        (e)      <u>Disposition</u>. The Administrator may assign, transfer, convey, any or all of the Collateral, by public or private sale subject to TERI's rights to retain a copy of each Related Document now or in the future in TERI's possession. The Administrator shall provide TERI with reasonable written notice of the time and place of any such sale.

        (f)      <u>Proceeds</u>. All proceeds from the sale or other disposition of Collateral by the Administrator under this Section 9 of this Agreement, and all other moneys received by the Administrator pursuant to the terms of this Agreement shall be applied as follows:

        (i)      First, to the payment of all expenses incurred by the Administrator or Trustee in connection with this Agreement or the exercise of any right or remedy hereunder, or any sale or disposition, including, but not limited to the expenses of taking, advertising, processing, preparing and storing the Collateral to be sold, all court costs and the Administrator's reasonable legal fees in connection therewith;

        (ii)      Second, to the payment of valid Guaranty Claims in accordance with the terms thereof in the order in which a complete claim (including all required documentation) is received, treating all such complete claims received the same day as received at the same time (if there are not sufficient funds in the Pledged Account to pay all claims payable therefrom received on a given day, all such claims shall be paid in part, pro rata, from the Pledged Account as directed by the Administrator); and

        (iii)      Third, any remainder to be held pursuant to the terms of this Agreement as continuing security for TERI's payment of the remaining Secured Obligations.

        The Administrator shall apply any such proceeds, monies, or balances in accordance with this Agreement promptly upon its receipt of the same. In respect of any application pursuant to clause (ii) above, such proceeds, monies, or balances shall be applied by the Administrator to discharge in whole or in part any unpaid Secured Obligation, notwithstanding any manifestation of an intent to the contrary expressed in writing or otherwise by TERI at any time. Upon any sale of Collateral by the Administrator (whether pursuant to a power of sale granted by a statute or under a judicial proceeding), the receipt of the Administrator or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be

obligated to see to the application of any part of the purchase money paid over to the Administrator or such officer, or be answerable in any way for the misapplication thereof. Notwithstanding the sale or other disposition of any Collateral by the Administrator hereunder, TERI shall remain liable for any deficiency. Any Loan with respect to which the Owner receives payment in full hereunder will forthwith be transferred to TERI on the terms and conditions set forth in the Guaranty Agreements.

10.    Remedies Cumulative. All rights, remedies, or powers conferred upon the Owner herein or by law shall be cumulative and concurrent at the option of the Administrator, and the Administrator may, to whatever extent is reasonably necessary to cure any default, foreclose or exercise the power of sale or any other remedy available to it successively upon any default or upon successive defaults hereunder without the necessity of declaring all sums secured hereby to be due and payable. Upon any such occasion, the Administrator shall be authorized to sell or dispose of all or any such part of the Collateral as provided in this Agreement or pursuant to the Indenture and as permitted by law. The remaining Collateral shall continue as security for any other sums remaining due after such sale, lease, or disposition or thereafter to become due or payable on any of the Secured Obligations.

11.    Pledge by the Owner; Role of the Administrator.

(a)    TERI acknowledges that the Owner has pledged all of its right, title and interest under this Agreement and its interest in the Pledged Account as collateral security to the Trustee pursuant to the Indenture. Pursuant to such pledge, all rights of the Owner hereunder, subject to the limitations and obligations of this Agreement, may be exercised by the Trustee, pursuant to the terms of the Indenture. Subject to the terms and limitations of this Agreement, the Administrator, on the Owner's behalf or at the direction of the Note Insurer, in accordance with the Indenture, shall request that the Trustee exercise the Owner's rights and obligations hereunder, including, without limitation:

(i)    The withdrawal of funds from the Pledged Account to pay the Trustee, as assignee of the Loans, with respect to a Guaranty Claim pursuant to Section 3(d)(i) hereof;

(ii)    The withdrawal of funds pursuant to Section 3(d)(ii) hereof;

(iii)    The investment of funds in the Pledged Account in Eligible Investments as directed by TERI from time to time; and

(iv)    The exercise of the remedies of the Owner on default by TERI under Section 9.

(b)    The Owner hereby directs TERI to pay all sums intended to be placed in the Pledged Account, including, without limitation, all future Recoveries, directly to the Trustee. The Pledged Account shall be maintained by the Trustee in accordance with 8.02(c)(F) of the Indenture and funds held therein shall be invested by the Trustee in Eligible Investments pursuant to and in accordance with 8.02(b) of the Indenture. Funds held in the Pledged Account in the form of bank deposits shall be deposited only with institutions that are federally insured.

(c)    The Trustee, the Note Insurer and the holders of the notes authenticated and delivered pursuant to the Indenture, are intended third-party beneficiaries on this Agreement, with rights to enforce the Owner's interests in the same. Such third-party beneficiaries are not parties hereto and incur no liabilities hereunder.

(d)    The Administrator has been appointed to act for the Owner in connection with the transactions contemplated by the Indenture. The Administrator has the power and authority to take any action and give any notice required or permitted by the Owner hereunder and TERI may deal with Administrator as if it were dealing with the Owner. Any notice required to be given to the Owner by TERI shall also be given to Administrator. The Administrator will request instructions from the Trustee on behalf of the Noteholders or the Note Insurer (pursuant to the Indenture), as the case may be, for any non-ministerial action that the Administrator is required to take under this Agreement.

12.    Possession of Collateral. Throughout the term of this Agreement, possession of the Collateral shall be maintained by the Trustee, or its agent or nominee (if the Trustee so chooses from time to time), as necessary and appropriate to perfect the Owner's, and, while the Indenture is in effect, the Trustee's security interest therein as provided in and subject to the terms of this Agreement. Upon termination of the Indenture and satisfaction in full of all debt secured thereby and release of the Pledged Account to the Owner, the Administrator may designate an alternative collateral agent to hold the Pledged Account.

13.    Termination of Security Interests. This Agreement and the security interests under this Agreement shall terminate when all amounts due and owing on account of, and all obligations and liabilities of TERI in respect of, the Secured Obligations shall have been fully performed, satisfied and paid as provided in this Agreement and the Guaranty Agreements. At such time, the

Administrator shall promptly reassign and deliver to TERI, without recourse or representation, against TERI's receipt, all Collateral then held by the Owner or anyone claiming by, through or under the Owner.  TERI shall execute and if necessary deliver to the Administrator for execution, and the Administrator shall promptly cause to be filed at the Owner's expense, termination statements in respect of any financing statements filed under this Agreement.  The Administrator agrees to fulfill the Owner's obligations to file such termination statements at its own cost and expense.  The security interests hereunder shall terminate as to all Collateral lawfully withdrawn by or paid to TERI hereunder, upon the occurrence of such withdrawal or payment.

14.    Representations and Warranties.

(a)    Each party, with respect to itself, represents and warrants that:

(i)    The making and performance of this Agreement and the activities contemplated hereby have been duly authorized by all necessary action and do not and will not:

(A)    Violate any provision of law, or any regulation, order, decree, writ or injunction, or any provision of such party's charter, bylaws, or any other organizing document; or

(B)    Violate or result in the breach of, or constitute a default or require any consent under, any agreement or instrument by which it or any of its property may be bound or affected.

(ii)    This Agreement is the legal, valid and binding obligation of such party, enforceable in accordance with the terms hereof, subject to the exercise of judicial discretion in accordance with general principles of equity, the valid exercise of state police powers and the constitutional powers of the United States of America, and bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally.

(iii)    There is no pending or threatened litigation that would, if resolved adversely to such party, adversely impact such party's ability to perform any of its obligations under this Agreement or each of the Guaranty Agreements.

(b)    TERI represents and warrants that:

(i)    Except for the security interests of the Owner created under this Agreement, TERI is and will be the owner of the Collateral, whenever acquired or arising, free and clear of all liens, security interests, claims, encumbrances, charges, set-offs, defenses and counterclaims;

(ii)    This Agreement creates a valid and continuing security interest (as defined in the applicable Uniform Commercial Code ("UCC") in effect in the Commonwealth of Massachusetts) in the Collateral in favor of the Owner, which security interest is prior to all other liens, charges, security interests, mortgages or other encumbrances, and is enforceable as such as against creditors of and purchasers from TERI;

(iii)    The Collateral constitutes "money" or a "deposit account" or "investment property" or "general intangibles" or "accounts" within the meaning of the applicable UCC.

(iv)    TERI has caused or will have caused, within ten days, the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the security interest in the Collateral granted to the Owner hereunder in which a security interest can be perfected by the filing of a financing statement in such office.

(v)    Other than the security interest granted to the Owner pursuant to this Agreement, TERI has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Collateral.  TERI has not authorized the filing of and is not aware of any financing statements against TERI that include a description of collateral covering the Collateral other than any financing statement relating to the security interest granted to the Owner hereunder or that has been terminated.  TERI is not aware of any judgment or tax lien filings against TERI.

The foregoing representations and warranties in this Section 14(b) shall continue in full force and effect until termination of this Agreement.

(c)    The foregoing representations and warranties are subject to (i) the exercise of judicial discretion in accordance with the general principles of equity; (ii) the valid exercise of the police powers of the several states of the United States of America and of

the constitutional powers of the United States of America and (ii) bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditor's rights generally.

15.    Covenants of TERI.  TERI agrees and covenants with the Owner as follows:

(a)    Maintenance and Use of Collateral.  TERI shall not permit the Collateral to be used in violation of any of the Guaranty Agreements or this Agreement.

(b)    Taxes.  TERI shall, if so obligated, pay and discharge when due all taxes, assessments, license or permit fees, levies and other charges upon the Collateral, and TERI shall, if so obligated, also pay and discharge when due all other taxes, levies, or assessments relating to its business which, if unpaid, might give rise to any penalty, security interest, lien, charge, levy, assessment, or encumbrance in, on or against the Collateral.  The Collateral and all income and/or proceeds of the Collateral shall be, and be treated by TERI as being, the property of TERI, subject to the pledge and security interest created hereunder, and TERI shall report the Collateral and all such proceeds as its sole property until, unless and except to the extent any of the Collateral is paid and transferred pursuant to each of the Guaranty Agreements and this Agreement.

(c)    No Encumbrance.  Except as otherwise expressly permitted in this Agreement, TERI shall not sell, assign, transfer, pledge, hypothecate, or otherwise dispose of or encumber any of the Collateral or any interest therein until all of the Secured Obligations are fully satisfied.  TERI shall protect and defend the Collateral from and against any and all claims, demands, or legal proceedings brought or asserted by any party other than the Trustee.

(d)    Maintenance of Security Interest.  TERI agrees that it shall do all things necessary to preserve and maintain the security interests of the Owner under this Agreement and Indenture as a first priority lien in the Collateral and shall not permit the creation of any other lien, charge, security interest, or encumbrance in the Collateral.  TERI agrees that it shall execute and if necessary deliver to the Trustee for execution, and the Administrator agrees to file or record (at its own cost and expense), such notices, financing statements, continuation statements, certificates of title and other documents, and TERI shall deliver to the Trustee upon request therefor such securities, agreements, writings, documents, certificates, instruments, or other intangibles, as the Trustee reasonably deems necessary from time to time to perfect and maintain the perfection of the security interests of the Trustee under this Agreement.  The Trustee or the Administrator shall have the right to file this Agreement and any financing statement reflecting the content of this Agreement for record in any governmental office.

(e)    Records, Statements and Related Documents.  TERI agrees:

(i)    When reasonably requested to do so by the Administrator, to prepare and deliver to the Administrator a schedule in form satisfactory to the Administrator, certified by an authorized officer of TERI, listing all Collateral and the location thereof; and

(ii)    To keep accurate and complete records at all times in respect of the Collateral and to deliver to the Administrator copies of such records and such other information regarding the Collateral which the Administrator may reasonably request.

(f)    Location of Books and Records.  The principal office of TERI is located at 31 St. James Avenue, Boston, Massachusetts 02116, and all books of account and records relating to the collateral and TERI's business are located at TERI's principal office.  TERI shall not, without giving the Administrator at least ten (10) days prior written notice, change the location of any of the Collateral or the location at which it does business, including, without limitation, the location at which any books of account or records relating to the Collateral and TERI's business are kept.

(g)    Notice.  TERI shall promptly notify the Owner of any change in TERI's name or its jurisdiction of organization or any physical loss, destruction, or damage to any material portion of the Collateral.  TERI shall also promptly notify the Owner and the Note Insurer of any default hereunder.  In the event of a name change or change in its jurisdiction of organization, TERI shall take such actions, if any, as shall be necessary to maintain the security interests of the Owner hereunder.

(h)    Further Information.  TERI shall execute and deliver, or cause to be executed and delivered, to the Trustee (and to any other financial institution holding the Pledged Account), in a form satisfactory to the Trustee (or such other institution), TERI's certification of its tax identification number and such other documents as the Trustee shall reasonably request to perform its obligations hereunder.

(i)    Non-Petition.  TERI shall not at any time prior to one year and one day after all outstanding obligations of the Owner are paid under the Indenture institute against the Owner any bankruptcy proceeding under the Bankruptcy Code or any state bankruptcy or similar law in connection with any obligations of the Owner under this Agreement.  The Administrator shall not at any time prior to one year and one day after all outstanding obligations of the Owner are paid under the Indenture institute against the Owner any bankruptcy proceeding under the Bankruptcy Code or any state bankruptcy or similar law in connection with any obligations of the Owner under this Agreement.

16.    Waiver.  No delays or omissions by any party hereto in exercising or enforcing any of its respective rights, remedies, powers, privileges and discretions ("Rights and Remedies") shall operate as or constitute a waiver of any such Rights and Remedies.  No waiver by a party of any default under this Agreement or any of the Guaranty Agreements shall operate as a waiver of any other default under this Agreement or any Guaranty Agreement.  No waiver of a default by TERI shall be valid without the Note Insurer's consent.  No single or partial exercise by a party of any of its Rights and Remedies shall preclude the other of further exercise of such Rights and Remedies.  No waiver or modification of a party's Rights and Remedies on any one occasion shall be deemed a waiver on any subsequent occasion, nor shall it be deemed a continuing waiver.  All Rights and Remedies shall be cumulative and not alternative or exclusive, and a party may exercise any such Rights and Remedies at such time or times and in such order of preference as that party in its sole discretion may determine.

17.    Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall together be deemed a single agreement.

18.    Confidentiality.  The parties acknowledge that this Agreement contains confidential information and agree not to disclose any of the terms and conditions relating to this Agreement and the Pledged Account without the prior express written consent of the others.  The provisions of the foregoing sentence to the contrary notwithstanding, any such information may be disclosed (a) to any employees, officers, directors or representatives of the parties to effect the purpose of the Student Loan Programs; (b) by TERI and the Administrator to the affiliates and agents of either of them, and other third parties, to effectuate this Agreement, provided that such parties are under a corresponding written obligation to maintain the confidentiality of the Owner's information; and (c) to the attorneys and accountants of the parties on a confidential basis.  This provision shall, further, not be construed to prohibit the disclosure of any information relating to this Agreement (i) that is now or in the future becomes public information, (ii) as may be required by applicable law or this Agreement, each of the Guaranty Agreements or the Indenture, (iii) to the underwriters and rating agencies, their employees, trustees and attorneys and to such others as the Administrator may determine necessary (including regulators, potential investors in a private or public offering and the Note Insurer) in connection with the sale, securitization or other financing of any of the Loans, (iv) in any private placement memorandum in connection with the sale, securitization or other financing of any of the Loans, and (v) as necessary to perfect or enforce the security interest in the Collateral granted hereunder.  Nothing in this Agreement shall limit or restrict TERI, the Administrator, or any affiliate of the Administrator (A) in their exchange and use of information as among them, to the extent such exchange or use is governed by other agreements; or (B) from using, manipulating, sharing and disclosing Loan information that has been de-identified so that the identity of the borrower, the lender, or the holder of a Loan (including but not limited to the Owner and Trustee) cannot be determined.

19.    Choice of Law.  This Agreement shall be governed and construed in accordance with Massachusetts law, without regard to principles of conflict of laws.

20.    Severability.  If at any time one or more provisions of this Agreement is or becomes invalid, illegal or unenforceable in whole or in part, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

21.    Assignment.  This Agreement may not be assigned by any party without the others' prior express written consent and the consent of the Note Insurer; provided, however, that pursuant to Section 11, this Agreement and the Owner's rights hereunder may be assigned by the Owner as collateral security to the Trustee, and the Trustee and certain other persons are intended beneficiaries of this Agreement.

22.    Headings.  The section headings used in this Agreement are for convenience of reference only and are not to affect the construction or to be taken into consideration in interpreting this Agreement.

23.    Amendment.  This Agreement may be amended or modified only by the written agreement of TERI, the Owner, the Administrator and while the Indenture remains in effect, the prior written consent of the Trustee and, so long as any of the Notes are outstanding or any amounts are owed to the Note Insurer, the Note Insurer.

24.     Notices.  All notices under this Agreement shall be sent by any means requiring receipt signature, or if by facsimile confirmed by first-class mail, postage or other delivery charge prepaid to

TERI:

The Education Resources Institute, Inc.
31 St. James Avenue
Boston, MA 02116
Attention:  President

The Trustee:

U.S. Bank National Association
Corporate Trust Services-SFS
One Federal Street, 3rd Floor
Boston, MA 02110
Attention:  Karen Beard

The Administrator or the Owner:

First Marblehead Data Services, Inc.
The Prudential Tower
800 Boylston Street - 34th Floor
Boston, MA 02199-8157
Attention:  Ms. Rosalyn Bonaventure

with a copy to:

First Marblehead Corporation
The Prudential Tower
800 Boylston Street - 34th Floor
Boston, MA 02199-8157
Attention: Corporate Law Department

The Note Insurer:

Ambac Assurance Corporation
One State Street Plaza
New York, New York  10004
Attention:  Student Loan Group - CABS
Telecopy No.:  212-363-1459

Any party may, by notice to the other parties in accordance with this section, designate a different address for notices thereafter under this Agreement.

25.     Non-Business Days.  Any action required or permitted to be taken or done hereunder on a day which is not a business day in Boston, Massachusetts may be taken or done on the next business day with the same effect as if taken or done on such non-business day.

26.     Role of the Owner Trustee.  It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by Wilmington Trust Company ("WTC"), not individually or personally but solely as trustee of the Owner in the exercise of the powers and authority conferred and vested in it, (b) each of the representations, undertakings and agreements herein made on the part of the Owner is made and intended not as personal representations, undertakings and agreements by WTC but is made and intended for the purpose for binding only the Owner, (c) nothing herein contained shall be construed as creating any liability on WTC, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto and (d) under no circumstances shall WTC be personally liable for the payment of any indebtedness or expenses of the Owner or be liable for the breach

or failure of any obligation, representation, warranty or covenant made or undertaken by the Owner under this Agreement or any other document.

<div style="text-align:center">[Signature Pages Follow]</div>

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers, being first duly authorized, as of the day and year first above written.

THE EDUCATION RESOURCES INSTITUTE, INC.

By: /s/ William G. Davidson
    Name: William G. Davidson
    Title:  Vice President, Treasurer and CFO


FIRST MARBLEHEAD DATA SERVICES, INC.

By: /s/ Rosalyn Bonaventure
    Name: Rosalyn Bonaventure
    Title:  President


THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4

By:    WILMINGTON TRUST COMPANY, acting solely
      as Owner Trustee and not in its individual capacity


By: /s/ Patricia A. Evans
    Name: Patricia A. Evans
    Title:  Vice President

**SCHEDULES TO DEPOSIT AND SECURITY AGREEMENT**

Schedule A – Student Loan Programs

Schedule B – Loan Originators, Guaranty Agreements, Student Loan Purchase Agreements and Account Security Agreements

Schedule C – Loan Rosters

**EXHIBITS TO DEPOSIT AND SECURITY AGREEMENT**

Exhibit 1 – Payment of Guaranty Claims Direction Letter

Exhibit 2 – Remittance of Guaranty Fees and/or Recoveries Letter

Exhibit 3 – Request for Reimbursement of Income Tax or Other Tax Amounts

---

**SCHEDULE A**

*Student Loan Programs*

Bank of America, N.A.

- Bank of America Private Loan Program
- Bank of America TERI (School Channel) Loan Program
- Direct to Consumer (DTC) Loan Program
- Bank of America TERI ISLP Loan Program

Charter One Bank, N.A.

- Alternative Loan Program
- AAA Southern New England Bank
- AES EducationGAIN Loan Program
- American Student Loan Services Private Loan Program
- Citibank Education Assistance Loan Program
- College Loan Corporation Loan Program
- National Education Loan Program
- nBuy Private Loan Program
- NextStudent Alternative Loan Program
- Astrive Education (f/k/a START) Loan Program
- Astrive Alliance (f/k/a START) Education Loan Program
- E-Loan Private Loan Program
- UPromise Alternative Loan Program
- Collegiate Solutions Alternative Loan Program
- College Board Alternative Loan Program
- Axiom Alternative Loan Program
- ThinkFinancial Alternative Loan Program

Citizens Bank of Rhode Island

- Alternative Loan Program (DTC and School Channel)

- ISLP Loan Program

- Compass Bank Loan Program

- FinanSure Alternative Loan Program

- Navy Federal Alternative Loan Program

- Xanthus Alternative Loan Program

- Penn State Undergraduate Loan Program

Comerica Bank

- Comerica Private Loan Program

HSBC Bank USA, National Association

- HSBC Loan Program

InsurBanc

- InsurBanc Loan Program

JPMorgan Chase Bank, N.A.

- CORPORATE ADVANTAGE Loan Program

- EDUCATION ONE Loan Program

- Campus One Loan Program

KeyBank National Association

- KeyBank Private Education Loan Program

Manufacturers and Traders Trust Company

- M&T Alternative Loan Program

National City Bank

- National City Bank Loan Program
- National City Referral Loan Program, including the Astute Private Loan Program and Student Lending Works Private Loan Program

PNC Bank, N.A.

- PNC Bank Alternative Loan Program

- Brazos Alternative Loan Program

- Edvisors Alternative Loan Program

- Fondo Futuro Loan Program

- GE Money Bank Student Loan Program

- Old National Bank Private Loan Program

- Regions Bank Private Loan Program

Sovereign Bank

- Alternative Student Loan Program

SunTrust Bank

- SunTrust Loan Program

TCF National Bank

- TCF National Bank Alternative Loan Program

Union Federal Savings Bank

- UFSB Astrive Loan Program

-

### SCHEDULE B
*Loan Originators, Guaranty Agreements, Student Loan Purchase Agreements and Account Security Agreements*

**Loan Originators**

- Bank of America, N.A.

- Charter One Bank, N.A.

- Citizens Bank of Rhode Island

- Comerica Bank

- HSBC Bank USA, National Association

- The Huntington National Bank

- InsurBanc

- JPMorgan Chase Bank, N.A.

- KeyBank National Association

- Manufacturers and Traders Trust Company

- National City Bank

- PNC Bank, N.A.

- Sovereign Bank

- SunTrust Bank

- TCF National Bank.

- Union Federal Savings Bank

### Guaranty Agreements

Each of the following Guaranty Agreements, as amended or supplemented, was entered into by and between The Education Resources Institute, Inc. and:

- Bank of America, N.A., dated April 30, 2001, for loans that were originated under Bank of America's Private Loan Program, TERI (School Channel) Loan Program and TERI ISLP Loan Program.

- Bank of America, N.A., dated June 30, 2006, for loans that were originated under Bank of America's Private Loan Program, TERI (School Channel) Loan Program and TERI ISLP Loan Program.

- Bank of America, N.A., dated June 30, 2003, for loans that were originated under Bank of America's Direct to Consumer Loan Program.

- Charter One Bank, N.A., dated as of December 29, 2003 for loans that were originated under Charter One's AAA Southern New England Bank Loan Program.

- Charter One Bank, N.A., dated October 31, 2003, for loans that were originated under Charter One's AES EducationGAIN Loan Program.

- Charter One Bank, N.A., dated June 30, 2003, for loans that were originated under Charter One's Citibank Education Assistance Loan Program.

- Charter One Bank, N.A., dated July 1, 2002, for loans that were originated under Charter One's College Loan Corporation Loan Program.

- Charter One Bank, N.A., dated November 17, 2003, for loans that were originated under Charter One's National Education Loan Program.

- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's NextStudent Alternative Loan Program.

- Charter One Bank, N.A., dated March 25, 2004, for loans that were originated under Charter One's Astrive and AstriveAlliance Education (f/k/a START) Loan Program.

- Charter One Bank, N.A., dated February 15, 2005, for loans that were originated under Charter One's Referral Loan Program (including loans in the Charter One Bank Alternative Loan Program, E-Loan Private Loan Program, UPromise Alternative Loan Program, Collegiate Solutions Alternative Loan Program, College Board Alternative Loan Program, Axiom Alternative Loan Program, American Student Loan Services Private Loan Program, nBuy Private Loan Program, and ThinkFinancial Alternative Loan Program).

- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Alternative Loan Program, ISLP Loan Program, Compass Bank Alternative Loan Program, FinanSure Alternative Loan Program, Navy Federal Alternative Loan Program, and Xanthus Alternative Loan Program.

- Citizens Bank of Rhode Island, dated October 1, 2002, for loans that were originated under Citizens Bank of Rhode Island's Penn State Undergraduate Loan Program.

- Comerica Bank, dated June 30, 2006, for loans that were originated under Comerica Bank's Private Loan Program.

- HSBC Bank USA, National Association, dated April 17, 2002, for loans that were originated under the HSBC Loan Program.

- The Huntington National Bank, dated May 20, 2003, for loans that were originated under the Huntington Education Loan Program.

- InsurBanc, dated July 1, 2006, for loans that were originated under the InsurBanc Loan Program.

- JPMorgan Chase Bank, N.A., (successor to Bank One N.A.,) dated May 19, 2002, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program, EDUCATION ONE Loan Program, and Campus One Loan Program.

- KeyBank National Association, dated May 12, 2006, for loans that were originated under KeyBank's Private Education Loan Program.

- Manufacturers and Traders Trust Company, dated April 29, 2004, for loans that were originated under the M&T Alternative Loan Program.

- National City Bank, dated July 26, 2002, for loans that were originated under the National City Loan Program.

- National City Bank, dated July 21, 2006, for loans that were originated under the National City Referral Loan Program, including the Astute Private Loan Program and the Student Lending Works Private Loan Program.

- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's Alternative Loan Program, Brazos Alternative Loan Program, Edvisors Alternative Loan Program, Fondo Futuro Loan Program, GE Money Bank Student Loan Program, Old National Bank Private Loan Program, and Regions Bank Private Loan Program

- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Student Loan Program.

- SunTrust Bank, dated March 1, 2002, for loans that were originated under the SunTrust Loan Program.

- TCF National Bank, dated July 22, 2005, for loans that were originated under the TCF National Bank Alternative Loan Program.

- Union Federal Savings Bank, dated March 26, 2007, for loans that were originated under the USFB Astrive Loan Program.

---

## Note Purchase Agreements

Each of the Note Purchase Agreements, as amended or supplemented, was entered into by and between The First Marblehead Corporation and:

- Bank of America, N.A., dated April 30, 2001, for loans that were originated under Bank of America's Private Loan Program, TERI School Channel Loan Program and ISLP Loan Program.

- Bank of America, N.A., dated June 30, 2006, for loans that were originated under Bank of America's Private Loan Program, TERI School Channel Loan Program and ISLP Loan Program.

- Bank of America, N.A., dated April 1, 2006, for loans that were originated under Bank of America's Direct to Consumer Loan Program.

- Charter One Bank, N.A., dated as of December 29, 2003 for loans that were originated under Charter One's AAA Southern New England Bank Loan Program.

- Charter One Bank, N.A., dated October 31, 2003, for loans that were originated under Charter One's AES EducationGAIN Loan Program.

- Charter One Bank, N.A., dated June 30, 2003, for loans that were originated under Charter One's Citibank Education Assistance Loan Program.

- Charter One Bank, N.A., dated July 1, 2002, for loans that were originated under Charter One's College Loan Corporation Loan Program.

- Charter One Bank, N.A., dated November 17, 2003, for loans that were originated under Charter One's National Education Loan Program.

- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's NextStudent Alternative Loan Program.

- Charter One Bank, N.A., dated March 25, 2004, for loans that were originated under Charter One's Astrive and AstriveAlliance Education (f/k/a START) Loan Programs.

- Charter One Bank, N.A., dated February 15, 2005, for loans that were originated under Charter One's Referral Loan Program (including loans in the Charter One Bank Alternative Loan Program, E-Loan Private Loan Program, UPromise Alternative Loan Program, Collegiate Solutions Alternative Loan Program, College Board Alternative Loan Program, Axiom Alternative Loan Program, American Student Loan Services Private Loan Program, nBuy Private Loan Program, and ThinkFinancial Alternative Loan Program).

- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Alternative Loan Program, ISLP Loan Program, Compass Bank Loan Program, FinanSure Alternative Loan Program, Navy Federal Alternative Loan Program, and Xanthus Alternative Loan Program.

- Citizens Bank of Rhode Island, dated October 1, 2002, for loans that were originated under Citizens Bank of Rhode Island's Penn State Undergraduate Loan Program.

- Comerica Bank, dated June 30, 2006, for loans that were originated under Comerica Bank's Private Loan Program.

- HSBC Bank USA, National Association, dated April 17, 2002, as amended on June 2, 2003 and August 1, 2003, for loans that were originated under the HSBC Loan Program.

- The Huntington National Bank, dated May 20, 2003, for loans that were originated under the Huntington Education Loan Program.

- InsurBanc, dated July 1, 2006, for loans that were originated under the InsurBanc Loan Program.

- JPMorgan Chase Bank, N.A,, (successor to Bank One, N.A.), dated May 1, 2002, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program, EDUCATION ONE Loan Program, and Campus One Loan Program.

- KeyBank National Association, dated May 12, 2006, for loans that were originated under KeyBank's Private Education Loan Program.

- Manufacturers and Traders Trust Company, dated April 29, 2004, for loans that were originated under the M&T Alternative Loan Program.

- National City Bank, dated November 13, 2002, for loans that were originated under the National City Loan Program.

- National City Bank, dated July 21, 2006, for loans that were originated under the National City Referral Loan Program, including the Astute Private Loan Program and Student Lending Works Private Loan Program.

- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's Alternative Loan Program, Brazos Alternative Loan Program, Edvisors Alternative Loan Program, Fondo Futuro Loan Program, GE Money Bank Student Loan Program, Old National Bank Private Loan Program, and Regions Bank Private Loan Program.

- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Student Loan Program.

- SunTrust Bank, dated March 1, 2002, for loans that were originated under the SunTrust Loan Program.

- TCF National Bank, dated July 22, 2005, for loans that were originated under the TCF National Bank Alternative Loan Program.

- Union Federal Savings Bank, dated March 26, 2007, for loans that were originated under the UFSB Astrive Loan Program.

**Deposit Agreements**

Each of the following Deposit and Security Agreements or Security Agreements and Control Agreements, as amended or supplemented, was entered into by and among The Education Resources Institute, Inc., The First Marblehead Corporation, U.S. Bank National Association (successor in interest to State Street Bank and Trust Company) and:

- Bank of America, N.A., dated April 30, 2001, for loans that were originated under Bank of America's BAGEL Loan Program, TERI (School Channel) Loan Program and TERI ISLP Loan Program.

- Bank of America, N.A., dated June 30, 2003, for loans that were originated under Bank of America's Direct to Consumer Loan Program.

- Citizens Bank of Rhode Island, dated October 1, 2002, for loans that were originated under Citizens Bank of Rhode Island's Penn State Undergraduate Loan Program.

- HSBC Bank USA, National Association, dated April 17, 2002, for loans that were originated under the HSBC Loan Program.

- The Huntington National Bank, dated May 20, 2003, for loans that were originated under the Huntington Education Loan Program.

- JPMorgan Chase Bank, N.A. (as successor to Bank One, N.A.), dated April 30, 2001, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program, EDUCATION ONE Loan Program, and Campus One Loan Program.

- National City Bank, dated July 26, 2002, for loans that were originated under the National City Loan Program and the National City Referral Loan Program, including the Astute Private Loan Program and the Student Lending Works Private Loan Program.

- SunTrust Bank, dated March 1, 2002, for loans that were originated under the SunTrust Loan Program.

Each of the following Control Agreements, as amended or supplemented, was entered into by and among The First Marblehead Corporation, U.S. Bank National Association and:

- Charter One Bank, N.A., dated March 1, 2004, for all TERI-guaranteed loan programs funded by Charter One Bank, N.A.

- Citizens Bank of Rhode Island, dated April 30, 2004, for all loan TERI-guaranteed programs funded by Citizens Bank of Rhode Island other than the Citizens Bank Penn State Undergraduate Loan Program.

- Comerica Bank, dated June 30, 2006, for loans that were originated in the Comerica Direct to Consumer Loan Program.

- InsurBanc, dated July 1, 2006, for loans that were originated in the InsurBanc Loan Program.

- KeyBank National Association, dated May 12, 2006, for loans that were originated in the KeyBank Private Education Loan Program.

- Manufacturers and Traders Trust Company, dated April 29, 2004, for loans that were originated under the M&T Alternative Loan Program.

- PNC Bank, N.A., dated April 22, 2004, for all TERI-guaranteed loan programs funded by PNC Bank, N.A..

- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Student Loan Program.

- TCF National Bank, dated July 22, 2005, for loans that were originated under the TCF National Bank Alternative Loan Program.

- Union Federal Savings Bank, dated March 26, 2007, for loans that were originated under the UFSB Astrive Loan Program.

Each of the following Security Agreements, as amended or supplemented, was entered into by and between The Education Resources Institute, Inc. and:

- Charter One Bank, N.A., dated March 1, 2004, for all TERI-guaranteed loan programs funded by Charter One Bank, N.A..

- Citizens Bank of Rhode Island, dated April 30, 2004, for all TERI-guaranteed loan programs funded by Citizens Bank of Rhode Island.

- Comerica Bank, dated June 30, 2006, for loans that were originated in the Comerica Direct to Consumer Loan Program.

- InsurBanc, dated July 1, 2006, for loans that were originated in the InsurBanc Loan Program.

- KeyBank National Association, dated May 12, 2006, for loans that were originated in the KeyBank Private Education Loan Program.

- Manufacturers and Traders Trust Company, dated April 29, 2004, for loans that were originated under the M&T Alternative Loan Program.

- PNC Bank, N.A., dated April 22, 2004, for all TERI-guaranteed loan programs funded by PNC Bank, N.A..

- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Student Loan Program.

- TCF National Bank, dated July 22, 2005, for loans that were originated under the TCF National Bank Alternative Loan Program.

- Union Federal Savings Bank, dated March 26, 2007, for loans that were originated under the UFSB Astrive Loan Program.

-

**SCHEDULE C-1**

**[On file with Trustee]**

### SCHEDULE C-2

**[On file with Trustee]**

---

## EXHIBIT 1

### *Payment of Guaranty Claims Direction Letter*

[TERI LETTERHEAD]

**First Marblehead Data Services, Inc.**
**The Prudential Tower**
**800 Boylston Street - 34th Floor**
**Boston, MA 02199-8157**

**with a copy to:**

**U.S. Bank National Association**
**Corporate Trust Services-SFS**
**One Federal Street, 3rd Floor**
**Boston, MA 02110**

Re:  TERI/NCT Pledged Account  #

Ladies and Gentlemen:

        Reference is made to (i) the Deposit and Security Agreement (the "Agreement"), dated as of September 20, 2007, by and among THE EDUCATION RESOURCES INSTITUTE, INC. ("TERI"), FIRST MARBLEHEAD DATA SERVICES, INC. and THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4.  Capitalized terms used and not otherwise defined herein have the respective meanings ascribed to such terms in the Agreement.

        In accordance with the Agreement, please remit $_____ in Guarantee Claims to

U.S. Bank National Association
ABA # _____]
Corporate Trust Department
DDA A/C# _____]
Attention: _____]Collateral Proceeds Acct.
SEI#: _____]

        In addition, please fax this direction letter along with the attached breakdown, which lists the Loan(s), associated with the above-referenced claim funds to:

        **Owner]** Attention:  Name]; and  **Servicer]** Attention:  [Name]:
        Fax Number:  _____        Fax Number:

Please contact me at **[TERI Contact Telephone Number**] should you have any questions regarding this request.

                                        Authorized Signature
                                        TERI

Enc

---

**EXHIBIT 2**

*Recoveries Letter*

[TERI LETTERHEAD]

**First Marblehead Data Services, Inc.**
**The Prudential Tower**
**800 Boylston Street - 34th Floor**
**Boston, MA 02199-8157**

**with a copy to:**

**U.S. Bank National Association**
**Corporate Trust Services-SFS**
**One Federal Street, 3rd Floor**
**Boston, MA 02110**

Re:  TERI/NCT Pledged Account #

Ladies and Gentlemen:

Reference is made to the Deposit and Security Agreement (the "Agreement"), dated as of September 20, 2007, by and among THE EDUCATION RESOURCES INSTITUTE, INC., ("TERI"), FIRST MARBLEHEAD DATA SERVICES, INC. and THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4.  Capitalized terms used and not otherwise defined herein have the respective meanings ascribed to such terms in the Agreement.

In accordance with the Agreement, the following amounts will be wired to the Pledged Account:

1.  $_____ Total Guaranty Fees*

      *Attached is a list of each loan name, loan number and amount associated with this Guaranty Fee Remittance.*

2.  $_____ Total Recovery**

      ** Attached is a list of each loan name, loan number and amount associated with this Recovery Remittance.*

$_____ Total Amount wired to the Trustee

The above-referenced funds will be wired to the Trustee using the following wire instruction:

      **U.S. Bank National Association**
      **Boston, MA 02110**
      **ABA # [_____]**
      **A/C# [_____]**
      **Pledged Account**
      **SEI ##### - 000**

Please contact me at **[TERI Contact Telephone Number]** should you have any questions regarding this request.

Authorized Signature
**[TERI]**

## EXHIBIT 3

*Request for Reimbursement of Income Tax or Other Tax Amounts*

[TERI LETTERHEAD]

**U.S. Bank National Association**
**Corporate Trust Services-SFS**
**One Federal Street, 3rd Floor**
**Boston, MA 02110**

**First Marblehead Data Services, Inc.**
**The Prudential Tower**
**800 Boylston Street - 34th Floor**
**Boston, MA 02199-8157**

**Ambac Assurance Corporation**
**One State Street Plaza**
**New York, New York  10004**

Re:  TERI/NCT Pledged Account  #

Ladies and Gentlemen:

      Reference is made to (i) the Deposit and Security Agreement (the "Agreement"), dated as of September 20, 2007, by and among THE EDUCATION RESOURCES INSTITUTE, INC., ("TERI"), FIRST MARBLEHEAD DATA SERVICES, INC. and THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4.  Capitalized terms used and not otherwise defined herein have the respective meanings ascribed to such terms in the Agreement.

      In accordance with Section 3(d)(ii) of the Agreement, this is to inform you that TERI has been assessed and has paid the sum of $_____ in income or excise taxes with respect to income earned on the Pledged Account.  We hereby request reimbursement of such amount to be sent as follows:

**PLEASE USE THE FOLLOWING WIRE INSTRUCTIONS:**

[Bank Name
[Bank Location]
ABA #
A/C#
ATTENTION:  TERI
Comments:

      In accordance with the Agreement, we are forwarding a copy of this request to the Owner and the Trustee. We have also enclosed documentation to support this request.

      Please contact me at **[TERI Contact Telephone Number]** should you have any questions regarding this request.

                                Authorized Signature

                                TERI

Enc

Consented to:

By:    Ambac Assurance Corporation

By: _____
Name:
Title:

# Exhibit J

Subject to Motion to File Confidential Documents Under Seal

Exhibit J

Subject to Motion to File Confidential Documents Under Seal

# Exhibit K

Subject to Motion to File Confidential Documents Under Seal

Exhibit K

Subject to Motion to File Confidential Documents Under Seal