# Exhibit K

Exhibit K

**Note: This Agreement contains confidential & proprietary information and may not be disclosed without the consent of both parties or as required by law**

## GUARANTY AGREEMENT
### between
## THE EDUCATION RESOURCES INSTITUTE, INC.
### and
## CHARTER ONE BANK, N.A.

This Guaranty Agreement (this "Agreement") is made as of this 25th day of March, 2004, by and between The Education Resources Institute, Inc. ("TERI"), a private non-profit corporation organized under Chapter 180 of the Massachusetts General Laws with its principal place of business at 31 St. James Avenue, 6th Floor, Boston, Massachusetts 02116, and Charter One Bank, N.A., (the "LENDER"), a national banking association organized under the laws of the United States and having a place of business located at 1215 Superior Avenue, Cleveland, Ohio 44114, and a student loan department located at 833 Broadway, Albany, NY 12207.

WHEREAS, TERI is in the business of providing financial assistance in the form of loan guaranties to and on behalf of students enrolled in programs of higher education and their parents at TERI-approved schools; and

WHEREAS, the LENDER is willing to make Loans to eligible Borrowers under the Program, and TERI is willing to guaranty the payment of principal and interest against the Borrowers' default or certain other events as more fully described below, in accordance with the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, TERI and the LENDER agree as follows:

Section 1:    DEFINITIONS

As used in this Agreement the following terms shall have the following meanings:

1.1    "Borrower" shall mean the person, or all persons collectively, including all students, cosigners, coborrowers, guarantors, endorsers, and accommodation parties, who execute a Promissory Note individually or, in the case of multiple Borrowers, severally and jointly, for the purpose of obtaining funds from the LENDER under the Program.

1.2    "Custodian" shall mean U.S. Bank National Association, its successors and assigns, in its capacity as Depository Institution under the Security Agreement of even date herewith and as Bank under the Control Agreement of even date herewith (together, "Security Documents"), or a successor custodian (alternative

W0203641                          {W0203641 1} 1

CONFIDENTIAL NCSLT0387

Depository Institution or Bank, as the case may be) appointed in accordance with the Security Documents.

1.3   "Due Diligence" shall mean the utilization by the LENDER of policies, practices and procedures in the origination, servicing and collection of Loans that comply with the standards set forth in the Program Guidelines and that comply with the requirements of federal and state law and regulation.

1.4   "FMC" shall mean The First Marblehead Corporation, a Delaware corporation located at 800 Boylston St., 34th Floor, Boston, MA 02199.

1.5   "Guaranty Claim" shall mean a claim by the LENDER to TERI for a guaranty payment with respect to a Loan pursuant to Section 2.1 of this Agreement.

1.6   "Guaranty Event" shall mean any of the following events with respect to a Loan:

   a.   failure of a Borrower to make monthly principal and/or interest payments on a Loan when due, provided such failure persists for a period of one hundred eighty (180) consecutive days,

   b.   the filing of a petition in bankruptcy with respect to a Borrower, or

   c.   the death of a Borrower.

For Loans on which the Borrower is two or more persons, none of the above, with the exception of paragraph b., shall be a Guaranty Event unless one or more such events shall have occurred with respect to all such persons. The foregoing notwithstanding, if a Borrower files a petition in bankruptcy pursuant to Chapter 7 of the U.S. Bankruptcy Code and does not seek a discharge of the affected Loan(s) under 11 U.S.C. §523(a)(8)(B) of the U.S. Bankruptcy Code, the LENDER at TERI's request will withdraw its guaranty claim unless or until one of the other Guaranty Events shall have occurred with respect thereto.

1.7   "Loan" shall mean a loan of funds, including all disbursements thereof, made by the LENDER to a Borrower under the Program.

1.8   "Loan Origination Agreement" means the agreement of that name between LENDER and TERI dated as of March 25, 2004, as it may be amended from time to time.

1.9   "Note Purchase Agreement" means the agreement of that name between LENDER and FMC dated as of March 25, 2004, as it may be amended from time to time.

1.10   "Program" shall mean the Charter One Start Education Loan Program, as more fully described in the Program Guidelines.

CONFIDENTIAL NCSLT0388

1.11   "Program Guidelines" shall mean the Charter One Start Education Loan Program
Guidelines attached hereto as Exhibit A, and all changes thereto as provided in
Section 6 hereof. The Program Guidelines (a) consist of the Program Overview,
the TERI Underwriting, Origination and Loan Term Guidelines, the Servicing
Guidelines, and Program Borrower Documents (consisting of the forms of
Promissory Note and Truth in Lending Disclosure) and (b) are hereby
incorporated in this Agreement by reference and made a part hereof.

1.12   "Promissory Note" shall mean a promissory note executed by a Borrower
evidencing a Loan, in the form attached hereto as part of the Program Guidelines
or as approved pursuant to Section 3.2 below.

1.13   "Securitization Transaction" shall mean and refer to (a) a purchase of Loans
guaranteed hereunder by a special purpose entity ("SPE") formed by FMC, which
purchase is funded through the issuance of debt instruments or other securities by
such entity, the repayment of which is supported by payments on the Loans or (b)
any other transaction whereby a Loan is transferred from the LENDER to FMC or
one of its affiliates.

1.14   "Security Documents" shall have the meaning assigned to it in Section 1.2.

## Section 2:   GUARANTY OF LOANS

2.1   TERI hereby guarantees to the LENDER, unconditionally except as set forth in
Section 2.2 below, the payment of 100% of the principal of and accrued interest
on every Loan as to which a Guaranty Event has occurred.  "Accrued interest"
shall mean interest accrued and unpaid to the date of payment in full by TERI of a
Guaranty Claim, less any interest that shall have accrued after the filing of a
Guaranty Claim but before TERI shall have received all the documentation
necessary to process the Guaranty Claim as set forth in the Program Guidelines.
TERI will use all reasonable efforts to make payment on its guaranty within sixty
(60) days, and will in any event make payment within ninety (90) days, of receipt
by TERI of a Guaranty Claim from the LENDER stating the name of the
Borrower and the type of Guaranty Event that has occurred accompanied by the
full claim documentation required in the Program Guidelines.

2.2   TERI's guaranty is conditioned upon the following:

a.   The LENDER must have filed its Guaranty Claim within the time period
and following the procedures specified in the Program Guidelines.

b.   The LENDER and its predecessors in interest must at all times have
exercised Due Diligence with respect to the Loan in question (or shall
have cured any failure to exercise Due Diligence under the reinstatement
provisions in Section 2.4 hereof and the Program Guidelines), and must

CONFIDENTIAL NCSLT0389

have complied with all other requirements of the Program Guidelines applicable to the Loan.

c.   The LENDER shall have paid to TERI the Initial Guaranty Fee (as defined in Section 3.3.a. below) for the Loan in question, and shall have paid to the Custodian any Subsequent Guaranty Fee (as defined in Section 3.3.b. below) for the Loan in question that is due and payable as provided in Section 3.3.b. below.

d.   TERI must have received from the LENDER the original Promissory Note relating to the Loan in question, enforceable against the Borrower (except as provided in this Section 2.2.d., below), endorsed to TERI in such manner as to transfer to TERI all rights in and title to such Promissory Note, free and clear of all liens and encumbrances, and of all defenses, counterclaims, offsets, and rights of rescission that might be raised by the Borrower. Submission of a Guaranty Claim to TERI shall constitute the LENDER's certification that the conditions of 2.2.b. and 2.2.d. have been met, and TERI is entitled to rely on such certification.

Subsections 2.2.b. and 2.2.d. above notwithstanding, if a Loan that is the subject of a Guaranty Claim was originated by TERI on behalf of the LENDER pursuant to a Loan Origination Agreement between the parties, (i) TERI will not deny the LENDER's Guaranty Claim on such Loan if the sole basis for denial is a violation of the Program Guidelines or a violation of Massachusetts or federal law committed by TERI in the origination process, and (ii) TERI will have no recourse against the LENDER in the event that TERI's actions or omissions in the origination process shall have given rise to a successful defense in favor of the Borrower in a suit on the Promissory Note relating to such Loan.

2.3   TERI's guaranty obligation with respect to any Loan shall not be terminated or otherwise affected or impaired (i) by the LENDER's granting an extension of time to the Borrower to make scheduled payments, or by any other indulgence the LENDER may grant to the Borrower, provided that all extensions and other indulgences meet the forbearance standards and other requirements of the Program Guidelines; or, Section 2.2.d. above notwithstanding, (ii) because of any fraud in the execution of the Promissory Note relating to such Loan, (iii) because of any illegal or improper acts of the Borrower, or (iv) because the Borrower may be relieved of liability for such Loan due to lack of contractual capacity or any other statutory exemption.

2.4   TERI may deny the LENDER's Guaranty Claim on any Loan on the grounds of Due Diligence deficiencies. If TERI properly denies the LENDER's Guaranty Claim on any Loan on the grounds of Due Diligence deficiencies, the LENDER may thereafter require that TERI reinstate the guaranty of such Loan if (a) the LENDER corrects such deficiencies and receives four (4) consecutive full on-time

CONFIDENTIAL NCSLT0390

monthly payments from the Borrower, according to any schedule permitted by the Program Guidelines, and if at the time of the LENDER's request the Borrower is within thirty (30) days of being current on all principal and interest payments on such Loan, or (b) the LENDER satisfies any other method of cure set forth in the Program Guidelines.

2.5     TERI's guaranty hereunder is a continuing and absolute guaranty of payment and not merely of collection, covering Loans made in accordance herewith either (i) prior to termination of this Agreement, or (ii) based upon applications received by the LENDER prior to such termination; and such termination shall not affect TERI's obligations to the LENDER then existing, whether direct or indirect, absolute or contingent, then due or thereafter to become due.

2.6     TERI agrees not to exercise any right of subrogation, reimbursement, indemnity, contribution or the like against the Borrower of any Loan unless and until all of TERI's obligations to the LENDER under this Agreement with respect to such Loan have been satisfied in full, except to the extent that it is deemed a valid claimant as a contingent creditor, for example, under Title 11 of the United States Code (the "Bankruptcy Code"), or applicable state law.

2.7     TERI will permit the LENDER, any duly designated representative of the LENDER, or any governmental body having jurisdiction over the LENDER (subject to written notice being provided to TERI by the LENDER, identifying the requesting party and the date of the review), to examine and audit the books and records of TERI pertaining to the Loans, at any time during TERI's regular business hours, provided that in the case of examinations by the LENDER or its representative, absent good cause (i) TERI must be given ten (10) business days' prior written notice and, (ii) no more than one such audit may be conducted with respect to any twelve-month period or will take place in any twelve-month period. In no event will any audit be performed during July, August, September, or October in any year except at the request of a regulatory authority having jurisdiction over the LENDER.

2.8     TERI will indemnify the LENDER and hold it harmless from and against any loss, cost, damage or expense that the LENDER may suffer as a result of claims to the extent they arise out of TERI's breach of this Agreement and do not arise out of the LENDER's actions or omissions. "Expense" includes, without limitation, the LENDER's reasonable attorney's fees. TERI will further indemnify the LENDER and hold it harmless from and against any claim brought against the LENDER by any Borrower based on actions or omissions of the LENDER that were mandated under the Program Guidelines.

2.9     Although the LENDER agrees not to use any loan servicer not approved by TERI, the LENDER acknowledges that TERI's approval of a servicer is in no way an endorsement of such servicer and that TERI shall have no liability to the LENDER for any losses arising from such servicer's failure to comply with Due

CONFIDENTIAL NCSLT0391

Diligence or the Program Guidelines or applicable law, nor shall TERI be required to honor any claim submitted by such servicer if the claim does not comply with the requirements of this Agreement.

<u>Section 3:</u>    <u>OBLIGATIONS OF THE LENDER</u>

3.1    In originating, servicing, disbursing, and collecting Loans, the LENDER will comply, and cause its servicer and others acting on its behalf to comply, at all times with all Program Guidelines (including Due Diligence requirements) and all applicable requirements of federal and state laws and regulations.

3.2    The LENDER will use Promissory Notes, Loan applications, disclosure statements, and other forms mutually agreeable to the parties. The forms of Promissory Notes, Loan applications and disclosure statement attached hereto as part of the Program Guidelines are agreed to be satisfactory to both parties. Without limiting the generality of Sections 3.1 and 4.1, the LENDER warrants the conformity of such instruments and any agreed successors thereto with all applicable legal requirements, other than those of federal and Massachusetts laws and regulations, and TERI warrants their conformity with Massachusetts and federal laws. In addition, upon TERI's request, the LENDER will submit to TERI sample copies of promotional and marketing materials used in connection with the Program. No such delivery of materials shall constitute or be construed as a representation or warranty by TERI that such materials comply with applicable law or with the LENDER's obligations under this Agreement, and no such delivery shall excuse the LENDER's performance of any of its obligations under this Agreement.

3.3    The LENDER will pay a guaranty fee for each Loan (the "Guaranty Fee") as follows:

    a.    At the time of each disbursement of the Loan, the LENDER will promptly remit to TERI one and one-half percent (1.5%) of the principal amount of the Loan disbursed (the "Initial Guaranty Fee").

    b.    At such times as are set forth in Schedule 3.3 attached hereto and incorporated herein by reference, such additional fees as are set forth in the fifth and sixth columns of Schedule 3.3 ("Subsequent Guaranty Fee").

        i.    If the terms of Schedule 3.3 call for any Guaranty Fees to be paid concurrent with the Securitization Transaction, the LENDER shall pay such fees directly (and be reimbursed in the Securitization Transaction to the extent provided in the Note Purchase Agreement).

        ii.    In the event that a Guaranty Claim is made with respect to a Loan before a Subsequent Guaranty Fee is scheduled to be paid by the

CONFIDENTIAL NCSLT0392

LENDER for such Loan, the Subsequent Guaranty Fee shall become immediately due and payable.

iii.    In the event that a loan is prepaid in full prior to the date that a Subsequent Guaranty Fee is scheduled to be paid by the LENDER for such Loan, the Subsequent Guaranty Fee shall nevertheless become due and payable at the time that would have applied if such prepayment had not occurred. For example, if a Subsequent Guaranty Fee is due at the time of a Securitization Transaction and a Loan is prepaid before it is eligible for Securitization, then the Subsequent Guaranty Fee with respect to such Loan shall become due at the first Securitization Transaction in which such Loan would have been eligible for inclusion, had prepayment not occurred.

iv.    In the event that FMC fails to purchase any Loan under the Note Purchase Agreement, and the LENDER sells such Loan to a third party, the Guaranty Fees due with respect to such loan at the time of a Securitization Transaction will instead be paid by the LENDER at the time the loan is sold to the third party.

c.    Failure to remit any Guaranty Fee within thirty (30) days of the time set forth above will not affect the validity of the guaranty for any Loan for which the Guaranty Fee has already been paid in full, but, as a result, TERI will have the right, at its discretion to (i) void its obligation to guarantee or collect the Loan to which such Guaranty Fee relates or (ii) collect the amount of any such Guaranty Fee and to add interest at the rate of eighteen percent (18%) per annum from the disbursement date of the Loan to which such Guaranty Fee relates, plus any costs (including attorneys' fees and expenses) incurred by TERI in collecting or attempting to collect such Guaranty Fee from the LENDER.

d.    Anything in the Program Guidelines to the contrary notwithstanding, if the LENDER is required under the terms of a Promissory Note to refund all or part of the Guaranty Fees identified above to a Borrower, TERI will refund all or part of the Initial Guaranty Fee it has received and the Custodian will refund all or part of any Subsequent Guaranty Fee it has received (in each case related to the refund to such Borrower) to the LENDER upon being so advised by the LENDER in writing.

3.4    If TERI shall have purchased a Loan pursuant to Section 2.1 above, the LENDER will promptly repurchase such Loan upon request from TERI if (i) TERI succeeds, after purchasing the Loan, in obtaining from the Borrower three full consecutive on-time monthly payments, according to any schedule permitted by the Program Guidelines, provided that on the date such repurchase, the Borrower is within thirty (30) days of being current on his or her payments on such Loan,

CONFIDENTIAL NCSLT0393

and provided further that this repurchase obligation may be invoked by TERI only once as to any Loan (in which case, the Loan shall be considered "rehabilitated"); or (ii) if TERI should determine that the Loan does not meet the conditions set forth in subsections b., c. and d. of Section 2.2 above. With respect to the repurchase of any Guaranteed Loan pursuant to this Section 3.4, the repurchase price shall be equal to (1) the remaining unpaid principal balance of such Loan, plus (2) any accrued and unpaid interest thereon.

3.5     To the extent permitted by applicable law, the LENDER will (i) deliver to TERI such reports, documents, and other information concerning the Loans as TERI may reasonably require, and (ii) permit independent auditors, authorized representatives of TERI and governmental agencies, if any, having regulatory authority over TERI, to have access to the operational and financial records and procedures directly applicable to Loans and to the LENDER's participation in the Program. LENDER will cause its loan servicer to deliver to TERI such reports, documents, and other detailed information concerning each Loan as TERI may reasonably require. LENDER shall provide a monthly report containing the information set forth on Exhibit B hereto at LENDER's actual cost, if any. Any other reporting or information shall be provided upon TERI's agreement to reimburse LENDER for its incremental cost of such report.

3.6     LENDER will indemnify TERI and hold it harmless from and against any loss, cost, damage or expense that TERI may suffer as a result of claims to the extent they arise out of the LENDER's breach of this Agreement, and do not arise out of TERI's actions or omissions. The LENDER will similarly indemnify TERI with respect to any defenses arising from the LENDER's violation of or failure to comply with any law, regulation or order, or any term of this Agreement, that may be raised by a Borrower to any suit upon a Promissory Note. "Expense" includes, without limitation, TERI's reasonable attorney's fees.

Section 4:      REPRESENTATIONS AND WARRANTIES

4.1     Each party represents and warrants to the other that its execution, delivery and performance of this Agreement are within its power and authority, have been authorized by proper proceedings, and do not and will not contravene any provision of law or such party's organizational documents or by-laws or contravene any provision of, or constitute an event of default or an event which, with the lapse of time or with the giving of notice or both, would constitute an event of default, under any other agreement, instrument or undertaking by which such party is bound. Each party represents and warrants that it has and will maintain in full force and effect all licenses required under applicable state, federal, local or other law for the conduct of all activities contemplated by this Agreement and comply with all requirements of such applicable law relative to its licenses and the conduct of all activities contemplated by this Agreement. This Agreement and all of its terms and provisions are and shall remain the legal and binding obligation of the parties, enforceable in accordance with their terms

CONFIDENTIAL NCSLT0394

subject to bankruptcy and insolvency laws. The warranties given herein shall survive any termination of this Agreement.

4.2     The parties acknowledge that TERI is not an insurer or reinsurer and the LENDER expressly waives all claims it might otherwise have under applicable law were TERI to be held by any court or regulatory agency to be acting as an insurer or reinsurer hereunder. The only obligations of TERI to the LENDER shall be those expressly set forth herein.

Section 5:     MISCELLANEOUS

5.1     Neither party is or will hold itself out to be the agent, partner, or joint venturer of the other party with regard to any transaction under or pursuant to this Agreement.

5.2     Each party's respective rights, remedies, powers, privileges, and discretions ("Rights and Remedies") shall be cumulative and not exclusive. No delay or omission by either party in exercising or enforcing any of its Rights and Remedies shall operate as to constitute a waiver of them. No waiver by a party of any default under this Agreement shall operate as a waiver of any subsequent or other default under this Agreement. No single or partial exercise by a party of any of its Rights and Remedies shall preclude the other party of further exercise of such Rights and Remedies. No waiver or modification by a party of the Rights and Remedies on any one occasion shall be deemed a continuing waiver. A party may exercise its various Rights and Remedies at such time or times and in such order of preference as it in its sole discretion may determine. In no event will either party be liable to the other for special, incidental, or consequential damages, including but not limited to lost profits, even if advised in advance of the possibility of the same, or for punitive or exemplary damages, provided that such exclusions shall not apply to the indemnification against an award of such damages pursuant to a third party claim.

5.3     This Agreement (including the Program Guidelines and all exhibits and schedules hereto), together with (i) the Security Documents and (ii) the Loan Origination Agreement, of even date herewith, between TERI and the LENDER ((i) and (ii) together, the "Ancillary Agreements"), represents the entire understanding of the parties with respect to the subject matter hereof. This Agreement, together with any contemporaneous contract concerning credit analysis and the Ancillary Agreements, supersedes all prior communications whatsoever between the parties relative in any way to Loans or the LENDER's participation in the Program. This Agreement may be modified only by written agreement of the parties hereto, except as may otherwise be set forth herein.

5.4     Any determination that any provision of this Agreement is invalid, illegal, or unenforceable in any respect shall not affect the validity, legality, or enforceability of such provision in any other instance and shall not affect the validity, legality, or enforceability of any other provision of this Agreement.

W0203641                    {W0203641.1}9

CONFIDENTIAL NCSLT0395

5.5     Each of the parties will timely implement, if it has not already, and will maintain, a reasonable disaster recovery plan.  Subject to the foregoing, no party hereto shall be responsible for, or in breach of this Agreement if it is unable to perform as a result of delays or failures due to any cause beyond its control, howsoever arising, and not due to its own act or negligence and that cannot be overcome by the exercise of due diligence.  Such causes shall include, but not be limited to, labor disturbances, riots, fires, earthquakes, floods, storms, lightning, epidemics, wars, hostilities, terrorist acts, civil disorder, expropriation or confiscation of property, failure or delay by carriers, interference by civil and military authorities whether by legal proceeding or in fact and whether purporting to act under some constitution, decree, law or otherwise, acts of God and perils of the sea.

5.6     This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard to the conflict of laws provisions thereof.

5.7     This Agreement will be binding on the parties' respective successors and assigns. Except as otherwise set forth in this Section 5.7, this Agreement may not be assigned by either party without the other's written consent.

    a.  The LENDER may, without TERI's consent, assign any Loan, together with the provisions hereof as applicable to such Loan, to another entity participating in the Program, or to an SPE formed by the LENDER, in each case upon written notice to TERI.

    b.  TERI specifically acknowledges that FMC or an SPE sponsored by FMC is expected to purchase some or all of the Loans, and this Agreement shall inure to the benefit of FMC or any such SPE upon such purchase.  No notice of such purchase or consent to the assignment of the LENDER's rights under this Agreement in connection with a purchase of some or all of the Loans by FMC or any SPE sponsored by FMC shall be necessary.

    c.  In assigning any Loan and its rights under this Agreement relating to such Loan in accordance with Section 5.7(a), (i) the LENDER's written notice to TERI must be made within thirty (30) days after said assignment and must identify each Loan to which such assignment relates, and (ii) TERI will fully cooperate with any Securitization Transaction or other sale of a portfolio of Loans, provided it is given thirty (30) days advance written notice of the date that information or documents are required of it and provided that its reasonable legal fees and other expenses incurred in connection with such transaction are reimbursed by the seller of such Loans.

    d.  Except for any assignment hereunder to FMC or any SPE sponsored by FMC in connection with a purchase of Loans as described in subsection b. above, no assignment of Loans or the LENDER's rights hereunder without TERI's

express written consent shall release the LENDER from any liability to TERI under this Agreement arising out of the LENDER's ownership of such Loans (whether arising prior to, as a result of or after the sale of such Loans by the LENDER) including, without limitation, the LENDER's obligation to pay any unpaid Guaranty Fees and to repurchase Loans pursuant to Section 3.4.

e. The Lender acknowledges that TERI has outsourced or subcontracted some or all of its administrative functions, including but not limited to the processing of guarantee claims, to First Marblehead Education Resources, Inc. In addition, the Lender acknowledges that TERI has subcontracted and may hereafter subcontract any administrative obligations necessary or convenient to TERI to perform its obligations hereunder, and that such subcontracts do not and shall not require the consent of the LENDER. Such outsourcing or subcontracting shall not relieve TERI of its obligations under this Agreement.

5.8    Notice for any purpose hereunder may be given by any means requiring receipt signature, or by facsimile transmission confirmed by first class mail. In the case of TERI, notices should be sent to its President, and if by fax, to (617) 451-9425. In the case of the LENDER, notices should be sent to Robert Moriale, Charter One Bank, Student Lending Dept., 833 Broadway, Albany, NY 12207, and if by fax, to 518-472-6805. Either party may from time to time change the person, address or fax number for notice purposes by formal notice to the other party.

5.9    For the Charter One Start Education Loan Program, TERI has established a system of risk-based pricing based on tiered guaranty fees and/or tiered interest rates that correspond to the actual risk of lending to borrowers with lesser creditworthiness ("Risk-Based Pricing") The Risk-Based Pricing system is set forth in the Program Guidelines attached hereto and Schedule 3.3 hereto. TERI bases Risk-Based Pricing upon the projected net cost of defaults, which TERI believes provides business justification for the pricing levels set forth in the Risk-Based Pricing it has offered to LENDER. Any representation or warranty of compliance with federal or state law made by TERI in this Guaranty Agreement, or the Loan Origination Agreement between the parties of same date, that may relate to Risk-Based Pricing does not extend beyond the pricing actually included in the Program Guidelines attached hereto.

Section 6:    CHANGES TO PROGRAM GUIDELINES

The parties agree that the Program Guidelines will need to be updated and modified from time to time to respond to changed conditions. The parties intend to make such modifications in a manner that does not interfere with the ordinary advertising and origination cycle for education loans. Amendments necessary to meet state or federal regulatory requirements may be made at any time. With respect to all other changes, the parties shall exchange requests for modification of the Program Guidelines, including without limitation any requested changes to the provisions of the Program Guidelines

CONFIDENTIAL NCSLT0397

concerning the Guaranty Fees, in the first part of the first calendar quarter of each year. Each party shall respond in writing to proposals from the other within thirty (30) days, and both parties will attempt to resolve any differences within thirty (30) days after receiving a response to a request. All modifications must be mutually acceptable. Any modifications approved by the parties and not requiring system adjustments by the LENDER's loan servicer shall take effect within thirty (30) days after approval. Modifications requiring system adjustments by the LENDER's loan servicer shall take effect as soon after approval as such servicer shall be able to adjust its systems to accept loans made on the modified terms, and the LENDER agrees to take such actions as are reasonably necessary to ensure that such servicer adjusts its systems as promptly as practicable. The parties shall use their best efforts to conclude all negotiations of proposed changes prior to May 1 of each year. The foregoing process shall not apply to modification of the Servicing Guidelines, which are subject to the modification process contained therein.

Section 7:      TERM AND TERMINATION

7.1     The initial term of this Agreement shall commence on March 25, 2004, and shall expire on the first anniversary of such date. Thereafter, this Agreement shall automatically renew for successive one-year terms unless either party provides written notice of non-renewal and termination of this Agreement not less than ninety (90) days prior to the end of the then-current term.

7.2     In the event that the parties are unable to agree on a proposed modification to the Program Guidelines as provided in Section 6, above, the party proposing the modification shall have the option of terminating this Agreement effective immediately upon written notice of termination to the other party, provided that the party desiring to exercise this option to terminate does so within thirty (30) days of the end of the thirty (30) day period provided in Section 6 for the resolution of any differences.

7.3     To the extent permitted by applicable law, if either party should become subject to bankruptcy, receivership, or other proceedings affecting the rights of its creditors generally, the party becoming subject to such proceedings will promptly notify the other party thereof, and this Agreement will be deemed terminated immediately upon the initiation of such proceedings without the need of notice to the other party.

7.4     Termination shall be prospective only and shall not affect the obligations of the parties hereto which were incurred prior to such termination or any of the warranties and indemnities contained herein or the provisions of Section 8 below (regarding confidentiality). Not less than thirty (30) days prior to the effective date of termination, TERI may, by additional notice to the Lender, terminate its obligation to assume the guaranty of all or any subset of otherwise qualifying Loans as to which a commitment to lend is made after the Lender's receipt of such additional notice. In the absence of such additional notice TERI will, subject to

CONFIDENTIAL NCSLT0398

the terms and conditions of this Agreement, assume the guaranty of all Loans as to which a commitment to lend is made prior to the effective date of termination. In the event this Agreement terminates or expires and only one disbursement of a multi-disbursement loan has been made prior to that date, the other disbursement will also be guaranteed pursuant to the terms of this Agreement.

Section 8:   CONFIDENTIALITY; RESTRICTIONS ON USE OF INFORMATION

8.1   During the course of negotiating this Agreement and hereafter during the pendency of this Agreement, the parties from time to time may have revealed or may hereafter reveal to each other certain information concerning their respective business plans, business methods, financial data and projections, and/or information that is not generally known in the student loan industry, including, without limitation, the terms and conditions of this Agreement. All the foregoing is referred to herein as "Confidential Information." In TERI's case, its Confidential Information also includes, but is not limited to, information concerning the operation of its telephone and on-line loan applications procedures, and its online credit scoring system. Each party will use reasonable efforts to preserve the confidentiality of Confidential Information contained herein or disclosed to it by the other party, such efforts to be not less vigilant than those that such party uses to protect its own proprietary information. The foregoing is subject to the following qualifications:

a.   No party will be so bound with respect to information that is or becomes public knowledge in the student loan industry (but if it does so through any fault of such party that fault will be considered a material breach of this Agreement);

b.   No party will be so bound with respect to information that is now or hereafter comes into its possession by its own documented independent efforts or from a third party who, so far as the recipient party has reason to believe, is under no comparable restriction with respect to such information;

c.   Either party may disclose Confidential Information to its attorneys, auditors, agents, and consultants who are bound to maintain the confidentiality of such information;

d.   Either party may disclose Confidential Information in the context of any regulatory review of its operations or as compelled by law, regulation, or court order, provided that in the context of a court order the party required to disclose will (i) give the other party prompt written notice upon learning of the requirement so that the other party may take appropriate action to prevent or limit the disclosure, (ii) consult with the other party and use all reasonable efforts to agree on the nature, form, timing and content of the disclosure, (iii) except as otherwise agreed under (ii), disclose no more than its counsel advises is legally required, and (iv) inform the Court and all

CONFIDENTIAL NCSLT0399

counsel concerned that such information is and should be treated as confidential information of the other party; and

e.     Information concerning Loans and Borrowers that comes into TERI's possession shall not be considered Confidential Information of the Lender.

f.     Without limiting the foregoing, TERI may disclose any of the LENDER's Confidential Information to any entity to which TERI subcontracts its obligations under this Agreement pursuant to Section 5.7(e) hereof.

8.2     In accordance with the provisions of Title V of the Gramm-Leach-Bliley Act (the "GLB Act") and Federal Reserve Board Regulation P ("Regulation P"), TERI agrees, as a financial institution subject to Regulation P, to respect and protect the security and confidentiality of any "nonpublic personal information" (as defined in the GLB Act and Regulation P) relating to applicants for Loans and to Borrowers, including, where applicable, the restrictions on the re-use and disclosure of such information set forth in the GLB Act and Regulation P.

8.3     Without limiting the foregoing, TERI may retain as its own property and use for any lawful purpose any or all aggregated or de-identified data concerning Loan applicants and Borrowers, which does not include the name, address or social security number of the Loan applicants or Borrowers.  TERI may sell, assign, transfer or disclose such information to third parties including, without limitation, FMC, who may also use such information for any lawful purpose.


REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK

CONFIDENTIAL NCSLT0400

IN WITNESS WHEREOF, TERI and the LENDER have caused this Agreement to be executed by their duly authorized officers under seal as of the day and year indicated above.

THE EDUCATION RESOURCES INSTITUTE, INC.

By: _____

Print Name: _____

Title: _____PRESIDENT_____

CHARTER ONE BANK, N.A.

By: _____

Print Name: _____

Title: _____

CONFIDENTIAL NCSLT0401

IN WITNESS WHEREOF, TERI and the LENDER have caused this Agreement to be executed by their duly authorized officers under seal as of the day and year indicated above.

THE EDUCATION RESOURCES
INSTITUTE, INC.

By:_____

Print Name:_____

Title:_____

CHARTER ONE BANK, N.A.

By:_____

Print Name:_____

Title:_____

W0203641

{W0203641.1} 15

CONFIDENTIAL NCSLT0402

## TABLE OF EXHIBITS

Exhibit A – Program Guidelines for the Start Education Loan Program

Exhibit B – Servicer Data Requirements

Schedule 3.3 – Guaranty Fee Amounts

CONFIDENTIAL NCSLT0403

**CHARTER ONE 2004-05 TEMPLATE START PROGRAM GUIDELINES**

# START Education Loan Program
# Program Guidelines

## Updated:
## March 26, 2004

## Effective: Program Year 2004-05



FIRST MARBLEHEAD



TERI
The Education Resources Institute

{W0224058.1}

CONFIDENTIAL NCSLT0404

## Table of Contents

Program Overview

1.    Schedule 3.3

2.    TERI Underwriting Guidelines

3.    PHEAA Servicing Guidelines

4.    Program Borrower Documents

      A.    Promissory Notes
      B.    Truth In Lending Disclosure

CONFIDENTIAL NCSLT0405

# Program Overview

The First Marblehead Corporation ("FMC") has combined resources with The Education Resources Institute ("TERI") to provide Charter One Bank, N.A. ("Charter One") with a unique opportunity to deliver privately branded alternative loan products to meet specific marketing and economic objectives.

## A.    Summary of Program Participants

**Program Lender:** As program lender, Charter One is an FDIC insured financial institution able to "export" the laws concerning interest rate and fees from the state where Lender is located to all 50 states. Charter One will sub-contract origination functions to TERI but will be the legal entity who approves credit criteria and makes program loans in accordance with TERI underwriting guidelines. Charter One will provide initial loan funding and own the loans until they are purchased at agreed upon intervals in a transaction organized by the Securitization Sponsor.

**Program Origination Processing:** TERI will provide the full complement of alternative student loan origination capabilities for Charter One's programs. These services include application processing, underwriting, loan documentation and disclosure, and loan disbursement processing. TERI may subcontract these services as provided in the Loan Origination Agreement.

**Program Guarantor:** TERI will provide loan guarantee services on behalf of the Lender during the loan holding period and then to the Securitization Sponsor from the point of purchase forward. As guarantor, TERI approves the program's underwriting guidelines.

**Program Marketer:**                             . The Program Marketer promotes START Education Loans to prospective borrowers pursuant to a Referral Marketing Agreement with Charter One.

**Program Servicer:** The Servicer, Pennsylvania Higher Education Assistance Agency is responsible for performing loan servicing and administration services over the life of the loan. The Servicer maintains loan servicing procedures in accordance with the loan program guidelines.

**Securitization Sponsor:** FMC will form or cause to be formed special purpose business trusts or other special purpose entities to purchase loans from Charter One at agreed intervals. FMC coordinates all aspects of the loan purchase process with the program partners.

**Participating Schools:** Eligible primary and secondary schools, undergraduate colleges and universities, and graduate schools approved by TERI in consultation with FMC. (See Section I.B.6 of the TERI Underwriting Guidelines).

## B.    Basic Loan Program Description

Charter One Loan Programs are programs with borrowers who are credit-tested in the loan application process according to the standards set forth in these Guidelines. Graduate students may obtain a loan on their own signature in accordance with Creditready Guidelines set forth in Section I.D of the underwriting guidelines. Students and families may use the loan to finance any portion of the current academic year's educational expenses as well as past due balances. Students must be enrolled for the loan period in question at least half-time at Participating Schools, except for continuing education loans (for which students are enrolled less than half-time) and loans to fund past due balances (for which current enrollment is not required). For all loans except

START Education K-12 loans and continuing education loans, the program in which the student is enrolled must be a degree- or certificate-granting program. Students are the primary borrowers (except in the K-12 loan program), with other creditworthy persons signing the loan note as co-obligors if necessary.

Charter One may solicit borrowers and/or Participating Schools to promote the respective Loan Program(s) to students and parents.  Charter One may distribute branded application materials to targeted families and/or institutions as well as make them available more generally (Internet, etc.). Pursuant to a Referral Marketing Agreement, the principal marketing of the START Education Loan Program will be conducted by Program Marketer.

Students (and co-borrowers) apply through the program for a credit-tested loan, with multiple repayment options.  The loans have a variable rate, based on the average of the one-month London Interbank Offered Rates ("LIBOR") published in The Wall Street Journal on the first business day of each of the three (3) calendar months immediately preceding each quarterly change date.

Generally, school channel loan proceeds, which with the exception of the Continuing Education Loan are school certified, are distributed directly to the Participating School as specified on the School Certification Form (or via the web), with multiple disbursements within a single academic year covered under a single promissory note. If the Lender approves for use by TERI the distribution of loan proceeds through ELM NDN, another Central Disbursing Agent, or any other network that modifies the standard distribution method for loan proceeds stated above (e.g., by distributing loan proceeds directly to the borrower), loan proceeds will instead be distributed through such network using its disbursement method.  On School Channel Continuing Education Loans, where school certification is not required, proceeds are mailed directly to the borrower. Upon the written request of a borrower or a school and approval by TERI, checks for school channel loans can be made payable to the student borrower only, the co-borrower only, the school only, or the borrower(s) and the school.

Generally, proceeds on Direct to Consumer loans, which are not school certified, are mailed directly to the borrower (and co-borrower) in a single disbursement after TERI receives enrollment verification. If no enrollment verification is received within 90 days after it is requested from the borrower, then the loan application is considered withdrawn. Upon the written request of a borrower or a school and approval by TERI, checks for direct-to-consumer loans can be made payable to the student borrower only, the co-borrower only, the school only, or the borrower(s) and the school.

Shortly after the final disbursement(s) have been made, it is anticipated that all eligible program loans will be purchased into a securitization organized by the Securitization Sponsor.

CONFIDENTIAL NCSLT0407

# 1. SCHEDULE 3.3 TO GUARANTY AGREEMENT BETWEEN TERI AND Charter One

January 22, 2004
(Page 1 of 2)

## Charter One Bank School Channel [INSERT MARKETER'S NAME] Referral Loan Products: TERI Guarantee Fee Payment Structure by Program

| 1. Charter One Bank Program (In credit definitions below: "B" stands for borrower; "F" stands for co-borrower; "S" stands for student; "CWS" stands for creditworthy student; and "F" stands for FICO score) | 2. Loan interest rate charged to Borrower — LIBOR Index[1] + a margin of: | 3. Loan origination fee charged to Borrower[2] | | 4. Guaranty Fee paid by Charter One Bank to TERI on gross loan amount at time of disbursement | 5a. Subsequent Guaranty Fee paid by Charter One Bank to TERI on gross loan amount at disbursement and subject to the Deposit and Security Agreement | | 6a. Subsequent Guaranty Fee paid to TERI at time of securitization (regardless of repayment date) on gross loan amount as of disbursement and subject to the Deposit and Security Agreement | | 6b. Subsequent Guaranty Fee paid to TERI by the holder of the loan at time borrower enters repayment. Guaranty Fee is computed on the capitalized loan amount as of the repayment start date and added to the borrower's loan principal and subject to the Deposit and Security Agreement | | 7. Total Guaranty Fee paid to TERI on the loan | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Immediate repay | Deferred repayment[3] | | Immediate repay | Deferred repay[3] | Immediate repay | Deferred repayment[3] | Immediate repay | Deferred repayment[3] | Immediate repay | Deferred repayment[3] |
| **K-12 Creditworthy loan:** | | | | | | | | | | | | |
| B F ≥ 660 | 3.60% | 6.0% | | 1.5% | 4.5% | | 0% | | 0% | | 6.0% | |
| **Continuing Education Creditworthy loan:** | | | | | | | | | | | | |
| Tier 1: C F ≥ 645 with S F ≥ 625 (or no F) | 3.60% | | 6.5% | 1.5% | | 5.0% | | 0% | | 0% | | 6.5% |
| Tier 2: CWS F ≥ 645 | 3.60% | | 9.5% | 1.5% | | 8.0% | | 0% | | 0% | | 9.5% |
| Tier 3: C F ≥ 645 with S F 575-624 | 3.60% | | 8.5% | 1.5% | | 7.0% | | 0% | | 0% | | 8.5% |
| Tier 4: C F ≥ 645 with S F < 575 | 3.60% | | 10.5% | 1.5% | | 9.0% | | 0% | | 0% | | 10.5% |
| **Undergraduate Creditworthy loan:** | | | Immediate repay /Interest-only repay /Deferred repay[3] | | | Immediate repay /Interest-only repay /Deferred repay[3] | | Immediate repay /Interest-only repay /Deferred repay[3] | | Immediate repayment /Interest-only repay /Deferred repay[3] | | Immediate repayment /Interest-only repay /Deferred repay[3] |
| Tier 1: C F ≥ 645 with S F ≥ 625 (or no F) | 3.10% | | 5.0%/5.0%/6.5% | 1.5% | | 3.5%/3.5%/5.0% | | 0%/0%/0% | | 0% | | 5.0%/5.0%/6.5% |
| Tier 2: CWS F ≥ 645 | 3.10% | | 8.0%/8.0%/9.5% | 1.5% | | 6.5%/6.5%/8.0% | | 0%/0%/0% | | 0% | | 8.0%/8.0%/9.5% |
| Tier 3: C F ≥ 645 with S F 575-624 | 3.10% | | 7.0%/7.0%/8.5% | 1.5% | | 5.5%/5.5%/7.0% | | 0%/0%/0% | | 0% | | 7.0%/7.0%/8.5% |
| Tier 4: C F ≥ 645 with S F < 575 | 3.10% | | 9.0%/9.0%/10.5% | 1.5% | | 7.5%/7.5%/9.0% | | 0%/0%/0% | | 0% | | 9.0%/9.0%/10.5% |
| **Graduate Creditworthy loan:** | | | Deferred repay[3] | | | Deferred repay[3] | | Deferred repayment[3] | | Deferred repayment[3] | | Deferred repayment[3] |
| Tier 1: C F ≥ 645 with S F ≥ 625 (or no F) | 3.20% | | 6.5% | 1.5% | | 5.0% | | 0% | | 0% | | 6.5% |
| Tier 2: CWS F ≥ 645 | 3.20% | | 9.5% | 1.5% | | 8.0% | | 0% | | 0% | | 9.5% |
| Tier 3: C F ≥ 645 with S F 575-624 | 3.20% | | 8.5% | 1.5% | | 7.0% | | 0% | | 0% | | 8.5% |
| Tier 4: C F ≥ 645 with S F < 575 | 3.20% | | 10.5% | 1.5% | | 9.0% | | 0% | | 0% | | 10.5% |
| **Graduate Credit-ready loan:** | | | Deferred repay[3] | | | Deferred repay[3] | | Deferred repayment[3] | | Deferred repayment[3] | | Deferred repayment[3] |
| S F ≥ 675 | 3.85% | | 8.0% at disbursement & 3.0% at repayment[4] | 1.5% | | 6.5% | | 0% | | 3.0% | | 11.0% |

[1] The LIBOR index is equal to the average of the one-month LIBOR rates as published in the "Money Rates" section of the Wall Street Journal on the first business day of each of the three (3) calendar months immediately preceding each quarterly adjustment date. LIBOR means the London Interbank Offered Rate.

[2] The origination fee is computed as a percentage of the sum of the requested loan amount and the origination fee and is added to the loan principal.

[3] Deferred interest is capitalized in accordance with the terms of the Notes.

[4] The origination fee at repayment is computed on the outstanding loan balance (including capitalized interest) at repayment and added to loan principal

[W0224058.1]

CONFIDENTIAL NCSLT0408

January 22, 2004
(Page 2 of 2)

# Charter One Bank Direct to Consumer [INSERT MARKETER'S NAME] Referral Loans: TERI Guarantee Fee Payment Structure by Program

| 1. Charter One Bank Program (In credit definitions below: "B" stands for borrower, "C" stands for co-borrower, "S" stands for student, "CWS" stands for creditworthy student; and "F" stands for FICO score) | 2. Loan Interest Rate charged to Borrower LIBOR Index[1] + a margin of: | 3. Loan fee charged to Borrower[2] Deferred repay[3] | 4. Guaranty Fee paid by Charter One Bank to TERI on gross loan amount at time of disbursement | 5a. Subsequent Guaranty Fee paid by Charter One Bank to TERI at disbursement and subject to the Deposit and Security Agreement Deferred repay[3] | 6a. Subsequent Guaranty Fee paid to TERI at time of securitization (regardless of repayment date) on gross loan amount as of disbursement and subject to the Deposit and Security Agreement Deferred repayment[3] | 6b. Subsequent Guaranty Fee paid to TERI by the holder of the loan at time borrower enters repayment. Guaranty Fee is computed on the capitalized loan amount as of the repayment start date and added to the borrower's loan principal and subject to the Deposit and Security Agreement Deferred repayment[3] | 7. Total Guaranty Fee paid to TERI on the loan Deferred repayment[3] |
|---|---|---|---|---|---|---|---|
| **Continuing Education Creditworthy loan:** | | Deferred repay[3] | | Deferred repay[3] | Deferred repayment[3] | Deferred repayment[3] | Deferred repayment[3] |
| Tier 1: C F ≥ 645 with S F ≥ 625 (or no F) | 4.95% | 6.5% | 1.5% | 5.0% | 0% | 0% | 6.5% |
| Tier 2: CWS F > 645 | 4.95% | 9.5% | 1.5% | 8.0% | 0% | 0% | 9.5% |
| Tier 3: C F ≥ 645 with S F 575-624 | 4.95% | 8.5% | 1.5% | 7.0% | 0% | 0% | 8.5% |
| Tier 4: C F ≥ 645 with S F < 575 | 4.95% | 10.5% | 1.5% | 9.0% | 0% | 0% | 10.5% |
| Tier 5: C F 625-644 & S with any F (or no F) | 7.25% | 10.5% | 1.5% | 9.0% | 1.5% | 1.5% | 12% (plus 80 bps per annum for life of loan[4]) |
| **Undergraduate Creditworthy loan:** | | Im. repay /Int. only /deferred[3] | | Immediate repay /Int. only /deferred[3] | Immediate repay /Int. only /deferred[3] | Immediate repay /Int. only /deferred[3] | Immediate repay/ /Int. only /deferred[3] |
| Tier 1: C F ≥ 645 & S ≥ 625 (or no F) | 4.65% | 5.0%/5.0%/6.5% | 1.5% | 3.5%/3.5%/5.0% | 0% | 0% | 5.0%/5.0%/6.5% |
| Tier 2: CWS ≥ 645 | 4.65% | 8.0%/8.0%/9.5% | 1.5% | 6.5%/6.5%/8.0% | 0% | 0% | 8.0%/8.0%/9.5% |
| Tier 3: C F ≥ 645 & S F 575-624 | 4.65% | 7.0%/7.0%/8.5% | 1.5% | 5.5%/5.5%/7.0% | 0% | 0% | 7.0%/7.0%/8.5% |
| Tier 4: C F ≥ 645 & S F < 575 | 4.65% | 9.0%/9.0%/10.5% | 1.5% | 7.5%/7.5%/9.0% | 0% | 0% | 9.0%/9.0%/10.5% |
| Tier 5: C F 625-644 & S with any F (or no F) | 7.25% | 9.5%/9.5%/10.5% | 1.5% | 8.0%/8.0%/9.0% | 2.5%/2.5%/1.5% | 2.5%/2.5%/1.5% | 12%/12%/12% (plus 80 bps per annum for life of loan[4]) |
| **Graduate Creditworthy loan:** | | Deferred[3] | | Deferred[3] | Deferred[3] | Deferred[3] | Deferred[3] |
| Tier 1: C F ≥ 645 & S ≥ 625 (or no F) | 4.65% | 6.5% | 1.5% | 5.0% | 0% | 0% | 6.5% |
| Tier 2: CWS ≥ 645 | 4.65% | 9.5% | 1.5% | 8.0% | 0% | 0% | 9.5% |
| Tier 3: C F ≥ 645 & S F 575-624 | 4.65% | 8.5% | 1.5% | 7.0% | 0% | 0% | 8.5% |
| Tier 4: C F ≥ 645 & S F < 575 | 4.65% | 10.5% | 1.5% | 9.0% | 0% | 0% | 10.5% |
| Tier 5: C F 625-644 & S with any F (or no F) | 7.25% | 10.5% | 1.5% | 9.0% | 1.5% | 1.5% | 12% (plus 80 bps per annum for life of loan[4]) |

This ongoing guaranty fee is paid quarterly to TERI by the holder of the loan as of the end of each calendar quarter. The payment amount is computed by multiplying 20 bp times the outstanding loan balance (including accrued interest) on the Servicer's system as of the end of March, June, September & December, respectively.

[1] The LIBOR Index is equal to the average of the one-month LIBOR rates as published in the "Money Rates" section of the Wall Street Journal on the first business day of each of the three (3) calendar months immediately preceding each quarterly adjustment date. LIBOR means the London Interbank Offered Rate.
[2] The origination fee is computed as a percentage of the sum of the requested loan amount and the origination fee and is added to the loan principal.
[3] Deferred interest is capitalized in accordance with the terms of the Notes.

(W0224058 1)

CONFIDENTIAL NCSLT0409

## 2. TERI Program Underwriting Guidelines

CONFIDENTIAL NCSLT0410

# UNDERWRITING, ORIGINATION AND LOAN TERM

## GUIDELINES FOR:

### Charter One Bank, N.A.

## START Education Loan Program

**START Education K-12 Loans**
**START Education Undergraduate Loans**
**START Education Graduate Loans**
**START Education Continuing Education Loans**

**THE EDUCATION RESOURCES INSTITUTE, INC.**
**31 St. James Avenue, 6th Floor**
**Boston, MA  02116**

Revised: March 26, 2004
Effective: 2004-05

CONFIDENTIAL NCSLT0411

## Table of Contents

**Overview**

**Guidelines**

**I.    Loan Acceptance Criteria**
    A.    General Policies
    B.    Eligible Borrowers
    C.    Creditworthiness Criteria
    D.    Creditreadiness Criteria
    E.    "Good Credit" Criteria
    F.    Documentation Required
    G.    Faxed Signature Policy

**II.    Loan Program Terms**
    A.    Loan Amount
    B.    Interest Rate
    C.    Guaranty Fee

**III.    Guideline Amendment Process**

**Schedule A**

**Schedule B**

**Schedule C**

**Schedule D**

**Schedule E**

CONFIDENTIAL NCSLT0412

# OVERVIEW

## I.    Scope of coverage

Lender and TERI, in coordination with the Program Manager (hereinafter defined), have adopted the following Program Guidelines ("Guidelines") to apply to all loans made pursuant to the Guaranty Agreement dated _____, 2004 between Lender and TERI. Unless otherwise agreed hereafter, these Guidelines do not apply to loans made pursuant to any other Guaranty Agreement between Lender and TERI, which remains in full force and effect according to their terms.

## II.    Basic Program Design

- The **START Education K-12 Loans** are education loans made to fully credit-tested borrowers for students enrolled in private primary or secondary schools. The parent is the primary obligor; co-borrowers are accepted if necessary to meet credit criteria.
- The **START Education Undergraduate Loans** are education loans made to fully credit-tested borrowers. The student is the primary obligor; co-borrowers are accepted if necessary to meet credit criteria.
- The **START Education Graduate Loans** are education loans made to fully credit-tested borrowers. The student is the primary obligor; co-borrowers are accepted if necessary to meet credit criteria. Graduate students may obtain a loan on their own signature in accordance with creditready program underwriting guidelines.
- The **START Education Continuing Education Loans** are education loans made to . fully credit-tested borrowers. The student is the primary obligor; co-borrowers are accepted if necessary to meet credit criteria.
- Borrowers may use these loans to finance any portion of the current academic year's certified educational expenses and past due balances, subject to certain minimum and maximum amounts.
- Lender may solicit borrowers directly, or may solicit Participating Schools to promote these loan programs to students and parents. Lender may distribute branded application materials to targeted families and/or Participating Institutions, as well as make them available generally (e.g., via the Internet). Applications may be submitted by mail, by phone and via the Internet. Pursuant to a Referral Marketing Agreement, the principal marketing of the START Education Loan Program will be conducted by [PROGRAM MARKETER].
- Proceeds on School Channel Loans, which, with the exception of the Continuing Education Loan, are school certified, are distributed directly to Participating Schools as specified by each Participating School on the School Certification Form (or via the web), with up to four disbursements within a single academic year covered under a single promissory note. If the Lender approves for use by TERI the distribution of loan proceeds through ELM NDN, another Central Disbursing Agent, or any other network that modifies the standard distribution method for loan proceeds stated above (e.g., by distributing loan proceeds directly to the borrower), loan proceeds will instead be distributed through such network using its disbursement method. The Participating School should specify disbursement dates that fall as close as possible to, but no earlier than the student's tuition due dates. On School Channel Continuing Education Loans, where school certification is not required, proceeds are mailed directly to the borrower. Upon the written request of a borrower or a school and approval by TERI, checks for school channel loans can be made payable to the student borrower only, the co-borrower only, the school only, or the borrower(s) and the school.
- Proceeds on Direct to Consumer Loans, which are not school certified, are mailed directly to the borrower (and co-borrower) in a single disbursement after TERI receives enrollment verification. If no enrollment verification is received within 90 days after it is

{W0224058 1}

CONFIDENTIAL NCSLT0413

requested from the borrower, then the loan application is considered withdrawn. Upon the written request of a borrower or a school and approval by TERI, checks for direct-to-consumer loans can be made payable to the student borrower only, the co-borrower only, the school only, or the borrower(s) and the school.

CONFIDENTIAL NCSLT0414

**GUIDELINES**

I.     **Loan Acceptance Criteria:**

A.     **General Policies**

In order to obtain a loan under any of the programs described above, an applicant must be an eligible borrower, meet certain credit criteria, and be within the maximum loan limits (including aggregate education debt limits) that are set forth in the attached Schedules. No borrower who meets the eligibility requirements and qualifies under the above standards may be denied a loan within the applicable loan limits. Conversely, if a borrower is not eligible and does not meet the credit standards of these guidelines, he/she may not obtain a loan except pursuant to the overrides specifically permitted in these Guidelines.

B.     **Borrower Eligibility and Documentation Thereof-**

1.     The student borrower must be enrolled at least half-time for the loan period in question in a Participating School (except for Continuing Education Program borrowers—see below). For all loans except START Education K-12 loans and continuing education loans the program in which the student is enrolled must be a degree- or certificate-granting program.

2.     The student borrower must be at least the age of majority at the time of the loan application. (This does not apply to START Education K-12 loan students, because they are not signatories on their promissory notes.)

3.     In order to qualify for subsequent loans, the student must maintain satisfactory academic progress. Satisfactory academic progress is demonstrated by school certification or verification of continued enrollment (see subsection 7 below).

4.     Joint application is not required. If a second signer is necessary to meet credit criteria, or desired by the borrowers, then both applicants become joint applicants for the benefit of the student and co-borrowers under the promissory note. Borrower and co-borrower(s) need to sign the application and promissory note to be eligible for the loan. Unless the context requires otherwise, wherever the term "borrower" is used in these Guidelines it refers to all co-borrowers of a note collectively.

5.     U. S. Citizenship/Permanent Residency Status - On each loan, the borrower must be a United States citizen/national or a Permanent Resident alien of the United States. (If there are multiple borrowers on a loan, then at least one borrower who meets these citizenship requirements must also meet the credit criteria (see below)). Every applicant who is *not* a citizen must submit appropriate forms of documentation approved by United States Citizenship and Immigration Services (f/k/a Immigration and Naturalization Service). Such forms include, but are not limited to:

a)     INS 151 or INS 551 or 1551 form with a valid expiration date or a departure record (1-94) with a valid expiration date issued from the INS showing "Refugee" or "Asylum Granted" or "Indefinite Parole" and/or humanitarian parole.

b)     In the case of a student, a copy of his or her student visa, permanent resident card, F-1 or I –20 form.

{W0224058.1}

6. School eligibility to participate in these loan programs is determined by TERI in its sole discretion in consultation with FMC. The standards for school eligibility to participate in these loan programs vary from program to program. The factors TERI considers for school eligibility may include, without limitation:

— accreditation as a degree-granting institution of higher education in the United States or Canada, and proof thereof (for graduate loan programs, schools must be accredited to grant master and/or doctorate degrees, or the equivalent, in any professional field);
— a default rate as reported by the U.S. Department of Education no greater than twelve percent (12%);
— the submission of two years of its audited Financial Statements and additional financial information;
— review of the school catalog;
— proof that the school is operating legally in the state in which it is located;
— certification that the school is in compliance with all laws of that state concerning its education curriculum; and
— other documentation as TERI may require.

These criteria can be waived on a case by case basis by agreement of TERI, the Lender, and the Program Manager. TERI will maintain a list of approved Participating Schools, which will be updated from time to time in accordance with the procedures, if any, referenced in the Guaranty Agreement, or as otherwise agreed. Upon the LENDER'S request, TERI will review other institutions for approval and provide written confirmation to the LENDER. Should a school's eligibility to participate in the Program cease, the LENDER will be advised in writing. The revocation has no retroactive effect. TERI will remove the school from such list effective with new applications received from date of notice and the completion of requisite system changes (unless TERI, the Lender and Program Manager mutually agree to allow the school to continue as a Participating School). Loan applications in process at the time of notice are to be processed normally.

7. School Certification or Verification of Enrollment

For *School Channel Programs other than continuing education loans*, in order to process any loan application, the Lender must obtain a certification from the Participating School attended by the student concerned. The school must certify the following:

a) cost of attendance minus financial aid received by the student or the loan amount,
b) academic period,
c) enrollment status, grade level, and degree or other program in which the student is enrolled, and
d) expected graduation date.

For *Direct-to-Consumer programs and all continuing education loans*, the applicant must submit one of the following proofs of enrollment that corresponds with the loan term and includes the school name and the name of the borrower:

a) a letter from the Participating School,
b) a bill or receipt for the applicable term, or
c) a letter of acceptance, in the case of a new incoming student.

No verification is required for amounts requested by the borrower for the purchase of a personal computer to be used in school, but any such request is subject to a cap as stated in the Schedules.

For *loans to fund a past due balance* (school channel or direct-to-consumer), current enrollment is not required, but the borrower must provide a current invoice (dated within the past 60 days) from the school for the loan period in question that demonstrates a continued outstanding balance for a past academic period. In addition, for *school channel* loans, school certification must be obtained for the loan period in question.

8.  Annual Borrowing Limits and Documentation Thereof

In *school channel programs other than continuing education programs*, students (or borrower(s) on behalf of students) may borrow up to the lesser of (a) the cost of attendance minus financial aid received by the student, as certified by the school, or (b) the "Maximum annual loan amount" shown in the Schedules attached hereto, if any. *Continuing education borrowers who borrow in school channel programs* may borrow up to the "Maximum annual loan amount" shown in the Continuing Education Loan Program Definitions Schedule attached hereto.

In *undergraduate and graduate, direct-to-consumer programs* no student (including borrower(s) on behalf of a student) may borrow in the aggregate in one year (measured from July 1 to June 30) greater than the lesser of (a) $30,000 or (b) the Participating School's Annual Program Education Expense (as defined in the "Maximum annual loan amount" section in the applicable Loan Program Definitions Schedule attached hereto).

If a student (or a borrower on behalf of a student) borrowing in an Undergraduate or Graduate Direct-to-Consumer program requests to borrow in one year (measured from July 1 to June 30) amounts less than $30,000 but in excess of the Participating School's Annual Program Education Expense (as defined in the "Maximum annual loan amount" section in the applicable Loan Program Definitions Schedule attached hereto), the student (or borrower on behalf of a student) will be offered and may accept a loan amount for which the student remains eligible as part of the Annual Program Education Expense. The student (and borrowers on behalf of students) will not be permitted to borrow in excess of the amount for which the student remains eligible as part of the Annual Program Education Expense.

In *continuing education direct-to-consumer programs*, no student (or borrower(s) on behalf of any single student) may borrow greater than $30,000 in the aggregate in one year (measured from July 1 to June 30). See Continuing Education Loan Program Definitions Schedule attached hereto.

9.  If TERI becomes aware that the borrower made any materially false statement in the application process for a previous student loan (whether or not guaranteed by TERI), TERI may deny any application made by that borrower.

10.  The borrower (and co-borrower) must pass TERI's Customer Identification Program (CIP) adopted pursuant to and in compliance with the USA PATRIOT Act.

11.  At the time of application, the borrower cannot be a debtor in a Ch. 11 or Ch. 13 bankruptcy proceeding. The borrower can be a debtor in a Ch. 7 bankruptcy proceeding as long as the borrower provides a copy of the discharge from that proceeding to demonstrate that the filing was properly completed.

   CONFIDENTIAL NCSLT0417

**C.**   **Creditworthiness Criteria-**

In most cases creditworthiness is mandatory for at least one applicant for any loan. This section of the Guidelines discusses what "creditworthiness" means.

**1.**   **Credit Analysis.**

The process of credit underwriting for all loan programs begins with obtaining an online credit bureau report for each applicant. The underwriter must analyze this report

- to determine if the **credit score** meets the minimum criteria for the particular loan program concerned,
- to determine if the **credit bureau rating** indicates the presence of derogatory items, and if so, then,
- to determine if the report meets the additional **judgmental criteria**.

➢ **Credit Bureau Criteria**

a.   The credit bureau report must indicate a credit score that meets or exceeds the minimum requirement for the particular loan program concerned. (See the Schedules attached to these Guidelines for the score criteria.) *(An override may be granted by proper authority on a case-by-case basis after thorough review of the file.)*

**Note:**   TERI reserves the right to raise the credit score cutoff by up to <u>20 points</u> during the course of a program year in response to changes in the credit quality of applications. In addition, in programs with tiered pricing, if a disproportionate volume of loans are referred by Program Marketer in tiers below tier 1, TERI reserves the right to suspend approvals of loans in those tiers.

b.   The Credit Bureau Rating must be E1 or better. (An E1 rating indicates the presence of no more than one (1) major derogatory item, meaning any trade line reported as 90 or more days delinquent.)

c.   If the Rating is E1, the underwriter must review the report to determine that the derogatories meet the judgmental criteria set forth below.

d.   At least two years of credit history.

➢ **Judgmental Criteria**

Where the underwriter is required to apply judgmental criteria to a credit bureau report, a loan may not be approved unless there is:

a.   No record of a paid or unpaid charged off account, collection account, or settled account over $200.00 within the past five years. *(An override may be granted after thorough review.)*

b.   No record of a foreclosure, repossession, open judgment or suit, unpaid tax lien, or other negative public record items in the past seven years. *(An override may*

CONFIDENTIAL NCSLT0418

be granted where the Applicant provides written documentation demonstrating the obligation has been paid.)

c.      No record of a bankruptcy in the past ten years. *(An override may be granted where the Applicant provides written documentation demonstrating that the circumstances leading up to the bankruptcy were beyond his/her control. Examples - large medical expenses; unemployment due to being laid off, etc.)*

*and*

d.      No record of a student loan default. *(An override may be granted where the Applicant provides written documentation demonstrating the obligation has been paid.)*

## 2.      Additional Creditworthiness Criteria

In order to be "creditworthy," a borrower must also meet the following employment, income, and length of residence criteria:

### ➢ Employment and Income Verification

In order to be "creditworthy", a borrower must demonstrate *proof of positive income*, which proof shall take the form of one or more of the following, as applicable:

**a.**      If the borrower is a Wage Earner:

1.      Borrower must supply a pay stub not more than sixty (60) days old that states the employer's name. If not available, letter from employer on company  letterhead stationary listing gross yearly salary is acceptable.

2.      If the borrower cannot supply a paystub or the paystub is insufficient, alternative documentation can substitute, as follows:

(i)      A letter from employer(s) documenting start date(s), full-time status and hours worked; or
(ii)     Previous W2 statement or the first two pages of the most recent tax return (signed by the borrower/taxpayer). The total gross annual wage will be divided by the amount listed on most recent pay stub.

**(Note:** Disability, military or maternity leave will not be deducted from time of employment.)

3.      Borrower must have been employed at current or former employers for a minimum of two (2) continuous years.

4.      If borrower is a Student and wishes to have his/her wage income used in the loan decision, borrower must submit, a paystub no more than sixty (60) days old or a letter from employer(s) documenting start date(s), full-time status and hours worked.

**b.**      **If borrower is Self Employed:** Must submit a signed copy of the last two (2) years' Federal personal income tax returns with all schedules plus a copy of the most recent Federal income tax return for each corporation or partnership that

{W0224058.1}                                                     CONFIDENTIAL NCSLT0419

such applicant cites as an income source. (Must have been operating business for a minimum of 24 months.)

c.   **If borrower is Retired**, he/she must submit:

    1.   A copy of most recent pension statement (1099), or

    2.   A copy of most recent social security income statement (1099).

d.   **If borrower cites OTHER INCOME** (interest, rental, etc.) in application, he/she must submit a copy of the most recent Federal personal income tax return (signed by the borrower/taxpayer) with all schedules.

e.   **EMPLOYMENT AND INCOME VERIFICATION RULES FOR CREDITWORTHY CO-BORROWERS WITH A SCORE GREATER THAN OR EQUAL TO 680**

    1.   For those creditworthy co-borrowers who meet the following criteria:
A wage earner
Applies for $10,000 or less
Has a FICO score of 680 or greater
Applying for an undergraduate, graduate, or K-12 loan, will be requested, **BUT NOT REQUIRED**, to verify income/employment through the stated forms of verification.

    2.   If a creditworthy co-borrower meets the above criteria but does not provide documentation of 2 years of continuous employment the following verification and action will be taken:

        a.   Telephone verification of employment will substitute for income and employment documentation omitted by the co-borrower.

        b.   Income and employment verification may be waived by the analyst after an attempt to verify by phone.

Once telephone verification is attempted, a written record, signed by the analyst, will document the name and title of employer, dates of employment, calls, contacts, or waiver of the verification criteria.

The above income/employment waiver is subject to quarterly review and may be revoked by TERI at any time. Written notification will be given by TERI if revocation occurs.

All other income and employment criteria will remain the same for self-employed individuals, retired individuals, students applying in their own name as creditworthy, continuing education loans, and borrowers applying for more than $10,000.

> **Length of Residency**

If a borrower is applying on the basis of creditworthiness, then at least one creditworthy borrower must have:

a.   resided at his/her current address for a period exceeding twelve (12) months, **and**
b.   resided in the United States for the past two (2) years.

{W0224058.1}

CONFIDENTIAL NCSLT0420

**D.    Creditreadiness Criteria.**

In some programs students may borrow on their own signatures.  Any such student borrower must be "credit-ready" but need not be "creditworthy."  Where this lower standard applies, it is noted on the Schedules attached to these Guidelines.  To be credit-ready, an applicant must meet the following:

➤ **Credit Bureau Criteria**

A. The applicant must
(1) have a credit score that meets the program minimum (see Schedule 3.3 to the Guaranty Agreement) *or*
(2) have *no* credit score but also *no* derogatories on his her credit bureau report *or*
(3) have a score below the program minimum, but a credit rating of E1 or better, and pass the Judgmental Criteria.

B. No matter which of the above applies, the applicant must also meet the Revolving Debt Criteria below.

**Note:** TERI reserves the right to raise the credit score cutoff by up to <u>20 points</u> during the course of a program year in response to changes in the credit quality of applications

➤ **Judgmental Criteria**

If applicable (i.e., if subsection A(3) above applies), the judgmental criteria for a credit-ready borrower are the same as for a creditworthy borrower.

➤ **Revolving Debt Criteria**

The underwriter will examine the credit bureau report to determine what percentage and amount of the applicant's debt is revolving debt.  If the total revolving debt listed on the credit bureau exceeds $15,000, and is greater than 70% of the applicant's total debt, the application may be approved only with the consent of TERI on a case-by-case basis.

➤ **Length of Residency**

Length of residency requirements are the same as for a creditworthy borrower.

➤ **Employment Criteria**

None.

**E.    "Good Credit" Criteria**

In some programs, if there is a creditworthy co-borrower the primary borrower need only have "good credit."  Where this lower standard applies, it is noted on the Schedules attached to these Guidelines.  To have good credit, an applicant must pass the same credit report analysis as a creditworthy applicant (or have *no* credit score but also *no* derogatories on his her credit bureau report), but need not meet the additional employment, income, and residency requirements for creditworthiness.  In other words, the applicant must pass the credit score test and credit rating test (or, in the alternative, judgmental test) described in Section C.1 above ("Credit Analysis"), but not the requirements of C.2 above ("Additional Creditworthiness Criteria").

CONFIDENTIAL NCSLT0421

**F.     Documentation required for final approval-**

1.     APPLICATION/PROMISSORY NOTE- Signed by all borrowers.
2.     SCHOOL CERTIFICATION- Signed by school official OR VERIFICATION OF ENROLLMENT (for continuing education loans and Direct-to-Consumer loans).
3.     SCHOOL INVOICE (If loan is being taken out to pay a past due balance)
4.     INS CARD/PROOF OF PERMANENT RESIDENCY
5.     CREDIT BUREAU REPORT - for all borrowers.
6.     FULL RECOURSE LETTER (if applicable)
7.     INCOME VERIFICATION LETTER (if applicable)
8.     REVOLVING DEBT BURDEN CALCULATION (if applicable)

TERI will forward to the Lender's servicer the application and promissory note and such other documentation as the servicer may need to retain in order to submit a guaranty claim.

**G.     Faxed Signature Policy**

Charter One has approved "borrower instructions" permitting faxed signatures. TERI will accept faxed borrower and co-borrower signatures on promissory notes and credit applications as final signatures.

**II.     Loan Program Terms-**

**A.     Loan Amount-** Subject to the credit underwriting criteria described in Section 1, the borrower may obtain funds under the program, subject to the applicable annual, program, and aggregate minimum and maximum amounts identified on the Schedules to these Guidelines.

**B.     Interest Rate-** The interest rate(s) applicable to each program are set out in Schedule 3.3 to the Guaranty Agreement; Schedule 3.3 is incorporated in these Guidelines by reference.

If the Lender so chooses, fee and margin combinations for the undergraduate, graduate, and continuing education programs for creditworthy borrowers may be tiered according to the credit scores of the borrower and/or co-borrower. If applicable, pricing tiers and credit scoring for tiered pricing are set forth in Schedule 3.3 to the Guaranty Agreement.

**C.     Guaranty Fee-** The Lender will pay a guaranty fee for every loan in a given program. The amount(s) of guaranty fees and the timing of payment are set forth in Schedule 3.3 to the Guaranty Agreement.

**III.     Guideline Amendment Process:**

Modifications or changes to the Guidelines will be made pursuant to the procedures outlined in the Guaranty Agreement.

CONFIDENTIAL NCSLT0422

# Schedule A
# START Education
# UNDERGRADUATE LOAN PROGRAM DEFINITIONS

## ELIGIBILITY:

- Undergraduate students enrolled at least ½ time in a degree or certificate program at a Participating School.
- The student and co-borrower, if any, must meet the eligibility requirements applicable to each of them, as set forth in Section I.B of these Guidelines.
- Pricing for creditworthy students applying without a co-borrower and for students applying with a creditworthy co-borrower is set forth on Schedule 3.3.
- Acceptable student and co-borrower credit scores for this program are set forth on Schedule 3.3. In all cases, at least one applicant must (a) have a credit score of 645 or better (except as permitted for Direct to Consumer Loans in Tier 5 (see Schedule 3.3) and subject to the "no score" rules below) and (b) meet the Creditworthiness Criteria set forth in Section I.C of these Guidelines.
- For students applying with a creditworthy co-borrower, student credit scores below 645 are acceptable, but only at the pricing levels set forth in Schedule 3.3.
- Students applying with a creditworthy co-borrower are not required to meet any Creditworthiness Criteria in Section I.C of these Guidelines other than credit score (subject to the no-score rules below).
- No-Score Rules
  --If the student has no credit score but the co-borrower meets the Creditworthiness Criteria set forth in Section I.C of these Guidelines, the price for the loan will be tier 1 (see Schedule 3.3).
  --If the co-borrower has no credit score but meets all other Creditworthiness Criteria set forth in Section I.C of these Guidelines, the price of the loan will be based on the student score (see Schedule 3.3).
  --If the student and co-borrower both have no credit score, the loan application is denied.

## LIMITS:

### Direct to Consumer:

- Minimum loan amount:  $1,500 (excluding origination fees)
- Maximum annual loan amount (measured from July 1 to June 30):  the lesser of
  (a) $30,000 (excluding origination fees), up to $5,000 of which may be for personal computer to use for school, or
  (b) Annual Program Education Expense, which is the school's most recently published cost of attendance[1] plus the average annual increase in cost of attendance not accounted for in the most recently published cost of attendance, if any,[2] plus $5,000 for personal computer to use for school
- Aggregate START Education maximum:
  --$130,000 (excluding origination fees)

### School Channel:

- Minimum loan amount: $1,000 (excluding origination fees)

---

[1] Cost of attendance shall be taken from the most recent school file published by the U.S. Department of Education or, if none, from Thomson Peterson's *College and Universities.*
[2] The average increase in the cost of attendance shall be taken from the most recently available figures in the College Board Study.

{W0224058.1}                                               CONFIDENTIAL NCSLT0423

- Maximum annual loan amount: up to but no greater than cost of education minus aid certified by the school (excluding origination fees).
- Aggregate START Education Loan Maximum: none.

## REPAYMENT:

- Repayment varies depending on loan type as follows:
  - For immediate repayment loans, payment of principal and interest begins 30-60 days after the last disbursement;
  - For loans with deferred principal and interest, repayment of principal and interest begins 180 days after graduation (or if the student ceases to be enrolled at least half-time prior to graduation, repayment of principal and interest begins 180 days after that event), or
  - For loans with deferred principal payments, interest payments begin 30-60 days after the loan's first disbursement, and principal payments begin 30-60 days after graduation (or if the student ceases to be enrolled at least half-time prior to graduation, repayment of principal begins 30-60 days after that event).
- Minimum monthly payment —$25
- Up to 20 years to repay if loan amount is less than $40,000; Up to 25 years to repay for loan amounts $40,000 or more.

## INTEREST CAPITALIZATION:

- For all loans, interest is capitalized once at repayment and then again at the end of any forbearance period. In addition, for Direct-to-Consumer loans in full deferment of both interest and principal, interest is capitalized quarterly prior to repayment.

## DEFERMENT OPTIONS:

- Defer principal and pay interest for up to five years from the date of the first disbursement of the loan while the student remains enrolled at least half-time, plus 30-60 days after graduation or separation from the school.
- Defer both principal and interest for up to five years from the date of the first disbursement of the loan while the student remains enrolled at least half-time, plus 180 days after graduation or separation from the school.

## RATES AND FEES:

See Schedule 3.3 attached to the Guaranty Agreement for interest rate and guaranty fee information.

CONFIDENTIAL NCSLT0424

## Schedule B
## START Education
## CREDITWORTHY GRADUATE LOAN
## PROGRAM DEFINITIONS

**ELIGIBILITY**:

- Graduate/Professional students enrolled at least ½ time in a degree or certificate program at a Participating School.
- The student and co-borrower, if any, must meet the eligibility requirements applicable to each of them, as set forth in Section I.B of these Guidelines.
- Pricing for creditworthy students applying without a co-borrower and for students applying with a creditworthy co-borrower is set forth on Schedule 3.3.
- Acceptable student and co-borrower credit scores for this program are set forth on Schedule 3.3. In all cases, at least one applicant must (a) have a credit score of 645 or better (except as permitted for Direct to Consumer Loans in Tier 5 (see Schedule 3.3) and subject to the "no score" rules below) and (b) meet the Creditworthiness Criteria set forth in Section I.C of these Guidelines.
- For students applying with a creditworthy co-borrower, student credit scores below 645 are acceptable, but only at the pricing levels set forth in Schedule 3.3.
- Students applying with a creditworthy co-borrower are not required to meet any Creditworthiness Criteria in Section I.C of these Guidelines other than credit score (subject to the no-score rules below).
- <u>No-Score Rules</u>
  --If the student has no credit score but the co-borrower meets the Creditworthiness Criteria set forth in Section I.C of these Guidelines, the price for the loan will be tier 1 (see Schedule 3.3).
  --If the co-borrower has no credit score but meets all other Creditworthiness Criteria set forth in Section I.C of these Guidelines, the price of the loan will be based on the student score (see Schedule 3.3).
  -- If the student and co-borrower both have no credit score, the loan application is denied.

**LIMITS**:

<u>Direct to Consumer</u>:
- Minimum loan amount: $1,500 (excluding origination fees)
- Maximum annual loan amount (measured from July 1 to June 30):  <u>the lesser of</u>
  (a) $30,000 (excluding origination fees), up to $5,000 of which may be for personal computer to use for school, or
  (b) Annual Program Education Expense, which is the school's most recently published cost of attendance[1] plus the average annual increase in cost of attendance not accounted for in the most recently published cost of attendance, if any[2], plus $5,000 for personal computer to use for school
- Aggregate START Education Loan maximum:
  --$130,000 (excluding origination fees)

<u>School Channel</u>:
- Minimum loan amount: $1,000 (excluding origination fees)

---

[1] Cost of attendance shall be taken from the most recent school file published by the U.S. Department of Education or, if none, from Thomson Peterson's *College and Universities.*.
[2] The average increase in the cost of attendance shall be taken from the most recently available figures in the College Board Study.

    CONFIDENTIAL NCSLT0425

- Maximum annual loan amount: cost of attendance minus aid certified by the school, but no greater than $45,000.00 per year (excluding origination fees)
- Aggregate START Education Loan Maximum: none.

## REPAYMENT:

- Repayment begins 180 days after graduation or separation from the school.
- Minimum monthly payment—$25.
- Up to 20 years to repay if loan amount is less than $40,000; up to 25 years to repay for loan amounts $40,000 or more.

## INTEREST CAPITALIZATION

- For all loans, interest is capitalized once at repayment and then again at the end of any forbearance period. In addition, for Direct to Consumer loans, interest is also capitalized quarterly prior to repayment.

## DEFERMENT OPTIONS:

- All loans have deferment of principal and interest while the student remains enrolled at least half-time, up to a maximum of 4½ years (including the 180 day grace period) from the date of the first disbursement of the loan.
- Medical students can request a deferment after graduation while completing an internship or residency, as long as the total deferment period does not exceed the program maximum of 8 ½ years of deferment (including the 180 day grace period) from the date of the first disbursement of the loan.

## RATES AND FEES:

See Schedule 3.3 attached to the Guaranty Agreement for interest rate and guaranty fee information.

CONFIDENTIAL NCSLT0426

## Schedule C
# CREDITREADY GRADUATE LOANS
## PROGRAM DEFINITIONS

**ELIGIBILITY:**
- Graduate/Professional students enrolled at least ½ time in a degree or certificate program at a graduate school approved by TERI.
- The borrower must meet the eligibility requirements set forth in Section I.B of these Guidelines.
- In all cases, the applicant must meet the Creditreadiness Criteria in Section I.D of these Guidelines.

**LIMITS:**
- Minimum loan amount: $1,000 (excluding origination fees)
- Annual maximum loan amount: $20,000 (excluding origination fees)
- Aggregate maximum of education debt on own student's own signature (excluding origination fees)
  - —Dental: $225,000
  - —Medical: $225,000
  - —Law: $130,000
  - —Osteopathic: $130,000
  - —All Others: $120,000

**REPAYMENT:**
- Repayment begins 180 days after graduation or separation from the school.
- Minimum monthly payment— $25.
- Up to 20 years to repay.

**INTEREST CAPITALIZATION**
- Interest is capitalized once at repayment and then again at the end of any forbearance period.

**DEFERMENT OPTIONS:**
- All loans have deferment of principal and interest while the student remains enrolled at least half-time, up to a maximum of 4½ years (including the 180 day grace period) from the date of the first disbursement of the loan.
- Medical students can request a deferment after graduation while completing an internship or residency, as long as it does not exceed the program maximum of 8 1/2 years of deferment (including the 180 day grace period) from the date of the first disbursement of the loan.

**RATES AND FEES:**

See Schedule 3.3 attached to the Guaranty Agreement for interest rate and guaranty fee information.

CONFIDENTIAL NCSLT0427

# Schedule D
## START Education
## CONTINUING EDUCATION LOAN PROGRAM DEFINITIONS

## ELIGIBILITY:

- Students enrolled less than ½ time in continuing education programs at Participating Schools.
- The student and co-borrower, if any, must meet the eligibility requirements applicable to each of them, as set forth in Section I.B of these Guidelines.
- Pricing for creditworthy students applying without a co-borrower and for students applying with a creditworthy co-borrower is set forth on Schedule 3.3.
- Acceptable student and co-borrower credit scores for this program are set forth on Schedule 3.3. In all cases, at least one applicant must (a) have a credit score of 645 or better (except as permitted for Direct to Consumer Loans in Tier 5 (see Schedule 3.3) and subject to the "no score" rules below) and (b) meet the Creditworthiness Criteria set forth in Section I.C of these Guidelines.
- For students applying with a creditworthy co-borrower, student credit scores below 645 are acceptable, but only at the pricing levels set forth in Schedule 3.3.
- Students applying with a creditworthy co-borrower are not required to meet any Creditworthiness Criteria in Section I.C of these Guidelines other than credit score (subject to the no-score rules below).
- <u>No-Score Rules</u>
  --If the student has no credit score but the co-borrower meets the Creditworthiness Criteria set forth in Section I.C of these Guidelines, the price for the loan will be tier 1 (see Schedule 3.3).
  --If the co-borrower has no credit score but meets all other Creditworthiness Criteria set forth in Section I.C of these Guidelines, the price of the loan will be based on the student score (see Schedule 3.3).
  -- If the student and co-borrower both have no credit score, the loan application is denied.

## LIMITS:
### Direct to Consumer:
- Minimum loan amount: $1,500 (excluding origination fees)
  Maximum annual loan amount (measured from July 1 to June 30): $30,000 (excluding origination fees), up to $5,000 of which may be for personal computer to use for school
- Aggregate START Education Loan maximum:
  --$130,000 (excluding origination fees)

### School Channel:
- Minimum loan amount: $1,000 (excluding origination fees)
- Maximum annual loan amount: $15,000 (excluding origination fees)
- $30,000 aggregate program maximum (excluding origination fees)
- Aggregate education debt limit: none

CONFIDENTIAL NCSLT0428

## REPAYMENT:

- If the Student is enrolled in a degree or certificate-granting program at the school, the earliest of the dates which is (i) 180 days after the student graduates or earns the certificate, (ii) 180 days after the student ceases to be enrolled at the school, or (iii) 2 years after date of the first loan disbursement.

- If the student is not enrolled in a degree or certificate-granting program at the school, the earlier of the date which is (i) 180 days after the end of the current academic period, or (ii) 180 days after the student ceases to be enrolled at the school.

- $25 minimum monthly payment.

- Up to 20 years to repay for all loan amounts.

## INTEREST CAPITALIZATION:

- For all loans, interest is capitalized once at repayment and then again at the end of any forbearance period. In addition, for Direct to Consumer loans, interest is also capitalized quarterly prior to repayment.

## DEFERMENT:

Full deferment of interest and principal prior to repayment

## RATES AND FEES:

See Schedule 3.3 attached to the Guaranty Agreement for interest rate and guaranty fee information.

CONFIDENTIAL NCSLT0429

# Schedule E
## START Education K-12 LOAN PROGRAM DEFINITIONS

**ELIGIBILITY**:
- Parents of students enrolled full time at elementary or secondary schools that are approved by TERI.
- The borrower and co-borrower, if any, must meet the eligibility requirements applicable to each of them, as set forth in Section I.B of these Guidelines.
- Credit score for each applicant applying as creditworthy is set forth in Schedule 3.3 to the Guaranty Agreement.
- In all cases, at least one applicant must meet the Creditworthiness Criteria set forth in Section I.C of these Guidelines:
    **EITHER**
    --Primary applicant must meet the Creditworthiness Criteria set forth in Section I.C of these Guidelines;
    **OR**
    --Primary applicant must have Good Credit as set forth in Section I.E of these Guidelines and co-applicant must meet the Creditworthiness Criteria set forth in Section I.C of these Guidelines.

**LIMITS**:

- Minimum loan amount: $1,000 (excluding origination fees)
- Maximum annual loan amount: $20,000 (excluding origination fees)
- Aggregate maximum of education debt: $80,000 (excluding origination fees)

**REPAYMENT**:
- Repayment of principal and interest begins 30-60 days after the last disbursement.
- Minimum monthly payment— $25.
- Up to 20 years to repay for all loan amounts.

**INTEREST CAPITALIZATION:**

For loans with multiple disbursements, interest that accrues between the first disbursement date and the final disbursement date is capitalized after the final disbursement and prior to repayment. For all loans, interest is capitalized at the end of any forbearance period.

**DEFERMENT**:

Not applicable.

**RATES AND FEES**:

See Schedule 3.3 attached to the Guaranty Agreement for interest rate and guaranty fee information.

CONFIDENTIAL NCSLT0430

## 3. Servicing Guidelines

CONFIDENTIAL NCSLT0431

> ## SERVICING GUIDELINES FOR TERI
> ## LOAN PROGRAMS SERVICED AT SLSC/GLC

## INTEREST RATE

The interest rate calculation for each TERI program may vary based on the year of the application, the lender, and the program. The interest rates are fixed or variable on either a monthly or a quarterly basis determined by the lender and TERI. See the Program Specific Requirements for lender and loan program detail.

## INTEREST NOTICES/CAPITALIZATION

Interest notices may be sent during the enrollment, deferment, and forbearance period(s). These interest notices may be sent to the primary borrower on a monthly/quarterly basis. Interest will capitalize at the end of the grace period, deferment period, and forbearance period, unless otherwise notated on the program guidelines.

ALP borrowers who selected to pay the interest during the in-school period may switch to deferred principal and interest for an additional guarantee fee. The borrower/co-borrowers must contact the SERVICER and sign an amendment to their promissory note agreeing to have the additional guarantee fee added to their principal balance. The SERVICER will make the adjustment and notify TERI and the lender of the amount. The lender will forward the additional guarantee fee to TERI. (will be implemented after all the legal issues with the amendment to the promissory note are resolved)

## GUARANTEE FEE

The guarantee fee for each TERI program may vary based on the year of the application, the lender and the program. These rates may be tied to the loan program's repayment option(s) and status. The guarantee fee may periodically be adjusted by TERI. In these instances, the lenders and the SERVICER will be notified 90 days prior to the change in the guarantee fee.

## REFUNDS/CANCELLATIONS

Any disbursements returned by the school within 182 days will result in a full cancellation of the disbursement and/or loan including fees and interest. If TERI receives the funds they will return the check amount plus the fees to the lender and send a transmittal to the SERVICER to post the cancellation with an advice transaction on the borrower's account.

A borrower who repays a loan in full (principal and interest) within 182 days after disbursement will receive, based on lender parameters, TERI's policies, and state banking regulations, a 100% refund of the guarantee fee. See Appendix A for Guaranty Fee Rebate Calculations.

If the disbursement is returned after 182 days, the borrower is responsible for any accrued interest and the fees.

CONFIDENTIAL NCSLT0432

## DEFERMENT ELIGIBILITY

The TERI loan programs vary on deferment eligibility. The amount of deferment time differs based on the loan program requirements. See the Program Specific Requirements for lender and loan program detail. Deferments may be applied to a loan anytime prior to the claim being paid as long as a call is placed to TERI for approval to recall the claim.

## IN-SCHOOL/GRACE PERIOD ELIGIBILITY

Students must maintain an enrolled status of at least half-time in a degree program to be eligible for an in-school status on their loan(s). TERI loan programs vary on the in-school period eligibility. The length and status of the grace and in-school period(s) differ based on the loan program requirements.

For loans in an in-school status, the SERVICER will receive updated enrollment information through certification from applications, deferment forms, letters from a school official, the Clearinghouse or the NSLDS/SSCR process, and/or by direct communication from the school.

If a student leaves school and does not immediately transfer to another school (except for summers), then the account must be placed into a principal and interest repayment plan after the grace period expires. When a student transfers to a different school to complete a degree program, TERI will allow the student to continue in an in-school status. Further, TERI will allow the student to continue in an in-school status if the school grants him/her an authorized leave of absence. The school must provide a letter certifying that the leave of absence has been granted to the student. Such leave of absence may not exceed six months in length.

## REPAYMENT TERMS

Repayment terms vary based on the lender and loan program specifics. The term begins at the start of the repayment of principal and interest.

Any change in the interest rate may cause the repayment schedule to be lengthened or shortened. The term may be extended by an additional 2 1/2 years beyond the maximum if necessary to accommodate an increase in the interest rate.

The minimum monthly payment amount is $50.00*.

Maximum repayment terms for loans serviced in Professional Account Services (PAS) is 20 years for loans less than $40,000 and 25 years for loans over $40,000*.

The maximum repayment terms for loans serviced in the Graduate Loan Center (GLC) is 20 years*.

If the borrower requests his or her payment amount be revised, the loan must be less than 30 days delinquent. Additionally, if the borrower requests that the day of the month in which his or her payment is due be changed the payment due date may not be advanced more than one calendar month.

A graduated repayment schedule can occur at the discretion of the lender. This schedule must meet the minimum payment requirements and not exceed the maximum term of the loan.

*The above repayment terms are applicable, unless otherwise notated on the Loan Program Specific Requirements.

CONFIDENTIAL NCSLT0433

## REPAYMENT OPTIONS

TERI loan programs vary on the repayment options. During the in-school and grace period, loan programs allow for one or all of the following repayment options listed below. The selection of immediate or deferred repayment is made by the borrower on the loan application.

1. Immediate repayment of principal and interest – the first payment of principal and interest is due within 45 days of the date of disbursement.
2. Full deferral of principal and interest – while the student is continuously enrolled at least half-time.
3. Deferral of principal, borrower makes interest only payments. (ALP loans only)

For the loan programs that allow for full deferral of principal and interest, the interest accrues from the date the loan is disbursed. The interest is then added to the principal amount (i.e., capitalized) at the end of the grace period, unless otherwise notated in the Program Specific Requirements. See the Program Specific Requirements for lender and loan program detail.

## MODIFIED GRADUATED REPAYMENT SCHEDULE (MGRS)

In an effort to assist borrowers who are experiencing difficulty meeting their monthly payments, TERI has approved the use of MGRS as an alternative to making full monthly payments prior to using forbearance. MGRS can be applied if an account is current or up to 60 days delinquent. If the account is more than 60 days past due, the SERVICER will use the borrower's hardship forbearance time to bring the account current. If the borrower has already used their 12 months of hardship forbearance, TERI has authorized the SERVICER to use up to 60 days of administrative forbearance to apply MGRS. The borrower must complete and return to the SERVICER an amendment to their promissory note to apply for MGRS. Borrowers can only have MGRS one time over the life of the loan.

MGRS 1: (will be replaced by MGRS2. Borrowers currently on MGRS1 will finish this repayment schedule and return to level repayment)
    Six months @ 50% of the regular monthly principal and interest payment amount
    Six months @ 75% of the regular monthly principal and interest payment amount
    Twelve months @ interest only
    Remaining term at full principal and interest

MGRS 2: (will be implemented as soon as programming is completed by the servicer)
    Twelve months @ 50% of the regular monthly principal and interest payment amount
    Twelve months @ interest only
    Remaining term at full principal and interest

CONFIDENTIAL NCSLT0434

**PREPARATION FOR REPAYMENT** (will be implemented as soon as programming is completed by the servicer)
The SERVICER will make a courtesy call to the primary borrower prior to the loan(s) entering repayment for the first time. The SERVICER will introduce the borrower to the Servicing Center, confirm that they have received their repayment schedule, and understand when and where they need to make their first payment. If the borrower has questions or concerns about entering repayment the SERVICER will be able to assist the borrower before the borrower is due for their first payment. This will be used as a default prevention tool. The SERVICER will make one contact or two attempts at reaching the primary borrower between the repayment start date and the borrower's first due date. A contact is defined as a right party contact or a left message. Loans due for immediate repayment may be by-passed. Failure to comply with these preparation for repayment guidelines will be cause for one due diligence violation.

**FORBEARANCE ELIGIBILITY**
If a loan is eligible for hardship forbearance, the primary borrower must complete and sign the forbearance form. The hardship forbearance is normally granted in increments of six months for a maximum of 12 monthly installments during the life of the loan. The forbearance period may be backdated to include periods of delinquency so that any one forbearance period may exceed six months, but may not surpass the maximum eligibility of 12 months. During the forbearance period, the borrower's principal and interest payments are deferred and the interest that accrues during the period will be capitalized at the expiration of the forbearance. The SERVICER is not required to obtain additional documents from the borrower or the signatures of the co-borrowers on the forbearance form. Forbearance may be granted based on the SERVICER's discretion. Forbearances may be applied to a loan anytime prior to the claim being paid as long as a call is placed to TERI for approval to recall the claim.

If a borrower needs additional hardship forbearance time in excess of twelve months, TERI must review and approve the extension of hardship forbearance in writing. The borrower/co-borrower(s) need to include the following documents; detailed list of income vs. expenses, most recent 1040 tax return, most recent copy of W-2 forms. They also must provide a letter explaining their current financial hardship, how that status will change to enable monthly payments at the expiration of the forbearance, and how much additional forbearance time is needed.

Late School Notification Forbearance may be granted in the event the SERVICER is notified late that the borrower has entered repayment. This forbearance period will cover the date the borrower left school until the date the SERVICER was notified. This period of forbearance does not require a written request from the borrower and is NOT counted as part of the 12 month hardship forbearance period allowed during the life of the loan. Any accrued and outstanding interest remaining on the account at the time the forbearance ends will be capitalized.

Administrative forbearance may also be used on immediate repayment loans, when there is a delay in file shipments to the SERVICER. This will prevent the loan from releasing and going into an immediate delinquency.

**LATE CHARGES**
Late Charges are assessed at the lender's discretion and in accordance with the provisions on the promissory note.

CONFIDENTIAL NCSLT0435

## SKIP TRACING

If the SERVICER receives notification or becomes aware that a borrower or co-borrower's address is invalid, skip tracing activities as listed below must begin within 30 days, provided that such notification occurs on or before the 89th day of delinquency and must be completed prior to claim filing. The SERVICER must attempt to locate the borrower or co-borrower through the following skip tracing techniques:

- Calling directory assistance
- One attempt to reach each reference on the application*
- One attempt to reach each borrower and co-borrower on the application
- Contacting the school by phone or written notice*
- Calling the borrower's or co-borrower's place of employment, when known
- Conducting a ssn search through the credit bureau(s)

    * This is required activity for the borrower only
    * Failure to adhere to the above requirements will constitute cause for TERI to cite a violation for each occurrence.

The SERVICER may cease skip tracing efforts if its attempts to locate the borrower or co-borrower through above referenced techniques fail. In the case of an invalid telephone number, the SERVICER must continue to contact the borrower by mail unless the address is also determined to be invalid.

The SERVICER may reperform skip tracing activities which may have been inadvertently omitted during the skip tracing period if such reperformance is completed by the date the claim is filed. Such reperformance of omitted skip tracing activities will thereby preclude the assessment of any penalty to the SERVICER by the guarantor.

## CREDIT BUREAU REPORTING

The SERVICER must report the borrower and all co-borrowers to at least one national credit agency on a monthly basis. Reporting must occur for all loans more than 45 days delinquent. Tolerance for delayed reporting is plus or minus 30 days. The SERVICER must continue to report account delinquency up to claim payment date. After receipt of the claim payment, TERI will report the loan as a default to the credit bureaus. Failure to comply with these credit bureau reporting guidelines will be cause for a rejected claim.

## PRE-CLAIM ASSISTANCE

The SERVICER must submit a request for pre-claim assistance to TERI between the 75th and 90th day of delinquency. The SERVICER must notify TERI to cancel the pre-claim if the account becomes less than 75 days delinquent. The tolerance for error is ten (10) calendar days. Once a request for assistance is filed and the loan is over 90 days delinquent, the loan will be under the direct supervision of TERI and TERI will assume all responsibility for the performance of all telephone due diligence activities. If the loan becomes less than 75 days delinquent, the SERVICER will resume the performance of telephone due diligence activities. The SERVICER can continue telephone due diligence after day 90 for reperformance activities. Failure to comply with these pre-claim assistance guidelines will be cause for a rejected claim.

CONFIDENTIAL NCSLT0436

## DUE DILIGENCE and DEFAULT

For the purpose of these Servicing Guidelines the term "default" means a failure to make monthly principal and/or interest payments on a loan, and only if this failure persists until the loan is 120 days past due, the customer declares bankruptcy, dies, or becomes permanently disabled. For the purpose of Due Diligence, only the most current period of delinquency will be reviewed for Due Diligence violations as enumerated in these Servicing Guidelines.

Before a claim can be filed with TERI, The SERVICER must attempt to collect the loan from the borrower and co-borrower as applicable in accordance with the due diligence guidelines outlined below:

Telephone and Letter Contact Requirements:
Note: Two (2) attempts equal one (1) contact.

On a given day, only one attempt to each individual at a specific telephone number will be counted toward satisfying the due diligence requirement.

### 1-30 Days Past Due
➤ Complete two telephone contacts _or_ four attempts to each borrower and co-borrower(s). (A contact in this bucket is defined as a right party contact or a left message.)

➤ Send a late notice to the borrower and co-borrower(s).

### 31-60 Days Past Due
➤ Complete two telephone contacts _or_ four attempts to each borrower and co-borrower(s). (A contact in this bucket is defined as a right party contact only.)

➤ Send a late notice to the borrower and co-borrower(s).

### 61-90 Days Past Due
➤ Complete two telephone contacts _or_ four attempts to each borrower and co-borrower(s). (A contact in this bucket is defined as a right party contact only.)

➤ Send a late notice to the borrower and co-borrower(s).

### 91-180 Days Past Due
➤ A Final Demand must be sent to the borrower and co-borrower(s) on the 120th day of delinquency, plus or minus 10 days. Until the 120th day, letters addressed and sent to two or more co-borrowers jointly satisfy the letter contact requirements when co-borrower(s) are residing at the same address. However, the Final Demand letter must be forwarded to each borrower or co-borrower separately at his or her address even if two or more borrowers or co-borrowers reside at the same address.

➤ The SERVICER will cease telephone collection activities by the 90th day of delinquency. Any calls made by the SERVICER during this time would be the re-performance of previously missed calls.

\* Failure to adhere to the above requirements will constitute cause for TERI to cite a violation for each occurrence.

CONFIDENTIAL NCSLT0437

In the event of a rolling delinquency, the SERVICER will resume scheduled due diligence activities at the point in which the delinquency rolls in the next bucket. The SERVICER will not be required to make up missed due diligence activities in the bucket the delinquency rolls into if the day delinquent in which servicing resumes is after a scheduled activity.

The SERVICER may perform due diligence activities that may have been inadvertently omitted during the 1-120 day delinquency range if completed no later than the date the claim is filed. TERI will not require collection notices to be sent if the borrower's address is unknown to the SERVICER. Such performance of omitted due diligence activities will thereby preclude the assessment of any penalty to the SERVICER by the guarantor. No collection activity is to be performed in contravention of any applicable federal or state debt collection laws and regulations.

## VIOLATIONS OF DUE DILIGENCE
The SERVICER may be assessed up to two (2) violations before TERI will formally reject the loan for cure procedures to be initiated, except in cases of origination violations. Any origination violations are cause for immediate reject and cannot be cured. If violations occur, the following interest penalties will be assessed:
- If due diligence activities are missed (not performed), interest will be limited to ninety (90) days.
- If due diligence activities are performed late (made up), interest will be limited to one hundred eighty (180) days.
- TERI will deduct the interest penalty of ninety (90) or one hundred eighty (180) days from the payoff calculation provided by the SERVICER.
- TERI will identify loans that have been assessed interest penalties on their payoff roster to the SERVICER.

## DEFAULT CLAIMS
Default claims must be submitted to TERI between the 180th and 210th day of delinquency. TERI allows a five (5) business day tolerance for submission of default claims. Required claim documentation includes:

- Application, Promissory Note and Disclosure Statement (these are the only required documents for REHAB claims)
- Forbearance Form(s) and supporting documentation where required and/or system generated history reflecting the forbearance period
- Credit Bureau Report
- Due Diligence History for the most recent 120 day delinquency period
- Payment History
- Assignment of Rights
- Immigrant Naturalization Services (INS) card (if applicable)
- Bankruptcy, Death, and/or Disability information as appropriate*
- Preparation for Repayment call verification
- School Certification (non TERI originated loans only)
- Income/Employment Documentation (non TERI originated/non law loans only)

*If TERI requires a claim to be filed, some additional documentation may be required to support the claim; e.g., letter from the SERVICER stating it could not obtain a Death Certificate, a Physician's Statement to support a permanent disability claim, etc.

CONFIDENTIAL NCSLT0438

In the event of a rolling delinquency, the SERVICER will submit the history for the most recent 120 days of due diligence. This may not include all due diligence activities for the loan (e.g., activities performed in the early states of delinquency due to the fact the borrower rolled several times during the delinquency period).

TERI will accept microfilm or laser copies of all original documents with the claim package. In the event that the SERVICER is unable to secure the original Promissory Note, TERI will accept a copy of such Note if it is accompanied by a notarized affidavit certifying that the original has been misplaced and that the copy is a true one. Further, the complete copy of the Note must contain the signatures of all obligors of the note. TERI will make their best effort to send claim payments to the SERVICER 90-120 days after the claim has been submitted. Accrued interest is included through the payoff date. If a court of competent jurisdiction refuses to accept the submitted copy of a note in the event that TERI must litigate a case, and TERI loses the case for that reason, TERI will be reimbursed by the LENDER for the amount that TERI paid to the LENDER on the claim. TERI, the LENDER and the SERVICER acknowledge there may be contractual agreements between LENDER and SERVICER governing the entity responsible for reimbursing TERI the amount of the claim if a court of competent jurisdiction refuses to accept such a copy of a Note.

## CLAIM RECALL

If the SERVICER files a claim and the borrower or co-borrower makes a payment which brings his or her loan less than 60 days delinquent, or qualifies for a deferment or forbearance, the claim can be recalled. A loan rejected for non-origination errors can be recalled, and the rejected claim will be removed if the recall is submitted to TERI within 60 days of the claim filing date.

## BANKRUPTCY CLAIMS

If the SERVICER is notified that a borrower or co-borrower has filed for bankruptcy, the SERVICER must forward to TERI copies of all documentation relating to the bankruptcy within ten (10) calendar days, with a tolerance of five business days. The SERVICER must file a claim with TERI within sixty (60) calendar days after it is notified of the bankruptcy action for Chapter 13, Chapter 11, and Chapter 7 bankruptcy with an adversary action noted in the filing.

Chapter 7 Bankruptcy Claim Filing Procedures

In the event that the primary borrower files Chapter 7 bankruptcy and has not been claim submitted for delinquency, the SERVICER must place the account on an Administrative Forbearance to cover all delinquency and the period of the bankruptcy proceeding on the account. All activities on the account with regard to due diligence must cease until such time a determination is made as to the dismissal, discharge or the close of the case(s). If the loan(s) are discharged TERI will contact the SERVICER, and the SERVICER must file the claim with TERI accordingly. If a co-borrower files Chapter 7 bankruptcy, the SERVICER must place a "stay" on the co-borrower's account. All activities on the account with regard to due diligence must cease for the co-borrower until the bankruptcy proceeding is dismissed, discharged, or the close of the case(s). The SERVICER must continue collection activities for the other signatories on the Note up to the time that TERI pays the claim or the account reaches 120 days delinquent, whichever occurs first.

If the SERVICER receives a Bankruptcy filing for Chapter 13, 11, or Chapter 7 with either an adversary action noted in the filing, dismissal, discharge, or close of the case(s), TERI may request a claim recall on the account. Upon receipt of the recall request from TERI, the loan must be brought current by the use of an administrative forbearance and repayment activities must commence.

CONFIDENTIAL NCSLT0439

**Errors and Omissions:** Errors or omissions related to bankruptcy will consist of the following penalties:

1. If the notification is received by TERI on or after the eleventh (11th) business day, but no later than the twentieth (20th) business day, TERI will pay 90% of the total claim amount.
2. If the notification is received by TERI on or after the twenty-first (21st) business day, but no later than the thirtieth (30th) business day, TERI will pay 80% of the total claim amount.
3. If the notification is received by TERI on or after the thirty-first (31st) business day, TERI will reject the entire claim amount.

## DEATH CLAIMS

Upon receipt of acceptable written notification* indicating that the borrower/co-borrower has died, the SERVICER must suspend any/all collection activity against that person. If there is more than one signatory on the note, the SERVICER must continue to invoice the surviving obligees. If the primary borrower has died the SERVICER will deconvert and reconvert the loan under the co-borrowers name.

### *Acceptable Written Notification of Death

- Certified copy of the death certificate
- Letters of testamentary or appointment of the executor/executrix of the estate with raised seal attached.
- Obituary from a local paper

All written notification must be received by TERI within sixty (60) calendar days of receipt by the SERVICER. If the SERVICER receives verbal or written notification that is not considered acceptable, the SERVICER will still provide TERI, within sixty (60) calendar days, with the written notification. In instances where unacceptable information is received, the SERVICER will continue all collection activity as well as pursue all avenues to obtain acceptable written notification.

The SERVICER will file a claim to TERI within sixty (60) days of receipt of the acceptable notification provided the loan(s) are single signatory. In instances where there is more than one signatory, a claim will not be filed to TERI, as the surviving signatory(s) is still obligated to the debt.

Any payments that TERI receives from the deceased's Estate will be forwarded to the SERVICER to be applied to all applicable loan(s), provided the SERVICER has retained servicing of the loan(s).

## DISABILITY CLAIMS

TERI does not offer disability claims. The SERVICER will continue normal servicing functions in accordance with TERI's servicing guidelines.

CONFIDENTIAL NCSLT0440

## APPEAL PERIOD FOR CLAIM REJECTS

The SERVICER will have 60 days to appeal a decision by TERI to reject a claim or cite an interest penalty for either origination error(s) or omissions in the servicing of the loan as specified in these Servicing Guidelines. TERI will not reconsider a decision to deny a claim if the SERVICER fails to appeal the reject within the allotted time. A new 60 Day Appeal Period is started for each subsequent reject if the reject reason differs from the initial reject reason(s); however, if the initial reject reasons(s) has (have) not been addressed, the claim will be rejected without regard to subsequent reject reasons. The SERVICER will not be held liable for the time TERI holds the appeal during the appeal period. The 60 Day Appeal Period begins four (4) calendar days after the date TERI sends the decision to the SERVICER, also known as the "date shipped."

If a missing document is located from an outside entity within the 60 days following the appeal period, the loan will be eligible for reinstatement of guarantee by using the established Cure Procedures.


## CURE PROCEDURES

If a claim has been rejected due to due diligence violations, the guarantee will be reinstated if the SERVICER is successful in collecting payments from the borrower in one of three ways. Either, a lump sum payment to bring the account current, by collecting four (4) consecutive on-time payments, or by completing the first twelve (12) months of MGRS. A payment is considered on time, if the payment is received within ten (10) days of the agreed upon due date. In addition, the payment amount must be within $5.00 of the agreed payment amount.

In the case that a loan is eligible for claim filing but the SERVICER can identify an error that would result in a rejected claim, the SERVICER may begin cure activities and avoid filing the claim with TERI. The SERVICER will provide TERI with notification of the start of cure activities for these loans.

If, on a rejected claim, it is later determined that a processing error that caused an incorrect delinquency was made prior to the claim filing, and if correcting the error reduces the delinquency to less than *60 days*, the loan can be recalled and rejected claim status will be removed.

The SERVICER may capitalize all accrued interest that covers the delinquent payments up to the date of the cure. If a loan is cured and subsequently defaults, TERI will not pay capitalized interest that accrued between the reject date and the date the guarantee was reinstated. A loan may be cured only once.

A loan can be cured for any servicing errors except for an error in the Origination of the loan.

After the loan is cured, the borrower is eligible for any remaining in-school, deferment and/or forbearance time that he or she may qualify to use.

When the SERVICER has completed the Cure process, the loan can be placed back into repayment. If the loan becomes more than 60 days delinquent then the SERVICER will provide TERI with the reinstatement paperwork listed below.

1. Reinstatement form
2. Copy of the new repayment schedule summary showing the disclosure
3. Payment history showing the payments made to Cure the loan

CONFIDENTIAL NCSLT0441

## CONSOLIDATION POLICY

Although TERI does not require lenders to offer borrowers the option to consolidate their loans, TERI strongly encourages it. Consolidation of loans usually results in lower payments, thus making it easier for borrowers to meet their obligations.

If a lender chooses to offer the borrower the opportunity to consolidate his/her loans, the following Servicing Guidelines must be followed.

a. The loans must be of the same type; i.e., one cannot consolidate TERI Alternative loans with Professional Education Plan (PEP) loans.

b. Every person who signed an original note must sign the new Note and Disclosure Statement. If the borrower and co-borrower(s) are not the same on the original notes, all parties must sign the new Note and Disclosure Statement to consolidate all of the underlying loans.

c. A new TERI loan application must be completed and submitted with the request to consolidate outstanding loan. This allows TERI to receive updated information. The borrower must place the following notation in the School Section – "Application to consolidate outstanding Education Loans".

d. A lender may consolidate one or more loans that are 60 or less days delinquent without endangering TERI's guarantee of the loan.

e. The first payment due date for the consolidated loan must be within 45 days of the disbursement date.

f. All accrued interest on the underlying loans will be included in the Consolidation Loan.

g. The underwriting criteria will be that enumerated in the most recent Underwriting and Origination Guidelines. The exception will be that, if all loans being consolidated were underwritten on behalf of the lender by TERI, then the request to consolidate the loans will automatically be granted by TERI as long as the loans are 60 or less days delinquent.

h. All underlying loans will be considered to be paid in full with the loan consolidation proceeds once the funds have been credited to the respective accounts. Therefore, once the underlying loans have been paid in full, there will be no need for the SERVICER to keep any documentation from those loan files unless law requires it.

i. Any over payment received by the SERVICER will be applied to the consolidation loan. If an under payment is received by the SERVICER the borrower will be responsible to pay the remaining principal and interest on the underlying loans.

CONFIDENTIAL NCSLT0442

## ADDITIONAL TERMS

The term of this agreement shall be for an initial term of one (1) year. However, this agreement shall extend for successive one (1) year periods unless any one of the parties makes a request in writing, at least one hundred and eighty (180) days prior to the anniversary date, for additions, changes, or deletions.

Any amendments, changes or revisions to these guidelines must be agreed to by TERI, the LENDER and the SERVICER prior to implementation. Further, unless required by either state or federal regulatory requirements, TERI agrees that the introduction of any amendments, changes or revisions to these guidelines should generally take place in the spring of each year so that they will be in place for the upcoming academic year. In general, the effective dates for the changes will be June 1, 2000. This will be considered the loan program academic year.

TERI agrees to provide LENDER and SERVICER with at least sixty (60) days written notice of proposed "Program Guidelines" changes so as to allow both LENDER and SERVICER time to review them. TERI agrees to meet with LENDER and SERVICER shortly after the expiration of the sixty (60) day review period in order to discuss the suggested "Program Guidelines" changes with them. LENDER and SERVICER comments concerning modifications or changes to the suggested "Program Guidelines" may be accepted by TERI at its sole discretion. LENDER and SERVICER will have sixty (60) days from the date that they receive the "final," revised "Program Guidelines" from TERI to either reject or accept the revision. All notifications to TERI must be in writing and consent will be deemed given unless TERI receives notification within the specified time period as described above.

If either LENDER or SERVICER rejects the revised "Program Guidelines", all parties will adhere to the previously adopted "Program Guidelines." If all parties agree to adopt the new, revised "Program Guidelines," SERVICER shall have at least sixty (60) days to implement new changes. If the SERVICER needs additional time to implement the agreed upon changes, SERVICER shall notify both TERI and LENDER of the need for additional time setting forth the reasons for such request. TERI and LENDER will not unreasonably deny SERVICER'S request for additional time unless the request is due to SERVICER'S negligence in the implementation of the agreed upon changes. Any change that affects only one Lender will be handled as an addendum to these Servicing Guidelines.

Concur: _____          _____
                    TERI                                              Date

Concur: _____          _____
                    PHEAA (SERVICER)                      Date

## APPENDIX A

CONFIDENTIAL NCSLT0443

## GUARANTY FEE REBATE CALCULATIONS

A borrower who prepays a TERI loan in full within 182 days after disbursement will receive, as a matter of TERI policy, a 100 percent refund of the guaranty fee. In addition, Massachusetts law requires that if a loan with a original principal balance equal to or less than $6,000 (exclusive of fees such as guarantee fees, origination fees or application fees), was made in Massachusetts and prepaid in full, then there must be a rebate of all "pre-computed charges," a term which includes the guaranty fee. Refinancing a loan through consolidation with a new loan is not considered prepayment for these purposes.

If the loan has been open for more than 182 days from the date of disbursement, and it was made in Massachusetts with an original principal balance equal to or less than $6,000, use the Actuarial Refund Chart and worksheet to calculate the amount of refund due. The maximum period a loan is eligible for a refund is 120 months.

There will be no rebate where the original NET amount of the loan (the amount of the loan actually received by the student exclusive of guarantee fees, origination fees or application fees) was in excess of $6,000.00.

TERI will not issue a rebate of the guaranty fee for any loan that was made by a lender based outside of the Commonwealth of Massachusetts.

Lastly, if a Promissory Note requires a rebate of the guaranty fee, TERI will honor that requirement upon presentation of the request accompanied by a copy of the promissory note.

Please direct all refund requests to:

The Education Resources Institute
330 Stuart Street, Suite 300
Boston, MA  02116
ATTN.: REBATE DEPARTMENT

CONFIDENTIAL NCSLT0444

## HOW TO CALCULATE THE GUARANTY FEE REFUND

1.  The worksheet is divided into two sections, one for general information and the other to calculate the refund. It is designed to accommodate up to four loans for a single borrower. The refund for each loan must be calculated individually since the different disbursement dates alter the parameters used to determine the amount of refund due. The total amount refunded is the sum of the amounts refunded for each loan.

    Please consider the following information when referring to the specified items on the worksheet:

    You should refer to the promissory note or initial disclosure statement to determine the correct guaranty fee percentage. If these do not list the guaranty fee percent, simply divide the amount of the guaranty fee paid to TERI by the total amount financed. This figure will yield the fee percentage.

    The number of months refers to the elapsed time from the date of disbursement through the date the account was paid in full. Any partial month should be considered a whole month. Example, a loan disbursed on February 3, 1987 and paid in full on June 17, 1987 is outstanding for five months.

2.  The Actuarial Refund Table accommodates an original term up to 120 months. If the original repayment term is greater than 120 months, calculate the refund due based on a 120-month term.

3.  To determine the Annual Percentage Rate (APR) at the inception of the loan refer to the appropriate promissory note or disclosure statement. The APR is used as the interest rate when referring to the Actuarial Refund Table. Round to the nearest 1/4 of 1 percent.

4.  Based on the APR, the number of months remaining in repayment and the original term of the loan (or 120 months, whichever is less) use the Actuarial Refund Table to determine the correct factor. These items are starred on the worksheet.

    The word "original term" includes periods of "in-school" deferment and it shall not be interpreted to include only the principal and interest repayment period; e.g., the "original term" begins on the date of disbursement.

5.  To determine the amount to be refunded, multiply the factor just determined by the guaranty fee amount calculation.

CONFIDENTIAL NCSLT0445