1   M. Erik Clark, #188693
    BOROWITZ & CLARK, LLP
2   100 N. Barranca Street, Suite 250
    West Covina, CA 91791
3   Tel: (626) 332-8600
    Fax: (626) 332-8644
4
    Austin C. Smith
5   SMITH LAW GROUP LLP
    3 Mitchell Place
6   New York, NY 10017
    917-992-2121
7   austin@acsmithlawgroup.com

8   Attorneys for Debtor

                UNITED STATES BANKRUPTCY COURT
9                CENTRAL DISTRICT CALIFORNIA

10

11
    In re:                          )   Case No. 13-30625-MH
12                                   )   Chapter 7
                                     )
13  JOHN M. MATA                     )
14        Debtor                     )
                                     )
15  _____        )
                                     )
16  JOHN MATA                        )
17  Plaintiff                        )
                                     )
18  v.                               )
19                                   )   Adv. Pro. No. 18-01089-MH
                                     )
20  NATIONAL COLLEGIATE              )
    STUDENT LOAN TRUST 2006-1,       )   **PLAINTFF'S OPPOSITION TO
21  NATIONAL COLLEGIATE              )   DEFENDANTS' MOTION FOR
    STUDENT LOAN TRUST 2006-4,       )   SUMMARY JUDGMENT
22  NATIONAL COLLEGIATE              )   *REDACTED VERSION***
23  STUDENT LOAN TRUST 2007-4,       )
                                     )
24  Defendant.                       )
25                                   )

26

27

28

                        **Page i**

M. Erik Clark, #188693
BOROWITZ & CLARK, LLP
100 N. Barranca Street, Suite 250
West Covina, CA 91791
Tel: (626) 332-8600
Fax: (626) 332-8644

Austin C. Smith
SMITH LAW GROUP LLP
3 Mitchell Place
New York, NY 10017
917-992-2121
austin@acsmithlawgroup.com

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT CALIFORNIA

|  |  |
|---|---|
| In re: | Case No. 13-30625-MH |
|  | Chapter 7 |
| JOHN M. MATA | |
|     Debtor | |
| | |
| JOHN MATA | |
| Plaintiff | |
| | |
| v. | |
| | Adv. Pro. No. 18-01089-MH |
| NATIONAL COLLEGIATE | |
| STUDENT LOAN TRUST 2006-1, | **PLAINTFF'S OPPOSITION TO** |
| NATIONAL COLLEGIATE | **DEFENDANTS' MOTION FOR** |
| STUDENT LOAN TRUST 2006-4, | **SUMMARY JUDGMENT** |
| NATIONAL COLLEGIATE | ***REDACTED VERSION*** |
| STUDENT LOAN TRUST 2007-4, | |
| | |
| Defendant. | |

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT.................................................................1

II. BACKGROUND OF SECTION 523(a)(8) OF TITLE 11.......................…..2

III. CASE LAW INTERPRETING SECTION 523(A)(8)(A)(I).....................12

IV. ARGUMENT AND AUTHORITIES.................................…...13

    A. Summary of Argument...........................................................13
    B. Defendants Have Failed To Offer Any Evidence Or Even Argue That The
       Loans Are "Educational Loans"......................................15
    C. Plaintiff's Loans Were Not Funded By A Nonprofit Institution...............18
    D. Plaintiff's Loans Were Made Outside The Confines Of The Identified Loan
       Program..............................................................24
    E. The Charter One Bank/TERI Guarantee Was Voided And Refunded In
       TERI's Own Bankruptcy.........................................…...26
    F. Defendants Are Not Now Permitted To Advance New Facts In Their Reply..
V. CONCLUSION........................................................27

# TABLE OF AUTHORITIES

*Bates v. United States,*
522 U.S. 23 (1997)...............................................................17-18

*Beth Rochel Seminary v. Bennett,*
 624 F.Supp. 911 (D.D.C. 1985) ......................................................8

*Crowley v. TVSM, Inc.,*
1991 WL 267868 (S.D.N.Y. 1991) ................................................26

*Inter-American University of Puerto Rico, Inc. v. Concepcion,*
716 F.2d 933 (1st Cir. 1983) ..........................................................5

*In re Adamo,*
619 F.2d 216 (2nd Cir. 1980) ........................................................7

*In re Brunner,*
46 B.R. 752 (S.D.N.Y 1985) ..........................................................4

*In re Clouser,*
2016 WL 5864493 (Bkrtcy.D.Or. 2016) ...................................2, 22

*In re Campbell,*
547 B.R. 49 (Bkrtcy.E.D.N.Y. 2016) ..............................................2

*In re Christoff,*
527 B.R. 624 (9th Cir. BAP 2015) .................................................3

*In re Huang,*
275 F.3d 1173 (9th Cir. 2002) .....................................................21

*In re Kashikar,*
567 B.R. 160 (9th Cir. BAP 2017). ............................................3, 12

*In re McDaniel,*
590 B.R. 537 (Bkrtcy. D. Colo. 2018). ..........................................2

*In re Merchant,*

958 F.2d 738 (6th Cir. 1992) ............................................................14

*In re McClure,*
210 B.R. 985 (Bkrtcy. N.D. Tex. 1997) ...........................................4

*In re Roth,*
490 B.R. 908 (9th Cir. BAP 2013) .................................................1

*In re Southard,*
2 B.R. 124 (Bkrtcy.Va. 1979). ......................................................5

*In re Taratuska,*
374 B.R. 24 (Bkrtcy.D.Mass. 2007) ............................................18

*In re The First Marblehead Corp. Securities Litigation,*
639 F.Supp.2d 145 (D.Mass. 2009) ............................................15

*In re Wiley,*
579 B.R. 1 (Bkrtcy.D.Me. 2017) .................................................20

*In re Yee,*
7 B.R. 747 (Bkrtcy. N.Y. 1980) ....................................................6

*Matter of Williamson,*
665 F.2d 683 (5th Cir. 1982) ........................................................8

*Mays v. Shinseki,*
25 Vet. App. 256 (2012) .............................................................10

*Matter of Scher,*
12 B.R. 258 (Bkrtcy. N.Y. 1981) ..................................................4

*Matter of Halpern,*
50 B.R. 260, 262 (Bankr. N.D. Ga. 1985), *aff'd sub nom. In re Halpern,* 810 F.2d 1061
(11th Cir. 1987). .........................................................................21

*Matter of Roberson,*
999 F.2d 1132 (7th Cir 1993) .....................................................14

*McClure v. U.S.,*

95 F.2d 744 (9th Cir. 1938) ............................................................................4

*National Collegiate Student Loan Trust 2007-4 v Watson,*
2016 WL 9384235 (N.Y.City Civ.Ct. Jan. 07, 2016) ...............................................19

*New Neighborhoods, Inc. v. West Virginia Workers' Compensation Fund,* 886 F.2d 714
(4th Cir. 1989) .....................................................................................18

*Perlman v. Permonite Mfg. Co.,*
568 F.Supp. 222 (D.C. Ind. 1983) ......................................................................16

*Saviano v. C.I.R.,*
765 F.2d 643 (7th Cir. 1985) ..........................................................................21

*TI Fed. Credit Union v. DelBonis,*
72 F.3d 921, (1st Cir. 1995) ..........................................................................21

*U.S. Dept. of Health and Human Services v. Smith,*
807 F.2d 122 (8th Cir. 1986) ........................................................................10

*Provenz v. Miller,*
102 F.3d 1478 (9th Cir 1996) ........................................................................27

*Santa Fe Medical Services, Inc. v. Segal (In re Segal),*
57 F.3d 342 (3d Cir. 1995) ............................................................................10

*U.S. ex rel. Giles v. Sardie,*
191 F.Supp.2d 1117 (C.D.Cal. 2000). ...................................................................2

# I.   PRELIMINARY STATEMENT

Plaintiff files this opposition to Defendants' motion for summary judgment (the "Motion").   In the Motion, Defendants argue they should be granted summary judgment because there are no material facts in dispute that Plaintiff's direct-to-consumer loans ("DTC Loans" or "Loans") were excepted from discharge by section 523(a)(8)(A)(i) as "educational . . .loan[s] . . .made under any program funded in whole or in part by a . . . nonprofit institution."[1]   Defendants bear the ultimate burden at trial.[2]   Accordingly, in order to meet its burden on this Motion, Defendants must prove that there are no genuine issues of material fact regarding whether the Loans are: (i) educational loans; (2) made under a program; (3) funded in whole or part; (4) by a nonprofit institution.   Defendants' motion must fail, because there remain numerous genuine issues of disputed fact, including:

---

[1] As described in the Motion, the First Loan originated on or about January 6, 2006 in the amount of $30,000 with an interest rate of 9.938%; the Second Loan originated on or about September 29, 2006 in the amount of $30,000 with an interest rate of 12.149%; and the Third Loan originated on or about August 21, 2007 in the amount of $30,000 with an interest rate of 14.03%.

[2] *In re Roth*, 490 B.R. 908, 916 (9th Cir. BAP 2013) ("Under § 523(a)(8), the lender has the initial burden to establish the existence of the debt and that the debt is an educational loan within the statute's parameters.").

[3] *See also In re Clouser*, 2016 WL 5864493, at *2 (Bkrtcy.D.Or., 2016) ("[T]he terms 'student loan' and 'education loan' are not coextensive with *nondischargeable loans* covered by § 523(a)(8)."); *In re Campbell*, 547 B.R. 49, 61 (Bkrtcy.E.D.N.Y., 2016) ("§ 523(a)(8) . . . does not except from discharge all student loans . . .[s]imply calling the Bar Loan a student loan is not a declaration that the Bar Loan comes within the ambit of these provisions, and says nothing about the dischargeability of the Bar Loan."); *In re Roth*, 490 B.R. 908, 916 (9th Cir. BAP 2013) ("Under § 523(a)(8), the lender has the initial burden to establish the existence of the debt and that the debt is an educational loan within the statute's parameters.").

1. Whether the DTC Loans are "educational loans";

2. Whether the DTC Loans were in fact guaranteed by TERI;

3. Whether the DTC Loans were in fact made under with the identified "program" for the purposes of section 523(a)(8)(A)(i);

4. Whether TERI's own bankruptcy and rejection of its guaranty agreements voided any program funding;

5. Whether TERI is an "institution" as that term is used in the Code.

## II.    BACKGROUND OF SECTION 523(a)(8) OF TITLE 11

"'Educational' loans, or 'student' loans, are not nondischargeable simply because they are labeled as such; they must meet one or more of the criteria set forth in Section 523(a)(8)." *In re McDaniel*, 590 B.R. 537, 545 (Bkrtcy. D. Colo. 2018).[3] Despite this basic truth, private lenders have persuaded a number of courts to interpret section 523(a)(8) broadly enough to capture any debt made to any student since at least 1984. Courts have done this in two chief ways. First, some courts have found that any loan made to any student that provides any educational advantages is non-dischargeable as an "educational benefit" under section 523(a)(8)(A)(ii) ("Romante II"). Second, some courts have found that any loan that was directly or indirectly touched by a nonprofit

---

[3] *See also In re Clouser*, 2016 WL 5864493, at *2 (Bkrtcy.D.Or., 2016) ("[T]he terms 'student loan' and 'education loan' are not coextensive with *nondischargeable loans* covered by § 523(a)(8)."); *In re Campbell*, 547 B.R. 49, 61 (Bkrtcy.E.D.N.Y., 2016) ("§ 523(a)(8) . . . does not except from discharge all student loans . . .[s]imply calling the Bar Loan a student loan is not a declaration that the Bar Loan comes within the ambit of these provisions, and says nothing about the dischargeability of the Bar Loan in bankruptcy.").

corporation is non-dischargeable as one "funded in whole or part by a nonprofit institution" under section 523(a)(8)(A)(i) ("Romanette I"). Both of these approaches are wrong because section 523(a)(8)(A) only applies to subsidized, low-interest loans made pursuant to the Higher Education Act. Private lenders have no protection from discharge in section 523(a)(8)**(A)** and must seek protection only in subsection 523(a)(8)**(B).**

And indeed, since 2016, a majority of courts have recognized this. Specifically, these courts have disavowed the broad interpretation of "educational benefit," including two opinions from the Ninth Circuit BAP.[4] These courts recognized that a broad interpretation of "educational benefit" rendered the remainder of the statute superfluous, violated the canon of *nosictur a soccis*, and otherwise makes no sense. This case presents another opportunity to restore precision to section 523(a)(8)(A). Just as courts have rethought the meaning of the term "educational benefit" in Romanette II, this case presents a similar opportunity for the Court to rethink the meaning of the term "educational loan" and "nonprofit institution" in Romanette I and restore precision and clarity to section 523(a)(8)(A)(i).

In order to understand the structure and intent of Congress in codifying section 523(a)(8), it is useful to trace the evolution of the Higher Education Act of 1965, and section 523(a)(8). The non-dischargeability of certain student loans was originally

---

[4] *In re Christoff*, 527 B.R. 624, 634 (9th Cir. BAP 2015) ("[W]e agree with Debtor's counsel's statement at oral argument that § 523(a)(8)(A)(ii) is not a 'catch-all' provision designed to include every type of credit transaction that bestows an educational benefit on a debtor."); *In re Kashikar*, 567 B.R. 160, 162 (9th Cir. BAP 2017).

enacted as a *quid pro quo* between students and the federal government. The *quid* was

the Higher Education Act, which provided students without credit profiles or cosignors

access to low-interest educational loans from colleges, universities and the government.[5]

In exchange for this largess, Congress extracted the *quo* in section 523(a)(8) of the Code.

Specifically, Congress determined that these federally subsidized educational loans made

pursuant to the Higher Education Act should not be dischargeable in bankruptcy.[6] And

indeed if one reads section 523(a)(8) in concert with the history of the Higher Education

Act, all the terms that have given courts trouble over the last 40 years (*e.g.,* "educational

benefit," "nonprofit institution," "program funded in whole or in part," etc.) suddenly

make perfect sense.

　　The federal government first began lending money to students in the 1960s and

1970s through two major programs: (1) National Defense Student Loans ("NDSL")[7]; and

---

　　[5] *In re Brunner,* 46 B.R. 752, 756 (S.D.N.Y 1985) ("Because of this enlightened social policy . . .[t]hose who might obtain loans only at exhorbitant rates are similarly able to obtain low cost, deferred loans. In return for this largesse—and it is undeniable that guaranteed student loans have extended higher education to thousands who would otherwise have been forced to forego college or vocational training—the government exacts a *quid pro quo.*")

　　[6] *In re McClure,* 210 B.R. 985, 988 (Bkrtcy. N.D. Tex. 1997) ("Although Congress expanded the reach of the contested statute in order to provide uniformity of treatment and eliminated the higher education requirement, *there is no indication that Congress intended any of the amendments to apply to for-profit businesses in no way connected to the government guaranteed student loan program.*") (emphasis added).

　　[7] *See, e.g., Matter of Scher,* 12 B.R. 258, 260 (Bkrtcy. N.Y. 1981) ("Debtor's loans were incurred under the two major loan programs available for students engaged in higher education, the National Direct Student Loan Program (NDSL), and the Guaranteed Student Loan Program (GSL).").

(2) Guaranteed Student Loans ("GSL").[8]   Like most federal programs, the regulatory

scheme behind these loans was of immense complexity and the programs were structured

very differently.   The GSL were originated by private banks, but insured and guaranteed

by the federal government. The NDSL, on the other hand, were made by the schools

themselves, drawing upon a revolving fund of money that was in part supplied by the

federal government.[9]   In order to ensure this money was available for future generations,

Congress enacted section 523(a)(8) of the Code in 1978 in order to protect the two

entitles involved in student lending: the government, and the schools.   The original

version of the statute as added by the Bankruptcy Reform Act read as follows:

> (a) a discharge . . . does not discharge an individual debtor from any debt--
> (3) to a governmental unit, or a nonprofit institution of higher education, for an
> educational loan.[10]

As written, the language was intended to capture both the GSL and NDSL: GSL loans

were owed "to a governmental unit" and NDSL loans were owed to a "nonprofit

institution of higher education." However, it soon became clear that the statute as written

---

[8] The GSL ultimately became the FFEL. In 2010, the Obama Administration ended the FFEL and began originating all new loans directly from the Department of Education. For the purposes of this motion, Plaintiff has summarized the important components of the Higher Education Act of 1965 and 11 U.S.C. 523(a)(8). *See generally*, Matthew Fuller, *A History of Financial Aid to Students*, 44 Journal of Student Financial Aid 4 (2014).

[9] *Inter-American University of Puerto Rico, Inc. v. Concepcion*, 716 F.2d 933, 934 (1st Cir. 1983) ("The National Direct Student Loan program (NDSL) is one of the student loan programs established under the Higher Education Act of 1965, 20 U.S.C. § 1071 *et seq*. Under the NDSL program, both the Department of Education and an eligible lending institution such as IAU make capital contributions to a loan fund.").

[10] 11 U.S.C. 523(a)(8) (Pub L. 95-598).   *See also In re Southard*, 2 B.R. 124, 126 (Bkrtcy.Va., 1979).

was insufficient protection for the federally subsidized loans for two reasons. First, as stated above, the federal government did not originate debt under the GSL program, but instead guaranteed debt that was originated by private lenders. Thus, unless the debtor had defaulted on the debt before their bankruptcy and the government had purchased the debt, the federal government did not own or hold the loan, and the student could conceivably obtain discharge because the debt was not owed to a "governmental unit." Second, the government did not guarantee money made under the NDSL program, but instead provided matching funds to the schools themselves to originate the money.[11] Some of these institutions were for-profit schools, and thus even where the government provided matching funds to an eligible for-profit school, the student could obtain discharge of an NDSL to a for-profit school under a literal reading of the 1978 version of the statute.    All of this is discussed in the Congressional record from 1979 when discussing why Congress needed to amend the language in section 523(a)(8):

> 11 U.S.C. 523(a)(8) applied only to debts for educational loans owing to a governmental unit or to a nonprofit institution of higher education, it has a very uneven effect upon the student loan programs administered by the Department of Health, Education, and Welfare. *For example, national direct student loan (NDSL) funds are administered by both nonprofit and profitmaking institutions of higher education. Under the new law, a student who obtained an NDSL loan*

---

[11] *In re Yee*, 7 B.R. 747, 751 (Bkrtcy. N.Y., 1980) ("Two major loan programs, the "National Direct Student Loan Program" ('NDSL') and the "Guaranteed Student Loan Program" ('GSL'), currently make funds available for higher education. The former . . enables a student to borrow directly from an institution's loan fund, which is supported by federal and institutional contributions. See 20 U.S.C. s 1087aa-1087gg (1976). Under the GSL program, the student borrows money from a qualifying lender, and the guarantee agency, either the Federal government, a state agency or a private nonprofit organization, endorses the loan.").

*from a profit-making institution of higher education would be free to have that loan discharged in bankruptcy. In contrast, a student who obtained an NDSL loan from a nonprofit institution of higher education would be subject to the prohibitions contained in the new law . . .* The application of new 11 U.S.C. 523(a)(8) to loans made under the guaranteed student loan (GSL) and health education assistance loan (HEAL) programs would produce even more anomalous results. *If the borrower of a GSL or HEAL loan filed a bankruptcy petition and the lender then holding the loan was a bank, savings and loan association, credit union, insurance company, pension fund, the student loan marketing association or, in the case of the GSL loan a profit-making institution of higher education, the loan would be fully dischargeable.* S. REP. 96-230, 2, 1979 U.S.C.C.A.N. 936, 937

Congress specifically stated that this amendment was being designed to ensure the government was protected whatever form its lending took.[12] The second clause, which provided protection for loans made outside the federal lending programs by "nonprofit institutions of higher education," would be unaffected:

The bill would not alter the protection from discharge which the present version of 11 U.S.C. 523(a)(8) affords to educational loans made outside the auspices of federal programs by nonprofit institutions of higher education, states and local governments. S. REP. 96-230, 2, 1979 U.S.C.C.A.N. 936, 937

Thereafter, the language of section 523(a)(8) was amended again in 1979 to ensure all of the government's lending programs were protected:

(a) a discharge . . . does not discharge an individual debtor from any debt--
(8) for an educational loan made, insured, or guaranteed by a governmental unit, or

---

[12] *In re Adamo*, 619 F.2d 216, 221 (2nd Cir. 1980) ("Although such an interpretation by a subsequent Congress is not necessarily controlling, it may be useful in determining the intention of an earlier Congress.")

made under any program funded in whole or in part by a governmental unit or a nonprofit institution of higher education.[13]

Thus although this sentence looks convoluted, it is actually a perfect reflection of the federal student-lending program as it existed in 1979: the first clause protected the GSL, and the second clause protected the NDSL. At no point was Congress intending to provide discharge protection to private banks.

A small change was then made in 1984. During the early 1980s, some courts began wrestling with whether a seminary or a trade school technically provided "higher education."[14] Since "higher education" was generally understood to consist of education in the liberal arts, schools that participated in the Title IV program but provided non-liberal arts education were seemingly being excluded. In response, Congress thereafter removed the term "of higher education" from section 523(a)(8). But the legislative history demonstrates two critical things:

> [D]eleting 'of higher education' enlarges the scope of the nondischargeability exception and is therefore substantive to that extent. It is a modest enlargement, however, in that the claimant must be a nonprofit institution and the loan must be one for an educational loan. The change eliminates litigation over the question whether a seminary, for example, is an institution of higher education. The amendment is thus to some extent at least clarifying.[15]

---

[13] See 11 U.S.C. 523(a)(8) (Pub. L. 96-56). See also Matter of Williamson, 665 F.2d 683, 684 (5th Cir.. 1982)

[14] Beth Rochel Seminary v. Bennett, 624 F.Supp. 911, 913 (D.D.C. 1985).

[15] See Bankruptcy Improvement Act: Hearing on P.L. 98-353 Before the S. Comm. on Judiciary, at 328 (April 6, 1983) (Comments on Subtitle I of S. 445) (Attached as **Exhibit 1**).

Note that this change could not have altered the meaning of the word "institution," which was codified to mean "school" and must have continued to mean "school" even after the modifier "higher education" was eliminated.[16]    Importantly, the Congressional record also notes that the "claimant" in a non-dischargeability proceeding would still need to be the nonprofit institution itself in order to render the debt non-dischargeable (unless the debt was also guaranteed by a governmental unit).    Furthermore, the removal of "of higher education" was made to avoid confusion and litigation over whether a seminary or a technical school provided "higher education." This reasoning is crucially important to the instant action, as will become plain later on.    Thereafter, the section read as follows:

> (a) a discharge . . . does not discharge an individual debtor from any debt--
> (8) for an educational loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or part by a governmental unit or a nonprofit institution.[17]

The next problem the courts and Congress had to wrestle with were conditional educational grants funded by the government. For instance, the federal government furthers higher education through service scholarships and grants, such as the

---

[16] *McClure v. U.S.*, 95 F.2d 744, 750 (9th Cir. 1938) ("Where an amendment leaves certain portions of the original act unchanged, such portions are continued in force with the same meaning and effect they had before amendment.").

[17] *See* 11 U.S.C. 523(a)(8) (Supp. 1984).

Montgomery GI Bill and the National Health Service Corps Scholarship.[18]  These grants only require repayment if the student defaults on some contractual obligation to the government, such as by failing to join the army after college, or failing to perform some other form of public service.  Prior to the 1990 amendments, students who took federal money in the form of these conditional educational scholarships and defaulted on a condition of the obligation could obtain a discharge under a literal reading of the statute, which only restricted discharge of student loans, not defaulted contractual obligations.[19] For this reason, Section 523(a)(8) was amended in 1990 to except from discharge an "obligation to repay funds received as an educational benefit, scholarship, or stipend."[20] After the 1990 amendment, the statute stated:

> (a) a discharge . . . does not discharge an individual debtor from any debt--
> (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend.[21]

---

[18] *See Mays v. Shinseki*, 25 Vet. App. 256, 261 (2012) (describing statutory scheme for military educational benefits).

[19] *See U.S. Dep't of Health & Human Servs. v. Smith (In re Smith)*, Adv. Pro. No. 84-05113, 1985 WL 660512, at *1 (Bankr. D.N.D. June 26, 1985) *subsequently rev'd sub nom. U.S. Dep't of Health & Human Servs. v. Smith*, 807 F.2d 122 (8th Cir. 1986).

[20] *See* Federal Debt Collection Procedures of 1990: Hearing on P.L. 101-647 Before the H. Subcomm. on Econ. and Commercial Law, H. Judiciary Committee 101st Cong. 74-75 (June 14, 1990) (Mr. Brooks' Questions for the Record from Mr. Wortham).

[21] *See* 11 U.S.C. 523(a)(8)(1990); *Santa Fe Medical Services, Inc. v. Segal (In re Segal)*, 57 F.3d 342, 347 (3d Cir. 1995) ("Subsection 523(a)(8) was yet again expanded by the Crime Control Act of 1990 . . . [m]ost relevant to this case, however, was the addition of language which prohibited the discharge of 'an obligation to repay funds received as an educational benefit, scholarship, or stipend.'").

This language protected the government from a discharge regardless of whether its financial assistance took the form of student loans or conditional scholarships, benefits or stipends.

In 2005, the statute was amended again to extend protection to commercial lenders, *but only to the extent their loan products mirrored and supplemented federal lending*. Specifically, Congress awarded bankruptcy protection to private education loans that were made *solely* for qualified higher education expenses. Qualified higher education expenses are defined in federal law as debts incurred by eligible students *solely* to cover the "Cost of Attendance" at a Title IV accredited institution.[22] The "Cost of Attendance" is determined and published by the school, and includes tuition, room, board, and books. After 2005, the language of section 523(a)(8) stated:

> (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—
>
> > (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
> > (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
> > (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual.[23]

---

[22] Where part of a debt is used to cover qualified education expenses and part is not, the debt is a mixed-use loan, and therefore, not a qualified education loan. *See* IRS, 26 C.F.R. 1, REG-116826-97.

[23] *See* 11 U.S.C § 523(a)(8) (2015).

As it stands today, Section 523(a)(8) of the Bankruptcy Code excepts from discharge only three types of educational debts: (1) governmental educational loans, or educational loans originated and held by the colleges and universities themselves; (2) defaulted conditional educational grants (*e.g.,* benefits, scholarships, and stipends); and (3) private student loans made for qualified higher education expenses. If one takes the time to understand the structure of the federal student lending programs, it soon becomes apparent that Congress drafted section 523(a)(8)(A) perfectly to mimic the federal student lending programs, and any attempt to except high-interest non-qualified private credit loans from discharge should be rejected.

### III.    CASE LAW INTERPRETING SECTION 523(A)(8)(A)(I)

Defendants' case law presents a superficial obstacle to Plaintiff's analysis. Plaintiff here reminds the Court that until 2014, nearly every bankruptcy court who examined section 523(a)(8)(A)(ii) found that any loan made for any education purpose was non-dischargeable as a matter of law.  In fact, this Court was among the many courts who made this erroneous holding in 2016, only to be summarily reversed by the Ninth Circuit BAP.[24]  It was not until courts took the time to examine the statute that they learned section 523(a)(8)(A) was far narrower than appeared at first glance.  Because space does not permit an in-depth review and analysis of all the case law, Plaintiff will

---

[24] *See In re Kashikar*, 567 B.R. 160, 162 (9th Cir. BAP 2017) (reversing CDCA bankruptcy court that held debtor's student loan was non-dischargeable as an "educational benefit" under section 523(a)(8)(A)(ii)).

address at oral argument how and where these opinions ignored basic cannons of statutory construction, and the requirement to construe exceptions to discharge narrowly. These courts all seemed to start with the flawed assumption that all "debts-made-to-students" were "educational loans" deserving of protection under section 523(a)(8) and then devising ways to reach that result. Plaintiff respectfully asks this Court to examine the characteristics of the DTC Loans in this action and note how dissimilar they are to traditional educational loans made under the Higher Education Act of 1965. They are really little more than payday loans dressed up as educational loans.

## IV.    ARGUMENT AND AUTHORITIES

### A. Summary of Argument

Defendants argue that there are no genuine issues of material fact that the Loans were guaranteed by TERI, which was a 501(c)(3). Defendant further argues that where TERI guarantees a loan, it constructively funds a program under section 523(a)(8)(A)(ii). Defendants' motion must fail for four major reasons. First, Defendant has failed to offer any evidence, or even argue, that the DTC Loans are "educational loans." On these grounds alone the Motion must fail. Second, as a matter of statutory interpretation, the DTC Loans do not fit within section 523(a)(8)(A)(i) because TERI is not a "nonprofit institution" as that term is used in the Code. Third, defendants have offered no evidence that TERI actually guaranteed the Loans; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████ Fourth,

TERI's bankruptcy voided all associated guarantees, and TERI even refunded the guarantee fees, which undid any conceivable "program funding."

### B. Defendants Have Failed To Offer Any Evidence Or Even Argue That The Loans Are "Educational Loans."

Despite citing case law that states the first question to be answered in a section 523(a)(8) action is whether the loans are "educational loans,"[25] Defendants conveniently skip this step and make no argument and offer no evidence that the Loans are "educational loans." This may seem like a metaphysical dispute — but it is not. "Educational loan" under the Code is not synonymous with "loan made to a student." In fact, Congress was explicit in describing what it meant by "educational loan":

> Educational loans are different from most loans. They are made without business considerations, without security, without cosigners, and relying for repayment solely on the debtor's future increased income resulting from the education."
> H.R.Rep. No. 595, 95th Cong., 2d Sess. 133, reprinted in 1978 U.S. Code Cong. & Ad. News 5963, 6094.[26]

Congress codified section 523(a)(8) strictly to protect these types of subsidized, low-interest loans made to students. There are all sorts of other debts made to students:

---

[25] *See* Motion at 10 ("A threshold issue is whether the loans qualify as educational loans in the first place.")(citing In re *Belforte,* 2012 WL 4620987, at *4-5 (Bankr. D. Mass. Oct. 1, 2012))

[26] *See also Matter of Roberson*, 999 F.2d 1132, 1136 (7th Cir 1993); *U.S. Dept. of Health and Human Services v. Smith*, 807 F.2d 122, 126 (8th Cir. 1986). *See also In re Merchant*, 958 F.2d 738, 740 (6th Cir. 1992)("This was due to the fact that unlike commercial transactions where credit is extended based on the debtor's collateral, income, and credit rating, student loans are generally unsecured and based solely upon the belief that the student-debtor will have sufficient income to service the debt following graduation.")

personal loans from banks, personal loans from family, credit cards, mortgages, auto loans, payday loans, layaway agreements for dorm-room furniture, etc. None of these are "educational loans" under the Bankruptcy Code. And neither are the Loans in this action. The Loans in this action are titled "Consumer Credit Transactions," have 9-14% interest rates, had 10.5% origination fees, required a cosignor, and were only made after a credit check.[27] Consider that for a moment. The Third Loan was originated for $30,000. Yet, Plaintiff paid an origination fee of *$3,519.54* and a *14.003%* interest rate.[28] Plaintiff was contracted to pay *more than $90,000 in interest* over the life of a $30,000 loan. This is clearly not what Congress was talking about when it described how "educational loans" differ from consumer credit. And perhaps more tellingly, these Loans were made directly to the Plaintiff, and outside the confines of the financial aid office.[29] In that way, the Loans are far more similar to a student credit card than a traditional federal student loan made directly to a school to cover tuition and books.

## C. Plaintiff's Loans Were Not Funded By A Nonprofit Institution

---

[27] *See* Defendants' **Exhibits A-1, A-5, A-9.**

[28] Defendants' **Exhibit A-9,** at page 102 of 369 of Declaration of Bradley Luke (**ECF # 33-4**).

[29] The "direct to consumer" loans were largely the invention of the First Marblehead Corporation ("FMC"). As stated in Defendants' Exhibits, FMC partnered with large banks to originate consumer debt to students and then securitized them into the national collegiate trusts. These debts were not and should not be treated like subsidized and charitable educational loans made to needy students. They were subprime consumer debt exactly like those then being made in the mortgage industry. *See In re The First Marblehead Corp. Securities Litigation*, 639 F.Supp.2d 145, 149–50 (D.Mass. 2009) (stating that testimony revealed that First Marblehead began bending underwriting criteria in 2006 to originate excessive loans to students with bad credit in order to feed the securitization market)

TERI is not a "nonprofit institution" under section 523(a)(8)(A)(i).  Although the term is not defined in the Code, the legislative and statutory history teaches that the term "institution" means a college, university, or school.  As originally codified, the clause read "nonprofit institution of higher education."  That is plainly another term for a college or university.  Congress removed the modifier "of higher education" in 1984, but this could not have changed the meaning of the words "nonprofit institution" as originally codified by Congress.[30]  When Congress codified the term "nonprofit institution" it meant "school."  Therefore, the term must still mean "school"— albeit not one that exclusively provides a traditional liberal arts education. The legislative history from 1984 supports this reading:

> "[D]eleting 'of higher education' enlarges the scope of the nondischargeability exception and is therefore substantive to that extent. It is a modest enlargement, however, in that the claimant must be a nonprofit institution and the loan must be one for an educational loan. The change eliminates litigation over the question whether a seminary, for example, is an institution of higher education. The amendment is thus to some extent at least clarifying."[31]

The reason for removing "of higher education" was to resolve confusion over whether a *seminary* technically provided "higher education."  It was never intended to open the floodgates to commercial lenders who created corporate non-profits through

---

[30] *Perlman v. Permonite Mfg. Co., 568 F.Supp.* 222, 234–35 (D.C.Ind.,1983) (""Given . . . the general rule that where 'an amendment leaves certain portions of the original act unchanged, such portions are continued in force, with the same meaning and effect they had before the amendment.").

[31] *See* Bankruptcy Improvement Act: Hearing on P.L. 98-353 Before the S. Comm. on Judiciary, at 328 (April 6, 1983) (Comments on Subtitle I of S. 445) (attached as **Exhibit 1**).

which they added credit enhancements to their loans for securitization purposes. The meaning remains plain: the statute was intended to prevent debtors from discharging student loans owed directly to non-profit colleges and universities who participated in subsidized lending under the Higher Education Act.[32]

Furthermore, the Loans were not "funded" by a governmental unit or nonprofit institution. The Loans were funded by Charter One Bank. The most the Defendants are arguing is that TERI guaranteed the loans, and that guaranteeing constitutes "constructive funding." But note that section 523(a)(8) uses both terms (*i.e.,* "funded" and "guaranteed") intentionally in different clauses of the provision: "an educational loan....made, insured or **guaranteed** by a governmental unit, or made under any program **funded** in whole by a governmental unit or nonprofit institution."   The statute plainly says that a governmental unit may affect non-dischargeablity either by guaranteeing a loan in the first clause (*i.e.,* under the GSL), or by funding the program in whole or part in the second clause (*i.e.,* the NDSL). The second clause does not say a guarantee is sufficient for a non-profit institution.  Rather, the language says the nonprofit institution or governmental unit must "fund" the program. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate

---

[32] The court will also note that the legislative history states the claimant must be the non-profit. The claimant in this action is not a non-profit.

inclusion or exclusion." *Bates v. United States,* 522 U.S. 23, 29–30 (1997).   Congress

allowed a "governmental unit" to obtain non-dischargeability either by making, insuring,

guaranteeing, or funding a program.   Nonprofit institutions, however, only got protection

where they "funded" loans made through a program.[33]

More generally, the Defendants' broad interpretation of section 523(a)(8)(A)(i) is

contrary to the command that exceptions to discharge are to be construed narrowly

against the creditor.   To the extent any of terms above are ambiguous, the narrower

finding should control.   For example, the term "nonprofit institution" is conceivably

ambiguous.   Defendants will argue it means any corporation with 501(c)(3) status.

Plaintiff believes it only means a school recognized under the Higher Education Act that

participates in Title IV funding programs.   Even if both are plausible applications, the

debtor's interpretation should control because of the requirement to resolve ambiguities

in favor of the debtor.   *See New Neighborhoods, Inc. v. West Virginia Workers'*

*Compensation Fund,* 886 F.2d 714, 719 (4th Cir. 1989) ("Exceptions to discharge are

usually construed in favor of the debtor. Further, ambiguities in the Code are generally

resolved in favor of the debtor."). Likewise, the word "funded" and "educational loan"

---

[33] *In re Taratuska,* 374 B.R. 24, 29 (Bkrtcy.D.Mass. 2007) ("Notably, the statute employs both terms [guaranteed and funded], plainly indicating that they have different meanings; otherwise, one or the other would be unnecessary. Hence, the giving of the Guaranty does not constitute the program funding contemplated by Section 523(a)(8) on account of the Loan.") (reversed on appeal).

are conceivably ambiguous, and in such an event, the Court should construe the terms narrowly to effectuate one of the central purposes of the Code.

### D. Plaintiff's Loans Were Made Outside The Confines Of The Identified Loan Program

Even if this Court rejects the above statutory analysis, the DTC Loans still do not fit within section 523(a)(8)(A)(i). Defendants contend that the Loans were "made under a program funded in whole or in part by a nonprofit institution" because TERI guaranteed the loans. But the Defendants have produced **no** evidence that TERI actually guaranteed the Loans.[34] Defendants argue that the loan documents "unequivocally" say the DTC Loans are non-dischargeable. *See* Motion at 11. That is false. Two of the three documents are quite literally "equivocal" in that they say the debt *might have* been funded by TERI or *might not have*:

> I understand and agree that this loan is an education loan and certify that it will be used only for costs of attendance at [LLU]. I acknowledge that the requested loan is subject to the limitations on dischargeability in bankruptcy contained in Section 523(a)(8) of the United States Bankruptcy Code because either or both of the following apply: (a) this loan was made pursuant to a program funded in whole or in part by ...TERI ... a non-profit institution, or (b) this is a qualified education

---

[34] In fact, the NCSLT 2006-1 Deposit and Sale Agreement does not even list the NextStudent Graduate Loan as one of the loan programs that was being transferred and sold into the NCSLT 2006-1 trust under Schedule A. The Pool Supplement lists a number of Charter One loan program, including the NextStudent Alternative Loan, and the NextStudent Private Consolidation Loan, but not the NextStudent Graduate Loan. Thus it is not even clear whether this program was eligible for transfer under the contracts. *See National Collegiate Student Loan Trust 2007-4 v Watson*, 2016 WL 9384235, at *3, (N.Y.City Civ.Ct., Jan. 07, 2016) (denying motion for judgment where "[t]his Court's review of the Deposit and Sale Agreement finds that assignment does not specifically identify the Charter One Continuing Education Loan as part of Schedule A relied upon by the Plaintiff.").

loan as defined in the Internal Revenue Code.[35]

In *Wiley*, Wells Fargo sought to introduce the identical language from a loan document on summary judgment. The Court cited the above language, and rejected it as a basis for summary judgment.[36] More recently in a decision by the Eastern District of New York, the Court examined identical terminology in a loan held by Defendant National Collegiate Trust 2006-1 and held:

> [M]ore is required to satisfy the requirements of Section 523(a)(8) than a statement in a loan document that "either or both" of certain exceptions from discharge may apply. If that language alone were sufficient, then it is hard to see what role would be left for Congress or the courts in drafting, interpreting, and applying these sections of the Bankruptcy Code.[37]

As the *Golden* and *Wiley* courts held, these statements are insufficient to determine whether the DTC Loans actually fit within section 523(a)(8).[38] Indeed, parties can

---

[35] See Defendants' **Exhibits A-5, A-9** (at page 98 of 369 of Declaration of Bradley Luke).

[36] *In re Wiley*, 579 B.R. 1, 7 (Bkrtcy.D.Me., 2017) ("On summary judgment, these indications are not enough to carry the day. These preprinted portions of the Agreements do not mandate an inference that the Loans were, in fact, made under a program funded by a nonprofit institution.").

[37] *Golden, et. al v. JP Morgan Chase Bank., et. al.*, 17-AP-1005, at p. 43 (Bankr. E.D.N.Y. Jan 31, 2019) (attached as **Exhibit 7**).

[38] Consider the consequence if parties could stipulate to legal conclusions in contracts. Defendants could simply insert a statement into all agreements that reads, "I certify that NCSLT 2006-1 is not a debt collector as that term is defined in 15 U.S.C. 1692 " and thereby immunize itself from any Fair Debt Collection Practices Act lawsuits in perpetuity. Indeed, a creditor could presumably insert into all promissory notes a certification that reads "I certify that I am not a debtor as that term is defined in 11 USC 101" and thereby object to a consumer's discharge under 11 U.S.C 727.

neither contract around determinations of discharge,[39] nor stipulate to legal conclusions.[40] "Policy considerations dictate that dischargeability questions cannot be predetermined . . . by agreement of the parties prior to or in anticipation of the possible filing of a bankruptcy case. Whether or not a debt is dischargeable is a legal conclusion based on facts of each case and the bankruptcy court has the exclusive jurisdiction to make that conclusion." *Matter of Halpern*, 50 B.R. 260, 262 (Bankr. N.D. Ga. 1985), *aff'd sub nom. In re Halpern*, 810 F.2d 1061 (11th Cir. 1987). Nor have Defendants offered testimony from anyone with personal knowledge regarding whether TERI actually

---

[39] *In re Huang*, 275 F.3d 1173, 1177 (9th Cir. 2002) ("It is against public policy for a debtor to waive the prepetition protection of the Bankruptcy Code. This prohibition of prepetition waiver has to be the law; otherwise, astute creditors would routinely require their debtors to waive.").

[40] *TI Fed. Credit Union v. DelBonis*, 72 F.3d 921, 928 (1st Cir. 1995) ("Issues of law are the province of courts, not of parties to a lawsuit, individuals whose legal conclusions may be tainted by self-interest. Courts, accordingly, 'are not bound to accept as controlling, stipulations as to questions of law.'"); *Saviano v. C.I.R.*, 765 F.2d 643, 645 (7th Cir. 1985) ("The parties to a lawsuit are free to stipulate to factual matters. However, the parties may not stipulate to the legal conclusions to be reached by the court. For example, in this case it is undisputed that the International Monetary Exchange (IME) and Saviano executed a 'Loan Agreement.' Appellant then states in his brief, as a fact, that IME loaned him $30,000 which he then paid for mining expenses. However, *neither the nomenclature of the 'Loan Agreement' nor the agreement with the Commissioner binds this court as to the appropriate characterization of that transaction for tax purposes. That determination involves a conclusion of law.* Thus, while the parties are free to stipulate to the factual elements of the transactions, the court is not bound by the legal conclusions implied by the terminology utilized.") (emphasis added).

Page 21

guaranteed the Loans, let alone "funded" the program under which the Loans were made.[41]

Defendants have offered no evidence that Charter One ever paid a guarantee fee to TERI for the DTC Loans.  In discovery, Plaintiff asked for proof that Charter One actually paid the guarantee fee to TERI on the DTC Loans.[42]  In addition to directing Plaintiff to the preprinted language in the promissory notes, Defendants provided a "Payment of Guarantee Claims Direction Letter" at **Exhibit I** (page 362 of Declaration of Bradley Luke). ***But that document is blank***.  It provides no evidence that TERI ever paid any guaranty fees to Charter One, let alone a guaranty fee on these specific DTC Loans. Plaintiff was told the Request was otherwise was irrelevant and harassing.[43]

And there seems to be good reason for Defendants' failure to produce demonstrable evidence that TERI guaranteed the DTC Loans ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[41] *In re Clouser*, 2016 WL 5864493, at *3 (Bkrtcy. D. Or. 2016) ("The only evidence that NCSLT offers concerning the existence of a guaranty is that the Loan Documents signed by Debtor contain a statement reading "I understand that you have purchased a guaranty of this loan, and that this loan is guaranteed by [TERI]." NCSLT has not shown how Debtor would be competent to testify to such a fact. Because there is no suggestion in the record that Debtor ever had personal knowledge of the existence or terms of a third-party guaranty, the boilerplate language of the Loan Documents cannot prove the actual existence of a guaranty.").

[42] See Defendants' Responses and Objections To Requests for Production No. 7 (attached as **Exhibit 4**).

[43] See Defendants' Responses and Objections To Request for Production No. 7 (attached as **Exhibit 4**).

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ TERI's website, which states that graduate students could only, "[b]orrow annually up to *the __lesser of__ $45,000 or the cost of attendance minus other aid (as certified by your school)*."[45] TERI would not and did not guarantee or fund loans made in excess of the "cost of attendance."

And yet the DTC Loans in this action were demonstrably made in excess of the cost of attendance. The Cost of Attendance at Loma Linda University for a graduate student was: (i) $15,672 during the 2005-2006 academic year; (ii) $18,520 during the 2006-2007 academic year; (iii) $19,640 during the 2007-2008 academic year.[46] Despite the COA, Charter One Bank lent Plaintiff three direct-to-consumer loans for $30,000 each on January 6, 2006, September 29, 2006, and August 21, 2007.[47] Each loan was by



[44] █████████████████████████████████████████████

[45] *See* TERI Graduate Loan Borrowing Limits, attached as **Exhibit 2.**

████████████████████████████████████████████████████

[46] See Institutional Characteristics, Loma Linda University, Part D: Graduate Student Charges, at pages 6-7, 15, 25-25 (attached as **Exhibit 3**).

[47] See Defendants' Exhibits A-1, A-5, A-9.

**Page 23**

itself in excess of the Cost of Attendance for each academic year 2005-2006, 2006-2007, and 2007-2008. Despite this plain excess, ████████████████████████████████

████████████████████████████████

Defendants will now likely argue that it does not matter if TERI actually guaranteed these DTC Loans because what matters is whether TERI funded, guaranteed, or otherwise "meaningfully participated" in the loan program. The Defendants have identified the "NextStudent Loan Program" as the "program" under section 523(a)(8)(A)(i). Defendants have stated that this program is defined in the Program Guidelines. ████████████████████████████████

████████████████████████████████

### E. The Charter One Bank/TERI Guarantee Was Voided And Refunded In TERI's Own Bankruptcy

Even if this Court is not persuaded by the statutory interpretation arguments, and believes the DTC Loans were guaranteed by TERI and thus were "made under any program funded in whole or in part . . .by a nonprofit intuition," the guaranty agreements were voided in TERI's bankruptcy, and the guarantee payments (or some portion of them) were refunded.

The Guaranty Agreement was made between TERI and Charter One Bank.[48] Charter One Bank was acquired by Citizens Bank in 2004. Citizens Bank was a wholly

---

[48] See Defendants' **Exhibit J.**

Page 24

owned subsidiary of the Royal Bank of Scotland between 1998 and 2014.   In TERI's

bankruptcy, the Court so ordered the stipulation that authorized the rejection of the

Guaranty Agreement between Charter One Bank and TERI.[49]   In addition, in TERI's

Fourth Amended Plan,[50] TERI refunded to RBS approximately $46 million in guaranty

fees, and refunded to Defendants more than $65 million.[51]   At the very least, these

judicial proceedings raise genuine issues of material fact surrounding the guarantees that

Defendants' have failed to explain or even disclose.[52]

      These actions are far beyond simply ceasing operation of the lending program.

There is no outstanding guarantee, and any money that could conceivably constitute

---

[49] *See* Order Rejecting and Terminating Certain Executory Contracts **Exhibit 5**.  *See also* TERI's
Fourth Amended Plan at **Exhibit 6** at page 40 ("Rejection of Executory Contracts. On the Effective
Date, all Guaranty Agreements executed in favor of the Securitization Trusts and the related Deposit and
Security Agreements and other related documents entered into by the Debtor prior to the
Commencement Date will be deemed rejected, and with respect to Claims asserted by Securitization
Trusts accepting the Plan or that are deemed to accept the Plan, thereby receiving the treatment provided
by the Securitization Trust Settlement, all Debtor's claims or rights to set off any Guaranty fees, basis
point fees and other interests in loans held by such Securitization Trusts will be deemed waived.")

[50] Confirmed and ordered by the Court on October 29, 2010. *See In re The Education Resources
Institute, Inc.*, 08-12540, ECF No. 1170 (Bankr. D. Mass Oct. 29, 2010).

[51] See **Exhibit 6**, at page 65 of 68 ("Payment to Accepting Make and Wait Lender from
Collateral Account").

[52] Defendants went further and represented to this Court that the DTC Loans were currently
guaranteed by TERI. *See* Declaration of Bradley Luke, at paragraph 17 ("TERI is the guarantor for
Plaintiffs loan owing to NCSLT 2006-1."). That is demonstrably false.  The most that could be said is
that the loans were at one time guaranteed by TERI.  Defendants should not be phrasing this in the
present tense and should not be trying to hide from Plaintiff and this Court the fact that the guaranty was
voided and rejected in TERI's bankruptcy.  Tellingly, Defendants have already been admonished by the
Consumer Finance Protection Bureau for filing misleading affidavits seeking to reduce debts to
judgment. *See* CFPB Takes Action Against National Collegiate Student Loan Trusts, Sept. 18, 2017,
*available at*: https://www.consumerfinance.gov/about-us/newsroom/cfpb-takes-action-against-national-
collegiate-student-loan-trusts-transworld-systems-illegal-student-loan-debt-collection-lawsuits/

"funding" under section 523(a)(8)(A)(i) *was refunded and all further claims waived*. The Guaranty Agreements were rejected, voided, and everyone was put back in their original position as far as that was possible within TERI's bankruptcy capacity. It would be the height of inequity to allow NCSLT to now use the "dead hand" of TERI to render the DTC Loans non-dischargeable when the contracts have been voided, and the money refunded that purportedly went into constructively "funding" the "program."[53]    As a matter of analogy, consider the following. A private bank created a 501(c)(3) on January 1, 2019, originated a billion dollars of consumer debt during the month of January, had the nonprofit guarantee the loans, and paid the nonprofit certain guarantee fees. Then on January 30, 2019, the bank dissolved the nonprofit, and put it into bankruptcy. In the bankruptcy, the guaranty agreement was voided, and the nonprofit refunded all the guarantee payments to the bank. Could that bank still argue that all the debt originated was non-dischargeable under section 523(a)(8)(A)(i)? That is essentially what happened

---

[53] *Crowley v. TVSM, Inc.*, 1991 WL 267868, at *3 (S.D.N.Y. 1991) ("A party to a series of interrelated contracts cannot selectively avoid those obligations it chooses to avoid, while keeping for itself the benefit of those contracts it wishes to honor.").

with TERI and Defendants, albeit the timeline was several years rather than a single month.[54]

### F. Defendants Are Not Now Permitted To Allege New Facts In Their Reply

Defendants failed to argue a number of factual elements their Motion, including that the DTC Loans are "educational loans," or evidentiary proof that TERI guaranteed the DTC Loans.    They may not do so in their reply brief.    "It is improper for a moving party to introduce new facts or different legal arguments in the reply brief than those presented in the moving papers."    *U.S. ex rel. Giles v. Sardie*, 191 F.Supp.2d 1117, 1127 (C.D.Cal.,2000).   If they do, Plaintiff should be permitted to file a sur-reply. *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir 1996) ("[W]here new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the [non-]movant an opportunity to respond.").

## V.   CONCLUSION

---

[54] Plaintiff repeats that these "direct to consumer" loans are not like traditional student loans. They were created by banks to feed the securitization market leading up to the crash of 2008. *See* Consumer Finance Protection Bureau, Private Student Loans, 2012 *("*During the lending boom, [Private Student Lenders] sought to increase volume through a new marketing channel and processing protocol: Direct-to-Consumer ("DTC"). DTC lending circumvented the school's financial aid office, marketing instead through mass media, online advertising, and direct media. Funds were generally disbursed directly to the student, instead of to the school. The school did not certify the borrower's financial need, and the lender instead imposed a cap of the lesser of total cost of attendance or a fixed amount, such as $30,000. This new technique could simultaneously increase the number of borrowers and the amount each one borrowed. It also created an opportunity for the student to borrow more than the [Expected Family Contribution]."), *available at:* http://files.consumerfinance.gov/f/201207_cfpb_Reports_Private-Student-Loans.pdf

1   Plaintiff hereby requests that this Court deny the Motion, and order this matter sent to

2   trial for final determination.

3

4

5   February 4, 2019

6

7                                                                /s/

8                                                                M. Erik Clark, #188693
                                                                 BOROWITZ & CLARK, LLP
9                                                                100 N. Barranca Street, Suite 250
                                                                 West Covina, CA 91791
10                                                               Tel: (626) 332-8600
                                                                 Fax: (626) 332-8644
11
                                                                 Austin C. Smith (*pro hac vice*)
12                                                               SMITH LAW GROUP LLP
                                                                 3 Mitchell Place
13                                                               New York, NY 10017
                                                                 917-992-2121
14                                                               austin@acsmithlawgroup.com

15                                                               Attorneys for Debtor

16

17

18

19

20

21

22

23

24

25

26

27

28

Page 28

# EXHIBIT 1

w/ 98 S.445

S. Hrg. 98-574

# BANKRUPTCY IMPROVEMENTS ACT

# HEARING

BEFORE THE

## COMMITTEE ON THE JUDICIARY
## UNITED STATES SENATE

### NINETY-EIGHTH CONGRESS

FIRST SESSION

ON

## S. 333

A BILL TO AMEND TITLE 11 OF THE UNITED STATES CODE TO MAKE
CERTAIN CHANGES IN THE PERSONAL BANKRUPTCY LAW, AND FOR
OTHER PURPOSES

AND

## S. 445

A BILL TO AMEND TITLE 11, UNITED STATES CODE, AND FOR OTHER
PURPOSES

APRIL 6, 1983

Serial No. J-98-26

Printed for the use of the Committee on the Judiciary



FILED WITH

PL 98-353

325

### COMMENTS ON SUBTITLE I OF S.445
### TECHNICAL AMENDMENTS TO TITLE

Frank R. Kennedy

I have had the opportunity to see Professor Vern Countryman's letter of March 28, 1983, commenting on the Technical Amendments part of S.445, which has been submitted to this Committee, and a letter of Richard Levin of the firm of Stutman, Treister & Glatt, dated March 31, 1983, addressed to the office of Senator Metzenbaum, and enclosing comments on technical amendments included in bills introduced in the 97th Congress. I concur in large part with these comments, but the statement I submit and the comments I make today are my own and are restricted for the most part to what appear to me not to be technical amendments.

Professor Countryman, Mr. Levin, and I are all members of the National Bankruptcy Conference, but the Conference has not taken positions on these amendments. I speak as one who has been engaged principally in studying, teaching, and writing about the subject of bankruptcy since 1940. During the first two decades of that period I was a member of the law faculty of the University of Iowa and since 1961 I have been teaching at the University of Michigan Law School.

I am in agreement with Professor Countryman's and Mr. Levin's general objections to technical amendments that are not technical but propose substantive and significant changes in the law. Inclusion of such amendments in a part of an omnibus bill purporting to be a collection of technical amendments runs the serious risk of facilitating enactment, after only cursory examination, of changes of provisions that were thoroughly examined and drafted and passed after prolonged and careful consideration in the course of the formulation and enactment of Public Law No. 95-598. Repeal or modification of any provision of the Bankruptcy Reform Act that is not a technical amendment should receive at least as much attention as was given the provision during the course of the formulation of that Act.

My purpose this morning is to call to your attention numerous instances of inappropriate and premature proposals advanced under Subtitle I in the guise of technical, noncontroversial changes of a law that included many controversial provisions. The controversies were thoroughly ventilated and resolved in a context and setting where the implications and the interrelations of specific alternatives with the entire bankruptcy law could be assessed. There is substantial danger that any proposal in the technical amendments package that goes beyond formal, nonsubstantive changes will have unexpected and unintended impacts. Experience under the Bankruptcy Reform Act has demonstrated that, even though it was not and could not have been anticipated that the law would be required to govern so many bankruptcies and reorganizations as have been precipitated by economic conditions since 1978, the law has worked extremely well. I concur in Mr. Levin's observation that the experience does not yet warrant most of the changes that have been proposed under the label "technical."

Notwithstanding the foregoing, I must acknowledge that some of the amendments in Subpart I are substantive but probably, or at least arguably, noncontroversial and generally acknowledged to be desirable. There is a risk in assuming that a technical amendment is noncontroversial: the categorization is likely to discourage publicity and close scrutiny of the proposal. Nonetheless, I have not expressed objections to some of the technical amendments because they seem entirely unobjectionable and desirable.

### S:445 - Subtitle I

P.45, lines 22-24:  § 311, amending § 101(26)(B)(ii).

This amendment is garbled in the version I have. It purports to strike language from § 101(26)(B)(ii) that is not in this pro-

328

P.72, lines 7-8.  § 344(b), amending § 506(b).

I agree with Professor Countryman's comment on the proposed
amendment of § 506(b) insofar as it suggests that the amendment
does little to clarify the subsection.  His suggested redraft does
clarify a purpose to make the contract controlling with respect
to the interest, but I am not so clear as he that this was the
Congressional purpose and still less clear that the section ought to
be amended to make the contract controlling even when nonbankruptcy
law may make such a contract provision illegal.

P.72, lines 11-12:  § 344(c), amending § 506(d)(1).

Although Professor Countryman is right in suggesting that the
amendment of § 506(d)(1) to save a lien securing unmatured alimony
and support is substantive, it is certainly noncontroversial.  I
would not be surprised if a court would find a way to reach the
same result as that provided by the amendment.

P.73, lines 19-24 and
P.74, lines 1-8:  § 345(b), amending § 507(b).

I applaud Professor Countryman's suggestion at page 5 of his
letter for a clarifying amendment of § 507(b), which can only
facilitate understanding and rational application of the statutory
provision.

P.74, lines 12-25, and
P.75, lines 1-7:  § 345(d), amending § 507(d).

Professor Countryman is right in his letter of March 25,
indicating that this amendment is substantive in its impact.  It
will certainly increase the eligibility of claimants for priority
under paragraphs (3), (4), (5), and (6) of § 507(a).  On the other
hand, I surmise that the changes are noncontroversial and are intended
to effectuate rather than reverse the policies that underlay the
enacted version of § 507(d).

P.76, lines 19-25, and
P.77, lines 1-112:  § 349(b), amending § 522(c).

Professor Countryman's proposed amendments of § 329(b) and
522(c), set out near the top of page 6 of his letter, appear to be
wholly desirable and clarifying amendments, though they are also
probably substantive.

P.80, lines 20-25:  § 349(j), amending § 522.

I do not understand why the proposed § 522(n) would look to the
law as of the date of the order for relief rather than the date of
the filing of the petition.  The date of the filing of the petition
is the point of reference in § 522(b)(2), and was the crucial time of
reference under § 6 of the Bankruptcy Act.  Many cases have accepted
the date of the filing of the petition as the critical time for
determining the debtor's right to exemptions.  See, e.g., White v.
Stump, 266 U.S. 310 (1924); Butz v. Blue (In re Blue), 3 C.B.C.2d 4
(Bankr.Ct. S.D.Ohio 1980); In re Sivley, CCH B.L.R. § 68,409
(Bankr.Ct. E.D.Tenn. 1981).  I see no justification for this
amendment, and it should either be deleted or revised to refer to
the date of the filing of the petition.

P.82, lines 3-4:  § 350(a), amending § 523(a)(9).

Professor Countryman is right in his letter of March 25 that
deleting "of higher education" enlarges the scope of the non-
dischargeability exception and is therefore substantive to that
extent.  It is a modest enlargement, however, in that the claimant
must be a nonprofit institution and the loan must be one for an
educational loan.  The change eliminates litigation over the question
whether a seminary, for example, is an institution of higher edu-
cation.  The amendment is thus to some extent at least clarifying.

329

The hardship exception sill applies. I am ambivalent about this
proposed amendment, even though I am generally opposed to enlarge
the scope of nondischargeability.

P.82, lines 20-25:  § 351, amending § 524(a)(2).

It is beyond my understanding what the purpose of the amendment
of § 524(a)(2) proposed in lines 20-23 is.  Does a dischargeddebtor
need to be protected against collection of a discharged debt out of
property that he no longer holds and is located in some remote
jurisdiction?  An amendment is needed to eliminate the conflict
between § 522(c)(2) and the injunction against the recovery of a
discharged debt from property of the debtor, which led to the
erroneous decision in In re Williams, 4 B.C.D. 95 (Bankr.Ct.
D.Kan. 1981).  That error could be corrected simply by the
deletion of the mischief-making words in § 524(a)(2), "or from property
of the debtor".  The proposed amendment is an invitation to pointless
litigation.  As Professor Countryman has pointed out on pages 6 and
7 of his letter of March 25, the exception proposed to be added at
the end of § 524(a) is confusing.  Moreover, it does not recognize
the right of the holder of a valid lien on property abandoned pur-
suant to § 554 to enforce his lien although it secures a discharged
debt.

P.83, lines 6-17:  § 352, amending § 525.

I am surprised by encountering the substantial enlargement of
the protection accorded a debtor or bankrupt against discrimination
by the proposed new § 525(b).  I should expect this amendment to be
controversial and to generate considerable litigation.

P.85, lines 15-24:  § 352(d), amending § 543.

I agree with Professor Countryman's comment on page 7 of his
letter of March 25 as to the substantive and dubious character of
this amendment, exempting an assignee from any duty of accountability
or turnover if he was appointed or took possession over 120 days
before the petition was filed.  It seems to me that the provisions
of subsection (d), authorizing the court to excuse compliance with
the other subsections of § 543, and § 305(a)(1), authorizing abstention,
afford appropriate safeguards against supersession of an assignment
when the assignee is serving the best interests of the creditors and
the security holders.  The fact that 120 days have passed does not
constitute a guarantee that those interests have been and will
continue to be well served.  In any event, it is not apparent why
any other custodian, whether appointed by a court or the debtor,
should be subject to § 543 irrespective of when appointed, whereas
an assignee selected by the debtor should become untouchable after
120 days.

P.89, lines 8-10:  § 359(c), amending § 547(c)(5).

Professor Countryman is undoubtedly correct in his letter on
page 8 in pointing that the minor language change in § 547(c)(5)
effects a substantive change and in suggesting more appropriate language
to clarify what was the original intent.

P.89, lines 18-25, and
P.90, lines 1-3:  § 359(c)(7), amending § 547(c).

This amendment would add another exception to the avoidance
power of the trustee under the preference section.  I concur in
Professor Countryman's criticism at page 8 of his letter.  The
amendment is certainly far from being merely a technical one.  It
would insulate what appears to be blatantly preferential transfer
from avoidance.

# EXHIBIT 2

1/20/2019                              TERI - Loan Center - Loan Programs - Graduate - Borrowing Limits



http://www.teri.org:80/loan-center/loan-programs/graduate/borrowing-limi | Go | OCT FEB APR

13 captures                                                                 ◄ 10 ►
25 Nov 2005 – 14 May 2008                                                 2005 2007 2008    ▼ About this capture



Bringing a Better Future Within Reach

**Students & Parents** | **Financial Aid Officers** | **Education Leaders**

About Us

**Loan Center**

Overview

Students & Parents

Financial Aid Officers

Education Leaders

Apply for a Loan

Check Loan Status

**Loan Programs**

Undergraduate

Graduate

Continuing Education

Health Professions

Elementary & Secondary

TERI Lenders

College Access

Research Studies

Apply Now

Loan Center    Loan Programs

### Graduate Loan > Borrowing Limits

| Eligibility | Borrowing Limits | Lenders | Repayment Terms |

#### For a credit-worthy applicant, the following borrowing limits apply:

Borrow annually up to the lesser of $45,000 or the cost of attendance minus other aid (as certified by your school)

$1,000 minimum loan amount

#### If you apply as a credit-ready applicant, the following borrowing limits apply:

Borrow annually up to the lesser of $20,000 or the cost of attendance minus other aid (as certified by your school)

An aggregate maximum borrowing limit of $120,000. Limit is $225,000 for those in dental and medical programs and $130,000 for those in law and osteopathy programs

$1,000 minimum loan amount

The table below will help you to estimate how much you are able to borrow.

| | |
|---|---|
| **Total Cost of Attendance**<br>May include tuition, room and board, books, lab fees, computers, school-related transportation and other educational expenses. | $ |
| **Available Financial Aid**<br>May include grants, scholarships, other loans and other forms of financial aid awarded for same enrollment period as this loan application. | Minus $ |
| **Maximum Loan Amount**<br>$45,000 annual maximum for credit-worthy applicant or co-signer, if any.<br>$20,000 annual maximum for credit-ready applicant. | Equals $ |

©2007 The Education Resources Institute, Inc.

Privacy Policy | Terms of Use | Site Map

# EXHIBIT 3

# National Center for Education Statistics

## IPEDS Data Center

**Loma Linda University**

| | |
|---|---|
| **UnitID** | 117636 |
| **OPEID** | 00121800 |
| **Address** | 11139 Anderson Street, Loma Linda, CA, 92350 |
| **Web Address** | www.llu.edu/index.html |

### Institutional Characteristics 2005-06

Institution: Loma Linda University (117636)

### Part A - Educational Offerings

**1. Which of the following types of instruction/programs are offered by your institution? [Check one or more]**
*If your institution does not offer occupational, academic or continuing professional programs, you are not expected to complete this or any other IPEDS survey.*

- ☑ Occupational, may lead to a certificate, degree, or other formal award
- ☑ Academic, leading to a certificate, degree, or diploma
- ☑ Continuing professional (postbaccalaureate only)
- ☐ Recreational or avocational (leisure) programs
- ☐ Adult basic or remedial instruction or high school equivalency
- ☐ Secondary (high school)

Institution: Loma Linda University (117636)

### Part A - Mission Statement

**2. Please enter your institution's mission statement or a web address (URL) where your mission statement can be found. Mission statements provided manually must be limited to 2,000 characters or less. If your mission statement is lengthy but available electronically, please provide the web address in the space provided. The mission statement will be available to the public on the College Opportunities On-Line (IPEDS COOL) website.**

Mission Statement URL:                    http:// www.llu.edu/mission/llumission.html
Mission Statement

Institution: Loma Linda University (117636)

### Part B - Organization - Control and Level

**1. What is your institutional control or affiliation?**

| | | |
|---|---|---|
| ○ | Public - Specify | |
| | Primary control | Secondary control (if applicable) |
| | No selection ▾ | No selection ▾ |
| ○ | Private for-profit | |
| ○ | Private not-for-profit independent (no religious affiliation) | |
| ◉ | Private not-for-profit religious affiliation - Specify | |

Seventh Day Adventists

**2. What award levels are offered by your institution? [Check all that apply]**
Award Level

BELOW THE BACCALAUREATE:

| | | |
|---|---|---|
| 1 | ☑ | Postsecondary award, certificate, or diploma of **less than one academic year**<br>•less than 900 contact or clock hours, or<br>•less than 30 semester or trimester credit hours, or<br>•less than 45 quarter credit hours |
| 2 | ☑ | Postsecondary award, certificate, or diploma of **at least one but less than two academic years**<br>•at least 900 but less than 1800 contact or clock hours, or<br>•at least 30 but less than 60 semester or trimester credit hours, or<br>•at least 45 but less than 90 quarter credit hours |
| 3 | ☑ | Associate's degree |
| 4 | ☑ | Postsecondary award, certificate, or diploma of **at least two but less than four academic years**<br>•1800 or more contact or clock hours, or<br>•60 or more semester or trimester credit hours, or<br>•90 or more quarter credit hours |

BACCALAUREATE AND ABOVE:

| | | |
|---|---|---|
| 5 | ☑ | Bachelor's degree or equivalent |
| 6 | ☑ | Postbaccalaureate certificate |
| 7 | ☑ | Master's degree |
| 8 | ☑ | Post-master's certificate |
| 9 | ☑ | Doctor's degree |
| 10 | ☑ | First-professional degree |
| 11 | ☑ | First-professional certificate (Post-degree) |
| 12 | ☐ | Other; please specify in the Caveats box |

CAVEATS

Institution: Loma Linda University (117636)

**Part B - Organization - Calendar System**

*Your response to the next question determines how your institution reports Graduation Rates data in the Spring and how you report student charges in Part D of this survey.*

**3. What is the predominant calendar system at the institution? [Choose one]**

**Standard academic terms**
*Checking one of these systems determines that your institution will provide Graduation Rates data based on a FALL COHORT and student charges based on a FULL ACADEMIC YEAR*

- ○ Semester
- ◉ Quarter
- ○ Trimester
- ○ 4-1-4 or similar plan
- ○ Other academic calendar

**Other calendar system**

*Checking one of the following determines that your institution will provide Graduation Rates data based on a FULL YEAR COHORT and student charges data will be requested by PROGRAM.*

○ Differs by program

○ Continuous basis (every 2 weeks, monthly, or other period)

Institution: Loma Linda University (117636)

## Part B - Organization - Student Enrollment

**4. Does your institution enroll any of the following types of students?**

*Include all levels that your institution offers, even if there are no students currently enrolled at that level.*

*The answers to these questions determine which screens will be generated for reporting academic year tuition charges, and for reporting Fall Enrollment during the Winter and Spring collections. Additionally, checking Yes for full-time, first-time, degree/certificate-seeking undergraduate students determines that your institution must report pricing information for these students (on the IC survey) and Student Financial Aid information in the Spring collection. The reported full- and part-time 2004 Fall Enrollment counts are provided for your reference.*

| | Full-time | | | FT PY Enroll-ment | Part-time | | | PT PY Enroll-ment |
|---|---|---|---|---|---|---|---|---|
| Undergraduate (academic or occupational programs) | ○ No | ⊙ Yes | | 770 | ○ No | ⊙ Yes | | 312 |
| First-time, degree/certificate-seeking undergraduate | ⊙ No | ○ Yes | | | ⊙ No | ○ Yes | | |
| Graduate | ○ No | ⊙ Yes | | 802 | ○ No | ⊙ Yes | | 858 |
| First-professional | ○ No | ⊙ Yes | | 1,207 | ⊙ No | ○ Yes | | |

**5. For academic year 1999-2000, did your institution have any full-time first-time degree/certificate-seeking students enrolled in programs at the baccalaureate level or below?**

*If you answer Yes to this question, you will be required to provide Graduation Rates data for 1999-2000 in the Spring collection. If you answer No to this question, please indicate the reason you are not required to report Graduation Rates for the cohort year requested. If you reported any full-time, first-time degree/certificate-seeking undergraduates on the 1999-2000 Enrollment survey, the data will be preloaded below.*

| | | | |
|---|---|---|---|
| ⊙ | No | | |
| | | ☑ | This institution did not enroll full-time, first-time (undergraduate) students. |
| | | ☐ | This institution did not offer programs at or below the baccalaureate level. |
| | | ☐ | This institution was not in operation in 1999-2000. |
| ○ | Yes | | |

**Cohort from 1999-2000 Enrollment of full-time, first-time degree/certificate-seeking students (GRS Cohort)**

Institution: Loma Linda University (117636)

## Part C - Admission Requirements and Services - Special Learning Opportunities

**5. Does your institution accept any of the following? [Check all that apply]**

☐ Dual credit (college credit earned while in high school)

☐ Credit for life experiences

| | Advanced placement (AP) credits |
|---|---|
| ☑ | None of the above |

**6. What types of special learning opportunities are offered by your institution? [Check all that apply]**

| | | | | | |
|---|---|---|---|---|---|
| ☑ | Distance learning opportunities (e-learning) | | | | |
| ☐ | ROTC | | | | |
| | ☐ Army | ☐ | Navy | ☐ | Air Force |
| ☐ | Study abroad | | | | |
| ☐ | Weekend/evening college | | | | |
| ☐ | Teacher certification (below the postsecondary level) | | | | |
| | ☐ Students can complete their preparation in certain areas of specialization | | | | |
| | ☐ Students must complete their preparation at another institution for certain areas of specialization | | | | |
| | ☐ This institution is approved by the state for the initial certification or licensure of teachers | | | | |
| ☐ | None of the above | | | | |

Institution: Loma Linda University (117636)

**Part C - Admission Requirements and Services - Student Services**

**7. If your institution grants a bachelor's degree or higher but does not offer a full 4-year program of study at the undergraduate level, how many years of completed college-level work are required for entrance?**

Number of years

One ▾

**8. Which of the following selected students services are offered by your institution? [Check all that apply]**

| | |
|---|---|
| ☑ | Remedial services |
| ☑ | Academic/career counseling services |
| ☑ | Employment services for current students |
| ☑ | Placement services for program completers |
| ☑ | On-campus day care for children of students |
| ☐ | None of the above |

**9. Does your institution have its own library or are you financially supporting a shared library with another postsecondary education institution?**

- ◉ Have our own library
- ○ Do not have our own library but contribute financial support to a shared library
- ○ Neither of the above

Institution: Loma Linda University (117636)

**Part D - Student Charges - Application Fees**

**1. Is an application fee for admission required by your institution?**

| | | Amount | Prior year |
|---|---|---|---|
| ○ | No | | |
| ◉ | Yes - Indicate amount of application fee | | |
| | Undergraduate | 60 | 60 |
| | Graduate | 60 | 60 |

| | | | |
|---|---|---|---|
| First-professional | | 195 | 195 |

Institution: Loma Linda University (117636)

| Part D - Student Charges Questions |
|---|

**4. Does your institution charge different tuition for in-district, in-state, or out-of-state students?**
*If you anwser Yes to this question, you will be expected to report tuition amounts for in-district, in-state, and out-of-state students.*

| | |
|---|---|
| ◉ | No |
| ○ | Yes |

**5. Does your institution offer institutionally-controlled housing (either on or off campus)?**
*If you answer Yes to this question, you will be expected to specify a housing capacity, and to report a room charge or a combined room and board charge (D12 and D13).*

| | |
|---|---|
| ○ | No |
| ◉ | Yes |
| | Specify housing capacity for academic year 2005-06. 400 |

**6. Do you offer board or meal plans to your students?**
*If you answer Yes to this question, you will be expected to report a board charge or combined room and board charge (D12 and D13).*

| | |
|---|---|
| ◉ | No |
| ○ | Yes - Number of meals per week in the maximum meal plan offered |
| ○ | Yes - Number of meals per week can vary (for example, student receives a meal card and charges meals against the card) |

Institution: Loma Linda University (117636)

| Part D - Undergraduate Student Charges |
|---|

**7. Charges to full-time undergraduate students for the full academic year 2005-06**

| | Amount | Prior year |
|---|---|---|
| All full-time undergraduates | | |
| Average tuition | 22,320 | 21,000 |
| Required fees | 1,572 | 1,050 |

**8. Per credit hour charge for part-time undergraduate students**

| | Amount | Prior year |
|---|---|---|
| Per credit hour charge | 375 | 372 |

Institution: Loma Linda University (117636)

| Part D - Graduate Student Charges |
|---|

**9. Charges to full-time graduate students for the full academic year 2005-06**

| | Amount | Prior year |
|---|---|---|

| | Amount | Prior year |
|---|---|---|
| Average tuition | 14,100 | 14,100 |
| Required fees | 1,572 | 900 |

**10. Per credit hour charge for part-time graduate students**

| | Amount | Prior year |
|---|---|---|
| Per credit hour charge | 465 | 465 |

## Part D - First Professional Student Charges

**11. List the typical tuition and required fees for a full-time first-professional student for the full academic year 2005-06**

DO NOT include room and board charges

| First-professional student | Amount | Prior year |
|---|---|---|
| 1. Chiropractic (D.C. or D.C.M.): | | |
|     Tuition amount | | |
|     Required fees | | |
| 2. Dentistry (D.D.S. or D.M.D.): | | |
|     Tuition amount | 41,928 | 32,961 |
|     Required fees | 2,864 | 1,100 |
| 3. Medicine (M.D.): | | |
|     Tuition amount | 32,192 | 32,500 |
|     Required fees | 1,572 | 1,200 |
| 4. Optometry (O.D.): | | |
|     Tuition amount | | |
|     Required fees | | |
| 5. Osteopathic Medicine (D.O.): | | |
|     Tuition amount | | |
|     Required fees | | |
| 6. Pharmacy (Pharm.D.): | | |
|     Tuition amount | 31,179 | 27,000 |
|     Required fees | 3,072 | 1,000 |
| 7. Podiatry (Pod.D., D.P., or D.P.M.): | | |
|     Tuition amount | | |
|     Required fees | | |
| 8. Veterinary Medicine (D.V.M.): | | |
|     Tuition amount | | |
|     Required fees | | |
| 9. Law (L.L.B. or J.D.): | | |
|     Tuition amount | | |
|     Required fees | | |
| 10.Theology (M. Div., M.H.L., B.D., or Ordination): | | |
|     Tuition amount | | |
|     Required fees | | |
| 11. Other: | | |
|     Tuition amount | | |
|     Required fees | | |

## Part D - Student Charges - Room

**12. What are the typical room charges for a student for the full academic year 2005-06?**

*If your institution offers room at no charge to students, enter zero.*

|  | Amount | Prior year |
|---|---|---|
| Room charges (Double occupancy) | 2,235 | 2,145 |

Institution: Loma Linda University (117636)

## Part E - Additional Information - Athletic Association

**1. Is this institution a member of a national athletic association?**

- ⦿ No
- ○ Yes - Check all that apply
  - ☐ National Collegiate Athletic Association (NCAA)
  - ☐ National Association of Intercollegiate Athletics (NAIA)
  - ☐ National Junior College Athletic Association (NJCAA)
  - ☐ United States Collegiate Athletic Association (USCAA)
  - ☐ National Christian College Athletic Association (NCCAA)
  - ☐ Other

**2. If this institution is a member of the NCAA or NAIA, specify the conference FOR EACH SPORT using the droplist.**

| Sport | NCAA or NAIA member | | Conference |
|---|---|---|---|
| Football | ⦿ No | ○ Yes-Specify | No selection ▾ |
| Basketball | ⦿ No | ○ Yes-Specify | No selection ▾ |
| Baseball | ⦿ No | ○ Yes-Specify | No selection ▾ |
| Cross country and/or track | ⦿ No | ○ Yes-Specify | No selection ▾ |

**3. Did your institution offer athletically-related aid to ANY students in academic year 2004-05?**
*If you answer Yes to this question, you will be provided with screens to report the total number of students that received athletically-related student aid during the 2004-05 academic year (Section V of the Graduation Rates survey).*

- ○ No.
- ○ Yes.

# National Center for Education Statistics

## IPEDS Data Center

**Loma Linda University**
**UnitID**       117636
**OPEID**        00121800
**Address**      11139 Anderson Street, Loma Linda, CA, 92350
**Web Address**  www.llu.edu/index.html

| Institutional Characteristics 2006-07 |
| --- |

Institution: Loma Linda University (117636)

| Part A - Educational Offerings |
| --- |

**1. Which of the following types of instruction/programs are offered by your institution? [Check one or more]**

*If your institution does not offer occupational, academic or continuing professional programs, you are not expected to complete this or any other IPEDS survey.*

- ☑ Occupational, may lead to a certificate, degree, or other formal award
- ☑ Academic, leading to a certificate, degree, or diploma
- ☑ Continuing professional (postbaccalaureate only)
- ☐ Recreational or avocational (leisure) programs
- ☐ Adult basic or remedial instruction or high school equivalency
- ☐ Secondary (high school)

Institution: Loma Linda University (117636)

| Part A - Mission Statement |
| --- |

**2. Please enter your institution's mission statement or a web address (URL) where your mission statement can be found. Mission statements provided manually must be limited to 2,000 characters or less. If your mission statement is lengthy but available electronically, please provide the web address in the space provided. The mission statement will be available to the public on the College Opportunities Online Locator (IPEDS COOL) website.**

Mission Statement URL:                    http:// www.llu.edu/mission/ll

Mission Statement

Institution: Loma Linda University (117636)

| Part B - Organization - Control and Level |
| --- |

**1. What is your institutional control or affiliation?**

Case 6:18-ap-01089-MH    Doc 46    Filed 02/05/19    Entered 02/05/19 13:46:26    Main Document    Page 50 of 286

| ○ | Public - Specify | |
| | Primary control | Secondary control (if applicable) |
| | Select One ▾ | Select One ▾ |
| ○ | Private for-profit | |
| ○ | Private not-for-profit independent (no religious affiliation) | |
| ⊙ | Private not-for-profit religious affiliation - Specify | |
| | Seventh Day Adventists | |

## 2. What award levels are offered by your institution? [Check all that apply]

| Award Level | | |
|---|---|---|

**BELOW THE BACCALAUREATE:**

| 1 | ☑ | Postsecondary award, certificate, or diploma of **less than one academic year**<br>•less than 900 contact or clock hours, or<br>•less than 30 semester or trimester credit hours, or<br>•less than 45 quarter credit hours |
| 2 | ☑ | Postsecondary award, certificate, or diploma of **at least one but less than two academic years**<br>•at least 900 but less than 1800 contact or clock hours, or<br>•at least 30 but less than 60 semester or trimester credit hours, or<br>•at least 45 but less than 90 quarter credit hours |
| 3 | ☑ | Associate's degree |
| 4 | ☑ | Postsecondary award, certificate, or diploma of **at least two but less than four academic years**<br>•1800 or more contact or clock hours, or<br>•60 or more semester or trimester credit hours, or<br>•90 or more quarter credit hours |

**BACCALAUREATE AND ABOVE:**

| 5 | ☑ | Bachelor's degree or equivalent |
| 6 | ☑ | Postbaccalaureate certificate |
| 7 | ☑ | Master's degree |
| 8 | ☑ | Post-master's certificate |
| 9 | ☑ | Doctor's degree |
| 10 | ☑ | First-professional degree |
| 11 | ☑ | First-professional certificate (Post-degree) |
| 12 | ☐ | Other; please specify in the Caveats box |

CAVEATS

Institution: Loma Linda University (117636)

**Part B - Organization - Calendar System**

*Your response to the next question determines how your institution reports Graduation Rates data in the Spring and how you report student charges in Part D of this survey.*

## 3. What is the predominant calendar system at the institution? [Choose one]

**Standard academic terms**

*Checking one of these systems determines that your institution will provide Graduation Rates data based on a FALL COHORT and student charges based on a FULL ACADEMIC YEAR*

○ Semester
⦿ Quarter
○ Trimester
○ 4-1-4 or similar plan
○ Other academic calendar

**Other calendar system**

*Checking one of the following determines that your institution will provide Graduation Rates data based on a FULL YEAR COHORT and student charges data will be requested by PROGRAM.*

○ Differs by program
○ Continuous basis (every 2 weeks, monthly, or other period)

---

**Institution:** Loma Linda University (117636)

**Part B - Organization - Student Enrollment**

## 4. Does your institution enroll any of the following types of students?
*Include all levels that your institution offers, even if there are no students currently enrolled at that level.*

*The answers to these questions determine which screens will be generated for reporting academic year tuition charges, and for reporting Fall Enrollment during the Winter and Spring collections. Additionally, checking Yes for full-time, first-time, degree/certificate-seeking undergraduate students determines that your institution must report pricing information for these students (on the IC survey) and Student Financial Aid information in the Spring collection. The reported full- and part-time 2005 Fall Enrollment counts are provided for your reference.*

| | Full-time | | FT PY Enrollment | Part-time | | | PT PY Enrollment |
|---|---|---|---|---|---|---|---|
| **Undergraduate** (academic or occupational programs) | ○ No | ⦿ Yes | 780 | ○ No | ⦿ Yes | | 312 |
| **First-time, degree/certificate-seeking undergraduate** | ⦿ No | ○ Yes | | ⦿ No | ○ Yes | | |
| **Graduate** | ○ No | ⦿ Yes | 832 | ○ No | ⦿ Yes | | 633 |
| **First-professional** | ○ No | ⦿ Yes | 1,297 | ⦿ No | ○ Yes | | |

**Estimated 2006 Fall Enrollment**

Please provide an early estimate of your institution's fall enrollment for all levels offered at your institution as indicated above for full - and part-time students. Estimates should be based on the definitions used in the IPEDS Enrollment component submitted in the Winter or Spring collection. These data will NOT appear in IPEDS COOL (College Opportunities Online Locator), but will be made available in the IPEDS Peer Analysis System.

| | Full-time | Part-time | Total |
|---|---|---|---|
| Undergraduate (academic or occupational programs) | 800 | 320 | **1,120** |
| Of undergraduates, those who are first-time, degree/certificate-seeking students | 0 | 0 | **0** |
| Graduate | 930 | 520 | **1,450** |
| First-Professional | 1,300 | 0 | **1,300** |

### 5. For academic year 2000-01, did your institution have any full-time first-time degree/certificate-seeking students enrolled in programs at the baccalaureate level or below?

*If you answer Yes to this question, you will be required to provide Graduation Rates data for 2000-01 in the Spring collection. If you answer No to this question, please indicate the reason you are not required to report Graduation Rates for the cohort year requested. If you reported any full-time, first-time degree/certificate-seeking undergraduates on the 2000-01 Enrollment survey, the data will be preloaded below.*

◉ No

☑ This institution did not enroll full-time, first-time (undergraduate) students.

☐ This institution did not offer programs at or below the baccalaureate level.

☐ This institution was not in operation in 2000 -01

○ Yes

Cohort from 2000-01 Enrollment of full-time, first-time degree/certificate-seeking students (GRS Cohort)

### 6. System, Governing Board or Corporate Structure (please see instructions for reporting System or Corporate data.)

◉ This institution is NOT a part of a system or corporate entity.

○ This institution is a part of a system or corporate entity.

Specify name of the system or coporate entity.

-2

---

Institution: Loma Linda University (117636)

**Part C - Admission Requirements and Services - Special Learning Opportunities**

### 5. Does your institution accept any of the following? [Check all that apply]

☐ Dual credit (college credit earned while in high school)

Credit for life experiences
☐ Advanced placement (AP) credits
☑ None of the above

## 6. What types of special learning opportunities are offered by your institution? [Check all that apply]

☑ Distance learning opportunities (e-learning)
☐ ROTC
    ☐ Army         ☐ Navy         ☐ Air Force
☐ Study abroad
☐ Weekend/evening college
☐ Teacher certification (below the postsecondary level)
    ☐ Students can complete their preparation in certain areas of specialization
    ☐ Students must complete their preparation at another institution for certain areas of specialization
    ☐ This institution is approved by the state for the initial certification or licensure of teachers
☐ None of the above

---

Institution: Loma Linda University (117636)

**Part C - Admission Requirements and Services - Student Services**

## 7. If your institution grants a bachelor's degree or higher but does not offer a full 4-year program of study at the undergraduate level, how many years of completed college-level work are required for entrance?

| Number of years | One |
|---|---|

## 8. Which of the following selected students services are offered by your institution? [Check all that apply]

☑ Remedial services
☑ Academic/career counseling services
☑ Employment services for current students
☑ Placement services for program completers
☑ On-campus day care for children of students
☐ None of the above

## 9. Does your institution have its own library or are you financially supporting a shared library with another postsecondary education institution?

◉ Have our own library
○ Do not have our own library but contribute financial support to a shared library

Neither of the above

---

Institution: Loma Linda University (117636)

## Part D - Student Charges - Application Fees

### 1. Is an application fee for admission required by your institution?

○ No

◉ Yes - Indicate amount of application fee

| | Amount | Prior year |
|---|---|---|
| Undergraduate | 60 | 60 |
| Graduate | 75 | 60 |
| First-professional | ⊠ 195 | 195 |

---

Institution: Loma Linda University (117636)

## Part D - Student Charges Questions

### 4. Does your institution charge different tuition for in-district, in-state, or out-of-state students?
*If you anwser Yes to this question, you will be expected to report tuition amounts for in-district, in-state, and out-of-state students.*

◉ No

○ Yes

### 5. Does your institution offer institutionally-controlled housing (either on or off campus)?
*If you answer Yes to this question, you will be expected to specify a housing capacity, and to report a room charge or a combined room and board charge (D12 and D13).*

○ No

◉ Yes

Specify housing capacity for academic year 2006-07.

525

### 6. Do you offer board or meal plans to your students?
*If you answer Yes to this question, you will be expected to report a board charge or combined room and board charge (D12 and D13).*

◉ No

○ Yes - Number of meals per week in the maximum meal plan offered

○ Yes - Number of meals per week can vary (for example, student receives a meal card and charges meals against the card)

Institution: Loma Linda University (117636)

## Part D - Undergraduate Student Charges

**7. Charges to full-time undergraduate students for the full academic year 2006-07**

| All full-time undergraduates | Amount | Prior year |
|---|---|---|
| Average tuition | 23,575 | 22,320 |
| Required fees | 1,720 | 1,572 |

**8. Per credit hour charge for part-time undergraduate students**

| | Amount | Prior year |
|---|---|---|
| Per credit hour charge | ☒ 485 | 375 |

Institution: Loma Linda University (117636)

## Part D - Graduate Student Charges

**9. Charges to full-time graduate students for the full academic year 2006-07**

| | Amount | Prior year |
|---|---|---|
| Average tuition | 16,800 | 14,100 |
| Required fees | 1,720 | 1,572 |

**10. Per credit hour charge for part-time graduate students**

| | Amount | Prior year |
|---|---|---|
| Per credit hour charge | 535 | 465 |

Institution: Loma Linda University (117636)

## Part D - First Professional Student Charges

**11. List the typical tuition and required fees for a full-time first-professional student for the full academic year 2006-07**

DO NOT include room and board charges

| First-professional student | Amount | Prior year |
|---|---|---|
| **1. Chiropractic (D.C. or D.C.M.):** | | |
| Tuition amount | | |
| Required fees | | |
| **2. Dentistry (D.D.S. or D.M.D.):** | | |
| Tuition amount | 45,280 | **41,928** |
| Required fees | ☒ 7,203 | **2,864** |
| **3. Medicine (M.D.):** | | |
| Tuition amount | 35,000 | **32,192** |
| Required fees | 1,720 | **1,572** |
| **4. Optometry (O.D.):** | | |
| Tuition amount | | |
| Required fees | | |
| **5. Osteopathic Medicine (D.O.):** | | |
| Tuition amount | | |
| Required fees | | |
| **6. Pharmacy (Pharm.D.):** | | |
| Tuition amount | 31,890 | **31,179** |
| Required fees | ☒ 1,720 | **3,072** |
| **7. Podiatry (Pod.D., D.P., or D.P.M.):** | | |
| Tuition amount | | |
| Required fees | | |
| **8. Veterinary Medicine (D.V.M.):** | | |
| Tuition amount | | |
| Required fees | | |
| **9. Law (L.L.B. or J.D.):** | | |
| Tuition amount | | |
| Required fees | | |
| **10.Theology (M. Div., M.H.L., B.D., or Ordination):** | | |

|  | Tuition amount | | |
|---|---|---|---|
|  | Required fees | | |
| 11. Other: | | | |
|  | Tuition amount | | |
|  | Required fees | | |

---

### Part D - Student Charges - Room

12. **What are the typical room charges** for a student for the full academic year 2006-07?
*If your institution offers room at no charge to students, enter zero.*

|  | Amount | Prior year |
|---|---|---|
| Room charges (Double occupancy) | 3,100 | 2,235 |

---

### Part E - Additional Information - Athletic Association

**1. Is this institution a member of a national athletic association?**

⊙ No

○ Yes - Check all that apply

☐ National Collegiate Athletic Association (NCAA)

☐ National Association of Intercollegiate Athletics (NAIA)

☐ National Junior College Athletic Association (NJCAA)

☐ United States Collegiate Athletic Association (USCAA)

☐ National Christian College Athletic Association (NCCAA)

☐ Other

**2. If this institution is a member of the NCAA or NAIA, specify the conference FOR EACH SPORT using the droplist.**

| Sport | NCAA or NAIA member | Conference |
|---|---|---|
| Football | ⊙ No ○ Yes-Specify | Select One ▾ |
| Basketball | ⊙ No ○ Yes-Specify | Select One ▾ |
| Baseball | ⊙ No ○ Yes-Specify | Select One ▾ |
|  | ⊙ No ○ Yes-Specify | |

Cross country and/or track

Select One

**3. Did your institution offer athletically-related aid to ANY students in academic year 2005–06?**

*If you answer Yes to this question, you will be provided with screens to report the total number of students that received athletically-related student aid during the 2005-06 academic year (Section V of the Graduation Rates survey).*

○ No.

○ Yes.

# National Center for Education Statistics

## IPEDS Data Center

**Loma Linda University**

| | |
|---|---|
| **UnitID** | 117636 |
| **OPEID** | 00121800 |
| **Address** | 11139 Anderson Street, Loma Linda, CA, 92350 |
| **Web Address** | www.llu.edu/index.html |

| Institutional Characteristics 2007-08 |
|---|

Institution: Loma Linda University (117636)

### Part A - Educational Offerings
**1. Which of the following types of instruction/programs are offered by your institution? [Check one or more]**

*If your institution does not offer occupational, academic or continuing professional programs, you are not expected to complete this or any other IPEDS survey.*

- ☑ Occupational, may lead to a certificate, degree, or other formal award
- ☑ Academic, leading to a certificate, degree, or diploma
- ☑ Continuing professional (postbaccalaureate only)
- ☐ Recreational or avocational (leisure) programs
- ☐ Adult basic or remedial instruction or high school equivalency
- ☐ Secondary (high school)

Institution: Loma Linda University (117636)

### Part A - Mission Statement
**2. Please enter your institution's mission statement or a web address (URL) where your mission statement can be found. Mission statements provided manually must be limited to 3,000 characters or less. If your mission statement is lengthy but available electronically, please provide the web address in the space provided. The mission statement will be available to the public on the College Opportunities Online Locator (IPEDS COOL) website.**

Mission Statement URL:          http:// www.llu.edu/mission/ll

Mission Statement

Institution: Loma Linda University (117636)

### Part B - Organization - Control and Level
**1. What is your institutional control or affiliation?**

- ○ Public - Specify

Primary control                Secondary control (if applicable)

[Select One ▾]                 [Select One ▾]

○ Private for-profit

○ Private not-for-profit independent (no religious affiliation)

◉ Private not-for-profit religious affiliation - Specify

[Seventh Day Adventists ▾]

**2. What award levels are offered by your institution? [Check all that apply]**

**Award Level**

**BELOW THE BACCALAUREATE:**

1   ☑ Postsecondary award, certificate, or diploma of **less than one academic year**
    •less than 900 contact or clock hours, or
    •less than 30 semester or trimester credit hours, or
    •less than 45 quarter credit hours

2   ☑ Postsecondary award, certificate, or diploma of **at least one but less than two academic years**
    •at least 900 but less than 1800 contact or clock hours, or
    •at least 30 but less than 60 semester or trimester credit hours, or
    •at least 45 but less than 90 quarter credit hours

3   ☑ Associate's degree

4   ☑ Postsecondary award, certificate, or diploma of **at least two but less than four academic years**
    •1800 or more contact or clock hours, or
    •60 or more semester or trimester credit hours, or
    •90 or more quarter credit hours

**BACCALAUREATE AND ABOVE:**

5   ☑ Bachelor's degree or equivalent

6   ☑ Postbaccalaureate certificate

7   ☑ Master's degree

8   ☑ Post-master's certificate

9   ☑ Doctor's degree

10  ☑ First-professional degree

11  ☑ First-professional certificate (Post-degree)

12  ☐ Other; please specify in the Caveats box

**CAVEATS**

[                    ]

---

Institution: Loma Linda University (117636)

**Part B – Organization – Calendar System**
*Your response to the next question determines how your institution reports Graduation Rates data in the Spring and how you report student charges in Part D of this survey.*
*If your calendar system is different from prior year or requires a change, please contact the Help Desk at 1-877-225-2568.*

**3. What is the predominant calendar system at the institution? [Choose one]**

**Standard academic terms**
*Checking one of these systems determines that your institution will provide Graduation Rates data based on a FALL COHORT and student charges based on a FULL ACADEMIC YEAR*

○ Semester
◉ Quarter
○ Trimester
○ 4-1-4 or similar plan
○ Other academic calendar

**Other calendar system**
*Checking one of the following determines that your institution will provide Graduation Rates data based on a FULL YEAR COHORT and student charges data will be requested by PROGRAM.*

○ Differs by program
○ Continuous basis (every 2 weeks, monthly, or other period)

Institution: Loma Linda University (117636)

**Part B - Organization - Student Enrollment**
**4. Does your institution enroll any of the following types of students?**

*Include all levels that your institution offers, even if there are no students currently enrolled at that level.*
*The answers to these questions determine which screens will be generated for reporting academic year tuition charges, and for reporting Fall Enrollment during the Winter and Spring collections. Additionally, checking Yes for full-time, first-time, degree/certificate-seeking undergraduate students determines that your institution must report pricing information for these students (on the IC survey) and Student Financial Aid information in the Spring collection. The reported full- and part-time 2006 Fall Enrollment counts are provided for your reference.*

| | Full-time | | FT PY Enrollment | Part-time | | PT PY Enrollment |
|---|---|---|---|---|---|---|
| | No | Yes | | No | Yes | |
| **Undergraduate** (academic or occupational programs) | ○ | ◉ | 865 | ○ | ◉ | 310 |
| **First-time, degree/certificate-seeking undergraduate** | ◉ | ○ | | ◉ | ○ | |
| **Graduate** | ○ | ◉ | 830 | ○ | ◉ | 519 |
| **First-professional** | ○ | ◉ | 1,357 | ◉ | ○ | |

**Estimated 2007 Fall Enrollment**
*Please provide an early estimate of your institution's fall enrollment for all levels offered at your institution as indicated above for full - and part-time students. Estimates should be based on the definitions used in the IPEDS Enrollment component submitted in the Winter or Spring collection. These data will NOT appear in IPEDS COOL (College Opportunities Online Locator), but will be made available in the IPEDS Peer Analysis System.*

| | Full-time | Part-time | Total |
|---|---|---|---|
| **Undergraduate** (academic or occupational programs) | 848 | 228 | 1,076 |
| **Number of undergraduates, those who are first-time, degree/certificate-seeking students** | | | 0 |

| | | | |
|---|---|---|---|
| Graduate | 881 | 579 | 1,460 |
| First-Professional | 1,378 | | 1,378 |

**5. For academic year 2001-02, did your institution have any full-time first-time degree/certificate-seeking students enrolled in programs at the baccalaureate level or below?**

*If you answer Yes to this question, you will be required to provide Graduation Rates data for 2001-02 in the Spring collection. If you answer No to this question, please indicate the reason you are not required to report Graduation Rates for the cohort year requested. If you reported any full-time, first-time degree/certificate-seeking undergraduates on the 2001-02 Enrollment survey, the data will be preloaded below.*

⊙       No

           ☑       This institution did not enroll full-time, first-time (undergraduate) students.

           ☐       This institution did not offer programs at or below the baccalaureate level.

           ☐       This institution was not in operation in 2001-02

○       Yes

**Cohort from 2001-02 Enrollment of full-time, first-time degree/certificate-seeking students (GRS Cohort)**

**6. System, Governing Board or Corporate Structure (please see instructions for reporting System or Corporate data.)**

*If your institution is a part of a system, select yes and enter name of system. If you need assistance, contact the Help Desk at 1-877-225-2568. You will not be able to lock your submission if this question is blank.*

⊙       This institution is NOT a part of a system or corporate entity.

○       This institution is a part of a system or corporate entity.

      Specify name of the system or corporate entity.

Institution: Loma Linda University (117636)

**Part C – Admission Requirements and Services – Special Learning Opportunities**

**5. Does your institution accept any of the following? [Check all that apply]**

☐       Dual credit (college credit earned while in high school)

☐       Credit for life experiences

☐       Advanced placement (AP) credits

☑       None of the above

**6. What types of special learning opportunities are offered by your institution? [Check all that apply]**

☑       Distance learning opportunities (e-learning)

☐       ROTC

      Army                Navy                Air Force

☐          ☐          ☐

☐ Study abroad

☐ Weekend/evening college

☐ Teacher certification (below the postsecondary level)

    ☐ Students can complete their preparation in certain areas of specialization

    ☐ Students must complete their preparation at another institution for certain areas of specialization

    ☐ This institution is approved by the state for the initial certification or licensure of teachers

☐ None of the above

---

Institution: Loma Linda University (117636)

**Part C – Admission Requirements and Services – Student Services**
**7. If your institution grants a bachelor's degree or higher but does not offer a full 4-year program of study at the undergraduate level, how many years of completed college-level work are required for entrance?**

Number of years
                | One ▾ |

**8. Which of the following selected students services are offered by your institution? [Check all that apply]**

☑ Remedial services

☑ Academic/career counseling services

☑ Employment services for current students

☑ Placement services for program completers

☑ On-campus day care for children of students

☐ None of the above

**9. Does your institution have its own library or are you financially supporting a shared library with another postsecondary education institution?**

⦿ Have our own library

○ Do not have our own library but contribute financial support to a shared library

○ Neither of the above

---

Institution: Loma Linda University (117636)

**Part D – Student Charges Questions**
**4. Does your institution charge different tuition for in-district, in-state, or out-of-state students?**
*If you anwser Yes to this question, you will be expected to report tuition amounts for in-district, in-state, and out-of-state students.*

◉ No

◯ Yes

## 5. Does your institution offer institutionally-controlled housing (either on or off campus)?

*If you answer Yes to this question, you will be expected to specify a housing capacity, and to report a room charge or a combined room and board charge (D12 and D13).*

◯ No

◉ Yes

Specify housing capacity for academic year 2007-08

654

## 6. Do you offer board or meal plans to your students?

*If you answer Yes to this question, you will be expected to report a board charge or combined room and board charge (D12 and D13).*

◉ No

◯ Yes - Number of meals per week in the maximum meal plan offered

◯ Yes - Number of meals per week can vary (for example, student receives a meal card and charges meals against the card)

Institution: Loma Linda University (117636)

### Part D - Undergraduate Student Charges
If your institution charges an application fee for admission, indicate the amount.

| | Amount | Prior year |
|---|---|---|
| **Undergraduate application fee** | 60 | 60 |

## 7. Charges to full-time undergraduate students for the full academic year 2007-08

| | Amount | Prior year |
|---|---|---|
| All full-time undergraduates Average tuition | 23,760 | 23,575 |
| Required fees | 1,880 | 1,720 |

## 8. Per credit hour charge for part-time undergraduate students

| | Amount | Prior year |
|---|---|---|
| Per credit hour charge | 495 | 485 |

Institution: Loma Linda University (117636)

### Part D - Graduate Student Charges

If your institution charges an application fee for admission, indicate the amount.

| | Amount | Prior year |
|---|---|---|
| **Graduate application fee** | 75 | 75 |

## 9. Charges to full-time graduate students for the full academic year 2007-08

| | Amount | Prior year |
|---|---|---|
| Average tuition | 17,760 | 16,800 |
| Required fees | 1,880 | 1,720 |

## 10. Per credit hour charge for part-time graduate students

| | Amount | Prior year |
|---|---|---|
| Per credit hour charge | 555 | 535 |

Institution: Loma Linda University (117636)

## Part D – First Professional Student Charges
If your institution charges an application fee for admission, indicate the amount.

| | Amount | Prior year |
|---|---|---|
| **First-professional application fee** | 75 | 195 |

## 11. List the typical tuition and required fees for a full-time first-professional student for the full academic year 2007-08

**DO NOT include room and board charges**

| First-professional student | Amount | Prior year |
|---|---|---|
| **1. Chiropractic (D.C. or D.C.M.):** | | |
| Tuition amount | | |
| Required fees | | |
| **2. Dentistry (D.D.S. or D.M.D.):** | | |
| Tuition amount | 48,904 | 45,280 |
| Required fees | 7,427 | 7,203 |
| **3. Medicine (M.D.):** | | |
| Tuition amount | 34,592 | 35,000 |
| Required fees | 1,904 | 1,720 |
| **4. Optometry (O.D.):** | | |
| Tuition amount | | |
| Required fees | | |
| **5. Osteopathic Medicine (D.O.):** | | |
| Tuition amount | | |

|  | | | |
|---|---|---|---|
| Required fees | | | |

**6. Pharmacy (Pharm.D.):**

| | | Prior year |
|---|---|---|
| Tuition amount | 32,100 | 31,890 |
| Required fees | 1,410 | 1,720 |

**7. Podiatry (Pod.D., D.P., or D.P.M.):**

| | |
|---|---|
| Tuition amount | |
| Required fees | |

**8. Veterinary Medicine (D.V.M.):**

| | |
|---|---|
| Tuition amount | |
| Required fees | |

**9. Law (L.L.B. or J.D.):**

| | |
|---|---|
| Tuition amount | |
| Required fees | |

**10. Theology (M. Div., M.H.L., B.D., or Ordination):**

| | |
|---|---|
| Tuition amount | |
| Required fees | |

**11. Other:**

| | |
|---|---|
| Tuition amount | |
| Required fees | |

Institution: Loma Linda University (117636)

**Part D – Student Charges – Room**
**12. What are the typical room charges for a student for the full academic year 2007-08?**

*If your institution offers room at no charge to students, enter zero.*

| | Amount | Prior year |
|---|---|---|
| Room charges (Double occupancy) | 3,160 | 3,100 |

Institution: Loma Linda University (117636)

**Part E – Additional Information – Athletic Association**
**1. Is this institution a member of a national athletic association?**

◉ No

○ Yes - Check all that apply

☐ National Collegiate Athletic Association (NCAA)

□ National Association of Intercollegiate Athletics (NAIA)

□ National Junior College Athletic Association (NJCAA)

□ United States Collegiate Athletic Association (USCAA)

□ National Christian College Athletic Association (NCCAA)

□ Other

**2. If this institution is a member of the NCAA or NAIA, specify the conference FOR EACH SPORT using the droplist.**

| Sport | NCAA or NAIA member | | Conference |
|---|---|---|---|
| Football | ● No | ○ Yes-Specify | Select One ▾ |
| Basketball | ● No | ○ Yes-Specify | Select One ▾ |
| Baseball | ● No | ○ Yes-Specify | Select One ▾ |
| Cross country and/or track | ● No | ○ Yes-Specify | Select One ▾ |

# EXHIBIT 4

1    Damian P. Richard, Esq. (SBN 262805)
2    Sessions, Fishman, Nathan & Israel, L.L.P.
     1545 Hotel Circle South, Suite 150
3    San Diego, CA 92108-3426
4    Tel: 619/758-1891
5    Fax: 619/296-2013
     drichard@sessions.legal
6    *Attorneys for Defendants*
7    *National Collegiate Student Loan Trust 2006-1*
     *National Collegiate Student Loan Trust 2006-4*
8    *National Collegiate Student Loan Trust 2007-4*
9    *(erroneously sued as*
     *National Collegiate Student Loan Trust 2007-1)*
10

11                UNITED STATES BANKRUPTCY COURT

12                CENTRAL DISTRICT OF CALIFORNIA

13

14

| | |
|---|---|
| IN RE: | Case No. 16-BK-30625-MH |
| JOHN MARTIN MATA | |
| LIVIER MATA | Chapter 7 |
| | |
| JOHN M. MATA, | Adversary No. 6:18-AP-01089-MH |
|        Plaintiff, | |
| vs. | |
| NATIONAL COLLEGIATE STUDENT | NATIONAL COLLEGIATE STUDENT |
| LOAN TRUST 2006-1; NATIONAL | LOAN TRUST 2007-4'S RESPONSE |
| COLLEGIATE STUDENT LOAN | TO PLAINTIFF'S REQUESTS FOR |
| TRUST 2006-4; NATIONAL | PRODUCTION |
| COLLEGIATE STUDENT LOAN | |
| TRAUT 2007-1, | |
|        Defendants. | |

PROPOUNDING PARTY:      Plaintiff, John M. Mata

RESPONDING PARTY:      Defendant, NCSLT 2007-4

SET NUMBER:      One

NOW INTO COURT, through undersigned counsel, comes defendant, National Collegiate Student Loan Trust 2007-4 ("NCSLT 2007-4") (erroneously sued as National Collegiate Student Loan Trust 2007-1), which responds to the Discovery Requests propounded by Plaintiff.

NCSLT 2007-4 objects to the instructions contained in Plaintiff's discovery requests as being overbroad and requesting irrelevant and privileged information and documents. Notwithstanding said objections, NCSLT 2007-4 responds to Plaintiff's Request for Production as follows:

## REQUEST FOR PRODUCTION

**Request for Production No. 1:**

All communications including invoices and monthly statements between You and Plaintiff regarding the Loan after the entry of discharge in the above captioned bankruptcy proceeding.

**Response to Request for Production No. 1:**

**NCSLT 2007-4 objects on the grounds that the student loan owing to NCSLT 2007-4 is nondischargeable and therefore not subject to the Chapter 7 Discharge referenced above. NCSLT 2007-4 objects on the basis that the request is overbroad and seeking confidential and proprietary information disproportional to the needs of the case. NCSLT 2007-4 further objects to this Request on the grounds that it seeks documents which have already been provided, already in the possession, custody or control of Plaintiff, and/or equally available to Plaintiff.**

**Subject to and without waiving these objections, NCSLT 2007-4 responds as follows:** *see* **attached documents NCSLT 0001 through NCSLT 0282.**

**Request for Production No. 2:**

All applications, promissory notes, and Truth in Lending Disclosure Statements, for the Loans.

**Response to Request for Production No. 2:**

NCSLT 2007-4 objects to this Request on the grounds that it seeks documents which have already been provided, already in the possession, custody or control of Plaintiff and/or equally available to and is unduly burdensome, oppressive and overbroad.

Subject to and without waiving these objections, NCSLT 2007-4 responds as follows: *see* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 3:**

All documents concerning any "write-off" of the Loans, including any documents filed with the Internal Revenue Service concerning a "write-off" of the Loans that resulted in tax benefits to You.

**Response to Request for Production No. 3:**

NCSLT 2007-4 objects on the basis that the request is overbroad and seeking confidential and proprietary information disproportional to the needs of the case. NCSLT 2007-4 further objects to this request as overbroad in time and scope, harassing in nature, and seeking information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.

**Request for Production No. 4:**

All communications concerning the assignment or transfer of the Loan.

**Response to Request for Production No. 4:**

NCSLT 2007-4 objects to this Request on the grounds that Plaintiff lacks standing to challenge the assignment of his Loans. *See Anh Nguyet Tran v. Bank of New York*, No. 13 CIV. 580 RPP, 2014 WL 1225575 (S.D.N.Y. Mar. 24,

2014), aff'd, 592 F. App'x 24 (2d Cir. 2015), order amended and superseded, 610 F. App'x 82 (2d Cir. 2015), cert denied 610 F. App'x 82, 136 S.Ct. 409 (2015) (citing *Rajamin v. Deutsche Bank Nat. Trust. Co.,* 2013 WL 1285160, *3 (S.D.N.Y. Mar. 28, 2013)); *In re Walker,* 466 B.R. 271, 282 (Bankr. E.D. Pa. 2012); *Livonia Property Holdings, LLC. v. 12840-12976 Farmington Rd. Holdings, LLC,* 717 F.Supp.2d 724, 736-37 (E.D. Mich. 2010) ("[F]or over a century, state and federal courts around the country have [held] that a litigant who is not a party to an assignment lacks standing to challenge that assignment."), aff'd, 399 Fed.Appx. 97 (6th Cir. 2010).

Subject to and without waiving these objections, NCSLT 2007-4 responds as follows: *see* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 5:**

All documents You provided to Plaintiff after the origination of the Loan, including 1098s, for the Plaintiff to deduct any interest payments from their income tax.

**Response to Request for Production No. 5:**

NCSLT 2007-4 objects on the basis that the request is overbroad and information disproportional to the needs of the case. NCSLT 2007-4 further objects to this request as overbroad in time and scope, harassing in nature, and seeking information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.

Subject to and without waiving these objections, NCSLT 2007-4 responds as follows: *see* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 6:**

All documents including, but not limited to, contracts, assignment, bills of sale, invoices, and other similar documents that establish that You are the servicer for or owner of the Loan.

**Response to Request for Production No. 6:**

*See* **attached documents NCSLT 0001 through NCSLT 0282.**

**Request for Production No. 7:**

All documents demonstrating that TERI guaranteed the Loans, including any Guaranty Agreements between TERI and the originator of the Loans, the Program Guidelines incorporated by reference into the Guaranty Agreements, and any copies of checks made payable by the originator of the Loans for TERI for the Guarantee fee.

**Response to Request for Production No. 7:**

**NCSLT 2007-4 objects on the basis that the request is overbroad and seeking confidential and proprietary information disproportional to the needs of the case. NCSLT 2007-4 further objects to this request as overbroad in time and scope, harassing in nature, and seeking information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.**

**Subject to and without waiving these objections, NCSLT 2007-4 responds as follows:** *see* **attached documents NCSLT 0001 through NCSLT 0282.**

**Request for Production No. 8:**

All documents establishing that You are authorized to act as a debt collector pursuant to STATE OF CALIFORNIA LAW.

**Response to Request for Production No. 8:**

**NCSLT 2007-4 objects on the basis that the term "debt collector" is undefined. NCSLT 2007-4 further objects on the grounds that the request is**

overbroad and seeking information disproportional to the needs of the case. NCSLT 2007-4. NCSLT 2007-4 further objects on the grounds that NCSLT 2007-4 is Plaintiff's student loan creditor, not a debt collector.

Subject to and without waiving these objections, NCSLT 2007-4 further responds as follows: NCSLT 2007-4 is a Delaware Statutory Trust. A Delaware statutory trust is considered a separate legal entity with the ability to file suit on its own behalf. Delaware Statutory Trust Act, 12 Del. Code Ann. 3801. Delaware statutory trusts are recognized as their own legal entity, separate from their trustee. Delaware Code section 3804 grants statutory trusts the ability to file lawsuits, stating "[a] statutory trust may sue and be sued." Del. Code Ann. § 3804(a). Delaware law also refers to a statutory trust as a "business trust." Del. Code Ann. § 3801(g). Delaware courts have acknowledged these same business trusts as valid business organizations since 1947. *Commonwealth Trust Co. v. Capital Ret. Plan*, 54 A.2d 739, 740 (Del. Ch. 1947). Like a corporation, California law recognizes "business trusts" as persons who may sue or be sued under California law. Bus. & Prof.Code § 14001 ("'person' means any person, association, organization, partnership, business trust, limited liability company, or corporation"); Rev. & Tax.Code § 23038; Corp.Code § 174.5; *see Wang v. Wal–Mart Real Estate Bus. Trust*, 153 Cal.App.4th 790, 793 n.1 (2007).

**Request for Production No. 9:**

All documents that You intend to introduce as an exhibit at the trial of this matter.

**Response to Request for Production No. 9:**

*See* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 10:**

All documents that You intend to rely on in meeting your initial legal burden to prove by a preponderance of the evidence that the Loans are encompassed by section 523(a)(8)

**Response to Request for Production No. 10:**

*See* **attached documents NCSLT 0001 through NCSLT 0282.**

**Request for Production No. 11:**

Any and all tape recordings of any conversations between any of Your employees or agents and the Plaintiff.

**Response to Request for Production No. 11:**

**NCSLT 2007-4 objects to this request as overbroad in time and scope, harassing in nature, disproportional to needs of this case, and seeking information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.**

**Request for Production No. 12:**

All documents concerning your determination that Plaintiff's applications for the Loans did not exceed the Plaintiff's published "Cost of Attendance" during the applicable academic terms.

**Response to Request for Production No. 12:**

**NCSLT 2007-4 objects because, although "Cost of Attendance" is defined, the definition merely references a statute and improperly seeks a response interpreting that statute and responding as to whether the statute even applies.  NCSLT 2007-4 further objects because this request misstates facts in evidence as NCSLT 2007-4 was not the original creditor.  NCSLT 2007-4 further objects to this request to the extent it seeks information that is not relevant to a claim or defense of any party, and not relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.**

**Request for Production No. 13:**

All documents that you intended to introduce at trial to prove that Plaintiff's Loan is a Qualified Education Loan.

**Response to Request for Production No. 13:**

NCSLT 2007-4 objects to this request because it seeks information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence. NCSLT 2007-4 further objects to this request to the extent it seeks information that is not relevant to a claim or defense of any party, and not relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving these objections, NCSLT 2007-4 responds as follows: *see* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 14:**

All documents that you intended to introduce at trial to prove that Plaintiff's Loans were made under a program funded in whole or part by a non-profit institution.

**Response to Request for Production No. 14:**

*See* attached documents NCSLT 0001 through NCSLT 0282.

Date: 9/4/18                SESSIONS FISHMAN NATHAN & ISRAEL, LLP
                            */s/Damian Richard*
                            Damian Richard
                            Attorney for Defendants
                            National Collegiate Student Loan Trust 2006-1,
                            National Collegiate Student Loan Trust 2006-4,
                            National Collegiate Student Loan Trust 2007-4

1  Damian P. Richard, Esq. (SBN 262805)
2  SESSIONS, FISHMAN, NATHAN & ISRAEL, L.L.P.
   1545 Hotel Circle South, Suite 150
3  San Diego, CA 92108-3426
4  Tel:   619/758-1891
   Fax:  619/296-2013
5  drichard@sessions.legal
6  *Attorneys for Defendants*
7  *National Collegiate Student Loan Trust 2006-1*
   *National Collegiate Student Loan Trust 2006-4*
8  *National Collegiate Student Loan Trust 2007-4*
9  *(erroneously sued as*
   *National Collegiate Student Loan Trust 2007-1)*
10

11                UNITED STATES BANKRUPTCY COURT
12                CENTRAL DISTRICT OF CALIFORNIA
13

14  IN RE:                          )  Case No.  16-BK-30625-MH
15  JOHN MARTIN MATA                )  Chapter 7
16  LIVIER MATA                     )
                                    )
17  _____        )
18  JOHN M. MATA,                   )  Adversary No. 6:18-AP-01089-MH
              Plaintiff,            )
19                                  )
         vs.                        )
20                                  )  NATIONAL COLLEGIATE STUDENT
    NATIONAL COLLEGIATE STUDENT     )  LOAN TRUST 2006-1'S RESPONSE
21  LOAN TRUST 2006-1; NATIONAL     )  TO PLAINTIFF'S REQUESTS FOR
    COLLEGIATE STUDENT LOAN         )  PRODUCTION
22  TRUST 2006-4; NATIONAL          )
    COLLEGIATE STUDENT LOAN         )
23                                  )
    TRAUT 2007-1,                   )
24             Defendants.          )
                                    )
25  _____        )

26  PROPOUNDING PARTY:         Plaintiff, John M. Mata

27  RESPONDING PARTY:          Defendant, NCSLT 2006-1

28  SET NUMBER:                One

              NCSLT 2006-1's Response to Plaintiff's Requests for Production

                                    l

NOW INTO COURT, through undersigned counsel, comes defendant, National Collegiate Student Loan Trust 2006-1 ("NCSLT 2006-1"), which responds to the Discovery Requests propounded by Plaintiff.

NCSLT 2006-1 objects to the instructions contained in Plaintiff's discovery requests as being overbroad and requesting irrelevant and privileged information and documents. Notwithstanding said objections, NCSLT 2006-1 responds to Plaintiff's Request for Production as follows:

## REQUEST FOR PRODUCTION

### Request for Production No. 1:

All communications including invoices and monthly statements between You and Plaintiff regarding the Loan after the entry of discharge in the above captioned bankruptcy proceeding.

### Response to Request for Production No. 1:

NCSLT 2006-1 objects on the grounds that the student loan owing to NCSLT 2006-1 is nondischargeable and therefore not subject to the Chapter 7 Discharge referenced above. NCSLT 2006-1 objects on the basis that the request is overbroad and seeking confidential and proprietary information disproportional to the needs of the case. NCSLT 2006-1 further objects to this Request on the grounds that it seeks documents which have already been provided, already in the possession, custody or control of Plaintiff, and/or equally available to Plaintiff.

Subject to and without waiving these objections, NCSLT 2006-1 responds as follows: *see* attached documents NCSLT 0001 through NCSLT 0282.

### Request for Production No. 2:

All applications, promissory notes, and Truth in Lending Disclosure Statements, for the Loans.

**Response to Request for Production No. 2:**

NCSLT 2006-1 objects to this Request on the grounds that it seeks documents which have already been provided, already in the possession, custody or control of Plaintiff and/or equally available to and is unduly burdensome, oppressive and overbroad.

Subject to and without waiving these objections, NCSLT 2006-1 responds as follows: *see* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 3:**

All documents concerning any "write-off" of the Loans, including any documents filed with the Internal Revenue Service concerning a "write-off" of the Loans that resulted in tax benefits to You.

**Response to Request for Production No. 3:**

NCSLT 2006-1 objects on the basis that the request is overbroad and seeking confidential and proprietary information disproportional to the needs of the case. NCSLT 2006-1 further objects to this request as overbroad in time and scope, harassing in nature, and seeking information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.

**Request for Production No. 4:**

All communications concerning the assignment or transfer of the Loan.

**Response to Request for Production No. 4:**

NCSLT 2006-1 objects to this Request on the grounds that Plaintiff lacks standing to challenge the assignment of his Loans. *See Anh Nguyet Tran v. Bank of New York*, No. 13 CIV. 580 RPP, 2014 WL 1225575 (S.D.N.Y. Mar. 24, 2014), aff'd, 592 F. App'x 24 (2d Cir. 2015), order amended and superseded, 610 F. App'x 82 (2d Cir. 2015), cert denied 610 F. App'x 82, 136 S.Ct. 409

1   (2015) (citing *Rajamin v. Deutsche Bank Nat. Trust. Co.*, 2013 WL 1285160, *3

2   (S.D.N.Y. Mar. 28, 2013)); *In re Walker*, 466 B.R. 271, 282 (Bankr. E.D. Pa.

3   2012); *Livonia Property Holdings, LLC. v. 12840-12976 Farmington Rd.*

4   *Holdings, LLC*, 717 F.Supp.2d 724, 736-37 (E.D. Mich. 2010) ("[F]or over a

5   century, state and federal courts around the country have [held] that a litigant

6   who is not a party to an assignment lacks standing to challenge that

7   assignment."), aff'd, 399 Fed.Appx. 97 (6th Cir. 2010).

8        Subject to and without waiving these objections, NCSLT 2006-1

9   responds as follows: *see* attached documents NCSLT 0001 through NCSLT

10  0282.

11  **Request for Production No. 5:**

12       All documents You provided to Plaintiff after the origination of the Loan,

13  including1098s, for the Plaintiff to deduct any interest payments from their income

14  tax.

15

16  **Response to Request for Production No. 5:**

17       NCSLT 2006-1 objects on the basis that the request is overbroad and

18  information disproportional to the needs of the case. NCSLT 2006-1 further

19  objects to this request as overbroad in time and scope, harassing in nature, and

20  seeking information not relevant to the allegations contained in the Adversary

21  Complaint and not likely to lead to the discovery of admissible evidence.

22       Subject to and without waiving these objections, NCSLT 2006-1

23  responds as follows: *see* attached documents NCSLT 0001 through NCSLT

24  0282.

25  **Request for Production No. 6:**

26       All documents including, but not limited to, contracts, assignment, bills of

27  sale, invoices, and other similar documents that establish that You are the servicer

28  for or owner of the Loan.

**Response to Request for Production No. 6:**

*See* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 7:**

All documents demonstrating that TERI guaranteed the Loans, including any Guaranty Agreements between TERI and the originator of the Loans, the Program Guidelines incorporated by reference into the Guaranty Agreements, and any copies of checks made payable by the originator of the Loans for TERI for the Guarantee fee.

**Response to Request for Production No. 7:**

NCSLT 2006-1 objects on the basis that the request is overbroad and seeking confidential and proprietary information disproportional to the needs of the case. NCSLT 2006-1 further objects to this request as overbroad in time and scope, harassing in nature, and seeking information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.

Subject to and without waiving these objections, NCSLT 2006-1 responds as follows: *see* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 8:**

All documents establishing that You are authorized to act as a debt collector pursuant to STATE OF CALIFORNIA LAW.

**Response to Request for Production No. 8:**

NCSLT 2006-1 objects on the basis that the term "debt collector" is undefined. NCSLT 2006-1 further objects on the grounds that the request is overbroad and seeking information disproportional to the needs of the case. NCSLT 2006-1. NCSLT 2006-1 further objects on the grounds that NCSLT 2006-1 is Plaintiff's student loan creditor, not a debt collector.

**Subject to and without waiving these objections, NCSLT 2006-1 further responds as follows: NCSLT 2006-1 is a Delaware Statutory Trust. A Delaware statutory trust is considered a separate legal entity with the ability to file suit on its own behalf. Delaware Statutory Trust Act, 12 Del. Code Ann. 3801. Delaware statutory trusts are recognized as their own legal entity, separate from their trustee. Delaware Code section 3804 grants statutory trusts the ability to file lawsuits, stating "[a] statutory trust may sue and be sued." Del. Code Ann. § 3804(a). Delaware law also refers to a statutory trust as a "business trust." Del. Code Ann. § 3801(g). Delaware courts have acknowledged these same business trusts as valid business organizations since 1947. *Commonwealth Trust Co. v. Capital Ret. Plan*, 54 A.2d 739, 740 (Del. Ch. 1947). Like a corporation, California law recognizes "business trusts" as persons who may sue or be sued under California law. Bus. & Prof.Code § 14001 ("'person' means any person, association, organization, partnership, business trust, limited liability company, or corporation"); Rev. & Tax.Code § 23038; Corp.Code § 174.5; *see Wang v. Wal–Mart Real Estate Bus. Trust*, 153 Cal.App.4th 790, 793 n.1 (2007).**

**<u>Request for Production No. 9:</u>**

All documents that You intend to introduce as an exhibit at the trial of this matter.

**<u>Response to Request for Production No. 9:</u>**

***See* attached documents NCSLT 0001 through NCSLT 0282.**

**<u>Request for Production No. 10:</u>**

All documents that You intend to rely on in meeting your initial legal burden to prove by a preponderance of the evidence that the Loans are encompassed by section 523(a)(8)

**<u>Response to Request for Production No. 10:</u>**

*See* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 11:**

Any and all tape recordings of any conversations between any of Your employees or agents and the Plaintiff.

**Response to Request for Production No. 11:**

NCSLT 2006-1 objects to this request as overbroad in time and scope, harassing in nature, disproportional to needs of this case, and seeking information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.

**Request for Production No. 12:**

All documents concerning your determination that Plaintiff's applications for the Loans did not exceed the Plaintiff's published "Cost of Attendance" during the applicable academic terms.

**Response to Request for Production No. 12:**

NCSLT 2006-1 objects because, although "Cost of Attendance" is defined, the definition merely references a statute and improperly seeks a response interpreting that statute and responding as to whether the statute even applies.  NCSLT 2006-1 further objects because this request misstates facts in evidence as NCSLT 2006-1 was not the original creditor.  NCSLT 2006-1 further objects to this request to the extent it seeks information that is not relevant to a claim or defense of any party, and not relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

**Request for Production No. 13:**

All documents that you intended to introduce at trial to prove that Plaintiff's Loan is a Qualified Education Loan.

**Response to Request for Production No. 13:**

NCSLT 2006-1 objects to this request because it seeks information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.  NCSLT 2006-1 further objects to this request to the extent it seeks information that is not relevant to a claim or defense of any party, and not relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving these objections, NCSLT 2006-1 responds as follows:  *see* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 14:**

All documents that you intended to introduce at trial to prove that Plaintiff's Loans were made under a program funded in whole or part by a non-profit institution.

**Response to Request for Production No. 14:**

*See* attached documents NCSLT 0001 through NCSLT 0282.

Date: 9/4/18                        SESSIONS FISHMAN NATHAN & ISRAEL, LLP
                                    */s/Damian Richard*
                                    Damian Richard
                                    Attorney for Defendants
                                    National Collegiate Student Loan Trust 2006-1,
                                    National Collegiate Student Loan Trust 2006-4,
                                    National Collegiate Student Loan Trust 2007-4

1  Damian P. Richard, Esq. (SBN 262805)
2  SESSIONS, FISHMAN, NATHAN & ISRAEL, L.L.P.
   1545 Hotel Circle South, Suite 150
3  San Diego, CA  92108-3426
4  Tel:   619/758-1891
   Fax:  619/296-2013
5  drichard@sessions.legal
6  *Attorneys for Defendants*
7  *National Collegiate Student Loan Trust 2006-1*
   *National Collegiate Student Loan Trust 2006-4*
8  *National Collegiate Student Loan Trust 2007-4*
9  *(erroneously sued as*
   *National Collegiate Student Loan Trust 2007-1)*
10

11           UNITED STATES BANKRUPTCY COURT
12             CENTRAL DISTRICT OF CALIFORNIA
13

14 IN RE:                          )  Case No.  16-BK-30625-MH
15 JOHN MARTIN MATA                )  Chapter 7
16 LIVIER MATA                     )
17                                 )
   JOHN M. MATA,                   )  Adversary No. 6:18-AP-01089-MH
18            Plaintiff,           )
19     vs.                         )
20 NATIONAL COLLEGIATE STUDENT     )  NATIONAL COLLEGIATE STUDENT
21 LOAN TRUST 2006-1; NATIONAL     )  LOAN TRUST 2006-4'S RESPONSE
   COLLEGIATE STUDENT LOAN         )  TO PLAINTIFF'S REQUESTS FOR
22 TRUST 2006-4; NATIONAL          )  PRODUCTION
23 COLLEGIATE STUDENT LOAN         )
24 TRAUT 2007-1,                   )
             Defendants.           )
25
26 PROPOUNDING PARTY:       Plaintiff, John M. Mata
27 RESPONDING PARTY:        Defendant, NCSLT 2006-4
28
   SET NUMBER:              One

NCSLT 2006-4's Response to Plaintiff's Requests for Production

1

NOW INTO COURT, through undersigned counsel, comes defendant, National Collegiate Student Loan Trust 2006-4 ("NCSLT 2006-4"), which responds to the Discovery Requests propounded by Plaintiff.

NCSLT 2006-4 objects to the instructions contained in Plaintiff's discovery requests as being overbroad and requesting irrelevant and privileged information and documents. Notwithstanding said objections, NCSLT 2006-4 responds to Plaintiff's Request for Production as follows:

## REQUEST FOR PRODUCTION

### Request for Production No. 1:

All communications including invoices and monthly statements between You and Plaintiff regarding the Loan after the entry of discharge in the above captioned bankruptcy proceeding.

### Response to Request for Production No. 1:

**NCSLT 2006-4 objects on the grounds that the student loan owing to NCSLT 2006-4 is nondischargeable and therefore not subject to the Chapter 7 Discharge referenced above. NCSLT 2006-4 objects on the basis that the request is overbroad and seeking confidential and proprietary information disproportional to the needs of the case. NCSLT 2006-4 further objects to this Request on the grounds that it seeks documents which have already been provided, already in the possession, custody or control of Plaintiff, and/or equally available to Plaintiff.**

**Subject to and without waiving these objections, NCSLT 2006-4 responds as follows:** *see* **attached documents NCSLT 0001 through NCSLT 0282.**

### Request for Production No. 2:

All applications, promissory notes, and Truth in Lending Disclosure Statements, for the Loans.

**Response to Request for Production No. 2:**

NCSLT 2006-4 objects to this Request on the grounds that it seeks documents which have already been provided, already in the possession, custody or control of Plaintiff and/or equally available to and is unduly burdensome, oppressive and overbroad.

Subject to and without waiving these objections, NCSLT 2006-4 responds as follows: *see* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 3:**

All documents concerning any "write-off" of the Loans, including any documents filed with the Internal Revenue Service concerning a "write-off" of the Loans that resulted in tax benefits to You.

**Response to Request for Production No. 3:**

NCSLT 2006-4 objects on the basis that the request is overbroad and seeking confidential and proprietary information disproportional to the needs of the case. NCSLT 2006-4 further objects to this request as overbroad in time and scope, harassing in nature, and seeking information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.

**Request for Production No. 4:**

All communications concerning the assignment or transfer of the Loan.

**Response to Request for Production No. 4:**

NCSLT 2006-4 objects to this Request on the grounds that Plaintiff lacks standing to challenge the assignment of his Loans. *See Anh Nguyet Tran v. Bank of New York,* No. 13 CIV. 580 RPP, 2014 WL 1225575 (S.D.N.Y. Mar. 24, 2014), aff'd, 592 F. App'x 24 (2d Cir. 2015), order amended and superseded, 610 F. App'x 82 (2d Cir. 2015), cert denied 610 F. App'x 82, 136 S.Ct. 409

(2015) (citing *Rajamin v. Deutsche Bank Nat. Trust. Co.,* 2013 WL 1285160, *3 (S.D.N.Y. Mar. 28, 2013)); *In re Walker,* 466 B.R. 271, 282 (Bankr. E.D. Pa. 2012); *Livonia Property Holdings, LLC. v. 12840-12976 Farmington Rd. Holdings, LLC,* 717 F.Supp.2d 724, 736-37 (E.D. Mich. 2010) ("[F]or over a century, state and federal courts around the country have [held] that a litigant who is not a party to an assignment lacks standing to challenge that assignment."), aff'd, 399 Fed.Appx. 97 (6th Cir. 2010).

Subject to and without waiving these objections, NCSLT 2006-4 responds as follows: *see* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 5:**

All documents You provided to Plaintiff after the origination of the Loan, including1098s, for the Plaintiff to deduct any interest payments from their income tax.

**Response to Request for Production No. 5:**

NCSLT 2006-4 objects on the basis that the request is overbroad and information disproportional to the needs of the case. NCSLT 2006-4 further objects to this request as overbroad in time and scope, harassing in nature, and seeking information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.

Subject to and without waiving these objections, NCSLT 2006-4 responds as follows: *see* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 6:**

All documents including, but not limited to, contracts, assignment, bills of sale, invoices, and other similar documents that establish that You are the servicer for or owner of the Loan.

**Response to Request for Production No. 6:**

*See* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 7:**

All documents demonstrating that TERI guaranteed the Loans, including any Guaranty Agreements between TERI and the originator of the Loans, the Program Guidelines incorporated by reference into the Guaranty Agreements, and any copies of checks made payable by the originator of the Loans for TERI for the Guarantee fee.

**Response to Request for Production No. 7:**

NCSLT 2006-4 objects on the basis that the request is overbroad and seeking confidential and proprietary information disproportional to the needs of the case. NCSLT 2006-4 further objects to this request as overbroad in time and scope, harassing in nature, and seeking information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.

Subject to and without waiving these objections, NCSLT 2006-4 responds as follows: *see* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 8:**

All documents establishing that You are authorized to act as a debt collector pursuant to STATE OF CALIFORNIA LAW.

**Response to Request for Production No. 8:**

NCSLT 2006-4 objects on the basis that the term "debt collector" is undefined. NCSLT 2006-4 further objects on the grounds that the request is overbroad and seeking information disproportional to the needs of the case. NCSLT 2006-4. NCSLT 2006-4 further objects on the grounds that NCSLT 2006-4 is Plaintiff's student loan creditor, not a debt collector.

Subject to and without waiving these objections, NCSLT 2006-4 further responds as follows:   NCSLT 2006-4 is a Delaware Statutory Trust.   A Delaware statutory trust is considered a separate legal entity with the ability to file suit on its own behalf. Delaware Statutory Trust Act, 12 Del. Code Ann. 3801.   Delaware statutory trusts are recognized as their own legal entity, separate from their trustee.   Delaware Code section 3804 grants statutory trusts the ability to file lawsuits, stating "[a] statutory trust may sue and be sued." Del. Code Ann. § 3804(a).   Delaware law also refers to a statutory trust as a "business trust."   Del. Code Ann. § 3801(g).   Delaware courts have acknowledged these same business trusts as valid business organizations since 1947. *Commonwealth Trust Co. v. Capital Ret. Plan*, 54 A.2d 739, 740 (Del. Ch. 1947).   Like a corporation, California law recognizes "business trusts" as persons who may sue or be sued under California law.   Bus. & Prof.Code § 14001 ("'person' means any person, association, organization, partnership, business trust, limited liability company, or corporation"); Rev. & Tax.Code § 23038; Corp.Code § 174.5; *see Wang v. Wal–Mart Real Estate Bus. Trust*, 153 Cal.App.4th 790, 793 n.1 (2007).

**Request for Production No. 9:**

All documents that You intend to introduce as an exhibit at the trial of this matter.

**Response to Request for Production No. 9:**

*See* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 10:**

All documents that You intend to rely on in meeting your initial legal burden to prove by a preponderance of the evidence that the Loans are encompassed by section 523(a)(8)

**Response to Request for Production No. 10:**

*See* **attached documents NCSLT 0001 through NCSLT 0282.**

**Request for Production No. 11:**

Any and all tape recordings of any conversations between any of Your employees or agents and the Plaintiff.

**Response to Request for Production No. 11:**

NCSLT 2006-4 objects to this request as overbroad in time and scope, harassing in nature, disproportional to needs of this case, and seeking information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.

**Request for Production No. 12:**

All documents concerning your determination that Plaintiff's applications for the Loans did not exceed the Plaintiff's published "Cost of Attendance" during the applicable academic terms.

**Response to Request for Production No. 12:**

NCSLT 2006-4 objects because, although "Cost of Attendance" is defined, the definition merely references a statute and improperly seeks a response interpreting that statute and responding as to whether the statute even applies. NCSLT 2006-4 further objects because this request misstates facts in evidence as NCSLT 2006-4 was not the original creditor. NCSLT 2006-4 further objects to this request to the extent it seeks information that is not relevant to a claim or defense of any party, and not relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

**Request for Production No. 13:**

All documents that you intended to introduce at trial to prove that Plaintiff's Loan is a Qualified Education Loan.

**Response to Request for Production No. 13:**

NCSLT 2006-4 objects to this request because it seeks information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.  NCSLT 2006-4 further objects to this request to the extent it seeks information that is not relevant to a claim or defense of any party, and not relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving these objections, NCSLT 2006-4 responds as follows:  *see* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 14:**

All documents that you intended to introduce at trial to prove that Plaintiff's Loans were made under a program funded in whole or part by a non-profit institution.

**Response to Request for Production No. 14:**

*See* attached documents NCSLT 0001 through NCSLT 0282.

Date: 9/4/18                           SESSIONS FISHMAN NATHAN & ISRAEL, LLP
                                       */s/Damian Richard*
                                       Damian Richard
                                       Attorney for Defendants
                                       National Collegiate Student Loan Trust 2006-1,
                                       National Collegiate Student Loan Trust 2006-4,
                                       National Collegiate Student Loan Trust 2007-4

# EXHIBIT 5

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| In re | ) | |
| | ) | **Chapter 11** |
| THE EDUCATION RESOURCES INSTITUTE, INC., | ) | **Case No. 08-12540(HJB)** |
| | ) | |
| Debtor. | ) | |

**ORDER AUTHORIZING THE EDUCATION RESOURCES INSTITUTE, INC.**
**TO REJECT AND TERMINATE CERTAIN EXECUTORY CONTRACTS AND**
**APPROVING SETTLEMENT UNDER FED. R. BANKR. P. 9019 OF CLAIMS AND**
**DISPUTES OVER THE CONSEQUENCES THEREOF**
[RBS CITIZENS, N.A. – LOAN ORIGINATION AND GUARANTY AGREEMENTS]

Upon the motion of The Education Resources Institute, Inc., the debtor and debtor in

possession in the above-captioned case (the "Debtor"), seeking entry of an order (a) authorizing

the Debtor to reject and terminate its existing loan origination agreements and guaranty

agreements with RBS Citizens, N.A. ("Citizens"), (b) approving a settlement between the Debtor

and Citizens by which Citizens will release certain alleged post-petition administrative claims in

exchange for the Debtor's release of its post-petition guaranty fees which would otherwise

secure Citizens' claim, and (c) approving a certain Transition Agreement for the orderly

termination and wind down of loan programs, which seeks to minimize adverse consequences to

the estate, its creditors and qualified applicants whose loans are in the Pipeline (the "Motion")[1];

and upon the record of the hearing on the Motion, the Court finds that: (i) the relief requested is

in the best interests of the Debtor's estate, its creditors and other parties in interest; (ii) this Court

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (iii) the Motion is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2); (iv) venue of this proceeding and the Motion is

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the
Motion.

proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; (v) proper and adequate notice of

the Motion and any hearing thereon has been given and no other or further notice is necessary;

and (vi) upon the record herein, after due deliberation thereon, good and sufficient cause exists

for the granting of the relief as set forth herein.

IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED and APPROVED on the terms and conditions set forth

below, as requested in the Motion.

2.    Notice of the Motion as set forth in the Motion and herein is sufficient under the

circumstances.

3.    Effective immediately, and in accordance with the provisions of the Motion, the

Terminated Contracts are hereby rejected and terminated, without prejudice to Citizen's

contention that said Terminated Contracts are not capable of assumption under Section 365 of

the Code and without prejudice to the rights of the Debtor, the Committee or any estate

representative to dispute such contention.

4.    The Transition Agreement in the form attached hereto as Exhibit A, is

APPROVED, effective immediately, and the Debtor is authorized to enter into the Transition

Agreement.

5.    Citizens shall continue to fund Pipeline Loans in accordance with the terms of the

Transition Agreement.

6.    Subject to the "Committee Review Procedure" (as defined below), the Debtor

shall waive, relinquish and release to Citizens all guaranty fees for any Pipeline Loan (which are

estimated to be in the approximate amount of $5,287,131 as set forth in the Affidavit of Eileen

Morris), (hereinafter referred to as the "Released Fees") and such Released Fees are hereby

2

deemed not to be property of the estate, as that term is defined in Section 541(a) of the Code, and

as that term is used in Section 362(a) of the Code. Nothing in this Order shall impair or limit the

rights of the Debtor, the Official Committee of Unsecured Creditors ("Committee") or any other

party in interest to contest whether any particular amounts released or to be released to Citizens

in point of fact are Pipeline Loan guaranty fees, and to seek disgorgement of any overpayment

from Citizens or such other appropriate relief from this Court accordingly. The Committee shall

have the right to review the Debtor's books and records and make inquiry of the Debtor and the

Debtor's professional advisers regarding the accuracy of the calculation of the Released Fees,

and the Committee may object to the amount of the Released Fees on or before Thursday, June

19, 2008, and request an emergency hearing in connection with such objection, which objection

shall be considered by the Court at the omnibus hearing scheduled for June 23, 2008 in this

bankruptcy case (the "Committee Review Procedure"). On June 20, 2008, the Debtor shall remit

any undisputed portion of the Released Fees to Citizens, and the disputed portion of the Released

fees, if any, shall only be remitted upon and pursuant to further order of the Court.

7.    On the Effective Date, in accordance with the provisions of the Motion, Citizens

shall be deemed to have released and waived the following, and only the following: (i) any and

all claims for damages arising from termination and rejection of all Loan Origination

Agreements, (but Citizens shall retain all prepetition claims under the Guarantees, and any

security agreements and other Program documents, subject to the rights of all parties in interest,

who would otherwise have standing, to object to allowance of any such claims, to seek to

subordinate or recharacterize any such claims and to contest the extent, priority or validity of any

prepetition security interest or lien asserted by Citizens); (ii) all alleged post-petition

administrative claims on account of the Debtor's Guaranty of any Pipeline Loans by Citizens;

and, (iii) any and all claims arising from accrued interest charges credited to Program Loan

borrower's account balances under the Program Loans due to delays in Program Loan

disbursements resulting from certain Program Loan disbursement checks drawn by the

Debtor not having been honored by the Debtor's drawee bank during the month of April

2008, which waiver shall be limited to the maximum amount of $35,000 (which amount the

Debtor believes will not be exceeded), with any excess over $35,000 to be reimbursed by the

Debtor to Citizens within two business days following the Effective Date.

      8.    Citizens shall continue to deliver to the Debtor information concerning Program

Loans identified as Servicer Data Requirements in the exhibits to certain Guarantees, which

information shall be subject to the confidentiality provisions of the Transition Agreement.

      9.    Except as provided in numbered paragraph 7 above, nothing herein waives,

releases, relinquishes or otherwise compromises any other claim, obligation, collateral,

agreement, right or any defense that either the Debtor, the Committee, all parties in interest or

Citizens may have against or with respect to the other, or with respect to any other person or

entity, including, without limitation, any claims arising from the alleged failure by the Debtor to

perform its alleged guaranty obligations and obligations concerning indemnities, warranties,

intellectual property, confidentiality or other prepetition claims under Sections 502, 506 or any

other provision of the Code ("Dispute"); provided, however, that any pre-petition claim asserted

by Citizens is hereby deemed to be (i) a secured claim to the extent that such claim is secured by

the prepetition Pledged Accounts pursuant to the Program Agreements and (ii) otherwise, a

general unsecured claim.

      10.    Except as provided herein, nothing in this Order is intended to or shall operate as

an adjudication of, and the Debtor, Citizens, the Committee and all parties in interest retain all

rights with respect to, (i) the allowance or disallowance of any claim asserted by Citizens in this case, (ii) the extent, priority or validity of any security interest or lien asserted or that hereinafter is asserted by Citizens and (iii) whether any claims, security interests or liens asserted by Citizens or to be asserted by Citizens should be subordinated or recharacterized. This Order is effective immediately as a final order for purposes of 28 U.S.C. § 158(a)(1) and this Order is binding upon and enforceable against the Debtor's estate, the Debtor, Citizens, and the Committee, and upon their respective successors and assigns, including any subsequently appointed trustee under Chapters 11 or 7 of the Code.

11.    Solely as between the Debtor and Citizens, notwithstanding anything in this Order, or in the Program Documents, or anything that occurs by operation of the Bankruptcy Code, including, without limitation, 11 U.S.C. section 365, the entry and implementation of this Order shall not be deemed in and of itself to be a default or to give rise to a default under any other document or agreement between or among Citizens and the Debtor, whether by operation of the express terms of any such document (including, without limitation, any cross-default provision) or otherwise, without prejudice to any of Citizens contentions as to third parties on any contract as to which TERI is not a party, and without prejudice to any contention of Citizens that there was a default under any such agreement independent of the fact of entry of this Order.

12.    This Court shall retain jurisdiction to interpret, enforce and implement the terms of this Order.

Dated: June //, 2008

_____
Honorable Henry J. Boroff
United States Bankruptcy Judge

5

# EXHIBIT A

R&B – 6/5/08 C&M 6.6.03

## TRANSITION AGREEMENT

This Transition Agreement dated as of June __, 2008 is by and between The Education Resources Institute, Inc., a private non-profit corporation organized under Chapter 180 of the Massachusetts General Laws with its principal place of business at 31 St. James Avenue, 4ʰ floor, Boston, Massachusetts 02116 ("**TERI**"), and RBS Citizens, N.A., a national banking association with its principal place of business at One Citizens Plaza, Providence, Rhode Island 02903, for itself and as successor in interest to Charter One Bank, N.A. and Citizens Bank of Rhode Island (collectively, "**Lender**").

WHEREAS, TERI is the debtor and debtor-in-possession in a case styled *In re The Education Resources Institute, Inc.* (United States Bankruptcy Court, District of Massachusetts, Eastern Division, Chapter 11 Case No. 08-12540 (HGB) ("**Bankruptcy Case**") and has submitted a motion seeking an order authorizing the rejection and termination of its Loan Origination Agreements and Guaranty Agreements with Lender and for the approval of this Agreement (the "**Motion**"); and

WHEREAS, TERI and Lender wish to enter into this Agreement to establish in conjunction with the Motion their respective rights and obligations with regard to certain issues arising from termination of the Guarantees and the wind down of Loan programs.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, subject only to approval of the United States Bankruptcy Court for the District of Massachusetts ("**Bankruptcy Court**") and the terms and conditions set forth in this Agreement, and intending to be legally bound, TERI and Lender hereby agree as follows:

1.   **Definitions.**

Capitalized terms used herein and not otherwise defined shall have the meanings provided in the Motion. The following terms shall have the meanings provided:

"**Agreement**" shall mean this Transition Agreement dated as of June __, 2008, by and between Lender and TERI, as amended.

"**Bankruptcy Case**" shall have the meaning provided in the first "Whereas" clause hereof.

"**Borrower**" shall mean the person, or all persons collectively, including all students, co-borrowers, guarantors, endorsers, and accommodation parties, who execute a promissory note individually or, in the case of multiple Borrowers, severally and jointly, for the purpose of obtaining funds from Lender under a Program.

"**Due Diligence**" shall mean the utilization by Lender of policies, practices and procedures in the origination, servicing and collection of Loans that comply with the standards set forth in the Program Guidelines and the requirements of all applicable federal and state laws and regulations.

1

**"FMC"** shall mean The First Marblehead Corporation, a Delaware corporation.

**"FMER"** shall mean First Marblehead Education Resources, Inc., a Delaware corporation.

**"GLB Act"** shall mean the Gramm-Leach-Bliley Act of 1999 and its implementing regulations, to the extent applicable.

**"Guaranty Claim"** shall mean a claim by Lender to TERI for a guaranty payment under a Guaranty with respect to a Loan.

**"Guaranty"** and **"Guarantees"** shall have the meaning set forth in the Motion.

**"Guaranty Fees"** shall have the meaning provided in the Guaranty pursuant to which a Loan was extended.

**"Loan"** shall mean a Program Loan as defined in the Motion.

**"LOA"** or **"Loan Origination Agreement"** shall have the meaning set forth in the Motion.

**"Loan Origination Fee"** shall have the meaning set forth in the applicable LOA as in effect the day before the Petition Date..

**"Motion"** shall have the meaning set forth in the first "Whereas" clause hereof.

**"Net Pipeline Guaranty Fee"** shall have the meaning set forth in Section 3.a hereof.

**"Order"** means any order entered on the Motion.

**"Pipeline Loans"** shall have the meaning provided in the Motion.

**"Pledged Account"** shall mean the Pledged Account established by TERI under the Security Agreement.

**"Prior Loans"** shall mean Program Loans extended prior to the Petition Date.

**"Program"** shall mean a Program, as defined in the Guarantees as from time to time amended and supplemented, under which Loans guaranteed under a Guaranty are made.

**"Program Guideline(s)"** shall mean Program Guideline(s) established with respect to a Program as amended from time to time and all changes thereto. The Program Guidelines typically consist of the Program Overview, Servicing Guidelines and Program Borrower Documents (consisting of the forms of Promissory Note and Truth in Lending Disclosure). References in this Agreement to Program Guidelines shall refer to the Program Guidelines applicable to a Loan

2

under a Program as in effect on the Petition Date, whether or not such Program Guidelines continues effective generally.

"**Refinance Loans**" shall have the meaning provided in the Motion.

"**Security Agreement**" shall mean the Security Agreement of TERI in favor of Lender dated March 14, 2008 and the related Blocked Account Agreement.

"**Subsequent Guaranty Fees**" shall have the meaning provided in the Guaranty pursuant to which a Loan was extended.

"**Termination Date**" shall mean August 2, 2008, or, as to any specific Program under a LOA and Guaranty, the date prior to August 2, 2008 which is three (3) business days after the date on which Lender gives TERI written notice to stop accepting applications under that Program under a LOA and Guaranty as described in Section 4.b hereof.

2.    **Purpose.**

        The Motion seeks the rejection and termination of the Loan Origination Agreements and the Guarantees.  In order to facilitate an orderly cessation of the Programs that are the subject of the Terminated Contracts, and to minimize adverse consequences to qualified applicants for student loans, the Lender and TERI wish to agree as to matters concerning the Pipeline Loans and to memorialize the understanding of Lender and TERI concerning their relationship after the entry of an Order.

        The Loans have been extended pursuant to a series of agreements, including the Guarantees, between TERI and Lender, which are substantially similar but differ as to certain details.  In the interest of simplicity and consistency, TERI and Lender agree that upon the approval of the Motion and the entry of the Order, this Agreement shall apply to, and shall be the sole agreement governing, all Pipeline Loans by Lender.

        This Agreement establishes the procedures for originating and administering Pipeline Loans.  As provided in the Motion, in exchange for the Lender agreeing to release claims against TERI under  its Guaranty of Pipeline Loans, upon the Court Order approving the Motion becoming final, Guaranty Fees with regard to Pipeline Loans shall be waived, relinquished, released and paid over to Lender in full satisfaction of TERI's Guaranty of Pipeline Loans; Lender shall be deemed to have released TERI's Guaranty of all Pipeline Loans; and Lender shall have no further recourse against TERI on its Guaranty of any Pipeline Loans.

        To the extent that any provision in this Agreement conflicts with the Order, the terms of the Order shall govern.

3.    **Agreements Concerning Pipeline Loans.**

        a.        On and after the Petition Date, TERI has originated, and will continue to originate, and Lender has funded, and will continue to fund, Pipeline Loans.  Upon approval of the Motion by the Bankruptcy Court and the entry of the Order, the amount of all Guaranty Fees

3

with respect to Pipeline Loans paid to TERI by Lender, whether retained by TERI or deposited in the Pledged Account, net of any disbursements of paid default claims, required refunds or permitted cancellations (the "Net Pipeline Guaranty Fee"), shall be released and paid to the Lender pursuant to the Order in satisfaction of any obligations of TERI under its Guaranty of the Pipeline Loans.  Lender shall be deemed to have released any claims against TERI on its Guaranty of the Pipeline Loans, and shall have no recourse against TERI therefor, in exchange for TERI causing all such Net Pipeline Guaranty Fee to be paid to Lender. TERI agrees to provide Lender with an accounting of the Pipeline Loan Guaranty Fee within thirty (30) days of the approval of the Motion. For the avoidance of doubt, nothing herein shall apply to any loan origination fee paid under an LOA, and Lender shall continue to pay Loan Origination Fees on Pipeline Loans. The failure of TERI to provide origination or collection services with respect to any Pipeline Loan shall not give rise to any administrative claim in the Bankruptcy Case, provided however that this shall not in any way restrict any claim arising from improperly provided services.

        b.    Lender agrees to continue to fund Pipeline Loans based on qualified applications made on or prior to the Termination Date. For the purposes of this Agreement: (i) all electronic applications shall be deemed to have been made on the date such application is submitted; (ii) all phone applications shall be deemed to be made on the date on which the Borrower makes such phone application; and (iii) unless otherwise agreed all paper applications for Pipeline Loans other than Refinance Loans shall be deemed to have been made on the date that the paper application is submitted to TERI, and (iv) as to Refinance Loans, a qualified application shall be one made with respect to a Loan as to which on the date of this Agreement at least one payment has been received following a default, which application is received by TERI within 120 days of the date the application is provided to the applicant. TERI agrees to instruct FMER not to provide applicants (other than on Refinance Loans) with paper applications. This Agreement is made to minimize the disruption to Lender's and TERI's operations, to enable TERI to wind down the rejected/terminated Terminated Contracts in an orderly, economical and reasonable fashion, and to minimize adverse consequences to applicants for student loans.

        c.    Pursuant to the Loan Origination Agreements, Lender has retained TERI as its agent to perform certain loan origination functions. TERI and Lender agree that the loan origination procedures set forth in Sections 1, 2, 3 and 4(a) of the Loan Origination Agreement between TERI and Lender dated April 30, 2004, or comparable provisions of other Loan Origination Agreements between TERI and Lender, as applicable, shall continue to govern the origination of the Pipeline Loans.

        d.    Lender and TERI acknowledge and agree that all Loans funded post-petition, including Loans based on applications hereafter received by TERI on or before the Termination Date, will be deemed a Pipeline Loan and may be funded to the extent that all applicable Program Guidelines are fully satisfied.

        e.    No Guaranty Fees shall be due with respect to the Pipeline Loans, and TERI shall pay to Lender the Net Pipeline Guaranty Fee as provided in Section 3.a. hereof, in full satisfaction of TERI's Guaranty obligations.

      f.     TERI and Lender also agree that Sections 5(a), (b) and (c) of the Loan Origination Agreements, dealing with Reports and Access to Records, shall apply to the Pipeline Loans.

      g.     Except as otherwise agreed by TERI and Lender, or otherwise ordered by the Bankruptcy Court, Lender will continue to make available to TERI, whether directly or through its servicer, and TERI may retain and use, information concerning the Loans as presently provided, including without limitation information of the type described in the Servicing Guidelines attached as exhibits to certain of the Guarantees. Without limiting the foregoing, TERI may retain as its own property and use for any lawful purposes any or all aggregated or de-identified data concerning Loan applicants and Borrowers which does not include the name, address or Social Security number of the Loan applicants or Borrowers. TERI may sell, assign, transfer or disclose such information to third parties including, without limitation, FMC, who may also use such information for any lawful purpose.

### 4.    Websites.

      a.     TERI will use commercially reasonable efforts to require FMER to modify TERI's website (www.TERI.org), or to acknowledge that such modification has occurred, within three (3) business days of the entry of the Order to reflect that applications for Program Loans will no longer be accepted after the Termination Date. Lender shall be responsible for making comparable changes within three (3) business days of the entry of the Order, if any are required, to its website, and, to the extent that Lender has contractual authority to do so, for making commercially reasonable efforts to direct that third party referral marketers that market loans make similar changes, if required, to their websites.

      b.     TERI will cease taking any further applications for Loans on August 2, 2008 or such earlier date (which in no event shall be a date on or prior to the effective date of the Order) of which Lender in good faith notifies TERI to cease taking any further applications for Loans under a specific Program resulting in a Termination Date for the Loans subject to such notice(s) earlier than August 2, 2008, as provided in the definition of "Termination Date." TERI will use commercially reasonable efforts not to accept applications as to Loans subject to an earlier Termination Date after such earlier Termination Date. In connection therewith, TERI, shall eliminate any applications for Loan programs as to which a Termination Date has occurred from any websites that TERI controls, and shall substitute, for such application, a notice that the Loan program in question is no longer offered. TERI shall request in writing that FMER and FMC eliminate any applications for such Loan programs from any websites under their control, and to substitute, for such application, a notice that the Loan program in question is no longer offered.

### 5.    Agreements concerning Servicing of Loans.

      a.     <u>Servicers.</u>

Lender has entered into agreements with servicers as to the servicing of Program Loans, and Lender shall be responsible for such agreements. TERI shall have no obligation with respect to the servicing of any Loan except as expressly provided herein.

      b.    <u>Servicing of Prior Loans and Pipeline Loans</u>.

TERI and Lender contemplate negotiating an agreement within 30 days of this Agreement relating to TERI providing various services for Prior Loans and Pipeline Loans that will be effective as of June 1, 2008. In the period from and including June 1, 2008 through and including July 15, 2008, TERI may, upon Lender's request, provide "default prevention activities" services to Lender in the same manner as it did prior to the Petition Date. If the parties are unable to reach agreement on the scope and cost of post-rejection services, Lender shall pay TERI fees for any default prevention activities services provided during such interim period pursuant to Lender's request, which fees shall be based on the historic cost to TERI of providing such services.

**6.    Funding of Future Loan Increments.**

Program Loans under certain Programs provide for disbursements after the initial disbursement in increments provided for in the Loan documentation. Lender shall fund any subsequent disbursements required under the Loan documents for any Prior Loans, and shall also fund any such subsequent disbursements required under the loan documents for any Pipeline Loans for which an application is received prior to the Termination Date. For the purpose of the Motion and this Agreement, any such subsequent disbursements shall be treated as follows: for Prior Loans, TERI shall remit all Guaranty Fees received from Lender on account of a subsequent disbursement, including Subsequent Guaranty Fees, into the Pledged Account and for Pipeline Loans, all Guaranty Fees for the subsequent disbursements shall be retained by Lender in satisfaction of TERI's Guaranty obligation to Lender.

**7.    Confidentiality.**

The confidentiality provisions of Terminated Contracts, meaning Section 8 of the Guaranty Agreement and Section 9 of the Loan Origination Agreements dated April 30, 2004, and comparable terms of other Terminated Contracts, as supplemented by that certain Mutual Confidentiality Agreement dated March 17, 2008, as affirmed, shall continue in effect, subject to the terms of this Agreement and the Order.

**8.    Agreement as to Original Documents.**

The Guaranty Agreements and Loan Origination Agreements contain terms requiring the return of original documents and other matters upon termination of such agreements. Notwithstanding the reference to "termination" of the Terminated Contracts under the Motion, TERI and Lender agree that such provisions shall not apply and, in particular, that no change in the custody of original documents is required by the Motion, and that TERI is not obligated to deliver Borrower "nonpublic personal information" (as defined in the GLB Act) to Lender. In the event Lender requires an original document relating to a Loan that is in TERI's sole possession, TERI agrees to provide it to Lender on Lender's request, and upon Lender's payment of TERI's reasonable expense of providing such document. Failure by TERI or any successor in interest, including any trustee, to comply with this Section 8 shall not give rise to an administrative claim in the Bankruptcy Case, provided, however, Lender may seek specific performance by filing a motion in the Bankruptcy Case.

9.    **Notice.**

Notice for any purpose hereunder shall be given be email confirmed by overnight delivery requiring receipt signature. In the case of TERI, notices shall be sent to its President and General Counsel, at the address provided on page 1 hereof, email addresses hulings@teri.org and bizar@teri.org, respectively, with copies to Daniel M. Glosband, Esq., Goodwin Procter LLP, Exchange Place, Boston, MA 02109, dglosband@goodwinprocter.com and Christopher I. Panos, Esq., Craig and Macauley Professional Corporation, 600 Atlantic Avenue, Boston, MA 02210, panos@craigmacauley.com. In the case of the Lender, notices should be sent to its Education Finance Department, 725 Canton Street, Norwood, MA 02062, _____, with a copy to Steven T. Greene, Esq., Riemer & Braunstein LLP, 3 Center Plaza, Boston, MA 02108, sgreene@riemerlaw.com, Patrick C. Joyce, SVP RBS Citizens, N.A., 53 State Street, 9th Floor, Boston, MA 02109, Patrick.joyce@citizensbank.com, and Christine McManus, Esq., SVP and Counsel, RBS Citizens, N.A., 53 State Street, 9th Floor, Boston, MA 02109, Christine.mcmanus@citizensbank.com.

Either party may from time to time change the person, address or email address for notice purposes by written notice to the other party.

10.    **Further Obligations.**

TERI shall have no obligations under any Loan Origination Agreement, Guaranty or Program Agreement that is rejected pursuant to the Order, except as expressly provided in the Order,.

11.    **Jurisdiction.**

The Bankruptcy Court shall retain jurisdiction over the performance of this Agreement, and any disputes of the parties concerning this Agreement.

12.    **General.**

This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard to the conflict of laws provisions thereof.

THE EDUCATION RESOURCES
INSTITUTE, INC.

By: _____.
     Its

RBS CITIZENS, N.A.

By: _____.

7

# EXHIBIT 6

**EXECUTION VERSION**

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

</div>

|  |  |  |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
|  | ) |  |
| **THE EDUCATION RESOURCES INSTITUTE, INC.,** | ) | **Case No. 08-12540 (HJB)** |
|  | ) |  |
| **Debtor.** | ) |  |
|  | ) |  |
|  | ) |  |

<div align="center">

**FOURTH AMENDED JOINT PLAN OF REORGANIZATION OF THE EDUCATION
RESOURCES INSTITUTE, INC. AND THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS**

</div>

Dated:  February 25, 2010

GOODWIN PROCTER LLP
Daniel M. Glosband
Gina Lynn Martin
Exchange Place
53 State Street
Boston, MA 02109
(617) 570-1000

DUANE MORRIS LLP
Jeffrey D. Sternklar
470 Atlantic Avenue
Boston, MA 02210
(857) 488-4216

DM3\1301010.2

**EXECUTION VERSION**

## TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND INTERPRETATION ................................................8

1.1    Accepting KeyCorp Trust ................................................ 8
1.2    Accepting Make and Hold Lender ....................................... 8
1.3    Accepting Make and Wait Lender ....................................... 9
1.4    Accepting Securitization Trust ....................................... 9
1.5    Additional Share ..................................................... 9
1.6    Administrative Expense Claim ......................................... 9
1.7    Allowed .............................................................. 9
1.8    Ambac Trusts ......................................................... 9
1.9    Approval Order ....................................................... 9
1.10   Approved Make and Wait Settlement .................................... 9
1.11   Assumed Agreements ................................................. 10
1.12   Available Cash ..................................................... 10
1.13   Ballot ............................................................. 10
1.14   Bankruptcy Code .................................................... 10
1.15   Bankruptcy Court ................................................... 10
1.16   Bankruptcy Rules ................................................... 10
1.17   Business Day ....................................................... 10
1.18   Cash ............................................................... 10
1.19   Causes of Action ................................................... 10
1.20   Chapter 11 Case .................................................... 10
1.21   Claim .............................................................. 10
1.22   Claims Agent ....................................................... 11
1.23   Class .............................................................. 11
1.24   Collateral ......................................................... 11
1.25   Collateral Account ................................................. 11
1.26   (Intentionally deleted) ............................................ 11
1.27   Collection Contract ................................................ 11
1.28   Commencement Date .................................................. 11
1.29   Confirmation Date .................................................. 11
1.30   Confirmation Hearing ............................................... 11
1.31   Confirmation Order ................................................. 11
1.32   Convenience Class Claim ............................................ 11
1.33   Creditor ........................................................... 11
1.34   Creditors' Committee ............................................... 12
1.35   Cure Amount ........................................................ 12
1.36   Data ............................................................... 12
1.37   Debtor ............................................................. 12
1.38   Debtor Releasors ................................................... 12
1.39   Decoder ............................................................ 12
1.40   Deficiency Claim ................................................... 12

i

**EXECUTION VERSION**

| | | |
|---|---|---|
| 1.41 | Disclosure Statement | 12 |
| 1.42 | Disputed | 12 |
| 1.43 | Disputed Claims Reserve | 13 |
| 1.44 | Effective Date | 13 |
| 1.45 | Effective Date Anniversary | 13 |
| 1.46 | (Intentionally deleted) | 13 |
| 1.47 | (Intentionally deleted). | 13 |
| 1.48 | Entity | 13 |
| 1.49 | ERISA | 13 |
| 1.50 | Estate | 13 |
| 1.51 | Final Order | 13 |
| 1.52 | First Year Eligible Collections | 13 |
| 1.53 | General Unsecured Claim | 14 |
| 1.54 | General Unsecured Claim Distribution | 14 |
| 1.55 | Guaranty Fee | 14 |
| 1.56 | Impaired | 14 |
| 1.57 | (Intentionally deleted) | 14 |
| 1.58 | IRC | 14 |
| 1.59 | IRS | 14 |
| 1.60 | Joint Pool Account | 14 |
| 1.61 | Joint Pool Account Lenders | 14 |
| 1.62 | (Intentionally deleted). | 14 |
| 1.63 | Key Access Program Election | 14 |
| 1.64 | Key Access Program Settlement | 14 |
| 1.65 | Key Access Program Deficiency Claim | 14 |
| 1.66 | Key Corp Trust | 15 |
| 1.67 | Litigating Creditor | 15 |
| 1.68 | Litigation Claims Costs | 15 |
| 1.69 | (Intentionally Deleted | 15 |
| 1.70 | Make and Hold Base Case | 15 |
| 1.71 | Make and Hold Claim | 15 |
| 1.72 | (Intentionally deleted). | 15 |
| 1.73 | Make and Hold Lender | 15 |
| 1.74 | Make and Hold Settlement | 15 |
| 1.75 | Make and Wait Claim | 15 |
| 1.76 | (Intentionally deleted). | 15 |
| 1.77 | Make and Wait Lender | 15 |
| 1.78 | (Intentionally deleted). | 15 |
| 1.79 | (Intentionally deleted). | 15 |
| 1.80 | Make and Wait Lender Settlement | 15 |
| 1.81 | Make and Wait Lien Dispute | 15 |
| 1.82 | Master Trust | 16 |
| 1.83 | Nellie Mae Adversary Proceeding | 16 |
| 1.84 | Other General Unsecured Claim | 16 |
| 1.85 | Other Trusts | 16 |
| 1.86 | Pension Plan | 16 |

**EXECUTION VERSION**

1.87    Person ........................................................................... 16
1.88    Pipeline Loans ............................................................. 16
1.89    Plan ............................................................................... 16
1.90    Plan Proponents ........................................................... 16
1.91    (Intentionally deleted) ................................................ 16
1.92    Plan Supplement .......................................................... 16
1.93    Plan Trust ..................................................................... 16
1.94    Plan Trust Agreement .................................................. 16
1.95    Plan Trust Assets ......................................................... 16
1.96    Plan Trustee .................................................................. 17
1.97    Plan Trustee Advisory Committee ............................... 17
1.98    Pledged Account ........................................................... 17
1.99    Pool Account ................................................................. 17
1.100    Priority Claim ............................................................. 17
1.101    Priority Non-Tax Claim .............................................. 17
1.102    Priority Tax Claim ...................................................... 17
1.103    Pro Rata ...................................................................... 17
1.104    Pro Rata Distribution ................................................. 17
1.105    Record Date ................................................................ 17
1.106    Rejection Bar Date ..................................................... 17
1.107    Released Party ............................................................ 18
1.108    Remaining Plan Trust Assets ...................................... 18
1.109    Reorganized Articles of Incorporation ....................... 18
1.110    Reorganized By-laws ................................................... 18
1.111    Reorganized TERI ...................................................... 18
1.112    Reorganized TERI Assets ........................................... 18
1.113    Residual ....................................................................... 18
1.114    Restricted Charitable Funds ....................................... 18
1.115    Restricted Charitable Funds Carve-Out ..................... 18
1.116    Restricted Grant Funds .............................................. 19
1.117    Revised Calculation .................................................... 19
1.118    Retained Cash ............................................................. 19
1.119    Retained Contracts ..................................................... 19
1.120    Schedules ..................................................................... 19
1.121    Second Year Eligible Collections ............................... 19
1.122    Secured Claim ............................................................. 19
1.123    Secured Creditor ......................................................... 19
1.124    (Intentionally deleted) ................................................ 19
1.125    Securitization Trust .................................................... 19
1.126    Securitization Trust Collateral ................................... 19
1.127    Securitization Trust Deficiency Claim ........................ 20
1.128    Securitization Trust Settlement .................................. 20
1.129    Securitization Trust Settlement Claim ........................ 20
1.130    Securitization Trust Settlement Claim Reduction ....... 20
1.131    Solicitations Procedure Order .................................... 20
1.132    Tax Claim .................................................................... 20

iii

EXECUTION VERSION

**1.133**  **TERI First Year Share** ..................................................................... 20
**1.134**  **(Intentionally Deleted)** .................................................................. 20
**1.135**  **(Intentionally Deleted)** .................................................................. 20
**1.136**  **TERI Loan Net Proceeds**. .............................................................. 20
**1.137**  **TERI Loan Proceeds**. .................................................................... 20
**1.138**  **TERI Net Recovery** ....................................................................... 20
**1.139**  **TERI Owned Loan** ......................................................................... 20
**1.140**  **TERI Second Year Share** ............................................................... 21
**1.141**  **Term**  21
**1.142**  **Transfer Taxes** ............................................................................. 21
**1.143**  **Treasury Regulations**. ................................................................... 21
**1.144**  **Trust Adversary Proceeding** ......................................................... 21
**1.145**  **Unimpaired** ................................................................................... 21
**1.146**  **United States Trustee** .................................................................... 21
**1.147**  **Unrestricted Cash** ......................................................................... 21
**1.148**  **Victory Fund** ................................................................................. 21
**1.149**  **Voting Agent** ................................................................................. 21
**1.150**  **Voting Record Date** ....................................................................... 21
**1.151**  **Other Terms**. ................................................................................. 21
**1.152**  **Construction Of Certain Terms**. .................................................. 21

**ARTICLE II** TREATMENT OF UNCLASSIFIED CLAIMS -- ADMINISTRATIVE
EXPENSE CLAIMS AND PRIORITY TAX CLAIMS ................................................22

**2.1**  **Administrative Expense Claims**. .................................................... 22
**2.2**  **Pre-Effective Date Professional Fees and Expenses**. ................... 22
**2.3**  **United States Trustee Quarterly Fees and Other Statutory Fees**.......... 22
**2.4**  **Priority Tax Claims** ....................................................................... 23

**ARTICLE III** CLASSIFICATION OF CLAIMS ................................................23

**3.1**  **Class 1 – Priority Non-Tax Claims**. .............................................. 23
**3.2**  **Classes 2a – 2p – Secured Claims of Make and Wait Lenders** ......... 24
**3.3**  **Classes 3a – 3l – Secured Claims of Securitization Trusts**. ............ 25
**3.4**  **Classes 4a – 4k – Secured Claims of the Keycorp Trusts and KeyBank**
**National Association (other than in its capacity as a Make and Wait**
**Lender** ............................................................................................ 27
**3.5**  **Class 5 – General Unsecured Claims**. ............................................ 28
**3.6**  **Class 6 – Convenience Class Claims** .............................................. 28

**ARTICLE IV** TREATMENT OF CLASSES 2 - 5 ................................................28

**4.1**  **Treatment of Class 2 Claims (Make and Wait Lender Claims)** ......... 28
**4.2**  **Treatment of Class 3 Claims (Securitization Trusts)**. ................... 29
**4.3**  **Classes 4a – 4k**. ............................................................................. 30
**4.4**  **Class 5**. .......................................................................................... 31

iv

EXECUTION VERSION

**ARTICLE V** VOTING AND DISTRIBUTION ............................................................31

5.1    Voting of Claims..................................................................... 31
5.2    Acceptance by Impaired Class................................................ 32
5.3    Presumed Acceptances of Plan............................................... 32
5.4    Nonconsensual Confirmation................................................. 32
5.5    Method of Distributions Under this Plan................................ 32

**ARTICLE VI** MEANS FOR IMPLEMENTATION AND EXECUTION OF THE
PLAN ..........................................................................................................35

6.1    Reorganized TERI. ................................................................ 35
6.2    Compromise and Settlement. ................................................. 35
6.3    Plan Trust. ............................................................................. 41
6.4    Calculation of TERI Net Recovery. ...................................... 46
6.5    Distribution to Secured Creditors. ......................................... 47
6.6    Restricted Funds. ................................................................... 47
6.7    Operations of Reorganized TERI. .......................................... 47
6.8    Closing of the Chapter 11 Case. ............................................ 48
6.9    Section 1123(b)(3). ............................................................... 48
6.10   Establishment and Implementation of a Most Favored Nations
       Clause. ................................................................................... 48
6.11   Nellie Mae Adversary Proceeding. ........................................ 48

**ARTICLE VII** PROCEDURES FOR RESOLVING AND TREATING DISPUTED
CLAIMS .....................................................................................................48

7.1    No Distribution Pending Allowance. ..................................... 48
7.2    Resolution of Disputed Claims. ............................................. 49
7.3    Estimation. ............................................................................ 49
7.4    Allowance of Disputed Claims. ............................................. 49
7.5    Disallowance of Claims Without Further Order of the Bankruptcy
       Court. ..................................................................................... 49
7.6    No Distribution in Respect of Disallowed Claims. ................ 49

**ARTICLE VIII** TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ......................................................................................................49

8.1    Assumption or Rejection of Executory Contracts and Unexpired
       Leases. ................................................................................... 49
8.2    Approval of Assumption or Rejection of Executory Contracts and
       Unexpired Leases. ................................................................. 50
8.3    Inclusiveness. ........................................................................ 50
8.4    Return of Guaranty Fees........................................................ 51
8.5    Bar Date for Filing Proofs of Claim Relating to Executory Contracts
       and Unexpired Leases Rejected Pursuant to this Plan. ........... 51
8.6    Insurance Policies.................................................................. 51

v

EXECUTION VERSION

| | | | |
|---|---|---|---|
| **8.7** | **Compensation and Benefit Programs.** | | 51 |
| **8.8** | **Retiree Benefits.** | | 51 |

**ARTICLE IX CONDITIONS PRECEDENT TO ENTRY OF THE CONFIRMATION ORDER** .................................................................................52

| | | | |
|---|---|---|---|
| **9.1** | **Conditions Precedent to entry of the Confirmation Order.** | | 52 |
| **9.2** | **Waiver of Conditions.** | | 52 |
| **9.3** | **Effect of Failure of Condition to Entry of Confirmation Order.** | | 52 |

**ARTICLE X EFFECTIVENESS OF THE PLAN** .......................................................52

| | | | |
|---|---|---|---|
| **10.1** | **Conditions Precedent to the Effective Date.** | | 52 |
| **10.2** | **Waiver of Conditions.** | | 53 |
| **10.3** | **Effect of Failure of Condition to Entry of Confirmation Order.** | | 53 |

**ARTICLE XI CONSEQUENCES OF A FAILURE OF A CONDITION IN ARTICLES IX AND X** ...........................................................................................................53

**ARTICLE XII EFFECTS OF CONFIRMATION** ...................................................54

| | | | |
|---|---|---|---|
| **12.1** | **Vesting of Assets** | | 54 |
| **12.2** | **Binding Effect** | | 54 |
| **12.3** | **Discharge.** | | 54 |
| **12.4** | **Releases, Injunctions and Exculpation.** | | 55 |
| **12.5** | **Release of Assets** | | 56 |
| **12.6** | **Claims Preserved.** | | 56 |
| **12.7** | **Residual.** | | 57 |
| **12.8** | **ERISA.** | | 57 |

**ARTICLE XIII RETENTION OF JURISDICTION** ................................................57

| | | | |
|---|---|---|---|
| **13.1** | **Jurisdiction of Bankruptcy Court.** | | 57 |

**ARTICLE XIV MISCELLANEOUS PROVISIONS** ................................................59

| | | | |
|---|---|---|---|
| **14.1** | **Effectuating Documents and Further Transactions.** | | 59 |
| **14.2** | **Exemption from Transfer Taxes.** | | 59 |
| **14.3** | **Post-Confirmation Date Fees and Expenses.** | | 59 |
| **14.4** | **Modification of Plan.** | | 59 |
| **14.5** | **Withdrawal or Revocation.** | | 60 |
| **14.6** | **Courts of Competent Jurisdiction.** | | 60 |
| **14.7** | **Notices.** | | 60 |
| **14.8** | **Severability.** | | 61 |
| **14.9** | **Governing Law.** | | 61 |
| **14.10** | **Headings.** | | 61 |
| **14.11** | **Exhibits.** | | 61 |

**EXECUTION VERSION**

14.12   Successors and Assigns. ............................................................... 61
14.13   Dissolution of the Creditors' Committee. ....................................... 61
14.14   Courts of Competent Jurisdiction. ................................................. 62
14.15   Plan Supplement. .......................................................................... 62
14.16   Plan Controls Disclosure Statement; Confirmation Order Controls
        Plan.   62
14.17   Filing of Additional Documents. ................................................... 62
14.18   Tax-Exempt Status. ....................................................................... 62
14.19   Consent to Transfer of Residual. ................................................... 62

vii

**EXECUTION VERSION**

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

</div>

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **THE EDUCATION RESOURCES INSTITUTE, INC.,** | ) | **Case No. 08-12540 (HJB)** |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |

<div align="center">

**FOURTH AMENDED JOINT PLAN OF REORGANIZATION OF**
**THE EDUCATION RESOURCES INSTITUTE, INC. AND THE OFFICIAL**
**COMMITTEE OF UNSECURED CREDITORS**

</div>

The Education Resources Institute, Inc., debtor and debtor in possession in the above-captioned Chapter 11 Case, and the Official Committee of Unsecured Creditors, as Plan Proponents, jointly propose the following Fourth Amended chapter 11 Plan pursuant to section 1121(a) of the Bankruptcy Code. The Plan[1] contemplates the reorganization of the Debtor and the resolution of all outstanding claims against the Debtor.

If any Impaired Class of Claims against the Debtor entitled to vote on the Plan does not accept the Plan by the requisite statutory majority required by section 1126(c) of the Bankruptcy Code or as provided for in the Solicitations Procedures Order, then the Plan Proponents may take any of the actions specified herein, including proceeding to confirm the Plan under section 1129(b) of the Bankruptcy Code.

<div align="center">

**ARTICLE I**

**DEFINITIONS AND INTERPRETATION**

</div>

**Definitions**.  As used in the Plan, the following terms have the respective meanings specified below, unless the context otherwise requires:

**1.1**   **Accepting KeyCorp Trust** means a KeyCorp Trust that has accepted the Plan and thus has not elected the Key Access Program Election.

**1.2**   **Accepting Make and Hold Lender** means a Make and Hold Lender that has accepted the Plan.

---

[1]   Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in Article I of this Plan.

**EXECUTION VERSION**

      **1.3**    **Accepting Make and Wait Lender** means a Make and Wait Lender that has accepted the Plan.

      **1.4**    **Accepting Securitization Trust** means a Securitization Trust that has accepted the Plan or that has been deemed to accept the Plan, and thereby, the Securitization Trust Settlement.

      **1.5**    **Additional Share** means the amount, if any, by which $2,000,000 exceeds the sum of (i) the TERI First Year Share plus (ii) the TERI Second Year Share.

      **1.6**    **Administrative Expense Claim** means any right to payment constituting a cost or expense of administration of the Chapter 11 Case under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the assets of the Debtor, any actual and necessary expenses of operating the business of the Debtor, all compensation and reimbursement of expenses Allowed by the Bankruptcy Court under sections 330 or 503 of the Bankruptcy Code, and any fees and charges assessed against the Debtor under section 1930 of chapter 123 of title 28 of the United States Code.

      **1.7**    **Allowed** means, with reference to any Claim against the Debtor, (a) any Claim against the Debtor that has been listed by the Debtor in its Schedules (as such Schedules may be amended by the Debtor) as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed or no timely objection to allowance or request for estimation has been interposed, (b) any timely filed proof of Claim as to which no objection has been or is interposed or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder of such Claim, (c) any Claim expressly allowed by a Final Order or under the Plan, and (d) any Claim that is compromised, settled or otherwise resolved pursuant to the authority granted to the Plan Trustee pursuant to a Final Order of the Bankruptcy Court or under the Plan; *provided, however,* that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court will not be considered "Allowed Claims." Unless otherwise specified in the Plan or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" will not, for any purpose under the Plan, include interest on such Claim from and after the Commencement Date.

      **1.8**    **Ambac Trusts** means the Master Trust, the National Collegiate Student Loan Trust 2007-3 and the National Collegiate Student Loan Trust 2007-4.

      **1.9**    **Approval Order** means the Order (a) approving the Disclosure Statement; (b) (to the extent not addressed in the Solicitations Procedure Order) approving Solicitation Procedures; (c) approving Forms of Ballots and establishing procedures for voting on the Plan; and (d) scheduling a hearing and establishing notice and objection procedures in respect of confirmation of the Plan.

      **1.10**    **Approved Make and Wait Settlement** means the compromise and settlement agreements between the Debtor and (1) Bank of America, N.A. (2) JP Morgan Chase, N.A. and (3) Union Federal Savings Bank, previously approved by the Bankruptcy Court pursuant to a Final Order.

9

**EXECUTION VERSION**

      **1.11**    <u>Assumed Agreements</u> means the executory contracts and unexpired leases identified on Schedule 8.1(A) and Schedule 8.1(B) in the Plan Supplement.

      **1.12**    <u>Available Cash</u> means, as of the Effective Date, Unrestricted Cash <u>minus</u> the Retained Cash.

      **1.13**    <u>Ballot</u> means the form ballot approved by the Bankruptcy Court to indicate acceptance or rejection of the Plan and to make any other elections or representations required pursuant to the Plan, the Solicitations Procedure Order or the Approval Order.

      **1.14**    <u>Bankruptcy Code</u> means Title 11 of the United States Code, 11 U.S.C. § 101, et seq, as amended from time to time, as applicable to the Chapter 11 Case.

      **1.15**    <u>Bankruptcy Court</u> means the United States Bankruptcy Court for the District of Massachusetts (Eastern Division), or any other court of the United States having jurisdiction over the Chapter 11 Case.

      **1.16**    <u>Bankruptcy Rules</u> means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Case, including the local rules of the Bankruptcy Court.

      **1.17**    <u>Business Day</u> means any day other than a Saturday, a Sunday, any other day on which commercial banks in Boston, Massachusetts are required or authorized to close by law or executive order.

      **1.18**    <u>Cash</u> means legal tender of the United States of America and equivalents thereof.

      **1.19**    <u>Causes of Action</u> means any and all rights, claims, causes of action, suits and proceedings that could have been brought or raised by or on behalf of the Debtor and/or the Estate arising before, on, or after the Commencement Date, including, without limitation, whether known or unknown, suspected or unsuspected, in contract or in tort, at law or in equity, under any theory of law, and all actions that may be commenced before or after the Effective Date by or on behalf of the Debtor and/or the Estate, pursuant to Chapter 5, including, without limitation, (i) claims arising under or related to sections 105, 502(d), 510, 544, 545, 547, 548, 549, 550, 551 and 553(b) of the Bankruptcy Code or under similar provisions of applicable state law, (ii) all claims that have been or may be asserted by the plaintiff in the Trust Adversary Proceeding against any of Classes 3a-3q that is deemed to reject the Plan and/or opt out of the Securitization Trust Settlement, and (iii) any and all claims against First Marblehead Corporation, First Marblehead Educations Resources, Inc., First Marblehead Data Services, Inc. and their respective affiliates.

      **1.20**    <u>Chapter 11 Case</u> means the voluntary case under chapter 11 of the Bankruptcy Code, commenced by the Debtor in the Bankruptcy Court, styled "<u>In re The Education Resources Institute, Inc.</u>," Case Number 08-12540 (HJB).

      **1.21**    <u>Claim</u> has the meaning assigned to such term in section 101(5) of the Bankruptcy Code.

**EXECUTION VERSION**

     **1.22**    <u>Claims Agent</u> means Epiq Systems, Inc., which is located at 757 Third Avenue, Third Floor, New York, NY 10017, and was retained as the Debtor's claim agent in the Chapter 11 Case.

     **1.23**    <u>Class</u> means any Claim or group of substantially similar Claims classified by the Plan pursuant to section 1123(a)(1) of the Bankruptcy Code.

     **1.24**    <u>Collateral</u> means any property or interest in property of the Estate of the Debtor subject to a lien to secure the payment or performance of a Claim, which lien is valid, perfected and enforceable under applicable law, and is not subject to avoidance under the Bankruptcy Code or other applicable law.

     **1.25**    <u>Collateral Account</u> means a Pledged Account, Victory Fund, a Pool Account, or the Joint Pool Account, as applicable.

     **1.26**    <u>(Intentionally deleted)</u>.

     **1.27**    <u>Collection Contract</u> means the contract regarding the collection of TERI Loan Proceeds, substantially in the form set forth in the Plan Supplement, between Reorganized TERI and the Plan Trustee.

     **1.28**    <u>Commencement Date</u> means April 7, 2008, the date on which the Debtor commenced the Chapter 11 Case.

     **1.29**    <u>Confirmation Date</u> means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case.

     **1.30**    <u>Confirmation Hearing</u> means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

     **1.31**    <u>Confirmation Order</u> means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance satisfactory to the Debtor and Creditors' Committee.

     **1.32**    <u>Convenience Class Claim</u> means a Claim that would otherwise be an allowed General Unsecured Claim and that is greater than $0 and less than or equal to $1,500 in Allowed amounts or the Claim of any Creditor that elects to reduce its Allowed General Unsecured Claim to an amount equal to $1,500, *provided, however*, that in the event the aggregate amount of Convenience Class Claims exceeds $250,000, the Plan Proponents or after the Effective Date the Plan Trustee, in their sole discretion, can reject an election made by a Creditor to reduce its Allowed General Unsecured Claim to $1,500. In the event that the Plan Proponents or the Plan Trustee (as applicable) reject any such election, then such Creditor's Claim will be treated as a General Unsecured Claim classified in Class 5.

     **1.33**    <u>Creditor</u> means any holder of a Claim.

<div align="center">11</div>

**EXECUTION VERSION**

     **1.34**    **Creditors' Committee** means the official statutory committee of unsecured creditors appointed by the Office of the United States Trustee in the Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code, as such committee has been amended from time to time.

     **1.35**    **Cure Amount** means any amounts required to be paid to a counterparty to an executory contract or unexpired lease to assume such contract or lease pursuant to section 365 of the Bankruptcy Code.

     **1.36**    **Data** means all books and records of the Debtor, including, but not limited to, computer generated or computer maintained books and records and computer data, and electronically generated or maintained books and records or data.

     **1.37**    **Debtor** means The Education Resources Institute, Inc., including, where applicable, in its capacity as debtor in possession in the Chapter 11 Case pursuant to sections 1101, 1107(a) and 1108 of the Bankruptcy Code.

     **1.38**    **Debtor Releasors** means the Debtor, Reorganized TERI and any Person or Entity seeking to exercise the rights of the Estate, including without limitation, any successor to the Debtor or any representative of the Estate appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (including, but not limited to, the Plan Trustee).

     **1.39**    **Decoder** means the Claims estimation methodology included in the Plan Supplement.

     **1.40**    **Deficiency Claim** means the amount by which the Claim of a Secured Creditor exceeds the value of the Collateral securing such Claim, which amount shall be treated as a General Unsecured Claim.

     **1.41**    **Disclosure Statement** means the disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as such may be amended and ultimately be approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as amended, modified or supplemented in accordance with applicable law.

     **1.42**    **Disputed** means, with respect to an Administrative Expense Claim or other Claim, any such Administrative Expense Claim or other Claim (a) as to which no proof of Claim was timely and properly filed and that is scheduled by the Debtor as disputed, unliquidated or contingent; or (b) proof of which was timely and properly filed, and (i) which has been or is listed on the Schedules as unliquidated, disputed or contingent, and which has not been resolved by a Final Order or (ii) as to which the Debtor or any other party-in-interest, has interposed a timely objection or request for estimation for purposes of distribution in accordance with the Plan, the Bankruptcy Code and the Bankruptcy Rules, which objection or request for estimation has not been withdrawn, compromised, resolved, settled or determined by a Final Order.  Prior to (x) the filing of an objection to a Claim or (y) the expiration of the time within which to object to such Claim set forth in the Plan or otherwise established by order of the Bankruptcy Court, for purposes of the Plan, a Claim will be considered a Disputed Claim if (i) the amount of the Claim specified in the proof of Claim exceeds the amount of the Claim scheduled by the Debtor as other than disputed, contingent or unliquidated or (ii) the Claim is not listed on the Schedules.

12

**EXECUTION VERSION**

1.43   <u>**Disputed Claims Reserve**</u> means the portion of the Plan Trust Assets that would be allocable to, or retained on account of, Disputed General Unsecured Claims, as determined from time to time if such Claims were Allowed Claims, which assets must (to the extent practicable) be held separately from other assets of the Plan Trust, but shall be subject to an allocable share of all expenses and obligations of the Plan Trust.

1.44   <u>**Effective Date**</u> means a Business Day selected by the Plan Proponents on or after the Confirmation Date, on which (a) no stay of the Confirmation Order is in effect and (b) the conditions precedent to the effectiveness of this Plan specified in section 9.1 of this Plan will have been satisfied or waived as provided in section 9.2.

1.45   <u>**Effective Date Anniversary**</u> means the annual anniversary of the Effective Date; *provided, however,* that if the anniversary of the Effective Date in any year is not a Business Day, then the Effective Date Anniversary will be the first Business Day after the anniversary of the Effective Date in such year.

1.46   <u>**(Intentionally deleted)**</u>.

1.47   <u>**(Intentionally deleted).**</u>

1.48   <u>**Entity**</u> has the meaning assigned to such term in section 101(15) of the Bankruptcy Code

1.49   <u>**ERISA**</u> means Title IV of the Employee Retirement Income Security Act of 1974, as amended, codified as 29 U.S.C. §§ 1301-1461.

1.50   <u>**Estate**</u> means the estate created pursuant to section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

1.51   <u>**Final Order**</u> means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however,* that the possibility that a motion under Rules 59 and 60 of the Federal Rules of Civil Procedure, 11 U.S.C. §1144 or any analogous rules under the Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order.

1.52   <u>**First Year Eligible Collections**</u> means all TERI Loan Net Proceeds in excess of $1,000,000 collected pursuant to the Collection Contract during the first year of the Term.

<center>13</center>

**EXECUTION VERSION**

**1.53**    **General Unsecured Claim** means any Claim against the Debtor that is not a Secured Claim, Administrative Expense Claim, Priority Claim or Convenience Class Claim.  For avoidance of doubt, any Deficiency Claim is a General Unsecured Claim.

**1.54**    **General Unsecured Claim Distribution** means a distribution on account of an Allowed General Unsecured Claim of a beneficial interest in the Plan Trust determined on a Pro Rata basis with respect to all General Unsecured Claims.

**1.55**    **Guaranty Fee** means a fee payable to the Debtor in consideration for the Debtor's guaranty of a student loan.

**1.56**    **Impaired** means any Claim that is "impaired" under section 1124 of the Bankruptcy Code.

**1.57**    **(Intentionally deleted)**.

**1.58**    **IRC** means the Internal Revenue Code of 1986, as amended.

**1.59**    **IRS** means the United States Internal Revenue Service.

**1.60**    **Joint Pool Account** means that certain account maintained at U.S. Bank, N.A. containing deposits of, among other things, Guaranty Fees, which deposits serve as Collateral in which each Joint Pool Account Lender has a *pari passu* interest.

**1.61**    **Joint Pool Account Lenders** means the following lenders:  (1) Comerica Bank, N.A., (2) Insurbanc, (3) KeyBank National Association, (4) M&T Bank, (5) PNC Bank, N.A., (6) Sovereign Bank, (7) TCF National Bank and (8) U.S. Bank, N.A.

**1.62**    **(Intentionally deleted)**.

**1.63**    **Key Access Program Election** means the election of KeyBank National Association (excluding in its capacity as a Make and Wait Lender) or a KeyCorp Trust, pursuant to a timely Ballot completed and delivered in accordance with the Solicitations Procedure Order, to (i) reject this Plan and thereby forego receipt of the Key Access Program Settlement on account of its Claim, and (ii) request that the Allowed amount of such Claim be determined by the Bankruptcy Court after entry of the Confirmation Order.

**1.64**    **Key Access Program Settlement** means the settlement described in section 6.2(d) of this Plan whereby each Accepting KeyCorp Trust and KeyBank National Association (excluding in its capacity as a Make and Wait Lender), agrees to accept in full settlement of all of its Claims, (i) its allocable share of the Victory Fund account as of the Commencement Date in accordance with Section 6.2(d) of this Plan, and (ii) an Allowed General Unsecured Claim as listed as the "Key Access Program Settlement Amount" on Schedule C attached hereto.

**1.65**    **Key Access Program Deficiency Claim** means, with respect to each Accepting KeyCorp Trust and (if it accepts the Plan) KeyBank National Association (excluding in its capacity as a Make and Wait Lender), the amount of KeyBank National Association's and each

14

EXECUTION VERSION

KeyCorp Trust's Allowed Deficiency Claim set forth in the column labeled "Key Access Program Decoder Settlement Claim" on <u>Schedule C</u> attached hereto.

     **1.66**   **<u>Key Corp Trust</u>** means collectively, each of KeyCorp Student Loan Trust ("KSLT") 1999-A, KSLT 1999-B, KSLT 2000-A, KSLT 2000-B, KSLT 2001-A, KSLT 2002-A, KSLT 2003-A, KSLT 2004-A, KSLT 2005-A and KSLT 2006-A.

     **1.67**   **<u>Litigating Creditor</u>** has the meaning ascribed to such term in Section 6.10 of this Plan.

     **1.68**   **<u>Litigation Claims Costs</u>** means any and all costs incurred by the Plan Trustee for prosecuting the Causes of Action, enforcing any judgment on the Causes of Action, and recovering proceeds on account of the Causes of Action, including reasonable professionals' fees, if any, incurred by this Plan Trust.

     **1.69**   **<u>(Intentionally Deleted</u>**

     **1.70**   **<u>Make and Hold Base Case</u>** means, for each Make and Hold Claim classified in Class 4, the amount listed as the "Make and Hold Base Case" on Schedule D attached hereto.

     **1.71**   **<u>Make and Hold Claim</u>** means the General Unsecured Claim of a Make and Hold Lender.

     **1.72**   **<u>(Intentionally deleted).</u>**

     **1.73**   **<u>Make and Hold Lender</u>** means those entities that are listed on Schedule D attached hereto.

     **1.74**   **<u>Make and Hold Settlement</u>** means the settlement described in section 6.2(b) below.

     **1.75**   **<u>Make and Wait Claim</u>** means a Secured Claim held by a Make and Wait Lender in Class 2 and its respective subclasses.

     **1.76**   **<u>(Intentionally deleted).</u>**

     **1.77**   **<u>Make and Wait Lender</u>** means those entities whose Claims are classified in Classes 2a through 2p of this Plan.

     **1.78**   **<u>(Intentionally deleted).</u>**

     **1.79**   **<u>(Intentionally deleted).</u>**

     **1.80**   **<u>Make and Wait Lender Settlement</u>** means the settlement between the Debtor and an Accepting Make and Wait Lender described in section 6.2(a) below.

     **1.81**   **<u>Make and Wait Lien Dispute</u>** means the potential challenge to the validity of liens and security interests of Insurbanc, M&T Bank, PNC Bank and RBS Citizens, N.A.

<div align="center">15</div>

**EXECUTION VERSION**

**1.82** <u>**Master Trust**</u> means The National Collegiate Master Student Loan Trust I.

**1.83** <u>**Nellie Mae Adversary Proceeding**</u> means Adversary Proceeding 10-01034, <u>Nellie Mae Education Foundation, Inc. v. The Education Resources Institute, Inc.</u>, in the United States Bankruptcy Court for the District of Massachusetts.

**1.84** <u>**Other General Unsecured Claim**</u> means any General Unsecured Claim that is not otherwise defined in this Plan.

**1.85** <u>**Other Trusts**</u> mean a portfolio of student loans securitized and guaranteed by TERI and owned by a trust, which trust has no Collateral Account and is not a Securitization Trust or a Key Corp Trust.

**1.86** <u>**Pension Plan**</u> means the tax qualified defined benefit pension plan covered by ERISA, sponsored and maintained by the Debtor.

**1.87** <u>**Person**</u> has the meaning assigned to such term in section 101(41) of the Bankruptcy Code.

**1.88** <u>**Pipeline Loans**</u> means student loans funded by a lender pursuant to a loan program with the Debtor on or after the Commencement Date.

**1.89** <u>**Plan**</u> means this chapter 11 plan and the Plan Supplement, including all exhibits and schedules annexed hereto, as all such documents, exhibits and schedules may be altered, amended or modified from time to time.

**1.90** <u>**Plan Proponents**</u> means the Debtor and the Creditors' Committee.

**1.91** <u>**(Intentionally deleted)**</u>.

**1.92** <u>**Plan Supplement**</u> means the compilation of documents and forms of documents specified in this Plan and listed on attached <u>Schedule ____</u> that will be filed with the Bankruptcy Court by the time established by the Bankruptcy Court prior to the Voting Deadline. The Plan Supplement constitutes part of this Plan.

**1.93** <u>**Plan Trust**</u> means the trust established under Section 6.3 of this Plan and the Plan Trust Agreement.

**1.94** <u>**Plan Trust Agreement**</u> means the agreement, substantially in the form set forth in the Plan Supplement, between the Debtor and the Plan Trustee, governing the Plan Trust, which agreement shall be in form and substance acceptable to the Debtor and Creditors' Committee.

**1.95** <u>**Plan Trust Assets**</u> means all assets of the Debtor, other than the Reorganized TERI Assets, including, without limitation, any proceeds or products of all such assets, including but not limited to (a) the Available Cash (including the Restricted Charitable Funds Carve-Out), (b) TERI Owned Loans, (c) the TERI Loan Proceeds, (subject to Reorganized TERI's right to receive payment of the TERI Net Recovery), (d) all Causes of Action, (e) property (including

16

**EXECUTION VERSION**

Cash) received in respect of a Make and Wait Settlement, (f) all other property of the Estate that is not included in Reorganized TERI Assets.

**1.96**   **Plan Trustee** means the Person appointed by the Creditors' Committee with the consent of the Debtor, which consent may not be unreasonably withheld, to administer the Plan Trust, as identified in the Plan Trust Agreement.

**1.97**   **Plan Trustee Advisory Committee** means a committee selected by the Creditors' Committee, the membership of which is disclosed in the Plan Supplement, created in furtherance of the Plan Trust Agreement, that will have the responsibility to review and advise the Plan Trustee with respect to the liquidation and distribution of Plan Trust Assets in accordance with the Plan Trust Agreement.

**1.98**   **Pledged Account** means any bank account in which each Securitization Trust, as applicable, holds a valid, perfected and unavoidable security interest and lien to secure an Allowed Secured Claim.

**1.99**   **Pool Account** means any bank account in which some or all of the Make and Wait Lenders, as applicable, assert a valid, perfected and unavoidable security interest and lien to secure an Allowed Secured Claim.

**1.100**   **Priority Claim** means a Priority Tax Claim or Priority Non-Tax Claim.

**1.101**   **Priority Non-Tax Claim** means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment under section 507(a) of the Bankruptcy Code.

**1.102**   **Priority Tax Claim** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.103**   **Pro Rata** means the proportion that the amount of any Allowed Claim in a particular class bears to the aggregate amount of all Claims in such Class, including Disputed Claims.

**1.104**   **Pro Rata Distribution** means a distribution by the Plan Trustee to beneficiaries of the Plan Trust, made proportionally, so that with respect to a particular beneficial interest in the Plan Trust, the ratio of (a)(i) the value of property distributed on account of such beneficial interest to (ii) the amount of the Allowed Claim on account of which such beneficial interest was distributed, is the same as the ratio of (b)(i) the value of property distributed on account of all beneficial interests to (ii) the amount of all Allowed Claims on account of which all beneficial interests in the Plan Trust are distributed.

**1.105**   **Record Date** means February 26, 2010.

**1.106**   **Rejection Bar Date** means the deadline for filing proofs of Claim arising from the rejection of an executory contract or unexpired lease, which deadline will be 30 calendar

17

**EXECUTION VERSION**

days after the entry of an order approving the rejection of such executory contract or unexpired lease and which order may be the Confirmation Order.

     **1.107**  **Released Party** means any current or former officer, director, member or employee of the Debtor; any attorney or financial advisor engaged by the Debtor in respect of Chapter 11 Case; and any attorney, accountant, financial advisor or other professional of the Creditors' Committee and the former, current and future members of the Creditors Committee in such capacity.

     **1.108**  **Remaining Plan Trust Assets** means assets remaining in the Plan Trust in the event that the Plan Trustee has distributed Plan Trust Assets to the holders of Allowed General Unsecured Claims equal to 100% of the aggregate amount of Allowed General Unsecured Claims, plus any statutory interest payable to holders of such Allowed General Unsecured Claims necessary to pay such Claims "in full."

     **1.109**  **Reorganized Articles of Incorporation** means the articles of incorporation or similar corporate organizational document of Reorganized TERI, as amended and restated, substantially in the forms to be filed with the Plan Supplement.

     **1.110**  **Reorganized By-laws** means the by-laws or similar corporate organizational document, to the extent applicable, of Reorganized TERI, as amended and restated, substantially in the forms to be filed with the Plan Supplement.

     **1.111**  **Reorganized TERI** means The Education Resources Institute, Inc. on and after the Effective Date.

     **1.112**  **Reorganized TERI Assets** means all of the Debtor's right, title and interest in and to (a) the Retained Cash; (b) the Restricted Charitable Funds; (c) the Restricted Grant Funds; (d) Reorganized TERI's right to receive payment of the TERI Net Recovery; (e) the Retained Contracts; (f) Reorganized TERI's rights under the Collection Contract; (g) the Remaining Plan Trust Assets, if any; (h) the Residual and (i) all furniture, fixtures, equipment, Data, and all other related assets necessary to support Reorganized TERI's business, all as determined substantially consistently with the Pro Forma Statement of Reorganized TERI Assets included in the Plan Supplement.

     **1.113**  **Residual** means the residual interest of the Debtor as partial owner of the Securitization Trusts identified in Class 3 and its subclasses.

     **1.114**  **Restricted Charitable Funds** means Cash or other assets held by the Debtor pursuant to a charitable deed of gift, the use of which is restricted by applicable state law or other non-bankruptcy law, which funds will be identified in the Plan Supplement minus the Restricted Charitable Funds Carve-Out.

     **1.115**  **Restricted Charitable Funds Carve-Out** means an amount equal to $6,000,000.

**EXECUTION VERSION**

**1.116**  **Restricted Grant Funds** means Cash or other assets held by the Debtor pursuant to private or government grants, the use of which is restricted to specific activities by the terms of the grants, which funds will be identified in the Plan Supplement.

**1.117**  **Revised Calculation** has the meaning ascribed to such term in Section 6.10 of this Plan.

**1.118**  **Retained Cash** means $3,400,000, less amounts necessary to satisfy in full all priority claims under 11 U.S.C. §§507(a)(3) – (10), 507(b) – (d) to the extent such claims in the aggregate exceed $50,000, subject to further reduction as provided for in the Plan.

**1.119**  **Retained Contracts** means (i) any Assumed Agreement, (ii) any contract entered into during the pendency of this Chapter 11 Case and (iii) any Approved Make and Wait Settlement, and (iv) any other contract that is neither assumed nor rejected pursuant to 11 U.S.C. §365, in all cases to which the Debtor is a party, that is listed as a Retained Contract in the Plan Supplement.

**1.120**  **Schedules** means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtor pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, including any supplements or amendments thereto through the Confirmation Date.

**1.121**  **Second Year Eligible Collections** means all TERI Loan Net Proceeds in excess of $1,000,000 collected pursuant to the Collection Contract during the second year of the Term.

**1.122**  **Secured Claim** means an Allowed Claim held by any entity against the Debtor secured by Collateral, but only to the extent of the value, as set forth in this Plan, as agreed to by the holder of such Claim and the Debtor, or as determined by Final Order pursuant to section 506(a) of the Bankruptcy Code, of such entity's interest in the Estate's interest in such Collateral; *provided, however*, that a Secured Claim does not include a Deficiency Claim.

**1.123**  **Secured Creditor** means a Creditor that holds a Secured Claim.

**1.124**  **(Intentionally deleted)**.

**1.125**  **Securitization Trust** means collectively, each of the "National Collegiate Trusts" that are holders of Claims as more fully described in Classes 3a – 3q hereof.

**1.126**  **Securitization Trust Collateral** means with respect to each Securitization Trust, as applicable, (a) at all relevant times, all funds, monies and other assets in the applicable Pledged Account created and maintained for the applicable Securitization Trust, (b) all defaulted loans that were purchased by or on behalf of the Debtor or its agent (acting in such capacity) from the applicable Securitization Trust prior to the Commencement Date, (c) all recoveries collected (and the right to collect such recoveries earned but not paid) and all future recoveries with respect to such prepetition defaulted loans and (d) the proceeds from the sale by the Debtor of such prepetition defaulted loans to a Securitization Trust at any time following rehabilitation.

19

**EXECUTION VERSION**

**1.127**  <u>Securitization Trust Deficiency Claim</u> means a Deficiency Claim, classified in Class 5 and determined in accordance with section 4.2 of this Plan.

**1.128**  <u>Securitization Trust Settlement</u> means, with respect to a Securitization Trust that accepts this Plan or is deemed to accept the Plan and, thereby, the Securitization Trust Settlement, the allowance of Claims and compromise and settlement of the Trust Adversary Proceeding as set forth in Section 6.2(c) of this Plan.

**1.129**  <u>Securitization Trust Settlement Claim</u> means the amount of a General Unsecured Claim listed as "Securitization Trust Settlement Claim" on <u>Schedule B</u> attached hereto.

**1.130**  <u>Securitization Trust Settlement Claim Reduction</u> means, with respect to the applicable Securitization Trust, the amount by which the Allowed Claim of a Securitization Trust is reduced as part of the Securitization Trust Settlement, as set forth in the "Securitization Trust Settlement Claim Reduction" column of <u>Schedule B</u>.

**1.131**  <u>Solicitations Procedure Order</u> means the Order approving or otherwise determining the Debtor's Motion for an Order (A) Temporarily Allowing Claims for Voting Purposes, (B) Establishing Plan Solicitation and Voting Procedures and (C) Approving Forms of Notices and Ballots.

**1.132**  <u>Tax Claim</u> means a (a) Priority Tax Claim or (b) an Administrative Expense Claim or Secured Claim to the extent such Administrative Expense Claim or Secured Claim is a Claim based on taxes due to a taxing authority.

**1.133**  <u>TERI First Year Share</u> means the amount of TERI Loan Net Proceeds collected during the first year of the Term, payable to Reorganized TERI as calculated in Article VI, section 6.4(a) hereof.

**1.134**  <u>(Intentionally Deleted)</u>.

**1.135**  <u>(Intentionally Deleted)</u>

**1.136**  <u>TERI Loan Net Proceeds</u> means any TERI Loan Proceeds less any costs of collection of such TERI Loan Proceeds.

**1.137**  <u>TERI Loan Proceeds</u> means any Cash or other property collected from an obligor of a TERI Owned Loan in respect of such obligor's obligations under the agreement establishing such TERI Owned Loan.

**1.138**  <u>TERI Net Recovery</u> means the sum of (i) the TERI First Year Share <u>plus</u> (ii) the TERI Second Year Share <u>plus</u> (iii) the Additional Share.

**1.139**  <u>TERI Owned Loan</u> means a student loan owned by the Debtor as of the Effective Date, whether purchased by the Debtor or transferred to the Debtor pursuant to an Approved Make and Wait Settlement, a Securitization Trust Settlement or otherwise, other than

20

# National Center for Education Statistics

## IPEDS Data Center

**Loma Linda University**

| | |
|---|---|
| **UnitID** | 117636 |
| **OPEID** | 00121800 |
| **Address** | 11139 Anderson Street, Loma Linda, CA, 92350 |
| **Web Address** | www.llu.edu/index.html |

---

### Institutional Characteristics 2006-07

Institution: Loma Linda University (117636)

#### Part A - Educational Offerings

**1. Which of the following types of instruction/programs are offered by your institution? [Check one or more]**

*If your institution does not offer occupational, academic or continuing professional programs, you are not expected to complete this or any other IPEDS survey.*

- ☑ Occupational, may lead to a certificate, degree, or other formal award
- ☑ Academic, leading to a certificate, degree, or diploma
- ☑ Continuing professional (postbaccalaureate only)
- ☐ Recreational or avocational (leisure) programs
- ☐ Adult basic or remedial instruction or high school equivalency
- ☐ Secondary (high school)

---

Institution: Loma Linda University (117636)

#### Part A - Mission Statement

**2. Please enter your institution's mission statement or a web address (URL) where your mission statement can be found. Mission statements provided manually must be limited to 2,000 characters or less. If your mission statement is lengthy but available electronically, please provide the web address in the space provided. The mission statement will be available to the public on the College Opportunities Online Locator (IPEDS COOL) website.**

Mission Statement URL:          http:// www.llu.edu/mission/ll

Mission Statement

---

Institution: Loma Linda University (117636)

#### Part B - Organization - Control and Level

**1. What is your institutional control or affiliation?**

| ○ | Public - Specify | |
|---|---|---|
| | Primary control | Secondary control (if applicable) |
| | Select One ▾ | Select One ▾ |
| ○ | Private for-profit | |
| ○ | Private not-for-profit independent (no religious affiliation) | |
| ⊙ | Private not-for-profit religious affiliation - Specify | |
| | Seventh Day Adventists | |

## 2. What award levels are offered by your institution? [Check all that apply]

| Award Level | | |
|---|---|---|

**BELOW THE BACCALAUREATE:**

| 1 | ☑ | Postsecondary award, certificate, or diploma of **less than one academic year**<br>•less than 900 contact or clock hours, or<br>•less than 30 semester or trimester credit hours, or<br>•less than 45 quarter credit hours |
|---|---|---|
| 2 | ☑ | Postsecondary award, certificate, or diploma of **at least one but less than two academic years**<br>•at least 900 but less than 1800 contact or clock hours, or<br>•at least 30 but less than 60 semester or trimester credit hours, or<br>•at least 45 but less than 90 quarter credit hours |
| 3 | ☑ | Associate's degree |
| 4 | ☑ | Postsecondary award, certificate, or diploma of **at least two but less than four academic years**<br>•1800 or more contact or clock hours, or<br>•60 or more semester or trimester credit hours, or<br>•90 or more quarter credit hours |

**BACCALAUREATE AND ABOVE:**

| 5 | ☑ | Bachelor's degree or equivalent |
|---|---|---|
| 6 | ☑ | Postbaccalaureate certificate |
| 7 | ☑ | Master's degree |
| 8 | ☑ | Post-master's certificate |
| 9 | ☑ | Doctor's degree |
| 10 | ☑ | First-professional degree |
| 11 | ☑ | First-professional certificate (Post-degree) |
| 12 | ☐ | Other; please specify in the Caveats box |

CAVEATS

Institution: Loma Linda University (117636)

**Part B - Organization - Calendar System**

*Your response to the next question determines how your institution reports Graduation Rates data in the Spring and how you report student charges in Part D of this survey.*

## 3. What is the predominant calendar system at the institution? [Choose one]

**Standard academic terms**
*Checking one of these systems determines that your institution will provide Graduation Rates data based on a FALL COHORT and student charges based on a FULL ACADEMIC YEAR*

- O Semester
- ⦿ Quarter
- O Trimester
- O 4-1-4 or similar plan
- O Other academic calendar

**Other calendar system**
*Checking one of the following determines that your institution will provide Graduation Rates data based on a FULL YEAR COHORT and student charges data will be requested by PROGRAM.*

- O Differs by program
- O Continuous basis (every 2 weeks, monthly, or other period)

---

Institution: Loma Linda University (117636)

### Part B - Organization - Student Enrollment

### 4. Does your institution enroll any of the following types of students?
*Include all levels that your institution offers, even if there are no students currently enrolled at that level.*

*The answers to these questions determine which screens will be generated for reporting academic year tuition charges, and for reporting Fall Enrollment during the Winter and Spring collections. Additionally, checking Yes for full-time, first-time, degree/certificate-seeking undergraduate students determines that your institution must report pricing information for these students (on the IC survey) and Student Financial Aid information in the Spring collection. The reported full- and part-time 2005 Fall Enrollment counts are provided for your reference.*

| | **Full-time** | | **FT PY Enrollment** | **Part-time** | | | **PT PY Enrollment** |
|---|---|---|---|---|---|---|---|
| | No | Yes | | | No | Yes | |
| **Undergraduate** (academic or occupational programs) | O | ⦿ | 780 | O | No ⦿ | Yes | 312 |
| **First-time, degree/certificate-seeking undergraduate** | ⦿ No | O Yes | | ⦿ | No | O Yes | |
| **Graduate** | O No | ⦿ Yes | 832 | O | No ⦿ | Yes | 633 |
| **First-professional** | O No | ⦿ Yes | 1,297 | ⦿ No | O | Yes | |

### Estimated 2006 Fall Enrollment

Please provide an early estimate of your institution's fall enrollment for all levels offered at your institution as indicated above for full - and part-time students. Estimates should be based on the definitions used in the IPEDS Enrollment component submitted in the Winter or Spring collection. These data will NOT appear in IPEDS COOL (College Opportunities Online Locator), but will be made available in the IPEDS Peer Analysis System.

| | Full-time | Part-time | Total |
|---|---|---|---|
| Undergraduate (academic or occupational programs) | 800 | 320 | **1,120** |
| Of undergraduates, those who are first-time, degree/certificate-seeking students | 0 | 0 | **0** |
| Graduate | 930 | 520 | **1,450** |
| First-Professional | 1,300 | 0 | **1,300** |

**5. For academic year 2000-01, did your institution have any full-time first-time degree/certificate-seeking students enrolled in programs at the baccalaureate level or below?**

*If you answer Yes to this question, you will be required to provide Graduation Rates data for 2000-01 in the Spring collection. If you answer No to this question, please indicate the reason you are not required to report Graduation Rates for the cohort year requested. If you reported any full-time, first-time degree/certificate-seeking undergraduates on the 2000-01 Enrollment survey, the data will be preloaded below.*

⊙ No

☑ This institution did not enroll full-time, first-time (undergraduate) students.

☐ This institution did not offer programs at or below the baccalaureate level.

☐ This institution was not in operation in 2000-01

○ Yes

Cohort from 2000-01 Enrollment of full-time, first-time degree/certificate-seeking students (GRS Cohort)

**6. System, Governing Board or Corporate Structure (please see instructions for reporting System or Corporate data.)**

⊙ This institution is NOT a part of a system or corporate entity.

○ This institution is a part of a system or corporate entity.

Specify name of the system or coporate entity.

-2

---

Institution: Loma Linda University (117636)

**Part C - Admission Requirements and Services - Special Learning Opportunities**

**5. Does your institution accept any of the following? [Check all that apply]**

☐ Dual credit (college credit earned while in high school)

| | Credit for life experiences |
|---|---|
| ☐ | Advanced placement (AP) credits |
| ☑ | None of the above |

**6. What types of special learning opportunities are offered by your institution? [Check all that apply]**

| ☑ | Distance learning opportunities (e-learning) |
|---|---|
| ☐ | ROTC |

| ☐ Army | ☐ Navy | ☐ Air Force |
|---|---|---|

| ☐ | Study abroad |
|---|---|
| ☐ | Weekend/evening college |
| ☐ | Teacher certification (below the postsecondary level) |

| ☐ | Students can complete their preparation in certain areas of specialization |
|---|---|
| ☐ | Students must complete their preparation at another institution for certain areas of specialization |
| ☐ | This institution is approved by the state for the initial certification or licensure of teachers |

| ☐ | None of the above |
|---|---|

---

**Institution: Loma Linda University (117636)**

**Part C - Admission Requirements and Services - Student Services**

**7. If your institution grants a bachelor's degree or higher but does not offer a full 4-year program of study at the undergraduate level, how many years of completed college-level work are required for entrance?**

| Number of years | One |
|---|---|

**8. Which of the following selected students services are offered by your institution? [Check all that apply]**

| ☑ | Remedial services |
|---|---|
| ☑ | Academic/career counseling services |
| ☑ | Employment services for current students |
| ☑ | Placement services for program completers |
| ☑ | On-campus day care for children of students |
| ☐ | None of the above |

**9. Does your institution have its own library or are you financially supporting a shared library with another postsecondary education institution?**

| ◉ | Have our own library |
|---|---|
| ○ | Do not have our own library but contribute financial support to a shared library |

Neither of the above

---

**Institution:** Loma Linda University (117636)

### Part D - Student Charges - Application Fees

**1. Is an application fee for admission required by your institution?**

○ No

◉ Yes - Indicate amount of application fee

| | Amount | Prior year |
|---|---|---|
| Undergraduate | 60 | 60 |
| Graduate | 75 | 60 |
| First-professional | ☒ 195 | 195 |

---

**Institution:** Loma Linda University (117636)

### Part D - Student Charges Questions

**4. Does your institution charge different tuition for in-district, in-state, or out-of-state students?**

*If you answer Yes to this question, you will be expected to report tuition amounts for in-district, in-state, and out-of-state students.*

◉ No

○ Yes

**5. Does your institution offer institutionally-controlled housing (either on or off campus)?**
*If you answer Yes to this question, you will be expected to specify a housing capacity, and to report a room charge or a combined room and board charge (D12 and D13).*

○ No

◉ Yes

Specify housing capacity for academic year 2006-07.

525

**6. Do you offer board or meal plans to your students?**
*If you answer Yes to this question, you will be expected to report a board charge or combined room and board charge (D12 and D13).*

◉ No

○ Yes - Number of meals per week in the maximum meal plan offered

○ Yes - Number of meals per week can vary (for example, student receives a meal card and charges meals against the card)

Institution: Loma Linda University (117636)

## Part D - Undergraduate Student Charges

### 7. Charges to full-time undergraduate students for the full academic year 2006-07

| | Amount | Prior year |
|---|---|---|
| All full-time undergraduates | | |
| Average tuition | 23,575 | 22,320 |
| Required fees | 1,720 | 1,572 |

### 8. Per credit hour charge for part-time undergraduate students

| | Amount | Prior year |
|---|---|---|
| Per credit hour charge | ⊠ 485 | 375 |

---

Institution: Loma Linda University (117636)

## Part D - Graduate Student Charges

### 9. Charges to full-time graduate students for the full academic year 2006-07

| | Amount | Prior year |
|---|---|---|
| Average tuition | 16,800 | 14,100 |
| Required fees | 1,720 | 1,572 |

### 10. Per credit hour charge for part-time graduate students

| | Amount | Prior year |
|---|---|---|
| Per credit hour charge | 535 | 465 |

---

Institution: Loma Linda University (117636)

## Part D - First Professional Student Charges

**11. List the typical tuition and required fees for a full-time first-professional student for the full academic year 2006-07**

DO NOT include room and board charges

| First-professional student | Amount | Prior year |
|---|---|---|
| 1. Chiropractic (D.C. or D.CM.): | | |
| Tuition amount | | |
| Required fees | | |
| 2. Dentistry (D.D.S. or D.M.D.): | | |
| Tuition amount | 45,280 | **41,928** |
| Required fees | ☒ 7,203 | **2,864** |
| 3. Medicine (M.D.): | | |
| Tuition amount | 35,000 | **32,192** |
| Required fees | 1,720 | **1,572** |
| 4. Optometry (O.D.): | | |
| Tuition amount | | |
| Required fees | | |
| 5. Osteopathic Medicine (D.O.): | | |
| Tuition amount | | |
| Required fees | | |
| 6. Pharmacy (Pharm.D.): | | |
| Tuition amount | 31,890 | **31,179** |
| Required fees | ☒ 1,720 | **3,072** |
| 7. Podiatry (Pod.D., D.P., or D.P.M.): | | |
| Tuition amount | | |
| Required fees | | |
| 8. Veterinary Medicine (D.V.M.): | | |
| Tuition amount | | |
| Required fees | | |
| 9. Law (L.L.B. or J.D.): | | |
| Tuition amount | | |
| Required fees | | |
| 10. Theology (M. Div., M.H.L., B.D., or Ordination): | | |

| | | |
|---|---|---|
| Tuition amount | | |
| Required fees | | |
| **11. Other:** | | |
| Tuition amount | | |
| Required fees | | |

**Part D – Student Charges – Room**

12. **What are the typical room charges** for a student for the full academic year 2006-07?
*If your institution offers room at no charge to students, enter zero.*

| | Amount | Prior year |
|---|---|---|
| Room charges (Double occupancy) | 3,100 | **2,235** |

**Part E – Additional Information – Athletic Association**

1. **Is this institution a member of a national athletic association?**

- ⦿ No
- ○ Yes - Check all that apply
  - ☐ National Collegiate Athletic Association (NCAA)
  - ☐ National Association of Intercollegiate Athletics (NAIA)
  - ☐ National Junior College Athletic Association (NJCAA)
  - ☐ United States Collegiate Athletic Association (USCAA)
  - ☐ National Christian College Athletic Association (NCCAA)
  - ☐ Other

2. **If this institution is a member of the NCAA or NAIA, specify the conference FOR EACH SPORT using the droplist.**

| Sport | NCAA or NAIA member | Conference |
|---|---|---|
| Football | ⦿ No ○ Yes-Specify | Select One |
| Basketball | ⦿ No ○ Yes-Specify | Select One |
| Baseball | ⦿ No ○ Yes-Specify | Select One |
| | ⦿ No ○ Yes-Specify | |



Cross country and/or track

Select One

**3. Did your institution offer athletically-related aid to ANY students in academic year 2005-06?**

*If you answer Yes to this question, you will be provided with screens to report the total number of students that received athletically-related student aid during the 2005-06 academic year (Section V of the Graduation Rates survey).*

○ No.
○ Yes.

# National Center for Education Statistics

## IPEDS Data Center

**Loma Linda University**
**UnitID**      117636
**OPEID**       00121800
**Address**     11139 Anderson Street, Loma Linda, CA, 92350
**Web Address** www.llu.edu/index.html

| Institutional Characteristics 2007-08 |
|---|

Institution: Loma Linda University (117636)

### Part A - Educational Offerings
**1. Which of the following types of instruction/programs are offered by your institution? [Check one or more]**

*If your institution does not offer occupational, academic or continuing professional programs, you are not expected to complete this or any other IPEDS survey.*

- ☑ Occupational, may lead to a certificate, degree, or other formal award
- ☑ Academic, leading to a certificate, degree, or diploma
- ☑ Continuing professional (postbaccalaureate only)
- ☐ Recreational or avocational (leisure) programs
- ☐ Adult basic or remedial instruction or high school equivalency
- ☐ Secondary (high school)

Institution: Loma Linda University (117636)

### Part A - Mission Statement
**2. Please enter your institution's mission statement or a web address (URL) where your mission statement can be found. Mission statements provided manually must be limited to 3,000 characters or less. If your mission statement is lengthy but available electronically, please provide the web address in the space provided. The mission statement will be available to the public on the College Opportunities Online Locator (IPEDS COOL) website.**

Mission Statement URL:                          http:// www.llu.edu/mission/ll

Mission Statement

Institution: Loma Linda University (117636)

### Part B - Organization - Control and Level
**1. What is your institutional control or affiliation?**

- ○ Public - Specify

Primary control          Secondary control (if applicable)

Select One  ▼          Select One  ▼

○ Private for-profit

○ Private not-for-profit independent (no religious affiliation)

◉ Private not-for-profit religious affiliation - Specify

Seventh Day Adventists  ▼

**2. What award levels are offered by your institution? [Check all that apply]**

**Award Level**

**BELOW THE BACCALAUREATE:**

| 1 | ☑ | Postsecondary award, certificate, or diploma of **less than one academic year**<br>•less than 900 contact or clock hours, or<br>•less than 30 semester or trimester credit hours, or<br>•less than 45 quarter credit hours |
| 2 | ☑ | Postsecondary award, certificate, or diploma of **at least one but less than two academic years**<br>•at least 900 but less than 1800 contact or clock hours, or<br>•at least 30 but less than 60 semester or trimester credit hours, or<br>•at least 45 but less than 90 quarter credit hours |
| 3 | ☑ | Associate's degree |
| 4 | ☑ | Postsecondary award, certificate, or diploma of **at least two but less than four academic years**<br>•1800 or more contact or clock hours, or<br>•60 or more semester or trimester credit hours, or<br>•90 or more quarter credit hours |

**BACCALAUREATE AND ABOVE:**

| 5 | ☑ | Bachelor's degree or equivalent |
| 6 | ☑ | Postbaccalaureate certificate |
| 7 | ☑ | Master's degree |
| 8 | ☑ | Post-master's certificate |
| 9 | ☑ | Doctor's degree |
| 10 | ☑ | First-professional degree |
| 11 | ☑ | First-professional certificate (Post-degree) |
| 12 | ☐ | Other; please specify in the Caveats box |

**CAVEATS**

Institution: Loma Linda University (117636)

**Part B - Organization - Calendar System**
*Your response to the next question determines how your institution reports Graduation Rates data in the Spring and how you report student charges in Part D of this survey.*
*If your calendar system is different from prior year or requires a change, please contact the Help Desk at 1-877-225-2568.*

**3. What is the predominant calendar system at the institution? [Choose one]**

**Standard academic terms**
*Checking one of these systems determines that your institution will provide Graduation Rates data based on a FALL COHORT and student charges based on a FULL ACADEMIC YEAR*

○ Semester
◉ Quarter
○ Trimester
○ 4-1-4 or similar plan
○ Other academic calendar

**Other calendar system**
*Checking one of the following determines that your institution will provide Graduation Rates data based on a FULL YEAR COHORT and student charges data will be requested by PROGRAM.*

○ Differs by program
○ Continuous basis (every 2 weeks, monthly, or other period)

Institution: Loma Linda University (117636)

**Part B - Organization - Student Enrollment**
**4. Does your institution enroll any of the following types of students?**

*Include all levels that your institution offers, even if there are no students currently enrolled at that level.*
*The answers to these questions determine which screens will be generated for reporting academic year tuition charges, and for reporting Fall Enrollment during the Winter and Spring collections. Additionally, checking Yes for full-time, first-time, degree/certificate-seeking undergraduate students determines that your institution must report pricing information for these students (on the IC survey) and Student Financial Aid information in the Spring collection. The reported full- and part-time 2006 Fall Enrollment counts are provided for your reference.*

| | Full-time | | | FT PY Enrollment | Part-time | | | PT PY Enrollment |
|---|---|---|---|---|---|---|---|---|
| | No | Yes | | | No | Yes | | |
| **Undergraduate** (academic or occupational programs) | ○ | ◉ | | 865 | ○ | ◉ | | 310 |
| **First-time, degree/certificate-seeking undergraduate** | ◉ | ○ | | | ◉ | ○ | | |
| **Graduate** | ○ | ◉ | | 830 | ○ | ◉ | | 519 |
| **First-professional** | ○ | ◉ | | 1,357 | ◉ | ○ | | |

**Estimated 2007 Fall Enrollment**
*Please provide an early estimate of your institution's fall enrollment for all levels offered at your institution as indicated above for full - and part-time students. Estimates should be based on the definitions used in the IPEDS Enrollment component submitted in the Winter or Spring collection. These data will NOT appear in IPEDS COOL (College Opportunities Online Locator), but will be made available in the IPEDS Peer Analysis System.*

| | Full-time | Part-time | Total |
|---|---|---|---|
| **Undergraduate** (academic or occupational programs) | 848 | 228 | 1,076 |
| **Number of undergraduates, those who are first-time, degree/certificate-seeking students** | | | 0 |

| | | | |
|---|---|---|---|
| Graduate | 881 | 579 | 1,460 |
| First-Professional | 1,378 | | 1,378 |

**5. For academic year 2001-02, did your institution have any full-time first-time degree/certificate-seeking students enrolled in programs at the baccalaureate level or below?**

*If you answer Yes to this question, you will be required to provide Graduation Rates data for 2001-02 in the Spring collection. If you answer No to this question, please indicate the reason you are not required to report Graduation Rates for the cohort year requested. If you reported any full-time, first-time degree/certificate-seeking undergraduates on the 2001-02 Enrollment survey, the data will be preloaded below.*

     ⦿     No

           ☑     This institution did not enroll full-time, first-time (undergraduate) students.

           ☐     This institution did not offer programs at or below the baccalaureate level.

           ☐     This institution was not in operation in 2001-02

     ◯     Yes

**Cohort from 2001-02 Enrollment of full-time, first-time degree/certificate-seeking students (GRS Cohort)**

**6. System, Governing Board or Corporate Structure (please see instructions for reporting System or Corporate data.)**

*If your institution is a part of a system, select yes and enter name of system. If you need assistance, contact the Help Desk at 1-877-225-2568. You will not be able to lock your submission if this question is blank.*

     ⦿     This institution is NOT a part of a system or corporate entity.

     ◯     This institution is a part of a system or corporate entity.

          Specify name of the system or corporate entity.

Institution: Loma Linda University (117636)

**Part C - Admission Requirements and Services - Special Learning Opportunities**
**5. Does your institution accept any of the following? [Check all that apply]**

    ☐   Dual credit (college credit earned while in high school)

    ☐   Credit for life experiences

    ☐   Advanced placement (AP) credits

    ☑   None of the above

**6. What types of special learning opportunities are offered by your institution? [Check all that apply]**

    ☑   Distance learning opportunities (e-learning)

    ☐   ROTC

        Army          Navy          Air Force

☐ ☐ ☐

☐ Study abroad

☐ Weekend/evening college

☐ Teacher certification (below the postsecondary level)

 ☐ Students can complete their preparation in certain areas of specialization

 ☐ Students must complete their preparation at another institution for certain areas of specialization

 ☐ This institution is approved by the state for the initial certification or licensure of teachers

☐ None of the above

---

Institution: Loma Linda University (117636)

**Part C - Admission Requirements and Services - Student Services**
**7. If your institution grants a bachelor's degree or higher but does not offer a full 4-year program of study at the undergraduate level, how many years of completed college-level work are required for entrance?**

Number of years
 [ One ▾ ]

**8. Which of the following selected students services are offered by your institution? [Check all that apply]**

☑ Remedial services

☑ Academic/career counseling services

☑ Employment services for current students

☑ Placement services for program completers

☑ On-campus day care for children of students

☐ None of the above

**9. Does your institution have its own library or are you financially supporting a shared library with another postsecondary education institution?**

⦿ Have our own library

○ Do not have our own library but contribute financial support to a shared library

○ Neither of the above

---

Institution: Loma Linda University (117636)

**Part D - Student Charges Questions**
**4. Does your institution charge different tuition for in-district, in-state, or out-of-state students?**
*If you anwser Yes to this question, you will be expected to report tuition amounts for in-district, in-state, and out-of-state students.*

No

○

Yes

○

**5. Does your institution offer institutionally-controlled housing (either on or off campus)?**

*If you answer Yes to this question, you will be expected to specify a housing capacity, and to report a room charge or a combined room and board charge (D12 and D13).*

No

○

Yes

◉

Specify housing capacity for academic year 2007-08

654

**6. Do you offer board or meal plans to your students?**

*If you answer Yes to this question, you will be expected to report a board charge or combined room and board charge (D12 and D13).*

No

◉

Yes – Number of meals per week in the maximum meal plan offered

○

Yes – Number of meals per week can vary (for example, student receives a meal card and charges meals against the card)

○

---

Institution: Loma Linda University (117636)

---

**Part D – Undergraduate Student Charges**
If your institution charges an application fee for admission, indicate the amount.

| | Amount | Prior year |
|---|---|---|
| Undergraduate application fee | 60 | 60 |

**7. Charges to full-time undergraduate students for the full academic year 2007-08**

| | Amount | Prior year |
|---|---|---|
| All full-time undergraduates Average tuition | 23,760 | 23,575 |
| Required fees | 1,880 | 1,720 |

**8. Per credit hour charge for part-time undergraduate students**

| | Amount | Prior year |
|---|---|---|
| Per credit hour charge | 495 | 485 |

---

Institution: Loma Linda University (117636)

---

**Part D – Graduate Student Charges**

If your institution charges an application fee for admission, indicate the amount.

| | Amount | Prior year |
|---|---|---|
| **Graduate application fee** | 75 | 75 |

**9. Charges to full-time graduate students for the full academic year 2007-08**

| | Amount | Prior year |
|---|---|---|
| Average tuition | 17,760 | 16,800 |
| Required fees | 1,880 | 1,720 |

**10. Per credit hour charge for part-time graduate students**

| | Amount | Prior year |
|---|---|---|
| Per credit hour charge | 555 | 535 |

Institution: Loma Linda University (117636)

**Part D – First Professional Student Charges**
If your institution charges an application fee for admission, indicate the amount.

| | Amount | Prior year |
|---|---|---|
| **First-professional application fee** | ◈ 75 | 195 |

**11. List the typical tuition and required fees for a full-time first-professional student for the full academic year 2007-08**

DO NOT include room and board charges

| First-professional student | Amount | Prior year |
|---|---|---|
| **1. Chiropractic (D.C. or D.C.M.):** | | |
|    Tuition amount | | |
|    Required fees | | |
| **2. Dentistry (D.D.S. or D.M.D.):** | | |
|    Tuition amount | 48,904 | 45,280 |
|    Required fees | 7,427 | 7,203 |
| **3. Medicine (M.D.):** | | |
|    Tuition amount | 34,592 | 35,000 |
|    Required fees | 1,904 | 1,720 |
| **4. Optometry (O.D.):** | | |
|    Tuition amount | | |
|    Required fees | | |
| **5. Osteopathic Medicine (D.O.):** | | |
|    Tuition amount | | |

| | Amount | Prior year |
|---|---|---|
| Required fees | | |

**6. Pharmacy (Pharm.D.):**
| | Amount | Prior year |
|---|---|---|
| Tuition amount | 32,100 | 31,890 |
| Required fees | 1,410 | 1,720 |

**7. Podiatry (Pod.D., D.P., or D.P.M.):**
| | Amount | Prior year |
|---|---|---|
| Tuition amount | | |
| Required fees | | |

**8. Veterinary Medicine (D.V.M.):**
| | Amount | Prior year |
|---|---|---|
| Tuition amount | | |
| Required fees | | |

**9. Law (L.L.B. or J.D.):**
| | Amount | Prior year |
|---|---|---|
| Tuition amount | | |
| Required fees | | |

**10. Theology (M. Div., M.H.L., B.D., or Ordination):**
| | Amount | Prior year |
|---|---|---|
| Tuition amount | | |
| Required fees | | |

**11. Other:**
| | Amount | Prior year |
|---|---|---|
| Tuition amount | | |
| Required fees | | |

---

Institution: Loma Linda University (117636)

**Part D - Student Charges - Room**
**12. What are the typical room charges for a student for the full academic year 2007-08?**

*If your institution offers room at no charge to students, enter zero.*

| | Amount | Prior year |
|---|---|---|
| Room charges (Double occupancy) | 3,160 | 3,100 |

---

Institution: Loma Linda University (117636)

**Part E – Additional Information – Athletic Association**
**1. Is this institution a member of a national athletic association?**

( ) No

( ) Yes - Check all that apply

☐ National Collegiate Athletic Association (NCAA)

☐ National Association of Intercollegiate Athletics (NAIA)

☐ National Junior College Athletic Association (NJCAA)

☐ United States Collegiate Athletic Association (USCAA)

☐ National Christian College Athletic Association (NCCAA)

☐ Other

**2. If this institution is a member of the NCAA or NAIA, specify the conference FOR EACH SPORT using the droplist.**

| Sport | NCAA or NAIA member | | Conference |
|---|---|---|---|
| | No | Yes-Specify | |
| Football | ⊙ | ○ | Select One |
| Basketball | ⊙ | ○ | Select One |
| Baseball | ⊙ | ○ | Select One |
| Cross country and/or track | ⊙ | ○ | Select One |

# EXHIBIT 4

1  Damian P. Richard, Esq. (SBN 262805)
2  SESSIONS, FISHMAN, NATHAN & ISRAEL, L.L.P.
   1545 Hotel Circle South, Suite 150
3  San Diego, CA  92108-3426
4  Tel:   619/758-1891
5  Fax:  619/296-2013
   drichard@sessions.legal
6  *Attorneys for Defendants*
7  *National Collegiate Student Loan Trust 2006-1*
   *National Collegiate Student Loan Trust 2006-4*
8  *National Collegiate Student Loan Trust 2007-4*
9  *(erroneously sued as*
   *National Collegiate Student Loan Trust 2007-1)*
10

11            UNITED STATES BANKRUPTCY COURT

12            CENTRAL DISTRICT OF CALIFORNIA

13

14
   IN RE:                          )  Case No.  16-BK-30625-MH
15 JOHN MARTIN MATÁ                 )
   LIVIER MATA                      )  Chapter 7
16                                  )
17 _____        )
   JOHN M. MATA,                    )  Adversary No. 6:18-AP-01089-MH
18           Plaintiff,             )
19      vs.                         )
20 NATIONAL COLLEGIATE STUDENT      )  NATIONAL COLLEGIATE STUDENT
   LOAN TRUST 2006-1; NATIONAL      )  LOAN TRUST 2007-4'S RESPONSE
21 COLLEGIATE STUDENT LOAN          )  TO PLAINTIFF'S REQUESTS FOR
   TRUST 2006-4; NATIONAL           )  PRODUCTION
22 COLLEGIATE STUDENT LOAN          )
23 TRAUT 2007-1,                    )
24           Defendants.            )
25 _____        )

26 PROPOUNDING PARTY:          Plaintiff, John M. Mata

27 RESPONDING PARTY:           Defendant, NCSLT 2007-4
28
   SET NUMBER:                 One

NOW INTO COURT, through undersigned counsel, comes defendant, National Collegiate Student Loan Trust 2007-4 ("NCSLT 2007-4") (erroneously sued as National Collegiate Student Loan Trust 2007-1), which responds to the Discovery Requests propounded by Plaintiff.

NCSLT 2007-4 objects to the instructions contained in Plaintiff's discovery requests as being overbroad and requesting irrelevant and privileged information and documents. Notwithstanding said objections, NCSLT 2007-4 responds to Plaintiff's Request for Production as follows:

## REQUEST FOR PRODUCTION

**Request for Production No. 1:**

All communications including invoices and monthly statements between You and Plaintiff regarding the Loan after the entry of discharge in the above captioned bankruptcy proceeding.

**Response to Request for Production No. 1:**

**NCSLT 2007-4 objects on the grounds that the student loan owing to NCSLT 2007-4 is nondischargeable and therefore not subject to the Chapter 7 Discharge referenced above. NCSLT 2007-4 objects on the basis that the request is overbroad and seeking confidential and proprietary information disproportional to the needs of the case. NCSLT 2007-4 further objects to this Request on the grounds that it seeks documents which have already been provided, already in the possession, custody or control of Plaintiff, and/or equally available to Plaintiff.**

**Subject to and without waiving these objections, NCSLT 2007-4 responds as follows: *see* attached documents NCSLT 0001 through NCSLT 0282.**

**Request for Production No. 2:**

All applications, promissory notes, and Truth in Lending Disclosure Statements, for the Loans.

**Response to Request for Production No. 2:**

NCSLT 2007-4 objects to this Request on the grounds that it seeks documents which have already been provided, already in the possession, custody or control of Plaintiff and/or equally available to and is unduly burdensome, oppressive and overbroad.

Subject to and without waiving these objections, NCSLT 2007-4 responds as follows: *see* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 3:**

All documents concerning any "write-off" of the Loans, including any documents filed with the Internal Revenue Service concerning a "write-off" of the Loans that resulted in tax benefits to You.

**Response to Request for Production No. 3:**

NCSLT 2007-4 objects on the basis that the request is overbroad and seeking confidential and proprietary information disproportional to the needs of the case. NCSLT 2007-4 further objects to this request as overbroad in time and scope, harassing in nature, and seeking information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.

**Request for Production No. 4:**

All communications concerning the assignment or transfer of the Loan.

**Response to Request for Production No. 4:**

NCSLT 2007-4 objects to this Request on the grounds that Plaintiff lacks standing to challenge the assignment of his Loans. *See Anh Nguyet Tran v. Bank of New York,* No. 13 CIV. 580 RPP, 2014 WL 1225575 (S.D.N.Y. Mar. 24,

2014), aff'd, 592 F. App'x 24 (2d Cir. 2015), order amended and superseded, 610 F. App'x 82 (2d Cir. 2015), cert denied 610 F. App'x 82, 136 S.Ct. 409 (2015) (citing *Rajamin v. Deutsche Bank Nat. Trust. Co.,* 2013 WL 1285160, *3 (S.D.N.Y. Mar. 28, 2013)); *In re Walker,* 466 B.R. 271, 282 (Bankr. E.D. Pa. 2012); *Livonia Property Holdings, LLC. v. 12840-12976 Farmington Rd. Holdings, LLC,* 717 F.Supp.2d 724, 736-37 (E.D. Mich. 2010) ("[F]or over a century, state and federal courts around the country have [held] that a litigant who is not a party to an assignment lacks standing to challenge that assignment."), aff'd, 399 Fed.Appx. 97 (6th Cir. 2010).

Subject to and without waiving these objections, NCSLT 2007-4 responds as follows:  *see* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 5:**

All documents You provided to Plaintiff after the origination of the Loan, including1098s, for the Plaintiff to deduct any interest payments from their income tax.

**Response to Request for Production No. 5:**

NCSLT 2007-4 objects on the basis that the request is overbroad and information disproportional to the needs of the case.  NCSLT 2007-4 further objects to this request as overbroad in time and scope, harassing in nature, and seeking information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.

Subject to and without waiving these objections, NCSLT 2007-4 responds as follows:  *see* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 6:**

All documents including, but not limited to, contracts, assignment, bills of sale, invoices, and other similar documents that establish that You are the servicer for or owner of the Loan.

**Response to Request for Production No. 6:**

*See* **attached documents NCSLT 0001 through NCSLT 0282.**

**Request for Production No. 7:**

All documents demonstrating that TERI guaranteed the Loans, including any Guaranty Agreements between TERI and the originator of the Loans, the Program Guidelines incorporated by reference into the Guaranty Agreements, and any copies of checks made payable by the originator of the Loans for TERI for the Guarantee fee.

**Response to Request for Production No. 7:**

**NCSLT 2007-4 objects on the basis that the request is overbroad and seeking confidential and proprietary information disproportional to the needs of the case. NCSLT 2007-4 further objects to this request as overbroad in time and scope, harassing in nature, and seeking information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.**

**Subject to and without waiving these objections, NCSLT 2007-4 responds as follows:** *see* **attached documents NCSLT 0001 through NCSLT 0282.**

**Request for Production No. 8:**

All documents establishing that You are authorized to act as a debt collector pursuant to STATE OF CALIFORNIA LAW.

**Response to Request for Production No. 8:**

**NCSLT 2007-4 objects on the basis that the term "debt collector" is undefined. NCSLT 2007-4 further objects on the grounds that the request is**

overbroad and seeking information disproportional to the needs of the case. NCSLT 2007-4. NCSLT 2007-4 further objects on the grounds that NCSLT 2007-4 is Plaintiff's student loan creditor, not a debt collector.

Subject to and without waiving these objections, NCSLT 2007-4 further responds as follows: NCSLT 2007-4 is a Delaware Statutory Trust. A Delaware statutory trust is considered a separate legal entity with the ability to file suit on its own behalf. Delaware Statutory Trust Act, 12 Del. Code Ann. 3801. Delaware statutory trusts are recognized as their own legal entity, separate from their trustee. Delaware Code section 3804 grants statutory trusts the ability to file lawsuits, stating "[a] statutory trust may sue and be sued." Del. Code Ann. § 3804(a). Delaware law also refers to a statutory trust as a "business trust." Del. Code Ann. § 3801(g). Delaware courts have acknowledged these same business trusts as valid business organizations since 1947. *Commonwealth Trust Co. v. Capital Ret. Plan,* 54 A.2d 739, 740 (Del. Ch. 1947). Like a corporation, California law recognizes "business trusts" as persons who may sue or be sued under California law. Bus. & Prof.Code § 14001 ("'person' means any person, association, organization, partnership, business trust, limited liability company, or corporation"); Rev. & Tax.Code § 23038; Corp.Code § 174.5; *see Wang v. Wal–Mart Real Estate Bus. Trust,* 153 Cal.App.4th 790, 793 n.1 (2007).

**Request for Production No. 9:**

All documents that You intend to introduce as an exhibit at the trial of this matter.

**Response to Request for Production No. 9:**

*See* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 10:**

All documents that You intend to rely on in meeting your initial legal burden to prove by a preponderance of the evidence that the Loans are encompassed by section 523(a)(8)

**Response to Request for Production No. 10:**

*See* **attached documents NCSLT 0001 through NCSLT 0282.**

**Request for Production No. 11:**

Any and all tape recordings of any conversations between any of Your employees or agents and the Plaintiff.

**Response to Request for Production No. 11:**

**NCSLT 2007-4 objects to this request as overbroad in time and scope, harassing in nature, disproportional to needs of this case, and seeking information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.**

**Request for Production No. 12:**

All documents concerning your determination that Plaintiff's applications for the Loans did not exceed the Plaintiff's published "Cost of Attendance" during the applicable academic terms.

**Response to Request for Production No. 12:**

**NCSLT 2007-4 objects because, although "Cost of Attendance" is defined, the definition merely references a statute and improperly seeks a response interpreting that statute and responding as to whether the statute even applies. NCSLT 2007-4 further objects because this request misstates facts in evidence as NCSLT 2007-4 was not the original creditor. NCSLT 2007-4 further objects to this request to the extent it seeks information that is not relevant to a claim or defense of any party, and not relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.**

**Request for Production No. 13:**

All documents that you intended to introduce at trial to prove that Plaintiff's Loan is a Qualified Education Loan.

**Response to Request for Production No. 13:**

NCSLT 2007-4 objects to this request because it seeks information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence. NCSLT 2007-4 further objects to this request to the extent it seeks information that is not relevant to a claim or defense of any party, and not relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving these objections, NCSLT 2007-4 responds as follows:  *see* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 14:**

All documents that you intended to introduce at trial to prove that Plaintiff's Loans were made under a program funded in whole or part by a non-profit institution.

**Response to Request for Production No. 14:**

*See* attached documents NCSLT 0001 through NCSLT 0282.

Date: 9/4/18

SESSIONS FISHMAN NATHAN & ISRAEL, LLP
*/s/Damian Richard*
Damian Richard
Attorney for Defendants
National Collegiate Student Loan Trust 2006-1,
National Collegiate Student Loan Trust 2006-4,
National Collegiate Student Loan Trust 2007-4

1  Damian P. Richard, Esq. (SBN 262805)
2  SESSIONS, FISHMAN, NATHAN & ISRAEL, L.L.P.
   1545 Hotel Circle South, Suite 150
3  San Diego, CA  92108-3426
4  Tel:   619/758-1891
   Fax:  619/296-2013
5  drichard@sessions.legal
6  *Attorneys for Defendants*
7  *National Collegiate Student Loan Trust 2006-1*
   *National Collegiate Student Loan Trust 2006-4*
8  *National Collegiate Student Loan Trust 2007-4*
9  *(erroneously sued as*
   *National Collegiate Student Loan Trust 2007-1)*
10

11               UNITED STATES BANKRUPTCY COURT

12               CENTRAL DISTRICT OF CALIFORNIA

13

14  IN RE:                              )   Case No.  16-BK-30625-MH
15  JOHN MARTIN MATA                    )
                                        )   Chapter 7
16  LIVIER MATA                         )
17  _____        )
    JOHN M. MATA,                       )   Adversary No. 6:18-AP-01089-MH
18             Plaintiff,               )
                                        )
19        vs.                           )
                                        )   NATIONAL COLLEGIATE STUDENT
20  NATIONAL COLLEGIATE STUDENT         )   LOAN TRUST 2006-1'S RESPONSE
    LOAN TRUST 2006-1; NATIONAL         )   TO PLAINTIFF'S REQUESTS FOR
21  COLLEGIATE STUDENT LOAN             )   PRODUCTION
    TRUST 2006-4; NATIONAL              )
22  COLLEGIATE STUDENT LOAN             )
23  TRAUT 2007-1,                       )
                                        )
24             Defendants.              )
25  _____        )

26  PROPOUNDING PARTY:        Plaintiff, John M. Mata

27  RESPONDING PARTY:         Defendant, NCSLT 2006-1

28  SET NUMBER:               One

NCSLT 2006-1's Response to Plaintiff's Requests for Production

1

NOW INTO COURT, through undersigned counsel, comes defendant, National Collegiate Student Loan Trust 2006-1 ("NCSLT 2006-1"), which responds to the Discovery Requests propounded by Plaintiff.

NCSLT 2006-1 objects to the instructions contained in Plaintiff's discovery requests as being overbroad and requesting irrelevant and privileged information and documents. Notwithstanding said objections, NCSLT 2006-1 responds to Plaintiff's Request for Production as follows:

## REQUEST FOR PRODUCTION

**Request for Production No. 1:**

All communications including invoices and monthly statements between You and Plaintiff regarding the Loan after the entry of discharge in the above captioned bankruptcy proceeding.

**Response to Request for Production No. 1:**

NCSLT 2006-1 objects on the grounds that the student loan owing to NCSLT 2006-1 is nondischargeable and therefore not subject to the Chapter 7 Discharge referenced above. NCSLT 2006-1 objects on the basis that the request is overbroad and seeking confidential and proprietary information disproportional to the needs of the case. NCSLT 2006-1 further objects to this Request on the grounds that it seeks documents which have already been provided, already in the possession, custody or control of Plaintiff, and/or equally available to Plaintiff.

Subject to and without waiving these objections, NCSLT 2006-1 responds as follows: *see* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 2:**

All applications, promissory notes, and Truth in Lending Disclosure Statements, for the Loans.

**Response to Request for Production No. 2:**

NCSLT 2006-1 objects to this Request on the grounds that it seeks documents which have already been provided, already in the possession, custody or control of Plaintiff and/or equally available to and is unduly burdensome, oppressive and overbroad.

Subject to and without waiving these objections, NCSLT 2006-1 responds as follows: *see* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 3:**

All documents concerning any "write-off" of the Loans, including any documents filed with the Internal Revenue Service concerning a "write-off" of the Loans that resulted in tax benefits to You.

**Response to Request for Production No. 3:**

NCSLT 2006-1 objects on the basis that the request is overbroad and seeking confidential and proprietary information disproportional to the needs of the case. NCSLT 2006-1 further objects to this request as overbroad in time and scope, harassing in nature, and seeking information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.

**Request for Production No. 4:**

All communications concerning the assignment or transfer of the Loan.

**Response to Request for Production No. 4:**

NCSLT 2006-1 objects to this Request on the grounds that Plaintiff lacks standing to challenge the assignment of his Loans. *See Anh Nguyet Tran v. Bank of New York,* No. 13 CIV. 580 RPP, 2014 WL 1225575 (S.D.N.Y. Mar. 24, 2014), aff'd, 592 F. App'x 24 (2d Cir. 2015), order amended and superseded, 610 F. App'x 82 (2d Cir. 2015), cert denied 610 F. App'x 82, 136 S.Ct. 409

1   (2015) (citing *Rajamin v. Deutsche Bank Nat. Trust. Co.*, 2013 WL 1285160, *3

2   (S.D.N.Y. Mar. 28, 2013)); *In re Walker*, 466 B.R. 271, 282 (Bankr. E.D. Pa.

3   2012); *Livonia Property Holdings, LLC. v. 12840-12976 Farmington Rd.*

4   *Holdings, LLC*, 717 F.Supp.2d 724, 736-37 (E.D. Mich. 2010) ("[F]or over a

5   century, state and federal courts around the country have [held] that a litigant

6   who is not a party to an assignment lacks standing to challenge that

7   assignment."), aff'd, 399 Fed.Appx. 97 (6th Cir. 2010).

8       Subject to and without waiving these objections, NCSLT 2006-1

9   responds as follows:  *see* attached documents NCSLT 0001 through NCSLT

10  0282.

11

12  **Request for Production No. 5:**

13      All documents You provided to Plaintiff after the origination of the Loan,

14  including1098s, for the Plaintiff to deduct any interest payments from their income

15  tax.

16  **Response to Request for Production No. 5:**

17      NCSLT 2006-1 objects on the basis that the request is overbroad and

18  information disproportional to the needs of the case.  NCSLT 2006-1  further

19  objects to this request as overbroad in time and scope, harassing in nature, and

20  seeking information not relevant to the allegations contained in the Adversary

21  Complaint and not likely to lead to the discovery of admissible evidence.

22      Subject to and without waiving these objections, NCSLT 2006-1

23  responds as follows:  *see* attached documents NCSLT 0001 through NCSLT

24  0282.

25  **Request for Production No. 6:**

26      All documents including, but not limited to, contracts, assignment, bills of

27  sale, invoices, and other similar documents that establish that You are the servicer

28  for or owner of the Loan.

**Response to Request for Production No. 6:**

*See* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 7:**

All documents demonstrating that TERI guaranteed the Loans, including any Guaranty Agreements between TERI and the originator of the Loans, the Program Guidelines incorporated by reference into the Guaranty Agreements, and any copies of checks made payable by the originator of the Loans for TERI for the Guarantee fee.

**Response to Request for Production No. 7:**

NCSLT 2006-1 objects on the basis that the request is overbroad and seeking confidential and proprietary information disproportional to the needs of the case. NCSLT 2006-1 further objects to this request as overbroad in time and scope, harassing in nature, and seeking information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.

Subject to and without waiving these objections, NCSLT 2006-1 responds as follows: *see* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 8:**

All documents establishing that You are authorized to act as a debt collector pursuant to STATE OF CALIFORNIA LAW.

**Response to Request for Production No. 8:**

NCSLT 2006-1 objects on the basis that the term "debt collector" is undefined. NCSLT 2006-1 further objects on the grounds that the request is overbroad and seeking information disproportional to the needs of the case. NCSLT 2006-1. NCSLT 2006-1 further objects on the grounds that NCSLT 2006-1 is Plaintiff's student loan creditor, not a debt collector.

Subject to and without waiving these objections, NCSLT 2006-1 further responds as follows:   NCSLT 2006-1 is a Delaware Statutory Trust.   A Delaware statutory trust is considered a separate legal entity with the ability to file suit on its own behalf.  Delaware Statutory Trust Act, 12 Del. Code Ann. 3801.   Delaware statutory trusts are recognized as their own legal entity, separate from their trustee.  Delaware Code section 3804 grants statutory trusts the ability to file lawsuits, stating "[a] statutory trust may sue and be sued."  Del. Code Ann. § 3804(a).  Delaware law also refers to a statutory trust as a "business trust."   Del. Code Ann. § 3801(g).   Delaware courts have acknowledged these same business trusts as valid business organizations since 1947. *Commonwealth Trust Co. v. Capital Ret. Plan*, 54 A.2d 739, 740 (Del. Ch. 1947).   Like a corporation, California law recognizes "business trusts" as persons who may sue or be sued under California law.  Bus. & Prof.Code § 14001 ("'person' means any person, association, organization, partnership, business trust, limited liability company, or corporation"); Rev. & Tax.Code § 23038; Corp.Code § 174.5; *see Wang v. Wal–Mart Real Estate Bus. Trust*, 153 Cal.App.4th 790, 793 n.1 (2007).

**Request for Production No. 9:**

All documents that You intend to introduce as an exhibit at the trial of this matter.

**Response to Request for Production No. 9:**

*See* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 10:**

All documents that You intend to rely on in meeting your initial legal burden to prove by a preponderance of the evidence that the Loans are encompassed by section 523(a)(8)

**Response to Request for Production No. 10:**

*See* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 11:**

Any and all tape recordings of any conversations between any of Your employees or agents and the Plaintiff.

**Response to Request for Production No. 11:**

NCSLT 2006-1 objects to this request as overbroad in time and scope, harassing in nature, disproportional to needs of this case, and seeking information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.

**Request for Production No. 12:**

All documents concerning your determination that Plaintiff's applications for the Loans did not exceed the Plaintiff's published "Cost of Attendance" during the applicable academic terms.

**Response to Request for Production No. 12:**

NCSLT 2006-1 objects because, although "Cost of Attendance" is defined, the definition merely references a statute and improperly seeks a response interpreting that statute and responding as to whether the statute even applies. NCSLT 2006-1 further objects because this request misstates facts in evidence as NCSLT 2006-1 was not the original creditor. NCSLT 2006-1 further objects to this request to the extent it seeks information that is not relevant to a claim or defense of any party, and not relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

**Request for Production No. 13:**

All documents that you intended to introduce at trial to prove that Plaintiff's Loan is a Qualified Education Loan.

**Response to Request for Production No. 13:**

NCSLT 2006-1 objects to this request because it seeks information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.  NCSLT 2006-1 further objects to this request to the extent it seeks information that is not relevant to a claim or defense of any party, and not relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving these objections, NCSLT 2006-1 responds as follows:  *see* attached documents NCSLT 0001 through NCSLT 0282.

### Request for Production No. 14:

All documents that you intended to introduce at trial to prove that Plaintiff's Loans were made under a program funded in whole or part by a non-profit institution.

### Response to Request for Production No. 14:

*See* attached documents NCSLT 0001 through NCSLT 0282.

Date: 9/4/18                    SESSIONS FISHMAN NATHAN & ISRAEL, LLP
                               */s/Damian Richard*
                               Damian Richard
                               Attorney for Defendants
                               National Collegiate Student Loan Trust 2006-1,
                               National Collegiate Student Loan Trust 2006-4,
                               National Collegiate Student Loan Trust 2007-4

1  Damian P. Richard, Esq. (SBN 262805)
2  SESSIONS, FISHMAN, NATHAN & ISRAEL, L.L.P.
   1545 Hotel Circle South, Suite 150
3  San Diego, CA  92108-3426
4  Tel:   619/758-1891
   Fax:  619/296-2013
5  drichard@sessions.legal
6  *Attorneys for Defendants*
7  *National Collegiate Student Loan Trust 2006-1*
   *National Collegiate Student Loan Trust 2006-4*
8  *National Collegiate Student Loan Trust 2007-4*
9  *(erroneously sued as*
   *National Collegiate Student Loan Trust 2007-1)*
10

11              UNITED STATES BANKRUPTCY COURT

12              CENTRAL DISTRICT OF CALIFORNIA

13

14 | IN RE:                              | ) Case No.  16-BK-30625-MH
15 | JOHN MARTIN MATA                    | )
16 | LIVIER MATA                         | ) Chapter 7
   |                                     | )
17 |                                     | )
18 | JOHN M. MATA,                       | ) Adversary No. 6:18-AP-01089-MH
   |              Plaintiff,             | )
19 |                                     | )
   |      vs.                            | )
20 |                                     | ) NATIONAL COLLEGIATE STUDENT
   | NATIONAL COLLEGIATE STUDENT         | ) LOAN TRUST 2006-4'S RESPONSE
21 | LOAN TRUST 2006-1; NATIONAL         | ) TO PLAINTIFF'S REQUESTS FOR
   | COLLEGIATE STUDENT LOAN             | ) PRODUCTION
22 | TRUST 2006-4; NATIONAL              | )
23 | COLLEGIATE STUDENT LOAN             | )
   | TRAUT 2007-1,                       | )
24 |                                     | )
   |              Defendants.            | )
25

26  PROPOUNDING PARTY:        Plaintiff, John M. Mata

27  RESPONDING PARTY:         Defendant, NCSLT 2006-4

28
    SET NUMBER:               One

NCSLT 2006-4's Response to Plaintiff's Requests for Production

1

NOW INTO COURT, through undersigned counsel, comes defendant, National Collegiate Student Loan Trust 2006-4 ("NCSLT 2006-4"), which responds to the Discovery Requests propounded by Plaintiff.

NCSLT 2006-4 objects to the instructions contained in Plaintiff's discovery requests as being overbroad and requesting irrelevant and privileged information and documents. Notwithstanding said objections, NCSLT 2006-4 responds to Plaintiff's Request for Production as follows:

## REQUEST FOR PRODUCTION

### Request for Production No. 1:

All communications including invoices and monthly statements between You and Plaintiff regarding the Loan after the entry of discharge in the above captioned bankruptcy proceeding.

### Response to Request for Production No. 1:

**NCSLT 2006-4 objects on the grounds that the student loan owing to NCSLT 2006-4 is nondischargeable and therefore not subject to the Chapter 7 Discharge referenced above. NCSLT 2006-4 objects on the basis that the request is overbroad and seeking confidential and proprietary information disproportional to the needs of the case. NCSLT 2006-4 further objects to this Request on the grounds that it seeks documents which have already been provided, already in the possession, custody or control of Plaintiff, and/or equally available to Plaintiff.**

**Subject to and without waiving these objections, NCSLT 2006-4 responds as follows:  *see* attached documents NCSLT 0001 through NCSLT 0282.**

### Request for Production No. 2:

All applications, promissory notes, and Truth in Lending Disclosure Statements, for the Loans.

**Response to Request for Production No. 2:**

NCSLT 2006-4 objects to this Request on the grounds that it seeks documents which have already been provided, already in the possession, custody or control of Plaintiff and/or equally available to and is unduly burdensome, oppressive and overbroad.

Subject to and without waiving these objections, NCSLT 2006-4 responds as follows: *see* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 3:**

All documents concerning any "write-off" of the Loans, including any documents filed with the Internal Revenue Service concerning a "write-off" of the Loans that resulted in tax benefits to You.

**Response to Request for Production No. 3:**

NCSLT 2006-4 objects on the basis that the request is overbroad and seeking confidential and proprietary information disproportional to the needs of the case. NCSLT 2006-4 further objects to this request as overbroad in time and scope, harassing in nature, and seeking information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.

**Request for Production No. 4:**

All communications concerning the assignment or transfer of the Loan.

**Response to Request for Production No. 4:**

NCSLT 2006-4 objects to this Request on the grounds that Plaintiff lacks standing to challenge the assignment of his Loans. *See Anh Nguyet Tran v. Bank of New York,* No. 13 CIV. 580 RPP, 2014 WL 1225575 (S.D.N.Y. Mar. 24, 2014), aff'd, 592 F. App'x 24 (2d Cir. 2015), order amended and superseded, 610 F. App'x 82 (2d Cir. 2015), cert denied 610 F. App'x 82, 136 S.Ct. 409

(2015) (citing *Rajamin v. Deutsche Bank Nat. Trust. Co.,* 2013 WL 1285160, *3 (S.D.N.Y. Mar. 28, 2013)); *In re Walker,* 466 B.R. 271, 282 (Bankr. E.D. Pa. 2012); *Livonia Property Holdings, LLC. v. 12840-12976 Farmington Rd. Holdings, LLC,* 717 F.Supp.2d 724, 736-37 (E.D. Mich. 2010) ("[F]or over a century, state and federal courts around the country have [held] that a litigant who is not a party to an assignment lacks standing to challenge that assignment."), aff'd, 399 Fed.Appx. 97 (6th Cir. 2010).

Subject to and without waiving these objections, NCSLT 2006-4 responds as follows: *see* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 5:**

All documents You provided to Plaintiff after the origination of the Loan, including1098s, for the Plaintiff to deduct any interest payments from their income tax.

**Response to Request for Production No. 5:**

NCSLT 2006-4 objects on the basis that the request is overbroad and information disproportional to the needs of the case. NCSLT 2006-4 further objects to this request as overbroad in time and scope, harassing in nature, and seeking information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.

Subject to and without waiving these objections, NCSLT 2006-4 responds as follows: *see* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 6:**

All documents including, but not limited to, contracts, assignment, bills of sale, invoices, and other similar documents that establish that You are the servicer for or owner of the Loan.

**Response to Request for Production No. 6:**

    *See* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 7:**

    All documents demonstrating that TERI guaranteed the Loans, including any Guaranty Agreements between TERI and the originator of the Loans, the Program Guidelines incorporated by reference into the Guaranty Agreements, and any copies of checks made payable by the originator of the Loans for TERI for the Guarantee fee.

**Response to Request for Production No. 7:**

    NCSLT 2006-4 objects on the basis that the request is overbroad and seeking confidential and proprietary information disproportional to the needs of the case. NCSLT 2006-4 further objects to this request as overbroad in time and scope, harassing in nature, and seeking information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.

    Subject to and without waiving these objections, NCSLT 2006-4 responds as follows: *see* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 8:**

    All documents establishing that You are authorized to act as a debt collector pursuant to STATE OF CALIFORNIA LAW.

**Response to Request for Production No. 8:**

    NCSLT 2006-4 objects on the basis that the term "debt collector" is undefined. NCSLT 2006-4 further objects on the grounds that the request is overbroad and seeking information disproportional to the needs of the case. NCSLT 2006-4. NCSLT 2006-4 further objects on the grounds that NCSLT 2006-4 is Plaintiff's student loan creditor, not a debt collector.

Subject to and without waiving these objections, NCSLT 2006-4 further responds as follows: NCSLT 2006-4 is a Delaware Statutory Trust. A Delaware statutory trust is considered a separate legal entity with the ability to file suit on its own behalf. Delaware Statutory Trust Act, 12 Del. Code Ann. 3801. Delaware statutory trusts are recognized as their own legal entity, separate from their trustee. Delaware Code section 3804 grants statutory trusts the ability to file lawsuits, stating "[a] statutory trust may sue and be sued." Del. Code Ann. § 3804(a). Delaware law also refers to a statutory trust as a "business trust." Del. Code Ann. § 3801(g). Delaware courts have acknowledged these same business trusts as valid business organizations since 1947. *Commonwealth Trust Co. v. Capital Ret. Plan,* 54 A.2d 739, 740 (Del. Ch. 1947). Like a corporation, California law recognizes "business trusts" as persons who may sue or be sued under California law. Bus. & Prof.Code § 14001 ("'person' means any person, association, organization, partnership, business trust, limited liability company, or corporation"); Rev. & Tax.Code § 23038; Corp.Code § 174.5; *see Wang v. Wal–Mart Real Estate Bus. Trust,* 153 Cal.App.4th 790, 793 n.1 (2007).

**Request for Production No. 9:**

All documents that You intend to introduce as an exhibit at the trial of this matter.

**Response to Request for Production No. 9:**

*See* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 10:**

All documents that You intend to rely on in meeting your initial legal burden to prove by a preponderance of the evidence that the Loans are encompassed by section 523(a)(8)

**Response to Request for Production No. 10:**

*See* **attached documents NCSLT 0001 through NCSLT 0282.**

**Request for Production No. 11:**

Any and all tape recordings of any conversations between any of Your employees or agents and the Plaintiff.

**Response to Request for Production No. 11:**

NCSLT 2006-4 objects to this request as overbroad in time and scope, harassing in nature, disproportional to needs of this case, and seeking information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.

**Request for Production No. 12:**

All documents concerning your determination that Plaintiff's applications for the Loans did not exceed the Plaintiff's published "Cost of Attendance" during the applicable academic terms.

**Response to Request for Production No. 12:**

NCSLT 2006-4 objects because, although "Cost of Attendance" is defined, the definition merely references a statute and improperly seeks a response interpreting that statute and responding as to whether the statute even applies. NCSLT 2006-4 further objects because this request misstates facts in evidence as NCSLT 2006-4 was not the original creditor. NCSLT 2006-4 further objects to this request to the extent it seeks information that is not relevant to a claim or defense of any party, and not relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

**Request for Production No. 13:**

All documents that you intended to introduce at trial to prove that Plaintiff's Loan is a Qualified Education Loan.

**Response to Request for Production No. 13:**

NCSLT 2006-4 objects to this request because it seeks information not relevant to the allegations contained in the Adversary Complaint and not likely to lead to the discovery of admissible evidence.  NCSLT 2006-4 further objects to this request to the extent it seeks information that is not relevant to a claim or defense of any party, and not relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving these objections, NCSLT 2006-4 responds as follows:  *see* attached documents NCSLT 0001 through NCSLT 0282.

**Request for Production No. 14:**

All documents that you intended to introduce at trial to prove that Plaintiff's Loans were made under a program funded in whole or part by a non-profit institution.

**Response to Request for Production No. 14:**

*See* attached documents NCSLT 0001 through NCSLT 0282.

Date: 9/4/18                SESSIONS FISHMAN NATHAN & ISRAEL, LLP
                            */s/Damian Richard*
                            Damian Richard
                            Attorney for Defendants
                            National Collegiate Student Loan Trust 2006-1,
                            National Collegiate Student Loan Trust 2006-4,
                            National Collegiate Student Loan Trust 2007-4

# EXHIBIT 5

**EXECUTION VERSION**

loans being transferred by the Debtor or its agents to other entities (other than the Plan Trustee) pursuant to this Plan.

**1.140    TERI Second Year Share** means the amount of TERI Loan Net Proceeds collected during the second year of the Term, payable to Reorganized TERI as calculated in Article VI, section 6.4(b) hereof.

**1.141    Term** means a period of two years beginning on the Effective Date.

**1.142    Transfer Taxes** means any sales, use, notorial, or other transfer taxes (including any interest, penalties or other additions thereto) of the Debtor that have been or may be assessed with respect to any transfer under this Plan.

**1.143    Treasury Regulations** means final, temporary and proposed regulations promulgated by the U.S. Treasury Department in respect of the IRC.

**1.144    Trust Adversary Proceeding** means that certain adversary proceeding, Case No. 09-1040, pending in the Bankruptcy Court against the Wilmington Trust Company, as owner-trustee of the Securitization Trusts, U.S. Bank National Association as indenture trustee and custodian and First Marblehead Data Services, Inc. as administrator for the Securitization Trusts.

**1.145    Unimpaired** means not Impaired.

**1.146    United States Trustee** means the acting or appointed United States Trustee for the District of Massachusetts, as applicable.

**1.147    Unrestricted Cash** means all Cash (including, without limitation, the Restricted Charitable Funds Carve-Out) that is not Collateral, Restricted Charitable Funds or Restricted Grant Funds.

**1.148    Victory Fund** means the Collateral Account the Debtor maintains at KeyBank National Association.

**1.149    Voting Agent** means Epiq Bankruptcy Solutions, LLC.

**1.150    Voting Record Date** means the date established by the Approval Order by which the Voting Agent must actually receive an otherwise valid vote on this Plan in order for such vote to count as a vote to accept or reject this Plan. Such deadline will be 4:30 p.m. (prevailing Eastern Time) on the date the Court enters an order approving the Disclosure Statement.

**1.151    Other Terms.** A term used in this Plan that is not defined will have the meaning ascribed to that term, if any, in the Bankruptcy Code.

**1.152    Construction Of Certain Terms.**

*(a)*    The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to this Plan as a whole, including, as applicable, the documents contained in the Plan

21

**EXECUTION VERSION**

Supplement, and not to any particular section, subsection or clause contained in this Plan or the Plan Supplement.

        *(b)*      Wherever from the context it appears appropriate, each term stated in either the singular or the plural includes the singular and the plural and pronouns stated in the masculine, feminine or neuter gender include the masculine, the feminine and the neuter.

# ARTICLE II

## TREATMENT OF UNCLASSIFIED CLAIMS -- ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

    **2.1**    **Administrative Expense Claims**. Except to the extent the holder of an Allowed Administrative Expense Claim agrees otherwise, each holder of an Allowed Administrative Expense Claim will be paid on account of such Allowed Administrative Expense Claim (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or upon other agreed terms between the holder of such claim and the Debtor, or (b) such lesser amount as the holder of an Allowed Administrative Expense Claim and the Debtor and Plan Trustee might otherwise agree; *provided, however* that expenses of operation accrued and unpaid as of the Effective Date arising in the ordinary course of the Debtor's business and payable in such ordinary course (including any and all Claims and Expenses directly or indirectly arising from or related to the Pension Plan) will be paid solely by Reorganized TERI from Reorganized TERI Assets in the ordinary course after the Effective Date. For the avoidance of doubt, ordinary course expenses shall not include direct costs of collections or the recoveries or costs of recoveries (including litigation and other collection costs associated with recoveries on defaulted loans) that are payable from the proceeds of such collections pursuant to the Collection Contract. Rather, ordinary course expenses to be paid from Reorganized TERI Assets pursuant to this section include rent, payroll, utility, other similar monthly expenses, pension costs, Claims and expenses directly or indirectly arising from or related to the Pension Plan retiree benefits, employee benefits and other expenses attributable to the Debtor's or Reorganized TERI's business.

    **2.2**    **Pre-Effective Date Professional Fees and Expenses**. All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement for fees and/or expenses incurred prior to and including the Effective Date under section 330 or 503(b) of the Bankruptcy Code will file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the date that is thirty (30) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court. Objections to any such final application must be filed on or before a date to be set by the Bankruptcy Court in the Confirmation Order or, if no such date is set in the Confirmation Order or in any other Order, then by the date required by the Massachusetts Local Bankruptcy Rules. Any entity granted such an award by the Bankruptcy Court must be paid in full by the Plan Trustee, in such amounts as are Allowed, within ten (10) days after the order granting such award is a Final Order.

    **2.3**    **United States Trustee Quarterly Fees and Other Statutory Fees** All fees payable pursuant to 28 U.S.C. § 1930(a)(6) of the United States Code, as determined by the

22

**EXECUTION VERSION**

Bankruptcy Court on the Confirmation Date, will be paid on the Effective Date by the Debtor. Following the Effective Date the Plan Trustee shall file all post-confirmation reports and pay all fees (solely from and to the extent of available Plan Trust Assets) payable pursuant to 28 U.S.C. §1930(a)(6) until the Chapter 11 Case is closed pursuant to a Final Order.

2.4    **Priority Tax Claims** Except to the extent the holder of an Allowed Priority Tax Claim agrees otherwise, each holder of an Allowed Priority Tax Claim will be paid in respect of such Allowed Claim either (a) the full amount thereof, without post-petition interest or penalty, in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or (b) such lesser amount as the holder of an Allowed Priority Tax Claim and the Debtor or the Plan Trustee agree. **Any Allowed Priority Tax Claim paid after the Effective Date shall accrue interest at the rate calculated in accordance with 28 U.S.C. §1961 until such Allowed Priority Tax Claim is paid in full.**

## ARTICLE III

## CLASSIFICATION OF CLAIMS

The following table designates and summarizes the Classes of Claims, other than Administrative Expense Claims and Priority Tax Claims, and specifies which of those classes are (i) Impaired or Unimpaired by this Plan and (ii) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code:

| CLASS | STATUS |
|---|---|
| Class 1 – Priority Non-Tax Claims | Unimpaired/Deemed to Accept |
| Classes 2a – 2p – Secured Claims of Make and Wait Lenders | Impaired/Entitled to Vote |
| Classes 3a – 3q – Secured Claims of Certain Securitization Trusts | Impaired/Entitled to Vote |
| Classes 4a – 4k – Secured Claims of Keycorp Trusts and KeyBank (other than in its capacity as a Make and Wait Lender) | Impaired/Entitled to Vote |
| Class 5 – General Unsecured Claims | Impaired/Entitled to Vote |
| Class 6 – Convenience Claims | Unimpaired/Deemed to Accept |

3.1    **Class 1 – Priority Non-Tax Claims.Impairment and Voting**. Class 1 is Unimpaired by this Plan. For purposes of this Plan, each holder of an Allowed Claim in Class 1

23

**EXECUTION VERSION**

is conclusively deemed to have accepted this Plan and is not entitled to vote to accept or reject
this Plan.

>(b)    **Distributions**.  In full and complete satisfaction, settlement and release of
and in exchange for the Priority Non-Tax Claims, each holder of an Allowed Priority Non-Tax
Claim against the Debtor will receive, except to the extent that such holder of an Allowed
Priority Non-Tax Claim has been paid by the Debtor prior to the Effective Date and except to the
extent such holder agrees to less favorable treatment, an amount in Cash equal to the Allowed
amount of such Priority Non-Tax Claim on the later of the Effective Date and the date such
Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is
practicable.  Such Claims will be paid from Available Cash.

>**3.2**    **Classes 2a – 2p – Secured Claims of Make and Wait Lenders**.  Class 2 consists
of the Secured Claims of the Make and Wait Lenders.  Each Allowed Secured Claim in Class 2
shall be considered to be a separate subclass within Class 2, and each such subclass shall be
deemed to be a separate class for purposes of this Plan and of Bankruptcy Code Sections 1122,
1123, 1126, and 1129.  Each subclass in class 2 is Impaired by this Plan and is entitled to vote to
accept or reject this Plan.

>(a)    **Class 2a**. (Intentionally omitted).

>(b)    **Class 2b - Comerica Bank**. Class 2b consists of all Comerica Bank's
Claims that are Secured Claims.  Class 2b is Impaired by this Plan and is entitled to vote to
accept or reject this Plan.

>(c)    **Class 2c -** (Intentionally omitted).

>(d)    **Class 2d - GMAC Bank**. Class 2d consists of all GMAC Bank's Claims
that are Secured Claims.  Class 2d is Impaired by this Plan and is entitled to vote to accept or
reject this Plan.

>(e)    **Class 2e – HSBC Bank USA, N.A.**  Class 2e consists of all HSBC Bank
USA, N.A.'s Claims that are Secured Claims.  Class 2e is Impaired by this Plan and is entitled to
vote to accept or reject this Plan.

>(f)    **Class 2f – Huntington National Bank**. Class 2 consists of all Huntington
National Bank's Claims that are Secured Claims.  Class 2f is Impaired by this Plan and is entitled
to vote to accept or reject this Plan.

>(g)    **Class 2g – Insurbanc**. Class 2g consists of Insurbanc's Secured Claims.
Class 2g is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

>(h)    **Class 2h – KeyBank National Association** Class 2h consists of all
KeyBank National Association's Claims that are Secured Claims.  Class 2h is Impaired by this
Plan and is entitled to vote to accept or reject this Plan.

>(i)    **Class 2i – Manufacturers and Traders Trust Company (including All
First)**. Class 2i consists of Manufacturers and Traders Trust Company's Claims that are Secured

24

**EXECUTION VERSION**

Claims (including All First's Secured Claims).  Class 2i is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(j)    **Class 2j – National City Bank**. Class 2j consists of all National City Bank's Claims that are Secured Claims.  Class 2j is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(k)    **Class 2k – PNC Bank, N.A.**. Class 2k consists of all PNC Bank, N.A.'s Claims that are Secured Claims.  Class 2k is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(l)    **Class 2l – RBS Citizens, N.A.**  Class 2l consists of all RBS Citizens, N.A.'s Claims that are Secured Claims.  Class 2l is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(m)    **Class 2m – Sovereign Bank**. Class 2m consists of all Sovereign Bank's Secured Claims.  Class 2m is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(n)    **Class 2n – SunTrust Bank**. Class 2n consists of all SunTrust Bank's Secured Claims.  Class 2n is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(o)    **Class 2o – TCF National Bank**. Class 2o consists of all TCF National Bank's Secured Claims.  Class 2o is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(p)    **Class 2p –U.S. Bank, N.A.**  Class 2p consists of all U.S. Bank, N.A.'s Secured Claims (other than claims of U.S. Bank, N.A., if any, in its capacity as indenture trustee, trustee or other representative capacity with respect to the Securitization Trusts and Other Trusts or in its capacity as custodial or agent for a Make and Wait Lender).  Class 2p is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

**3.3    Classes 3a – 3l – Secured Claims of Securitization Trusts**. Class 3 consists of the Secured Claims of the Securitization Trusts. Each Allowed Secured Claim in Class 3 shall be considered to be a separate subclass within Class 3, and each such subclass shall be deemed to be a separate class for purposes of this Plan and of Bankruptcy Code Sections 1122, 1123, 1126, and 1129. Each subclass in Class 3 is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(a)    **Class 3a – The National Collegiate Trust 2003-1**. Class 3a consists of all claims of The National Collegiate Student Loan Trust 2003-1 that are Secured Claims.  Class 3a is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

(b)    **Class 3b – The National Collegiate Trust 2004-1**. Class 3b consists of all claims of The National Collegiate Student Loan Trust 2004-1 that are Secured Claims.  Class 3b is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

25

DM3\3010010.2

**EXECUTION VERSION**

      *(c)*    **Class 3c – The National Collegiate Trust 2004-2**. Class 3c consists of all claims of The National Collegiate Student Loan Trust 2004-2 that are Secured Claims. Class 3c is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

      *(d)*    **Class 3d – The National Collegiate Trust 2005-1**. Class 3d consists of all claims of The National Collegiate Student Loan Trust 2005-1 that are Secured Claims. Class 3d is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

      *(e)*    **Class 3e – The National Collegiate Trust 2005-2**. Class 3e consists of all claims of The National Collegiate Student Loan Trust 2005-2 that are Secured Claims. Class 3e is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

      *(f)*    **Class 3f – The National Collegiate Trust 2005-3**. Class 3f consists of all claims of The National Collegiate Student Loan Trust 2005-3 that are Secured Claims. Class 3f is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

      *(g)*    **Class 3g – The National Collegiate Trust 2006-1**. Class 3g consists of all claims of The National Collegiate Student Loan Trust 2006-1 that are Secured Claims. Class 3g is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

      *(h)*    **Class 3h – The National Collegiate Trust 2006-2**. Class 3h consists of all claims of The National Collegiate Student Loan Trust 2006-2 that are Secured Claims. Class 3h is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

      *(i)*    **Class 3i – The National Collegiate Trust 2006-3**. Class 3i consists of all claims of The National Collegiate Student Loan Trust 2006-3 that are Secured Claims. Class 3i is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

      *(j)*    **Class 3j – The National Collegiate Trust 2006-4**. Class 3j consists of all claims of The National Collegiate Student Loan Trust 2006-4 that are Secured Claims. Class 3j is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

      *(k)*    **Class 3k – The National Collegiate Trust 2007-1**. Class 3k consists of all claims of The National Collegiate Student Loan Trust 2007-1 that are Secured Claims. Class 3k is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

      *(l)*    **Class 3l – The National Collegiate Trust 2007-2**. Class 3l consists of all claims of The National Collegiate Student Loan Trust 2007-2 that are Secured Claims. Class 3l is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

      *(m)*    **Class 3m – The National Collegiate Trust 2001-CP1**. Class 3m consists of all claims of The National Collegiate Trust 2001-CP1 that are Secured Claims. Class 3m is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

      *(n)*    **Class 3n – The National Collegiate Trust 2002-CP1**. Class 3n consists of all claims of The National Collegiate Trust 2002-CP1 that are Secured Claims. Class 3n is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

**EXECUTION VERSION**

       *(o)*    **Class 3o – The National Collegiate Master Student Loan Trust I**. Class 3o consists of all claims of The National Collegiate Master Student Loan Trust I. Class 3o is Impaired by this Plan and is entitled to vote to accept or reject the Plan.

       *(p)*    **Class 3p – The National Collegiate Student Loan Trust 2007-3**. Class 3p consists of all claims of The National Collegiate Student Loan Trust 2007-3. Class 3p is Impaired by this Plan and is entitled to vote to accept or reject the Plan.

       *(q)*    **Class 3q – The National Collegiate Student Loan Trust 2007-4**. Class 3q consists of all claims of The National Collegiate Student Loan Trust 2007-4. Class 3q is Impaired by this Plan and is entitled to vote to accept or reject the Plan.

       **3.4**    **Classes 4a – 4k – Secured Claims of the Keycorp Trusts and KeyBank National Association (other than in its capacity as a Make and Wait Lender**. Class 4 consists of the Secured Claims of the Keycorp Trusts and KeyBank National Association (other than in its capacity as a Make and Wait Lender). Each Allowed Secured Claim in Class 4 shall be considered to be a separate subclass within Class 4, and each such subclass shall be deemed to be a separate class for purposes of this Plan and of Bankruptcy Code Sections 1122, 1123, 1126, and 1129. Each subclass in Class 4 is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

       *(a)*    **Class 4a – KSLT 1999-A**. Class 4a consists of all claims of KSLT 1999-A that are Secured Claims. Class 4a is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

       *(b)*    **Class 4b – KSLT 1999-B**. Class 4b consists of all claims of KSLT 1999-B that are Secured Claims. Class 4b is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

       *(c)*    **Class 4c – KSLT 2000-A**. Class 4c consists of all claims of KSLT 2000-A that are Secured Claims. Class 4c is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

       *(d)*    **Class 4d – KSLT 2000-B**. Class 4d consists of all claims of KSLT 2000-B that are Secured Claims. Class 4d is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

       *(e)*    **Class 4e – KSLT 2001-A**. Class 4e consists of all claims of KSLT 2001-A that are Secured Claims. Class 4e is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

       *(f)*    **Class 4f – KSLT 2002-A**. Class 4f consists of all claims of KSLT 2002-A that are Secured Claims. Class 4f is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

**EXECUTION VERSION**

   *(g)* **Class 4g – KSLT 2003-A**. Class 4g consists of all claims of KSLT 2003-A that are Secured Claims. Class 4g is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

   *(h)* **Class 4h – KSLT 2004-A**. Class 4h consists of all claims of KSLT 2004-A that are Secured Claims. Class 4h is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

   *(i)* **Class 4i – KSLT 2005-A**. Class 4i consists of all claims of KSLT 2005-A that are Secured Claims. Class 4i is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

   *(j)* **Class 4j – KSLT 2006-A**. Class 4j consists of all claims of KSLT 2006-A that are Secured Claims. Class 4j is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

   *(k)* **Class 4k – KeyBank National Association.** Class 4k consists of all Claims of KeyBank, National Association (other than in its capacity as a Make and Wait Lender). Class 4k is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

  **3.5** **Class 5 – General Unsecured Claims**. Class 5 consists of all General Unsecured Claims. Class 5 is Impaired by this Plan and is entitled to vote to accept or reject this Plan.

  **3.6** **Class 6 – Convenience Class Claims**. Class 6 consists of Convenience Class Claims.

   *(a)* **Impairment and Voting**. Class 6 is Unimpaired by this Plan. Each holder of an Allowed Claim in Class 6 is deemed to have accepted this Plan.

   *(b)* **Distributions**. In full and complete satisfaction, settlement and release of and in exchange for the Convenience Class Claims, each holder of an Allowed Convenience Class Claim will be paid in full from Available Cash, except to the extent such holder of an Allowed Convenience Class Claim agrees to less favorable treatment, on the later of the Effective Date and the date such Convenience Class Claim becomes an Allowed Convenience Class Claim.

**ARTICLE IV**

**TREATMENT OF CLASSES 2 - 5**

 **4.1** **Treatment of Class 2 Claims (Make and Wait Lender Claims)**

   *(a)* **Classes 2a – 2p that accept the Plan**. The holder of a Claim in each of classes 2a – 2p that accepts the Plan or that is deemed to accept the Plan shall be deemed to have accepted the Make and Wait Lender Settlement, and shall receive the distribution provided for and otherwise be treated in accordance with in the Make and Wait Lender Settlement, as described in Section 6.2(a) of this Plan.

<div align="center">28</div>

**EXECUTION VERSION**

    *(b)*  <u>**Classes 2a – 2p that reject the Plan**</u>. The holder of a Claim in each of classes 2a – 2p that rejects the Plan or is deemed to reject the Plan shall be deemed to opt out of and reject the Make and Wait Lender Settlement, and as to Claims in such rejecting Classes (A) the Allowed amount of the Secured Claim (if any) in such rejecting Classes will be determined by the Bankruptcy Court pursuant to 11 U.S.C. §502, and the Plan Trustee will seek to have such Secured Claim, if any, determined on any appropriate basis as determined by the Plan Trustee, (B) the Collateral Accounts allegedly securing the Claims in such rejecting Classes will not be released to the applicable Make and Wait Lender in such rejecting Class unless the Court determines pursuant to one or more Final Orders that such holders hold Allowed Secured Claims, in which event such holder's Collateral Account, if any, shall be released to such holder to the extent of available funds and to the extent necessary to satisfy such Allowed Secured Claim, with the excess, if any, released to the Plan Trustee.

    *(c)*  <u>**Disposition of Collateral Accounts Pending Resolution for Classes 2a – 2p that reject the Plan**</u>. On the Effective Date (or as soon thereafter as reasonably practicable) with respect to a Make and Wait Lender that rejects or is deemed to reject this Plan and is thereby deemed to opt out of the Make and Wait Lender Settlement, the funds in the Pledged Account (whether earned or accrued) as of the Effective Date shall be transferred to the Plan Trustee or its designee(s) in escrow pursuant to the terms of one or more escrow agreements.

  **4.2**  <u>**Treatment of Class 3 Claims (Securitization Trusts)**</u>.

    *(a)*  <u>**Classes 3a –3q that accept the Plan**</u>. The holder of a Claim in each of classes 3a – 3q that accepts the Plan or that is deemed to accept the Plan pursuant to the Solicitations Procedure Order shall be deemed to have accepted the Securitization Trust Settlement, and shall receive the distribution provided for and otherwise be treated in accordance with in the Securitization Trust Settlement, as described in Section 6.2(c) of this Plan.

    *(b)*  <u>**Classes 3a – 3q that reject the Plan**</u>. The holder of a Claim in each of classes 3a – 3q that rejects the Plan or is deemed to reject the Plan (including, without limitation, pursuant to the Solicitations Procedure Order) shall be deemed to opt out of and reject the Securitization Trust Settlement, and as to Claims in such rejecting Classes (A) the Allowed amount of the Secured Claim (if any) of the Claims in such rejecting Classes will be determined by the Bankruptcy Court pursuant to 11 U.S.C. §502, and the Plan Trustee will seek to have such Secured Claim, if any, determined on any appropriate basis as determined by the Plan Trustee, (B) the Trust Adversary Proceeding against the holders of Claims in such rejecting Classes will proceed in the Bankruptcy Court, (C) the Collateral Accounts allegedly securing the Claims in such rejecting Classes will not be released to the Indenture Trustee (or its servicer or any other representative) on behalf of the holder of such Claim in such rejecting Class (or such other party as the Indenture Trustee may designate) unless the Court determines pursuant to one or more Final Orders that such holders hold Allowed Secured Claims, in which event such holder's Collateral Account, if any, shall be released to such holder to the extent of available funds and to the extent necessary to satisfy such Allowed Secured Claim, with the excess, if any, released to the Plan Trustee, and (D) such Securitization Trust shall reserve the right in the Trust

EXECUTION VERSION

Adversary Proceeding to contest the Debtor's assertion that it acquired title to defaulted loans sold or transferred to the Debtor or its agent as a result of such sale or transfer.

        (c)    **Disposition of Pledged Accounts Pending Resolution of Trust Adversary Proceeding for Classes 3a – 3q that reject the Plan**. On the Effective Date (or as soon thereafter as reasonably practicable) with respect to a Securitization Trust that rejects or is deemed to reject this Plan and is thereby deemed to opt out of the Securitization Trust Settlement, the funds in the Pledged Account (whether earned or accrued) as of the Effective Date shall be transferred to U.S. Bank National Association ("U.S. Bank") and held by U.S. Bank in escrow pursuant to the terms of one or more escrow agreements among U.S. Bank, the administrator of the Securitization Trust and the Plan Trustee. The escrow agreement(s) shall be mutually acceptable to U.S. Bank, the administrator of the Securitization Trust and the Plan Trustee and shall provide that (i) the funds shall be held by U.S. Bank in the applicable escrow account to be released upon the earlier of (1) one or more Final Orders of the Bankruptcy Court (as applicable to such Trust), or (2) pursuant to joint written instruction of the Plan Trustee, the applicable Securitization Trust [and indenture trustee for such Trust], (ii) the funds shall be invested by U.S. Bank in accordance with such written instructions, and that investment earnings on such funds shall be added to the fund and released as provided above, and (iii) such other matters as shall be agreed to by the parties to such agreement (including payment of customary fees and other bank charges). Notwithstanding such transfer of funds to the escrow account or accounts, each of the Plan Trustee, Securitization Trustee and indenture trustee reserve all rights, and such transfer(s) to the escrow account or accounts are subject to the rights of the Plan Trustee, Securitization Trustee and indenture trustee, with respect to recoveries and other funds transferred by the Debtor to the applicable Pledged Account on or after the Commencement Date, together with any interest or other earnings thereon, including, without limitation, the rights of the parties with respect to the extent, priority, validity or existence of any alleged security interest in such recoveries and funds.

    **4.3**    **Classes 4a – 4k.**

        (a)    **Classes 4a – 4k that do not make the Key Access Program Election**. Each Accepting KeyCorp Trust within Classes 4a – 4j and (if it accepts the Plan) KeyBank National Association (other than in its capacity as a Make and Wait Lender), shall receive the distribution provided for in the Key Access Program Settlement, as described in Section 6.2(d) of this Plan, and shall have an Allowed Deficiency Claim in the amount listed in the "Key Access Program Decoder Settlement Claim" column of the attached Schedule C.

        (b)    **Classes 4a – 4k that make the Key Access Program Election**. Each of Classes 4a - 4k in which the holders of Claims in such Class reject the Plan, and thereby make the Key Access Program Election, shall be deemed to opt out of the Key Access Program Settlement. The Allowance or disallowance amounts of the Claims in such rejecting Classes shall be determined by the Bankruptcy Court after the Effective Date in accordance with 11 U.S.C. §502.

EXECUTION VERSION

4.4    Class 5.

(a)    **Make and Hold Claims**. Each Accepting Make and Hold Lender shall receive the treatment described in section 6.2(b). The Allowance or disallowance of a Class 5 Claim of a Make and Hold Lender that rejects the Plan shall be determined by the Bankruptcy Court after the Effective Date in accordance with 11 U.S.C. §502.

(b)    **Make and Wait Deficiency Claims**. Each Accepting Make and Wait Lender shall receive the treatment described in section 6.2(a). The Allowance or disallowance of a Class 5 Deficiency Claim of a Make and Wait Lender that rejects the Plan, if any, shall have its Deficiency Claim (if any) determined in accordance with Section 4.1 of this Plan.

(c)    **Securitization Trust Deficiency Claims**. Each Securitization Trust that accepts this Plan and, thereby, the Securitization Trust Settlement shall receive the treatment described in Section 6.2(c). The Allowance or disallowance of a Class 5 Deficiency Claim (if any) of a Securitization Trust that rejects the Plan, and thereby, the Securitization Trust Settlement, shall be determined by the Bankruptcy Court after the Effective Date in accordance with 11 U.S.C. §502.

(d)    **Key Access Deficiency Claims**. Each Accepting KeyCorp Trust within Classes 4a – 4j and (if it accepts the Plan) KeyBank National Association (other than in its capacity as a Make and Wait Lender), shall receive the treatment described in section 6.2(d). The Allowance or disallowance of a Class 5 Deficiency Claim (if any) of a KeyCorp Trust within Classes 4a – 4j that rejects the Plan and (if it rejects the Plan) KeyBank National Association (other than in its capacity as a Make and Wait Lender), shall be determined by the Bankruptcy Court after the Effective Date in accordance with 11 U.S.C. §502.

(e)    **Other General Unsecured Claims**. Unless otherwise provided in this Plan, the Allowed amount of Other General Unsecured Claims will be determined by the Bankruptcy Court in accordance with section 502 of the Bankruptcy Code.

## ARTICLE V

## VOTING AND DISTRIBUTION

5.1    **Voting of Claims**. Each holder of an Allowed Claim as of the Voting Record Date in Classes 2a – 2p, Classes 3a – 3q, Class 4a-4k, Class 5 or the holder of a Claim that has been temporarily allowed for voting purposes only under Bankruptcy Rule 3018(a) pursuant to the Approval Order or the Solicitation Procedures Order will be entitled to vote to accept or reject this Plan, which vote may be amended prior to the deadline for submitting votes. For voting purposes, and consistent with the provisions of the Solicitations Procedure Order, the amount of Claim that a holder of a Claim in Classes 2a-2p, Classes 3a-3q and Classes 4a-4k that is entitled to vote, may vote in respect of its General Unsecured Claim in Class 5 (if any) will be the amount asserted by such holder in its proof of Claim, or such amount as may be agreed upon pursuant to a stipulated order entered by the Court or as otherwise determined by the Court, less the amount held in the Collateral Account as of July 31, 2009. For voting purposes, and consistent with the provisions of the Approval Order or the Solicitations Procedure Order, the

31

**EXECUTION VERSION**

amount of Make and Hold Claims in Class 5 will be temporarily allowed and permitted to vote in the amount asserted by such Creditor in such Creditor's Proof of Claim, or such amount as may be agreed upon pursuant to a stipulated order entered by the Court or as otherwise determined by the Court,.

**5.2    Acceptance by Impaired Class.** Consistent with section 1126(c) of the Bankruptcy Code, and except as provided for in section 1126(e) of the Bankruptcy Code, a Class of creditors will have accepted this Plan if it is accepted by at least two-thirds in dollar amount and more than one-half in number of the holders of Allowed Claims of such Class or holders of Claims permitted to vote pursuant to the provisions of the Solicitations Procedure Order that have timely and properly voted to accept or reject this Plan. The Solicitations Procedure Order, to the extent and as applicable, shall govern the voting by the Securitization Trusts, the Other Trusts and the KeyCorp Trusts.

**5.3    Presumed Acceptances of Plan.** Classes 1 and 6 are not Impaired under this Plan and, therefore, are conclusively presumed to have accepted this Plan.

**5.4    Nonconsensual Confirmation.** If any Impaired Class of Claims entitled to vote will not accept this Plan by the requisite statutory majority provided in sections 1126(c) and (d) of the Bankruptcy Code, the Plan Proponents may request that the Bankruptcy Court confirm this Plan pursuant to section 1129(b) of the Bankruptcy Code.

**5.5    Method of Distributions Under this Plan.**

    *(a)*    **Distributions Generally.**

        (i)    Reorganized TERI will make all distributions required by this Plan other than those to be made by the Plan Trustee.

        (ii)    The Plan Trustee will make all other distributions from the Plan Trust to holders of Claims in accordance with this Plan and the terms and conditions set forth in the Plan Trust Agreement.

    *(b)*    **Distributions of Cash.** Any payment of Cash made by Reorganized TERI or the Plan Trustee pursuant to this Plan may be made at the option of such party either by check drawn on a domestic bank or by wire transfer from a domestic bank.

    *(c)*    **Distributions Free and Clear.** Except as otherwise provided herein, any distributions or transfers by or on behalf of the Debtor under this Plan, including, but not limited to, distributions to any holder of an Allowed Claim, will be free and clear of any liens, claims, and encumbrances, and no other entity will have any interest – legal, beneficial, or otherwise – in assets transferred pursuant to this Plan. Notwithstanding the foregoing, all obligors of student loans transferred to the Plan Trustee may assert defenses (but not counterclaims or claims for affirmative relief) thereunder to the same extent, and with the same validity, as such defenses may be asserted against the Debtor as of the Effective Date.

32

**EXECUTION VERSION**

     *(d)*    **Timing of Performance**. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but will be deemed to have been completed as of the required date.

     *(e)*    **Delivery of Distributions**. Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim will be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtor. The holder must notify Reorganized TERI or the Plan Trustee, as applicable, in writing of a change of address, in the case of holders of transferred Claims only, by the filing of a proof of claim or statement pursuant to Bankruptcy Rule 3001(e) by such holder or transferee that contains an address for such holder different from the address of such holder as set forth in the Schedules. Neither Reorganized TERI nor the Plan Trustee will be liable for any distribution sent to the address of record of a holder in the absence of the written change thereof as provided herein. Notwithstanding the foregoing, with respect to each Securitization Trust, Other Trusts and the KeyCorp Trusts, distributions in respect of an Allowed Claim of such Trust including defaulted loans (if any), shall be made to the Trust, subject to the lien and security interest of the applicable indenture trustee for such Trust, and shall be delivered to the trustee or indenture trustee for such Trust (as appropriate) or to such other person as may be designated by the indenture trustee or trustee in writing delivered to Reorganized TERI or the Plan Trustee, as applicable, provided that loan documents, including the related student loan note in respect of a defaulted loan, shall be delivered by the entity that has possession of such loan documents, to the applicable servicer as custodian and agent for the indenture trustee or trustee , to be held under the applicable custody agreement among such servicer as custodian for the indenture trustee or trustee and the Trust.

     *(f)*    **Distributions to Holders as of Record Date**. As of the close of business on the Record Date, the claims register for the Debtor will be closed and there will be no further changes made to the identity of the record holder of any Claim. Neither Reorganized TERI nor the Plan Trustee will have any obligation to recognize any transfer of any Claim occurring after the Record Date. Reorganized TERI and the Plan Trustee will instead be authorized and entitled to recognize and deal for all purposes under this Plan with only those record holders stated on the applicable claims register at the close of business on the Record Date.

     *(g)*    **Undeliverable and Unclaimed Distributions**. If any Claim holder's distribution is returned as undeliverable, no further distributions to such holder will be made unless and until the holder notifies Reorganized TERI or the Plan Trustee, as appropriate, in writing of such holder's then-current address, at which time all missed distributions will, subject to the last sentence of this paragraph, be made as soon as is practicable to such holder, without interest. Checks issued by Reorganized TERI or the Plan Trustee in respect of Allowed Claims will be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. Requests for re-issuance of any check will be made in accordance with the notice provisions of this Plan to Reorganized TERI or the Plan Trustee, as appropriate, by the holder of the Allowed Claim to whom such check originally was issued. All claims for undeliverable distributions or voided checks will be made on or before one hundred and twenty (120) days after the date such undeliverable distribution was initially made. After such dates, all

33

**EXECUTION VERSION**

such distributions will be deemed unclaimed property under section 347(b) of the Bankruptcy
Code and will become unencumbered Cash of Reorganized TERI, or the Plan Trust, as
appropriate pursuant to this Plan.  The holder of any Claim for which any undeliverable
distribution has been deemed unclaimed property under section 347(b) of the Bankruptcy
Code will not be entitled to any other or further distribution under this Plan on account of such Claim.

      *(h)*    <u>Setoffs</u>.  Except with respect to an Allowed Claim that is Allowed as part
of a compromise and settlement approved pursuant to a Final Order (including the settlements set
forth in Section 6.2 hereof), to the extent permitted under the Bankruptcy Code or other
applicable law, Reorganized TERI, or the Plan Trustee, as applicable, may set off against or
recoup from any Allowed Claim and the distributions to be made pursuant to this Plan on
account of such Allowed Claim (before any distribution is made on account of such Allowed
Claim), the claims, rights and Causes of Action of any nature that the Debtor has against the
holder of such Allowed Claim.

      *(i)*    <u>Application of Distributions</u>.  Distributions to any holder of an Allowed
Claim will be applied first to the satisfaction of the principal portion (as determined for federal
income tax purposes) of any such Allowed Claim and thereafter to the remaining portion of such
Allowed Claim, if any, unless the application is governed by an indenture or other governing
document in which case the terms of such documents shall govern.  No provision of this Plan or
Confirmation Order shall modify any charging lien or other right of the indenture trustee, trustee
or other entity in another representative capacity to reimburse itself for fees, expenses and
disbursements against any distribution.

      *(j)*    <u>Withholding and Reporting Requirements</u>.  In connection with this
Plan and all instruments issued in connection therewith and distributed thereon, the Debtor or the
Plan Trustee, as applicable, will comply with all applicable withholding and reporting
requirements imposed by any federal, state or local taxing authority, and all distributions under
this Plan will be subject to any such withholding or reporting requirements.  ***The Debtor and the
Plan Trustee will have the right to withhold distributions to any holder of a Claim, and any
such Claim shall not become an Allowed Claim, notwithstanding any other provision of this
Plan, unless and until such holder of a Claim executes and delivers to the Plan Trustee an
Internal Revenue Service Form W-9.***  Notwithstanding the above, each holder of an Allowed
Claim that is to receive a distribution under this Plan will have the sole and exclusive
responsibility for the satisfaction and payment of any tax obligations imposed by any
governmental unit on account of such distribution, including income, withholding, and other tax
obligations, on account of such distribution.  Any party issuing any instrument or making any
distribution under this Plan has the right, but not the obligation, to refrain from making a
distribution until the holder of the Allowed Claim has made arrangements satisfactory to such
issuing or disbursing party for payment of any such tax obligations.

      *(k)*    <u>Distribution</u>.  In full and complete satisfaction, settlement and release of
and in exchange for the General Unsecured Claims, each holder of an Allowed General
Unsecured Claim will receive the General Unsecured Claim Distribution.

<div align="center">34</div>

**EXECUTION VERSION**

# ARTICLE VI

## MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN

### 6.1    Reorganized TERI.

(a)    **Reorganized Articles of Incorporation and Reorganized By-laws**. Reorganized TERI will adopt Reorganized Articles of Incorporation and Reorganized By-laws prior to, but effective as of, the Effective Date, which will be included in this Plan Supplement. Prior to the closing of TERI's Chapter 11 Case, any amendments to Reorganized TERI's Articles of Incorporation and Reorganized By-laws will be filed with the Bankruptcy Court.

(b)    **Boards of Directors and Officers**. The identities of the members of the initial Board of Directors and the initial officers of Reorganized TERI will be disclosed in the Plan Supplement and will be in effect as of the Effective Date.

(c)    **Reorganized TERI (Not-For-Profit)**. Reorganized TERI will, as of the Effective Date, remain a not-for-profit corporation.

(d)    **Retention of Reorganized TERI Assets**. On and after the Effective Date, Reorganized TERI will retain all rights, title, and interests in the Reorganized TERI Assets.

### 6.2    Compromise and Settlement.

(a)    **Make and Wait Lender Settlement**. Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, the acceptance of this Plan by an Accepting Make and Wait Lender will constitute a good faith compromise and settlement of all Claims and controversies between the Debtor and such Accepting Make and Wait Lender, including the amounts, allowance, relative priority and treatment of the Secured Claim and the Deficiency Claim (if any) of such Accepting Make and Wait Lender.

(i)    **Claims of An Accepting Make and Wait Lender**. Each Make and Wait Lender in Classes 2a – 2p that accepts this Plan or is deemed to accept the Plan, and, thereby, the Make and Wait Lender Settlement (1) will have an Allowed Secured Claim in the applicable subclass of Class 2 in the amount set forth in the column labeled "Payment to Accepting Make and Wait Lender from Collateral Account" on attached Schedule A, and will have an Allowed Unsecured Claim that will be treated as a Class 5 Claim in the amount, if any, set forth in the "Make and Wait Lender Decoder Deficiency Claim (If Any)" column of the attached Schedule A.

(ii)    **Release of Make and Wait Lender Equity and Make and Wait Lien Dispute Amount to Plan Trustee by Accepting Make and Wait Lender**. Each Make and Wait Lender in Classes 2a – 2p that accepts this Plan or is deemed to accept the Plan, and, thereby, the Make and Wait Lender Settlement, will release its interest in the amount, if any and as applicable, in the column labeled "Make and Wait Lender Payment Amount (If Any)" in the attached Schedule A

35

**EXECUTION VERSION**

and shall be deemed to have authorized and instructed the Debtor to transfer such amount to the Plan Trustee on the Effective Date free and clear of any and all claims, interests, liens and encumbrances.

      (iii)   **Disbursement of Remainder of Collateral Account to Accepting Make and Wait Lender.** On the Effective Date, the Debtor shall be deemed to release from the applicable Collateral Account, and such amount shall be remitted, to each Accepting Make and Wait Lender, in full satisfaction of such Accepting Make and Wait Lender's Allowed Secured Class 2 Claim, the applicable amount for such Accepting Make and Wait Lender in the column labeled "Payment to Accepting Make and Wait Lender from Collateral Account" on attached Schedule A, plus all interest and other earnings (if any) paid and deposited into such Pledged Account as of the Effective Date.

      (iv)   **Retention by Accepting Make and Wait Lender of Loans Not Purchased by the Debtor.** Each Accepting Make and Wait Lender will retain all loans that were not purchased by the Debtor as of the Effective Date.

      (vi)   **Bankruptcy Court Approval of Make and Wait Lender Settlement**. For each Accepting Make and Wait Lender, entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the Make and Wait Lender Settlement and the Bankruptcy Court's finding that such settlement is fair, equitable and reasonable and in the best interests of the Debtor, this Plan, Reorganized TERI and all Creditors.

      (vii)   **Release of Claims against the Debtor and The Estate**. On the Effective Date, the Claims against the Debtor and the Estate of each Accepting Make and Wait Lender receiving the treatment provided by the Make and Wait Lender Settlement, subject to and upon implementation of the Make and Wait Lender Settlement, will be deemed satisfied and no further recovery shall be permitted in respect of such Claims.

      (viii)   **Rejection of Executory Contracts**. On the Effective Date, all Guaranty Agreements executed in favor of the Make and Wait Lenders and the related Deposit and Security Agreements and other related documents entered into by the Debtor prior to the Commencement Date will be deemed rejected, and with respect to Claims asserted by Accepting Make and Wait Lenders, all Debtor's claims or rights to set off any Guaranty Fees, basis point fees and other interests in loans held by such Make and Wait Lenders will be deemed waived.

      *(b)*   **Make and Hold Settlement.** Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, the acceptance of this Plan by an Accepting Make and Hold Lender will constitute a good faith compromise and settlement of all Claims and controversies between the Debtor and such Accepting Make and Hold Lender, including the amounts, allowance, relative priority and treatment of the Make and Hold Claims of such Accepting Make and Hold Lender.

<div align="center">36</div>

DM3\1301010.2

**EXECUTION VERSION**

(i)    <u>Claims of An Accepting Make and Hold Lender.</u>  An Accepting Make and Hold Lender shall have an Allowed Claim calculated as the larger of the Claim calculated by the Decoder and the Claim calculated by the Debtor's Base Case, as set forth in the column labeled "Make and Hold Lender Settlement Claim" on attached <u>Schedule D</u>.  All such claims will be treated as Allowed Class 5 Claims.

(ii)    <u>Distributions to Accepting Make and Hold Lenders and Effectiveness of Make and Hold Settlement</u>.  All distributions to Accepting Make and Hold Lenders pursuant to this Plan will be made on account of and in consideration of the Make and Hold Lender Settlement, which, upon the Effective Date, will be binding on all Accepting Make and Hold Lenders, the Plan Proponents, and Reorganized TERI.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the Make and Hold Lender Settlement and the Bankruptcy Court's finding that such Make and Hold Lender Settlement is fair, reasonable, equitable and in the best interests of the Accepting Make and Hold Lenders, the Plan Proponents and Reorganized TERI.

(iii)    <u>Rejection of Make and Hold Guaranty Agreements</u>. On the Effective Date, all Guaranty Agreements executed in favor of the Make and Hold Lenders and other related documents entered into by the Debtor prior to the Commencement Date will be deemed rejected, and with respect to Claims asserted by Accepting Make and Hold Lenders, all Debtor's claims or rights to set off any Guaranty Fees, basis point fees and other interests in loans held by such Make and Hold Lenders will be deemed waived.

(c)    <u>Securitization Trust Settlement.</u>  Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 the acceptance of this Plan by a Securitization Trust Settlement will constitute a good faith compromise and settlement of all Claims, Causes of Action and controversies between the Debtor and each Securitization Trust receiving the treatment provided by the Securitization Trust Settlement, including, without limitation, the amounts, allowance, relative priority and treatment of the Secured Claim and Deficiency Claim of each Securitization Trust and any other claim, whether a general unsecured claim, priority claim or administrative expenses claim that each such Securitization Trust, the Indenture Trustee under the Indenture for such Securitization Trust, or the administrator for such Securitization Trust (in such capacity) has asserted or might assert against the Debtor or its estate. Notwithstanding the foregoing, nothing in this Plan shall bar any entity from seeking Allowance of an Administrative Expense Claim arising under 11 U.S.C. §503(b)(3)(D) and (4) ("Substantial Contribution Claim"), and as to any such Substantial Contribution Claim, the parties reserve all their respective rights, claims and defenses.

**EXECUTION VERSION**

(i)  **Claims of An Accepting Securitization Trust**.  Each Securitization Trust in Classes 3a – 3q that accepts this Plan or is deemed to accept the Plan, and, thereby, the  Securitization Trust Settlement  (A) will have an Allowed Secured Claim in the applicable subclass of Class 3 in the amount set forth in the column labeled "Payment to Accepting Securitization Trust from Collateral Account" on attached Schedule B, and (B) will have an Allowed Unsecured Claim that will be treated as a Class 5 Claim in the amount, if any, set forth in the "Securitization Trust Settlement Claim (If Any)" column of the attached Schedule B.

(ii)  **Release of Securitization Trust Equity by Accepting Securitization Trust**.  Each Securitization Trust in Classes 3a – 3q that accepts this Plan or is deemed to accept the Plan, and, thereby, the Securitization Trust Settlement, will release its interest in the amount, if any and as applicable, in the column labeled "Securitization Trust Decoder Equity (Rounded)" in the attached Schedule B and shall be deemed to have authorized and instructed the Debtor to transfer such amount to the Plan Trustee on the Effective Date free and clear of any and all claims, interests, liens and encumbrances.

(iii)  **Disbursement of Remainder of Pledged Account to Accepting Securitization Trust.**  On the Effective Date, the Debtor shall be deemed to release from the applicable Pledged Account, and such amount shall be remitted, to each Securitization Trust in Classes 3a – 3q that accepts this Plan or is deemed to accept the Plan, and, thereby, the Securitization Trust Settlement, in full satisfaction of the Allowed Secured Claim of such Accepting Securitization Trust, the applicable amount for such Accepting Securitization Trust in the column labeled "Payment to Accepting Securitization Trust from Pledged Account" on attached Schedule B, plus all interest paid and deposited into such Pledged Account as of the Effective Date.

(iv)  **Disbursement of Remainder of Securitization Trust Collateral to Accepting Securitization Trust**.  On the Effective Date, the Debtor shall cause to be transferred to each Accepting Securitization Trust such Securitization Trust's Securitization Trust Collateral remaining after payment by such Securitization Trust of the amounts described in paragraph 6.2(c)(ii) above.

(v)  **Securitization Trusts Release With Respect to Postpetition Defaulted Loans**.  In full and final settlement of the Trust Adversary Proceeding with respect to each Securitization Trust that accepts this Plan or is deemed to accept this Plan, and, thereby, the Securitization Trust Settlement, (A) each such Securitization Trust will have no claim to any loans purchased by or on behalf of the Debtor (or its agent) or otherwise transferred to or for the benefit of the Debtor on or after the Commencement Date or to any recoveries on such loans, including recoveries received prior to the date hereof, (B) all such defaulted postpetition loans and postpetition recoveries shall be transferred free and clear of all liens, claims, interests and encumbrances to the Plan Trust, and (C) neither the

38

**EXECUTION VERSION**

applicable Securitization Trusts nor their indenture trustees shall have any security interest in, or Claim to, such defaulted loans or recoveries obtained in respect thereof (but otherwise reserving rights under this Plan as the holder of a Claim in Class 5). Any defaulted loan on account of which (i) the Debtor made payment, (ii) payment was made from funds in a Pledged Account, or (iii) a Securitization Trust received payment, shall be considered a defaulted loan purchased by the Debtor.

(vi)    **Retention by Accepting Securitization Trust of Loans Not Purchased by the Debtor**. Each Securitization Trust will retain all loans that were not purchased by the Debtor as of the Effective Date. Other than with respect to the Securitization Trusts in Classes 3m and 3n, on the Effective Date, the Debtor shall cause to be transferred to each Accepting Securitization Trust all of Debtor's right, title and interest in and to (a) all defaulted loans that were purchased by or on behalf of the Debtor or its agent (acting in such capacity) from the applicable Accepting Securitization Trust prior to the Commencement Date, (b) all recoveries collected (and the right to collect such recoveries earned but not paid) and all future recoveries with respect to such prepetition defaulted loans and (c) the proceeds from the sale by the Debtor of such prepetition defaulted loans to such Accepting Securitization Trust at any time following rehabilitation.

(vii)    **Bankruptcy Court Approval of Securitization Trust Settlement**. For each Securitization Trust that accepts the Plan, and thereby the Securitization Trust Settlement, entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the Securitization Trust Settlement and the Bankruptcy Court's finding that such settlement is fair, equitable and reasonable and in the best interests of the Debtor, this Plan, Reorganized TERI and each Securitization Trust (including the Indenture Trustee and other secured parties under the related Indenture pursuant to which such Trust issued its notes), receiving the treatment provided by the Securitization Trust Settlement.

(viii)    **Dismissal of Trust Adversary Proceeding**. On the Effective Date, the Trust Adversary Proceeding will be deemed dismissed with prejudice, and judgment of dismissal may enter pursuant to Fed.R.Civ.P. 54, made applicable to the Trust Adversary Proceeding pursuant to Fed.R.Bankr.P. 7054, as to (a) each Securitization Trust that accepts or is deemed to accept the Plan, thereby receiving the treatment provided by the Securitization Trust Settlement, (b) the administrator with respect to each such Securitization Trust accepting this Plan and the Securitization Trust Settlement, (c) the owner trustee of each such Securitization Trust accepting this Plan and the Securitization Trust Settlement, (d) U.S. Bank, National Association, in any capacity in which it was named as a defendant in the Trust Adversary Proceeding with respect to each such Securitization Trust accepting this Plan and the Securitization Trust Settlement, and (e) the indenture trustee under any indenture pursuant to which such Securitization Trust issued notes and accepted this Plan and Securitization Trust

**EXECUTION VERSION**

Settlement with respect to each such Securitization Trust accepting this Plan and the Securitization Trust Settlement, each of the foregoing administrators, owner trustees and indenture trustees, in their respective capacities, and not individually.

(ix)    **Release of Claims against the Debtor and The Estate**. On the Effective Date, the Claims against the Debtor and the Estate of the Securitization Trusts, the Indenture Trustees under the Indenture for such Securitization Trusts and the administrators for such Securitization Trust (in such capacity) receiving the treatment provided by the Securitization Trust Settlement, subject to and upon implementation of the Securitization Trusts Settlement, will be deemed satisfied and no further recovery shall be permitted in respect of such Claims.

(x)    **Rejection of Executory Contracts**. On the Effective Date, all Guaranty Agreements executed in favor of the Securitization Trusts and the related Deposit and Security Agreements and other related documents entered into by the Debtor prior to the Commencement Date will be deemed rejected, and with respect to Claims asserted by Securitization Trusts accepting the Plan or that are deemed to accept the Plan, thereby receiving the treatment provided by the Securitization Trust Settlement, all Debtor's claims or rights to set off any Guaranty fees, basis point fees and other interests in loans held by such Securitization Trusts will be deemed waived.

(xi)    **Estate's Retention of Rights With Respect to Residuals**. Nothing herein shall be deemed a waiver or release of the rights, if any, that the Debtor or any other party may have to receive a portion (if any) of the Residual with respect to any and all of the Securitization Trusts.

*(d)*    **KeyBank National Association and KeyCorp Trusts Settlement**

(i)    Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, the acceptance of this Plan by KeyBank National Association (excluding in its capacity as a Make and Wait Lender) and acceptance of this Plan by each KeyCorp Trust will constitute a good faith compromise and settlement of all Claims and controversies between the Debtor and KeyBank National Association and each Accepting KeyCorp Trust, including the amounts, allowance, relative priority and treatment of the Claims of KeyBank National Association and each Accepting KeyCorp Trust.

(ii)    Unless KeyBank National Association (excluding KeyBank National Association in its capacity as a Make and Wait Lender) or a KeyCorp Trust rejects this Plan, KeyBank National Association and each KeyCorp Trust, as applicable, shall receive the following treatment on the Effective Date of this Plan or as soon thereafter as is practicable:  (a) it shall be paid its allocable share in the Victory Fund as of the Commencement Date (as appears in column in <u>Schedule C</u> labeled "Allocation of Victory Fund"), (b) it shall have an Allowed Key Access Program Deficiency Claim as set forth in the column labeled "Key Access Program Decoder Settlement Claim" on <u>Schedule C</u> pursuant to

40

EXECUTION VERSION

Section 4.4 of this Plan; and (c) it shall cause to be paid to the Plan Trustee free and clear of all interests, liens, claims and encumbrances, its allocable share of all recoveries or other funds transferred by the Debtor to the Victory Fund on or after the Commencement Date, together with any interest or other earnings thereon not previously transferred to the Debtor.

(iii)    Notwithstanding the preceding paragraph, if KeyBank National Association (excluding KeyBank National Association in its capacity as a Make and Wait Lender) or a KeyCorp Trust rejects this Plan and is thereby deemed to opt out of the Key Access Program Settlement, the following treatment shall be applied: (a) each KeyCorp Trust that rejects this Plan, and KeyBank National Association if it rejects this Plan, shall have the Allowed amount of its Claim determined by the Bankruptcy Court by Final Order, following appropriate notice and an opportunity to be heard, in accordance with the Key Access Program Election; (b) the funds in the Victory Fund as of the Commencement Date shall be paid to KeyBank National Association and held in escrow until the Bankruptcy Court has determined by Final Order, following appropriate notice and an opportunity to be heard, the proper method for distributing such funds; and (c) the parties reserve all rights with respect to recoveries and other funds transferred by the Debtor to the Victory Fund on or after the Commencement Date, together with any interest or other earnings thereon, including, without limitation, the rights of the parties with respect to the extent, priority, validity or existence of any alleged security interest in such recoveries and funds.

(iv)    Any distributions to KeyBank National Association (excluding KeyBank National Association in its capacity as a Make and Wait Lender), if it accepts this Plan, or to an Accepting KeyCorp Trust pursuant to this Plan will be made on account and in consideration of the Key Access Program Settlement, which, upon the Effective Date, will be binding on KeyBank National Association, the Accepting KeyCorp Trusts, the Debtor, and Reorganized TERI. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the Key Access Program Settlement and the Bankruptcy Court's finding that such Key Access Program Settlement is in the best interests of KeyBank National Association, the Accepting KeyCorp Trusts, the Debtor, and Reorganized TERI, and is fair, equitable and reasonable.

(v)    On the Effective Date, all Guaranty Agreements and the related Deposit and Security Agreements and other related documents executed in favor of KeyBank National Association (excluding KeyBank National Association in its capacity as a Make and Wait Lender) and the KeyCorp Trusts receiving the treatment provided in the Key Access Program Settlement will be deemed rejected.

6.3    **Plan Trust.**

*(a)*    **General.** On or before the Effective Date, the Plan Trust Agreement, in a form reasonably acceptable to the Plan Proponents, will be executed and all other necessary steps

41

**EXECUTION VERSION**

will be taken to establish the Plan Trust and the beneficial interests therein, which will be for the benefit of the holders of Allowed General Unsecured Claims, whether Allowed on or after the Effective Date. In the event of any conflict or inconsistency between the terms of this Plan and the terms of the Plan Trust Agreement, then the terms of the Plan Trust Agreement will govern. The Plan Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Plan Trust as a liquidating trust for United States federal income tax purposes, or otherwise have material adverse effect on the recovery of holders of Allowed General Unsecured Claims. This Section 6.3 is qualified in its entirety by the terms of and is subject to the terms of the Plan Trust Agreement.

   *(b)* **Purpose of Plan Trust**. The Plan Trust will be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to achieve, and consistent with, the liquidating purpose of the Plan Trust.

   *(c)* **Costs and Expenses of Plan Trust**. The costs and expenses of the Plan Trust, including the fees and expenses of the Plan Trustee and its retained professionals, will be paid out of the Plan Trust Assets, and Reorganized TERI will not be responsible for any fees, expenses or costs of the Plan Trust. The Litigation Claims Costs incurred by the Plan Trustee and the fees and expenses incurred in connection with the prosecution and settlement of any Claims are costs and expenses of the Plan Trust.

   *(d)* **Plan Trust Assets**. As of and as soon as practicable after the Effective Date, Debtor will assign and transfer to the Plan Trust all of its rights, title and interests in and to the Plan Trust Assets for the benefit of the holders of Allowed General Unsecured Claims, whether such Claims are Allowed on or after the Effective Date. Such transfers will be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax and, subject to clause (c) of section 6.2(d)(iii) of the Plan, and except as otherwise may be set forth specifically herein, will be free and clear of any liens, claims and encumbrances and no other entity (other than Creditors receiving rights under this plan), including the Debtor or Reorganized TERI, will have any interest, legal, beneficial, or otherwise, in the Plan Trust or the Plan Trust Assets upon their assignment and transfer to the Plan Trust (other than as provided herein or in the Plan Trust Agreement). Upon delivery of the Plan Trust Assets to the Plan Trust, Reorganized TERI will be released of all liability with respect to the delivery of distributions to holders of Allowed General Unsecured Claims and, except as provided in the Collection Contract, will have no further monetary obligations to the Plan Trust or the Plan Trustee.

   *(e)* **Governance of Plan Trust**. The Plan Trust will be governed by the Plan Trust Agreement and administered by the Plan Trustee.

   *(f)* **Appointment of a Plan Trustee**. Prior to the Effective Date, the Creditors' Committee will select the Plan Trustee. The salient terms of the Plan Trustee's employment, including the Plan Trustee's duties and compensation, will be set forth in the Plan Trust Agreement. The Plan Trust Agreement will specify the procedures for replacing the Plan Trustee. The Plan Trustee will not be the Debtor, an affiliate of the Debtor or former agent of

**EXECUTION VERSION**

the Debtor. The Plan Trustee, in the reasonable discretion of the Creditors' Committee will have the qualifications and experience necessary to satisfy the responsibilities and obligations of the Plan Trustee as outlined in the Plan and the Plan Trust Agreement.

(g)    **The Plan Trustee Advisory Committee**. The Plan Trustee Advisory Committee will advise the Plan Trustee with respect to the liquidation and distribution of Plan Trust Assets in accordance with the Plan Trust Agreement. The Plan Trust Agreement will specify the procedures for replacing any member of the Plan Trustee Advisory Committee.

(h)    **Transferability of Plan Trust Interests**. The beneficial interests of the Plan Trust shall not be transferable, unless otherwise provided for in the Plan Trust Agreement. To the extent such beneficial interests are deemed securities under applicable non-bankruptcy law, then such securities shall be exempt from the requirements of applicable non-bankruptcy law to the maximum extent permitted by 11 U.S.C. §1145.

(i)    **Investment of Cash**. The Plan Trustee may invest Cash (including any earnings thereon or proceeds there from) as permitted by section 345 of the Bankruptcy Code; *provided, however*, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities. The Plan Trustee shall be authorized to manage any transferred Collateral Accounts pending resolution of the disposition of such Collateral Account pursuant to the terms of the Plan or a Final Order.

(j)    **Receipt or Retention of Cash**. The Plan Trust shall not be permitted to receive or retain Cash or Cash equivalents in excess of a reasonable amount to meet claims and contingent liabilities (including disputed claims) or to maintain the value of the Plan Trust Assets during liquidation and distribution.

(k)    **Retention of Professionals by the Plan Trustee**. The Plan Trustee may retain and reasonably compensate counsel and other professionals, as applicable, to assist in its duties as Plan Trustee on such terms as the Plan Trustee deems appropriate, without Bankruptcy Court approval; provided, however, that such counsel and other professionals shall be subject to the prior approval of the Plan Trustee Advisory Committee or, if such approval is not obtained, then such counsel and other professionals may be retained only upon Bankruptcy Court approval. All costs of compensation and expenses of professionals retained by the Plan Trustee are costs and expenses of the Plan Trust and will be paid out of the Plan Trust Assets.

(l)    **Compensation of the Plan Trustee**. The Plan Trustee will be entitled to reasonable compensation (which will be negotiated by the Plan Trustee with the Creditors' Committee) in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

(m)    **Cooperation of Reorganized TERI**. Reorganized TERI will provide information, including, Data needed for Claim administration and asset monetization, to the Plan Trustee. Such information will include, but will not be limited to, information regarding the status and amount of General Unsecured Claims to enable the Plan Trustee to perform its duties.

43

**EXECUTION VERSION**

Reorganized TERI will cooperate with the reasonable requests of the Plan Trustee and its
professionals in the administration of the Plan Trust, including, in providing Data,
documentation, witness testimony, and other evidence in support of the prosecution of the
Litigation Claims. The Plan Trust will reasonably reimburse Reorganized TERI , pursuant to the
terms of a reimbursement agreement to be negotiated, for any extraordinary costs incurred to
comply with requests for cooperation made by the Plan Trustee.

       *(n)*    **Distribution of Plan Trust Assets**. Plan Trust Assets shall be distributed
in accordance with the Plan Trust Agreement without the need for further order of the
Bankruptcy Court or notice to any entities. The aggregate of all distributions made on account of
each beneficial interest in the Plan Trust shall be Pro Rata Distributions. Each separate
distribution made by the Plan Trustee shall, to the extent reasonably practicable, be Pro Rata
Distributions, except the Plan Trustee may alter any particular distributions so that the aggregate
of all distributions are Pro Rata Distributions.

       *(o)*    **(Intentionally deleted)**.

       *(p)*    **Federal Income Tax Treatment of Plan Trust**.

       (i)    **Plan Trust Assets Treated as Owned by Creditors**. For all
federal income tax purposes, all parties (including, without limitation, the Debtor,
Reorganized TERI, the Plan Trustee, and the holders of Allowed General
Unsecured Claims) will treat the transfer of this Plan Trust Assets to the Plan
Trust including any amounts or other assets subsequently transferred to the Plan
Trust (but only at such time as actually transferred) for the benefit of the holders
of General Unsecured Claims, whether Allowed on or after the Effective Date, as
(A) a transfer of the Plan Trust Assets directly to the holders of Allowed General
Unsecured Claims, followed by (B) the transfer by such Persons to this Plan Trust
of such Plan Trust Assets in exchange for beneficial interests in the Plan Trust.
Accordingly, the holders of Allowed General Unsecured Claims will be treated
for federal income tax purposes as the grantors and owners of their respective
shares of the applicable Plan Trust Assets.

       (ii)   **Tax Reporting**.

       (A)    Subject to definitive guidance from the IRS or a court of
competent jurisdiction to the contrary (including the issuance of applicable
Treasury Regulations, the receipt by the Plan Trustee of a private letter
ruling if the Plan Trustee so requests one, or the receipt of an adverse
determination by the IRS upon audit if not contested by the Plan Trustee),
all parties will treat the Plan Trust as a "liquidating trust" in accordance
with Treasury Regulation section 301.7701-4(d), of which the holders of
Allowed General Unsecured Claims, whether Allowed on or after the
Effective Date, are the grantors and beneficiaries. In the event an
alternative treatment of the Plan Trust is required for federal income tax
purposes, the Plan Trustee will promptly notify in writing (or by
comparable means) all holders of beneficial interests in the Plan Trust, and

44

**EXECUTION VERSION**

anyone who subsequently becomes a holder, of such alternative treatment. The Plan Trust will file returns for the Plan Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Section 6.3(p). The Plan Trustee also may send annually to each record holder of a beneficial interest in the Plan Trust a separate statement setting forth such holder's share of items of income, gain, loss, deduction, or credit and will instruct all such holders to report such items on their federal income tax returns or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns. The Plan Trustee will also file (or cause to be filed) any other statements, returns, or disclosures relating to the Plan Trust that are required by any governmental unit. Except as may otherwise be provided, the Plan Trust's taxable income, gain, loss, deduction or credit will be allocated by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distribution described in the Plan) if, immediately prior to the deemed distribution, the Plan Trust had distributed all of its other assets (valued at their tax book value) in accordance with the provisions of the Plan and the Plan Trust Agreement, up to the tax book value of the Plan Trust Assets treated as contributed by the holders of Allowed General Unsecured Claims, whether Allowed on or after the Effective Date, adjusted for prior taxable income and loss, and taking into account all prior and concurrent distributions from the Plan Trust. Similarly, taxable loss of the Plan Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets.

(B)    As soon as possible after the Effective Date, the Plan Trustee will make a good faith valuation of the value of the Plan Trust Assets. Such valuation will be made available from time to time, to the extent relevant, and used consistently by all parties for all federal income tax purposes.

(C)    Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Plan Trustee of a private letter ruling if the Plan Trustee requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Plan Trustee), the Plan Trustee will (1) make an election pursuant to Treasury Regulation section 1.468B-9 to treat the Disputed Claims Reserve as a "disputed ownership fund" within the meaning of that section; (2) treat as taxable income or loss of the Disputed Claims Reserve, with respect to any given taxable year, the portion of the taxable income or loss of the Plan Trust that would have been allocated to the holders of Disputed General Unsecured Claims had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such

45

**EXECUTION VERSION**

Claims are unresolved), (3) treat as a distribution from the Disputed Claims Reserve any assets previously allocated to or retained on account of Disputed General Unsecured Claims as and when, and to the extent, such claims are subsequently resolved (following which time such assets will no longer be held in the Disputed Claims Reserve) and (4) to the extent permitted by applicable law, report consistent with the foregoing for state and local income tax purposes (including making any appropriate elections). The holders of Allowed General Unsecured Claims, whether Allowed on or after the Effective Date, will report, for tax purposes, consistent with the foregoing.

(D)    The Plan Trustee will be responsible for payments, out of and to the extent of available Plan Trust Assets, of any taxes imposed on the Plan Trust or the Plan Trust Assets, including the Disputed Claims Reserve.

(E)    The Plan Trustee may request an expedited determination of taxes of the Plan Trust, including the Disputed Claims Reserve, under section 505(b) of the Bankruptcy Code, for all returns filed for, or on behalf of, the Plan Trust for all taxable periods through the dissolution of the Plan Trust (including the Disputed Claims Reserve).

(q)    **Dissolution of Plan Trust**. The Plan Trustee and the Plan Trust will be discharged or dissolved, as the case may be, as set forth in the Plan Trust Agreement.

(r)    **Transition of Servicing and Collections of Defaulted Loans.** For a period of at least 30 days following the Effective Date, the Plan Trustee and First Marblehead Education Resources, Inc. ("FMER") shall attempt in good faith to negotiate the terms of a mutually acceptable transition agreement with respect to the servicing and collection of defaulted loans subject to the Trust Adversary Proceeding or otherwise subject to any Securitization Trust Settlement. For a period of no less than 90 days following the Effective Date, FMER shall continue to perform the services it has been providing during the Chapter 11 Case with respect to servicing and collecting defaulted loans subject to the Trust Adversary Proceeding pursuant to the Order Pursuant to Sections 105, 362 and 363 of the Bankruptcy Code Authorizing and Directing Debtor to Honor Certain of its Guaranty Obligations and Purchase Defaulted Loans Using Cash in Certain Pledged Accounts Established for the Benefit of the Trusts, entered on June 23, 2008, and FMER shall be entitled to payment from the Plan Trustee pursuant to such order; provided, however, FMER shall have no obligation to provide such services after the 90th day following the Effective Date.

6.4    **Calculation of TERI Net Recovery**. The TERI Net Recovery will be calculated as follows:

(a)    For the first year of the Term, the first $1,000,000 of TERI Loan Net Proceeds collected will be payable to the Plan Trust to fund the Plan Trust's administrative expenses, and after satisfaction of such administrative expenses, for inclusion in the Plan Trust Assets. For the first year of the Term, the TERI First Year Share will comprise 20% of each

46

**EXECUTION VERSION**

dollar of TERI Loan Net Proceeds collected in excess of $1 million, but the TERI First Year Share will not exceed $1,000,000.

(b)    For the second year of the Term, the first $1,000,000 of TERI Loan Net Proceeds collected will be payable to the Plan Trust to fund the Plan Trust's administrative expenses, and after satisfaction of such administrative expenses, for inclusion in the Plan Trust Assets. For the Second Year of the Term, the TERI Second Year Share will comprise 20% of each dollar of TERI Loan Net Proceeds collected in excess of $1 million but the TERI Second Year Share will not exceed $1,000,000.

(c)    If, and only if, as of the end of the Term: (a) the Collection Contract has not been terminated for cause; (b) the sum of (i) the TERI First Year Share plus (ii) the TERI Second Year Share is less than $2,000,000; (c) the sum of (i) the First Year Eligible Collections plus (ii) the Second Year Eligible Collections is at least $10,000,000 and (d) the Plan Trust has received $2,000,000 of TERI Loan Net Proceeds Trust to fund the Plan Trust's administrative expenses, and after satisfaction of such administrative expenses, for inclusion in the Plan Trust Assets during the Term, Reorganized TERI will be entitled to the Additional Share.

**6.5    Distribution to Secured Creditors.**    Secured Creditors will reasonably cooperate with Reorganized TERI or the Plan Trustee in connection with distribution of the funds in the Collateral Accounts, including executing any necessary documents or forms, including but not limited to a Form W-9.

**6.6    Restricted Funds.**    Notwithstanding anything to the contrary herein, (i) the Restricted Charitable Funds and the Restricted Grant Funds will not be applied to satisfy any Allowed Claim or distribution under the Plan; (ii) the Restricted Charitable Funds shall be administered from and after the Effective Date in accordance with all applicable deeds of gift and related stipulations; (iii) the Restricted Charitable Funds shall be used from and after the Effective Date solely for purposes of furthering higher education; (iv) the Restricted Charitable Funds subject to the Deed of Gift dated September 30, 1986 in favor of the Debtor from Massachusetts Higher Education Assistance Corporation (the "Financial Aid Gift") shall be used from and after the Effective Date solely for paying the costs of, and general overhead expenses reasonably attributable to, Reorganized TERI's "College Access" outreach programs; and (v) the Financial Aid Gift shall not be used from and after the Effective Date for paying any costs of, or general overhead expenses attributable to, Reorganized TERI's portfolio management or collection management operations. The Debtor's Board of Directors has agreed to, and Reorganized TERI's board of directors will agree to, the restrictions set forth in the foregoing clauses (iv) and (v) of this Section 6.6.

**6.7    Operations of Reorganized TERI.**    On and after the Effective Date, Reorganized TERI may operate its business, may use, acquire and dispose of property other than Plan Trust Assets, may retain, compensate and pay any professionals or advisors, and compromise or settle any causes of action, claims or interests, other than Causes of Action that are Plan Trust Assets, without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code and the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order or other Orders of the Bankruptcy Court.

47

EXECUTION VERSION

**6.8    Closing of the Chapter 11 Case**. The Plan Trustee will seek authority from the Bankruptcy Court to close the Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**6.9    Section 1123(b)(3)**. From and after the Effective Date, the Plan Trustee shall have the exclusive right and standing to take all actions identified in section 1123(b)(3) of the Bankruptcy Code, except as to any claims or interests that are retained by Reorganized TERI pursuant to this Plan. For the avoidance of doubt, the Plan Trustee is authorized to pursue the Causes of Action (including the Trust Adversary Proceeding).

**6.10    Establishment and Implementation of a Most Favored Nations Clause**. In the event that a Make and Wait Lender or make and Hold Lender rejects the Plan, or a representative of a Securitization Trust rejects this Plan and thereby the Securitization Trust Settlement, or KeyBank National Association (other than in its capacity as a Make and Wait Lender) or a Key Corp Trust rejects this Plan and thereby the Key Access Program Settlement (any of which is referred to herein as a "Litigating Creditor") and such Litigating Creditor, pursuant to a Final Order of the Bankruptcy Court, is found to have an Allowed Deficiency Claim or General Unsecured Claim that exceeds such Litigating Creditor's Class 5 Claim, by at least 10%, then the Plan Trustee shall be obligated to re-calculate the amount of the Deficiency Claims of all Creditors using the findings of the Bankruptcy Court regarding the proper calculation of such Claim (the "Revised Calculation"). The Plan Trustee may seek further or other orders of the Bankruptcy Court as the Plan Trustee desires to facilitate the proper determination of the Revised Calculation with respect to any and all Claims. To the extent that there are multiple evidentiary hearings to determine the amount of Allowed Class 5 Claims, the Revised Calculation shall be completed using the Final Order of the Bankruptcy Court that would yield the greatest Claim amounts. Notwithstanding anything in this section 6.10, however, (i) no Allowed Claim shall be reduced as a result of any Revised Calculation, and (ii) the Plan Trustee shall not use any Revised Calculation as set forth in this section 6.10 without prior approval of the Bankruptcy Court after notice and a hearing within the meaning of 11 U.S.C. §102(1).

**6.11    Nellie Mae Adversary Proceeding**. All student loans identified by the Debtor (if any) that are the subject of the Nellie Mae Adversary Proceeding, shall be held in escrow by Reorganized TERI after the Effective Date pending determination by the Bankruptcy Court of the Nellie Mae Adversary Proceeding, and shall be distributed in accordance with such Final Orders the Bankruptcy Court may enter in the Nellie Mae Adversary Proceeding.

## ARTICLE VII

## PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS

**7.1    No Distribution Pending Allowance**. Notwithstanding any other provision of this Plan the Plan Trustee will not be compelled or required to distribute any Cash or other property on account of any Disputed Claim or any portion thereof, unless and until such Claim becomes an Allowed Claim, and distribution on account of such Allowed Claim is required pursuant to the terms of the Plan. In the event that a Make and Wait Lender or Make and Hold Lender purchased or sold loans guaranteed by the Debtor on the secondary market and the Debtor's records do not reflect such purchase or sale, the Plan Trustee shall be entitled to

48

**EXECUTION VERSION**

withhold distributions to such Creditors pending determination of the rightful owner of such loans.

      **7.2**    <u>Resolution of Disputed Claims</u>.  Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Debtor, and following the Effective Date, only the Plan Trustee will have the right, to the exclusion of all others, to make, file, and prosecute objections to Claims, and will serve a copy of each objection upon the holder of the Claim to which the objection is made as soon as practicable.  Objections to Claims must, subject to the Local Rules for the United States Bankruptcy Court—District of Massachusetts, be filed with the Bankruptcy Court and served upon each affected creditor.  From and after the Confirmation Date, all objections will be litigated to a Final Order except to the extent that the Plan Trustee elects to withdraw any such objection or the Plan Trustee and the holder of the Disputed Claim elect to compromise, settle or otherwise resolve any such objection, in which event they may settle, compromise or otherwise resolve any Disputed Claim with approval of the Bankruptcy Court.

      **7.3**    <u>Estimation</u>.  In the event that the Plan Proponents seek entry of an Order estimating claims, such estimation order shall not prejudice or otherwise affect the ability of the Plan Proponents or Plan Trustee, as the case may be, to object to the allowance of any such Claim on any basis and the Bankruptcy Court will retain jurisdiction with respect to all Claims, including any Claim estimated pursuant to an estimation order.

      **7.4**    <u>Allowance of Disputed Claims</u>.  If, on or after the Effective Date, any Disputed Claim in a Class that is entitled to receive a distribution under the Plan becomes an Allowed Claim, the Debtor, Reorganized TERI, or the Plan Trustee, as applicable, must, as soon as practicable following the date on which the Disputed Claim becomes an Allowed Claim, distribute to the holder of such Allowed Claim an amount sufficient to pay to such holder of a Disputed Claim the amount that such holder would have been entitled to receive under this Plan if such Claim had been an Allowed Claim on the Effective Date.

      **7.5**    <u>Disallowance of Claims Without Further Order of the Bankruptcy Court.</u>  As of the Confirmation Date, any Disputed Claim for which a proof of Claim has not been filed, will be deemed disallowed and expunged, without further act or deed.

      **7.6**    <u>No Distribution in Respect of Disallowed Claims</u>.  To the extent that a Disputed Claim is expunged or reduced, the holder of such Claim will not receive any distribution on account of the portion of such Claim that is disallowed.

<div align="center">

**ARTICLE VIII**

**<u>TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>**

</div>

      **8.1**    <u>Assumption or Rejection of Executory Contracts and Unexpired Leases</u>. Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtor and any Person or Entity prior to the Commencement Date will be deemed rejected by the Debtor as of the Effective Date, except for any executory contract or unexpired lease (a) that has been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (b) as to which a motion for approval of

<div align="center">49</div>

**EXECUTION VERSION**

the assumption of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date or (c) that is specifically designated as a contract or lease to be assumed on schedules 8.1(A)(executory contracts) or 8.1(B) (unexpired leases), which schedules will be contained in the Plan Supplement or (d) those contracts not subject to assumption or rejection pursuant to Section 8.7 hereof and disclosed in the Plan Supplement; *provided, however*, that the Debtor reserves the right, on or prior to the Confirmation Date, to amend such schedules to delete any executory contract or unexpired lease there from or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) will be deemed to be, respectively, either rejected or assumed as of the Effective Date. The Debtor will provide notice of any such amendments to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on schedules 8.1(A) or (B) will not constitute an admission by the Debtor that such document is an executory contract or an unexpired lease or that the Debtor has any liability thereunder.

     *(a)*     Reorganized TERI will pay from Reorganized TERI Assets all Cure Amounts, if any, to the non-Debtor parties to the executory contracts and unexpired leases assumed pursuant to this Section 8.1 of this Plan by the earlier to occur of (i) the first Effective Date Anniversary or (ii) ten (10) days after resolution of the Cure Amount by Final Order or agreement of the parties, except as otherwise agreed to by the parties.

     *(b)*     If a non-Debtor party to an executory contract or unexpired lease assumed pursuant to this Section 8.1 of this Plan timely objects to the assumption or the proposed Cure Amount for that agreement, the Debtor and the objecting party may settle, compromise, or otherwise resolve the proper Cure Amount without further order of the Court or, at the Debtor's sole discretion, may submit the dispute to the Bankruptcy Court for a determination as to the proper Cure Amount.

     *(c)*     Notwithstanding anything to the contrary in this Plan or in any other document, the amount of the Retained Cash shall be reduced by an amount equal to one-half of any Allowed General Unsecured Claims, minus $50,000, arising from the rejection by the Debtor of the aggregate of all executory contracts by this Plan, without reference to the Claims arising from (a) the Debtor's rejection by this Plan of guaranty agreements and other program documents between and among the Debtor and any of the Creditors holding Claims in Classes (including subclasses) 2 – 6, and (b) Claims filed prior to the filing of this Plan in the Bankruptcy Court by parties to executory contracts rejected by this Plan that are related to such executory contracts.

     **8.2**     **Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.** Entry of the Confirmation Order will, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed and assigned pursuant to Section 8.1 of this Plan and (ii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 8.1 of this Plan.

     **8.3**     **Inclusiveness**. Unless otherwise specified on Schedules 8.1(A) and 8.1(B), each executory contract and unexpired lease listed or to be listed on Schedules 8.1(A) and 8.1(B) will

**EXECUTION VERSION**

include modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedules 8.1(A) and 8.1(B).

      **8.4**    **Return of Guaranty Fees**. As soon as practicable following the Effective Date, the Plan Trustee (or the Debtor in cooperation with the Plan Trustee) will return any Guaranty Fees received in respect of Pipeline Loans to holders of Make and Wait and Make and Hold Claims that accept the Make and Wait Lender Settlement or Make and Hold Settlement.

      **8.5**    **Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to this Plan**. Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 8.1 of this Plan must be filed with the Claims Agent on or before the Rejection Bar Date. All such Claims not filed within such time will be forever barred from assertion against the Debtor, its Estate or Reorganized TERI and its property.

      **8.6**    **Insurance Policies**. All of the Debtor's insurance policies (which policies are maintained by the Debtor in the ordinary course of business and the premiums for which have been prepaid) will remain in full force and effect with regard to Reorganized TERI, and are not required to be assumed by the Debtor. Nothing contained herein shall constitute or be deemed a waiver of any cause of action that the Debtor may hold against any entity to the extent of available insurance, including, without limitation, the insurer under any of the Debtor's policies of insurance. Under all circumstances, Reorganized TERI, and not the Plan Trustee or the Plan Trust Assets, shall be responsible for and available to pay all premiums and other insurance related expenses and liabilities.

      **8.7**    **Compensation and Benefit Programs**. From and after the Effective Date, Reorganized TERI shall make any and all payments due (for Cure Costs, contributions, Administrative Expense Claims, Claims or otherwise) solely from Reorganized TERI Assets for any and all savings plans, retirement plans (including without limitation the Pension Plan), health care plans, performance-based incentive plans, retention plans, workers' compensation programs and life, disability, directors and officers liability, other insurance plans and management contracts. Reorganized TERI's obligations under this section shall apply regardless whether the Debtor assumes, rejects or neither assumes nor rejects such plans and contracts as of the Effective Date.

      **8.8**    **Retiree Benefits**. On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, Reorganized TERI will continue to pay all retiree benefits of the Debtor (within the meaning of section 1114 of the Bankruptcy Code) and all amounts due or to become due in any way related to the Pension Plan, if any, at the level established in accordance with section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, for the duration of the period for which the Debtor had obligated itself to provide such benefits, *provided, however*, nothing herein will alter Reorganized TERI's right to amend or modify retiree benefits in accordance with applicable law. Reorganized TERI will remain obligated (to the exclusion of the Plan Trustee or any Creditor) to contribute to the Pension Plan the amount necessary to satisfy ERISA's minimum funding standards, ERISA

**EXECUTION VERSION**

§302; Internal Revenue Code §412. The Pension Plan may be terminated only if the statutory requirements of either ERISA §4041, 29 U.S.C. §1341, or ERISA §4042, 29 U.S.C. §1342, are met. If the Pension Plan terminates, Reorganized TERI and all members of its controlled group will be jointly and severally liable for unpaid minimum funding contributions, remiums, and unfundged benefit liabilities of the Pension Plan. See 29 U.S.C. §1362(a). Confirmation of the Plan shall operate as a judicial determination, binding on all Entities, that neither the Plan Trustee nor any Creditor that is not an insider of the Debtor (i) is a member of the controlled group of Reorganized TERI or the Debtor for any purpose, including as set forth in the immediately preceding sentence, and (ii) shall incur any liability whatsoever to any Entity (including, without limitation, to the United States of America, any of its administrative agencies or political subdivisions, the United States Internal Revenue Service or the United States Pension Benefit Guaranty Administration) on account of or related to the Pension Plan.

## ARTICLE IX

## CONDITIONS PRECEDENT TO ENTRY OF THE CONFIRMATION ORDER

**9.1    Conditions Precedent to entry of the Confirmation Order**. The following are conditions precedent to the entry of the Confirmation Order:

*(a)*    The Bankruptcy Court has found and determined that all of the applicable requirements of 11 U.S.C. §1129 have been satisfied, have been performed or have occurred;

*(b)*    The Creditors Committee does not reasonably determine that the Debtor and the Creditors Committee are unable or will be unable to agree upon the form and substance of any document included in the Plan Supplement;

*(c)*    The Confirmation Order shall be entered no later than June 15, 2010;

*(d)*    The Debtor has disbursed Cash prior to the Confirmation Hearing substantially in accordance with its Cash projections provided to the Creditors Committee and Final Orders of the Bankruptcy Court, and for no other purposes.

**9.2    Waiver of Conditions**. Each of the conditions precedent in sections 9.1 (b) – (d) hereof may be waived, in whole or in part, by the Plan Proponents. Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court or any formal action.

**9.3    Effect of Failure of Condition to Entry of Confirmation Order**. The failure of a condition set forth in section 9.1 above shall be as described in Article XI below.

## ARTICLE X

## EFFECTIVENESS OF THE PLAN

**10.1    Conditions Precedent to the Effective Date**. The following are conditions precedent to the occurrence of the Effective Date of this Plan, which shall occur on or before

**EXECUTION VERSION**

June 30, 2010, unless the Creditors Committee consents to an extension of time beyond the such date:

      *(a)*      The Bankruptcy Court shall have entered the Confirmation Order, which shall approve this Plan on substantially the same terms and conditions set forth herein, which shall be in form and substance satisfactory to the Plan Proponents;

      *(b)*      No stay of the Confirmation Order shall then be in effect at the time the other conditions set forth in Section 9.1 or this Section 10.1 are satisfied or waived;

      *(c)*      The Available Cash transferred to the Plan Trustee on the Effective Date shall not be less than $36,000,000 (inclusive of the aggregate Cash the Debtor deposited into the KeyBank Victory Fund after the Commencement Date), exclusive of any Cash or other property transferred or released (or to be transferred or to be released) to the Debtor or Plan Trustee from any Collateral Account;

      *(d)*      The Creditors Committee shall have filed with the Court a Notice establishing the date for the Effective Date, and

      *(e)*      All documents, instruments and agreements, in form and substance satisfactory to the Plan Proponents, provided for under or necessary to implement this Plan, including but not limited to the Plan Trust Agreement, shall have been executed and delivered by the parties thereto.

      **10.2**    **Waiver of Conditions**. Each of the conditions precedent in section 10.1 hereof may be waived, in whole or in part, by the Plan Proponents. Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court or any formal action.

      **10.3**    **Effect of Failure of Condition to Entry of Confirmation Order**. The consequences or effect of the failure of a condition set forth in section 9.1 above shall be as described in Article XI below. However, if there is a failure of the condition described in section 10.1(c) above, then, at the election of the Creditors Committee in its sole discretion, the Effective Date may occur, and the Retained Cash shall be reduced by an amount equal to the difference between $36,000,000 and the Available Cash.

## ARTICLE XI

## CONSEQUENCES OF A FAILURE OF A CONDITION IN ARTICLES IX AND X

Upon a failure of one or more conditions described in Articles IX and/or X above that the Plan Proponents jointly do not waive as set forth in Sections 9.2 and 10.2 above,

      *(a)*      Except for this Article XI, the Plan shall be null, void and of no effect;

      *(b)*      The Debtor shall not proceed with any hearing to confirm this Plan or any other plan not supported by the Committee unless and until a plan of reorganization or plan of liquidation, as applicable, supported by the Creditors Committee is considered by the Court for

53

**EXECUTION VERSION**

confirmation under 11 U.S.C. §1129, provided, however, that nothing shall prevent the simultaneous consideration of a plan presented by the Debtor; and

      *(c)*    Nothing in this Plan or in the Disclosure Statement shall be binding upon the Plan Proponents or impair their rights, claims and defenses with respect to any issue.

## ARTICLE XII

## EFFECTS OF CONFIRMATION

**12.1**    **Vesting of Assets**.

      *(a)*    As of the Effective Date, the property of the Estate, including all claims and Causes of Action against third parties that arose prior to or after the Commencement Date, will vest in Reorganized TERI or the Plan Trust as provided in this Plan.

      *(b)*    From and after the Effective Date, Reorganized TERI and the Plan Trust may dispose of its respective assets free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of this Plan.

      *(c)*    Pursuant to 11 U.S.C. §1141(c), as of the Effective Date, all assets of Reorganized TERI and the Plan Trust (including, without limitation, all funds in all Collateral Accounts established for the benefit of Entities who have not filed timely a proof of claim) will be free and clear of all Claims, liens, encumbrances, charges, and other interests, except as provided in this Plan or the Confirmation Order.

      *(d)*    Notwithstanding anything in the Plan or the Confirmation Order to the contrary, nothing in this Plan or in the Confirmation Order shall affect the terms of the Transition Services Agreement dated May 30, 2008, as approved by the order of the Bankruptcy Court dated June 23, 2008, or the parties' respective rights thereunder or with respect thereto.

**12.2**    **Binding Effect**. Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of this Plan shall bind any holder of a Claim against the Debtor and its respective successors and assigns, whether or not the Claim of such holder is Impaired under this Plan and whether or not such holder has accepted this Plan. The rights, benefits and obligations of any entity named or referred to in this Plan whose actions may be required to effectuate the term of this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity (including, but not limited to, any trustee appointed for the Debtor under chapters 7 or 11 of the Bankruptcy Code).

**12.3**    **Discharge**. Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, each holder (as well as any trustees and agents on behalf of each holder) of a Claim and any affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtor and Reorganized TERI, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all

**EXECUTION VERSION**

Claims, rights, and liabilities that arose prior to the Confirmation Date. Upon the Effective Date, all such Persons or Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against the Debtor or Reorganized TERI.

### 12.4    Releases, Injunctions and Exculpation.

(a)    **Satisfaction of Claims Against the Debtor**. Except as otherwise provided for in section 12.4(b) and (c) below, the treatment to be provided for respective Allowed Claims against the Debtor pursuant to this Plan shall be in full satisfaction, settlement and release of such respective Claims against the Debtor.

(b)    *Releases by Debtor Releasors*. *Except as otherwise specifically provided in this section 12.4(b) of this Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the implementation of this Plan, the Released Parties, on and after the Effective Date, are released by the Debtor Releasors from any and all Claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that the Debtor, or any Person or Entity claiming derivatively through or on behalf of the Debtor would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or other Person or Entity, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date other than for claims based upon gross negligence or willful misconduct; provided, however, that for the avoidance of doubt, the foregoing release does not include a release of any objection or defense that the Debtor Releasors may have with respect to Allowance of any Claim; provided, further, that that nothing in this paragraph shall be deemed to be a release by any of the Debtor Releasors of any Person or Entity of any Causes of Action or of any obligations imposed on any of them pursuant to this Plan.*

(c)    *Injunction*. *As of the Confirmation Date, except as provided in the Plan or the Confirmation Order, all Persons or Entities who, directly or indirectly, have held, hold or may hold Claims against the Debtor or, as to Claims which are derivative of the Debtor and released pursuant to Section 12.4(b), the Released Parties, are permanently enjoined from taking any of the following actions on account of any such Claims, debts, interests or liabilities, other than actions brought to enforce any rights or obligations under this Plan: (i) commencing or continuing in any manner any action or other proceeding against the Debtor, the Plan Trustee, the Released Parties or their respective properties; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor, the Plan Trustee, the Released Parties or their respective properties; (iii) creating, perfecting or enforcing any lien or encumbrance against the Debtor, the Plan Trustee, the Released Parties or their respective properties; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor, the Plan Trustee, the Released Parties or their respective properties, (v) commencing or continuing, in any manner or any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. For the avoidance of doubt, nothing in this Plan or the Confirmation Order shall be deemed to (a) be a release by any of the Debtor Releasors, or any Person or Entity other than Released Parties, of any Causes of Action; (b) enjoin the prosecution by the*

55

**EXECUTION VERSION**

*Plan Trustee of the Causes of Action (other than to the limited extent provided for in the Plan against the Released Parties), and (c) subject to section 5.5(h) above, enjoin any Person or Entity from asserting any defense or claims as a defense in any civil action, including, without limitation, in the Trust Adversary Proceeding. Notwithstanding any language to the contrary herein or in any other document, as to any Entity (including the Released Parties), nothing herein shall impair or enjoin the Plan Trustee from seeking to enforce, or to assert rights and recover damages with respect to any breach of the terms of this Plan.*

*(d)    Exculpation. The Debtor, the Released Parties, KeyBank National Association, as Administrator and Master Servicer of the KeyCorp Trusts, The Bank of New York Mellon Trust Co., N.A., as Eligible Lender Trustee and as Indenture Trustee for certain KeyCorp Trusts, The Bank of New York (Delaware), as Owner Trustee for certain KeyCorp Trusts, Deutsche Bank Trust Company Americas, as Indenture Trustee and Owner Trustee for certain KeyCorp Trusts, FMDS, solely in its capacity as Administrator to the Securitization Trusts, U.S. Bank National Association, solely in its capacity as Indenture Trustee, trustee and eligible lender trustee to the Securitization Trusts and Other Trusts, and in any capacity in which it was named as a defendant in the Trust Adversary Proceeding, and as bank or agent with respect to the Collateral Accounts, MBIA Insurance Corporation and AMBAC Assurance Corporation, and their respective members and professionals (acting in such capacity), shall neither have nor incur any liability to any Person or Entity for any act taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, administration, confirmation or consummation of this Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, or any act taken or omitted to be taken in connection with, in contemplation of, during or in any way related to the Chapter 11 Case (all of the foregoing being collectively referred to as the "Exculpated Acts"), except for transactions, acts or omissions (i) as a result of willful misconduct or gross negligence, (ii) with respect to transactions occurring pursuant to the "Order Pursuant to Sections 105, 362 and 363 of the Bankruptcy Code Authorizing and Directing Debtor to Honor Certain of its Guaranty Obligations and Purchase Defaulted Loans Using Cash in Certain Pledged Accounts Established for the benefit of the Trusts" entered by the Bankruptcy Court on June 23, 2008, (iii) occurring pursuant to the Transition Services Agreement between FMER and the Debtor approved by the Bankruptcy Court on June 23, 2008, or (iv) pursuant to any contracts between or among the Debtor and any entity entered into prior to the commencement of this Bankruptcy Case. This provision does not exculpate the foregoing Persons, including the Debtor, from performing their duties under the Plan and effectuating the Plan. Nothing in this section 12.4 (i) exculpates the Debtor or Reorganized TERI from performing its obligations under any contract or agreement not rejected under this Plan pursuant to 11 U.S.C. §365, or (ii) exculpates any Person from obligations unrelated to the Exculpated Acts it may owe to any other Person under any contract.*

**12.5    Release of Assets.** Until the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Debtor, its assets and properties and the Estate. Thereafter, jurisdiction of the Bankruptcy Court shall be limited as set forth in Article XI of this Plan.

**12.6    Claims Preserved.** As of the Effective Date, subject to the releases and waivers granted pursuant to section 12.4 of this Plan, the Plan Trust shall succeed to the Debtor's interest in the Causes of Action, and the Plan Trustee shall have all requisite authorization, approval and

DM3\1301010.2

EXECUTION VERSION

standing to prosecute any Causes of Action in the name of, on behalf of, in the stead of, or as assignee of the Debtor and the Estate.

### 12.7  Residual.

(a)  **Reorganized TERI Deemed Owner of Residual**. Confirmation of the Plan constitutes a determination, binding on all Entities (including, without limitation, the United States Internal Revenue Service and all state taxing authorities) that as a result of the implementation of the transactions contemplated by this Plan, (i) the Plan Trustee is not and shall not become the owner of the Residual (or any portion thereof) for purposes of taxation under the laws of the United States or of any State, and (ii) none of the beneficiaries of the Plan Trust shall in any way be liable for any taxes attributable to or arising as a result of ownership of the Residual, or payable on account of income or accretion of value, if any, earned by, allocated to or attributable to the owner(s) of the Residual, to the United States or any State, including to any political subdivision or agency of any of them.

(b)  **Post-confirmation Treatment of Residual**. The Plan Trustee and TERI shall in good faith attempt to reach agreement regarding the proper treatment of the Residual, in a manner that will not impose obligations upon the Plan Trustee or the beneficiaries of the Plan Trust to recognize and/or pay taxes relating to Reorganized TERI's ownership of the Residual.

(c)  **No Tax Liability For Plan Trust or Creditors Arising From Residual**. Notwithstanding anything in the Plan to the contrary, nothing in the Plan shall obligate the Plan Trustee, the Plan Trust, or the beneficiaries of the Plan Trust to assume any obligation or liability relating to the Residual, including any liability with respect to federal or state taxes in any way attributable to or arising as a result of ownership of the Residual, or payable on account of income or accretion of value earned by, allocated to or attributable to the owner(s) of the Residual.  In the absence of any agreement to the contrary between the Plan Trustee and TERI pursuant to Section 12.7(b) of the Plan, Reorganized TERI shall retain all right, title, interest, obligations and liabilities related to or arising from the Residual.

### 12.8  ERISA.  Nothing in this Plan will release or discharge any fiduciary of the Pension Plan, within the meaning of 29 U.S.C. §1002(21), from any liability arising as a result of such fiduciary's breach of fiduciary duty under ERISA with respect to the Pension Plan. Confirmation of the Plan shall operate as a judicial determination, binding on all Entities, that neither the Plan Trustee nor any Creditor that is not an insider of the Debtor is or shall become due to implementation of this Plan a fiduciary of the Pension Plan within the meaning of 29 U.S.C. §1002(21).

## ARTICLE XIII

## RETENTION OF JURISDICTION

### 13.1  Jurisdiction of Bankruptcy Court.  The Bankruptcy Court shall retain jurisdiction of all matters arising under, arising out of, or related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

57

DM3\1301010.2

**EXECUTION VERSION**

       *(a)*      To hear and determine any motions for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases and the allowance of any Claims resulting there from;

       *(b)*      To determine any and all pending adversary proceedings, applications and contested matters relating to the Chapter 11 Case;

       *(c)*      To hear and determine any objection to any Claims;

       *(d)*      To hear and determine the Causes of Action;

       *(e)*      To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

       *(f)*      To issue such orders in aid of execution of the Plan to the extent authorized by section 1142 of the Bankruptcy Code;

       *(g)*      To consider any modifications of this Plan, to cure any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

       *(h)*      To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code;

       *(i)*      To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of this Plan, including, without limitation, any claim or issue arising under or in any way related to section 12.7 of this Plan;

       *(j)*      To hear and determine any actions brought against the Plan Trustee or Reorganized TERI;

       *(k)*      To recover all assets of the Debtor, property of the Estate and the assets of the Plan Trustee, wherever located;

       *(l)*      To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code filed, or to be filed, with respect to tax returns for any and all taxable periods ending after the Commencement Date through the closing of the Chapter 11 Case);

       *(m)*      To hear and determine any other matters related hereto, including matters related to the implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Case;

       *(n)*      To hear any other matter consistent with the provisions of the Bankruptcy Code; and

**EXECUTION VERSION**

(o)    To enter a final decree closing the Chapter 11 Case.

## ARTICLE XIV

### MISCELLANEOUS PROVISIONS

**14.1    Effectuating Documents and Further Transactions**. Each of the officers of the Debtor and Reorganized TERI, and the Plan Trustee is authorized and directed to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

**14.2    Exemption from Transfer Taxes**. Pursuant to section 1146(a) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan, including any deeds, bills of sale or assignments executed in connection with any disposition of assets contemplated by this Plan, will not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax.

**14.3    Post-Confirmation Date Fees and Expenses**. After the Effective Date, Reorganized TERI will, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses, incurred after the Effective Date, of the professional persons employed by Reorganized TERI in connection with the implementation and consummation of this Plan and any other matters as to which such professionals may be engaged. The fees and expenses of such professionals will be paid within ten (10) Business Days after submission of a detailed invoice therefor. If Reorganized TERI disputes the reasonableness of any such invoice, Reorganized TERI will timely pay the undisputed portion of such invoice, and Reorganized TERI or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of such portion of the disputed invoice.

**14.4    Modification of Plan**.

(a)    The Plan Proponents reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan at any time prior to the entry of the Confirmation Order, subject to the consent of the Creditors' Committee. After the entry of the Confirmation Order but prior to the Effective Date, the Plan Proponents may, upon order of the Bankruptcy Court, jointly amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan. A holder of an Allowed Claim that is deemed to have accepted this Plan will be deemed to have accepted this Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

(b)    Prior to the Effective Date, the Creditors Committee, in its sole and absolute discretion, shall have the right not to accept any portion of the Plan Trust Assets. Any

59

**EXECUTION VERSION**

such Plan Trust Assets that the Creditors Committee declines to accept as Plan Trust Assets shall instead be deemed to be Reorganized TERI Assets under this Plan.

**14.5    Withdrawal or Revocation.**  The Plan Proponents may withdraw or revoke this Plan at any time prior to the Confirmation Date.  If the Plan Proponents revoke or withdraw this Plan prior to the Confirmation Date, or if the Confirmation Date does not occur, then this Plan will be deemed null and void.  In such event, nothing contained herein will be deemed to constitute a waiver or release of any Claim by or against the Debtor or any other Person or Entity or to prejudice in any manner the rights of the Debtor or any other Person or Entity in any further proceedings involving the Debtor.

**14.6    Courts of Competent Jurisdiction.**  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal or failure of jurisdiction will have no effect upon and will not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

**14.7    Notices.**  Any notices to or requests of the Debtor by parties-in-interest under or in connection with the Plan must be in writing and served either by (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) reputable overnight delivery service, all charges prepaid, and will be deemed to have been given when received by the following parties:

To the Company/Debtor:

THE EDUCATION RESOURCES INSTITUTE, INC.
31 St. James Ave., 9th Floor
Boston, MA 02116
Attn: Willis J. Hulings III

*With copies to:*

GOODWIN PROCTER LLP
Attorneys for the Debtor
Exchange Place
53 State Street
Boston, MA 02109-2881
(617) 570-1930
Attn: Daniel Glosband, Esq.
        Gina Lynn Martin, Esq.

To the Creditors' Committee:

DUANE MORRIS, LLP
470 Atlantic Avenue, Suite 500
Boston, Ma 02210

60

**EXECUTION VERSION**

(857) 488-4216
Attn: Jeffrey D. Sternklar

To the Plan Trustee:

[  ]

**14.8    Severability.** In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision of the Plan is invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, Impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**14.9    Governing Law.** Except to the extent the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under this Plan will be governed by, and construed and enforced in accordance with, the laws of the State of Massachusetts without giving effect to the principles of conflicts of law thereof.

**14.10    Headings.** Headings are used in this Plan for convenience and reference only, and will not constitute a part of this Plan for any other purpose.

**14.11    Exhibits.** All Exhibits and schedules to this Plan are incorporated into and are a part of this Plan as if set forth in full herein.

**14.12    Successors and Assigns.** All the rights, benefits and obligations of any Person or Entity named or referred to in this Plan will be binding on, and will inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Person or Entity.

**14.13    Dissolution of the Creditors' Committee.** On the Effective Date, the Creditors' Committee will be dissolved and the members thereof will be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Case, and the retention or employment of the Creditors' Committee's attorneys, accountants and other agents will terminate; *provided, however*, that immediately prior to the dissolution of the Creditors' Committee, any and all analyses or work product prepared by and/or information obtained by the Creditors' Committee or its attorneys, accountants and other agents related to the Causes of Action must be transferred to the Plan Trust and will be deemed an asset of the Plan Trust for purposes of the Plan; *provided further, however*, the Creditors' Committee will continue to exist after such date solely with respect to all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code seeking payment of

61

DM3\1301010.2

**EXECUTION VERSION**

fees and expenses incurred by any professional retained by the Creditors' Committee. On and after the Effective Date, the Plan Trustee Advisory Committee will have the same standing to participate in proceedings before the Bankruptcy Court as the Creditors' Committee had prior to the Effective Date.

**14.14    Courts of Competent Jurisdiction**. If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of this Plan, such abstention, refusal or failure of jurisdiction will have no effect upon and will not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

**14.15    Plan Supplement**. The documents comprising the Plan Supplement will be filed with the clerk of the Bankruptcy Court at least ten (10) days prior to the deadline to vote to accept or reject this Plan. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court during normal court hours. Holders of Claims may obtain a copy of the Plan Supplement upon written request to the Debtor's bankruptcy counsel or on the website of the Voting Agent (*www.epiqsystems.com*). All exhibits and schedules contained in the Plan Supplement, are incorporated into and are a part of this Plan as if set forth in full herein.

**14.16    Plan Controls Disclosure Statement; Confirmation Order Controls Plan**. To the extent this Plan is inconsistent with the Disclosure Statement, the provisions of this Plan will be controlling. To the extent the Confirmation Order is inconsistent with this Plan, the provisions of the Confirmation Order will be controlling.

**14.17    Filing of Additional Documents**. On or before substantial consummation of this Plan, the Debtor will file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan, including those contained in the Plan Supplement.

**14.18    Tax-Exempt Status**. Nothing in this Plan will adversely affect, or be interpreted to be inconsistent with, the tax-exempt status of the Debtor, Reorganized TERI or any entity established pursuant to this Plan that is expressly intended to be tax-exempt.

**14.19    Consent to Transfer of Residual**. The Debtor shall be deemed to have consented to the transfer of any residual interests in any Securitization Trust by any holder of a residual interest in any Securitization Trust that has provided the Debtor with written consent to transfer such interest. Notwithstanding the foregoing, however, without the need for any further action by any entity, the Debtor shall be deemed to have all necessary consents from all entities and to have provided all necessary consents to permit the transfer of the Residual to the Plan Trustee notwithstanding that the Residual will not be transferred as of the Effective Date under this Plan.

62

DM3\1301010.2

**EXECUTION VERSION**

Dated:    Boston, Massachusetts
          February 25, 2010

                              **THE EDUCATION RESOURCES INSTITUTE,
                              INC.**


                              By:_____
                                  Name:
                                  Title:


                              **THE OFFICIAL COMMITTEE OF
                              UNSECURED CREDITORS OF THE
                              EDUCATION RESOURCES INSTITUTE, INC.**


                              By:_____
                                  Name:
                                  Title:

63

DM3\1301010.2

Joint Plan of Reorganization
Schedule A

| Class | Make and Wait Collateral Account Funds (as of 12/31/08) | Make and Wait Lien Dispute Amount (5% of Collateral Account Funds) | Make and Wait Lender Base Case Equity (If Any) | Make and Wait Lender Decoder Equity (If Any) | Make and Wait Lender Payment Amount (If Any) [1] | Payment to Accepting Make and Wait Lender from Collateral Account [2] | Make and Wait Lender Decoder Deficiency Claim (If Any) [3] |
|---|---|---|---|---|---|---|---|
| | A | A *5%=B | C | D | B+D=E | A-E=F | G |
| Class 2a Intentionally Omitted | $0 | $0 | $0 | NA | NA | NA | NA |
| Class 2b Comerica Bank | $379,951 | $0 | $164,345 | $41,582 | $41,582 | $338,368 | $0 |
| Class 2c Intentionally Omitted | $790 | $0 | $0 | NA | NA | NA | NA |
| Class 2d GMAC Bank | $5,906,949 | $0 | $782,057 | $0 | $0 | $5,906,949 | $941,904 |
| Class 2e HSBC Bank USA, N.A. | $861,764 | $0 | $627,147 | $320,702 | $320,702 | $541,061 | $0 |
| Class 2f Huntington National Bank | $831,333 | $0 | $325,854 | $0 | $0 | $831,333 | $2,126 |
| Class 2g Insurbanc | $16,233 | $812 | $8,650 | $2,098 | $2,910 | $13,323 | $0 |
| Class 2h KeyBank National Association | $856,777 | $0 | $92,883 | $0 | $0 | $856,777 | $159,860 |
| Class 2i Manufacturers and Traders Trust Company | $678,383 | $33,919 | $524,891 | $215,499 | $249,418 | $428,965 | $0 |
| Class 2j National City Bank | $3,973,170 | $0 | $1,140,016 | $0 | $0 | $3,973,170 | $206,358 |
| Class 2k PNC Bank, N.A. | $8,025,823 | $401,291 | $3,026,789 | $0 | $401,291 | $7,624,532 | $448,989 |
| Class 2l RBS Citizens, N.A. | $48,488,139 | $2,424,407 | $8,857,767 | $0 | $2,424,407 | $46,063,732 | $7,803,433 |
| Class 2m Sovereign Bank | $537,888 | $0 | $265,002 | $64,848 | $64,848 | $473,040 | $0 |
| Class 2n SunTrust Bank | $437,566 | $0 | $250,542 | $110,277 | $110,277 | $327,289 | $0 |
| Class 2o TCF National Bank | $129,172 | $0 | $76,941 | $23,996 | $23,996 | $105,177 | $0 |
| Class 2p U.S. Bank, N.A. | $2,795,334 | $0 | $1,143,599 | $88,198 | $88,198 | $2,707,136 | $0 |

[1] This is the sum of the "Make and Wait Lien Dispute Amount (5% of Collateral Account Funds)" and "Make and Wait Lender Decoder Equity (if any)". The balance of the funds in the Collateral Account, including accrued interest, shall be payable to the applicable Accepting Make and Wait Lender.

[2] For purposes of the Plan, payment to accepting Make and Wait Lender from Collateral Account is net of any equity calculated with the Decoder methodology described in the Plan Supplement. Amounts in the Collateral Account will be adjusted on the date of transfer.

[3] Under the Base Case, no Make and Wait Lender holds a Deficiency Claim.

Joint Plan of Reorganization
Schedule B

| Class | Securitization Trust Collateral Acct Collateral Acct (As of 12/31/08)[1] | Securitization Trust Collateral Acct Collateral Acct (As of 9/30/09)[2] | Securitization Trust Base Case[3] Equity | Securitization Trust Base Case[3] Claim | Decoder Case[4] | | | | Securitization Trust Settlement Claim If Any[8] |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Securitization Trust Decoder Equity (rounded)[6] | PMT to Accepting Securitization Trust from Collateral Acct.[6] | Securitization Trust Decoder Claim (rounded)[5] | Securitization Trust Settlement Claim Reduction[7] | |
| | A | B | | | C | B-C | D | E | D-E = F |
| Class 3a The National Collegiate Trust 2003-1 | $540,778 | $232 | - | $12,214,990 | - | $232 | $13,500,000 | $6,900,000 | $6,600,000 |
| Class 3b The National Collegiate Trust 2004-1 | $505,430 | $659 | - | $10,696,186 | - | $659 | $12,300,000 | $6,700,000 | $5,600,000 |
| Class 3c The National Collegiate Trust 2004-2 | $788,078 | $497 | - | $12,884,635 | - | $497 | $21,200,000 | $7,000,000 | $14,200,000 |
| Class 3d The National Collegiate Trust 2005-1 | $632,914 | $1,026 | - | $5,219,602 | - | $1,026 | $13,900,000 | $5,200,000 | $8,700,000 |
| Class 3e The National Collegiate Trust 2005-2 | $395,825 | $1,355 | - | $5,575,091 | - | $1,355 | $12,700,000 | $3,400,000 | $9,300,000 |
| Class 3f The National Collegiate Trust 2005-3 | $1,809,447 | $2,242 | - | $6,015,971 | - | $2,242 | $32,800,000 | $5,200,000 | $27,600,000 |
| Class 3g The National Collegiate Trust 2006-1 | $472,236 | $2,656 | - | $6,761,746 | - | $2,656 | $24,500,000 | $2,700,000 | $21,800,000 |
| Class 3h The National Collegiate Trust 2006-2 | $225,021 | $125 | - | $11,186,298 | - | $125 | $24,600,000 | $1,700,000 | $22,900,000 |
| Class 3i The National Collegiate Trust 2006-3 | $51,161,652 | $48,247,618 | $14,690,347 | - | - | $48,247,618 | $15,700,000 | $1,700,000 | $14,000,000 |
| Class 3j The National Collegiate Trust 2006-4 | $20,967,919 | $19,560,861 | - | $2,175,723 | - | $19,560,861 | $22,000,000 | $900,000 | $21,100,000 |
| Class 3k The National Collegiate Trust 2007-1 | $31,632,569 | $30,646,587 | $2,680,796 | - | - | $30,646,587 | $14,200,000 | $300,000 | $13,900,000 |
| Class 3l The National Collegiate Trust 2007-2 | $38,018,657 | $36,920,407 | $4,331,492 | - | - | $36,920,407 | $10,400,000 | $200,000 | $10,200,000 |
| Class 3m The National Collegiate Trust 2001-CP1 | $404 | $405 | N/A | NA | $405 | - | - | - | Subject to Stipulation |
| Class 3n The National Collegiate Trust 2002-CP1 | $740,974 | $752,347 | N/A | NA | $752,347 | - | - | - | Subject to Stipulation |
| Class 3o The National Collegiate Master Trust | $906,902 | $262 | - | $14,954,201 | - | $262 | $16,200,000 | $10,300,000 | $5,900,000 |
| Class 3p The National Collegiate Trust 2007-3 | $65,493,625 | $65,379,145 | $20,234,263 | - | $1,600,000 | $63,779,145 | - | - | - |
| Class 3q The National Collegiate Trust 2007-4 | $64,615,864 | $64,548,316 | $19,264,504 | - | $700,000 | $63,848,316 | - | - | - |

(1) The 2001-CP1 and 2002-CP1 Trusts have been repurchasing defaulted loans after 12/31/08, and as such, the current estimation uses lower collateral account balances as of 10/31/09 and higher post-petition repurchased loan amounts for these two trusts.

(2) Represents Allowed Secured Claim for Accepting Trusts. Amounts subject to reduction by Securitization Trust Decoder Equity, as referenced in footnote 5 of this schedule. Amounts reflect market value before accrued interest and will be updated as of the date of transfer.

(3) Base Case is provided for illustrative purposes. The Base Case Claim/Equity amounts were determined in accordance with the Debtor Base Case methodology described in the Disclosure Statement. If any Securitization Trust rejects the Plan, the Plan Trustee reserves the right to seek to have the amount of the claims of such Securitization Trust determined at any amount the Plan Trustee determines is reasonable, including the Debtor's Base Case.

(4) The Decoder Case Claim/Equity amounts were determined in accordance with the Decoder methodology described in the Plan Supplement.

(5) Assumes Trust Collateral includes defaulted loans purchased by TERI pre-petition using funds in respective pledged accounts but not the defaulted loans purchased by TERI post-petition, pursuant to the Securitization Trust Settlement.

(6) Payment to accepting Securitization Trust from collateral account is net of any equity calculated with the Decoder methodology described in the Plan Supplement. Amounts in the collateral account will be adjusted on the date of transfer.

(7) Reflects reduction to Securitization Trust Decoder Claim pursuant to the Securitization Trust Settlement and as defined in the Plan.

(8) Decoder Case Claim reduced by the Securitization Trust Settlement Claim Reduction, as referenced in footnote 7. Reflects Allowed General Unsecured Claim for Trusts accepting the Plan, and, thereby, the Securitization Trust Settlement.

Joint Plan of Reorganization
Schedule C

| Keycorp Trust | Allocation of Victory Fund [1] | Key Access Program Base Case Claim [2] | Key Access Program Decoder Settlement Claim [3,4] |
|---|---|---|---|
| Key Bank National Association | $ 17,572 | $ 2,990,666 | $ 4,183,461 |
| KSLT 1999-A | $ 5,304 | $ 845,309 | $ 1,182,942 |
| KSLT 1999-B | $ 4,426 | $ 1,025,614 | $ 1,227,168 |
| KSLT 2000-A | $ 2,777 | $ 365,040 | $ 482,156 |
| KSLT 2000-B | $ 4,989 | $ 1,266,274 | $ 1,477,086 |
| KSLT 2001-A | $ 3,055 | $ 951,496 | $ 1,168,802 |
| KSLT 2002-A | $ 3,278 | $ 1,158,829 | $ 1,352,056 |
| KSLT 2003-A | $ 1,122 | $ 492,155 | $ 623,586 |
| KSLT 2004-A | $ 2,053 | $ 586,767 | $ 803,372 |
| KSLT 2005-A | $ 1,358 | $ 263,483 | $ 377,533 |
| KSLT 2006-A | $ 65 | $ 301,180 | $ 362,215 |

[1]  Reflects allocation of the Victory Fund as of the Commencement Date based on the original principal balance. These amounts are to be returned to the respective trust as part of KeyCorp Trust Settlement.

[2]  Base Case is provided for illustrative purposes.  The Base Case Claim/Equity amounts were determined in accordance with the Debtor Base Case methodology described in the Disclosure Statement. If any Keycorp Trust rejects the Plan, the Plan Trustee reserves the right to seek to have the amount of the claim for such Keycorp Trust determined at any amount the Plan Trustee determines is reasonable, including the Debtor's Base Case.

[3]  The Decoder Settlement Claim amounts were determined in accordance with the Decoder methodology described in the Plan Supplement.

[4]  Decoder Settlement Claim reflects Allowed General Unsecured Claim for Accepting Keycorp Trusts.

Joint Plan of Reorganization
Schedule D

| Make and Hold Lender | Make and Hold [1] Lender Base Case Claim | Make and Hold [2] Lender Decoder Claim | Make and Hold [3] Lender Settlement Claim |
|---|---|---|---|
| Brazos Student Finance Corporation | See Star Bank Claim | See Star Bank Claim | See Star Bank Claim |
| California Bank & Trust | $ 864 | $ 866 | $ 866 |
| CHELA Financial USA/Inc. (n/k/a Nelnet) | $ 63,612 | $ 54,890 | $ 63,612 |
| Citibank | $ 48,946 | $ 42,538 | $ 48,946 |
| Comerica Bank | $ 407,313 | $ 430,720 | $ 430,720 |
| Corus Bank, N.A. | $ 9,207 | $ 9,509 | $ 9,509 |
| Deutsche Bank | $ 420,994 | $ 355,277 | $ 420,994 |
| HealthMarkets, Inc. (f/k/a UICI) | $ 2,526,339 | $ 2,404,978 | $ 2,526,339 |
| HSBC Bank USA | $ 1,079 | $ 1,824 | $ 1,824 |
| Keystone (Pheaa) | $ 1,148,081 | $ 1,052,911 | $ 1,148,081 |
| Maine Education Services (f/k/a MELA) | $ 6,466 | $ - | $ 6,466 |
| Manufacturers and Traders Trust Company | $ 98,304 | $ 117,110 | $ 117,110 |
| Members 1st Federal Credit Union | $ 134,120 | $ 166,089 | $ 166,089 |
| National City Bank | $ 101,766 | $ 256,320 | $ 256,320 |
| Nellie Mae Education Foundation | $ 191,419 | $ 193,249 | $ 193,249 |
| NelNet, Inc. | See CHELA Claim | See CHELA Claim | See CHELA Claim |
| Penn Security Bank and Trust | $ 171,099 | $ 212,035 | $ 212,035 |
| PNC Bank, N.A. | $ 235,207 | $ 289,677 | $ 289,677 |
| RBS Citizens, N.A. | $ 12,480,953 | $ 14,664,444 | $ 14,664,444 |
| Rhode Island Student Loan Authority | $ 167 | $ - | $ 167 |
| Richland State Bank | $ 3,463 | $ 2,471 | $ 3,463 |
| Sallie Mae - Academic Management Services | $ 348,074 | $ 338,416 | $ 348,074 |
| Sallie Mae - ECFC | $ 490,918 | $ 477,360 | $ 490,918 |
| Southwest Student Services Corp. | $ - | $ - | $ - |
| Star Bank | $ 1,375,226 | $ 1,851,476 | $ 1,851,476 |
| Student Loan Funding Corp (KnowledgeWorks) | $ 17,630 | $ 43,352 | $ 43,352 |
| TFSI | $ 80,067 | $ 116,805 | $ 116,805 |
| Wachovia Bank of Delaware, N.A. | $ 37,391,156 | $ 48,849,269 | $ 48,849,269 |
| Zions First National Bank | $ 714 | $ 750 | $ 750 |
| The National Collegiate Trust 2006-A | n/a | $ 468,871 | $ 468,871 |

[1] Base Case is provided for illustrative purposes. The Make and Hold Lender Base Case Claim amounts were determined in accordance with the Debtor
Base Case methodology described in the Disclosure Statement. If any Make and Hold Lender rejects the Plan, then the Plan Trustee reserves the right to
seek to have the amount of the claim for such Make and Hold Lender determined at any amount the Plan Trustee determines is reasonable, including the

[2] The Make and Hold Lender Decoder Claim amounts were determined in accordance with the Decoder methodology described in the Plan Supplement.
Make and Hold Lender Settlement Claim reflects Allowed General Unsecured Claim for Accepting Make and Hold Lenders.

[3] Greater of Make and Hold Lender Base Case Claim and Make and Hold Lender Decoder Decoder Claim.

# EXHIBIT 7

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

In re:                                                              Chapter 7

TASHANNA B. GOLDEN,                                                 Case No. 16-40809-ess
*fka* TASHANNA B PEARSON,

                              Debtor.

------------------------------------------------------------------------x

TASHANNA B. GOLDEN,                                                 Adv. Pro. No.: 17-01005-ess

                              Plaintiff,

        -against-

JP MORGAN CHASE BANK, NATIONAL COLLEGIATE
TRUST, FIRSTMARK SERVICES, GOLDEN TREE
ASSET MANAGEMENT LP, GS2 2016-A (GS2),
NATIONAL COLLEGIATE STUDENT LOAN TRUST
2005-3, NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2006-4, PENNSYLVANIA HIGHER
EDUCATION ASSISTANCE AGENCY D/B/A/
AMERICAN EDUCATION SERVICES,

                              Defendants.

------------------------------------------------------------------------x

## MEMORANDUM DECISION ON THE DEFENDANTS'
## MOTIONS TO DISMISS THE AMENDED COMPLAINT

*Appearances*:

George F. Carpinello, Esq.                    Barbara L. Seniawski, Esq.
Adam Shaw, Esq.                               The Seniawski Law Firm PLLC
Boies Schiller Flexner LLP                    1460 Broadway (4th Floor)
30 South Pearl Street (11th Floor)            New York, NY 10036
Albany, NY 12207                                *Attorneys for Defendant Firstmark Services*
  *Attorneys for Plaintiff Tashanna B. Golden*

                                              Charles F. Kaplan, Esq.
Austin C. Smith, Esq.                         Perry, Guthery, Haase & Gessford P.C.
Smith Law Group                               L.L.O.
3 Mitchell Place (Suite 5)                    233 South 13th Street (Suite 1400)
New York, NY 10017                            Lincoln, NE 68508
  *Attorneys for Plaintiff Tashanna B. Golden*   *Attorneys for Defendant Firstmark Services*

Jason Walker Burge, Esq.
Fishman Haygood LLP
201 St. Charles Avenue (46th Floor)
New Orleans, LA 70170
 *Attorneys for Plaintiff Tashanna B. Golden*

Gregory T. Casamento, Esq.
Locke Lord LLP
Brookfield Place
200 Vesey Street (20th Floor)
New York, NY 10281
 *Attorneys for Defendants National
 Collegiate Student Loan Trust 2005-3,
 National Collegiate Student Loan Trust
 2006-4, and Goal Structured Solutions
 Trust 2016-A*

H. Peter Haveles, Jr., Esq.
Pepper Hamilton LLP
620 Eighth Avenue (37th Floor)
New York, NY 10018
 *Attorneys for Defendant Pennsylvania
 Higher Education Assistance Agency*

HON. ELIZABETH S. STONG
UNITED STATES BANKRUPTCY JUDGE

## Introduction

Before the Court are the motions to dismiss of defendants Firstmark Services ("Firstmark"), Pennsylvania Higher Education Assistance Agency ("PHEAA"), and jointly, defendants National Collegiate Student Loan Trust 2005-3, National Collegiate Student Loan Trust 2006-4, and Goal Structure Solutions Trust 2016-A (the "Trusts") (collectively, the "Defendants").

In these motions, each of the Defendants argues that the Amended Complaint must be dismissed because it fails to state a plausible claim for relief for a declaratory judgment that any of them violated the discharge order entered in Tashanna Golden's bankruptcy case, or for damages, attorneys' fees, and costs as a result of a discharge violation. They argue, among other things, that they simply cannot discern what loans are at issue here, or what they have done to violate the discharge entered in Ms. Golden's bankruptcy case. And they argue that Ms. Golden has *not* alleged a plausible claim that her loans are *not* excluded from discharge by Bankruptcy Code Section 523(a)(8)(B), as "qualified education loan[s]." In addition, PHEAA argues that the Amended Complaint must be dismissed because it is blocked by a different obstacle – the nondischargeability provisions of Bankruptcy Code Section 523(a)(8)(A)(ii) – because Ms. Golden's loans are excluded from discharge as "an obligation to repay funds received as an educational benefit, scholarship, or stipend." And the Trusts argue that one of the loans at issue is rendered nondischargeable by Bankruptcy Code Section 523(a)(8)(A)(i), because it was funded, at least in part, by a nonprofit institution.

Ms. Golden responds that she has alleged adequately that her direct-to-consumer student "Tuition Answer Loans" do not come within a category of debt that is excluded from discharge

under *any* subsection of Bankruptcy Code Section 523(a)(8), including Section 523(a)(8)(B), as

specifically alleged in the Amended Complaint, or any other subsection of Section 523. She also

argues that she has alleged adequately her request for a declaratory judgment that her loans were

discharged pursuant to this Court's discharge order in her Chapter 7 bankruptcy case, and also

her request for damages, attorneys' fees, and costs, arising from the Defendants' violations of the

discharge order entered in her case. For these reasons, she argues, the Court should not dismiss

the Amended Complaint, and the Defendants' motions to dismiss should be denied.

### Jurisdiction

This Court has jurisdiction over this adversary proceeding pursuant to Judiciary Code

Sections 157(b)(1) and 1334(b), and the Standing Order of Reference dated August 28, 1986, as

amended by the Order dated December 5, 2012, of the United States District Court for the

Eastern District of New York. In addition, this Court may adjudicate these claims to final

judgment to the extent that they are core proceedings pursuant to Judiciary Code Section 157(b),

and to the extent that they are not core proceedings, pursuant to Judiciary Code Section 157(c)

because the parties have stated their consent to this Court entering a final judgment. Tr. 6:25-

7:15 (May 14, 2018), ECF No. 83. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932,

1940 (2015) (holding that in a non-core proceeding, a bankruptcy court may enter final orders

"with the consent of all the parties to the proceeding" (quoting 28 U.S.C. § 157(c)(2)).

### Background

*Ms. Golden's Bankruptcy Case*

On February 29, 2016, Tashanna Golden, fka Tashanna B. Pearson, filed a petition for

relief under Chapter 7 of the Bankruptcy Code, together with her bankruptcy schedules and

statements. Case No. 16-40809. On April 22, 2016, she filed amended schedules and

2

statements.  In her Schedule F, "Creditors Holding Unsecured Nonpriority claims," she listed a "Student Loan" owed to "Aes/Nct" in the amount of $6,758.00 (the "NCT Loan"), a "Student Loan" owed to "Fm/Slfv Tru" in the amount of $8,828.00 (the "Citibank Loan"), and a "Student Loan" owed to "Aes/Jpmg Ch" in the amount of $5,539.00 (the "Chase Loan").  On July 28, 2016, the Chapter 7 Trustee filed a "no-asset" report stating that "there is no property available for distribution from the estate over and above that exempted by law."  Case No. 16-40809, Doc. entry dated July 28, 2016.  On August 3, 2016, the Court entered an order discharging Ms. Golden (the "Discharge Order"), and on that same day, her bankruptcy case was closed.

On December 6, 2016, Ms. Golden filed a motion to reopen her bankruptcy case to obtain a determination of the dischargeability of certain of her student loans, and on January 10, 2017, the Court entered an order reopening the case.

### *This Adversary Proceeding*

On January 18, 2017, Ms. Golden commenced this adversary proceeding by filing a complaint against JP Morgan Chase Bank, Firstmark Services, GoldenTree Asset, and National Collegiate Trust.  She seeks a determination that certain debts that she incurred as a student are not nondischargeable student loan debts under Bankruptcy Code Section 523(a)(8)(B), and an award of damages, including attorneys' fees and costs, for the Defendants' willful violations of the bankruptcy discharge injunction.  Compl., Adv. Pro. No. 17-01005, ECF No. 1.

On May 31, 2017, the Court approved a stipulation between Ms. Golden and National Collegiate Student Loan Trust 2005-3 and 2006-4, permitting them to intervene in this action.  And on July 25, 2017, the Court approved a stipulation of dismissal as to defendant JP Morgan Chase Bank.

On October 17, 2017, Ms. Golden filed an Amended Complaint to add class action allegations and additional defendants. Am. Compl., ECF No. 32. And on November 2, 2017, Ms. Golden voluntarily dismissed defendant GoldenTree Asset Management from this action.

By Memorandum Decision and Order dated July 25, 2018, the Court denied Firstmark's motion to the extent that it sought to compel arbitration of these claims. *Golden v. JP Morgan Chase Bank (In re Golden)*, 587 B.R. 414 (Bankr. E.D.N.Y. 2018).

*The Allegations of the Amended Complaint*

Ms. Golden alleges that "[f]or at least the last ten years, Defendants and other student lenders and servicers have acted to mislead student debtors and subvert the orderly working of the bankruptcy courts." Am. Compl. ¶ 1. She claims that the "Defendants . . . originated and serviced dischargeable consumer loans but have disguised them as non-dischargeable student loans." *Id.* Ms. Golden advances these allegations on behalf of an alleged class of similarly situated "individuals who have declared bankruptcy since 2005 [across the] United States with loans originated and/or serviced by Defendants." Am. Compl. ¶ 7. And she alleges that these loans "do not meet the definition of a non-dischargeable qualified education loan" as set forth in Internal Revenue Code Section 221(d) and Bankruptcy Code Section 523(a)(8)(B). *Id.*

Ms. Golden alleges that Congress enacted Section 523(a)(8) in order to "prohibit the discharge of federal student loans . . . [and] to address a growing concern that students were taking advantage of the Bankruptcy Code by incurring extensive student loan debt and then declaring bankruptcy soon after graduation." Am. Compl. ¶ 12. She claims that as initially adopted in the 1978 Bankruptcy Act, Section 523(a)(8) excluded from discharge government-issued student loans that became due within the five years prior to the bankruptcy petition. Am. Compl. ¶ 13. Ms. Golden states that "[l]ater amendments lengthened and then eliminated the

4

five-year non-dischargeability time frame for loans by the federal government, making it

increasingly difficult for debtors to ever attain discharges of those student loans." Am. Compl.

¶ 14.

Ms. Golden also alleges that the Bankruptcy Abuse Prevention and Consumer Protection

Act of 2005 ("BAPCPA") "expanded the definition of non-dischargeable student debt to include

'any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of

the Internal Revenue Code of 1986.'" Am. Compl. ¶ 15 (quoting 11 U.S.C. § 523(a)(8)(B)).

The Amended Complaint states that qualified education loans are defined by Internal Revenue

Code Section 221(d)(1) "as debts incurred by eligible students, at eligible institutions, for

eligible expenses.  In turn, a 'qualified higher education expense' is one that issued to pay for the

cost of attendance at a qualified educational institution." Am. Compl. ¶ 16 (quoting 26 U.S.C.

§ 221(d)(2)).

Ms. Golden alleges that "[o]riginally, the private lending mirrored the federal loans in

that the loans were paid directly to the qualified educational institution, which would then ensure

that the funds were used only for qualified expenses." Am. Compl. ¶ 17.  And she claims that

"lenders initiated new 'non-qualified' education loan programs . . . [including] direct-to-student

('DTC') loans to students" for more than the school's "cost of attendance." *Id.*  These "DTC"

loans "do not require school certification, and so can be originated in amounts that far exceed

federal borrowing limits" and therefore fall outside the scope of Bankruptcy Code Section

523(a)(8). Am. Compl. ¶ 18.  "Moreover, qualified loans must be made solely for qualified

education expenses," so if any portion of a "DTC" loan falls outside a school's "Cost of

Attendance," even if a portion falls within the "Cost of Attendance," the loan is a "'mixed-use'

loan and is not a qualified education loan." *Id.*  These loans, Ms. Golden argues, "are simply

5

another form of unsecured consumer debt." *Id.* Ms. Golden alleges that the Defendants and

other creditors represented to her and to similarly situated student debtors "that the Bankruptcy

Code prohibited discharge of *any* loan made to any person for any educational purpose," when

they knew that "only private loans that meet the requirements of section 523(a)(8)(B) [are]

nondischargeable." Am. Compl. ¶ 22.

The Amended Complaint states that Ms. Golden attended the University of Pennsylvania

Law School (the "University of Pennsylvania") during the 2006-07 academic year. Am. Compl.

¶ 27. And she alleges that the University of Pennsylvania's "cost of attendance" for that

academic year was $53,500. Ms. Golden received $22,440 in scholarship funds and grants from

the University of Pennsylvania, and she borrowed $27,500 in loans from the federal government.

She alleges that she borrowed an additional $7,103 in private loans from National Collegiate

Trust – the NCT Loan – and that the NCT Loan was serviced by PHEAA. Am. Compl. ¶¶ 30-

31. Ms. Golden claims that "the NCT Loan was originated in excess of the published 'cost of

attendance' and was not a qualified education loan under section 523(a)(8)(B)." Am. Compl.

¶ 30. And she claims that the NCT Loan "was not 'made, insured, or guaranteed by a

governmental unit' or made under a 'program funded in whole or party by' a non-profit[ ] and

thus was not non-dischargeable under section 523(a)(8)(A)(i)." Am. Compl. ¶ 32.

Ms. Golden alleges that she attended the University of Pennsylvania during the 2007-08

academic year as well, and during that term, the school's published "cost of attendance" was

$56,380. Am. Compl. ¶ 35. For that academic year, Ms. Golden alleges that she received

$12,850 in scholarship funds and grants, and that she borrowed $52,347 from the federal

government. Am. Compl. ¶ 36. At that point, she already received funds in excess of the

University of Pennsylvania's "cost of attendance" for the 2007-08 academic year. *Id.* Ms.

Golden borrowed an additional $6,557 from JP Morgan Chase – the Chase Loan – and $9,348 from Citibank – the Citibank Loan.  Am. Compl. ¶ 37.  She alleges that "[t]he Citibank Loan was subsequently sold to Defendant GoldenTree Asset Management on or about October 24, 2015, which was later securitized into the GS2 Trust."  Am. Compl. ¶ 37 n.1.  And on February 29, 2016, Ms. Golden filed for Chapter 7 bankruptcy.  Am. Compl. ¶ 39.

Ms. Golden claims that she "properly listed on Schedule F certain 'student loans' owed, including 'AES/Jpmg ch,' 'Fm/slfv tru,' 'AES/NCT', which represented the loans that were made in excess of [the University of Pennsylvania's] Cost of Attendance for the two relevant academic years."  Am. Compl. ¶ 40.  She claims that the Defendants "fraudulently informed [her] that the [d]ebts were not discharged and demanded . . . and accepted payment."  Am. Compl. ¶ 44.  She also alleges that she was "never issued a 1098-E tax form to deduct the interest payments made" on the Tuition Answer Loans.  Am. Compl. ¶¶ 33, 38.

Ms. Golden alleges that the "Defendants and other creditors represented to student debtors that the Bankruptcy Code prohibited discharge of *any* loan made to any person for any educational purpose."  Am. Compl. ¶ 22.  She claims that the Defendants utilized bankruptcy laws "to defraud vulnerable and unsophisticated student borrowers."  Am. Compl. ¶ 24.  Ms. Golden states that the "Defendants failed to disclose facts and information that would inform debtors of the fact that private loans were only non-dischargeable if they met the requirements of section 523(a)(8)(B), and in particular, that debtors' non-qualified loans were, in fact, discharged in bankruptcy."  Am. Compl. ¶ 23.  And she alleges that such loans are "disproportionately issued to low-income students who lack the resources and knowledge to understand the differences between loans that are or are not dischargeable or to seek relief in an adversary proceeding."  Am. Compl. ¶ 24.

She alleges that while the Defendants and other lenders informed consumers that their loans were nondischargeable, these lenders securitized the same obligations for sale on the secondary market. Am. Compl. ¶ 25. And she asserts that the prospectuses for these asset-backed securities cautioned investors that, pursuant to Bankruptcy Code Section 523(a)(8), "only private loans made for qualified expenses were excepted from discharge." *Id.* She alleges that instead of then treating these debts as discharged, the Defendants, "by and through themselves and their agents, resumed collection efforts after the discharge [was] entered." Am. Compl. ¶ 44. The Discharge Order was entered on August 3, 2016, and "[o]n or about August 5, 2016, all creditors received notice" of the Discharge Order. Am. Compl. ¶¶ 42-43.

Ms. Golden states that she did not "enter into an agreement [with respect to dischargeability of the Tuition Answer Loans] under section 524(c) of the Bankruptcy Code" and that "[n]one of the Defendants filed an adversary proceeding" to contest the dischargeability of the Tuition Answer Loans. Am. Compl. ¶ 43. Yet, Ms. Golden contends, the Defendants "fraudulently informed [her] that the Debts were not discharged and demanded payment and accepted payment." Am. Compl. ¶ 44. Specifically, she states, the Defendants sought to collect on the allegedly discharged debts "by use of dunning letters, emails, text messages, and phone calls." Am. Compl. ¶ 75. Ms. Golden alleges that the "Defendants' abusive, deceptive and illegal collection efforts after [the debts at issue] were discharged were made knowingly and willfully in violation of this Court's discharge orders." Am. Compl. ¶ 45.

Ms. Golden requests a declaratory judgment pursuant to Judiciary Code Section 2201 and Bankruptcy Rule 7001(9) that these debts were discharged by operation of law on August 3, 2016, the date of entry of the Discharge Order in her bankruptcy case, because they are not student loans excluded from discharge under Section 523(a)(8). Am. Compl. ¶ 71. Ms. Golden

also asserts that since the Defendants were notified of the Discharge Order pursuant to Bankruptcy Rule 4004(g), and still sought to collect on her debts by "use of dunning letters, e-mails, text messages, and [telephone] calls," the Court should cite the Defendants for civil contempt, for their willful violations of the Discharge Order, and order them to pay damages in an amount to be determined at trial pursuant to Bankruptcy Code Sections 524 and 105, and also to pay her attorneys' fees and costs. Am. Compl. ¶¶ 74-76.

*The Motions To Compel Arbitration, or in the Alternative, To Dismiss this Case*

On December 8, 2017, Firstmark moved to compel arbitration of Ms. Golden's claims, or in the alternative, to dismiss the Amended Complaint (the "Firstmark Motion to Dismiss"), and filed a supporting memorandum of law (the "Firstmark Mem."). ECF No. 42. That same day, PHEAA and the Trusts also moved to dismiss the Amended Complaint (the "PHEAA Motion to Dismiss" and "Trusts Motion to Dismiss"), and filed memoranda of law in support (the "PHEAA Mem." and "Trusts Mem."). ECF Nos. 40, 45. Ms. Golden opposes all of the relief sought by the Defendants, and on January 8, 2018, she filed a combined memorandum of law in opposition to each Motion to Dismiss (the "Plf's Opp."). ECF No. 57. On January 23, 2018, PHEAA, Firstmark, and the Trusts each filed a reply memorandum in further support of their Motions to Dismiss (the "PHEAA Reply," "Firstmark Reply," and "Trusts Reply"). ECF Nos. 59, 60, 61.

On July 25, 2018, the Court issued a memorandum decision on that portion of the Firstmark Motion to Dismiss which seeks to compel arbitration, and declined to compel arbitration of Ms. Golden's claims. *Golden v. JP Morgan Chase Bank (In re Golden)*, 587 B.R. 414 (Bankr. E.D.N.Y. 2018).

And on August 6, 2018, the Court approved a stipulation of dismissal as to the defendant National Collegiate Student Loan Trust 2005-3. ECF No. 92.

*PHEAA's Arguments in Support of Dismissal*

PHEAA relies on Bankruptcy Code Sections 523(a)(8)(A)(ii) and 523(a)(8)(B), among other grounds, in support of its arguments for dismissal. It argues that Ms. Golden's Tuition Answer Loans are exempted from discharge under Section 523(a)(8)(A)(ii) as "funds received as an educational benefit" and Section 523(a)(8)(B) as "qualified education loan[s], as defined in section 221(d)(1) of the Internal Revenue Code of 1986."

PHEAA argues that "Ms. Golden utterly fails to plead any claims against PHEAA." PHEAA Mem. at 1. It urges that the Amended Complaint "is deficient for two principal reasons." PHEAA Mem. at 2. First, PHEAA argues that applying the pleading standard of Federal Rule of Civil Procedure 8, Ms. Golden fails to allege any plausible facts to support any claims against PHEAA "with respect to whether the loan allegedly serviced by PHEAA has been discharged." *Id.* Second, PHEAA argues that the loan for which it "is allegedly responsible" for as a servicer is a nondischargeable loan, because it "is either a qualified education loan or education benefit that is exempted from discharge under Section 523(a)(8)." *Id.*

PHEAA also argues that the Amended Complaint does not allege adequately "plausible facts" against PHEAA to sustain a claim for relief, and that instead, Ms. Golden makes "group allegations against all defendants, without specific reference to PHEAA." PHEAA Mem. at 8. It argues that because she names multiple defendants in her pleading, Ms. Golden "is required to 'indicate clearly the defendants against whom relief is sought and the basis upon which the relief is sought against the particular defendants.'" PHEAA Reply at 4 (quoting *Harris v. NYU Langone Medical Center*, 2013 WL 3487032, at *7 (S.D.N.Y. July 9, 2013)). And PHEAA asserts that in the Amended Complaint, Ms. Golden does not make any specific allegations against PHEAA as a lender in the context of her request for a declaratory judgment.

10

In addition, PHEAA argues that "Ms. Golden has a duty to plead sufficient plausible facts directed specifically at PHEAA especially in light of her assertion that PHEAA is in contempt of an order that did not, by its terms, discharge repayment of the student loan that PHEAA serviced." PHEAA Reply at 3. PHEAA states that the Amended Complaint is "devoid in all respects of any allegations as against PHEAA, other than identifying PHEAA's place of business, stating that it conducts business in the Eastern District of New York and stating that PHEAA is the servicer for the [National Collegiate Trust] Loan." PHEAA Mem. at 9. It argues that Ms. Golden does not identify PHEAA's role in connection with her allegations of violations of the Discharge Order in 2016. And PHEAA asserts that "there are no allegations that PHEAA is a lender," and, for this reason, Ms. Golden cannot allege that the debts are dischargeable as against PHEAA. PHEAA Mem. at 10.

At the same time, PHEAA argues that Ms. Golden's loans are qualified education loans, and therefore, nondischargeable under Bankruptcy Code Section 523(a)(8)(B). PHEAA states that Ms. Golden argues, in substance, that "any loans that exceed a school's published cost of attendance are not qualified education loans," but that is not correct. PHEAA Mem. at 10. PHEAA argues that Ms. Golden's assertion that the "cost of attendance" is limited to the University of Pennsylvania's published cost of attendance "is insufficient as a matter of law." PHEAA Mem. at 14. It states that there are many considerations with respect to determining cost of attendance, and Ms. Golden does not "allege any plausible facts establishing that her loan proceeds were used for non-education expenses." *Id.* And it argues that an educational institution's public cost of attendance may not include all the considerations listed in Higher Education Act Section 1087ll. For these reasons, PHEAA asserts, a court should consult the enumerated list used in determining "cost of attendance" under Higher Education Act Section

11

1087ll, rather than the institution's published cost of attendance. And PHEAA argues that "Ms. Golden has failed to identify any expenses that fall outside the enumerated list used in determining 'cost of attendance' under Section 1087ll." PHEAA Mem. at 15.

PHEAA notes that any allegations that Ms. Golden now makes are "overridden by [her] judicial admission in Schedule F that all of the Debts are 'student loans' for the purposes of her bankruptcy proceedings in this Court." PHEAA Mem. at 15. PHEAA argues that Ms. Golden's admissions on Schedule F "give rise to a judicial estoppel," because "'[s]tatements in bankruptcy schedules are executed under penalty of perjury and when offered against a debtor are eligible for treatment as judicial admissions.'" PHEAA Mem. at 7 (quoting *In re Bohrer*, 266 B.R. 200, 201 (Bankr. N.D. Cal. 2001)). And PHEAA states that Ms. Golden may not now argue that her Tuition Answer Loans are not student loans, as her admissions that they are student loans in Schedule F "must be considered and override her allegations." PHEAA Mem. at 7.

PHEAA also argues that Ms. Golden's arguments are "inconsistent with the holding in *Carow v. Chase Loan Service (In re Carow)*, 2011 Bankr. LEXIS 823 (Bankr. D.N.D. Mar. 2, 2011)." PHEAA Reply at 6. PHEAA argues that in *In re Carow*, the "court rejected the argument that, because the lender did not follow a prescribed formula in determining loan eligibility, the loans were not 'qualified education loans.'" *Id.*

And PHEAA argues that other courts have similarly held that loans like the ones at issue here are not dischargeable, because they come within the category of "funds used for an educational benefit" under Section 523(a)(8)(A)(ii). PHEAA Mem. at 15-16. PHEAA argues that "[a]s long as the loans relate in some way to education, they are non-dischargeable." PHEAA Mem. at 16. It notes that based on Ms. Golden's admissions in her Schedule F that her

12

loans were student loans, they are related to her education and nondischargeable. PHEAA Mem. at 16.

PHEAA acknowledges that in *Campbell v. Citibank, N.A. (In re Campbell)*, 547 B.R. 49 (Bankr. E.D.N.Y. 2016), the court found that "funds used for an educational benefit" is more narrowly construed, but PHEAA states that this decision is "wrongly decided and should be given no precedential weight." PHEAA Mem. at 17. It argues that "[t]he language of that sub-provision of [Bankruptcy Code] Section 523 is plain in its meaning, and applies to repayment of all funds advanced for educational benefits without exception." *Id.* PHEAA also states that "the *Campbell* court, at the end of its decision, avoided making any final determination as to the scope of the exemption, and decided the matter on other grounds." PHEAA Reply at 12.

PHEAA also argues that in the Amended Complaint, Ms. Golden does not reference the underlying loan documents and agreements. It argues that this omission is "fatal because courts have held that the stated purpose of the loan (rather than its use) determines whether it is a qualified education loan or an educational benefit." PHEAA Mem. at 18. PHEAA argues that how Ms. Golden actually used the loans is not dispositive, "what she represented to the lenders in the promissory note for the [loan] is the key fact." PHEAA Mem. at 19. And PHEAA states that "[it is] determinative . . . how the loans were intended to be used, as opposed to what was the actual use of the loan proceeds." PHEAA Reply at 6-7.

And PHEAA argues that Ms. Golden's arguments that her loans are not nondischargeable are inconsistent with the purposes of BAPCPA. PHEAA claims that "[i]t is oxymoronic to suggest that Congress specifically included private lenders within the ambit of the statute's protection but simultaneously wanted to restrict those lenders' ability to lend to consumers in this manner." PHEAA Reply at 16.

13

*Firstmark's Arguments in Support of Dismissal*

Firstmark relies generally on the terms of Federal Rule of Civil Procedure 8 and Bankruptcy Code Section 523, among other grounds, in support of its request to dismiss the Amended Complaint.

Firstmark argues that the Amended Complaint "does not provide Firstmark with the basic information needed to investigate or respond to [Ms.] Golden's claims, as required by [Federal Rule of Civil Procedure] 8(a)." Firstmark Mem. at 16. It argues that Ms. Golden makes certain "conclusory allegations," but "does *not* allege that Firstmark originated or serviced any of the loans at issue in this action." *Id.* Firstmark also asserts that Ms. Golden "fails to adequately identify the underlying loans," and that it "cannot ascertain which of the many student loans listed in Schedule F of [Ms.] Golden's bankruptcy petition constitutes the so-called Citibank Loan, which, apparently, is the only loan in this action that implicates Firstmark." Firstmark Mem. at 17. And Firstmark states that while Ms. Golden's Schedule F lists two student loans owed to "Fm/Slfv Tru" and lists Firstmark's address in connection with both, but "she leaves Firstmark to guess which one, if either, is the mysterious Citibank Loan." *Id.*

Firstmark also argues that Ms. Golden's characterization of her student loans as "direct-to-consumer loans" is not accurate, and points out that her loan documents include "language . . . specifying that [Ms.] Golden's loan proceeds would be disbursed directly to her school." Firstmark Reply at 1. Firstmark also argues that while Ms. Golden states that one of the loans at issue is the "Citibank Loan," according to its records, "Citibank never originated a loan to [Ms.] Golden in the amount of $9,348. However, Firstmark's records only reflect one loan from 2007. That loan is identified in Firstmark's system by the number 1218101 . . . Firstmark must now assume that loan number 1218101 is the Citibank Loan." Firstmark Reply at 2.

14

In addition, Firstmark asserts that Ms. Golden cannot assert her Bankruptcy Code Section 524 claims in an adversary proceeding, and that such claims must be brought under Bankruptcy Code Sections 524 and 105 in the form of a proceeding for a finding of contempt.

It also argues that the Discharge Order entered in Ms. Golden's bankruptcy case is not clear and unambiguous, as required in a contempt proceeding. Rather, Firstmark states that an order is clear and unambiguous when "it 'enables the enjoined party to ascertain from the four corners of the order precisely what acts are forbidden.'" Firstmark Mem. at 23 (quoting *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995)). And it argues that "[a]ny doubts about whether an order is sufficiently 'clear and unambiguous' must be 'resolved in favor of the alleged contemnor.'" Firstmark Mem. at 23 (quoting *In re CPW Acquisition Corp.*, 2010 WL 423101, at *2 (Bankr. S.D.N.Y. Feb. 4, 2010)).

Firstmark states that it is "axiomatic" that student loans are nondischargeable, and for this reason "[c]larity as to whether a debt has been discharged is especially necessary to support a finding of contempt against a student loan servicer such as Firstmark." Firstmark Mem. at 23. And here, Firstmark argues, the Discharge Order was not clear and unambiguous. "Instead of containing the type of clear, unambiguous, and unequivocal language ordinarily needed to sustain a finding of contempt, the discharge order in [Ms.] Golden's case was imprecise and equivocal, as it relied heavily on the use of caveats and qualifiers." Firstmark Mem. at 24.

Firstmark argues that Ms. Golden suggests that the Court should establish a "bright-line rule" that all discharge orders are sufficiently clear and unambiguous to alert creditors as to which debts were discharged, but the cases she "relies upon do not articulate such a rule." Firstmark Reply at 10-11. Firstmark argues that in *McKenzie-Gilyard v. HSBC (In re McKenzie-Gilyard)*, 388 B.R. 474 (Bankr. E.D.N.Y. 2007), "this Court engaged in a protracted analysis that

considered . . . whether the creditor knew that the debtor disputed that status of the debt."
Firstmark Reply at 11 (citing *In re McKenzie-Gilyard*, 388 B.R. at 483). And there, Firstmark
states, the Court "focused on whether the creditor had awareness that the credit information it
was furnishing about the debtor was inaccurate, and treated this inquiry as separate from the
issue of whether the creditor generally knew a discharge injunction had [been] issued." *Id.*
Firstmark states that it does not argue that the standard discharge order is "always insufficiently
'clear and unambiguous'" to support a finding of contempt "regardless of the circumstance," but
rather contends that the standard discharge order is insufficiently clear and unambiguous in the
narrow circumstances presented here, "especially in light of the novel legal theory advanced by
[Ms.] Golden." Firstmark Mem. at 25 n.13.

       And Firstmark also argues that Ms. Golden waived her right to participate in class action
proceedings. It quotes the Master Student Promissory Note associated with the Citibank Loan,
which states that "no class action, private attorney general action or other representative action
may be pursued in arbitration, *nor may such action be pursued if any party has elected
arbitration.*" Firstmark Mem. at 18 (citing Exhibit A at 2). Here, as Firstmark elected
arbitration, it argues that Ms. Golden may not adjudicate her claims on a class-wide basis, and
the Court should "dismiss and/or strike all class allegations" in the Amended Complaint.
Firstmark Mem. at 18-19.[1]

       In addition, Firstmark argues that this Court does not have jurisdiction over the claims of
the alleged nationwide class, because, "as a procedural matter, injunctions must be enforced by

---

[1] As noted above, this Court has denied Firstmark's motion to the extent that it sought to compel
arbitration of these claims. *Golden v. JP Morgan Chase Bank (In re Golden)*, 587 B.R. 414
(Bankr. E.D.N.Y. 2018). And the question of class certification is not presently before the Court
for decision.

the issuing court." Firstmark Mem. at 19.  Firstmark argues that the fact that discharge orders

are authorized by statute and routinely entered in a standardized form "does not exempt

[discharge orders] from this rule." Firstmark Mem. at 20.  And Firstmark states that the

discharge of the debtor's debts in bankruptcy only occurs "upon the entry of a court-ordered

injunction," and therefore each discharge order is "unique to the issuing court." Firstmark Mem.

at 20.

### The Trusts' Arguments in Support of Dismissal

The Trusts rely on Bankruptcy Code Section 523(a)(8)(A)(i), and the pleading standards

of Federal Rules of Civil Procedure 8(a), 12(b)(6), and 9(b), among other grounds, in support of

their arguments that the Amended Complaint should be dismissed.

The Trusts argue that the Amended Complaint does not meet the pleading standards of

Federal Rule of Civil Procedure 8(a).  They state that Ms. Golden does not adequately identify

the loans at issue, and does not adequately connect those loans to the Trusts.  They argue that

"[a]fter individually defining the Trust Defendants in the [Amended Complaint's] opening

paragraph, [Ms. Golden] never makes another allegation that references the Trust Defendants or

connects any loan at issue to a specific trust." Trusts Mem. at 5.  The Trusts argue that Ms.

Golden "proceeds as if there are connections between the Loans and the Trust Defendants, but

she never sets forth any plausible allegations that actually tie any of the Loans to any of the Trust

Defendants." Trusts Mem. at 11.  For these reasons, the Trusts argue that Ms. Golden does not

allege "plausible allegations" of a claim against the Trusts.  Trusts Mem. at 12.

The Trusts also argue that Ms. Golden fails plausibly to allege that the loans at issue here

were covered by the Discharge Order, that the Trusts collected on the loans, or that a violation of

the Discharge Order actually occurred.  They claim that Ms. Golden makes "conclusory

17

assertions [that] do not even address, much less explain away, the numerous deficiencies in the [Amended Complaint]." Trusts Reply at 2. And they state that while they stipulated to be substituted in as a party in this adversary proceeding, "[t]he fact that the Trust Defendants may, as [Ms. Golden] argues, have stipulated that they held loans made to [Ms. Golden] does not mean that they held *the* Loans at issue in the lawsuit . . . it is simply impossible to tell which loans on the Schedule F are the Loans [at issue here]." Trusts Reply at 3.

In addition, the Trusts note that Ms. Golden alleges that her loans are dischargeable because, in substance, they exceed the University of Pennsylvania's cost of attendance, but that "[a]ccording to her Schedule F, each academic year Plaintiff took out numerous student loans that were each individually less than the alleged 'Cost of Attendance' but in aggregate are alleged to have surpassed it." Trusts Mem. at 10.

The Trusts argue that while Ms. Golden alleges that the NCT Loan is not excluded from discharge by Bankruptcy Code Section 523(a)(8)(A)(i) because it was not "'made, insured, or guaranteed by a governmental unit' or made under a 'program funded in whole or part by a non-profit,'" the documentation for that loan "says the exact opposite." Trusts Mem. at 9. Rather, the Trusts state, "the check made out to [Ms. Golden] that funded this loan" came from The Education Resources Institute Inc. ("TERI"). Trusts Mem. at 9 (citing Am. Compl., Ex. 1 at 11). And "where TERI has funded a student loan, that 'student loan was made under a program that was funded in whole or in part by a nonprofit institution,'" and is therefore nondischargeable under Section 523(a)(8)(A)(i). Trusts Mem. at 9 (quoting *In re O'Brien*, 419 F. 3d 104, 106 (2d Cir. 2005)). As a consequence, the Trusts state, either the NCT Loan is within the scope of Section 523(a)(8)(A)(i), "or it is an entirely unidentifiable loan." Trusts Mem. at 9-10.

18

The Trusts also argue that the Amended Complaint "sounds in fraud," but does not satisfy the pleading requirements of Federal Rule of Civil Procedure 9(b).  Trusts Mem. at 13. The Trusts argue that Ms. Golden "lump[s] all the [D]efendants together and does not 'inform each defendant of the nature of his alleged participation in the fraud.'"  Trusts Mem. at 15 (quoting *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)).

The Trusts also assert that the Discharge Order is not clear and unambiguous, and for this reason as well, Ms. Golden's claims for violations of the Discharge Order should be dismissed. The Trusts note that "the Discharge Order and the accompanying Official Form B18 stated that '[d]ebts for most student loans' and '[s]ome debts which were not properly listed by the debtor' were not dischargeable."  Trusts Mem. at 16.  And they claim that this means that the Amended Complaint "demonstrates that the 'four corners of the order' do not forbid collection of the Loans so as to support a finding of contempt."  *Id.*

And the Trusts argue that Ms. Golden's scheduling of the loans as "student loans" precludes her from arguing that these loans are discharged by operation of law because they were not student loans.  By describing her loans in this way, the Trusts note, Ms. Golden "undercuts her assertion that [they] engaged in willful behavior by hiding the fact that the 'Debts were discharged pursuant to the Discharge Order . . . because they were unsecured consumer loans and not non-dischargeable student loans' and then misled her into repaying the Loans."  Trusts Mem. at 17.  The Trusts argue that Ms. Golden represented to the Court and her creditors that the loans were used for educational purposes, and were likely nondischargeable.  They add that for this same reason, "she has already admitted that the Discharge Order did not discharge the Loans. The Trust Defendants cannot be in contempt for willfully violating an order by collecting on the Loans, when that order did not explicitly prohibit them from doing so."  *Id.*

19

Finally, the Trusts argue that Ms. Golden asks the Court to exceed its jurisdiction by alleging her claims on behalf of a putative nationwide class. The Trusts argue that generally only a court that issued an order has subject matter jurisdiction to adjudicate a contempt claim with respect to that order. They state that there is "no authority which supports this Court having the ability to exercise jurisdiction to make individual, retroactive determinations" with respect to whether certain student loans were discharged, and then whether the Trusts violated the discharge orders where the loans were found to be discharged, in bankruptcies completed in other jurisdictions. Trusts Mem. at 19.[2]

### Ms. Golden's Opposition

Ms. Golden opposes the dismissal of her Amended Complaint, and on January 8, 2018, she filed a combined memorandum of law in opposition to each Motion to Dismiss, addressing the arguments made both to dismiss the Amended Complaint and to compel arbitration of her claims.

Ms. Golden responds that the Defendants have not shown that she does not state plausible claims for relief. She argues that "[a]lthough Defendants have done their utmost to obfuscate the contents of the [Amended Complaint], Defendants know what two loans are at issue in this proceeding and what they are alleged to have done." Plf's Opp. at 7. She states that the first loan at issue is the "NCT Loan, which was originated by Bank One, N.A. on September 26, 2006, in the amount of $7,103 and thereafter was transferred to either Defendants National Collegiate Student Loan Trust 2005-3 or 2006-4 or both." *Id.* She notes that those entities were subsequently substituted as defendants in this action by in place of National Collegiate Trust, by

---

[2]  As noted above, the question of class certification is not presently before the Court for decision.

stipulation of the parties that was so-ordered by the Court. *Id.* Ms. Golden argues that PHEAA

services the NCT Loan. And Ms. Golden states that the second loan at issue is the "Citibank

Loan, which was originated by Citibank in 2007, in the amount of $9,348, and is now owned by

Defendant Goal Structured Solutions Trust 2016-A, sued as GS2 2016-A Trust." Plf's Opp. at 8.

Ms. Golden also responds that the Amended Complaint "clearly alleges what conduct the

Defendants committed." *Id.* Ms. Golden asserts that the Amended Complaint "clearly alleges"

that the loans at issue were in excess of the cost of attendance at the University of Pennsylvania,

and therefore are not nondischargeable loans under Bankruptcy Code Section 523(a)(8)(B). *Id.*

She points to allegations in the Amended Complaint that "Defendants, lenders and servicers of

the two subject loans have nonetheless continued to collect on the loans and have demanded

payment from [her], as they have from other class members." *Id.* And she notes that the

Amended Complaint "alleges that Defendants were aware that these loans were not exempted by

§ 523(a)(8) and were therefore discharged, but they continued to collect on them after

discharge." *Id.*

And she responds that PHEAA's argument that she fails to allege any plausible facts that

her loans were used for non-education expenses, and therefore, the Amended Complaint should

be dismissed, is also unpersuasive, for two reasons. The first is that "how [she] used the

proceeds does not make the loan non-dischargeable if it otherwise does not meet the express

criteria of [Section] 523(a)(8)(B)," and that "PHEAA itself concedes this fact." Plf's Opp. at 26.

And she asserts that, in substance, "Defendants are coming into court demanding that the

exception to discharge [in Bankruptcy Code Section 523(a)(8)(B)] be limitless. It is not." Plf's

Opp. at 27. And the second is that "even if it were relevant how [Ms. Golden] used the

proceeds" of the loans at issue, that is a question of fact, and such questions "cannot be

determined on a motion to dismiss." Plf's Opp. at 28.  She also notes that the label "student

loan," the language in the loan documents, and her own description of these loans on her

Schedule F cannot "convert an unqualified loan[] into a qualified one[]." Plf's Opp. at 31.

Ms. Golden further responds that the Amended Complaint also expressly alleges that the

loans do not constitute "an obligation to repay funds received as an educational benefit." Plf's

Opp. at 28.  And she states that "PHEAA's argument was recently considered and rejected –

twice – by bankruptcy judges in this very District in *In re Campbell*, 547 B.R. at 49 (Bankr.

E.D.N.Y. 2016) (Craig, C.B.J.) and in *In re Decena*, 549 B.R. at 11 (Bankr. E.D.N.Y.)

(Grossman, B.J.), *rev'd in part on other grounds*, 562 B.R. 202 (E.D.N.Y. 2016)." *Id.*

She also responds that the Amended Complaint states that her loans are not qualified

educational loans, but instead, are direct-to-consumer loans that are dischargeable under the

Bankruptcy Code.  Ms. Golden states that "[t]he subject loans lack the traditional characteristics

of 'educational loans.'" Plf's Opp. at 29.  Rather, she notes, "courts have repeatedly held that

educational loans differ from consumer loans because they are made [] directly to schools on the

student's behalf, without credit or collateral considerations, to further a public good." *Id.*  And

here, the Amended Complaint states, the loans at issue were made pursuant to a direct-to-

consumer program, not through any financial aid office of an eligible school.

Ms. Golden similarly disputes Firstmark's argument that she "cannot seek a remedy for

discharge violations through an adversary proceeding because there is no private right of action

for violation of a discharge injunction," and responds that there "is no question that bankruptcy

courts have the power to enforce discharge injunctions regardless of any specified private right

of action." Plf's Opp. at 32.  She states that "an action to enforce a discharge injunction may be

maintained in an adversary proceeding." Plf's Opp. at 33.

As to whether the Discharge Order is "too vague to support a contempt finding," Ms.
Golden responds that "the only questions a court must ask are whether the defendant (1) knew of
the discharge violation; and (2) intended the action that violated the discharge." Plf's Opp. at 33
(citing *In re DiGeronimo*, 354 B.R. 625, 642 (Bankr. E.D.N.Y. 2006)).  She argues that in the
Amended Complaint, she has alleged adequately those two elements.  Ms. Golden also responds
that "[b]ecause all discharge injunctions are the same, Defendants' argument here would strip the
Court's power to enforce its own discharge orders through contempt proceedings." Plf's Opp. at
34.  And Ms. Golden states that it is the creditor's burden, not the debtor's, to establish the
discharge status of a debts after the discharge is entered.

### The Applicable Legal Standards

#### *The Pleading Requirements of Federal Rule of Civil Procedure 8(a)*

As this Court has noted, Federal Rule of Civil Procedure 8(a) requires that a pleading
contain "'a short and plain statement of the claim showing that the pleader is entitled to relief.'"
*In re Brizinova*, 554 B.R. at 74 (quoting Fed. R. Civ. P. 8(a)(2)).  In *Bell Atlantic Corp. v.
Twombly*, 550 U.S. 544 (2007), the Supreme Court stated that under this rule, "a plaintiff's
obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and
conclusions, and a formulaic recitation of the elements of a cause of action will not do."
*Twombly*, 550 U.S. at 555 (citation omitted).

Thereafter, in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court set forth a two-
step approach for courts to follow when deciding a motion to dismiss.  First, a court should
"identify[] pleadings that, because they are no more than conclusions, are not entitled to the
assumption of truth." *Iqbal*, 556 U.S. at 679.  "While legal conclusions can provide the
framework of a complaint, they must be supported by factual allegations." *Id.*  Thus,
"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

23

statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

*The Pleading Requirements of Federal Rule of Civil Procedure 12(b)(6)*

Federal Rule of Civil Procedure 12(b)(6) permits a party to seek dismissal of a claim at the pleading stage if it does not state a claim upon which relief may be granted. In *Twombly*, the Supreme Court held that for a complaint to survive a motion to dismiss under Rule 12(b)(6), the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The Court explained that "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted).

When considering a motion to dismiss under Rule 12(b)(6), the court should "'accept[] all factual allegations as true, and draw[] all reasonable inferences in the plaintiff's favor.'" *DiFolco v. MSNBC Cable, L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010) (quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993). But a court is not required to accept as true those allegations that amount to no more than legal conclusions. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.

In deciding a Rule 12(b)(6) motion, a court may look to the facts alleged in the complaint, and also to those "[d]ocuments that are attached to the complaint or incorporated in it

24

by reference." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). *See Gillingham v. Geico Direct*, 2008 WL 189671, at *2 (E.D.N.Y. Jan. 18, 2008) (stating that when considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court may look to the complaint, its exhibits, and documents incorporated by reference in the complaint).

### The Pleading Requirements of Federal Rule of Civil Procedure 9(b)

Federal Rule of Civil Procedure 9(b), as incorporated by Bankruptcy Rule 7009(b), adopts a special pleading standard with respect to allegations of fraud.

To allege a claim for fraud or mistake, "a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). As the Second Circuit has found, "in order to comply with Rule 9(b), 'the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)). "A fraud claim must additionally express and spell out with reasonable clarity the specific factual misconduct relied on – not encased in a thicket of words or legalistic concepts – and should express the basis for the assertion of such charges." *Spiegler v. Wills*, 60 F.R.D. 681, 682 (S.D.N.Y. 1973).

### The Categories of Nondischargeable Debt Under Bankruptcy Code Section 523(a)(8)

Bankruptcy Code Section 523(a)(8) outlines several categories of student debt that may be excluded from discharge. It states that a debtor is not discharged from any debt that constitutes:

> (A)(i)  an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

25

    (ii)    an obligation to repay funds received as an educational benefit, scholarship or stipend; or

(B)    any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual.

11 U.S.C. §§ 523(a)(8)(A)(i), 523(a)(8)(A)(ii), 523(a)(8)(B).  Stated otherwise, Bankruptcy Code Section 523(a)(8) "protects four categories of educational loans from discharge." *Rumer v. American Educational Servs. (In re Rumer)*, 469 B.R. 553, 561 (Bankr. M.D. Pa. 2012).

The first and second categories of debt excluded from discharge are described in Bankruptcy Code Section 523(a)(8)(A)(i).  These are "two types of educational claims: (1) educational benefit overpayments or loans made, insured, or guaranteed by a governmental unit; and (2) educational benefit overpayments or loans made under any program partially or fully funded by a governmental unit or nonprofit institution." *In re Decena*, 549 B.R. at 18.  The Trusts argue that the second category applies here to exempt Ms. Golden's NCT Loan from discharge, and seek dismissal on that grounds.

A third category of student debt that is excluded from discharge is described in Bankruptcy Code Section 523(a)(8)(A)(ii).  This category encompasses "funds received as an educational benefit, scholarship or stipend."  PHEAA argues that Ms. Golden's debt arises from "funds received as an educational benefit," and for this reason, that the Amended Complaint should be dismissed.

And finally, Bankruptcy Code Section 523(a)(8)(B) excludes from discharge any "qualified education loan as defined in section 221(d)(1) of the Internal Revenue Code of 1986." This Section is at the core of Ms. Golden's Amended Complaint, and is addressed by the Defendants as an additional grounds upon which her claims should be dismissed.

26

*The Elements of a Discharge Injunction Violation Claim*

Bankruptcy Code Section 524 describes the effect of a discharge. It states that a
bankruptcy discharge "operates as an injunction against the commencement or continuation of an
action, the employment of process, or an act, to collect, recover or offset any such debt as a
personal liability of the debtor, whether or not discharge of such debt is waived." 11 U.S.C.
§ 524. In order adequately to allege a claim for violations of a discharge injunction, a plaintiff-
debtor must allege that the debtor received a discharge, the defendant received notice of the
discharge, and the defendant intended the acts that violated the discharge. *In re Motichko*, 395
B.R. 25, 31 (Bankr. N.D. Ohio 2008). Of course, for a discharge injunction claim to lie, the debt
at issue must be within the scope of the debtor's dischargeable debt. *See In re Eppolito*, 583
B.R. 822, 826 (Bankr. S.D.N.Y. 2018) (stating that "[t]he discharge injunction survives the
closure of a bankruptcy case and applies permanently to every debt *that is discharged*"
(emphasis added)); *In re Azevedo*, 506 B.R. 277, 283 (Bankr. E.D. Cal. 2014) (observing that
"[s]howing a violation of a discharge order by definition requires showing specifically that the
order applies to the debt on which the violation is premised") (citing 11 U.S.C. § 524(a)(1)-(2));
*Otten v. Majesty Used Cars, Inc. (In re Otten)*, 2013 WL 1881736, at *6-8 (Bankr. E.D.N.Y.
May 3, 2013) (analyzing the scope of a discharge injunction issued in the plaintiff's bankruptcy
case in the context of determining whether the defendants' actions violated the discharge
injunction).

## Discussion

As the summary of the parties' arguments makes clear, Ms. Golden's claims and the
Defendants' arguments in support of dismissal arise in a larger context of questions about the
dischargeability of student loans, the history of the student loan market and the conduct of

27

lenders and borrowers in that market, the words used by Congress and Congress's intent in crafting exceptions to discharge, and more.

But the question presented by each of the Defendants in their Motions to Dismiss is limited to whether Ms. Golden's Amended Complaint states plausible claims for relief. Two claims are at issue: first, Ms. Golden's claim for a declaratory judgment that her Tuition Answer Loans were discharged by operation of law by the Discharge Order entered by this Court in her bankruptcy case; and second, her claim for a finding of civil contempt, and an award of damages, attorneys' fees, and costs, for the Defendants' violations of that Discharge Order in attempting to collect on those loans.

That is, the question to be answered by the Court is neither more nor less than whether these claims and each of their elements has been plausibly alleged in the Amended Complaint. And the Court must do so by applying the standard set forth in Rule 8(a) and 12(b)(6), and the guidance established by the Supreme Court, to determine whether Ms. Golden has alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. In doing so, the Court must accept the well-pleaded factual allegations of the Amended Complaint as true, and must draw all reasonable inferences in favor of Ms. Golden as the non-moving party.

*Whether the Defendants Have Shown that Ms. Golden's First Claim for Relief Should Be Dismissed*

Ms. Golden's first claim for relief seeks a declaratory judgment, pursuant to Judiciary Code Section 2201 and Bankruptcy Rule 7001(9), that certain of her debts were discharged by operation of law on August 3, 2016, because they were not student loans excluded from discharge by any subsection of Bankruptcy Code Section 523(a)(8). And in this Motion to

28

Dismiss, the Defendants argue that, for a panoply of reasons, she does not state a plausible claim for this relief.

In order to address the question of whether Ms. Golden's First Claim for Relief states a plausible claim, the Court first considers the question whether the allegations of the Amended Complaint set forth a plausible basis to conclude that the threshold requirements for a declaratory judgment are met. Next, the Court considers whether the Defendants have shown that Bankruptcy Code Section 523(a)(8)(A)(ii) excludes Ms. Golden's Tuition Answer Loans from discharge as a matter of law. Then, the Court considers whether the Defendants have shown that Bankruptcy Code Section 523(a)(8)(A)(i) applies to exclude one of those loans, the NCT Loan, from discharge as a matter of law. And finally, the Court considers whether, under the standards set forth in Federal Rules of Civil Procedure 8(a), 12(b)(6), and 9(b), the Amended Complaint states each of the elements of a plausible claim for relief.

Whether the Threshold Requirements for a Declaratory Judgment Are Met

First, the Court considers whether, in light of the allegations of the Amended Complaint and the arguments advanced by the Defendants, the threshold requirements for a declaratory judgment claim are met. Judiciary Code Section 2201 states that "in any case of actual controversy," a court may, "upon the filing of an appropriate pleading . . . declare the rights and other legal relations of any interested party seeking such declaration," and such declaration "shall have the force and effect of a final judgment or decree." 28 U.S.C. § 2201.

According to the Second Circuit, "[a] declaratory judgment action presents an actual controversy if 'the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Dicola v. Am. S.S. Owners Mut. Prot. &*

29

*Indem. Ass'n (In re Prudential Lines Inc.)*, 158 F.3d 65, 70 (2d Cir. 1998) (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

Here, it is plain from the Amended Complaint that Ms. Golden has alleged a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance" of relief. At the outset, the dispute is substantial. The Amended Complaint states that the Defendants knowingly undertook collection efforts on debts that – she alleges – come within the Discharge Order entered in her bankruptcy case. Ms. Golden alleges that she has been damaged, in a tangible way, by those efforts. And she alleges that the Defendants' collection efforts violated this Court's Discharge Order, warranting a finding of civil contempt.

For these same reasons, the allegations of the Amended Complaint show that the parties have "adverse legal interests," in light of these claims. It is in Ms. Golden's interests that her Tuition Answer Loans be discharged under the applicable bankruptcy law, and it is in the Defendants' interests that this Court reach the opposite conclusion. It is also in Ms. Golden's interests that her allegations of contempt be sustained, and just as much, in the Defendants' interests that they be rejected.

Finally, there is nothing speculative about the relief that Ms. Golden seeks or, for that matter, the dismissal that the Defendants urge. The debts have been incurred, the Discharge Order has been entered, and the collection efforts have been undertaken. The controversy presented has the necessary "immediacy and reality to warrant" consideration of declaratory relief. The circumstances as alleged are immediate and real. For these reasons, the Court concludes that the threshold requirements for a declaratory judgment claim are met.

**Whether the Defendants Have Shown that Bankruptcy Code Section 523(a)(8)(A)(ii) Applies To Exclude the Loans at Issue from Discharge as a Matter of Law**

Next, the Court considers whether the Defendants have shown that one of the exceptions to discharge set forth in Section 523(a)(8) applies to exclude Ms. Golden's Tuition Answer Loans from the scope of her bankruptcy discharge as a matter of law. In particular, the Court considers whether the Defendants – specifically, PHEAA – have shown that the loans at issue here are excluded from discharge because they are "an obligation to repay funds used for an educational benefit, scholarship, or stipend" within the scope of Bankruptcy Code Section 523(a)(8)(A)(ii).

The starting point for the analysis of exceptions to discharge is the rule, as stated by the Supreme Court, that "exceptions to discharge 'should be confined to those plainly expressed,' and construed narrowly against the creditor." *In re Campbell*, 547 B.R. at 54 (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998)). And equally important is, of course, the plain text of the statute. But that does not mean that a court must read the words with blinders on. Rather, as the Supreme Court has observed, it is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989).

Bankruptcy Code Section 523(a)(8)(A)(ii) excepts from discharge any "obligation to repay funds received as an educational benefit, scholarship, or stipend." 11 U.S.C. § 523(a)(8)(A)(ii). But Section 523(a)(8) does not define "student loans." Nor does it define "educational benefit." Rather, it describes certain categories of debt that are not dischargeable in bankruptcy unless the debtor establishes that excepting the debt from discharge would impose an undue hardship on the debtor and his or her family, and those descriptions are particular and detailed.

31

In this light, the text of Section 523(a)(8)(A)(ii) merits attention.  It describes "funds received as an educational benefit."  This would be an unconventional way to discuss a loan.  And the neighboring terms to "benefit" are "scholarship or stipend."  11 U.S.C. § 523(a)(8)(A)(ii).  These, plainly, do not describe a loan.  The prior and following subsections refer to "loan made," "educational loan," and "qualified education loan."  11 U.S.C. §§ 523(a)(8)(A)(i), 523(a)(8)(B).  That is, the term "loan" was part of the drafting process of Section 523(a)(8), and it seems reasonable to assume that if Congress intended this subsection to include loans, it would have said so.

Bankruptcy Code Section 523(a)(8)(A)(ii), both by its terms and read in context, does not sweep in all education-related debt, or all loans that support a student's efforts to gain the benefits of an education.  If this Section had the breadth for which the Defendants advocate, it is hard to see where it would end – conceivably, it could encompass credit card debt that was incurred to purchase textbooks, personal loans that were used to pay for tuition and school fees, and any other debt that, in one way or another, facilitated a student's efforts to gain the "benefits" of an "education."  And plainly, this is not what Section 523(a)(8)(A)(ii) encompasses, or what the Bankruptcy Code permits, or what Congress intended.

In addition, this Court also agrees with those other courts, including courts within and outside this District, that have concluded that "an obligation to repay funds received as an educational benefit" must mean something other than a loan.  As one bankruptcy court observed, this conclusion is necessary because another subsection, Section 523(a)(8)(B), excludes from discharge "qualified education loans."  *In re Decena*, 549 B.R. at 19.  Interpreting Section 523(a)(8)(A)(ii) to encompass a loan would result "in subsection 523(a)(8)(B) being subsumed by subsection 523(a)(8)(A)(ii), and [would] render[] subsection 523(a)(8)(B) superfluous."  *Id.*

To similar effect, as the bankruptcy court concluded in *In re Campbell*, "funds received

as an educational benefit" refers to certain kinds of education-related conditional grants, and not

to *all* student loans. *In re Campbell*, 547 B.R. at 55. There, the court undertook a careful and

thorough review of the case law and the legislative history of this exception to discharge, and

held that "in the absence of plain meaning to the contrary, or compelling legislative history,

'educational benefit' must be understood to refer to something other than a loan, especially given

that Congress uses the word 'loan' elsewhere in [Bankruptcy Code Section] 523(a)(8)." *Id.*

As the court reasoned:

> If the term "educational benefit" includes any student loan, there would be no
> need to specifically identify, as Congress did in § 523(a)(8)(i) and § 523(a)(8)(B),
> particular loans, extended by particular lenders, which are excepted from
> discharge, since § 523(a)(8)(A)(ii), if interpreted to extend to all education-related
> loans, would swallow both provisions.

*Id.* And the court observed that "[t]he concept which unites the three separate terms in the list in

[Bankruptcy Code Section] 523(a)(8)(A)(ii) is that they all refer to types of conditional grants."

*Id.*

More recently, in *McDaniel v. Navient Solutions, LLC (In re McDaniel)*, 590 B.R. 537

(Bankr. D. Colo. 2018), the court considered whether the debtors' Tuition Answer Loans were

excluded from discharge under Bankruptcy Code 523(a)(8)(A)(ii) as "an obligation to repay

funds received as an educational benefit, scholarship or stipend." *In re McDaniel*, 590 B.R. at

546. In denying Navient Solutions' motion to dismiss, the court concluded that "[t]he language

of the statute sets an educational benefit apart from a loan, and excepts from discharge a category

of obligations in Section 523(a)(8)(A)(ii) that does not include loans but rather, 'educational

benefit[s]', 'scholarship[s]', and 'stipend[s].'" *In re McDaniel*, 590 B.R. at 548.

And the court observed:

If Navient's interpretation of Section 523(a)(8)(A)(ii) is correct – i.e., obligations that confer educational benefits are excepted from discharge – there would be no need for a separate provision excepting from discharge benefit overpayments or loans made, insured, or guaranteed by governmental units or non-profit institutions (Section 523(a)(8)(A)(i)). Nor would there be any need for a separate provision excepting from discharge "qualified education loans" (Section 523(a)(8)(B)). Navient's interpretation offends a "cardinal principle" of statutory construction, that courts have a "duty to give effect, if possible, to every clause and word of a statute." *United States v. Smith*, 756 F.3d 1179, 1187 (10th Cir. 2014) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (internal quotation marks and brackets omitted)).

*Id.* As the court concluded, "based upon the plain language of the statute, this Court embraces the trending narrower view of Section 523(a)(8)(A)(ii) espoused in *Campbell*." *In re McDaniel*, 590 B.R. at 549 (citing cases).

Recent decisions of other courts are in accord. For example, in *Nypaver v. Nypaver (In re Nypaver)*, 581 B.R. 431 (Bankr. W.D. Pa. 2018), the court considered whether a loan from the debtor's father to the debtor to pay for her undergraduate education was excluded from discharge as an "educational benefit." There, the respondent – the debtor's father -- obtained federal "Parent PLUS" loans to fund the debtor's undergraduate education. And the debtor agreed in a promissory note – which the parties agreed was to be interpreted as a loan – to repay her father for the Parent PLUS loans. The respondent father obtained a state court judgment against the debtor after she defaulted under the terms of the note. During the pendency of the state court action, the debtor filed for bankruptcy, a discharge was entered, and the case was closed. The debtor successfully moved to reopen her bankruptcy case to determine the dischargeability of the note. Both parties moved for summary judgment, and the respondent argued that the note constituted an "educational benefit" that was excepted from discharge pursuant to Bankruptcy Code Section 523(a)(8)(a)(ii).

34

The *Nypaver* court undertook a close analysis of the text of Section 523(a)(8)(a)(ii), adopted the more narrowly crafted view, and found that the promissory note did not come within the scope of this section, for several reasons.  First, the court noted the discrepancy between the subjects of Section 523(a)(8)(a)(i) – "an educational benefit overpayment or loan" – and Section 523(a)(8)(a)(ii) – "an obligation to repay funds."  It found that "[a]lthough common usage of the word 'funds' could include the proceeds of a loan, the structure of *Section 523(a)(8)* suggests a more limited and tailored definition."  *In re Nypaver*, 581 B.R. at 437.  Second, the court observed that the word "as" in the phrase "an obligation to repay funds received as an educational benefit, scholarship, or stipend" in Section 523(a)(8)(a)(ii), suggests that the predicate of that subsection – "educational benefit, scholarship, or stipend" – informs the "character" of the funds owed, rather than the "purpose" of those funds.  *Id.*  The court also stated that the use of the word "as" casts doubt upon the "purpose of the loan" analysis employed by courts that give a broad meaning to the term "educational benefit."  *Nypaver*, 581 B.R. at 438.  Finally, the court found that Section 523(a)(8)(a)(ii), interpreted broadly, would render other subsections of Section 523(a)(8) "largely meaningless," "unnecessary," and "surplusage."  *Id.*

And in *Crocker v. Navient Solutions, LLC (In re Crocker)*, 585 B.R. 830 (Bankr. S.D. Tex. 2018), the court similarly found the reasoning of *Nypaver*, among other cases, to be persuasive, and adopted the narrower interpretation of Section 523(a)(8)(A)(ii).  It found Section 523(a)(8)(A)(ii) to be "unambiguous," and stated that it excepts from discharge a "specifically tailored" category of debts.  *In re Crocker*, 585 B.R at 836.

The court found it instructive that Section 523(a)(8)(A)(ii) begins with the phrase "obligation to repay" and excludes the word "loan," noting that Congress employed the word "loan" elsewhere in Section 523(a)(8), and presumably made an intentional decision with respect

35

to "when to use [the word 'loan'] and when to choose something different." *Id.* It found that

Section 523(a)(8)(A)(ii) "must be read against the context of the entire language" of Section

523(a)(8), and therefore, that the phrase "obligation to repay" must be read to refer to something

other than loans. *Id.* In addition, the court echoed the reasoning of the *Nypaver* court with

respect to the use of the word "as" in the phrase "obligation to repay funds received as an

educational benefit." *Id.* And the court looked to Black's Law Dictionary, defining "as" to

mean "in the character or under the name of." *In re Crocker*, 585 B.R at 836 (quoting BLACK'S

LAW DICTIONARY 113 (6th ed. 1990)). The court found that Congress's choice of language

described a particular category of debts, and "did not include all loans that were in some way

used by a debtor for education." *In re Crocker*, 585 B.R at 836. If it were otherwise, the court

noted, "would not a loan for a car used by a commuter student to travel to and from school every

day be nondischargeable under § 523(a)(8)(A)(ii)? The answer is obvious." *Id.*

Finally, in *Wiley v. Wells Fargo Bank, N.A. (In re Wiley)*, 579 B.R. 1 (Bankr. D. Me.

2017), the court also adopted the narrow view of "educational benefit." As in *Nypayer* and

*Crocker*, the court carefully analyzed the statutory text, and was persuaded by the difference in

language between "obligation to repay" in Section 523(a)(8)(A)(ii), and "any other educational

loan" and "educational benefit overpayment or loan" in Sections 523(a)(8)(B) and

523(a)(8)(A)(i) respectively. *In re Wiley*, 579 B.R. at 8. The court also cited "the principle that

an interpretation yielding statutory surplusage should be avoided if a competing interpretation

would give effect 'to every clause and word of a statute.'" *Id.* (quoting *Marx v. Gen. Revenue

Corp.*, 568 U.S. 371, 385 (2013)). And the court asked:

> Why would Congress exclude qualified education loans from discharge under
> section 523(a)(8)(B) if all educational loans were excepted from discharge under
> section 523(a)(8)(A)(ii)? And, why would Congress exclude government-backed
> loans from discharge under section 523(a)(8)(A)(i) if all educational loans were

excepted under section 523(a)(8)(A)(ii)?  [The creditor] has no compelling
answers for these questions.

*Id.*

To be sure, some courts have assumed or decided, without significant explanation or
analysis, that "educational benefit" in this context means any loan which relates in some way to
education.  For example, in *In re Desormes*, 569 F. App'x 42 (2d Cir. 2014), an unpublished
summary order, the Second Circuit observed, without significant discussion, that "[s]tudent loans
are presumptively nondischargeable in bankruptcy," and concluded that "[c]ontrary to [the
debtor's] argument, if a transfer of funds directly to the debtor is not necessary for the creation of
a loan, there is little reason to think such a transfer is necessary for the loan to be received within
the meaning of the statute."  *In re Desormes*, 569 F. App'x at 42.  That is, the court neither
considered nor addressed the issues that are presented here.

And several decisions of bankruptcy courts outside this Circuit reach conclusions
consistent with the Defendants' broad interpretation of Section 523(a)(8)(A)(ii), though few
considered and addressed the arguments that are made here.  Some courts state that it is
undisputed that the debt at issue is within the scope of Section 523(a)(8)(A)(ii).  Here, by
contrast, the issues are contested and have been presented for this Court's consideration.  *See,
e.g., In re Edwards*, 561 B.R. at 855 n.11 (observing in a footnote that "[t]here is no dispute that
the Navient loans fall within th[e] definition" of educational loans under Section 523(a)(8)(A));
*Micko v. Student Loan Fin. Corp. (In re Micko)*, 356 B.R. 210, 216 (Bankr. D. Ariz. 2006)
(noting that "[i]t is undisputed that the Plaintiff committed himself to repay the money extended
to him by the Defendant, as evidenced by the GOAL notes [and] it is undisputed that the loans at
issue conferred an educational benefit on the Plaintiff.  Thus, on the plain language reading of
the statute . . . the Plaintiff's loans are nondischargeable").

37

Other courts conclude, in substance, that if the loans supported or aided the debtor in his or her pursuit of the benefits of an education, including in meeting the costs of tuition, room and board, textbooks, tutoring, and a bar review course, then they are within the scope of the nondischargeability terms of Section 523(a)(8)(A)(ii). Again, for the reasons stated above, this Court does not concur in this broad interpretation of this Section. *See, e.g., Brown v. Citibank, N.A. (In re Brown)*, 539 B.R. 853, 859 (Bankr. S.D. Cal. 2015) (finding that "[Section] 523(a)(8)(A)(ii) should be interpreted broadly to include a bar examination loan under the definition of 'educational benefit'"); *Beesley v. Royal Bank of Canada (In re Beesley)*, 2013 WL 5134404, at *5 (Bankr. W.D. Pa. Sept. 13, 2013) (stating that "[i]t is undisputed that the Debtor entered into the Royal Credit Line Agreement for Students (by its title, a loan for students), and consistent therewith, the proceeds were used for tuition, room and board, and books by the Debtor. Accordingly, this Court finds that the funds provided the Debtor with an educational benefit"); *Roy v. Sallie Mae (In re Roy)*, 2010 WL 1523996, at *1 (Bankr. D.N.J. Apr. 15, 2010) (finding that loans to pay for tutoring provided an "educational benefit" within the meaning of Section 523(a)(8) because, among other reasons, the statute "'must be read as encompassing a broader range of educational benefit obligations'" (quoting *In re Baiocchi*, 389 B.R. 828 (Bankr. E.D. Wis. 2008)); *Skipworth v. Citibank Student Loan Corp. (In re Skipworth)*, 2010 WL 1417964, at *2 (Bankr. N.D. Ala. Apr. 1, 2010) (concluding that "the debtor's obligation . . . is clearly 'an obligation to repay funds received as an educational benefit' for purposes of § 523(a)(8)(A)(ii) in that Citibank loaned funds to the debtor to assist the debtor with his educational expenses i.e. the debtor's bar review course").

And still other courts simply conclude that Section 523(a)(8)(A)(ii) merits a broad interpretation. *See, e.g., Shaw v. EduCap, Inc. (In re Shaw)*, 2015 WL 1000213, at *3 (Bankr.

38

S.D. Tex. Mar. 3, 2015) (stating generally that "unless the debtor affirmatively secured a

hardship determination, the discharge order will not include a student loan debt"); *Brown v. Rust

(In re Rust)*, 510 B.R. 562, 568, 571-72 (Bankr. E.D. Ky. 2014) (observing that "[u]nder the

plain language of § 523(a)(8)(A)(ii), the debt herein is an 'obligation to repay funds received as

an educational benefit'"); *Carow v. Chase Student Loan Serv. (In re Carow)*, 2011 WL 802847,

at *4 (Bankr. D.N.D. Mar. 2, 2011) (concluding that "[g]iven the breadth afforded to the phrase

'educational benefit,' these facts clearly establish that the Chase loans were used to provide

Debtor an educational benefit").

But, as the court concluded in *In re Campbell*:

> This broad interpretation of the exception to discharge in § 523(a)(8)(A)(ii) would
> render superfluous most of the other provisions of § 523(a)(8). If the term
> "educational benefit" includes any student loan, there would be no need to
> specifically identify, as Congress did in § 523(a)(8)(A)(i) and § 523(a)(8)(B),
> particular loans, extended by particular lenders, which are excepted from
> discharge, since § 523(a)(8)(A)(ii), if interpreted to extend to all education-related
> loans, would swallow both provisions. The cases which have failed to address
> this issue . . . are for this reason unpersuasive.

*In re Campbell*, 547 B.R. at 54-55. This Court, too, finds those cases to be unpersuasive.

And this Court, as well, joins that "trending narrower view" of the scope of Section

523(a)(8)(A)(ii). That is, both the text and the context of Section 523(a)(8)(A)(ii) indicate that it

encompasses "alternatives to the typical debtor-creditor relationship in the education context.

These alternatives encompass cash benefit programs, such as veteran educational benefits,

stipends for teaching assignments, conditional grants, cash scholarships and other obligations

that are distinct from traditional student loans." *In re Decena*, 549 B.R. at 20. This Court

concludes that, in substance, an "obligation to repay funds received as an educational benefit"

refers to the wide range of benefits that aid a student in meeting the costs of his or her education,

often with conditions and prospective obligations attached. But it does not include *all* debt that

confers the benefits of an education on the borrower. *See Homaidan v. SLM Corp. (In re Homaidan)*, Adv. Pro. No. 17-01085, slip op. (Bankr. E.D.N.Y. January 31, 2019) (denying defendants' motion to dismiss).

Here, the record shows that Ms. Golden alleges that the Tuition Answer Loans were "direct-to-consumer" loans, and not conditional grants. That is, her allegations show that the debt at issue is not "an obligation to repay funds received as an educational benefit, scholarship, or stipend." 11 U.S.C. § 523(a)(8)(A)(ii). The record also shows that Ms. Golden seeks a declaratory judgment that the Tuition Answer Loans were discharged in her bankruptcy case, upon the entry of the Discharge Order, and by implication, that they were not excluded from discharge by Section 523, including Bankruptcy Code Section 523(a)(8)(A)(ii).

While it is far from clear whether Ms. Golden can prove her allegations, that question is not before the Court on these Motions to Dismiss. Rather, the Defendants argue that Ms. Golden's claims are rendered implausible by the nondischargeability terms of Bankruptcy Code Section 523(a)(8)(A)(ii). And here, at this stage in these proceedings, the Court concludes that the Defendants have not established that these claims are implausible on these grounds.

<u>Whether the Defendants Have Shown that Bankruptcy Code Section 523(a)(8)(A)(i) Applies To Exclude the NCT Loan from Discharge as a Matter of Law</u>

Next, the Court considers whether the Defendants have shown that a different exception to discharge set forth in Section 523(a)(8) applies to exclude certain of Ms. Golden's Tuition Answer Loans from the scope of her bankruptcy discharge as a matter of law. In particular, the Court considers whether the Defendants – specifically, the Trusts – have shown that the NCT Loan is excluded from discharge under Bankruptcy Code Section 523(a)(8)(A)(i).

Bankruptcy Code Section 523(a)(8)(A)(i) excludes from discharge a loan that is "made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in

part by a governmental unit or nonprofit institution." This gives effect to one of the key

purposes of Section 523(a)(8), that student loans that are funded or guaranteed by a government

or nonprofit entity may not generally be discharged in bankruptcy. As the court observed in *In*

*re Campbell*:

> The original impetus for including an exception to discharge for education loans
> made by the government was the concern that if debtors were allowed to
> discharge such loans, the solvency of government education loan programs would
> be undermined, in effect "discriminating against future students, because there
> will be no funds available for them to get an education."

*In re Campbell*, 547 B.R. at 59-60 (quoting *In re Pelkowsky*, 990 F.2d 737, 742 (3d Cir. 1993)).

Citing the Second Circuit's decision in *In re O'Brien*, 419 F.3d 104 (2d Cir. 2005), the

Trusts suggest that Ms. Golden's NCT Loan should accordingly be excluded from discharge, and

her claims against them dismissed, because "where TERI has funded a student loan, that 'student

loan was made under a program that was funded in whole or in part by a non-profit institution.'"

Trusts Mem. at 9 (quoting *In re O'Brien*, 419 F.3d at 107).

In *O'Brien*, the Second Circuit's conclusion was based on the "undisputed" and

"uncontested" fact, as noted by the district court, that the loan at issue was made by a program

funded at least in part by TERI, and the loan at issue was exempt from discharge pursuant to

Bankruptcy Code Section 523(a)(8)(A)(i). *In re O'Brien*, 419 F.3d at 106-07. The Second

Circuit did not address, or need to consider, whether the particular loan at issue was, in fact,

funded by TERI. Courts have interpreted *O'Brien* to hold that a loan may be exempt from

discharge under Bankruptcy Code Section 523(a)(8)(A)(i) where "the nonprofit entity played any

meaningful part in procurement of the loans under the program." *In re Page*, 592 B.R. 334, 337

(B.A.P. 8th Cir. 2018).

The Trusts point to language in the loan documentation to the effect that Ms. Golden's loan is "'subject to the limitations on dischargeability in bankruptcy contained in [Bankruptcy Code] Section 523(a)(8)'" because "'either or both'" of certain grounds for discharge exceptions apply. Trusts Mem. at 9 (quoting Credit Agreement). And the Trusts note that "in fact, the check made out to [Ms. Golden] that funded this loan came from TERI." Trusts Mem. at 9.

Ms. Golden disputes these assertions. She responds that TERI "is a guarantor, not a funder, and whether or not these funds were issued under a program guaranteed in whole or in part by TERI is, of course, a question of fact." Plf's Opp. at 9 n.1. And she states that the language relied upon by TERI is simply insufficient to change Ms. Golden's dischargeable debt into a nondischargeable student loan, because "a loan that does not come within the terms of the § 523(a)(8) exemption. . . cannot become nondischargeable by a pre-bankruptcy acknowledgement or waiver by the debtor." Plf's Opp. at 2.

Ms. Golden also responds that TERI funds only those loans that do not exceed the cost of attendance, and therefore it is unlikely that TERI funded the NCT Loan, which "clearly exceed[s] the cost of attendance." Plf's Opp. at 9 n.1. And she disputes whether TERI is "in fact, a bonafide nonprofit institution," or if it is a division of the for-profit entity First Marblehead Corporation created "for the sole purpose of taking advantage of [the] non-profit exemption of § 523(a)(8)(A)(i). *Id.* That is, here, unlike the situation in *O'Brien*, the parties dispute whether TERI had a role in funding the NCT Loan.

At the outset, in deciding a motion to dismiss, the court does not determine whether a plaintiff's factual allegations are true – rather, all factual allegations must be accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. Disputed facts can be addressed in the context of dispositive motion practice, including a motion for summary

42

judgment, but there too, the standard is high, and summary judgment – which is not the question

before the Court here – may be granted only where there is no genuine dispute as to a material

fact, so that the movant is entitled to judgment as a matter of law. As one court observed in

response to similar arguments, summary judgment would be denied where the movant did "not

identify the program under which the Loans were extended, address the relationship between

[another party] and TERI, or otherwise show that TERI funded the program under which the

Loans were made." *In re Wiley*, 579 B.R. at 6. The court concluded, "on summary judgment,

these indications are not enough to carry the day." *In re Wiley*, 579 B.R. at 7.

   Here, a review of the Amended Complaint shows that Ms. Golden alleges that she

borrowed "an additional $7,103 on September 28, 2006 in private loans from National Collegiate

Trust" and that this loan "was originated in excess of the published 'cost of attendance' and was

not a qualified education loan under section 523(a)(8)(B)." Am. Compl. ¶ 30. She also alleges

that "the NCT Loan was not 'made, insured, or guaranteed by a governmental unit' or made

under a 'program funded in whole or in part by a non-profit.'" Am. Compl. ¶ 32.

   In addition, more is required to satisfy the requirements of Section 523(a)(8) than a

statement in a loan document that "either or both" of certain exceptions from discharge may

apply. If that language alone were sufficient, then it is hard to see what role would be left for

Congress or the courts in drafting, interpreting, and applying these sections of the Bankruptcy

Code. At the most, the Trusts have identified a disputed issue of fact that is not ripe for

resolution at this stage of these proceedings.

   That is, and here again, while it is far from clear whether Ms. Golden can prove her

allegations, that question is not before the Court on these Motions to Dismiss. Rather, the

Defendants argue that Ms. Golden's claims are rendered implausible by the nondischargeability

43

terms of Bankruptcy Code Section 523(a)(8)(A)(i).  And here, at this stage in these proceedings,

the Court concludes that the Defendants have not established that these claims are implausible on

these grounds.

<u>Whether the Defendants Have Shown that the Amended Complaint Does Not State a Plausible
Claim that the Loans at Issue Are Outside the Scope of Bankruptcy Code Section 523(a)(8)(B)</u>

Finally, the Court considers whether the Defendants have shown that the allegations of

the Amended Complaint do not set forth a plausible claim that Ms. Golden's Tuition Answer

Loans are outside the scope of Bankruptcy Code Section 523(a)(8)'s exclusions from discharge,

including in particular, Section 523(a)(8)(B).

The Defendants urge that the Amended Complaint falls short of the pleading standards

required by the Federal Rules because, in substance, it does not establish a plausible basis to

conclude that Ms. Golden's Tuition Answer Loans are outside the scope of the

nondischargeability provisions of Section 523(a)(8)(B).  They also argue, in substance, that the

Amended Complaint falls short of these standards because it does not give each Defendant notice

as to what loans are at issue, what each of their individual roles was in connection with the loan,

or what activities they each individually undertook to violate the discharge injunction.  PHEAA

states that the Amended Complaint names multiple defendants, but does not "'indicate clearly

the defendants against whom relief is sought and the basis upon which the relief is sought against

the particular defendants.'"  PHEAA Reply at 4 (quoting *Harris*, 2014 WL 3487032, at *7).  And

Firstmark asserts that it is left "to guess which" loan is at issue.  Firstmark Mem. at 17.  To

similar effect, the Trusts note that "it is simply impossible to tell which loans on the Schedule F

are the Loans [at issue here]."  Trusts Reply at 3.

Ms. Golden responds that the Amended Complaint sets forth a plausible claim that the

loans at issue do not come within the nondischargeability provisions of Bankruptcy Code Section

44

523(a)(8)(B).  The Amended Complaint states that qualified education loans are defined by

Internal Revenue Code Section 221(d)(1) "as debts incurred by eligible students, at eligible

institutions, for eligible expenses.  In turn, a 'qualified higher education expense' is one that

issued to pay for the cost of attendance at a qualified educational institution."  Am. Compl. ¶ 16

(quoting 26 U.S.C. § 221(d)(2)).  She argues that the Amended Complaint sets forth allegations

sufficient to show that her Tuition Answer Loans were for amounts that clearly exceeded the

stated "cost of attendance" at the University of Pennsylvania, and for those reasons, her loans are

not "qualified education loans."  And she points to allegations in the Amended Complaint that

show that these loans "lack the traditional characteristics of 'educational loans'" because they

"were made under Defendants' direct-to-consumer lending programs" and "[were] not conducted

through the financial aid offices of eligible schools."  Plf's Opp. at 29.  Ms. Golden's loans

"[were] not limited as to the amount of money that could be lent above and beyond the published

cost of attendance," and "were assigned an adjustable interest rate at the time of origination, the

same as any commercial loan."  *Id.*

Ms. Golden also responds that the Amended Complaint provides each of the Defendants

with sufficient notice as to "what two loans are at issue in this proceeding and what they are

alleged to have done."  Plf's Opp. at 7.  She identifies the first loan as the NCT Loan, now

owned by one or more of the Trust Defendants.  And she notes that two of the Trust Defendants,

National Collegiate Student Loan Trust 2005-3 and National Collegiate Student Loan Trust

2006-4, were substituted in as defendants in this action by a stipulation that was so-ordered by

the Court.  She states that the NCT Loan is serviced by PHEAA.

Ms. Golden identifies the second loan as the Citibank Loan, now owned by Defendant

Goal Structured Trust 2016-A.  That defendant, too, was brought into this action as a defendant

by a stipulation that was so-ordered by the Court.  And she states that the Citibank Loan is serviced by Firstmark.

And Ms. Golden states that the Amended Complaint clearly identifies the conduct that is alleged to have violated the Discharge Order entered in her bankruptcy case.  She points to allegations that the loans at issue exceeded her cost of attendance at the University of Pennsylvania, and that as a result, these loans are dischargeable debts.  And she points to allegations that the Defendants, and the lenders and servicers of the loans at issue, have continued to demand payment and collect on these discharged debts.

The Court first considers whether the Defendants have shown that Amended Complaint does not state plausible claims because the loans at issue are excluded from discharge by Section 523(a)(8) as a matter of law.

At the outset, it is plain that not every debt that is incurred by a student in pursuit of an education is, without more, a nondischargeable "student loan."  This Court also notes that Section 523 must be applied in a way that provides discernable boundaries between a dischargeable and a nondischargeable debt.  To be sure, that boundary may require a factual determination – such as whether a debt is obtained by "false pretenses, a false representation, or actual fraud," as provided by Bankruptcy Code Section 523(a)(2)(A).  But borrowers and lenders, debtors and creditors, and courts and parties should be able to discern whether a loan or debt is within or outside a debtor's discharge by reference to objective criteria.  Where statutes – including, as here, the Bankruptcy Code and the Internal Revenue Code – provide definition, those definitions should be the starting point, and likely the concluding point, for the analysis.

Here, a review of the Amended Complaint shows that Ms. Golden alleges that she attended the University of Pennsylvania during the 2006-07 and 2007-08 academic years.  Am.

46

Compl. ¶¶ 27, 35.  She also alleges that in each of those years, she received scholarship funds

and borrowed significant sums in loans from the federal government.  Am. Compl. ¶¶ 29, 36.

And she alleges that she borrowed additional sums in the form of private Tuition Answer Loans

– the NCT Loan and the Citibank Loan – which are the loans at issue here.  Am. Compl. ¶¶ 30,

37.

 A review of the Amended Complaint also shows that Ms. Golden alleges that during the

2006-07 academic year, in light of her federal student loans, scholarships, and grants, "the NCT

Loan was originated in excess of the published 'cost of attendance,'" and for that reason, "was

not a qualified education loan under section 523(a)(8)(B)."  Am. Compl. ¶ 30.  And she claims

that the NCT Loan "was not 'made, insured, or guaranteed by a governmental unit' or made

under a 'program funded in whole or party by' a non-profit[ ] and thus was not non-

dischargeable under section 523(a)(8)(A)(i)."  Am. Compl. ¶ 34.

 And Ms. Golden alleges that during the 2007-08 academic year, at the time the Citibank

Loan was originated, she "already had exceeded the Cost of Attendance in loans and

scholarship/grants."  Am. Compl. ¶ 36.  As a result, she alleges, the Citibank Loan was

"originated in excess of the published 'cost of attendance' and [was] not [a] qualified education

loan[] as that term is defined in section 523(a)(8)(B)."  Am. Compl. ¶ 37.

 For these reasons, based on the allegations of the Amended Complaint, accepting all of

the factual allegations as true, and drawing all reasonable inferences in Ms. Golden's favor, the

Court finds that the Defendants have not shown that Bankruptcy Code Section 523(a)(8)(B)

applies to exclude the loans at issue from the scope of the Discharge Order as a matter of law.

The Court next considers whether the Defendants have shown that Amended Complaint does not state plausible claims because it does not adequately identify the loans at issue, or the role that each of them played in connection with efforts to collect on those loans.

It is fundamental that a defendant is entitled to know the nature of the claim that is asserted against it. It is likewise fundamental that a defendant is entitled to the dismissal of a claim that is implausible on its face. But a complaint is not the same as a closing argument, and at the pleading stage of an action, a plaintiff must plead, but not yet prove, its claims.

Here, a review of the Amended Complaint shows that Ms. Golden's allegations identify the loans at issue – the NCT Loan and the Citibank Loan – with sufficient specificity for the Defendants to discern their identity. As to the NCT Loan, the Amended Complaint states that she "borrowed an additional $7,103 on September 28, 2006 in private loans from National Collegiate Trust." Am. Compl. ¶ 30. That is, she identifies the amount of the loan, the date that the loan was made, and the lender.

Similarly, as to the Citibank Loan, the Amended Complaint states that during the 2007-08 academic year, Ms. Golden "borrowed an additional . . . $9,348 [from] Citibank." Am. Compl. ¶ 37. It further states that "[t]he Citibank Loan was subsequently sold to Defendant GoldenTree Asset Management on or about October 24, 2015, which was later securitized into the GS2 Trust." Am. Compl. ¶ 37 n.1. That is, she identifies the amount of the loan, the time period in which the loan was made, and the lender.

In addition, Ms. Golden alleges that the loans at issue are "properly listed on Schedule F." Am. Compl. ¶ 40. Specifically, the Amended Complaint states "[Ms.] Golden properly listed on Schedule F certain 'student loans' owed, including 'AES/Jpmgn ch,' 'FM/slfv tru,'

48

'AES/NCT', which represented the loans that were made in excess of Penn's Cost of Attendance for the two relevant academic years." *Id.*

And as to collection efforts, a review of the Amended Complaint shows that Ms. Golden's allegations identify the actions of the Defendants that violated the Discharge Order entered in her case with sufficient specificity for the Defendants to know the nature of their asserted actionable conduct. The Amended Complaint states that "[o]n or about August 3, 2016, this Court issued a discharge order in [Ms.] Golden's bankruptcy proceeding," and two days later, "[o]n or about August 5, 2016, all creditors received notice of discharge." Am. Compl. ¶¶ 42-43. And Ms. Golden alleges "instead of treating the Debts as discharged (because they were unsecured debt that was discharged in bankruptcy and not properly contested), Defendants, by and through themselves and their agents, resumed collection efforts after the discharge entered, and fraudulent informed the debtor that the Debts were not discharged and demanded payment and accepted payment." Am. Compl. ¶ 44. She also alleges that despite the entry of the Discharge Order, "Defendants nonetheless sought to collect on the Debts by use of dunning letters, emails, text messages, and phone calls [to] recover the discharged debt." Am. Compl. ¶ 75.

For these reasons, based on the allegations of the Amended Complaint, accepting all of the factual allegations as true, and drawing all reasonable inferences in Ms. Golden's favor, the Court finds that the Defendants have not shown that the Amended Complaint does not state plausible claims because it does not adequately identify the loans at issue, or the role that each of them played in connection with efforts to collect on those loans.

Finally, the Court considers whether the Defendants have shown that the Amended Complaint does not meet the pleading requirements of Federal Rule of Civil Procedure 9(b).

49

Rule 9(b) establishes a heightened pleading standard for claims that sound in fraud.  Rule

9(b) provides that in order to allege a claim for fraud, "a party must state with particularity the

circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of

a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  To allege with particularity a

claim for fraud, the Second Circuit has held that "'the complaint must: (1) specify the statements

that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the

statements were made, and (4) explain why the statements were fraudulent.'"  *Rombach v.

Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170,

1175 (2d Cir. 1993)).

Here, a review of the Amended Complaint shows that Ms. Golden asserts claims for a

declaratory judgment for violations of the Discharge Order, and for related relief.  In describing

the context of these claims, she alleges that "unscrupulous creditors" took steps "to defraud

vulnerable and unsophisticated student borrowers."  Am. Compl. ¶ 24.  The Amended Complaint

also states that "[t]he loans at issue here are disproportionately issued to low-income students

who lack the resources and knowledge to understand the differences between loans that are or

not dischargeable or to seek relief in an adversary proceeding."  *Id.*  And Ms. Golden contrasts

the Defendants' communications with consumers such as herself with statements made by

"Defendants and other major lenders and underwriters . . . in student loan asset-backed

securities' prospectuses . . . expressly warning investors that pursuant to section 523(a)(8), only

private loans made for qualified expenses were excepted from discharge."  Am. Compl. ¶ 25.

But Ms. Golden's claims asserted in the Amended Complaint are claims for a declaratory

judgment that her Tuition Answer Loans are not excluded from discharge under any subsection

of Bankruptcy Code Section 523(a)(8), including Section 523(a)(8)(B), and for violations of the

Discharge Order entered in her bankruptcy case. They are not claims for fraud, and they do not

invoke the heightened pleading standard of Rule 9(b).

For these reasons, the Court finds that the Defendants have not shown that Ms. Golden

states claims that invoke Rule 9(b)'s heightened pleading standard for fraud, or that Rule 9(b)

requires the dismissal of these claims.

In sum, while it is far from clear whether Ms. Golden can prove her allegations, that

question is not before the Court on these Motions to Dismiss. Rather, the question posed by

these motions is whether Ms. Golden's claim for a declaratory judgment that her Tuition Answer

Loans were discharged in her bankruptcy case is rendered implausible by any of the grounds

advanced by the Defendants. And here, at this stage in these proceedings, the Court concludes

that the Defendants have not established that this claim is implausible. For these reasons, the

Motions to Dismiss the First Claim for Relief are denied.

### *Whether the Defendants Have Shown that Ms. Golden's Second Claim for Relief Should Be Dismissed*

Ms. Golden's second claim for relief seeks an award of damages and attorneys' fees and

costs for the Defendants' willful violations of the discharge injunction pursuant to Bankruptcy

Code Sections 524 and 105. Am. Compl. ¶ 76.

Bankruptcy Code Section 524(a)(2) states that "[a] discharge in a case under this title . . .

operates as an injunction against the commencement or continuation of an action, the

employment of process, or an act, to collect, recover or offset any such debt as a personal

liability of the debtor, whether or not discharge of such debt is waived." As one court recently

observed, "[b]ankruptcy without the discharge is like a car without an engine; a useful tool

rendered ineffective." *Roth v. Butler University (In re Roth)*, 594 B.R. 672, 677 (Bankr. S.D.

Ind. 2018). In order to state a claim that a creditor violated Bankruptcy Code Section 524(a)(2),

51

a plaintiff must allege that the debtor received a discharge, the defendant received a notice of the discharge, and the defendant intended the acts that violated the discharge.

The Defendants argue that Ms. Golden's claim that they violated the Discharge Order should be dismissed for several reasons, including for the same reason that her first claim for relief should be dismissed – namely, that her Tuition Answer Loans were not discharged in her bankruptcy case. The Defendants also argue that Ms. Golden can recover damages for discharge injunction violations only through a claim for contempt of court, not the claim that she has brought here. And the Defendants argue that for a contempt claim to lie, the order at issue must be clear and unambiguous, and here, the Discharge Order is not. For these reasons, the Defendants argue that Ms. Golden's allegations cannot support a claim for what amount to contempt sanctions against the Defendants.

Ms. Golden responds that the argument that there is no private right of action to address a discharge violation through an adversary proceeding is "a red herring." Plf's Opp. at 32. Additionally, she states that the Defendants argue that the Court's Discharge Order is "too vague to support a contempt finding," but if the Defendants are correct in this assertion, then "there could never be a contempt of a discharge order because every discharge order is vague." Plf's Opp. at 33-34.

Ms. Golden also responds that bankruptcy courts have the power to enforce discharge injunctions through adversary proceedings such as this. She argues that "[t]here is no question that bankruptcy courts have the power to enforce discharge injunctions regardless of any specified private right of action," and "there is no question that this is a proper action to address the alleged discharge injunction violations." Plf's Opp. at 32-33. And she states that the argument that the Court's Discharge Order is too vague to support a contempt finding is simply

52

incorrect and would, in substance, strip the Court's power to enforce its own discharge orders. She also responds that the Defendants knew that her Tuition Answer Loans would be discharged, as indicated by, among other things, their statements to investors.

At the outset, the Court considers whether an adversary proceeding is a permissible means to seek redress for a claimed violation of the discharge order entered in a debtor's bankruptcy case. Here, the Court is persuaded that an adversary proceeding is a permissible path to seek this relief, for several reasons.

First, a bankruptcy court may "issue any order, process, or judgment necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105. Accordingly, a bankruptcy court may issue a judgment, which is "a form of relief that is the result of an adversary proceeding, not the result of a motion," to enforce its statutory contempt powers and effectuate compliance with 11 U.S.C. § 524(a). *In re Anderson*, 550 B.R. 228, 240 (S.D.N.Y. 2016) (concluding that "an adversary proceeding is an appropriate vehicle to enforce a discharge injunction").

Second, and as another bankruptcy court has reasoned, to dismiss this case because the debtor seeks relief through an adversary proceeding rather than by motion would "elevate form over substance [as] an adversary proceeding provides [the Defendants] with more, not less, procedural protection" than would a motion for contempt. *West v. Home Sav. & Loan (In re West)*, 2015 WL 3962569, at *3 (Bankr. N.D. Ohio June 29, 2015).

Notably, this Court's decision in *In re McKenzie-Gilyard*, 388 B.R. 474 (Bankr. E.D.N.Y. 2007), cited by the Defendants, is consistent with this conclusion. There, the plaintiff made claims for violation and contempt of the discharge injunction, and the Court noted that "[a]

53

plaintiff may bring a claim for a violation of the discharge injunction in the form of an action for

a sanction for civil contempt." *In re McKenzie-Gilyard*, 388 B.R. at 481.

But that is not the same as a finding that a claim for a discharge injunction violation may

*only* be brought as a motion for contempt. Many courts have considered requests for damages

for discharge injunction violations in the form of adversary proceedings, including courts in this

District and Circuit. *See, e.g.*, *Haynes v. Chase Bank USA, N.A. (In re Haynes)*, 2014 WL

3608891, at *9 (Bankr. S.D.N.Y. July 22, 2014) (denying to dismiss an adversary proceeding

alleging discharge violation on behalf of the plaintiff and alleged nationwide class); *Torres v.

Chase Bank USA, N.A. (In re Torres)*, 367 B.R. 478, 491 (Bankr. S.D.N.Y. 2007) (denying the

defendant's motions to dismiss adversary proceedings alleging discharge violations).  And

whether the claim is styled as one for violation of the Discharge Order – as it is in the Amended

Complaint – or as one for contempt for violation of the Discharge Order, Ms. Golden will be

required first to plead, and then to prove, the grounds for her entitlement to relief.

Next, the Court considers whether the Court's Discharge Order is too vague to support a

claim for relief.  Here again, the Court is persuaded that the Discharge Order is not too vague to

provide a basis for Ms. Golden's claim for relief, for several reasons.  Such orders, and the

Discharge Order here, are plain and unambiguous.  To be sure, a proceeding arising from an

alleged discharge violation may well raise a host of issues.  As one noted commentator observes,

"[a] proceeding to enforce the discharge injunction is a core proceeding . . . and courts should

readily reopen a closed bankruptcy case to ensure that the essential purposes of the discharge are

not undermined." 4 *Collier on Bankruptcy* ¶ 524.02[2][c] (Alan N. Resnick & Henry J. Sommer

eds., 16th ed. 2018).  And in such proceedings, "[o]ften, a major issue . . . is whether the debt is

one that was discharged." *Id.* But that does not mean that the discharge injunction generally, or the Discharge Order here, is somehow vague.

And finally, the Court considers whether the elements of a discharge violation have been adequately set forth in the Amended Complaint.  In order adequately to allege a claim for violations of the discharge injunction, the plaintiff must allege that he or she received a discharge, the defendant received notice of the discharge, and the defendant intended the acts that violated the discharge. *In re Motichko*, 395 B.R. 25, 31 (Bankr. N.D. Ohio 2008).  And the debt at issue must be within the scope of the debtor's discharge.  As one court noted, "[s]howing a violation of a discharge order by definition requires showing specifically that the order applies to the debt on which the violation is premised." *In re Azevedo*, 506 B.R. at 283. *See In re Eppolito*, 583 B.R. at 826; *In re Otten*, 2013 WL 1881736, at *6-8.

Here, the record shows that Ms. Golden alleges that she received a discharge.  In particular, the Amended Complaint states that on February 29, 2016, Ms. Golden filed a Chapter 7 bankruptcy case and "properly listed on Schedule F certain 'student loans' owed".  Am. Compl. ¶¶ 39, 40.  The Amended Complaint also states that "[o]n or about August 3, 2016, this Court issued a discharge order in Golden's bankruptcy proceeding," and that "[t]he Debts were discharged pursuant to the Discharge Order entered by this Court on August 3, 2016 because they were unsecured consumer loans and not non-dischargeable student loans under section 523(a)(8)." Am. Compl. ¶¶ 42, 73.  And as the Court has already concluded, Ms. Golden has described facts that establish a plausible basis to conclude that her Tuition Answer Loans are not excluded from discharge by operation of Bankruptcy Code Section 523(a)(8).

The record also shows that Ms. Golden alleges that the Defendants received notice of the discharge in her case.  Specifically, she alleges that "[o]n or about August 5, 2016, all creditors

55

received notice of discharge," and "Defendants were notified of the Discharge Order pursuant to

Federal Rule of Bankruptcy Procedure 4004(g)." Am. Compl. ¶¶ 43, 74.  And the Amended

Complaint states that "[n]one of the Defendants filed an adversary proceeding to contest

discharge of the Debts, although it was their legal burden to do so." Am. Compl. ¶ 43.

And finally, the record shows that Ms. Golden alleges that the Defendants intended the

acts that violated the discharge.  In particular, Ms. Golden alleges:

> instead of treating the Debts as discharged (because they were unsecured debt that
> was discharged in bankruptcy and not properly contested), Defendants, by and
> through themselves and their agents, resumed collection efforts after the discharge
> entered, and fraudulently informed [Ms. Golden] that the Debts were not
> discharged and demanded payment and accepted payment.

Am. Compl. ¶ 44.  And she alleges that "Defendants nonetheless sought to collect on the Debts

by use of dunning letters, emails, text messages, and phone calls [to] recover the discharged debt

in violation of 11 U.S.C. § 524." Am. Compl. ¶ 75.

Ms. Golden alleges that "[d]uring the same time that lenders were telling consumers that

their loans were non-dischargeable, Defendants and other lenders were securitizing these debts

for sale on the secondary market," and making very different statements to investors.  Am.

Compl. ¶ 25.  The Amended Complaint states:

> Lenders were rightfully concerned that if they represented to investors that all
> private student loans were non-dischargeable in bankruptcy, sophisticated
> investors would easily enough discover the misrepresentation (based on a plain
> reading of the statute), and issuers would be liable for securities violations.
> Defendants and other major lenders and underwriters . . . thereafter included in
> student loan asset-backed securities' prospectuses language expressly warning
> investors that, pursuant to section 523(a)(8), only private loans made for qualified
> expenses were excepted from discharge.

Am. Compl. ¶ 25.

In sum, and as with Ms. Golden's first claim for relief, the question posed by these

motions is whether Ms. Golden has stated a plausible claim that the Defendants violated the

Discharge Order entered in her case. And here again, at this stage in these proceedings, the

Court concludes that the Defendants have not established that this claim is implausible. For

these reasons, the Motions to Dismiss the Second Claim for Relief are denied.

## Conclusion

Based on the entire record and for the reasons stated herein, the Court finds that the

Defendants have not shown that the Plaintiff, Tashanna Golden, has not stated plausible claims

for relief. For these reasons, the Defendants' Motions to Dismiss are denied.

An order in accordance with this Memorandum Decision will be entered simultaneously

herewith.



**Dated: Brooklyn, New York**
**January 31, 2019**

**Elizabeth S. Stong**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

In re:                                                          Chapter 7

TASHANNA B. GOLDEN,                                             Case No. 16-40809-ess
*fka* TASHANNA B PEARSON,

                              Debtor.

-----------------------------------------------------------------------x

TASHANNA B. GOLDEN,                                            Adv. Pro. No.: 17-01005-ess

                              Plaintiff,

    -against-

JP MORGAN CHASE BANK, NATIONAL COLLEGIATE
TRUST, FIRSTMARK SERVICES, GOLDEN TREE
ASSET MANAGEMENT LP, GS2 2016-A (GS2),
NATIONAL COLLEGIATE STUDENT LOAN TRUST
2005-3, NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2006-4, PENNSYLVANIA HIGHER
EDUCATION ASSISTANCE AGENCY D/B/A/
AMERICAN EDUCATION SERVICES,

                              Defendants.

-----------------------------------------------------------------------x

### ORDER ON THE DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT

Upon the Amended Complaint filed by Tashanna B. Golden filed on October 17,

2017, against the Defendants,[1] seeking a declaratory judgment pursuant to Judiciary Code

Section 2201 and Bankruptcy Rule 7001(9) that certain of her student loans were

discharged by operation of law on August 3, 2016, the date of her bankruptcy discharge,

---

[1] All capitalized terms not otherwise defined herein have the same meanings as used in this
Court's Memorandum Decision and Order on the Motions to Dismiss this Adversary
Proceeding dated January 31, 2019.

and an order holding the Defendants in contempt for willful violations of the Discharge

Order and Bankruptcy Code Section 524; the Motion to Dismiss this adversary proceeding

filed on December 8, 2017, by the Defendant PHEAA; the Motion to Dismiss this adversary

proceeding filed on December 8, 2017, by the Defendant Firstmark; the Motion to Dismiss

this adversary proceeding filed on December 8, 2017, by the Trust Defendants; the

Opposition to the Motions to Dismiss filed on January 8, 2018, by Plaintiff; the Reply to the

Plaintiff's Opposition filed on January 23, 2018, by PHEAA; the Reply to the Plaintiff's

Opposition filed on January 23, 2018, by Firstmark; the Reply to the Plaintiff's Opposition

filed on January 23, 2018, by the Trusts; the hearings held before this Court on July 26,

2018, on October 3, 2018; and on November 28, 2018; and based upon the entire record,

and for the reasons stated in the Court's Memorandum Decision on Defendants' Motions to

Dismiss dated January 31, 2019, and for cause shown, it is hereby

    ORDERED, that PHEAA's Motion to Dismiss is denied; and it is further

    ORDERED, that Firstmark's Motion to Dismiss is denied; and it if further

    ORDERED, that the Trusts' Motion to Dismiss is denied.

**Dated: Brooklyn, New York**
**January 31, 2019**

**Elizabeth S. Stong**
**United States Bankruptcy Judge**

2

TO:

Tashanna B Golden
84 Alberta Avenue
Staten Island, NY 10314

Jason W Burge
Fishman Haygood LLP
201 St Charles Ave, Ste 4600
New Orleans, LA 70170

George F. Carpinello
Boies Schiller Flexner, LLP
30 South Pearl Street
11th Floor
Albany, NY 12207

Kathryn J. Johnson
Fishman Haygood, LLP
201 St. Charles Ave., Ste. 4600
New Orleans, LA 70170

Adam Shaw
Boies Schiller Flexner LLP
30 South Pearl Street
Albany, NY 12207-3427

Austin C Smith
Smith Law Group
3 Mitchell Place
Suite 5
New York, NY 10017

Lynn E Swanson
Jones, Swanson, Huddell & Garrison, LLC
601 Poydras Street
Suite 2655
New Orleans, LA 70130

Robert C Tietjen
Boies Schiller Flexner LLP
30 South Pearl Street
11 Floor
Albany, NY 12207-3427

Charles F Kaplan
Perry Guthery Haase & Gessford PC
233 South 13th Street
Lincoln, NE 68508

Charles F Kaplan
Perry, Guthery, Haase & Gessford P.C L.L
233 South 13th Street
Suite 1400
Lincoln, NE 68508

Shawn Fox
McGuireWoods LLP
1345 Avenue of the Americas, 7th Floor
New York, New York 10105

James Matthew Goodin
Locke Lord LLP
111 South Wacker Drive
Chicago, IL 60606

H. Peter Haveles, Jr.
Pepper Hamilton LLP
620 Eighth Avnue
37th Floor
New York, NY 10018

Francis J Lawall
Pepper Hamilton, LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103

Gregory T. Casamento
LOCKE LORD LLP
Brookfield Place
200 Vesey Street, 20th Floor
New York, New York 10281-2101

PEPPER HAMILTON LLP
H. Peter Haveles, Jr.
37th Floor
620 Eighth Avenue
New York, NY 10018-140

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

100 N. Barranca Street, Suite 250
West Covina, CA 91791

A true and correct copy of the foregoing document entitled (*specify*): **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT *REDACTED VERSION***will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On _February 5, 2019_____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

| | | |
|---|---|---|
| John M. & Livier Mata<br>426 1/2 West B Street<br>Ontario  CA  91762 | Honorable Mark Houle<br>US Bankruptcy Court<br>3420 Twelfth Street, Suite 365<br>Riverside,  CA 92501 | Smith Law Group LLP<br>3 Mitchell Place<br>New York, NY 10017 |
| Attorney for Defendant National Collegiate Student Loan Trust 2006-1, National Collegiate Student Loan Trust 2006-4, National Collegiate Student Loan Trust 2007-1<br>Patenaude & Felix, A.P.C.<br>4545 Murphy Canyon Road, 3rd Fl.<br>San Diego, CA 92123 | National Collegiate Student Loan Trust 2006-1, National Collegiate Student Loan Trust 2006-4, National Collegiate Student Loan Trust 2007-1<br>800 Boylston Street 34Th Floor<br>Boston, MA02199-8157 | |

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| February 5, 2019 | Dolores Orozco | |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                      **F 9013-3.1.PROOF.SERVICE**