M. Erik Clark, CA Bar #188693
**BOROWITZ & CLARK, LLP**
100 N. Barranca Street, Suite 250
West Covina, CA 91791
Tel: (626) 332-8600
Fax: (626) 332-8644

Attorneys for Plaintiff

FILED

FEB - 5 2019

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ Deputy Clerk

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA-RIVERSIDE DIVISION

| | |
|---|---|
| IN RE: <br> JOHN MARTIN MATA <br> LIVIER MATA | Case No. 16-BK-30625-MH <br><br> Chapter 7 |
| JOHN M. MATA, <br><br>          Plaintiff, <br><br>     vs. <br> NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4; NATIONAL COLLEGIATE STUDENT LOAN TRAUT 2007-1, <br><br>          Defendants. | Adversary No. 6:18-AP-01089-MH <br><br> SEALED – TO BE FILED UNDER SEAL |

Enclose document to be filed under seal.

1

M. Erik Clark, #188693
BOROWITZ & CLARK, LLP
100 N. Barranca Street, Suite 250
West Covina, CA 91791
Tel: (626) 332-8600
Fax: (626) 332-8644

Austin C. Smith
SMITH LAW GROUP LLP
3 Mitchell Place
New York, NY 10017
917-992-2121
austin@acsmithlawgroup.com

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT CALIFORNIA

| | |
|---|---|
| In re:<br><br>JOHN M. MATA<br>    Debtor<br><br>JOHN MATA<br>Plaintiff<br><br>v.<br><br>NATIONAL COLLEGIATE<br>STUDENT LOAN TRUST 2006-1,<br>NATIONAL COLLEGIATE<br>STUDENT LOAN TRUST 2006-4,<br>NATIONAL COLLEGIATE<br>STUDENT LOAN TRUST 2007-4,<br><br>Defendant. | Case No. 13-30625-MH<br>Chapter 7<br><br><br><br><br>Adv. Pro. No. 18-01089-MH<br><br>**PLAINTFF'S OPPOSITION TO<br>DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT<br>FILED UNDER SEAL** |

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT……………………………………………………1

II. BACKGROUND OF SECTION 523(a)(8) OF TITLE 11…………………...…..2

III. CASE LAW INTERPRETING SECTION 523(A)(8)(A)(I)…………………12

IV. ARGUMENT AND AUTHORITIES……………………………………...……13

   A. Summary of Argument……………………………………………………13
   B. Defendants Have Failed To Offer Any Evidence Or Even Argue That The
      Loans Are "Educational Loans"…………………………………………..15
   C. Plaintiff's Loans Were Not Funded By A Nonprofit Institution…………...18
   D. Plaintiff's Loans Were Made Outside The Confines Of The Identified Loan
      Program……………………………………………………………………..24
   E. The Charter One Bank/TERI Guarantee Was Voided And Refunded In
      TERI's Own Bankruptcy…………………………………………………...26
   F. Defendants Are Not Now Permitted To Advance New Facts In Their Reply..

V. CONCLUSION……………………………………………………………………27

# TABLE OF AUTHORITIES

*Bates v. United States,*
522 U.S. 23 (1997)……………………………… ..…. ...… .…………....……17-18

*Beth Rochel Seminary v. Bennett,*
624 F.Supp. 911 (D.D.C. 1985) ……………….....……………………….……..8

*Crowley v. TVSM, Inc.,*
1991 WL 267868 (S.D.N.Y. 1991) ……………….…………..………………...……26

*Inter-American University of Puerto Rico, Inc. v. Concepcion,*
716 F.2d 933 (1st Cir. 1983) ……………….........…...……………………...……5

*In re Adamo,*
619 F.2d 216 (2nd Cir. 1980) ……………….……….…..……...………….……7

*In re Brunner,*
46 B.R. 752 (S.D.N.Y 1985) …………….….……..…..……………....…..…..4

*In re Clouser,*
2016 WL 5864493 (Bkrtcy.D.Or. 2016) ……………..….…..…………...…2, 22

*In re Campbell,*
547 B.R. 49 (Bkrtcy.E.D.N.Y. 2016) ……………....…....………….......……..2

*In re Christoff,*
527 B.R. 624 (9th Cir. BAP 2015) …………….…..….....…….……….…...…..3

*In re Huang,*
275 F.3d 1173 (9th Cir. 2002) …………….….....…...…….……………...…..21

*In re Kashikar,*
567 B.R. 160 (9th Cir. BAP 2017). ………….…......………….…….…...……3, 12

*In re McDaniel,*
590 B.R. 537 (Bkrtcy. D. Colo. 2018). …………….………..….…...………..2

*In re Merchant,*

958 F.2d 738 (6th Cir. 1992) ............................................................................14

*In re McClure,*
210 B.R. 985 (Bkrtcy. N.D. Tex. 1997) ...........................................................4

*In re Roth,*
490 B.R. 908 (9th Cir. BAP 2013) ...................................................................1

*In re Southard,*
2 B.R. 124 (Bkrtcy.Va. 1979). .........................................................................5

*In re Taratuska,*
374 B.R. 24 (Bkrtcy.D.Mass. 2007) ...............................................................18

*In re The First Marblehead Corp. Securities Litigation,*
639 F.Supp.2d 145 (D.Mass. 2009) ...............................................................15

*In re Wiley,*
579 B.R. 1 (Bkrtcy.D.Me. 2017) ....................................................................20

*In re Yee,*
7 B.R. 747 (Bkrtcy. N.Y. 1980) .......................................................................6

*Matter of Williamson,*
665 F.2d 683 (5th Cir. 1982) ............................................................................8

*Mays v. Shinseki,*
25 Vet. App. 256 (2012) .................................................................................10

*Matter of Scher,*
12 B.R. 258 (Bkrtcy. N.Y. 1981) .....................................................................4

*Matter of Halpern,*
50 B.R. 260, 262 (Bankr. N.D. Ga. 1985), *aff'd sub nom. In re Halpern*, 810 F.2d 1061
(11th Cir. 1987). ............................................................................................21

*Matter of Roberson,*
999 F.2d 1132 (7th Cir 1993) .........................................................................14

*McClure v. U.S.,*

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

95 F.2d 744 (9th Cir. 1938) ……………………..…..……..………………………….4

*National Collegiate Student Loan Trust 2007-4 v Watson*,
2016 WL 9384235 (N.Y.City Civ.Ct.  Jan. 07, 2016) …………..…..…….…..……….19

*New Neighborhoods, Inc. v. West Virginia Workers' Compensation Fund*, 886 F.2d 714
(4th Cir. 1989) ……………………………..…..…..…..…..…..…..……………18

*Perlman v. Permonite Mfg. Co.,*
568 *F.Supp.* 222 (D.C. Ind. 1983) ………………..…..…..…..…………………….16

*Saviano v. C.I.R.,*
765 F.2d 643 (7th Cir. 1985) …………………….…..…..…..…..………………….21

*TI Fed. Credit Union v. DelBonis,*
72 F.3d 921, (1st Cir. 1995) ………………….……..………..…………………….21

*U.S. Dept. of Health and Human Services v. Smith,*
807 F.2d 122 (8th Cir. 1986) …………………..…..…..…..…..…………………….10

*Provenz v. Miller,*
102 F.3d 1478 (9th Cir 1996) ………………….………….…………………………….27

*Santa Fe Medical Services, Inc. v. Segal (In re Segal),*
57 F.3d 342 (3d Cir. 1995) ………………….…..……..…..…………....…..…….10

*U.S. ex rel. Giles v. Sardie,*
191 F.Supp.2d 1117 (C.D.Cal. 2000). ………………….…..……………………….2

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                                      Page v

## I.    PRELIMINARY STATEMENT

Plaintiff files this opposition to Defendants' motion for summary judgment (the "Motion").  In the Motion, Defendants argue they should be granted summary judgment because there are no material facts in dispute that Plaintiff's direct-to-consumer loans ("DTC Loans" or "Loans") were excepted from discharge by section 523(a)(8)(A)(i) as "educational . . .loan[s] . . .made under any program funded in whole or in part by a . . . nonprofit institution."[1]  Defendants bear the ultimate burden at trial.[2]  Accordingly, in order to meet its burden on this Motion, Defendants must prove that there are no genuine issues of material fact regarding whether the Loans are: (i) educational loans; (2) made under a program; (3) funded in whole or part; (4) by a nonprofit institution.  Defendants' motion must fail, because there remain numerous genuine issues of disputed fact, including:

---

[1] As described in the Motion, the First Loan originated on or about January 6, 2006 in the amount of $30,000 with an interest rate of 9.938%; the Second Loan originated on or about September 29, 2006 in the amount of $30,000 with an interest rate of 12.149%; and the Third Loan originated on or about August 21, 2007 in the amount of  $30,000 with an interest rate of 14.03%.

[2] *In re Roth*, 490 B.R. 908, 916 (9th Cir. BAP 2013) ("Under § 523(a)(8), the lender has the initial burden to establish the existence of the debt and that the debt is an educational loan within the statute's parameters.").

[3] *See also In re Clouser*, 2016 WL 5864493, at *2 (Bkrtcy.D.Or., 2016) ("[T]he terms 'student loan' and 'education loan' are not coextensive with *nondischargeable loans* covered by § 523(a)(8)."); *In re Campbell*, 547 B.R. 49, 61 (Bkrtcy.E.D.N.Y., 2016) ("§ 523(a)(8) . . . does not except from discharge all student loans . . .[s]imply calling the Bar Loan a student loan is not a declaration that the Bar Loan comes within the ambit of these provisions, and says nothing about the dischargeability of the Bar Loan."); *In re Roth*, 490 B.R. 908, 916 (9th Cir. BAP 2013) ("Under § 523(a)(8), the lender has the initial burden to establish the existence of the debt and that the debt is an educational loan within the statute's parameters.").

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                                                        Page 1

1. Whether the DTC Loans are "educational loans";

2. Whether the DTC Loans were in fact guaranteed by TERI;

3. Whether the DTC Loans were in fact made under with the identified "program" for the purposes of section 523(a)(8)(A)(i);

4. Whether TERI's own bankruptcy and rejection of its guaranty agreements voided any program funding;

5. Whether TERI is an "institution" as that term is used in the Code.

## II.    BACKGROUND OF SECTION 523(a)(8) OF TITLE 11

"'Educational' loans, or 'student' loans, are not nondischargeable simply because they are labeled as such; they must meet one or more of the criteria set forth in Section 523(a)(8)."   *In re McDaniel*, 590 B.R. 537, 545 (Bkrtcy. D. Colo. 2018).[3] Despite this basic truth, private lenders have persuaded a number of courts to interpret section 523(a)(8) broadly enough to capture any debt made to any student since at least 1984.  Courts have done this in two chief ways.  First, some courts have found that any loan made to any student that provides any educational advantages is non-dischargeable as an "educational benefit" under section 523(a)(8)(A)(ii) ("Romante II").  Second, some courts have found that any loan that was directly or indirectly touched by a nonprofit

---

[3] *See also In re Clouser*, 2016 WL 5864493, at *2 (Bkrtcy.D.Or., 2016) ("[T]he terms 'student loan' and 'education loan' are not coextensive with *nondischargeable loans* covered by § 523(a)(8)."); *In re Campbell*, 547 B.R. 49, 61 (Bkrtcy.E.D.N.Y., 2016) ("§ 523(a)(8) . . . does not except from discharge all student loans . . .[s]imply calling the Bar Loan a student loan is not a declaration that the Bar Loan comes within the ambit of these provisions, and says nothing about the dischargeability of the Bar Loan in bankruptcy.").

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

corporation is non-dischargeable as one "funded in whole or part by a nonprofit institution" under section 523(a)(8)(A)(i) ("Romanette I").   Both of these approaches are wrong because section 523(a)(8)(A) only applies to subsidized, low-interest loans made pursuant to the Higher Education Act.  Private lenders have no protection from discharge in section 523(a)(8)**(A)** and must seek protection only in subsection 523(a)(8)**(B).**

And indeed, since 2016, a majority of courts have recognized this.  Specifically, these courts have disavowed the broad interpretation of "educational benefit," including two opinions from the Ninth Circuit BAP.[4]   These courts recognized that a broad interpretation of "educational benefit" rendered the remainder of the statute superfluous, violated the canon of *nosictur a soccis*, and otherwise makes no sense.   This case presents another opportunity to restore precision to section 523(a)(8)(A).  Just as courts have rethought the meaning of the term "educational benefit" in Romanette II, this case presents a similar opportunity for the Court to rethink the meaning of the term "educational loan" and "nonprofit institution" in Romanette I and restore precision and clarity to section 523(a)(8)(A)(i).

In order to understand the structure and intent of Congress in codifying section 523(a)(8), it is useful to trace the evolution of the Higher Education Act of 1965, and section 523(a)(8).   The non-dischargeability of certain student loans was originally

---

[4] *In re Christoff*, 527 B.R. 624, 634 (9th Cir. BAP 2015) ("[W]e agree with Debtor's counsel's statement at oral argument that § 523(a)(8)(A)(ii) is not a 'catch-all' provision designed to include every type of credit transaction that bestows an educational benefit on a debtor."); *In re Kashikar*, 567 B.R. 160, 162 (9th Cir. BAP 2017).

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                                          Page 3

enacted as a *quid pro quo* between students and the federal government.  The *quid* was

the Higher Education Act, which provided students without credit profiles or cosignors

access to low-interest educational loans from colleges, universities and the government.[5]

In exchange for this largess, Congress extracted the *quo* in section 523(a)(8) of the Code.

Specifically, Congress determined that these federally subsidized educational loans made

pursuant to the Higher Education Act should not be dischargeable in bankruptcy.[6]  And

indeed if one reads section 523(a)(8) in concert with the history of the Higher Education

Act, all the terms that have given courts trouble over the last 40 years (*e.g.,* "educational

benefit," "nonprofit institution," "program funded in whole or in part," etc.) suddenly

make perfect sense.

The federal government first began lending money to students in the 1960s and

1970s through two major programs: (1) National Defense Student Loans ("NDSL")[7]; and

---

[5] *In re Brunner*, 46 B.R. 752, 756 (S.D.N.Y 1985) ("Because of this enlightened social policy . . .[t]hose who might obtain loans only at exhorbitant rates are similarly able to obtain low cost, deferred loans. In return for this largesse—and it is undeniable that guaranteed student loans have extended higher education to thousands who would otherwise have been forced to forego college or vocational training—the government exacts a *quid pro quo*.")

[6] *In re McClure*, 210 B.R. 985, 988 (Bkrtcy. N.D. Tex. 1997) ("Although Congress expanded the reach of the contested statute in order to provide uniformity of treatment and eliminated the higher education requirement, ***there is no indication that Congress intended any of the amendments to apply to for-profit businesses in no way connected to the government guaranteed student loan program***.") (emphasis added).

[7] *See, e.g., Matter of Scher*, 12 B.R. 258, 260 (Bkrtcy. N.Y. 1981) ("Debtor's loans were incurred under the two major loan programs available for students engaged in higher education, the National Direct Student Loan Program (NDSL), and the Guaranteed Student Loan Program (GSL).").

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    Page 4

(2) Guaranteed Student Loans ("GSL").[8]   Like most federal programs, the regulatory scheme behind these loans was of immense complexity and the programs were structured very differently.   The GSL were originated by private banks, but insured and guaranteed by the federal government. The NDSL, on the other hand, were made by the schools themselves, drawing upon a revolving fund of money that was in part supplied by the federal government.[9]   In order to ensure this money was available for future generations, Congress enacted section 523(a)(8) of the Code in 1978 in order to protect the two entitles involved in student lending: the government, and the schools.   The original version of the statute as added by the Bankruptcy Reform Act read as follows:

> (a) a discharge . . . does not discharge an individual debtor from any debt--
> (3) to a governmental unit, or a nonprofit institution of higher education, for an educational loan.[10]

As written, the language was intended to capture both the GSL and NDSL: GSL loans were owed "to a governmental unit" and NDSL loans were owed to a "nonprofit institution of higher education."  However, it soon became clear that the statute as written

---

[8] The GSL ultimately became the FFEL.  In 2010, the Obama Administration ended the FFEL and began originating all new loans directly from the Department of Education. For the purposes of this motion, Plaintiff has summarized the important components of the Higher Education Act of 1965 and 11 U.S.C. 523(a)(8). *See generally*, Matthew Fuller, *A History of Financial Aid to Students*, 44 Journal of Student Financial Aid 4 (2014).

[9] *Inter-American University of Puerto Rico, Inc. v. Concepcion*, 716 F.2d 933, 934 (1st Cir. 1983) ("The National Direct Student Loan program (NDSL) is one of the student loan programs established under the Higher Education Act of 1965, 20 U.S.C. § 1071 *et seq*. Under the NDSL program, both the Department of Education and an eligible lending institution such as IAU make capital contributions to a loan fund.").

[10] 11 U.S.C. 523(a)(8) (Pub L. 95-598).  *See also In re Southard*, 2 B.R. 124, 126 (Bkrtcy.Va., 1979).

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
                                                    Page 5

was insufficient protection for the federally subsidized loans for two reasons. First, as

stated above, the federal government did not originate debt under the GSL program, but

instead guaranteed debt that was originated by private lenders. Thus, unless the debtor

had defaulted on the debt before their bankruptcy and the government had purchased the

debt, the federal government did not own or hold the loan, and the student could

conceivably obtain discharge because the debt was not owed to a "governmental unit."

Second, the government did not guarantee money made under the NDSL program, but

instead provided matching funds to the schools themselves to originate the money.[11]

Some of these institutions were for-profit schools, and thus even where the government

provided matching funds to an eligible for-profit school, the student could obtain

discharge of an NDSL to a for-profit school under a literal reading of the 1978 version of

the statute.    All of this is discussed in the Congressional record from 1979 when

discussing why Congress needed to amend the language in section 523(a)(8):

> 11 U.S.C. 523(a)(8) applied only to debts for educational loans owing to a
> governmental unit or to a nonprofit institution of higher education, it has a very
> uneven effect upon the student loan programs administered by the Department of
> Health, Education, and Welfare. *For example, national direct student loan
> (NDSL) funds are administered by both nonprofit and profitmaking institutions
> of higher education. Under the new law, a student who obtained an NDSL loan*

---

[11] *In re Yee*, 7 B.R. 747, 751 (Bkrtcy. N.Y., 1980) ("Two major loan programs, the "National
Direct Student Loan Program" ('NDSL') and the "Guaranteed Student Loan Program" ('GSL'),
currently make funds available for higher education. The former . . enables a student to borrow directly
from an institution's loan fund, which is supported by federal and institutional contributions. See 20
U.S.C. s 1087aa-1087gg (1976). Under the GSL program, the student borrows money from a qualifying
lender, and the guarantee agency, either the Federal government, a state agency or a private nonprofit
organization, endorses the loan.").

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                                        Page 6

*from a profit-making institution of higher education would be free to have that loan discharged in bankruptcy. In contrast, a student who obtained an NDSL loan from a nonprofit institution of higher education would be subject to the prohibitions contained in the new law . . .* The application of new 11 U.S.C. 523(a)(8) to loans made under the guaranteed student loan (GSL) and health education assistance loan (HEAL) programs would produce even more anomalous results. *If the borrower of a GSL or HEAL loan filed a bankruptcy petition and the lender then holding the loan was a bank, savings and loan association, credit union, insurance company, pension fund, the student loan marketing association or, in the case of the GSL loan a profit-making institution of higher education, the loan would be fully dischargeable.* S. REP. 96-230, 2, 1979 U.S.C.C.A.N. 936, 937

Congress specifically stated that this amendment was being designed to ensure the government was protected whatever form its lending took.[12]   The second clause, which provided protection for loans made outside the federal lending programs by "nonprofit institutions of higher education," would be unaffected:

The bill would not alter the protection from discharge which the present version of 11 U.S.C. 523(a)(8) affords to educational loans made outside the auspices of federal programs by nonprofit institutions of higher education, states and local governments. S. REP. 96-230, 2, 1979 U.S.C.C.A.N. 936, 937

Thereafter, the language of section 523(a)(8) was amended again in 1979 to ensure all of the government's lending programs were protected:

(a) a discharge . . . does not discharge an individual debtor from any debt--
(8) for an educational loan made, insured, or guaranteed by a governmental unit, or

---

[12] *In re Adamo*, 619 F.2d 216, 221 (2nd Cir. 1980) ("Although such an interpretation by a subsequent Congress is not necessarily controlling, it may be useful in determining the intention of an earlier Congress.")

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

made under any program funded in whole or in part by a governmental unit or a nonprofit institution of higher education.[13]

Thus although this sentence looks convoluted, it is actually a perfect reflection of the federal student-lending program as it existed in 1979: the first clause protected the GSL, and the second clause protected the NDSL. At no point was Congress intending to provide discharge protection to private banks.

A small change was then made in 1984. During the early 1980s, some courts began wrestling with whether a seminary or a trade school technically provided "higher education."[14] Since "higher education" was generally understood to consist of education in the liberal arts, schools that participated in the Title IV program but provided non-liberal arts education were seemingly being excluded. In response, Congress thereafter removed the term "of higher education" from section 523(a)(8). But the legislative history demonstrates two critical things:

> [D]eleting 'of higher education' enlarges the scope of the nondischargeability exception and is therefore substantive to that extent. It is a modest enlargement, however, in that the claimant must be a nonprofit institution and the loan must be one for an educational loan. The change eliminates litigation over the question whether a seminary, for example, is an institution of higher education. The amendment is thus to some extent at least clarifying.[15]

---

[13] *See* 11 U.S.C. 523(a)(8) (Pub. L. 96-56). *See also Matter of Williamson*, 665 F.2d 683, 684 (5th Cir.. 1982)

[14] *Beth Rochel Seminary v. Bennett*, 624 F.Supp. 911, 913 (D.D.C. 1985).

[15] *See* Bankruptcy Improvement Act: Hearing on P.L. 98-353 Before the S. Comm. on Judiciary, at 328 (April 6, 1983) (Comments on Subtitle I of S. 445) (Attached as **Exhibit 1**).

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                                    **Page 8**

Note that this change could not have altered the meaning of the word "institution," which was codified to mean "school" and must have continued to mean "school" even after the modifier "higher education" was eliminated.[16]   Importantly, the Congressional record also notes that the "claimant" in a non-dischargeability proceeding would still need to be the nonprofit institution itself in order to render the debt non-dischargeable (unless the debt was also guaranteed by a governmental unit).   Furthermore, the removal of "of higher education" was made to avoid confusion and litigation over whether a seminary or a technical school provided "higher education." This reasoning is crucially important to the instant action, as will become plain later on.   Thereafter, the section read as follows:

> (a) a discharge . . . does not discharge an individual debtor from any debt--
> (8) for an educational loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or part by a governmental unit or a nonprofit institution.[17]

The next problem the courts and Congress had to wrestle with were conditional educational grants funded by the government. For instance, the federal government furthers higher education through service scholarships and grants, such as the

---

[16] *McClure v. U.S.*, 95 F.2d 744, 750 (9th Cir. 1938) ("Where an amendment leaves certain portions of the original act unchanged, such portions are continued in force with the same meaning and effect they had before amendment.").

[17] *See* 11 U.S.C. 523(a)(8) (Supp. 1984).

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                              Page 9

Montgomery GI Bill and the National Health Service Corps Scholarship.[18]  These grants only require repayment if the student defaults on some contractual obligation to the government, such as by failing to join the army after college, or failing to perform some other form of public service.  Prior to the 1990 amendments, students who took federal money in the form of these conditional educational scholarships and defaulted on a condition of the obligation could obtain a discharge under a literal reading of the statute, which only restricted discharge of student loans, not defaulted contractual obligations.[19] For this reason, Section 523(a)(8) was amended in 1990 to except from discharge an "obligation to repay funds received as an educational benefit, scholarship, or stipend."[20] After the 1990 amendment, the statute stated:

> (a) a discharge . . . does not discharge an individual debtor from any debt--
> (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend.[21]

---

[18] *See Mays v. Shinseki,* 25 Vet. App. 256, 261 (2012) (describing statutory scheme for military educational benefits).

[19] *See U.S. Dep't of Health & Human Servs. v. Smith* (*In re Smith*), Adv. Pro. No. 84-05113, 1985 WL 660512, at *1 (Bankr. D.N.D. June 26, 1985) *subsequently rev'd sub nom. U.S. Dep't of Health & Human Servs. v. Smith*, 807 F.2d 122 (8th Cir. 1986).

[20] *See* Federal Debt Collection Procedures of 1990: Hearing on P.L. 101-647 Before the H. Subcomm. on Econ. and Commercial Law, H. Judiciary Committee 101st Cong. 74-75 (June 14, 1990) (Mr. Brooks' Questions for the Record from Mr. Wortham).

[21] *See* 11 U.S.C. 523(a)(8)(1990); *Santa Fe Medical Services, Inc. v. Segal* (*In re Segal*), 57 F.3d 342, 347 (3d Cir. 1995) ("Subsection 523(a)(8) was yet again expanded by the Crime Control Act of 1990 . . . [m]ost relevant to this case, however, was the addition of language which prohibited the discharge of 'an obligation to repay funds received as an educational benefit, scholarship, or stipend.'").

This language protected the government from a discharge regardless of whether its

financial assistance took the form of student loans or conditional scholarships, benefits or

stipends.

In 2005, the statute was amended again to extend protection to commercial lenders,

*but only to the extent their loan products mirrored and supplemented federal lending.*

Specifically, Congress awarded bankruptcy protection to private education loans that

were made *solely* for qualified higher education expenses.  Qualified higher education

expenses are defined in federal law as debts incurred by eligible students *solely* to cover

the "Cost of Attendance" at a Title IV accredited institution.[22]  The "Cost of Attendance"

is determined and published by the school, and includes tuition, room, board, and books.

After 2005, the language of section 523(a)(8) stated:

> (8) unless excepting such debt from discharge under this paragraph would impose
> an undue hardship on the debtor and the debtor's dependents, for—
>
> > (A)(i) an educational benefit overpayment or loan made, insured, or
> > guaranteed by a governmental unit, or made under any program funded
> > in whole or in part by a governmental unit or nonprofit institution; or
> > (ii) an obligation to repay funds received as an educational benefit,
> > scholarship, or stipend; or
> > (B) any other educational loan that is a qualified education loan, as defined
> > in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a
> > debtor who is an individual.[23]

---

[22] Where part of a debt is used to cover qualified education expenses and part is not, the debt is a mixed-use loan, and therefore, not a qualified education loan.  *See* IRS, 26 C.F.R. 1, REG-116826-97.

[23] *See* 11 U.S.C § 523(a)(8) (2015).

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                                        Page 11

As it stands today, Section 523(a)(8) of the Bankruptcy Code excepts from discharge only three types of educational debts: (1) governmental educational loans, or educational loans originated and held by the colleges and universities themselves; (2) defaulted conditional educational grants (*e.g.,* benefits, scholarships, and stipends); and (3) private student loans made for qualified higher education expenses. If one takes the time to understand the structure of the federal student lending programs, it soon becomes apparent that Congress drafted section 523(a)(8)(A) perfectly to mimic the federal student lending programs, and any attempt to except high-interest non-qualified private credit loans from discharge should be rejected.

## III.    CASE LAW INTERPRETING SECTION 523(A)(8)(A)(I)

Defendants' case law presents a superficial obstacle to Plaintiff's analysis. Plaintiff here reminds the Court that until 2014, nearly every bankruptcy court who examined section 523(a)(8)(A)(ii) found that any loan made for any education purpose was non-dischargeable as a matter of law.  In fact, this Court was among the many courts who made this erroneous holding in 2016, only to be summarily reversed by the Ninth Circuit BAP.[24]  It was not until courts took the time to examine the statute that they learned section 523(a)(8)(A) was far narrower than appeared at first glance.  Because space does not permit an in-depth review and analysis of all the case law, Plaintiff will

---

[24] *See In re Kashikar*, 567 B.R. 160, 162 (9th Cir. BAP 2017) (reversing CDCA bankruptcy court that held debtor's student loan was non-dischargeable as an "educational benefit" under section 523(a)(8)(A)(ii)).

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    Page 12

address at oral argument how and where these opinions ignored basic cannons of statutory construction, and the requirement to construe exceptions to discharge narrowly. These courts all seemed to start with the flawed assumption that all "debts-made-to-students" were "educational loans" deserving of protection under section 523(a)(8) and then devising ways to reach that result. Plaintiff respectfully asks this Court to examine the characteristics of the DTC Loans in this action and note how dissimilar they are to traditional educational loans made under the Higher Education Act of 1965. They are really little more than payday loans dressed up as educational loans.

## IV.   ARGUMENT AND AUTHORITIES

### A. Summary of Argument

Defendants argue that there are no genuine issues of material fact that the Loans were guaranteed by TERI, which was a 501(c)(3). Defendant further argues that where TERI guarantees a loan, it constructively funds a program under section 523(a)(8)(A)(ii). Defendants' motion must fail for four major reasons. First, Defendant has failed to offer any evidence, or even argue, that the DTC Loans are "educational loans." On these grounds alone the Motion must fail. Second, as a matter of statutory interpretation, the DTC Loans do not fit within section 523(a)(8)(A)(i) because TERI is not a "nonprofit institution" as that term is used in the Code. Third, defendants have offered no evidence that TERI actually guaranteed the Loans; and in fact, by the terms of the contracts cited by Defendants, TERI did not guarantee the loans, or else had no duty to honor the

guarantee because the Loans were made outside the underwriting parameters. Fourth, TERI's bankruptcy voided all associated guarantees, and TERI even refunded the guarantee fees, which undid any conceivable "program funding."

### B. Defendants Have Failed To Offer Any Evidence Or Even Argue That The Loans Are "Educational Loans."

Despite citing case law that states the first question to be answered in a section 523(a)(8) action is whether the loans are "educational loans,"[25] Defendants conveniently skip this step and make no argument and offer no evidence that the Loans are "educational loans." This may seem like a metaphysical dispute — but it is not. "Educational loan" under the Code is not synonymous with "loan made to a student." In fact, Congress was explicit in describing what it meant by "educational loan":

> Educational loans are different from most loans. They are made without business considerations, without security, without cosigners, and relying for repayment solely on the debtor's future increased income resulting from the education." H.R.Rep. No. 595, 95th Cong., 2d Sess. 133, reprinted in 1978 U.S. Code Cong. & Ad. News 5963, 6094.[26]

Congress codified section 523(a)(8) strictly to protect these types of subsidized, low-interest loans made to students. There are all sorts of other debts made to students:

---

[25] *See* Motion at 10 ("A threshold issue is whether the loans qualify as educational loans in the first place.")(citing In re *Belforte,* 2012 WL 4620987, at *4-5 (Bankr. D. Mass. Oct. 1, 2012))

[26] *See also Matter of Roberson*, 999 F.2d 1132, 1136 (7th Cir 1993); *U.S. Dept. of Health and Human Services v. Smith*, 807 F.2d 122, 126 (8th Cir. 1986). *See also In re Merchant*, 958 F.2d 738, 740 (6th Cir. 1992)("This was due to the fact that unlike commercial transactions where credit is extended based on the debtor's collateral, income, and credit rating, student loans are generally unsecured and based solely upon the belief that the student-debtor will have sufficient income to service the debt following graduation.")

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

personal loans from banks, personal loans from family, credit cards, mortgages, auto loans, payday loans, layaway agreements for dorm-room furniture, etc.  None of these are "educational loans" under the Bankruptcy Code. And neither are the Loans in this action. The Loans in this action are titled "Consumer Credit Transactions," have 9-14% interest rates, had 10.5% origination fees, required a cosignor, and were only made after a credit check.[27]  Consider that for a moment.  The Third Loan was originated for $30,000.  Yet, Plaintiff paid an origination fee of **$3,519.54** and a **14.003%** interest rate.[28] Plaintiff was contracted to pay **more than $90,000 in interest** over the life of a $30,000 loan.  This is clearly not what Congress was talking about when it described how "educational loans" differ from consumer credit.  And perhaps more tellingly, these Loans were made directly to the Plaintiff, and outside the confines of the financial aid office.[29]   In that way, the Loans are far more similar to a student credit card than a traditional federal student loan made directly to a school to cover tuition and books.

### C. Plaintiff's Loans Were Not Funded By A Nonprofit Institution

---

[27] *See* Defendants' **Exhibits A-1, A-5, A-9.**

[28] Defendants' **Exhibit A-9,** at page 102 of 369 of Declaration of Bradley Luke (**ECF # 33-4**).

[29] The "direct to consumer" loans were largely the invention of the First Marblehead Corporation ("FMC").  As stated in Defendants' Exhibits, FMC partnered with large banks to originate consumer debt to students and then securitized them into the national collegiate trusts. These debts were not and should not be treated like subsidized and charitable educational loans made to needy students.  They were subprime consumer debt exactly like those then being made in the mortgage industry.  *See In re The First Marblehead Corp. Securities Litigation*, 639 F.Supp.2d 145, 149–50 (D.Mass. 2009) (stating that testimony revealed that First Marblehead began bending underwriting criteria in 2006 to originate excessive loans to students with bad credit in order to feed the securitization market)

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                                                Page 15

TERI is not a "nonprofit institution" under section 523(a)(8)(A)(i).  Although the term is not defined in the Code, the legislative and statutory history teaches that the term "institution" means a college, university, or school.  As originally codified, the clause read "nonprofit institution of higher education."  That is plainly another term for a college or university.  Congress removed the modifier "of higher education" in 1984, but this could not have changed the meaning of the words "nonprofit institution" as originally codified by Congress.[30]  When Congress codified the term "nonprofit institution" it meant "school."  Therefore, the term must still mean "school"— albeit not one that exclusively provides a traditional liberal arts education. The legislative history from 1984 supports this reading:

> "[D]eleting 'of higher education' enlarges the scope of the nondischargeability exception and is therefore substantive to that extent. It is a modest enlargement, however, in that the claimant must be a nonprofit institution and the loan must be one for an educational loan. The change eliminates litigation over the question whether a seminary, for example, is an institution of higher education. The amendment is thus to some extent at least clarifying."[31]

The reason for removing "of higher education" was to resolve confusion over whether a *seminary* technically provided "higher education."  It was never intended to open the floodgates to commercial lenders who created corporate non-profits through

---

[30] *Perlman v. Permonite Mfg. Co., 568 F.Supp.* 222, 234–35 (D.C.Ind.,1983) (""Given . . . the general rule that where 'an amendment leaves certain portions of the original act unchanged, such portions are continued in force, with the same meaning and effect they had before the amendment.").

[31] *See* Bankruptcy Improvement Act: Hearing on P.L. 98-353 Before the S. Comm. on Judiciary, at 328 (April 6, 1983) (Comments on Subtitle I of S. 445) (attached as **Exhibit 1**).

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

which they added credit enhancements to their loans for securitization purposes.   The meaning remains plain: the statute was intended to prevent debtors from discharging student loans owed directly to non-profit colleges and universities who participated in subsidized lending under the Higher Education Act.[32]

Furthermore, the Loans were not "funded" by a governmental unit or nonprofit institution. The Loans were funded by Charter One Bank. The most the Defendants are arguing is that TERI guaranteed the loans, and that guaranteeing constitutes "constructive funding."   But note that section 523(a)(8) uses both terms (*i.e.,* "funded" and "guaranteed") intentionally in different clauses of the provision: "an educational loan....made, insured or **guaranteed** by a governmental unit, or made under any program **funded** in whole by a governmental unit or nonprofit institution."    The statute plainly says that a governmental unit may affect non-dischargeablity either by guaranteeing a loan in the first clause (*i.e.,* under the GSL), or by funding the program in whole or part in the second clause (*i.e.,* the NDSL). The second clause does not say a guarantee is sufficient for a non-profit institution.   Rather, the language says the nonprofit institution or governmental unit must "fund" the program. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate

---

[32] The court will also note that the legislative history states the claimant must be the non-profit. The claimant in this action is not a non-profit.

1  inclusion or exclusion." *Bates v. United States,* 522 U.S. 23, 29–30 (1997).    Congress

2  allowed a "governmental unit" to obtain non-dischargeability either by making, insuring,

3  guaranteeing, or funding a program.  Nonprofit institutions, however, only got protection

4  where they "funded" loans made through a program.[33]

5

6

7  More generally, the Defendants' broad interpretation of section 523(a)(8)(A)(i) is

8  contrary to the command that exceptions to discharge are to be construed narrowly

9  against the creditor.  To the extent any of terms above are ambiguous, the narrower

10  finding should control.  For example, the term "nonprofit institution" is conceivably

11  ambiguous.  Defendants will argue it means any corporation with 501(c)(3) status.

12  Plaintiff believes it only means a school recognized under the Higher Education Act that

13  participates in Title IV funding programs.  Even if both are plausible applications, the

14  debtor's interpretation should control because of the requirement to resolve ambiguities

15  in favor of the debtor.  *See New Neighborhoods, Inc. v. West Virginia Workers'*

16  *Compensation Fund*, 886 F.2d 714, 719 (4th Cir. 1989) ("Exceptions to discharge are

17  usually construed in favor of the debtor. Further, ambiguities in the Code are generally

18  resolved in favor of the debtor."). Likewise, the word "funded" and "educational loan"

---

[33] *In re Taratuska,* 374 B.R. 24, 29 (Bkrtcy.D.Mass. 2007) ("Notably, the statute employs both terms [guaranteed and funded], plainly indicating that they have different meanings; otherwise, one or the other would be unnecessary. Hence, the giving of the Guaranty does not constitute the program funding contemplated by Section 523(a)(8) on account of the Loan.") (reversed on appeal).

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    Page 18

are conceivably ambiguous, and in such an event, the Court should construe the terms

narrowly to effectuate one of the central purposes of the Code.

### D. Plaintiff's Loans Were Made Outside The Confines Of The Identified Loan Program

Even if this Court rejects the above statutory analysis, the DTC Loans still do not

fit within section 523(a)(8)(A)(i).  Defendants contend that the Loans were "made under

a program funded in whole or in part by a nonprofit institution" because TERI guaranteed

the loans.  But the Defendants have produced **no** evidence that TERI actually guaranteed

the Loans.[34] Defendants argue that the loan documents "unequivocally" say the DTC

Loans are non-dischargeable. *See* Motion at 11.   That is false.   Two of the three

documents are quite literally "equivocal" in that they say the debt *might have* been

funded by TERI or *might not have*:

> I understand and agree that this loan is an education loan and certify that it will be
> used only for costs of attendance at [LLU]. I acknowledge that the requested loan
> is subject to the limitations on dischargeability in bankruptcy contained in Section
> 523(a)(8) of the United States Bankruptcy Code because either or both of the
> following apply: (a) this loan was made pursuant to a program funded in whole or
> in part by …TERI … a non-profit institution, or (b) this is a qualified education

---

[34] In fact, the NCSLT 2006-1 Deposit and Sale Agreement does not even list the NextStudent Graduate Loan as one of the loan programs that was being transferred and sold into the NCSLT 2006-1 trust under Schedule A.  The Pool Supplement lists a number of Charter One loan program, including the NextStudent Alternative Loan, and the NextStudent Private Consolidation Loan, but not the NextStudent Graduate Loan. Thus it is not even clear whether this program was eligible for transfer under the contracts. *See National Collegiate Student Loan Trust 2007-4 v Watson*, 2016 WL 9384235, at *3, (N.Y.City Civ.Ct., Jan. 07, 2016) (denying motion for judgment where "[t]his Court's review of the Deposit and Sale Agreement finds that assignment does not specifically identify the Charter One Continuing Education Loan as part of Schedule A relied upon by the Plaintiff.").

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                                    Page 19

1  loan as defined in the Internal Revenue Code.[35]

2

3  In *Wiley*, Wells Fargo sought to introduce the identical language from a loan

4  document on summary judgment.  The Court cited the above language, and rejected it as

5

6  a basis for summary judgment.[36]  More recently in a decision by the Eastern District of

7  New York, the Court examined identical terminology in a loan held by Defendant

8

9  National Collegiate Trust 2006-1 and held:

10      [M]ore is required to satisfy the requirements of Section 523(a)(8) than a statement
        in a loan document that "either or both" of certain exceptions from discharge may
11      apply. If that language alone were sufficient, then it is hard to see what role would
        be left for Congress or the courts in drafting, interpreting, and applying these
12      sections of the Bankruptcy Code.[37]

13

14

15  As the *Golden* and *Wiley* courts held, these statements are insufficient to determine

16  whether the DTC Loans actually fit within section 523(a)(8).[38]    Indeed, parties can

17

18

19

20

---

21      [35] See Defendants' **Exhibits A-5, A-9** (at page 98 of 369 of Declaration of Bradley Luke).

22      [36] *In re Wiley*, 579 B.R. 1, 7 (Bkrtcy.D.Me., 2017) ("On summary judgment, these indications
        are not enough to carry the day. These preprinted portions of the Agreements do not mandate an
23      inference that the Loans were, in fact, made under a program funded by a nonprofit institution.").

24      [37] *Golden, et. al v. JP Morgan Chase Bank., et. al.*, 17-AP-1005, at p. 43 (Bankr. E.D.N.Y. Jan
        31, 2019) (attached as **Exhibit 7**).
25      [38] Consider the consequence if parties could stipulate to legal conclusions in contracts.
26      Defendants could simply insert a statement into all agreements that reads, "I certify that NCSLT 2006-1
        is not a debt collector as that term is defined in 15 U.S.C. 1692 " and thereby immunize itself from any
27      Fair Debt Collection Practices Act lawsuits in perpetuity.  Indeed, a creditor could presumably insert
        into all promissory notes a certification that reads "I certify that I am not a debtor as that term is defined
28      in 11 USC 101" and thereby object to a consumer's discharge under 11 U.S.C 727.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

neither contract around determinations of discharge,[39] nor stipulate to legal conclusions.[40]

"Policy considerations dictate that dischargeability questions cannot be predetermined . . .

by agreement of the parties prior to or in anticipation of the possible filing of a

bankruptcy case. Whether or not a debt is dischargeable is a legal conclusion based on

facts of each case and the bankruptcy court has the exclusive jurisdiction to make that

conclusion." *Matter of Halpern*, 50 B.R. 260, 262 (Bankr. N.D. Ga. 1985), *aff'd sub*

*nom. In re Halpern*, 810 F.2d 1061 (11th Cir. 1987). Nor have Defendants offered

testimony from anyone with personal knowledge regarding whether TERI actually

---

[39] *In re Huang*, 275 F.3d 1173, 1177 (9th Cir. 2002) ("It is against public policy for a debtor to waive the prepetition protection of the Bankruptcy Code. This prohibition of prepetition waiver has to be the law; otherwise, astute creditors would routinely require their debtors to waive.").

[40] *TI Fed. Credit Union v. DelBonis*, 72 F.3d 921, 928 (1st Cir. 1995) ("Issues of law are the province of courts, not of parties to a lawsuit, individuals whose legal conclusions may be tainted by self-interest. Courts, accordingly, 'are not bound to accept as controlling, stipulations as to questions of law.'"); *Saviano v. C.I.R.*, 765 F.2d 643, 645 (7th Cir. 1985) ("The parties to a lawsuit are free to stipulate to factual matters. However, the parties may not stipulate to the legal conclusions to be reached by the court. For example, in this case it is undisputed that the International Monetary Exchange (IME) and Saviano executed a 'Loan Agreement.' Appellant then states in his brief, as a fact, that IME loaned him $30,000 which he then paid for mining expenses. However, *neither the nomenclature of the 'Loan Agreement' nor the agreement with the Commissioner binds this court as to the appropriate characterization of that transaction for tax purposes. That determination involves a conclusion of law*. Thus, while the parties are free to stipulate to the factual elements of the transactions, the court is not bound by the legal conclusions implied by the terminology utilized.") (emphasis added).

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    Page 21

guaranteed the Loans, let alone "funded" the program under which the Loans were made.[41]

Defendants have offered no evidence that Charter One ever paid a guarantee fee to TERI for the DTC Loans.  In discovery, Plaintiff asked for proof that Charter One actually paid the guarantee fee to TERI on the DTC Loans.[42]  In addition to directing Plaintiff to the preprinted language in the promissory notes, Defendants provided a "Payment of Guarantee Claims Direction Letter" at **Exhibit I** (page 362 of Declaration of Bradley Luke). ***But that document is blank***.  It provides no evidence that TERI ever paid any guaranty fees to Charter One, let alone a guaranty fee on these specific DTC Loans. Plaintiff was told the Request was otherwise was irrelevant and harassing.[43]

And there seems to be good reason for Defendants' failure to produce demonstrable evidence that TERI guaranteed the DTC Loans.  If one reads the hundreds of pages of documents submitted by Defendants, one quickly learns that they undermine rather than support Defendants' arguments. For example, Section 2.2 of the Guaranty

---

[41] *In re Clouser*, 2016 WL 5864493, at *3 (Bkrtcy. D. Or. 2016) ("The only evidence that NCSLT offers concerning the existence of a guaranty is that the Loan Documents signed by Debtor contain a statement reading "I understand that you have purchased a guaranty of this loan, and that this loan is guaranteed by [TERI]." NCSLT has not shown how Debtor would be competent to testify to such a fact. Because there is no suggestion in the record that Debtor ever had personal knowledge of the existence or terms of a third-party guaranty, the boilerplate language of the Loan Documents cannot prove the actual existence of a guaranty.").

[42] See Defendants' Responses and Objections To Requests for Production No. 7 (attached as **Exhibit 4**).

[43] See Defendants' Responses and Objections To Request for Production No. 7 (attached as **Exhibit 4**).

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                                    Page 22

Agreement (**Defendants' Exhibit J at page 3**) lists several conditions precedent that had to be met before TERI would consummate its guaranty, including that the loan had to be made within the Program Guidelines.  The Program Guidelines (**Defendants' Exhibit K at Section B.7, page 24**), in turn, state that loans could not be made in excess of the "Cost of Attendance."[44]  This is confirmed on TERI's website, which states that graduate students could only, "[b]orrow annually up to *the lesser of $45,000 or the cost of attendance minus other aid (as certified by your school)*."[45]  TERI would not and did not guarantee or fund loans made in excess of the "cost of attendance."

And yet the DTC Loans in this action were demonstrably made in excess of the cost of attendance.  The Cost of Attendance at Loma Linda University for a graduate student was: (i) $15,672 during the 2005-2006 academic year; (ii) $18,520 during the 2006-2007 academic year; (iii) $19,640 during the 2007-2008 academic year.[46]  Despite the COA, Charter One Bank lent Plaintiff three direct-to-consumer loans for $30,000 each on January 6, 2006, September 29, 2006, and August 21, 2007.[47]  Each loan was by

------

[44] See Defendants' Exhibit K, NextStudent Program Guidelines at B.7, at page 24 ("In addition, if the student wishes to borrow amounts in excess of a Participating School's published cost of attendance, a letter is required from the School stating that these additional funds are needed as an education expense. Costs verified in this manner are consider part of the "Cost of Education' for purposes of the program maximums set forth in the attached Schedules.").

[45] *See* TERI Graduate Loan Borrowing Limits, attached as **Exhibit 2.**  *See also* Section 2.2(b) of the Guaranty Agreement (Bates # NCSLT0285) and Section B.7 of the NextStudent Program Guidelines at page 24 (Bates # NCSLT0320).

[46] See Institutional Characteristics, Loma Linda University, Part D: Graduate Student Charges, at pages 6-7, 15, 25-25 (attached as **Exhibit 3**).

[47] See Defendants' Exhibits A-1, A-5, A-9.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                                **Page 23**

itself in excess of the Cost of Attendance for each academic year 2005-2006, 2006-2007, and 2007-2008. Despite this plain excess, Defendants have not produced any evidence explaining how or why TERI permitted this excessive borrowing.

Defendants will now likely argue that it does not matter if TERI actually guaranteed these DTC Loans because what matters is whether TERI funded, guaranteed, or otherwise "meaningfully participated" in the loan program. The Defendants have identified the "NextStudent Loan Program" as the "program" under section 523(a)(8)(A)(i). Defendants have stated that this program is defined in the Program Guidelines. But if the DTC Loans were made outside the "Program Guidelines," then the DTC Loans cannot be said to have been "made" under the NextStudent Loan Program.

### E. The Charter One Bank/TERI Guarantee Was Voided And Refunded In TERI's Own Bankruptcy

Even if this Court is not persuaded by the statutory interpretation arguments, and believes the DTC Loans were guaranteed by TERI and thus were "made under any program funded in whole or in part . . .by a nonprofit intuition," the guaranty agreements were voided in TERI's bankruptcy, and the guarantee payments (or some portion of them) were refunded.

The Guaranty Agreement was made between TERI and Charter One Bank.[48] Charter One Bank was acquired by Citizens Bank in 2004. Citizens Bank was a wholly

---

[48] See Defendants' **Exhibit J.**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

owned subsidiary of the Royal Bank of Scotland between 1998 and 2014.  In TERI's

bankruptcy, the Court so ordered the stipulation that authorized the rejection of the

Guaranty Agreement between Charter One Bank and TERI.[49]  In addition, in TERI's

Fourth Amended Plan,[50] TERI refunded to RBS approximately $46 million in guaranty

fees, and refunded to Defendants more than $65 million.[51]  At the very least, these

judicial proceedings raise genuine issues of material fact surrounding the guarantees that

Defendants' have failed to explain or even disclose.[52]

These actions are far beyond simply ceasing operation of the lending program.

There is no outstanding guarantee, and any money that could conceivably constitute

---

[49] *See* Order Rejecting and Terminating Certain Executory Contracts **Exhibit 5**. *See also* TERI's
Fourth Amended Plan at **Exhibit 6** at page 40 **(**"Rejection of Executory Contracts. On the Effective
Date, all Guaranty Agreements executed in favor of the Securitization Trusts and the related Deposit and
Security Agreements and other related documents entered into by the Debtor prior to the
Commencement Date will be deemed rejected, and with respect to Claims asserted by Securitization
Trusts accepting the Plan or that are deemed to accept the Plan, thereby receiving the treatment provided
by the Securitization Trust Settlement, all Debtor's claims or rights to set off any Guaranty fees, basis
point fees and other interests in loans held by such Securitization Trusts will be deemed waived.")

[50] Confirmed and ordered by the Court on October 29, 2010. *See In re The Education Resources
Institute, Inc.*, 08-12540, ECF No. 1170 (Bankr. D. Mass Oct. 29, 2010).

[51] See **Exhibit 6,** at page 65 of 68 ("Payment to Accepting Make and Wait Lender from
Collateral Account").

[52] Defendants went further and represented to this Court that the DTC Loans were currently
guaranteed by TERI. *See* Declaration of Bradley Luke, at paragraph 17 ("TERI is the guarantor for
Plaintiffs loan owing to NCSLT 2006-1."). That is demonstrably false.  The most that could be said is
that the loans were at one time guaranteed by TERI. Defendants should not be phrasing this in the
present tense and should not be trying to hide from Plaintiff and this Court the fact that the guaranty was
voided and rejected in TERI's bankruptcy.  Tellingly, Defendants have already been admonished by the
Consumer Finance Protection Bureau for filing misleading affidavits seeking to reduce debts to
judgment. *See* CFPB Takes Action Against National Collegiate Student Loan Trusts, Sept. 18, 2017,
*available at*: https://www.consumerfinance.gov/about-us/newsroom/cfpb-takes-action-against-national-
collegiate-student-loan-trusts-transworld-systems-illegal-student-loan-debt-collection-lawsuits/

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                                          Page 25

1  "funding" under section 523(a)(8)(A)(i) *was refunded and all further claims waived*.

2  The Guaranty Agreements were rejected, voided, and everyone was put back in their

3
4  original position as far as that was possible within TERI's bankruptcy capacity.  It would

5  be the height of inequity to allow NCSLT to now use the "dead hand" of TERI to render

6  the DTC Loans non-dischargeable when the contracts have been voided, and the money
7
8  refunded that purportedly went into constructively "funding" the "program."[53]    As a

9  matter of analogy, consider the following.  A private bank created a 501(c)(3) on January
10
11  1, 2019, originated a billion dollars of consumer debt during the month of January, had

12  the nonprofit guarantee the loans, and paid the nonprofit certain guarantee fees.  Then on
13
14  January 30, 2019, the bank dissolved the nonprofit, and put it into bankruptcy.  In the

15  bankruptcy, the guaranty agreement was voided, and the nonprofit refunded all the

16  guarantee payments to the bank.  Could that bank still argue that all the debt originated
17
18  was non-dischargeable under section 523(a)(8)(A)(i)?  That is essentially what happened

19
20
21
22
23
24
25
26

27    [53] *Crowley v. TVSM, Inc.*, 1991 WL 267868, at *3 (S.D.N.Y. 1991) ("A party to a series
28  of interrelated contracts cannot selectively avoid those obligations it chooses to avoid, while keeping for
itself the benefit of those contracts it wishes to honor.").

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                                                        Page 26

with TERI and Defendants, albeit the timeline was several years rather than a single month.[54]

### F. Defendants Are Not Now Permitted To Allege New Facts In Their Reply

Defendants failed to argue a number of factual elements their Motion, including that the DTC Loans are "educational loans," or evidentiary proof that TERI guaranteed the DTC Loans.    They may not do so in their reply brief.  "It is improper for a moving party to introduce new facts or different legal arguments in the reply brief than those presented in the moving papers."    *U.S. ex rel. Giles v. Sardie*, 191 F.Supp.2d 1117, 1127 (C.D.Cal.,2000).  If they do, Plaintiff should be permitted to file a sur-reply. *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir 1996) ("[W]here new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the [non-]movant an opportunity to respond.").

## V.    CONCLUSION

---

[54] Plaintiff repeats that these "direct to consumer" loans are not like traditional student loans. They were created by banks to feed the securitization market leading up to the crash of 2008. *See* Consumer Finance Protection Bureau, Private Student Loans, 2012 *("*During the lending boom, [Private Student Lenders] sought to increase volume through a new marketing channel and processing protocol: Direct-to-Consumer ("DTC"). DTC lending circumvented the school's financial aid office, marketing instead through mass media, online advertising, and direct media. Funds were generally disbursed directly to the student, instead of to the school. The school did not certify the borrower's financial need, and the lender instead imposed a cap of the lesser of total cost of attendance or a fixed amount, such as $30,000. This new technique could simultaneously increase the number of borrowers and the amount each one borrowed. It also created an opportunity for the student to borrow more than the [Expected Family Contribution]."), *available at:*
http://files.consumerfinance.gov/f/201207_cfpb_Reports_Private-Student-Loans.pdf

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                                      Page 27

1  Plaintiff hereby requests that this Court deny the Motion, and order this matter sent to

2  trial for final determination.

3

4

5  February 4, 2019

6

7

8                                    /s/ _____

                                         M. Erik Clark, #188693
9                                        BOROWITZ & CLARK, LLP
                                    100 N. Barranca Street, Suite 250
10                                        West Covina, CA 91791
                                           Tel: (626) 332-8600
11                                         Fax: (626) 332-8644

12                                     Austin C. Smith (*pro hac vice*)
                                         SMITH LAW GROUP LLP
13                                            3 Mitchell Place
                                          New York, NY 10017
14                                            917-992-2121
                                    austin@acsmithlawgroup.com

15                                        Attorneys for Debtor

16

17

18

19

20

21

22

23

24

25

26

27

28

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    Page 28