Erik Clark, #188693
BOROWITZ & CLARK, LLP
100 N. Barranca Street, Suite 250
West Covina, CA 91791
Tel: (626) 332-8600
Fax: (626) 332-8644

Austin C. Smith
SMITH LAW GROUP LLP
3 Mitchell Place
New York, NY 10017
917-992-2121
austin@acsmithlawgroup.com

Attorneys for Debtor

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:<br>JOHN MARTIN MATA<br>LIVIER MATA | Case No.  16-BK-30625-MH<br><br>Chapter 7 |
| JOHN M. MATA,<br>            Plaintiff,<br><br>      vs.<br>NATIONAL COLLEGIATE STUDENT<br>LOAN TRUST 2006-1; NATIONAL<br>COLLEGIATE STUDENT LOAN<br>TRUST 2006-4; NATIONAL<br>COLLEGIATE STUDENT LOAN<br>TRAUT 2007-1,<br>            Defendants. | Adversary No. 6:18-AP-01089-MH |

**SUPPLEMENTAL DECLARATION OF AUSTIN C. SMITH IN
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND REQUEST FOR JUDICIAL NOTICE**

1. I am counsel of record for Plaintiffs in this matter.

2. A true and correct copy of the Transcript of Telephonic Hearing On Confirmation Of Fourth Amended Plan, etc. from TERI's bankruptcy proceedings is attached as **Exhibit 8.** I obtained this document from PACER. *See* Fed. Evid. R. 201(b); *see MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).

3. A true and correct copy of a June 23, 2008 Order from TERI's bankruptcy is attached as **Exhibit 9.** I obtained this document from PACER.    *See* Fed. Evid. R. 201(b); *see MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).

4. A true and correct copy of the Plaintiff's National Student Loan Database System summary is attached as **Exhibit 10**. Documents obtained from government websites are self-authenticating.[1] Furthermore, the Department of Education is required by law to collect and make public this data by the Higher Education Act, 20 U.S.C. 1092b.

---

[1]    *Williams v. Long,* 585 F.Supp.2d 679, 687–88 (D.Md.,2008) ("Cases following *Sannes* showed approval of the decision, and a willingness to accept postings on "government websites" as inherently authentic. For example, in *Hispanic Broad. Corp. v. Educ. Media Found.,* No. CV027134CAS (AJWX), 2003 WL 22867633 (C.D.Cal. Oct.30, 2003), the court noted how "exhibits which consist of *records* from *government websites,* such as the FCC website, are self-authenticating." *Id.* at *5 n.5 (emphasis added). Subsequently, in *688 Shell Oil Co. v. Franco,* No. CV 03–8846 NM (PJWx), 2004 WL 5615656 (C.D.Cal. May 18, 2004), the court remarked that "records from government websites are self-authenticating," and permitted the plaintiff to introduce internet reports from the U.S. State Department website (citing *Hispanic Broad. Corp.,* 2003 WL 22867633, at *5).")

5. A true, complete and correct copy of the Transcript of Hearing in *Shilinski v. Navient Solutions, LLC et. al.* Adv. Pro. 16-08252 (Bankr. S.D.N.Y Apr. 9, 2018) is attached as **Exhibit 11**. I obtained this document from the Court reporting service as registered on the PACER docket. *See* Fed. Evid. R. 201(b); *see MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).

6. A true and correct copy of the Part 2 of the Disclosure Statement from TERI's bankruptcy proceedings is attached as **Exhibit 12.** Defendants previously provided only Part 1 of this Disclosure Statement. I obtained this document from PACER.      *See* Fed. Evid. R. 201(b); *see MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).

7. A true and correct copy of the Affidavit of John M. Mata is attached as **Exhibit 13.**

8. Plaintiff hereby requests that the Court take judicial notice of the above referenced documents.

**I declare under penalties of perjury of the laws of the United States that the above is true and correct.**

**Executed this 10th day of April, 2019.**


*/s Austin C. Smith*

**Attorney for Plaintiff**

# EXHIBIT 8

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS - SPRINGFIELD

| | | |
|---|---|---|
| IN THE MATTER OF: | . | Case #08-12540 |
| | . | |
| THE EDUCATION RESOURCES | . | Springfield, Massachusetts |
| INSTITUTE, INC. | . | **April 28, 2010** |
| Debtor. | . | 10:17:04 a.m. O'clock |

**A.M. Session
Volume I**

### TRANSCRIPT OF TELECONFERENCE HEARING ON:
**(#1011) HEARING ON CONFIRMATION OF FOURTH AMENDED
JOINT PLAN OF REORGANIZATION;
(#1045) DEBTOR'S MOTION FOR ORDER APPROVING REJECTION OF CERTAIN
EXECUTORY CONTRACTS;
(#1046) DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO REJECT
AND TERMINATE EXECUTORY CONTRACTS;
(#1066) JOINT MOTION FOR ORDER AUTHORIZING DEBTOR, RBS CITIZENS,
N.A., AND THE CREDITORS' COMMITTEE TO ENTER INTO STIPULATION FOR
THE SETTLEMENT OF GUARANTY CLAIMS RELATING TO THE TERMINATION
OF CERTAIN LOAN GUARANTEES
BEFORE THE HONORABLE HENRY J. BOROFF, J.U.S.B.C.**

**APPEARANCES**: (See next Page)

Electronic Sound Recording Operator:   Laura L. Chambers

*Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Certified Transcription Service*

GCI TRANSCRIPTION SERVICES
210 Bayberry Avenue
Egg Harbor Township, NJ 08234-5901
1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299
e-mail - irwingloria@comcast.net

Page 2 Cover
# 08-12540
4-28-2010    A.M. Volume I

**APPEARANCES: (continued)**

| | |
|---|---|
| For The Debtor: | DANIEL GLOSBAND, ESQ. |
| | GINA L. MARTIN, ESQ. |
| | DAHLIA S. FETOUH, ESQ. |
| | KIRK D. JOHNSON, ESQ. |
| | GEORGIA C. PICKETT, ESQ. |
| | Goodwin Procter, LLP |
| | Exchange Place |
| | Boston, MA   02109 |
| | |
| For the Official Committee of Unsecured Creditors: | JEFFREY D. STERNKLAR, ESQ. |
| | Duane Morris |
| | 470 Atlantic Avenue |
| | Boston, MA  02210 |
| | |
| For First Marblehead Corp. and First Marblehead Data Services, Inc., Trust Administrator: | DENNIS L. JENKINS, ESQ. |
| | Wilmer Cutler Pickering Hale & Dorr, LLP |
| | 60 State Street |
| | Boston, MA  02109 |
| | |
| For U.S. Bank, N.A.: Indenture Trustee for Student Loan Trusts: | RICHARD C. PEDONE, ESQ. |
| | Nixon Peabody, LLP |
| | 100 Summer Street |
| | Boston, MA   02110 |
| | |
| For Nellie Mae Education Foundation: | D. ROSS MARTIN, ESQ. |
| | Ropes & Gray, LLP |
| | One International Place |
| | Boston, MA  02110 |

-----------continued----------->

Electronic Sound Recording Operator:   Laura L. Chambers

*Proceedings Recorded by Electronic Sound Recording*
*Transcript Produced by Certified Transcription Service*

## GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299     FAX 1-609-927-9768     1-800-471-0299**
**e-mail - irwingloria@comcast.net**

Page 3 Cover
#08-12540
4-28-2010    A.M. Volume I

**APPEARANCES: (continued)**

For Official Committee of Unsecured Creditors:    DAVID J. REIER, ESQ.
Posternak, Blankstein & Lund, LLP
800 Boylston Street
Boston, MA  01299

For Pension Benefit Guaranty Corporation :    SAMUEL C. BATSELL, ESQ.
U.S. Government Agency
1200 K Street N.W.    Suite 340
Washington, D.C.  20005

For AMBAC Assurance Co.:    JAMES W. KAPP, III, ESQ.
McDermott, Will & Emery
227 West Monroe Street
Chicago, IL  60606

For RBS Citizens, N.A.:    PAUL S. SAMSON, ESQ.
Riemer & Braunstein, LLP
Three Center Plaza
Boston, MA  02108

For the U.S. Trustee:    ERIC K. BRADFORD, AUST
Office of the U.S. Trustee
J.W. McCormack Post Office, Court House
5 Post Office Square    Suite 1000
Boston, MA  02109

Electronic Sound Recording Operator:  Laura L. Chambers

*Proceedings Recorded by Electronic Sound Recording*
*Transcript Produced by Certified Transcription Service*

**GCI TRANSCRIPTION SERVICES**
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299    FAX 1-609-927-9768    1-800-471-0299**
**e-mail - irwingloria@comcast.net**

Page 2

# I N D E X

<u>A.M. Session</u> — page 6      Argument on the following:


1.    P. 8  (#1045)  DEBTOR'S MOTION FOR ORDER APPROVING REJECTION OF
CERTAIN EXECUTORY CONTRACTS;
2.    P. 14 (#1046) DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO
REJECT AND TERMINATE EXECUTORY CONTRACTS;
3.    P. 14 (#1066) JOINT MOTION FOR ORDER AUTHORIZING DEBTOR, RBS
CITIZENS, N.A., AND THE CREDITORS' COMMITTEE TO ENTER INTO
STIPULATION FOR THE SETTLEMENT OF GUARANTY CLAIMS RELATING TO
THE TERMINATION OF CERTAIN LOAN GUARANTEES


<u>P.M. Session</u> — page 95, Volume II

(#1011) HEARING ON CONFIRMATION OF FOURTH AMENDED PLAN OF
REORGANIZATION

Case 6:18-ap-01089-MH    Doc 63    Filed 04/10/19    Entered 04/10/19 17:10:57    Desc
Case 08-12540    Doc 1096    Main Document      Page 9 of 241
Filed 05/06/10    Entered 05/06/10 04:59:31    Desc Main
Document    Page 5 of 99

Page 3

1  (At 10:17:04 a.m.)

2          THE COURT:    Please be seated.

3          MR. REYNOLDS:    Case #08-12540, The Education

4  Resources.    We're here for confirmation hearing.    Mr.

5  Bradford, on behalf of the United States Trustee, do we still

6  have you on the telephone?

7          MR. BRADFORD:    You do.    Thank you.    Good morning,

8  Your Honor.    Eric Bradford, for the United States Trustee.

9          MR. REYNOLDS  And beginning with Mr. Glosband, could

10 I ask the counsel present in the courtroom to please identify

11 themselves, as well as who they represent?

12         MR. GLOSBAND:    Good morning, Your Honor.    Daniel

13 Glosband, from Goodwin Procter, representing the debtor.

14         MS. MARTIN:    Good morning, Your Honor.    Gina Martin,

15 from Goodman Procter, representing the debtor.

16         MS. FETOUH:    Good morning, Your Honor.    Dahlia

17 Fetouh, with Goodwin Procter, also representing the debtor.

18         MR. STERNKLAR:    Good morning, Your Honor.    Jeffrey

19 Sternklar from Duane Morris, representing he Official

20 Committee of Unsecured Creditors.

21         MR. REIER:    Good morning, Your Honor.    David Reier,

22 from Posternak, Blankstein & Lund, special conflicts counsel

23 for the Creditors' Committee.

24         MR. BATSELL:    Good morning, Your Honor.    Sam Batsell

25 representing Pension Benefit Guaranty Corporation.

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Main Document      Page 10 of 241
Document      Page 6 of 99

Page 4

1          MR. PEDONE:  Good morning, Your Honor.  Richard

2     Pedone, representing U.S. Bank as Indenture Trustee.

3          MR. SAMSON:  Good morning, Your Honor.  Paul Samson.

4     (unclear, nowhere near a microphone and speaking very low)

5          MR. KAPP:  Good morning, Your Honor.  James Kapp

6     from McDermott, Will & Emery representing AMBAC Assurance

7     Company (unclear, nowhere near a microphone, speaking very

8     low)

9          MR. JENKINS:  Good morning, Your Honor.  Dennis

10    Jenkins, Wilmer Hale, representing First Marblehead.

11         MR. MARTIN:  Good morning, Your Honor.  Ross Martin,

12    Ropes and Gray for the Nellie Mae Education Foundation

13    (unclear, nowhere near microphone; speaking very low)

14         MR. GLOSBAND:  Good morning, Your Honor.  Dan

15    Glosband still.  I'd like to suggest, if I might, at the

16    outset the order in which we intend to proceed, and if that's

17    acceptable, we'll proceed in that order.

18         We've submitted an agenda for today's hearing, and

19    Items 1 through 3 will be presented by Ms. Martin, and we'll

20    proceed with those first.  I will then present the debtor's

21    case in support of confirmation of its plan of reorganization.

22    Towards the end of my presentation I'm going to ask that Ms.

23    Fetouh examine James Peko, our financial advisor, on matters

24    pertaining to the best interest of creditors' test and the

25    feasibility of the plan, after which I'll conclude briefly and

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document     Page 11 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document     Page 7 of 99

Page 5

1   cede the podium to the Creditors' Committee.

2        I would expect last, but not least, after the

3   affirmative presentations we would hear the objections filed

4   by the Nellie Mae Foundation.

5        THE COURT:  Well, Nellie Mae has objected, at least

6   in part, on the basis of feasibility, so --

7        MR. GLOSBAND:  Correct.

8        THE COURT:  -- will Nellie Mae at some point get the

9   opportunity to cross examine Mr. Peko?

10        MR. GLOSBAND  Absolutely, Your Honor.  I would leave

11   it to your discretion on whether you'd prefer that to be while

12   he's presenting his direct case or whether they would like to

13   call in on the context of their objection.  We don't have an

14   opinion either way.

15        THE COURT:  Well, let's proceed along the lines that

16   you suggest, and then we'll see where we go from there.

17        MR. GLOSBAND  Thank you.  Then I'm going to turn

18   over the --

19        THE COURT:  Mr. Martin, did you want to be heard on

20   that?

21        MR. MARTIN:  Just on one small (unclear)  We would

22   like to have time before we get into the presentation

23   (unclear, not near a microphone and not speaking very loud)

24   for an opening statement and obviously (unclear) debtor

25   (unclear)  normally at an evidentiary hearing (unclear)  case

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document      Page 12 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document      Page 8 of 99

Page 6

1  before the (unclear)

2       THE COURT:  Well, why don't I hear you on the

3  objection before Mr. Peko gets on the stand.  It seems to me

4  that's the more efficient way to do that and --

5       MR. GLOSBAND  That's fine.

6       THE COURT:  Mister -- Mr. Martin, in support of your

7  objection will you be presenting witnesses, as well?

8       MR. MARTIN:  We -- we -- I had certainly intended to

9  cross-examine Mr. Peko, and we may (unclear, nowhere near

10  microphone; voice low) call him (unclear, nowhere near

11  microphone; voice low) We might (unclear, nowhere near

12  microphone; voice low) through the debtor, and we might also

13  call the financial advisor for the Committee (unclear, nowhere

14  near microphone; voice low)

15       THE COURT:  Well, let's get ourselves to the point

16  right before Mr. Peko would get on the stand, and then we'll

17  figure out what to do from there on.

18       MR. GLOSBAND  Okay.  In that case I'm going to turn

19  the podium over to Ms. Martin.

20       MS. MARTIN:  Good morning, Your Honor.  Mr. Glosband

21  said that there were three items.  I actually think that

22  there's four.  There's two motions to reject contracts.

23  There's a motion to approve a stipulation with RBS Citizens,

24  and there is a motion that we filed regarding the modification

25  of the plan with respect to Classes III-M and III-N.

Case 6:18-ap-01089-MH    Doc 63    Filed 04/10/19    Entered 04/10/19 17:10:57    Desc
Main Document      Page 13 of 241
Case 08-12540    Doc 1096    Filed 05/06/10    Entered 05/06/10 04:59:31    Desc Main
Document      Page 9 of 99

Page 7

1          Your Honor, the first motion is the motion -- the

2   motion for order approving rejection of certain executory

3   contracts pursuant to Section 365 of the Bankruptcy Code.

4   It's Docket #1045.

5          As part of the plan process the debtor reviewed

6   hundreds of contracts to determine what contracts it should

7   assume and what contracts it should reject.  Pursuant to the

8   terms of the plan, if it's -- if it is confirmed, if an

9   executory contract is not assumed and was not listed on our

10  plan supplement as a contract to be assumed, it is to be

11  rejected; however, in order to create -- to give people better

12  notice than that, what we have done is we've filed an omnibus

13  motion to reject contracts, and all of the contracts listed on

14  Exhibit A to the motion are being rejected by the debtor.

15         Exhibit A is largely made up of collection contracts

16  that TERI had with various collection agencies prior to the

17  bankruptcy.  There are some other executory contracts on

18  there, but that is the bulk of them.  The motion seeks an

19  order authorizing the rejection of the contracts.  The debtors

20  determined that that's in their best interest, and pursuant to

21  the terms of the order, what we have provided that all

22  counter-parties to the executory contracts will have 30 days

23  from the entry of the order approving the rejection to submit

24  a proof of claim.

25         Your Honor, we believe that almost all of these

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document   Page 14 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document   Page 10 of 99

Page 8

1  parties have filed claims, but, again, in the abundance of

2  caution we want to make sure that they have at least 30 days

3  to file and submit proofs of claim.  We've received no

4  objections to this motion.

5          THE COURT:  Does anyone wish to be heard with

6  respect to this motion?

7      (No audible response)

8          THE COURT:  All right, hearing nothing, it's

9  granted.  We need to select s date, unless you have a date in

10  mind, for the third paragraph of that order.

11          MS. MARTIN:  Your Honor, I believe May 30th is a

12  Friday.  Perhaps we could pick that day.  May 30th.  Oh, I'm

13  sorry.  Mr. Reynolds is telling me May 30th is a Sunday, so the

14  28th.

15      (Pause)

16          THE COURT:  Well, we haven't left any -- any room

17  for mailing so why don't we -- why don't we make it June 1.

18          MS. MARTIN:  That's fine, Your Honor.

19          THE COURT:  Okay.  Thank you.

20          MS. MARTIN:  Thank you, Your Honor.  The next is a

21  motion to reject and terminate executory contracts, and these

22  two contracts deal with the employment contracts of Mr.

23  Hulings, who is the debtor's chief executive officer, and Mr.

24  Davidson, who is the debtor's chief financial officer; and for

25  the past several years Mr. Hulings and Mr. Davidson have

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document   Page 15 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document   Page 11 of 99

Page 9

1   served in that capacity.  Their employment continued

2   throughout the Chapter 11 case, and they were paid pursuant to

3   their employment agreements during that time.

4          Given the change in operations of TERI that are

5   contemplated by the plan, a substantially scaled down not-for-

6   profit, the board of directors has determined that it must

7   review the compensation and employment terms of Mr. Hulings

8   and Mr. Davidson, the only two with employment contractors.

9   The board of directors expects that compensation will probably

10  be reduced for many employees, but Mr. Hulings and Mr.

11  Davidson are the only two with employment contracts at TERI.

12         Because of the cost of terminating the employment

13  contracts post-emergence may be significant, the board

14  concluded that it should terminate and reject the contracts

15  prior to TERI's emergence from Chapter 11 so that any damages

16  will be dealt with under TERI's plan.

17         Notwithstanding the rejection of employment

18  contracts, the board believes the services of Mr. Hulings and

19  Mr. Davidson will be vital to the reorganized TERI's success

20  going forward and expects to agree to new terms for the

21  employment of Mr. Hulings and Davidson.

22         While the board has embarked on that process, it has

23  not set new compensation levels, and that process remains

24  ongoing, although we expect that it will be in the very near

25  term.  Until that process is complete, Mr. Hulings and Mr.

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document     Page 16 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document     Page 12 of 99

Page 10

1  Davidson will continue to be paid at their current salary and

2  benefits with the stated understanding that the board expects

3  to reduce their salaries to be more in line with other

4  companies of comparable size and scope to reorganized TERI.

5          The debtor has not received any objections to this

6  motion.  Pursuant to the terms of the order the employment

7  contracts of Mr. Davidson and Mr. Hulings will be deemed

8  rejected and terminated, and each of them will have 30 days to

9  file a proof of claim as a result of the rejection of their

10 contracts.

11         THE COURT:  Now in the Nellie Mae objection Nellie

12 Mae makes the observation that rejection and termination may

13 be two different things with different legal consequences.  Do

14 I understand that what the debtor means is here is simply that

15 the contracts are rejected?

16         MS. MARTIN:  Yes, Your Honor.

17         THE COURT:  But --

18         MS. MARTIN:  Sorry.

19         THE COURT:  -- is that now likely to -- to realize a

20 rejection claim?

21         MS. MARTIN:  We believe that they'll have the right

22 to file a proof of claim, yes, Your Honor.

23         THE COURT:  So it's more that they're being rejected

24 than they're being terminated for cause.

25         MS. MARTIN:  Yes, Your Honor.  The only reason we

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document      Page 17 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document     Page 13 of 99

Page 11

 1  said terminated and rejection is that rejection is a breach,

 2  and we -- and it leaves somewhat ambiguous whether the

 3  contract has been terminated or not.  We wanted to make it

 4  clear that the contract is terminated and deemed rejected.

 5          THE COURT:  Now in this order --

 6          MS. MARTIN:  We didn't put a date.

 7          THE COURT:  -- there isn't a date, but the term

 8  "effective date" is used as a defined term, but there's no

 9  reference to it that I can find in the order, so -- so do you

10  mean by that the effective date of the plan --

11          MS. MARTIN:  Yeah.  Your Honor, I'm just checking to

12  see.  I think I might have misspoke.  I think that we -- what

13  we proposed in the motion was 30 days from the effective date

14  of the plan.  If you give me one -- (pause)  yeah, we -- in

15  that -- in this we mean the effective date of the plan.

16          THE COURT:  And what if there never is confirmation

17  of the plan, then what is their deadline?

18          MS. MARTIN:  Well, their contract is still deemed

19  rejected.  It'd just be their -- their bar date.

20          THE COURT:  The bar date would be --

21          MS. MARTIN:  If we want to change that to June 1st,

22  that would be acceptable.

23          THE COURT:  I think we should.  Okay,.  Thank you.

24          MS. MARTIN:  Thank you, Your Honor.  The third

25  motion we have on is a joint motion filed by the debtor to

Case 6:18-ap-01089-MH    Doc 63    Filed 04/10/19    Entered 04/10/19 17:10:57    Desc
Main Document      Page 18 of 241
Case 08-12540    Doc 1096    Filed 05/06/10    Entered 05/06/10 04:59:31    Desc Main
Document      Page 14 of 99

Page 12

1  deem acceptances of the plan to be acceptances of the plan as

2  modified with respect to Classes III-M and III-N.  Your Honor,

3  for a little bit of background, Classes III-M and III-N are

4  two of the smaller trusts in the National Collegiate Trusts.

5  They're commonly referred to as C -- 2001 CP1 and 2002 CP1.

6       Your Honor, we have been in settlement negotiations

7  with the voting control party for those trusts for several

8  months now.  They are slightly different than the other trusts

9  in terms of size, and the -- that it is clear that MBIA has

10  the power to direct the trusts' actions, which is one of the

11  hurdles we've had in this case.

12       Ultimately, the debtor, the Creditors' Committee,

13  and MBIA, with respect to the two trusts, agreed to settle the

14  claims in the adversary proceeding pursuant to the terms set

15  forth in the stipulation that's attached to the motion.

16       So the way -- the major terms of the stipulations

17  are as follows:

18       The decoder methodology is accepted by all the

19  parties to determine the claim amounts.  MBIA and the trusts

20  will be allowed to continue putting loans to TERI or

21  reorganized TERI, so as loans default they will be satisfied

22  out of the remaining funds in those pledged accounts, those

23  funds -- those trusts' pledged accounts.  Once there is not

24  enough money in those pledged accounts to fund any additional

25  defaulted loans, the nominal amount will be returned to the

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document      Page 19 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document      Page 15 of 99

**Page 13**

1  Indenture Trustee or such other party as directed under the

2  governing documents.

3         2001 CP1 shall have an allowed unsecured claim of

4  $300,000, and the trust adversary proceeding will be dismissed

5  as to the trusts, the CP1 trusts, and the related parties,

6  such as the Indenture Trustee.

7         Your Honor, in the plan the -- it references a

8  stipulation as the claim amount under the decoder.  When -- if

9  you went to look what 2001 CP1 or 2002 CP1's claim was and you

10 looked at that spreadsheet, it said "see stipulation."  As a

11 result of that, how we decided to implement the stipulation is

12 to -- is to seek a modification of the plan with respect to

13 those classes, and we think under Rule 3019 and Section 14 --

14 14.4 of the plan we have the authority to modify the plan.

15 The modification doesn't adversely change the treatment of the

16 claim of any creditor.  Acceptance by all creditors who have

17 accepted the plan should be deemed to be an acceptance by such

18 creditors to the plan as modified.

19        We received -- we've received no objections to this

20 motion of the stipulation.  I did speak with Mr. Pedone

21 earlier today, who represents U.S. Bank as Indenture Trustee

22 for these two trusts, and he wanted to make clear for the

23 record that the same exculpation provisions in respect to the

24 release of the trust adversary proceeding in respect of these

25 two trusts that the Indenture Trustee receives will be the

Case 6:18-ap-01089-MH    Doc 63    Filed 04/10/19    Entered 04/10/19 17:10:57    Desc
Main Document      Page 20 of 241
Case 08-12540    Doc 1096    Filed 05/06/10    Entered 05/06/10 04:59:31    Desc Main
Document      Page 16 of 99

**Page 14**

1  same as the other 14 National Collegiate Trusts, that -- that

2  the release as a result of the settlement of the trust

3  adversary proceeding extends to the Indenture Trustee and not

4  just MBIA as voting control party; and that -- the third point

5  I already I already touched on, which is that the nominal

6  funds remaining in the account would be sent to the Indenture

7  Trustee.

8           Your Honor, because this is a modification to the

9  plan, we propose to include its approval of the stipulation

10  and the terms of the stipulation and the treatment of Classes

11  III-M and III-N in the confirmation order, should it be

12  approved.   Thank you.

13          THE COURT:   Does anyone wish to speak to the

14  proposed amendment?

15      (No audible response)

16          THE COURT:   All right, hearing nothing it rides with

17  the plan approval.

18          MS. MARTIN:   Thank you, Your Honor.   The last motion

19  we have on is the joint motion filed by the Creditors'

20  Committee and the debtor and RBS Citizens to enter into a

21  stipulation for the settlement of guarantee claims relating to

22  the termination of certain loan guarantees with RBS Citizens.

23          Citizens is one of the largest make-and-hold

24  lenders in this case.   They have been actively involved --

25  they were not a member of the Creditors' Committee, but they

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document   Page 17 of 99

Page 15

1  have been actively involved throughout the duration of the

2  case.  We met with them several times.  Once it was -- once we

3  agreed that we were going to propose the decoder methodology

4  as the accepted methodology for valuing claims, we met with

5  Citizens again.  They had their financial advisers review the

6  decoder and the claim generated by the decoder with respect to

7  RBS Citizens.

8         One of the features of the decoder is that fees that

9  would have been paid by the lender prior to TERI being

10 obligated to pay its guarantee are essentially offset from the

11 claim so that the claim is reduced by the amount of fees that

12 the lender would have to pay.

13        One of the fees that were deducted are what we call

14 securitization fees, so when a -- once a securitization event

15 occurred there were a group of fees that became due by the

16 lender and were paid.  Nearly all guarantee agreements had a

17 provision that if the securitization event did not occur in a

18 specified period of time, the fees were accelerated at the

19 time of -- were accelerated at the end, at the expiration of

20 that period.

21        Of -- in respect of Citizens' 42 loan programs, 39

22 of those -- of those guarantee agreements had this fee

23 acceleration clause, but three did not.  Of the three, they

24 were the Astrive program, the Penn State program, and the Ed

25 Financial Program, and they also were --

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Main Document    Page 22 of 241
Document    Page 18 of 99

Page 16

1           THE COURT:  What was the first program?

2           MS. MARTIN:  Astrive.

3           THE COURT:  Astrive?

4           MS. MARTIN:  And these three programs also happen to

5    be Citizens' largest loan portfolios, so Citizens asserted

6    that we had essentially overcharged them in fees that weren't

7    actually ever going to be due to the lenders because the --

8    because, again, we charged almost -- we charged the entire

9    loan portfolio as -- as having paid those fees.

10          So that's approximately 7.2 million dollars of fees

11   that the asserted would not have become due, which we mostly

12   agreed with.  Again, as loans came due, those -- those fees

13   would be offset, but -- so their 7.2 number wasn't a one-for-

14   one reduction to the claim amount, but the Creditors'

15   Committee and Citizens finally agreed that the proper number

16   was some -- somewhere around 5.6 million; and so, therefore,

17   the parties have agreed to increase the make-and-wait claim

18   for Citizens from 7.8 million to 13.4 million.  The make-and-

19   hold -- the make-and-hold claim remains the same.

20          The other feature of the Citizens stipulation is, if

21   you know recalls, Citizens -- we rejected all of Citizens'

22   guarantee agreements.  It was one of the first things done in

23   the case.  It was in the first month of the case.  I think we

24   rejected all of the Citizens guarantee agreements.  Pursuant

25   to that rejection, they no longer had to pay basis point fees,

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
                    Main Document      Page 23 of 241
                    Document      Page 19 of 99

Page 17

1   but by error they continued to do so for a period of time, and

2   a few months ago there was an order approving the return of

3   those fees paid in error to Citizens.

4           Citizens also has a issue with respect to their

5   security interest in the pledged account, which we refer to in

6   the plan as the make-and-wait lien dispute, and pursuant to

7   the plan we've offered settlement of the make-and-wait lien

8   dispute, five per cent of the amount in the collateral

9   account, so whatever's in a make-and-wait lender with a make-

10  and-wait liens dispute at the effective date, essentially five

11  per cent of that amount the plan Trustee -- will be

12  transferred to the plan Trustee.  The remainder will go to --

13  the remainder will go to the lender.  Because Citizens had

14  essentially overpaid its pledged account, we've now deducted

15  those fees back out, and the five per cent will be based on --

16  on that reduction.

17          Two more points:  One is in the motion and not part

18  of the stipulation, but the plan also has what's called a most

19  favored nations provision, so if a lender rejects the plan and

20  has its claim determined by the Court, if it determines-- if

21  the Court determines that, you know, the decoder basically got

22  it wrong and that lender's claim is in excess of 10 per cent

23  of the amount that the decoder estimated it to be, basically,

24  the plan trust -- the plan Trustee can evaluate all of the

25  claims again and make sure that everyone's treated the same.

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
                Main Document      Page 24 of 241
                Document      Page 20 of 99

Page 18

1 | It's designed to keep equal treatment among all of the

2 | creditors.

3 |       Because we are confident that these three loan

4 | programs are unique in not having that acceleration provision

5 | for all the make-and-wait lien dispute, we think that this

6 | issue is unique to Citizens, and the most favored nation

7 | provision is not triggered by the increase of the claim amount

8 | of Citizens.

9 |       Finally, Your Honor, the stipulation provides that

10 | if the stipulation is approved, Citizens' vote to reject the

11 | plan, both as a make-and-wait lender and a make-and-hold

12 | lender, will be changed to a vote to accept the plan.

13 |       Your Honor, we've received no objections to this

14 | motion.

15 |       THE COURT:  Does anyone wish to be -- anyone else

16 | wish to be heard with respect to the motion?  Mr. Samson.

17 |       MR. SAMSON:  Good morning, Your Honor.  Just very

18 | briefly, Paul Samson, on behalf of RBS Citizens.

19 |       As Attorney Martin noted, we are one of the larger

20 | lenders with -- as far as our proof of claim is concerned

21 | here.  We held 1.3 billion dollars of student loans, subject

22 | to the TERI guarantee as of the petition date.  850 million of

23 | that was earmarked for securitization, what's referred to as

24 | the make-and-wait loans now.  We had 46 million dollars of

25 | cash collateral, and we've lost the guarantees and the use of

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document    Page 25 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document    Page 21 of 99

**Page 19**

1   our cash collateral for two years now, Your Honor.

2          We have been discussing the case throughout with

3   the -- with the debtor, the Committee and their various

4   consultants, and I will agree with Ms. Martin that this was

5   a -- a settlement that was part of extensive negotiations that

6   evaluated the decoder, the base case, and we had our

7   consultants working together with TERI's and the Committee's

8   consultants.

9          So we're satisfied with this resolution, Your Honor,

10  and with this resolution we're prepared to support the plan.

11  We think the plan is in the best interest of lenders, at least

12  in our position -- I think there's many of them -- and would

13  also like the opportunity at some later point today to speak

14  in support of the plan once the objection's been raised.

15  Thank you.

16         THE COURT:  Anyone else wish to be heard?

17     (No audible response)

18         THE COURT:  All right.  (Pause) All right.  So

19  that's allowed.  Thank you.

20         MS. MARTIN:  Thank you, Your Honor.

21         MR. GLOSBAND  Good morning again.  This is Dan

22  Glosband again.  With us today in the courtroom, in addition

23  to those folks who have entered appearances, just so the Court

24  will know, are two of Goodwin Procter's associates, Georgia

25  Pickett and Kirk Johnson, who've assisted with this matter;

Case 6:18-ap-01089-MH    Doc 63    Filed 04/10/19    Entered 04/10/19 17:10:57    Desc
Main Document      Page 26 of 241
Case 08-12540    Doc 1096    Filed 05/06/10    Entered 05/06/10 04:59:31    Desc Main
Document      Page 22 of 99

Page 20

 1  and then also from TERI, Alan Blair, its director of

 2  collections; Amy Bizar, its general counsel; and William

 3  Davidson, its chief financial officer.   In addition from our

 4  financial adviser, Grant Thornton, James Peko and John E. Lee

 5  are present.

 6          We have submitted, in addition to our memorandum in

 7  support of confirmation, affidavits from James Peko, from

 8  Grant Thornton, in addition to his preliminary affidavit we

 9  submitted last night as part of a response to the Nellie Mae

10  objection, a supplemental affidavit.   We've also submitted an

11  affidavit from Amy Bizar and, again, a supplemental affidavit.

12  Finally, we submitted an affidavit from Alan Blair, the

13  collections manager.

14          In addition to those affidavits, with the assistance

15  of the Committee, we submitted an affidavit of Mark Renzi from

16  FTI Consulting, which is the Committee's financial adviser.

17  As I go through my presentation, to the extent that I'm

18  referring to factual matters, they are either supported by

19  materials long in the record of this case or by evidence

20  contained in those affidavits.

21          I'd like to begin by announcing the voting results.

22  We filed our voting affidavit.   I handed a marked copy earlier

23  to Mr. Reynolds.   And while I'll go into more detail later,

24  basically there are only two Classes out of 43 that did not

25  vote to accept the plan.   Of those two, one actually voted No,

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document    Page 27 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document    Page 23 of 99

Page 21

1   and it's a small secured Class, and the other simply didn't

2   vote.  Were you to look at the chart of acceptances contained

3   in our memorandum, it shows a couple more that neglected to

4   vote.  Those votes have since come in, and they're reflected

5   in the voting affidavit.

6         Just anecdotally, this is not an evidentiary matter,

7   I understand that the one Class that neglected to vote has

8   simply gone out of the student loan business, and there may be

9   no one receiving its mail, although no doubt someone will get

10  the check eventually.

11        So what I intend to do is just provide a very brief

12  overview of the case and the plan and then proceed to go

13  through the elements that we need to prove under Section 1129

14  of the Bankruptcy Code to have our plan confirmed.

15        The only live testimony, as I've indicated earlier,

16  that we intend to present directly is that of Mr. Peko on the

17  interest -- the best interest test and on feasibility.  He may

18  also, in the context of responding to the Nellie Mae

19  objection, deal a bit more with the executive compensation

20  issue, but that's all we plan to introduce by way of direct

21  testimony.  As I said before, Ms. Fetoouh will examine him on

22  those matters whenever the Court decides is the appropriate

23  time to do that.

24        Just stepping back a bit, this case was filed on

25  April 7, 2008, and I think we've come an awfully long way in

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document    Page 28 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document    Page 24 of 99

Page 22

1  just a little over two years.  When TERI filed that petition,

2  it was on the heels of essentially the implosion of the

3  securitization markets.  Shrapnel from that is still affecting

4  us in many different respects, but it affected TERI because

5  part of TERI's revenue stream only reached TERI when loans

6  were securitized.  So TERI received parts of its guarantee

7  fees when loans were originated and made.  Parts of them were

8  held back, pending release on securitization.

9      When securitization stopped, even as to business it

10  had already conducted, TERI didn't get paid its fees, and, of

11  course, TERI paid its operating expenses and its guarantee

12  liabilities out of, in some instances, collateral pledge

13  accounts held for those purposes, but in other instances from

14  its general account; and as the general accounts no longer

15  were being replenished, it wasn't able to do that, and that's

16  the intervening precipitating event that I'll mention as what

17  brought us here.

18      At the time of the filing all of this came as quite

19  a surprise.  This wasn't a situation where the company had

20  months to plan its Chapter 11 case.  This was a situation

21  where the company with a finite pool of cash, some revenues,

22  some of which were arguably subject to security interest,

23  others were not, and huge looming liabilities as the economic

24  circumstances also accelerated loan defaults and demands.

25  But the precipitating factor was the fact that one unsecured

Case 6:18-ap-01089-MH    Doc 63    Filed 04/10/19    Entered 04/10/19 17:10:57    Desc
Main Document    Page 29 of 241
Case 08-12540    Doc 1096    Filed 05/06/10    Entered 05/06/10 04:59:31    Desc Main
Document    Page 25 of 99

Page 23

1  creditor, a make-and-hold creditor, had a right in its

2  documents, if TERI's financial ratings dropped to a certain

3  level, to demand collateral.  That drop occurred because of

4  the circumstances that I've described.  If that lender

5  demanded that TERI post collateral, that collateral would have

6  essentially comprised nearly all of TERI's free assets, and we

7  would have been left with no choice but to have what we would

8  expect to have been a very unruly liquidation.  And so rather

9  than -- and, in turn, that would have, we think, had a very

10  detrimental effect on everyone, TERI not the least, but all of

11  its creditors.  So that brought us to Chapter 11.

12       At the time of the filing, as I said, things weren't

13  able to be planned in advance, and there was a tremendous

14  amount of chaos to be managed.  There were student loan

15  programs extant that worked essentially on automatic.  The

16  structure was such that when a qualified application was

17  submitted, a series of mechanical events occurred that led to

18  the disbursement of funds for the account of the lender to

19  which the application was submitted.  Those were what we

20  called at the beginning of this case pipeline loans.

21       They were loans in the pipeline, and it took awhile

22  to undo and to shut down the pipeline, and our friends at

23  Citizens were perhaps the most extreme example of that because

24  they had loan arrangements that weren't directly through

25  Citizens, but were out through marketing agencies and to

Case 6:18-ap-01089-MH    Doc 63    Filed 04/10/19    Entered 04/10/19 17:10:57    Desc
Main Document    Page 30 of 241
Case 08-12540    Doc 1096    Filed 05/06/10    Entered 05/06/10 04:59:31    Desc Main
Document    Page 26 of 99

Page 24

1    unwind and stop that process took awhile.  So even after the

2    bankruptcy was filed, loans were being funded for the accounts

3    of lenders through this mechanical process that couldn't

4    initially be terminated.

5            And so that led to two concerns at the outset of the

6    case:  One, how do we stop it?  Because those loans were being

7    made initially in contemplation of TERI guaranteeing those

8    loans, and that guarantee was no longer going to be available.

9    Secondly, how did we make sure that TERI didn't have

10   administrative expense exposure for guarantees of loans made

11   post-bankruptcy?  And we brought those matters before the

12   Court, made it quite clear that we would reserve and return to

13   creditors all fees paid in respect of guarantee exposure post-

14   bankruptcy and have in fact done so.

15           So we both got the pipeline shut down, and we

16   avoided huge administrative expense liability to TERI.

17           In addition, at the time of the filing TERI had been

18   running a business that over time guaranteed, you know, nearly

19   30 billion dollars in loans and was processing huge amounts of

20   cash, maintaining large volumes of -- of data in very

21   intricate fashion and was staffed commensurately and had many

22   of its services outsourced through First Marblehead related

23   entities at significant expense.  And so our next major goal

24   in the case was to get that expense level down to the point

25   where TERI simply didn't exhaust all of its funds, paying

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
                    Document       Page 27 of 99

Page 25

1   expenses that were tied to a business that didn't exist

2   anymore.

3          And so Your Honor will recall that we, after

4   negotiation with the First Marblehead entities, rejected all

5   of the contracts with those entities and began the process of

6   transitioning into TERI services that had been performed by

7   First Marblehead.  We thank them for their assistance in that

8   transition, and we also thank them for the agreement that we

9   reached to reduce our costs with respect to those services

10  from many millions of dollars a month to a few hundred

11  thousand dollars a month.

12          All of that exercise was not just economics because

13  it involved, as I said before, transitioning necessary

14  functions to an entity, TERI, that at that point only played a

15  supervisory role in those functions, and it had to undertake

16  an operational loan.  So TERI had to incur expenses, had to

17  incur transition costs, and had to manage that process, but

18  not an easy process, and it's fortunate that we had both

19  capable advisers and capable management to get there, but we

20  got there.

21          As all of this was going on, if you think just about

22  the size of TERI and what it was doing, TERI was managing a

23  huge amount of cash.  At all times TERI had custody over 400

24  million dollars in cash.  Still does.  Much of that is in

25  collateral accounts for the benefit of secured creditors, but

1  it's money that has to be attended to, to be managed, to be

2  invested, to be accounted for; and at the outset of the case,

3  and, again, you may very well recall this, that process was

4  horribly disrupted by what I would call a dysfunctional

5  response from our primary bank.  They simply weren't prepared

6  to accommodate the necessary changes in transitions filed by

7  the bankruptcy.  They were -- it turned out as a result of

8  series of mergers.  Many parts of TERI's activity were in

9  different parts of the bank, didn't communicate well with

10  other parts of the bank.

11        Simply managing through that so that nothing went

12  wrong, nobody lost any money, TERI was able to pay its bills

13  and continued to manage its operations, was another huge and

14  complicated exercise, again, managed by TERI and its financial

15  advisers at the beginning of the case to the point where now

16  all of TERI's banking activities are simply at a different

17  bank, and everything is running smoothly.

18        Along the way, as we got past the major crises --

19  and I don't mean to read our disclosure statement.  This

20  material is in much more detail.  I'm just trying to give a

21  high level overview.  Along the way, in addition to the First

22  Marblehead contract rejections and transition, at the request

23  of some of the larger lenders we rejected their contracts

24  earlier on.  RBS Citizens was one that had to do with

25  terminating its pipeline responsibilities as much as anything.

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Main Document   Page 33 of 241
Document   Page 29 of 99

Page 27

1 Chase Bank was another.  Bank of America was another.

2 Wachovia was another.  Those were all large lender

3 constituents with whom we made essentially one off deal,

4 sometimes with some resistence from the Committee, but

5 basically to simplify the case going forward.  We removed

6 large blocks of creditors and issues with settlements that

7 this Court approved, and not to suggest that it became very

8 simple, it at least became simpler.

9 　　　　At that point, and I would characterize "that point"

10 as sometime in the last summer, early fall of 2008, we began

11 to think about, "Well, now what are we going to do?"  We're

12 under control, but how do we get this company out of

13 bankruptcy?   How do we deal with creditor claims and the

14 like?  And that was when we started to try to figure out how

15 to calculate liabilities and how to deal with creditors who

16 had guarantee claims that were not liquidated or easy to

17 liquidate.  They all require predictions of future events,

18 many future events:  the economy, student default rates,

19 interest rates. and the like.

20 　　　　Creditors filed proofs of claim for these kinds of

21 liabilities in the amount of 30 billion dollars.  For the most

22 part the lenders filed claims based on their total loan

23 exposure, clearly, much worse than any foreseeable worst case,

24 but that was the universe that we -- we had to deal with.

25 　　　　To approach it, with the assistance of our financial

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document     Page 34 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document     Page 30 of 99

Page 28

1  advisers and TERI's in-house financial staff, we started doing

2  a financial model based on historical performance, based on

3  adjustments for current economic conditions and the like, and

4  developed the methodology that's described in our disclosure

5  statement as our base case.

6       That was TERI's view of the future and what loan

7  defaults and loan claims, creditor guarantee claims, would be,

8  and it turned out along the way that there were two very

9  important and distinct dimensions to that -- to the results of

10  that calculation.  One was simply how much do we think the

11  creditor is owed, what should that claim be estimated at?  But

12  the second dimension was that in those cases of creditors who

13  had collateral accounts were those creditors fully secured,

14  under-secured or over-secured?

15       And Your Honor has been at this long enough to

16  understand the distinction between what's a claim worth and

17  what's cash worth, and consequently, the creditors were much

18  more intensely focused on the cash in the pledge accounts and

19  what the effective claim estimation was on that than they

20  ultimately were on what the aggregate amount of their claim

21  was going to be, and so we had to deal with those issues in

22  our analysis.

23       And without suggesting that anybody was functioning

24  from ulterior motives, the base case that TERI projected

25  yielded lower claims.  Its assumptions were more favorable

Case 6:18-ap-01089-MH    Doc 63    Filed 04/10/19    Entered 04/10/19 17:10:57    Desc
Case 08-12540    Doc 1096    Filed 05/06/10    Main Document    Page 35 of 241    Entered 05/06/10 04:59:31    Desc Main
Document    Page 31 of 99

Page 29

1  with respect to the future than other cases, and as a

2  consequence left more value in pledge accounts over what we

3  said creditors was owed, what we've been calling equity in the

4  pledge accounts.

5       At the other end of the spectrum and without

6  identifying creditors, various of the creditors came back with

7  their own models and said, "Well, no, you're clearly mistaken.

8  The claims are significantly higher, and, by the way, that

9  means there's no equity in the pledge accounts.  We get back

10  all of that collateral."

11       So we had two extremes in that process, and into the

12  middle, if you will, rode the Creditors' Committee with the

13  methodology that's been described as the decoder; and the

14  decoder, which perhaps they will described in more detail

15  later, is their view of what are the proper assumptions to

16  apply in doing this claim estimation, and whether intentional

17  or not, the decoder falls in between the two extremes that

18  I've described.

19       And so as we proceeded along with the Committee

20  towards trying to discuss plan structure and negotiation, the

21  key element of how we determine claims was on the table, and

22  the result that we agreed to, and it was ultimately accepted

23  by the other major creditor constituencies, was to adopt the

24  decoder as a fair middle ground between the extreme.  It

25  wasn't our favorite case, but neither was it the favorite case

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document    Page 36 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document    Page 32 of 99

Page 30

1  of a number of the larger creditors.

2         Then, of course, we had the problem that none of us

3  is a Judge, and we couldn't impose the decoder on creditors,

4  so when I get to talking more about the compromise in the

5  plan, the decoder is a compromise proposed to creditors, and

6  they didn't have to accept that compromise.  But I'll -- I'll

7  come back to that.

8         In addition to the claim determination issue, which

9  is now presented as one of a series of compromises under the

10  plan, there were other litigable or litigated issues that

11  needed to be resolved, and those are all, again, dealt with in

12  the plan; and primarily, with one exception, they deal with

13  security interests and the extent to which security interests

14  are perfected in assets that TERI has or will have, and I'll,

15  again, go into the details of those a bit later.

16         The basic point of all that I've been saying so far

17  is just to sort of provide some context and maybe a refresher

18  course on the environment that we were functioning in and

19  to -- to say, even though I think we're nearly there now,

20  subject to the one objection, none of this was very easy.

21  This was a big case.  It was a complicated case, more

22  complicated in many ways than others that I'd been involved

23  in, and to get through it all basically required, you know,

24  very sophisticated legal and financial advice for both the

25  company and the Creditors' Committee and the significant

Case 6:18-ap-01089-MH    Doc 63    Filed 04/10/19    Entered 04/10/19 17:10:57    Desc
Main Document    Page 37 of 241
Case 08-12540    Doc 1096    Filed 05/06/10    Entered 05/06/10 04:59:31    Desc Main
Document    Page 33 of 99

Page 31

1 | individual creditors, and for the company's management to

2 | function at a high level throughout this, and ultimately for

3 | parties to negotiate in good faith; and at the end of the day

4 | I'd have to say that all of that came to pass successfully.

5 | We're only here because parties were able to negotiate in good

6 | faith and resolve a series of what could have been intractable

7 | issues.

8 | I can hardly imagine what this case would have

9 | looked like had it started off as a liquidation because it

10 | would have been very difficult to manage all of these issues

11 | I've described, would have been, you know, handled, I think,

12 | in a much more chaotic environment.  Instead, we had a bunch

13 | of very capable professionals and a very capable company

14 | management team worked together to where I think we have a

15 | pretty successful result.

16 | At the end of the day we will have resolved those 30

17 | billion dollars of claims at around 300 million dollars in

18 | allowed claims, no small feat.  We'll be turning over to

19 | secured creditors about 365 million dollars in collateral.

20 | We'll be turning over to the plan trust assets that we

21 | estimate to be worth about 170 million dollars.  What's left

22 | of TERI, and TERI will be a much smaller company and won't be

23 | guaranteeing loans, at least not at the outset, is going to

24 | consist of about twelve million dollars, much of that

25 | dedicated to its College Access mission.  We've agreed that it

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
                    Document     Page 34 of 99

Main Document     Page 38 of 241

Page 32

1   would stay so dedicated; a few million dollars to deal with

2   peripheral business activities to both accommodate the

3   collections agreement with the creditors and hopefully

4   generate revenues to supplement the College Access fund, but a

5   much smaller TERI.

6        When we get to the testimony, we will introduce

7   testimony that this reorganized TERI, while it's small, is

8   viable; that it can continue to maintain its college access

9   program; that it can continue to provide its collection and

10  other loan-related services.

11       From the perspective of the creditors we've had

12  overwhelming approval of the plan.  On the affidavit that I've

13  handed to you it will show that 42 Classes of secured

14  creditors have accepted the plan.  One Class, and it's a tiny

15  Class -- it's one of the small KeyBank trusts, voted No.  That

16  Class, we think, is an easy candidate for Section 1129(b)

17  because basically we're going to give them back their

18  collateral, and all that's at issue, really, is determining

19  how much of a deficiency claim they have over that we get

20  resolved.  One Class didn't vote.  That's the one I mentioned

21  that nobody can find anymore, but in the same -- but they're

22  in the same situation.  They're a small secured creditor.  If

23  we can find them, we'll give them back their collateral, and

24  their deficiency claim will have to be estimated.

25       THE COURT:  And if you don't find them, what happens

Case 6:18-ap-01089-MH    Doc 63    Filed 04/10/19    Entered 04/10/19 17:10:57    Desc
Main Document      Page 39 of 241
Case 08-12540    Doc 1096    Filed 05/06/10    Entered 05/06/10 04:59:31    Desc Main
Document      Page 35 of 99

Page 33

1    to the collateral?

2          MR. GLOSBAND   To their collateral -- I suppose if we

3    don't ever find them, it'll escheat at some point.

4          I think perhaps the most compelling observation on

5    top of the fact that, you know, 42 secured Classes voted to

6    accept the plan, is that the 43rd Class, the Class of unsecured

7    creditors, voted to accept the plan overwhelmingly.  Over 95

8    per cent in number in that class voted to accept the plan,

9    representing about 92 per cent in amount.  In terms of voting

10   claims, 15.7 billion dollars in claims voted -- unsecured

11   claims voted to accept this plan, albeit those claims are

12   going to be reduced by accepting the compromises under the

13   plan, but that's what they were entitled to vote.  That's what

14   their claim was.

15         The hearing is going forward today with only one

16   real objection to confirmation.  While the PBDC filed an

17   objection, Mr. Sternklar and Mr. Batsell can tell you how

18   they've resoled that objection.

19         So that would leave us with only one objection.

20   That's the Nellie Mae Foundation.  They'll be heard soon.  As

21   the Court knows, they're involved in an adversary proceeding

22   with the complaint over who owns loans and recoveries that

23   they claim to own and the estate says maybe they don't;

24   however, their rights, notwithstanding the fact that they're

25   objecting, are really not affected by the plan.  Their claim

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document   Page 40 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document   Page 36 of 99

Page 34

 1  will be resolved in that litigation, and whatever they own,

 2  they own; and whatever their claim amount is as a consequence

 3  of that will be determined, but that happens whether the plan

 4  gets confirmed or not.

 5          The only other observation I'd make with respect to

 6  Nellie Mae is that it's a bit of a turnabout there because

 7  they were on the Committee at the time the Committee voted

 8  unanimously to approve the plan.  So they changed their mind.

 9  I guess they have a right to do that, but they started off

10  favoring the plan.

11          The -- I'm going to now just turn to run through

12  quickly the classification and acceptance under the plan, so

13  I'll anticipate my 1123 discussion when I get to 1129, but

14  the -- as I said, the secured creditor Classes, with the two

15  exceptions that I've mentioned, all voted to accept the plan.

16          The secured creditor Classes were grouped

17  collectively by essentially affinity.  Class 2 -- let me stop

18  for a second.  Class 1 are priority claims.  They'll be paid

19  in full.

20          Class 2 were all of the make-and-wait lenders

21  categorically, but they're all secured claims.  They'll get

22  their collateral back to the extent of the determination of

23  their allowed secured claim.  In a few instances in fact there

24  is equity in those accounts, and that money will remain with

25  the estate.

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document      Page 41 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document      Page 37 of 99

Page 35

1          Class 3, again, is a group of -- and for voting

2    purposes all of these have been -- every member of each of

3    those Classes has been treated as a sub-class with a separate

4    vote.

5          Class 3 is comprised of the National Collegiate

6    Trusts.  Those are the trusts that were sponsored by First

7    Marblehead related entities.  There are 17 sub-classes.  Each

8    of them is treated as a separate Class.  Each voted in favor

9    of the plan.  Each will get its collateral back as its allowed

10   secured claim.

11         Class 4 is similar, but it's the KeyCorp related

12   trusts.  They're smaller trusts.  They have less collateral,

13   but the same methodology applies, and with the one exception

14   that I mentioned, they voted to support the claim -- to

15   support the plan.  To the extent that creditors in those

16   Classes have deficiency claims, those deficiency claims fall

17   into Class 5 with all of the general unsecured claims.

18         The determination of the amounts of those claim, as

19   I indicated earlier, is based on the decoder, and because all

20   of these claims are contingent, they had to be estimated; and

21   I'm pleased to say that with the exception of the two Classes

22   that I've identified, all of the Classes have accepted the

23   decoder by way of compromise, but a compromise proposed in the

24   plan is the way to value their claims.  So I think we've leapt

25   a huge hurdle by not having to deal with valuation, estimation

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document   Page 42 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document   Page 38 of 99

Page 36

1  litigation.

2       The last key part of the plan, and I may have

3  touched on this before, is that in addition to the settlements

4  that I've mentioned, the claim amounts and the other issues

5  that I'll go into in more detail later, the end result of the

6  plan is to transfer nearly all of the assets, the roughly 171

7  million dollars in value that I mentioned, to a plan trust, to

8  a trust to be liquidated for the benefit of creditors.  It's

9  kind of an unusual plan trust in my experience in that, at

10 least in terms of what we can now anticipate, the only

11 litigation that that trust may be involved in is the

12 determination of the amounts of the two claims that -- that

13 didn't accept the compromise.

14       This is not a situation -- there may be a bit more

15 because there's the Nellie Mae adversary proceeding.  We have

16 to conclude resolution of claim determination with the First

17 Marblehead entities, but for the most part it's not a trust

18 that's inheriting a lot of preference or fraudulent transfer

19 litigation, and that's because TERI was, so far as it knew, in

20 good shape up to the date that it filed bankruptcy and paid

21 its bills on a timely basis, didn't have transfers on account

22 of antecedent indebtedness.  The Committee's reviewed that

23 issue and concluded there's nothing there to be pursued, at

24 least as of what they now know.

25       So it's really functionally just a trust designed to

Case 6:18-ap-01089-MH    Doc 63    Filed 04/10/19    Entered 04/10/19 17:10:57    Desc
Main Document      Page 43 of 241
Case 08-12540    Doc 1096    Filed 05/06/10    Entered 05/06/10 04:59:31    Desc Main
Document      Page 39 of 99

Page 37

1   try to realize value, and the way it will realize value is by

2   hopefully efficiently collecting on the loans that it is going

3   to receive -- again, I'll talk about those a bit more later --

4   and to manage the cash that it has and to stay out of trouble.

5   So it's a -- it's a fairly neat package compared to a number

6   of cases I've been involved in.

7           So if the Court will suffer me for some more time,

8   I'm going to go through the 1129 elements and explain how we

9   satisfy --

10          THE COURT:  Would you like a break before we do

11  that?

12          MR. GLOSBAND   Sure.

13          THE COURT:  Ten minutes.

14          MR. GLOSBAND   Okay.

15              (Off the record at 11:16:18 a.m.)

16                  *  *  *  *  *

17              (On the record at 11:38:44 a.m.)

18          THE COURT:  Please be seated.

19          MR. GLOSBAND:  First, Your Honor, I'd like to ask

20  whether our Balloting Agent can be excused.  We submitted her

21  voting affidavit, and if no one has questions or objections

22  I'd like to allow her to leave.

23          THE COURT:   Does anyone have an issue with respect

24  to which the Balloting Agent might be helpful?

25      (No response)

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document     Page 44 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document     Page 40 of 99

**Page 38**

1            THE COURT:    Okay.  You're excused.

2            MR. GLOSBAND:  Thank you.    I believe that our

3    satisfaction of most the Section 1129 factors is not very

4    controversial, and I'll kind of move through them quickly as

5    a consequence.

6            First of all, Section 1129(a)(1) requires that we

7    comply with the Bankruptcy Code, basically the applicable

8    revisions of Chapter 11.  The legislative history

9    interpretation of that says it's focused primarily on

10   classification of claims.  We've gone through our claim

11   Classes.  Each secured creditor with separate collateral is

12   in its own Class, and all unsecured claims are in a separate

13   Class; and then the final Class is the priority claims, which

14   is being paid in full.

15           There is nothing discriminatory among the Classes.

16   All of the Classes are receiving essentially identical

17   treatment except for the Unsecured Class, of which every

18   member is receiving identical treatment.    So I believe that

19   we have satisfied Section 1122 as it's incorporated in

20   Section 1129(a)(1).

21           Section 1129(a)(2) adds the requirement that the

22   plan proponent comply with the provisions of Title II; and,

23   in turn, the legislative history tells us that that is

24   intended to ensure that we comply with the disclosure and

25   solicitation requirements.

Case 6:18-ap-01089-MH    Doc 63    Filed 04/10/19    Entered 04/10/19 17:10:57    Desc
Case 08-12540    Doc 1096    Filed 05/06/10    Entered 05/06/10 04:59:31    Desc Main
Main Document    Page 45 of 241
Document    Page 41 of 99

**Page 39**

1    This Court on March 8th, 2010 approved our

2    disclosure statement, and subsequent to that approved voting

3    and solicitation procedures which have been complied with and

4    which resulted in the submission of the voting affidavit that

5    we just mentioned, so I believe there's no contest over our

6    having complied with Section 1129(a)(2).

7    Section 1129(a)(3) says the plan may only be

8    confirmed if it has been proposed in good faith and not by

9    any means forbidden by law.  I understand that that's an

10    issue raised by the Nellie Mae objection.  I will address it

11    briefly, and then we'll address it further with testimony

12    subsequently.

13    The case law makes clear that good faith is not a

14    single-item test.  It's a totality of the circumstances test.

15    Factors that Courts have found constitute a lack of good

16    faith are plans that are proposed primarily for tax

17    consideration reasons; plans proposed for the personal profit

18    of the debtor's investors; plans proposed for unfair

19    competitive advantage; conversely, if a plan promotes either

20    rehabilitation and reorganization or at least satisfactory

21    resolution of creditor positions, that's determined to be

22    good faith.

23    This plan, as I've described, is basically

24    bifurcated between transfer of nearly all assets for

25    liquidation for the benefit of creditors in a way in which

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document   Page 42 of 99

Page 40

1  they have found overwhelmingly to be acceptable, and provides

2  for the survival of a small business primarily focused on

3  what had been TERI's College Access not-for-profit

4  activities.

5       To the extent that the Nellie Mae objection

6  suggests that there were management compensation issues that

7  drove this plan, I think first of all it's belied by the

8  totality of the circumstances of this plan.  There's a teeny

9  little bit of the plan that involves ongoing management.  To

10 the extent that we are anticipating through their argument

11 here Section 1129(a)(5) with respect to disclosure of

12 officers, directors, and the nature of their compensation,

13 why don't I just do that and anticipate 1129(a)(5).

14      The lists of officers and directors was disclosed

15 in the plan supplement.  Officer and director historical

16 compensation, which will continue until a new compensation

17 program has been put in place, has been disclosed from the

18 beginning of this case; and I would not ask that these be

19 marked in evidence, but I would just offer to the Court the

20 debtor's Statement of Financial Affairs which lists the

21 petition date and prior compensation levels of every member

22 of management and every member of the board of directors.

23      I would also hand up the motion for order under

24 Section 367(3)(c)(1) and 105, that we filed in February of

25 2009 by which the Court approved directors' compensation,

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document     Page 47 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document     Page 43 of 99

Page 41

 1   both accrued and prospective.  That information is in the

 2   public record; it's in the Court record.

 3          In addition, a not-for-profit like TERI is

 4   obligated to file something called a Form 990, which is an

 5   Internal Revenue Service required form that disclosed on an

 6   annual basis the names and compensation of the officers and

 7   directors.  It's a matter of public record, and it's

 8   available to anyone who seeks it.

 9          Finally, every month in this case we file a monthly

10   operating report.  That monthly operating report lists the

11   compensation paid to officers and directors and is available

12   to anyone who asks the U.S. Trustee's Office for it.

13          So I believe we've fully satisfied the 1129(a)(5)

14   requirements with respect to that disclosure.  There's

15   nothing in the case law or the statute that suggests that the

16   Court needs to approve prospective compensation -- only if

17   it's egregious, and so egregious, that it might affect good

18   faith is it an issue; and in that regard I go back to

19   1129(a)(3) and say that at the time this case was filed TERI

20   was one of the largest not-for-profit entities in the

21   country.  It was running essentially a 500-plus million

22   dollar business, dealing with billions of dollars of loan

23   guarantees, and its compensation at that time was both

24   appropriate and also reasonable in the context of what the

25   Internal Revenue Service permits for compensation for not-

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document     Page 48 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document     Page 44 of 99

**Page 42**

1    for-profit officers and directors.

2         In light of TERI's emergence as a much smaller

3    business, the board of directors, as evidenced in the

4    affidavits filed by Messrs. Peko and Ms. -- Mr. Peko and Ms.

5    Bizar, the board of directors is now well into a process to

6    comply with those Internal Revenue Code requirements.

7         The Internal Revenue Code has a concept called

8    intermediate sanction, and what that translate to in non-tax

9    English is that compensation levels of officers and directors

10   of not-for-profit entities must be reasonable.  It is a

11   process by which an entity can obtain a presumption of

12   reasonableness.

13        TERI, as it has in the past, is now following that

14   process.  If it doesn't comply with that process, and if

15   compensation is not reasonable, then the officers, directors,

16   the company are all subject to sanction.

17        So what the process essentially requires is right

18   sizing, and it requires resort to comparable information for

19   profit -- for for-profit and not-for-profit entities of

20   similar size and scope; and that process is some -- is

21   underway.  Both Mr. Peko's affidavit and testimony elicited

22   from Mr. Davidson in a deposition taken by Nellie Mae

23   indicates that there is no doubt that to the extent it is

24   relevant, management compensation and board compensation is

25   in the process of being produced.

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Main Document   Page 49 of 241
Document   Page 45 of 99

Page 43

1        So I think we've, (a), satisfied the disclosure

2   requirements; (b), to the extent there is an overflow into

3   good faith, I think we've satisfied the good faith

4   requirements.   There's nothing in any of the negotiations

5   that any of us or the Committee can tell you about that would

6   indicate that this plan was driven by the goal of either

7   preserving management's jobs or inflating its compensation.

8   There is no evidence of that in the record.

9        I'm just going to offer up these two matters just

10  to show that they've been in the record for months.

11        THE COURT:   Thank you.

12        MR. GLOSBAND:   And the one thing I would note as

13  you look at those is that they reflect compensation at the

14  beginning of the case before the company, as indicated in the

15  testimony from Mr. Peko, discontinued his bonus policy.   And

16  so the current numbers as reflected in the operating reports

17  and as disclosed in Mr. Davidson's testimony for base

18  compensation for Davidson and Hulings, which is what they'll

19  get until their compensation is reduced by the board, are

20  significantly lower than those numbers.

21        The point of all of this is to satisfy the

22  disclosure requirements, and I think we have.   At best,

23  things will be better from a cost perspective than in any of

24  the disclosures that are currently extant.

25        I should say, if anyone wants copies of what I've

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document   Page 50 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document   Page 46 of 99

Page 44

1  handed to the Court, please see Mr. Johnson back there, and

2  they're available to you.

3          THE COURT:   Go ahead.

4          MR. GLOSBAND:   Thank you.   I'd like to move then to

5  1129(a)(6), which refers only to regulatory agency approval

6  of rights.   That's not relevant to this case.

7          1129(a)(7) invokes what's colloquially known as the

8  best interest test.   That requires that unless every holder

9  of every Class accepts the plan, then each creditor must

10 receive or retain property under the plan having a present

11 value of more than they would receive or retain if the debtor

12 were liquidated in a hypothetical Chapter 7.

13         The disclosure statement contains as Exhibit C our

14 presentation of the best interest tests, and it shows

15 conclusively that what the creditors are going to get as a

16 result of this Chapter 11 is significantly better than what

17 they might receive in a liquidation.   Mr. Peko will further

18 elaborate on that when he testifies.

19         Section 1129(a)(8) requires that each Class of

20 claims or interests must either accept the plan or be

21 unimpaired by the plan.   As I've indicated earlier, one

22 Class, Class I, is unimpaired.   All Classes but two have

23 accepted the plan.   Two Classes have not accepted the plan.

24 That will take us, when I get further into this presentation,

25 to Section 1129(b), which provides the standards for imposing

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document     Page 51 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document     Page 47 of 99

Page 45

1  a plan when not all Classes have accepted.

2        Section 1129(a)(9) requires that persons holding

3  claims entitled to priority either receive specified cash

4  payments or agree to something different.  As we've

5  indicated, all of those claims will be paid in full.

6  Ordinary course operating expenses will carry forward and

7  will be paid in the ordinary course.

8        Section 1129(a)(10) is essentially the gating

9  provision for Section 1129(b), and that requires that at

10 least one Class of impaired claims affirmative accepts the

11 plan, not considering the votes of any insiders relative to

12 that Class's acceptance.  As I've said many times, 42 Classes

13 of impaired creditors have accepted this plan.  No insider

14 votes were involved with respect to any of those Classes, so

15 I think we've clearly satisfied Section 1129(a)(10).

16       Section 1129(a)(11) requires the Court to determine

17 that the plan is feasible, although it doesn't say it that

18 way, and that leads to basically two alternative

19 interpretations of what this Section requires.

20       What the statute says is that confirmation of the

21 plan is not likely to be followed by liquidation or the need

22 for further financial reorganization of the debtor or any

23 successor of the debtor unless that liquidation or

24 reorganization is proposed in the plan.

25       That deals primarily with the viability of either

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document      Page 52 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document     Page 48 of 99

**Page 46**

1  TERI or the plan trust; however, the plan trust liquidation

2  *is* contemplated, so that resolves the plan trust issue, and

3  it leads to the question of whether TERI itself is viable.

4        On that topic, we will be introducing testimony,

5  but the standards that will apply to the evidence on that

6  issue is -- is a standard of reasonable probability, but by

7  no means absolute certainty; and we think we more than

8  satisfy the standards that reorganized TERI will be viable

9  certainly on a reasonable probability basis, and in our view

10 a much stronger evidence of viability will be presented.

11       The second dimension, which isn't discernible from

12 the face of the statute is whether the plan itself is

13 feasible, and cases look to that dimension, even without the

14 statutory guidance.  I think that's an easy one for us to

15 solve here, that the plan is feasible on its face.  Most of

16 the assets are being transferred to the liquidating trust, to

17 be done on the effective date, stroke of one or more pens,

18 and the pushing of a lot of computer buttons, and feasible in

19 terms of the implementation with respect to TERI is that TERI

20 gets to keep the small quantity of assets described in the

21 plan as retained TERI assets.

22       So it's unquestionably feasible in that regard.

23 Whether it's feasible from the perspective of reorganized

24 TERI being viable or confident that it is, but we'll

25 introduce evidence to supplement that included in Mr. Peko's

Case 6:18-ap-01089-MH    Doc 63    Filed 04/10/19    Entered 04/10/19 17:10:57    Desc
Main Document      Page 53 of 241
Case 08-12540    Doc 1096    Filed 05/06/10    Entered 05/06/10 04:59:31    Desc Main
Document      Page 49 of 99

**Page 47**

1 affidavit.

2    I'd just like to make one note in passing to the

3 Nellie Mae objection.  They sort of argue this feasibility

4 issue in terms of TERI's viability from a set of numbers that

5 were in the disclosure statement at their request pretty

6 much, on a worst-case basis.  If you carved away everything

7 but the 3.4 million dollars in the collection business would

8 TERI survive long enough to collect contracts for two years?

9 And we said, "Yes."  And we'd even have a million four left

10 at the end of the day, if that's all there was.   And they

11 argued that because of that, TERI's not viable because it's

12 going to run out of money at the end of that time period, and

13 what have you.

14    That's a little piece of the business, and Mr. Peko

15 will tell you about the rest of the business.  It's not fair

16 to premise a viability analysis on what we said was worst-

17 case for that part of the business.  Even if that part of the

18 business performs only at the worst-case, it leaves a million

19 four, and it leaves the College Access business, which is

20 viable on its own.

21    THE COURT:  When I looked at the projections --

22 and I don't want to anticipate the way that the evidence will

23 flow -- but when I looked projections it seemed to me that

24 there was a substantial revenue stream from something called

25 Portfolio Management, and I know that Nellie Mae complained

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document     Page 54 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document     Page 50 of 99

Page 48

 1   that that was a plan for a business, not the actual details

 2   of the business.

 3          But how does that fit with your comment that that

 4   projection was just on the collections side -- that there was

 5   a lot more money that wasn't projected, that that was a

 6   projection simply to satisfy the concern about whether TERI

 7   would survive the next two years?  Didn't TERI actually

 8   project revenues from more than just the collection of the

 9   plan trust loan?

10          MR. GLOSBAND:  In that -- Mr. Peko is clearly

11   better qualified to answer this than I am -- but in that

12   excerpt, which I believe was at page 52 of the disclosure

13   statement, I do not believe we assumed any revenues beyond

14   existing --

15          THE COURT:   I'm just remembering --

16          MR. GLOSBAND:  -- contra -- beyond existing

17   contracted collection business.

18          THE COURT:   Okay.

19          MR. GLOSBAND:  That particular worst-case didn't

20   assume the generation of any of the business that they

21   questioned as Portfolio Management, which will be addressed

22   in the testimony.

23          And my only point -- and we'll save the rest for

24   testimony -- is they set up a straw man, and they firmly

25   thrashed that straw man, but that's all it was.

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document      Page 55 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document      Page 51 of 99

**Page 49**

1           THE COURT:   I was -- I wasn't referring to the

2     text of the disclosure statement, I was referring to what I

3     seem to remember was Exhibit D -- D as in David.

4           MR. GLOSBAND:   Correct, and that's much broader

5     than the text of the dis -- the excerpt from the disclosure

6     statement which is one of the points where they founded their

7     attack.

8           Moving to 1129(a)(12), simply requires that the

9     fees that are due under Section 1930 of Title 28 be paid or

10    provided for, and they are.   They either have been paid or

11    will be paid as provided for in the plan that they will

12    continue to be paid.

13          Section 1129(a)(13) requires that the plan provide

14    for the continuation of retiree benefits, as defined in

15    Section 1114.   We don't believe TERI has any of the retiree

16    benefits defined in Section 1114, and so this section really

17    isn't relevant.   TERI has only a pension plan with respect to

18    retired employees, and that pension plan has been frozen.

19    The freeze in the pension plan was directed by the board

20    after an analysis of alternatives available to the board for

21    either terminating a plan or freezing it or continuing it,

22    and it was the least expensive of the alternatives.   And so

23    no new employee benefits vest, and no new employees can

24    qualify for the plan.   On the other hand, there are some

25    residual financial obligations, even for a terminated plan,

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document      Page 56 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document      Page 52 of 99

Page 50

1   and those are in our projections, but those are not literally

2   retiree benefits, but they are provided for, in any event.

3          Section 1129(a)(14) is a domestic support

4   provision.  TERI does not have domestic support obligations.

5          Section 1129(a)(15) applies only to individuals,

6   and TERI is not an individual.

7          Section 1129(a)(16) does apply to not-for-profit

8   entities such as TERI, and it requires that any transfers of

9   property by such an entity be consistent with applicable

10   provisions of non-bankruptcy law.  Section 8A(c) of Chapter

11   180 of the Massachusetts General Laws requires that TERI

12   provide notice of a transfer of the type intended by the plan

13   to the Attorney General of the Commonwealth of Massachusetts

14   more than thirty days before the transfer is implemented.

15          That notice was given on March 24th.  The transfer

16   will not be implemented until the effective date, which is a

17   date after today, and so we've complied with that notice

18   requirement.  So we've satisfied Section 1129(a)(16), the

19   notice and a description of compliance is part of Ms. Bizar's

20   affidavit.

21          That takes us to the end of Section 1129(a), but

22   leads us to Section 1129(b), and unlike other cramdown

23   situations I've been involved in, this one is blessedly

24   simple because we have only two Classes that haven't accepted

25   the plan.  They haven't accepted the plan in their capacity

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document      Page 57 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document      Page 53 of 99

**Page 51**

 1  as secured creditors, as their Class of secured creditors.

 2  And for a plan then to be confirmed by invoking Section

 3  1129(b), it requires the plan does not discriminate unfairly,

 4  and that it's fair and equitable with respect to each Class

 5  of claims or interest that is impaired under and has not

 6  accepted the plan.

 7         As I said, the plan does not discriminate at all.

 8  Every secured Class gets identical treatment, and the

 9  unsecured Classes -- the unsecured creditors are all in a

10  single Class as to which there cannot be any internal

11  discrimination.

12         So that leads us to the question of, is the plan

13  fair and equitable to these two Classes of secured creditors?

14  And in that regard, Section 1129(b)(2)(A) tells you what fair

15  and equitable is with respect to a Class of secured

16  creditors; and the relevant subsection is Romanette (I) Roman

17  numeral II, which says that,

18         "Each holder of a claim of such Class receive on

19          account of such claim deferred cash payments

20          totaling at least the allowed amount of that

21          claim."

22         Here our only deviation is we're not deferring the

23  cash payments.  They're going to be paid in cash, in full, at

24  the allowed amount of the secured claim.  So as to them, this

25  plan is fair and equitable.

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document    Page 58 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document    Page 54 of 99

Page 52

1          The only portion of my presentation remaining is

2    one that I intended to do at the conclusion of the rest of

3    the hearing, and that is to just discuss briefly the

4    conditions to confirmation set forth in the plan.  And so I'd

5    like to cede the podium, and the question is, how would you

6    like to proceed?  We'll either go directly to Mr. Peko's

7    testimony, or we can have Nellie Mae go first, whichever the

8    Court prefers.

9          THE COURT:   Well, I think that the first thing I'd

10   like to hear is how the PBGC's claim was resolved.

11         MR. GLOSBAND:  Okay.

12         THE COURT:   And then I'd like to hear from Mr.

13   Martin with respect to his approach so that I think adopting,

14   paraphrasing his words, his position can be framed as I'm

15   listening to the testimony from Mr. Peko.   All right?

16         MR. GLOSBAND:  That's fine.

17         THE COURT:   Mr. Sternklar?

18         MR. STERNKLAR:   Thank you, Your Honor.   Jeffrey

19   Sternklar for the Creditors' Committee.

20         Your Honor, the PBGC objected to two sentences in

21   the plan, both of which we frankly thought were not

22   controversial at the time, akin to asking the Court to find

23   the proverbial equivalent of the sun does, in fact, rise in

24   the east.  But nevertheless, for its own internal policy

25   reasons, the PBGC prefers that plans not ask the Court to

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document      Page 59 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document      Page 55 of 99

**Page 53**

1 make the findings we ask the Court to make about potential

2 liability under the PBGC's -- under ERISA, or pension plans.

3      The pension plan in this case, Your Honor, under

4 the plan, is being retained by reorganized TERI, and under

5 the plan, reorganized TERI exclusively is liable for anything

6 and everything relating to the pension plan.

7      THE COURT:   Is the plan under-funded?

8 NOTE:  Mr. Batsell is difficult to hear 100 per cent clearly.

9 Many portions of rapid mumbled words, and he is not close

10 enough to a microphone for clarity)

11      MR. BATSELL:  Excuse me, Your Honor.  Sam Batsell.

12 I wasn't sure (unclear mumbling) stand here together

13 (unclear) different ways.   Yes, the plan is underfunded.

14 It's underfunded by approximately two million dollars, using

15 PBGC's statutory way of calculating the damages.   That's on

16 a termination basis.

17      Obviously on an ongoing basis, to the best of my

18 knowledge, and the Agency did check a month or two ago, the

19 debtor has made all payments that are currently due.  That's

20 been one reason we haven't appeared here before.  That's on

21 an ongoing basis; on a termination basis at least two million

22 dollars' worth of funding, and as we (unclear mumbling not

23 close enough to microphone) and (unclear) we do not plan a

24 trustee under the plan for it to go forward; but should

25 anything happen in the future and the debtor not make it, the

Case 6:18-ap-01089-MH    Doc 63    Filed 04/10/19    Entered 04/10/19 17:10:57    Desc
Main Document    Page 60 of 241
Case 08-12540    Doc 1096    Filed 05/06/10    Entered 05/06/10 04:59:31    Desc Main
Document    Page 56 of 99

**Page 54**

1 reorganized debtor not make it, we would at that point in

2 time trustee it and investigate (unclear mumbling ) egregious

3 and such, we don't investigate -- we have no authority to

4 investigate until we trustee it.

5           And while we don't know of anything that's wrong,

6 we also -- I guess I'm stealing from his argument -- we also

7 can't give releases that affects the ERISA Section 410

8 because anything that gives that releases for fiduciary

9 breaches and such is void, and we don't like any attempt to

10 redefine who is in the control group, the statute, (unclear

11 mumbling).

12           THE COURT:    I read -- I read your (unclear, voice

13 dropped)

14           MR. BATSELL:    Thank you, Your Honor.    But we have

15 reached, I think, an agreement which is that the two Sections

16 that we mentioned, and (unclear) the plan (unclear) I think

17 there would be a section in the order confirming a plan that

18 strips these two sections out of the plan itself.    Article

19 VIII, Section 8.8, and Article XII, Section 12.8   (unclear

20 mumbling very difficult to understand) proceed here to verify

21 (unclear).

22           THE COURT:    Thank you.

23           MR. STERNKLAR:    I thank -- I thank my brother, Mr.

24 Batsell.

25           Your Honor, the two -- there are two sentences in

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Main Document    Page 61 of 241
Document    Page 57 of 99

**Page 55**

1  those -- not the entire provision -- that are at issue, which

2  we will agree to strike; and the sentence is the last

3  sentence in Section 8.8 of the plan, and it is the last

4  sentence of Section 12.8 of the plan.

5        8.8, that sentence effectively asks the Court to

6  find that confirmation of the plan would operate as a

7  judicial determination, binding on all entities; that any

8  creditor not an insider of the the debtor in fact will not

9  pick up certain liabilities.  We think again that's obvious,

10  but we have fiduciaries and the like coming in.  We wanted to

11  give them the functional equivalent of a representation

12  warranty we'd get outside of bankruptcy.  Nevertheless, we've

13  agreed not to ask the Court to make that finding, but we

14  don't mean to imply by that that the finding couldn't be made

15  or shouldn't be made, but we'll reserve that for another day.

16        Similarly, in Section 12.8 of the plan, the last

17  sentence asks the Court to,

18        "-- make a finding that confirmation of the plan

19        operated as judicial determination, binding on all

20        entities; that neither the plan Trustee nor any

21        creditor that is not an insider of the debtor is or

22        shall become, due to implementation of the plan, a

23        fiduciary of the pension plan within the meaning of

24        ERISA."

25        Again, we think that's obvious, but we are prepared

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document   Page 58 of 99

Main Document   Page 62 of 241

**Page 56**

1  to resolve this and strike that sentence from the plan and

2  not ask the Court to make that finding, again without

3  allowing their -- without any inference appropriately to be

4  drawn, that that finding couldn't be made or, in fact, isn't

5  true.

6         So with deleting those two sentences, Your Honor, I

7  believe resolves the PBGC's objection, and we would propose

8  to mechanically deal with that by including appropriate

9  language in the confirmation order if Your Honor is inclined

10 to confirm the plan to accomplish that result.  Thank you,

11 Your Honor.

12         THE COURT:   Thank you.  Mr. Martin.

13         MR. MARTIN:   Good morning, Your Honor.  Ross

14 Martin from Ropes & Gray for the Nellie Mae Educational

15 Foundation.

16         Let me start where everybody else wants to start

17 because we all know what everybody is thinking here today,

18 Your Honor, okay?

19         Everybody here wants to portray my client, Nellie

20 Mae, as trying to hold up the train.  That's the message

21 we've been hearing for the last hour and a half or more, and

22 that we're trying to leverage the process for our own

23 adversary proceeding.  So let's just get that out on the

24 table and make sure that's out there.

25         We're not here for that reason, okay?  We're here

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Main Document   Page 63 of 241
Document   Page 59 of 99

Page 57

1  because Nellie Mae is a creditor.  It's their position that

2  we're a creditor.  We were a big enough creditor to be

3  appointed to the Creditors' Committee.   Now there was a

4  reference made briefly of the fact that my client was on the

5  Creditors' Committee when the initial plan and disclosure

6  statement were filed in September.  I only want to say one

7  thing in respect to that, because I don't want to get into a

8  "he said, she said," about what went on at the Creditors'

9  Committee.  I think that's separate, to the side.  But we

10  anticipated that being said.

11        We didn't sit -- we, Ropes & Gray, didn't help our

12  client with the Creditors' Committee process, and the reason

13  that I say that is my client had no bankruptcy experience and

14  did what this system exp -- wants clients -- wants creditors

15  to do, of Nellie Mae's size, to sit on Creditors' Committees

16  for free.  And I will only say that Mr. Glosband is correct:

17  We're entitled to change our mind after we resign from the

18  Creditors' Committee, but my client will not be serving on

19  the Creditors' Committee.  They were very disappointed with

20  the process, and I'd just like to leave it at that, just to

21  address that issue, and I don't want to get into a "he said,

22  she said"  on that.

23        What I will say is that, again, we couldn't settle

24  these objections if we wanted to.  This isn't an attempt to

25  leverage some settlement.  These are -- the objections we've

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Main Document      Page 64 of 241
Document      Page 60 of 99

Page 58

```
 1   raised are things the Court has to find.  So we went out in

 2   the hallway into the twenty-minute break -- the infamous

 3   Bankruptcy Court twenty-minute break in the hallway.  It's

 4   not going to solve any problems, so I'm not here, you know,

 5   with my client paying me here today to leverage some

 6   settlement in the hallway, because that's just -- and I've

 7   told them that, that it's not going to happen, because this

 8   Court has to rule anyway.  So I wanted to get that out of the

 9   way before we could kind of talk about the merits here.

10          THE COURT:   I do have one question, and I -- when

11   you say that everybody has reached a particular conclusion,

12   that may or may not be true as to everybody but me.

13          MR. MARTIN:   Thank you, Your Honor.

14          THE COURT:   So -- but I do have a question --

15          MR. MARTIN:   Yes, Your Honor.

16          THE COURT:   -- about Nellie Mae's position, and

17   that is, if a plan is confirmed, then Nellie Mae -- then the

18   loans, is should say, that comprise Nellie Mae's collateral,

19   in Nellie Mae's opinion, go into the plan trust.   Is that

20   right?

21          MR. MARTIN:   I think so.  We haven't seen the

22   confirmation order, and there is some general language in the

23   plan about some sort of escrow.  We're assuming that's going

24   to be taken care of in a confirmation order.

25          THE COURT:   A plan Trustee will be responsible for
```

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document     Page 65 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document     Page 61 of 99

**Page 59**

1  collecting on those -- on those loans, although there is an

2  agreement that reorganized TERI will assist in that.

3         MR. MARTIN:   I gather that's right.

4         THE COURT:   But I take it that after confirmation

5  Nellie Mae would not have a claim to assert against the

6  reorganized TERI.

7         MR. MARTIN:   That's right, because under the plan

8  -- the reorganized -- but that's a function of the plan, Your

9  Honor.

10        THE COURT:   That's a function of the plan.  Yes.

11        MR. MARTIN:   That's a function of the plan.

12 They're supposed to -- you know, one -- for example, one of

13 the things that we believe -- not to get -- I don't want to

14 get sidetracked into our adversary because that's not why

15 we're here today, but just as an example, we haven't been

16 paid a single dollar of collections during the case.  All

17 right?  They're prepared to reserve those amounts.  I'm not

18 even sure some of those are in dispute, but we've got nothing

19 -- not even the parts that they would agree to.

20        THE COURT:   No, but -- but my question --

21        MR. MARTIN:   As long as the --

22        THE COURT:   -- my question is that the rights that

23 Nellie Mae says that it has, assuming that everything that

24 Nellie Mae says is true --

25        MR. MARTIN:   Yes.

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Main Document   Page 66 of 241
Document   Page 62 of 99

Page 60

1          THE COURT:    -- all those loans are going into the

2  plan trust.

3          MR. MARTIN:    That --

4          THE COURT:    So why does Nellie Mae care whether

5  reorganized TERI succeeds or fails?

6          MR. MARTIN:    I will explain exactly why, Your

7  Honor.   There are two reasons.   One is the reason that I

8  raised at the very first disclosure statement hearing when --

9  and this is actually the lesser of the two, but just to show

10  that this is not a point we're raising today.

11          The very first disclosure statement hearing we

12  frankly observed, almost in passing, that the disclosure

13  statement didn't contain any description of the go-forward

14  business of a reorganized debtor emerging from bankruptcy.

15  And this Court -- frankly, without controversy because it

16  just seems obvious -- said it needs to include projections

17  and describe the go-forward business.   "What is this thing?"

18  And that's because the Code requires that new entities going

19  out in the world be able to survive.

20          So one is, the system can't be putting new entities

21  out into the world like that.   Now that's -- that's one

22  perfectly valid grounds for objection and maybe it could be

23  said that --

24          THE COURT:   Well, wait --

25          MR. MARTIN:    -- why do we care?   But let me get

Case 6:18-ap-01089-MH    Doc 63    Filed 04/10/19    Entered 04/10/19 17:10:57    Desc
Main Document      Page 67 of 241
Case 08-12540    Doc 1096    Filed 05/06/10    Entered 05/06/10 04:59:31    Desc Main
Document      Page 63 of 99

**Page 61**

 1  to why I care --

 2           THE COURT:    Okay.

 3           MR. MARTIN:    -- and why my client cares.    Because

 4  we heard a lot this morning about how this plan is in two

 5  pieces -- the plan trust with a pile of assets, and TERI.

 6  It's not in two pieces.    The plan trust will have no

 7  employees.    It will have no people to manage the collections.

 8  It is not -- it was interesting, Mr. Glosband said this is a

 9  different liquidating trust than he's seen, and I completely

10  agree with that, Your Honor, because this is not the usual

11  pile of cash after a sale -- 363 sale -- with a bunch of

12  disputed claims.

13           This isn't even a situation where there are

14  miscellaneous assets to be sold, and maybe some claims --

15  maybe all the claims have been resolved, but there are some

16  miscellaneous assets to be sold, or litigation to be pursued.

17           This trust in many respects, Your Honor, isn't a

18  liquidating trust.    It's a pile of assets that are going to

19  generate income for years -- maybe more than a decade.

20  Student loans pay over a very long period of time, and the

21  sole source of recovery to creditors, as Your Honor is

22  indicating by your question, is the plan trust.    And the

23  question is, who's doing the work?    And who's doing the work

24  is TERI.    And our point is the person doing -- one, our point

25  is you can't turn a new debtor out into the world -- you just

1  can't do that under the Code.

2       But two, this is who is going to collect the loans.

3  The Creditors' Committee made a statement at one of the

4  procedural hearings we had leading up to this that said,

5  "Well, the reason we think this is all fine is because we're

6  not worse off two years from now if TERI fails."

7       Well, Your Honor, we're a lot worse off.  The

8  person who's going to be collecting the money for them is

9  going to be out of business.  Are they going to have to

10  renegotiate the collection contract under duress, of money

11  coming into the trust every month, people making the phone

12  calls -- all those things?  Are they going to have to

13  renegotiate with third parties when TERI's going out of

14  business?  All the cash will have been disbursed, Your Honor,

15       What they've done is they've set up a ten-year plan

16  trust with a two-year collection contract.  They haven't

17  solved the problem.  That's why creditors need to care.

18       Your Honor, we have an interrogatory answer from

19  the Committee that says they never shopped for anyone else.

20  They never asked whether anyone else should service these

21  loans going forward.  There are tons of companies in the

22  marketplace.  This industry is out of business.  You read the

23  First Marblehead 10-K, which the Committee has put into

24  evidence.  This industry is in the tank.  Everyone is trying

25  to get into the portfolio management business.  Everyone

1  would love to get the income stream for servicing these

2  loans.

3          THE COURT:   Doesn't that -- doesn't that justify

4  the Creditors' Committee's counsel's comment, "We really

5  don't care whether reorganized TERI survives or not.  We'll

6  be in the same position," since they obviously will have a

7  bunch of loans, and all these people who want to collect

8  them.

9          MR. MARTIN:   Maybe so, Your Honor, but now we're

10  projecting two years into the future how many of them will go

11  out of business.  I don't -- I don't know the answer.  Maybe

12  we should have one that's going to stick around.  Is this one

13  of the larger or stronger competitors?  Would the rate be

14  better?  Would the services be better?  I don't know, Your

15  Honor.

16          But you asked fundamentally why we care and why

17  they're tied together, and I have to say, Your Honor, it's

18  actually frankly surprising to me.  I -- one of the things I

19  wanted to touch on -- and I'll get back to this, but I think

20  it's a very perceptive question -- is -- you know, it -- to

21  the extent that Mr. Glosband commented, you know, "There's

22  nothing in the negotiations that suggests this is done for

23  the benefit of keeping management on board."  What I point to

24  primarily -- and there's -- we're going to talk about the

25  sequence of disclosure and all that, but it's the assumption

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document      Page 70 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document      Page 66 of 99

Page 64

1 | that it would only be TERI, because -- and that allows -- and

2 | the negotiation of a collection contract that's going to

3 | provide enough revenue for two years -- or at least a year

4 | they say, according to them, in their worst-case scenario, to

5 | continue paying some sort of high salary to people.  That's

6 | the linkage here, and that's the core of what went on, in my

7 | view; and I think that's the issue.

8 | It's -- I agree with Mr. Glosband, it's an unusual

9 | trust.  I'm not sure -- I'm not here to necessarily litigate

10 | this issue, but one way to think about this is -- I'm not

11 | sure it's a liquidating plan.  I mean, there are -- there is

12 | a discharge being given here:   A discharge of reorganized

13 | TERI, as you asked; but I'm not sure it's even a liquidating

14 | plan as to the plan trust.  They can set it up however they

15 | want a trust, an LLC -- I don't care.  But it's a ten-year

16 | trust with a two-year collection contract with an entity that

17 | everybody says under their new business plan may have to shut

18 | the new business plan down in a year.  And I just think

19 | that's a fundamental problem.  Okay?

20 | THE COURT:   Thank you.

21 | MR. MARTIN:   Now the other theme we've sort of

22 | heard this morning and one way to characterize the theme

23 | we've  heard this morning is that everybody's tired; and

24 | again, I'll withhold judgment from the Court, but I

25 | understand; it's a two-year-old case, and I've been in cases

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document     Page 71 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document     Page 67 of 99

Page 65

1  longer than this, and two years is a pretty old case, and

2  people get tired.  And my client's tired, you know?

3        But having a case that's two years old, and people

4  being tired doesn't mean that we can ignore the law and the

5  facts in the case, and we can ignore 1129 and try to skirt

6  around the edges of it.

7        Another thing we hear is that TERI is a non-profit,

8  and it's reorganizing out of the best of motives.  You know,

9  we think their non-profit mission is laudable; quite frankly,

10 Nellie Mae was in a similar business.  One of the affidavits

11 submitted by the collections manager for TERI, the gentleman

12 is a former Nellie Mae employee.  There are a lot of people

13 who used to work for one organization or the other who have

14 gone back and forth.

15       But in the non-profit context where we don't have

16 the usual absolute priority rule, and the usual economic

17 rules don't apply, and the non-profit is seeking to emerge as

18 an operating entity, if anything, the rules apply more

19 because we don't have the same -- all that the non-voting,

20 non -- every creditor kind of objections, the feasibility

21 objections, the good faith objections frankly should apply

22 even more because there aren't the checks of -- the creditors

23 are going to take over as the shareholders unless they're

24 paid in full.

25       Now let me just make one other general observation

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document    Page 72 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document    Page 68 of 99

Page 66

1  and then I'll turn to the specific objections.

2       Chapter 11 is hard, and it's supposed to be hard,

3  all right?  Chapter 11 gives a huge benefit to debtors:

4  corporate debtors, individual debtors, non-profit debtors.

5  And that benefit is the discharge, and a stay that's been in

6  place in this case for two years.  And I will concede that

7  had to deal with a lot over the first year of this case.

8       But in order to emerge and get the discharge and

9  get the benefit of that, the Bankruptcy Code says you have to

10  do certain things to emerge from bankruptcy and get the

11  benefit of the federal law discharge.  And at the core of

12  those things are feasibility.  You have to fix the problem

13  that landed you in bankruptcy in the first place or otherwise

14  transform your business into something that is more likely

15  than not to survive.  You have to fix the problem.

16       People always ask me, "What do these fancy words

17  mean in 1129?"  But when I -- when people ask me that about

18  feasibility, I say you have to fix the problem, and to --

19  what I said before, it's a ten-year trust, and they're only

20  fixing the problem for a year or two.  I don't think they're

21  fixing the problem.  My client, who's worked with them,

22  doesn't think they're fixing it.

23       Secondly, the process cannot be used to simply drag

24  things out.  It has to be proposed in good faith, and we'll

25  talk about that more in a little bit.

Case 6:18-ap-01089-MH    Doc 63    Filed 04/10/19    Entered 04/10/19 17:10:57    Desc
Case 08-12540    Doc 1096    Filed 05/06/10    Entered 05/06/10 04:59:31    Desc Main
                Main Document    Page 73 of 241
                Document    Page 69 of 99

Page 67

1          And lastly, there are certain disclosure

2    obligations, and they just have to be met.  There are certain

3    things -- we don't -- Chapter 11 isn't to get you halfway

4    there.  Confirmation is about bringing it all together and

5    forcing people to solve the problems in the case.

6          So let me start with the three objections that we

7    have.  The first objection, which we think is the most

8    straightforward, is 1129(a)(5)(B).  It requires that the plan

9    proponents disclose insider compensation.  It doesn't require

10   that the (unclear)  past insider compensation.  This is a go-

11   forward, what-are-they-going-to-be-paid? compensation.

12   That's what's required.

13         Now it's interesting to see what the answers have

14   been.  Yesterday around two o'clock the debtors filed their

15   first confirmation brief, and in that they addressed

16   1129(a)(5) on this issue.  And they said, "Take a look at

17   our by-laws."  That's what their answer was yesterday at two

18   o'clock?  Okay?  And I -- that's what they said.  They said,

19   "Look at our by-laws."  Let me -- but let me a little more

20   precise.  What they actually said was,

21         "Section 1129(a)(5)(B) is satisfies if you look at

22         Exhibit F of our plan supplement."

23   That's what it actually says in the confirmation brief, and

24   I'm maybe paraphrasing slightly, but it's a reference to an

25   exhibit in the plan supplement.

Case 6:18-ap-01089-MH    Doc 63    Filed 04/10/19    Entered 04/10/19 17:10:57    Desc
Case 08-12540    Doc 1096    Filed 05/06/10    Entered 05/06/10 04:59:31    Desc Main
Main Document    Page 74 of 241
Document    Page 70 of 99

Page 68

1      When I read it and I flipped through Exhibit F I

2  thought it was a typo, Your Honor, because all I found were

3  the by-laws.  "How is that disclosure of the nature of

4  compensation?" I said to myself.  And they didn't even point

5  to any particular section of the by-laws.

6      So what we figured out in thinking about it a

7  little bit was what they must mean is that the by-laws have

8  this limitation in them that says the compensation will be

9  reasonable, because that's the only mention of compensation

10  in the by-laws.

11      Now that can't possibly meet 1129(a)(5)(B),

12  otherwise every debtor could simply drop, you know, five or

13  six words into their plan or disclosure statement and say,

14  "Compensation going forward will be reasonable."  A federal

15  law requirement to disclose compensation doesn't mean you

16  just write down, "It will be reasonable" and stop there.

17  They just can't mean that.

18      So interestingly enough, at eleven o'clock last

19  night we got another brief from the debtor, and I want to

20  address that now, just -- and it won't take very long, and

21  it's the best way to respond to it now, so let me just walk

22  through what they said.

23      First, they repeat this idea that they've done

24  enough because the compensation will be reasonable under IRS

25  Guidelines and other things; but interestingly enough, they

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document     Page 75 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document     Page 71 of 99

Page 69

1  don't actually mention the by-law idea again.  They sort of

2  abandoned that. "We disclosed it" (unclear) so --

3       Now they just want us in the new thing to say,

4  "Well, there's -- we're saying in this pleading that it's

5  going to be reasonable going forward."  So they're still

6  saying it's reasonable is enough disclosure, but they've --

7  you actually abandoned their first theory.

8       But then they go on to do a couple of other things.

9  The first thing they do is they cite a case called *Holly*

10 *Garden Apartments*, and I don't know whether the Court's had a

11 chance to look at that case yet, but let me talk about it.

12      They cite it for the proposition that the

13 disclosure is fine if the insiders are receiving the same

14 compensation as before, if that compensation was court-

15 approved.  That's the proposition they cite it for.   It's

16 not clear to me they've read the case, Your Honor, I have to

17 confess, because what happened in that case is that they

18 actually did disclose the amount in the first instance; and

19 as they note, the compensation to the insiders had been

20 Court-approved.  Two  hours ago, Your Honor, we had a hearing

21 and approval right here, of their motion to reject to two

22 large executive contracts because the compensation was too

23 high.

24      The compensation -- to say that what was being paid

25 before was -- through a line of cases that said it was Court-

Case 6:18-ap-01089-MH    Doc 63    Filed 04/10/19    Entered 04/10/19 17:10:57    Desc
Case 08-12540    Doc 1096    Filed 05/06/10    Entered 05/06/10 04:59:31    Desc Main
Main Document    Page 76 of 241
Document    Page 72 of 99

**Page 70**

1   approved -- they just asked for the Court to approve the

2   rejection of the contract.  It's exactly the opposite of the

3   case they've cited.  The Court didn't approve these executive

4   arrangements.

5           And the other thing we learned last night, all of a

6   sudden, is that, well, now the board is reconsidering their

7   compensation as well.  For the first time we heard that last

8   night in an affidavit filed at eleven o'clock.

9           THE COURT:   Let me ask you two quick questions.

10          MR. MARTIN:   Mmhmm.

11          THE COURT:   I'm sorry to interrupt.

12          MR. MARTIN:   No, that's --

13          THE COURT:   And the first one is, if the board of

14  directors intends to lower the compensation for those two

15  individuals that had the employment contract, isn't it

16  necessary that they reject those contracts?  Otherwise those

17  individuals would have the right to -- if they were assumed

18  -- would have the right to insist upon the full performance.

19  So isn't rejection of the contract simply consistent with the

20  fact that they're going to change, even if they're going to

21  go down?

22          MR. MARTIN:   Absolutely, Your Honor.  I completely

23  with that.  We didn't object to the motion.  Our whole point

24  is that we agree on that score.  My point here is that to say

25  that disclosure is fine because the pay is going to be the

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document   Page 77 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document   Page 73 of 99

Page 71

1    same as something that was previously Court-approved, it's

2    just not the case here.   In fact, they've said the

3    compensation is too high.

4             THE COURT:   I agree, that case may not be

5    applicable.

6             MR. MARTIN:   It's just that --

7             THE COURT:   And then the second question I have

8    is, is this objection satisfied by simply an amendment to the

9    plan that discloses the compensation for these key employees?

10            MR. MARTIN:   It is if the disclosure is what the

11   go-forward compensation is going to be, yes.   But what they

12   -- and I found this very interesting, Your Honor, because I

13   frankly had expected, as it happens in many cases, for -- you

14   know, often it's in the plan supplement.   We've done that in

15   many cases, and there's even cases -- and I want to talk

16   about their cases, about disclosing it at the confirmation

17   hearing because there is a case about that that they cite,

18   and I've seen that done before -- but -- and certainly at

19   least in cases where it's not contested, and it's at least

20   disclosed at that point.

21            But here the problem is -- and this is why I was

22   surprised the rejection motion when I saw it a week or two

23   ago when it was filed -- they're specifically saying they're

24   not going to decide right now, and this goes to my point that

25   the Bankruptcy Code requires certain things to happen at

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document   Page 74 of 99
Main Document   Page 78 of 241

**Page 72**

1   confirmation.  If -- Your Honor, if they had rejected this a

2   month ago and then come to this Court and said, "We

3   renegotiated the contracts, and here's the compensation," I'm

4   in a very different position.

5          First of all, those numbers are going to feed into

6   the feasibility analysis.  But more importantly than that,

7   Your Honor, one of the things that was said this morning was

8   that the executives here -- and especially the two whose

9   contracts are going to be renegotiated -- but others whose

10  pay is going to be lower -- are vital to the operation of

11  reorganized TERI, who is going to be servicing the plan trust

12  assets as well going forward.

13         We don't know whether they're going to stay.  We

14  have no idea.  We're being told there's going to be a

15  renegotiation.  We don't know whether they're going to

16  agree.  Maybe the reasonableness level for a non-profit that

17  we're being told is drastically reduced in size, they won't

18  stay.  And if they're vital to the enterprise, that's a

19  feasibility issue; it's a disclosure issue.  It goes right

20  down 1129.  So I -- again, this is why the Code wants this

21  all brought together.

22         But I agree with you, Your Honor, that you can come

23  relatively late in the process with this, but you have to

24  have the process done, figuring out who's running the

25  reorganized debtor and what they're being paid.  And we're

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document      Page 79 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document     Page 75 of 99

Page 73

1  not arguing that (a)(5) requires Court approval.  That's a

2  good -- that feeds into a good faith issue, of feasibility of

3  the amounts, feed into another piece of 1129.

4         There's a reason there is a disclosure requirement,

5  so that this gets figured out before the plan is confirmed,

6  and the numbers are then relevant to other items.  Is that --

7  I don't know if that --

8         THE COURT:   That answers my question.  Thank you.

9         MR. MARTIN:   Now before I get to their second

10  case, let me talk about their facts, because Mr. Glosband

11  pointed, and in their papers they plead to a number of places

12  where they say they've previously disclosed and satisfied

13  1129(a)(5)(B); and I have no objection, Your Honor, to any of

14  the things they've handed up.  They're either in the Court

15  records, or there's something filed with the IRS, and I think

16  it's fine that the Court should take judicial notice of all

17  that.

18         But let's just run through them.  So the first one

19  is the Statement of Financial Affairs filed almost two years

20  ago, tucked in the back of a document that is not served on

21  all creditors, does not happen at the culminating hearing in

22  the case, and is frankly, maybe most importantly, a statement

23  of what executives were paid before the bankruptcy, not

24  today.  And the disclosure requirement is going forward

25  today.

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document      Page 80 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document      Page 76 of 99

Page 74

1          Secondly, they cite their rejection motion on the

2    employment contracts.  Those rejection motions say the comp

3    is too high, and they're renegotiating.  It's very circular,

4    Your Honor.

5          Third, they cite an IRS form, which, as I

6    understand it, there are aggregating services which I gather

7    you can search on the web for these things, that there are

8    aggregating services that pull up all the Form 990s that

9    disclose executive compensation at non-profits.  But to say

10   that a form submitted with the IRS that may be available

11   through an aggregating service on the web satisfies

12   Bankruptcy Code requirements is to say that now all of us

13   have to be experts in the law of the taxation of non-profit

14   corporations.  That cannot possibly satisfy 1129(a)(5)(B).

15   And the disclosures they're claiming they made again are

16   completely retro -- retrospective.  They're not the go-

17   forward disclosure required by 1129(a)(5)(B).

18          The monthly operating reports are very interesting,

19   Your Honor, because before we actually served discovery debt

20   information on executive comp in this case, we thought about

21   getting that information from the monthly operating reports,

22   and we found three things:

23          First, in this District, which is fine -- other

24   Districts do it differently -- the monthly operating reports

25   are not filed with the courts and they're not on the docket.

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document      Page 81 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document      Page 77 of 99

Page 75

1           Secondly, we called the U.S. Trustee's Office, and

2    Mr. Bradford informed us, which frankly makes some sense to

3    me, that they've instituted new policies that they don't give

4    out the copies sent to them, because there can be personal

5    identifying information on them.  So we couldn't get them

6    there.

7           And then I asked Mr. Sternklar for them, whether

8    they would be helpful to me in trying to work out the

9    discovery request, and I was told that the monthly operating

10   reports here are essentially data dumps of all the bank

11   transactions for the hundreds of millions of dollars of cash

12   that Mr. Glosband's been talking about, and that they ran to

13   the thousands of pages.  And I said, "Mr. Sternklar, thanks,

14   but no thanks.  I'll just ask what the compensation is."

15          So the notion that this has all been disclosed in

16   the monthly operating reports, you know, maybe somebody's

17   going to pull one out and say it was on page 3 or something,

18   and -- but we went through that exercise, at least to some

19   level of good faith, and we ultimately got the information

20   from the debtor in a more direct fashion.

21          Lastly, they point to a board compensation motion

22   where, to be fair, the Court did approve the board

23   compensation early in the case and they came into court and

24   did that, so maybe that fits a little bit more in the first

25   case that we talked about.  But we learned at eleven o'clock

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document    Page 82 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document    Page 78 of 99

Page 76

1  last night, you know, I'm sure not in response to our

2  objection, you know, -- I'm quite sure that that wasn't the

3  case, but at eleven o'clock last night for the first time

4  we've seen an affidavit that says the board's going to

5  reconsider their compensation downward, too.

6        So we're in the same -- effectively in the same

7  position.  We don't know what the board's going to be paid

8  going forward, and we know that the company is effectively

9  admitting it's too high currently.  We're essentially in the

10  same place.

11        Now this just isn't the 1129(a)(5) standard.  The

12  case law -- the Code is simple, and it's clear.  You just

13  have to disclose.   The ***Granite Broadcasting*** case, which is

14  the lead case on this at this point just makes this crystal

15  clear.  No -- there's not an independent court duty to

16  approve, you know, independently under (a)(5), set aside good

17  faith, feasibility, but there has to be disclosure of the

18  amounts.

19        Now essentially what they're saying here is, "We

20  can disclose a cap."  Now maybe you could disclose a cap in a

21  case, but to disclose a cap that is reasonableness when

22  they've already conceded that the current compensation is too

23  high is meaningless.  It's a meaningless disclosure.

24        Now let me turn to -- I'll make one final set of

25  observations on what they've done here in their last case to

Case 6:18-ap-01089-MH    Doc 63    Filed 04/10/19    Entered 04/10/19 17:10:57    Desc
Main Document      Page 83 of 241
Case 08-12540    Doc 1096    Filed 05/06/10    Entered 05/06/10 04:59:31    Desc Main
Document      Page 79 of 99

**Page 77**

1  close up the 1129(a)(5) point, Your Honor.

2          What I find most intriguing and frankly telling is

3  the following:  There have been at least eight to ten papers

4  filed now in this case in which they could have put a chart

5  of what they even actually are paying people; and they say

6  retrospective disclosure is enough.  We say it has to be

7  prospective, and I think that's clear under the statute.  But

8  they say retrospective is enough, but by my count there's at

9  least eight to ten papers, recent papers, in which they could

10  have put a chart, at least to support their theory, okay?

11  The rejection motion, the monthly operating reports, the

12  board motion, the plan, the disclosure statement, a

13  supplement to the plan, a second supplement to the plan, the

14  memorandum in support of the plan, the supplemental

15  memorandum in support of the plan, and six affidavits filed

16  so far in support of this plan -- not all of which but many

17  of which go to this issue.

18          In not a single place -- they keep saying, "Oh,

19  we've disclosed it somewhere else."    Put in the numbers.

20  Why -- where are the numbers?  I think it's telling, Your

21  Honor, that all they want to do is say, "We did it somewhere

22  else, but we don't want to show you the numbers."  Now that's

23  a credibility issue, quite frankly, Your Honor.  I mean, it

24  really is at some point.  You get to ten pleadings where they

25  say, "Go look somewhere else, but we won't just pull it out

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document      Page 84 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document      Page 80 of 99

Page 78

1  and excerpt it for you.   But trust us.  We're going to

2  renegotiate to something reasonable."

3           It's just a credibility issue at this point, Your

4  Honor.  Frankly, it's easily fixable, as Your Honor pointed

5  out.  It's fixed easily in many cases, and when it's not

6  fixed repeatedly like this, it makes my client wonder why,

7  and I think it's fairly obvious why.

8           Now let me point out one last thing on this, Your

9  Honor, which is the case -- the other case they cite, which

10 is *Future Energy Corp.*, it's an older case -- 83 Bankruptcy

11 Reporter.  It's from Ohio.  And they cite this for the

12 proposition that they can make disclosure at the hearing, and

13 that's enough.  This is the question that Your Honor had

14 before.  And I don't know quite what to say about their

15 citing this case, Your Honor.  So let me just read what the

16 case actually says, and then talk about what it ultimately

17 did.

18           What the case says, when they're talking about the

19 end of their discussion of 8-5, and this is at the -- the PIN

20 cite is 489 -- it's at the end of Section D, I gather --

21           "Here, the identity, affiliations, and compensation

22           of the debtor's post-confirmation officers were

23           disclosed at the compensation hearing.  The Court

24           believes that such disclosures are more

25           appropriately made in the context of a disclosure

Case 6:18-ap-01089-MH    Doc 63    Filed 04/10/19    Entered 04/10/19 17:10:57    Desc
Main Document      Page 85 of 241
Case 08-12540    Doc 1096    Filed 05/06/10    Entered 05/06/10 04:59:31    Desc Main
Document      Page 81 of 99

**Page 79**

 1              statement.  Nevertheless, the Court concludes that

 2              the fact that the required disclosures were not

 3              made in the disclosure statement but were instead

 4              presented in the course of the confirmation hearing

 5              will not alone serve as a barrier to confirmation

 6              of the plan in this case."

 7          So let me point out two things about that:  First

 8  of all they disclosed the am -- three things:

 9          First they disclosed the amount, which hasn't been

10  done here.

11          Second, the Court is not saying it was happy with

12  this process by any means.  The Court was making absolutely

13  clear that that disclosure requirement is in there for a

14  reason, and it should happen as early as possible.

15          Third, I can't quite figure out why they cited this

16  case, Your Honor, because the Court denied confirmation.  The

17  reason the Court went on to say this wasn't itself a reason

18  to deny confirmation is because there were four other reasons

19  to deny confirmation in that case.  And interestingly, Your

20  Honor, one of them was feasibility, raised *sua sponte* by the

21  Court citing the leading case from this District,  **Agawam.**

22          It's -- in many ways it's a very similar case in

23  which the Court was troubled by insider releases.  There was

24  issues about around the disclosure that were cured at the

25  last minute.  And the Court actually *sua sponte* reached the

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Main Document   Page 86 of 241
Document   Page 82 of 99

Page 80

1  feasibility issue at the very end of the case, and for that

2  and third-party releases and some other issues, denied

3  confirmation.

4          So to say that that case supports the notion that

5  the disclosure here leads to the conclusion that this case

6  should be confirmed is a little bit mind-boggling, when you

7  read the case as a whole and you really think about it in

8  context.

9          Now with that, Your Honor, let me turn to

10  feasibility and good faith, and I hope to be a little bit

11  briefer here.  Part of that is because the 1129(a)(5) issue

12  is frankly just a pure legal issue, I think as this Court

13  recognized at the outset, and I'll talk a little bit about

14  where maybe we go from here at the end.  But let me make a

15  few preliminary notes on feasibility and good faith.

16          The debtor -- a key part of their plan is to start

17  a totally new start-up business -- this port -- so-called

18  portfolio management business.  It's based on projects that

19  start today from essential zero revenue, and they're going to

20  grow at an astronomical rate.  Now I would note, Your Honor,

21  that they only provided these projections after we asked for

22  them, and the Court had them put them in.

23          One thing I would note on that, Your Honor, and Mr.

24  Glosband mentioned this morning -- I think it was him, and I

25  apologize if it was the Committee instead -- that the worst-

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Main Document   Page 87 of 241
Document   Page 83 of 99

Page 81

1   case scenario that was put in was put in at our request.

2   Quite to the contrary, Your Honor;  we only ever asked for

3   projections, and I'm going to come back to the worst case

4   scenario in a minute.

5        It was easy for this Court to tell them to add

6   disclosure about the reorganized debtor and projections,

7   because it's a core piece of the Bankruptcy Code.   This

8   notion, as I mentioned before, of fixing what the problem was

9   and making sure that new entities emerging from bankruptcy

10  don't end up back here.

11       In many cases the underlying business is sort of

12  fundamentally sound on an operating basis.  You can have a

13  quick bankruptcy case, and the feasibility analysis is

14  somewhat simpler.  I fully recognize what Mr. Glosband

15  detailed this morning, which is, the truth is this business

16  went away.  It's just gone, and so they have to do a

17  fundamental restructuring of their business.  I understand

18  that.  That's what the feasibility test is all about in

19  operational restructuring case.  They don't get to put it

20  off.  They have to come forward and prove that this debtor is

21  going to survive.

22       Now it's -- just to go back to this point on the

23  worst-case scenario, Your Honor, my recollection -- and maybe

24  it's incorrect -- is that we never asked for worst-case

25  scenario.  We just asked for projections.  I think when they

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
          Main Document      Page 88 of 241
          Document     Page 84 of 99

Page 82

1   put their per cent in, we called them scant; but other than

2   that that's -- in looking back at the papers, that's all we

3   said.

4        What they've done is put in this worst-case

5   scenario, and it's interesting, Your Honor, because many

6   disclosure statements include a downside case.  You see that

7   quite frequently.  There's sort of a base case, a set of

8   projections that support the debtor's valuation in the case,

9   so on and so forth.  But then they show a downside case to

10  show that the debtor is not going to hit a brick wall.  But

11  those downside cases are -- "Okay, our revenue is not going

12  to grow quite as much as we think," so on and so forth.

13        This one's different.  Their case, settled by them,

14  says -- and they leapt to this conclusion, which I think is

15  very telling.  Like, "Okay, our worst-case scenario is that

16  our start-up business completely failed."  That is very

17  telling on feasibility.  Their own -- their own worst-case

18  planning is not that, "Oh, there's going to be a revenue dip.

19  You know, it won't turn out quite as well as we think."

20  Their own -- in their own minds their worst-case scenario is,

21  "This isn't going to make it a year, and we're going to have

22  to do another set of massive lay-offs," -- and frankly, Your

23  Honor, I'm not sure whether that's going to trigger the two

24  million dollars PBGC liability I just heard about for the

25  first time.

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document   Page 89 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document   Page 85 of 99

Page 83

1          You know, do they have to shut the pension plan

2    down a year from now when they have to lay everybody off and

3    make those budget cuts, and have a two million dollar hit in

4    the reorganized debtor?  I don't know.  I just -- that's -- I

5    don't see.  It's the first I've heard it.   But, you know,

6    these are all questions that have to be answered by this

7    Court before -- especially before a totally new business plan

8    is put out there, and I think their downside business plan is

9    very telling.

10          Now let me again, not by way of diversion, Your

11   Honor, still focusing on feasibility, but address the issues

12   that the debtor raised last night in some filings they made

13   late last night, just to get our piece on the record so we

14   don't have to file another paper.

15          Our responses to their brief late last night on

16   feasibility are pretty simple.  First, the debtor says that

17   all that matters is what's necessary to produce recovery to

18   creditors, and since the assets are all over in the plan

19   trust, the feasibility of reorganized TERI doesn't matter.  I

20   addressed that in response to the Court's initial question,

21   "Why does it matter?"  It matters because they're the ones

22   collecting the loans.

23          Second, they now have an argument, which is new as

24   of last night.  There is yet another core business.  There is

25   now the core non-profit mission business.  Not really their

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Main Document   Page 90 of 241
Document   Page 86 of 99

Page 84

1  worst-case scenario.  They're actually saying, "Well, now the

2  worst case numbers we have, there's actually another business

3  that we could operate profitably."  I don't know anything

4  about that.  I don't know what the grants are.  I don't know

5  what -- you know, I don't know the probability of the grant

6  income for pure non-profit business.  I don't know what the

7  endowment income is.  I don't know what the expenses are.  I

8  do know that this massive enterprise that was -- TERI was

9  supporting that non-profit business before, they are

10 proposing to continue support of their for-profit business

11 now; but now they're saying something else can survive on a

12 stand-alone basis, and I frankly don't know anything about

13 that.  This is kind of the first I've heard about that, late

14 last night.

15       Most notably, Your Honor, just to highlight this

16 point, and I'll be brief, because I think your question kind

17 of covered the third point I wanted to make here is this

18 point about this notion that, you know, TERI's reorganization

19 isn't going to affect the creditors.  I can't emphasize

20 enough that that's just not the deal.  I don't -- I don't --

21 I'm not even sure where that comes from when they're the ones

22 providing the collection services.

23       And, you know, I just think we're being put in a

24 situation where effectively the re -- in many ways you could

25 say the reorganization is just being put off for two years to

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document   Page 87 of 99

Page 85

1  another renegotiation with some other asset manager, but not

2  under the supervision of the Court -- just under the

3  supervision of some plan -- of a plan Trustee.

4         Now let me talk a little bit about good faith, Your

5  Honor.  I'd like here to just provide a history of events.

6  I've touched on a number of these things already, but I think

7  the history of events is what I'd really like to get at here,

8  because I think it really shows what we're concerned about.

9         At its crux, Your Honor what we're concerned about

10  is I understand this is -- this case had a lot of issues in

11  the beginning, and I appreciate that.  We've all been in

12  these securitization cases, and they're difficult at the

13  beginning because these structures were not designed --

14  nobody ever contemplated they would fail.  They were just

15  machines that would kind of go and go and go and go; and when

16  they stop, it's a lot to work, and I appreciate that.

17         But the plan process itself, since they filed the

18  plan, is now six months old, maybe more.  So the history of

19  this a little bit, whether you call it two years or sort of

20  six months to drag out the confirmation process is not really

21  that big a difference; but when we -- when we started, you

22  know, everyone understands that the executives were highly

23  compensated, and you can argue about whether it was one of

24  the biggest non-profits in the Commonwealth and so on and so

25  forth, but it's clear that until very recently there's been

Case 6:18-ap-01089-MH    Doc 63    Filed 04/10/19    Entered 04/10/19 17:10:57    Desc
Main Document    Page 92 of 241
Case 08-12540    Doc 1096    Filed 05/06/10    Entered 05/06/10 04:59:31    Desc Main
Document    Page 88 of 99

Page 86

1  no discussion about pay cuts other than not taking a

2  discretionary bonus, which I'm not sure it's really a pay

3  cut, but that's -- we can probably quibble about that.

4  　　　　But late last year the original plan and disclosure

5  statement were filed, and there's no discussion about

6  reorganized TERI.  It seems innocuous as we talked about.  We

7  get something put in about it, but there's really no

8  description of what portfolio management is going to be --

9  what the whole idea of this is going to be that's going to

10  justify the retention of executives.

11  　　　　Come April we served discovery on the debtor on

12  three very discrete topics, one of which was executive comp;

13  and, you know, I'm sure there will be testimony that they

14  were thinking about pay cuts before, but the motion to reject

15  came after we started that discovery.  And the affidavit of

16  the general counsel saying, "And we're considering board

17  compensation reductions, too," came at eleven o'clock last

18  night, and I'll just -- the Court can draw its own

19  conclusions on that.

20  　　　　They've admitted now that pay is too high.  But

21  they also say they just want to decide, out of the light of

22  day.  Now we've got the actual discovery on executive

23  compensation:  What we actually got and what we actually

24  didn't get.  We were -- said, "We don't need the monthly

25  operating reports.  Just give us, you know, --" -- they said,

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Main Document   Page 93 of 241   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document      Page 89 of 99

Page 87

1  "What we have is the W-2s."  We said, "We'll take the W-2s."

2       What we came to find out in the discovery process,

3  Your Honor, is that there is a study.  There was a study done

4  by Grant Thornton, paid for by this estate, at the request of

5  the debtor, as to what reasonable compensation would be, and

6  they won't give it to me.

7       In fact, the reasons stated that they wouldn't give

8  it to us is that the board may or may not rely on the expert

9  opinion commissioned by them of Grant Thornton, paid for by

10  this estate, in setting future compensation.  That, too, you

11  know, makes me very concerned.

12       Now what started as frankly something I thought was

13  innocuous in February -- "Can you put some projections in for

14  the reorganized debtor?" -- is a pattern.  They don't want to

15  say what they're going to pay.  They just don't want to say

16  it.  They don't even want to say what they're being paid now.

17  They want to point to other stuff.  They want to point to

18  other places it's hard to find.  And it's -- and they don't

19  want to decide in the light of day, and I think that's very

20  telling.

21       Now that, Your Honor, to us sums up to bad faith.

22  Now that's what I have as to substance, Your Honor, and I'd

23  just like to -- actually, let me take one step back.

24       There are two proponents of this plan.  That aspect

25  of bad faith is with respect to the debtor, and the second is

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document     Page 94 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document     Page 90 of 99

Page 88

1 with respect to the Committee, who's also a proponent of this

2 plan.

3          Now I'm quite certain, you know, that the Committee

4 is not negotiating to enrich the debtor's executive.  I'm

5 quite confident of that.  But what went on -- what apparently

6 went on here is something quite different as to what I talked

7 about before.  Nothing was ever done to look at the

8 alternatives.  They simply ceded the field.  They don't care

9 -- they're a plan proponent, and they said at the last court

10 hearing on this that they don't care, and they have no view

11 as to whether the debtor survives more than two -- the

12 reorganized debtor survives more than two years.  I don't

13 know how you can say that and be a plan proponent.

14          I just -- I'm sure everyone's done yeoman's work on

15 lots of issues in this case, and I'm sure everyone's tired,

16 and I know everyone would like to move on, but that's not how

17 the process works.  If you're going to be a plan proponent,

18 and there's going to be reorganized entities, you've got to

19 care about whether they're going to be feasible.  That's --

20 it's to the lawyers and the professionals out here to do that

21 job.  The Court can't do it for them.  We have to do that

22 job, and it just -- by their own admission the Committee

23 didn't do any of that.

24          But what's even more bizarre to me is that they're

25 relying on this entity to collect the money to pay the

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document    Page 95 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document    Page 91 of 99

Page 89

1   creditors, and I just don't -- I just don't understand.

2          Now again, Your Honor, I apologize because I had

3   that one last point of substance, but let me just say where I

4   think we are.

5          1129(a)(5) is an issue of law.  I think the Court

6   can rule on it, and I think it's very straightforward.  But

7   those amounts -- the debtor has said they're not prepared --

8   they don't have a deal today.   Whatever the deal is is

9   relevant to good faith and feasibility.  It's at the core of

10  those issues.  So we can take a lot of testimony today, and,

11  you know, I prepared because there's a good chance the Court

12  is just going to go forward with testimony; but I would

13  submit, Your Honor, that's actually procedurally and

14  substantively improper at this point.

15         Your Honor made an excellent observation earlier.

16  You know, can they cure this, and can we kind of go forward?

17  They could cure the (a)(5) thing, Your Honor, at least as to

18  (a)(5) itself by figuring out what the compensation is going

19  to be, making the disclosure; and then we'll actually have

20  the universe of facts to do the feasibility and good faith

21  thing full-on, actually knowing the numbers.   And to kind of

22  do it in a mish-mosh, I'm not sure, given the way they're

23  intertwined, as you can tell from my argument, makes a lot of

24  sense.

25         But that said, Your Honor, you know, I understand

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Main Document   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document      Page 92 of 99

Page 90

1    -- I've been in plenty of Bankruptcy Court hearings where we

2    do things very flexibly, so I'm prepared to go forward, but I

3    will object if we do it otherwise for the sake of the record.

4          Now, Your Honor, in many ways, while the debtor and

5    the Committee have solved a lot of problems, with respect to

6    this core issue of how we're going to get money into this

7    estate or into the plan trust and how we're going to actually

8    collect it, the process looks a lot like we're just going to

9    push it off, and we're going to push it off for a year or two

10   years, keep paying enough money on the collections contract

11   to TERI so they can keep paying the executives something.

12         The idea of confirmation is to resolve these issues

13   so that there's not any chance this comes back with a shut-

14   down of TERI, lay-offs at TERI, PBGC termination at TERI --

15   whatever might conceivably happen.  We don't even have a

16   confirmation order.  There's no draft confirmation order.

17         I would submit, Your Honor, that this case just

18   isn't ready.  I don't know whether it's going to be ready a

19   week from now, a month from now.  It needs to be ready, and

20   it needs to be ready soon, Your Honor, and the case is six

21   years old, and I fully recognize that, and I frankly have

22   some thoughts about how we might proceed to try to get this

23   thing across the goal line, given our suspicions and our

24   objections, because we want to be productive.  We don't want

25   to just sit here and say, "We're just going to hold this case

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Main Document   Page 97 of 241
                           Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
                           Document   Page 93 of 99

Page 91

1  up until the end of time," because we're here to make our

2  objections, and we're going to make them once, and it's going

3  to be what it's going to be.

4       But I would frankly submit, Your Honor, that

5  procedurally a lot of people came today, and they're not

6  ready.  Let's -- let's get ready.  I have some suggestions

7  about how maybe we can really be sure we're ready, or maybe

8  even try to bring this case together to a close in a

9  productive way -- maybe not as fast as people would like;

10 maybe not in a week or two weeks, but in a reasonable period

11 of time.  But let's be ready because this Court and the

12 system can't do this.  You know, we can't just run roughshod

13 over 1129(a)(5), and we can't run roughshod over feasibility

14 when it's a totally new start-up business.  We just -- it

15 doesn't make any sense, Your Honor.  It's not how the system

16 works, just because we've here for two years.

17      That's all I have, Your Honor   Thank you.

18      MR. GLOSBAND:   Thank you, Your Honor.   Just a

19 couple of responses, and I promise not to be anywhere near as

20 hyperbolic.

21      In the 1129(a)(5) issue, three things:  First, the

22 current compensation information that Mr. Martin complains

23 mightily isn't available was supplied to them in an answer to

24 interrogatory.  It's not a secret for all the reasons I've

25 indicated, and if it would make anybody feel better we'll

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Main Document   Page 98 of 241
Document   Page 94 of 99

Page 92

1 submit -- we'll file the interrogatory in court. So that

2 information is there. They have it. We're not hiding it

3 from them, and --

4         THE COURT: The answer to the interrogatory is

5 given in hard numbers?

6         MR. GLOSBAND: Yes.

7         THE COURT: Okay.

8         MR. MARTIN: Only asked for past compensation,

9 Your Honor. And our point is that they haven't disclosed

10 (Not near microphone; difficult to hear)

11         MR. GLOSBAND: Not past. Current until the

12 revisions take effect.

13         In terms of when the revisions will take effect and

14 whether we should wait for those, I just don't see why that's

15 necessary. They have, and we will make generally available

16 to anybody who doesn't have, the current compensation levels

17 -- not the Statement of Affair numbers, but the current

18 numbers. They will be in effect until new compensation is

19 completed. My guess is, because there is a technical process

20 required by the Internal Revenue Code. that it will be the

21 end of May.

22         I, (a), don't think disclosure of that ultimate

23 resolution is necessary to comply with Section 1129(a)(5),

24 because we will give you the ceiling, if you will, that Mr.

25 Martin alluded to; and you can find, based on the evidence

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Main Document     Page 99 of 241
Document     Page 95 of 99

Page 93

1  that's already in the affidavits and that you will hear, that

2  the prospective numbers will be lower than the ceiling.

3      I don't think that 1129(a)(5) is limited

4  exclusively to providing details of prospective compensation.

5  It doesn't say that.  It says, "the nature of the

6  compensation."  The nature of the compensation in many of the

7  cases is, is it equity?  Is it incentive-based?  Is it

8  salary?  The answer is, what is being paid now -- what we can

9  definitively is being paid now is salary and benefits,

10  period; and that will be in the affidavit -- in the

11  interrogatory response that we submit.  So the information is

12  there, and there is a lot of noise about it being missing,

13  but it's not missing.

14      Secondly, the monthly operating reports that Mr.

15  Martin seemed to have such a difficult time finding, I'd be

16  happy to supply him copies; but his client was on the

17  Committee that got the copies up until perhaps the last

18  meeting.  So perhaps they just didn't look in the right

19  folder, but that information was given to them.

20      Third, the enigmatic Form 990s that one has to go

21  searching obscure data sites for are forms that his client

22  files, too; and so their existence and means of access to

23  them should have been no secret.

24      So notwithstanding all that we've heard, there was

25  certainly no effort at concealment.  All this information is

Case 6:18-ap-01089-MH    Doc 63    Filed 04/10/19    Entered 04/10/19 17:10:57    Desc
Case 08-12540    Doc 1096    Main Document    Page 100 of 241    Desc Main
Filed 05/06/10    Entered 05/06/10 04:59:31    Desc Main
Document    Page 96 of 99

Page 94

1  public; and in particular the specific information that they

2  ask for they were given.

3       If it does help, as I said -- and whether it helps

4  or not, maybe we'll just do it -- we'll file that

5  interrogatory so those numbers will be in the record.

6       Secondly, on -- and Mr. Sternklar may address this

7  as well.  On feasibility, what's going to happen to this

8  company if TERI can't survive to collect these loans, one

9  thing that Mr. Martin seems to be missing is that the amount

10  of loans subject to TERI's collection contract on our

11  numbers, loans, expected to realize about 36 million dollars

12  in net present value.

13       The amount of loans that the plan trust is going to

14  have to collect in addition to that, which it hasn't hired

15  TERI to collect -- and it may, and TERI would like to bid for

16  that job, but so would others -- have a present value in the

17  evidentiary materials of about 92 million dollars.

18       So the plan trust will have to have in place

19  arrangements that it's comfortable with to collect roughly

20  slightly under three times the amounts of loans that TERI's

21  collecting for it.  To think that it couldn't somehow -- if

22  TERI's a problem -- transition TERI's share to whomever else

23  it is using is -- is, you know, kind of unimaginable.  This

24  is a smaller piece of a much larger portfolio that they'll be

25  working on.  So it doesn't determine the entire fate.

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document     Page 101 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document     Page 97 of 99

Page 95

1          Thirdly, as we'll indicate when we present our case

2    on feasibility, there's absolutely no reason to think that

3    TERI won't be around to do it for the two years that TERI has

4    contracted to do it for.  So expanding it beyond that is a

5    fantasy.

6          THE COURT:   Let me see if I can bring this initial

7    area to a close.

8          With respect to 1129(a)(5), does Mr. -- is Mr. Peko

9    familiar with the compensation levels of the -- of the

10   directors and officers?

11         MR. GLOSBAND:  He is.

12         THE COURT:   He testifies to that?

13         MR. GLOSBAND:  He could.

14         THE COURT:   Okay.  So I'm sensitive to Nellie

15   Mae's concern that somehow -- somehow 1129(a)(5) has been

16   skirted.  Now the debtor says, and I suppose a Creditors'

17   Committee would add as well, that the current compensation

18   level of these individuals are already well known to Nellie

19   Mae, and the debtor says, "Well, they're going to go down."

20         Well, I take your argument, Mr. Glosband, that the

21   current compensation levels are going to be the compensation

22   levels until and unless the board of directors says

23   otherwise; and when they say otherwise, it will be less than

24   what they are right now.  So Mr. Peko I assume will tell me

25   what those -- tell me and those are attending here today what

Case 6:18-ap-01089-MH   Doc 63   Filed 04/10/19   Entered 04/10/19 17:10:57   Desc
Main Document      Page 102 of 241
Case 08-12540   Doc 1096   Filed 05/06/10   Entered 05/06/10 04:59:31   Desc Main
Document      Page 98 of 99

Page 96

1  those levels are now.

2       But when it comes time to talk about feasibility,

3  the feasibility argument needs to be structured also on what

4  they are now, and not on the assumption that they will be

5  reduced, because the debtor hasn't been able to come down to

6  the question of what they ought to be reduced to.

7       So you'll have to argue feasibility on a worst-case

8  basis, what they are right -- what they are right now,

9  assuming that the board of directors fails to reduce them,

10  and then if the board of directors does reduce them, well,

11  all the better for the viability of the debtor.  But not

12  having reduced them today -- to date, the feasibility

13  argument will have to be grounded on what they are now as if

14  they will not be reduced into the future.

15       So let's take now a lunch hour.  We'll start at two

16  o'clock with Mr. Peko on the stand.  Okay?

17       MR. GLOSBAND:  Thank you very much.

18  (End A.M. Session at 1:03:41 p.m.)

19  (See separate Transcript, Volume II, for afternoon session)

20                 * * * * * * * * * * *

21

22

23

24

25

**Page 97**

1           I certify that the foregoing is a true and accurate

2    transcript from the digitally sound recorded record of the

3    proceedings.

*/s/ Gloria C. Irwin*                                    *5-5-2010*

_____

**Certified Transcriber NJ AOC200**                      **Date:**
     **Federal CERT #122**
**GCI TRANSCRIPTION SERVICES**
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**609-927-0299  1-800-471-0299**
     **FAX 609-927-9768**
**e-mail irwingloria@comcast.net**
**✔Tm/gci**

# EXHIBIT 9

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re | ) | |
| | ) | Chapter 11 |
| THE EDUCATION RESOURCES INSTITUTE, INC., | ) | Case No. 08-12540 (HJB) |
| | ) | |
| Debtor. | ) | |

ORDER PURSUANT TO SECTIONS 105, 362, AND 363 OF THE BANKRUPTCY
CODE AUTHORIZING AND DIRECTING DEBTOR TO HONOR CERTAIN OF ITS
GUARANTY OBLIGATIONS AND PURCHASE DEFAULTED LOANS USING
CASH IN CERTAIN PLEDGED ACCOUNTS ESTABLISHED FOR THE BENEFIT
OF THE TRUSTS

Upon the motion (the "Motion")[1] of The Education Resources Institute, Inc., the debtor

and debtor in possession in the above-captioned case (the "Debtor"), for an order authorizing and

directing the Debtor to honor certain of its guaranty obligations and purchase defaulted loans

using cash in certain Pledged Accounts (including all property credited thereto) established for

the benefit of the Trusts, and sufficient notice having been given and due cause appearing

therefore, the Court finds that, for the reasons set forth more specifically in the Motion, cause has

been shown for granting the requested relief, it is accordingly:

ORDERED, that the Motion is granted to the extent provided herein; and it is further

ORDERED that each Trust has a valid, enforceable, perfected security interest in its

respective Collateral; provided however that the Committee or any other person or entity shall

have the right to object to, or contest in any manner or raise any defenses to, the validity,

perfection, priority or enforceability of the Trust's security interests in the Collateral, including

---

[1] Defined terms not otherwise defined herein shall have the meaning ascribed to such terms in the
Motion.

without limitation, the Recoveries (as defined in the applicable Deposit and Security

Agreements) and Pledged Accounts, including, without limitation, the application of section 552

of the Bankruptcy Code to Recoveries, only in a proceeding initiated in this Court (or other court

then having jurisdiction over this case) on or before (i) the 60th day following the date of this

Order with respect to all Collateral other than the Pledged Accounts and the Postpetition

Transfers (as defined below) and (ii) the 14th day following the date of this Order with respect to

the Pledged Accounts (other than the Postpetition Transfers); and (iii) the 45th day following the

date of this Order with respect to funds transferred to any Pledged Account after the Petition

Date and before the date hereof ("Postpetition Transfers"); that, subject to the foregoing, all

parties reserve their rights in respect of such issues and their implications; provided further,

however, that to the extent any postpetition sales or transfers of funds from such sales to the

Pledged Accounts have previously been approved by this Court, such postpetition sales or

transfers shall not be subject to challenge by the Committee or any other person or entity, and it

is further

ORDERED, that any and all Recoveries that have not prior to the date of this Order been

transferred to a Pledged Account, or otherwise paid to a third party, (a) shall be placed in a

segregated account established for the applicable Trusts by the Debtor at U.S. Bank and TERI

will maintain records of the Recoveries allocable to each respective Trust (the "Segregated

Recoveries Account") and (b) held in such account until the earliest of (i) the 61st day following

the date of this Order, unless a proceeding has been initiated in accordance with the preceding

paragraph of this Order and (ii) the entry of an order of this Court directing the disposition,

transfer, or other use of the funds in the Segregated Recoveries Account; and that the funds in the

Segregated Recoveries Account shall be transferred by U.S. Bank at the direction of the Debtor

2

(i) to the applicable Pledged Accounts on the 61st day following the date of this Order if no proceeding has been initiated in accordance with the preceding paragraph of this Order or (ii) if another order of this Court has been entered directing the disposition, transfer or other use of such funds, pursuant to such order; and it is further

ORDERED, that the Debtor is authorized to invest and manage the investment of funds held in the Segregated Recoveries Account to the same extent and manner as it is authorized to invest funds in the respective Pledged Accounts (and U.S. Bank is authorized to act in accordance with such instructions of the Debtor) and that all customary costs for establishing and maintaining the Segregated Recoveries Account (including customary charges and fees of U.S. Bank) shall be the obligation of and paid by TERI; and it is further

ORDERED, that the Debtor is authorized and directed to purchase defaulted loans from the funds in the applicable Pledged Accounts, provided that (1) the Debtor, the Indenture Trustee and the administrator have complied with the applicable Guaranty Agreement, Deposit and Security Agreement and any other governing documents concerning payment and, provided further that, (2) there are sufficient funds in the applicable Pledged Account to purchase such student loans; and it is further

ORDERED, that the Debtor's performance of its obligations under the applicable Guaranty Agreements and Deposit and Security Agreements, to the extent authorized by this Order, shall be consistent with past practice, and in accordance with the terms of the applicable Guaranty Agreement and Deposit and Security Agreement; and it is further

ORDERED, that nothing in this Order shall permit or allow the Debtor to purchase any defaulted loans with funds from the Debtor's general operating accounts; and it is further

LIBC/3313239.10

ORDERED, that should a Trust's Pledged Account ever be replenished (from collection efforts or otherwise), the Debtor will, at such time as the funds become sufficient, purchase defaulted student loans as funds become available in accordance with the terms of the applicable Guaranty Agreement and Deposit and Security Agreement; and it is further

ORDERED, that, subject to the terms and conditions of this Order, relief from the automatic stay of section 362(a) is hereby granted for the limited purpose of permitting and authorizing: (a) the Debtor to transfer cash collateral to the Trusts; (b) each Trust to accept or withdraw such cash collateral from the applicable Pledged Account to satisfy valid Guaranty Claims (as defined in the applicable Deposit and Security Agreement) made in accordance with the applicable Guaranty Agreement; (c) each party to each Guaranty Agreement and/or Deposit and Security Agreement to take such actions as are necessary or appropriate to satisfy the conditions precedent to the payment of any Guaranty Claim (as defined in the applicable Deposit and Security Agreement), including but not limited to the sending of any and all applicable notices to Debtor of the occurrence of a Guaranty Event; (d) the Trusts and their authorized agents to retain and apply cash collateral pursuant to the applicable security documents, including but not limited to the applicable Deposit and Security Agreements; (e) each collection agency to net its Defaulted Loan Collection charges out of the recoveries it remits to TERI; and (f) TERI to deposit into the applicable Pledged Account proceeds of any loan that is sold back to a Trust pursuant to the terms of a Guaranty Agreement; and it is further

ORDERED, that FMC is authorized to provide the Claims Review and Management services, including the post-default collections and claims processing and review services, and, subject to the conditions of this Order, the pre-default collection services; and that this provision,

4

including TERI's reimbursement obligations, will survive termination of the Transition Services Agreement; and it is further

ORDERED, that TERI will continue in its ordinary course to allow the collection agencies to retain the Defaulted Loan Collection Charges and will continue to remit the Rehabilitated Loan Collection Charges directly to the applicable collection agencies; and it is further

ORDERED, that upon receipt of any Recovery after the date hereof, the Debtor shall promptly (i) cause such Recovery (net of amounts payable pursuant to clause (ii) of this paragraph) to be deposited in the Segregated Recoveries Account to the extent provided herein or otherwise in the applicable Pledged Account and (ii) cause to be paid to FMC or its designee an amount in cash equal to the scheduled cost to TERI under the Transition Services Agreement for post-default collections of non-securitized loans (the "FMER Cost") plus the recovery fee to which TERI would be entitled under the applicable Guaranty or Deposit and Security Agreement, provided that if a final order or other similar order acceptable to FMER has been entered by the Bankruptcy Court finding or otherwise determining that the Trusts have a first priority, valid, enforceable perfected security interest in all "Recoveries" (as defined in the applicable Deposit and Security Agreements) or if FMER ceases providing post-default collection services, then TERI shall not be required to pay the FMER Cost recovered after such date with respect to Securitized Loans and if FMER ceases providing post-default collection services no fees shall be due and it is further; and it is further

ORDERED, that to the extent a loan is "rehabilitated", such that the borrower begins making payments again, the applicable Trust is authorized but shall not be required to purchase and TERI is authorized but not directed to sell that loan, in each case in accordance with the

terms of the applicable Guaranty Agreement and Deposit and Security Agreement, and the amount of the repurchased loan and all Recoveries from such loan will be placed into the applicable Pledged Account (less the Rehabilitated Loan Collection Charges); and that the applicable Trust shall have a valid, enforceable, perfected first priority security interest in all such amounts placed into the Pledged Account hereafter, notwithstanding the reservation of rights referenced in the second ordered paragraph of this Order; provided, however, that TERI shall not hereafter sell any such loan unless (i) the Committee has consented to such sale in writing or (ii) the Committee has not commenced a proceeding pursuant to the second ordered paragraph of this Order prior to the 61st day after the date of this Order or (iii) the Court has entered an order determining the proper disposition of such funds; provided further, however, that to the extent any postpetition sales or transfers of funds from such sales to the Pledged Accounts have previously been approved by this Court, such postpetition sales or transfers shall not be subject to challenge by the Committee or any other person or entity , and it is further

ORDERED, that notwithstanding anything herein to the contrary, any costs incurred by FMC for post-default collection services will be paid by TERI in cash at the rates and costs set forth in the Transition Services Agreement; to the extent that such costs relate to Recoveries that are to be transferred to the Segregated Recoveries Account, TERI may pay such costs from the Recoveries ; and that this provision, including TERI's reimbursement obligations, will survive termination of the Transition Services Agreement; and it is further

ORDERED, that any costs incurred by FMC for claims processing and review services will be offset from the Debtor's residual interest that any of the Trusts create (the "Residual Interest"); and that the costs charged by FMC pursuant to this paragraph shall be at the rates and costs set forth in the Transition Services Agreement; and that this provision, including TERI's

6

reimbursement obligations, will survive termination of the Transition Services Agreement; and it is further

ORDERED, that in the event that FMC decides, in its sole discretion, to continue its pre-default collection efforts on behalf of the student loans in the Trusts to the extent FMC is able to demonstrate that such pre-default efforts resulted in an increase in any Residual Interest, then the costs of such pre-default collection efforts shall be offset from the Residual Interest pursuant to a formula to be agreed upon by and between the Debtor and FMC that fairly apportions the costs to all beneficiaries of residual interests that the Trusts create; and that this provision, including TERI's reimbursement obligations, will survive termination of the Transition Services Agreement; and it is further

ORDERED, that FMC may, in its sole discretion, cease providing any post-default collection services at any time following the filing of any objection, adversary proceeding or other contested matter objecting to, contesting, or raising any defenses to the validity, perfection, priority or enforceability of the Trust's security interests in Recoveries or after the 61st day after the entry of this Order if all Recoveries are not deposited directly into the applicable Pledged Account, provided that FMC shall give TERI at least 30 days prior written notice of its intent to terminate such services; and its is further

ORDERED, that the requirement of Bankruptcy Rule 4001(a)(3), to the extent applicable hereto, that this order be stayed for a period of ten (10) days from the date hereof shall be and hereby is waived; and it is further

7

ORDERED, that this Court will retain jurisdiction to construe and enforce the terms of this

Order.

Dated: __June 23__ , 2008

_____
The Honorable Henry J. Boroff
United States Bankruptcy Judge

L1BC/3313239.10

# EXHIBIT 10

# Federal Student Aid
### An OFFICE of the U.S. DEPARTMENT of EDUCATION

| PROUD SPONSOR of
the AMERICAN MIND™

## National Student Loan Data System (NSLDS) for Students

*NSLDS is a repository of information from many sources. Changes to the data are made by those sources. Collecting the data into one central location such as NSLDS gives you convenience and saves you time. If for any reason you disagree with the information reported to NSLDS, please contact one or more of the sources of your data listed on the detail pages on this site. The Department is also available as a resource at 1-800-4FEDAID if you need additional assistance. Your comments and corrections will help improve the services NSLDS provides.*

Aid Summary for JOHN M MATA | Your enrollment status is WITHDRAWN , effective 08/31/2014.



MyStudentData
Download

### Loans

**Please click on numbers in first column to see details including point of contact.**

| | Type of Loan | Loan Amount | Loan Date | Disbursed Amount | Canceled Amount | Outstanding Principal | Outstanding Interest |
|---|---|---|---|---|---|---|---|
| 1 | DIRECT CONSOLIDATED UNSUBSIDIZED | $109,329 | 08/07/2017 | $109,329 | $0 | $109,329 | $3,358 |
| 2 | DIRECT CONSOLIDATED SUBSIDIZED | $43,255 | 08/07/2017 | $43,255 | $0 | $43,255 | $220 |
| 3 | DIRECT STAFFORD UNSUBSIDIZED | $13,666 | 09/06/2013 | $13,666 | $0 | $0 | $0 |
| 4 | DIRECT STAFFORD UNSUBSIDIZED | $6,285 | 08/05/2011 | $6,285 | $0 | $0 | $0 |
| 5 | DIRECT STAFFORD UNSUBSIDIZED | $4,463 | 11/05/2010 | $4,463 | $0 | $0 | $0 |
| 6 | DIRECT STAFFORD SUBSIDIZED | $915 | 11/05/2010 | $915 | $0 | $0 | $0 |
| 7 | DIRECT STAFFORD UNSUBSIDIZED | $9,282 | 10/21/2010 | $9,282 | $0 | $0 | $0 |
| 8 | DIRECT STAFFORD SUBSIDIZED | $3,218 | 10/21/2010 | $3,218 | $0 | $0 | $0 |
| 9 | FFEL STAFFORD SUBSIDIZED | $8,500 | 09/19/2008 | $0 | $8,500 | $0 | $0 |
| 10 | FFEL STAFFORD UNSUBSIDIZED | $12,000 | 09/19/2008 | $0 | $12,000 | $0 | $0 |
| 11 | FFEL STAFFORD UNSUBSIDIZED | $12,000 | 08/09/2007 | $3,000 | $9,000 | $0 | $0 |
| 12 | FFEL STAFFORD SUBSIDIZED | $8,500 | 08/09/2007 | $2,125 | $6,375 | $0 | $0 |
| 13 | FFEL STAFFORD SUBSIDIZED | $8,500 | 07/05/2006 | $4,250 | $4,250 | $0 | $0 |
| 14 | FFEL STAFFORD UNSUBSIDIZED | $10,000 | 07/05/2006 | $5,000 | $5,000 | $0 | $0 |
| 15 | FFEL CONSOLIDATED | $17,000 | 03/08/2006 | $17,000 | $0 | $0 | $0 |
| 16 | FFEL CONSOLIDATED | $26,865 | 03/08/2006 | $26,865 | $0 | $0 | $0 |
| 17 | FFEL STAFFORD UNSUBSIDIZED | $2,524 | 01/30/2006 | $2,524 | $0 | $0 | $0 |
| 18 | FFEL STAFFORD UNSUBSIDIZED | $2,524 | 01/05/2006 | $0 | $2,524 | $0 | $0 |
| 19 | FFEL CONSOLIDATED | $5,731 | 12/28/2005 | $5,731 | $0 | $0 | $0 |
| 20 | FFEL STAFFORD UNSUBSIDIZED | $7,476 | 08/31/2005 | $7,476 | $0 | $0 | $0 |
| 21 | FFEL STAFFORD SUBSIDIZED | $8,500 | 08/31/2005 | $8,500 | $0 | $0 | $0 |
| 22 | FFEL STAFFORD UNSUBSIDIZED | $20,784 | 07/15/2005 | $20,655 | $129 | $0 | $0 |
| 23 | FFEL CONSOLIDATED | $17,000 | 07/15/2005 | $17,000 | $0 | $0 | $0 |
| 24 | FEDERAL PERKINS | $3,800 | 07/01/2004 | $3,800 | $0 | $0 | $0 |
| 25 | FFEL STAFFORD UNSUBSIDIZED | $10,000 | 06/28/2004 | $10,000 | $0 | $0 | $0 |
| 26 | FFEL STAFFORD SUBSIDIZED | $8,500 | 06/28/2004 | $8,500 | $0 | $0 | $0 |
| 27 | FFEL STAFFORD UNSUBSIDIZED | $10,000 | 08/28/2003 | $10,000 | $0 | $0 | $0 |
| 28 | FFEL STAFFORD SUBSIDIZED | $8,500 | 08/28/2003 | $8,500 | $0 | $0 | $0 |
| 29 | DIRECT CONSOLIDATED SUBSIDIZED | $5,832 | 03/12/2001 | $5,832 | $0 | $0 | $0 |
| 30 | DIRECT CONSOLIDATED SUBSIDIZED | $1,500 | 02/17/1988 | $1,500 | $0 | $0 | $0 |
| 31 | FFEL STAFFORD SUBSIDIZED | $2,500 | 11/20/1986 | $2,500 | $0 | $0 | $0 |
| Total | DIRECT CONSOLIDATED UNSUBSIDIZED | | | | | $109,329 | $3,358 |
| Total | DIRECT CONSOLIDATED SUBSIDIZED | | | | | $43,255 | $220 |
| Total | DIRECT STAFFORD UNSUBSIDIZED | | | | | $0 | $0 |

4/2/2018                                    Financial Aid Review - JOHN M MATA

| | | | | | | $0 | $0 |
|---|---|---|---|---|---|---|---|
| Total DIRECT STAFFORD SUBSIDIZED | | | | | | $0 | $0 |
| Total FFEL STAFFORD SUBSIDIZED | | | | | | $0 | $0 |
| Total FFEL STAFFORD UNSUBSIDIZED | | | | | | $0 | $0 |
| Total FFEL CONSOLIDATED | | | | | | $0 | $0 |
| Total FEDERAL PERKINS | | | | | | $0 | $0 |
| Total All Loans | | | | | | $152,584 | $3,578 |

## Grants

### Pell Lifetime Eligibility Used: 175.000%

### Please click on numbers in first column to see details including point of contact.

| | Award Year | Type Of Grant: | School | Disbursed Amount |
|---|---|---|---|---|
| 1 | 2002 - 2003 | FEDERAL PELL GRANT | CALIFORNIA STATE UNIVERSITY, FULLERTON | $3,000 |
| 2 | 2001 - 2002 | FEDERAL PELL GRANT | CALIFORNIA STATE UNIVERSITY, FULLERTON | $3,300 |
| Total All Grants | | | | $6,300 |

*Information contained on these pages reflects the most current data in the NSLDS database. The data contained on this site is for general information purposes and should not be used to determine eligibility, loan payoffs, overpayment status, or tax reporting. Please consult the Financial Aid Officer at your school or the specific holder of your debts for further information.*

# EXHIBIT 11

Page 1

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  Case No. 16-23191-rdd

4  Adv. Case No. 16-08252-rdd

5  - - - - - - - - - - - - - - - - - - - - - - - - - - x

6  In the Matter of:

7

8  MICHAEL TODD SHILINSKI,

9

10        Debtor.

11  - - - - - - - - - - - - - - - - - - - - - - - - - - x

12  SHILINSKI,

13              Plaintiff,

14        v.

15  NAVIENT SOLUTIONS, LLC, et al.,

16              Defendants.

17  - - - - - - - - - - - - - - - - - - - - - - - - - - x

18

19

20

21

22

23

24

25

Page 2

1                         United States Bankruptcy Court

2                         300 Quarropas Street

3                         White Plains, NY 10601

4

5                         April 9, 2018

6                         10:54 AM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    B E F O R E :

22    HON ROBERT D. DRAIN

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:   JUSTIN

1     HEARING re Adversary proceeding:   16-08252-rdd Shilinski v.

2     Navient Solutions, LLC et al Motion for Summary Judgment

3     REPLY to OP (related document(s)30)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25     Transcribed by:  Sonya Ledanski Hyde

Page 4

1  A P P E A R A N C E S :

2

3

4  PAUL J. HOOTEN & ASSOCIATES

5       Attorneys for the Defendants

6       5505 Nesconset Hwy., Suite 203

7       Mt. Sinai, NY 11766

8

9  BY:  PAUL J. HOOTEN

10

11  LAW OFFICES OF KENNETH L. BAUM

12       Attorneys for the Plaintiff / Debtor

13       99 Church Street, 4th Floor

14       White Plains, NY 10601

15

16  BY:  KENNETH L. BAUM

17

18  ALSO PRESENT:

19

20  MICHAEL SHILINSKI, Debtor

21

22

23

24

25

1                   P R O C E E D I N G S

2          THE COURT:  Okay.  In Re Shilinski and Shilinski

3   v. Navient Solutions et al.  Okay.  Good morning.

4          MR. HOOTEN:  Good morning, Your Honor.

5          THE COURT:  Can you just state your names.

6          MR. HOOTEN:  Paul Hooten on behalf of Navient

7   Solutions.

8          THE COURT:  I'm sorry.  I was talking over you.

9          MR. HOOTEN:  Paul Hooten on behalf of Navient

10   Solutions.

11          THE COURT:  Good morning.

12          MR. BAUM:  Good morning, Your Honor.  Kenneth Baum

13   for defendant Educational Credit Management Corporation.

14          THE COURT:  Good morning.

15          MR. SHILINSKI:  Michael Shilinski. Plaintiff pro

16   se.

17          THE COURT:  Okay.  So, there are two matters on

18   the calendar today.  There's the plaintiff, Mr. Shilinski's

19   Summary Judgement Motion with respect to Navient, as well as

20   the motion under rule 7037 to compel discovery.  Why don't

21   we deal with the Summary Judgement Motion first?

22          I've read the pleadings on this including Mr.

23   Shilinski's supplemental -- I'm sorry.  His reply, which

24   came in on Friday afternoon, I guess.  I don't know if

25   you've got a chance to review that for Navient.

1          MR. HOOTEN:  Your Honor, apparently, it was filed

2     yesterday.  I --

3          THE COURT:  I -- we first saw it this morning, so

4     I'm assuming it --

5          MR. HOOTEN:  Yes, but --

6          THE COURT:  -- it came in Friday but --

7          MR. HOOTEN:  -- my secretary emailed it.  I read

8     it on my phone while I was waiting to come in here but I --

9          MR. SHILINSKI:  All right.

10         MR. HOOTEN:  -- I literally just saw it.  It came

11    in apparently around two o'clock yesterday afternoon.

12         THE COURT:  Okay.  Well, anyway, I've reviewed all

13    the documents through that pleading.  And we could deal with

14    certain aspects of the pleading as far as whether it should

15    be part of the record or not during oral argument if you

16    want.  But that's just it -- the heads up to both of you in

17    terms of what I've reviewed.

18         So, Mr. Shilinski, it's your motion.  Again, I've

19    reviewed the pleadings on this but you're free to make an

20    oral argument if you want.

21         MR. SHILINSKI:  Okay.  Should I --

22         THE COURT:  No, wherever you're comfortable.  I'd

23    just let you know, as long as you stand in front of a

24    microphone.

25         MR. SHILINSKI:  If you don't mind, if I could

1    stand there, I could see --

2              MR. SHILINSKI:  That's fine.

3              MR. SHILINSKI:  -- my notes better.

4              THE COURT:  Sure.

5              MR. SHILINSKI:  I apologize in advance.  This is

6    my first oral argument in Federal Court.

7              THE COURT:  Okay.

8              MR. SHILINSKI:  I will just, I guess, this is --

9    I'm going to try to briefly summarize what I've already

10   provided, I guess, with some opposition to what they've

11   provided.  My Motion for Summary Judgement is essentially to

12   preclude retroactive application of BAPCPA and have the law

13   at the time of the mo-, at the time of the contracts that I

14   signed for these loans applied.

15             In support of that, I have provided mandatory case

16   law in my brief.  The statute itself is also supportive of

17   my position, as well as the United States Constitution.

18             The case law that I've cited, but different

19   primary case, was in brief -- was U.S. v Carlton, which

20   demonstrates how limited retroactive application is.  And in

21   short, the Supreme Court seems to only allow retroactive

22   application of statues when they are for the general good

23   that only seem to be only tax statues, and not other statues

24   regarding --

25             THE COURT:  Well, it was a tax case, so they

Page 8

1    didn't really need to talk about other statutes.

2              MR. SHILINSKI:  Okay.  Yes.  I haven't found -- in

3    my research of retroactive application of statues, any other

4    instances of it except for tax cases.

5              THE COURT:  But can I interrupt you?  I mean, when

6    you talk about retroactive application --

7              MR. SHILINSKI:  Mm hmm.

8              THE COURT:  -- as it applies to the Bankruptcy

9    Code, there are plenty of contracts that are entered into or

10   that were entered into well before 1978, when the Bankruptcy

11   Code was enacted.  Prior to that date, the Bankruptcy Act of

12   1892 is amended a couple of times.  It was in effect, you

13   know, there were lots of loans that had been issued in the

14   1960s, early 1970s that the Bankruptcy Code applied to.

15             In essence, it's not really a retroactive statute,

16   I think, unlike the facts in Carlton or Landgraf.  I mean,

17   it's a statute that just sets forth a new regime for

18   bankruptcy.  And it applies to -- it applied, you know,

19   clearly to docu-, to factual relationships that occurred

20   well before the enactment of the statute.  And similarly,

21   you know, BAPCPA -- B-A -- for the benefit of the court

22   reporter -- B-A-P-C-P-A, which was enacted in 2005, refers

23   to it being applicable to cases filed after a particular

24   date.  You know, October 19, 2005.

25             But, clearly, they would -- plenty of credit

1    cards, debts incurred before then, and other loans incurred

2    before then that -- I just don't see how that's really said

3    to be applied retroactively.

4         MR. SHILINSKI:  Well, so if I'm in it and I'm

5    going to try to not lose my -- no, I'm -- I believe that it

6    is retroactive application because it's a law that didn't

7    exist at the time that these contracts were created.  I

8    don't know that this argument has been made before, so I'm

9    doing my best to present something that I do believe to be

10   true.

11        The Supreme Court, the Constitution all have --

12   the Supreme Court cases and the Constitution all have

13   specific prohibitions on retroactive in -- ex post facto

14   laws.  And if I could get to the statute itself because

15   maybe -- that will be more convincing.

16        I've gone through the statute -- bless you --

17   very, very carefully.  And the statute itself statute itself

18   has four specific sections.  And all of the case law seems

19   to say if there's a question about applicability, look to

20   Congresses intent.  So, I spent the time and I looked at the

21   statutes -- the BAPCPA statute has four sections, as you've

22   said, which create this staggered proactive application.

23        So, Congress knows how to do this and say, we're

24   putting this into place now, but by the way, the next four

25   sections are going to be only applicable during the next 80

1    days, 90 days, 18 months, et cetera.  Strikingly, or more

2    importantly, there is a single statute where Congress -- a

3    single part of the statute where Congress demonstrates that

4    they know how to apply this retroactively.  And they

5    specifically say in §1404 that SEC claims are going to be

6    able to be applied retroactive to July 30, 2002.

7              But they don't say that about any other parts in

8    the statutes.  So, isn't that demonstrative of their intent?

9              THE COURT:  Can I interrupt you on that point?

10   The -- I think that the two relevant sections, the general

11   one, which is BAPCPA §1501(a) says that the amendments under

12   BAPCPA shall not apply with respect to cases commenced

13   before the effective date.  And the effective date is given

14   in a different provision or subsection.  So, it ties in to

15   cases filed, cases commenced.

16             In a case in a bankruptcy is the whole case.

17   There are proceedings within a case, but the case is -- in

18   your case the Chapter 7 case.  And the exception that you're

19   referring to also refers to cases commenced, but it says

20   cases commenced before that date.  It specifies the, you

21   know, period where those cases are grandfathered in for a

22   brief period before the effective date.

23             MR. SHILINSKI:  The SEC part you're suggest --

24   speaking of?

25             THE COURT:  The discharge issue.

1            MR. SHILINSKI:  Right, but you know --

2            THE COURT:  Yeah, but it's to cases, not to facts,

3    but to cases.  So, it's the filing of the case that governs.

4    Congress is not looking at conduct except as bounded by the

5    filing of the case.  So, it -- Congress isn't saying that

6    BAPCPA applies to various conduct or not that occurred

7    before the effective date of the statute.

8            It says that we're talking about types of cases,

9    and if the conduct occur in a case, and that conduct was --

10   conduct violative of the Securities Laws, then it's

11   retroact-, then you look at the filing of the case at an

12   earlier date.  But in both cases, it's looking at just the

13   cases.

14           And, to me, that's a very important fact because

15   generally speaking, the petition date, the commencement of

16   the case under the reported decisions, is always the date

17   that you apply the Bankruptcy Code -- the applicable version

18   of the Bankruptcy Code to.

19           So, if the case is filled after the 1984

20   amendments, you apply the 1984 amendments even if it applies

21   to a loan that was made in 1980.

22           MR. SHILINSKI:  But doesn't it also say that --

23   with regard to Congressional intent that it -- if it doesn't

24   say specifically, and I know what works (indiscernible) be

25   parsing or I'm losing on the retroactive approach here, but

1    that Congress -- if the retroactive application, in this

2    case loans pre-BAPCPA, would create a detrimental effect,

3    that it should not be written into the way it's interpreted.

4            And in that case, what I'm saying is, when I took

5    out these loans, the law was drastically different.  I've

6    not waived my right to have these private loans discharged.

7    And, I think, that that's a humongous change between the

8    laws.

9            If Congress wanted to specifically talk to even

10   that part because it's so dramatic, would not they have done

11   this more specifically than this oblique language that's,

12   you know, been interpreted by every circuit and every

13   district court -- Bankruptcy Court all over this country

14   inconsistently everywhere?  There's nothing specific in

15   there that says, you know, this is the way we want you to do

16   it.  And, by the way, we understand that we're going to pull

17   away everybody's prior rights to file -- who signed a

18   contract 15 years ago, and by then, you know, back then it

19   was dischargeable in bankruptcy.

20           THE COURT:  Well, first, I don't see how -- where

21   there's any authority for the proposition that there's

22   inconsistent case law on this issue.  I -- the case law is

23   uniform.  That you look at the date of the filing of the

24   case as to how you -- which version of the Bankruptcy Code

25   you apply.

1           MR. SHILINSKI:  I apologize, I was speaking more

2    to 5238, not that particular part.  That was a mis --

3           THE COURT:  And, I guess, the second point is that

4    if the statute is clear or alternatively, if the legislative

5    history is clear, you don't look at  undue hardship or

6    unfairness.

7           MR. SHILINSKI:  You know, I meant -- it says if it

8    was -- give me a second.  Not undue hardship.  Again, I'm

9    misspeaking on my -- ability to speak publicly.

10           THE COURT:  Okay.

11           MR. SHILINSKI:  My position would be -- I used the

12    wrong terms -- manifesting justice would occur if BAPCPA

13    would be retroactively -- and again, I know we're struggling

14    with that term -- retroactively applied to my contracts

15    which were taken out when the law was in a different state.

16    In an extremely different state.  I mean, it --

17           THE COURT:  Well --

18           MR. SHILINSKI:  -- seems that there should be, if

19    anything, an err on the side of -- on the side of caution.

20    Their -- the interpretation of this right now is allowing --

21    this interpretation, I believe, I guess, is it's, kind of,

22    laid under what everybody is seeing as the protection of

23    government student loans.  Which I understand that purpose

24    of -- fully and allowing more money to be available for all

25    the other public students -- (indiscernible) might need it.

1          But this is given this extreme protection which if

2     they've given it, it's fine.  But it didn't -- it's a

3     private for-profit company and I believe that if it was

4     supposed to be applied all the way back given the -- what I

5     think is the extremity of what this change was, then they

6     would have specifically said it.

7          I know that we're, kind of, upset about or we're

8     not agreeing on the retroactivity -- I don't know how else

9     to describe it, but I think that it -- if it's not a

10    retroactive application, and it's just based on when I file

11    it, I have to disagree because that is what I'm posturing

12    here.

13         THE COURT:  Okay.  I guess on the manifest

14    injustice point, it -- I think, I mean, even the case you

15    cite, the Sheerer case says the Supreme Court has stated

16    that a court is to apply the law in effect at the time it

17    renders a decision unless doing so would result in manifest

18    injustice or there is statutory direction or legislative

19    history to the contrary.

20         But ultimately, again, the Court looks at the

21    language of the statute itself to determine whether Congress

22    intended the statute to be retroactive.  And here, the

23    statute says it applies to cases commenced after the

24    effective date.  And all the case law leading up to it,

25    which Congress is presumed to know, is -- applies in the

1  discharge context, I think, uniformly.

2          They say you apply the version of the Bankruptcy

3  Code in effect when the case is commenced to determine

4  whether that is dischargeable or not.  You don't look at the

5  underlying loan, when it was entered into, or the conduct

6  that arguably gave rise to nondischargeability, but you look

7  at the date when the case was commenced.

8          MR. SHILINSKI:  But is the severity of the waiver

9  of a fresh start discharge a monstrous thing to be lost

10  under this statute --

11          THE COURT:  Well --

12          MR. SHILINSKI:  -- if it's not directly addressed?

13          THE COURT:  I guess that goes to the issue of

14  whether bankruptcy is a -- whether you have an interest -- a

15  property interest in the right to go bankrupt -- to have

16  your debt discharged, as opposed to bankruptcy being a

17  statutory creation.  That lays out the parameters for one's

18  right to have debt discharged.  And I think it's the later.

19          MR. SHILINSKI:  That I don't have a property

20  interest in --

21          THE COURT:  Right.  In a particular state of the

22  statute when the debt was undertaken.  Now, it is true that

23  bankruptcy is a sort of unwritten clause in every contract,

24  but the unwritten clause looks again to bankruptcy at the

25  time when the bankruptcy happens because it hasn't happened

1    yet, and the code gets rewritten over time.

2          MR. SHILINSKI:  I understand.  I just don't think

3    that anyone, including myself, would have ever pictured

4    themselves at this point in their lives, at 45, and would

5    have thought about that change happening.  And whether or

6    not it could be expressed as a property right.  That the

7    fact that it's been taken away if it doesn't seem like a

8    property right, it seems like an injustice in that when

9    those loans were taken out, they were dischargeable and by

10   chance, because it went years beyond and the statute

11   changed, that has been taken away from me.

12          And to the best I believe, I put my mandatory case

13   law, Constitution and statutory arguments as best I can and

14   --

15          THE COURT:  Well, on the Constitutional point, the

16   acts of attainder language, et cetera, that doesn't apply to

17   civil, I mean, you know, do we all agree that that doesn't

18   apply to civil proceedings?  This really goes to criminal --

19          MR. SHILINSKI:  Well, it --

20          THE COURT:  -- activity?

21          MR. SHILINSKI:  I understand that -- from my

22   research again, that most of the time, the ex post facto

23   stuff is refer to criminal.  But -- my also understanding is

24   that bills of attainders seems to be more so about civil

25   cases, and that's why I've gone that way.

1            I mean, there seems to be enough case law written

2    about it, whether you're referring to one or the other that

3    the game shouldn't be played afterwards.  The fact that I

4    cited to Scalia in here, I mean, that was personally

5    shocking, but it supported my point, so -- but it seems that

6    going back and changing the rule or changing rules afterward

7    -- the facts that occurred 15 years ago is just as offensive

8    as saying, by the way, that crime you committed 15 years ago

9    is now illegal and we've caught you, so we're going to bring

10   you up and you're going to be charged with it.

11            THE COURT:  Well, except -- well, again, in

12   Landgraf, the Court says at 267, absent the violation of the

13   takings or contracts clauses, the potential unfairness of

14   retroactive civil legislation is not a sufficient reason for

15   a court to fail to give a statute it's extended scope.  So,

16   you know, and I don't, you know, it's -- this isn't a taking

17   because it's a bankruptcy ultimately.  I think is, again,

18   it's relief that's available to the honest but unfortunate

19   debtor.

20            And Congress has the ability to decide how you

21   parse though that phrase.

22            MR. SHILINSKI:  Right, but that honest,

23   unfortunate debtor, Congress decided something ran that debt

24   was incurred.  And then, changed it later.

25            THE COURT:  But it -- but the point is the cases

1    which use that phrase refer to it as not a right, but a

2    privilege for the honest but unfortunate debtor.  And it's

3    something that Congress can confer and change.

4           MR. SHILINSKI:  Respectfully to --

5           THE COURT:  I mean, it's unfortunate, I guess, for

6    those whose -- were able to say that they entered into a

7    loan on one basis and how its treated changes thereafter,

8    but I think, again, the -- as far as the constitutional

9    reading is concerned or a reading that would go against the

10   language of the statute.

11           I think the Supreme Court case law is led by

12   Landgraf and Carlton frankly, say that if the language is

13   clear as to when it should apply, and you're not taking away

14   someone's property, then it can apply to conduct that

15   occurred before the enactment of the statute.

16           MR. SHILINSKI:  Or perhaps the -- you will find

17   your wait to see that in -- I believe and hope that it is

18   property for all of the other people who are in this stage

19   and haven't had the good luck to sit down and do a bunch of

20   research on this and hopefully that is --

21           THE COURT:  All right.  Well, I mean, there are

22   plenty of cases that deal with the dischargeability issue.

23   And the dischargeability statutes have changed over time.

24   BAPCPA wasn't the first time that they changed.

25           MR. SHILINSKI:  Right.  Well, that's why I tried

1    to focus on mandatory versus persuasive case law to keep us

2    focused on what I believe the Court has to consider as

3    opposed to --

4              THE COURT:  Right.

5              MR. SHILINSKI:  -- what is just persuasive.

6              THE COURT:  But I guess I -- I mean, I didn't want

7    to -- I'm not trying to argue with you but --

8              MR. SHILINSKI:  I'm sorry.

9              THE COURT:   -- as far as the Constitution is

10   concerned, it doesn't seem to be mandatory because this is a

11   civil proceeding, not even dealing with a property right.

12   As far as the Supreme Court precedents are concerned, I

13   think they're, you know, very clearly distinguishable.  In

14   fact, it seems to me that they actually support Navient's

15   position.  At least Landgraf does by focusing on the

16   language of the statute and making it clear that Congress

17   has quite a bit of power to specify when a statute should go

18   into effect.

19            And I think you're over reading the language in

20   Carlton to say that this only applies to gravities of

21   statute.  And I really think it's -- it's a revenue case, so

22   that's what they're dealing with -- is revenue statutes.

23   But I just don't think that all the judges who applied the

24   analysis of dischargeability as of the petition date went

25   along on this point.

1           I mean, I think they're doing what Congress

2     intended and specifically intended in the case of BAPCPA.

3     They're not up -- they're not really -- I don't think there

4     are BAPCPA cases on this issue.  But in BAPCPA, they say,

5     you know, this -- it's very clear that any case that's

6     commenced after the effective date of BAPCPA is going to be

7     controlling.  And the effective date language of BAPCPA,

8     §1501.  So, I think I have to follow it.

9           But this is, in essence, the same analysis as the

10    case law that goes back to the date, you know, the cases

11    that were decided shortly after the '78 code.  Like

12    (indiscernible) which was in 1980.  It's a Bankruptcy Court

13    case but, you know, they had to ask themselves the same

14    question back then.  And Mojica, which is from 1983.  You

15    know, which version of the statute do I apply.  It was a new

16    statute then.  People had done stuff pre-1978, pre-1982 when

17    the statute was amended again.  You know, it's just -- and

18    the Courts say, well, you know, as is generally the case

19    with federal laws, you apply the statute that is in effect

20    when the bright light occurs.

21          And in bankruptcy, the bright line is the petition

22    date.  Otherwise, you'd be, you know, you really wouldn't

23    have any real -- you'd be treating loans, for example,

24    differently.  Depending -- in the same case based on the

25    dates that the loans were taken out.  And you, you know, the

1    whole thing about bankruptcy is equality of distribution,

2    treatment of everyone in similarly situating classes

3    similarly.  And, you know, if it -- indenture is dated 1977,

4    and another one is dated 1979, you'd be having, you know,

5    the Bankruptcy Act applying in a Chapter 11 case.

6            It just doesn't, you know, it wouldn't work.  You

7    couldn't do reorganization then.  So, it just seems to me

8    that -- I agree, when Congress changes a statute and pulls

9    something away that existed before, you know, you have to

10   look at what that something is.  But I think here, given

11   that the whole emphasis of bankruptcy is the case because

12   you're dealing with all sorts of rights that occur at

13   different times but through the frontal of the bankruptcy

14   case, it's really one where you do focus on the date of the

15   case, as opposed to when the various rights were created.

16           MR. SHILINSKI:  I understand.  Thank you.

17           THE COURT:  Now, the second point they've raised -

18   - Navient has raised is that even if I were to find the

19   applicable version of the bankruptcy code not to be BAPCPA

20   but the -- instead, the version that was in effect when

21   these loans were undertaken, the -- that would still be

22   nondischargeable.  And this is where the timing of the

23   pleadings comes into play a little bit.

24           My inclination, having read the reply and, of

25   course, the objection to the motion, is that I don't have

1    enough undisputed factual information about the Law Loans

2    Program to really decide today, one way or another, on that

3    issue.  I mean, there's quite a bit of case law that applies

4    the old version of 523(a)(8) to Law Loans Program debt.

5             But a lot of that case law is premised on not just

6    the, sort of, administrative handling --

7             MR. SHILINSKI:  Mm hmm.

8             THE COURT:  -- of the loans, but the fact that a

9    governmental unit effectively guaranteed the debt.  And the

10   case law tries to analyze whether that fits into the funded

11   by language or not.  But generally speaking, with I think

12   one exception, does find that it does but I'm not sure where

13   one would stand if there wasn't that guarantee.

14            And all the objection says that the program

15   included -- although it doesn't say for this particular loan

16   -- insurance, which I think under the case law including the

17   Second Circuit case in re O'Brien.  We pretty much carry the

18   day for the lender.  But, you know, I don't really have

19   those facts yet.

20            MR. SHILINSKI:  Okay.  I -- so, just to that point

21   though, I do -- and this part of the argument quite a

22   struggle for me, but the defendants have in their response

23   to my discovery demands as to whether or not loans were

24   private, have responded that the loans that they're

25   defending --

Page 23

```
1              THE COURT:  They were not guaranteed.

2              MR. SHILINSKI:  I'm sorry.  Yes, I keep saying --

3              THE COURT:  Yeah.

4              MR. SHILINSKI:  -- I apologize.  Enough --

5              THE COURT:  Right.  They do say that.  That's

6     attached to your reply.

7              MR. SHILINSKI:  Yes, sir.  Yes, Your Honor.

8              THE COURT:  But there's a difference between a

9     guarantee and insure and, you know, the objection says at

10    times they were insured.  So, that's different than a

11    guarantee.  I just would like to note better the facts.  And

12    frankly, most of the case law, as I said, deals with, you

13    know, some sort of financial support.  But not all of it.

14             The Ninth Circuit BAP case.  Just reads a

15    materiality condition into the program funded by -- and

16    under the undisputed facts in that case.  But they were

17    undisputed.  It was found to be material.  So, even if

18    there's no guarantee as -- I accept because of the

19    interrogatory answer, and it turns out there's no insurance

20    either, and I don't know on that one.  I think I would need

21    a factual record to see how material the financial support

22    is based on the, you know, the managerial, ministerial

23    functions that -- it appears that the, you know, that were

24    performed.

25             MR. SHILINSKI:  Is that something that you're
```

1    asking the defendants to provide?  I'm not sure --

2              THE COURT:  No, no.  I'm just saying, for today's

3    hearing which is a Summary Judgement Motion.  I think there

4    are -- they're disputed material facts.

5              MR. SHILINSKI:  Okay.

6              THE COURT:  So that I can't really deal with that

7    issue.

8              MR. SHILINSKI:  I understand.  Okay.

9              THE COURT:  So, in other words, even if I were to

10   conclude, which I'm not, that the pre-BAPCPA version of the

11   statute applies here, I would still deny the Summary

12   Judgement Motion because I think there are material disputed

13   facts as to whether it would matter under the earlier

14   version of the statute.

15             MR. SHILINSKI:  I understand.  Okay.  Thank you.

16             THE COURT:  So, Mr. Hooten, I don't know if you

17   have anything more to say on that.  I've pretty well

18   indicated how I intend to rule on this but...

19             MR. HOOTEN:  No, Your Honor, I learned in law

20   school that when you're ahead, sit down and keep quiet.

21             THE COURT:  Okay.

22             MR. HOOTEN:  And I intend to do that.

23             THE COURT:  All right.  Okay.  Well, I have before

24   me a Motion by the plaintiff here -- the debtor, who has the

25   burden in this adversary proceeding which seeks a

1    declaration that the loans identified in the adversary

2    complaint are dischargeable.  Either because they don't fall

3    within §523(a)(8) of the Bankruptcy Code, or because if they

4    do, the debtor can satisfy the grounds for having such loans

5    be dischargeable.

6            The Summary Judgement Motion is premised on the

7    first aspect of the complaint.  It contends that the Navient

8    loans at issue do not, in fact, fall within §523(a)(8) of

9    the Bankruptcy Code because the motion contends the

10   appropriate version of that section should be the version

11   that was in effect in the period when the loans were made

12   that is prior to the 2005 amendments to the Bankruptcy Code

13   referred to as BAPCPA -- B-A-P-C-P-A.

14           Navient has objected to the motion on three

15   grounds.  First, it contends that in light of the fact that

16   there's no rule 7056 statement, I should deny the motion

17   under Local Rule 7056-1.  Second, Navient contends that

18   contrary to the motion's position, BAPCPA's version of

19   §523(a)(8) applies here as opposed to the pre-BAPCPA

20   version.  Third, Navient contends that even if the pre-

21   BAPCPA version applied, the loans would be covered by that

22   section and, therefore, the motion should be denied.

23           Based on my review of the pleadings, I conclude

24   that Navient's first objection should be denied.  This

25   motion is supported by an affidavit by a pro se litigant,

Page 26

1    albeit one who is a lawyer, and is primarily based on the

2    law as opposed to the facts. As to the issue about whether

3    the pre-opposed petition -- I'm sorry. The pre-opposed

4    BAPCPA version of the statute applies, it really is almost

5    like a judgement on the pleadings. So, I don't believe that

6    the defendant Navient is unduly prejudiced here.

7         The one exception to that goes to an aspect of my

8    ruling on it. It's still an argument which is that even if

9    the pre-BAPCPA version of the statute applied, that version

10   would still cover these loans. I've concluded based on my

11   review of the record that the record is sufficiently skimpy.

12   That I would need more facts to even consider it for Summary

13   Judgement purposes.

14        And then, in all likelihood, there are material

15   facts that would be in dispute on that third argument. As

16   to the second argument, which is that BAPCPA should apply as

17   opposed to the pre-BAPCPA version of the statute, Congress,

18   in enacting BAPCPA made it clear that with certain

19   exceptions, the amendments made in that statute shall not

20   apply with respect to cases commenced before the effective

21   date.

22        That is BAPCPA shall apply to cases after the

23   statutory effective date. BAPCPA §1501(b)(1) Stat. 23. The

24   exceptions, as I stated during oral argument, also apply to

25   cases as opposed to conduct. And I believe that's a very

1   important distinction central to the Bankruptcy Court's

2   ability to administer bankruptcy cases which bring in all

3   the debtor's assets and all of the debtor's liabilities, no

4   matter when incurred or obtained.

5           That interpretation has long been applied by

6   Bankruptcy Courts and District Courts sitting in bankruptcy.

7   I.E. that the version of the Bankruptcy Code in effect when

8   the case was commenced, unless Congress very clearly

9   indicated otherwise, should be the version that is applied

10   in that case.  This goes, not only as a general matter, but

11   also specifically as to the issue of whether a debt is

12   dischargeable or not.

13           See, for example, in re Mojica -- M-O-J-I-C-A IN

14   30 B.R. 925 927 Bankruptcy E.D.N.Y. 1983.  As well as

15   numerous other cases from jurisdictions outside of the

16   Second Circuit that are cited at page 6 of Navient's

17   Memorandum of Law in support of it's objection.

18           The case law, I believe, is clear that the

19   statutory text, i.e. Congress's intention as set forth in

20   the statutory text, should govern except in very rare

21   circumstances, which I believe do not apply in a civil case

22   such as a bankruptcy case which -- and bankruptcy cases in

23   particular is so dependent on the cleavage of the actual

24   filling of the case.

25           The right to file bankruptcy is not a property

1    interest or a contract.  It's effectively a privilege that

2    Congress creates and, I believe, can alter or limit in

3    amending the bankruptcy code.  Consequently, it appears to

4    me that this ruling, in which I had joined numerous other

5    bankruptcy in District Court cases in applying the version

6    of the statute that's in effect as of the commencement of

7    the bankruptcy case as opposed to an earlier version, is in

8    fact consistent with the main authorities relied upon by the

9    debtor/plaintiff including United States v. Carlton, 512

10   U.S. 26 at 3331 (1994).  Landgraf, the USI film products 510

11   U.S. 244, and in particular, 264 and 267 (1994).  And in Re

12   Shearer, 167 B.R. 153.

13          Bankruptcy at WD Missouri 1994, which track of

14   the, you know, they put primary consideration on the plain

15   language of the statute.  Which, I think, here is also

16   informed by multiple applications of -- an consistent

17   applications by the Bankruptcy Courts and District Courts

18   applying bankruptcy law that the statute in effect as of the

19   petition date is the controlling statute.

20          That would moot the -- that whole -- it would moot

21   the third objection by Navient which is that the version of

22   the statute in effect when the loans were incurred would

23   also lead to the statute applying to those loans.  But I --

24   to be thorough, I want to address that objection as well.

25          The version of the statute that was in effect

1    then, which was enacted in 1988, provides that the

2    bankruptcy discharge does not discharge the individual

3    debtor from any debt for an educational benefit overpayment

4    or loan made, insured, or guaranteed by a governmental unit

5    -- and then, here's the key phrase -- or made under any

6    program funded in whole or in part by a governmental unit or

7    nonprofit institution.

8            And then it continues on to say, or if an

9    obligation to repay funds received as an educational

10   benefit, scholarship, or stipend unless accepting such debt

11   from discharge under this paragraph would impose an undue

12   hardship on the debtor and the debtor's dependents.

13           The current version of the statute, which was

14   enacted under BAPCPA, includes within it that key phrase, or

15   made under any program funded in whole or in part by a

16   governmental unit or nonprofit institution.

17           The case law on this issue is extensive.  It is

18   most recently dealt with in the Second Circuit by In re

19   Jean-Baptiste 2018 Bankruptcy Lexus 505 February 23 -- I'm

20   sorry.  Bankruptcy EDNY February 26, 2018.  Where the

21   Bankruptcy Court Judge Scarcella parses through whether a

22   loan made by a private institution, such as the lender here,

23   would still have the benefit of that section, and under what

24   circumstances it would.

25           And it, I think, discusses the law thoroughly,

1    including the leading plate -- the controlling case in the

2    Second Circuit, O'brien v First Marblehead Educational

3    Resources Inc in re O'Brien 419 F.3d 104, Second Circuit

4    2005.  As well as in re Bolen, 287 B.R. 127 131 Bankruptcy D

5    Vermont 2002, both of which dealt with the law access

6    program which apparently implies here.

7           Now, in those cases and many of the other cases

8    discussed by Judge Scarcella, the loan was -- had some form

9    of credit support by a nonprofit or governmental entity

10   beyond the, apparently undisputed here, administrative and

11   servicing functions that would have been performed by such

12   an entity.

13          It is asserted by the objection that the not for

14   profit or government entity may have ensured this loan, and

15   also refers to the servicing function, which appears to be

16   undisputed.  But I do not have sufficient facts as to

17   whether the insurance applies to this loan and what the

18   scope standing alone of the servicing functions were.

19          In re Pilcher, 149 BR 595, 599-600 (9th Cir. BAP

20   1993), took the view that servicing functions at that time,

21   in respect to the program, the law access program, were

22   sufficiently material to cause the loan and issue to fall

23   within 523(a)(8).  But I don't yet have sufficient facts as

24   to where they are.  How this applies to this case to decide

25   the issue one way or the other.

1                Although, it is, I believe, clear from the

2       interrogatory attached -- interrogatory answer attached to

3       the reply that the loan here was not guaranteed by the

4       federal government.  So, I believe, under Celotex and Zenith

5       and the other case law in respect to applying rule 7056.

6       There's, at this point, a disputed issue of material fact

7       that would preclude Summary Judgement on that alternative

8       objection.

9                The last thing I'll say on this motion is that Mr.

10      Shilinski has pointed out that it seems unfair that Congress

11      changed the grounds that one would -- or arguably change the

12      grounds that one would not be able to discharge a student

13      loan between the date that the loans here were incurred and

14      the petition date.  As I said before, I do not believe that

15      that is so fundamentally unfair given the nature of

16      bankruptcy and that clear requirements of the code to find

17      the statute improper on some grounds.

18                It does appear to me, however, the number of

19      judges have said this in their opinions that if the change

20      is truly material from the date that the once controlling

21      case law applying 523(a)(8) came down -- in this case, the

22      Brunner case -- maybe they -- applicability of that case law

23      is in question -- i.e. Brunner applied to a very different

24      statute temporally than the statue we have today.  And that

25      may eventually affect how one looks at the particular facts

1    under the current statute.

2           But that is in -- is as to the interpretation of

3    undue hardship, as opposed to whether the statute applies or

4    not since that interpretation was left by Congress up to the

5    Courts.  So, I'll deny the Motion for Summary Judgement on

6    those two alternative grounds and ask Navient's counsel to

7    email chambers in order -- consistent with that ruling.

8           You don't have to go through all the bench ruling.

9    You just refer to it in the order.  And you also --

10          MR. HOOTEN:  Your Honor, we did attach to our

11   opposition.  There is a proposed order to --

12          THE COURT:  Yeah, you need to email it to chambers

13   though, in Word format, so it could be entered.

14          MR. HOOTEN:  That's fine.

15          THE COURT:  When you said that you should just

16   send a copy to Mr. Shilinski so that he could see it's

17   consistent with what you earlier submitted and my ruling.

18          So, the other matter that's on the calendar today

19   in this adversary proceeding is the Navient Motion to Compel

20   Responses to Discovery Request.  On this one, is -- are we

21   just focusing on the interrogatories and document request

22   pertaining to the debtor's spouses financial condition?

23          MR. HOOTEN:  Yes, Your Honor.

24          THE COURT:  Okay.  There's not -- there's no other

25   issue?

1          MR. HOOTEN:  No.

2          THE COURT:  Okay.  All right.  And before we get

3    into that patient, where are the parties on discovery

4    otherwise?  Are we done?

5          MR. BAUM:  I think so, Your Honor.  Mr. -- we did

6    Mr. Shilinski deposition a few months ago, back in the fall,

7    I believe it was.  We completed that.

8          THE COURT:  Right.  Because of the pre-trial

9    order, we should be done today.

10          MR. BAUM:  Yeah.  I think so, for sure, Your

11    Honor.

12          THE COURT:  Okay.  And Mr. Shilinski, is that your

13    view too?

14          MR. SHILINSKI:  Yes.  Yes, Your Honor.

15          THE COURT:  Okay.  So, this is a fairly limited

16    issue.  And having read the pleadings on this, on the

17    merits, Mr. Shilinski, you take the view that this is

18    irrelevant information, right?  And --

19          MR. SHILINSKI:  Did you say --

20          THE COURT:  -- secondly, you say that it's not

21    appropriate to be considered constitutionally because it

22    goes to the marital relations, right?

23          MR. SHILINSKI:  Yes, sir.

24          THE COURT:  Okay.  And then, I guess, lastly, you

25    argue that Navient waved this request because it didn't keep

1    raising it?

2            MR. SHILINSKI:  Yes, I -- I'm willing to waive

3    that last argument for expediency sake.

4            THE COURT:  Okay.  All right.  All right.  So, on

5    the second point, you know, the Supreme Court has cut back

6    on the domestic exception significantly.  In the first Stern

7    v Marshall case, it's really a discretionary issue.  And

8    this isn't -- it doesn't seem to me to be a domestic

9    relations exception anyway because it -- it's not like I'm

10   being asked to decide, you know, divorce, alimony, child

11   custody -- those types of underlying controversies that the

12   State Courts are recognized to have unique expertise and

13   role in.

14           So, it seems to me, just like any -- if any

15   evidence is relevant to a determination in the bankruptcy

16   case, whether it comes from someone's spouse or not,

17   shouldn't matter.  I mean, for example, if in a fraudulent

18   transfer case, the debtor transferred his art collection to

19   his spouse within the fraudulent transfer period, they -- it

20   would seem to me there's no question that a Chapter 7

21   trustee could take discovery on the spouse to see if she

22   still has the art collection or whether the transfer

23   actually occurred and whether she gave value for it.

24           So, it doesn't appear to me that the domestic

25   relations exception should apply here.  I don't know if you

1    have any reaction to that.  But it's not -- I don't think

2    that this type of discovery is what the domestic relations

3    exception is about.

4            MR. SHILINSKI:  But this isn't a -- as far as I

5    understand, this isn't a fraudulent --

6            THE COURT:  No, I understand.  I'm not talking

7    about relevance yet.  I'm just talking about the domestic

8    relations exception.

9            MR. SHILINSKI:  I'm doing my best to -- with the

10   law that I can find --

11           THE COURT:  Right.  Okay.

12           MR. SHILINSKI:  -- to explain that my wife is not

13   a party to this case.  And if this Court ends up with a

14   judgement against me, for whatever reason, it can't be

15   enforced against her.

16           THE COURT:  I get that too.

17           MR. SHILINSKI:  And that's why I don't get to the

18   relevance -- I don't understand the relevance of it.

19           THE COURT:  Well, let's turn to relevance.  Mr.

20   Hooten, what is the relevance of getting this information?

21           MR. HOOTEN:  Your Honor, the -- we have no idea

22   what the assets of the spouse are in all the cases that we

23   cited.  Talk about it that household income is -- and

24   household assets are -- whether important in a chap-, in any

25   bankruptcy case, but in particular a Chapter 13 case.

1           So, she may have that art collection that you're

2    talking about.  We don't know anything about it.

3           THE COURT:  Okay.  Well, Mr. Shilinski, in your

4    pleadings, you refer to children, right?  That you have

5    children?

6           MR. SHILINSKI:  Yes.

7           THE COURT:  Are they minors?

8           MR. SHILINSKI:  I'm sorry?

9           THE COURT:  Are they minor children?

10          MR. SHILINSKI:  Oh, yes.

11          THE COURT:  Okay.  So, it -- I mean, that -- the -

12   - we're not talking about the other way to get this debt

13   discharged which is the undue hardship grounds.  And it does

14   seem to me that if -- there's a material difference.  I

15   mean, you have an obligation under New York law to care for

16   your children, which includes educating them, among other

17   things.

18          If you were the only breadwinner, that would be

19   relevant to undue hardship because ultimately, I will look

20   at, you know, your budget and see whether you, you know, the

21   money that Navient says you could pay to them is instead

22   earmarked, among other things, to take care of your

23   children.  But your wife has the same duty -- legal duty

24   under New York law to keep -- to take care of the children

25   which includes, you know, food, clothing, education, et

1    cetera.

2         If she can do that fully, then, you know, your

3    income is more available to pay the loan. I mean, there are

4    other ways, depending on how closely I would adhere to the

5    Brunner test, that Navient might win. But one way they

6    could win is saying, look, you know, just based on Mr.

7    Shilinski's income and his expenses, there's money left over

8    here. And it can go to pay us.

9         MR. SHILINSKI: But isn't it true also that my

10    wife can decide, and very well does, how that money is

11    spent? She -- I don't

12         THE COURT: Well, certain things, yes. But not

13    other things.

14         MR. SHILINSKI: She has to pay for education and

15    care and things like that, but this -- it's not a part of

16    this case about how she decides to --

17         THE COURT: Well --

18         MR. SHILINSKI: -- if she wants to save more than

19    --

20         THE COURT: No, but I think -- if, for example,

21    she's paying the housing cost, and, you know, I think that's

22    relevant too. I mean, I guess what you're saying is if she

23    decides just to save the money --

24         MR. SHILINSKI: Mm hmm.

25         THE COURT: -- that she earns -- put it in a 401K

1   or a -- or just to spend it on luxuries, I don't know how I

2   would deal with that issue.  But that's not the only way

3   that she could spend the money.  She might, instead, very

4   well be spending it on things that -- would otherwise be

5   your expenses.  Either mandatory expenses, like for

6   children, or sort of, not discretionary -- at least, at some

7   level, expenses like food, clothing, house.

8         You know, there are housing budgets in the --

9   people take into account in bankruptcy cases.  I don't know

10  how you live.  I don't know if you live in a mansion or in a

11  modest apartment or something in between but, you know,

12  there are normal housing expenses.  Again, if you were

13  single, you would have to pay that.  And that, to me, is a,

14  you know, that cost is not available to pay Navient.

15        On the other hand, if someone else is paying, it

16  wouldn't have to be your wife.  You know, it could be your

17  grandfather.  It could be anybody.  I think it's relevant to

18  know, you know, where that -- whether that's happening.

19  Whether there's money to pay it.

20        MR. SHILINSKI:  I ask the court -- but -- what I

21  read about the next test of trial or the undue hardship is -

22  - the struggles that the Court's have are trying to deal

23  with now and the future.

24        THE COURT:  Right.

25        MR. SHILINSKI:  How does the Court propose to

Page 39

1    address what ever she might do with that money that she

2    earns?  Whether it's today or

3            THE COURT:  I --

4            MR. SHILINSKI:  -- all these years down the roads

5    --

6            THE COURT:  Look, I agree.

7            MR. SHILINSKI:  -- I mean, I can't tell her

8    anything to do.

9            THE COURT:  There is clearly -- Congress clearly

10    gave the Bankruptcy Judge a difficult job with this statute.

11    It just said undue hardship.  And, frankly, the Courts are

12    all over the lot on that issue, you know?

13            But you do the best you can.  And I think if

14    someone has a, you know, if someone's spouse has a really

15    good income, and is making the debtor pay all the payments

16    for food, housing, childcare, you know, I think the Court

17    would look at it one way.

18            If, on the other hand, they're evenly shared, you

19    look at it a different way.  I mean, I think it's a

20    judgement call.  But I don't think you can preclude on

21    grounds of relevance looking into the income and how it's

22    spent -- of the spouse.

23            MR. SHILINSKI:  I just don't -- I understand -- I

24    could concede relevance but I don't understand is how the --

25    skip that part.  The Court can try to take in all of the

1    parts that would be going on at this point.  I mean, if you

2    don't think thing that my wife is not one hair away from

3    possibly leaving me at -- every other day because of the

4    chaos that I've created with this.  How does the Court do

5    that --?

6              THE COURT:  Well, alter --

7              MR. SHILINSKI:  -- forward with regard to here --

8    you know, I'm going to go home and tell her, by the way, the

9    Court --

10             THE COURT:  Right.  Ultimately -- well --

11             MR. SHILINSKI:  -- says that all of your income

12   would be for the following.

13             THE COURT:  -- but look, ultimately, it's your

14   burden in this case.  So, I guess, if you don't provide that

15   type of discovery, you won't be -- it would -- to make that

16   argument that I'm in danger of losing everything because of

17   this case.  I don't know.  I won't be able to say because

18   Navient's lawyer will stand up and say, how do we know that?

19   Because I haven't -- I wasn't allowed to take discovery of

20   Mr. Shilinski's financial position.

21             MR. SHILINSKI:  Okay.  And that being said, I am

22   also -- my original response to these discovery demands,

23   except for -- I could go through them.  But they have

24   everything.  They have the whole petition.  They have -- and

25   they've said that there could be these assets.  I mean,

1   well, wouldn't I have put -- I'm not hiding anything.

2           THE COURT:  Well, they're entitled to ask it.

3   They're entitled to ask about that.

4           MR. SHILINSKI:  And it's going to be an answer

5   that I provide based on what I know about my wife.

6           THE COURT:  Well, I don't know who -- whether -- I

7   don't know if they've sought third party of her or of you.

8   I -- what have you -- have you subpoenaed her or is it a --

9           MR. HOOTEN:  At this point, we hadn't yet.

10          THE COURT:  Okay.

11          MR. HOOTEN:  We've only asked for --

12          THE COURT:  So, right now --

13          MR. HOOTEN:  -- for him to tell.

14          THE COURT:  -- they're asking just for -- from

15  you.  And it may be, since they do have the schedules, that

16  may be enough for them.

17          MR. SHILINSKI:  Okay.  Well, they've said that

18  that isn't, but that's fine, so --

19          THE COURT:  Well, I don't know.  You're not asking

20  for than that at this point, are you?  Or are you?

21          MR. HOOTEN:  At this point, we're not.  But we

22  don't know what the answer are yet and --

23          THE COURT:  So, once they see that -- once they

24  see --

25          MR. SHILINSKI:  You have the schedules.  I sent

1    that in my first response.

2            THE COURT:  No, but they're entitled to go beyond

3    that.  I mean, the schedules are as -- they're entitled to

4    look beyond that.  They're entitled to inquire as to that.

5    Okay?  You know, it's just due diligence.  So, I'll grant --

6    well, I'll grant the motion to compel.  I'm not going to

7    pre-decide what the result will be if it's not complied with

8    because I would -- don't know the reasons at this point.

9            MR. SHILINSKI:  It will be complied with but --

10           THE COURT:  I'm not assuming it will, so that

11    aspect of the motion, I'll grant.  The rest, I'll just deny

12    without prejudice.

13            So, how -- what sort of deadline should I put on

14    this?  How soon do you believe you can respond to those

15    discovery requests?  Thirty days?

16           MR. SHILINSKI:  Tops.  Tops.

17           THE COURT:  Okay.  So, that's what the order

18    should say.  Thirty days from today to respond.  Well,

19    hopefully that's -- whatever the -- assuming it's a weekday.

20    Make it the closest weekday after that if it's a weekend.

21            And then, we should get a final pretrial date and

22    a trial date.  Now, is -- I know we've discussed this

23    before, but I don't remember the answer.  Are these loans

24    subject to internal modification programs depending on the

25    financial disclosure?

1          MR. HOOTEN:  Your Honor, mine are not.  I believe

2     Mr. Baum's are though.

3          MR. BAUM:  Yes, Your Honor.  The ECMC loans are,

4     as federally guaranteed loans of Higher Education of -- the

5     (indiscernible) program, then they are.

6          THE COURT:  All right.  So, have you two discussed

7     that?  I mean, we haven't been talking but we've been

8     talking just about Navient, not the ECM -- MC but have you -

9     - I would just encourage you all to discuss that.

10          MR. BAUM:  I did provide Mr. Shilinski with a --

11     generally a listing of what the options would be, what the

12     numbers would rough out to be in general.

13          THE COURT:  Okay.  And as far as Navient is

14     concerned, there's no mandatory thing, but they could always

15     negotiate, right?

16          MR. HOOTEN:  Oh, absolutely.  We would love to

17     settle this.  Your Honor --

18          THE COURT:  All right.  All right.  And I'm not

19     telling either side to do that, but I always tell people

20     before a trial, you know, particularly if I've denied

21     Summary Judgement, that they should pursue that option.  And

22     doing the due diligence on the financial disclosure, I

23     think, should make it easier for Navient to consider those

24     issues.

25          You know, I always say to people, even though here

1    you have the burden, Mr. Shilinski, but I always say to

2    people, usually when they're bring a nondischargeability

3    case as a creditor, you know, you may win, but you still

4    don't get much if the debtor can't pay.  So, you know,

5    financial disclosure here -- separate and apart from the

6    litigation -- maybe quite important if there's ever to be a

7    settlement of this.

8            MR. SHILINSKI:  Yeah, so, if I may, Your Honor.

9    With regard to what Mr. Baum has sent over with regard to

10   these possible income sensitive programs, I have sent back

11   in discovery because I've -- these are -- I went to Navient

12   prior to having filed for bankruptcy begging for more time

13   and more adjustments on loans and was denied that because of

14   --

15           THE COURT:  Well --

16           MR. SHILINSKI:  -- hold on, let me just finish so I

17   can get the point out.

18           THE COURT:  Sure.  Yeah.

19           MR. SHILINSKI:  Denied that because of not being

20   able to qualify for it.  Now, I'm bankruptcy and they're

21   providing these -- all of a sudden, wonderful things which

22   had they provided in the first place, I wouldn't have lost

23   everything.

24           THE COURT:  Different lenders, right?

25           MR. SHILINSKI:  No, I didn't even know about ECMC

1    when I was --

2           THE COURT:  Well, that's the point.  It's a

3    different program.  But, I think, you should --

4           MR. SHILINSKI:  I --

5           THE COURT:  -- I don't think they can just look at

6    what you provide in discovery.  I think you have to fill out

7    forms, right?

8           MR. BAUM:  Your Honor, I can't -- and, Your Honor

9    is correct.  That this was -- the loans were previously held

10   by, I believe it was New York State Higher Education

11   Services Corp was our predecessor.

12          THE COURT:  The government takes it over because

13   of their guarantee.  So, there's a -- that's what -- that

14   triggers this program.  It's not a Navient loan.  It's a

15   different loan.

16          MR. SHILINSKI:  But it's the same idea though.

17   They're threatening to bring this stuff in and say --

18          THE COURT:  It's a different -- it's different

19   programs.  All I'm saying -- it's like you were here

20   earlier, I was doing the last mitigation conferences?

21          MR. SHILINSKI:  Right.

22          THE COURT:  There was a period where there was a

23   government program called HAMP.  And just everyone had to

24   follow it.  And at times, it made sense.  At times, it

25   didn't.  but they had to follow it.  That's what they have

1   to do.  That's what ECMC has to do.

2          MR. BAUM:  And, Your Honor, I can't speak to, you

3   know, conversations that Mr. Shilinski may have had with

4   ECMC's predecessor and interest, I can tell you that my

5   client has confirmed, and I've confirmed in a letter to him,

6   he is eligible for certain of these income-driven repayment

7   options that I'm happy to explore it further.

8          I'm happy, you know, my client is always willing -

9   - and Your Honor knows.  We've been -- I've had this case

10  with you before where a lot of them do end up in that

11  direction.

12         THE COURT:  Right.  With very low payments.

13  Sometimes, no payments.  I'm not saying that would happen

14  here, but I think --

15         MR. SHILINSKI:  Until one is 70.

16         THE COURT:  What?

17         MR. SHILINSKI:  Until one is 70.

18         THE COURT:  Well, yeah.  I understand.  But it's -

19  - that, I mean, there are two different loans.  You still

20  have the issue as to whether this fits in the statute on the

21  -- not the retroactive point, but the other point for

22  Navient.  Right?

23         MR. SHILINSKI:  With regard to whether or not it's

24  a -- I'm sorry.

25         THE COURT:  It's a program funded.

1              MR. SHILINSKI:  I understand.

2              THE COURT:  But the other loan is a, you know,

3    it's a government loan.  So, you just have the unfair --

4    undue hardship point.  So, it's worth exploring.  And fill

5    out the forms, you know, give them the information.  You

6    can't do it just by a discovery.  They have forms they have

7    to fill out because they have metrics that they have to

8    follow and, you know, the government requires them to do it

9    that way.

10             So, I would recommend you take up that

11   opportunity.  I mean, the worst that could happen is they

12   say no and you're in the same position you are with them

13   today.

14             MR. SHILINSKI:  But isn't that opportunity still

15   available post trial also?

16             THE COURT:  I think it's better to do it now.  I -

17   - right?

18             MR. BAUM:  As to whether -- it probably would be

19   available post-trial, Your Honor.  Certain of the options,

20   you could arguable do better pretrial though, than post-

21   trial, depending upon which of the income driven options --

22             THE COURT:  Okay.  So, I suggest -- is maybe you

23   all talk to each other?  I've already authorized counsel to

24   talk to you because you're pro se, so just talk through it

25   with them.  It's just something I think you should consider.

1           As far as Navient is concerned, they don't have

2      this overlay where they have to offer something, but, yeah,

3      they're business issues.  They might do it, you know, as

4      opposed to having a trial and taking the risk of a trial and

5      maybe, you know, Judge Drain doesn't exactly follow the

6      Brunner standard, and recommends the Second Circuit that

7      they change it because that was the standard that was

8      enacted when 523(a)(8) only applied to loans that fell in

9      default within a very short period after the, you know, the

10     bankruptcy occurred in a very short period after the loan

11     was issued.

12          It's very different from the current statute.  So,

13     there are reasons to settle on both sides.  That the income

14     here, your prospects, you know, those -- I don't know enough

15     about to say.  You know, you're obviously looking like

16     you're healthy.  And you're articulate, so you're not like

17     some of the student loan people who I've had in front of me

18     who've, you know, clearly, there's a good reason for a

19     settlement.  But you'll never know.

20          Okay.  So, I'll look for both of those orders from

21     you, Mr. Hooten.

22          MR. HOOTEN:  Yes, Your Honor.

23          THE COURT:  Okay.

24          MR. BAUM:  So, Your Honor, will we set a final

25     pretrial date or --

1              THE COURT:  Well, yeah, I think given that Mr.

2      Shilinski is pro se, I think we should have a final pretrial

3      date and then it -- get a trial date about -- within a month

4      after that.

5              MR. HOOTEN:  All right.  Should we then obtain a

6      pretrial conference?

7              THE COURT:  You think -- speak to the Clerk's

8      Office about that.

9              MR. BAUM:  Okay.

10              MR. HOOTEN:  Your Honor, it -- well, we can call

11      it a final --

12              THE COURT:  It should be within a reasonable

13      period after this late minute discovery is done, so.

14              MR. HOOTEN:  Right, that's my only issue is that

15      if the discovery --

16              THE COURT:  Yeah, so I can't imagine that --

17              MR. HOOTEN:  -- we need more, you know.

18              THE COURT:  -- you know, 60 days -- no earlier

19      than 60 days from today.  Yeah.  And that will give you some

20      time to talk about settling one or both of the loans -- or

21      two.  Okay.  Thank you.

22              MR. SHILINSKI:  Thank you.

23              MR. HOOTEN:  Thank you, Your Honor.

24              MR. BAUM:  Thank you, Your Honor.

25

Page 50

1                 (Whereupon these proceedings were concluded at

2      12:12 PM)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 51

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  April 23, 2018

**[& - appears]**    Page 1

### &

**&**  4:4

### 1

**1**  26:23
**104**  30:3
**10601**  2:3 4:14
**10:54**  2:6
**11**  21:5
**11501**  51:23
**11766**  4:7
**127**  30:4
**12:12**  50:2
**13**  35:25
**131**  30:4
**1404**  10:5
**149**  30:19
**15**  12:18 17:7,8
**1501**  10:11 20:8
  26:23
**153**  28:12
**16-08252**  1:4 3:1
**16-23191**  1:3
**167**  28:12
**18**  10:1
**1892**  8:12
**19**  8:24
**1960s**  8:14
**1970s**  8:14
**1977**  21:3
**1978**  8:10 20:16
**1979**  21:4
**1980**  11:21 20:12
**1982**  20:16
**1983**  20:14 27:14
**1984**  11:19,20
**1988**  29:1
**1993**  30:20
**1994**  28:10,11,13

### 2

**2002**  10:6 30:5
**2005**  8:22,24
  25:12 30:4

**2018**  2:5 29:19,20
  51:25
**203**  4:6
**23**  26:23 29:19
  51:25
**244**  28:11
**26**  28:10 29:20
**264**  28:11
**267**  17:12 28:11
**287**  30:4

### 3

**30**  3:3 10:6 27:14
**300**  2:2 51:22
**330**  51:21
**3331**  28:10

### 4

**401k**  37:25
**419**  30:3
**45**  16:4
**4th**  4:13

### 5

**505**  29:19
**510**  28:10
**512**  28:9
**523**  22:4 25:3,8,19
  30:23 31:21 48:8
**5238**  13:2
**5505**  4:6
**595**  30:19
**599-600**  30:19

### 6

**6**  27:16
**60**  49:18,19

### 7

**7**  10:18 34:20
**70**  46:15,17
**7037**  5:20
**7056**  25:16 31:5
**7056-1**  25:17
**78**  20:11

### 8

**8**  22:4 25:3,8,19
  30:23 31:21 48:8
**80**  9:25

### 9

**9**  2:5
**90**  10:1
**925**  27:14
**927**  27:14
**99**  4:13
**9th**  30:19

### a

**ability**  13:9 17:20
  27:2
**able**  10:6 18:6
  31:12 40:17 44:20
**absent**  17:12
**absolutely**  43:16
**accept**  23:18
**accepting**  29:10
**access**  30:5,21
**account**  38:9
**accurate**  51:4
**act**  8:11 21:5
**activity**  16:20
**acts**  16:16
**actual**  27:23
**address**  28:24
  39:1
**addressed**  15:12
**adhere**  37:4
**adjustments**
  44:13
**administer**  27:2
**administrative**
  22:6 30:10
**adv**  1:4
**advance**  7:5
**adversary**  3:1
  24:25 25:1 32:19
**affect**  31:25

**affidavit**  25:25
**afternoon**  5:24
  6:11
**afterward**  17:6
**ago**  12:18 17:7,8
  33:6
**agree**  16:17 21:8
  39:6
**agreeing**  14:8
**ahead**  24:20
**al**  1:15 3:2 5:3
**albeit**  26:1
**alimony**  34:10
**allow**  7:21
**allowed**  40:19
**allowing**  13:20,24
**alter**  28:2 40:6
**alternative**  31:7
  32:6
**alternatively**  13:4
**amended**  8:12
  20:17
**amending**  28:3
**amendments**
  10:11 11:20,20
  25:12 26:19
**analysis**  19:24
  20:9
**analyze**  22:10
**answer**  23:19 31:2
  41:4,22 42:23
**anybody**  38:17
**anyway**  6:12 34:9
**apart**  44:5
**apartment**  38:11
**apologize**  7:5 13:1
  23:4
**apparently**  6:1,11
  30:6,10
**appear**  31:18
  34:24
**appears**  23:23
  28:3 30:15

**[applicability - carry]**                                                    Page 2

**applicability**  9:19
  31:22
**applicable**  8:23
  9:25 11:17 21:19
**application**  7:12
  7:20,22 8:3,6 9:6
  9:22 12:1 14:10
**applications**
  28:16,17
**applied**  7:14 8:14
  8:18 9:3 10:6
  13:14 14:4 19:23
  25:21 26:9 27:5,9
  31:23 48:8
**applies**  8:8,18
  11:6,20 14:23,25
  19:20 22:3 24:11
  25:19 26:4 30:17
  30:24 32:3
**apply**  10:4,12
  11:17,20 12:25
  14:16 15:2 16:16
  16:18 18:13,14
  20:15,19 26:16,20
  26:22,24 27:21
  34:25
**applying**  21:5
  28:5,18,23 31:5
  31:21
**approach**  11:25
**appropriate**
  25:10 33:21
**april**  2:5 51:25
**arguable**  47:20
**arguably**  15:6
  31:11
**argue**  19:7 33:25
**argument**  6:15,20
  7:6 9:8 22:21 26:8
  26:15,16,24 34:3
  40:16
**arguments**  16:13

**art**  34:18,22 36:1
**articulate**  48:16
**asked**  34:10 41:11
**asking**  24:1 41:14
  41:19
**aspect**  25:7 26:7
  42:11
**aspects**  6:14
**asserted**  30:13
**assets**  27:3 35:22
  35:24 40:25
**associates**  4:4
**assuming**  6:4
  42:10,19
**attach**  32:10
**attached**  23:6
  31:2,2
**attainder**  16:16
**attainders**  16:24
**attorneys**  4:5,12
**authorities**  28:8
**authority**  12:21
**authorized**  47:23
**available**  13:24
  17:18 37:3 38:14
  47:15,19

                **b**

**b**  2:21 8:21,22
  25:13 26:23
**b.r.**  27:14 28:12
  30:4
**back**  12:18 14:4
  17:6 20:10,14
  33:6 34:5 44:10
**bankrupt**  15:15
**bankruptcy**  1:1
  2:1,23 8:8,10,11
  8:14,18 10:16
  11:17,18 12:13,19
  12:24 15:2,14,16
  15:23,24,25 17:17
  20:12,21 21:1,5
  21:11,13,19 25:3

  25:9,12 27:1,2,6,6
  27:7,14,22,22,25
  28:3,5,7,13,17,18
  29:2,19,20,21
  30:4 31:16 34:15
  35:25 38:9 39:10
  44:12,20 48:10
**bap**  23:14 30:19
**bapcpa**  7:12 8:21
  9:21 10:11,12
  11:6 12:2 13:12
  18:24 20:2,4,4,6,7
  21:19 24:10 25:13
  25:19,21 26:4,9
  26:16,17,18,22,23
  29:14
**bapcpa's**  25:18
**baptiste**  29:19
**based**  14:10 20:24
  23:22 25:23 26:1
  26:10 37:6 41:5
**basis**  18:7
**baum**  4:11,16
  5:12,12 33:5,10
  43:3,10 44:9 45:8
  46:2 47:18 48:24
  49:9,24
**baum's**  43:2
**begging**  44:12
**behalf**  5:6,9
**believe**  9:5,9
  13:21 14:3 16:12
  18:17 19:2 26:5
  26:25 27:18,21
  28:2 31:1,4,14
  33:7 42:14 43:1
  45:10
**bench**  32:8
**benefit**  8:21 29:3
  29:10,23
**best**  9:9 16:12,13
  35:9 39:13

**better**  7:3 23:11
  47:16,20
**beyond**  16:10
  30:10 42:2,4
**bills**  16:24
**bit**  19:17 21:23
  22:3
**bless**  9:16
**bolen**  30:4
**bounded**  11:4
**br**  30:19
**breadwinner**
  36:18
**brief**  7:16,19
  10:22
**briefly**  7:9
**bright**  20:20,21
**bring**  17:9 27:2
  44:2 45:17
**brunner**  31:22,23
  37:5 48:6
**budget**  36:20
**budgets**  38:8
**bunch**  18:19
**burden**  24:25
  40:14 44:1
**business**  48:3

                **c**

**c**  4:1 5:1 8:22
  25:13 27:13 51:1
  51:1
**calendar**  5:18
  32:18
**call**  39:20 49:10
**called**  45:23
**cards**  9:1
**care**  36:15,22,24
  37:15
**carefully**  9:17
**carlton**  7:19 8:16
  18:12 19:20 28:9
**carry**  22:17

[case - copy]

case  1:3,4 7:15,18
  7:19,25 9:18
  10:16,16,17,17,18
  10:18 11:3,5,9,11
  11:16,19 12:2,4
  12:22,22,24 14:14
  14:15,24 15:3,7
  16:12 17:1 18:11
  19:1,21 20:2,5,10
  20:13,18,24 21:5
  21:11,14,15 22:3
  22:5,10,16,17
  23:12,14,16 27:8
  27:10,18,21,22,24
  28:7 29:17 30:1
  30:24 31:5,21,21
  31:22,22 34:7,16
  34:18 35:13,25,25
  37:16 40:14,17
  44:3 46:9
cases  8:4,23 9:12
  10:12,15,15,19,20
  10:21 11:2,3,8,12
  11:13 14:23 16:25
  17:25 18:22 20:4
  20:10 26:20,22,25
  27:2,15,22 28:5
  30:7,7 35:22 38:9
caught  17:9
cause  30:22
caution  13:19
celotex  31:4
central  27:1
certain  6:14 26:18
  37:12 46:6 47:19
certified  51:3
cetera  10:1 16:16
  37:1
chambers  32:7,12
chance  5:25 16:10
change  12:7 14:5
  16:5 18:3 31:11
  31:19 48:7
changed  16:11
  17:24 18:23,24
  31:11
changes  18:7 21:8
changing  17:6,6
chaos  40:4
chap  35:24
chapter  10:18
  21:5 34:20 35:25
charged  17:10
child  34:10
childcare  39:16
children  36:4,5,9
  36:16,23,24 38:6
church  4:13
cir  30:19
circuit  12:12
  22:17 23:14 27:16
  29:18 30:2,3 48:6
circumstances
  27:21 29:24
cite  14:15
cited  7:18 17:4
  27:16 35:23
civil  16:17,18,24
  17:14 19:11 27:21
claims  10:5
classes  21:2
clause  15:23,24
clauses  17:13
clear  13:4,5 18:13
  19:16 20:5 26:18
  27:18 31:1,16
clearly  8:19,25
  19:13 27:8 39:9,9
  48:18
cleavage  27:23
clerk's  49:7
client  46:5,8
closely  37:4
closest  42:20
clothing  36:25
  38:7
code  8:9,11,14
  11:17,18 12:24
  15:3 16:1 20:11
  21:19 25:3,9,12
  27:7 28:3 31:16
collection  34:18
  34:22 36:1
come  6:8
comes  21:23
  34:16
comfortable  6:22
commenced  10:12
  10:15,19,20 14:23
  15:3,7 20:6 26:20
  27:8
commencement
  11:15 28:6
committed  17:8
company  14:3
compel  5:20 32:19
  42:6
complaint  25:2,7
completed  33:7
complied  42:7,9
concede  39:24
concerned  18:9
  19:10,12 43:14
  48:1
conclude  24:10
  25:23
concluded  26:10
  50:1
condition  23:15
  32:22
conduct  11:4,6,9
  11:9,10 15:5
  18:14 26:25
confer  18:3
conference  49:6
conferences  45:20
confirmed  46:5,5
congress  9:23
  10:2,3 11:4,5 12:1
  12:9 14:21,25
  17:20,23 18:3
  19:16 20:1 21:8
  26:17 27:8 28:2
  31:10 32:4 39:9
congress's  27:19
congresses  9:20
congressional
  11:23
consequently  28:3
consider  19:2
  26:12 43:23 47:25
consideration
  28:14
considered  33:21
consistent  28:8,16
  32:7,17
constitution  7:17
  9:11,12 16:13
  19:9
constitutional
  16:15 18:8
constitutionally
  33:21
contends  25:7,9
  25:15,17,20
context  15:1
continues  29:8
contract  12:18
  15:23 28:1
contracts  7:13 8:9
  9:7 13:14 17:13
contrary  14:19
  25:18
controlling  20:7
  28:19 30:1 31:20
controversies
  34:11
conversations
  46:3
convincing  9:15
copy  32:16

[corp - discovery]                                                        Page 4

**corp** 45:11
**corporation** 5:13
**correct** 45:9
**cost** 37:21 38:14
**counsel** 32:6
  47:23
**country** 12:13
  51:21
**couple** 8:12
**course** 21:25
**court** 1:1 2:1 5:2,5
  5:8,11,14,17 6:3,6
  6:12,22 7:4,6,7,21
  7:25 8:5,8,21 9:11
  9:12 10:9,25 11:2
  12:13,13,20 13:3
  13:10,17 14:13,15
  14:16,20 15:11,13
  15:21 16:15,20
  17:11,12,15,25
  18:5,11,21 19:2,4
  19:6,9,12 20:12
  21:17 22:8 23:1,3
  23:5,8 24:2,6,9,16
  24:21,23 28:5
  29:21 32:12,15,24
  33:2,8,12,15,20
  33:24 34:4,5 35:6
  35:11,13,16,19
  36:3,7,9,11 37:12
  37:17,20,25 38:20
  38:24,25 39:3,6,9
  39:16,25 40:4,6,9
  40:10,13 41:2,6
  41:10,12,14,19,23
  42:2,10,17 43:6
  43:13,18 44:15,18
  44:24 45:2,5,12
  45:18,22 46:12,16
  46:18,25 47:2,16
  47:22 48:23 49:1
  49:7,12,16,18

**court's** 27:1 38:22
**courts** 20:18 27:6
  27:6 28:17,17
  32:5 34:12 39:11
**cover** 26:10
**covered** 25:21
**create** 9:22 12:2
**created** 9:7 21:15
  40:4
**creates** 28:2
**creation** 15:17
**credit** 5:13 8:25
  30:9
**creditor** 44:3
**crime** 17:8
**criminal** 16:18,23
**current** 29:13
  32:1 48:12
**custody** 34:11
**cut** 34:5

**d**

**d** 2:22 5:1 30:4
**danger** 40:16
**date** 8:11,24
  10:13,13,20,22
  11:7,12,15,16
  12:23 14:24 15:7
  19:24 20:6,7,10
  20:22 21:14 26:21
  26:23 28:19 31:13
  31:14,20 42:21,22
  48:25 49:3,3
  51:25
**dated** 21:3,4
**dates** 20:25
**day** 22:18 40:3
**days** 10:1,1 42:15
  42:18 49:18,19
**deadline** 42:13
**deal** 5:21 6:13
  18:22 24:6 38:2
  38:22

**dealing** 19:11,22
  21:12
**deals** 23:12
**dealt** 29:18 30:5
**debt** 15:16,18,22
  17:23 22:4,9
  27:11 29:3,10
  36:12
**debtor** 1:10 4:12
  4:20 17:19,23
  18:2 24:24 25:4
  28:9 29:3,12
  34:18 39:15 44:4
**debtor's** 27:3,3
  32:22
**debtor's** 29:12
**debts** 9:1
**decide** 17:20 22:2
  30:24 34:10 37:10
  42:7
**decided** 17:23
  20:11
**decides** 37:16,23
**decision** 14:17
**decisions** 11:16
**declaration** 25:1
**default** 48:9
**defendant** 5:13
  26:6
**defendants** 1:16
  4:5 22:22 24:1
**defending** 22:25
**demands** 22:23
  40:22
**demonstrates**
  7:20 10:3
**demonstrative**
  10:8
**denied** 25:22,24
  43:20 44:13,19
**deny** 24:11 25:16
  32:5 42:11

**dependent** 27:23
**dependents** 29:12
**depending** 20:24
  37:4 42:24 47:21
**deposition** 33:6
**describe** 14:9
**determination**
  34:15
**determine** 14:21
  15:3
**detrimental** 12:2
**difference** 23:8
  36:14
**different** 7:18
  10:14 12:5 13:15
  13:16 21:13 23:10
  31:23 39:19 44:24
  45:3,15,18,18
  46:19 48:12
**differently** 20:24
**difficult** 39:10
**diligence** 42:5
  43:22
**direction** 14:18
  46:11
**directly** 15:12
**disagree** 14:11
**discharge** 10:25
  15:1,9 29:2,2,11
  31:12
**dischargeability**
  18:22,23 19:24
**dischargeable**
  12:19 15:4 16:9
  25:2,5 27:12
**discharged** 12:6
  15:16,18 36:13
**disclosure** 42:25
  43:22 44:5
**discovery** 5:20
  22:23 32:20 33:3
  34:21 35:2 40:15
  40:19,22 42:15

**[discovery - first]**

44:11 45:6 47:6
49:13,15
**discretionary**
34:7 38:6
**discuss** 43:9
**discussed** 30:8
42:22 43:6
**discusses** 29:25
**dispute** 26:15
**disputed** 24:4,12
31:6
**distinction** 27:1
**distinguishable**
19:13
**distribution** 21:1
**district** 1:2 12:13
27:6 28:5,17
**divorce** 34:10
**docu** 8:19
**document** 3:3
32:21
**documents** 6:13
**doing** 9:9 14:17
20:1 35:9 43:22
45:20
**domestic** 34:6,8
34:24 35:2,7
**drain** 2:22 48:5
**dramatic** 12:10
**drastically** 12:5
**driven** 46:6 47:21
**due** 42:5 43:22
**duty** 36:23,23

**e**

**e** 2:21,21 4:1,1 5:1
5:1 51:1
**e.d.n.y.** 27:14
**earlier** 11:12
24:13 28:7 32:17
45:20 49:18
**early** 8:14
**earmarked** 36:22

**earns** 37:25 39:2
**easier** 43:23
**ecm** 43:8
**ecmc** 43:3 44:25
46:1
**ecmc's** 46:4
**ecro** 2:25
**edny** 29:20
**educating** 36:16
**education** 36:25
37:14 43:4 45:10
**educational** 5:13
29:3,9 30:2
**effect** 8:12 12:2
14:16 15:3 19:18
20:19 21:20 25:11
27:7 28:6,18,22
28:25
**effective** 10:13,13
10:22 11:7 14:24
20:6,7 26:20,23
**effectively** 22:9
28:1
**either** 23:20 25:2
38:5 43:19
**eligible** 46:6
**email** 32:7,12
**emailed** 6:7
**emphasis** 21:11
**enacted** 8:11,22
29:1,14 48:8
**enacting** 26:18
**enactment** 8:20
18:15
**encourage** 43:9
**ends** 35:13
**enforced** 35:15
**ensured** 30:14
**entered** 8:9,10
15:5 18:6 32:13
**entitled** 41:2,3
42:2,3,4

**entity** 30:9,12,14
**equality** 21:1
**err** 13:19
**essence** 8:15 20:9
**essentially** 7:11
**et** 1:15 3:2 5:3
10:1 16:16 36:25
**evenly** 39:18
**eventually** 31:25
**everybody** 13:22
**everybody's**
12:17
**evidence** 34:15
**ex** 9:13 16:22
**exactly** 48:5
**example** 20:23
27:13 34:17 37:20
**exception** 10:18
22:12 26:7 34:6,9
34:25 35:3,8
**exceptions** 26:19
26:24
**exist** 9:7
**existed** 21:9
**expediency** 34:3
**expenses** 37:7
38:5,5,7,12
**expertise** 34:12
**explain** 35:12
**explore** 46:7
**exploring** 47:4
**expressed** 16:6
**extended** 17:15
**extensive** 29:17
**extreme** 14:1
**extremely** 13:16
**extremity** 14:5

**f**

**f** 2:21 51:1
**f.3d** 30:3
**fact** 11:14 16:7
17:3 19:14 22:8
25:8,15 28:8 31:6

**facto** 9:13 16:22
**facts** 8:16 11:2
17:7 22:19 23:11
23:16 24:4,13
26:2,12,15 30:16
30:23 31:25
**factual** 8:19 22:1
23:21
**fail** 17:15
**fairly** 33:15
**fall** 25:2,8 30:22
33:6
**far** 6:14 18:8 19:9
19:12 35:4 43:13
48:1
**february** 29:19,20
**federal** 7:6 20:19
31:4
**federally** 43:4
**fell** 48:8
**file** 12:17 14:10
27:25
**filed** 6:1 8:23
10:15 44:12
**filing** 11:3,5,11
12:23
**fill** 45:6 47:4,7
**filled** 11:19
**filling** 27:24
**film** 28:10
**final** 42:21 48:24
49:2,11
**financial** 23:13,21
32:22 40:20 42:25
43:22 44:5
**find** 18:16 21:18
22:12 31:16 35:10
**fine** 7:2 14:2
32:14 41:18
**finish** 44:16
**first** 5:21 6:3 7:6
12:20 18:24 25:7
25:15,24 30:2

[first - income]                                                                 Page 6

34:6 42:1 44:22
fits  22:10 46:20
floor  4:13
focus  19:1 21:14
focused  19:2
focusing  19:15
  32:21
follow  20:8 45:24
  45:25 47:8 48:5
following  40:12
food  36:25 38:7
  39:16
foregoing  51:3
form  30:8
format  32:13
forms  45:7 47:5,6
forth  8:17 27:19
forward  40:7
found  8:2 23:17
four  9:18,21,24
frankly  18:12
  23:12 39:11
fraudulent  34:17
  34:19 35:5
free  6:19
fresh  15:9
friday  5:24 6:6
front  6:23 48:17
frontal  21:13
fully  13:24 37:2
function  30:15
functions  23:23
  30:11,18,20
fundamentally
  31:15
funded  22:10
  23:15 29:6,15
  46:25
funds  29:9
further  46:7
future  38:23

g

g  5:1
game  17:3
general  7:22
  10:10 27:10 43:12
generally  11:15
  20:18 22:11 43:11
getting  35:20
give  13:8 17:15
  47:5 49:19
given  10:13 14:1,2
  14:4 21:10 31:15
  49:1
go  15:15 18:9
  19:17 32:8 37:8
  40:8,23 42:2
goes  15:13 16:18
  20:10 26:7 27:10
  33:22
going  7:9 9:5,25
  10:5 12:16 17:6,9
  17:10 20:6 40:1,8
  41:4 42:6
good  5:3,4,11,12
  5:14 7:22 18:19
  39:15 48:18
govern  27:20
government  13:23
  30:14 31:4 45:12
  45:23 47:3,8
governmental
  22:9 29:4,6,16
  30:9
governs  11:3
grandfather
  38:17
grandfathered
  10:21
grant  42:5,6,11
gravities  19:20
grounds  25:4,15
  31:11,12,17 32:6
  36:13 39:21

guarantee  22:13
  23:9,11,18 45:13
guaranteed  22:9
  23:1 29:4 31:3
  43:4
guess  5:24 7:8,10
  13:3,21 14:13
  15:13 18:5 19:6
  33:24 37:22 40:14

h

hair  40:2
hamp  45:23
hand  38:15 39:18
handling  22:6
happen  46:13
  47:11
happened  15:25
happening  16:5
  38:18
happens  15:25
happy  46:7,8
hardship  13:5,8
  29:12 32:3 36:13
  36:19 38:21 39:11
  47:4
heads  6:16
healthy  48:16
hearing  3:1 24:3
held  45:9
hiding  41:1
higher  43:4 45:10
history  13:5 14:19
hmm  8:7 22:7
  37:24
hold  44:16
home  40:8
hon  2:22
honest  17:18,22
  18:2
honor  5:4,12 6:1
  23:7 24:19 32:10
  32:23 33:5,11,14
  35:21 43:1,3,17

44:8 45:8,8 46:2,9
  47:19 48:22,24
  49:10,23,24
hooten  4:4,9 5:4,6
  5:6,9,9 6:1,5,7,10
  24:16,19,22 32:10
  32:14,23 33:1
  35:20,21 41:9,11
  41:13,21 43:1,16
  48:21,22 49:5,10
  49:14,17,23
hope  18:17
hopefully  18:20
  42:19
house  38:7
household  35:23
  35:24
housing  37:21
  38:8,12 39:16
humongous  12:7
hwy  4:6
hyde  3:25 51:3,8

i

i.e.  27:7,19 31:23
idea  35:21 45:16
identified  25:1
illegal  17:9
imagine  49:16
implies  30:6
important  11:14
  27:1 35:24 44:6
importantly  10:2
impose  29:11
improper  31:17
inclination  21:24
included  22:15
includes  29:14
  36:16,25
including  5:22
  16:3 22:16 28:9
  30:1
income  35:23 37:3
  37:7 39:15,21

**[income - live]**                                    Page 7

40:11 44:10 46:6
  47:21 48:13
**inconsistent** 12:22
**inconsistently**
  12:14
**incurred** 9:1,1
  17:24 27:4 28:22
  31:13
**indenture** 21:3
**indicated** 24:18
  27:9
**indiscernible**
  11:24 13:25 20:12
  43:5
**individual** 29:2
**information** 22:1
  33:18 35:20 47:5
**informed** 28:16
**injustice** 14:14,18
  16:8
**inquire** 42:4
**instances** 8:4
**institution** 29:7
  29:16,22
**insurance** 22:16
  23:19 30:17
**insure** 23:9
**insured** 23:10
  29:4
**intend** 24:18,22
**intended** 14:22
  20:2,2
**intent** 9:20 10:8
  11:23
**intention** 27:19
**interest** 15:14,15
  15:20 28:1 46:4
**internal** 42:24
**interpretation**
  13:20,21 27:5
  32:2,4
**interpreted** 12:3
  12:12

**interrogatories**
  32:21
**interrogatory**
  23:19 31:2,2
**interrupt** 8:5 10:9
**irrelevant** 33:18
**issue** 10:25 12:22
  15:13 18:22 20:4
  22:3 24:7 25:8
  26:2 27:11 29:17
  30:22,25 31:6
  32:25 33:16 34:7
  38:2 39:12 46:20
  49:14
**issued** 8:13 48:11
**issues** 43:24 48:3
**i'm** 35:7 42:10

**j**

**j** 4:4,9 27:13
**jean** 29:19
**job** 39:10
**joined** 28:4
**judge** 2:23 29:21
  30:8 39:10 48:5
**judgement** 5:19
  5:21 7:11 24:3,12
  25:6 26:5,13 31:7
  32:5 35:14 39:20
  43:21
**judges** 19:23
  31:19
**judgment** 3:2
**july** 10:6
**jurisdictions**
  27:15
**justice** 13:12
**justin** 2:25

**k**

**keep** 19:1 23:2
  24:20 33:25 36:24
**kenneth** 4:11,16
  5:12

**key** 29:5,14
**kind** 13:21 14:7
**know** 5:24 6:23
  8:13,18,21,24 9:8
  10:4,21 11:1,24
  12:12,15,18 13:7
  13:13 14:7,8,25
  16:17 17:16,16
  19:13 20:5,10,13
  20:15,17,18,22,25
  21:3,4,6,9 22:18
  23:9,13,20,22,23
  24:16 28:14 34:5
  34:10,25 36:2,20
  36:20,25 37:2,6
  37:21 38:1,8,9,10
  38:11,14,16,18,18
  39:12,14,16 40:8
  40:17,18 41:5,6,7
  41:19,22 42:5,8
  42:22 43:20,25
  44:3,4,25 46:3,8
  47:2,5,8 48:3,5,9
  48:14,14,15,18,19
  49:17,18
**knows** 9:23 46:9

**l**

**l** 4:11,16
**laid** 13:22
**landgraf** 8:16
  17:12 18:12 19:15
  28:10
**language** 12:11
  14:21 16:16 18:10
  18:12 19:16,19
  20:7 22:11 28:15
**lastly** 33:24
**late** 49:13
**law** 4:11 7:12,16
  7:18 9:6,18 12:5
  12:22,22 13:15
  14:16,24 16:13
  17:1 18:11 19:1

20:10 22:1,3,4,5
  22:10,16 23:12
  24:19 26:2 27:17
  27:18 28:18 29:17
  29:25 30:5,21
  31:5,21,22 35:10
  36:15,24
**laws** 9:14 11:10
  12:8 20:19
**lawyer** 26:1 40:18
**lays** 15:17
**lead** 28:23
**leading** 14:24
  30:1
**learned** 24:19
**leaving** 40:3
**led** 18:11
**ledanski** 3:25 51:3
  51:8
**left** 32:4 37:7
**legal** 36:23 51:20
**legislation** 17:14
**legislative** 13:4
  14:18
**lender** 22:18
  29:22
**lenders** 44:24
**letter** 46:5
**level** 38:7
**lexus** 29:19
**liabilities** 27:3
**light** 20:20 25:15
**likelihood** 26:14
**limit** 28:2
**limited** 7:20 33:15
**line** 20:21
**listing** 43:11
**literally** 6:10
**litigant** 25:25
**litigation** 44:6
**little** 21:23
**live** 38:10,10

**[lives - objection]**

lives  16:4
llc  1:15 3:2
loan  11:21 15:5
    18:7 22:15 29:4
    29:22 30:8,14,17
    30:22 31:3,13
    37:3 45:14,15
    47:2,3 48:10,17
loans  7:14 8:13
    9:1 12:2,5,6 13:23
    16:9 20:23,25
    21:21 22:1,4,8,23
    22:24 25:1,4,8,11
    25:21 26:10 28:22
    28:23 31:13 42:23
    43:3,4 44:13 45:9
    46:19 48:8 49:20
local  25:17
long  6:23 27:5
look  9:19 11:11
    12:23 13:5 15:4,6
    21:10 36:19 37:6
    39:6,17,19 40:13
    42:4 45:5 48:20
looked  9:20
looking  11:4,12
    39:21 48:15
looks  14:20 15:24
    31:25
lose  9:5
losing  11:25 40:16
lost  15:9 44:22
lot  22:5 39:12
    46:10
lots  8:13
love  43:16
low  46:12
luck  18:19
luxuries  38:1

**m**

m  27:13
main  28:8

making  19:16
    39:15
management  5:13
managerial  23:22
mandatory  7:15
    16:12 19:1,10
    38:5 43:14
manifest  14:13,17
manifesting  13:12
mansion  38:10
marblehead  30:2
marital  33:22
marshall  34:7
material  23:17,21
    24:4,12 26:14
    30:22 31:6,20
    36:14
materiality  23:15
matter  1:6 24:13
    27:4,10 32:18
    34:17
matters  5:17
mc  43:8
mean  8:5,16 13:16
    14:14 16:17 17:1
    17:4 18:5,21 19:6
    20:1 22:3 34:17
    36:11,15 37:3,22
    39:7,19 40:1,25
    42:3 43:7 46:19
    47:11
meant  13:7
memorandum
    27:17
merits  33:17
metrics  47:7
michael  1:8 4:20
    5:15
microphone  6:24
mind  6:25
mine  43:1
mineola  51:23

ministerial  23:22
minor  36:9
minors  36:7
minute  49:13
mis  13:2
missouri  28:13
misspeaking  13:9
mitigation  45:20
mm  8:7 22:7
    37:24
mo  7:13
modest  38:11
modification
    42:24
mojica  20:14
    27:13
money  13:24
    36:21 37:7,10,23
    38:3,19 39:1
monstrous  15:9
month  49:3
months  10:1 33:6
moot  28:20,20
morning  5:3,4,11
    5:12,14 6:3
motion  3:2 5:19
    5:20,21 6:18 7:11
    21:25 24:3,12,24
    25:6,9,14,16,22
    25:25 31:9 32:5
    32:19 42:6,11
motion's  25:18
mt  4:7
multiple  28:16

**n**

n  4:1 5:1 51:1
names  5:5
nature  31:15
navient  1:15 3:2
    5:3,6,9,19,25
    21:18 25:7,14,17
    25:20 26:6 28:21
    32:19 33:25 36:21

37:5 38:14 43:8
    43:13,23 44:11
    45:14 46:22 48:1
navient's  19:14
    25:24 27:16 32:6
    40:18
need  8:1 13:25
    23:20 26:12 32:12
    49:17
negotiate  43:15
nesconset  4:6
never  48:19
new  1:2 8:17
    20:15 36:15,24
    45:10
ninth  23:14
nondischargeab...
    15:6 44:2
nondischargeable
    21:22
nonprofit  29:7,16
    30:9
normal  38:12
note  23:11
notes  7:3
number  31:18
numbers  43:12
numerous  27:15
    28:4
ny  2:3 4:7,14
    51:23

**o**

o  2:21 5:1 27:13
    51:1
o'brien  22:17 30:2
    30:3
o'clock  6:11
objected  25:14
objection  21:25
    22:14 23:9 25:24
    27:17 28:21,24
    30:13 31:8

[obligation - privilege]                                                Page 9

obligation 29:9
  36:15
oblique 12:11
obtain 49:5
obtained 27:4
obviously 48:15
occur 11:9 13:12
  21:12
occurred 8:19
  11:6 17:7 18:15
  34:23 48:10
occurs 20:20
october 8:24
offensive 17:7
offer 48:2
office 49:8
offices 4:11
oh 36:10 43:16
okay 5:2,3,17 6:12
  6:21 7:7 8:2 13:10
  14:13 22:20 24:5
  24:8,15,21,23
  32:24 33:2,12,15
  33:24 34:4 35:11
  36:3,11 40:21
  41:10,17 42:5,17
  43:13 47:22 48:20
  48:23 49:9,21
old 22:4 51:21
once 31:20 41:23
  41:23
one's 15:17
op 3:3
opinions 31:19
opportunity
  47:11,14
opposed 15:16
  19:3 21:15 25:19
  26:2,3,3,17,25
  28:7 32:3 48:4
opposition 7:10
  32:11

option 43:21
options 43:11
  46:7 47:19,21
oral 6:15,20 7:6
  26:24
order 32:7,9,11
  33:9 42:17
orders 48:20
original 40:22
outside 27:15
overlay 48:2
overpayment
  29:3

                p

p 4:1,1 5:1 8:22
  8:22 25:13,13
page 27:16
paragraph 29:11
parameters 15:17
parse 17:21
parses 29:21
parsing 11:25
part 6:15 10:3,23
  12:10 13:2 22:21
  29:6,15 37:15
  39:25
particular 8:23
  13:2 15:21 22:15
  27:23 28:11 31:25
  35:25
particularly
  43:20
parties 33:3
parts 10:7 40:1
party 35:13 41:7
patient 33:3
paul 4:4,9 5:6,9
pay 36:21 37:3,8
  37:14 38:13,14,19
  39:15 44:4
paying 37:21
  38:15

payments 39:15
  46:12,13
people 18:18
  20:16 38:9 43:19
  43:25 44:2 48:17
performed 23:24
  30:11
period 10:21,22
  25:11 34:19 45:22
  48:9,10 49:13
personally 17:4
persuasive 19:1,5
pertaining 32:22
petition 11:15
  19:24 20:21 26:3
  28:19 31:14 40:24
phone 6:8
phrase 17:21 18:1
  29:5,14
pictured 16:3
pilcher 30:19
place 9:24 44:22
plain 28:14
plains 2:3 4:14
plaintiff 1:13 4:12
  5:15,18 24:24
  28:9
plate 30:1
play 21:23
played 17:3
pleading 6:13,14
pleadings 5:22
  6:19 21:23 25:23
  26:5 33:16 36:4
plenty 8:9,25
  18:22
pm 50:2
point 10:9 13:3
  14:14 16:4,15
  17:5,25 19:25
  21:17 22:20 31:6
  34:5 40:1 41:9,20
  41:21 42:8 44:17

45:2 46:21,21
  47:4
pointed 31:10
position 7:17
  13:11 19:15 25:18
  40:20 47:12
possible 44:10
possibly 40:3
post 9:13 16:22
  47:15,19,20
posturing 14:11
potential 17:13
power 19:17
pre 12:2 20:16,16
  24:10 25:19,20
  26:3,3,9,17 33:8
  42:7
precedents 19:12
preclude 7:12
  31:7 39:20
predecessor 45:11
  46:4
prejudice 42:12
prejudiced 26:6
premised 22:5
  25:6
present 4:18 9:9
presumed 14:25
pretrial 42:21
  47:20 48:25 49:2
  49:6
pretty 22:17
  24:17
previously 45:9
primarily 26:1
primary 7:19
  28:14
prior 8:11 12:17
  25:12 44:12
private 12:6 14:3
  22:24 29:22
privilege 18:2
  28:1

[pro - road]

pro  5:15 25:25
  47:24 49:2
proactive  9:22
probably  47:18
proceeding  3:1
  19:11 24:25 32:19
proceedings
  10:17 16:18 50:1
  51:4
products  28:10
profit  14:3 30:14
program  22:2,4
  22:14 23:15 29:6
  29:15 30:6,21,21
  43:5 45:3,14,23
  46:25
programs  42:24
  44:10 45:19
prohibitions  9:13
property  15:15,19
  16:6,8 18:14,18
  19:11 27:25
propose  38:25
proposed  32:11
proposition  12:21
prospects  48:14
protection  13:22
  14:1
provide  24:1
  40:14 41:5 43:10
  45:6
provided  7:10,11
  7:15 44:22
provides  29:1
providing  44:21
provision  10:14
public  13:25
publicly  13:9
pull  12:16
pulls  21:8
purpose  13:23
purposes  26:13

pursue  43:21
put  16:12 28:14
  37:25 41:1 42:13
putting  9:24

q

qualify  44:20
quarropas  2:2
question  9:19
  20:14 31:23 34:20
quiet  24:20
quite  19:17 22:3
  22:21 44:6

r

r  2:21 4:1 5:1 51:1
raised  21:17,18
raising  34:1
ran  17:23
rare  27:20
rdd  1:3,4 3:1
reaction  35:1
read  5:22 6:7
  21:24 33:16 38:21
reading  18:9,9
  19:19
reads  23:14
real  20:23
really  8:1,15 9:2
  16:18 19:21 20:3
  20:22 21:14 22:2
  22:18 24:6 26:4
  34:7 39:14
reason  17:14
  35:14 48:18
reasonable  49:12
reasons  42:8
  48:13
received  29:9
recognized  34:12
recommend  47:10
recommends  48:6
record  6:15 23:21
  26:11,11 51:4

refer  16:23 18:1
  32:9 36:4
referred  25:13
referring  10:19
  17:2
refers  8:22 10:19
  30:15
regard  11:23 40:7
  44:9,9 46:23
regarding  7:24
regime  8:17
related  3:3
relations  33:22
  34:9,25 35:2,8
relationships  8:19
relevance  35:7,18
  35:18,19,20 39:21
  39:24
relevant  10:10
  34:15 36:19 37:22
  38:17
relied  28:8
relief  17:18
remember  42:23
renders  14:17
reorganization
  21:7
repay  29:9
repayment  46:6
reply  3:3 5:23
  21:24 23:6 31:3
reported  11:16
reporter  8:22
request  32:20,21
  33:25
requests  42:15
requirements
  31:16
requires  47:8
research  8:3
  16:22 18:20
resources  30:3

respect  5:19 10:12
  26:20 30:21 31:5
respectfully  18:4
respond  42:14,18
responded  22:24
response  22:22
  40:22 42:1
responses  32:20
rest  42:11
result  14:17 42:7
retroact  11:11
retroactive  7:12
  7:20,21 8:3,6,15
  9:6,13 10:6 11:25
  12:1 14:10,22
  17:14 46:21
retroactively  9:3
  10:4 13:13,14
retroactivity  14:8
revenue  19:21,22
review  5:25 25:23
  26:11
reviewed  6:12,17
  6:19
rewritten  16:1
right  6:9 11:1
  12:6 13:20 15:15
  15:18,21 16:6,8
  17:22 18:1,21,25
  19:4,11 23:5
  24:23 27:25 33:2
  33:8,18,22 34:4,4
  35:11 36:4 38:24
  40:10 41:12 43:6
  43:15,18,18 44:24
  45:7,21 46:12,22
  47:17 49:5,14
rights  12:17 21:12
  21:15
rise  15:6
risk  48:4
road  51:21

roads 39:4
robert 2:22
role 34:13
rough 43:12
rule 5:20 17:6
   24:18 25:16,17
   31:5
rules 17:6
ruling 26:8 28:4
   32:7,8,17

s

s 3:3 4:1 5:1
sake 34:3
satisfy 25:4
save 37:18,23
saw 6:3,10
saying 11:5 12:4
   17:8 23:2 24:2
   37:6,22 45:19
   46:13
says 10:11,19 11:8
   12:15 13:7 14:15
   14:23 17:12 22:14
   23:9 36:21 40:11
scalia 17:4
scarcella 29:21
   30:8
schedules 41:15
   41:25 42:3
scholarship 29:10
school 24:20
scope 17:15 30:18
se 5:16 25:25
   47:24 49:2
sec 10:5,23
second 13:3,8
   21:17 22:17 25:17
   26:16 27:16 29:18
   30:2,3 34:5 48:6
secondly 33:20
secretary 6:7
section 25:10,22
   29:23

sections 9:18,21
   9:25 10:10
securities 11:10
see 7:1 9:2 12:20
   18:17 23:21 27:13
   32:16 34:21 36:20
   41:23,24
seeing 13:22
seeks 24:25
send 32:16
sense 45:24
sensitive 44:10
sent 41:25 44:9,10
separate 44:5
services 45:11
servicing 30:11,15
   30:18,20
set 27:19 48:24
sets 8:17
settle 43:17 48:13
settlement 44:7
   48:19
settling 49:20
severity 15:8
shared 39:18
shearer 28:12
sheerer 14:15
shilinski 1:8,12
   3:1 4:20 5:2,2,15
   5:15 6:9,18,21,25
   7:2,3,5,8 8:2,7 9:4
   10:23 11:1,22
   13:1,7,11,18 15:8
   15:12,19 16:2,19
   16:21 17:22 18:4
   18:16,25 19:5,8
   21:16 22:7,20
   23:2,4,7,25 24:5,8
   24:15 31:10 32:16
   33:6,12,14,17,19
   33:23 34:2 35:4,9
   35:12,17 36:3,6,8
   36:10 37:9,14,18

37:24 38:20,25
   39:4,7,23 40:7,11
   40:21 41:4,17,25
   42:9,16 43:10
   44:1,8,16,19,25
   45:4,16,21 46:3
   46:15,17,23 47:1
   47:14 49:2,22
shilinski's 5:18,23
   37:7 40:20
shocking 17:5
short 7:21 48:9,10
shortly 20:11
side 13:19,19
   43:19
sides 48:13
signed 7:14 12:17
significantly 34:6
similarly 8:20
   21:2,3
sinai 4:7
single 10:2,3
   38:13
sir 23:7 33:23
sit 18:19 24:20
sitting 27:6
situating 21:2
skimpy 26:11
skip 39:25
solutions 1:15 3:2
   5:3,7,10 51:20
someone's 18:14
   34:16 39:14
sonya 3:25 51:3,8
soon 42:14
sorry 5:8,23 19:8
   23:2 26:3 29:20
   36:8 46:24
sort 15:23 22:6
   23:13 38:6 42:13
sorts 21:12
sought 41:7

southern 1:2
speak 13:9 46:2
   49:7
speaking 10:24
   11:15 13:1 22:11
specific 9:13,18
   12:14
specifically 10:5
   11:24 12:9,11
   14:6 20:2 27:11
specifies 10:20
specify 19:17
spend 38:1,3
spending 38:4
spent 9:20 37:11
   39:22
spouse 34:16,19
   34:21 35:22 39:14
   39:22
spouses 32:22
stage 18:18
staggered 9:22
stand 6:23 7:1
   22:13 40:18
standard 48:6,7
standing 30:18
start 15:9
stat 26:23
state 5:5 13:15,16
   15:21 34:12 45:10
stated 14:15 26:24
statement 25:16
states 1:1 2:1 7:17
   28:9
statue 31:24
statues 7:22,23,23
   8:3
statute 7:16 8:15
   8:17,20 9:14,16
   9:17,17,21 10:2,3
   11:7 13:4 14:21
   14:22,23 15:10,22
   16:10 17:15 18:10

[statute - understanding]                                    Page 12

18:15 19:16,17,21
20:15,16,17,19
21:8 24:11,14
26:4,9,17,19 28:6
28:15,18,19,22,23
28:25 29:13 31:17
31:24 32:1,3
39:10 46:20 48:12
**statutes** 8:1 9:21
10:8 18:23 19:22
**statutory** 14:18
15:17 16:13 26:23
27:19,20
**stern** 34:6
**stipend** 29:10
**street** 2:2 4:13
**strikingly** 10:1
**struggle** 22:22
**struggles** 38:22
**struggling** 13:13
**student** 13:23
31:12 48:17
**students** 13:25
**stuff** 16:23 20:16
45:17
**subject** 42:24
**submitted** 32:17
**subpoenaed** 41:8
**subsection** 10:14
**sudden** 44:21
**sufficient** 17:14
30:16,23
**sufficiently** 26:11
30:22
**suggest** 10:23
47:22
**suite** 4:6 51:22
**summarize** 7:9
**summary** 3:2 5:19
5:21 7:11 24:3,11
25:6 26:12 31:7
32:5 43:21

**supplemental**
5:23
**support** 7:15
19:14 23:13,21
27:17 30:9
**supported** 17:5
25:25
**supportive** 7:16
**supposed** 14:4
**supreme** 7:21
9:11,12 14:15
18:11 19:12 34:5
**sure** 7:4 22:12
24:1 33:10 44:18

**t**

**t** 51:1,1
**take** 33:17 34:21
36:22,24 38:9
39:25 40:19 47:10
**taken** 13:15 16:7
16:9,11 20:25
**takes** 45:12
**takings** 17:13
**talk** 8:1,6 12:9
35:23 47:23,24,24
49:20
**talking** 5:8 11:8
35:6,7 36:2,12
43:7,8
**tax** 7:23,25 8:4
**tell** 39:7 40:8
41:13 43:19 46:4
**telling** 43:19
**temporally** 31:24
**term** 13:14
**terms** 6:17 13:12
**test** 37:5 38:21
**text** 27:19,20
**thank** 21:16 24:15
49:21,22,23,24
**thing** 15:9 21:1
31:9 40:2 43:14

**things** 36:17,22
37:12,13,15 38:4
44:21
**think** 8:16 10:10
12:7 14:5,9,14
15:1,18 16:2
17:17 18:8,11
19:13,19,21,23
20:1,3,8 21:10
22:11,16 23:20
24:3,12 28:15
29:25 33:5,10
35:1 37:20,21
38:17 39:13,16,19
39:20 40:2 43:23
45:3,5,6 46:14
47:16,25 49:1,2,7
**third** 25:20 26:15
28:21 41:7
**thirty** 42:15,18
**thorough** 28:24
**thoroughly** 29:25
**thought** 16:5
**threatening** 45:17
**three** 25:14
**ties** 10:14
**time** 7:13,13 9:7
9:20 14:16 15:25
16:1,22 18:23,24
30:20 44:12 49:20
**times** 8:12 21:13
23:10 45:24,24
**timing** 21:22
**today** 5:18 22:2
31:24 32:18 33:9
39:2 42:18 47:13
49:19
**today's** 24:2
**todd** 1:8
**tops** 42:16,16
**track** 28:13
**transcribed** 3:25

**transcript** 51:4
**transfer** 34:18,19
34:22
**transferred** 34:18
**treated** 18:7
**treating** 20:23
**treatment** 21:2
**trial** 33:8 38:21
42:22 43:20 47:15
47:19,21 48:4,4
49:3
**tried** 18:25
**tries** 22:10
**triggers** 45:14
**true** 9:10 15:22
37:9 51:4
**truly** 31:20
**trustee** 34:21
**try** 7:9 9:5 39:25
**trying** 19:7 38:22
**turn** 35:19
**turns** 23:19
**two** 5:17 6:11
10:10 32:6 43:6
46:19 49:21
**type** 35:2 40:15
**types** 11:8 34:11

**u**

**u.s.** 2:23 7:19
28:10,11
**ultimately** 14:20
17:17 36:19 40:10
40:13
**underlying** 15:5
34:11
**understand** 12:16
13:23 16:2,21
21:16 24:8,15
35:5,6,18 39:23
39:24 46:18 47:1
**understanding**
16:23

**[undertaken - zenith]**

undertaken  15:22
  21:21
undisputed  22:1
  23:16,17 30:10,16
undue  13:5,8
  29:11 32:3 36:13
  36:19 38:21 39:11
  47:4
unduly  26:6
unfair  31:10,15
  47:3
unfairness  13:6
  17:13
unfortunate
  17:18,23 18:2,5
uniform  12:23
uniformly  15:1
unique  34:12
unit  22:9 29:4,6
  29:16
united  1:1 2:1
  7:17 28:9
unwritten  15:23
  15:24
upset  14:7
use  18:1
usi  28:10
usually  44:2

**v**

v  1:14 3:1 5:3 7:19
  28:9 30:2 34:7
value  34:23
various  11:6
  21:15
veritext  51:20
vermont  30:5
version  11:17
  12:24 15:2 20:15
  21:19,20 22:4
  24:10,14 25:10,10
  25:18,20,21 26:4
  26:9,9,17 27:7,9
  28:5,7,21,25

29:13
versus  19:1
view  30:20 33:13
  33:17
violation  17:12
violative  11:10

**w**

wait  18:17
waiting  6:8
waive  34:2
waived  12:6
waiver  15:8
want  6:16,20
  12:15 19:6 28:24
wanted  12:9
wants  37:18
waved  33:25
way  9:24 12:3,15
  12:16 14:4 16:25
  17:8 22:2 30:25
  36:12 37:5 38:2
  39:17,19 40:8
  47:9
ways  37:4
wd  28:13
we've  17:9 41:11
  42:22 43:7 46:9
weekday  42:19,20
weekend  42:20
went  16:10 19:24
  44:11
white  2:3 4:14
who've  48:18
wife  35:12 36:23
  37:10 38:16 40:2
  41:5
willing  34:2 46:8
win  37:5,6 44:3
wonderful  44:21
word  32:13
words  24:9
work  21:6

works  11:24
worst  47:11
worth  47:4
written  12:3 17:1
wrong  13:12

**x**

x  1:5,11,17

**y**

yeah  11:2 23:3
  32:12 33:10 44:8
  44:18 46:18 48:2
  49:1,16,19
years  12:18 16:10
  17:7,8 39:4
yesterday  6:2,11
york  1:2 36:15,24
  45:10

**z**

zenith  31:4

# EXHIBIT 12

## C.    EVENTS LEADING TO THIS CHAPTER 11 CASE

As stated previously, FMC acted as TERI's exclusive loan processing agent. TERI received the bulk of its guarantee fees at the time of origination and received subsequent payments at the time the loans were securitized. In late 2007, the turmoil in the financial markets began and demand for bonds backed by student loans evaporated. FMC has not been able to arrange a securitization since late 2007. As a result, TERI experienced a significant decline in revenues just as the slowing economy led to an increase in the default rate of student loans. Thus, TERI's revenues declined and its obligations to purchase loans increased.

In response to the reduction in revenues, the Debtor reduced its operating budget for 2008 by 20%. Although the Debtor was able to accomplish this reduction without terminating any employees, immediately prior to the Commencement Date, it made further reductions by terminating 25 employees, representing 22% of its staff.

On March 26, 2008, Moody's Investors Service downgraded TERI's issuer rating, citing concerns about TERI's asset quality, liquidity position and adequacy of capital and reserves. As a result of the downgrade by Moody's, a bank made a demand, pursuant to its guaranty agreement with TERI, that TERI establish a segregated reserve to support TERI's guarantees to that lender. Establishment of such a reserve would have had a negative effect on TERI's cash position and liquidity, possibly to the detriment of other parties in interest. TERI believed that the filing of the Chapter 11 Case enabled it to avoid a liquidity crunch that, without the protections afforded by Chapter 11, may have resulted in TERI's demise. The Chapter 11 Case also has provided TERI with the breathing room it needs to develop a long-term business plan so that it can continue its College Access Programs and pursue other related activities to fund its College Access pursuits.

## III.    THE CHAPTER 11 CASE

### A.    FILING AND FIRST DAY ORDERS

On the Commencement Date, the Debtor filed its petition under chapter 11 of the Bankruptcy Code. The Debtor has continued to operate its business and manage its properties as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

#### 1.    Certain First Day Orders

Early in this case, the Court entered a number of orders requested by the Debtor that were designed to minimize disruption to the Debtor's business operations as a result of the chapter 11 filing. Among other things, these orders authorized the Debtor (a) to maintain its existing bank accounts, cash management systems, and use of existing checks and business forms and (b) to pay prepetition wages, payroll taxes, employee benefits and related expenses.

The Court also entered orders intended to facilitate the administration of this case. Among other things, these orders (a) authorized specific case management procedures; (b) extended the time for the Debtor to file schedules and statements of financial affairs; and (c) established procedures for compensation and reimbursement of professionals.

### 2. Retention of Debtor's Professionals

To assist the Debtor in carrying out its duties as a debtor-in-possession and to otherwise represent the Debtor's interests in the Chapter 11 Cases, the Bankruptcy Court authorized the Debtor to retain and employ the following advisors: (a) Epiq Bankruptcy Solutions, LLC, as claims, noticing, and balloting agent to the Debtor; (b) Grant Thornton LLP, as financial advisor to the Debtor; (c) Goodwin Procter LLP, as counsel to the Debtor; and (d) Craig and Macauley PC, as special conflicts counsel to the Debtor. The Bankruptcy Court also entered an order approving certain procedures for the interim compensation and reimbursement of professionals and Creditors' Committee members in the Chapter 11 Case.

### 3. The Creditors' Committee

On April 30, 2008, the United States Trustee appointed a five-member Creditors' Committee to represent the interests of unsecured creditors of the Debtor pursuant to section 1102 of the Bankruptcy Code. The original members of the Creditors' Committee included the following: (a) Bank of America, One Federal Street, 5th Floor, Boston, MA 02110; (b) U.S. Bank, 800 Boylston Street, Boston, MA 02199-8004; (c) M & T Bank, One M & T Plaza, Buffalo, NY 14203; (d) Nellie Mae, 1250 Hancock Street, Suite 205 N, Quincy, MA 02169-4331; (e) Wachovia Securities, Wachovia Capital Markets, LLC, 301 South College Street, NC0537, Charlotte, NC 28288. KeyBank, 127 Public Square, Cleveland, OH, 44114, was appointed to the Creditors' Committee in May, 2008.

In April 2009, Bank of America withdrew as a member of the Creditors' Committee. In January 2010, Nellie Mae withdrew as a member of the Creditors' Committee.

The Creditors' Committee retained (a) Duane Morris LLP as counsel; (b) Posternak Blankstein & Lund LLP as special conflicts counsel; and (c) FTI Consulting, Inc. as financial advisors.

### 4. Claims Bar Date

The Bankruptcy Court approved October 17, 2008 as the deadline for filing proofs of claim against the Debtor (the "Claims Bar Date"), and approved the form and manner of notice of the Claims Bar Date.

## B. OTHER DEVELOPMENTS

### 1. Rejection of FMC Contracts

Prior to the Commencement Date, the Debtor was party to several contracts with FMC, First Marblehead Education Resources, Inc., and TERI Marketing Services, Inc., which contracts included a Master Servicing Agreement, a Guarantee Agreement, a Database Agreement, and a Marketing Agreement (the "FMC Contracts"). The Debtor, in its business judgment, determined that performance of its obligations under such contracts was either cost prohibitive given the shutdown of the securitization markets or of no utility to the estate. Early in this Chapter 11 Case, the Debtor requested that the Bankruptcy Court approve the rejection of the FMC Contracts under section 365 of the Bankruptcy Code.

LIBC/3667825.11

Because the Debtor's operations had been largely outsourced to FMC and its affiliates, the Debtor needed time to transition its operations away from the FMC and its affiliates to provide those services in house or through third party service providers. To facilitate this process, the Debtor and FMC entered into a Transition Services Agreement pursuant to which FMC and/or FMER would provide certain services for a limited time period to the Debtor following the rejection of the FMC Contracts, including loan origination services, multiple loan disbursement services, services in connection with collection efforts, and support services to improve the Debtor's infrastructure. The services provided by FMC and FMER pursuant to the Transition Services Agreement were to be provided at reduced costs from the costs under the FMC Contracts.

On June 23, 2008, the Bankruptcy Court approved the rejection of the FMC Contracts and the Debtor's entry into the Transition Services Agreement. Notwithstanding anything in the Plan or the Confirmation Order to the contrary, nothing in the Plan or in the Confirmation Order shall affect the terms of the Transaction Services Agreement dated May 30, 2008, as approved by the Bankruptcy Court on June 23, 2008.

### 2.   Stipulations With Certain Creditors

#### a)   *Stipulations Previously Approved*

At various times during the Chapter 11 Case, the Debtor negotiated stipulations with Bank of America, N.A., Chase, UFSB, Union Federal Savings Bank and UFSB Private Loan SPV ("UFSB SPV," and together with Bank of America, Chase, and UFSB, the "Settling Creditors"). Pursuant to each of these stipulations, the Debtor and each Settling Creditor agreed to terminate the contracts underlying the loan programs through which student loans were made by the Settling Creditor and guaranteed by the Debtor. The stipulations settled disputes over, among other things, amounts owed by the Debtor to each Settling Creditor based on assumptions about default rates.   In exchange for a waiver of Claims against the Debtor, including Claims based on the Debtor's prepetition obligations to guarantee defaulted student loans, Administrative Expense Claims based on the Settling Creditors' postpetition funding of certain loans (the "Pipeline Loans"), and claims for interest as a consequence of delays in receipt of funds due to interruptions in the Debtor's cash management systems caused by the chapter 11 filing (the "Interest Claims"), the Debtor agreed to transfer certain amounts to the Settling Creditors outside the context of a Plan. The specific terms of each stipulation are summarized as follows:

**Chase**

- The Debtor transferred to Chase all of the funds in the Chase Pledged Account, totaling approximately $40.2 million as of April 31, 2008.

- Chase waived all Claims and Administrative Expense Claims based on the Debtor's guarantee obligations, and its Interest Claim up to the aggregate amount of $20,000.

- The Debtor waived any existing or future claim to guarantee fees.

- Chase and the Debtor did not waive other claims, defenses, and obligations.

- Rights and obligations that by the terms of the underlying agreement survive termination remain in force.

- Chase and the Debtor agreed to perform certain transitional activities.

### Bank of America

- The Debtor transferred all funds in the Bank of America Pledged Account, totaling $25,556,081 as of November 30, 2008, to Bank of America except for $1,460,000 which was transferred to the Debtor's operating account free and clear of all liens, claims, and encumbrances.

- The Debtor retained all postpetition recoveries on TERI Owned Loans.

- The Debtor transferred to Bank of America all guaranty fees, totaling approximately $1,003,000, received in respect of Bank of America's Pipeline Loans, held in the Debtor's operating account.

- Bank of America waived all Claims, including certain Administrative Expense Claims, and its Interest Claim.

- The Debtor waived any existing or future claim to guaranty fees.

- The Debtor and Bank of America agreed to release each other from all claims, defenses, and obligations other than certain identified exceptions, including with respect to certain confidentiality agreements and certain ongoing deposit accounts and lease obligations.

- The Debtor agreed to provide certain transition services to Bank of America.

### UFSB and UFSB SPV

- The Debtor transferred to UFSB and UFSB SPV (collectively, the "UFSB Entities") the full amount of funds in the UFSB Pledged Account, totaling $31,623,103, except for $1,586,204, which was transferred to the Debtor's operating account free and clear of all liens, claims, and encumbrances.

- The Debtor retained all TERI Owned Loans and all postpetition recoveries on TERI Owned Loans.

- The Debtor waived any existing or future claim to guaranty fees.

- The Debtor and UFSB Entities released each other from all claims, defenses, and obligations other than limited exceptions.

52

- All proofs of claim filed by the UFSB Entities were expunged and the UFSB entities were precluded from filing any further proofs of claim against the Debtor.

Each of the stipulations between the Debtor and the Settling Creditors has been approved by the Bankruptcy Court.

### 3.    The Nellie Mae Adversary Proceeding

On February 4, 2010, Nellie Mae Education Foundation, Inc. ("Nellie Mae") filed an adversary complaint against the Debtor, seeking, inter alia, a declaratory judgment that certain loans in TERI's possession, in the principal amount of approximately $22.3 million, are property of Nellie Mae. Nellie Mae also asserts that the Debtor has been improperly accounting for, and therefore, misappropriating, collections on a portion of those so-called "Non-Cash Loans", which are property of Nellie Mae. Nellie Mae asserts that the total amount of cash held by TERI that in fact belongs to Nellie Mae is at least $1.0 million.

The Debtor has not had any meaningful opportunity to review each of the allegations made by Nellie Mae in its Complaint and will file an answer or other responsive pleading as required pursuant to the Federal Rules of Bankruptcy Procedure or the Bankruptcy Court, as applicable. Upon a preliminary review of the Nellie Mae Complaint, the Debtor believes that any recoveries received by the Debtor in respect of "Non-Cash Loans" prior to the Commencement Date are, at best, a pre-petition claim against the Debtor. The Debtor also believes that the Nellie Mae Complaint will largely turn on whether the defaulted loans in question were "purchased" by TERI.

The Plan provides that all student loans identified by the Debtor (if any) that are the subject of the Nellie Mae Adversary Proceeding, shall be held in escrow by Reorganized TERI after the Effective Date pending determination by the Bankruptcy Court of the Nellie Mae Adversary Proceeding, and shall be distributed in accordance with such Final Orders the Bankruptcy Court may enter in the Nellie Mae Adversary Proceeding.

Assuming that Nellie Mae were successful in its Complaint against TERI, the Debtor does not believe that the transfer of the student loans to Nellie Mae or the payment of $1 million would materially change (1) the anticipated recovery to general unsecured creditors or (2) Reorganized TERI's ability to operate. Specifically (1) none of the Nellie Mae loans were included in the "Receivables recoverable on claim payments" column of the Liquidation Analysis, in recognition of the dispute with Nellie Mae regarding the ownership of the so-called "Non-Cash Loans" and (2) any cash payments to be made to Nellie Mae would be within the $2.3 million of the "accrued expenses" column of the Liquidation Analysis. Moreover, although a complete investigation of the facts underlying Nellie Mae's Complaint has not been completed at this juncture, the Debtor anticipates that it will vigorously dispute many of the allegations contained in such Complaint.

The Plan Proponents anticipate that, following the Effective Date, the defendants to the Nellie Mae Adversary Proceeding will be both Reorganized TERI and the Plan Trustee.

LIBC/3667825.11

### 4. Plan Proponents' Negotiations

Since late July, 2008, the Debtor and Creditors' Committee have been working towards a consensual and successful resolution of this Chapter 11 Case. On July 24, 2008, the Bankruptcy Court approved a stipulation by and among the Debtor and Creditors' Committee that provided certain milestones for the Debtor to satisfy, including providing a claims analysis, liquidation analysis and business plan to the Creditors' Committee by certain dates.

The Debtor met each milestone and such documents became the building blocks of the Plan. In November 2008, the Debtor and the Creditors' Committee entered into a further stipulation that provided that each party had the right to file a plan of reorganization provided that the other party consented, in writing, to such filing. That agreement among the parties remained in place until August 5, 2009, the date on which the exclusive right to file a plan of reorganization expired.

In November 2008, the Debtor and Creditors' Committee began negotiating a term sheet regarding the principle terms of a Plan. That term sheet formed the framework of the Plan.

## IV. SUMMARY OF THE PLAN

**THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. IT IS NOT INTENDED TO REPLACE A CAREFUL REVIEW AND ANALYSIS OF THE PLAN, BUT ONLY TO AID AND SUPPLEMENT SUCH REVIEW. YOU ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ THIS ENTIRE DISCLOSURE STATEMENT BEFORE DECIDING HOW TO VOTE WITH RESPECT TO THE PLAN.**

### A. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

#### 1. Administrative Claims

Except to the extent the holder of an Allowed Administrative Expense Claim agrees otherwise, each holder of an Allowed Administrative Expense Claim will be paid (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or upon other agreed terms between the holder of such claim and the Debtor, or (b) such lesser amount as the holder of an Allowed Administrative Expense Claim and the Debtor might otherwise agree; *provided, however* that expenses of operation accrued and unpaid as of the Effective Date arising in the ordinary course of the Debtor's business and payable in such ordinary course (including any and all Claims and Expenses directly or indirectly arising from or related to the Pension Plan) will be paid solely by Reorganized TERI from Reorganized TERI Assets in the ordinary course after the Effective Date.

**2.    Pre-Effective Date Professional Fees and Expenses**

All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement for fees and/or expenses prior to and including the Effective Date under section 330 or 503(b) of the Bankruptcy Code will file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the date that is thirty (30) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court. Objections to any such final application must be filed on or before a date to be set by the Bankruptcy Court in the Confirmation Order. Any entity granted such an award by the Bankruptcy Court must be paid in full by the Plan Trustee, in such amounts as are Allowed, within ten (10) days after the order granting such award is a Final Order.

**3.    United States Trustee Quarterly Fees and Other Statutory Fees**

All fees payable pursuant to 28 U.S.C. § 1930(a)(6) of the United States Code, as determined by the Bankruptcy Court on the Confirmation Date, will be paid by the Debtor on the Effective Date. Following the Effective Date, the Plan Trustee shall file all post-confirmation reports and pay all fees (solely from and to the extent of available Plan Trust Assets) payable pursuant to 28 U.S.C. §1930(a)(6) until the Chapter 11 Case is closed pursuant to a Final Order.

**4.    Priority Tax Claims**

Except to the extent the holder of an Allowed Priority Tax Claim agrees otherwise, each holder of an Allowed Priority Tax Claim, will be paid from Available Cash in respect of such Allowed Claim either (a) the full amount thereof, without post-petition interest or penalty, in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or (b) such lesser amount as the holder of an Allowed Priority Tax Claim and the Debtor or the Plan Trustee agree. Any Allowed Priority Tax Claim paid after the Effective Date shall accrue interest at the rate calculated in accordance with 28 U.S.C. §1961 until such Allowed Priority Tax Claim is paid in full.

**B.    CLASSIFICATION AND TREATMENT OF CLAIMS**

**1.    Summary of Classification and Treatment of Claims**

The following table designates the Classes of Claims, other than Administrative Expense Claims and Priority Tax Claims, and specifies which of those classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to reject the Plan:

| CLASS | STATUS |
|---|---|
| Class 1 – Priority Non-Tax Claims | Unimpaired/Deemed to Accept |
| Classes 2a – 2p – Secured Claims of Make and Wait Lenders | Impaired/Entitled to Vote |

LIBC/3667825.11

| Classes 3a – 3q – Secured Claims of Securitization Trusts | Impaired/Entitled to Vote |
|---|---|
| Classes 4a-4k – Secured Claims of Key Corp Trusts and KeyBank (other than in its capacity as a Make and Wait Lender) | Impaired/Entitled to Vote |
| Class 5 – General Unsecured Claims | Impaired/Entitled to Vote |
| Class 6 – Convenience Claims | Unimpaired/Deemed to Accept |

### 2.    Classification and Treatment of Claims and Interests

a)    *Class 1 — Priority Non-Tax Claims*

*Classification*: Class 1 consists of Priority Non-Tax Claims against the Debtor.

*Impairment and Voting*: Class 1 is Unimpaired by the Plan. For purposes of the Plan, each holder of an Allowed Claim in Class 1 is conclusively deemed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

*Distributions:* In full and complete satisfaction, settlement and release of and in exchange for the Priority Non-Tax Claims, each holder of an Allowed Priority Non-Tax Claim against the Debtor shall receive, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the Debtor prior to the Effective Date and except to the extent such holder agrees to less favorable treatment, an amount in Cash equal to the Allowed amount of such Priority Non-Tax Claim on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable. Such Claims shall be paid from Available Cash.

b)    *Classes 2a – 2p – Secured Claims of Make and Wait Lenders*

Class 2 consists of the Secured Claims of the Make and Wait Lenders. Each Allowed Secured Claim in Class 2 shall be considered to be a separate subclass within Class 2, and each such subclass shall be deemed to be a separate class for purposes of the Plan and of Bankruptcy Code Sections 1122, 1123, 1126, and 1129. Each subclass in class 2 is Impaired by the Plan and is entitled to vote to accept or reject the Plan. Issues affecting Secured Claims of the Make and Wait Lenders are discussed in Section I.A.3.c. of this Disclosure Statement.

c)    *Classes 3a – 3q – Secured Claims of Securitization Trusts.*

Classes 3a-3q consist of the Secured Claims of the Securitization Trusts. Each Allowed Secured Claim in Classes 3a-3q shall be considered to be a separate subclass within Class 3, and each such subclass shall be deemed to be a separate class for purposes of the Plan and of Bankruptcy Code Sections 1122, 1123, 1126, and 1129. Classes 3a-3q are Impaired by the Plan

and each is entitled to vote to accept or reject the Plan.  Issues affecting Secured Claims of Securitization Trusts are discussed in Section I.A.3.d. of this Disclosure Statement.

> d)   *Classes 4a – 4k Secured Claims of Key Corp Trusts.*

Class 4 consists of the Secured Claims of KeyCorp Trusts and KeyBank (other than in its capacity as a Make and Wait Lender).  Each Allowed Secured Claim in Class 4 will be considered a separate subclass within Class 4, and each subclass will be deemed to be a separate class for purposes of the Plan and of Bankruptcy Code, Sections 1122, 1123, 1126 and 1129.  Each subclass in Class 4 is Impaired by the Plan is entitled to vote to accept or reject the Plan.  Issues affecting Key Corp Trust Claims and the Claim of KeyBank (other than in its capacity as a Make and Wait Lender) are discussed in Section I.A.3.d. of this Disclosure Statement.

> e)   *Class 5 – General Unsecured Claims.*  Class 5 consists of all General Unsecured Claims, including the Make and Hold Claims.  Issues affecting General Unsecured Claims are discussed in Section I.A.3.g. of this Disclosure Statement.  Class 5 is Impaired by the Plan and is entitled to vote to accept or reject the Plan.

The following make up the General Unsecured Claims in this Chapter 11 Case:

> (i)   **Make and Hold Claims.**  The Allowed amount of the Make and Hold Claim of an Accepting Make and Hold Lender will be the amount of the "Make and Hold Lender Settlement Claim" for such Make and Hold Lender as listed on Schedule D to the Plan.  The Allowance or disallowance of the Claim of a Make and Hold Lender that rejects the Plan, shall be determined after the Effective Date by the Bankruptcy Court pursuant to 11 U.S.C. §502.  To the extent the Court determines pursuant to 11 U.S.C. §502 that such Make and Hold Claim should be allowed, then such Allowed Make and Hold Claim shall be treated and classified as an Allowed Claim in Class 5.

> (ii)   **Make and Wait Deficiency Claims.**  Each Make and Wait Lender that accepts the Plan (i) shall be deemed to have authorized the transfer to the Plan Trustee the amount, if any, listed with respect to such Make and Wait Lender in the "Make and Wait Lender Payment Amount (If Any)" column of Schedule A to the Plan and (ii) shall have an Allowed Deficiency Claim in the amount, if any, listed with respect to such "Make and Wait Lender Decoder Deficiency Claim (If Any)" column of the attached Schedule A.  Each Make and Wait Lender that rejects the Plan shall have the Allowed amount of its Secured Claim (if any) and Deficiency Claim (if any) determined by the Bankruptcy Court pursuant to 11 U.S.C. §502.

> (iii)   **Securitization Trust Deficiency Claims.**  Each Securitization Trust that accepts the Plan and, thereby, the Securitization Trust Settlement will have an Allowed Claim (if any) in the amount listed in the "Securitization Trust Settlement Claim" column of Schedule B attached to the Plan.  Each Securitization Trust that rejects the Plan, and thereby, the Securitization Trust

57

Settlement, shall have its Allowed Claim (if any) determined in accordance with Section 4.2 of the Plan.

(iv)    **KeyBank (other than in its capacity as a Make and Wait Lender) and KeyCorp Trust Deficiency Claims**. Each KeyCorp Trust that accepts the Plan and KeyBank (other than in its capacity as a Make and Wait Lender), if it accepts the Plan, and, thereby, the Key Access Program Settlement, will have an Allowed Claim in the amount listed in the "Program Decoder Settlement Claim" column of <u>Schedule C</u> attached to the Plan. Each KeyCorp Trust that rejects and, KeyBank (other than in its capacity as a Make and Wait Lender) if it rejects the Plan, and thereby, the Key Access Program Settlement, shall have its Deficiency Claim (if any) determined in accordance with Section 4.3 of the Plan.

(v)    **Other General Unsecured Claims**. Unless otherwise provided in the Plan, the Allowed amount of Other General Unsecured Claims will be determined by the Bankruptcy Court in accordance with section 502 of the Bankruptcy Code.

f)    *Class 6 – Convenience Class Claims*

*Classification*: Class 6 consists of Convenience Class Claims.

*Impairment and Voting*: Class 6 is Unimpaired by the Plan. Each holder of an Allowed Claim in Class 6 is deemed to have accepted the Plan.

*Distributions*. In full and complete satisfaction, settlement and release of and in exchange for the Convenience Class Claims, each holder of an Allowed Convenience Class Claim will be paid in full from Unrestricted Cash, except to the extent such holder of an Allowed Convenience Class Claim agrees to less favorable treatment, on the later of the Effective Date and the date such Convenience Class Claim becomes an Allowed Convenience Class Claim.

## C.    PROVISIONS REGARDING VOTING AND DISTRIBUTION UNDER THE PLAN

### 1.    Voting of Claims

Each holder of an Allowed Claim as of the Record Date in Classes 2a – 2p, Classes 3a – 3q, Classes 4a-4k or Class 5 will be entitled to vote to accept or reject the Plan. For voting purposes, and consistent with the provisions of the Solicitation Procedures Order, the amount of Claim that a holder of a Claim in Classes 2a – 2p, Classes 3a – 3q and Classes 4a – 4k may vote in respect of its General Unsecured Claim in Class 5 (if any) will be the amount of the Claim (as filed or as otherwise temporarily allowed by the Bankruptcy Court for voting purposes) less the amount held in the Collateral Account. For voting purposes, and consistent with the provisions of the Solicitation Procedures Order, the amount of Make and Hold Claims in Class 5 will be

deemed to be the amount stated on such Creditor's Proof of Claim or as otherwise temporarily allowed by the Bankruptcy Court for voting purposes.

### 2.    Acceptance by Impaired Class

Consistent with section 1126(c) of the Bankruptcy Code, and except as provided for in section 1126(e) of the Bankruptcy Code, a Class of creditors will have accepted the Plan if it is accepted by at least two-thirds in dollar amount and more than one-half in number of the holders of Allowed Claims of such Class or holders of Claims permitted to vote pursuant to the provisions of the Solicitation Procedures Order that have timely and properly voted to accept or reject the Plan. The Solicitation Procedures Order governs the voting by the Securitization Trusts, the Other Trusts and the Key Corp. Trusts and the Plan Proponents urge you to read such order in its entirety for a more complete understanding regarding which entities are entitled to vote and the mechanics by which a Class may be deemed to accept or reject the Plan.

### 3.    Presumed Acceptances of the Plan

Classes 1 and 6 are not Impaired under the Plan and, therefore, are conclusively presumed to have accepted the Plan.

### 4.    Nonconsensual Confirmation

If any Impaired Class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority provided in sections 1126(c) and (d) of the Bankruptcy Code, the Debtor will request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

### 5.    Method of Distributions Under the Plan

a)    *Distributions Generally*

(1)    Reorganized TERI will make all distributions required by the Plan other than those to be made by the Plan Trustee.

(2)    The Plan Trustee will make all other distributions from the Plan Trust to holders of Claims in accordance with the Plan and the terms and conditions set forth in the Plan Trust Agreement.

b)    *Distributions of Cash*

Any payment of Cash made by Reorganized TERI or the Plan Trustee pursuant to the Plan may be made at the option of such party either by check drawn on a domestic bank or by wire transfer from a domestic bank.

LIBC/3667825.11

c)    *Distributions Free and Clear*

Except as otherwise provided in the Plan, any distributions or transfers by or on behalf of the Debtor under the Plan, including, but not limited to, distributions to any holder of an Allowed Claim, will be free and clear of any liens, claims, and encumbrances, and no other entity will have any interest – legal, beneficial, or otherwise – in assets transferred pursuant to the Plan.

d)    *Timing of Performance*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but will be deemed to have been completed as of the required date.

e)    *Delivery of Distributions*

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim will be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtor. The holder must notify Reorganized TERI or the Plan Trustee, as applicable, in writing of a change of address, in the case of holders of transferred Claims only, by the filing of a proof of claim or statement pursuant to Bankruptcy Rule 3001(e) by such holder or transferee that contains an address for such holder different from the address of such holder as set forth in the Schedules. Neither Reorganized TERI nor the Plan Trustee will be liable for any distribution sent to the address of record of a holder in the absence of the written change thereof as provided in the Plan. Notwithstanding the foregoing, with respect to each Securitization Trust, Other Trust and KeyCorp Trust, distributions in respect of an Allowed Claim of such Trust including defaulted loans (if any), shall be made to the Trust, subject to the lien and security interest of the applicable indenture trustee for such Trust, and shall be delivered to the trustee or indenture trustee for such Trust (as appropriate) or to such other person as may be designated by the indenture trustee or trustee in writing delivered to Reorganized TERI or the Plan Trustee, as applicable, provided that loan documents, including the related student loan note in respect of a defaulted loan, shall be delivered by the entity that has possession of such loan documents, to the applicable servicer as custodian and agent for the indenture trustee or trustee, to be held under the applicable custody agreement among such servicer as custodian for the indenture trustee or trustee and the Trust.

f)    *Distributions to Holders as of Record Date*

As of the close of business on the Record Date, the claims register for the Debtor will be closed and there will be no further changes made to the identity of the record holder of any Claim. Neither Reorganized TERI nor the Plan Trustee will have any obligation to recognize any transfer of any Claim occurring after the Record Date. Reorganized TERI and the Plan Trustee will instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the applicable claims register at the close of business on the Record Date.

LIBC/3667825.11

g)    *Undeliverable and Unclaimed Distributions*

If any Claim holder's distribution is returned as undeliverable, no further distributions to such holder will be made unless and until the holder notifies Reorganized TERI or the Plan Trustee, as appropriate, in writing of such holder's then-current address, at which time all missed distributions will, subject to the last sentence of this paragraph, be made as soon as is practicable to such holder, without interest. Checks issued by Reorganized TERI or the Plan Trustee in respect of Allowed Claims will be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. Requests for re-issuance of any check will be made in accordance with the notice provisions of the Plan to Reorganized TERI or the Plan Trustee, as appropriate, by the holder of the Allowed Claim to whom such check originally was issued. All claims for undeliverable distributions or voided checks will be made on or before one hundred and twenty (120) days after the date such undeliverable distribution was initially made. After such dates, all such distributions will be deemed unclaimed property under section 347(b) of the Bankruptcy Code and will become unencumbered Cash of Reorganized TERI, or the Plan Trust, as appropriate pursuant to the Plan. The holder of any Claim for which any undeliverable distribution has been deemed unclaimed property under section 347(b) of the Bankruptcy Code will not be entitled to any other or further distribution under the Plan on account of such Claim.

h)    *Setoffs*

Except with respect to an Allowed Claim that is Allowed as part of a compromise and settlement approved pursuant to a Final Order (including settlements set forth in Section 6.2 of the Plan), to the extent permitted under the Bankruptcy Code or other applicable law, Reorganized TERI, or the Plan Trustee, as applicable, may set off against or recoup from any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the claims, rights and Causes of Action of any nature that the Debtor has against the holder of such Allowed Claim.

i)    *Application of Distributions*

Distributions to any holder of an Allowed Claim will be applied first to the satisfaction of the principal portion (as determined for federal income tax purposes) of any such Allowed Claim and thereafter to the remaining portion of such Allowed Claim, if any unless the application is governed by an indenture or other governing document in which case the terms of such document shall govern. No provision of the Plan or Confirmation Order shall modify any charging lien or other right of the indenture trustee, trustee or other entity in another representative capacity to reimburse itself for fees, expenses and disbursements against any distribution.

j)    *Withholding and Reporting Requirements*

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Debtor or the Plan Trustee, as applicable, will comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan will be subject to any such withholding or reporting

LIBC/3667825.11

requirements. ***The Debtor and the Plan Trustee will have the right to withhold distributions to any holder of a Claim, and any such Claim shall not become an Allowed Claim, notwithstanding any other provision of the Plan, unless and until such holder of a Claim executes and delivers to the Plan Trustee an Internal Revenue Service Form W-9.*** Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit on account of such distribution, including income, withholding, and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to refrain from making a distribution until the holder of the Allowed Claim has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

### D.    MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN

####   1.    Reorganized TERI

#####       a)    *Reorganized Articles of Incorporation and Reorganized By-Laws*

Reorganized TERI will adopt Reorganized Articles of Incorporation and Reorganized By-laws prior to, but effective as of, the Effective Date, which will be included in the Plan Supplement. Prior to the closing of TERI's Chapter 11 case, any amendments to Reorganized TERI's Articles of Incorporation and Reorganized By-laws will be filed with the Bankruptcy Court.

#####       b)    *Boards of Directors and Officers*

The identities of the members of the  initial Board of Directors and the initial officers of Reorganized TERI will be disclosed in the Plan Supplement and will be in effect as of the Effective Date.

#####       c)    *Reorganized TERI (Not-For-Profit)*

Reorganized TERI will, as of the Effective Date, remain a not-for-profit corporation.

#####       d)    *Retention of Reorganized TERI Assets*

On and after the Effective Date, Reorganized TERI will retain its rights, title, and interests in the Reorganized TERI Assets.

####   2.    Compromise and Settlement

The Plan is the product of months of negotiations between many interested parties, including the Debtor, the Creditors' Committee, FMDS, as Administrator to the Securitization Trusts and U.S. Bank, N.A., in its capacity as Indenture Trustee to the Securitization Trusts and KeyBank. The following is an outline of the terms of the proposed compromise and settlements for the Make and Wait Lenders, Make and Hold Lenders, KeyBank (other than in its capacity as a Make and Wait Lender), Key Corp Trusts and Securitization Trusts.

a)    *Make and Wait Lender Settlement*

(1)    Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, the acceptance of the Plan by an Accepting Make and Wait Lender will constitute a good faith compromise and settlement of all Claims and controversies between the Debtor and such Accepting Make and Wait Lender, including the amounts, allowance, relative priority and treatment of the Secured Claim and the Deficiency Claim (if any) of such Accepting Make and Wait Lender.

(2)    **Claims of An Accepting Make and Wait Lender**.  Each Make and Wait Lender in Classes 2a – 2p that accepts the Plan or is deemed to accept the Plan, and, thereby, the Make and Wait Lender Settlement  (1) will have an Allowed Secured Claim in the applicable subclass of Class 2 in the amount set forth in the column labeled "Payment to Accepting Make and Wait Lender from Collateral Account" on Schedule A attached to the Plan, and will have an Allowed Unsecured Claim that will be treated as a Class 5 Claim in the amount, if any, set forth in the "Make and Wait Lender Decoder Deficiency Claim (If Any)" column of Schedule A attached to the Plan.

(3)    **Release of Make and Wait Lender Equity and Make and Wait Lien Dispute Amount to Plan Trustee by Accepting Make and Wait Lender**.  Each Make and Wait Lender in Classes 2a – 2p that accepts the Plan or is deemed to accept the Plan, and, thereby, the Make and Wait Lender Settlement, will release its interest in the amount, if any and as applicable, in the column labeled "Make and Wait Lender Payment Amount (If Any)" on Schedule A attached to the Plan and shall be deemed to have authorized and instructed the Debtor to transfer such amount to the Plan Trustee on the Effective Date free and clear of any and all claims, interests, liens and encumbrances.

(4)    **Disbursement of Remainder of Collateral Account to Accepting Make and Wait Lender.**   On the Effective Date, the Debtor shall be deemed to release from the applicable Collateral Account, and such amount shall be remitted, to each Accepting Make and Wait Lender, in full satisfaction of such Accepting Make and Wait Lender's Allowed Secured Class 2 Claim, the applicable amount for such Accepting Make and Wait Lender in the column

63

labeled "Payment to Accepting Make and Wait Lender from Collateral Account" on Schedule A attached to the Plan, plus all interest and other earnings (if any) paid and deposited into such Pledged Account as of the Effective Date.

(5)   **Retention by Accepting Make and Wait Lender of Loans Not Purchased by the Debtor**. Each Accepting Make and Wait Lender will retain all loans that were not purchased by the Debtor as of the Effective Date.

(6)   **Bankruptcy Court Approval of Make and Wait Lender Settlement**. For each Accepting Make and Wait Lender, entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the Make and Wait Lender Settlement and the Bankruptcy Court's finding that such settlement is fair, equitable and reasonable and in the best interests of the Debtor, the Plan Proponents, Reorganized TERI and all Creditors.

(7)   **Release of Claims against the Debtor and the Estate**. On the Effective Date, the Claims against the Debtor and the Estate of each Accepting Make and Wait Lender receiving the treatment provided by the Make and Wait Lender Settlement, subject to and upon implementation of the Make and Wait Lender Settlement, will be deemed satisfied and no further recovery shall be permitted in respect of such Claims.

(8)   **Rejection of Executory Contracts**. On the Effective Date, all Guaranty Agreements executed in favor of the Make and Wait Lenders and the related Deposit and Security Agreements and other related documents entered into by the Debtor prior to the Commencement Date will be deemed rejected, and with respect to Claims asserted by Accepting Make and Wait Lenders, all Debtor's claims or rights to set off any Guaranty Fees, basis point fees and other interests in loans held by such Make and Wait Lenders will be deemed waived.

b)   *Make and Hold Settlement*

(1)   Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, the acceptance of the Plan by an Accepting Make and Hold Lender will constitute a good faith compromise and settlement of all Claims and controversies between the Debtor and such Accepting

64

Make and Hold Lender, including the amounts, allowance, relative priority and treatment of the Make and Hold Claims of such Accepting Make and Hold Lender

(2)    **Claims of An Accepting Make and Hold Lender**.  An Accepting Make and Hold Lender shall have an Allowed Claim calculated as the larger of the Claim calculated by the Decoder and the Claim calculated by the Debtor's Base Case, as set forth in the column labeled "Make and Hold Lender Settlement Claim" on Schedule D attached to the Plan. All such claims will be treated as Allowed Class 5 Claims.

(3)    **Distributions to Accepting Make and Hold Lenders and Effectiveness of Make and Hold Settlement**.  All distributions to Accepting Make and Hold Lenders pursuant to the Plan will be made on account of and in consideration of the Make and Hold Lender Settlement, which, upon the Effective Date, will be binding on all Accepting Make and Hold Lenders, the Plan Proponents, and Reorganized TERI.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the Make and Hold Lender Settlement and the Bankruptcy Court's finding that such Make and Hold Lender Settlement is fair, reasonable, equitable and in the best interests of the Accepting Make and Hold Lenders, the Plan Proponents and Reorganized TERI.

(4)    **Rejection of Make and Hold Guaranty Agreements**.  On the Effective Date, all Guaranty Agreements executed in favor of the Make and Hold Lenders and other related documents entered into by the Debtor prior to the Commencement Date will be deemed rejected, and with respect to Claims asserted by Accepting Make and Hold Lenders, all Debtor's claims or rights to set off any Guaranty Fees, basis point fees and other interests in loans held by such Make and Hold Lenders will be deemed waived.

c)    *Securitization Trust Settlement*

(1)    Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 the acceptance of the Plan by a Securitization Trust Settlement will constitute a good faith compromise and settlement of all Claims, Causes of Action and controversies between the Debtor and each Securitization Trust receiving the treatment provided by the

65

Securitization Trust Settlement, including, without limitation, the amounts, allowance, relative priority and treatment of the Secured Claim and Deficiency Claim of each Securitization Trust and any other claim, whether a general unsecured claim, priority claim or administrative expenses claim that each such Securitization Trust, the Indenture Trustee under the Indenture for such Securitization Trust, or the administrator for such Securitization Trust (in such capacity) has asserted or might assert against the Debtor or its estate. Notwithstanding the foregoing, nothing in the Plan shall bar any entity from seeking Allowance of an Administrative Expense Claim arising under 11 U.S.C. §503(b)(3)(D) and (4) ("Substantial Contribution Claim"), and as to any such Substantial Contribution Claim, the parties reserve all their respective rights, claims and defenses.

(2)     **Claims of An Accepting Securitization Trust**. Each Securitization Trust in Classes 3a – 3q that accepts the Plan or is deemed to accept the Plan, and, thereby, the Securitization Trust Settlement  (A) will have an Allowed Secured Claim in the applicable subclass of Class 3 in the amount set forth in the column labeled "Payment to Accepting Securitization Trust from Collateral Account" on Schedule B attached to the Plan, and (B) will have an Allowed Unsecured Claim that will be treated as a Class 5 Claim in the amount, if any, set forth in the "Securitization Trust Settlement Claim (If Any)" column of Schedule B attached to the Plan.

(3)     **Release of Securitization Trust Equity by Accepting Securitization Trust**. Each Securitization Trust in Classes 3a – 3q that accepts the Plan or is deemed to accept the Plan, and, thereby, the Securitization Trust Settlement, will release its interest in the amount, if any and as applicable, in the column labeled "Securitization Trust Payment Amount" on Schedule B attached to the Plan and shall be deemed to have authorized and instructed the Debtor to transfer such amount to the Plan Trustee on the Effective Date free and clear of any and all claims, interests, liens and encumbrances.

(4)     **Disbursement of Remainder of Pledged Account to Accepting Securitization Trust**. On the Effective Date, the Debtor shall be deemed to release from the applicable Pledged Account, and such amount shall be remitted, to each Securitization Trust in Classes 3a – 3q that accepts the

66

Plan or is deemed to accept the Plan, and, thereby, the Securitization Trust Settlement, in full satisfaction of the Allowed Secured Claim of such Accepting Securitization Trust, the applicable amount for such Accepting Securitization Trust in the column labeled "Payment to Accepting Securitization Trust from Pledged Account" on Schedule B attached to the Plan, plus all interest paid and deposited into such Pledged Account as of the Effective Date.

(5) **Disbursement of Remainder of Securitization Trust Collateral to Accepting Securitization Trust**. On the Effective Date, the Debtor shall cause to be transferred to each Accepting Securitization Trust such Securitization Trust's Securitization Trust Collateral remaining after payment by such Securitization Trust of the Securitization Trust Payment Amount.

(6) **Securitization Trusts Release With Respect to Postpetition Defaulted Loans**. In full and final settlement of the Trust Adversary Proceeding with respect to each Securitization Trust that accepts the Plan or is deemed to accept the Plan, and, thereby, the Securitization Trust Settlement, (A) each such Securitization Trust will have no claim to any loans purchased by or on behalf of the Debtor (or its agent) or otherwise transferred to or for the benefit of the Debtor on or after the Commencement Date or to any recoveries on such loans, including recoveries received prior to the date hereof, (B) all such defaulted postpetition loans and postpetition recoveries shall be transferred free and clear of all liens, claims, interests and encumbrances to the Plan Trust, and (C) neither the applicable Securitization Trusts nor their indenture trustees shall have any security interest in, or Claim to, such defaulted loans or recoveries obtained in respect thereof (but otherwise reserving rights under the Plan as the holder of a Claim in Class 5). Any defaulted loan on account of which (i) the Debtor made payment, (ii) payment was made from funds in a Pledged Account, or (iii) a Securitization Trust received payment, shall be considered a defaulted loan purchased by the Debtor.

(7) **Retention by Accepting Securitization Trust of Loans Not Purchased by the Debtor**. Each Securitization Trust will retain all loans that were not purchased by the Debtor as of the Effective Date. Each Securitization Trust will also retain (a) all defaulted loans that were purchased by or

67

on behalf of the Debtor or its agent (acting in such capacity) from the applicable Securitization Trust prior to the Commencement Date, (b) all recoveries collected (and the right to collect such recoveries earned but not paid) and all future recoveries with respect to prepetition defaulted loans and (c) the proceeds from the sale by the Debtor of such prepetition defaulted loans to a Securitization Trust at any time following rehabilitation.

(8)  **Bankruptcy Court Approval of Securitization Trust Settlement**.  For each Securitization Trust that accepts the Plan, and thereby the Securitization Trust Settlement, entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the Securitization Trust Settlement and the Bankruptcy Court's finding that such settlement is fair, equitable and reasonable and in the best interests of the Debtor, the Plan, Reorganized TERI and each Securitization Trust (including the Indenture Trustee and other secured parties under the related Indenture pursuant to which such Trust issued its notes), receiving the treatment provided by the Securitization Trust Settlement.

(9)  **Dismissal of Trust Adversary Proceeding**.  On the Effective Date, the Trust Adversary Proceeding will be deemed dismissed with prejudice, and judgment of dismissal may enter pursuant to Fed.R.Civ.P. 54, made applicable to the Trust Adversary Proceeding pursuant to Fed.R.Bankr.P. 7054, as to (a) each Securitization Trust that accepts or is deemed to accept the Plan, thereby receiving the treatment provided by the Securitization Trust Settlement, (b) the administrator with respect to each such Securitization Trust accepting the Plan and the Securitization Trust Settlement, (c) the owner trustee of each such Securitization Trust accepting the Plan and the Securitization Trust Settlement, (d) U.S. Bank, National Association, in any capacity in which it was named as a defendant in the Trust Adversary Proceeding with respect to each such Securitization Trust accepting the Plan and the Securitization Trust Settlement, and (e) the indenture trustee under any indenture pursuant to which such Securitization Trust issued notes and accepted the Plan and Securitization Trust Settlement with respect to each such Securitization Trust accepting the Plan and the Securitization Trust Settlement, each of the foregoing administrators, owner trustees and indenture trustees, in their respective capacities, and not individually.

68

(10)   **Release of Claims against the Debtor and The Estate**. On the Effective Date, the Claims against the Debtor and the Estate of the Securitization Trusts, the Indenture Trustees under the Indenture for such Securitization Trusts and the administrators for such Securitization Trust (in such capacity) receiving the treatment provided by the Securitization Trust Settlement, subject to and upon implementation of the Securitization Trusts Settlement, will be deemed satisfied and no further recovery shall be permitted in respect of such Claims.

(11)   **Rejection of Executory Contracts**.  On the Effective Date, all Guaranty Agreements executed in favor of the Securitization Trusts and the related Deposit and Security Agreements and other related documents entered into by the Debtor prior to the Commencement Date will be deemed rejected, and with respect to Claims asserted by Securitization Trusts accepting the Plan or that are deemed to accept the Plan, thereby receiving the treatment provided by the Securitization Trust Settlement, all Debtor's claims or rights to set off any Guaranty fees, basis point fees and other interests in loans held by such Securitization Trusts will be deemed waived.

(12)   **Estate's Retention of Rights With Respect to Residuals**. Nothing herein shall be deemed a waiver or release of the rights, if any, that the Debtor or any other party may have to receive a portion (if any) of the Residual with respect to any and all of the Securitization Trusts.

d)   *KeyBank National Association and KeyCorp Trusts Settlement*

(1)   Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, the acceptance of the Plan by KeyBank National Association (excluding in its capacity as a Make and Wait Lender) and acceptance of the Plan by each KeyCorp Trust will constitute a good faith compromise and settlement of all Claims and controversies between the Debtor and KeyBank National Association and each Accepting KeyCorp Trust, including the amounts, allowance, relative priority and treatment of the Claims of KeyBank National Association and each Accepting KeyCorp Trust.

(2)   Unless KeyBank National Association (excluding KeyBank National Association in its capacity as a Make and Wait Lender) or a KeyCorp Trust rejects the Plan, KeyBank

69

National Association and each KeyCorp Trust, as applicable, shall receive the following treatment on the Effective Date of the Plan or as soon thereafter as is practicable: (a) it shall be paid its allocable share in the Victory Fund as of the Commencement Date (as appears in column on Schedule C of the Plan labeled "Allocation of Victory Fund"), (b) it shall have an Allowed Key Access Program Deficiency Claim as set forth in the column labeled "Key Access Program Decoder Settlement Claim" on Schedule C of the Plan; and (c) it shall cause to be paid to the Plan Trustee free and clear of all interests, liens, claims and encumbrances, its allocable share of all recoveries or other funds transferred by the Debtor to the Victory Fund on or after the Commencement Date, together with any interest or other earnings thereon not previously transferred to the Debtor.

(3)    Notwithstanding the preceding paragraph, if KeyBank National Association (excluding KeyBank National Association in its capacity as a Make and Wait Lender) or a KeyCorp Trust rejects the Plan and is thereby deemed to opt out of the Key Access Program Settlement, the following treatment shall be applied: (a) each KeyCorp Trust that rejects the Plan, and KeyBank National Association if it rejects the Plan, shall have the Allowed amount of its Claim determined by the Bankruptcy Court by Final Order, following appropriate notice and an opportunity to be heard, in accordance with the Key Access Program Election; (b) the funds in the Victory Fund as of the Commencement Date shall be paid to KeyBank National Association and held in escrow until the Bankruptcy Court has determined by Final Order, following appropriate notice and an opportunity to be heard, the proper method for distributing such funds; and (c) the parties reserve all rights with respect to recoveries and other funds transferred by the Debtor to the Victory Fund on or after the Commencement Date, together with any interest or other earnings thereon, including, without limitation, the rights of the parties with respect to the extent, priority, validity or existence of any alleged security interest in such recoveries and funds.

(4)    Any distributions to KeyBank National Association (excluding KeyBank National Association in its capacity as a Make and Wait Lender), if it accepts the Plan, or to an Accepting KeyCorp Trust pursuant to the Plan will be made on account and in consideration of the Key Access

70

Program Settlement, which, upon the Effective Date, will be binding on KeyBank National Association, the Accepting KeyCorp Trusts, the Debtor, and Reorganized TERI. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the Key Access Program Settlement and the Bankruptcy Court's finding that such Key Access Program Settlement is in the best interests of KeyBank National Association, the Accepting KeyCorp Trusts, the Debtor, and Reorganized TERI, and is fair, equitable and reasonable.

3.      **Plan Trust**

a)      *General*

On or before the Effective Date, the Plan Trust Agreement, in a form reasonably acceptable to the Plan Proponents, shall be executed, and all other necessary steps shall be taken to establish the Plan Trust and the beneficial interests therein, which shall be for the benefit of the holders of Allowed General Unsecured Claims, whether Allowed on or after the Effective Date. In the event of any conflict between the terms of the Plan and the terms of the Plan Trust Agreement, the terms of the Plan Trust Agreement shall govern. The Plan Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated in the Plan, but only to the extent that such powers, duties, and authorities do not affect the status of the Plan Trust as a liquidating trust for United States federal income tax purposes, or otherwise have material adverse effect on the recovery of holders of Allowed General Unsecured Claims. This Section 6.3 is qualified in its entirety by the terms of the Plan Trust Agreement. If there is any inconsistency between the terms of the Plan and the terms of the Plan Trust Agreement, the terms of the Plan Trust agreement shall control.

b)      *Purpose of Plan Trust*

The Plan Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to achieve, and consistent with, the liquidating purpose of the Plan Trust.

c)      *Costs and Expenses of Plan Trust*

The costs and expenses of the Plan Trust, including the fees and expenses of the Plan Trustee and its retained professionals, shall be paid out of the Plan Trust Assets, and Reorganized TERI shall not be responsible for any fees, expenses, or costs of the Plan Trust. The Litigation Claims Costs incurred by the Plan Trustee and the fees and expenses incurred in connection with the prosecution and settlement of any Claims are costs and expenses of the Plan Trust.

d)      *Plan Trust Assets*

71

As of and as soon as practicable after the Effective Date, Debtor shall assign and transfer to the Plan Trust all of its rights, title and interests in and to the Plan Trust Assets for the benefit of the holders of Allowed General Unsecured Claims, whether such Claims are Allowed on or after the Effective Date. Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax, and subject to clause (c) of Section 6.2(d)(iii) of the Plan or as otherwise specifically set forth therein shall be free and clear of any liens, claims and encumbrances, and no other entity (other than Creditors receiving rights under the Plan), including the Debtor or Reorganized TERI, will have any interest, legal, beneficial, or otherwise, in the Plan Trust or the Plan Trust Assets upon their assignment and transfer to the Plan Trust (other than as provided in the Plan or in the Plan Trust Agreement). Upon delivery of the Plan Trust Assets to the Plan Trust, Reorganized TERI will be released of all liability with respect to the delivery of distributions to holders of Allowed General Unsecured Claims, and, except as provided in the Collection Contract, shall have no further monetary obligations to the Plan Trust or the Plan Trustee.

The Plan Proponents expect that the Plan Trust Assets will consist of (1) approximately $46 million in Cash (including $4.0 million in Cash obtained as a result of various settlements with Make and Wait Lenders set forth in the Plan), (2) $36.1 million in book value of projected recoveries of defaulted loans, and (3) $85.9 million in book value of projected recoveries of defaulted loans transferred to the Plan Trustee in the event the Securitization Trust Settlement is accepted by each Securitization Trust. The Plan Proponents currently estimate that the value of assets transferred to the Plan Trustee (assuming the parties accept the various settlements set forth in the Plan) is approximately $168 million. However, there can be no assurance that such value will actually be achieved. (See Section VII. Risk Factors -- Risk that Plan Trustee Will Not Achieve the Projected Recoveries in Respect of Defaulted Loans).

    e)    *Governance of Plan Trust*

The Plan Trust will be governed by the Plan Trust Agreement and administered by the Plan Trustee.

    f)    *Appointment of a Plan Trustee*

Prior to the Effective Date, the Creditors' Committee shall select the Plan Trustee. The identity of the Plan Trustee will be disclosed by the Creditors' Committee no later than the date of the hearing to consider confirmation of the Plan. The salient terms of the Plan Trustee's employment, including the Plan Trustee's duties and compensation, shall be set forth in the Plan Trust Agreement. The Plan Trustee will not be the Debtor, an affiliate of the Debtor or former agent of the Debtor. The Plan Trustee, in the reasonable discretion of the Creditors' Committee, will have the qualifications and experience necessary to satisfy the responsibilities and obligations of the Plan Trustee as outlined in the Plan and the Plan Trust Agreement

    g)    *The Plan Trustee Advisory Committee*

The Plan Trustee Advisory Committee shall advise the Plan Trustee with respect to the liquidation and distribution of Plan Trust Assets in accordance with the Plan Trust

Agreement. The Plan Trust Agreement shall specify the procedures for replacing any member of the Plan Trustee Advisory Committee.

     h)    _Transferability of Plan Trust Interests_

       The beneficial interests of the Plan Trust shall not be transferable, unless otherwise provided for in the Plan Trust Agreement. To the extent such beneficial interests are deemed securities under applicable non-bankruptcy law, then such securities shall be exempt from the requirements of applicable non-bankruptcy law to the maximum extent permitted by 11 U.S.C. §1145.

     i)    _Investment of Cash_

       The Plan Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code; _provided, however_, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities. The Plan Trustee shall be authorized to manage any transferred Collateral Accounts pending resolution of the disposition of such Collateral Account pursuant to the terms of the Plan or a Final Order.

     j)    _Retention of Professionals by the Plan Trustee_

       The Plan Trustee may retain and reasonably compensate counsel and other professionals, as applicable, to assist in its duties as Plan Trustee on such terms as the Plan Trustee deems appropriate, without Bankruptcy Court approval; _provided however_ that such counsel and other professionals shall be subject to the prior approval of the Plan Trustee Advisory Committee or, if such approval is not obtained, then such counsel and other professionals may be retained only upon Bankruptcy Court approval. All costs of compensation and expenses of professionals retained by the Plan Trustee are costs and expenses of the Plan Trust and shall be paid out of the Plan Trust Assets.

     k)    _Compensation of the Plan Trustee_

       The Plan Trustee will be entitled to reasonable compensation (which shall be negotiated by the Plan Trustee with the Creditors' Committee) in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

     l)    _Cooperation of Reorganized TERI_

       Reorganized TERI will provide information, including Data needed for Claim administration and asset monetization, to the Plan Trustee. Such information will include, but will not be limited to, information regarding the status and amount of General Unsecured Claims to enable the Plan Trustee to perform its duties. Reorganized TERI will cooperate with the reasonable requests of the Plan Trustee and its professionals in the administration of the Plan Trust, including, in providing Data, documentation, witness testimony and other evidence in support of the prosecution of the Litigation Claims. The Plan Trust will reasonably reimburse

LIBC/3667825.11

Reorganized TERI, pursuant to the terms of a reimbursement agreement to be negotiated, for any extraordinary costs incurred to comply with requests for cooperation made by the Plan Trustee.

           m)     *Distribution of Plan Trust Assets*

           The Plan Trust Assets shall be distributed in accordance with the Plan Trust Agreement without the need for further order of the Bankruptcy Court or notice to any entities.

           n)     *Federal Income Tax Treatment of Plan Trust*

           (1)     Plan Trust Assets Treated as Owned by Creditors

           For all federal income tax purposes, all parties (including, without limitation, the Debtor, Reorganized TERI, the Plan Trustee, and the holders of Allowed General Unsecured Claims) shall treat the transfer of the Plan Trust Assets to the Plan Trust including any amounts or other assets subsequently transferred to the Plan Trust (but only at such time as actually transferred) for the benefit of the holders of General Unsecured Claims, whether Allowed on or after the Effective Date, as (A) a transfer of the Plan Trust Assets directly to the holders of Allowed General Unsecured Claims, followed by (B) the transfer by such Persons to the Plan Trust of such Plan Trust Assets in exchange for beneficial interests in the Plan Trust. Accordingly, the holders of Allowed General Unsecured Claims shall be treated for federal income tax purposes as the grantors and owners of their respective shares of the applicable Plan Trust Assets.

           (2)     Tax Reporting

           (a)     Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Plan Trustee of a private letter ruling if the Plan Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Trustee), all parties shall treat the Plan Trust as a "liquidating trust" in accordance with Treasury Regulation section 301.7701-4(d), of which the holders of Allowed General Unsecured Claims, whether Allowed on or after the Effective Date, are the grantors and beneficiaries. In the event an alternative treatment of the Plan Trust is required for federal income tax purposes, the Plan Trustee shall promptly notify in writing (or by comparable means) all holders of beneficial interests in the Plan Trust, and anyone who subsequently becomes a holder, of such alternative treatment. The Plan Trustee shall file returns for the Plan Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with Section 1 of the Plan. The Plan Trustee also shall annually send to each record holder of a beneficial interest in the Plan Trust a separate statement setting forth such holder's share of items of income, gain, loss, deduction, or credit and shall instruct all such holders to report such items on their federal income tax returns or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns. The Plan Trustee shall also file (or cause to be filed) any other statements, returns, or disclosures relating to the Plan Trust that are required by any governmental unit. Subject to

Section 6.3(o)(ii)(C) of the Plan, the Plan Trust's taxable income, gain, loss, deduction or credit shall be allocated by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distribution described in the Plan) if, immediately prior to the deemed distribution, the Plan Trust had distributed all of its other assets (valued at their tax book value) in accordance with the provisions of the Plan and the Plan Trust Agreement, up to the tax book value of the Plan Trust Assets treated as contributed by the holders of Allowed General Unsecured Claims, whether Allowed on or after the Effective Date, adjusted for prior taxable income and loss, and taking into account all prior and concurrent distributions from the Plan Trust. Similarly, taxable loss of the Plan Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets.

(b)    As soon as possible after the Effective Date, the Plan Trustee shall make a good faith valuation of the value of the Plan Trust Assets. Such valuation shall be made available from time to time, to the extent relevant, and used consistently by all parties for all federal income tax purposes.

(c)    Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Plan Trustee of a private letter ruling if the Plan Trustee requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Plan Trustee), the Plan Trustee shall (1) make an election pursuant to Treasury Regulation section 1.468B-9 to treat the Disputed Claims Reserve as a "disputed ownership fund" within the meaning of that section; (2) treat as taxable income or loss of the Disputed Claims Reserve, with respect to any given taxable year, the portion of the taxable income or loss of the Plan Trust that would have been allocated to the holders of Disputed General Unsecured Claims had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved), (3) treat as a distribution from the Disputed Claims Reserve any assets previously allocated to or retained on account of Disputed General Unsecured Claims as and when, and to the extent, such claims are subsequently resolved (following which time such assets shall no longer be held in the Disputed Claims Reserve) and (4) to the extent permitted by applicable law, report consistent with the foregoing for state and local income tax purposes (including making any appropriate elections). The holders of Allowed General Unsecured Claims, whether Allowed on or after the Effective Date, shall report, for tax purposes, consistent with the foregoing.

(d)    The Plan Trustee shall be responsible for payments, out of the Plan Trust Assets, of any taxes imposed on the Plan Trust or the Plan Trust Assets, including the Disputed Claims Reserve.

(e)    The Plan Trustee may request an expedited determination of taxes of the Plan Trust, including the Disputed Claims Reserve, under section 505(b) of the Bankruptcy Code, for all returns filed for, or on behalf of, the Plan Trust for all taxable periods through the dissolution of the Plan Trust (including the Disputed Claims Reserve).

LIBC/3667825.11

o)     *Dissolution of Plan Trust*

The Plan Trustee and the Plan Trust shall be discharged or dissolved, as the case may be as set forth in the Plan Trust Agreement.

p)     *Transition of Servicing and Collections of Defaulted Loans*

For a period of at least 30 days following the Effective Date, the Plan Trustee and First Marblehead Education Resources, Inc. ("FMER") shall attempt in good faith to negotiate the terms of a mutually acceptable transition agreement with respect to the servicing and collection of defaulted loans subject to the Trust Adversary Proceeding or otherwise subject to any Securitization Trust Settlement. For a period of no less than 90 days following the Effective Date, FMER shall continue to perform the services it has been providing during the Chapter 11 Case with respect to servicing and collecting defaulted loans subject to the Trust Adversary Proceeding pursuant to the Order Pursuant to Sections 105, 362 and 363 of the Bankruptcy Code Authorizing and Directing Debtor to Honor Certain of its Guaranty Obligations and Purchase Defaulted Loans Using Cash in Certain Pledged Accounts Established for the Benefit of the Trusts, entered on June 23, 2008, and FMER shall be entitled to payment from the Plan Trustee pursuant to such order; provided, however, FMER shall have no obligation to provide such services after the 90th day following the Effective Date.

### 4.     Closing of the Chapter 11 Case

The Plan Trustee will seek authority from the Bankruptcy Court to close the Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### E.     PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS

### 1.     No Distribution Pending Allowance

Notwithstanding any other provision of the Plan the Plan Trustee will not be compelled or required to distribute any Cash or other property on account of any Disputed Claim or any portion thereof, unless and until such Claim becomes an Allowed Claim, and distribution on account of such Allowed Claim is required pursuant to the terms of the Plan. In the event that a Make and Wait Lender or Make and Hold Lender purchased or sold loans guaranteed by the Debtor on the secondary market and the Debtor's records do not reflect such purchase or sale, the Plan Trustee shall be entitled to withhold distributions to such Creditors pending determination of the rightful owner of such loans.

### 2.     Resolution of Disputed Claims

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Debtor, and following the Effective Date, only the Plan Trustee, will have the right to the exclusion of all others to make, file, and prosecute objections to Claims, and will serve a copy of each objection upon the holder of the Claim to which the objection is made as soon as practicable. Objections to Claims must, subject to the Local Rules for the United States Bankruptcy Court—District of Massachusetts, be filed with the Bankruptcy Court and served upon each affected creditor. From

LIBC/3667825.11

and after the Confirmation Date, all objections will be litigated to a Final Order except to the extent that the Plan Trustee elects to withdraw any such objection or the Plan Trustee and the holder of the Disputed Claim elect to compromise, settle or otherwise resolve any such objection, in which event they may settle, compromise or otherwise resolve any Disputed Claim without approval of the Bankruptcy Court.

### 3. Estimation

In the event that the Plan Proponents seek entry of an order estimating claims, such estimation order shall not prejudice or otherwise affect the ability of the Plan Proponents or Plan Trustee, as the case may be, to object to the allowance of any Claim on any basis and the Bankruptcy Court will retain jurisdiction with respect to all Claims, including any Claim estimated pursuant to an estimation order.

### 4. Allowance of Disputed Claims

If, on or after the Effective Date, any Disputed Claim in a Class that is entitled to receive a distribution under the Plan becomes an Allowed Claim, the Debtor, Reorganized TERI, or the Plan Trustee, as applicable, must, as soon as practicable following the date on which the Disputed Claim becomes an Allowed Claim, distribute to the holder of such Allowed Claim an amount sufficient to pay to such holder of a Disputed Claim the amount that such holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim on the Effective Date.

### 5. Disallowance of Claims Without Further Order of the Bankruptcy Court

As of the Confirmation Date, any Disputed Claim for which a proof of Claim has not been filed, will be deemed disallowed and expunged, without further act or deed.

### 6. No Distribution in Respect of Disallowed Claims

To the extent that a Disputed Claim is expunged or reduced, the holder of such Claim will not receive any distribution on account of the portion of such Claim that is disallowed.

### F. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1. Assumption or Rejection of Executory Contracts and Unexpired Leases

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtor and any Person or Entity prior to the Commencement Date will be deemed rejected by the Debtor as of the Effective Date, except for any executory contract or unexpired lease (a) that has been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (b) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date or (c) that is specifically designated as a contract or lease to be assumed

77

on schedules 8.1(A)(executory contracts) or 8.1(B) (unexpired leases), which schedules will be contained in the Plan Supplement; provided, however, that the Debtor reserves the right, on or prior to the Confirmation Date, to amend such schedules to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) will be deemed to be, respectively, either rejected or assumed as of the Effective Date. The Debtor will provide notice of any such amendments to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on schedules 8.1(A) or (B) will not constitute an admission by the Debtor that such document is an executory contract or an unexpired lease or that the Debtor has any liability thereunder.

Reorganized TERI will pay from Reorganized TERI Assets all Cure Amounts, if any, to the non-Debtor parties to the executory contracts and unexpired leases assumed pursuant to Section 8.1 of the Plan by the earlier to occur of (i) the first Effective Date Anniversary or (ii) ten (10) days after resolution of the Cure Amount by Final Order or agreement of the parties, except as otherwise agreed to by the parties.

If a non-Debtor party to an executory contract or unexpired lease assumed pursuant to Section 8.1 of the Plan timely objects to the assumption or the proposed Cure Amount for that agreement, the Debtor and the objecting party may settle, compromise, or otherwise resolve the proper Cure Amount without further order of the Court or, at the Debtor's sole discretion, may submit the dispute to the Bankruptcy Court for a determination as to the proper Cure Amount.

The Retained Cash of the Debtor shall be reduced by an amount equal to one-half of any Allowed General Unsecured Claims minus $50,000 arising from the rejection by the Debtor of the aggregate of all executory contracts rejected by the Plan (excluding Claims arising from the Debtor's rejection of Guaranty Agreements or other program documents or Claims filed against the Debtor prior to the filing of the Plan regardless of whether the underlying contract to which the claim relates was previously rejected pursuant to an Order of the Bankruptcy Court.

## 2.    Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases

Entry of the Confirmation Order will, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed and assigned pursuant to Section 8.1 of the Plan and (ii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 8.1 of the Plan.

## 3.    Inclusiveness

Unless otherwise specified on Schedules 8.1(A) and 8.1(B), each executory contract and unexpired lease listed or to be listed on Schedules 8.1(A) and 8.1(B) will include modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or

unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedules 8.1(A) and 8.1(B).

### 4.    Return of Guaranty Fees

As soon as practicable following the Effective Date, the Plan Trustee (or the Debtor in cooperation with the Plan Trustee) will return any Guaranty Fees received in respect of Pipeline Loans to holders of Make and Wait and Make and Hold Claims that accept the Secured Creditor Settlement or Make and Hold Settlement.

| AMOUNT OF GUARANTY FEES TO BE RETURNED | |
|---|---|
| **BANK** | **AMOUNT** |
| PNC Bank | $959,136.00 |
| National City | $76,358.00 |
| HSBC | $30,000.00 |
| Comerica Bank | $40,541.04 |
| HSBC Bank | $30,717.63 |
| Sun Trust Bank | $28,363.91 |
| U.S. Bank | $26,619.45 |
| M&T Bank | $21,027.44 |
| Huntington Bank | $18,364.62 |
| Members 1st Federal Credit | $13,131.12 |
| KeyBank | $11,718.70 |
| Sovereign Bank | $3,627.77 |
| Penn Security Bank and Trust | $3,623.58 |
| UICI/CFLD | $3,440.44 |
| TCF Bank | $2,791.36 |
| AES (Keystone) | $1,406.11 |
| GMAC Bank | $1,379.55 |
| InsurBanc | $573.21 |
| M&T Bank (Keystone) | $151.65 |

### 5.    Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan

Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Sections 8.1 or 8.4 of the Plan must be filed with the Claims Agent on or before the Rejection Bar Date. All such Claims not filed within such time will be forever barred from assertion against the Debtor, its Estate or Reorganized TERI and its property.

LIBC/3667825.11

### 6. Insurance Policies

All of the Debtor's insurance policies (which policies are maintained by the Debtor in the ordinary course of business and the premiums for which have been prepaid) will remain in full force and effect with regard to Reorganized TERI, and are not required to be assumed by the Debtor. Nothing contained in the Plan shall constitute or be deemed a waiver of any cause of action that the Debtor may hold against any entity to the extent of available insurance, including, without limitation, the insurer under any of the Debtor's policies of insurance. Under all circumstances, Reorganized TERI, and not the Plan Trustee or the Plan Trust Assets, shall be responsible for and available to pay all premiums and other insurance related expenses and liabilities.

### 7. Compensation and Benefit Programs

From and after the Effective Date, Reorganized TERI shall make any and all payments due (for Cure Costs, contributions, Administrative Expense Claims, Claims or otherwise) solely from Reorganized TERI Assets for any and all savings plans, retirement plans (including without limitation the Pension Plan), health care plans, performance-based incentive plans, retention plans, workers' compensation programs and life, disability, directors and officers liability, other insurance plans and management contracts. Reorganized TERI's obligations under this section shall apply regardless whether the Debtor assumes, rejects or neither assumes nor rejects such plans and contracts as of the Effective Date.

### 8. Retiree Benefits

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, Reorganized TERI will continue to pay all retiree benefits of the Debtor (within the meaning of section 1114 of the Bankruptcy Code) and all amounts due or to become due in any way related to the Pension Plan, if any, at the level established in accordance with section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, for the duration of the period for which the Debtor had obligated itself to provide such benefits, *provided, however,* nothing herein will alter Reorganized TERI's right to amend or modify retiree benefits in accordance with applicable law. Reorganized TERI will remain obligated (to the exclusion of the Plan Trustee or any Creditor) to contribute to the Pension Plan the amount necessary to satisfy ERISA's minimum funding standards, ERISA §302; Internal Revenue Code §412. The Pension Plan may be terminated only if the statutory requirements of either ERISA §4041, 29 U.S.C. §1341, or ERISA §4042, 29 U.S.C. §1342, are met. If the Pension Plan terminates, Reorganized TERI and all members of its controlled group will be jointly and severally liable for unpaid minimum funding contributions, premiums, and unfunded benefit liabilities of the Pension Plan. See 29 U.S.C. §1362(a).

Confirmation of the Plan shall operate as a judicial determination, binding on all Entities, that neither the Plan Trustee nor any Creditor that is not an insider of the Debtor (i) is a member of the controlled group of Reorganized TERI or the Debtor for any purpose, including as set forth in the immediately preceding sentence, and (ii) shall incur any liability whatsoever to any Entity (including, without limitation, to the United States of America, any of its administrative

80

agencies or political subdivisions, the United States Internal Revenue Service or the United States Pension Benefit Guaranty Administration) on account of or related to the Pension Plan.

### G.    CONDITIONS PRECEDENT TO THE ENTRY OF THE CONFIRMATION ORDER

The following are conditions to the entry of the Confirmation Order by the Bankruptcy Court:

(a)    The Bankruptcy Court has found and determined that all of the applicable requirements of 11 U.S.C. §1129 have been satisfied, have been performed or have occurred;

(b)    The Creditors' Committee has not reasonably determined that the Debtor and the Creditors' Committee are unable or will be unable to agree upon the form and substance of any document included in the Plan Supplement;

(c)    The Confirmation Order shall be entered no later than June 15, 2010; and

(d)    The Debtor has disbursed Cash prior to the Confirmation Hearing substantially in accordance with its cash projections provided to the Creditors' Committee and Final Orders of the Bankruptcy Court, and for no other purposes.

### H.    EFFECTIVENESS OF THE PLAN

#### 1.    Conditions Precedent to the Effective Date

The following are conditions precedent to the occurrence of the Effective Date of the Plan which shall occur on or before June 30, 2010 unless the Creditors' Committee consents to an extension beyond June 30, 2010.

(a)    The Bankruptcy Court shall have entered the Confirmation Order, which shall approve the Plan on substantially the same terms and conditions set forth in the Plan, which shall be in form and substance satisfactory to the Plan Proponents;

(b)    No stay of the Confirmation Order shall then be in effect at the time the other conditions set forth in Section 9.1 or 10.1 of the Plan are satisfied or waived;

(c)    The Available Cash transferred to the Plan Trustee on the Effective Date shall not be less than $36,000,000 (inclusive of the aggregate Cash the Debtor deposited into the KeyBank Victory Fund after the Commencement Date) and exclusive of any Ambac Trust payments to the Debtor by the Cash (or other property transferred to released) to the Debtor or Plan Trustee from any Collateral Account;

(d)    The Creditors' Committee shall have filed with the Court a "Notice Establishing the Date for the Effective Date," and

LIBC/3667825.11

(e)     All documents, instruments and agreements, in form and substance satisfactory to the Plan Proponents, provided for under or necessary to implement the Plan, including but not limited to the Plan Trust Agreement, shall have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties thereto.

2.     **Waiver of Conditions**

Each of the conditions precedent in section 10.1 of the Plan may be waived, in whole or in part, by the Plan Proponents.  Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court or any formal action.

3.     **Reduction in Retained Cash**

If Available Cash is not at least equal to $36,000,000 (inclusive of the amounts held in the KeyBank Victory Fund), then, at the election of the Creditors' Committee, in its sole discretion, the Effective Date of the Plan may occur and the Retained Cash will be reduced by an amount equal to the difference between $36,000,000 and the Available Cash.

I.     **EFFECTS OF CONFIRMATION**

1.     **Vesting of Assets.**

(a)     As of the Effective Date, the property of the Estate, including all claims and Causes of Action against third parties that arose prior to or after the Commencement Date, will vest in Reorganized TERI or the Plan Trust as provided in the Plan.

(b)     From and after the Effective Date, Reorganized TERI and the Plan Trust may dispose of its respective assets free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the Plan.

(c)     Pursuant to Section 1141(c) of the Bankruptcy Code, as of the Effective Date, all assets of Reorganized TERI and the Plan Trust (including, without limitation, all funds in all Collateral Account established for the benefit of Entities who have not filed timely a proof of claim) will be free and clear of all Claims, liens, encumbrances, charges, and other interests, except as provided in the Plan or the Confirmation Order.

(d)     Notwithstanding anything in the Plan or the Confirmation Order to the contrary, nothing in the Plan or Confirmation Order shall affect the terms of the Transition Services Agreement dated May 30, 2008, as approved by order of the Bankruptcy Court dated June 23, 2008, or the parties' respective rights thereunder or with respect thereto.

2.     **Binding Effect**

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against the Debtor and its respective successors and assigns, whether or not the Claim of such holder is

82

Impaired under the Plan and whether or not such holder has accepted the Plan. The rights, benefits and obligations of any entity named or referred to in the Plan whose actions may be required to effectuate the term of the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity (including, but not limited to, any trustee appointed for the Debtor under chapters 7 or 11 of the Bankruptcy Code).

### 3.   Discharge

Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided in the Plan, each holder (as well as any trustees and agents on behalf of each holder) of a Claim and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtor and Reorganized TERI, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, rights, and liabilities that arose prior to the Confirmation Date. Upon the Effective Date, all such Persons or Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against the Debtor or Reorganized TERI.

### 4.   Releases

#### a)   *Satisfaction of Claims Against the Debtor*

*Except as otherwise provided for in section 12.4(b) and (c) of the Plan, the treatment to be provided for respective Allowed Claims against the Debtor pursuant to the Plan shall be in full satisfaction, settlement and release of such respective Claims against the Debtor.*

#### b)   *Releases by Debtor Releasors*

*Except as otherwise specifically provided in section 12.4(b) of the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the implementation of the Plan, the Released Parties, on and after the Effective Date, are released by the Debtor Releasors from any and all Claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that the Debtor, or any Person or Entity claiming derivatively through or on behalf of the Debtor would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or other Person or Entity, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date other than for claims based upon gross negligence or willful misconduct; provided, however, that for the avoidance of doubt, the foregoing release does not include a release of any objection or defense that the Debtor Releasors may have with respect to Allowance of any Claim, provided, further, that nothing in this paragraph shall be deemed to be a release by any of the Debtor Releasors of any Person or Entity of any Causes of Action or of any obligations imposed on any of them pursuant to the Plan.*

#### c)   *Injunction*

LIBC/3667825.11

*As of the Confirmation Date, except as provided in the Plan or the Confirmation Order, all Persons or Entities who, directly or indirectly, have held, hold or may hold Claims against the Debtor or, as to Claims which are derivative of the Debtor and released pursuant to Section 12.4(b), the Released Parties, are permanently enjoined from taking any of the following actions on account of any such Claims, debts, interests or liabilities, other than actions brought to enforce any rights or obligations under this Plan: (i) commencing or continuing in any manner any action or other proceeding against the Debtor, the Plan Trustee, the Released Parties or their respective properties; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor, the Plan Trustee, the Released Parties or their respective properties; (iii) creating, perfecting or enforcing any lien or encumbrance against the Debtor, the Plan Trustee, the Released Parties or their respective properties; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor, the Plan Trustee, the Released Parties or their respective properties, (v) commencing or continuing, in any manner or any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. For the avoidance of doubt, nothing in the Plan or the Confirmation Order shall be deemed to (a) be a release by any of the Debtor Releasors, or any Person or Entity other than Released Parties, of any Causes of Action; (b) enjoin the prosecution by the Plan Trustee of the Causes of Action (other than to the limited extent provided for in the Plan against the Released Parties), and (c) subject to section 5.5(h) above, enjoin any Person or Entity from asserting any defense or claims as a defense in any civil action, including, without limitation, in the Trust Adversary Proceeding. Notwithstanding any language to the contrary herein or in any other document, as to any Entity (including the Released Parties), nothing herein shall impair or enjoin the Plan Trustee from seeking to enforce, or to assert rights and recover damages with respect to any breach of the terms of this Plan.*

### d)    *Exculpation*

*The Debtor, the Released Parties, KeyBank National Association, as Administrator and Master Servicer of the KeyCorp Trusts, The Bank of New York Mellon Trust Co., N.A., as Eligible Lender Trustee and as Indenture Trustee for certain KeyCorp Trusts, The Bank of New York (Delaware), as Owner Trustee for certain KeyCorp Trusts, Deutsche Bank Trust Company Americas, as Indenture Trustee and Owner Trustee for certain KeyCorp Trusts, FMDS, solely in its capacity as Administrator to the Securitization Trusts, U.S. Bank, National Association, solely in its capacity as Indenture Trustee, trustee and eligible lender trustee to the Securitization Trusts and Other Trusts, and in any capacity in which it was named as a defendant in the Trust Adversary Proceeding, and as bank or agent with respect to the Collateral Accounts, and MBIA Insurance Corporation, and Ambac Assurance Corporation and their respective members and professionals (acting in such capacity) (the foregoing, excluding the Debtor, the "Plan Exculpation Parties"), shall neither have nor incur any liability to any Person or Entity for any act taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, administration, confirmation or consummation of this Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, or any act taken or omitted to be taken in connection with, in contemplation of, during or in any way related to the Chapter 11 Case (all of the foregoing being collectively referred to as the "Exculpated Acts"), except for transactions, acts or omissions (i) as a result of willful misconduct or gross negligence, (ii) with respect to*

84

*transactions occurring pursuant to the "Order Pursuant to Sections 105, 362 and 363 of the
Bankruptcy Code Authorizing and Directing Debtor to Honor Certain of its Guaranty
Obligations and Purchase Defaulted Loans Using Cash in Certain Pledged Accounts
Established for the benefit of the Trusts" entered by the Bankruptcy Court on June 23, 2008, (iii)
occurring pursuant to the Transition Services Agreement between FMER and the Debtor
approved by the Bankruptcy Court on June 23, 2008, or (iv) pursuant to any contracts between
or among the Debtor and any entity entered into prior to the commencement of this Bankruptcy
Case. This provision does not exculpate the foregoing Persons, including the Debtor, from
performing their duties under the Plan and effectuating the Plan. Nothing in this section 12.4(i)
exculpates the Debtor or Reorganized TERI from performing its obligations under any contract
or agreement not rejected under the Plan pursuant to 11 U.S.C. §365 or (ii) exculpates any
Person from obligations unrelated to the Exculpated Acts it may owe to any other Person under
any contract.*

### 5. Release of Assets

Until the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Debtor,
its assets and properties and the Estate. Thereafter, jurisdiction of the Bankruptcy Court shall be
limited as set forth in Article XI of the Plan.

## J. RETENTION OF JURISDICTION

### 1. Jurisdiction of Bankruptcy Court

The Bankruptcy Court shall retain jurisdiction of all matters arising under, arising out of,
or related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of,
sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following
purposes:

(a) To hear and determine any motions for the assumption, assumption and
assignment or rejection of executory contracts or unexpired leases and the allowance of
any Claims resulting therefrom;

(b) To determine any and all pending adversary proceedings, applications and
contested matters relating to the Chapter 11 Case;

(c) To hear and determine any objection to any Claims;

(d) To hear and determine the Causes of Action;

(e) To enter and implement such orders as may be appropriate in the event the
Confirmation Order is for any reason stayed, revoked, modified or vacated;

(f) To issue such orders in aid of execution of the Plan to the extent
authorized by section 1142 of the Bankruptcy Code;

85

(g)     To consider any modifications of the Plan, to cure any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(h)     To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code;

(i)     To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

(j)     To hear and determine any actions brought against the Plan Trustee or Reorganized TERI;

(k)     To recover all assets of the Debtor, property of the Estate and assets of the Plan Trustee, wherever located;

(l)     To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code filed, or to be filed, with respect to tax returns for any and all taxable periods ending after the Commencement Date through the closing of the Chapter 11 Case);

(m)     To hear and determine any other matters related hereto, including matters related to the implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Case;

(n)     To hear any other matter consistent with the provisions of the Bankruptcy Code; and

(o)     To enter a final decree closing the Chapter 11 Case.

## K.     MISCELLANEOUS PROVISIONS

### 1.     Post-Confirmation Date Fees and Expenses

After the Effective Date, Reorganized TERI will, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses, incurred after the Effective Date, of the professional persons employed by Reorganized TERI in connection with the implementation and consummation of the Plan and any other matters as to which such professionals may be engaged. The fees and expenses of such professionals will be paid within ten (10) Business Days after submission of a detailed invoice therefor. If Reorganized TERI disputes the reasonableness of any such invoice, Reorganized TERI will timely pay the undisputed portion of such invoice, and Reorganized TERI or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of such portion of the disputed invoice.

LIBC/3667825.11

### 2. Dissolution of the Creditors' Committee

On the Effective Date, the Creditors' Committee will be dissolved and the members thereof will be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Case, and the retention or employment of the Creditors' Committee's attorneys, accountants and other agents will terminate; *provided, however*, that immediately prior to the dissolution of the Creditors' Committee, any and all analyses or work product prepared by and/or information obtained by the Creditors' Committee or its attorneys, accountants and other agents related to the Causes of Action must be transferred to the Plan Trust and will be deemed an asset of the Plan Trust for purposes of the Plan; *provided further, however*, the Creditors' Committee will continue to exist after such date solely with respect to all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code seeking payment of fees and expenses incurred by any professional retained by the Creditors' Committee. On and after the Effective Date, the Plan Trustee Advisory Committee will have the same standing to participate in proceedings before the Bankruptcy Court as the Creditors' Committee had prior to the Effective Date.

### 3. Plan Supplement

The documents comprising the Plan Supplement will be filed with the clerk of the Bankruptcy Court at least ten (10) days prior to the deadline to vote to accept or reject the Plan. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court during normal court hours. Holders of Claims may obtain a copy of the Plan Supplement upon written request to the Debtor's bankruptcy counsel or on the website of the Voting Agent (www.epiqsystems.com). All exhibits and schedules contained in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.

### 4. Plan Controls Disclosure Statement; Confirmation Order Controls Plan

To the extent the Plan is inconsistent with the Disclosure Statement, the provisions of the Plan will be controlling. To the extent the Confirmation Order is inconsistent with the Plan, the provisions of the Confirmation Order will be controlling.

### 5. Modification of the Plan.

The Plan Proponents reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan at any time prior to the entry of the Confirmation Order, subject to the consent of the Creditors' Committee. After the entry of the Confirmation Order but prior to the Effective Date, the Plan Proponents may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. A holder of an Allowed Claim that is deemed to have accepted the Plan will be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

Prior to the Effective Date, the Creditors' Committee, in its sole and absolute discretion, shall have the right not to accept any portion of the Plan Trust Assets. Any such Plan Trust Assets that the Creditors' Committee declines to accept as Plan Trust Assets shall instead be deemed to be Reorganized TERI Assets under the Plan.

## V.   CONFIRMATION PROCEDURES

### A.   VOTING PROCEDURES AND SOLICITATION OF VOTES

The voting procedures and the procedures governing the solicitation of votes are described above in Section I, and in the Solicitation Procedures Order, which has been sent to you simultaneously with this Disclosure Statement if you are entitled to vote on the Plan.

### B.   CONFIRMATION HEARING

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. The Confirmation Hearing will commence on _____, 2010 at _____ prevailing Eastern Time, before the Honorable Henry J. Boroff, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Massachusetts, ___ Floor, Courtroom ___, **[ADDRESS]**.

### C.   STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Plan Proponents believe that: (a) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (b) they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (c) the Plan has been proposed in good faith.

Specifically, the Plan Proponents believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Plan proponents will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the Plan Proponents under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the case, has been approved or is subject to approval by the Bankruptcy Court.

- The Plan Proponents have disclosed the identity and affiliations of the individuals proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of Reorganized TERI and the appointment to or continuance in office of such individuals is consistent with the interest of Creditors and with public policy.

88

- The requirement that any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtor has approved any rate change provided for in the Plan does not apply.

- Either each holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtor was liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Claims deemed to reject the Plan.

- Each Class of Claims or Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that Administrative Claims and Priority Non-Tax Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successors thereto under the Plan. The Plan contemplates the liquidation of the Plan Trust Assets by the Plan Trustee.

- The Debtor has paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

- In addition to the filing fees paid to the clerk of the Bankruptcy Court, the Debtor will pay quarterly fees no later than the last day of the calendar month, following the calendar quarter for which the fee is owed during the Debtor's Chapter 11 Case for each quarter (including any fraction thereof), to the Office of the United States Trustee. Subsequent to the Effective Date, the Plan Trustee will pay such fees until the case is closed.

LIBC/3667825.11

### 1.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the bankruptcy court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the debtor's chapter 11 case was converted to a chapter 7 case and the assets of the debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the plan that such holder would receive if the plan were confirmed.

In a chapter 7 case, unsecured creditors of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for: (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

As described in more detail in the Liquidation Analysis, the Plan Proponents believe that the value of any distributions if the Chapter 11 Case were converted to a case under chapter 7 of the Bankruptcy Code would be less than the value of distributions under the Plan because conversion of the Chapter 11 Case would likely result in additional costs. There could also be higher general unsecured claims, including claims of the Pension Benefit Guaranty Corporation (estimated to be at least $1.5 million) and claims by senior management for claims under such officer's employment contracts. The Plan Proponents estimate that General Unsecured Creditors will receive a distribution of approximately 40-60% of their total Allowed Claims pursuant to the terms of the Plan and approximately 15%-17% if the case were converted to Chapter 7. However, such estimation includes a number of assumptions and significant economic uncertainties so there can be no assurance that the estimates provided herein and in the Best Interest Analysis will actually be achieved.

As set forth in the Liquidation Analysis, the Plan Proponents have assumed that the contingent guaranty claims would be the same in Chapter 7 as Chapter 11. However, as set forth in this Disclosure Statement, the value of the guaranty claims using the Creditors' Committee's "Decoder" is the product of months of negotiations. There is no assurance that Chapter 7 Trustee would adopt the "Decoder" or that creditors would continue to agree to a claim based upon such Decoder. Therefore, guaranty claims in a Chapter 7 could be substantially higher.

The Plan Proponents also believe that the value of any distributions to each Class of Allowed Claims in a hypothetical Chapter 7 case would be less than the value of distributions under the Plan because the distributions in a hypothetical Chapter 7 case likely would be delayed for a substantial period of time due to litigation regarding security interests and claim amounts. There is a risk that distribution of the proceeds of a hypothetical Chapter 7 liquidation might not

occur for one or more years after the completion of such liquidation in order to resolve Claims and prepare for distributions. Incorporating the time value of distributions to the liquidation analysis attached as Exhibit 3, would further lower the estimated recoveries as presented.

In addition, the Plan Proponents believe that if the case were converted to a Chapter 7, the estate would lose its tax exempt status and would incur "phantom income tax" as a result of the Debtor's ownership interest in the Residuals. While the amount of such tax is uncertain, the Plan Proponents currently estimate that such phantom income tax could cause the Chapter 7 estate to incur millions of dollars of tax liability, per annum.

Finally, the Plan Proponents believe that a Chapter 7 Trustee who has no specific familiarity with the Debtor's business or Causes of Action, and no agreement with the Debtor's personnel to cooperate, may not be able to maximize the value of the estate's assets. The Plan Proponents believe that the structure of the Plan, including utilizing the expertise of the Debtor, the Creditors' Committee and their respective professionals, and allowing Reorganized TERI to collect the TERI Owned Loans, will provide additional recoveries for creditors that could not be obtained by outside trustees and professionals who are not familiar with this Chapter 11 Case.

## 2.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation of the reorganized debtor or the need for further financial reorganization, unless the plan contemplates such liquidation. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtor has analyzed the ability of Reorganized TERI to meet its obligations under the Plan and to retain sufficient liquidity and capital resources to conduct its business.

Reorganized TERI expects to have approximately 60 employees -- 40 of whom will work almost exclusively in the "College Access" outreach programs. The remaining employees will be Reorganized TERI's senior management, collection management and accounting staff. Reorganized TERI expects to generate revenues by providing loan related services, including portfolio management and collection management services.

The Debtor has prepared Exhibit D to this Disclosure Statement, entitled Reorganized TERI Financial Statement and comprised of financial projections and pro forma balance sheets ("Projections") for the three years ended April 30, 2011, 2012, and 2013. The Projections are based upon a variety of assumptions subject to significant business, economic and competitive uncertainties, contingencies and risks, many of which are beyond the control of the Debtor. Consequently, the Projections should not be regarded as a representation or warranty by the Debtor that the Projections will be realized. Actual results may vary materially from those presented and the variations may be adverse..

The Projections indicate that Reorganized TERI will have sufficient cash to operate its business and collect the TERI Owned Loans pursuant to the Collections Contract. The Projections assume that Reorganized TERI will be able to generate revenue in addition to the revenue generated by the Collections Contract by providing various portfolio management and collection management services. However, in the event that such new business does not

LIBC/3667825.11

materialize within 12 months of the Effective Date, Reorganized TERI intends to further reduce costs by further reducing headcount and implementing additional cost-saving measures. Regardless of whether Reorganized TERI is able to generate new business, the Debtor believes that it will have sufficient cash, resources and time to implement operational changes, reduce overhead and continue to operate its business and perform under the Collections Contract. Pursuant to internal projections prepared by the Debtor (and set forth below), even in a "worst-case" scenario in which Reorganized TERI is unable to generate any revenue other than the Collections Contract and existing collection management contracts, and without use of any the funds from the Restricted Charitable Gifts or Restricted Grant Funds, Reorganized TERI will be able to reduce costs (but maintain its collection staff) and still have nearly $1,400,000 of the $3,400,000 of Retained Cash as of April 30, 2012.

**The Education Resources Institute, Inc.**

Income Statement – TERI "Conservative Case" Scenario

| ($ in whole amounts) | Projected 12 Months Ended 4/30/2011 | Projected 12 Months Ended 4/30/2012 |
|---|---|---|
| **Revenue** | | |
| Collections revenue | 814,870 | 638,488 |
| Risk management revenue | - | - |
| Shared recoveries | 1,000,000 | 1,000,000 |
| Other revenue | - | - |
| **Total Revenue** | **1,814,870** | **1,638,488** |
| Expenses | | |
| Depreciation | (69,351) | (73,351) |
| Employee costs* | (2,231,733) | (883,939) |
| Professional services | (286,000) | (235,750) |
| SG&A | (793,699) | (758,735) |
| TERI other income (expense) | (52,268) | (52,406) |
| **Total Expenses** | **(3,433,021)** | **(2,004,181)** |
| **Operating Income** | **(1,618,150)** | **(365,694)** |
| Interest Income (expense) | 10,007 | 7,501 |
| **Net Increase in Assets** | **$  (1,608,143)** | **$   (358,192)** |

* May increase if Board elects to award severence

In addition, because the overwhelming majority of the Debtor's assets, will be transferred to the Plan Trust, the ability of the Plan Trustee to make the distributions contemplated by the Plan is independent of future earnings of Reorganized TERI. Accordingly, the Debtor believes that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

### 3. Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

The Claims in Classes 1 and 6 are not Impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan. The Claims in Classes 2a-2p, Classes 3a - 3q, Classes 4a-4k and Class 5 are Impaired under the Plan. These voting Classes will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of such Class (other than any Claims of Creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

### 4. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

#### a) *Unfair Discrimination*

The "unfair discrimination" test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that

93

the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class. The Plan Proponents believe that the Plan does not unfairly discriminate against any holders of Claims against the Debtor.

> b)    *Fair and Equitable*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class of claims, the test sets different standards depending on the type of claims in such class.

> (1)    Secured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (I) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the Effective Date of the Plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

> (2)    Unsecured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property. This second requirement is sometimes referred to as the "absolute priority rule".

The Plan Proponents believe that the Plan is fair and equitable to all Classes, and that the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

The Plan Proponents believe that pursuant to existing case law, the absolute priority rule is not applicable in a chapter 11 of a not for profit corporation.

94

Non-profit entities typically have no equity holders.[13] Courts have ruled that, as a result of the lack of equity holders, the absolute priority rule is not applicable to a non-profit Chapter 11 plan. The *Teamsters* Bankruptcy Court stated that "the [a]bsolute [p]riority rule does not provide that a debtor entity may not receive or retain property unless all creditors have been paid in full."[14] Rather, the Bankruptcy Court held that "the [a]bsolute [p]riority rule does not, by its terms, prohibit a debtor entity from retaining its own assets, and cannot, by its terms, apply to a situation such as this where the debtor has no equity security holders."[15] The Ninth Circuit upheld the Bankruptcy Court's ruling while explaining the rationale for its holding. The Ninth Circuit stated that the rationale for the absolute priority rule in the for profit context is that equity owners should be forced to choose between liquidating their interest in the debtor or contributing value to the debtor, because the equity owners only concern is the profitability of the corporation, making their decision one of pure economics.[16] Implied in this statement is the justification for the courts ruling that the absolute priority rule does not apply in nonprofit contexts because there is no equity holder whose sole motivation is profit. Under our facts, there is no equity holder, and the assets to be retained by the debtor are retained to facilitate the debtor's charitable mission. Profit is not the primary motivation.

Courts applying *Teamsters* and *Wabash* look at the question of whether there are equity interests in a non-profit Chapter 11 case, and will not apply the absolute priority rule if no equity interest exists. Thus, the fundamental question for courts is simply whether there is any ownership interest analogous to an equity interest being retained by the debtor in the proposed plan.[17] The absolute priority rule did not prevent plan confirmation in a non-profit hospital's bankruptcy because the debtor did not have a "favored position" over the hospital's largest unsecured creditor.[18]

## VI.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and Reorganized TERI and holders of certain Allowed Claims. The following summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), Treasury Regulations promulgated thereunder (the "Regulations"), and administrative and judicial interpretations thereof available on or before such date. Changes in such roles or new interpretations thereof may have retroactive effect and could significantly

---

[13]    *In re Save Our Springs (S.O.S) Alliance, Inc.*, 388 B.R. 202, 245 (W.D.Tex. 2008).

[14]    *In re General Teamsters, Warehouseman and Helpers Union, Local 890*, 225 B.R. 719, 735-736 (Bankr.N.D.Cal. 1998).

[15]    *Id. at 737.*

[16]    *Teamsters* at 874.

[17]    *In re Corcoran Hosp. Dist.*, 233 B.R.449, 458 (Bankr.E.D.Cal 1999) (holding that the absolute priority rule did not apply to a non-profit hospital district because the "residents" of the district had no ownership interest akin to that of shareholders of a corporation or partners in a partnership.).

[18]    *In re Whittaker Memorial Hosp. Ass'n, Inc.*, 149 B.R. 812, 816 (Bkrtcy.E.D.Va. 1993); *See also, Independence Village*, 52 B.R. 715, 726 (stating that where a non profit had no shareholders, no interest existed that was inferior to the unsecured creditors interest).

LIBC/3667825.11

affect the federal income tax consequences described below. The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtor has not requested and will not request a ruling from the Internal Revenue Service ("IRS") or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt.

The following discussion does not address any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, or foreign tax law or United States tax laws other than income taxation. This discussion does not apply to holders of Allowed Claims who are not United States Persons (as described by Section 7701(a)(30) of the Code), nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as Persons who are related to the Debtor within the meaning of the Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, holders liable for the alternative minimum tax, holders whose functional currency is not the US dollar, regulated investment companies, tax-exempt organizations, pass-through entities such as partnerships and holders through such pass-through entities and holders of Claims who are themselves in bankruptcy). Furthermore, this discussion assumes that holders of Claims hold only Claims in a single Class. Holders of Claims should consult their own tax advisors as to the effect such ownership may have on the federal income tax consequences described below.

If a partnership holds a Claim, the tax treatment of a partner of such partnership will generally depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership holding Claims against the Debtor, you should consult your tax advisors.

The following assumes that the Plan will be implemented as described herein and does not address the tax consequences if the Plan is not carried out. This discussion further assumes that the various debt and other arrangements to which the Debtor is a party will be respected for federal income tax purposes in accordance with their form.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE UNITED STATES INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS AND SCHEDULES) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT WRITTEN TO SUPPORT THE PROMOTION, MARKETING OR PROMOTION OF THE

LIBC/3667825.11

**TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT.
EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S
PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

### A. CONSEQUENCES TO THE DEBTOR AND REORGANIZED TERI

The Debtor is a not-for-profit corporation that is exempt from federal income taxation under section 501(c)(3) of the Title 26 of the United States Code (the "Tax Code"). After the Effective Date, Reorganized TERI will remain a not-for-profit. It is intended that nothing in the Plan shall adversely affect, or be interpreted inconsistently with, the tax exempt status of the Debtor or Reorganized TERI. Accordingly, the Debtor does not expect the implementation of the Plan to have any adverse federal income tax consequences to it or Reorganized TERI.

### B. CONSEQUENCES TO HOLDERS OF ALLOWED CLAIMS IN CLASSES 1, 2a – 2p, 3a – 3q, 4a-4k, 5 AND 6

Pursuant to the Plan, holders of Allowed Priority Non-Tax Claims (Class 1), Secured Claims of Make and Wait Lenders (Classes 2a through 2p), Secured Claims of Certain Securitization Trusts (Classes 3a through 3q), Secured Claims of Key Corp Trusts and KeyBank (other than in its capacity as a Make and Wait Lender) (Classes 4a-4k) and Convenience Class Claims (Class 6) will receive Cash in full payment of their Allowed Claims. A holder of a Claim who receives Cash in exchange for such Claim pursuant to the Plan generally will recognize income, gain, or loss for federal income tax purposes in an amount equal to the difference between (a) the amount of Cash received in exchange for its Claim and (b) the holder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim was purchased at a discount and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim.

### C. CONSEQUENCES TO HOLDERS OF ALLOWED CLAIMS IN CLASS 5

Pursuant to the Plan, holders of General Unsecured Claims (Class 5) will receive a Pro Rata share of the beneficial interests in the Plan Trust. In general, each holder of a General Unsecured Claim will recognize gain or loss equal to the difference between (a) "amount realized" which is equal to the fair market value of the undivided interest in the Plan Trust received by such holder and (b) the holder's adjusted tax basis in its Claim.

#### 1. The Plan Trust

The Plan Trust is intended to qualify as a liquidating trust for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor trust" (*i.e.*, a pass-through entity), such that the holders of its beneficial interests are treated as owning an undivided interest in the underlying assets of the trust. However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Plan Trust has been structured

97

with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, Reorganized TERI, the Plan Trustee and the holders of Allowed General Unsecured Claims against the Debtor) are required to treat, for federal income tax purposes, the Plan Trust as a grantor trust of which the holders of Allowed General Unsecured Claims against the Debtor, whether Allowed on or after the Effective Date, are the owners and grantors. However, no ruling has been requested from the IRS, and no opinion of counsel has been requested concerning the tax status of the Plan Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. Were the IRS successfully to challenge the trust classification, the federal income tax consequences to the Plan Trust, the holders of Claims against the Debtor, and Reorganized TERI may vary from those discussed herein.

*Holders of Allowed General Unsecured Claims are urged to consult with their tax advisors regarding potential alternative characterizations.*

a)    *General Tax Reporting by the Plan Trust Trustee and Beneficiaries*

For all federal income tax purposes, all parties (including, without limitation, Reorganized TERI, the Plan Trustee, and the holders of Allowed General Unsecured Claims against the Debtor) must treat the transfer of assets to the Plan Trust, and any amounts or other assets subsequently transferred to the Plan Trust in accordance with the terms of the Plan (but only at such time as actually transferred), as a transfer of an undivided interest in the Plan Trust Assets to the holders of Allowed General Unsecured Claims against the Debtor, whether Allowed on or after the Effective Date, followed by the transfer of the entire interest in the Plan Trust Assets by the beneficiaries of the Plan Trust to the Plan Trust (absent being notified by the Plan Trustee, as discussed below, or the IRS that an alternative treatment is required). Consistent therewith, all parties must treat the Plan Trust as a grantor trust of which the holders of Allowed General Unsecured Claims against the Debtor, whether Allowed on or after the Effective Date, are the owners and grantors. Thus, the holders of Allowed General Unsecured Claims against the Debtor, whether Allowed on or after the Effective Date, will be treated as the direct owners of an undivided interest in the assets of the Plan Trust for all federal income tax purposes (which assets will have a tax basis equal to their fair market value on the date transferred to the Plan Trust).

Pursuant to the Plan, the Plan Trustee shall make a good faith valuation of the value of the Plan Trust Assets and shall provide such valuation to the holders of Allowed General Unsecured Claims against the Debtor, whether Allowed on or after the Effective Date. Under the Plan, such holders (and all other parties, including Reorganized TERI) are required to report the value of such assets in a manner consistent with the valuations provided by the Plan Trustee for federal income tax purposes. There can be no assurance that the IRS will agree with the valuations provided by the Plan Trustee, and a different valuation of the assets transferred to the Plan Trust could subject the holders of Allowed General Unsecured Claims against the Debtor to additional income taxes.

Subject to the treatment of the Disputed Claims Reserve (discussed in the next section), the holders of Allowed General Unsecured Claims against the Debtor, whether Allowed on or after the Effective Date, will be required to report on their federal income tax return their allocable share of any taxable income, gain, loss, deduction or credit recognized or incurred by

the Plan Trust. Allocations of taxable income and gain will be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distribution described in the Plan) if, immediately prior to the deemed distribution, the Plan Trust had distributed all of its other assets (valued at their tax book value) in accordance with the provisions of the Plan and the Plan Trust Agreement, up to the tax book value of the Plan Trust Assets treated as contributed by the holders of Allowed General Unsecured Claims against the Debtor, whether Allowed on or after the Effective Date, adjusted for prior taxable income and loss, and taking into account all prior and concurrent distributions from the Plan Trust. Similarly, taxable loss of the Plan Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets. The character of items of income, gain, loss and credit to any holder, and the ability of such holder to benefit from any deduction or losses, may depend on the particular situation of each holder.

The federal income tax obligations of a holder of an Allowed General Unsecured Claim against the Debtor that will result from holding an interest in the Plan Trust are not dependent upon the Plan Trust distributing any Cash or other proceeds. Therefore, any such holder may incur a federal income tax liability with respect to its allocable share of the income of the Plan Trust regardless of the fact that the Plan Trust has not made any concurrent distribution to the holder. In general, other than in respect of assets treated as held in the Disputed Claims Reserve and distributions resulting from unclaimed distributions, a distribution of Cash or property by the Plan Trust will not be taxable to the holder as such holder would already be regarded for federal income tax purposes as owning the underlying assets (and would already have realized associated income, if any).

Subject to definitive guidance that an alternative treatment of the Plan Trust is required, the Plan Trustee will file with the IRS returns for the Plan Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Plan Trustee will also send to each record holder a separate statement setting forth the information necessary for such holder to determine its share of items of income, gain, loss, deduction, or credit and will instruct each holder to report such items on its federal income tax return or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns.

Pursuant to the Plan, all parties are required to treat the Plan Trust as a "grantor trust" subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Plan Trustee of a private letter ruling if the Plan Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Trustee). In the event an alternative treatment of the Plan Trust is required for federal income tax purposes, the Plan Trustee will promptly notify in writing (or by comparable means) all holders of beneficial interests in the Plan Trust, and anyone who subsequently becomes a holder, of such alternative treatment.

b) _Tax Treatment of Disputed Claims Reserve_

Pursuant to the Plan, the Plan Trustee will hold the assets of the Plan Trust allocable to, or retained on account of, Disputed General Unsecured Claims against the Debtor, as determined from time to time, separately from other assets of the Plan Trust in the Disputed Claims Reserve.

LIBC/3667825.11

Such assets shall be subject to an allocable share of all expenses and obligations of the Plan Trust. Distributions from the Disputed Claims Reserve will be made, in accordance with the Plan, as Disputed General Unsecured Claims against the Debtor are subsequently resolved.

Under section 468B(g) of the Tax Code, amounts earned in an escrow account, settlement fund or similar fund are subject to tax on a current basis, as the amounts are earned. The Plan provides that the Plan Trustee will, to the extent permitted under applicable law, make an election to treat the Disputed Claims Reserve as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9, and report consistently for state and local income tax purposes. In addition, pursuant to the Plan, all parties must report consistently with such treatment.

A disputed ownership fund is subject to a separate entity level tax, in a manner similar to either a corporation or a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1 *et seq.*, depending upon the nature of the assets transferred to the fund. In the present case, it is expected that the Disputed Claims Reserve will be taxable similar to a corporation. So treated, the Disputed Claims Reserve will be subject to a separate entity tax (maximum federal income tax rate, currently 35%).

In determining the taxable income of the Disputed Claims Reserve, (a) any amounts transferred by the Debtor to the reserve will be excluded from the reserve's income; (b) any sale or exchanges of property by the Disputed Claims Reserve (including recoveries on Plan assets, to the extent allocable to the Disputed Claims Reserve) will result in the recognition of gain or loss in an amount equal to the difference between the fair market value of the property on the date of disposition and the adjusted tax basis that the Disputed Claims Reserve has in such property; (c) any interest income or other earnings with respect to the Disputed Claims Reserve's assets will be included in the Disputed Claims Reserve's income; and (d) any administrative costs (including state and local taxes) incurred by the Disputed Claims Reserve will be deductible by the Disputed Claims Reserve.

Pursuant to the Plan, the Plan Trustee will take into account in determining the taxable income or loss of the Disputed Claims Reserve, with respect to any given taxable year, the portion of the taxable income or loss of the Plan Trust that would have been allocated to the holders of Disputed General Unsecured Claims against the Debtor had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved), and as a distribution from the Disputed Claims Reserve any assets previously allocated to or retained on account of Disputed General Unsecured Claims against the Debtor as and when, and to the extent, such Claims are subsequently resolved (following which time such assets shall no longer be held in the Disputed Claims Reserve).

Although not entirely certain, it appears that distributions from the Disputed Claims Reserve to holders of Allowed General Unsecured Claims against the Debtor should be taxed to such holders in the same manner as if such amounts were received directly from the Debtor. Although not expected, if upon the termination of the Disputed Claims Reserve, the reserve has any unused tax loss or credit carryforwards, the Treasury Regulations would allocate the carryforwards among all or part of the holders of the Allowed General Unsecured Claims against the Debtor.

LIBC/3667825.11

D.    INFORMATION REPORTING AND WITHHOLDING

All distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding obligations (including employment tax withholding). Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then-applicable rate (currently 28%). Backup withholding generally applies if the holder: (i) fails to furnish its social security number or other taxpayer identification number ("TIN"); (ii) furnishes an incorrect TIN; (iii) fails properly to report interest or dividends; or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is such holder's correct number and that such holder is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, applicable Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among others, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holders' federal income tax returns.

*The foregoing summary has been provided for informational purposes only. All holders of Claims are urged to consult their tax advisors concerning the federal, state, local, and foreign tax consequences applicable under the Plan.*

## VII.   RISK FACTORS

**HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

### A.    CERTAIN BANKRUPTCY CONSIDERATIONS

Although the Plan Proponents believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate a resolicitation of votes. Finally, there can be no assurance that any or all of the conditions to the Effective Date of the Plan will be met (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.

101

**B.   MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS**

THERE ARE A NUMBER OF MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS, RISKS AND UNCERTAINTIES ASSOCIATED WITH CONSUMMATION OF THE PLAN. INTERESTED PARTIES SHOULD READ CAREFULLY THE DISCUSSION SET FORTH IN SECTION VI OF THE DISCLOSURE STATEMENT, ENTITLED "CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES" FOR A DISCUSSION OF THE MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES AND RISKS FOR THE DEBTOR AND FOR HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN RESULTING FROM THE TRANSACTIONS OCCURRING IN CONNECTION WITH THE PLAN.

**C.   RISK THAT CLAIMS WILL BE HIGHER THAN ESTIMATED**

The projected distributions and recoveries set forth in this Disclosure Statement and the analysis attached as Exhibit C are based on the Plan Proponents' estimates of contingent claims as well as an estimate of other Allowed Claims. The Plan Proponents project that the Claims asserted against them will be resolved in and reduced to an amount that approximates their estimates. There can be no assurance, however, that the Plan Proponents' estimates will prove accurate. If the estimate is low, for example, the Plan Trust Assets may not be sufficient to reach the projected 55% recovery to General Unsecured Creditors.

**D.   RISK THAT THE CLAIMS OF FMC AND ITS SUBSIDIARIES WILL NOT BE SUBSTANTIALLY REDUCED BY THE COURT**

As disclosed previously, prior to the Commencement Date, TERI outsourced its front office and back office services to FMC, including loan processing, human resources and accounting. On October 16, 2008, FMC and its subsidiaries, FMER and FMDS filed separate proofs of claim against the Debtor alleging rejection damages and other claims in excess of $87,000,000. The Debtor believes that the Claims asserted by the FMC entities are substantially inflated and seeks damages that are not compensable under state law. The Debtor believes that the amount of FMC's aggregate claims are no more than $14,000,000 and potentially significantly less than that amount. The Debtor intends to file an objection to FMC's claim. However, there can be no assurance that the Debtor will prevail in its objection. If the FMC claims are not reduced, the recovery to holders of General Unsecured Claims will be diluted.

**E.   RISK THAT THE PLAN TRUSTEE WILL NOT ACHIEVE PROJECTED RECOVERIES IN RESPECT OF DEFAULTED LOANS**

A significant portion of the value ascribed to the Plan Trust is comprised of defaulted student loans that must be collected through various collection methods and agencies. The book value represents the present value of future recoveries of defaulted loans using a 48% net recovery rate (which is consistent with the Debtor's historical experience). The value of these loans is subject to a variety of factors -- including the timing of recoveries, the net recovery rate and the discount rate. However, there can be no assurance that such amount will actually be achieved. Moreover, often it takes years to recover defaulted loans and given the life of these

LIBC/3667825.11

assets, there is the possibility that the Plan Trustee will seek to monetize the defaulted loan portfolios at a future date, thereby, in all likelihood, reducing the value received in respect of the defaulted loan portfolios.

### F.    LITIGATION RISKS

The Plan provides, among other things that the Debtor's interest in Causes of Action will be transferred to the Plan Trust to be prosecuted by the Plan Trustee for the benefit of the holders of General Unsecured Claims.  Although the Plan Proponents anticipate that the Causes of Action will, in time, be resolved in a manner that provides a net benefit to the holders of General Unsecured Claims, there can be no guarantee that the result will be favorable.

Other than the Trust Adversary Proceeding and the Make and Wait Lien Dispute, the Plan Proponents are not aware of any Significant Causes of Action that may exist or might be asserted by the Plan Trustee.

## VIII.  CONCLUSION AND RECOMMENDATION

The Plan Proponents believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Claims.  Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs.  The Plan Proponents urge holders of impaired Claims that are entitled to vote on the Plan to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received no later than [time], Prevailing Eastern Time, on [Date, 2010].

LIBC/3667825.11

Dated: Boston, Massachusetts
February 25, 2010

Respectfully submitted,

THE EDUCATION RESOURCES
INSTITUTE, INC.

By their attorneys,

Daniel M. Glosband
Daniel M. Glosband, P.C. (BBO# 195620)
Gina Lynn Martin, Esq. (BBO# 643801)
Goodwin Procter  LLP
Exchange Place
Boston, Massachusetts  02109
(617) 570-1000


THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS


Jeffrey D. Sternklar
Jeffrey D. Sternklar (BBO# 549561)
Duane Morris LLP
470 Atlantic Avenue
Boston, Massachusetts  02110
(857) 488-4216

# EXHIBIT 13

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA

IN RE:                                          )    Case No.  13-BK-30625-MH
JOHN MARTIN MATA                                )
LIVIER MATA                                     )    Chapter 7
                                                )
_____                )
JOHN M. MATA,                                   )    Adversary No. 6:18-AP-01089-MH
                                                )
                    Plaintiff,                  )
                                                )
        vs.                                     )    AFFIDAVIT OF JOHN M. MATA
NATIONAL COLLEGIATE STUDENT                     )
LOAN TRUST 2006-1; NATIONAL                     )
COLLEGIATE STUDENT LOAN                         )
TRUST 2006-4; NATIONAL                          )
COLLEGIATE STUDENT LOAN                         )
TRAUT 2007-1,                                   )
                    Defendants.                 )
_____                )

1. My name is John M. Mata, and I am a resident of the state of California.

2. I attended Loma Linda University from 2005-2008 while pursuing a

master's degree in counseling.

3. During my years of study at Loma Linda, I lived at home with my parents.

4. Loma Linda has placed an administrative hold on my student account files,

and I have been unable to access my records.

**I declare under penalties of perjury of the laws of the United States that**

**the above is true and correct.**

**Executed this  _16th_  day of April, 2019.**

_Jh Mut_

**John M. Mata**

DAVID A. ROSALES
Commission No.2164161
NOTARY PUBLIC-CALIFORNIA
SAN BERNARDINO COUNTY
My Comm. Expires SEPTEMBER 4, 2020

Dvl A Rosrle, notary Public

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

100 N. Barranca Street, Suite 250
West Covina, CA 91791

A true and correct copy of the foregoing document entitled (*specify*): **SUPPLEMENTAL DECLARATION OF AUSTIN C. SMITH IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR JUDICIAL NOTICE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On _April 10, 2019_____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

| | | |
|---|---|---|
| **John M. & Livier Mata**<br>**426 1/2 West B Street**<br>**Ontario  CA  91762** | **Honorable Mark Houle**<br>**US Bankruptcy Court**<br>**3420 Twelfth Street, Suite 365**<br>**Riverside,  CA 92501** | **Smith Law Group LLP**<br>**3 Mitchell Place**<br>**New York, NY 10017** |

**Attorney for Defendant National Collegiate Student Loan
Trust 2006-1, National Collegiate Student Loan Trust 2006-4,
National Collegiate Student Loan Trust 2007-1**
Damian P. Richards, ESQ
Sessions, Fishman, Nathan & Isreal, LLP
1545 Hotel Circle South, Suite 150
San Diego, Ca 92108-3426

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| April 10, 2019 | Dolores Orozco | |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**