M. Erik Clark, CA Bar #188693
**BOROWITZ & CLARK, LLP**
100 N. Barranca Street, Suite 250
West Covina, CA 91791
Tel: (626) 332-8600
Fax: (626) 332-8644

Attorneys for Plaintiff

Filed de

RECEIVED

APR 1 1 2019

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:                      Deputy Clerk

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA-RIVERSIDE DIVISION

| | |
|---|---|
| IN RE:<br>JOHN MARTIN MATA<br>LIVIER MATA | Case No. 16-BK-30625-MH<br><br>Chapter 7 |
| JOHN M. MATA,<br><br>      Plaintiff,<br><br>    vs.<br>NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4; NATIONAL COLLEGIATE STUDENT LOAN TRAUT 2007-1,<br>      Defendants. | Adversary No. 6:18-AP-01089-MH<br><br>SEALED – TO BE FILED UNDER SEAL |

Enclose document to be filed under seal.

1  Erik Clark, #188693
2  BOROWITZ & CLARK, LLP
   100 N. Barranca Street, Suite 250
3  West Covina, CA 91791
4  Tel: (626) 332-8600
   Fax: (626) 332-8644
5
6  Austin C. Smith
7  SMITH LAW GROUP LLP
   3 Mitchell Place
8  New York, NY 10017
9  917-992-2121
   austin@acsmithlawgroup.com
10
11 Attorneys for Debtor/Plaintiff
12
13
14            UNITED STATES BANKRUPTCY COURT
15             CENTRAL DISTRICT OF CALIFORNIA
16 IN RE:                              ) Case No.  16-BK-30625-MH
17 JOHN MARTIN MATA                    ) Chapter 7
   LIVIER MATA                         )
18                                     )
19 JOHN M. MATA,                       ) Adversary No. 6:18-AP-01089-MH
20            Plaintiff,               )
        vs.                            )
21 NATIONAL COLLEGIATE STUDENT         ) **PLAINITFF'S SUPPLEMENTAL
22 LOAN TRUST 2006-1; NATIONAL         ) MEMORANDUM OF LAW IN
   COLLEGIATE STUDENT LOAN             ) OPPOSITION TO DEFENDANTS'
23 TRUST 2006-4; NATIONAL              ) MOTION FOR SUMMARY
24 COLLEGIATE STUDENT LOAN             ) JUDGMENT
   TRUST 2007-1,                       )
25            Defendants.              ) **FILED UNDER SEAL****
26                                     )
27
28

i

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.........................................................1

FACTUAL AND PROCEDURAL BACKGROUND...............................1

    Procedural Background................................................1

    Background of the NextStudent Graduate Loan Program...................2

ARGUMENT AND AUTHORITIES..........................................5

    The Court's Tentative Ruling.........................................5

    The Loans Were Made In Excess Of The Cost Of Attendance, And Thus Cannot Be Said To Have Been Made Under the NextStudent Graduate Program.........................................................5

        *The loans were made in excess of the "Cost of Attendance"*..........6

        *The Loans Were Not Made Under The "Program"*
        *Identified By Defendants*............................................8

There Is Insufficient Evidence To Conclude On Summary Judgment That TERI Guaranteed These Specific Loans...............................13

The Voiding Of The Guarantees Did Have An Effect On Their Legal Status.15

CONCLUSION..................................................................24

# TABLE OF AUTHORITIES

*In re Corbin,*
506 B.R. 287 (Bkrtcy.W.D.Wash. 2014)...............................................15-16

*In re Golden,*
596 B.R. 239 (Bkrtcy.E.D.N.Y. 2019) ........................................................10

*In re Hammarstrom,*
95 B.R. 160 (Bkrtcy.N.D.Cal. 1989). ..................................................9, 23

*Housing Pioneers, Inc. v. C.I.R.,*
58 F.3d 401 (9th Cir. 1995) ........................................................................4

*In re Kritt,*
190 B.R. 382 (9th Cir. BAP. 1995) ...........................................................19

*In re Page,*
592 B.R. 334 (8th Cir. BAP 2018) ..............................................................1

*In re Pilcher,*
149 B.R. 595 (9th Cir.BAP 1993) .............................................................10

*In re Pond,*
252 F.3d 122 (2nd Cir. 2001) ...................................................................21

*In re Santos,*
561 B.R. 825 (Bkrtcy.C.D.Cal. 2017) .......................................................19

*In re Segal,*
57 F.3d 342 (3rd Cir. 1995) ......................................................................15

*In re Shilinski,*
Adv Pro. 16-08252-RDD (Bankr. S.D.N.Y April 9, 2018) ......................20-21

*In re Sinclair-Ganos,*
133 B.R. 382 (Bkrtcy.W.D.Mich. 1991) ...................................................17

*In re Sutton-Robinson,*

472 B.R. 77, 85 (Bkrtcy.D.Ariz. 2012) ................................................21-22

*In re The First Marblehead Corp. Securities Litigation,*
639 F.Supp.2d 145 (D.Mass. 2009) ................................................3, 4, 16

*Medina v. National Collegiate Student Loan Trust 2004-2,*
2016 WL 11574867 (Bkrtcy. D. Nev. 2016) ................................................12

*National Collection Agency, Inc. v. Trahan,*
624 F.2d 906 (9th Cir. 1980) ................................................15

*National Collegiate Student Loan Trust 2006-4 v. Meyer*
2019 WL 985300 (Fla.App. 2 Dist., 2019) ................................................13

*National Collegiate Student Loan Trust 2006-2 v. Ramirez,*
2017 WL 929527 (Tex.App.-Fort Worth, 2017) ................................................14

*National Union Ins. Co. of Pittsburgh, Pa. v. Insurance Com'r of Guam,*
1984 WL 48863 (D.Guam App.Div. 1984) ................................................19

Plaintiff hereby submits this redacted supplemental memorandum of law in opposition to Defendant's motion for summary judgment. Plaintiff is contemporaneously filing with the Court the unredacted version under seal.

## I. PRELIMINARY STATEMENT

As this Court noted at oral argument, the issues presented in this case are of significant importance, and are very complex. Plaintiff respectfully believes that given the importance of these issues, and the near vacuum of case law on this unique factual pattern, it is important to give both sides the opportunity to develop facts at trial if for no other reason than to have a full record on appeal.[1] Plaintiff continues to believe a number of material facts are in dispute, and that since exceptions to discharge must be construed narrowly against a creditor and Defendants bear the ultimate burden at trial, summary judgment is not appropriate at this time.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural Background

Plaintiff John Mata borrowed three loans between 2005-2007 that are currently held by Defendants (the "NCT Loans" or "Private Loans"). In 2016,

---

[1] *See In re Page*, 592 B.R. 334, 339 (8th Cir. BAP 2018) (reversing and remanding grant of summary judgment to National Collegiate Trust and noting that a number of facts had not been addressed by the trial court). *See also* the oral argument recording in *Page* wherein the appellate panel stated it would not engage in fact finding on appeal, *available at*: https://ecf.ca8.uscourts.gov/n/beam/servlet/TransportRoom?servlet=CaseSummary.jsp&caseNum=18-6011&incOrigDkt=Y&incDktEntries=Y

Plaintiff filed for relief under Title 11 and was granted a discharge on April 14, 2016.

Shortly thereafter, Defendants sued Plaintiff in state court to reduce the NCT Loans

to judgment.   During the course of discovery, Plaintiff came to believe that the

Private Loans had been discharged in his bankruptcy, and thus the state court suit

was improper.  Plaintiff then reopened his bankruptcy and sought this determination

of discharge.  On January 9, 2019, Defendants moved for summary judgment.  On

March 27, 2019, this Court issued a tentative ruling granting summary judgment to

Defendants, but requested supplemental briefing and further oral argument.

### B. Factual Background Of The NextStudent Graduate Loan Program

Defendants argue that the NCT Loans are non-dischargeable because they

were "made under any program funded in whole or part by a non-profit institution."

According to the documents produced by Defendants, the structure and mechanics

of the loan program at issue was as follows.  The First Marblehead Corporation

("FMC") partnered with Charter One to originate and fund "direct-to-consumer"

loans under the NextStudent Graduate Loan Program that would ostensibly be

guaranteed by TERI.  Charter One charged borrowers a 5.5-6.5% origination fee—

a fee that was coincidentally equal to the guarantee fee that Charter One paid to

TERI.[2]    Presumably, Charter One and TERI anticipated a 5.5-6.5% default rate

(since that was the fee TERI was charging).[3]    At such a rate, TERI would be able to

cover all defaults with the accumulated guarantee fees.    But FMC was determined

to make more loans, and so began bending the lending criteria to originate more

debt.[4]    This resulted in a much higher default rate than was anticipated.[5]    Once the

loans were originated, they were immediately sold by Charter One to National

Collegiate Funding LLC, who then securitized the loans into the various national

collegiate student loan trusts.[6]    At some point, the defaults exceeded TERI's ability

---

[2] See Defendants' Exhibit J at NCSLT0301, Schedule 3.3 to Guaranty Agreement Between TERI and Charter One (showing that the Loan Origination Fee Charged To Borrower is identical to the Total Guaranty Fee Paid On the Loan).  Thus it seems as though TERI provided none of its own money for the guarantee program (as the federal government or schools do when they guarantee student debts), but was in truth acting as little more than a corporate shell designed to take advantage of section 523(a)(8)

[3] *In re The First Marblehead Corp. Securities Litigation*, 639 F.Supp.2d 145, 151 (D.Mass. 2009) ("The Former CISO stated that TERI was able 'to accommodate only a six to eight percent default rate").

[4] *Id.* at 149.

[5] *Id. at* 150 ("According to the former Chief Information Security Officer, employed at First Marblehead from 2004 through 2008, default rates were 'soaring' because First Marblehead had 'drastically lowered its credit guidelines in order to increase loan volume.'").

[6] See Defendants' Exhibit A-3, Pool Supplement, Charter One Bank, N.A. (at page 32 of Dec. of Bradley Luke) **(ECF No. 33-4).**

to pay, and TERI filed for relief under Title 11.[7]  In TERI's bankruptcy, all the banks

and trusts filed claims on the premise that all of the loans could potentially default.[8]

The parties settled the value of these claims using an agreed upon method of

anticipated future defaults and TERI's potential liability.   This may have (and

certainly should have) included consideration of which loans TERI had any legal

obligation to buy under the Guaranty Agreements.[9] At that point, TERI was no

longer the guarantor of any loans, and Defendants and the other banks were

---

[7] It is also worth noting that FMC's stock price dropped 36.5% on the day TERI filed for bankruptcy protection.  It seems questionable whether TERI could genuinely be considered a *bona fide* nonprofit operated exclusively for charitable purposes if it's financial health was tied that closely to a for-profit corporation.  *See In re The First Marblehead Corp. Securities Litigation*, 639 F.Supp.2d 145, 148–49 (D.Mass. 2009) ("An important component of First Marblehead's profitability was First Marblehead's relationship with The Education Resources Institute, Inc. ("TERI")."). *Compare with Housing Pioneers, Inc. v. C.I.R.*, 58 F.3d 401, 403 (9th Cir. 1995) (affirming revocation of nonprofit's tax exempt status because it had engaged in partnerships with for-profit entities whereby private investors stood to benefit from the non-profit's activities*).

[8] See Plaintiff's Supplemental Exhibit 8, Transcript of Telephonic Hearing, at pages 29, 33 (Apr. 28, 2010) ("Creditors filed proofs of claim for these kinds of liabilities in the amount of 30 billion dollars. For the most part the lenders filed claims based on their total loan exposure, clearly, much worse than any foreseeable worst case, but that was the universe that we -- we had to deal with . . . [a]t the end of the day we will have resolved those 30 billion dollars of claims at around 300 million dollars in allowed claims, no small feat. We'll be turning over to secured creditors about 365 million dollars in collateral. We'll be turning over to the plan trust assets that we estimate to be worth about 170 million dollars. What's left of TERI, and TERI will be a much smaller company and won't be guaranteeing loans, at least not at the outset, is going to consist of about twelve million dollars, much of that dedicated to its College Access mission.")

[9] Indeed, this was a condition of a previous Order of the court allowing TERI to purchase certain defaulted loans from the National Collegiate Trusts. *See* Plaintiff's Supplemental Exhibit 9, at 3 ("ORDERED that the Debtor is authorized and directed to purchase laons from the funds in the Pledged Accounts, provided that (1) the Debtor, the Indenture Trustee, and the Administrator **have complied with the applicable guaranty agreement**, Deposit and Sale Agreement and any other governing documents.") (emphasis added).

effectively self-insuring their own portfolio with the refunded guarantee fees provided by TERI.

### III.    ARGUMENT AND AUTHORITIES

#### A. The Court's Tentative Ruling

The Court's tentative ruling ("Tentative Opinion" or "TO") made four key findings. First, the NCT Loans were educational loans. Second, guaranteeing a debt constitutes "funding a program" under section 523(a)(8)(A)(i). Third, TERI had indisputably guaranteed the NCT Loans. Fourth, the voiding of the TERI guarantees had no effect on the dischargeability of the NCT Loans. For the purposes of this supplemental brief, Plaintiff will not seek to relitigate the first and second issues.[10] Instead, Plaintiff will focus on the third and fourth issues, and a fifth issue which the Court did not seem to consider in the Tentative Opinion, *i.e.,* given the evidence produced by Defendants, the NCT Loans cannot be said to have been made under the identified loan program.[11]

#### B. The Loans Were Made In Excess Of The Cost Of Attendance, And Thus Cannot Be Said To Have Been Made Under the NextStudent Graduate Program

---

[10] Plaintiff continues to believe, *inter alia*, that the "educational purpose" test is a necessary rather than a sufficient condition of a debt being an "educational loan" and respectfully reserves his rights to make these arguments on appeal, and incorporates by reference those arguments in Plaintiff's Memorandum of Law In Opposition To Defendant's Motion for Summary Judgment (**ECF No. 46**).

[11] This argument appeared on page 24 of Plaintiff's Opposition To Defendants' Motion for Summary Judgment. Plaintiff notes that this is an argument in the alternative. Plaintiff continues to believe that there is insufficient evidence to demonstrate that TERI guaranteed the NCT Loans. However, even if this Court concludes that TERI did guarantee the Loans, that does not mean the Loans were made under the NextStudent Graduate Loan Program.

*1. The loans were made in excess of the "Cost of Attendance"*

First, Plaintiff maintains that the Cost of Attendance ("COA") as identified in Exhibit 3 is either accurate, or at least more accurate that Defendants'. This Court found that Plaintiff had misstated the COA because he failed to include "room and board" in his calculation.  Respectfully, Plaintiff does not believe he was eligible for room expense since he was a graduate student and did not live on campus,[12] and the school explicitly did not provide board.[13]  However, even if we include the room allowance as outlined in the IPEDS data, that total COA only comes to $17,907 in 2005-2006, $21,620 in 2006-2007, and $22,800 in 2007-2008, all of which are still below the $30,000 loan amounts.[14]  In addition, the data provided by Plaintiff is the data required by law to be supplied to the Department of Education.[15]  If the school is reporting lower figures to the Department of Education in order to ensure it keeps

---

[12] See Plaintiff's Supplemental Exhibit 13, Affidavit of John M. Mata.

[13] See Plaintiff's Exhibit 3 at Parts D, Nos. 6 ("Does your school offer board or meal plans to its students? No.") **(ECF No. 46).**

[14] See Plaintiff's Exhibit 3 at Parts D Nos. 9 and 12 (adding tuition, fees, and room charges) **(ECF No. 46).**

[15] See Section 132 of the Higher Education Act, 20 U.S.C. 1015a (note that while Section 101 of the HEA only mandates this procedure for undergraduate students, Section 132 appears to also apply the graduate students).  Not only is this data required by federal law, but Defendants own documents state that TERI used the Department of Education data rather than the school's brochures to calculate the COA.  *See* Defendant's Exhibit J at NCSLT000425 ("Cost of attendance shall be taken from the most recent school file published by the U.S. Department of Education or, if none, from Thomson Peterson's College and Universities.") (FILED UNDER SEAL).

its Title IV accreditation, but is then charging students more money, that is a violation of any number of provisions of the Higher Education Act.[16]

Second, Defendants have misstated the calculation of the COA even from their own evidence. Defendants have submitted the school brochures (which are not legally required to be filed with the Department of Education), and proposed arriving at the annual COA by multiplying the dollar cost of each credit hour ***times the total number of credits needed for the entire 2-3 year program (debtor took 3 years to complete the program)***.[17] That is, the entire program required either 72 or 102 credits. But those credits were spread out over three years. Thus, the debtor needed between 24-34 per year to complete the program in 3 years. But Defendants have done the math as though the debtor paid for and completed all the required course work in a single year, and then repeated it for two more years, effectively arguing the program cost 3X the tuition and fees that it actually cost.[18] Under any conceivable calculation, this is a misrepresentation of the Plaintiff's COA at Loma Linda.

---

[16] *See* Statutory Requirements for Reporting IPEDS Data, *available at* https://surveys.nces.ed.gov/ipeds/ViewIPEDSStatutoryRequirement.aspx

[17] This resulted in the Tentative Opinion finding that Plaintiff's COA at Loma Linda during the 2007-2008 academic year was as much as $72,160. *See* TO at 66.

[18] Furthermore, the loan documents state that two of the three loans were being lent only for 2-4 month periods, not the entire academic year. *See* Defendant's Exhibits A-1 at page 10 of Declaration of Bradley Luke ("Academic Period: 1/2006-3/2006"), A-5 at page 55 of Dec. of Bradley Luke ("Academic Period: 8/2006-6/2007"), and A-9 at page 104 of Dec of Bradley Luke ("Academic Period: 8/2007-12/2007") **(all at ECF No. 33-4).**

Third, Plaintiff borrowed all (or most of) the money he needed to cover tuition in federal loans, none of which he is contesting are dischargeable.[19]  Specifically, Plaintiff borrowed $18,500 during the 2005-2006 academic year, $9,250 during the 2006-2007 academic year, and $5,125 during the 2007-2008 academic year.[20] Those loans were clearly guaranteed by the federal government, and thus are 100% non-dischargeable absent an affirmative showing of "undue hardship."  Plaintiff pled this is his complaint but (mistakenly in hindsight) did not wish to sow further confusion into the summary judgment motion and believed, and continues to believe, that even without this federal funding, the NCT Loans were in excess of the COA.

Although the Court accurately noted that "Cost of Attendance" is an element of a "qualified education loan" rather than an "educational loan," Plaintiff submits that this is a material fact in this action because the COA was incorporated into the specific contours of the NextStudent Graduate Loan Program, as will be explained below.

**2. The Loans Were Not Made Under The "Program" Identified By Defendants**

---

[19] See Plaintiff's Supplemental Exhibit 10.  That document is a little difficult to read, as some of the loans were partially cancelled, and many of the entries represent consolidation loans that refinanced previous federal loans and were not new obligations.

[20] Note that if you divide these amounts by the cost per credit in the year incurred, the Department of Education would have paid for 65 of the 72 credits needed.  However, the cost of credits were significantly cheaper if the student was only auditing a class, and furthermore, Plaintiff may have earned transfer credits if he obtained a B or better. *See* Defendant's Supplemental Exhibit 3 at page 26 ("Transfer credits will not be used to offset work at this University that is less than a B average.").

Defendants argue that the NCT Loans were "made under any program funded in whole or in part by a nonprofit institution." Defendants have identified TERI as the nonprofit institution, and the "NextStudent Graduate Loan Program" as the statutory "program" under which the NCT Loans were made. Now, the parameters of this program are laid out in the Guarantee Agreements, and the Program Guidelines.[21] One of the many parameters of this program was that the loan must be made within the COA.[22] Plaintiff believes the evidence demonstrates that the NCT Loans were in excess of the COA. If the NCT Loans were made in excess of the COA, then Plaintiff submits that the NCT Loans cannot be said to have been made under the identified program.[23]

Defendants or their predecessors-in-interest were free to create any lending program they wanted. Under the rationale of *Hammarstrom and Pilcher*, they could

---

[21] See Defendants' Exhibits J and K (FILED UNDER SEAL). *See also* First Marblehead Corporation 10-K, for year ending June 30, 2005 ("[E]ach lender has ultimate control over the selection of these criteria, and in providing our services, we are obligated by contract to observe them. ***Lenders that wish to have their loans guaranteed by TERI are required to meet TERI's underwriting criteria.***") (emphasis added), *available at*: https://www.sec.gov/Archives/edgar/data/1262279/000110465905043131/a05-15507_110k.htm

[22] See Defendants' Exhibit J, NextStudent Loan Program Guidelines at B.7 at NCSLT0320 ("In addition, if the student wishes to borrow amounts in excess of a Participating School's published cost of attendance, a letter is required from the School stating that these additional funds are needed as an education expense. Costs verified in this manner are consider part of the "Cost of Education' for purposes of the program maximums set forth in the attached Schedules.") (FILED UNDER SEAL).

[23] See Defendants' Exhibit J, NextStudent Loan Program Guidelines at NCSLT0319 ("In order to obtain a loan under any of the programs described above, an applicant must be an eligible borrower, meet certain credit criteria, and be within the maximum loan limits (including aggregate education debt limits) that are set forth in the attached Schedules.") (FILED UNDER SEAL).

have created any program that made any type of loan for any amount of money

provided it said in the promissory note it was for education, and any 501(c)(3) agreed

meaningfully participate in it.[24]  The program they chose to create, and the only

program TERI agreed to participate in, had contractual parameters.  And one of these

parameters was that TERI would only guarantee loans made within the COA.[25]  This

is not a metaphysical point.  Presumably unless TERI could demonstrate that the

loans it was guaranteeing had a charitable rather than a commercial purpose, the

nonprofit would risk losing its 501(c)(3) status.[26]  Indeed, the guarantee agreement

states that TERI could refuse to honor its guarantee for any loan that was not made

---

[24] *In re Hammarstrom*, 95 B.R. 160, 161 (Bkrtcy.N.D.Cal.,1989).  It is worth noting that the *Hammarstrom* court acknowledged that the nonprofit Nellie Mae was prohibited by law funding the student loan directly.  *See id.* ("Nellie Mae did not loan the funds directly because it was prohibited by law from doing so.").  Yet, the court found that Nellie Mae had somehow constructively funded the loan by purchasing the loan from the commercial bank. That is, the *Hammarstrom* court allowed Nellie Mae to do by private contract what it was explicitly precluded from doing under law. This hardly seems consistent with construing exceptions to discharge narrowly.

[25] See Defendants' Exhibit J, NextStudent Loan Program Guidelines at B.7 at NCSLT0320 ("In addition, if the student wishes to borrow amounts in excess of a Participating School's published cost of attendance, a letter is required from the School stating that these additional funds are needed as an education expense. Costs verified in this manner are consider part of the "Cost of Education' for purposes of the program maximums set forth in the attached Schedules.") (FILED UNDER SEAL).

[26] *In re Golden*, 596 B.R. 239, 266–67 (Bkrtcy. E.D.N.Y. 2019) ("Ms. Golden also responds that TERI funds only those loans that do not exceed the cost of attendance, and therefore it is unlikely that TERI funded the NCT Loan, which 'clearly exceed[s] the cost of attendance.' And she disputes whether TERI is 'in fact, a bonafide nonprofit institution,' or if it is a division of the for-profit entity First Marblehead Corporation created 'for the sole purpose of taking advantage of [the] non-profit exemption of § 523(a)(8)(A)(i).'")(citations omitted).

within the contractual parameters.[27]  Accordingly it stands to reason, and Plaintiff would argue at trial by calling a former TERI agent as a witness, that there were important legal and contractual reasons for this limitation on the amount of money TERI was willing to guarantee.  If Charter One was making loans both within the guidelines and outside the guidelines, then those loans being made outside the guidelines were not being made under the "NextStudent Graduate Loan Program."[28] Charter One was simply making generic for-profit student loans.  Charter One had no more contractual right to require TERI to buy a nonconforming loan than it would have a contractual right to require TERI to buy a defaulted Charter One car loan.

To be clear, Plaintiff acknowledges that a loan program existed between TERI, Charter One, and FMC.  And that the money refunded to Charter One and Defendants in TERI's bankruptcy is evidence of that program.  But whether there was a loan program, and whether the Plaintiff's NCT Loans were made under that program are two different questions.  Defendants cannot offer evidence to prove that a loan program existed for the purposes of section 523(a)(8)(A)(i) and then argue

---

[27] See Defendants' Exhibit J at NCSLT0286 ("TERI's guaranty is conditioned upon the following . . .the LENDER . . .must have complied with all other requirements of the Program Guidelines applicable to the Loan.") (FILED UNDER SEAL).

[28] According to the *Pilcher* court what matters is whether the nonprofit funded the "program" not whether it funded the "loan."  *See In re Pilcher*, 149 B.R. 595, 598 (9th Cir. BAP 1993) ("Congress did not use language indicating that the loan itself must be funded by a nonprofit institution, but that the program pursuant to which the loan was made be funded in part by a nonprofit institution.").  The only program TERI arguably funded was that described in the program guidelines and guaranty agreements.  TERI explicitly stated it would not fund or otherwise guarantee loans made outside those parameters.

the contours of the program are irrelevant for the purposes of determining whether the NCT Loans were made under that program. If the documents produced by Defendants demonstrate that a program existed, then that program must have certain characteristics and parameters (if for no other reason than to distinguish it from all the other loans being made by Charter One). If Defendants have succeeded in establishing that a loan program existed under section 523(a)(8)(A)(i), then that same evidence has also established that the Plaintiff's Loans were not part of that program. Defendants should not be allowed to have it both ways.[29]

To illustrate this point, consider if TERI were still in existence today. Pursuant to the Guaranty Agreement, TERI could have refused to purchase the NCT Loans because they were demonstrably not originated within the program guidelines.[30] When Plaintiff defaulted on the NCT Loans, if TERI had refused to buy the Loans because the Loans did not meet the program guidelines, would it still be said that the Loans had been made under the NextStudent Graduate Loan Program? Would it still be said that TERI had guaranteed the NCT Loans? Surely

---

[29] Defendants have also argued that Plaintiff does not have standing to argue about the Program Guidelines. To be clear, Plaintiff is not alleging a breach of contract or that the Loan would be void absent his bankruptcy discharge. Plaintiff is simply rebutting the evidence offered by Defendants to prove the NCT Loans were made within the NextStudent Graduate Loan Program. If Plaintiff lacks standing to challenge that evidence because he is not a party to the Guaranty Agreement or Program Guidelines, then presumably Defendants lack standing to challenge the "Cost of Attendance" because they were not a party to the Title IV funding contract between Loma Linda University and the Department of Education.

[30] See Defendants' Exhibit J at NCSLT0286 ("TERI's guaranty is conditioned upon the following . . .the LENDER . . .must have complied with all other requirements of the Program Guidelines applicable to the Loan.") (FILED UNDER SEAL).

construing exceptions to discharge narrowly against a creditor means this point raises at least a genuine issue of material fact that should be fully argued at trial.

### C. There Is Insufficient Evidence To Conclude On Summary Judgment That TERI Guaranteed These Specific Loans

Plaintiff will first note that Defendants have not produced a single check copy showing that TERI funded or guaranteed any of the NCT Loans. In at least one other case on summary judgment, a bankruptcy court found that because the National Collegiate Trust had offered a copy of a check to demonstrate that TERI guaranteed one loan, its inability to produce a check for other loans raised a genuine issue of material fact. *See Medina v. National Collegiate Student Loan Trust 2004-2* (In re Medina), 2016 WL 11574867, at *4 (Bkrtcy. D. Nev. 2016) ("Defendants' exhibits in connection with the last of the 2004-2006 Loans includes a copy of a check dated June 21, 2006, in the amount of $ 30,000, from TERI payable directly to the Debtor. If the 2007 Loan was funded in whole or part by TERI, there presumably would be a similar check payable to the Debtor or some explanation provided.").[31] That said, the Court tentatively found that TERI had guaranteed the Loans, based on three facts. First, the Court found that the Loan Financial Activity pages stated that the loans were guaranteed by TERI. Second, the Court found that one of the offered pages

---

[31] *See also National Collegiate Student Loan Trust 2006-4 v. Meyer*, 2019 WL 985300, at *1 (Fla.App. 2 Dist., 2019) ("Additionally, a copy of the endorsed check for $ 30,000, was attached to the complaint; it was drawn on a Bank of America check for The Education Resources Institute (TERI).").

showed that the Plaintiff's Loans, by reference to his social security number, had in fact been securitized into the trusts. Third the Court found that the guarantee agreement between TERI and Charter One showed that TERI guaranteed the Loans.

First, with all due respect, the Loan Financial Activity also lists the current balance of the Loans as $0.[32] Since that is not likely accurate, Plaintiff submits that it is possible this document is not entirely reliable, and Plaintiff would like to test its accuracy at trial. Second, the documents the Court relied upon to conclude that the Loans had been securitized into the trusts are not actually part of the securitization filing. They are simply excel documents that the Defendants have created and attached to the securitization filings to make it look like they were part of the SEC filings. The Court will note that these documents do not have the EDGAR website links in the footer like all the other documents in those exhibits.[33] *See National Collegiate Student Loan Trust 2006-2 v. Ramirez*, 2017 WL 929527, at note 8 (Tex.App.-Fort Worth 2017) (affirming denial of judgment where lack of website address in footer demonstrated that offered document was not part of Schedule 2 of the master document filed with the SEC). Third, as already explained above in

---

[32] See Defendant's Exhibits A-2 (at page 18 of Declaration of Bradley Luke), A-6 (at page 63 of Dec. of Bradley Luke), and A-10 (page 104 of Dec of Bradley Luke) **(all at ECF No. 33-4).** These documents also state that the loan program was something called "PEPLN," which would not appear to be an acronym for "NextStudent Graduate Loan Program" or any combination of "Charter One" and "TERI."

[33] See Defendants' Exhibit A-7 at page 79 of Dec. of Bradley Luke. Compare with Page 78 that shows a www.sec.gov website in the footer. *See also* Exhibit A-11 (at page 121 of Dec of Bradley Luke) **(all at ECF No. 33-4).**

Section B.2, the guaranty agreements demonstrate that these specific Private Loans were made outside the NextStudent Graduate Loan Program.

### D. The Voiding Of The Guarantees Did Have An Effect On Their Legal Status

This Court tentatively found that what matters is whether the Loans were guaranteed by a nonprofit at the time of the origination, not the time of the filing of the debtor's bankruptcy. Plaintiff continues to believe that facts developed at trial may very well persuade the fact-finder to conclude that the voiding and refunding of the guarantees does have an effect on this action for at least three reasons.

First, the voiding of the guarantees extinguished the policy reasons for enforcing section 523(a)(8) in this context and against this debtor. Many courts have noted that section 523(a)(8) should be interpreted with reference to the fundamental purpose of section 523(a)(8), which was to protect government units, and nonprofit institution of higher education, from the effects of default. *In re Segal*, 57 F.3d 342, 348 (3rd Cir. 1995) ("By enacting section 523(a)(8), Congress sought principally to protect government entities and nonprofit institutions of higher education—places which lend money or guarantee loans to individuals for educational purposes—from bankruptcy discharge. Because such loans are not based upon a borrower's proven credit-worthiness, and because they serve a purpose which Congress sought to encourage, section 523(a)(8) protects the lender when a borrower, who often would not qualify under traditional underwriting standards, files a chapter 7 bankruptcy.").

Furthermore, the Ninth Circuit has held that private parties cannot take advantage of

the non-dischargeability provisions related to taxes because private creditors were

not the intended beneficiaries of Congress, and to allow third parties to be subrogated

to the government's interest would conflict with the requirements to construe

exceptions to discharge narrowly and give debtors a fresh start.[34] *Trahan* was found

by one bankruptcy court in this circuit to preclude a third party's ability to seek

subrogation under section 523(a)(8)(A)(i).[35] The *Corbin* court based this holding on

the fact that the policy and purpose behind section 523(a)(8)(A)(i) would not be

served by such a finding because there was no government interest left to protect.[36]

In this action, there is likewise no governmental unit or nonprofit institution

to protect.  While the Court stated it would not allow the Plaintiff to escape non-

---

[34] *National Collection Agency, Inc. v. Trahan*, 624 F.2d 906, 907 (9th Cir. 1980)
("Interpreting 11 U.S.C. s 35 broadly to include debts owed to a surety would not promote the
collection of taxes because the state is paid by the surety whether or not the bankrupt's
subsequent debt to the surety is nondischargeable. We conclude that any state statutory right that
National might have to recover against Trahan would conflict with the federal bankruptcy policy
favoring the discharge of debts."). Note that this holding was subsequently found not to apply to
debts incurred by fraud because the Code has as its premise that bankruptcy shall not be afforded
to dishonest debtors. That distinction is not relevant in motion.

[35] Importantly, the *Corbin* court went on to find that the loan would be held non-
dischargeable as an "educational benefit" under section 523(a)(8)(A)(ii). This holding was
subsequently disavowed by the *Kashikar* decision stating that educational loans are not
"obligations to repay funds received as an educational benefit."

[36] *In re Corbin*, 506 B.R. 287, 295–96 (Bkrtcy.W.D.Wash.,2014) ("Interpreting
523(a)(8)(A)(i) broadly to include debts owed an accommodation party or guarantor would not
promote the collection of student loans because the lender is paid by the accommodation
party/guarantor whether or not the debtor's subsequent debt to the accommodation
party/guarantor is nondischargeable . . .[b]ecause *Trahan* continues to be binding authority in the
Ninth Circuit, and because policy considerations favor discharge of the debt over protecting the
rights of a subrogated party, Benson's request for summary judgment under 523(a)(8)(A)(i) is
denied.").

1    dischargeability because TERI's bankruptcy was the fault of debtors,[37] it might also

2
     be said (and has been said, by FMC employees) that TERI's bankruptcy was the
3

4    fault of FMC, who had bent lending criteria to originate more loans, and feed the

5    securitization market.[38]  But whomever we choose to blame, TERI is gone, and the
6
7    only entities left are for-profit banks and trusts, neither of which were the intended

8    beneficiaries of section 523(a)(8)(A)(i).  This does not mean private lenders have no
9
     protection from discharge.    For-profit entities like the Defendants still have
10

11

12

13

14

15

16

17

18

19

20

21

22

23    ───────────────

     [37] See Tentative Opinion at 71.

24     [38] *In re The First Marblehead Corp. Securities Litigation*, 639 F.Supp.2d 145, 149
     (D.Mass. 2009) ("A former Senior Process Analyst employed at First Marblehead from 2004
25    through 2008 stated that Defendant Kopnisky implemented a program in 2006 by
     which First Marblehead permitted students with 'bad credit' to 'take up to three lifetime loans with
26    a maximum of $4,000 granted per loan.' The Former Process Analyst stated further
     that First Marblehead's credit guidelines were being 'bent' and that applicants were authorized to
27    'take out excessive loans with terms beyond First Marblehead's historical criteria.' According to
     the   Former   VP   of   Applications,   the   risk   management   department's   'alarm
28    at First Marblehead's new   approach   to   credit   guidelines   'was   generally   overlooked
     by First Marblehead's management.'")

                                          17

significant protection in section 523(a)(8)(B). But they do not have protection in section 523(a)(8)(A)(i).[39]

In the only other decision Plaintiff was able to find on this question, the Western District of Michigan held that where an educational loan that was originally guaranteed by a governmental unit had been refinanced by a credit union prior to the debtor's bankruptcy, the loan could not be said to have been guaranteed by a governmental unit at the time of filing for the purposes of section 523(a)(8). *In re Sinclair-Ganos*, 133 B.R. 382, 383 (Bkrtcy.W.D.Mich. 1991) ("Since as of the date of the filing of this case the loan was not guaranteed, the debt owed to Lincoln Park Community Credit Union is not excepted from discharge based on the argument that

_____

[39] To grant Defendants protection under section 523(a)(8)(A)(i) would be to sanction sophisticated corporate structuring around the Code. Under such a holding, all private lenders would need to do is create a 501(c)(3), have it guarantee commercial student debt, put the 501(c)(3) in bankruptcy, refund all the money to the for-profit bank, and suddenly all the loans would be non-dischargeable and the bank would lose nothing by the transaction (save the legal fees for the bankruptcy). In fact, under the rational of *Hammarstrom*, lenders could simply partner with the NCAA to license various sports teams' logos for student credit cards, and courts would hold the debts were non-dischargeable because the NCAA—a registered nonprofit— might well have "meaningfully participated" in the origination of the debts. This is not a horrible hypothetical since many courts refuse to make a distinction between loans, and extensions of credit. *See, e.g., In re Johnson*, 215 B.R. 750, 752 (Bkrtcy.E.D.Mo. 1997) ("The correct analysis, in the opinion of this court, asks whether the creditor extended credit to the Debtor . . . and whether the Debtor promised to repay the amount of credit advanced. Whether a creditor actually disbursed cash to the debtor is irrelevant to the substance of the transaction.").This is not consistent with the purpose of section 523(a)(8), nor the requirement to construe exceptions to discharge narrowly.

this is an educational loan guaranteed by a governmental unit.").[40]   Notably, the

*Sinclair-Ganos* case cites to an unpublished opinion *In re Talbert* that made the same

holding in 1989.[41]   Both of these decisions are consistent with the Ninth Circuit's

holding in *Trahan*.  Private actors and assignees should not be able to take advantage

of the non-dischargeability provisions of the Code where it does not further

Congressional purpose, and otherwise conflicts with the policy favoring discharge

of debt.[42]

Now the instant situation obviously differs from *Sinclair-Ganos and Talbert*

in that the nonprofit was not paid, but instead went into bankruptcy and paid back

the lenders.  The Court's tentative holding implied that to allow the debtor to

discharge the debts because TERI had gone bankrupt would constitute an improper

windfall to the debtor.  Respectfully, Plaintiff contends that making the debt non-

---

[40] Defendants tried to confuse the court at the oral argument by stating that this holding had been disavowed by later courts.  And the opinion does have negative history.  But on different grounds.  The court in *Sinclair-Ganos* also held that a credit union was not a non-profit.  Many courts afterwards found that a credit union was a non-profit.  But whether the credit union was a nonprofit is immaterial because Plaintiff cites the law not for the argument that a credit union is a for-profit business, but instead for the proposition that what matters for purposes of section 523(a)(8) is whether the loan was guaranteed by a governmental unit or nonprofit at the time of the bankruptcy filing.

[41] Plaintiff has not been able to locate a copy of this opinion and it is too old to be on PACER.

[42] We should remember that the purpose of the section 523(a)(8)(A)(i) is not to punish student debtors—it is to protect taxpayers, and encourage schools to make low-interest loans to underprivileged students.  In contrast, we should no more want to encourage the First Marblehead Corporation to revamp its defunct student lending programs than we would want to encourage commercial banks to revamp their pre-2008 mortgage lending.  Both education and home ownership are social goods, but that does not mean any and all forms of credit to achieve those goals are worth the social cost.

dischargeable constitutes an improper windfall to the Defendants. Defendants received tens of millions of dollars in refunded guarantee fees in TERI's bankruptcy and were restored to their former position as near as that was possible. Thus it is simply not possible to hold everyone to their original bargained-for-position in light of TERI's bankruptcy.[43] Since that is impossible, Plaintiff submits that it would be inequitable to allow TERI, Charter One, and the Defendants to void and undo their agreements, while at the same time holding Plaintiff to the legal effects of these voided agreements.[44] Defendants would thereby effectively be entitled to double recovery: reaping the benefits of the voided contracts and refund of guarantee fees in TERI's bankruptcy, while at the same time enforcing the obligations of the pre-petition contracts with TERI on the debtors. Plaintiff respectfully submits that this is an unfair manipulation of the Bankruptcy Code. *See In re Santos*, 561 B.R. 825, 832 (Bkrtcy.C.D.Cal. 2017) ("Because the bankruptcy process constitutes a *quid pro quo*, obtaining benefits for the fulfillment of responsibilities, Debtors' attempt to

---

[43] In this sense, what happened in TERI's bankruptcy was really tantamount to rescission, the effects of which are retroactive. *See National Union Ins. Co. of Pittsburgh, Pa. v. Insurance Com'r of Guam*, 1984 WL 48863, at *3 (D.Guam App.Div.,1984) ("Cancellation and recision are not synonymous. One is prospective, while the other is retroactive . . . to cancel a contract means to abrogate so much of it as remains unperformed. It differs from recision, which means to restore the parties to their former position. The one refers to the state of things at the time of the cancellation; the other to the state of things existing when the contract was made.").

[44] Note here that any loan held by the Defendants would still be non-dischargeable provided it was made within the "cost of attendance" and thus is a qualified education loan under section 523(a)(8)(B). All that happened was Defendants lost protection in one provision, while at the same time gaining a protection in another provision that would coincidentally cover every loan provided it was made within the TERI guidelines.

retain the benefits of the bankruptcy process, without fulfilling their corresponding

duties, constitutes an unfair manipulation of the Bankruptcy Code.").[45]

Second, Plaintiff respectfully believes that the Court's tentative ruling

conflicts with the general rule in bankruptcy, which examines the debtor's and

creditor's arrangements at the time of the debtor's bankruptcy filing rather than the

time of contract formation. In a somewhat analogous situation, the Southern District

of New York discussed why it was that the petition date is the controlling date for

determining dischargeability of student loans. In that case, the debtor had borrowed

several private education loans before 2005, during a time when all private student

loans were freely dischargeable. The debtor argued that the date of origination

should control whether he could discharge the loans, not the date of filing. The Court

found that while it was perhaps a little bit unfair to the debtor to take away his right

to discharge a debt, bankruptcy courts had to look at the statute and the loan as the

date the case was filed not the date the debt was originated. *See In re Shilinski,* Adv

Pro. 16-08252-RDD (Bankr. S.D.N.Y April 9, 2018) ("You apply the version of the

Bankruptcy Code in effect when the case is commenced to determine whether that

is dischargeable or not. ***You don't look at the underlying loan, when it was entered***

---

[45] In fact, Plaintiff would like to argue at trial that Defendants may well be quasi-estopped from accepting the refunded guarantee fees in TERI's bankruptcy (i.e., accepting the benefits), and now seeking to hold the debtor to TERI's voided guarantee of the debt (i.e., avoiding the effects). *In re Kritt,* 190 B.R. 382, 388 (9th Cir. BAP 1995) ("One form of estoppel, 'quasi estoppel,' forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid the corresponding obligations or effects.").

*into, or the conduct that arguably gave rise to nondischargeability, but you look*

*at the date when the case was commenced* . . . in bankruptcy, the bright line is the

petition date . . .given that the whole emphasis of bankruptcy is the case because

you're dealing with all sorts of rights that occur at different times but through the

frontal of the bankruptcy case, *it's really one where you do focus on the date of the*

*case, as opposed to when the various rights were created*.") (emphasis added).[46]

       Admittedly this is a different context as it deals with changes to the statute as

opposed to changes to facts and contracts, but the principle that the court "focus[es]

on the date of the case, as opposed to when the various rights were created" holds

true in factual contexts as well.  Indeed, the Bankruptcy Code has many provisions

that allow for substantial changes to the character of debts/assets between the date

of origination and the date of filing under Title 11. For example, junior lien holders

can become unsecured creditors by virtue of the depreciation in the value of a home.

*See In re Pond*, 252 F.3d 122, 127 (2nd Cir. 2001) ("In the case at hand, both parties

agree that the value of the residential property underlying defendants' lien is

insufficient to cover any portion of the lien; as a result, defendants' lien is wholly

unsecured under Section 506(a). Because their lien is wholly unsecured, defendants

are not 'holders of ... a claim secured only by a security interest in ... the debtor's

principal residence,' 11 U.S.C. § 1322(b)(2), and their rights in the lien are not

---

[46] See Plaintiff's Supplemental Exhibit 11 at pages 15:2-7, 2:21-21:15.

protected under the antimodification exception of Section 1322(b)(2). Accordingly, the District Court properly declared that plaintiffs' Chapter 13 plan could void this lien."). Likewise, formerly exempt assets can become attachable assets because of the conduct of a debtor. *See In re Sutton-Robinson*, 472 B.R. 77, 85 (Bkrtcy.D.Ariz. 2012) ("Thus, an IRA loses its status as exempt property in a bankruptcy proceeding if the account holder engages in a prohibited transaction under I.R.C. § 4975."). The point is that the Code anticipates that intervening changes to contracts may affect the legal character of an asset or claim upon the filing of a petition. Neither a debtor's nor a creditor's obligations are frozen in time at the date of origination.

Third, it should also be noted that during TERI's bankruptcy, Defendants argued that TERI did not own any of the defaulted loans, but merely acted as collection agent on them. *See* Defendants' Supplemental Exhibit 4 at 23 ("The Trusts contend that the defaulted loans are not property of the estate, that TERI does not own the defaulted loans but holds them 'for collection purposes only.'"). This seems to undermine and contradict the purported scope of the Guarantee Agreements, which state that TERI would have ownership over any defaulted loans free and clear of all liens and encumbrances.[47] The filings in TERI's bankruptcy also noted that TERI had outsourced much of its operations to the First Marblehead

---

[47] See Defendants' Exhibit J at NCSLT0286 ("[T]o transfer to TERI all rights in and title to such Promissory Note, free and clear of all liens and encumbrances, and of all defenses, counterclaims, offsets, and rights of rescission that might be raised by the Borrower.") (FILED UNDER SEAL).

Corporation.[48] It thus seems plausible that under certain undisclosed contracts between TERI and FMC, TERI had outsourced its operations, duties, and liabilities such that FMC was the actual party in interest on the guarantees, and was the only party besides Charter One that was "meaningfully participating" in the loan program.[49] This would explain why Defendants argued that TERI did not own the defaulted loans, but merely acted as a collection agent (presumably) for FMC. FMC, unlike TERI, is not a non-profit. If that is the case, Plaintiff submits that a fact-finder could determine that FMC was the *de facto* (and perhaps even the *de jure*) party guaranteeing the loans, and thus the loans were not guaranteed by a nonprofit institution.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court DENY Defendants' motion for summary judgment, and allow this case to proceed to trial.

April 10, 2019

/s_____

Erik Clark, #188693
BOROWITZ & CLARK, LLP
100 N. Barranca Street, Suite 250
West Covina, CA 91791

---

[48] See Plaintiff's Supplemental Exhibit 12 at page 51 ("Because the Debtor's [TERI's] operations had been largely outsourced to FMC and its affiliates . . .").

[49] *In re Hammarstrom*, 95 B.R. 160, 161 (Bkrtcy.N.D.Cal.,1989) (holding that any "meaningful participation" constitutes "funding" loan under section 523(a)(8)(A)(i)).

1

Tel: (626) 332-8600

2

Fax: (626) 332-8644

3

Austin C. Smith

4

SMITH LAW GROUP LLP

5

3 Mitchell Place

New York, NY 10017

6

917-992-2121

7

austin@acsmithlawgroup.com

8

Attorneys for Plaintiff/Debtor

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28