Erik Clark, #188693
BOROWITZ & CLARK, LLP
100 N. Barranca Street, Suite 250
West Covina, CA 91791
Tel: (626) 332-8600
Fax: (626) 332-8644

Austin C. Smith
SMITH LAW GROUP LLP
3 Mitchell Place
New York, NY 10017
917-992-2121
austin@acsmithlawgroup.com

Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:<br>JOHN MARTIN MATA<br>LIVIER MATA | Case No.  13-BK-30625-MH<br>Chapter 7 |
| JOHN M. MATA,<br>　　　　　Plaintiff,<br>　　vs.<br>NATIONAL COLLEGIATE STUDENT<br>LOAN TRUST 2006-1; NATIONAL<br>COLLEGIATE STUDENT LOAN<br>TRUST 2006-4; NATIONAL<br>COLLEGIATE STUDENT LOAN<br>TRUST 2007-1,<br>　　　　　Defendants. | Adversary No. 6:18-AP-01089-MH<br><br>**NOTICE OF SUPPLEMENTAL<br>AUTHORITY** |

Plaintiff files this notice to bring to the Court's attention a recent decision from the United States Supreme Court, *Mission Product Holdings, Inc. v.*

*Tempnology, LLC*, 139 S. Ct. 1652 (U.S. 2019).   This decision was issued two

weeks after this Court held supplemental oral argument on summary judgment and

bears on the matters before the Court.   Attached as **Exhibit A**.

As the Supreme Court noted in *Tempnology*, when a debtor rejects an

executory contract in bankruptcy, the rejection operates as a breach rather than an

automatic rescission.   Thus, like in any breach of contract situation, the

counterparty may either continue performance and maintain the benefit of the

contract while suing for future damages related to mitigating the debtor's breach,

or else end performance, surrender the benefit of the bargain, and sue the debtor

for full compensatory and consequential damages. *Mission Product Holdings, Inc.*

*v. Tempnology, LLC,* 139 S.Ct. 1652, 1662 (U.S. 2019) (stating that when one

party is in breach by virtue of seeking relief under Title 11, the other party  "can

keep up its side of the bargain, continuing to pay for use of the copier, while suing

the dealer for damages from the service breach. Or the firm can call the whole deal

off, halting its own payments and returning the copier, while suing for any

damages incurred.").[1]  Importantly, if the nonbreaching party opts to cancel the

entire arrangement, it cannot also continue to demand the benefits of the contract.

*Jay Bharat Developers, Inc. v. Minidis*, 84 Cal.Rptr.3d 267, 272, 167 Cal.App.4th

---

[1] *See also In re Transact, Inc.,* 2014 WL 3888230, at *10 (C.D.Cal. 2014) (When one party to a
contract commits a material breach, the other party 'can either elect to allege a total breach,
terminate the contract and bring an action or, instead, elect to keep the contract in force, declare
the default only a partial breach, and recover those damages caused by that partial breach.'").

437, 443 (Cal.App. 2 Dist. 2008) ("Under no circumstances may the non-breaching party stop performance *and* continue to take advantage of the contract's benefits.").

TERI's bankruptcy and rejection of the guaranty agreements operated as a breach of contract under *Tempnology*.    The Defendants then had a choice. Defendants could have continued the guarantee program by finding another non-profit institution to step into the shoes of TERI while suing to recover only the difference in cost between TERI's performance and another party's performance. Or, Defendants could choose to call off the whole deal, and seek to recoup all its losses.  Defendants chose the latter.[2]  Having made that choice to abandon the guarantee agreements and recover all the guarantee fees paid, Defendants cannot now seek to avoid the consequence of that decision and continue to enforce the contract against the Plaintiff.[3]    *S & R Corp. v. Jiffy Lube Intern., Inc.,* 968 F.2d 371, 376 (3rd Cir. 1992) ("Under basic contract principles, when one party to a

---

[2]  *See* Plaintiff's Memorandum of Law In Opposition to Defendant's Motion for Summary Judgment at 25-26 (ECF No. 46); Plaintiff's Supplemental Brief at 4 (ECF No. 62).

[3]  Plaintiff reiterates that in *O'Brien*, the fact that TERI had actually performed on the guarantee was material to the Court's conclusion that TERI funded the loans in question. *In re O'Brien*, 318 B.R. 258, 263 (S.D.N.Y. 2004) ("[I]n the case at bar, [TERI] actually did 'fund' money when the Appellant defaulted on her obligation to repay the Loan. Following that default, [TERI] advanced money to Key Bank in accordance with its obligations under the Program and its guarantee thereof."). Not only did TERI not perform on the guarantees in this action, but Defendants' recovery of damages in TERI's bankruptcy relieved TERI of any duty to perform, *i.e.,* to "fund" the loans by performing on the guarantees.

1  contract feels that the other contracting party has breached its agreement, the non-

2

3  breaching party may either stop performance and assume the contract is avoided,

4  or continue its performance and sue for damages. Under no circumstances may the

5  non-breaching party stop performance *and* continue to take advantage of the

6

7  contract's benefits.").

8      In the alternative, given that the parties continue to dispute exactly what

9  happened to the guarantee agreements in TERI's bankruptcy[4], *Tempnology*, which

10

11  included three appellate reversals, further demonstrates why summary judgment is

12  not appropriate without a full factual record on such a complex question of law.

13

14

15  7/8/2019

16                          Erik Clark, #188693
                            BOROWITZ & CLARK, LLP
17                          100 N. Barranca Street, Suite 250
18                          West Covina, CA 91791
                            Tel: (626) 332-8600
19                          Fax: (626) 332-8644

20

21

22

23

24

25

26

27

28

---

[4] Compare Plaintiff's Supplemental Brief at 20-21 (ECF No. 62) with
Defendant's Supplemental Brief at 16 (ECF No. 67).

# EXHIBIT "A"

139 S.Ct. 1652
Supreme Court of the United States.

**MISSION** PRODUCT HOLDINGS, INC., Petitioner
v.
**TEMPNOLOGY**, LLC, nka Old Cold LLC

No. 17-1657
|
Argued February 20, 2019
|
Decided May 20, 2019

**Synopsis**
**Background:** Chapter 11 debtor moved for determination of what rights exclusive distributor of its products and licensee of its intellectual property retained as result of election that it made following debtor's rejection of underlying agreement between parties. The United States Bankruptcy Court for the District of New Hampshire, J. Michael Deasy, J., 541 B.R. 1, ruled that distributor/licensee had no remaining distribution rights or rights in debtor's trademarks or logo, and distributor/licensee appealed. The Bankruptcy Appellate Panel of the First Circuit, Hoffman, J., 559 B.R. 809, affirmed in part and reversed in part. Appeal was taken. The Court of Appeals for the First Circuit, Kayatta, Circuit Judge, 879 F.3d 389, affirmed the decision of the bankruptcy court. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Kagan, held that:

[1] distributor/licensee's plausible claim for money damages ensured a live controversy, such that this case was not moot, and

[2] a debtor-licensor's rejection of an executory trademark licensing agreement does not deprive a licensee of its rights to use the trademark.

Reversed and remanded.

Justice Sotomayor filed a concurring opinion.

Justice Gorsuch filed a dissenting opinion.

West Headnotes (35)

[1]    **Bankruptcy**
       ⟜ Executory nature in general
       Term "executory contract," as used in the section of the Bankruptcy Code governing executory contracts and unexpired leases, means a contract that neither party has finished performing. 11 U.S.C.A. § 365(a).

       Cases that cite this headnote

[2]    **Bankruptcy**
       ⟜ Effect of Acceptance or Rejection
       Debtor's rejection of an executory contract pursuant to its authority under the Bankruptcy Code constitutes a breach of such contract. 11 U.S.C.A. §§ 365(a), 365(g).

       2 Cases that cite this headnote

[3]    **Bankruptcy**
       ⟜ In general;nature and purpose
       Chapter 11 of the Bankruptcy Code sets out a framework for reorganizing a bankrupt business.

       Cases that cite this headnote

[4]    **Bankruptcy**
       ⟜ Creation of estate;time
       **Bankruptcy**
       ⟜ Property of Estate in General
       Filing of a bankruptcy petition creates a bankruptcy estate consisting of all the debtor's assets and rights. 11 U.S.C.A. § 541.

       Cases that cite this headnote

[5]    **Bankruptcy**
       ⟜ The Estate
       **Bankruptcy**
       ⟜ In general;judicial supervision
       **Bankruptcy**
       ⟜ Debtor in possession, in general

**Mission Product Holdings, Inc. v. Tempnology, LLC, 139 S.Ct. 1652 (2019)**

67 Bankr.Ct.Dec. 51, 19 Cal. Daily Op. Serv. 4565, 2019 Daily Journal D.A.R. 4275...

"Bankruptcy estate" is the "pot" out of which creditors' claims are paid, and is administered by either a trustee or the Chapter 11 debtor itself. 11 U.S.C.A. §§ 541, 1101, 1107.

Cases that cite this headnote

**[6]    Bankruptcy**
    Executory nature in general
Under the section of the Bankruptcy Code governing executory contracts and unexpired leases, a contract is "executory" if performance remains due to some extent on both sides. 11 U.S.C.A. § 365(a).

Cases that cite this headnote

**[7]    Bankruptcy**
    Contracts Assumable;Assignability
In bankruptcy, an executory contract represents both an asset, that is, the debtor's right to the counterparty's future performance, and a liability, the debtor's own obligations to perform. 11 U.S.C.A. § 365(a).

Cases that cite this headnote

**[8]    Bankruptcy**
    Grounds for and Objections to Assumption, Rejection, or Assignment
Section of the Bankruptcy Code governing executory contracts and unexpired leases enables the debtor or its trustee, upon entering bankruptcy, to decide whether a particular contract is a good deal for the estate going forward; if so, the debtor will want to assume the contract, fulfilling its obligations while benefiting from the counterparty's performance, but if not, the debtor will want to reject the contract, repudiating any further performance of its duties. 11 U.S.C.A. § 365(a).

Cases that cite this headnote

**[9]    Bankruptcy**
    "Business judgment" test in general

Under the deferential "business judgment" rule, the bankruptcy court will generally approve the choice of a debtor or its trustee to assume or reject an executory contract. 11 U.S.C.A. § 365(a).

Cases that cite this headnote

**[10]    Bankruptcy**
    Effect of Acceptance or Rejection
Following rejection of an executory contract, which constitutes a breach of such contract, the counterparty has a claim against the estate for damages resulting from the debtor's nonperformance, though one that is deemed to be a prepetition claim rather than a postpetition claim. 11 U.S.C.A. § 365(g).

Cases that cite this headnote

**[11]    Bankruptcy**
    Effect of Acceptance or Rejection
By giving the counterparty to a rejected executory contract a prepetition claim, the Bankruptcy Code places that party in the same boat as the debtor's unsecured creditors, who in a typical bankruptcy may receive only cents on the dollar. 11 U.S.C.A. § 365(g).

Cases that cite this headnote

**[12]    Bankruptcy**
    Effect of Acceptance or Rejection
Under the section of the Bankruptcy Code governing executory contracts and unexpired leases, if a bankrupt landlord rejects a lease, the tenant need not move out; instead, she may stay and pay rent, just as she did before, until the lease term expires. 11 U.S.C.A. § 365(h).

Cases that cite this headnote

**[13]    Bankruptcy**
    Effect of Acceptance or Rejection
Under the section of the Bankruptcy Code governing executory contracts and unexpired leases, if a debtor-licensor rejects certain types

Case 6:18-ap-01089-MH    Doc 78    Filed 07/08/19    Entered 07/08/19 14:13:44    Desc
Main Document    Page 8 of 21

Mission Product Holdings, Inc. v. Tempnology, LLC, 139 S.Ct. 1652 (2019)

67 Bankr.Ct.Dec. 51, 19 Cal. Daily Op. Serv. 4565, 2019 Daily Journal D.A.R. 4275...

of intellectual property licenses, the licensee can continue to use the property, typically, a patent, so long as it makes whatever payments the contract demands. 11 U.S.C.A. § 365(n).

Cases that cite this headnote

[14]    **Federal Courts**
   ⟜ Available and effective relief
Court may dismiss a case as "moot" only if it is impossible for court to grant any effectual relief whatever to prevailing party.

Cases that cite this headnote

[15]    **Bankruptcy**
   ⟜ Moot questions
Licensee of Chapter 11 debtor-licensor's trademarks presented a plausible claim for money damages, essentially lost profits, arising from its inability to use trademarks of debtor between the time debtor rejected the parties' licensing agreement and its scheduled expiration date, thereby ensuring a live controversy, such that the case was not moot, notwithstanding debtor's insolvency and the prior distribution of all of its assets, and the fact that licensee's lawsuit might not make it rich, or even better off. U.S. Const. art. 3, § 2, cl. 1; 11 U.S.C.A. § 365(a).

1 Cases that cite this headnote

[16]    **Federal Courts**
   ⟜ Available and effective relief
Claims for money damages, if at all plausible, ensure a live controversy; for better or worse, nothing so shows a continuing stake in a dispute's outcome as a demand for dollars and cents. U.S. Const. art. 3, § 2, cl. 1.

Cases that cite this headnote

[17]    **Federal Courts**
   ⟜ Available and effective relief
Although the ultimate recovery on a demand for money damages may be uncertain or even unlikely for any number of reasons, that is

of no moment in determining the existence of a live controversy; if there is any chance of money changing hands, the suit remains live. U.S. Const. art. 3, § 2, cl. 1.

Cases that cite this headnote

[18]    **Bankruptcy**
   ⟜ Moot questions
In context of assertion that party's compliance with judicial decision mooted its case, party need not have flouted a crystal-clear judicial ruling and courted yet more legal trouble to preserve its claim.

Cases that cite this headnote

[19]    **Bankruptcy**
   ⟜ Effect of Acceptance or Rejection
Rejection of an executory trademark licensing agreement by a debtor-licensor or a bankruptcy trustee under the Bankruptcy Code breaches the contract but does not rescind it, and so does not deprive the licensee of its rights to use the trademark; "breach" means in the Code what it means in contract law outside bankruptcy, thus giving the licensee a claim for damages while leaving intact the rights the licensee has received under the contract. 11 U.S.C.A. §§ 365, 365(a), 365(g).

1 Cases that cite this headnote

[20]    **Bankruptcy**
   ⟜ Effect of Acceptance or Rejection
Rejection of any contract in bankruptcy operates not as a rescission, but as a breach. 11 U.S.C.A. §§ 365, 365(a).

2 Cases that cite this headnote

[21]    **Bankruptcy**
   ⟜ Effect of Acceptance or Rejection
Term "breach," as used in the subsection of the Bankruptcy Code providing that rejection of an executory contract constitutes a breach of that contract, is neither a defined nor

Mission Product Holdings, Inc. v. Tempnology, LLC, 139 S.Ct. 1652 (2019)
67 Bankr.Ct.Dec. 51, 19 Cal. Daily Op. Serv. 4565, 2019 Daily Journal D.A.R. 4275...

a specialized bankruptcy term but, rather, means in the Code what it means in contract law outside bankruptcy. 11 U.S.C.A. § 365(g).

1 Cases that cite this headnote

**[22]    Bailment**
   ⟜ Termination, rescission, and option to purchase property
**Contracts**
   ⟜ Rights and Liabilities on Breach

Outside bankruptcy, the law of breach works as follows: if, for example, a dealer leases a photocopier to a law firm while agreeing to service it every month and, in exchange, the firm commits to pay a monthly fee, but, during the lease term, the dealer decides to stop servicing the machine, thus breaching the agreement in a material way, the firm generally has a choice either to keep up its side of the bargain, continuing to pay for use of the **copier** while suing the dealer for damages from the service breach, or to call the whole deal off, halting its own payments and returning the **copier** while suing for any damages incurred; the choice to terminate the agreement and send back the **copier** is for the firm, not the dealer.

Cases that cite this headnote

**[23]    Bankruptcy**
   ⟜ Effect of Acceptance or Rejection

In bankruptcy, rejection of an executory contract constitutes a breach, and so, for example, if a dealer that has leased a photocopier to a law firm while agreeing to service it every month files a Chapter 11 petition and decides to reject its agreement with the firm, meaning that the dealer will stop servicing the **copier**, the firm has an option either to continue the contract or to walk away while suing for whatever damages go with its choice; most important, it means that, assuming the firm wants to keep using the **copier**, the dealer cannot take it back, as the firm retains the rights it received under the agreement, and the rejection does not

terminate the contract or result in the parties going back to their pre-contract positions. 11 U.S.C.A. §§ 365, 365(a), 365(g).

1 Cases that cite this headnote

**[24]    Bankruptcy**
   ⟜ Executory nature in general

Licensing agreements involving trademarks or other property may be "executory," whereby the licensor not only grants a license, but provides associated goods or services during its term, while the licensee pays continuing royalties or fees. 11 U.S.C.A. § 365.

Cases that cite this headnote

**[25]    Trademarks**
   ⟜ Effect as estoppel
**Trademarks**
   ⟜ Duration and termination;revocation

If a trademark licensor breaches the licensing agreement outside bankruptcy, the breach generally does not revoke the license or stop the licensee from doing what it allows.

Cases that cite this headnote

**[26]    Bankruptcy**
   ⟜ Effect of Acceptance or Rejection

If a debtor-trademark licensor breaches an executory licensing agreement during bankruptcy, through rejection of the agreement, the debtor may stop performing its remaining obligations under the agreement, but the debtor may not rescind the license already conveyed, and so the licensee may continue to do whatever the license authorizes. 11 U.S.C.A. §§ 365, 365(a), 365(g).

Cases that cite this headnote

**[27]    Bankruptcy**
   ⟜ Interest of debtor in general

A general bankruptcy rule provides that the estate cannot possess anything more than

**Mission Product Holdings, Inc. v. Tempnology, LLC, 139 S.Ct. 1652 (2019)**

67 Bankr.Ct.Dec. 51, 19 Cal. Daily Op. Serv. 4565, 2019 Daily Journal D.A.R. 4275...

the debtor itself did outside bankruptcy. 11 U.S.C.A. § 541.

Cases that cite this headnote

[28]    **Bankruptcy**
    ⬠ Interest of debtor in general
Whatever limitations on a debtor's property apply outside of bankruptcy apply inside of bankruptcy as well; debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either. 11 U.S.C.A. § 541.

Cases that cite this headnote

[29]    **Bankruptcy**
    ⬠ Rights under contracts
If the not-yet debtor was subject to a counterparty's contractual right, so too is the trustee or debtor once the bankruptcy petition has been filed. 11 U.S.C.A. § 541.

Cases that cite this headnote

[30]    **Bankruptcy**
    ⬠ Avoidance rights and limits thereon, in general
"Avoidance actions" are exceptional cases in which bankruptcy trustees or debtors may unwind pre-bankruptcy transfers that undermine the bankruptcy process.

Cases that cite this headnote

[31]    **Bankruptcy**
    ⬠ Fraudulent conveyances in general
One example of avoidance actions in which a bankruptcy trustee or debtor may unwind pre-bankruptcy transfers that undermine the bankruptcy process is for fraudulent conveyances, which are usually something-for-nothing transfers that deplete the estate, and so cheat creditors, on the eve of bankruptcy. 11 U.S.C.A. § 548(a).

Cases that cite this headnote

[32]    **Bankruptcy**
    ⬠ Trustee as representative of debtor or creditors
Bankruptcy trustee's avoidance powers may be invoked in only narrow circumstances. 11 U.S.C.A. §§ 544-553.

Cases that cite this headnote

[33]    **Bankruptcy**
    ⬠ Grounds for and Objections to Assumption, Rejection, or Assignment
Power of rejection may be exercised by a debtor or a bankruptcy trustee for any plausible economic reason. 11 U.S.C.A. § 365.

Cases that cite this headnote

[34]    **Bankruptcy**
    ⬠ In general;nature and purpose
Although the Bankruptcy Code aims to make reorganizations possible, it does not permit anything and everything that might advance that goal.

Cases that cite this headnote

[35]    **Bankruptcy**
    ⬠ Effect of Acceptance or Rejection
In allowing rejection of a debtor's future contractual duties, the section of the Bankruptcy Code governing executory contracts and unexpired leases does not grant the debtor an exemption from all the burdens that generally applicable law imposes on property owners. 11 U.S.C.A. § 365.

Cases that cite this headnote

*Syllabus*[*]

Petitioner **Mission** Product Holdings, Inc., entered into a contract with Respondent **Tempnology**, LLC, which gave **Mission** a license to use **Tempnology's** trademarks in

Mission Product Holdings, Inc. v. Tempnology, LLC, 139 S.Ct. 1652 (2019)

67 Bankr.Ct.Dec. 51, 19 Cal. Daily Op. Serv. 4565, 2019 Daily Journal D.A.R. 4275...

connection with the distribution of certain clothing and accessories. **Tempnology** filed for Chapter 11 bankruptcy and sought to reject its agreement with **Mission**. Section 365 of the Bankruptcy Code enables a debtor to "reject any executory contract"—meaning a contract that neither party has finished performing. 11 U.S.C. § 365(a). It further provides that rejection "constitutes a breach of such contract." § 365(g). The Bankruptcy Court approved **Tempnology**'s rejection and further held that the rejection terminated **Mission**'s rights to use **Tempnology**'s trademarks. The Bankruptcy Appellate Panel reversed, relying on Section 365(g)'s statement that rejection "constitutes a breach" to hold that rejection does not terminate rights that would survive a breach of contract outside bankruptcy. The First Circuit rejected the Panel's judgment and reinstated the Bankruptcy Court's decision.

*Held*:

1. This case is not moot. **Mission** presents a plausible claim for money damages arising from its inability to use **Tempnology**'s trademarks, which is sufficient to preserve a live controversy. See *Chafin v. Chafin*, 568 U. S. 165, 172, 133 S.Ct. 1017, 185 L.Ed.2d 1. **Tempnology**'s various arguments that **Mission** is not entitled to damages do not so clearly preclude recovery as to render this case moot. Pp. 1660 – 1661.

2. A debtor's rejection of an executory contract under Section 365 of the Bankruptcy Code has the same effect as a breach of that contract outside bankruptcy. Such an act cannot rescind rights that the contract previously granted. Pp. 1660 – 1666.

(a) Section 365(g) provides that rejection "constitutes a breach." And "breach" is neither a defined nor a specialized bankruptcy term—it means in the Code what it means in contract law outside bankruptcy. See *Field v. Mans*, 516 U. S. 59, 69, 116 S.Ct. 437, 133 L.Ed.2d 351. Outside bankruptcy, a licensor's breach cannot revoke continuing rights given to a counterparty under a contract (assuming no special contract term or state law). And because rejection "constitutes a breach," the same result must follow from rejection in bankruptcy. In preserving a counterparty's rights, Section 365 reflects the general bankruptcy rule that the estate cannot possess anything more than the debtor did outside bankruptcy. See *Board of Trade of Chicago v. Johnson*, 264 U. S. 1, 15, 44 S.Ct. 232, 68 L.Ed. 533. And conversely, allowing rejection

to rescind a counterparty's rights would circumvent the Code's stringent limits on "avoidance" actions—the exceptional cases in which debtors may unwind pre-bankruptcy transfers that undermine the bankruptcy process. See, *e.g.*, § 548(a). Pp. 1661 – 1664.

(b) **Tempnology**'s principal counterargument rests on a negative inference drawn from provisions of Section 365 identifying categories of contracts under which a counterparty may retain specified rights after rejection. See §§ 365(h), (i), (n). **Tempnology** argues that these provisions indicate that the ordinary consequence of rejection must be something different—*i.e.*, the termination of contractual rights previously granted. But that argument offers no account of how to read Section 365(g) (rejection "constitutes a breach") to say essentially its opposite. And the provisions **Tempnology** treats as a reticulated scheme of exceptions each emerged at a different time and responded to a discrete problem—as often as not, correcting a judicial ruling of just the kind **Tempnology** urges.

**Tempnology**'s remaining argument turns on how the special features of trademark law may affect the fulfillment of the Code's goals. Unless rejection terminates a licensee's right to use a trademark, **Tempnology** argues, a debtor must choose between monitoring the goods sold under a license or risking the loss of its trademark, either of which would impede a debtor's ability to reorganize. But the distinctive features of trademarks do not persuade this Court to adopt a construction of Section 365 that will govern much more than trademark licenses. And **Tempnology**'s plea to facilitate reorganizations cannot overcome what Section 365(a) and (g) direct. In delineating the burdens a debtor may and may not escape, Section 365's edict that rejection is breach expresses a more complex set of aims than **Tempnology** acknowledges. Pp. 1663 – 1666.

879 F. 3d 389, reversed and remanded.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, GINSBURG, BREYER, ALITO, SOTOMAYOR, and KAVANAUGH, JJ., joined. SOTOMAYOR, J., filed a concurring opinion. GORSUCH, J., filed a dissenting opinion.

Mission Product Holdings, Inc. v. Tempnology, LLC, 139 S.Ct. 1652 (2019)

67 Bankr.Ct.Dec. 51, 19 Cal. Daily Op. Serv. 4565, 2019 Daily Journal D.A.R. 4275...

**Attorneys and Law Firms**

**\*1656** Danielle Spinelli, Washington, DC, for petitioner.

Zachary D. Tripp, for the United States as amicus curiae, by special leave of the Court, in support of the petitioner.

Douglas Hallward-Driemeier, Washington, DC, for respondent.

Robert J. Keach, Lindsay Z. Milne, Bernstein, Shur, Sawyer & Nelson, Portland, ME, Danielle Spinelli, Craig Goldblatt, Joel Millar, James Barton, Wilmer Cutler Pickering, Hale and Dorr LLP, Washington, DC, for petitioner.

James Wilton, Patricia Chen, Ropes & Gray LLP, Boston, MA, Lee Harrington, George Skelly, Nixon Peabody, LLP, Boston, MA, Daniel W. Sklar, Nixon Peabody, LLP, Manchester, NH, Douglas Hallward-Driemeier, Jonathan Ference-Burke, Ropes & Gray LLP, Washington, DC, Gregg Galardi, Ropes & Gray LLP, New York, NY, Christopher M. Desiderio, Nixon Peabody, LLP, New York, NY, for respondent.

**Opinion**

Justice KAGAN delivered the opinion of the Court.

**\*1657** **[1]** **[2]** Section 365 of the Bankruptcy Code enables a debtor to "reject any executory contract"—meaning a contract that neither party has finished performing. 11 U.S.C. § 365(a). The section further provides that a debtor's rejection of a contract under that authority "constitutes a breach of such contract." § 365(g).

Today we consider the meaning of those provisions in the context of a trademark licensing agreement. The question is whether the debtor-licensor's rejection of that contract deprives the licensee of its rights to use the trademark. We hold it does not. A rejection breaches a contract **\*1658** but does not rescind it. And that means all the rights that would ordinarily survive a contract breach, including those conveyed here, remain in place.

I

This case arises from a licensing agreement gone wrong. Respondent **Tempnology**, LLC, manufactured clothing and accessories designed to stay cool when used in

exercise. It marketed those products under the brand name "Coolcore," using trademarks (*e.g.*, logos and labels) to distinguish the gear from other athletic apparel. In 2012, **Tempnology** entered into a contract with petitioner **Mission** Product Holdings, Inc. See App. 203–255. The agreement gave **Mission** an exclusive license to distribute certain Coolcore products in the United States. And more important here, it granted **Mission** a non-exclusive license to use the Coolcore trademarks, both in the United States and around the world. The agreement was set to expire in July 2016. But in September 2015, **Tempnology** filed a petition for Chapter 11 bankruptcy. And it soon afterward asked the Bankruptcy Court to allow it to "reject" the licensing agreement. § 365(a).

**[3]** **[4]** **[5]** Chapter 11 of the Bankruptcy Code sets out a framework for reorganizing a bankrupt business. See §§ 1101–1174. The filing of a petition creates a bankruptcy estate consisting of all the debtor's assets and rights. See § 541. The estate is the pot out of which creditors' claims are paid. It is administered by either a trustee or, as in this case, the debtor itself. See §§ 1101, 1107.

**[6]** **[7]** **[8]** **[9]** Section 365(a) of the Code provides that a "trustee [or debtor], subject to the court's approval, may assume or reject any executory contract." § 365(a). A contract is executory if "performance remains due to some extent on both sides." *NLRB v. Bildisco & Bildisco*, 465 U. S. 513, 522, n. 6, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (internal quotation marks omitted). Such an agreement represents both an asset (the debtor's right to the counterparty's future performance)` and a liability (the debtor's own obligations to perform). Section 365(a) enables the debtor (or its trustee), upon entering bankruptcy, to decide whether the contract is a good deal for the estate going forward. If so, the debtor will want to assume the contract, fulfilling its obligations while benefiting from the counterparty's performance. But if not, the debtor will want to reject the contract, repudiating any further performance of its duties. The bankruptcy court will generally approve that choice, under the deferential "business judgment" rule. *Id.*, at 523, 104 S.Ct. 1188.

**[10]** **[11]** According to Section 365(g), "the rejection of an executory contract[ ] constitutes a breach of such contract." As both parties here agree, the counterparty thus has a claim against the estate for damages resulting from the debtor's nonperformance. See Brief for

**Mission Product Holdings, Inc. v. Tempnology, LLC, 139 S.Ct. 1652 (2019)**

67 Bankr.Ct.Dec. 51, 19 Cal. Daily Op. Serv. 4565, 2019 Daily Journal D.A.R. 4275...

Petitioner 17, 19; Brief for Respondent 30–31. But such a claim is unlikely to ever be paid in full. That is because the debtor's breach is deemed to occur "immediately before the date of the filing of the [bankruptcy] petition," rather than on the actual post-petition rejection date. § 365(g)(1). By thus giving the counterparty a pre-petition claim, Section 365(g) places that party in the same boat as the debtor's unsecured creditors, who in a typical bankruptcy may receive only cents on the dollar. See *Bildisco*, 465 U. S. at 531–532, 104 S.Ct. 1188 (noting the higher priority of post-petition claims).

In this case, the Bankruptcy Court (per usual) approved **Tempnology's** proposed rejection of its executory licensing agreement with **Mission**. See App. to Pet. for \***1659** Cert. 83–84. That meant, as laid out above, two things on which the parties agree. First, **Tempnology** could stop performing under the contract. And second, **Mission** could assert (for whatever it might be worth) a pre-petition claim in the bankruptcy proceeding for damages resulting from **Tempnology's** nonperformance.

[12]    [13] But **Tempnology** thought still another consequence ensued, and it returned to the Bankruptcy Court for a declaratory judgment confirming its view. According to **Tempnology**, its rejection of the contract also terminated the rights it had granted **Mission** to use the Coolcore trademarks. **Tempnology** based its argument on a negative inference. See Motion in No. 15–11400 (Bkrtcy. Ct. NH), pp. 9–14. Several provisions in Section 365 state that a counterparty to specific kinds of agreements may keep exercising contractual rights after a debtor's rejection. For example, Section 365(h) provides that if a bankrupt landlord rejects a lease, the tenant need not move out; instead, she may stay and pay rent (just as she did before) until the lease term expires. And still closer to home, Section 365(n) sets out a similar rule for some types of intellectual property licenses: If the debtor-licensor rejects the agreement, the licensee can continue to use the property (typically, a patent), so long as it makes whatever payments the contract demands. But **Tempnology** pointed out that neither Section 365(n) nor any similar provision covers trademark licenses. So, it reasoned, in that sort of contract a different rule must apply: The debtor's rejection must extinguish the rights that the agreement had conferred on the trademark licensee. The Bankruptcy Court agreed. See *In re Tempnology, LLC*, 541 B. R. 1 (Bkrtcy. Ct. NH 2015). It held, relying on the same "negative inference," that **Tempnology's** rejection of the

licensing agreement revoked **Mission's** right to use the Coolcore marks. *Id.*, at 7.

The Bankruptcy Appellate Panel reversed, relying heavily on a decision of the Court of Appeals for the Seventh Circuit about the effects of rejection on trademark licensing agreements. See *In re Tempnology, LLC*, 559 B. R. 809, 820–823 (Bkrtcy. App. Panel CA1 2016); *Sunbeam Products, Inc. v. Chicago Am. Mfg., LLC*, 686 F. 3d 372, 376–377 (CA7 2012). Rather than reason backward from Section 365(n) or similar provisions, the Panel focused on Section 365(g)'s statement that rejection of a contract "constitutes a breach." Outside bankruptcy, the court explained, the breach of an agreement does not eliminate rights the contract had already conferred on the non-breaching party. See 559 B. R. at 820. So neither could a rejection of an agreement in bankruptcy have that effect. A rejection "convert[s]" a "debtor's unfulfilled obligations" to a pre-petition damages claim. *Id.*, at 822 (quoting *Sunbeam*, 686 F. 3d at 377). But it does not "terminate the contract" or "vaporize[ ]" the counterparty's rights. 559 B. R. at 820, 822 (quoting *Sunbeam*, 686 F. 3d at 377). **Mission** could thus continue to use the Coolcore trademarks.

But the Court of Appeals for the First Circuit rejected the Panel's and Seventh Circuit's view, and reinstated the Bankruptcy Court decision terminating **Mission's** license. See *In re Tempnology, LLC*, 879 F. 3d 389 (2018). The majority first endorsed that court's inference from Section 365(n) and similar provisions. It next reasoned that special features of trademark law counsel against allowing a licensee to retain rights to a mark after the licensing agreement's rejection. Under that body of law, the majority stated, the trademark owner's "[f]ailure to monitor and exercise [quality] control" over goods associated with a trademark "jeopardiz[es] \***1660** the continued validity of [its] own trademark rights." *Id.*, at 402. So if (the majority continued) a licensee can keep using a mark after an agreement's rejection, the licensor will need to carry on its monitoring activities. And according to the majority, that would frustrate "Congress's principal aim in providing for rejection": to "release the debtor's estate from burdensome obligations." *Ibid.* (internal quotation marks omitted). Judge Torruella dissented, mainly for the Seventh Circuit's reasons. See *id.*, at 405–407.

Mission Product Holdings, Inc. v. Tempnology, LLC, 139 S.Ct. 1652 (2019)

67 Bankr.Ct.Dec. 51, 19 Cal. Daily Op. Serv. 4565, 2019 Daily Journal D.A.R. 4275...

We granted certiorari to resolve the division between the First and Seventh Circuits. 586 U. S. ——, 139 S.Ct. 397, 202 L.Ed.2d 309 (2018). We now affirm the Seventh's reasoning and reverse the decision below. [1]

## II

[14]  Before reaching the merits, we pause to consider **Tempnology's** claim that this case is moot. Under settled law, we may dismiss the case for that reason only if "it is impossible for a court to grant any effectual relief whatever" to **Mission** assuming it prevails. *Chafin v. Chafin*, 568 U. S. 165, 172, 133 S.Ct. 1017, 185 L.Ed.2d 1 (2013) (internal quotation marks omitted). That demanding standard is not met here.

[15]  [16]  [17]  **Mission** has presented a claim for money damages—essentially lost profits—arising from its inability to use the Coolcore trademarks between the time **Tempnology** rejected the licensing agreement and its scheduled expiration date. See Reply Brief 22, and n. 8. Such claims, if at all plausible, ensure a live controversy. See *Memphis Light, Gas & Water Div. v. Craft*, 436 U. S. 1, 8–9, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978). For better or worse, nothing so shows a continuing stake in a dispute's outcome as a demand for dollars and cents. See 13C C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3533.3, p. 2 (3d ed. 2008) (Wright & Miller) ("[A] case is not moot so long as a claim for monetary relief survives"). Ultimate recovery on that demand may be uncertain or even unlikely for any number of reasons, in this case as in others. But that is of no moment. If there is any chance of money changing hands, **Mission's** suit remains live. See *Chafin*, 568 U. S. at 172, 133 S.Ct. 1017.

[18]  **Tempnology** makes a flurry of arguments about why **Mission** is not entitled to damages, but none so clearly precludes recovery as to make this case moot. First, **Tempnology** contends that **Mission** suffered no injury because it "never used the trademark[s] during [the post-rejection] period." Brief for Respondent 24; see Tr. of Oral Arg. 33. But that gets things backward. **Mission's** non-use of the marks during that time is precisely what gives rise to its damages claim; had it employed the marks, it would not have lost any profits. So next, **Tempnology** argues that **Mission's** non-use was its own "choice," for which damages cannot lie. See *id.*, at 26. But recall that the Bankruptcy Court held that **Mission** *could not* use

the marks after rejection (and its decision remained in effect through the agreement's expiration). See *supra*, at 1659. And although (as **Tempnology** counters) the court issued "no injunction," Brief for Respondent 26, that difference does not matter: **Mission** need not have flouted a crystal-clear ruling and ***1661** courted yet more legal trouble to preserve its claim. Cf. 13B Wright & Miller § 3533.2.2, at 852 ("[C]ompliance [with a judicial decision] does not moot [a case] if it remains possible to undo the effects of compliance," as through compensation). So last, **Tempnology** claims that it bears no blame (and thus should not have to pay) for **Mission's** injury because all it did was "ask[ ] the court to make a ruling." Tr. of Oral Arg. 34–35. But whether **Tempnology** did anything to **Mission** amounting to a legal wrong is a prototypical merits question, which no court has addressed and which has no obvious answer. That means it is no reason to find this case moot.

And so too for **Tempnology's** further argument that **Mission** will be unable to convert any judgment in its favor to hard cash. Here, **Tempnology** notes that the bankruptcy estate has recently distributed all of its assets, leaving nothing to satisfy **Mission's** judgment. See Brief for Respondent 27. But courts often adjudicate disputes whose "practical impact" is unsure at best, as when "a defendant is insolvent." *Chafin*, 568 U. S. at 175, 133 S.Ct. 1017. And **Mission** notes that if it prevails, it can seek the unwinding of prior distributions to get its fair share of the estate. See Reply Brief 23. So although this suit "may not make [**Mission**] rich," or even better off, it remains a live controversy—allowing us to proceed. *Chafin*, 568 U. S. at 176, 133 S.Ct. 1017.

## III

[19]  [20]  What is the effect of a debtor's (or trustee's) rejection of a contract under Section 365 of the Bankruptcy Code? The parties and courts of appeals have offered us two starkly different answers. According to one view, a rejection has the same consequence as a contract breach outside bankruptcy: It gives the counterparty a claim for damages, while leaving intact the rights the counterparty has received under the contract. According to the other view, a rejection (except in a few spheres) has more the effect of a contract rescission in the non-bankruptcy world: Though also allowing a damages claim, the rejection terminates the whole

**Mission Product Holdings, Inc. v. Tempnology, LLC, 139 S.Ct. 1652 (2019)**

67 Bankr.Ct.Dec. 51, 19 Cal. Daily Op. Serv. 4565, 2019 Daily Journal D.A.R. 4275...

agreement along with all rights it conferred. Today, we hold that both Section 365's text and fundamental principles of bankruptcy law command the first, rejection-as-breach approach. We reject the competing claim that by specifically enabling the counterparties in some contracts to retain rights after rejection, Congress showed that it wanted the counterparties in all other contracts to lose their rights. And we reject an argument for the rescission approach turning on the distinctive features of trademark licenses. Rejection of a contract—any contract —in bankruptcy operates not as a rescission but as a breach.

## A

**[21]**  We start with the text of the Code's principal provisions on rejection—and find that it does much of the work. As noted earlier, Section 365(a) gives a debtor the option, subject to court approval, to "assume or reject any executory contract." See *supra*, at 1658. And Section 365(g) describes what rejection means. Rejection "constitutes a breach of [an executory] contract," deemed to occur "immediately before the date of the filing of the petition." See *supra*, at 1658. Or said more pithily for current purposes, a rejection is a breach. And "breach" is neither a defined nor a specialized bankruptcy term. It means in the Code what it means in contract law outside bankruptcy. See *Field v. Mans*, 516 U. S. 59, 69, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (Congress generally meant for the Bankruptcy Code to "incorporate the established meaning" of "terms that have accumulated settled meaning" (internal quotation marks omitted)). So the **\*1662** first place to go in divining the effects of rejection is to non-bankruptcy contract law, which can tell us the effects of breach.

**[22]**  Consider a made-up executory contract to see how the law of breach works outside bankruptcy. A dealer leases a photocopier to a law firm, while agreeing to service it every month; in exchange, the firm commits to pay a monthly fee. During the lease term, the dealer decides to stop servicing the machine, thus breaching the agreement in a material way. The law firm now has a choice (assuming no special contract term or state law). The firm can keep up its side of the bargain, continuing to pay for use of the **copier**, while suing the dealer for damages from the service breach. Or the firm can call the whole deal off, halting its own payments and returning

the **copier**, while suing for any damages incurred. See 13 R. Lord, Williston on Contracts § 39:32, pp. 701–702 (4th ed. 2013) ("[W]hen a contract is breached in the course of performance, the injured party may elect to continue the contract or refuse to perform further"). But to repeat: The choice to terminate the agreement and send back the **copier** is for the *law firm*. By contrast, the *dealer* has no ability, based on its own breach, to terminate the agreement. Or otherwise said, the dealer cannot get back the **copier** just by refusing to show up for a service appointment. The contract gave the law firm continuing rights in the **copier**, which the dealer cannot unilaterally revoke.

**[23]**  And now to return to bankruptcy: If the rejection of the photocopier contract "constitutes a breach," as the Code says, then the same results should follow (save for one twist as to timing). Assume here that the dealer files a Chapter 11 petition and decides to reject its agreement with the law firm. That means, as above, that the dealer will stop servicing the **copier**. It means, too, that the law firm has an option about how to respond—continue the contract or walk away, while suing for whatever damages go with its choice. (Here is where the twist comes in: Because the rejection is deemed to occur "immediately before" bankruptcy, the firm's damages suit is treated as a pre-petition claim on the estate, which will likely receive only cents on the dollar. See *supra*, at 1658 – 1659.) And most important, it means that assuming the law firm wants to keep using the **copier**, the dealer cannot take it back. A rejection does not terminate the contract. When it occurs, the debtor and counterparty do not go back to their pre-contract positions. Instead, the counterparty retains the rights it has received under the agreement. As after a breach, so too after a rejection, those rights survive.

**[24]    [25]    [26]**  All of this, it will hardly surprise you to learn, is not just about photocopier leases. Sections 365(a) and (g) speak broadly, to "any executory contract[s]." Many licensing agreements involving trademarks or other property are of that kind (including, all agree, the **Tempnology-Mission** contract). The licensor not only grants a license, but provides associated goods or services during its term; the licensee pays continuing royalties or fees. If the licensor breaches the agreement outside bankruptcy (again, barring any special contract term or state law), everything said above goes. In particular, the breach does not revoke the license or stop the licensee from doing what it allows. See, *e.g.*, *Sunbeam*, 686 F. 3d at

Case 6:18-ap-01089-MH    Doc 78    Filed 07/08/19    Entered 07/08/19 14:13:44    Desc
Main Document    Page 16 of 21

Mission Product Holdings, Inc. v. Tempnology, LLC, 139 S.Ct. 1652 (2019)

67 Bankr.Ct.Dec. 51, 19 Cal. Daily Op. Serv. 4565, 2019 Daily Journal D.A.R. 4275...

376 ("Outside of bankruptcy, a licensor's breach does not terminate a licensee's right to use [the licensed] intellectual property"). And because rejection "constitutes a breach," § 365(g), the same consequences follow in bankruptcy. The debtor can stop performing its remaining obligations under the agreement. But the debtor cannot rescind the license already conveyed. So the licensee *1663 can continue to do whatever the license authorizes.

[27]  [28]  [29]  In preserving those rights, Section 365 reflects a general bankruptcy rule: The estate cannot possess anything more than the debtor itself did outside bankruptcy. See *Board of Trade of Chicago v. Johnson*, 264 U.S. 1, 15, 44 S.Ct. 232, 68 L.Ed. 533 (1924) (establishing that principle); § 541(a)(1) (defining the estate to include the "interests *of the debtor* in property" (emphasis added)). As one bankruptcy scholar has put the point: Whatever "limitation[s] on the debtor's property [apply] outside of bankruptcy[ ] appl[y] inside of bankruptcy as well. A debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either." D. Baird, Elements of Bankruptcy 97 (6th ed. 2014). So if the not-yet debtor was subject to a counterparty's contractual right (say, to retain a **copier** or use a trademark), so too is the trustee or debtor once the bankruptcy petition has been filed. The rejection-as-breach rule (but *not* the rejection-as-rescission rule) ensures that result. By insisting that the same counterparty rights survive rejection as survive breach, the rule prevents a debtor in bankruptcy from recapturing interests it had given up.

[30]  [31]  [32]  [33]  And conversely, the rejection-as-rescission approach would circumvent the Code's stringent limits on "avoidance" actions—the exceptional cases in which trustees (or debtors) may indeed unwind pre-bankruptcy transfers that undermine the bankruptcy process. The most notable example is for fraudulent conveyances—usually, something-for-nothing transfers that deplete the estate (and so cheat creditors) on the eve of bankruptcy. See § 548(a). A trustee's avoidance powers are laid out in a discrete set of sections in the Code, see §§ 544–553, far away from Section 365. And they can be invoked in only narrow circumstances—unlike the power of rejection, which may be exercised for any plausible economic reason. See, *e.g.*, § 548(a) (describing the requirements for avoiding fraudulent transfers); *supra*, at 1658 – 1659. If trustees (or debtors) could use rejection to rescind previously granted interests, then rejection would become functionally equivalent to avoidance. Both,

that is, would roll back a prior transfer. And that result would subvert everything the Code does to keep avoidances cabined—so they do not threaten the rule that the estate can take only what the debtor possessed before filing. Again, then, core tenets of bankruptcy law push in the same direction as Section 365's text: Rejection is breach, and has only its consequences.

B

Tempnology's main argument to the contrary, here as in the courts below, rests on a negative inference. See Brief for Respondent 33–41; *supra*, at 1658 – 1659. Several provisions of Section 365, Tempnology notes, "identif[y] categories of contracts under which a counterparty" may retain specified contract rights "notwithstanding rejection." Brief for Respondent 34. Sections 365(h) and (i) make clear that certain purchasers and lessees of real property and timeshare interests can continue to exercise rights after a debtor has rejected the lease or sales contract. See § 365(h)(1) (real-property leases); § 365(i) (real-property sales contracts); §§ 365(h)(2), (i) (timeshare interests). And Section 365(n) similarly provides that licensees of some intellectual property —but not trademarks—retain contractual rights after rejection. See § 365(n); § 101(35A); *supra*, at 1659. Tempnology argues from those provisions that the ordinary consequence of rejection must be something different—*i.e.*, the termination, rather than survival, of contractual rights previously granted. Otherwise, Tempnology concludes, *1664 the statute's "general rule" would "swallow the exceptions." Brief for Respondent 19.

But that argument pays too little heed to the main provisions governing rejection and too much to subsidiary ones. On the one hand, it offers no account of how to read Section 365(g) (recall, rejection "constitutes a breach") to say essentially its opposite (*i.e.*, that rejection and breach have divergent consequences). On the other hand, it treats as a neat, reticulated scheme of "narrowly tailored exception[s]," *id.*, at 36 (emphasis deleted), what history reveals to be anything but. Each of the provisions Tempnology highlights emerged at a different time, over a span of half a century. See, *e.g.*, 52 Stat. 881 (1938) (real-property leases); § 1(b), 102 Stat. 2538 (1988) (intellectual property). And each responded to a discrete problem—as often as not, correcting a judicial ruling of just the kind Tempnology urges. See Andrew, Executory Contracts in

**Mission Product Holdings, Inc. v. Tempnology, LLC, 139 S.Ct. 1652 (2019)**

67 Bankr.Ct.Dec. 51, 19 Cal. Daily Op. Serv. 4565, 2019 Daily Journal D.A.R. 4275...

Bankruptcy, 59 U. Colo. L. Rev. 845, 911–912, 916–919 (1988) (identifying judicial decisions that the provisions overturned); compare, *e.g.*, *In re Sombrero Reef Club, Inc.*, 18 B. R. 612, 618–619 (Bkrtcy. Ct. SD Fla. 1982), with, *e.g.*, §§ 365(h)(2), (i). Read as generously as possible to **Tempnology**, this mash-up of legislative interventions says nothing much of anything about the content of Section 365(g)'s general rule. Read less generously, it affirmatively refutes **Tempnology's** rendition. As one bankruptcy scholar noted after an exhaustive review of the history: "What the legislative record [reflects] is that whenever Congress has been confronted with the consequences of the [view that rejection terminates all contractual rights], it has expressed its disapproval." Andrew, 59 U. Colo. L. Rev., at 928. On that account, Congress enacted the provisions, as and when needed, to reinforce or clarify the general rule that contractual rights survive rejection.[2]

Consider more closely, for example, Congress's enactment of Section 365(n), which addresses certain intellectual property licensing agreements. No one disputes how that provision came about. In *Lubrizol Enterprises v. Richmond Metal Finishers*, the Fourth Circuit held that a debtor's rejection of an executory contract worked to revoke its grant of a patent license. See 756 F. 2d 1043, 1045–1048 (1985). In other words, *Lubrizol* adopted the same rule for patent licenses that the First Circuit announced for trademark licenses here. Congress sprang into action, drafting Section 365(n) to reverse *Lubrizol* and ensure the continuation of patent (and some other intellectual property) licensees' rights. See 102 Stat. 2538 (1988); S. Rep. No. 100–505, pp. 2–4 (1988) (explaining that Section 365(n) "corrects [*Lubrizol's*] perception" that "Section 365 was ever intended to be a mechanism for stripping innocent licensee[s] of rights"). As **Tempnology** highlights, that provision does not cover trademark licensing agreements, which continue to fall, along with most other contracts, within Section 365(g)'s general rule. See Brief for Respondent 38. But what of that? Even put aside the claim that Section 365(n) is part of a pattern —that Congress whacked **Tempnology's** view **\*1665** of rejection wherever it raised its head. See *supra*, at 1664. Still, Congress's repudiation of *Lubrizol* for patent contracts does not show any intent to *ratify* that decision's approach for almost all others. Which is to say that no negative inference arises. Congress did nothing in adding Section 365(n) to alter the natural reading of Section 365(g)—that rejection and breach have the same results.

**Tempnology's** remaining argument turns on the way special features of trademark law may affect the fulfillment of the Code's goals. Like the First Circuit below, **Tempnology** here focuses on a trademark licensor's duty to monitor and "exercise quality control over the goods and services sold" under a license. Brief for Respondent 20; see *supra*, at 1659 – 1660. Absent those efforts to keep up quality, the mark will naturally decline in value and may eventually become altogether invalid. See 3 J. McCarthy, Trademarks and Unfair Competition § 18:48, pp. 18–129, 18–133 (5th ed. 2018). So (**Tempnology** argues) unless rejection of a trademark licensing agreement terminates the licensee's rights to use the mark, the debtor will have to choose between expending scarce resources on quality control and risking the loss of a valuable asset. See Brief for Respondent 59. "Either choice," **Tempnology** concludes, "would impede a [debtor's] ability to reorganize," thus "undermining a fundamental purpose of the Code." *Id.*, at 59–60.

To begin with, that argument is a mismatch with **Tempnology's** reading of Section 365. The argument is trademark-specific. But **Tempnology's** reading of Section 365 is not. Remember, **Tempnology** construes that section to mean that a debtor's rejection of a contract terminates the counterparty's rights "unless the contract falls within an express statutory exception." *Id.*, at 27–28; see *supra*, at 1663 – 1664. That construction treats trademark agreements identically to most other contracts; the only agreements getting different treatment are those falling within the discrete provisions just discussed. And indeed, **Tempnology** could not have discovered, however hard it looked, any trademark-specific rule in Section 365. That section's special provisions, as all agree, do not mention trademarks; and the general provisions speak, well, generally. So **Tempnology** is essentially arguing that distinctive features of trademarks should persuade us to adopt a construction of Section 365 that will govern not just trademark agreements, but pretty nearly every executory contract. However serious **Tempnology's** trademark-related concerns, that would allow the tail to wag the Doberman.

[34]    [35] And even putting aside that incongruity, **Tempnology's** plea to facilitate trademark licensors' reorganizations cannot overcome what Sections 365(a) and (g) direct. The Code of course aims to make reorganizations possible. But it does not permit anything

Mission Product Holdings, Inc. v. Tempnology, LLC, 139 S.Ct. 1652 (2019)

67 Bankr.Ct.Dec. 51, 19 Cal. Daily Op. Serv. 4565, 2019 Daily Journal D.A.R. 4275...

and everything that might advance that goal. See, *e.g.,* *Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.,* 554 U. S. 33, 51, 128 S.Ct. 2326, 171 L.Ed.2d 203 (2008) (observing that in enacting Chapter 11, Congress did not have "a single purpose," but "str[uck] a balance" among multiple competing interests (internal quotation marks omitted)). Here, Section 365 provides a debtor like **Tempnology** with a powerful tool: Through rejection, the debtor can escape all of its future contract obligations, without having to pay much of anything in return. See *supra,* at 1658 – 1659. But in allowing rejection of those contractual duties, Section 365 does not grant the debtor an exemption from all the burdens that generally applicable law—whether involving contracts or trademarks—imposes **\*1666** on property owners. See 28 U.S.C. § 959(b) (requiring a trustee to manage the estate in accordance with applicable law). Nor does Section 365 relieve the debtor of the need, against the backdrop of that law, to make economic decisions about preserving the estate's value—such as whether to invest the resources needed to maintain a trademark. In thus delineating the burdens that a debtor may and may not escape, Congress also weighed (among other things) the legitimate interests and expectations of the debtor's counterparties. The resulting balance may indeed impede some reorganizations, of trademark licensors and others. But that is only to say that Section 365's edict that rejection is breach expresses a more complex set of aims than **Tempnology** acknowledges.

## IV

For the reasons stated above, we hold that under Section 365, a debtor's rejection of an executory contract in bankruptcy has the same effect as a breach outside bankruptcy. Such an act cannot rescind rights that the contract previously granted. Here, that construction of Section 365 means that the debtor-licensor's rejection cannot revoke the trademark license.

We accordingly reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

It is so ordered.

Justice SOTOMAYOR, concurring.

I agree with the Court that a debtor's choice to reject an executory contact under 11 U.S.C. § 365(a) functions as a breach of the contract rather than unwinding the rejected contract as if it never existed. *Ante,* at 1661 – 1663. This result follows from traditional bankruptcy principles and from the general rule set out in § 365(g) of the Bankruptcy Code. I also agree that no specific aspects of trademark law compel a contrary rule that equates rejection with rescission. I therefore join the Court's opinion in full. I write separately to highlight two potentially significant features of today's holding.

First, the Court does not decide that every trademark licensee has the unfettered right to continue using licensed marks postrejection. The Court granted certiorari to decide whether rejection "terminates rights of the licensee that would survive the licensor's breach under applicable nonbankruptcy law." Pet. for Cert. i. The answer is no, for the reasons the Court explains. But the baseline inquiry remains whether the licensee's rights would survive a breach under applicable nonbankruptcy law. Special terms in a licensing contract or state law could bear on that question in individual cases. See *ante,* at 1661 – 1663; Brief for American Intellectual Property Law Association as *Amicus Curiae* 20–25 (discussing examples of contract terms that could potentially lead a bankruptcy court to limit licensee rights postrejection).

Second, the Court's holding confirms that trademark licensees' postrejection rights and remedies are more expansive in some respects than those possessed by licensees of other types of intellectual property. Those variances stem from § 365(n), one of several subject-specific provisions in the Bankruptcy Code that "embellish[h] on or twea[k]" the general rejection rule. *Ante,* at 1664, n. 2. Section 365(n)—which applies to patents, copyrights, and four other types of intellectual property, but not to trademarks, § 101(35A)—alters the general rejection rule in several respects. For example, a covered licensee that chooses to retain its rights postrejection must make all of its royalty payments; the licensee has no right to deduct damages from its payments even **\*1667** if it otherwise could have done so under nonbankruptcy law. § 365(n)(2)(C)(i). This provision and others in § 365(n) mean that the covered intellectual property types are governed by different rules than trademark licenses.

Although these differences may prove significant for individual licensors and licensees, they do not alter the

Mission Product Holdings, Inc. v. Tempnology, LLC, 139 S.Ct. 1652 (2019)
67 Bankr.Ct.Dec. 51, 19 Cal. Daily Op. Serv. 4565, 2019 Daily Journal D.A.R. 4275...

outcome here. The Court rightly rejects Tempnology's argument that the presence of § 365(n) changes what § 365(g) says. As the Senate Report accompanying § 365(n) explained, the bill did not "address or intend any inference to be drawn concerning the treatment of executory contracts" under § 365's general rule. S. Rep. No. 100–505, p. 5 (1988); see *ante*, at 1664 – 1665. To the extent trademark licensees are treated differently from licensees of other forms of intellectual property, that outcome leaves Congress with the option to tailor a provision for trademark licenses, as it has repeatedly in other contexts. See *ante*, at 1664 – 1665.

With these observations, I join the Court's opinion.

Justice GORSUCH, dissenting.

This Court is not in the business of deciding abstract questions, no matter how interesting. Under the Constitution, our power extends only to deciding "Cases" and "Controversies" where the outcome matters to real parties in the real world. Art. III, § 2. Because it's unclear whether we have anything like that here, I would dismiss the petition as improvidently granted.

This case began when Mission licensed the right to use certain of Tempnology's trademarks. After Tempnology entered bankruptcy, it sought and won from a bankruptcy court an order declaring that Mission could no longer use those trademarks. On appeal and now in this Court, Mission seeks a ruling that the bankruptcy court's declaration was wrong. But whoever is right about that, it isn't clear how it would make a difference: After the bankruptcy court ruled, the license agreement expired by its own terms, so nothing we might say here could restore Mission's ability to use Tempnology's trademarks.

Recognizing that its original case seems to have become moot, Mission attempts an alternative theory in briefing before us. Now Mission says that if it prevails here it will, on remand, seek money damages from Tempnology's estate for the profits it lost when, out of respect for the bankruptcy court's order, it refrained from using the trademarks while its license still existed.

But it's far from clear whether even this theory can keep the case alive. A damages claim "suffices to avoid mootness only if viable," which means damages must at least be "legally available for [the alleged] wrong." 13C C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3533.3, p. 22 (3d ed. 2008). Yet, as far as Mission has told us, Tempnology did nothing that could lawfully give rise to a damages claim. After all, when Tempnology asked the bankruptcy court to issue a declaratory ruling on a question of law, it was exercising its protected "First Amendment right to petition the Government for redress of grievances." *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U. S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). And petitioning a court normally isn't an actionable wrong that can give rise to a claim for damages. Absent a claim of malice (which Mission hasn't suggested would have any basis here), the ordinary rule is that " 'no action lies against a party for resort to civil courts' " or for "the assertion of a legal argument." *Lucsik v. Board of Ed. of Brunswick City School Dist.*, 621 F. 2d 841, 842 (CA6 1980) (*per curiam*); see, *e.g.*, *1668 *W. R. Grace & Co. v. Rubber Workers*, 461 U. S. 757, 770, n. 14, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983); *Russell v. Farley*, 105 U. S. 433, 437–438, 26 L.Ed. 1060 (1882).

Maybe Mission's able lawyers will conjure something better on remand. But, so far at least, the company hasn't come close to articulating a viable legal theory on which a claim for damages could succeed. And where our jurisdiction is so much in doubt, I would decline to proceed to the merits. If the legal questions here are of sufficient importance, a live case presenting them will come along soon enough; there is no need to press the bounds of our constitutional authority to reach them today.

**All Citations**

139 S.Ct. 1652, 67 Bankr.Ct.Dec. 51, 19 Cal. Daily Op. Serv. 4565, 2019 Daily Journal D.A.R. 4275, 27 Fla. L. Weekly Fed. S 813

Footnotes

**Mission Product Holdings, Inc. v. Tempnology, LLC, 139 S.Ct. 1652 (2019)**

67 Bankr.Ct.Dec. 51, 19 Cal. Daily Op. Serv. 4565, 2019 Daily Journal D.A.R. 4275...

| | |
|---|---|
| \* | The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U. S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499. |
| 1 | In its briefing before this Court, **Mission** contends that its exclusive distribution rights survived the licensing agreement's rejection for the same reason as its trademark rights did. See Brief for Petitioner 40–44; *supra,* at 1658. But the First Circuit held that **Mission** had waived that argument, see 879 F. 3d at 401, and we have no reason to doubt that conclusion. Our decision thus affects only **Mission**'s trademark rights. |
| 2 | At the same time, Congress took the opportunity when drafting those provisions to fill in certain details, generally left to state law, about the post-rejection relationship between the debtor and counterparty. See, *e.g.,* Andrew, Executory Contracts in Bankruptcy, 59 U. Colo. L. Rev. 845, 903, n. 200 (1988) (describing Congress's addition of subsidiary rules for real property leases in Section 365(h)); Brief for United States as *Amicus Curiae* 29 (noting that Congress similarly set out detailed rules for patent licenses in Section 365(n)). The provisions are therefore not redundant of Section 365(g): Each sets out a remedial scheme embellishing on or tweaking the general rejection-as-breach rule. |

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

100 N. Barranca Street, Suite 250
West Covina, CA 91791

A true and correct copy of the foregoing document entitled (*specify*):  **NOTICE OF SUPPLEMENTAL AUTHORITY**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in
the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
_____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that
the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated
below:

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On _July 8, 2019_____, I served the following persons and/or entities at the last known addresses in this
bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United
States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that
mailing to the judge will be completed no later than 24 hours after the document is filed.

| | | |
|---|---|---|
| John M. & Livier Mata<br>426 1/2 West B Street<br>Ontario  CA  91762 | Honorable Mark Houle<br>US Bankruptcy Court<br>3420 Twelfth Street, Suite 365<br>Riverside,  CA 92501 | Smith Law Group LLP<br>3 Mitchell Place<br>New York, NY 10017 |

| |
|---|
| Attorney for Defendant National Collegiate Student Loan<br>Trust 2006-1, National Collegiate Student Loan Trust 2006-4,<br>National Collegiate Student Loan Trust 2007-1<br>Damian P. Richards, ESQ<br>Sessions, Fishman, Nathan & Isreal, LLP<br>1545 Hotel Circle South, Suite 150<br>San Diego, Ca 92108-3426 |

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method
for each person or entity served)**:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served
the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to
such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration
that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is
filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 8, 2019 | Dolores Orozco | |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**