**FILED & ENTERED**

**JUL 31 2020**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY** cargill    **DEPUTY CLERK**

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

RIVERSIDE DIVISION

| | |
|---|---|
| In re:<br><br>JOHN MARTIN MATA & LIVIER MATA<br><br>　　　　　　　　　　　　Debtors.<br><br>───────────────────────<br><br>JOHN MARTIN MATA<br><br>　　　　　　　　　　　　Plaintiff,<br><br>v.<br><br>NAT'L COLLEGIATE STUDENT LOAN TRUST 2006-1;<br>NAT'L COLLEGIATE STUDENT LOAN TRUST 2006-4;<br>and NAT'L COLLEGIATE STUDENT LOAN TRUST 2007-1,<br><br>　　　　　　　　　　　　Defendants. | Bankruptcy Case: 6:13-bk-30625-MH<br><br>Chapter: 7<br><br>Adversarial Proceeding: 6:18-ap-01089-MH<br><br>**MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date:　May 8, 2019<br>Time:　　　　　2:00 p.m.<br>Courtroom:　　303 |

## I. PROCEDURAL BACKGROUND

On December 31, 2013, John ("Plaintiff")[1] and Livier Mata (collectively with Plaintiff, "Debtors") filed a Chapter 7 voluntary petition. On April 14, 2014, Debtors received a discharge and, the following day, their case was closed.

On April 18, 2018, Plaintiff filed a complaint against National Collegiate Student Loan Trust 2006-1, National Collegiate Student Loan Trust 2006-4, and National Collegiate Student Loan Trust 2007-1 (collectively, "Defendants" or "Trusts") seeking a determination of dischargeability. Specifically, Plaintiff seeks a declaratory judgment that his student loans have been discharged as part of his Chapter 7 discharge. On May 18, 2018, Defendants filed their answer.

On January 9, 2019, Defendants filed a motion for summary judgment (the "Motion"). On February 5, 2019, Plaintiff filed his opposition. Defendants filed their reply to Plaintiff's opposition on February 13, 2019. Plaintiff filed his supplemental memorandum on April 10, 2019, and Defendants filed their supplemental memorandum on April 24, 2019. Defendants subsequently filed a notice of supplemental authority on April 30, 2019, and Plaintiff filed a reply to Defendants' notice of supplemental authority on May 3, 2019. After a continued hearing on the Motion was held on May 8, 2019, Plaintiff filed a notice of supplemental authority on July 8, 2019, which Defendants responded to on July 24, 2019. Finally, Plaintiff filed an additional supplemental authority pleading on May 7, 2020, which Defendants responded to on May 18, 2020.

---

[1] The Court notes that most of the pleadings identify only John Mata as a plaintiff in this action, although Livier Mata co-signed on the underlying Loans, was a named plaintiff in the complaint, and has not been formally removed from the action. Nevertheless, the Court will use "Plaintiff" in the singular, as the parties appear to consider John Mata to be the sole plaintiff.

## II. FACTUAL BACKGROUND

First Marblehead Corporation is a formerly NYSE listed private company that, in the mid-2000's, was a dominant player in the private student loan business. In early 2001, it purchased the operating assets of The Education Resources Institute (hereinafter "TERI"), a nonprofit group primarily involved in the guaranteeing of private student loans. *In re First Marblehead Corp. Secs. Litig.*, 639 F. Supp. 2d 145, 148-9 (D. Mass. 2009). Beginning in 2001, First Marblehead established a financial plan under which banks would offer private student loans, and the notes would be purchased by National Collegiate Student Loan Trusts (each, a "NCSLT"). *Id*. The loans, once packaged into the trusts, would be, at least ostensibly, guaranteed by TERI, in order to preclude the loans from being discharged, and the NCSLTs would then be offered on the open market for investment. *Id*. The banks involved in the funding of these loans include JP Morgan, HSBC, Citizens, PNC, and, in this particular case, Charter One, among many others. There were 15 NCSLTs in total, owning more than 800,000 private loans totaling billions of dollars.

Beginning in 2005, First Marblehead began creating new loan product lines aimed at borrowers with riskier credit scores. *In re First Marblehead Corp.*, 639 F. Supp. 2d at 156-7. As the economy began its downturn in 2007, default rates began rapidly increasing, resulting in the eventual bankruptcy of TERI in 2008. *Id.* at 157-8, 160.

The question of whether the loans held by NCSLTs and guaranteed by TERI are excepted from discharge has been addressed by courts across the country since the beginning of the program.

In this case, Plaintiff took out three $30,000 loans - in January of 2006, September of 2006, and August of 2007 (each a "Loan," and, collectively, the "Loans") - for his three years of graduate studies in counseling at Loma Linda University from 2005 to 2007. Each Loan was cosigned by Livier Mata and carried an interest rate of 9%, 12%, and 14%, respectively. The loan agreements each stated that the

applicable Loan was explicitly limited to the costs of attending the school. The loan documentation for one of the Loans, that of January 2006, stated that TERI was guaranteeing the Loan, while the loan documentation for the other two Loans stated that TERI had the option to guarantee the Loan. Each of these Loans was allegedly then repackaged into one of the three trusts that are currently the Defendants in this matter (NCSLT 2006-1, 2006-4, and 2007-1).

By the Motion, since Plaintiff's complaint does not contain any allegation that the Loans caused an undue hardship, Defendants seek to have the Loans determined to be non-dischargeable pursuant to 11 U.S.C. § 523(a)(8)(A)(i) by showing that the Loans were educational loans made under a program funded or guaranteed by a nonprofit.

### III.   LEGAL STANDARD

Summary judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. Rule 56(a) (incorporated into bankruptcy proceedings by FED. R. BANKR. P. Rule 7056).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts that show a genuine issue for trial. *Id*. at 324. The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976).

If the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial. *Id.* However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact…." *Matsushita Electrical Industry Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## IV.  LEGAL ANALYSIS

11 U.S.C. § 523(a)(8) provides that:

> (a) A discharge under section 727, 1141, 1228(a), or 1328(b) of this title does not discharge an individual debtor from any debt –
>     (8) unless excepting such debt from discharge would impose an undue hardship on the debtor and the debtor's dependents, for –
>         (A)  (i) an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
>             (ii) an obligation to repay funds received as an educational benefit, scholarship or stipend; or
>         (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual;

Defendants base the Motion solely on 11 U.S.C. § 523(a)(8)(A)(i). In order for Defendants to establish that Plaintiff's debts are not dischargeable under § 523(a)(8)(A)(i), they must prove that: (1) the loans to the Plaintiff were "educational loans"; and (2) the loans were made under any program funded in whole or in part by a nonprofit institution. *See* 11 U.S.C. 523(a)(8)(A)(i).

A. **Whether the Loans were "educational loans."**

The three different student loan discharge standards under 11 U.S.C. § 523(a)(8) cover distinct forms of educational lending. Section 523(a)(8)(A)(i) applies to educational benefits or loans, section 523(a)(8)(A)(ii) applies to obligations to repay funds received as educational benefits, scholarships, or stipends, and § 523(a)(8)(B) applies to "qualified educational loans." "Qualified educational loans" must meet additional requirements imposed by 26 U.S.C. § 221 and 20 U.S.C. § 1087ll, which include limiting the loan disbursement to the cost of attendance of an institution. "Educational loans" do not need to meet the higher standard for "qualified educational loans." *See* 11 U.S.C. § 523(a)(8)(A)(i); *compare* § 523(a)(8)(B); *see also Kashikar v. Turnstile Capital Mgmt., LLC (In re Kashikar)*, 567 B.R. 160, 166 (B.A.P. 9th Cir. 2017); *see also In re Oliver*, 499 B.R. 617, 623-4 (Bankr. S.D. Ind. 2013). As Defendants are basing the Motion solely on 11 U.S.C. § 523(a)(8)(A)(i), the question before the Court is whether or not the Loans in question here are "educational loans," not whether they meet the higher standard for "qualified educational loans," including the disbursement limit.

The question of whether a loan is an "educational loan" is determined by its stated purpose, not its actual use. *See Busson-Sokolik v. Milwaukee Sch. of Eng'g (In re Busson-Sokolik)*, 635 F.3d 261, 266-7 (7th Cir. 2011). Living and social expenses are included within the bounds of "educational" purposes. *See Murphy v. Pa. Higher Educ. Assistance Agency*, 282 F.3d 868, 873 (5th Cir. 2002). This includes the costs of room and board for a student without dependents residing at home with their parents, as calculated by the institution, as well as other personal expenses. *See id.* at 872-3 (*citing* 20 U.S.C. § 1087ll(2)-(3) as a guide for what kinds of expenses are considered "educational").

Each of the respective Loans in this matter was explicitly restricted to the costs of attending Linda Loma University. [ECF No. 33, Exh. A-1 at 3 (January 2006 loan); ECF No. 33, Exh. A-5 at 3

(September 2006 loan); ECF No. 33, Exh. A-9 at 3 (August 2007 loan)]. This clearly states that the purpose of the loans was educational. *See In re Busson-Sokolik*, 635 F.3d at 266-7.

Plaintiff seeks to challenge the status of the Loans as "educational loans" on three grounds: (1) that the amounts disbursed were in excess of Linda Loma's graduate cost of attendance; (2) that the Loans carry an unusually high interest rate, have high origination fees, and require a cosigner and credit check; and (3) that the Loans are not educational loans because they were provided directly to the consumer and bypassed the school's financial aid office.

### 1.  Whether the Loans needed to be limited to Linda Loma's stated cost of attendance, and whether the cost of attendance includes off-campus room and board.

Strict limitation to the institution's stated cost of attendance is only a requirement for "qualified educational loans," not "educational loans." *See* § 523(a)(8)(A)(i) and (B). However, disbursement in significant excess of the cost of attendance may weigh against a loan being for "educational" purposes. Plaintiff argues that the cost of attendance is limited solely to the fees charged by the school, and that off-campus room and board should not be included in such costs. [ECF No. 46, Exh. 3 at 25 (claiming a yearly cost of attendance for Loma Linda of $19,640 purely through the addition of the average full-time graduate tuition of $17,760 and the required fees of $1,880, as reported by Institutional Characteristics)]. The Court disagrees. This is in direct contradiction to 20 U.S.C. § 1087ll(3)(A) and (D), which state that the cost of attendance includes allowances for room and board for students living at home with their parents, as well as "for all other students," such as those living off-campus in private housing.

Linda Loma itself provided, as part of its stated cost of attendance for graduate students, a calculation of off-campus living costs for year-round students of $15,360 in 2005-2006, $18,520 for

2006-2007, and $19,640 for 2007-2008. In addition, Defendants have shown that the total tuition costs required for completing Plaintiff's degree rose from between $33,480-$47,895, as calculated in 2006, to between $39,960-$57,160 as calculated in 2007. [ECF No. 55, Ex. 1 at 10-12, Ex. 2 at 16-19, and Ex. 3 at 24-26.]

As such, according to Linda Loma's stated cost of attendance calculations, the total cost of Plaintiff's three-year education ranged from $87,000 (using the three-year off-campus living cost of $53,520 and the minimum tuition cost of $33,480) to $110,680 (using the three-year off-campus living cost of $53,520 and the maximum tuition cost of $57,160). Even if the Court were to find that "educational loans" are strictly limited to the cost of attendance, which it does not, Plaintiff borrowed $90,000 for the three years of Plaintiff's attendance, placing the Loan amounts firmly at the lower end of the range of Linda Loma's cost of attendance for a student with off-campus housing. Therefore, the Court finds that there is no issue of fact or question of law that the amount of the Loans was within Loma Linda's costs of attendance, to the extent such finding is required under 11 U.S.C. § 523(a)(8)(a)(i).

Plaintiff next claims in his supplemental memorandum that Plaintiff's federal student loans already covered a significant amount of the cost of attending Linda Loma University, meaning that Charter One was disbursing amounts in excess of Linda Loma's cost of attendance. This implies that Charter One had both knowledge of Plaintiff's other Loans and the obligation to adjust the amounts disbursed accordingly. Plaintiff, however, has provided no persuasive authority to support such a legal or factual conclusion, and thus the argument fails.

**2.     Whether commercial features, disbursement directly to the student, or the method of funding the Loan, disqualify a loan from being an educational loan**

Plaintiff next argues that the Loans are not "educational loans" because they carry an unusually high interest rate, have high origination fees, and require a cosigner and credit check. There are no statutory requirements as to commercial form for "educational loans." *See* 11 U.S.C. § 523(a)(8). As such, the Court finds that it is the purpose of the loan, which determines whether it is "educational," not the commercial features. *See Busson-Sokolik v. Milwaukee Sch. of Eng'g (In re Busson-Sokolik)*, 635 F.3d 261, 266-7 (7th Cir. 2011); *see also Murphy v. Pa. Higher Educ. Assistance Agency*, 282 F.3d 868, 873 (5th Cir. 2002); *Page v. JP Morgan Chase Bank (In re Page)*, 592 B.R. 334, 336 (B.A.P. 8th Cir. 2018).

Plaintiff also challenges whether the Loans are "educational loans" because they were provided directly to the consumer, bypassing the school's financial aid office. As to the form of disbursement, the Court maintains its finding that the commercial features of a loan do not disqualify it from being an "educational loan." *See also McDaniel v. Navient Solutions Inc. (In re McDaniel)*, 590 B.R. 537, 542, 546-551 (Bankr. D. Colo. 2018) (analyzing whether a direct to consumer student loan was dischargeable, with the form of disbursement being considered irrelevant to the court's analysis).

In view of the above, even after drawing all reasonable inferences for the Plaintiff, the Court finds Plaintiff has not established any genuine issue of material fact, or question of law, as to the issue of whether these loans were "educational loans."

**B.    Whether the loans were "funded, in whole or in part, by a nonprofit institution."**

11 U.S.C. § 523(a)(8)(A)(i) renders excepted from discharge: "an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, *or* made under any program funded in whole or in part by a governmental unit or nonprofit institution." (Emphasis added).

Defendants' claim for exception from discharge under (A)(i) is dependent on them establishing that the Loans were made under a program funded in whole or in part by a nonprofit institution. They argue that a nonprofit (TERI) guaranteeing loans under a loan program is sufficient to establish that the nonprofit funded the loan program.

Plaintiff, on the other hand, argues that Congress deliberately structured § 523(a)(8)(A)(i) into two parts. The first, covering guarantees, allegedly limits exception from discharge to only those loans guaranteed by a governmental unit. The second, covering the direct funding of the loan itself, applies to loans made under a program funded by a government unit or a nonprofit like TERI. Thus, under the principle that the inclusion of one is the exclusion of the others, Plaintiff argues that Congress did not intend for nonprofits to be able to render "educational loans" excepted from discharge by guaranteeing them. Assuming, arguendo, that Plaintiff is correct, this essentially divides the question into two parts: (1) whether a nonprofit can "fund" a loan program by guaranteeing loans made under the program, and (2) if the nonprofit can fund the loan program through guarantees, whether TERI actually guaranteed the loans made under the loan program in question here.

Plaintiff also raises a third issue, by arguing that TERI's alleged, subsequent voiding of the guarantees of the Loans in its bankruptcy should, if the Court finds that TERI's guarantees rendered the Loans originally nondischargeable, retroactively strip the Loans of their status as exempt from discharge.

### 1. Whether a nonprofit can "fund" a loan program by guaranteeing loans made under the loan program.

The Court begins by noting that the rules of construction provided for the bankruptcy code at 11 U.S.C. § 102 states that "or" is not exclusive. As such, the Court will not assume, as Plaintiff argues, that the separation through "or" between the provision in § 523(a)(8)(A)(i) concerning the guaranteeing of the loan by a government unit and the provision concerning the funding of a loan program by a governmental unit or nonprofit was meant by Congress to exclusively limit the right of exception from discharge through guarantees to student loans issued by governmental units

Section 523(a)(8)(A)(i) states that a nonprofit can render loans made under a loan program excepted from discharge through "funding" the loan program "in whole or in part." The statute does not provide a definition for what constitutes "funding" a loan program, nor does it provide a standard for "in whole or in part." In particular, the Court notes that the statute determines exception from discharge based on the nonprofit funding the loan program, not the specific loans made under the program, which appears to open a wide door for what may be considered "funding." The question before the Court is thus how it should balance Congress' clear intent that exception from discharge require material funding from the nonprofit with the broad language covering how the funding can occur.

Several courts have considered this question, and the consensus is that a nonprofit guaranteeing loans under a loan program functions as the nonprofit funding, in whole, or in part, the loan program. *See O'Brien v. First Marblehead Educ. Res., Inc. (In re O'Brien)*, 419 F.3d 104, 106 (2nd Cir. 2005); *see also Educ. Res. Inst. Inc. v. Taratuska (In re Taratuska)*, 2008 U.S. Dist. LEXIS 93206 at *17-18 (D. Mass. 2008) (reversing *In re Taratuska*, 374 B.R. 24 (Bankr. D. Mass. 2007).

In the *O'Brien* decision, the Second Circuit similarly addressed First Marblehead Corporation issued student loans which had been guaranteed by TERI. *In re O'Brien*, 419 F.3d at 106 (2nd Cir. 2005). The debtor in the *O'Brien* cases made the same argument as Plaintiff does here, that Congress

intended for § 523(a)(8)(A)(i) to limit loans excepted from discharge through guarantees only to governmental units. *In re O'Brien*, 419 F.3d at 106 (2nd Cir. 2005). At the bankruptcy court level, the court disagreed, based on the foundation that § 102(5) defined "or" as non-exclusive, and found that the standard for determining whether a nonprofit guaranteeing loans under a loan program was a "funding" of the program was whether (1) whether the nonprofit actually paid out the guarantees when they came due, and (2) whether the existence of the loan program under which the loans were made was causally linked to the guaranteeing of the loans under the program by the nonprofit. *In re O'Brien*, 299 B.R. 725, 729-30 (Bankr. S.D.N.Y. 2005). More broadly, the *O'Brien* bankruptcy court found that the "the word 'funded' in § 532(a)(8) encompasses 'any meaningful contribution' to the provision of the loan, *including* the guarantee of the loan." *In re O'Brien*, 299 B.R. 725, 730 (Bankr. S.D.N.Y. 2003). The district court affirmed the bankruptcy court ruling that the loans were not dischargeable, and the Second Circuit adopted the district court's analysis and applied a relatively expansive standard to determine whether a non-profit funded a loan program "in whole or part." *In re O'Brien*, 419 F.3d at 106 (2nd Cir. 2005). The analysis was focused on whether the non-profit was "devoting some of its financial resources to supporting the [loan] program", which in turn included guaranteeing loans made thereto. *Id*.

Critically, the Second Circuit in *O'Brien* acknowledged that the test under § 523(a)(8) does not require that TERI "funded" a particular loan (stating "… it may be true that TERI merely guaranteed, without funding, O'Brien's particular loan …"), but rather that the non-profit funded, in part or whole, the loan program under which the particular loan was made, which can be established if the non-profit guaranteed loans under the program. *Id.*

Another case supporting Defendants' position is *Taratuska*, which also concerned itself with a First Marblehead Corporation student loan guaranteed by TERI. *In re Taratuska*, 2008 U.S. Dist. LEXIS 93206 at *3-4. In the underlying bankruptcy case the debtor made an identical argument to the one made in *O'Brien* and in this case. *In re Taratuska*, 374 B.R. at 26-7. The bankruptcy court agreed with the

- 12 -

debtor, found that the student loans were dischargeable, and granted the debtor's motion for summary judgment. *Id.* at 30-1. This bankruptcy court holding is the only one cited by Plaintiff which directly agrees with his assertion that "guaranteeing" and "funding" loans under a loan program are two explicitly distinct actions, meaning that a nonprofit cannot "fund" a loan program through guaranteeing loans. The district court reversed this holding, adopted the *O'Brien* standard, and found that the student loans were excepted from discharge due to TERI's guaranteeing of the loans. *In re Taratuska*, 2008 U.S. Dist. LEXIS 93206 at *17-18.

The Ninth Circuit Bankruptcy Appellate Panel also agrees with this line of reasoning, interpreting §523(a)(8)(A)(i) as covering "an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit ***or*** nonprofit institution." *Inst. of Imaginal Studies v. Christoff (In re Christoff)*, 527 B.R. 624, 632 (B.A.P. 9th Cir. 2015) (emphasis added).

In contrast, the Bankruptcy Court for the District of Maine reached the opposite conclusion, finding that the guarantee of a loan by a nonprofit did not constitute the "funding" of the loan. *Wiley v. Wells Fargo Bank, N.A. (In re Wiley)*, 579 B.R. 1, 6-7 (Bankr. D. Me. 2017). The *Wiley* court built this holding on their interpretation of *O'Brien*, finding that it required the nonprofit to both guarantee the loan *and* fund the loan program (emphasis added), as well as on *Educ. Res. Inst., Inc. v. Hammarstrom (In re Hammarstrom)*, 95 B.R. 160, 165 (Bankr. N.D. Cal. 1989), which held that a nonprofit must directly provide the funds through which the loans are made to render them excepted from discharge. *In re Wiley*, 579 B.R. at 6-7. There are two issues with the reasoning in *Wiley*.

The first is that the *Wiley* court's interpretation of *O'Brien* is distinctly flawed. The Second Circuit in *O'Brien* did state that the nonprofit had to "fund" the program. However, it defined "funding" much more broadly, looking at the various circumstances of TERI's relationship to the loan program in that case and noting TERI's financial support of the loan program. *O'Brien*, 419 F.3d at 106. As the Second Circuit stated:

> "The district court noted that it is undisputed that O'Brien's loan was made through a program that in turn was funded by a nonprofit institution. *Id.* at 262. Similarly, TERI's uncontested description of its relationship with the Law Access Loan Program strongly suggests that TERI funded the program. *TERI was clearly devoting some of its financial resources to supporting the program.* See *Klein*, NO. 92-B-44249, slip. op. at 12 (S.D.N.Y. Apr. 29, 1997) (*concluding that TERI funded program by guaranteeing loans made pursuant thereto*). We also note that the Promissory Note for O'Brien's loan itself stated that it "evidences an educational loan made pursuant to a loan program funded in part by a nonprofit institution and is therefore subject to the limitations on dischargeability contained in Section 523(a)(8) of the United States Bankruptcy Code."

*Id.* (emphasis added). Contrary to the *Wiley* court's interpretation, there is no distinction under *O'Brien* between "funding" and "guaranteeing" a loan program. *Id.* Instead, a nonprofit's guaranteeing loans under a loan program is one way the nonprofit can "fund" the loan program for purposes of § 523(a)(8). *Id.* at 106

The second is that *Hammerstrom*'s requirement of the direct funding of the loan by the nonprofit, is based on an older version of the bankruptcy code, is not supported by the statute, has been adopted by almost no other courts, and was soon explicitly criticized by the Ninth Circuit Bankruptcy Appellate Panel in *HEMAR Service Corp., Inc. v. Pilcher*, 149 B.R. 595, 600 (B.A.P. 9th Cir. 1993) (reversing the bankruptcy court's holding that a student loan could be discharged due to lack of a nonprofit providing the actual funds that debtor received, and finding that *Hammarstrom*'s direct funding requirement was a matter of pure judicial construction.)

As such, the Court finds persuasive the Second Circuit's reasoning in *O'Brien*, and adopts the expansive test provided for determining exception from discharge under 11 U.S.C. § 523(a)(8)(A)(I); i.e., whether the nonprofit devoted financial resources to supporting a loan program, including whether the nonprofit guaranteed loans made under the loan program that originated the loan in question. *See O'Brien*, 419 F.3d at 105-107. Specifically to frame its analysis, while perhaps narrower than the holding of the Second Circuit, the Court will look to the explicit test proposed by the *O'Brien* bankruptcy court: if Defendants can establish that (1) TERI guaranteed on paper the loans in question,

(2) TERI paid out its guarantees on loans made under the loan program when they came due, and (3) TERI's guarantees of the loans made under the loan program were casually linked to the loan program's existence, then the loans in question here are excepted from discharge under § 523(a)(8)(A)(i). The Court will begin its analysis by noting that (3) is not in controversy here, as no party contests the critical role that the TERI guarantees played in the creation of First Marblehead Corporation's student loan trust program.

## 2. Whether Defendants have established that there is no genuine issue of material fact that TERI actually guarantee the Loans.

### a. Did TERI guarantee the Loans on paper?

Plaintiff argues that there is a material issue of fact as to whether TERI was the actual guarantor of the September 2006 and August 2007 Loans. This is in part because the loan agreements do not explicitly state that TERI will guarantee the Loans, merely that they have the option to do so. In addition, the NSCLT trust agreement schedules do not specifically list the NextStudent Graduate Loan program as one of the programs transferred or sold to the Trusts (listing instead NextStudent Alternative Loan Program).

These arguments, however, are insufficient to create a material issue of fact. Here the Court finds there is no material question of fact that Plaintiff's Loans were in fact guaranteed on paper by TERI, and that they were each sold to the respective Defendants. Defendants have disclosed the Loan Financial Activity pages for each Loan, which identify Plaintiff by name and social security number, state that the Loans were guaranteed by TERI, and include the Trust into which they were securitized. [Decl. Bradley Luke at ¶15, ECF No. 33; *id.*, Exh. A-2 at 1, ECF No. 33 (January 2006 loan); *id.*, Exh.

A-6 at 1, ECF No. 33 (September 2006 loan); *id.*, Exh. A-10 at 1, ECF No. 33 (August 2007 loan)]. By contrast, in *Golden*, the genuine issue of material fact was due to the Defendants only providing the loan documentation stating that the loan potentially *could* be guaranteed by TERI. *Golden v. JP Morgan Chase Bank, et. al. (In re Golden)*, 596 B.R. 239, 266 (Bankr. E.D.N.Y. 2019).

Plaintiff raises several additional questions as to the loan activity pages in their supplemental brief. First, they assert that the listing of the current balance of the loan being $0 calls into question the accuracy of the loan financial activity pages. Given evidence that the loans have been charged off, the Court finds this is insufficient to create a material issue of fact. Second, they call into question why the loan program is labeled as "PEPLN" when the student loan program was NextStudent Graduate Loan. The Court notes that "PEPLN" appears to simply be the code used for private student loans as opposed to federal student loans, and otherwise is insufficient to raise a material issue of fact. Third, Plaintiff states that the evidence that loans originated under the NextStudent loan program were securitized into the respective trusts stems from excel pages that were not part of the securitization filing. However, the Court notes that the trust agreements on the SEC's EDGAR site for: (1) NSCLT 2006-1 [ECF No. 34, Exh. D at 42 (note purchase agreement) and 46 (guarantee agreement)], (2) NSCLT 2006-4 [ECF No. 34, Exh. E at 31, (note purchase) and 33 (guarantee)], and (3) 2007-4 [ECF No. 34, Exh. F at 34, (note purchase) and 36 (guarantee)], all list loans originated under the NextStudent loan program as being securitized into the trusts through note purchase agreements and guaranteed by TERI.

Based on the foregoing, and in light of the evidence provided, the Court finds there is no genuine issue of material fact or question of law as to whether TERI guaranteed the loans in question on paper when the evidence establishes that (1) loans originated under the NextStudent loan program were purchased by the Trusts and guaranteed by TERI, and (2) the loan financial activity statements clearly identify Plaintiff, state the respective Defendants as the owner of the Loans, and all state that TERI guaranteed the Loans. Plaintiff's speculative arguments simply do not raise a "material" question of fact.

### b.    Did TERI actually guarantee the loans?

In order to fund a loan program through guaranteeing the underlying loans, the guarantee must actually come into effect, instead of just being a paper promise to render the debt excepted from discharge. *See In re O'Brien*, 419 F.3d 104, 105-6 (2nd Cir. 2005). Plaintiff's student loan servicer has declared that Plaintiff's student loans were guaranteed by TERI, but Plaintiff alleges that the guarantees did not actually occur. [Decl. Luke ¶¶ 17, 25, 34 ECF No. 33-4]. As noted by Plaintiff, evidence demonstrating the actual guarantee by TERI of the loans within the loan program may include guarantee agreements between TERI and the loan originators, and evidence that the loan originators actually paid TERI guarantee fees as agreed upon. [P. Opp. to Def.'s Mot. for Summ. J., Exh. 4, Def.'s Responses and Objections to Requests for Production No. 7, ECF No. 46].

However, the Court finds sufficient evidence showing that Defendants had refunded the Royal Bank of Scotland ("RBS") (which wholly owned, at the time of Plaintiff's loan creation, Citizens Bank, which in turn owned Charter One, the loan originator) $46,000,000 in guarantee fees as part of resolving RBS's secured claims against TERI concerning loans extended prior to TERI's bankruptcy. [*Id.* at Exh. 6, Fourth Amended Joint Plan of Reorganization of The Education Resources Institute, Inc. at 65; *id.* at 11; *see also* Supplementary Request for Judicial Notice, Exh. 4, Disclosure Statement for Fourth Amended Joint Plan of Reorganization of The Education Resources Institute at 3-7, ECF No. 55]. The massive balances on the collateral accounts of the NCSLTs, <u>including all three Trusts in question</u>, revealed by the disclosure statement to the confirmed Fourth Amended Plan, show that the combined guarantee fees sequestered for guarantee payments, as well as the recoveries collected, numbered in the hundreds of millions of dollars. [*Id.* at 11].

Based on this showing, this court cannot reasonably find that Plaintiff has raised a genuine question of fact as to the substance of TERIs guarantees, when evidence establishes that hundreds of millions of dollars were being paid in guarantee fees to TERI, including tens of millions by Charter One, while TERI was simultaneously disbursing tens of millions of dollars in loan purchases under their guarantees. Notably, it was these disbursements which caused TERI's bankruptcy.

### 3. Whether TERI has voided their guarantee of the loan program in question, and whether, if shown, this would retroactively change whether the loans were funded by a nonprofit institution.

Plaintiff asserts that TERI's guarantees for loans extended prior to TERI's petition were "voided" as a part of their confirmed plan for reorganization. [Fourth Amended Plan, ECF No. 46 at page 40]. Defendants argue that TERI's guarantees for the Loans were not voided but rather that the guaranty obligations were settled by TERI's bankruptcy, and, therefore, "honored." Defendants also argue that the specific guarantee obligations actually rejected in TERI's bankruptcy case did not pertain the Loans. In any event, it is abundantly clear that the resolution of the guarantees in TERI's bankruptcy, including the Loans at issue, does not retroactively affect the characterization of the Loans as being "funded" by a non-profit.

Plaintiff's argument on this point is a red herring. Plaintiff incorrectly asks this Court to analyze the nature of the loan program under which the Loans were made at the moment that Plaintiff filed for bankruptcy, instead of at the actual time the Loans were made. The text of 11 U.S.C. § 523(a)(8)(A)(i) states that a loan is nondischargeable when it is "*made* under any program funded in whole or in part by a governmental unit or nonprofit institution" (emphasis added). This clearly points to the status of a loan being determined by the nature of its creation, not its nature at the time of petition. *See, e.g.*, *In re*

*Roberts*, 149 B.R 547, 549 (C.D. Ill. 1993) ("When the plain language of the Bankruptcy Code is clear, the Court need not inquire beyond the text of the statute."); *see also In re Francis*, 385 B.R. 800 (B.A.P. 10th Cir. 2008). The Court is mindful of the Pandora's box that would be opened, as well as of the chaos that would ensue, if nondischargeability under § 523(a)(8) depended on a moving target – i.e., what the status is of the guarantor or the guarantees at the time the borrower decides to file bankruptcy. Neither the plain language of the statute on its face, nor the case law supports such a conclusion. As such, the Court finds unpersuasive Plaintiff's argument that TERI's treatment of its guarantees during its bankruptcy somehow retroactively changed the nondischargeability characteristics of the Loans in question.

Construing all reasonable inferences in favor of the Plaintiff, the Court finds that Plaintiff has not established any genuine issue of material fact, or question of law, and that the Loans should be determined to be non-dischargeable. As such, and based on the pleadings in support of and in opposition to the Motion, the evidence presented by Defendants, and the arguments of counsel on the record of the hearings on the Motion, and good cause appearing, Defendants' motion for summary judgment is hereby granted.

###

Date: July 31, 2020

Mark Houle
United States Bankruptcy Judge